# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x
                             :

In re:                           :  Chapter 11
                             :

PROMISE HEALTHCARE GROUP, LLC, *et al.*,[1]  :  Case No. 18-12491 (CSS)
                             :

           Debtors.          :  (Joint Administration Requested)
-------------------------------------------------------------x

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION ABL PARTIES, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Promise Healthcare Group, LLC ("***Promise***") and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "***Debtors***"), by and through their proposed undersigned counsel, file this motion seeking entry of interim and final orders pursuant to sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code (the

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Professional Rehabilitation Hospital, L.L.C. (5340), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179),   Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc. (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc. (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), St. Alexius Hospital Corporation #1 (2766), St. Alexius Properties, LLC (4610), Success Healthcare 1, LLC (6535), Success Healthcare 2, LLC (8861), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766).  The mailing address for the Debtors, solely for purposes of notices and communications, is 999 Yamato Road, 3rd FL, Boca Raton, FL  33431.

"*Bankruptcy Code*"); rules 2002, 4001,  6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*"); and rules 2002-1, 4001-2, and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "*Local Rules*"). In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Andrew Hinkelman in Support of First Day Relief* (the "*First Day Declaration*") filed contemporaneously herewith. In further support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.      The Court has jurisdiction over the Debtors, their estates, and property of their estates and to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Debtors consent to the entry of final orders by the Court in connection with this matter to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

2.      Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

3.      On the date hereof (the "*Petition Date*"), each of the Debtors commenced a case under  chapter 11 of the Bankruptcy Code (the "*Chapter 11 Cases*"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases, and no committees have been appointed or designated.

4.      A description of the Debtors' businesses, the reasons for commencing the Chapter 11 Cases, the relief sought from the Court, and the facts and circumstances supporting this Motion are set forth in the First Day Declaration.

## RELIEF REQUESTED

5.      By this motion, the Debtors seek entry of an interim order substantially in the form attached hereto as **Exhibit A** (the "***Interim Order***") and a final order (the "***Final Order***" and together with the Interim Order, the "***DIP Orders***") pursuant to sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014, and Local Rules 2002-1, 4001-2, and 9013-1(m):

(i)      authorizing the Debtors to obtain senior secured, superpriority postpetition financing on a superpriority basis consisting of a senior secured superpriority credit facility in the aggregate principal amount of up to $85,000,000 (the "***DIP Facility***") consisting, in turn, of (a) $65,000,000 in aggregate principal amount of revolving loans (the "***DIP Revolving Loans***") and commitments and (b) $20,000,000 in aggregate principal amount of term loans (the "***DIP Term Loans***," and together with the DIP Revolving Loans, the "***DIP Loans***"), pursuant to the terms and conditions of that certain Senior Secured, Priming and Superpriority Debtor-In-Possession Credit Agreement (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "***DIP Agreement***"), by and among the Debtors, as borrowers and guarantors, Wells Fargo Bank, National Association, as administrative agent (in such capacity, the "***DIP Administrative Agent***") for and on behalf of itself and the other lenders party thereto (such lenders, collectively with the DIP Administrative Agent, the "***DIP Lenders***"), substantially in the form of **Exhibit B**, attached hereto;

(ii)     authorizing the Debtors to execute and deliver the DIP Agreement and any other agreements, instruments, pledge agreements, guarantees, control agreements and other Loan Documents (as defined in the DIP Agreement) and documents related thereto, including any security agreements, mortgages, deeds of trust, intellectual property security agreements, control agreements, or notes (each as amended, restated, supplemented, waived, and/or modified from time to time, and collectively, with the DIP Agreement and the DIP Orders, the "***DIP Documents***") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)    granting to the DIP Administrative Agent, for the benefit of itself and the DIP Lenders, on account of the DIP Facility and all obligations owing thereunder and

under, or secured by, the DIP Documents (collectively, and including all "***Obligations***" as described in the DIP Agreement, the "***DIP Obligations***") allowed superpriority administrative expense claim status in each of the Chapter 11 Cases and any Successor Cases (as defined in the Interim Order), subject only to the Carve Out (as defined below);

(iv)  granting to the DIP Administrative Agent, for the benefit of itself and the DIP Lenders, automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code ("***Cash Collateral***"), which liens shall be subject to the priorities set forth herein;

(v)  authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due and payable, including, letter of credit fees (including issuance and other related charges), continuing commitment fees, closing fees, audit fees, appraisal fees, valuation fees, liquidator fees, structuring fees, arrangement fees, upfront fees, administrative agent's fees, the reasonable fees and disbursements of the DIP Administrative Agents' attorneys, advisors, accountants and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

(vi)  authorizing the Debtors to use the assets or property granted as collateral to the Prepetition ABL Administrative Agent (as defined herein) (the "***Prepetition Collateral***"), including the Cash Collateral of the Prepetition ABL Parties (as defined herein) under the Prepetition ABL Documents (as defined herein) and (solely in the event and to the extent that Prepetition ABL Obligations (as defined herein) remain outstanding) providing adequate protection to the Prepetition ABL Parties for any diminution in value of their interests in the Prepetition Collateral, including Cash Collateral, resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of the Prepetition Collateral, including Cash Collateral, and the priming of their respective interests in the Prepetition Collateral, including Cash Collateral (including by the Carve Out) ("***Diminution in Value***");

(vii)  vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order; and

(viii)  scheduling a final hearing (the "***Final Hearing***") within twenty-four (24) days of the Petition Date to consider the relief requested in the DIP Motion and approving the form of notice with respect to the Final Hearing.

## PREPETITION DEBT

6.    As of the Petition Date, the debt obligations of the Debtors totaled in excess of

$565 million, excluding accrued and unpaid interest in the amount of approximately $110

million, accrued expenses and accounts payable of approximately $94 million, and capitalized leases of approximately $13 million.

7.    The Debtors' prepetition secured debt consists of obligations owing under that certain Credit Agreement dated as of March 21, 2016 (as amended, restated, supplemented, or otherwise modified from time to time, the "***Prepetition ABL Agreement***," and collectively with the Loan Documents (as defined in the Prepetition ABL Agreement) and any other agreements and documents executed or delivered in connection therewith (including, without limitation, various deposit account control agreements between the Prepetition ABL Administrative Agent (as defined herein) and City National Bank of Florida (collectively, the "***CNB Control Agreements***"); and various deposit account instruction agreements between the Prepetition ABL Administrative Agent and City National Bank of Florida (the "***CNB Instruction Agreements***" and, collectively with the CNB Control Agreements, the "***CNB Agreements***"), each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "***Prepetition ABL Documents***"), among (a) the borrowers party thereto (the "***Prepetition ABL Borrowers***"), (b) the guarantors party thereto (the "***Prepetition ABL Guarantors***"), (c) Wells Fargo Bank, National Association, as administrative agent (in such capacity, the "***Prepetition ABL Administrative Agent***"); (d) the "Revolving Lenders" (the "***Prepetition Revolving Lenders***") and the "Term Loan Lenders" (the "***Prepetition Term Loan Lenders***") (each as defined in the Prepetition ABL Agreement) party thereto (the "***Prepetition ABL Lenders***," and collectively with the Prepetition ABL Administrative Agent, the "***Prepetition ABL Parties***"), the Prepetition ABL Lenders provided revolving credit, term loans, and other financial accommodations to the Prepetition Borrowers pursuant to the Prepetition ABL Documents (the "***Prepetition ABL Facility***").

8.      The Prepetition ABL Facility provided the Prepetition ABL Borrowers with, among other things, (a) up to $65,000,000 aggregate principal amount of Revolving Loans (as defined in the Prepetition ABL Agreement) (the "***Prepetition Revolving Loans***"), and (b) $15,000,000 in Term Loans (as defined in the Prepetition ABL Agreement) (the "***Prepetition Term Loans***"). As of the Petition Date, the aggregate principal amount outstanding under the Prepetition ABL Facility was not less than $76,632,557.26 including all applicable "Obligations" as defined in the Prepetition ABL Agreement, and all interest, fees (including amendment fees), prepayment premiums, costs and other charges allowable under section 506(b) of the Bankruptcy Code, the "***Prepetition ABL Obligations***"), including not less than $61,657,557.2 in outstanding principal amount of Prepetition Revolving Loans and $14,975,000 in outstanding principal amount of Prepetition Term Loans.

9.      As more fully set forth in the Prepetition ABL Documents, prior to the Petition Date, the Prepetition ABL Borrowers and the Prepetition ABL Guarantors granted to the Prepetition ABL Administrative Agent, for the benefit of itself and the Prepetition ABL Lenders and the Bank Product Providers (as defined in the Prepetition ABL Agreement), a first priority security interest in and continuing lien on (the "***Prepetition ABL Liens***") substantially all of their assets and property, including mortgages on certain owned real property, the Collateral (as defined in the Prepetition ABL Agreement), and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "***Prepetition ABL Collateral***", subject only to certain Permitted Prior Liens (as defined therein). Each of the Prepetition ABL Guarantors has jointly and severally, absolutely, unconditionally and irrevocably guaranteed the Prepetition ABL Obligations.

## THE DIP FINANCING AND USE OF PROCEEDS IS NECESSARY

**A.    Immediate Need for Postpetition Financing and Use of Cash Collateral**

10.    The Debtors' need to obtain credit pursuant to the DIP Facility is immediate and critical in order to serve patient needs, enable the Debtors to continue operations, and to administer and preserve the value of their estates. The events leading up to the Debtors' critical financial situation are more fully described in the First Day Declaration. The  Debtors do not have sufficient available sources of working capital and financing to operate their businesses or to maintain their properties in the ordinary course of business—let alone pursue the various options available to create value for stakeholders—without the DIP Facility and authorized use of Cash Collateral. The DIP Lenders are willing to provide necessary and adequate liquidity on the terms provided in the DIP Documents and the Interim Order.

**B.    Prepetition Efforts to Obtain Financing**

11.    Prior to the Petition Date, the Debtors engaged FTI Consulting, Inc. ("***FTI***"), to assist them in evaluating strategic and financial alternatives to improve liquidity. Andrew Hinkelman, Senior Managing Director for Corporate Finance and Restructuring at FTI, is currently acting as Chief Restructuring Officer and interim Chief Financial Officer of the Debtors. The efforts of the Debtors and their advisors to raise new capital are described in the First Day Declaration. Before agreeing to enter into the DIP Agreement, the Debtors made inquiry into their alternatives for financing and solicited proposals for debtor in possession financing from two financial institutions. The Debtors and their advisors received two indicative term sheets that were fully negotiated prior to determining that the DIP Lenders' proposal was highest or otherwise best.

C.    **No Credit Available on More Favorable Terms**

12.    The Debtors were unable to find DIP financing on more favorable terms than the proposed DIP Facility, and the DIP Lenders have agreed to provide debtor in possession financing on the terms described in this Motion and set forth in the DIP Agreement and Interim Order. The Debtors evaluated the prospective lenders and their bids on a number of factors, which included economic terms, financing certainty, proposed restrictions on the operation of the business and the use of proceeds and the collateral and security packages requested. Given their current financial condition, financing arrangements and capital structure, the Debtors were unable to obtain financing from sources other than the DIP Lenders with a more favorable mix of terms than the DIP Facility.  Additionally, as parties to the Prepetition ABL Agreement, the DIP Lenders are familiar with the Debtors, giving them the ability to act more quickly and limiting diligence risk, both of which are crucial in light the Debtors' imminent need for liquidity as discussed further below.

13.    The Debtors have been unable to obtain unsecured financing allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors have also been unable to obtain credit (a) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to the Prepetition ABL Liens, at all, let alone in each case with comparable benefits afforded by the DIP Lenders and the DIP Facility. Financing on a postpetition basis is not otherwise available without granting the DIP Administrative Agent, for the benefit of the DIP Lenders, (1) perfected security interests in and liens on all of the Debtors' existing and after-acquired assets with the

priorities set forth in the Interim Order, (2) superpriority claims and (3) the other protections set forth in the Interim Order.

**D.      Use of Proceeds of the DIP Facility**

14.      As a condition to entry into the DIP Agreement, the extensions of credit under the DIP Facility and the authorization to use Cash Collateral, the DIP Lenders require, and the Debtors have agreed, that proceeds of the DIP Facility shall be used, in each case in a manner consistent with the terms and conditions of the Interim Order and the DIP Documents and in accordance with the budget (as the same may be modified from time to time consistent with the terms of the DIP Documents and subject to such variances as permitted in the DIP Agreement, the "***Budget***" attached as <u>**Schedule 1**</u> to the Interim Order),  solely for: (a) the repayment in cash from the proceeds of the DIP Loans to pay off the Prepetition Revolving Loans and the replacement and refinancing of such Prepetition Revolving Loans into DIP Obligations to the extent provided for in the Interim Order, the Final Order and the DIP Documents; (b) working capital; (c) permitted payment of costs of administering these Chapter 11 Cases and the Carve Out; (d) payment of such prepetition obligations as set forth in the Budget or otherwise approved by the DIP Administrative Agent in its sole discretion, and as approved by the Court; (e) payment of interest, fees, expenses and other amounts (including legal and other professionals' fees and expenses of the DIP Administrative Agent) owed under the DIP Documents; (f) payment of certain adequate protection amounts to the Prepetition ABL Parties; and (g) other general corporate purposes of the Debtors permitted by the Budget and the DIP Documents.

15.      The use of the DIP Facility proceeds for the repayment of the Prepetition Revolving Loans is a material component of the structure of the DIP Facility and was required by the DIP Lenders as a condition to their commitment to provide postpetition financing.

Pursuant to the DIP Documents and Interim Order, the DIP Facility will "roll-up" the full amount outstanding under the Prepetition Revolving Loans in addition to providing the Debtors with approximately $20 million in additional liquidity. Because the Prepetition Revolving Lenders are oversecured, no detriment to the estates or their creditors will result from the roll-up. Without access to the DIP Revolving Loans and the approximately $20 million in incremental liquidity under the DIP Term Loans to fund operations and the administration of these Chapter 11 Cases, the Debtors' patient services and business would cease and they would likely be forced to liquidate. The conversion of the obligations owed under the Prepetition Revolving Loans into DIP Obligations will pave the way to essential liquidity, allowing the Debtors to continue their ongoing sale processes.

## MATERIAL TERMS OF THE DIP FACILITY[2]

16.    Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, the Debtors set forth significant elements of the DIP Facility, as follows:

| Summary of Material Terms | |
| --- | --- |
| **DIP Agreement Parties**<br><br>DIP Agreement, Preamble | <u>Borrowers</u>: Promise Healthcare Group, LLC; Promise Hospital of Ascension, Inc.; Promise Hospital of Baton Rouge, Inc.; Promise Hospital of Dade, Inc.; Promise Hospital of East Los Angeles, L.P.; Promise Hospital of Florida at The Villages, Inc.; Promise Hospital of Lee, Inc.; Promise Hospital of Louisiana, Inc.; Promise Hospital of Phoenix, Inc.; Promise Hospital of Salt Lake, Inc.; Promise Hospital of Vicksburg, Inc.; Professional Rehabilitation Hospital, L.L.C.; Quantum Health, Inc.; Success Healthcare 1, LLC; St. Alexius Hospital Corporation #1; Promise Hospital of Dallas, Inc.; Promise Hospital of Wichita Falls, Inc.; Promise Hospital of Overland Park, Inc.; Promise Skilled Nursing Facility of Wichita Falls, Inc.; Promise Skilled Nursing Facility of Overland Park, Inc.; St. Alexius Properties, LLC<br><br><u>Guarantors</u>: Promise Healthcare Group, LLC; Promise Healthcare Holdings, Inc.; Promise Healthcare, Inc.; Promise Healthcare of California, Inc.; HLP HealthCare, Inc.; PH-ELA, Inc.; Success Healthcare, LLC; HLP of Los Angeles, LLC; Quantum Properties, L.P.; Bossier Land Acquisition Corp.; HLP of Shreveport, Inc.; Promise Properties of Dade, Inc.; Promise Properties of Lee, Inc.; Promise Properties of Shreveport, LLC; LH Acquisition, LLC; HLP Properties at the Villages, L.L.C.; Vidalia Real Estate Partners, LLC; |

---

[2] This concise statement is qualified in its entirety by reference to the applicable provisions of the DIP Documents or the Interim Order, as applicable. To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Documents, the provisions of the DIP Documents shall control, and the Interim Order shall control over the DIP Documents. Capitalized terms used, but not otherwise defined, in this summary shall be given the same meanings ascribed to them in the DIP Agreement, the Interim Order, and the Final Order, as applicable.

| | |
|---|---|
| | Administrative Agent: Wells Fargo Bank, National Association<br><br>Lenders: Wells Fargo Bank, National Association, and other potential financing parties |
| **DIP Facility**<br><br>DIP Agreement, §§ 2.1, 2.2<br><br>Interim Order, Preamble, ¶¶ 2, 3 | Senior secured, superpriority postpetition financing on a superpriority basis consisting of a senior secured superpriority credit facility in the aggregate principal amount of up to $85,000,000 consisting, in turn, of (a) $65,000,000 in aggregate principal amount of revolving loans and commitments including a roll-up of Prepetition Revolving Loans under the Interim Order and (b) $20,000,000 in aggregate principal amount of term loans |
| **Interest Rate**<br><br>DIP Agreement, § 2.6 | Revolving Loans. Base Rate plus 4%.<br><br>Term Loan. Base Rate plus 4.25%<br><br>"Base Rate" means the greatest of (a) the Federal Funds Rate *plus* ½%, (b) the LIBOR Index Rate (which rate shall be calculated based upon an interest period of one month and shall be determined on a daily basis), *plus* one percentage point, and (c) the rate of interest announced, from time to time, within Wells Fargo at its principal office in San Francisco as its "prime rate", with the understanding that the "prime rate" is one of Wells Fargo's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo may designate (and, if any such announced rate is below zero, then the rate determined pursuant to this clause (c) shall be deemed to be zero). |
| **Fees**<br><br>DIP Agreement, § 2.10, Fee Letter | Revolving Loan Closing Fee.  $650,000; *provided however*, that if the Obligations under the Credit Agreement (including all Revolving Loans and Term Loans) are repaid in full, all Letters of Credit are made the subject of Letter of Credit Collateralization and all Commitments are terminated on or prior to 90 days after the Closing Date, then the Revolver Closing Fee shall be automatically reduced to $325,000<br><br>Term Loan Closing Fee.  $200,000.00<br><br>Unused Line Fee: 0.50% per annum times the result of (i) the aggregate amount of the Revolver Commitments, less (ii) the average amount of the Revolver Usage during the immediately preceding month (or portion thereof)<br><br>Field Examination and Other Fees:  (i) a fee of $1,000 per day, per examiner, plus reasonable and documented out-of-pocket expenses (including travel, meals, and lodging) for each field examination of any Borrower performed by personnel employed by Agent, and (ii) the fees or charges paid or incurred by Agent (but, in any event, no less than a charge of $1,000 per day, per Person, plus reasonable and documented out-of-pocket expenses (including travel, meals, and lodging)) if it elects to employ the services of one or more third Persons to perform field examinations of any Loan Party to establish electronic reporting systems, or to assess any Loan Party's business valuation. |
| **Use of Proceeds**<br><br>DIP Agreement, §§ 6.11, 7<br><br>Interim Order ¶9 | The Borrowers shall use all proceeds of DIP Loans and any Cash Collateral, and shall operate, strictly in accordance with the Budget attached as **Schedule 1** to the Interim Order, as the Budget may be modified and subject to permitted variances, in each case subject to the terms of the DIP Agreement |
| **Security**<br><br>DIP Agreement, § 4.32(c)<br><br>Interim Order, ¶¶ | After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral, subject, as to priority only, to the Carve-Out, the Prepetition Lenders' Replacement Liens and Permitted Liens. |

| | |
|---|---|
| 5-6 | |
| **DIP Collateral (Including Chapter 5 Causes of Action)**<br><br>DIP Agreement, Definitions<br><br>Interim Order, ¶ 5 | All assets and interests in assets and proceeds thereof now owned or hereafter acquired by a Loan Party in or upon which a Lien is granted by such Loan Party in favor of Agent or the Lenders under any of the Loan Documents, including, without limitation, the Term Loan Priority Collateral and any claims and causes of action under section 549 of the Bankruptcy Code and any proceeds thereof and property received thereby, whether by judgment, settlement or otherwise, and, subject to entry of the Final Order, Avoidance Actions.<br><br>"Term Loan Priority Collateral" means all real property owned by any of the Debtors, except for the St. Alexius Real Property.. |
| **Superpriority Claim**<br><br>Interim Order, ¶ 7 | The DIP Lenders shall receive superpriority administrative claims and all other benefits and protections allowable under Bankruptcy Code §§ 507(b) and 503(b)(1), senior in right to all other administrative claims against the Debtors' estates, subject to any amounts set forth in the Interim Order and the Carve-Out. |
| **Termination Date**<br><br>DIP Agreement, Definitions | The date of the earliest to occur of (a) the Scheduled Commitment Termination Date, (b) the termination of the Commitments pursuant to Section 2.4 or Section 9.1 of the DIP Agreement, and (c) the date upon which the Interim Order expires, unless the Final Order shall have been entered and become effective on or prior to such date<br><br>"Scheduled Commitment Termination Date" means the date of the earliest to occur of (a) April 30, 2019; (b) the effective date of a plan of reorganization confirmed in the Chapter 11 Cases; or (c) the date on which Borrower consummates a transaction for the sale or disposition of all or substantially all of its assets. |
| **Mandatory Prepayments**<br><br>DIP Agreement, § 2.4(e) | If, at any time, (A) the Revolver Usage on such date exceeds (B) the Borrowing Base reflected in the Borrowing Base Certificate most recently delivered by Borrowers to Agent, then Borrowers shall immediately prepay the Obligations in accordance with Section 2.4(f) in an aggregate amount equal to the amount of such excess without a corresponding permanent reduction in the Commitments; *provided, that*, subject to availability under the Term Loan Commitment, Borrowers may satisfy such prepayment obligation by requesting a Term Loan in the amount of such excess, which shall then be applied by Agent directly to such prepayment obligation. |
| **Conditions Precedent to all Extension of Credit**<br><br>DIP Agreement, § 3.2 | The obligation of the Lender Group (or any member thereof) to make any DIP Loans at any time shall be subject to the following conditions precedent:<br><br>a.   the representations and warranties of each Loan Party contained in the DIP Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date);<br><br>b.   no Default or Event of Default shall have occurred and be continuing on the date of such extension of credit, nor shall either result from the making thereof;<br><br>c.   in the case of a request for a Term Loan, there shall be no Availability (after giving effect to any request for a Revolving Loan made simultaneously therewith);<br><br>d.   in the case of a request for a Revolving Loan or a Term Loan at any time after the Closing Date, the Bankruptcy Court shall have entered the Interim Order or Final Order, certified by the Clerk of the Bankruptcy Court as having been duly entered, and the Interim Order or Final Order, as applicable, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written |

|  |  |  |
|---|---|---|
|  |  | consent of the Agent and the Lenders; and |
|  | e. | in the case of a request for a Term Loan at any time after the entry of a Final Order, Agent shall have received title searches with respect to the Real Property constituting the Term Loan Priority Collateral in form and substance acceptable to Agent in its sole discretion. |
| **Milestones**<br><br>Interim Order, ¶ 32 | 11/5/18 | Petition Date |
|  | 11/5/18 | Filing of DIP financing motion; cash management motion; Silver Lake bid procedures and sale motion |
|  | 11/6/18 | Entry of Interim Order |
|  | 11/9/18 | Delivery to Wells Fargo of title reports with respect to agreed list of owned real property parcels |
|  | 11/16/18 | Delivery to Wells Fargo by all non-debtor affiliates and shareholders (if any) of subordination agreements as to encumbrances against owned real property parcels on agreed list |
|  | 11/30/18 | Filing of San Diego bid procedures and sale motion; filing of St. Alexius bid procedures and sale motion |
|  | 11/30/18 | Entry of final DIP financing order |
|  | 12/20/18 | Filing of general bid procedures and sale motion that includes designation of one or more stalking horse bids for substantially all of the debtors' assets and seeks approval of debtors' entry into one or more stalking horse asset purchase agreements and/or restructuring agreement (motion also to include procedures for designation of assumed and rejected leases and contracts and for setting cure amounts); in any and all events, for any sale or restructuring agreement(s) to meet Wells Fargo's approval, such agreement or agreement(s), taken in the aggregate, must provide sufficient cash at closing to satisfy at that time the debtors' obligations with respect to DIP financing in full in cash or otherwise be acceptable to Wells Fargo in its sole discretion |
|  | 12/31/18 | Closing of San Diego, St. Alexius sales (paydown of DIP financing from closing proceeds, on closing flow of funds) |
|  | 1/10/19 | Entry of general bid procedures order |
|  | 2/5/19 | Closing of Silver Lake sale (paydown of DIP financing from closing proceeds, on closing flow of funds) |
|  | 2/5/19 | General auction |
|  | 2/15/19 | General sale hearing; entry of general sale order |
|  | 4/30/19 | Closing of general sale(s) (repayment of DIP financing from closing proceeds, on closing flow of funds) |
|  | 4/30/19 | DIP financing maturity date |
| **Reporting**<br><br>DIP Agreement, | | Loan Parties (a) will deliver to Agent (and if so requested by Agent, with copies for each Lender) each of the reports set forth on Schedule 5.2 to the DIP Agreement at the times specified therein, and (b) agree to use commercially reasonable efforts in cooperation with |

| § 5.2 | Agent to facilitate and implement a system of electronic collateral reporting in order to provide electronic reporting of each of the items set forth on such Schedule. |
|---|---|
| **Events of Default**<br><br>DIP Agreement,<br>§§ 8.20, 8.21 | In addition to customary events of default, certain additional bankruptcy-related events, including:<br><br>The failure of the Loan Parties to continue to engage a restructuring advisor reasonably acceptable to Agent (it being understood and agreed that FTI is acceptable to Agent) to provide operational advice, perform cash flow modeling and otherwise provide advisory services pursuant to such terms of engagement (including such other duties and responsibilities) as are reasonably acceptable to Agent.<br><br>The occurrence of any of the following in any Chapter 11 Case:<br><br>a.  the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto, or the entry of any order by the Bankruptcy Court in any Chapter 11 Case: (i) that (in the case of Borrowers, any other Loan Party, the Committee or any of the members thereof) requests or seeks authority for Borrowers or any other Loan Party to obtain additional financing under sections 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to the DIP Agreement; (ii) except as provided in the Interim Order and/or the Final Order (as applicable), to grant any Lien other than Permitted Liens upon or affecting any Collateral; (iii) except as provided in the Interim Order or the Final Order, as the case may be, to use cash collateral or Collateral of Agent under section 363(c) of the Bankruptcy Code without the prior written consent of the Agent and the Required Lenders; (iv) that (in the case of any Borrower or any other Loan Party) requests or seeks authority for or that (in the case of an order entered by the Bankruptcy Court on account of a request by any Borrower or any other Loan Party) approves or provides authority to take any other action or actions materially adverse to the Agent and the Lenders or their rights and remedies hereunder or their interest in the Collateral; or (v) the entry of any order by the Bankruptcy Court in any Chapter 11 Case granting relief as described in subclauses (i) through (iv) herein;<br><br>b.  the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, that does not provide for the payment in full in cash of all DIP Obligations on the effective date of such plan, or the loss by Borrowers or any other Loan Party of the exclusive right to file and solicit acceptances of a plan of reorganization;<br><br>c.  the entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization that does not contain a provision for termination of the Commitments and repayment in full in cash of all of the DIP Obligations on or before the effective date of such plan or plans;<br><br>d.  the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or the Interim Order or the Final Order without the written consent of Agent;<br><br>e.  the Interim Order is not entered within three (3) days following the Petition Date;<br><br>f.  the Final Order is not entered on or before the deadline set forth in the Interim Order;<br><br>g.  the payment of, or application by Borrowers or any other Loan Party for authority to pay, any pre-petition claim without the Agent's and Required Lenders' prior written consent other than as provided in the Interim Order, the Final Order or any other order of the Bankruptcy Court in form and substance acceptable to Agent and as set forth in the Approved Budget or unless otherwise permitted under the DIP Agreement;<br><br>h.  the appointment of an interim or permanent trustee in any Chapter 11 Case or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in any Chapter 11 Case with expanded powers (beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial |

<table>
<tr><td></td><td>

affairs, the business, or reorganization of Borrowers or with the power to conduct an investigation of (or compel discovery from) Agent or Lenders or against agent or lenders under the Prepetition Credit Agreement; or a sale without the Agent's and Required Lenders' consent, of all or substantially all of Borrowers' assets either through a sale under section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise that does not provide for payment in full in cash of the Obligations and termination of the Commitments;

i.  the dismissal of any Chapter 11 Case, or the conversion of any Chapter 11 Case from one under chapter 11 to one under chapter 7 of the Bankruptcy Code or Borrowers or any other Loan Party shall file a motion or other pleading seeking the dismissal of any Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise;

j.  the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (A) to allow any creditor to execute upon or enforce a Lien on any Collateral, or (B) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a Material Adverse Effect;

k.  the entry of an order in any Chapter 11 Case avoiding or requiring disgorgement or repayment of any portion of the payments made on account of the DIP Obligations;

l.  the failure of Borrowers to perform any of its obligations under the Interim Order or the Final Order or any violation of any of the terms of the Interim Order or the Final Order; the challenge by Borrowers, any other Loan Party or any Committee to the validity, extent, perfection or priority of any Liens granted under the Prepetition Credit Agreement, or the filing by any such Person of any claim or cause of action against Agent or any Lender;

m.  the remittance, use or application of the proceeds of Collateral other than in accordance with cash management procedures and agreements reasonably acceptable to Agent;

n.  the entry of an order in any of the Chapter 11 Cases granting any other super priority administrative claim or Lien (other than the Prepetition Lenders' Replacement Liens and such other exceptions, if any, as are expressly set forth in the Interim Order and/or the Final Order (as applicable)) equal or superior to that granted to Agent, on behalf of itself and Lenders without the consent in writing of Agent and Required Lenders; or

o.  the failure to meet any of the milestones summarized above and set forth on Schedule 8.21 to the DIP Agreement.

</td></tr>
<tr><td>

**Rights and Remedies**

DIP Agreement, § 9.1

</td><td>

Notwithstanding section 362 of the Bankruptcy Code, and subject to the terms and conditions of the Interim Order and/or the Final Order, as applicable, upon the occurrence and during the continuation of an Event of Default, Agent may, and, at the instruction of the Required Lenders, shall (in each case under clauses (a) or (b) by written notice to Borrowers), in addition to any other rights or remedies provided for under any DIP Document or by applicable law, do any one or more of the following:

a.  declare the principal of, and any and all accrued and unpaid interest and fees in respect of, the Loans and all other Obligations (other than the Bank Product Obligations), to be immediately due and payable, and (ii) direct Borrowers to provide (and Borrowers agree that upon receipt of such notice Borrowers will provide) Letter of Credit Collateralization to Agent to be held as security for Borrowers' reimbursement obligations for drawings that may subsequently occur under issued and outstanding Letters of Credit;

b.  declare the Commitments terminated;

c.  cause any funds maintained in any Non-Government Receivables Lockbox Account to be swept to the Agent's Account; and

</td></tr>
</table>

| | |
|---|---|
| | d.  exercise all other rights and remedies available to Agent or the Lenders under the Loan Documents, under applicable law, or in equity. |
| **Carve-Out**<br><br>Interim Order, ¶ 39 | The "Carve-Out" means, collectively, the sum of—<br><br>a.  Allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6) for fees payable to the Office of the United States Trustee, as determined by agreement of the U.S. Trustee or by final order of this Court and 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of this Court or an agent of the Clerk of the Court;<br><br>b.  All accrued and unpaid fees, disbursements, costs and expenses, allowed at any time by this Court and incurred by professionals retained by the Debtors or the Committee (the "*Case Professionals*"), through the date of service of a Carve Out Trigger Notice (as defined below), up to and as limited by the Budget amounts for each Case Professional or category of Case Professional through the date of service of said Carve Out Trigger Notice (including partial amounts for any Carve Out Trigger Notice given other than at the end of a week, and after giving effect to all carryforwards and carrybacks from prior or subsequent favorable budget variances for such Case Professional), less the amount of any prepetition retainers received by such Case Professionals and not previously returned or applied to fees and expenses; and<br><br>c.  All accrued and unpaid fees, disbursements and expenses incurred by the Case Professionals from and after the date of service of a Carve Out Trigger Notice, to the extent allowed at any time, in an aggregate amount not to exceed $200,000 (the "*Carve Out Cap*") less the amount of any prepetition retainers received by such Case Professionals and not applied to the fees, disbursements, costs and expenses set forth in clause (b) above. The Carve Out Cap shall be reduced on a dollar-for-dollar basis by any payments of fees or expenses of the Case Professionals made after delivery of the Carve Out Trigger Notice in respect of fees and expenses incurred after delivery of the Carve Out Trigger Notice.<br><br>Coincident with the repayment in full in cash of the DIP Obligations and the Prepetition ABL Obligations (the date of such repayment, the "*Repayment Date*"), an amount equal to the Carve Out (as of the Repayment Date), shall, to the extent reflected in the most recent borrowing base certificate delivered to the DIP Administrative Agent by the Debtors and maintained as part of a reserve against the borrowing base, be funded (to the extent of any shortfall therein) with the proceeds of the DIP Facility (which shall then constitute DIP Obligations) and be included in the repayment amount). Following delivery of a Carve Out Trigger Notice, upon the funding of the Carve Out as of the date of the Carve Out Trigger Notice, none of the DIP Administrative Agent, the DIP Lenders, and the Prepetition ABL Parties shall have any further liability whatsoever for the Carve Out (including any amounts described in subsections (a)(i)-(iii) above) or any subordination in respect thereof. |
| **Challenge**<br><br>Interim Order, ¶ 42 | Prepetition Lien and Claim Stipulations, as set forth in the Interim Order, shall be binding on any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties in interest and all of their successors in interest and assigns, including a Committee (if appointed), unless, and solely to the extent that, a party in interest and requisite authority (other than the Debtors, as to which any Challenge (as defined below) is irrevocably waived and relinquished) timely file the appropriate pleadings, and timely commence the appropriate proceeding challenging the Prepetition Lien and Claim Stipulations (each such proceeding or appropriate pleading commencing a proceeding or other contested matter, a "*Challenge*") by no later than (a) 60 days from the date of formation of a Committee (if appointed), or (b) 75 days following the entry of the Interim Order for any other party in interest with requisite authority (the "*Challenge Deadline*"), as such applicable date may be extended in writing from time to time in the sole discretion of the Prepetition ABL Administrative Agent (with respect to the Prepetition ABL Documents), or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration |

| | |
|---|---|
| | of the Challenge Deadline, and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely and properly commenced Challenge proceeding and any such judgment has become a final judgment that is not subject to any further review or appeal. |
| **Cross-Collateralization**<br><br>Interim Order,<br>¶¶ 5, 45 | As noted above, the Debtors will apply proceeds from the DIP Facility towards repayment of the Prepetition Revolving Loans. In addition, as noted above, both the revolving and term loan components of the DIP Facility will be secured by all of the DIP Collateral.  Further, paragraph 45 of the Interim Order states:<br><br>Subject to entry of a Final Order, the DIP Administrative Agent, the DIP Lenders, and the Prepetition ABL Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as the case may be, and proceeds shall be received and applied pursuant to the Interim Order and the DIP Documents notwithstanding any other agreement or provision to the contrary; provided, however, that the DIP Administrative Agent and the DIP Lenders shall use reasonable efforts to satisfy claims on account of (i) DIP Revolving Loans from DIP Collateral that is also Prepetition Collateral or the proceeds thereof, and (ii) DIP Term Loans from DIP Collateral that is not Prepetition Collateral or the proceeds thereof. |
| **Indemnification**<br><br>DIP Agreement, §<br>10.3<br><br>Interim Order, ¶¶<br>26 | The Debtors shall indemnify and hold harmless the DIP Administrative Agent and the DIP Lenders in accordance with the terms and conditions of the DIP Agreement. Upon the repayment in full in cash of the DIP Revolving Loans, the Debtors shall pay $500,000 from proceeds of the DIP Collateral into an indemnity account (the "***DIP Indemnity Account***") subject to first priority liens of the DIP Administrative Agent, for the benefit of the DIP Administrative Agent and the DIP Lenders. The DIP Indemnity Account shall secure contingent indemnification obligations and other contingent claims arising under the DIP Agreement, the other DIP Documents or otherwise in respect of the DIP Obligations until such time as the DIP Administrative Agent and the DIP Lenders receive releases and discharges of claims and liabilities in form and substance reasonably satisfactory to the DIP Administrative Agent and the DIP Lenders. |

## **HIGHLIGHTED PROVISIONS UNDER LOCAL RULE 4001-2(a)(1)**

17.    The Interim Order includes certain terms that constitute material provisions requiring explicit disclosure under the Local Rules.[3]  The provisions described in Local Rule 4001-2(a)(i), to the extent applicable, are set forth at the following sections of the Interim Order:

a.    **Local Rule 4001-2(a)(i)(A) – Cross Collateralization.**  The Interim Order provides for cross collateralization in that both the revolving and term components of the DIP Facility will be secured by postpetition liens on all of the Debtors' assets, including all of the Debtors' real property.  In turn, Paragraph 45 of the Interim Order sets forth provisions as to various types of DIP Collateral. *See* Interim Order ¶¶ 5, 9, 10 and 45.

b.    **Local Rule 4001-2(a)(i)(B) – Validity, Perfection, and Amount of Prepetition Liens**.  Liens and security interests of the Prepetition Secured Parties are stipulated to be valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination

---

[3]    While the Debtors have attempted to highlight the provisions required by the Bankruptcy Rules and Local Rules, as well as certain other material provisions, the Debtors reserve the right to supplement this list at the hearing to consider this Motion on an interim basis.

immediately upon entry of the Interim Order, but subject to Challenge. *See* Interim Order ¶ 42.

c.  **Local Rule 4001-2(a)(i)(C) – Section 506(c) Waiver.**  Subject to entry of a Final Order.

d.  **Local Rule 4001-2(a)(i)(D) – Liens on Avoidance Actions.**  Subject to the entry of a Final Order.

e.  **Local Rule 4001-2(a)(i)(E) – Provisions Deeming Prepetition Debt to be Postpetition Debt.**  The Prepetition Revolving Loans will be exchanged for DIP Revolving Loans.  *See* Interim Order ¶¶ 9 and 10.

f.  **Local Rule 4001-2(a)(i)(F) – Disparate Treatment of Professionals Retained by the Committee.** The Interim Order contains no provisions that provide for disparate treatment for professionals retained by a creditors' committee, if any, with respect to the Carve Out, but such amounts are subject to an approved Budget. *See* Interim Order ¶¶ 9 and 39.

g.  **Local Rule 4001-2(a)(i)(G) – Non-Consensual Priming.**  The Interim Order does not provide for non-consensual priming of any existing lien.

h.  **Local Rule 4001-2(a)(i)(H) – Provisions Affecting the Court's Power to Consider Equities of the Case.**  Neither the DIP Lenders nor the Prepetition ABL Parties shall be subject to the equities of the case under section 552(b) or the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.  However, Paragraph 45 of the Interim Order sets forth provisions as to various types of DIP Collateral. *See* Interim Order ¶ 45.

## ADEQUATE PROTECTION

18.    In consideration of the Diminution in Value of their interests in the Prepetition Collateral as a result of (a) the provision of this Interim Order granting priming liens on such Prepetition Collateral to the DIP Administrative Agent, (b) the authorization of the use of Cash Collateral in the manner herein described, (c) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code and/or (d) otherwise, pursuant to sections 361(a), 363(c) and 364(d)(1) of the Bankruptcy Code, the Prepetition ABL Parties shall receive adequate protection in the form of—

i.   valid, enforceable, fully perfected security interests in and replacement liens on the DIP Collateral, subordinate only to: (i) the Permitted Prior Liens; (ii) the DIP Liens; (iii) the Prepetition ABL Liens; and (iv) the Prior Real Estate Liens (the "***Adequate Protection Liens***");

ii.  a superpriority claim under sections 503 and 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and unsecured claims now existing or after arising, provided, however, that such superpriority claim shall be junior and subject to the superpriority claim of the DIP Administrative Agent for the benefit of the DIP Lenders in respect of the DIP Facility and the Carve-Out (the "***Adequate Protection Superpriority Claims***");

iii. payment in cash (and as to fees and expenses, without the need for the filing of a formal fee application) (such payments, "***Adequate Protection Payments***") of (i) immediately upon entry of the Interim Order, payment of the reasonable and documented fees, out-of-pocket expenses, and disbursements (including the reasonable and documented fees, out-of-pocket expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition ABL Administrative Agent arising prior to the Petition Date, and (ii) the reasonable and documented fees, out-of-pocket expenses, and disbursements (including the reasonable and documented fees, out-of-pocket expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Prepetition ABL Administrative Agent arising subsequent to the Petition Date; and solely to the extent provided for in the Prepetition ABL Agreement, until the earlier to occur of (a) receipt by the Prepetition ABL Administrative Agent and the Prepetition ABL Lenders of releases and discharges of claims and liabilities in form and substance satisfactory to the Prepetition ABL Administrative Agent and the Prepetition ABL Lenders in their sole discretion, or (b) the expiration of the Challenge Deadline without the commencement of a Challenge, current payment of all costs, expenses, and other amounts (including reasonable and documented attorneys' fees) incurred in connection with contingent indemnification, reimbursement or similar continuing obligations arising under the Prepetition ABL Agreement, the other Prepetition ABL Documents or otherwise in respect of the Prepetition ABL Obligations (the "***Prepetition ABL Indemnification Obligations***"), including in connection with or responding to (1) formal or informal inquiries and/or discovery requests, any adversary proceeding, cause of action, objection, claim, defense, or other challenge, or (2) any Challenge against the Prepetition ABL Administrative Agent or Prepetition ABL Lenders related to the Prepetition ABL Documents, the Prepetition ABL Obligations, or the Prepetition ABL Liens granted to the Prepetition ABL Administrative Agent, as applicable, whether in these Chapter 11 Cases or independently in another forum, court, or venue.

19.   The foregoing adequate protection liens shall be deemed automatically perfected as of the Petition Date without further action.

20.     The provisions of the DIP Facility and the Interim Order were extensively negotiated and, under the present circumstances, are the most favorable that the Debtors were able to negotiate. The DIP Facility enables the Debtors to obtain the financing necessary to maintain patient care, their operations, and pursue a sale or reorganization that will maximize the value of their estates.

## BASIS FOR RELIEF REQUESTED

### I.   The Court Should Authorize the Debtors to Provide Adequate Protection to the Prepetition ABL Parties

21.     The Debtors' use of property of their estates is governed by section 363 of the Bankruptcy Code, which provides in pertinent part:

> the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

22.     To the extent any prepetition secured creditor has a lien on a Debtor's assets and does not consent to the Debtor's use of those assets, such creditor must be adequately protected. The propriety of adequate protection is determined on a case-by-case basis. *See Resolution Trust Corp. v. Swedeland Dev. Grp (In re Swedeland Dev. Grp)*, 16 F.3d 552, 564 (3d Cir. 1994) (citing *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1397 (10th Cir. 1987)); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

23.     Adequate protection shields a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re Continental Airlines, Inc.*, 154 B.R. 176, 180-181 (Bankr. D. Del. 1993); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626,

631 (Bankr. S.D.N.Y. 1992); *In re Beker Indus.,* 58 B.R. at 736; *In re Ledgemere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990); *In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988).

24.     Adequate protection is not expressly defined in the Bankruptcy Code. Rather, section 361 of the Bankruptcy Code provides a non-exclusive list of examples of adequate protection. The flexibility provided by section 361 provides the Court with discretion in fashioning the protection provided to a secured party. *See Resolution Trust (In re Swedeland)*, 16 F.3d at 564. Adequate protection may be provided through a "replacement lien" or "other relief" resulting in the "indubitable equivalent" of the secured creditor's interest in such property. *See* 11 U.S.C. § 361(2), (3).

25.     The Debtors are providing the Prepetition ABL Parties with adequate protection for their consent to the priming liens as follows: by the provision of Adequate Protection Liens, Adequate Protection Superpriority Claims, and the provisions of the Adequate Protection Payments. The Debtors believe that this form of adequate protection reasonably balances the Debtors' need to use the Prepetition Collateral and the Prepetition ABL Parties' right to adequate protection under the Bankruptcy Code. As a result, the Debtors submit that the proposed terms of the Debtors' use of Prepetition Collateral should be approved in their entirety.

**II.    Entering into the DIP Facility Documents is an Exercise of the Debtors' Sound Business Judgment**

26.     The Court should authorize the Debtors to enter into the DIP Documents and obtain access to the DIP Facility and the Cash Collateral as an exercise of the Debtors' sound business judgment.

27.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances as described in greater detail below.

Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit. *See In re Estrada*, 16-80003-G3-11, 2016 WL 745536, at *3 (Bankr. S.D. Tex. Feb. 24, 2016) ("In determining whether to approve a motion to obtain credit, courts generally permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties."); *In re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

28.     Moreover, the Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility. For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including noneconomic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

Case No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

29.    The Debtors' execution of the DIP Documents is an exercise of their sound business judgment that warrants approval by the Court. Prior to the Petition Date, the Debtors and their advisors undertook a detailed investigation as to the Debtors' projected financing needs during the pendency of any chapter 11 case, and determined that the Debtors would require postpetition financing to support their operational and restructuring activities. Accordingly, the Debtors negotiated the DIP Facility with the DIP Lenders in good faith, at arm's-length, and with the assistance of outside counsel, to obtain the required postpetition financing on terms favorable to the Debtors.

30.    Accordingly, the Debtors and their advisors determined in their sound business judgment that the DIP Facility provides a greater amount of financing on more favorable terms than any other reasonably available alternative. As noted above, the DIP Facility will provide the Debtors with access to the necessary liquidity, which the Debtors and their advisors have independently determined should be sufficient to support the Debtors' ongoing operations and reorganization activities through the pendency of the Chapter 11 Cases. Additionally, the DIP Facility provides the Debtors with access to existing Cash Collateral, which preserves the status quo and relieves the Debtors of the cost of borrowing additional amounts to replace that cash. Thus, the Debtors submit that entering into the DIP Documents constitutes an exercise of the Debtors' sound business judgment that should be approved by the Court.

### III.    The Debtors Should be Authorized to Obtain Postpetition Financing on a Senior Secured, Priming and Superpriority Basis

31.    The Debtors are authorized to operate their businesses under section 1108 of the Bankruptcy Code. As part of that operation, the Debtors may incur unsecured debt in the ordinary course of business. 11 U.S.C. § 364(a). The Bankruptcy Code offers a debtor in

possession additional flexibility to the extent it needs additional credit, but cannot obtain such credit on unsecured terms. Section 364 of the Bankruptcy Code provides a progression of various protections to induce a postpetition lender to extend credit to a debtor in possession. Specifically, a postpetition lender can be granted a superpriority administrative expense claim, a lien on unencumbered property, a junior lien on encumbered property, and, if the court finds that the interests of the holders of existing liens are adequately protected, a priming lien on encumbered property. 11 U.S.C. § 364(c), (d).

32.      The business necessity for obtaining the DIP Facility is described above. The Debtors will not have the cash needed to pay their current operating expenses absent the DIP Facility. Even if the Debtors obtained this Court's authorization to use every dollar of cash collateral generated from the Debtors' assets over the objections of the Prepetition ABL Parties, the Debtors' projected gross cash collections would be insufficient to fund current operating expenses during the pendency of the Chapter 11 Cases. During the Chapter 11 Cases, the Debtors' current operating expenses will exceed their cash collections. The Debtors can operate without drastic cuts in operations only with new financing.

33.      Section 364 of the Bankruptcy Code does not impose upon a debtor in possession the onerous duty to seek unsecured credit from every possible lender before concluding that such credit is not available. *See Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co., Inc.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). This is true especially when time is of the essence. *See, e.g., id.; In re Reading Tube Indus.*, 72 B.R. 329, 333 (Bankr. E.D. Pa. 1987). Here, as described in the First Day Declaration, the Debtors have searched for debtor in possession financing on the most favorable terms. The Debtors' submit that the terms and conditions of the DIP Facility are fair, reasonable and consistent with market terms. Further, given the regulatory

complexity of the Debtors' healthcare business, and the DIP Lenders' experience in working with and financing the Debtors' prepetition operations, the Debtors believe that the DIP Facility provides its needed financing on the most favorable terms.

34.    As a condition to extending the DIP Facility that the Debtors need, the DIP Lenders require the protections contained in subsections 364(c) and (d) of the Bankruptcy Code, as well as the cross-collateralization features of the DIP Facility, which the facts in these Chapter 11 Cases support. Specifically, upon entry of the Interim Order, the DIP Administrative Agent, on behalf of itself and the DIP Lenders will be granted, pursuant to section 364(c)(l) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases for all DIP Obligations: (a) subject only to the Carve Out, having priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of the Chapter 11 Cases, at any time existing or arising, of any kind or nature whatsoever, including administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code; and (b) which shall at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative to the extent permitted by law.

35.    The DIP Facility provides the funding needed for the Debtors to successfully emerge from Chapter 11. Without the DIP Facility, the Debtors would be required to terminate some or all of their operations (depending on whether the Court authorized the Debtors to use cash collateral), which would destroy at least a substantial portion of the going concern value of the Debtors' operations. Preservation of value generally constitutes the "adequate protection"

needed to prime existing liens. *See, e.g., Norton, et al., 2 Norton Bankruptcy Law and Practice 3d.* § *45:7* (2008) (addressing the § 364(d) determination, and providing that "[f]actors influencing a court's decision will be the viability of the debtor's business and the need to protect assets against a sharp decline in value"); *Bray (In re Snowshoe Co. Inc.)*, 789 F.2d at 1087 (§ 364(d) order affirmed on appeal where "the trustee reported that the resort [the collateral] would lose from 50% to 90% of its fair market value if it ceased operations"); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. at 631 (finding that funds from lender given "priming" lien used to improve collateral will be transferred into value "[that] will serve as adequate protection. . . ."); *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996). In any event, the only parties that the Debtors are aware of whose liens are being primed are the Prepetition ABL Parties, and they have consented to the priming lien to preserve the going concern value of their collateral. The Debtors also note that the DIP Facility's primary cross-collateralization feature— the granting of liens on the Debtors' owned real property (other than the St. Alexius Real Property, which real property is already collateral for the Debtors' prepetition obligations) to secure the repayment of the revolving portion of the DIP Facility—is provided on a non-priming basis.[4]  The Debtors believe that the cross-collateralization features of the DIP Facility are appropriate in light of, among other factors, the significant and immediate additional liquidity that the DIP Facility provides.

## IV.    The Repayment Feature of the DIP Facility is Appropriate

36.    Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval. It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound

---

[4] The Debtors further note that the adequate protection provisions set forth in the Interim Order with respect to the interests of City National Bank of Florida as to its real property collateral were agreed among the Debtors, the DIP Lenders and City National Bank of Florida prior to the Petition Date.

business purpose. *See In re Abbots Dairies, Inc.*, 788 F.2d 1.43 (3d Cir. 1986) (holding that in

the Third Circuit, a debtor's use of assets outside the ordinary course of business under section

363(b) of the Bankruptcy Code should be approved if the debtor can demonstrate a sound

business justification for the proposed transaction). The business judgment rule shields a debtor's

management from judicial second-guessing. *In re Johns-Manville Corp.*, 60 B.R. 61.2, 615-16

(Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business

by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

37.    Repayment of prepetition debt (often referred to as a "roll-up") is a common

feature in debtor in possession financing arrangements. Courts in this jurisdiction have approved

similar DIP features, including on the first day of the case. *See, e.g., In Re Remington Outdoor

Co., Inc.*, No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28, 2018) (authorizing approximately $338

million DIP and a roll-up of approximately $150 million, including a full ABL roll-up of $114

million, pursuant to interim order); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D.

Del. Feb. 6, 2018) (authorizing full roll-up of all $489 million outstanding prepetition revolving

obligations pursuant to interim order); *In re Charming Charlie, LLC*, No. 17-12906 (CSS)

(Bankr. D. Del. Dec. 12, 2017) (authorizing approximately $90 million DIP that included a full

ABL roll-up of approximately $22 million prepetition debt pursuant to interim order); *In re Real

Indus. Inc.*, No. 17-12464 (KJC) (Bankr. D. Del. Nov. 20, 2017) (authorizing approximately

$365 million DIP that included a creeping roll-up pursuant to interim order and a full roll-up

pursuant to final order of approximately $266 million prepetition debt);  *In re Radioshack Corp.*,

No. 15-10197 (BLS) (Bankr. D. Del. Feb. 5, 2015) (authorizing approximately $285 million DIP

and a roll-up of approximately $250 million. prepetition debt, including a full ABL roll-up of

$215 million, pursuant to interim order); *In re MACH Gen, LLC*, No. 14-10461 (MFW) (Bankr.

D. Del. Mar. 5, 2014) (authorizing approximately $200 million DIP that included a full roll-up of approximately $144 million prepetition debt pursuant to interim order); *In re Cenveo, Inc.*, No. 18-22178 (Bankr. S.D.N.Y. Feb. 2, 2018) (authorizing a $290 million DIP, including a full ABL roll-up of $190 million, pursuant to interim order); *In re BCBG Max Azria Global Holdings LLC*, No. 17- 10466 (Bankr. S.DN.Y. Mar. 2, 2017) (authorizing a $157 million DIP and a roll-up of $117 million, including a full ABL roll-up of $82 million pursuant to final order following a creeping roll-up pursuant to the interim order); *In re Toys "R" US, Inc.*, No. 17-34665 (Bankr. E.D. Va. Sept. 20, 2017) (authorizing a $2.3 billion DIP and a full roll-up of approximately $948 million in the prepetition ABL and FILO facilities); *In re Gymboree Corporation*, No. 17-32986 (Bankr. E.D. Va. June 12, 2017) (authorizing a $378 million DIP and $247 million roll-up, including a full ABL roll-up of $177 million).

38.     The DIP Facility will "roll-up" the full amount outstanding under the Prepetition Revolving Loans in addition to providing the Debtors with approximately $20 million in additional liquidity. Pursuant to the Interim Order, approximately $65 million owed to the Prepetition Revolving Lenders under the Prepetition ABL Credit Agreement will be "rolled-up" into the DIP Obligations. As stated above, the roll-up of the Prepetition Revolving Loans is a material component of the structure of the DIP Facility and was required by the DIP Lenders as a condition to their commitment to provide postpetition financing. Without continued access to the DIP Revolving Loans and the approximately $20 million in incremental liquidity under- the DIP Term Loans to fund operations and the administration of these Chapter 11 Cases, the Debtors' businesses would cease and they would likely be forced to liquidate. Maintaining the ability to continue as a going concern on the other side of a deleveraging restructuring transaction is of immense benefit to the Debtors' estates and stakeholders.

39.    The conversion of the obligations owed under the Prepetition Revolving Loans into obligations owed under the DIP Facility will provide essential liquidity, allowing the Debtors to continue their ongoing sale processes. In addition, the conversion merely accelerates the satisfaction of the obligations owed under the Prepetition Revolving Loans without affecting recovery to other creditors because the Debtors believe that these obligations are fully secured by perfected, first priority liens on substantially all of the Debtors' assets, with a value in excess of outstanding borrowings. Due to the senior priority of the Prepetition Revolving Lenders' loans, they are likely to receive a full recovery on their prepetition claims in any event. Thus, after careful consideration of all available alternatives, the Debtors have determined that conversion of the Prepetition Revolving Loans into DIP Obligations is necessary to obtain access to the liquidity necessary to preserve the value of their business for the benefit of all stakeholders.

40.    Absent the Prepetition ABL Parties' support, the first month of the Debtors' Chapter 11 Cases would likely devolve into a costly priming fight. In contrast, the roll-up of the Prepetition Revolving Loans merely affects the timing, not the amount or certainty, of the Prepetition Revolving Lenders' recovery—the secured claims arising as a result of the Prepetition Revolving Loans are required by section 1129 of the Bankruptcy Code to be satisfied in full before recoveries to junior creditors may be provided, absent consent of such secured parties (which consent the Debtors do not have here).

41.    Given these circumstances, repayment of the Prepetition Revolving Loans is reasonable, appropriate, and a sound exercise of the Debtors' business judgment.

## **REQUEST FOR WAIVER OF STAY**

42.    Under Federal Rule of Bankruptcy Procedure 6003, the Court may grant a motion to "use . . . property of the estate, including a motion to pay all or part of a claim that arose

before the filing of the petition" within 21 days after the chapter 11 case's commencement to the extent "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. Here, the relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates, as set forth in the First Day Declaration, and relief on an interim basis is therefore appropriate under Federal Rule of Bankruptcy Procedure 6003, if applicable.

43.    To implement the foregoing immediately, the Debtors respectfully request a waiver of the notice requirements of Bankruptcy Rule 6004(a) to the extent they are deemed to apply.

## NOTICE

44.    The Debtors have provided notice of the filing of the Motion to: (i) the Office of the United States Trustee; (ii) the Debtors' 30 largest unsecured creditors on a consolidated basis; (iii) counsel to Wells Fargo Bank, National Association, as administrative agent under the Debtors' prepetition credit facility; (iv) counsel to City National Bank of Florida as real estate lender to the Debtors; (v) Wilmington Trust Company; (vi) the Internal Revenue Service; (vii) the United States Attorney for the District of Delaware; (viii)  the United States Department of Justice; (ix) all lienholders; (x) the State Attorney General's Office in each state where the Debtors operate; (xi) the Debtors' depository banks; and (xii) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "***Notice Parties***").  As this Motion is seeking "first day" relief, notice of this Motion and any ordered entered in connection with the Motion will be served on all parties required by Local Rule 9013-1(m).  Due to the urgency of the circumstances surrounding this Motion and the nature of relief sought in it, the Debtors respectfully submit that no further notice of this Motion is required.

[*Remainder of Page Intentionally Left Blank*]

**WHEREFORE**, the Debtors respectfully request entry of the Interim Order, and pending a final hearing, the Final Order, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: November 5, 2018
Wilmington, Delaware

DLA PIPER LLP (US)

/s/ *Stuart M. Brown*
Stuart M. Brown (#4050)
Kaitlin MacKenzie Edelman (#5924)
1201 N. Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: Stuart.Brown@dlapiper.com
        Kaitlin.Edelman@dlapiper.com

-and-

WALLER LANSDEN DORTCH & DAVIS, LLP
John Tishler (*pro hac vice* admission pending)
Katie G. Stenberg (*pro hac vice* admission pending)
Blake D. Roth (*pro hac vice* admission pending)
Tyler N. Layne (*pro hac vice* admission pending)
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone: (615) 244-6380
Facsimile: (615) 244-6804
Email: John.Tishler@wallerlaw.com
        Katie.Stenberg@wallerlaw.com
        Blake.Roth@wallerlaw.com
        Tyler.Layne@wallerlaw.com

*Proposed Attorneys for the Debtors and*
*Debtors in Possession*

4849-0282-7632.14
EAST\162240987.1