**Exhibit B**
**DIP Agreement**

MW Draft 11/3/18

**THIS DRAFT REMAINS SUBJECT TO WELLS FARGO CREDIT COMMITTEE APPROVAL AND TO THE REVIEW, COMMENT, AND APPROVAL OF WELLS FARGO IN ALL RESPECTS AND REMAINS SUBJECT TO CHANGE BASED UPON DUE DILIGENCE**

**DISTRIBUTION OF THIS DRAFT DOES NOT REPRESENT A COMMITMENT OR OFFER ON THE PART OF WELLS FARGO**

---

### SENIOR SECURED, PRIMING AND SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

**by and among**



**WELLS FARGO BANK, NATIONAL ASSOCIATION,**

**as Administrative Agent,**

**THE LENDERS THAT ARE PARTIES HERETO,**

**as the Lenders,**

**PROMISE HEALTHCARE GROUP, LLC,**

**as Parent,**

**each Subsidiary of Parent signatory hereto as a "Borrower,"**

**as Borrowers,**

**and each Subsidiary of Parent signatory hereto as a "Guarantor,"**

**as Guarantors**

**Dated as of November [__], 2018**

---

# TABLE OF CONTENTS

**Page**

1. **DEFINITIONS AND CONSTRUCTION** ........................................................................ 1

    1.1    **Definitions** ..................................................................................................... 1

    1.2    **Accounting Terms** ........................................................................................ 1

    1.3    **Code** ............................................................................................................... 2

    1.4    **Construction** ................................................................................................. 2

    1.5    **Time References** ........................................................................................... 3

    1.6    **Schedules and Exhibits** ............................................................................... 3

2. **LOANS AND TERMS OF PAYMENT** ....................................................................... 3

    2.1    **Revolving Loans** .......................................................................................... 3

    2.2    **Term Loan** .................................................................................................... 4

    2.3    **Borrowing Procedures and Settlements** ..................................................... 4

    2.4    **Payments; Reductions of Commitments; Prepayments** .......................... 10

(ii)    Each Term Loan Lender hereby agrees that it shall not, directly or indirectly, challenge, contest or seek to avoid the rights possessed of or purported to be possessed of any Revolving Lender (or of the Agent for the benefit of any Revolving Lender) under this Agreement or any other Loan Document, including, without limitation, the Liens of the Agent for the benefit of the Revolving Lenders in the Collateral. ................................................................................................ 14

(iii)    Each Term Loan Lender hereby agrees that, as long as any Revolving Loans or the Revolver Commitments remains outstanding, it shall not pursue (or direct the Agent to pursue) any action, cause of action, right or claim under this Agreement or any other Loan Document (including, without limitation, any action, cause of action right or claim against the Collateral), except pursuant to the terms and conditions of Section 15.12(c) and the last sentence of Section 2.6(d). .......................... 14

(iv)    In any Insolvency Proceeding, each Term Loan Lender hereby (1) agrees not to challenge the validity or amount of any claim or valuations with respect to the Collateral or the Revolving Loans submitted by any other Person party hereto, (2) agrees to vote in favor of any plan of reorganization supported by Agent, (3) agrees to vote against any plan of reorganization to which Agent objects, (4) agrees that Agent may provide (or consent or decline the Agent to pursue) any action, of) debtor-in-possession financing, consent to (or decline to object to) the use of cash collateral and/or consent to (or decline to object to) the sale of all, substantially all or any portion of the Collateral (including, without limitation, the terms and conditions for the offering for sale and/or marketing thereof), in each event, on terms and conditions acceptable to the Agent in its sole and absolute discretion, and (5) agrees that it shall not seek any form of adequate protection as to its interest in the Collateral (if any) without the prior consent of Agent (which consent Agent may provide or decline to provide in its sole and absolute discretion). ......................................................... 14

# TABLE OF CONTENTS

(continued)

**Page**

(v)     No payments of principal, interest or fees shall be made with respect to the Term Loan (including at the maturity thereof), and no payments or proceeds of Collateral shall be applied to any Obligations with respect to the Term Loan or amounts owing to the Term Loan Lenders hereunder, until after the Repayment in Full of the Revolving Loans; provided, however, that prior to the Repayment in Full of the Revolving Loans each Term Loan Lender with a Term Loan Commitment shall be entitled to receive proceeds of the Term Loan Priority Collateral in accordance with the terms and conditions of Section 2.4(b)(iii)(B); provided further, however, that the Term Loan Lenders shall not have the right to consent to or effect any sale or other disposition of the Term Loan Priority Collateral, and the only rights of each Term Loan Lender with respect to the Term Loan Priority Collateral are the right to receive proceeds of the Term Loan Priority Collateral in accordance with the terms and conditions of Section 2.4(b)(iii)(B). .................................... 15

2.5     **Promise to Pay; Promissory Notes.**........................................................... 15

2.6     **Interest Rates and Letter of Credit Fee:  Rates, Payments, and Calculations.** ...................... 15

(i)     Revolving Loans.  Except as provided in Section 2.6(c), the outstanding principal amount of the Revolving Loans and all other Obligations (except for (1) undrawn Letters of Credit and (2) the outstanding principal amount of the Term Loan) that have been charged to the Loan Account pursuant to the terms hereof shall bear interest as follows at a per annum rate equal to the Base Rate plus the Revolving Loan Base Rate Margin. .................................................................... 15

(ii)    Term Loan.  Except as provided in Section 2.6(c), the outstanding principal amount of the Term Loan shall bear interest at the per annum rate equal to the Base Rate plus the Term Loan Base Rate Margin. .................................................................................................................... 15

2.7     **Crediting Payments** ............................................................................... 17

2.8     **Designated Account** ............................................................................... 17

2.9     **Maintenance of Loan Account; Statements of Obligations** ................................ 17

2.10    **Fees.** ...................................................................................................... 17

2.11    **Letters of Credit** ................................................................................... 18

2.12    **LIBOR Index Rate Loans.** ....................................................................... 22

2.13    **Capital Requirements** ............................................................................. 23

2.14    **[Reserved]** ............................................................................................. 24

2.15    **Joint and Several Liability of Borrowers.** ................................................... 24

3.      **CONDITIONS; TERM OF AGREEMENT.** .................................................. 26

3.1     **Conditions Precedent to the Initial Extension of Credit** ................................ 26

3.2     **Conditions Precedent to all Extensions of Credit** ........................................ 26

3.3     **Maturity** ............................................................................................... 27

3.4     **Effect of Maturity** ................................................................................. 27

-ii-

# TABLE OF CONTENTS

(continued)

**Page**

|  |  |  |
|---|---|---|
| 3.5 | Early Termination by Borrowers | 27 |
| 4. | REPRESENTATIONS AND WARRANTIES | 27 |
| 4.1 | Due Organization and Qualification; Subsidiaries. | 27 |
| 4.2 | Due Authorization; No Conflict. | 28 |
| 4.3 | Governmental Consents | 28 |
| 4.4 | Binding Obligations. Each Loan Document has been duly executed and delivered by each Loan Party that is a party thereto and, subject to entry of the Interim Order (or the Final Order, as applicable), is the legally valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally. | 29 |
| 4.5 | Title to Assets; No Encumbrances | 29 |
| 4.6 | Litigation. | 29 |
| 4.7 | Compliance with Laws | 29 |
| 4.8 | No Material Adverse Effect | 29 |
| 4.9 | Solvency | 30 |
| 4.10 | Employee Benefits | 30 |
| 4.11 | Environmental Condition | 30 |
| 4.12 | Complete Disclosure | 30 |
| 4.13 | Patriot Act | 31 |
| 4.14 | Indebtedness | 31 |
| 4.15 | Payment of Taxes | 31 |
| 4.16 | Margin Stock | 31 |
| 4.17 | Governmental Regulation | 31 |
| 4.18 | OFAC | 31 |
| 4.19 | Employee and Labor Matters | 32 |
| 4.20 | Holding Company Loan Parties | 32 |
| 4.21 | Leases | 32 |
| 4.22 | Eligible Accounts | 32 |
| 4.23 | [Reserved]. | 32 |
| 4.24 | [Reserved]. | 32 |

-iii-

# TABLE OF CONTENTS

(continued)

Page

|  | 4.25 | **[Reserved]** | 32 |
|---|---|---|---|
|  | 4.26 | **[Reserved].** | 32 |
|  | 4.27 | **Material Contracts** | 32 |
|  | 4.28 | **[Reserved].** | 33 |
|  | 4.29 | **[Reserved].** | 33 |
|  | 4.30 | **Hedge Agreements** | 33 |
|  | 4.31 | **Health Care Matters.** | 33 |
|  | 4.32 | **Reorganization Matters**. | 34 |
| 5. |  | 35 |  |
|  | **AFFIRMATIVE COVENANTS** | | 35 |
|  | 5.1 | **Financial Statements, Reports, Certificates** | 35 |
|  | 5.2 | **Reporting** | 35 |
|  | 5.3 | **Existence** | 35 |
|  | 5.4 | **Maintenance of Properties** | 36 |
|  | 5.5 | **Taxes** | 36 |
|  | 5.6 | **Insurance** | 36 |
|  | 5.7 | **Inspection** | 36 |
|  | 5.8 | **Compliance with Laws** | 37 |
|  | 5.9 | **Environmental** | 37 |
|  | 5.10 | **Disclosure Updates** | 37 |
|  | 5.11 | **[Reserved]** | 37 |
|  | 5.12 | **Further Assurances** | 37 |
|  | 5.13 | **[Reserved].** | 38 |
|  | 5.14 | **Compliance with ERISA and the IRC** | 38 |
|  | 5.15 | **[Reserved].** | 38 |
|  | 5.16 | **Payment of Tax Obligations** | 38 |
|  | 5.17 | **Compliance with Health Care Laws.** | 38 |
|  | 5.18 | **Cash Dominion** | 39 |
| 6. | **NEGATIVE COVENANTS** | | 39 |
|  | 6.1 | **Indebtedness** | 39 |

-iv-

# TABLE OF CONTENTS

(continued)

Page

| | | |
|---|---|---|
| 6.2 | **Liens** | 39 |
| 6.3 | **Restrictions on Fundamental Changes** | 39 |
| 6.4 | **Disposal of Assets** | 40 |
| 6.5 | **Nature of Business** | 40 |
| 6.6 | **Prepayments and Amendments** | 40 |
| 6.7 | **Restricted Payments** | 41 |
| 6.8 | **Accounting Methods** | 41 |
| 6.9 | **Investments** | 41 |
| 6.10 | **Transactions with Affiliates** | 41 |
| 6.11 | **Use of Proceeds** | 41 |
| 6.12 | **Limitation on Issuance of Equity Interests** | 41 |
| 6.13 | **Settlement Agreements.** No Loan Party shall enter into any Health Care Settlement Agreement on or after the Closing Date if the aggregate amount owing by all Loan Parties under all other Health Care Settlement Agreements entered into on or after the Closing Date exceeds $12,000,000 at the time of such proposed settlement or agreement; provided, however, that Agent in its sole discretion may consent to increase such $12,000,000 limit to an amount equal to or less than $20,000,000. | 42 |
| 6.14 | **Holding Company Loan Parties** | 42 |
| 6.15 | **[Reserved].** | 42 |
| 6.16 | **Deposit Accounts** | 42 |
| 6.17 | **Employee Benefits** | 42 |
| 6.18 | **Modifications to Leases and Other Agreements.** Each Loan Party will not enter into any amendment or modification of, or agree to or accept any waiver of, any Lease that would (a) modify any covenant, default, or event of default to make it materially more restrictive on the business or operations of any Loan Party, (b) cause a Default or Event of Default to occur under this Agreement, or (c) be materially adverse to the interests of the Lenders. | 42 |
| 6.19 | **Formation of Subsidiaries**. No Loan Party shall form any direct or indirect Subsidiary or acquire any direct or indirect Subsidiary after the Closing Date. | 43 |

# TABLE OF CONTENTS

(continued)

**Page**

6.20    **Reclamation Claims**. No Loan Party shall enter into any agreement to return any Goods to any of its creditors for application against any Prepetition Indebtedness, Prepetition trade payables or other Prepetition claims under section 546(c) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its Prepetition Indebtedness, Prepetition trade payables or other Prepetition claims based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount of Prepetition Indebtedness, Prepetition trade payables and other Prepetition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $[_____]. .................................. 43

6.21    **Chapter 11 Claims**. No Loan Party shall incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is *pari passu* with or senior to the claims of Agent and Lenders against Borrower, except for the Carve-Out and as otherwise set forth in the Interim Order or the Final Order, as applicable. ................................... 43

7.    **FINANCIAL COVENANTS.** ................................................. 43

8.    **EVENTS OF DEFAULT** ................................................. 44

   8.1    **Payments** ................................................. 44

   8.2    **Covenants** ................................................. 44

   8.3    **Judgments** ................................................. 44

   8.4    **[Reserved].** ................................................. 44

   8.5    **[Reserved].** ................................................. 44

   8.6    **Default Under Other Agreements** ................................................. 44

   8.7    **Representations, etc** ................................................. 45

   8.8    **Guaranty** ................................................. 45

   8.9    **Security Documents** ................................................. 45

   8.10    **Loan Documents** ................................................. 45

   8.11    **Change of Control** ................................................. 45

   8.12    **Overpayment** ................................................. 45

   8.13    **Lockbox Instructions** ................................................. 45

   8.14    **Health Care Laws** ................................................. 45

   8.15    **ERISA** ................................................. 46

   8.16    **Health Care Proceeding** ................................................. 46

   8.17    **Survey Deficiencies** ................................................. 46

   8.18    **Closure; Admissions Defaults; ALOS** ................................................. 46

-vi-

# TABLE OF CONTENTS

(continued)

**Page**

8.19    **Lease Default**.................................................................................. 47

8.20    **Restructuring Advisor**.  The failure of the Loan Parties to continue to engage a restructuring advisor reasonably acceptable to Agent (it being understood and agreed that Financial Advisor is acceptable to Agent) to provide operational advice, perform cash flow modeling and otherwise provide advisory services pursuant to such terms of engagement (including such other duties and responsibilities) as are reasonably acceptable to Agent. ............ 47

8.21    **Chapter 11 Case**.  The occurrence of any of the following in any Chapter 11 Case:.................. 47

9.     **RIGHTS AND REMEDIES** ............................................................. 48

9.1    **Rights and Remedies**.................................................................... 48

9.2    **Remedies Cumulative** ................................................................. 49

10.    **WAIVERS; INDEMNIFICATION** .................................................. 49

10.1    **Demand; Protest; etc** ................................................................... 49

10.2    **The Lender Group's Liability for Collateral** ................................. 49

10.3    **Indemnification** .......................................................................... 49

11.    **NOTICES** ..................................................................................... 50

12.    **CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER**............... 51

13.    **ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS** . ............. 52

13.1    **Assignments and Participations**.................................................... 52

13.2    **Successors** .................................................................................. 54

14.    **AMENDMENTS; WAIVERS** ......................................................... 54

14.1    **Amendments and Waivers** ........................................................... 54

14.2    **Replacement of Certain Lenders** .................................................. 56

14.3    **No Waivers; Cumulative Remedies** .............................................. 57

15.    **AGENT; THE LENDER GROUP** ................................................... 57

15.1    **Appointment and Authorization of Agent**...................................... 57

15.2    **Delegation of Duties** ................................................................... 58

15.3    **Liability of Agent** ....................................................................... 58

15.4    **Reliance by Agent** ...................................................................... 58

15.5    **Notice of Default or Event of Default** ........................................... 59

15.6    **Credit Decision**........................................................................... 59

15.7    **Costs and Expenses; Indemnification**............................................ 59

# TABLE OF CONTENTS

(continued)

Page

| | | |
|---|---|---|
| 15.8 | **Agent in Individual Capacity** | 60 |
| 15.9 | **Successor Agent** | 60 |
| 15.10 | **Lender in Individual Capacity** | 61 |
| 15.11 | **Collateral Matters** | 61 |
| 15.12 | **Restrictions on Actions by Lenders; Sharing of Payments** | 62 |
| 15.13 | **Agency for Perfection** | 63 |
| 15.14 | **Payments by Agent to the Lenders** | 63 |
| 15.15 | **Concerning the Collateral and Related Loan Documents** | 63 |
| 15.16 | **Field Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information** | 63 |
| 15.17 | **Several Obligations; No Liability** | 64 |
| 16. | **WITHHOLDING TAXES** | 64 |
| 16.1 | **Payments** | 64 |
| 16.2 | **Exemptions** | 65 |
| 16.3 | **Reductions** | 66 |
| 16.4 | **Refunds** | 66 |
| 17. | **GENERAL PROVISIONS** | 66 |
| 17.1 | **Effectiveness** | 66 |
| 17.2 | **Section Headings** | 66 |
| 17.3 | **Interpretation** | 66 |
| 17.4 | **Severability of Provisions** | 67 |
| 17.5 | **Bank Product Providers** | 67 |
| 17.6 | **Debtor-Creditor Relationship** | 67 |
| 17.7 | **Counterparts; Electronic Execution** | 67 |
| 17.8 | **Revival and Reinstatement of Obligations; Certain Waivers** | 68 |
| 17.9 | **Confidentiality** | 68 |
| 17.10 | **Survival** | 69 |
| 17.11 | **Patriot Act** | 70 |
| 17.12 | **Integration** | 70 |
| 17.13 | **Borrower Representative** | 70 |

# EXHIBITS AND SCHEDULES

Exhibit 1                    Form of Interim Order

Schedule A-1                 Agent's Account
Schedule A-2                 Authorized Persons
Schedule C-1                 Commitments
Schedule D-1                 Designated Account
Schedule P-1                 Permitted Intercompany Advances
Schedule P-2                 Permitted Holders
Schedule P-3                 Permitted Investments
Schedule P-4                 Permitted Liens
Schedule T-1                 Tax Settlement Agreements
Schedule T-2                 Term Loan Property Collateral

Schedule 3.1                 Conditions Precedent
Schedule 4.1(b)              Capitalization of Borrowers
Schedule 4.1(c)              Capitalization of Borrowers' Subsidiaries
Schedule 4.1(d)              Subscriptions, Options, Warrants, Calls
Schedule 4.6(b)              Litigation
Schedule 4.11                Environmental Matters
Schedule 4.14                Permitted Indebtedness
Schedule 4.21                Leased Real Property
Schedule 4.27                Material Contracts
Schedule 5.1                 Financial Statements, Reports, Certificates
Schedule 5.2                 Collateral Reporting
Schedule 6.5                 Nature of Business
Schedule 6.10                Transactions with Affiliates
Schedule 8.21                Sale Transaction Milestones

EAST\162241995.1

## SENIOR SECURED, PRIMING AND SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

**THIS SENIOR SECURED, PRIMING AND SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT** (this "<u>Agreement</u>"), is entered into as of November [___], 2018, by and among the lenders identified on the signature pages hereof (each of such lenders, together with its successors and permitted assigns, is referred to hereinafter as a "<u>Lender</u>", as that term is hereinafter further defined), **WELLS FARGO BANK, NATIONAL ASSOCIATION**, a national banking association, as administrative agent for each member of the Lender Group and the Bank Product Providers (in such capacity, together with its successors and assigns in such capacity, "<u>Agent</u>"), **PROMISE HEALTHCARE GROUP, LLC**, a Delaware limited liability company ("<u>Parent</u>"), the Subsidiaries of Parent identified as Guarantors on the signature pages hereof (such Subsidiaries, together with Parent, are referred to hereinafter each individually as a "<u>Guarantor</u>" and individually and collectively, jointly and severally, as the "<u>Guarantors</u>"), and the Subsidiaries of Parent identified as Borrowers on the signature pages hereof (such Subsidiaries are referred to hereinafter each individually as a "<u>Borrower</u>", and individually and collectively, jointly and severally, as the "<u>Borrowers</u>").

### RECITALS

Whereas, on November [___], 2018 (the "<u>Petition Date</u>"), the Borrower [and the other Loan Parties] commenced chapter 11 case numbers [_____] through [_____], as administratively consolidated at chapter 11 case number [_____] (each a "<u>Chapter 11 Case</u>" and collectively, the "<u>Chapter 11 Cases</u>") by filing separate voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"). The Borrowers continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

Whereas, prior to the Petition Date, certain lenders provided financing to the Borrowers pursuant to that certain Credit Agreement, dated as of March 21, 2016, among the lenders identified on the signature pages thereof, Agent, certain of the Guarantors and Borrowers (as amended, modified or supplemented through the Petition Date, the "<u>Prepetition Credit Agreement</u>");

Whereas, the Borrowers have requested that Lenders provide a senior secured, superpriority revolving and term loan debtor-in-possession credit facility to Borrowers in a principal amount up to $[85,000,000] in the aggregate to be used (1) to pay in full the outstanding balance of all Revolving Loans and other Obligations under (and in each case as defined in) the Prepetition Credit Agreement (other than the Prepetition Term Loan and Obligations (as defined in the Prepetition Credit Agreement) related thereto) and (2) for the purposes set forth in <u>Section 6.11</u>.

In consideration of the mutual agreements herein contained, the parties agree as follows:

1.        **DEFINITIONS AND CONSTRUCTION.**

1.1      **Definitions.**  Capitalized terms used in this Agreement shall have the meanings specified therefor on <u>Schedule 1.1</u>.

1.2      **Accounting Terms.**  All accounting terms not specifically defined herein shall be construed in accordance with GAAP; <u>provided</u>, that if Borrowers notify Agent that Borrowers request an amendment to any provision hereof to eliminate the effect of any Accounting Change occurring after the Closing Date or in the application thereof on the operation of such provision (or if Agent notifies Borrowers that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given

before or after such Accounting Change or in the application thereof, then Agent and Borrowers agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such Accounting Change with the intent of having the respective positions of the Lenders and Borrowers after such Accounting Change conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon and agreed to by the Required Lenders, the provisions in this Agreement shall be calculated as if no such Accounting Change had occurred.  When used herein, the term "financial statements" shall include the notes and schedules thereto.  Whenever the term "Parent" is used in respect of a financial covenant or a related definition, it shall be understood to mean Parent and its Subsidiaries on a consolidated basis, unless the context clearly requires otherwise.  Notwithstanding anything to the contrary contained herein, (a) all financial statements delivered hereunder shall be prepared, and all financial covenants contained herein shall be calculated, without giving effect to any election under the Statement of Financial Accounting Standards No. 159 (or any similar accounting principle) permitting a Person to value its financial liabilities or Indebtedness at the fair value thereof, and (b) the term "unqualified opinion" as used herein to refer to opinions or reports provided by accountants shall mean an opinion or report that is (i) unqualified, and (ii) does not include any explanation, supplemental comment, or other comment concerning the ability of the applicable Person to continue as a going concern or concerning the scope of the audit.

1.3    **Code.**  Any terms used in this Agreement that are defined in the Code shall be construed and defined as set forth in the Code unless otherwise defined herein; provided, that to the extent that the Code is used to define any term herein and such term is defined differently in different Articles of the Code, the definition of such term contained in Article 9 of the Code shall govern.

1.4    **Construction.**  Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."  The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be.  Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified.  Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein).  The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties.  Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean (a) the payment or repayment in full in immediately available funds of (i) the principal amount of, and interest accrued and unpaid with respect to, all outstanding Loans, together with the payment of any premium applicable to the repayment of the Loans, (ii) all Lender Group Expenses that have accrued and are unpaid regardless of whether demand has been made therefor, (iii) all fees or charges that have accrued hereunder or under any other Loan Document (including the Letter of Credit Fee and the Unused Line Fee) and are unpaid, (b) in the case of contingent reimbursement obligations with respect to Letters of Credit, providing Letter of Credit Collateralization, (c) in the case of obligations with respect to Bank Products (other than Hedge Obligations), providing Bank Product Collateralization, (d) the receipt by Agent of cash collateral in order to secure any other contingent Obligations for which a claim or demand for payment has been made on or prior to such time or in respect of matters or circumstances known to Agent or a Lender at such time that are reasonably expected to result in any loss, cost, damage, or expense (including attorneys fees and legal expenses), such cash collateral to be in such amount as Agent reasonably determines is appropriate to secure such contingent Obligations, (e) the payment or repayment in full in immediately available funds of all other outstanding Obligations (including the payment of any termination amount then applicable (or which would or could become applicable as a result of the repayment of the other Obligations) under Hedge Agreements provided by Hedge Providers) other than (i) unasserted contingent indemnification Obligations, (ii) any Bank Product Obligations (other than Hedge Obligations) that, at such time, are allowed by the applicable Bank Product Provider to remain outstanding without being required to be repaid or cash collateralized, and (iii) any Hedge Obligations that, at such time, are allowed by the applicable Hedge Provider

- 2 -

to remain outstanding without being required to be repaid, and (f) the termination of all of the Commitments of the Lenders.  Any reference herein to any Person shall be construed to include such Person's successors and assigns.  Any requirement of a writing contained herein or in any other Loan Document shall be satisfied by the transmission of a Record.  Whenever the phrase "to Borrowers' knowledge," "to the knowledge of the Loan Parties" or words of similar import relating to the knowledge or the awareness of a Borrower or Loan Party are used in this Agreement or other Loan Documents, such phrase shall mean and refer to (i) the actual knowledge of a senior officer of such Borrower or Loan Party or (ii) the knowledge that a senior officer of such Borrower or Loan Party would have obtained if he or she had engaged in good faith and diligent performance of his or her duties.

       1.5    **Time References.**  Unless the context of this Agreement or any other Loan Document clearly requires otherwise, all references to time of day refer to Pacific standard time or Pacific daylight saving time, as in effect in Los Angeles, California on such day.  For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to and including"; provided that, with respect to a computation of fees or interest payable to Agent or any Lender, such period shall in any event consist of at least one full day.

       1.6    **Schedules and Exhibits.**  All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

2.    **LOANS AND TERMS OF PAYMENT.**

    2.1    **Revolving Loans.**

       (a)    Subject to the terms and conditions of this Agreement, and during the term of this Agreement, each Revolving Lender agrees (severally, not jointly or jointly and severally) to make revolving loans ("Revolving Loans") to Borrowers in an amount at any one time outstanding not to exceed *the lesser of*:

       (i)    such Lender's Revolver Commitment, or

       (ii)    such Lender's Pro Rata Share of an amount equal to *the lesser of:*

       (A)    the amount equal to (1) the Maximum Revolver Amount *less* (2) the sum of (y) the Letter of Credit Usage at such time, *plus* (z) the principal amount of Swing Loans outstanding at such time, and

       (B)    the amount equal to (1) the Borrowing Base as of such date (based upon the most recent Borrowing Base Certificate delivered by Borrowers to Agent) *less* (2) the sum of (y) the Letter of Credit Usage at such time, *plus* (z) the principal amount of Swing Loans outstanding at such time.

       (b)    Amounts borrowed pursuant to this Section 2.1 may be repaid and, subject to the terms and conditions of this Agreement, reborrowed at any time during the term of this Agreement.  The outstanding principal amount of the Revolving Loans, together with interest accrued and unpaid thereon, shall constitute Obligations and shall be due and payable on the Maturity Date or, if earlier, on the date on which they are declared due and payable pursuant to the terms of this Agreement.

       (c)    Anything to the contrary in this Section 2.1 notwithstanding, Agent shall have the right (but not the obligation), in the exercise of its Permitted Discretion, to establish and increase or decrease Receivable Reserves, Bank Product Reserves, and other Reserves against the Borrowing Base or the Maximum Revolver Amount; provided, that (i) Agent shall endeavor to notify Borrowers at or before the time any such reserve in a material amount is to be established or increased, but a non-willful failure of Agent to so notify Borrowers shall not be a breach of this Agreement and shall not cause such establishment or increase of a reserve to be ineffective, (ii) Agent shall provide written notice to Borrowers not less than 5 Business Days prior to the date on which any such reserve is to be established or increased that would cause an Overadvance to exist, and (iii) during the 5 Business Day period set forth in clause (ii) above, Lenders will have no obligation to make Revolving Loans in excess of the Borrowing Base adjusted for such reserves.  The amount of any Receivable

- 3 -

Reserve, Bank Product Reserve, or other Reserve established by Agent shall have a reasonable relationship to the event, condition, other circumstance, or fact that is the basis for such reserve and shall not be duplicative of any other reserve established and currently maintained.

2.2     **Term Loan**.

(a)     Subject to the terms and conditions of this Agreement, including the satisfaction of each of the conditions precedent set forth in <u>Section 3.2</u>, on and after the Closing Date, each Term Loan Lender with a Term Loan Commitment agrees (severally, not jointly or jointly and severally) to make term loans (collectively, the "<u>Term Loan</u>") to Borrowers from time to time in an aggregate amount not to exceed such Term Loan Lender's Term Loan Commitment.  The entire outstanding principal amount of the Term Loan shall be repaid in full on the Maturity Date, subject to the payment and collateral priorities set forth in <u>Section 2.4</u>.  Any principal amount of the Term Loan that is repaid or prepaid may not be reborrowed.  All principal of, interest on, and other amounts payable in respect of the Term Loan shall constitute Obligations hereunder.

(b)     The initial advance of the Term Loan shall be made on the Closing Date in the aggregate principal amount of $5,000,000.  Each advance of a Term Loan after the Closing Date shall be made upon an irrevocable written request by an Authorized Person delivered to Agent and each Term Loan Lender at least two (2) Business Days prior to the date of such requested Term Loan.  On the date of each requested Term Loan, each Term Loan Lender shall make its pro rata share of the requested Term Loan available to Borrowers by transferring immediately available funds in the amount of such Term Loan to the Designated Account of the Borrowers.

2.3     **Borrowing Procedures and Settlements**.

(a)     **Procedure for Borrowing Revolving Loans.**  Each Borrowing shall be made by a written request by an Authorized Person delivered to Agent (which may be delivered through Agent's electronic platform or portal) and received by Agent no later than 8:00 a.m. (i) on the Business Day that is the requested Funding Date in the case of a request for a Swing Loan, (ii) on the Business Day that is 1 Business Day prior to the requested Funding Date in the case of a request for all other Loans (or, if Wells Fargo is the sole Lender, on the Business Day that is the requested Funding Date), in each case under clause (i) and (ii), specifying (A) the amount of such Borrowing, and (B) the requested Funding Date (which shall be a Business Day); provided, that Agent may, in its sole discretion, elect to accept as timely requests that are received later than 8:00 a.m. on the applicable Business Day.  All Borrowing requests which are not made on-line via Agent's electronic platform or portal shall be subject to (and unless Agent elects otherwise in the exercise of its sole discretion, such Borrowings shall not be made until the completion of) Agent's authentication process (with results satisfactory to Agent) prior to the funding of any such requested Revolving Loan.

(b)     **Making of Swing Loans.**  In the case of a request for a Revolving Loan and so long as either (i) the aggregate amount of Swing Loans made since the last Settlement Date, *minus* all payments or other amounts applied to Swing Loans since the last Settlement Date, plus the amount of the requested Swing Loan does not exceed $7,500,000, or (ii) Swing Lender, in its sole discretion, may make a Swing Loan notwithstanding the foregoing limitation, Swing Lender may make a Revolving Loan (any such Revolving Loan made by Swing Lender pursuant to this Section 2.3(b) being referred to as a "<u>Swing Loan</u>" and all such Revolving Loans being referred to as "<u>Swing Loans</u>") available to Borrowers on the Funding Date applicable thereto by transferring immediately available funds in the amount of such requested Borrowing to the Designated Account.  Each Swing Loan shall be deemed to be a Revolving Loan hereunder and shall be subject to all the terms and conditions (including <u>Section 3</u>) applicable to other Revolving Loans, except that all payments (including interest) on any Swing Loan shall be payable to Swing Lender solely for its own account.  Subject to the provisions of <u>Section 2.3(d)(ii)</u>, Swing Lender shall not make and shall not be obligated to make any Swing Loan if Swing Lender has actual knowledge that (i) one or more of the applicable conditions precedent set forth in <u>Section 3</u> will not be satisfied on the requested Funding Date for the applicable Borrowing, or (ii) the requested Borrowing would exceed the Availability on such Funding Date.  Swing Lender shall not otherwise be required to determine whether the applicable conditions precedent set forth in <u>Section 3</u> have been satisfied on the Funding Date applicable thereto prior to making any Swing Loan.  The Swing Loans shall be secured by Agent's Liens,

constitute Revolving Loans and Obligations, and bear interest at the rate applicable from time to time to Revolving Loans.

      (c)      **Making of Revolving Loans**.

      (i)      In the event that Swing Lender is not obligated to make a Swing Loan, then after receipt of a request for a Borrowing pursuant to Section 2.3(a), Agent shall notify the Lenders by telecopy, telephone, email, or other electronic form of transmission, of the requested Borrowing; such notification to be sent by 10:00 a.m. on the Business Day that is 1 Business Day prior to the requested Funding Date.  Unless Wells Fargo is the sole Lender, if Agent has notified the Lenders of a requested Borrowing on the Business Day that is 1 Business Day prior to the Funding Date, then each Lender shall make the amount of such Lender's Pro Rata Share of the requested Borrowing available to Agent in immediately available funds, to Agent's Account, not later than 12:00 p.m. on the Business Day that is the requested Funding Date.  After Agent's receipt of the proceeds of such Revolving Loans from the Lenders, Agent shall make the proceeds thereof available to Borrowers on the applicable Funding Date by transferring immediately available funds equal to such proceeds received by Agent to the Designated Account; provided, that, subject to the provisions of Section 2.3(d)(ii), no Lender shall have an obligation to make any Revolving Loan, if (1) one or more of the applicable conditions precedent set forth in Section 3 will not be satisfied on the requested Funding Date for the applicable Borrowing unless such condition has been waived, or (2) the requested Borrowing would exceed the Availability on such Funding Date.

      (ii)      Unless Agent receives notice from a Lender prior to 11:30 a.m. on the Business Day that is the requested Funding Date relative to a requested Borrowing as to which Agent has notified the Lenders of a requested Borrowing that such Lender will not make available as and when required hereunder to Agent for the account of Borrowers the amount of that Lender's Pro Rata Share of the Borrowing, Agent may assume that each Lender has made or will make such amount available to Agent in immediately available funds on the Funding Date and Agent may (but shall not be so required), in reliance upon such assumption, make available to Borrowers a corresponding amount.  If, on the requested Funding Date, any Lender shall not have remitted the full amount that it is required to make available to Agent in immediately available funds and if Agent has made available to Borrowers such amount on the requested Funding Date, then such Lender shall make the amount of such Lender's Pro Rata Share of the requested Borrowing available to Agent in immediately available funds, to Agent's Account, no later than 12:00 p.m. on the Business Day that is the first Business Day after the requested Funding Date (in which case, the interest accrued on such Lender's portion of such Borrowing for the Funding Date shall be for Agent's separate account).  If any Lender shall not remit the full amount that it is required to make available to Agent in immediately available funds as and when required hereby and if Agent has made available to Borrowers such amount, then that Lender shall be obligated to immediately remit such amount to Agent, together with interest at the Defaulting Lender Rate for each day until the date on which such amount is so remitted.  A notice submitted by Agent to any Lender with respect to amounts owing under this Section 2.3(c)(ii) shall be conclusive, absent manifest error.  If the amount that a Lender is required to remit is made available to Agent, then such payment to Agent shall constitute such Lender's Revolving Loan for all purposes of this Agreement.  If such amount is not made available to Agent on the Business Day following the Funding Date, Agent will notify Borrowers of such failure to fund and, upon demand by Agent, Borrowers shall pay such amount to Agent for Agent's account, together with interest thereon for each day elapsed since the date of such Borrowing, at a rate per annum equal to the interest rate applicable at the time to the Revolving Loans composing such Borrowing.

- 5 -

(d)      **Protective Advances and Optional Overadvances.**

(i)      Any contrary provision of this Agreement or any other Loan Document notwithstanding, at any time (A) after the occurrence and during the continuance of a Default or an Event of Default, or (B) that any of the other applicable conditions precedent set forth in <u>Section 3</u> are not satisfied, Agent hereby is authorized by Borrowers and the Lenders, from time to time, in Agent's sole discretion, to make Revolving Loans to, or for the benefit of, Borrowers, on behalf of the Revolving Lenders, that Agent, in its Permitted Discretion, deems necessary or desirable (1) to preserve or protect the Collateral, or any portion thereof, or (2) to enhance the likelihood of repayment of the Obligations (other than the Bank Product Obligations) (the Revolving Loans described in this <u>Section 2.3(d)(i)</u> shall be referred to as "<u>Protective Advances</u>").

(ii)      Any contrary provision of this Agreement or any other Loan Document notwithstanding, the Lenders hereby authorize Agent or Swing Lender, as applicable, and either Agent or Swing Lender, as applicable, may, but is not obligated to, knowingly and intentionally, continue to make Revolving Loans (including Swing Loans) to Borrowers notwithstanding that an Overadvance exists or would be created thereby, so long as after giving effect to such Revolving Loans, the outstanding Revolver Usage (except for and excluding amounts charged to the Loan Account for interest, fees, or Lender Group Expenses) does not exceed the Maximum Revolver Amount.  In the event Agent obtains actual knowledge that the Revolver Usage exceeds the amounts permitted by the immediately foregoing provisions, regardless of the amount of, or reason for, such excess, Agent shall notify the Lenders as soon as practicable (and prior to making any (or any additional) intentional Overadvances (except for and excluding amounts charged to the Loan Account for interest, fees, or Lender Group Expenses) unless Agent determines that prior notice would result in imminent harm to the Collateral or its value, in which case Agent may make such Overadvances and provide notice as promptly as practicable thereafter), and the Lenders with Revolver Commitments thereupon shall, together with Agent, jointly determine the terms of arrangements that shall be implemented with Borrowers intended to reduce, within a reasonable time, the outstanding principal amount of the Revolving Loans to Borrowers to an amount permitted by the preceding sentence.  In such circumstances, if any Lender with a Revolver Commitment objects to the proposed terms of reduction or repayment of any Overadvance, the terms of reduction or repayment thereof shall be implemented according to the determination of the Required Lenders.  The foregoing provisions are meant for the benefit of the Lenders and Agent and are not meant for the benefit of Borrowers, which shall continue to be bound by the provisions of <u>Section 2.4(e)</u>.  Each Lender with a Revolver Commitment shall be obligated to settle with Agent as provided in <u>Section 2.3(e)</u> (or <u>Section 2.3(g)</u>, as applicable) for the amount of such Lender's Pro Rata Share of any unintentional Overadvances by Agent reported to such Lender, any intentional Overadvances made as permitted under this <u>Section 2.3(d)(ii)</u>, and any Overadvances resulting from the charging to the Loan Account of interest, fees, or Lender Group Expenses.

(iii)      Each Protective Advance and each Overadvance (each, an "<u>Extraordinary Advance</u>") shall be deemed to be a Revolving Loan for all purposes hereunder, except that no Extraordinary Advance shall be eligible to be a LIBOR Index Rate Loan, and, prior to Settlement therefor, all payments on the Extraordinary Advances shall be payable to Agent solely for its own account.  The Extraordinary Advances shall be repayable on demand, secured by Agent's Liens, constitute Obligations hereunder, and bear interest at the rate applicable from time to time to Revolving Loans that are Base Rate Loans.  The provisions of this <u>Section 2.3(d)</u> are for the exclusive benefit of Agent, Swing Lender, and the Lenders and are not intended to benefit Borrowers (or any other Loan Party) in any way.

(e)      **Settlement.**  It is agreed that each Lender's funded portion of the Revolving Loans is intended by the Lenders to equal, at all times, such Lender's Pro Rata Share of the outstanding Revolving Loans.  Such agreement notwithstanding, Agent, Swing Lender, and the other Lenders agree (which agreement shall not be for the benefit of Borrowers) that in order to facilitate the administration of this Agreement and the other Loan Documents, settlement among the Lenders as to the Revolving Loans, the Swing Loans, and the Extraordinary Advances shall take place on a periodic basis in accordance with the following provisions:

(i)      Agent shall request settlement ("<u>Settlement</u>") with the Lenders on a weekly basis, or on a more frequent basis if so determined by Agent in its sole discretion (1) on behalf of Swing Lender, with

respect to the outstanding Swing Loans, (2) for itself, with respect to the outstanding Extraordinary Advances, and (3) with respect to Borrowers' payments or other amounts received, as to each by notifying the Lenders by telecopy, telephone, or other similar form of transmission, of such requested Settlement, no later than 2:00 p.m. on the Business Day immediately prior to the date of such requested Settlement (the date of such requested Settlement being the "Settlement Date").  Such notice of a Settlement Date shall include a summary statement of the amount of outstanding Revolving Loans, Swing  Loans, and Extraordinary Advances for the period since the prior Settlement Date.  Subject to the terms and conditions contained herein (including Section 2.3(g)):  (y) if the amount of the Revolving Loans (including Swing Loans, and Extraordinary Advances) made by a Lender that is not a Defaulting Lender exceeds such Lender's Pro Rata Share of the Revolving Loans (including Swing Loans, and Extraordinary Advances) as of a Settlement Date, then Agent shall, by no later than 12:00 p.m. on the Settlement Date, transfer in immediately available funds to a Deposit Account of such Lender (as such Lender may designate), an amount such that each such Lender shall, upon receipt of such amount, have as of the Settlement Date, its Pro Rata Share of the Revolving Loans (including Swing Loans, and Extraordinary Advances), and (z) if the amount of the Revolving Loans (including Swing Loans, and Extraordinary Advances) made by a Lender is less than such Lender's Pro Rata Share of the Revolving Loans (including Swing Loans, and Extraordinary Advances) as of a Settlement Date, such Lender shall no later than 12:00 p.m. on the Settlement Date transfer in immediately available funds to Agent's Account, an amount such that each such Lender shall, upon transfer of such amount, have as of the Settlement Date, its Pro Rata Share of the Revolving Loans (including Swing Loans and Extraordinary Advances).  Such amounts made available to Agent under clause (z) of the immediately preceding sentence shall be applied against the amounts of the applicable Swing Loans or Extraordinary Advances and, together with the portion of such Swing Loans or Extraordinary Advances representing Swing Lender's Pro Rata Share thereof, shall constitute Revolving Loans of such Lenders.  If any such amount is not made available to Agent by any Lender on the Settlement Date applicable thereto to the extent required by the terms hereof, Agent shall be entitled to recover for its account such amount on demand from such Lender together with interest thereon at the Defaulting Lender Rate.

(ii)     In determining whether a Lender's balance of the Revolving Loans, Swing Loans, and Extraordinary Advances is less than, equal to, or greater than such Lender's Pro Rata Share of the Revolving Loans, Swing Loans, and Extraordinary Advances as of a Settlement Date, Agent shall, as part of the relevant Settlement, apply to such balance the portion of payments actually received in good funds by Agent with respect to principal, interest, fees payable by Borrowers and allocable to the Lenders hereunder, and proceeds of Collateral.

(iii)    Between Settlement Dates, Agent, to the extent Extraordinary Advances or Swing Loans are outstanding, may pay over to Agent or Swing Lender, as applicable, any payments or other amounts received by Agent, that in accordance with the terms of this Agreement would be applied to the reduction of the Revolving Loans, for application to the Extraordinary Advances or Swing Loans.  Between Settlement Dates, Agent, to the extent no Extraordinary Advances or Swing Loans are outstanding, may pay over to Swing Lender any payments or other amounts received by Agent, that in accordance with the terms of this Agreement would be applied to the reduction of the Revolving Loans, for application to Swing Lender's Pro Rata Share of the Revolving Loans.  If, as of any Settlement Date, payments or other amounts of Borrowers received since the then immediately preceding Settlement Date have been applied to Swing Lender's Pro Rata Share of the Revolving Loans other than to Swing Loans, as provided for in the previous sentence, Swing Lender shall pay to Agent for the accounts of the Lenders, and Agent shall pay to the Lenders (other than a Defaulting Lender if Agent has implemented the provisions of Section 2.3(g)), to be applied to the outstanding Revolving Loans of such Lenders, an amount such that each such Lender shall, upon receipt of such amount, have, as of such Settlement Date, its Pro Rata Share of the Revolving Loans.  During the period between Settlement Dates, Swing Lender with respect to Swing Loans, Agent with respect to Extraordinary Advances, and each Lender with respect to the Revolving Loans other than Swing Loans and Extraordinary Advances, shall be entitled to interest at the applicable rate or rates payable under this Agreement on the daily amount of funds employed by Swing Lender, Agent, or the Lenders, as applicable.

(iv)     Anything in this Section 2.3(e) to the contrary notwithstanding, in the event that a Lender is a Defaulting Lender, Agent shall be entitled to refrain from remitting settlement amounts to the Defaulting Lender and, instead, shall be entitled to elect to implement the provisions set forth in Section 2.3(g).

- 7 -

(f)    **Notation.**    Agent, as a non-fiduciary agent for Borrowers, shall maintain a register showing the principal amount of the Revolving Loans owing to each Lender, including the Swing Loans owing to Swing Lender, and Extraordinary Advances owing to Agent, and the interests therein of each Lender, from time to time and such register shall, absent manifest error, conclusively be presumed to be correct and accurate.

(g)    **Defaulting Lenders.**

(i)    Notwithstanding the provisions of Section 2.4(b)(iii), Agent shall not be obligated to transfer to a Defaulting Lender any payments made by Borrowers to Agent for the Defaulting Lender's benefit or any proceeds of Collateral that would otherwise be remitted hereunder to the Defaulting Lender, and, in the absence of such transfer to the Defaulting Lender, Agent shall transfer any such payments (A) first, to Swing Lender to the extent of any Swing Loans that were made by Swing Lender and that were required to be, but were not, paid by the Defaulting Lender, (B) second, to Issuing Bank, to the extent of the portion of a Letter of Credit Disbursement that was required to be, but was not, paid by the Defaulting Lender, (C) third, to each Non-Defaulting Lender ratably in accordance with their Commitments (but, in each case, only to the extent that such Defaulting Lender's portion of a Revolving Loan (or other funding obligation) was funded by such other Non-Defaulting Lender), (D) to a suspense account maintained by Agent, the proceeds of which shall be retained by Agent and may be made available to be re-advanced to or for the benefit of Borrowers (upon the request of Borrowers and subject to the conditions set forth in Section 3.2) as if such Defaulting Lender had made its portion of Revolving Loans (or other funding obligations) hereunder, and (E) from and after the date on which all other Obligations have been paid in full, to such Defaulting Lender in accordance with tier (L) of Section 2.4(b)(iii).  Subject to the foregoing, Agent may hold and, in its discretion, re-lend to Borrowers for the account of such Defaulting Lender the amount of all such payments received and retained by Agent for the account of such Defaulting Lender.  Solely for the purposes of voting or consenting to matters with respect to the Loan Documents (including the calculation of Pro Rata Share in connection therewith) and for the purpose of calculating the fee payable under Section 2.10(b), such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Commitment shall be deemed to be zero; provided, that the foregoing shall not apply to any of the matters governed by Section 14.1(a)(i) through (iii).  The provisions of this Section 2.3(g) shall remain effective with respect to such Defaulting Lender until the earlier of (y) the date on which all of the Non-Defaulting Lenders, Agent, Issuing Bank, and Borrowers shall have waived, in writing, the application of this Section 2.3(g) to such Defaulting Lender, or (z) the date on which such Defaulting Lender makes payment of all amounts that it was obligated to fund hereunder, pays to Agent all amounts owing by Defaulting Lender in respect of the amounts that it was obligated to fund hereunder, and, if requested by Agent, provides adequate assurance of its ability to perform its future obligations hereunder (on which earlier date, so long as no Event of Default has occurred and is continuing, any remaining cash collateral held by Agent pursuant to Section 2.3(g)(ii) shall be released to Borrowers).  The operation of this Section 2.3(g) shall not be construed to increase or otherwise affect the Commitment of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by any Borrower of its duties and obligations hereunder to Agent, Issuing Bank, or to the Lenders other than such Defaulting Lender.  Any failure by a Defaulting Lender to fund amounts that it was obligated to fund hereunder shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle Borrowers, at their option, upon written notice to Agent, to arrange for a substitute Lender to assume the Commitment of such Defaulting Lender, such substitute Lender to be reasonably acceptable to Agent.  In connection with the arrangement of such a substitute Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of Assignment and Acceptance in favor of the substitute Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being paid its share of the outstanding Obligations (other than Bank Product Obligations, but including (1) all interest, fees, and other amounts that may be due and payable in respect thereof, and (2) an assumption of its Pro Rata Share of its participation in the Letters of Credit); provided, that any such assumption of the Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the Lender Groups' or Borrowers' rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund.  In the event of a direct conflict between the priority provisions of this Section 2.3(g) and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable

conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.3(g) shall control and govern.

(ii)    If any Swing Loan or Letter of Credit is outstanding at the time that a Lender becomes a Defaulting Lender then:

(A)    such Defaulting Lender's Swing Loan Exposure and Letter of Credit Exposure shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Pro Rata Shares but only to the extent (x) the sum of all Non-Defaulting Lenders' Revolving Loan Exposures plus such Defaulting Lender's Swing Loan Exposure and Letter of Credit Exposure does not exceed the total of all Non-Defaulting Lenders' Revolver Commitments and (y) the conditions set forth in Section 3.2 are satisfied at such time;

(B)    if the reallocation described in clause (A) above cannot, or can only partially, be effected, Borrowers shall within one Business Day following notice by the Agent (x) first, prepay such Defaulting Lender's Swing Loan Exposure (after giving effect to any partial reallocation pursuant to clause (A) above) and (y) second, cash collateralize such Defaulting Lender's Letter of Credit Exposure (after giving effect to any partial reallocation pursuant to clause (A) above), pursuant to a cash collateral agreement to be entered into in form and substance reasonably satisfactory to the Agent, for so long as such Letter of Credit Exposure is outstanding; provided, that Borrowers shall not be obligated to cash collateralize any Defaulting Lender's Letter of Credit Exposure if such Defaulting Lender is also the Issuing Bank;

(C)    if Borrowers cash collateralize any portion of such Defaulting Lender's Letter of Credit Exposure pursuant to this Section 2.3(g)(ii), Borrowers shall not be required to pay any Letter of Credit Fees to Agent for the account of such Defaulting Lender pursuant to Section 2.6(b) with respect to such cash collateralized portion of such Defaulting Lender's Letter of Credit Exposure during the period such Letter of Credit Exposure is cash collateralized;

(D)    to the extent the Letter of Credit Exposure of the Non-Defaulting Lenders is reallocated pursuant to this Section 2.3(g)(ii), then the Letter of Credit Fees payable to the Non-Defaulting Lenders pursuant to Section 2.6(b) shall be adjusted in accordance with such Non-Defaulting Lenders' Letter of Credit Exposure;

(E)    to the extent any Defaulting Lender's Letter of Credit Exposure is neither cash collateralized nor reallocated pursuant to this Section 2.3(g)(ii), then, without prejudice to any rights or remedies of the Issuing Bank or any Lender hereunder, all Letter of Credit Fees that would have otherwise been payable to such Defaulting Lender under Section 2.6(b) with respect to such portion of such Letter of Credit Exposure shall instead be payable to the Issuing Bank until such portion of such Defaulting Lender's Letter of Credit Exposure is cash collateralized or reallocated;

(F)    so long as any Lender is a Defaulting Lender, the Swing Lender shall not be required to make any Swing Loan and the Issuing Bank shall not be required to issue, amend, or increase any Letter of Credit, in each case, to the extent (x) the Defaulting Lender's Pro Rata Share of such Swing Loans or Letter of Credit cannot be reallocated pursuant to this Section 2.3(g)(ii) or (y) the Swing Lender or Issuing Bank, as applicable, has not otherwise entered into arrangements reasonably satisfactory to the Swing Lender or Issuing Bank, as applicable, and Borrowers to eliminate the Swing Lender's or Issuing Bank's risk with respect to the Defaulting Lender's participation in Swing Loans or Letters of Credit; and

(G)    Agent may release any cash collateral provided by Borrowers pursuant to this Section 2.3(g)(ii) to the Issuing Bank and the Issuing Bank may apply any such cash collateral to the payment of such Defaulting Lender's Pro Rata Share of any Letter of Credit Disbursement that is not reimbursed by Borrowers pursuant to Section 2.11(d).

(h)    **Independent Obligations.**    All Revolving Loans (other than Swing Loans and Extraordinary Advances) shall be made by the Lenders contemporaneously and in accordance with their Pro Rata

Shares.  It is understood that (i) no Lender shall be responsible for any failure by any other Lender to perform its obligation to make any Revolving Loan (or other extension of credit) hereunder, nor shall any Commitment of any Lender be increased or decreased as a result of any failure by any other Lender to perform its obligations hereunder, and (ii) no failure by any Lender to perform its obligations hereunder shall excuse any other Lender from its obligations hereunder.

2.4    **Payments; Reductions of Commitments; Prepayments.**

    (a)    **Payments by Borrowers.**

        (i)    Except as otherwise expressly provided herein, all payments by Borrowers shall be made to Agent's Account for the account of the Lender Group without further order of the Bankruptcy Court (except for the Interim Order and the Final Order, as applicable) and shall be made in immediately available funds, no later than 1:30 p.m. on the date specified herein.  Any payment received by Agent later than 1:30 p.m. shall be deemed to have been received (unless Agent, in its sole discretion, elects to credit it on the date received) on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

        (ii)    Unless Agent receives notice from Borrowers prior to the date on which any payment is due to the Lenders that Borrowers will not make such payment in full as and when required, Agent may assume that Borrowers have made (or will make) such payment in full to Agent on such date in immediately available funds and Agent may (but shall not be so required), in reliance upon such assumption, distribute to each Lender on such due date an amount equal to the amount then due such Lender.  If and to the extent Borrowers do not make such payment in full to Agent on the date when due, each Lender severally shall repay to Agent on demand such amount distributed to such Lender, together with interest thereon at the Defaulting Lender Rate for each day from the date such amount is distributed to such Lender until the date repaid.

    (b)    **Apportionment and Application.**

        (i)    So long as no Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, all principal and interest payments received by Agent shall be apportioned ratably among the Lenders (according to the unpaid principal balance of the Obligations to which such payments relate held by each Lender) and all payments of fees and expenses received by Agent (other than fees or expenses that are for Agent's separate account or for the separate account of Issuing Bank) shall be apportioned ratably among the Lenders having a Pro Rata Share of the type of Commitment or Obligation to which a particular fee or expense relates.

        (ii)    Subject to <u>Section 2.4(b)(v)</u>, <u>Section 2.4(d)</u>, and <u>Section 2.4(e)</u>, and so long all Revolving Loans and other Obligations under (and in each case as defined in) the Prepetition Credit Agreement (other than the Prepetition Term Loan and Obligations (as defined in the Prepetition Credit Agreement) related thereto) are repaid in full on the Closing Date from the initial advance of the Loans hereunder, then

            (A)    all payments to be made hereunder by Borrowers shall be remitted to Agent and all such payments, and all proceeds of Collateral (other than Term Loan Priority Collateral) received by Agent, shall be applied, so long as no Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, (1) <u>first</u>, to pay in full the outstanding balance of all Revolving Loans and other Obligations under (and in each case as defined in) the Prepetition Credit Agreement (other than the Prepetition Term Loan and Obligations (as defined in the Prepetition Credit Agreement) related thereto) and to repay in full and to reduce the balance of the Revolving Loans outstanding, (2) <u>second</u>, to cash collateralize the Letters of Credit in an amount equal to 103% of the then outstanding Letter of Credit Usage, (3) <u>third</u>, to cash collateralize the Bank Product Obligations in accordance with the terms and conditions hereof, (4) <u>fourth</u>, to reduce the balance of the Term Loan outstanding, and (5) thereafter, to Borrowers (to be wired to the Designated Account) or such other Person entitled thereto under applicable law; and

(B)      all proceeds of Term Loan Priority Collateral received by Agent, shall be applied, so long as no Application Event has occurred and is continuing, (1) first, to reduce the balance of the Term Loan outstanding, (2) second, to pay in full the outstanding balance of all Revolving Loans and other Obligations under (and in each case as defined in) the Prepetition Credit Agreement (other than the Prepetition Term Loan and Obligations (as defined in the Prepetition Credit Agreement) related thereto) and to repay in full and to reduce the balance of the Revolving Loans outstanding, (3) third, to cash collateralize the Letters of Credit in an amount equal to 103% of the then outstanding Letter of Credit Usage, (4) fourth, to cash collateralize the Bank Product Obligations in accordance with the terms and conditions hereof, and (5) thereafter, to Borrowers (to be wired to the Designated Account) or such other Person entitled thereto under applicable law.

(iii)      At any time that an Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders (subject only to the giving of notice pursuant to the Interim Order or the Final Order, as applicable), the Borrowers hereby irrevocably waive the right to direct the application of any and all payments in respect of the Obligations and agree that

(A)      all payments remitted to Agent and all proceeds of Collateral (other than Term Loan Priority Collateral), received by Agent shall be applied as follows:

a.      first, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to Agent under the Loan Documents, until paid in full,

b.      second, to pay any fees or premiums then due to Agent under the Loan Documents until paid in full,

c.      third, to pay interest due in respect of all Protective Advances until paid in full,

d.      fourth, to pay the principal of all Protective Advances until paid in full,

e.      fifth, ratably, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to any of the Revolving Lenders under the Loan Documents, until paid in full,

f.      sixth, ratably, to pay any fees or premiums then due to any of the Revolving Lenders under the Loan Documents until paid in full,

g.      seventh, to pay interest accrued in respect of the Swing Loans until paid in full,

h.      eighth, to pay the principal of all Swing Loans until paid in full,

i.      ninth, ratably, to pay interest accrued in respect of the Revolving Loans (other than Protective Advances) until paid in full,

j.      tenth, ratably

(a)      to pay the principal of all Revolving Loans until paid in full,

(b)      to Agent, to be held by Agent, for the benefit of Issuing Bank (and for the ratable benefit of each of the Lenders that have an obligation to pay to Agent, for the account of Issuing Bank, a share of each Letter of Credit Disbursement), as cash collateral in an amount up to 103% of the Letter of Credit Usage (to the extent permitted by applicable law, such cash collateral shall be applied to the reimbursement of any Letter of Credit Disbursement as and when such disbursement occurs and, if a Letter of Credit expires undrawn, the cash collateral

held by Agent in respect of such Letter of Credit shall, to the extent permitted by applicable law, be reapplied pursuant to this <u>Section 2.4(b)(iii)</u>, beginning with tier (A) hereof),

(c) ratably, to (y) the Bank Product Providers based upon amounts then certified by the applicable Bank Product Provider to Agent (in form and substance satisfactory to Agent) to be due and payable to such Bank Product Providers on account of Bank Product Obligations, and (z) with any balance to be paid to Agent, to be held by Agent, for the ratable benefit of the Bank Product Providers, as cash collateral (which cash collateral may be released by Agent to the applicable Bank Product Provider and applied by such Bank Product Provider to the payment or reimbursement of any amounts due and payable with respect to Bank Product Obligations owed to the applicable Bank Product Provider as and when such amounts first become due and payable and, if and at such time as all such Bank Product Obligations are paid or otherwise satisfied in full, the cash collateral held by Agent in respect of such Bank Product Obligations shall be reapplied pursuant to this <u>Section 2.4(b)(iii)</u>, beginning with tier (A) hereof,

k. <u>eleventh</u>, to pay any other Obligations with respect to the Revolving Loans, other than Obligations owed to Defaulting Lenders,

l. <u>twelfth</u>, ratably, to pay any Obligations with respect to the Revolving Loans owed to Defaulting Lenders,

m. <u>thirteenth</u>, to the Agent (on behalf of the Term Loan Lenders), to be applied to the Obligations with respect to the Term Loan, and

n. <u>fourteenth</u>, to Borrowers (to be wired to the Designated Account) or such other Person entitled thereto under applicable law.

(B) all proceeds of the Term Loan Priority Collateral received by Agent shall be applied as follows:

a. <u>first</u>, to pay any Lender Group Expenses (including cost or expense reimbursements) then due to Agent under the Loan Documents, until paid in full,

b. <u>second</u>, to pay any fees or premiums then due to Agent under the Loan Documents until paid in full,

c. <u>third</u>, to the Agent (on behalf of the Term Loan Lenders with Term Loan Commitments), to pay interest accrued in respect of the Term Loan and to pay principal of the Term Loan, until paid in full,

d. <u>fourth</u>, to pay interest due in respect of all Protective Advances until paid in full,

e. <u>fifth</u>, to pay the principal of all Protective Advances until paid in full,

f. <u>sixth</u>, ratably, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to any of the Revolving Lenders under the Loan Documents, until paid in full,

g. <u>seventh</u>, ratably, to pay any fees or premiums then due to any of the Revolving Lenders under the Loan Documents until paid in full,

h. <u>eighth</u>, to pay interest accrued in respect of the Swing Loans until paid in full,

- 12 -

i.      <u>ninth</u>, to pay the principal of all Swing Loans until paid in full,

j.      <u>tenth</u>, ratably, to pay interest accrued in respect of the Revolving Loans (other than Protective Advances) until paid in full,

k.      <u>eleventh</u>, ratably

(a)      to pay the principal of all Revolving Loans until paid in full,

(b)      to Agent, to be held by Agent, for the benefit of Issuing Bank (and for the ratable benefit of each of the Lenders that have an obligation to pay to Agent, for the account of Issuing Bank, a share of each Letter of Credit Disbursement), as cash collateral in an amount up to 103% of the Letter of Credit Usage (to the extent permitted by applicable law, such cash collateral shall be applied to the reimbursement of any Letter of Credit Disbursement as and when such disbursement occurs and, if a Letter of Credit expires undrawn, the cash collateral held by Agent in respect of such Letter of Credit shall, to the extent permitted by applicable law, be reapplied pursuant to this <u>Section 2.4(b)(iii)</u>, beginning with tier (A) hereof),

(c)      ratably, to (y) the Bank Product Providers based upon amounts then certified by the applicable Bank Product Provider to Agent (in form and substance satisfactory to Agent) to be due and payable to such Bank Product Providers on account of Bank Product Obligations, and (z) with any balance to be paid to Agent, to be held by Agent, for the ratable benefit of the Bank Product Providers, as cash collateral (which cash collateral may be released by Agent to the applicable Bank Product Provider and applied by such Bank Product Provider to the payment or reimbursement of any amounts due and payable with respect to Bank Product Obligations owed to the applicable Bank Product Provider as and when such amounts first become due and payable and, if and at such time as all such Bank Product Obligations are paid or otherwise satisfied in full, the cash collateral held by Agent in respect of such Bank Product Obligations shall be reapplied pursuant to this <u>Section 2.4(b)(iii)</u>, beginning with tier (A) hereof,

l.      <u>twelfth</u>, to pay any other Obligations with respect to the Revolving Loans, other than Obligations owed to Defaulting Lenders,

m.      <u>thirteenth</u>, ratably, to pay any Obligations with respect to the Revolving Loans owed to Defaulting Lenders,

n.      <u>fourteenth</u>, to the Agent (on behalf of the Term Loan Lenders), to be applied to the Obligations with respect to the Term Loan, and

o.      <u>fifteenth</u>, to Borrowers (to be wired to the Designated Account) or such other Person entitled thereto under applicable law.

(iv)      Agent promptly shall distribute to each Lender, pursuant to the applicable wire instructions received from each Lender in writing, such funds as it may be entitled to receive, subject to a Settlement delay as provided in <u>Section 2.3(e)</u>.

(v)      In each instance, so long as no Application Event has occurred and is continuing, <u>Section 2.4(b)(ii)</u> shall not apply to any payment made by Borrowers to Agent and specified by Borrowers to be for the payment of specific Obligations then due and payable (or prepayable) under any provision of this Agreement or any other Loan Document.

(vi)      For purposes of <u>Section 2.4(b)(iii)</u>, "paid in full" of a type of Obligation means payment in cash or immediately available funds of all amounts owing on account of such type of Obligation, including interest accrued after the commencement of the Chapter 11 Cases, default interest, interest on interest, and expense reimbursements, irrespective of whether any of the foregoing would be or is allowed or disallowed in whole or in part in the Chapter 11 Cases.

(vii)        In the event of a direct conflict between the priority provisions of this <u>Section 2.4</u> and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, if the conflict relates to the provisions of <u>Section 2.3(g)</u> and this <u>Section 2.4</u>, then the provisions of <u>Section 2.3(g)</u> shall control and govern, and if otherwise, then the terms and provisions of this <u>Section 2.4</u> shall control and govern.

(c)        **Termination of Commitments.**  If not earlier terminated pursuant to the terms of this Agreement, the Revolver Commitments shall terminate on the Maturity Date.

(d)        **Optional Prepayments**.  Borrowers may prepay the principal of any Revolving Loan or Term Loan (solely, in the case of a Term Loan, with proceeds of Term Loan Priority Collateral) at any time in whole or in part.

(e)        **Mandatory Prepayments.**  If, at any time, (A) the Revolver Usage on such date exceeds (B) the Borrowing Base reflected in the Borrowing Base Certificate most recently delivered by Borrowers to Agent, then Borrowers shall immediately prepay the Obligations in accordance with <u>Section 2.4(f)</u> in an aggregate amount equal to the amount of such excess without a corresponding permanent reduction in the Commitments; provided, that, subject to availability under the Term Loan Commitment, Borrowers may satisfy such prepayment obligation by requesting a Term Loan in the amount of such excess, which shall then be applied by Agent directly to such prepayment obligation.

(f)        **Application of Payments.**  Each prepayment pursuant to <u>Section 2.4(e)</u> shall, (A) so long as no Application Event shall have occurred and be continuing, be applied, *first*, to the outstanding principal amount of the Revolving Loans until paid in full (without any corresponding permanent reduction in the Maximum Revolver Amount), and *second*, to cash collateralize the Letters of Credit in an amount equal to 103% of the then outstanding Letter of Credit Usage, and (B) if an Application Event shall have occurred and be continuing, be applied in the manner set forth in <u>Section 2.4(b)(iii)</u>.

(g)        **Revolving Loan Payment Priority**.  Notwithstanding any provision in this Agreement or any other Loan Document to the contrary, each Borrower, the Agent, each Lender and each other member of the Lender Group acknowledges and agrees as follows:

(i)        The rights of the Revolving Lenders in the Collateral (other than the Term Loan Priority Collateral) shall be senior to the rights of the Term Loan Lenders therein.

(ii)        Each Term Loan Lender hereby agrees that it shall not, directly or indirectly, challenge, contest or seek to avoid the rights possessed of or purported to be possessed of any Revolving Lender (or of the Agent for the benefit of any Revolving Lender) under this Agreement or any other Loan Document, including, without limitation, the Liens of the Agent for the benefit of the Revolving Lenders in the Collateral.

(iii)        Each Term Loan Lender hereby agrees that, as long as any Revolving Loans or the Revolver Commitments remains outstanding, it shall not pursue (or direct the Agent to pursue) any action, cause of action, right or claim under this Agreement or any other Loan Document (including, without limitation, any action, cause of action right or claim against the Collateral), except pursuant to the terms and conditions of <u>Section 15.12(c)</u> and the last sentence of <u>Section 2.6(d)</u>.

(iv)        In any Insolvency Proceeding, each Term Loan Lender hereby (1) agrees not to challenge the validity or amount of any claim or valuations with respect to the Collateral or the Revolving Loans submitted by any other Person party hereto, (2) agrees to vote in favor of any plan of reorganization supported by Agent, (3) agrees to vote against any plan of reorganization to which Agent objects, (4) agrees that Agent may provide (or consent or decline to object to the provision of) debtor-in-possession financing, consent to (or decline to object to) the use of cash collateral and/or consent to (or decline to object to) the sale of all, substantially all or any portion of the Collateral (including, without limitation, the terms and

conditions for the offering for sale and/or marketing thereof), in each event, on terms and conditions acceptable to the Agent in its sole and absolute discretion, and (5) agrees that it shall not seek any form of adequate protection as to its interest in the Collateral (if any) without the prior consent of Agent (which consent Agent may provide or decline to provide in its sole and absolute discretion).

(v)    No payments of principal, interest or fees shall be made with respect to the Term Loan (including at the maturity thereof), and no payments or proceeds of Collateral shall be applied to any Obligations with respect to the Term Loan or amounts owing to the Term Loan Lenders hereunder, until after the Repayment in Full of the Revolving Loans; provided, however, that prior to the Repayment in Full of the Revolving Loans each Term Loan Lender with a Term Loan Commitment shall be entitled to receive proceeds of the Term Loan Priority Collateral in accordance with the terms and conditions of Section 2.4(b)(iii)(B); provided further, however, that the Term Loan Lenders shall not have the right to consent to or effect any sale or other disposition of the Term Loan Priority Collateral, and the only rights of each Term Loan Lender with respect to the Term Loan Priority Collateral are the right to receive proceeds of the Term Loan Priority Collateral in accordance with the terms and conditions of Section 2.4(b)(iii)(B).

2.5    **Promise to Pay; Promissory Notes.**

(a)    Borrowers agree to pay the Lender Group Expenses on the earlier of (i) the first day of the month following the date on which the applicable Lender Group Expenses were first incurred or (ii) the date on which demand therefor is made by Agent (it being acknowledged and agreed that any charging of such costs, expenses or Lender Group Expenses to the Loan Account pursuant to the provisions of Section 2.6(d) shall be deemed to constitute a demand for payment thereof for the purposes of this subclause (ii)). Borrowers promise to pay all of the Obligations (including principal, interest, premiums, if any, fees, costs, and expenses (including Lender Group Expenses)) in full on the Maturity Date or, if earlier, on the date on which the Obligations (other than the Bank Product Obligations) become due and payable pursuant to the terms of this Agreement. Borrowers agree that their obligations contained in the first sentence of this Section 2.5(a) shall survive payment or satisfaction in full of all other Obligations.

(b)    Any Lender may request that any portion of its Commitments or the Loans made by it be evidenced by one or more promissory notes. In such event, Borrowers shall execute and deliver to such Lender the requested promissory notes payable to the order of such Lender in a form furnished by Agent and reasonably satisfactory to Borrowers. Thereafter, the portion of the Commitments and Loans evidenced by such promissory notes and interest thereon shall at all times be represented by one or more promissory notes in such form payable to the order of the payee named therein.

2.6    **Interest Rates and Letter of Credit Fee:  Rates, Payments, and Calculations.**

(a)    **Interest Rates.**

(i)    Revolving Loans. Except as provided in Section 2.6(c), the outstanding principal amount of the Revolving Loans and all other Obligations (except for (1) undrawn Letters of Credit and (2) the outstanding principal amount of the Term Loan) that have been charged to the Loan Account pursuant to the terms hereof shall bear interest as follows at a per annum rate equal to the Base Rate plus the Revolving Loan Base Rate Margin.

(ii)    Term Loan. Except as provided in Section 2.6(c), the outstanding principal amount of the Term Loan shall bear interest at the per annum rate equal to the Base Rate plus the Term Loan Base Rate Margin.

(b)    **Letter of Credit Fee.** Borrowers shall pay Agent (for the ratable benefit of the Revolving Lenders), a Letter of Credit fee (the "Letter of Credit Fee") (which fee shall be in addition to the fronting fees and commissions, other fees, charges and expenses set forth in Section 2.11(k)) that shall accrue at a *per annum* rate equal to the Revolving Loan Base Rate Margin times the undrawn amount of all outstanding Letters of Credit.

(c)     **Default Rate.**  Upon the occurrence and during the continuation of an Event of Default and at the election of Agent or the Required Lenders,

(i)     all Obligations (except for undrawn Letters of Credit) that have been charged to the Loan Account pursuant to the terms hereof shall bear interest at a *per annum* rate equal to 2 percentage points above the *per annum* rate otherwise applicable thereto, and

(ii)     the Letter of Credit Fee shall be increased to 2 percentage points above the *per annum* rate otherwise applicable hereunder.

(d)     **Payment.**  Except to the extent provided to the contrary in <u>Section 2.10</u> or <u>Section 2.11(k)</u>, (i) all interest, all Letter of Credit Fees and all other fees payable hereunder or under any of the other Loan Documents shall be due and payable, in arrears, on the first day of each month and (ii) all costs and expenses payable hereunder or under any of the other Loan Documents, and all Lender Group Expenses shall be due and payable on the earlier of (x) the first day of the month following the date on which the applicable costs, expenses, or Lender Group Expenses were first incurred or (y) the date on which demand therefor is made by Agent (it being acknowledged and agreed that any charging of such costs, expenses or Lender Group Expenses to the Loan Account pursuant to the provisions of the following sentence shall be deemed to constitute a demand for payment thereof for the purposes of this subclause (y)).  Borrowers hereby authorize Agent, from time to time without prior notice to Borrowers, to charge to the Loan Account (A) on the first day of each month, all interest accrued during the prior month on the Revolving Loans hereunder, (B) on the first day of each month, all Letter of Credit Fees accrued or chargeable hereunder during the prior month, (C) as and when incurred or accrued, all fees and costs provided for in <u>Section 2.10 (a)</u> or <u>(c)</u>, (D) on the first day of each month, the Unused Line Fee accrued during the prior month pursuant to <u>Section 2.10(b)</u>, (E) as and when due and payable, all other fees payable hereunder or under any of the other Loan Documents, (F) as and when incurred or accrued, the fronting fees and all commissions, other fees, charges and expenses provided for in <u>Section 2.11(k)</u>, (G) as and when incurred or accrued, all other Lender Group Expenses, and (H) as and when due and payable all other payment obligations payable under any Loan Document or any Bank Product Agreement (including any amounts due and payable to the Bank Product Providers in respect of Bank Products).  All amounts (including interest, fees, costs, expenses, Lender Group Expenses, or other amounts payable hereunder or under any other Loan Document or under any Bank Product Agreement) charged to the Loan Account shall thereupon constitute Revolving Loans hereunder, shall constitute Obligations hereunder, and shall accrue interest at the rate then applicable to Revolving Loans.

(e)     **Computation.**  All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360 day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue.  In the event the Base Rate is changed from time to time hereafter, the rates of interest hereunder based upon the Base Rate automatically and immediately shall be increased or decreased by an amount equal to such change in the Base Rate.  The LIBOR Index Rate shall be determined on the Closing Date and on the first day of each month thereafter for such month (each a "date of determination").  In the event the LIBOR Index Rate changes on any date of determination hereafter, the rates of interest hereunder based upon the LIBOR Index Rate automatically and immediately shall be increased or decreased on such date of determination by an amount equal to such change in the LIBOR Index Rate.

(f)     **Intent to Limit Charges to Maximum Lawful Rate.**  In no event shall the interest rate or rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable.  Borrowers and the Lender Group, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; <u>provided</u>, that, anything contained herein to the contrary notwithstanding, if such rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, *ipso facto*, as of the date of this Agreement, Borrowers are and shall be liable only for the payment of such maximum amount as is allowed by law, and payment received from Borrowers in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

- 16 -

2.7    **Crediting Payments.**  The receipt of any payment item by Agent shall not be required to be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds made to Agent's Account or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then Borrowers shall be deemed not to have made such payment and interest shall be calculated accordingly.  Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Agent only if it is received into Agent's Account on a Business Day on or before 1:30 p.m.  If any payment item is received into Agent's Account on a non-Business Day or after 1:30 p.m. on a Business Day (unless Agent, in its sole discretion, elects to credit it on the date received), it shall be deemed to have been received by Agent as of the opening of business on the immediately following Business Day.

2.8    **Designated Account.**  Agent is authorized to make the Revolving Loans, and Issuing Bank is authorized to issue the Letters of Credit, under this Agreement based upon telephonic or other instructions received from anyone purporting to be an Authorized Person or, without instructions, if pursuant to Section 2.6(d). Borrowers agree to establish and maintain the Designated Account with the Designated Account Bank for the purpose of receiving the proceeds of the Revolving Loans requested by Borrowers and made by Agent or the Lenders hereunder.   Unless otherwise agreed by Agent and Borrowers, any Revolving Loan or Swing Loan requested by Borrowers and made by Agent or the Lenders hereunder shall be made to the Designated Account.

2.9    **Maintenance of Loan Account; Statements of Obligations.**  Agent shall maintain an account on its books in the name of Borrowers (the "Loan Account") on which Borrowers will be charged all Revolving Loans (including Extraordinary Advances and Swing Loans) made by Agent, Swing Lender, or the Lenders to Borrowers or for Borrowers' account, the Letters of Credit issued or arranged by Issuing Bank for Borrowers' account, and with all other payment Obligations hereunder or under the other Loan Documents, including, accrued interest, fees and expenses, and Lender Group Expenses.  In accordance with Section 2.7, the Loan Account will be credited with all payments received by Agent from Borrowers or for Borrowers' account.  Agent shall make available to Borrowers monthly statements regarding the Loan Account, including the principal amount of the Revolving Loans, interest accrued hereunder, fees accrued or charged hereunder or under the other Loan Documents, and a summary itemization of all charges and expenses constituting Lender Group Expenses accrued hereunder or under the other Loan Documents, and each such statement, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrowers and the Lender Group unless, within 30 days after Agent first makes such a statement available to Borrowers, Borrowers shall deliver to Agent written objection thereto describing the error or errors contained in such statement.

2.10    **Fees.**

(a)    **Agent Fees.**  Borrowers shall pay to Agent, for the account of Agent, as and when due and payable under the terms of the Fee Letter, the fees set forth in the Fee Letter.

(b)    **Unused Line Fee.**  Borrowers shall pay to Agent, for the ratable account of the Revolving Lenders, an unused line fee (the "Unused Line Fee") in an amount equal to 0.50% *per annum* times the result of (i) the aggregate amount of the Revolver Commitments, less (ii) the average amount of the Revolver Usage during the immediately preceding month (or portion thereof), which Unused Line Fee shall be due and payable on the first day of each month from and after the Closing Date up to the first day of the month prior to the date on which the Obligations are paid in full and on the date on which the Obligations are paid in full.

(c)    **Field Examination and Other Fees.**  Borrowers shall pay to Agent field examination fees and charges, as and when incurred or chargeable, as follows (i) a fee of $1,000 per day, per examiner, plus reasonable and documented out-of-pocket expenses (including travel, meals, and lodging) for each field examination of any Borrower performed by personnel employed by Agent, and (ii) the fees or charges paid or incurred by Agent (but, in any event, no less than a charge of $1,000 per day, per Person, plus reasonable and documented out-of-pocket expenses (including travel, meals, and lodging)) if it elects to employ the services of one or more third Persons to perform field examinations of any Loan Party to establish electronic reporting systems, or to assess any Loan Party's business valuation.

2.11     **Letters of Credit.**

(a)      Subject to the terms and conditions of this Agreement, upon the request of Borrowers made in accordance herewith, and prior to the Maturity Date, Issuing Bank agrees to issue a requested Letter of Credit for the account of Borrowers.  By submitting a request to Issuing Bank for the issuance of a Letter of Credit, Borrowers shall be deemed to have requested that Issuing Bank issue the requested Letter of Credit without further order of the Bankruptcy Court.  Each request for the issuance of a Letter of Credit, or the amendment, renewal, or extension of any outstanding Letter of Credit, shall be (i) irrevocable, and made in writing by an Authorized Person, (ii) delivered to Agent and Issuing Bank via telefacsimile or other electronic method of transmission reasonably acceptable to Agent and Issuing Bank and reasonably in advance of the requested date of issuance, amendment, renewal, or extension and (iii) subject to Issuing Bank's authentication procedures with results satisfactory to Issuing Bank.  Each such request shall be in form and substance reasonably satisfactory to Agent and Issuing Bank and (i) shall specify (A) the amount of such Letter of Credit, (B) the date of issuance, amendment, renewal, or extension of such Letter of Credit, (C) the proposed expiration date of such Letter of Credit, (D) the name and address of the beneficiary of the Letter of Credit, and (E) such other information (including, the conditions to drawing, and, in the case of an amendment, renewal, or extension, identification of the Letter of Credit to be so amended, renewed, or extended) as shall be necessary to prepare, amend, renew, or extend such Letter of Credit, and (ii) shall be accompanied by such Issuer Documents as Agent or Issuing Bank may request or require, to the extent that such requests or requirements are consistent with the Issuer Documents that Issuing Bank generally requests for Letters of Credit in similar circumstances.  Issuing Bank's records of the content of any such request will be conclusive absent manifest error.  Anything contained herein to the contrary notwithstanding, Issuing Bank may, but shall not be obligated to, issue a Letter of Credit that supports the obligations of Parent or any of its Subsidiaries in respect of (x) a lease of real property or (y) an employment contract.

(b)      Issuing Bank shall have no obligation to issue a Letter of Credit if any of the following would result after giving effect to the requested issuance:

(i)      the Letter of Credit Usage would exceed $250,000, or

(ii)      the Letter of Credit Usage would exceed the Maximum Revolver Amount *less* the outstanding amount of Revolving Loans (including Swing Loans), or

(iii)      the Letter of Credit Usage would exceed the Borrowing Base at such time *less* the outstanding principal balance of the Revolving Loans (inclusive of Swing Loans) at such time.

(c)      In the event there is a Defaulting Lender as of the date of any request for the issuance of a Letter of Credit, the Issuing Bank shall not be required to issue or arrange for such Letter of Credit to the extent (i) the Defaulting Lender's Letter of Credit Exposure with respect to such Letter of Credit may not be reallocated pursuant to Section 2.3(g)(ii), or (ii) the Issuing Bank has not otherwise entered into arrangements reasonably satisfactory to it and Borrowers to eliminate the Issuing Bank's risk with respect to the participation in such Letter of Credit of the Defaulting Lender, which arrangements may include Borrowers cash collateralizing such Defaulting Lender's Letter of Credit Exposure in accordance with Section 2.3(g)(ii).  Additionally, Issuing Bank shall have no obligation to issue a Letter of Credit if (A) any order, judgment, or decree of any Governmental Authority or arbitrator shall, by its terms, purport to enjoin or restrain Issuing Bank from issuing such Letter of Credit, or any law applicable to Issuing Bank or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over Issuing Bank shall prohibit or request that Issuing Bank refrain from the issuance of letters of credit generally or such Letter of Credit in particular, (B) the issuance of such Letter of Credit would violate one or more policies of Issuing Bank applicable to letters of credit generally, or (C) if amounts demanded to be paid under any Letter of Credit will or may not be in United States Dollars.

(d)      Any Issuing Bank (other than Wells Fargo or any of its Affiliates) shall notify Agent in writing no later than the Business Day immediately following the Business Day on which such Issuing Bank issued any Letter of Credit; provided that (i) until Agent advises any such Issuing Bank that the provisions of

Section 3.2 are not satisfied, or (ii) unless the aggregate amount of the Letters of Credit issued in any such week exceeds such amount as shall be agreed by Agent and such Issuing Bank, such Issuing Bank shall be required to so notify Agent in writing only once each week of the Letters of Credit issued by such Issuing Bank during the immediately preceding week as well as the daily amounts outstanding for the prior week, such notice to be furnished on such day of the week as Agent and such Issuing Bank may agree.  Each Letter of Credit shall be in form and substance reasonably acceptable to Issuing Bank, including the requirement that the amounts payable thereunder must be payable in Dollars.  If Issuing Bank makes a payment under a Letter of Credit, Borrowers shall pay to Agent an amount equal to the applicable Letter of Credit Disbursement on the Business Day such Letter of Credit Disbursement is made and, in the absence of such payment, the amount of the Letter of Credit Disbursement immediately and automatically shall be deemed to be a Revolving Loan hereunder (notwithstanding any failure to satisfy any condition precedent set forth in Section 3) and shall bear interest at the rate then applicable to Revolving Loans.   If a Letter of Credit Disbursement is deemed to be a Revolving Loan hereunder, Borrowers' obligation to pay the amount of such Letter of Credit Disbursement to Issuing Bank shall be automatically converted into an obligation to pay the resulting Revolving Loan.  Promptly following receipt by Agent of any payment from Borrowers pursuant to this paragraph, Agent shall distribute such payment to Issuing Bank or, to the extent that Revolving Lenders have made payments pursuant to Section 2.11(e) to reimburse Issuing Bank, then to such Revolving Lenders and Issuing Bank as their interests may appear.

(e)     Promptly following receipt of a notice of a Letter of Credit Disbursement pursuant to Section 2.11(d), each Revolving Lender agrees to fund its Pro Rata Share of any Revolving Loan deemed made pursuant to Section 2.11(d) on the same terms and conditions as if Borrowers had requested the amount thereof as a Revolving Loan and Agent shall promptly pay to Issuing Bank the amounts so received by it from the Revolving Lenders.  By the issuance of a Letter of Credit (or an amendment, renewal, or extension of a Letter of Credit) and without any further action on the part of Issuing Bank or the Revolving Lenders, Issuing Bank shall be deemed to have granted to each Revolving Lender, and each Revolving Lender shall be deemed to have purchased, a participation in each Letter of Credit issued by Issuing Bank, in an amount equal to its Pro Rata Share of such Letter of Credit, and each such Revolving Lender agrees to pay to Agent, for the account of Issuing Bank, such Revolving Lender's Pro Rata Share of any Letter of Credit Disbursement made by Issuing Bank under the applicable Letter of Credit.  In consideration and in furtherance of the foregoing, each Revolving Lender hereby absolutely and unconditionally agrees to pay to Agent, for the account of Issuing Bank, such Revolving Lender's Pro Rata Share of each Letter of Credit Disbursement made by Issuing Bank and not reimbursed by Borrowers on the date due as provided in Section 2.11(d), or of any reimbursement payment that is required to be refunded (or that Agent or Issuing Bank elects, based upon the advice of counsel, to refund) to Borrowers for any reason.  Each Revolving Lender acknowledges and agrees that its obligation to deliver to Agent, for the account of Issuing Bank, an amount equal to its respective Pro Rata Share of each Letter of Credit Disbursement pursuant to this Section 2.11(e) shall be absolute and unconditional and such remittance shall be made notwithstanding the occurrence or continuation of an Event of Default or Default or the failure to satisfy any condition set forth in Section 3.  If any such Revolving Lender fails to make available to Agent the amount of such Revolving Lender's Pro Rata Share of a Letter of Credit Disbursement as provided in this Section, such Revolving Lender shall be deemed to be a Defaulting Lender and Agent (for the account of Issuing Bank) shall be entitled to recover such amount on demand from such Revolving Lender together with interest thereon at the Defaulting Lender Rate until paid in full.

(f)     Each Borrower agrees to indemnify, defend and hold harmless each member of the Lender Group (including Issuing Bank and its branches, Affiliates, and correspondents) and each such Person's respective directors, officers, employees, attorneys and agents (each, including Issuing Bank, a "Letter of Credit Related Person") (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), which may be incurred by or awarded against any Letter of Credit Related Person (other than Taxes, which shall be governed by Section 16) (the "Letter of Credit Indemnified Costs"), and which arise out of or in connection with, or as a result of this Agreement, any Letter of Credit, any Issuer Document, or any Drawing Document referred to in or related to any Letter of Credit, or any

- 19 -

action or proceeding arising out of any of the foregoing (whether administrative, judicial or in connection with arbitration); in each case, including that resulting from the Letter of Credit Related Person's own negligence; provided, however, that such indemnity shall not be available to any Letter of Credit Related Person claiming indemnification to the extent that such Letter of Credit Indemnified Costs may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from the gross negligence or willful misconduct of the Letter of Credit Related Person claiming indemnity. This indemnification provision shall survive termination of this Agreement and all Letters of Credit.

(g)     The liability of Issuing Bank (or any other Letter of Credit Related Person) under, in connection with or arising out of any Letter of Credit (or pre-advice), regardless of the form or legal grounds of the action or proceeding, shall be limited to direct damages suffered by Borrowers that are caused directly by Issuing Bank's gross negligence or willful misconduct in (i) honoring a presentation under a Letter of Credit that on its face does not at least substantially comply with the terms and conditions of such Letter of Credit, (ii) failing to honor a presentation under a Letter of Credit that strictly complies with the terms and conditions of such Letter of Credit or (iii) retaining Drawing Documents presented under a Letter of Credit. Issuing Bank shall be deemed to have acted with due diligence and reasonable care if Issuing Bank's conduct is in accordance with Standard Letter of Credit Practice or in accordance with this Agreement. Borrowers' aggregate remedies against Issuing Bank and any Letter of Credit Related Person for wrongfully honoring a presentation under any Letter of Credit or wrongfully retaining honored Drawing Documents shall in no event exceed the aggregate amount paid by Borrowers to Issuing Bank in respect of the honored presentation in connection with such Letter of Credit under Section 2.11(d), plus interest at the rate then applicable to Revolving Loans. Borrowers shall take action to avoid and mitigate the amount of any damages claimed against Issuing Bank or any other Letter of Credit Related Person, including by enforcing its rights against the beneficiaries of the Letters of Credit. Any claim by Borrowers under or in connection with any Letter of Credit shall be reduced by an amount equal to the sum of (x) the amount (if any) saved by Borrowers as a result of the breach or alleged wrongful conduct complained of; and (y) the amount (if any) of the loss that would have been avoided had Borrowers taken all reasonable steps to mitigate any loss, and in case of a claim of wrongful dishonor, by specifically and timely authorizing Issuing Bank to effect a cure.

(h)     Borrowers are responsible for preparing or approving the final text of the Letter of Credit as issued by Issuing Bank, irrespective of any assistance Issuing Bank may provide such as drafting or recommending text or by Issuing Bank's use or refusal to use text submitted by Borrowers. Borrowers are solely responsible for the suitability of the Letter of Credit for Borrowers' purposes. With respect to any Letter of Credit containing an "automatic amendment" to extend the expiration date of such Letter of Credit, Issuing Bank, in its sole and absolute discretion, may give notice of nonrenewal of such Letter of Credit and, if Borrowers do not at any time want such Letter of Credit to be renewed, Borrowers will so notify Agent and Issuing Bank at least 15 calendar days before Issuing Bank is required to notify the beneficiary of such Letter of Credit or any advising bank of such nonrenewal pursuant to the terms of such Letter of Credit.

(i)     Borrowers' reimbursement and payment obligations under this Section 2.11 are absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever, provided, however, that subject to Section 2.11(g) above, the foregoing shall not release Issuing Bank from such liability to Borrowers as may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction against Issuing Bank following reimbursement or payment of the obligations and liabilities, including reimbursement and other payment obligations, of Borrowers to Issuing Bank arising under, or in connection with, this Section 2.11 or any Letter of Credit.

(i)     Without limiting any other provision of this Agreement, Issuing Bank and each other Letter of Credit Related Person (if applicable) shall not be responsible to Borrowers for, and Issuing Bank's rights and remedies against Borrowers and the obligation of Borrowers to reimburse Issuing Bank for each drawing under each Letter of Credit shall not be impaired by:

(i)        honor of a presentation under any Letter of Credit that on its face substantially complies with the terms and conditions of such Letter of Credit, even if the Letter of Credit requires strict compliance by the beneficiary;

(ii)       honor of a presentation of any Drawing Document that appears on its face to have been signed, presented or issued (A) by any purported successor or transferee of any beneficiary or other Person required to sign, present or issue such Drawing Document or (B) under a new name of the beneficiary;

(iii)      acceptance as a draft of any written or electronic demand or request for payment under a Letter of Credit, even if nonnegotiable or not in the form of a draft or notwithstanding any requirement that such draft, demand or request bear any or adequate reference to the Letter of Credit;

(iv)      the identity or authority of any presenter or signer of any Drawing Document or the form, accuracy, genuineness or legal effect of any Drawing Document (other than Issuing Bank's determination that such Drawing Document appears on its face substantially to comply with the terms and conditions of the Letter of Credit);

(v)       acting upon any instruction or request relative to a Letter of Credit or requested Letter of Credit that Issuing Bank in good faith believes to have been given by a Person authorized to give such instruction or request;

(vi)      any errors, omissions, interruptions or delays in transmission or delivery of any message, advice or document (regardless of how sent or transmitted) or for errors in interpretation of technical terms or in translation or any delay in giving or failing to give notice to Borrowers;

(vii)     any acts, omissions or fraud by, or the insolvency of, any beneficiary, any nominated person or entity or any other Person or any breach of contract between any beneficiary and any Borrower or any of the parties to the underlying transaction to which the Letter of Credit relates;

(viii)    assertion or waiver of any provision of the ISP or UCP that primarily benefits an issuer of a letter of credit, including any requirement that any Drawing Document be presented to it at a particular hour or place;

(ix)      payment to any paying or negotiating bank (designated or permitted by the terms of the applicable Letter of Credit) claiming that it rightfully honored or is entitled to reimbursement or indemnity under Standard Letter of Credit Practice applicable to it;

(x)       acting or failing to act as required or permitted under Standard Letter of Credit Practice applicable to where Issuing Bank has issued, confirmed, advised or negotiated such Letter of Credit, as the case may be;

(xi)      honor of a presentation after the expiration date of any Letter of Credit notwithstanding that a presentation was made prior to such expiration date and dishonored by Issuing Bank if subsequently Issuing Bank or any court or other finder of fact determines such presentation should have been honored;

(xii)     dishonor of any presentation that does not strictly comply or that is fraudulent, forged or otherwise not entitled to honor; or

(xiii)    honor of a presentation that is subsequently determined by Issuing Bank to have been made in violation of international, federal, state or local restrictions on the transaction of business with certain prohibited Persons.

(j)        Borrowers shall pay immediately upon demand to Agent for the account of Issuing Bank as non-refundable fees, commissions, and charges (it being acknowledged and agreed that any charging of such

fees, commissions, and charges to the Loan Account pursuant to the provisions of <u>Section 2.6(d)</u> shall be deemed to constitute a demand for payment thereof for the purposes of this <u>Section 2.11(k)</u>):  (i) a fronting fee which shall be imposed by Issuing Bank upon the issuance of each Letter of Credit of 0.125% per annum of the face amount thereof, *plus* (ii) any and all other customary commissions, fees and charges then in effect imposed by, and any and all expenses incurred by, Issuing Bank, or by any adviser, confirming institution or entity or other nominated person, relating to Letters of Credit, at the time of issuance of any Letter of Credit and upon the occurrence of any other activity with respect to any Letter of Credit (including transfers, assignments of proceeds, amendments, drawings, renewals or cancellations).

(k)    If by reason of (x) any Change in Law, or (y) compliance by Issuing Bank or any other member of the Lender Group with any direction, request, or requirement (irrespective of whether having the force of law) of any Governmental Authority or monetary authority including, Regulation D of the Board of Governors as from time to time in effect (and any successor thereto):

(i)    any reserve, deposit, or similar requirement is or shall be imposed or modified in respect of any Letter of Credit issued or caused to be issued hereunder or hereby, or

(ii)    there shall be imposed on Issuing Bank or any other member of the Lender Group any other condition regarding any Letter of Credit,

and the result of the foregoing is to increase, directly or indirectly, the cost to Issuing Bank or any other member of the Lender Group of issuing, making, participating in, or maintaining any Letter of Credit or to reduce the amount receivable in respect thereof, then, and in any such case, Agent may, at any time within a reasonable period after the additional cost is incurred or the amount received is reduced, notify Borrowers, and Borrowers shall pay within 30 days after demand therefor, such amounts as Agent may specify to be necessary to compensate Issuing Bank or any other member of the Lender Group for such additional cost or reduced receipt, together with interest on such amount from the date of such demand until payment in full thereof at the rate then applicable to Revolving Loans; <u>provided</u>, that (A) Borrowers shall not be required to provide any compensation pursuant to this <u>Section 2.11(l)</u> for any such amounts incurred more than 180 days prior to the date on which the demand for payment of such amounts is first made to Borrowers, and (B) if an event or circumstance giving rise to such amounts is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.  The determination by Agent of any amount due pursuant to this <u>Section 2.11(l)</u>, as set forth in a certificate setting forth the calculation thereof in reasonable detail, shall, in the absence of manifest or demonstrable error, be final and conclusive and binding on all of the parties hereto.

(i)    Unless otherwise expressly agreed by Issuing Bank and Borrowers when a Letter of Credit is issued, (i) the rules of the ISP and the UCP shall apply to each standby Letter of Credit, and (ii) the rules of the UCP shall apply to each commercial Letter of Credit.

(j)    In the event of a direct conflict between the provisions of this <u>Section 2.11</u> and any provision contained in any Issuer Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this <u>Section 2.11</u> shall control and govern.

2.12    <u>**LIBOR Index Rate Loans.**</u>

(a)    **Special Provisions Applicable to LIBOR Index Rate.**

(i)    The LIBOR Index Rate may be adjusted by Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs to such Lender of maintaining or obtaining any eurodollar deposits or increased costs, in each case, due to changes in applicable law, including any Changes in Law (including any changes in tax laws (except changes of general applicability in corporate income tax laws)) and changes in the reserve requirements imposed by the Board of Governors, which additional or increased costs would

- 22 -

increase the cost of funding or maintaining loans bearing interest at the LIBOR Index Rate.  In any such event, the affected Lender shall give Borrowers and Agent notice of such a determination and adjustment and Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, Borrowers may, by notice to such affected Lender (A) require such Lender to furnish to Borrowers a statement setting forth in reasonable detail the basis for adjusting such LIBOR Index Rate and the method for determining the amount of such adjustment, or (B) repay the LIBOR Index Rate Loans of such Lender with respect to which such adjustment is made.

(ii)	In the event that (A) any change in market conditions or any Change in Law shall at any time after the date hereof, in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain LIBOR Index Rate Loans or to continue such funding or maintaining, or to determine or charge interest rates at the LIBOR Index Rate, and such Lender has given notice of such changed circumstances to Agent and Borrowers (upon which, Agent promptly shall transmit the notice to each other Lender) or (B) an Event of Default has occurred and is continuing and Agent so elects in its sole discretion, then all Loans then outstanding or thereafter made shall accrue interest at the rate then applicable to Base Rate Loans, until such time as (1) in the case of clause (A) above, Agent and Lenders determine that it would no longer be unlawful or impractical to fund or maintain LIBOR Index Rate Loans or to determine or charge interest rates at the LIBOR Index Rate, as applicable, or (2) in the case of clause (B) above, such Event of Default has been waived in writing by Required Lenders (or by Agent at the written request of the Required Lenders), or by all Lenders if required by Section 14.1.

(b)	**No Requirement of Matched Funding.**  Anything to the contrary contained herein notwithstanding, neither Agent, nor any Lender, nor any of their Participants, is required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues at the LIBOR Index Rate.

(c)	**No LIBOR Loans**.  Notwithstanding any provision in this Agreement to the contrary, this Section 2.12 and the other provisions of this Agreement relating to the LIBOR Index Rate and LIBOR Index Rate  Loans shall be of no force or effect unless the Agent and Lenders agree in their sole discretion pursuant to an amendment satisfying the applicable conditions of Section 14.1 to establish a LIBOR margin and begin making LIBOR Index Rate Loans.

2.13	**Capital Requirements.**

(a)	If, after the date hereof, Issuing Bank or any Lender determines that (i) any Change in Law regarding capital, liquidity or reserve requirements for banks or bank holding companies, or (ii) compliance by Issuing Bank or such Lender, or their respective parent bank holding companies, with any guideline, request or directive of any Governmental Authority regarding capital adequacy (whether or not having the force of law), has the effect of reducing the return on Issuing Bank's, such Lender's, or such holding companies' capital as a consequence of Issuing Bank's or such Lender's commitments hereunder to a level below that which Issuing Bank, such Lender, or such holding companies could have achieved but for such Change in Law or compliance (taking into consideration Issuing Bank's, such Lender's, or such holding companies' then existing policies with respect to capital adequacy and assuming the full utilization of such entity's capital) by any amount deemed by Issuing Bank or such Lender to be material, then Issuing Bank or such Lender may notify Borrowers and Agent thereof.  Following receipt of such notice, Borrowers agree to pay Issuing Bank or such Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable within 30 days after presentation by Issuing Bank or such Lender of a statement in the amount and setting forth in reasonable detail Issuing Bank's or such Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error).  In determining such amount, Issuing Bank or such Lender may use any reasonable averaging and attribution methods.  Failure or delay on the part of Issuing Bank or any Lender to demand compensation pursuant to this Section shall not constitute a waiver of Issuing Bank's or such Lender's right to demand such compensation; provided that Borrowers shall not be required to compensate Issuing Bank or a Lender pursuant to this Section for any reductions in return incurred more than 180 days prior to the date that Issuing Bank or such Lender notifies Borrowers of such Change in Law giving rise to such reductions and of such Lender's intention to claim compensation therefor; provided further

that if such claim arises by reason of the Change in Law that is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(b)	If Issuing Bank or any Lender requests additional or increased costs referred to in Section 2.11(l) or Section 2.12(a)(i) or amounts under Section 2.13(a) or sends a notice under Section 2.12(a)(ii) relative to changed circumstances (such Issuing Bank or Lender, an "Affected Lender"), then such Affected Lender shall use reasonable efforts to promptly designate a different one of its lending offices or to assign its rights and obligations hereunder to another of its offices or branches, if (i) in the reasonable judgment of such Affected Lender, such designation or assignment would eliminate or reduce amounts payable pursuant to Section 2.11(l), Section 2.12(a)(i) or Section 2.13(a), as applicable, or would eliminate the illegality or impracticality of funding or maintaining LIBOR Index Rate Loans and (ii) in the reasonable judgment of such Affected Lender, such designation or assignment would not subject it to any material unreimbursed cost or expense and would not otherwise be materially disadvantageous to it.  Borrowers agree to pay all reasonable and documented out-of-pocket costs and expenses incurred by such Affected Lender in connection with any such designation or assignment.  If, after such reasonable efforts, such Affected Lender does not so designate a different one of its lending offices or assign its rights to another of its offices or branches so as to eliminate Borrowers' obligation to pay any future amounts to such Affected Lender pursuant to Section 2.11(l), Section 2.12(a)(i) or Section 2.13(a), as applicable, or to enable Borrowers to obtain LIBOR Index Rate Loans, then Borrowers (without prejudice to any amounts then due to such Affected Lender under Section 2.11(l), Section 2.12(a)(i) or Section 2.13(a), as applicable) may, unless prior to the effective date of any such assignment the Affected Lender withdraws its request for such additional amounts under Section 2.11(l), Section 2.12(a)(i) or Section 2.13(a), as applicable, or indicates that it is no longer unlawful or impractical to fund or maintain LIBOR Index Rate Loans, may designate a different Issuing Bank or substitute a Lender, in each case, reasonably acceptable to Agent to purchase the Obligations owed to such Affected Lender and such Affected Lender's commitments hereunder (a "Replacement Lender"), and if such Replacement Lender agrees to such purchase, such Affected Lender shall assign to the Replacement Lender its Obligations and commitments, and upon such purchase by the Replacement Lender, which such Replacement Lender shall be deemed to be "Issuing Bank" or a "Lender" (as the case may be) for purposes of this Agreement and such Affected Lender shall cease to be "Issuing Bank" or a "Lender" (as the case may be) for purposes of this Agreement.

(c)	Notwithstanding anything herein to the contrary, the protection of Sections 2.11(l), 2.12(a), and 2.13 shall be available to Issuing Bank and each Lender (as applicable) regardless of any possible contention of the invalidity or inapplicability of the law, rule, regulation, judicial ruling, judgment, guideline, treaty or other change or condition which shall have occurred or been imposed, so long as it shall be customary for issuing banks or lenders affected thereby to comply therewith.  Notwithstanding any other provision herein, neither Issuing Bank nor any Lender shall demand compensation pursuant to this Section 2.13 if it shall not at the time be the general policy or practice of Issuing Bank or such Lender (as the case may be) to demand such compensation in similar circumstances under comparable provisions of other credit agreements, if any.

2.14	**[Reserved].**

2.15	**Joint and Several Liability of Borrowers.**

(a)	Each Borrower is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Lender Group under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations.

(b)	Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including any Obligations arising under this Section 2.15), it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them.

(c)     If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligation until such time as all of the Obligations are paid in full.

(d)     The Obligations of each Borrower under the provisions of this Section 2.15 constitute the absolute and unconditional, full recourse Obligations of each Borrower enforceable against each Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of the provisions of this Agreement (other than this Section 2.15(d)) or any other circumstances whatsoever.

(e)     Except as otherwise expressly provided in this Agreement, each Borrower hereby waives notice of acceptance of its joint and several liability, notice of any Revolving Loans or Letters of Credit issued under or pursuant to this Agreement, notice of the occurrence of any Default, Event of Default, or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by Agent or Lenders under or in respect of any of the Obligations, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement (except as otherwise provided in this Agreement). Each Borrower hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Agent or Lenders at any time or times in respect of any default by any Borrower in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by Agent or Lenders in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any Borrower. Without limiting the generality of the foregoing, each Borrower assents to any other action or delay in acting or failure to act on the part of any Agent or Lender with respect to the failure by any Borrower to comply with any of its respective Obligations, including any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this Section 2.15 afford grounds for terminating, discharging or relieving any Borrower, in whole or in part, from any of its Obligations under this Section 2.15, it being the intention of each Borrower that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of each Borrower under this Section 2.15 shall not be discharged except by performance and then only to the extent of such performance. The Obligations of each Borrower under this Section 2.15 shall not be diminished or rendered unenforceable by the Chapter 11 Cases or any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any other Borrower or any Agent or Lender.

(f)     Each Borrower represents and warrants to Agent and Lenders that such Borrower is currently informed of the financial condition of Borrowers and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations. Each Borrower further represents and warrants to Agent and Lenders that such Borrower has read and understands the terms and conditions of the Loan Documents. Each Borrower hereby covenants that such Borrower will continue to keep informed of Borrowers' financial condition and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

(g)     The provisions of this Section 2.15 are made for the benefit of Agent, each member of the Lender Group, each Bank Product Provider, and their respective successors and assigns, and may be enforced by it or them from time to time against any or all Borrowers as often as occasion therefor may arise and without requirement on the part of Agent, any member of the Lender Group, any Bank Product Provider, or any of their successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any Borrower or to exhaust any remedies available to it or them against any Borrower or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy (except as may be required pursuant to the Interim Order or Final Order, as applicable). The provisions of this Section 2.15 shall remain in effect until all of the Obligations shall have been paid in full or otherwise fully satisfied. If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be

- 25 -

restored or returned by Agent or any Lender in connection with the Chapter 11 Cases or otherwise, the provisions of this Section 2.15 will forthwith be reinstated in effect, as though such payment had not been made.

(h)     Each Borrower hereby agrees that it will not enforce any of its rights of contribution or subrogation against any other Borrower with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to Agent or Lenders with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations have been paid in full in cash.  Any claim which any Borrower may have against any other Borrower with respect to any payments to any Agent or any member of the Lender Group hereunder or under any of the Bank Product Agreements are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations and all such Obligations shall be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefor.

(i)     Each Borrower hereby agrees that after the occurrence and during the continuance of any Default or Event of Default, such Borrower will not demand, sue for or otherwise attempt to collect any indebtedness of any other Borrower owing to such Borrower until the Obligations shall have been paid in full in cash.  If, notwithstanding the foregoing sentence, such Borrower shall collect, enforce or receive any amounts in respect of such indebtedness, such amounts shall be collected, enforced and received by such Borrower in trust for Agent, and such Borrower shall deliver any such amounts to Agent for application to the Obligations in accordance with Section 2.4(b).

3.     **CONDITIONS; TERM OF AGREEMENT.**

3.1     **Conditions Precedent to the Initial Extension of Credit**.  The obligation of each Lender to make the initial extensions of credit provided for hereunder is subject to the fulfillment, to the satisfaction of Agent and each Lender, of each of the conditions precedent set forth on Schedule 3.1 (the making of such initial extensions of credit by a Lender being conclusively deemed to be its satisfaction or waiver of the conditions precedent).

3.2     **Conditions Precedent to all Extensions of Credit.**  The obligation of the Lender Group (or any member thereof) to make any Loans hereunder (or to extend any other credit hereunder) at any time shall be subject to the following conditions precedent:

(a)     the representations and warranties of each Loan Party contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date);

(b)     no Default or Event of Default shall have occurred and be continuing on the date of such extension of credit, nor shall either result from the making thereof;

(c)     in the case of a request for a Term Loan, there shall be no Availability (after giving effect to any request for a Revolving Loan made simultaneously therewith);

(d)     in the case of a request for a Revolving Loan or a Term Loan at any time after the Closing Date, the Bankruptcy Court shall have entered the Interim Order or Final Order, certified by the Clerk of the Bankruptcy Court as having been duly entered, and the Interim Order or Final Order, as applicable, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the Agent and the Lenders; and

- 26 -

(e)       in the case of a request for a Term Loan at any time after the entry of a Final Order, Agent shall have received title searches with respect to the Real Property constituting the Term Loan Priority Collateral in form and substance acceptable to Agent in its sole discretion.

3.3       **Maturity.**  This Agreement shall continue in full force and effect for a term ending on the Maturity Date.

3.4       **Effect of Maturity.**   On the Maturity Date, all commitments of the Lender Group to provide additional credit hereunder shall automatically be terminated and all of the Obligations immediately shall become due and payable without notice or demand and Borrowers shall be required to repay all of the Obligations in full. No termination of the obligations of the Lender Group (other than payment in full of the Obligations and termination of the Commitments) shall relieve or discharge any Loan Party of its duties, obligations, or covenants hereunder or under any other Loan Document and Agent's Liens in the Collateral shall continue to secure the Obligations and shall remain in effect until all Obligations have been paid in full and the Commitments have been terminated.   When all of the Obligations have been paid in full and the Lender Group's obligations to provide additional credit under the Loan Documents have been terminated irrevocably, Agent will, at Borrowers' sole expense, execute and deliver any termination statements, lien releases, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, Agent's Liens and all notices of security interests and liens previously filed by Agent.

3.5       **Early Termination by Borrowers.**   Borrowers have the option, at any time upon 10 Business Days prior written notice to Agent (or such lesser period as agreed to by Agent in its sole discretion), to terminate this Agreement and terminate the Commitments hereunder by repaying to Agent all of the Obligations in full.  The foregoing notwithstanding, (a) Borrowers may rescind termination notices relative to proposed payments in full of the Obligations with the proceeds of third party Indebtedness if the closing for such issuance or incurrence does not happen on or before the date of the proposed termination (in which case, a new notice shall be required to be sent in connection with any subsequent termination), and (b) Borrowers may extend the date of termination at any time with the consent of Agent (which consent shall not be unreasonably withheld or delayed).

4.       **REPRESENTATIONS AND WARRANTIES.**

In order to induce the Lender Group to enter into this Agreement, each Loan Party makes the following representations and warranties to the Lender Group which shall be true, correct, and complete, in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), as of the Closing Date, and shall be true, correct, and complete, in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof), as of the date of the making of each Revolving Loan (or other extension of credit) made thereafter, as though made on and as of the date of such Revolving Loan (or other extension of credit) (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date) and such representations and warranties shall survive the execution and delivery of this Agreement:

4.1       **Due Organization and Qualification; Subsidiaries.**

(a)       Each Loan Party (i) is duly organized and existing and in good standing under the laws of the jurisdiction of its organization, (ii) is qualified to do business in any state where the failure to be so qualified could reasonably be expected to result in a Material Adverse Effect, except where the failure to so qualify is the result of the status of the Loan Parties as debtors-in-possession in the Chapter 11 Cases, and (iii) subject to the Bankruptcy Code, the Bankruptcy Rules, entry of the Interim Order or the Final Order, as applicable, and such other orders as have been or may hereafter be entered by the Bankruptcy Court in the Chapter 11 Cases has all requisite power and authority to own and operate its properties, to carry on its business

- 27 -

as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby.

(b)    As of the Closing Date, (i) set forth on <u>Schedule 4.1(b)</u> is a complete and accurate description of the authorized Equity Interests of each Loan Party, by class, and, as of the Closing Date, a description of the number of shares of each such class that are issued and outstanding, and (ii)  no Loan Party is subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its Equity Interests or any security convertible into or exchangeable for any of its Equity Interests.

(c)    As of the Closing Date, set forth on <u>Schedule 4.1(c)</u>, is a complete and accurate list of the Loan Parties' direct and indirect Subsidiaries, showing: (i) the number of shares of each class of common and preferred Equity Interests authorized for each of such Subsidiaries, and (ii) the number and the percentage of the outstanding shares of each such class owned directly or indirectly by Parent.  All of the outstanding Equity Interests of each such Subsidiary has been validly issued and is fully paid and non-assessable.

(d)    As of the Closing Date, except as set forth on <u>Schedule 4.1(d)</u>, there are no subscriptions, options, warrants, or calls relating to any shares of any Loan Party or any of its Subsidiaries' Equity Interests, including any right of conversion or exchange under any outstanding security or other instrument.

4.2    **Due Authorization; No Conflict.**

(a)    Subject to entry of the Interim Order (or the Final Order, as applicable), as to each Loan Party, the execution, delivery, and performance by such Loan Party of the Loan Documents to which it is a party have been duly authorized by all necessary action on the part of such Loan Party.

(b)    Subject to entry of the Interim Order (or the Final Order, as applicable), as to each Loan Party, the execution, delivery, and performance by such Loan Party of the Loan Documents to which it is a party do not and will not (i) upon entry by the Bankruptcy Court of the Interim Order (or Final Order, when applicable), violate any material provision of federal, state, or local law or regulation applicable to any Loan Party, the Governing Documents of any Loan Party, or any order, judgment, or decree of any court or other Governmental Authority binding on any Loan Party, (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material agreement of any Loan Party where any such conflict, breach or default could individually or in the aggregate reasonably be expected to have a Material Adverse Effect, (iii) result in or require the creation or imposition of any Lien of any nature whatsoever upon any assets of any Loan Party, other than Permitted Liens, or (iv) require any approval of any holder of Equity Interests of a Loan Party or any approval or consent of any Person under any material agreement of any Loan Party, other than consents or approvals that have been obtained and that are still in force and effect and except, in the case of material agreements, for consents or approvals, the failure to obtain could not individually or in the aggregate reasonably be expected to cause a Material Adverse Effect.

4.3    **Governmental Consents.**    The execution, delivery, and performance by each Loan Party of the Loan Documents to which such Loan Party is a party and the consummation of the transactions contemplated by the Loan Documents do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority, other than (x) registrations, consents, approvals, notices, or other actions that have been obtained and that are still in force and effect and (y) consent or approval of the Bankruptcy Court and except for filings and recordings with respect to the Collateral to be made, or otherwise delivered to Agent for filing or recordation, on or prior to the Closing Date.

4.4     **Binding Obligations.**  Each Loan Document has been duly executed and delivered by each Loan Party that is a party thereto and, subject to entry of the Interim Order (or the Final Order, as applicable), is the legally valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally.

4.5     **Title to Assets; No Encumbrances**.  Each of the Loan Parties has (a) good, sufficient and legal title to (in the case of fee interests in Real Property), (b) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (c) good and marketable title to (in the case of all other personal property), all of their respective assets reflected in their most recent financial statements delivered pursuant to Section 5.1, in each case except for assets disposed of since the date of such financial statements to the extent permitted hereby.  All of such assets are free and clear of Liens except for Permitted Liens and Liens securing the repayment of the Prepetition Obligations and any other exceptions, if any, expressly set forth in the Interim Order and/or the Final Order (as applicable).

4.6     **Litigation.**

(a)     There are no actions, suits, or proceedings pending or, to the knowledge of any Borrower threatened in writing against a Loan Party or any of its Subsidiaries that either individually or in the aggregate could reasonably be expected to result in a Material Adverse Effect, except the Chapter 11 Cases.

(b)     Schedule 4.6(b) sets forth a complete and accurate description, with respect to each of the actions, suits, or proceedings with asserted liabilities in excess of, or that could reasonably be expected to result in liabilities in excess of, $625,000 (except the Chapter 11 Cases) that, as of the Closing Date, is pending or, to the knowledge of any Borrower, threatened in writing against a Loan Party or any of its Subsidiaries, of (i) the parties to such actions, suits, or proceedings, (ii) the nature of the dispute that is the subject of such actions, suits, or proceedings, (iii) the procedural status, as of the Closing Date, with respect to such actions, suits, or proceedings, and (iv) whether any liability of the Loan Parties' and their Subsidiaries in connection with such actions, suits, or proceedings is covered by insurance.

(c)     Proceedings.  There is no pending (or, to the knowledge of any Loan Party, threatened in writing) Health Care Proceeding commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator against or affecting any Loan Party or any of its Subsidiaries, that either individually or in the aggregate could reasonably be expected to result in a Material Adverse Effect.  There are no facts, circumstances or conditions that would reasonably be expected to form the basis for any such Health Care Proceeding against or affecting any Loan Party or any Subsidiary of any Loan Party, that either individually or in the aggregate could reasonably be expected to result in a Material Adverse Effect.

4.7     **Compliance with Laws.**  No Loan Party or any of its Subsidiaries (a) is in violation of any applicable laws, rules, regulations, executive orders, or codes (including Environmental Laws) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect, or (b) is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

4.8     **No Material Adverse Effect.**  All historical financial statements relating to the Loan Parties and their Subsidiaries that have been delivered by Borrowers to Agent have been prepared in accordance with GAAP (except, in the case of unaudited financial statements, for the lack of footnotes and being subject to year-end audit adjustments and with respect to non-recurring expenses and extraordinary items as permitted in the calculation of EBITDA) and present fairly in all material respects, the Loan Parties' and their Subsidiaries' consolidated financial condition as of the date thereof and results of operations for the period then ended.  Since December 31, 2017, no event, circumstance, or change has occurred that has or could reasonably be expected to result in a Material Adverse Effect with respect to the Loan Parties and their Subsidiaries, except the Chapter 11 Cases.

4.9     **Solvency.**

(a)     [Reserved].

(b)     No transfer of property is being made by any Loan Party and no obligation is being incurred by any Loan Party in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of such Loan Party.

4.10    **Employee Benefits.**

(a)     No Loan Party, none of their Subsidiaries, nor any of their ERISA Affiliates maintains or contributes to any Benefit Plan.

(b)     Each Loan Party and each ERISA Affiliate has complied in all material respects with ERISA, the IRC and all applicable laws regarding each Employee Benefit Plan.

(c)     Each Employee Benefit Plan is, and has been, maintained in substantial compliance with ERISA, the IRC, all applicable laws and the terms of each such Employee Benefit Plan.

(d)     Each Employee Benefit Plan that is intended to qualify under Section 401(a) of the IRC has received a favorable determination letter from the Internal Revenue Service or an application for such letter is currently being processed by the Internal Revenue Service.  To the best knowledge of each Loan Party and the ERISA Affiliates, nothing has occurred which would prevent, or cause the loss of, such qualification.

(e)     No liability to the PBGC (other than for the payment of current premiums which are not past due) by any Loan Party or ERISA Affiliate has been incurred or is expected by any Loan Party or ERISA Affiliate to be incurred with respect to any Pension Plan.

(f)     No Notification Event exists or has occurred in the past six (6) years.

(g)     No Loan Party or ERISA Affiliate sponsors, maintains, or contributes to any Employee Benefit Plan, including any such plan maintained to provide benefits to former employees of such entities that may not be terminated by any Loan Party or ERISA Affiliate in its sole discretion at any time without material liability.

(h)     No Loan Party or ERISA Affiliate has provided any security under Section 436 of the IRC.

4.11    **Environmental Condition.**    Except as set forth on Schedule 4.11, (a) to each Borrower's knowledge, no Loan Party's properties or assets has ever been used by a Loan Party, its Subsidiaries, or by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Materials, where such disposal, production, storage, handling, treatment, release or transport was in violation, in any material respect, of any applicable Environmental Law, (b) to each Loan Party's knowledge, after due inquiry, no Loan Party's properties or assets has ever been designated or identified in any manner pursuant to any environmental protection statute as a Hazardous Materials disposal site, (c) no Loan Party has received notice that a Lien arising under any Environmental Law has attached to any revenues or to any Real Property owned or operated by a Loan Party or its Subsidiaries, and (d) no Loan Party nor any of its Subsidiaries nor any of their respective Health Care Facilities or operations is subject to any outstanding written order, consent decree, or settlement agreement with any Person relating to any Environmental Law or Environmental Liability that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

4.12    **Complete Disclosure.**    All written factual information taken as a whole (other than forward-looking information and projections and information of a general economic nature and general information about Borrowers' industry) furnished by or on behalf of a Loan Party or its Subsidiaries in writing to Agent or any Lender (including all information contained in the Schedules hereto or in the other Loan Documents) for purposes of or in connection with this Agreement or the other Loan Documents, and all other such factual information taken as a whole (other than forward-looking information and projections and information of a general economic nature and

- 30 -

general information about Borrowers' industry) hereafter furnished by or on behalf of a Loan Party or its Subsidiaries in writing to Agent or any Lender will be, true and accurate, in all material respects, on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided. The Approved Budget as in effect on the Closing Date represents Borrowers' good faith estimate, on the date such Approved Budget was delivered, of the Loan Parties' and their Subsidiaries' future performance for the periods covered thereby based upon assumptions believed by Borrowers to be reasonable at the time of the delivery thereof to Agent.

4.13    **Patriot Act**. To the extent applicable, each Loan Party is in compliance, in all material respects, with the (a) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (b) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001) (the "Patriot Act"). No part of the proceeds of the Loans made hereunder will be used by any Loan Party or any of their Affiliates, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

4.14    **Indebtedness.** Set forth on Schedule 4.14 is a true and complete list of all Indebtedness of each Loan Party outstanding immediately prior to the Closing Date that is to remain outstanding immediately after giving effect to the closing hereunder on the Closing Date and such Schedule accurately sets forth the aggregate principal amount of such Indebtedness as of the Closing Date.

4.15    **Payment of Taxes.** Except as otherwise permitted under Section 5.5, all tax returns and reports of each Loan Party required to be filed by any of them have been timely filed, and all federal and material state and local taxes shown on such tax returns to be due and payable and all assessments, fees and other governmental charges upon a Loan Party and upon its respective assets, income, businesses and franchises that are due and payable have been paid when due and payable. Each Loan Party has made adequate provision in accordance with GAAP for all taxes not yet due and payable. No Loan Party knows of any proposed tax assessment against a Loan Party that is not being actively contested by such Loan Party diligently, in good faith, and by appropriate proceedings; provided such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.

4.16    **Margin Stock.** No Loan Party nor any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock. No part of the proceeds of the loans made to Borrowers will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors.

4.17    **Governmental Regulation.** No Loan Party nor any of its Subsidiaries is subject to regulation under the Federal Power Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable. No Loan Party nor any of its Subsidiaries is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

4.18    **OFAC.** No Loan Party nor any of its Subsidiaries is in violation of any of the country or list based economic and trade sanctions administered and enforced by OFAC. No Loan Party nor any of its Subsidiaries (a) is a Sanctioned Person or a Sanctioned Entity, (b) has its assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. No proceeds of any loan made hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity.

4.19    **Employee and Labor Matters.**  There is (i) no unfair labor practice complaint pending or, to the knowledge of any Borrower, threatened in writing against any Loan Party before any Governmental Authority and no grievance or arbitration proceeding pending or threatened in writing against any Loan Party which arises out of or under any collective bargaining agreement and that could reasonably be expected to result in a Material Adverse Effect, (ii) no strike, labor dispute, slowdown, stoppage or similar action or grievance pending or threatened in writing against any Loan Party that could reasonably be expected to result in a Material Adverse Effect, or (iii) to the knowledge of any Borrower, no union representation question existing with respect to the employees of any Loan Party and no union organizing activity taking place with respect to any of the employees of any Loan Party. No Loan Party has incurred any material liability or obligation under the Worker Adjustment and Retraining Notification Act or similar state law, which remains unpaid or unsatisfied.  The hours worked and payments made to employees of the Loan Parties have been in violation of the Fair Labor Standards Act or any other applicable legal requirements, except to the extent such violations could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  All material payments due from the Loan Parties on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of such Person, except where the failure to do so could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

4.20    **Holding Company Loan Parties.**  Each Holding Company Loan Party is a holding company of the Equity Interests of its first-tier Subsidiaries and does not engage in any operations or business except for the ownership of its first-tier Subsidiaries and as provided in <u>Section 6.14</u> hereof.

4.21    **Leases.**  Each Loan Party enjoys peaceful and undisturbed possession under all Leases material to its business and to which it is a party or under which it is operating, and, subject to Permitted Protests, all of such material Leases are valid and subsisting and no material default by the applicable Loan Party, except for defaults arising from the filing of the Chapter 11 Cases, exists under any of them.  <u>Schedule 4.21</u> sets forth all real property leased by any of the Loan Parties as of the Closing Date, the applicable lessor thereof, and the lease applicable thereto.

4.22    **Eligible Accounts.**  As to each Account that is identified by Borrowers as an Eligible Account in a Borrowing Base Certificate submitted to Agent, such Account is (a) a bona fide existing payment obligation of the applicable Account Debtor created by the rendition of Medical Services to a patient in the ordinary course of the Borrowers' business, (b) owed to a Borrower without any known defenses, disputes, offsets, counterclaims, or rights of return or cancellation, and (c) not excluded as ineligible by virtue of one or more of the excluding criteria (other than any Agent-discretionary criteria) set forth in the definition of Eligible Accounts.  Each Account that is identified by Borrowers as an Eligible Account reimbursed pursuant to a Third Party Payor Arrangement in a Borrowing Base Certificate submitted to Agent (a) will be originated in compliance with the reimbursement policies of the applicable Third Party Payor Arrangement and (b) shall not exceed the amount the Borrower is entitled to receive under any applicable capitation arrangement, fee schedule, discount formula, cost-based reimbursement or other adjustment or limitation to Borrower's usual charges.

4.23    **[Reserved].**

4.24    **[Reserved].**

4.25    **[Reserved].**

4.26    **[Reserved]**.

4.27    **Material Contracts.**  Except for the Loan Documents and other agreements set forth on <u>Schedule 4.27</u>, as of the Closing Date, there are no (a) employment agreements covering the management of any Loan Party requiring payment of more than $1,000,000 in any calendar year, (b) agreements for managerial, consulting or similar services to which any Loan Party is a party or by which it is bound requiring payment of more than $1,000,000 in any calendar year, (c) agreements regarding any Loan Party, its assets or operations or any investment therein to which any of its equity holders is a party or by which it is bound (including shareholder agreements), (d) third party billing arrangements to which any Loan Party is a party, or (e) any other agreements or

instruments to which any Loan Party is a party, and the breach, nonperformance or cancellation of which, or the failure of which to review, could reasonably be expected to have a Material Adverse Effect.

4.28 **[Reserved].**

4.29 **[Reserved].**

4.30 **Hedge Agreements.**  On each date that any Hedge Agreement is executed by any Hedge Provider, each Borrower and other Loan Party satisfy all eligibility, suitability and other requirements under the Commodity Exchange Act (7 U.S.C. § 1, et seq., as in effect from time to time) and the Commodity Futures Trading Commission regulations.

4.31 **Health Care Matters.**

(a) **Compliance with Health Care Laws; Health Care Permits; Third Party Payors.** Each Loan Party and each of its Subsidiaries is in compliance with all Health Care Laws and requirements of Third Party Payor Arrangements applicable to it and its assets, business or operations, except to the extent that any noncompliance, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  Each Loan Party and each of its Subsidiaries (i) holds in full force and effect (without default, violation or noncompliance) all material Health Care Permits necessary for it to own, lease, sublease or operate its assets and Health Care Facilities or to conduct its business and operations as presently conducted (including to obtain reimbursement under all Third Party Payor Arrangements in which it participates),except for such defaults, violations or noncompliance that could not reasonably be expected to result in the termination or loss of such Health Care Permits, and (ii) to the extent required by any Third Party Payor, has obtained and maintains accreditation from all generally recognized accreditation agencies. Except for the Chapter 11 Cases, no circumstance exists or event has occurred which could reasonably be expected to result in the suspension, revocation, termination, restriction, limitation, modification or non-renewal of any Health Care Permit, except for such circumstances or events which could not reasonably be expected to result in a Material Adverse Effect.  The Health Care Facilities operated by each Loan Party and each of its Subsidiaries and the Medical Services provided at such Health Care Facilities are qualified for participation in the Government Reimbursement Programs, and each Loan Party and each of its Subsidiaries is entitled to reimbursement under the Government Reimbursement Programs for services rendered at such Health Care Facilities to qualified beneficiaries.  Except as could not reasonably be expected to result in a Material Adverse Effect, all Persons providing professional health care services for or on behalf of any Loan Party (either as an employee or independent contractor) are appropriately licensed in every jurisdiction in which they are required to be licensed in connection with the provision of health care services on behalf of a Loan Party.

(b) **Cost Reports; Overpayments.**  Each Loan Party and each of its Subsidiaries has timely filed or caused to be timely filed all material cost reports and other material reports of every kind whatsoever required by any Government Reimbursement Program to have been filed or made with respect to the operations of the Loan Parties.  There are no material claims, actions or appeals pending before CMS, any administrative contractor, intermediary or carrier or any other Governmental Authority with respect to any Government Reimbursement Programs cost reports or claims filed by any Loan Party, or any material disallowance by any Governmental Authority in connection with any audit of such cost reports.  No Loan Party nor any of their Subsidiaries (i) has retained a material overpayment received from, or failed to refund any material amount due to any Government Reimbursement Program or other Third Party Payor in violation of any Health Care Law or Third Party Payor Arrangement, or (ii) has received written notice of, or has knowledge of, any overpayment or refunds due to any Third Party Payor.

(c) **Material Statements.**  No Loan Party nor any of their Subsidiaries, nor any officer, affiliate, employee or agent of any Loan Party or any Subsidiary of any Loan Party, has made an untrue statement of a material fact or fraudulent statement to any Governmental Authority, failed to disclose a material fact that must be disclosed to any Governmental Authority, or committed an act, made a statement or failed to make a

- 33 -

statement that, at the time such statement, disclosure or failure to disclose occurred, would constitute a violation of any Health Care Law that could reasonably be expected to have a Material Adverse Effect.

(d)    **Exclusion.**  No Loan Party nor any of their Subsidiaries, nor any owner, officer, director, partner, agent or managing employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. § 420.201) in any Loan Party or any Subsidiary of any Loan Party or an Affiliate, has (i) been excluded from any Third Party Payor Arrangement or had a civil monetary penalty assessed pursuant to 42 U.S.C. § 1320a-7; (ii) been convicted (as that term is defined in 42 C.F.R. §1001.2) of or investigated for any of those offenses described in 42 U.S.C. §1320a-7b or 18 U.S.C. §§669, 1035, 1347 or 1518, including any of the following categories of offenses: (A) criminal offenses relating to the delivery of an item or service under any federal health care program (as that term is defined in 42 U.S.C. §1320a-7b) or healthcare benefit program (as that term is defined in 18 U.S.C. §24b), (B) criminal offenses under federal or state law relating to patient neglect or abuse in connection with the delivery of a healthcare item or service, (C) criminal offenses under laws relating to fraud and abuse, theft, embezzlement, false statements to third parties, money laundering, kickbacks, breach of fiduciary responsibility or other financial misconduct in connection with the delivery of a healthcare item or service or with respect to any act or omission in a program operated by or financed in whole or in part by any federal, state or local governmental agency, (D) laws relating to the interference with or obstruction of any investigations into any criminal offenses described in this clause (d), or (E) criminal offenses under laws relating to the unlawful manufacturing, distribution, prescription or dispensing of a controlled substance; or (iii) been involved or named in a U.S. Attorney complaint made or any other action taken pursuant to the False Claims Act under 31 U.S.C. §§3729-3731 or qui tam action brought pursuant to 31 U.S.C. §3729 et seq.

(e)    **HIPAA.**  Each Loan Party and each of its Subsidiaries is in compliance with HIPAA, except for noncompliance that could not reasonably be expected to result in a Material Adverse Effect.  In addition, except to the extent that any non-compliance, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, in each contractual arrangement that is subject to HIPAA, each Loan Party and each of its Subsidiaries has: (i) entered into a written business associate agreement (as such term is defined under the HIPAA regulations) that substantially meets the requirements of HIPAA; (ii) at all times complied in all material respects with such business associate agreements in respect of the HIPAA privacy or security standards; and (iii) at no time experienced or had a material unauthorized use or disclosure of Protected Health Information (as defined in the HIPAA regulations) or privacy or security breach or other privacy or security incident within the meaning of HIPAA.

(f)    **Corporate Integrity Agreement.**  No Loan Party nor any of their Subsidiaries, nor any owner, officer, director, partner, agent or managing employee of any Loan Party or any Subsidiary of any Loan Party, is a party to or bound by any individual integrity agreement, corporate integrity agreement, corporate compliance agreement, deferred prosecution agreement, or other formal or informal agreement with any Governmental Authority concerning compliance with Health Care Laws, any Government Reimbursement Programs or the requirements of any Health Care Permit.

4.32    **Reorganization Matters**.

(a)    **Chapter 11 Cases**. The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and proper notice for (i) the motion seeking approval of the Loan Documents and entry of the Interim Order and the Final Order, (ii) the hearing for the approval of the Interim Order, and (iii) the hearing for the approval of the Final Order will be given. Borrowers shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

(b)    **Administrative Expense Claims**.  After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Borrowers now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 105, 326, 330, 331, 365,

- 34 -

503(b), 506(c) (solely after entry of the Final Order), 507(a), 507(b), 546(c), 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(1) of the Bankruptcy Code, subject, as to priority and as to payment (subject to the Approved Budget and to applicable interim compensation procedures reasonably acceptable to the Agent), to the Carve-Out and subject to such other exceptions, if any, as are expressly set forth in the Interim Order or the Final Order.

(c)    **First Priority Lien**.  After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral, subject, as to priority only, to the Carve-Out, the Prepetition Lenders' Replacement Liens and Permitted Liens.

(d)    **Perfected Lien**.  After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected Lien on all of the Collateral (except for the Avoidance Actions (if any), which shall not secure any of the Obligations until entry of the Final Order).

(e)    **Effective Order**.  The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed, modified or amended without Agent's and Borrowers' consent.

**AFFIRMATIVE COVENANTS**

Each Loan Party covenants and agrees that, until termination of all of the Commitments and payment in full of the Obligations:

5.1    **Financial Statements, Reports, Certificates.**

(a)    Loan Parties (i) will deliver to Agent, with copies to each Lender, each of the financial statements, reports, and other items set forth on Schedule 5.1 no later than the times specified therein, (ii) agree that each Loan Party and each of its Subsidiaries will have a fiscal year ending December 31 of each year, (c) agree to maintain a system of accounting that enables Borrowers to produce financial statements in accordance with GAAP, and (iv) agree that they will, and will cause each other Loan Party to, (A) keep a reporting system that shows all additions, sales, claims, returns, and allowances with respect to their and their Subsidiaries' sales, and (B) maintain their billing systems and practices substantially as in effect as of the Closing Date and shall only make material modifications thereto with notice to, and with the consent of, Agent which consent shall be given or withheld by Agent in its reasonable discretion.

(b)    Loan Parties will, no later than the 20th day of each month beginning with December 20, 2018, propose a revised budget (each a "Proposed Revised Budget") for the period from the first day of the following month (e.g. January 1, 2019 for the Proposed Revised Budget due December 20, 2019), through and including the Scheduled Maturity Date.  Each Proposed Revised Budget will be subject to the review and approval of Agent which approval may be given or withheld by Agent in its sole discretion and no shall become the Approved Budget until approved by Agent.

5.2    **Reporting.**  Loan Parties (a) will deliver to Agent (and if so requested by Agent, with copies for each Lender) each of the reports set forth on Schedule 5.2 at the times specified therein, and (b) agree to use commercially reasonable efforts in cooperation with Agent to facilitate and implement a system of electronic collateral reporting in order to provide electronic reporting of each of the items set forth on such Schedule.

5.3    **Existence**.  Except as otherwise permitted under Section 6.3 or Section 6.4, each Loan Party will at all times preserve and keep in full force and effect such Person's valid existence and good standing in its jurisdiction of organization and, except as could not reasonably be expected to result in a Material Adverse Effect, good standing with respect to all other jurisdictions in which it is qualified to do business and any rights, franchises,

- 35 -

permits, licenses, accreditations, authorizations, or other approvals material to their businesses (except where the failure to so qualify is the result of the status of the Loan Parties as debtors-in-possession in the Chapter 11 Cases).

5.4     **Maintenance of Properties.**  Each Loan Party will maintain and preserve all of its respective assets that are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear, tear, casualty, and condemnation and Permitted Dispositions excepted (and except where the failure to so maintain and preserve assets could not reasonably be expected to result in a Material Adverse Effect).

5.5     **Taxes.**  Each Loan Party will pay in full before delinquency or before the expiration of any extension period all material governmental assessments and taxes imposed, levied, or assessed against it, or any of its assets or in respect of any of its income, businesses, or franchises, except to the extent that the validity of such governmental assessment or tax is the subject of a Permitted Protest.

5.6     **Insurance.**  Each Loan Party will, at Borrowers' expense, (a) maintain insurance respecting each such Person's assets wherever located, covering liabilities, losses or damages as are customarily are insured against by other Persons engaged in same or similar businesses and similarly situated and located.  All such policies of insurance shall be with financially sound and reputable insurance companies acceptable to Agent and in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located and, in any event, in amount, adequacy, and scope reasonably satisfactory to Agent (it being agreed that the amount, adequacy, and scope of the policies of insurance of Borrowers in effect as of the Closing Date are acceptable to Agent).  All property insurance policies covering the Collateral are to be made payable to Agent for the benefit of Agent and the Lenders, as their interests may appear, in case of loss, pursuant to a standard loss payable endorsement with a standard non contributory "lender" or "secured party" clause and are to contain such other provisions as Agent may reasonably require to fully protect the Lenders' interest in the Collateral and to any payments to be made under such policies.  All certificates of property and general liability insurance are to be delivered to Agent, with the loss payable (but only in respect of Collateral) and additional insured endorsements in favor of Agent and shall provide for not less than 30 days (10 days in the case of non-payment) prior written notice to Agent of the exercise of any right of cancellation.  If any Loan Party fails to maintain such insurance, within 5 days of such a request by Agent with written notice thereof to Borrowers, Agent may arrange for such insurance, but at Borrowers' expense and without any responsibility on Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims.  Borrowers may later request that Agent cancel any such insurance purchased by Agent pursuant to the foregoing sentence, but only after providing Agent with evidence that Borrowers have the insurance required to be maintained by this Section 5.6 (and Borrowers shall pay, on demand, any charges or fees incurred by Agent due to such cancellation).  Borrowers shall give Agent prompt notice of any loss exceeding $750,000 covered by the Loan Party's casualty, business interruption or medical malpractice insurance.  Upon the occurrence and during the continuance of an Event of Default, Agent shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

5.7     **Inspection.**

(a)     Each Loan Party will permit Agent, any Lender, and each of their respective duly authorized representatives or agents to visit any of its properties and inspect any of its assets or books and records, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees (provided an authorized representative of a Borrower shall be allowed to be present) at such reasonable times and intervals as Agent or any Lender, as applicable, may designate and, so long as no Default or Event of Default has occurred and is continuing, with reasonable prior notice to Borrowers and during regular business hours.

(b)     Each Loan Party will permit Agent and each of its duly authorized representatives or agents to conduct field examinations at such reasonable times and intervals as Agent may designate.

5.8     **Compliance with Laws.**  Each Loan Party will, and will cause each of its Subsidiaries to, comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

5.9     **Environmental.**  Each Loan Party will:

(a)     Keep any property either owned or operated by such Loan Party free of any Environmental Liens or, subject to Bankruptcy Court approval, as applicable, post bonds or other financial assurances sufficient to satisfy the obligations or liability evidenced by such Environmental Liens,

(b)     Comply with Environmental Laws, except to the extent such non-compliance could not reasonably be expected to result in a Material Adverse Effect, and provide to Agent documentation of such compliance which Agent reasonably requests,

(c)     Promptly notify Agent of any release of which any Loan Party has knowledge of a Hazardous Material in any reportable quantity from or onto property owned or operated by any Loan Party and, to the extent a Loan Party is required to do so by applicable Environmental Laws or pursuant to any Environmental Action or resulting order, take any Remedial Actions to abate said release or otherwise to come into compliance, in all material respects, with applicable Environmental Law, and

(d)     Promptly, but in any event within 5 Business Days of its receipt thereof, provide Agent with written notice of any of the following:  (i) notice that an Environmental Lien has been filed against any of the real or personal property of any Loan Party, (ii) commencement of any Environmental Action or written notice that an Environmental Action will be filed against any Loan Party, and (iii) written notice of a material violation, citation, or other administrative order from a Governmental Authority.

5.10     **Disclosure Updates.**  Borrowers will, promptly and in no event later than 5 Business Days after obtaining knowledge thereof, notify Agent if any written information, exhibit, or report furnished to Agent or the Lenders contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein not misleading in light of the circumstances in which made, in each case other than forward-looking information and the Projections and information of a general economic nature and general information about Borrowers' industry.   The foregoing to the contrary notwithstanding, any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules hereto.

5.11     **[Reserved].**

5.12     **Further Assurances.**  To the extent set forth in the Interim Order or the Final Order, as applicable, each Loan Party will, at any time upon the reasonable request of Agent, execute or deliver to Agent any and all financing statements, fixture filings, security agreements, pledges, assignments, mortgages, deeds of trust, opinions of counsel, and all other documents (the "Additional Documents") that Agent may reasonably request (provided that Agent will not request hereunder any mortgage or deed of trust from any Loan Party until such time as Agent has received confirmation from each Lender that each such Lender has completed its flood insurance review and flood insurance compliance has been completed and no Loan Party will deliver any mortgage or deed of trust until such time) in form and substance reasonably satisfactory to Agent, to create, perfect, and continue perfected or to better perfect Agent's Liens in all of the assets of the Loan Parties (whether now owned or hereafter arising or acquired, tangible or intangible), and in order to fully consummate all of the transactions contemplated hereby and under the other Loan Documents.  To the maximum extent permitted by applicable law, if any Borrower or any other Loan Party refuses or fails to execute or deliver any reasonably requested Additional Documents within a reasonable period of time following the request to do so, each Borrower and each other Loan Party hereby authorizes Agent to execute any such Additional Documents in the applicable Loan Party's name and authorizes Agent to file such executed Additional Documents in any appropriate filing office.  In furtherance of, and not in limitation of, the foregoing, each Loan Party shall take such actions as Agent may reasonably request from time to

- 37 -

time to ensure that the Obligations are guarantied by the Guarantors and are secured by all or substantially all of the assets of the Loan Parties.

5.13    **[Reserved].**

5.14    **Compliance with ERISA and the IRC.**  In addition to and without limiting the generality of Section 5.8, the Loan Parties and each of its ERISA Affiliates will (a) comply in all material respects with applicable provisions of ERISA and the IRC with respect to all Employee Benefit Plans, (b) without the prior written consent of Agent and the Required Lenders, not take any action or fail to take action the result of which could result in a Loan Party or ERISA Affiliate incurring a material liability to the PBGC or to a Multiemployer Plan (other than to pay contributions or premiums payable in the ordinary course), (c) allow any facts or circumstances to exist with respect to one or more Employee Benefit Plans that, in the aggregate, reasonably could be expected to result in a Material Adverse Effect, (d) not participate in any prohibited transaction that could result in other than a *de minimis* civil penalty excise tax, fiduciary liability or correction obligation under ERISA or the IRC, (e) operate each Employee Benefit Plan in such a manner that will not incur any material tax liability under the IRC (including Section 4980B of the IRC), and (e) furnish to Agent upon Agent's written request such additional information about any Employee Benefit Plan for which any Loan Party or ERISA Affiliate could reasonably expect to incur any material liability.  With respect to each Pension Plan (other than a Multiemployer Plan) except as could not reasonably be expected to result in liability to the Loan Parties, the Loan Parties and the ERISA Affiliates shall (i) satisfy in full and in a timely manner, without incurring any late payment or underpayment charge or penalty and without giving rise to any Lien, all of the contribution and funding requirements of the IRC and of ERISA, and (ii) pay, or cause to be paid, to the PBGC in a timely manner, without incurring any late payment or underpayment charge or penalty, all premiums required pursuant to ERISA.

5.15    **[Reserved].**

5.16    **Payment of Tax Obligations**.  Borrowers shall pay all payments due to the Internal Revenue Service or a state or local taxing authority on or before the due date for each such payment.

5.17    **Compliance with Health Care Laws.**

(a)    Each Loan Party and each of its Subsidiaries will comply with all applicable Health Care Laws except to the extent that any noncompliance, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b)    Each Loan Party and each of its Subsidiaries shall (i) obtain, maintain and preserve, and cause each of its Subsidiaries to obtain, maintain and preserve, and take all necessary action to timely renew, all material Health Care Permits necessary for the conduct of its business (including, as applicable, Health Care Permits necessary for it to be eligible to receive payment and compensation from and to participate in any Third Party Payor Arrangements), except to the extent any such failure could not reasonably be expected to result in the termination or loss of any such Health Care Permit; (ii) be and remain in compliance with all requirements for participation in, and for licensure required to provide the goods or services that are reimbursable under, all Third Party Payor Arrangements, except to the extent any such failure to remain in compliance could not reasonably be expected to result in exclusion from any material Third Party Payor Arrangement; (iii) except as could not reasonably be expected to have a Material Adverse Effect, cause all Persons providing professional health care services for or on behalf of any Loan Party (either as an employee or independent contractor) to comply with all applicable Health Care Laws in the performance of their duties, and to maintain in full force and effect all professional licenses and other Health Care Permits required to perform such duties; and (iv) keep and maintain in compliance in all material respects with any applicable Health Care Law all records required to be maintained by any Governmental Authority or under any such Health Care Law.

(c)    Each Loan Party and each of its Subsidiaries shall maintain a corporate and health care regulatory compliance program ("RCP") which addresses the requirements of Health Care Laws, including HIPAA, and includes at least the following components:  (i) standards of conduct and procedures that describe compliance policies regarding laws with an emphasis on prevention of fraud and abuse; (ii) a specific officer

- 38 -

within high-level personnel identified as having overall responsibility for compliance with such standards and procedures; (iii) training and education programs which effectively communicate the compliance standards and procedures to employees and agents, including fraud and abuse laws and illegal billing practices; (iv) auditing and monitoring systems and reasonable steps for achieving compliance with such standards and procedures including publicizing a reporting system to allow employees and other agents to anonymously report criminal or suspect conduct and potential compliance problems; (v) disciplinary guidelines and consistent enforcement of compliance policies including discipline of individuals responsible for the failure to detect violations of the RCP; and (vi) mechanisms to immediately respond to detected violations of the RCP.  Each Loan Party and each of its Subsidiaries shall modify such RCPs from time to time, as may be necessary to ensure continuing compliance with all applicable Health Care Laws.  Upon request, the Agent (and/or its consultants) shall be permitted to review such RCPs.

(d)    Each Loan Party that qualifies for reimbursement under the LTCH PPS shall timely submit quality reporting data or information to each applicable Governmental Authority pursuant to any Government Reimbursement Program, including standardized patient assessment data or information as required by the Improving Medicare Post-Acute Care Transformation (IMPACT) Act of 2014 (as may be amended from time to time) using either the LTCH Care Data set or the Centers for Disease Control and Prevention National Healthcare Safety Network (CDC NHSN), and each such Loan Party shall achieve data completeness thresholds on reporting quality measures set as 80% using the LTCH Care Data set or 100% using the CDC NHSN, as applicable.

(e)    Borrower shall promptly provide to Agent upon Agent's reasonable request, an accurate, complete and current list of all Third Party Payor Arrangements with respect to the business of the Loan Parties.

5.18    **Cash Dominion.**  Except as otherwise agreed by Agent and approved by the Bankruptcy Court, Borrowers shall comply with all provisions of the Guaranty and Security Agreement relating to each Government Receivables Lockbox Account, each Non-Government Receivables Lockbox Account and each other Deposit Account of Borrowers.

## 6.    NEGATIVE COVENANTS.

Each Loan Party covenants and agrees that, until termination of all of the Commitments and payment in full of the Obligations:

6.1    **Indebtedness.**  Each Loan Party will not create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness, except for Permitted Indebtedness, Obligations under the Prepetition Loan Documents and such other Indebtedness permitted pursuant to the Interim Order or the Final Order, as applicable.

6.2    **Liens.**  Each Loan Party will not create, incur, assume, or suffer to exist, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens and Liens arising under the Prepetition Loan Documents and the Adequate Protection Liens.

6.3    **Restrictions on Fundamental Changes.**  Each Loan Party will not:

(a)    Enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its Equity Interests, except for (i) any merger between Loan Parties, <u>provided</u>, that a Borrower must be the surviving entity of any such merger to which it is a party and no merger may occur between Parent and any Borrower, (ii) any merger between a Loan Party and a Subsidiary of such Loan Party that is not a Loan Party so long as such Loan Party is the surviving entity of any such merger, and (iii) any merger between Subsidiaries of Parent that are not Loan Parties,

(b)    liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution), except for the liquidation or dissolution of a Loan Party (other than Parent) so long as all of the assets (including any interest

- 39 -

in any Equity Interests) of such liquidating or dissolving Loan Party are transferred to a Loan Party (or, if the liquidating or dissolving entity is a Borrower, such assets are transferred to a Borrower) that is not liquidating or dissolving (except pursuant to a Sale Procedure Order), or

(c)     suspend or cease operating a substantial portion of its or their business, except as permitted pursuant to clauses (a) or (b) above or in connection with a transaction permitted under Section 6.4.

6.4     **Disposal of Assets.**   Other than Permitted Dispositions or transactions expressly permitted by Sections 6.3 or 6.9, each Loan Party will not convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any of its or their assets.

6.5     **Nature of Business.**   Each Loan Party will not make any change in the nature of its business as described in Schedule 6.5 or acquire any properties or assets that are not reasonably related to the conduct of such business activities; provided, that the foregoing shall not prevent the Loan Parties from engaging in any business that is reasonably related or ancillary to their business.

6.6     **Prepayments and Amendments.**   Each Loan Party will not:

(a)     Except in connection with Refinancing Indebtedness permitted by Section 6.1, optionally prepay, redeem, defease, purchase, or otherwise acquire any Indebtedness of any Loan Party (including Indebtedness under any Health Care Settlement Agreements, any Tax Settlement Agreement, the FPD Secured Note Documents, the FPD Term Loan Documents, the FPD Unsecured Term Note, the Secured Note Indebtedness, the Success Indebtedness or Affiliate Indebtedness), or make any payment in violation of any subordination terms of any Indebtedness, other than:

(i)     the Obligations in accordance with this Agreement, or

(ii)     Permitted Intercompany Advances in accordance with the Intercompany Subordination Agreement; or [1]

(iii)     Payments in accordance with the Approved Budget or Interim Order or the Final Order, as applicable; or

(b)     Except in accordance with any Bankruptcy Court order, directly or indirectly, amend, modify, or change any of the terms or provisions of:

(i)     any FPD Secured Note Document, FPD Term Loan Document, the FPD Unsecured Term Note, or the Secured Note or any agreement evidencing the Success Indebtedness,

(ii)     any Health Care Settlement Agreement, without the consent of Agent (provided that if the applicable amendment or modification to a Health Care Settlement Agreement does not cause the aggregate amounts owing under all Health Care Settlement Agreements to exceed the limitation set forth in Section 6.13, then the Agent agrees that its consent under this clause (b)(ii) shall not be unreasonably withheld, conditioned or delayed),

(iii)     any Tax Settlement Agreement or Tax Lien Subordination Agreement,

(iv)     any other agreement, instrument, document, indenture, or other writing evidencing or concerning Permitted Indebtedness other than (A) the Obligations in accordance with this Agreement,

---

[1] Please explain reason for request to add: "or the Approved Budget"

(B) Permitted Intercompany Advances, and (C) Indebtedness permitted under <u>clauses (c)</u>, <u>(f)</u>, <u>(h)</u> and <u>(i)</u> of the definition of Permitted Indebtedness, or

(v)     the Governing Documents of any Loan Party if the effect thereof, either individually or in the aggregate, could reasonably be expected to be materially adverse to the interests of the Lenders.

6.7     **Restricted Payments.**  Each Loan Party will not make any Restricted Payment.

6.8     **Accounting Methods.**  Each Loan Party will not modify or change its fiscal year or its method of accounting (other than as may be required to conform to or permitted by GAAP).

6.9     **Investments.**  Each Loan Party will not directly or indirectly, make or acquire any Investment or incur any liabilities (including contingent obligations) for or in connection with any Investment except for Permitted Investments.

6.10     **Transactions with Affiliates.**  Each Loan Party will not enter into or permit to exist any transaction with any other Loan Party except for:

(a)     transactions arising from the agreements listed on <u>Schedule 6.10</u>,

(b)     transactions between Parent or its Subsidiaries, on the one hand, and any Affiliate of Parent or its Subsidiaries, on the other hand, so long as such transactions (i) are fully disclosed to Agent prior to the consummation thereof, if they involve one or more payments by Parent or its Subsidiaries in excess of $500,000 for any single transaction or series of related transactions, and (ii) are no less favorable, taken as a whole, to Parent or its Subsidiaries, as applicable, than would be obtained in an arm's length transaction with a non-Affiliate,

(c)     so long as it has been approved by the applicable Loan Party's board of directors (or comparable governing body) in accordance with applicable law, any indemnity provided for the benefit of directors (or comparable managers) of such Loan Party,

(d)     so long as it has been approved by the applicable Loan Party's board of directors (or comparable governing body) in accordance with applicable law, the payment of reasonable compensation, severance, or employee benefit arrangements to employees, officers, and outside directors such Loan Party in the ordinary course of business and consistent with industry practice, and

(e)     transactions permitted by <u>Section 6.3</u> or <u>Section 6.7</u>, or any Permitted Intercompany Advance.

6.11     **Use of Proceeds.**  The proceeds of any Loan made hereunder shall not be used for any purpose other than (a) on the Closing Date, (i) to repay, in full, the outstanding principal balance of all Revolving Loans and all other Obligations under (and in each case as defined in) the Prepetition Credit Agreement (other than the Prepetition Term Loan and Obligations (as defined in the Prepetition Credit Agreement) related thereto) and (ii) to pay certain fees, costs and expenses incurred in connection with this Agreement, the other Loan Documents and the transactions contemplated hereby and thereby, and (b) thereafter, in accordance with the applicable Approved Budget as delivered in accordance with <u>Section 3.1</u> (including that no part of the proceeds of the Loans made to Borrowers will be used to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors).

6.12     **Limitation on Issuance of Equity Interests.**  Except for the issuance or sale of Qualified Equity Interests by Parent, each Loan Party will not issue or sell or enter into any agreement or arrangement for the issuance or sale of any of its Equity Interests.

6.13    **Settlement Agreements.** No Loan Party shall enter into any Health Care Settlement Agreement on or after the Closing Date if the aggregate amount owing by all Loan Parties under all other Health Care Settlement Agreements entered into on or after the Closing Date exceeds $12,000,000 at the time of such proposed settlement or agreement; provided, however, that Agent in its sole discretion may consent to increase such $12,000,000 limit to an amount equal to or less than $20,000,000.

6.14    **Holding Company Loan Parties.**    Each Holding Company Loan Party will not incur any Indebtedness (other than the Obligations and guaranties of Permitted Indebtedness and other liabilities of a Loan Party) or engage in any operations or business, except in connection with (i) its ownership of such Subsidiaries and its rights and obligations under the Prepetition Loan Documents and the Loan Documents, (ii) the performance of ministerial or administrative activities, (iii) the payment of taxes and administrative fees necessary for the maintenance of its existence, (iv) with respect to Parent, Holdings and PHI, their respective rights, obligations and liabilities under the FPD Secured Note Documents, the FPD Term Loan Documents, the FPD Unsecured Term Note, the Success Indebtedness, and the Affiliate Indebtedness, or (v) the administration and prosecution of the Chapter 11 Cases and activities associated with the exit therefrom.

6.15    **[Reserved].**

6.16    **Deposit Accounts.**  Each Loan Party will not fail to comply with any of the provisions set forth in Section 7(k) of the Guaranty and Security Agreement.

6.17    **Employee Benefits.**  Each Loan Party will not:

(a)    Terminate, or permit any ERISA Affiliate to terminate, any Pension Plan in a manner, or take any other action with respect to any Pension Plan, which could reasonably be expected to result in any liability of any Loan Party or ERISA Affiliate to the PBGC.

(b)    Fail to make, or permit any ERISA Affiliate to fail to make, full payment when due of all amounts which, under the provisions of any Benefit Plan, agreement relating thereto or applicable law, any Loan Party or ERISA Affiliate is required to pay if such failure could reasonably be expected to have a Material Adverse Effect.

(c)    Permit to exist, or allow any ERISA Affiliate to permit to exist, any accumulated funding deficiency within the meaning of section 302 of ERISA or section 412 of the Code, whether or not waived, with respect to any Pension Plan.

(d)    Acquire, or permit any ERISA Affiliate to acquire, an interest in any Person that causes such Person to become an ERISA Affiliate with respect to a Loan Party or with respect to any ERISA Affiliate if such Person sponsors, maintains or contributes to, or at any time in the six-year period preceding such acquisition has sponsored, maintained, or contributed to, (i) any Pension Pension or (ii) any Multiemployer Plan.

(e)    Contribute to or assume an obligation to contribute to, or permit any ERISA Affiliate to contribute to or assume an obligation to contribute to, any Multiemployer Plan.

(f)    Amend, or permit any ERISA Affiliate to amend, a Pension Plan resulting in a material increase in current liability such that a Loan Party or ERISA Affiliate is required to provide security to such Pension Plan under the IRC.

6.18    **Modifications to Leases and Other Agreements.**  Each Loan Party will not enter into any amendment or modification of, or agree to or accept any waiver of, any Lease that would (a) modify any covenant, default, or event of default to make it materially more restrictive on the business or operations of any Loan Party, (b) cause a Default or Event of Default to occur under this Agreement, or (c) be materially adverse to the interests of the Lenders.

6.19    **Formation of Subsidiaries**.  No Loan Party shall form any direct or indirect Subsidiary or acquire any direct or indirect Subsidiary after the Closing Date.

6.20    **Reclamation Claims**.  No Loan Party shall enter into any agreement to return any Goods to any of its creditors for application against any Prepetition Indebtedness, Prepetition trade payables or other Prepetition claims under section 546(c) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its Prepetition Indebtedness, Prepetition trade payables or other Prepetition claims based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount of Prepetition Indebtedness, Prepetition trade payables and other Prepetition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $[_____].

6.21    **Chapter 11 Claims**.  No Loan Party shall incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is *pari passu* with or senior to the claims of Agent and Lenders against Borrower, except for the Carve-Out and as otherwise set forth in the Interim Order or the Final Order, as applicable.

7.    **FINANCIAL COVENANTS.**

The Loan Parties covenant and agree that, until termination of all of the Commitments and payment in full of the Obligations:

(a)    Approved Budget. Agent and Lenders (a) may assume that the Borrowers will comply with the Approved Budget, (b) shall have no duty to monitor such compliance and (c) other than with respect to the Carve-Out, shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget.  The line items in the Approved Budget for payment of interest, expenses and other amounts to Agent and Lenders are estimates only, and the Borrowers remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents, the Interim Order and the Final Order. Nothing in any Approved Budget (including any estimates of a loan balance) shall constitute an amendment or other modification of this Agreement or any of the lending limits set forth therein.

(b)    Budget Variance. In addition to any and all other reporting requirements set forth in this Agreement, in connection with each update to the Approved Budget, Loan Parties shall prepare and deliver to Agent, no later than [_____] of each week, a report in form satisfactory to Agent (the "Variance Report"), comparing (1) Loan Parties' actual results and ending cash disbursements, cash receipts, and cash balance of Loan Parties for the immediately preceding week on a line item basis compared to the forecasted cash disbursements, cash receipts, and cash balance for such week on a line item basis as set forth in the immediately prior updated Approved Budget including, in each case, without limitation, an analysis of any budget variances with respect to such cash disbursements, cash receipts and net cash flow.  The net cash flow variance shall not be more than 15% less than the level of net cash flow projected for such reporting period (the "Permitted Variance")).  Such Variance Report shall (1) detail the variance, if any, of actual cash disbursements and actual cash receipts from the Approved Budget (on a weekly basis), (2) provide an explanation of any variance greater than the Permitted Variance, and (3) include a statement from an officer of the Administrative Borrower that to such person's actual knowledge after due inquiry an Event of Default has not occurred.

(c)    Budget Compliance. The Loan Parties shall maintain net cash flow in accordance with the Approved Budget or updated Approved Budget, subject to the Permitted Variance, which Approved Budget or updated Approved Budget compliance shall be measured every week commencing on the first Friday following the Effective Date.

8.    **EVENTS OF DEFAULT.**

Any one or more of the following events shall constitute an event of default (each, an "Event of Default") under this Agreement:

8.1    **Payments.**    If Borrowers fail to pay when due and payable, or when declared due and payable, (a) all or any portion of the Obligations consisting of interest, fees, or charges due the Lender Group, reimbursement of Lender Group Expenses, or other amounts (other than any portion thereof constituting principal) constituting Obligations (including any portion thereof that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), and such failure continues for a period of 3 Business Days, (b) all or any portion of the principal of the Loans, or (c) any amount payable to Issuing Bank in reimbursement of any drawing under a Letter of Credit;

8.2    **Covenants.**    If any Loan Party:

(a)    fails to perform or observe any covenant or other agreement contained in any of (i) Sections 3.6, 5.1, 5.2, 5.3 (solely if any Borrower is not in good standing in its jurisdiction of organization), 5.6, 5.7 (solely if any Borrower refuses to allow Agent or its representatives or agents to visit any Borrower's properties, inspect its assets or books or records, examine and make copies of its books and records, or discuss Borrowers' affairs, finances, and accounts with officers and employees of any Borrower), 5.10, , 5.13, or 5.14 of this Agreement, (ii) Section 6 of this Agreement, (iii) Section 7 of this Agreement, or (iv) Section 7 of the Guaranty and Security Agreement;

(b)    fails to perform or observe any covenant or other agreement contained in any of Sections 5.3 (other than if any Borrower is not in good standing in its jurisdiction of organization), 5.4, 5.5, 5.8, and 5.12 of this Agreement and such failure continues for a period of 15 days after the earlier of (i) the date on which such failure shall first become known to any officer of any Borrower or (ii) the date on which written notice thereof is given to Borrowers by Agent; or

(c)    fails to perform or observe any covenant or other agreement contained in this Agreement, or in any of the other Loan Documents, in each case, other than any such covenant or agreement that is the subject of another provision of this Section 8 (in which event such other provision of this Section 8 shall govern), and such failure continues for a period of 30 days after the earlier of (i) the date on which such failure shall first become known to any officer of any Borrower or (ii) the date on which written notice thereof is given to Borrowers by Agent;

8.3    **Judgments.**    If one or more judgments, orders, or awards for the payment of money involving an amount in any individual case in excess of $500,000 or in the aggregate in excess of $1,000,000 (except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has not denied coverage and to the extent not stayed pursuant to section 362 of the Bankruptcy Code) is entered or filed against a Loan Party, or with respect to any of their respective assets, and either (a) there is a period of 30 consecutive days at any time after the entry of any such judgment, order, or award during which (1) the same is not discharged, satisfied, vacated, or bonded pending appeal, or (2) a stay of enforcement thereof is not in effect, or (b) enforcement proceedings are commenced upon such judgment, order, or award;

8.4    **[Reserved].**

8.5    **[Reserved].**

8.6    **Default Under Other Agreements.**    If there is (a) a default under any FPD Secured Note Document, FPD Term Loan Document, the FPD Unsecured Term Note, the Secured Note, the Prepetition Principal Consulting Agreements, or any agreement evidencing the Success Indebtedness other than a default occurring under any of the foregoing resulting from the filing of the Chapter 11 Cases, (b) a default under any Tax Settlement Agreement, (c) a default under any other agreement to which a Loan Party is a party with one or more third Persons relative to a Loan Party's Indebtedness having an individual principal amount in excess of $500,000 or having an

- 44 -

aggregate principal amount in excess of $1,000,000, and, in each case under clauses (a), (b) or (c), such default (i) occurs at the final maturity of the obligations thereunder, or (ii) results in a right by such third Person, irrespective of whether exercised, to accelerate the maturity of such Loan Party's obligations thereunder, or (d) a failure to pay when due any amounts owing under any Tax Settlement Agreement, any Health Care Settlement Agreement or any other extended payment agreement with CMS or any Governmental Authority;

8.7    **Representations, etc.**    If any warranty, representation, certificate, statement, or Record made herein or in any other Loan Document or delivered in writing to Agent or any Lender in connection with this Agreement or any other Loan Document proves to be untrue in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date of issuance or making or deemed making thereof;

8.8    **Guaranty.**    If the obligation of any Guarantor under the guaranty contained in the Guaranty and Security Agreement is limited or terminated by operation of law or by such Guarantor (other than in accordance with the terms of this Agreement);

8.9    **Security Documents.**    If the Guaranty and Security Agreement or any other Loan Document that purports to create a Lien, shall, for any reason, fail or cease to create a valid and perfected and, except to the extent of Permitted Liens which are non-consensual Permitted Liens, permitted purchase money Liens or the interests of lessors under Capital Leases, first priority Lien on the Collateral covered thereby, except (a) as a result of a disposition of the applicable Collateral in a transaction permitted under this Agreement, (b) with respect to Collateral the aggregate value of which, for all such Collateral, does not exceed at any time, $250,000, or (c) as the result of an action or failure to act on the part of Agent;

8.10    **Loan Documents.**    The validity or enforceability of any Loan Document shall at any time for any reason (other than solely as the result of an action or failure to act on the part of Agent) be declared to be null and void, or a proceeding shall be commenced by a Loan Party or its Subsidiaries, or by any Governmental Authority having jurisdiction over a Loan Party or its Subsidiaries, seeking to establish the invalidity or unenforceability thereof, or a Loan Party or its Subsidiaries shall deny in writing that such Loan Party or its Subsidiaries has any liability or obligation purported to be created under any Loan Document, in each case, unless such Loan Document terminates pursuant to the terms and conditions thereof without any breach or default thereunder by any Loan Party;

8.11    **Change of Control.**    A Change of Control shall occur, whether directly or indirectly;

8.12    **Overpayment.**    If any Loan Party is found to have been overpaid by a Government Account Debtor by more than $750,000 during any period covered by an audit conducted by such Government Account Debtor, unless such overpayment is (a) repaid within 30 days of its due date, (b) subject to an ongoing payment plan with CMS or the applicable Governmental Authority that is permitted under Section 6.13, or (c) reserved for in a manner reasonably acceptable to the Agent;

8.13    **Lockbox Instructions.**    If (a) any instruction or agreement regarding any Government Receivables Lockbox Account, Non-Government Receivables Lockbox Account or Government Receivables Lockbox Account Agreement is amended or terminated by any Loan Party without the written consent of Agent, or any Borrower gives a notice with respect to any Government Receivables Lockbox Account Agreement to change the instructions for the disposition of funds thereunder (provided, that if a Government Receivables Lockbox Account, Non-Government Receivables Lockbox Account or Government Receivables Lockbox Account Agreement is terminated by the applicable depository bank, Loan Parties have complied with Section 7(k) of the Guaranty and Security Agreement), (b) any Loan Party fails to forward any Collections on Accounts to the applicable Government Receivables Lockbox Account or Non-Government Receivables Lockbox Account as required pursuant to Section 7(k) of the Guaranty and Security Agreement, or (c) any Loan Party directs any Account Debtor to make a payment in respect of any Account to any place, lockbox or Deposit Account other than a Government Receivables Lockbox Account or Non-Government Receivables Lockbox Account, as applicable;

8.14    **Health Care Laws.**    If any of the following shall occur:

- 45 -

(a)    any material Health Care Permit of a Loan Party shall be revoked, fail to be renewed, suspended or otherwise terminated,

(b)    any Loan Party shall become excluded from participation in any Government Reimbursement Program or to accept assignments or rights to reimbursement thereunder,

(c)    any Account Debtor shall terminate, revoke or fail to renew any Loan Party's right to participate in any Third Party Payor Arrangement that provides reimbursement for Medical Services, if such termination, revocation or failure to renew could reasonably be expected to have a Material Adverse Effect, or

(d)    any Loan Party or any officer, director, partner, shareholder or managing employee of a Loan Party (i) shall have been found guilty of an act of fraud or (ii) shall have been convicted of a felony crime in each case that relates to any Medical Services or Third Party Payor Arrangement;

8.15    **ERISA.**  The occurrence of any of the following events:  (a) any Loan Party or ERISA Affiliate fails to make full payment when due of all amounts which any Loan Party or ERISA Affiliate is required to pay as contributions, installments, or otherwise to or with respect to a Pension Plan or Multiemployer Plan, and such failure could reasonably be expected to result in liability in excess of $500,000, (b) an accumulated funding deficiency or funding shortfall in excess of $500,000 occurs or exists, whether or not waived, with respect to any Pension Plan, individually or in the aggregate, (c) a Notification Event, which could reasonably be expected to result in liability in excess of $500,000, either individually or in the aggregate, or (d) any Loan Party or ERISA Affiliate completely or partially withdraws from one or more Multiemployer Plans and incurs Withdrawal Liability in excess of $500,000 in the aggregate, or fails to make any Withdrawal Liability payment when due;

8.16    **Health Care Proceeding.**  The occurrence of any Health Care Proceeding (to the extent not stayed pursuant to section 362 of the Bankruptcy Code) that could reasonably be expected to result in a Material Adverse Effect (a "Health Care Proceeding Default"), provided any such Health Care Proceeding Default shall not be an Event of Default hereunder if the same is resolved to the reasonable satisfaction of the Agent within 150 days following the commencement thereof; provided in each case, (A) the Loan Parties have commenced the actions necessary to effect the lifting of the event giving rise to the Health Care Proceeding Default within 20 days following their imposition or issuance (B) the Loan Parties continually and diligently pursue such cure thereafter, (C) the Loan Parties shall have provided to Agent, promptly after Agent's request therefor, all written reports and information concerning the facts and circumstances giving rise to such Health Care Proceeding Default and the Loan Parties' efforts and progress in curing the same as Agent shall have requested, in the case of each of (A), (B) and (C), with such detail as Agent shall have reasonably requested, and (D) such Health Care Proceeding Default at all times affects fewer than 3 Health Care Facilities and less than 7.5% of EBITDA;

8.17    **Survey Deficiencies.**

(a)    If at any time during the term of this Agreement, two (2) or more Health Care Facilities that are reimbursed pursuant to the Inpatient Prospective Payment System or that qualify for reimbursement under the LTCH PPS have any outstanding survey that has resulted in the imposition by CMS or the applicable state survey agency or accrediting organization of sanctions, deficiencies or requirements for improvement, as applicable, that require remediation and submission of a plan of correction, or that result in Medicare or Medicaid program termination, denial of accreditation, or denial or delay of payment in excess of ninety (90) from the date of submission of claims for payment, or

(b)    If at any time during the term of this Agreement, any Health Care Facility that is a skilled nursing facility has outstanding Medicare or Medicaid survey deficiencies that have resulted in the imposition by CMS or the applicable state survey agency of sanctions in the form of program termination, temporary management, or denial or delay of payment in excess of 90 days from the date of submission of claims for payment;

8.18    **Closure; Admissions Defaults; ALOS.**

      (a)     Any Health Care Facility has been closed or ordered to be closed by any Governmental Authority, or any Governmental Authority ceases to permit new patients to be admitted to any Health Care Facility or orders the discharge of any patients from any Health Care Facility,

      (b)     Any Health Care Facility that qualifies for payment under the LTCH PPS has failed to achieve an average length of stay (ALOS) of greater than twenty-five (25) days, as such ALOS shall be calculated as set forth in 42 C.F.R. 412.23(e), during any cost reporting period for such Health Care Facility, or

      (c)     Any Health Care Facility that qualifies for payment under the LTCH PPS has failed to continue to qualify for payment under the LTCH PPS for any reason.

      8.19    **Lease Default.**  An event of default occurs under any Lease (each, a "<u>Lease Default</u>") permitting the landlord thereunder, after the giving of any notice and/or the passing of any applicable grace or cure period, if applicable, to terminate such Lease or evict one or more of the Borrowers (to the extent such actions are not stayed pursuant to section 362 of the Bankruptcy Code), but only if such Lease Default, together with all other Lease Defaults that have not otherwise been cured or waived, affects 3 or more Health Care Facilities or at least 7.5% of EBITDA.

      8.20    **Restructuring Advisor**.  The failure of the Loan Parties to continue to engage a restructuring advisor reasonably acceptable to Agent (it being understood and agreed that Financial Advisor is acceptable to Agent) to provide operational advice, perform cash flow modeling and otherwise provide advisory services pursuant to such terms of engagement (including such other duties and responsibilities) as are reasonably acceptable to Agent.

      8.21    **Chapter 11 Case**.  The occurrence of any of the following in any Chapter 11 Case:

      (a)     the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto, or the entry of any order by the Bankruptcy Court in any Chapter 11 Case: (i) that (in the case of Borrowers, any other Loan Party, the Committee or any of the members thereof) requests or seeks authority for Borrowers or any other Loan Party to obtain additional financing under sections 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (ii) except as provided in the Interim Order and/or the Final Order (as applicable), to grant any Lien other than Permitted Liens upon or affecting any Collateral; (iii) except as provided in the Interim Order or the Final Order, as the case may be, to use cash collateral or Collateral of Agent under section 363(c) of the Bankruptcy Code without the prior written consent of the Agent and the Required Lenders; (iv) that (in the case of any Borrower or any other Loan Party) requests or seeks authority for or that (in the case of an order entered by the Bankruptcy Court on account of a request by any Borrower or any other Loan Party) approves or provides authority to take any other action or actions materially adverse to the Agent and the Lenders or their rights and remedies hereunder or their interest in the Collateral; or (v) the entry of any order by the Bankruptcy Court in any Chapter 11 Case granting relief as described in subclauses (i) through (iv) of this <u>Section 9.21(a)</u>;

      (b)     the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, that does not provide for the payment in full in cash of all Obligations hereunder on the effective date of such plan, or the loss by Borrowers or any other Loan Party of the exclusive right to file and solicit acceptances of a plan of reorganization;

      (c)     the entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization that does not contain a provision for termination of the Commitments and repayment in full in cash of all of the Obligations under this Agreement on or before the effective date of such plan or plans;

      (d)     the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or the Interim Order or the Final Order without the written consent of Agent;

      (e)     the Interim Order is not entered within three (3) days following the Petition Date;

(f)      the Final Order is not entered on or before the deadline set forth in the Interim Order;

(g)      the payment of, or application by Borrowers or any other Loan Party for authority to pay, any pre-petition claim without the Agent's and Required Lenders' prior written consent other than as provided in the Interim Order, the Final Order or any other order of the Bankruptcy Court in form and substance acceptable to Agent and as set forth in the Approved Budget or unless otherwise permitted under this Agreement;

(h)      the appointment of an interim or permanent trustee in any Chapter 11 Case or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in any Chapter 11 Case with expanded powers (beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of Borrowers or with the power to conduct an investigation of (or compel discovery from) Agent or Lenders or against agent or lenders under the Prepetition Credit Agreement; or a sale without the Agent's and Required Lenders' consent, of all or substantially all of Borrowers' assets either through a sale under section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise that does not provide for payment in full in cash of the Obligations and termination of the Commitments;

(i)      the dismissal of any Chapter 11 Case, or the conversion of any Chapter 11 Case from one under chapter 11 to one under chapter 7 of the Bankruptcy Code or Borrowers or any other Loan Party shall file a motion or other pleading seeking the dismissal of any Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise;

(j)      the entry of an order by the Bankrupcy Court granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (A) to allow any creditor to execute upon or enforce a Lien on any Collateral, or (B) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a Material Adverse Effect;

(k)      the entry of an order in any Chapter 11 Case avoiding or requiring disgorgement or repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents;

(l)      the failure of Borrowers to perform any of its obligations under the Interim Order or the Final Order or any violation of any of the terms of the Interim Order or the Final Order;

(m)      the challenge by Borrowers, any other Loan Party or any Committee to the validity, extent, perfection or priority of any Liens granted under the Prepetition Credit Agreement, or the filing by any such Person of any claim or cause of action against Agent or any Lender;

(n)      the remittance, use or application of the proceeds of Collateral other than in accordance with cash management procedures and agreements reasonably acceptable to Agent;

(o)      the entry of an order in any of the Chapter 11 Cases granting any other super priority administrative claim or Lien (other than the Prepetition Lenders' Replacement Liens and such other exceptions, if any, as are expressly set forth in the Interim Order and/or the Final Order (as applicable)) equal or superior to that granted to Agent, on behalf of itself and Lenders without the consent in writing of Agent and Required Lenders; or

(p)      the failure to meet any of the sale transaction milestones set forth on <u>Schedule 8.21</u>.

## 9.      **RIGHTS AND REMEDIES.**

9.1      **Rights and Remedies.**  Notwithstanding section 362 of the Bankruptcy Code, and subject to the terms and conditions of the Interim Order and/or the Final Order, as applicable, upon the occurrence and during the continuation of an Event of Default, Agent may, and, at the instruction of the Required Lenders, shall (in each case

- 48 -

under clauses (a) or (b) by written notice to Borrowers), in addition to any other rights or remedies provided for hereunder or under any other Loan Document or by applicable law, do any one or more of the following:

(a)     (i) declare the principal of, and any and all accrued and unpaid interest and fees in respect of, the Loans and all other Obligations (other than the Bank Product Obligations), whether evidenced by this Agreement or by any of the other Loan Documents to be immediately due and payable, whereupon the same shall become and be immediately due and payable and Borrowers shall be obligated to repay all of such Obligations in full, without presentment, demand, protest, or further notice or other requirements of any kind, all of which are hereby expressly waived by each Borrower, and (ii) direct Borrowers to provide (and Borrowers agree that upon receipt of such notice Borrowers will provide) Letter of Credit Collateralization to Agent to be held as security for Borrowers' reimbursement obligations for drawings that may subsequently occur under issued and outstanding Letters of Credit;

(b)     declare the Commitments terminated, whereupon the Commitments shall immediately be terminated together with (i) any obligation of any Revolving Lender to make Revolving Loans, (ii) the obligation of the Swing Lender to make Swing Loans, and (iii) the obligation of Issuing Bank to issue Letters of Credit;

(c)     cause any funds maintained in any Non-Government Receivables Lockbox Account to be swept to the Agent's Account; and

(d)     exercise all other rights and remedies available to Agent or the Lenders under the Loan Documents, under applicable law, or in equity.

9.2     **Remedies Cumulative.**  The rights and remedies of the Lender Group under this Agreement, the other Loan Documents, and all other agreements shall be cumulative.  The Lender Group shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity.  No exercise by the Lender Group of one right or remedy shall be deemed an election, and no waiver by the Lender Group of any Event of Default shall be deemed a continuing waiver.  No delay by the Lender Group shall constitute a waiver, election, or acquiescence by it.

## 10.     WAIVERS; INDEMNIFICATION.

10.1     **Demand; Protest; etc.**  Each Borrower waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by the Lender Group on which any Borrower may in any way be liable.

10.2     **The Lender Group's Liability for Collateral.**  Each Borrower hereby agrees that:  (a) so long as Agent complies with its obligations, if any, under the Code, the Lender Group shall not in any way or manner be liable or responsible for:  (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person, and (b) all risk of loss, damage, or destruction of the Collateral shall be borne by Borrowers.

10.3     **Indemnification.**  Each Borrower shall pay, indemnify, defend, and hold the Agent-Related Persons, the Lender-Related Persons, and each Participant (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable and documented fees and disbursements of attorneys, experts, or consultants and all other reasonable and documented costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to the execution and delivery (provided that Borrowers shall not be liable for costs and expenses (including attorneys fees) of any Lender (other than Wells Fargo) incurred in advising, structuring, drafting, reviewing, administering or syndicating the Loan Documents), enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other

EAST\162241995.1

Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of the Loan Parties' compliance with the terms of the Loan Documents (<u>provided</u>, that the indemnification in this clause (a) shall not extend to (i) disputes solely between or among the Lenders that do not involve any acts or omissions of any Loan Party, or (ii) disputes solely between or among the Lenders and their respective Affiliates that do not involve any acts or omissions of any Loan Party; it being understood and agreed that the indemnification in this clause (a) shall extend to Agent (but not the Lenders) relative to disputes between or among Agent on the one hand, and one or more Lenders, or one or more of their Affiliates, on the other hand, or (iii) any Taxes or any costs attributable to Taxes, which shall be governed by <u>Section 16</u>), (b) with respect to any actual or prospective investigation, litigation, or proceeding related to this Agreement, any other Loan Document, the making of any Loans or issuance of any Letters of Credit hereunder, or the use of the proceeds of the Loans or the Letters of Credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto, and (c) in connection with or arising out of any presence or release of Hazardous Materials at, on, under, to or from any assets or properties owned, leased or operated by any Parent or any of its Subsidiaries or any Environmental Actions, Environmental Liabilities or Remedial Actions related in any way to any such assets or properties of Parent or any of its Subsidiaries (each and all of the foregoing, the "<u>Indemnified Liabilities</u>").  The foregoing to the contrary notwithstanding, no Borrower shall have any obligation to any Indemnified Person under this <u>Section 10.3</u> with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence or willful misconduct of such Indemnified Person or its officers, directors, employees, attorneys, or agents.  This provision shall survive the termination of this Agreement and the repayment in full of the Obligations.  If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which Borrowers were required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by Borrowers with respect thereto.  **WITHOUT LIMITATION, THE FOREGOING INDEMNITY SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON OR OF ANY OTHER PERSON.**

11.    **NOTICES.**

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement or any other Loan Document shall be in writing and (except for financial statements and other informational documents which may be sent by first-class mail, postage prepaid) shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a party may designate in accordance herewith), or telefacsimile.  In the case of notices or demands to any Loan Party or Agent, as the case may be, they shall be sent to the respective address set forth below:

|  |  |
|---|---|
| If to any Loan Party: | **c/o Promise Healthcare Group, LLC** |
|  | 999 Yamato Road, 3rd Floor |
|  | Boca Raton, Florida 33431 |
|  | Attn: Chief Financial Officer |
|  | Fax No. (561) 869-3101 |
|  |  |
| with copies to: | **Waller Lansden Dortch & Davis, LLP** |
|  | 511 Union Street, Suite 2700 |
|  | Nashville, Tennessee 37219 |
|  | Attn:  John C. Tishler |
|  | Fax No.:  (615) 244-6804 |

If to Agent:          **Wells Fargo Bank, National Association**
2450 Colorado Avenue, Suite 3000 West
Santa Monica, California 90404
Attn: Specialty Finance Loan Portfolio Manager
Fax No.: (310) 453-7442

with copies to:       **McGuireWoods LLP**
1230 Peachtree Street, N.E., Suite 2100
Atlanta, Georgia 30309
Attn:  Art Gambill, Esq.
Fax No.:  (404) 443-5691
Attn: Brian I. Swett, Esq.
Fax No.: [_____]

Any party hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party.  All notices or demands sent in accordance with this Section 11, shall be deemed received on the earlier of the date of actual receipt or 3 Business Days after the deposit thereof in the mail; provided, that (a) notices sent by overnight courier service shall be deemed to have been given when received, (b) notices by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient) and (c) notices by electronic mail shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgment).

## 12.      CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.

(a)      THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO, AND ANY CLAIMS, CONTROVERSIES OR DISPUTES ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES (BUT INCLUDING AND GIVING EFFECT TO SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

(b)      THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE BANKRUPTCY COURT.

(c)      TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH LOAN PARTY AND EACH MEMBER OF THE LENDER GROUP HEREBY WAIVE THEIR RESPECTIVE RIGHTS, IF ANY, TO A JURY TRIAL OF ANY CLAIM, CONTROVERSY, DISPUTE OR CAUSE OF ACTION DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS (EACH A "CLAIM"). EACH LOAN PARTY AND EACH MEMBER OF THE LENDER GROUP REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.   IN THE EVENT OF

LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(d)     EACH LOAN PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(e)     NO CLAIM MAY BE MADE BY ANY LOAN PARTY AGAINST THE AGENT, THE SWING LENDER, ANY OTHER LENDER, ISSUING BANK, OR ANY AFFILIATE, DIRECTOR, OFFICER, EMPLOYEE, COUNSEL, REPRESENTATIVE, AGENT, OR ATTORNEY-IN-FACT OF ANY OF THEM FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES OR LOSSES IN RESPECT OF ANY CLAIM FOR BREACH OF CONTRACT OR ANY OTHER THEORY OF LIABILITY ARISING OUT OF OR RELATED TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR ANY ACT, OMISSION, OR EVENT OCCURRING IN CONNECTION THEREWITH, AND EACH LOAN PARTY HEREBY WAIVES, RELEASES, AND AGREES NOT TO SUE UPON ANY CLAIM FOR SUCH DAMAGES, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOR.

13.     **ASSIGNMENTS AND PARTICIPATIONS; SUCCESSORS**.

13.1    **Assignments and Participations.**

(a)     (i) Subject to the conditions set forth in clause (a)(ii) below, any Lender may assign and delegate all or any portion of its rights and duties under the Loan Documents (including the Obligations owed to it and its Commitments) to one or more assignees (each, an "Assignee"), with the prior written consent (such consent not be unreasonably withheld or delayed) of:

(A)     Borrowers; provided, that no consent of Borrowers shall be required (1) if an Event of Default has occurred and is continuing, or (2) in connection with an assignment to a Person that is a Lender or an Affiliate (other than natural persons) of a Lender; provided further, that Borrowers shall be deemed to have consented to a proposed assignment unless they object thereto by written notice to Agent within 5 Business Days after having received written notice thereof; and

(B)     Agent, Swing Lender, and Issuing Bank.

(ii)    Assignments shall be subject to the following additional conditions:

(A)     no assignment may be made to a natural person,

(B)     no assignment may be made to a Loan Party or an Affiliate of a Loan Party,

(C)     the amount of the Commitments and the other rights and obligations of the assigning Lender hereunder and under the other Loan Documents subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to Agent) shall be in a minimum amount (unless waived by Agent) of $5,000,000 (except such minimum amount shall not apply to (I) an assignment or delegation by any Lender to any other Lender, an Affiliate of any Lender, or a Related Fund of such Lender or (II) a group of new Lenders, each of which is an Affiliate of each other or a Related Fund of such new Lender to the extent that the aggregate amount to be assigned to all such new Lenders is at least $5,000,000),

(D)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement,

(E)    the parties to each assignment shall execute and deliver to Agent an Assignment and Acceptance; provided, that Borrowers and Agent may continue to deal solely and directly with the assigning Lender in connection with the interest so assigned to an Assignee until written notice of such assignment, together with payment instructions, addresses, and related information with respect to the Assignee, have been given to Borrowers and Agent by such Lender and the Assignee.

(F)    unless waived by Agent, the assigning Lender or Assignee has paid to Agent, for Agent's separate account, a processing fee in the amount of $3,500, and

(G)    the assignee, if it is not a Lender, shall deliver to Agent an Administrative Questionnaire in a form approved by Agent (the "Administrative Questionnaire").

(b)    From and after the date that Agent receives the executed Assignment and Acceptance and, if applicable, payment of the required processing fee, (i) the Assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, shall be a "Lender" and shall have the rights and obligations of a Lender under the Loan Documents, and (ii) the assigning Lender shall, to the extent that rights and obligations hereunder and under the other Loan Documents have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights (except with respect to Section 10.3) and be released from any future obligations under this Agreement (and in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement and the other Loan Documents, such Lender shall cease to be a party hereto and thereto); provided, that nothing contained herein shall release any assigning Lender from obligations that survive the termination of this Agreement, including such assigning Lender's obligations under Section 15 and Section 17.9(a).

(c)    By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the Assignee thereunder confirm to and agree with each other and the other parties hereto as follows:  (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto, (ii) such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Borrower or the performance or observance by any Borrower of any of its obligations under this Agreement or any other Loan Document furnished pursuant hereto, (iii) such Assignee confirms that it has received a copy of this Agreement, together with such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance, (iv) such Assignee will, independently and without reliance upon Agent, such assigning Lender or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement, (v) such Assignee appoints and authorizes Agent to take such actions and to exercise such powers under this Agreement and the other Loan Documents as are delegated to Agent, by the terms hereof and thereof, together with such powers as are reasonably incidental thereto, and (vi) such Assignee agrees that it will perform all of the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)    Immediately upon Agent's receipt of the required processing fee, if applicable, and delivery of notice to the assigning Lender pursuant to Section 13.1(b), this Agreement shall be deemed to be amended to the extent, but only to the extent, necessary to reflect the addition of the Assignee and the resulting adjustment of the Commitments arising therefrom.  The Commitment allocated to each Assignee shall reduce such Commitments of the assigning Lender pro tanto.

(e)    Any Lender may at any time sell to one or more commercial banks, financial institutions, or other Persons (a "Participant") participating interests in all or any portion of its Obligations, its Commitment, and the other rights and interests of that Lender (the "Originating Lender") hereunder and under the other Loan Documents; provided, that (i) the Originating Lender shall remain a "Lender" for all purposes of this Agreement

EAST\162241995.1

and the other Loan Documents and the Participant receiving the participating interest in the Obligations, the Commitments, and the other rights and interests of the Originating Lender hereunder shall not constitute a "Lender" hereunder or under the other Loan Documents and the Originating Lender's obligations under this Agreement shall remain unchanged, (ii) the Originating Lender shall remain solely responsible for the performance of such obligations, (iii) Borrowers, Agent, and the Lenders shall continue to deal solely and directly with the Originating Lender in connection with the Originating Lender's rights and obligations under this Agreement and the other Loan Documents, (iv) no Lender shall transfer or grant any participating interest under which the Participant has the right to approve any amendment to, or any consent or waiver with respect to, this Agreement or any other Loan Document, except to the extent such amendment to, or consent or waiver with respect to this Agreement or of any other Loan Document would (A) extend the final maturity date of the Obligations hereunder in which such Participant is participating, (B) reduce the interest rate applicable to the Obligations hereunder in which such Participant is participating, (C) release all or substantially all of the Collateral or guaranties (except to the extent expressly provided herein or in any of the Loan Documents) supporting the Obligations hereunder in which such Participant is participating, (D) postpone the payment of, or reduce the amount of, the interest or fees payable to such Participant through such Lender (other than a waiver of default interest), or (E) decrease the amount or postpone the due dates of scheduled principal repayments or prepayments or premiums payable to such Participant through such Lender, (v) no participation shall be sold to a natural person, (vi) no participation shall be sold to a Loan Party, an Affiliate of a Loan Party, and (vii) all amounts payable by Borrowers hereunder shall be determined as if such Lender had not sold such participation, except that, if amounts outstanding under this Agreement are due and unpaid, or shall have been declared or shall have become due and payable upon the occurrence and during the continuance of an Event of Default, each Participant shall be deemed to have the right of set off in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement.  The rights of any Participant only shall be derivative through the Originating Lender with whom such Participant participates and no Participant shall have any rights under this Agreement or the other Loan Documents or any direct rights as to the other Lenders, Agent, Borrowers, the Collateral, or otherwise in respect of the Obligations.  No Participant shall have the right to participate directly in the making of decisions by the Lenders among themselves.

(f)      In connection with any such assignment or participation or proposed assignment or participation or any grant of a security interest in, or pledge of, its rights under and interest in this Agreement, a Lender may, subject to the provisions of Section 17.9, disclose all documents and information which it now or hereafter may have relating to Parent and its Subsidiaries and their respective businesses.

(g)      Any other provision in this Agreement notwithstanding, any Lender may at any time create a security interest in, or pledge, all or any portion of its rights under and interest in this Agreement in favor of any Federal Reserve Bank in accordance with Regulation A of the Federal Reserve Bank or U.S. Treasury Regulation 31 CFR §203.24, and such Federal Reserve Bank may enforce such pledge or security interest in any manner permitted under applicable law.

13.2    **Successors.**  This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that no Borrower may assign this Agreement or any rights or duties hereunder without the Lenders' prior written consent and any prohibited assignment shall be absolutely void *ab initio*.  No consent to assignment by the Lenders shall release any Borrower from its Obligations.  A Lender may assign this Agreement and the other Loan Documents and its rights and duties hereunder and thereunder pursuant to Section 13.1 and, except as expressly required pursuant to Section 13.1, no consent or approval by any Borrower is required in connection with any such assignment.

## 14.   AMENDMENTS; WAIVERS.

14.1    **Amendments and Waivers.**

(a)      No amendment, waiver or other modification of any provision of this Agreement or any other Loan Document (other than Bank Product Agreements or the Fee Letter), and no consent with respect to

any departure by any Loan Party therefrom, shall be effective unless the same shall be in writing and signed by the Required Lenders (or by Agent at the written request of the Required Lenders) and the Loan Parties that are party thereto and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given; provided, that no such waiver, amendment, or consent shall, unless in writing and signed by all of the Lenders directly affected thereby and all of the Loan Parties that are party thereto, do any of the following:

    (i)     increase the amount of or extend the expiration date of any Commitment of any Lender or amend, modify, or eliminate the last sentence of Section 2.4(c)(i),

    (ii)     postpone or delay any date fixed by this Agreement or any other Loan Document for any payment of principal, interest, fees, or other amounts due hereunder or under any other Loan Document,

    (iii)     reduce the principal of, or the rate of interest on, any loan or other extension of credit hereunder, or reduce any fees or other amounts payable hereunder or under any other Loan Document (except (y) in connection with the waiver of applicability of Section 2.6(c) (which waiver shall be effective with the written consent of the Required Lenders), and (z) that any amendment or modification of defined terms used in the financial covenants in this Agreement shall not constitute a reduction in the rate of interest or a reduction of fees for purposes of this clause (iii)),

    (iv)     amend, modify, or eliminate this Section or any provision of this Agreement providing for consent or other action by all Lenders,

    (v)     amend, modify, or eliminate Section 3.1 or 3.2,

    (vi)     amend, modify, or eliminate Section 15.11,

    (vii)     other than as permitted by Section 15.11, release Agent's Lien in and to any of the Collateral,

    (viii)     amend, modify, or eliminate the definitions of "Required Lenders", "Supermajority Lenders" or "Pro Rata Share",

    (ix)     contractually subordinate any of Agent's Liens,

    (x)     other than in connection with a merger, liquidation, dissolution or sale of such Person expressly permitted by the terms hereof or the other Loan Documents, release any Borrower or any Guarantor from any obligation for the payment of money or consent to the assignment or transfer by any Borrower or any Guarantor of any of its rights or duties under this Agreement or the other Loan Documents, or

    (xi)     amend, modify, or eliminate any of the provisions of Section 2.4(b)(i), (ii) or (iii) or Section 2.4(e) or (f), or

    (b)     No amendment, waiver, modification, or consent shall amend, modify, waive, or eliminate,

    (i)     the definition of, or any of the terms or provisions of, the Fee Letter, without the written consent of Agent and Borrowers (and shall not require the written consent of any of the Lenders),

    (ii)     any provision of Section 15 pertaining to Agent, or any other rights or duties of Agent under this Agreement or the other Loan Documents, without the written consent of Agent, Borrowers, and the Required Lenders;

    (c)     No amendment, waiver, modification, elimination, or consent shall amend, without written consent of Agent, Borrowers and the Supermajority Lenders, modify, or eliminate the definition of

Borrowing Base or any of the defined terms (including the definition of Eligible Accounts) that are used in such definition to the extent that any such change results in more credit being made available to Borrowers based upon the Borrowing Base, but not otherwise, or the definition of Maximum Revolver Amount, or change <u>Section 2.1(c)</u>;

(d)     No amendment, waiver, modification, elimination, or consent shall amend, modify, or waive any provision of this Agreement or the other Loan Documents pertaining to Issuing Bank, or any other rights or duties of Issuing Bank under this Agreement or the other Loan Documents, without the written consent of Issuing Bank, Agent, Borrowers, and the Required Lenders;

(e)     No amendment, waiver, modification, elimination, or consent shall amend, modify, or waive any provision of this Agreement or the other Loan Documents pertaining to Swing Lender, or any other rights or duties of Swing Lender under this Agreement or the other Loan Documents, without the written consent of Swing Lender, Agent, Borrowers, and the Required Lenders; and

(f)     Anything in this <u>Section 14.1</u> to the contrary notwithstanding, (i) any amendment, modification, elimination, waiver, consent, termination, or release of, or with respect to, any provision of this Agreement or any other Loan Document that relates only to the relationship of the Lender Group among themselves, and that does not affect the rights or obligations of any Loan Party, shall not require consent by or the agreement of any Loan Party, and (ii) any amendment, waiver, modification, elimination, or consent of or with respect to any provision of this Agreement or any other Loan Document may be entered into without the consent of, or over the objection of, any Defaulting Lender other than any of the matters governed by <u>Section 14.1(a)(i)</u> through <u>(iii)</u> that affect such Lender.

(g)     Anything in this <u>Section 14.1</u> to the contrary notwithstanding, Agent and the Loan Parties may amend or modify this Agreement and any other Loan Document to (i) cure any factual or typographical error, omission, defect or inconsistency therein, or (ii) grant a new Lien for the benefit of the Lenders or extend an existing Lien over additional property for the benefit of the Lenders, subject to Bankruptcy Court approval, as applicable.

(h)     Notwithstanding any provision in this <u>Section 14.1</u>, this Agreement or any other Loan Document to the contrary, each Borrower, the Agent, each Lender and each other member of the Lender Group acknowledges and agrees as follows:

(i)     The term "Required Lenders" and "Supermajority Lenders" shall not include any Term Loan Lender with respect to its Term Loan.

(ii)     No Term Loan Lender shall have any right to vote or give or withhold consent to any amendment, waiver or other modification of any provision of this Agreement or any other Loan Document, and any amendment, waiver, modification, elimination, or consent of or with respect to any provision of this Agreement or any other Loan Document may be entered into without the consent of, or over the objection of, any Term Loan Lender; <u>provided</u>, however, that no such amendment, waiver or other modification of this Agreement or any Loan Document shall be effective, unless in writing and signed by each Term Loan Lender, if the effect of such amendment, waiver or other modification is to:

(A)     increase the amount of or extend the expiration date of any Term Loan Commitment of any Term Loan Lender,

(B)     reduce the principal of, or the rate of interest on, the Term Loan, or

(C)     amend, modify, or eliminate <u>Section 2.4(b)(iii)(B)</u> or this <u>Section 14.1(h)</u>.

14.2    **Replacement of Certain Lenders.**

(a)    If (i) any action to be taken by the Lender Group or Agent hereunder requires the consent, authorization, or agreement of all Lenders or all Lenders affected thereby and if such action has received the consent, authorization, or agreement of the Required Lenders but not of all Lenders or all Lenders affected thereby, or (ii) any Lender makes a claim for compensation under Section 16, then Borrowers or Agent, upon at least 5 Business Days prior irrevocable notice, may permanently replace any Lender that failed to give its consent, authorization, or agreement (a "Non-Consenting Lender") or any Lender that made a claim for compensation (a "Tax Lender") with one or more Replacement Lenders, and the Non-Consenting Lender or Tax Lender, as applicable, shall have no right to refuse to be replaced hereunder.  Such notice to replace the Non-Consenting Lender or Tax Lender, as applicable, shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given.

(b)    Prior to the effective date of such replacement, the Non-Consenting Lender or Tax Lender, as applicable, and each Replacement Lender shall execute and deliver an Assignment and Acceptance, subject only to the Non-Consenting Lender or Tax Lender, as applicable, being repaid in full its share of the outstanding Obligations (without any premium or penalty of any kind whatsoever, but including (i) all interest, fees and other amounts that may be due in payable in respect thereof, and (ii) an assumption of its Pro Rata Share of participations in the Letters of Credit).  If the Non-Consenting Lender or Tax Lender, as applicable, shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, Agent may, but shall not be required to, execute and deliver such Assignment and Acceptance in the name or and on behalf of the Non-Consenting Lender or Tax Lender, as applicable, and irrespective of whether Agent executes and delivers such Assignment and Acceptance, the Non-Consenting Lender or Tax Lender, as applicable, shall be deemed to have executed and delivered such Assignment and Acceptance.  The replacement of any Non-Consenting Lender or Tax Lender, as applicable, shall be made in accordance with the terms of Section 13.1.  Until such time as one or more Replacement Lenders shall have acquired all of the Obligations, the Commitments, and the other rights and obligations of the Non-Consenting Lender or Tax Lender, as applicable, hereunder and under the other Loan Documents, the Non-Consenting Lender or Tax Lender, as applicable, shall remain obligated to make the Non-Consenting Lender's or Tax Lender's, as applicable, Pro Rata Share of Revolving Loans and to purchase a participation in each Letter of Credit, in an amount equal to its Pro Rata Share of participations in such Letters of Credit.

14.3    **No Waivers; Cumulative Remedies.**  No failure by Agent or any Lender to exercise any right, remedy, or option under this Agreement or any other Loan Document, or delay by Agent or any Lender in exercising the same, will operate as a waiver thereof.  No waiver by Agent or any Lender will be effective unless it is in writing, and then only to the extent specifically stated.  No waiver by Agent or any Lender on any occasion shall affect or diminish Agent's and each Lender's rights thereafter to require strict performance by Loan Parties of any provision of this Agreement.  Agent's and each Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy that Agent or any Lender may have.

## 15.    AGENT; THE LENDER GROUP.

15.1    **Appointment and Authorization of Agent.**  Each Lender hereby designates and appoints Wells Fargo as its agent under this Agreement and the other Loan Documents and each Lender hereby irrevocably authorizes (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to designate, appoint, and authorize) Agent to execute and deliver each of the other Loan Documents on its behalf and to take such other action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to Agent by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto.  Agent agrees to act as agent for and on behalf of the Lenders (and the Bank Product Providers) on the conditions contained in this Section 15.  Any provision to the contrary contained elsewhere in this Agreement or in any other Loan Document notwithstanding, Agent shall not have any duties or responsibilities, except those expressly set forth herein or in the other Loan Documents, nor shall Agent have or be deemed to have any fiduciary relationship with any Lender (or Bank Product Provider), and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against Agent.  Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement or the other Loan Documents with

reference to Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only a representative relationship between independent contracting parties. Each Lender hereby further authorizes (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to authorize) Agent to act as the secured party under each of the Loan Documents that create a Lien on any item of Collateral. Except as expressly otherwise provided in this Agreement, Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions that Agent expressly is entitled to take or assert under or pursuant to this Agreement and the other Loan Documents. Without limiting the generality of the foregoing, or of any other provision of the Loan Documents that provides rights or powers to Agent, Lenders agree that Agent shall have the right to exercise the following powers as long as this Agreement remains in effect: (a) maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Collateral, payments and proceeds of Collateral, and related matters, (b) execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to the Loan Documents, (c) make Revolving Loans, for itself or on behalf of Lenders, as provided in the Loan Documents, (d) exclusively receive, apply, and distribute payments and proceeds of the Collateral as provided in the Loan Documents, (e) open and maintain such bank accounts and cash management arrangements as Agent deems necessary and appropriate in accordance with the Loan Documents for the foregoing purposes, (f) perform, exercise, and enforce any and all other rights and remedies of the Lender Group with respect to Parent, any Borrower, or any of their Subsidiaries, the Obligations, the Collateral, or otherwise related to any of same as provided in the Loan Documents, and (g) incur and pay such Lender Group Expenses as Agent may deem necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to the Loan Documents.

15.2    **Delegation of Duties.**  Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, employees or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. Agent shall not be responsible for the negligence or misconduct of any agent or attorney in fact that it selects as long as such selection was made without gross negligence or willful misconduct.

15.3    **Liability of Agent.**  None of the Agent-Related Persons shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Lenders (or Bank Product Providers) for any recital, statement, representation or warranty made by Parent, any Borrower, or any of their Subsidiaries or Affiliates, or any officer or director thereof, contained in this Agreement or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or for any failure of Parent, any Borrower, or any of their Subsidiaries or any other party to any Loan Document to perform its obligations hereunder or thereunder. No Agent-Related Person shall be under any obligation to any Lenders (or Bank Product Providers) to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the books and records or properties of Parent, any Borrower, or any of their Subsidiaries.

15.4    **Reliance by Agent.**  Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, telefacsimile or other electronic method of transmission, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to Borrowers or counsel to any Lender), independent accountants and other experts selected by Agent. Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless Agent shall first receive such advice or concurrence of the Lenders as it deems appropriate and until such instructions are received, Agent shall act, or refrain from acting, as it deems advisable. If Agent so requests, it shall first be indemnified to its reasonable satisfaction by the Lenders (and, if it so elects, the Bank Product Providers) against any and all liability and expense

- 58 -

that may be incurred by it by reason of taking or continuing to take any such action. Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Lenders (and Bank Product Providers).

15.5 **Notice of Default or Event of Default.** Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to defaults in the payment of principal, interest, fees, and expenses required to be paid to Agent for the account of the Lenders and, except with respect to Events of Default of which Agent has actual knowledge, unless Agent shall have received written notice from a Lender or Borrowers referring to this Agreement, describing such Default or Event of Default, and stating that such notice is a "notice of default." Agent promptly will notify the Lenders of its receipt of any such notice or of any Event of Default of which Agent has actual knowledge. If any Lender obtains actual knowledge of any Event of Default, such Lender promptly shall notify the other Lenders and Agent of such Event of Default. Each Lender shall be solely responsible for giving any notices to its Participants, if any. Subject to Section 15.4, Agent shall take such action with respect to such Default or Event of Default as may be requested by the Required Lenders in accordance with Section 9; provided, that unless and until Agent has received any such request, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable.

15.6 **Credit Decision.** Each Lender (and Bank Product Provider) acknowledges that none of the Agent-Related Persons has made any representation or warranty to it, and that no act by Agent hereinafter taken, including any review of the affairs of Parent, any Borrower, or any of their Subsidiaries or Affiliates, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender (or Bank Product Provider). Each Lender represents (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to represent) to Agent that it has, independently and without reliance upon any Agent-Related Person and based on such due diligence, documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of each Borrower or any other Person party to a Loan Document, and all applicable bank regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to Borrowers. Each Lender also represents (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to represent) that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of each Borrower or any other Person party to a Loan Document. Except for notices, reports, and other documents expressly herein required to be furnished to the Lenders by Agent, Agent shall not have any duty or responsibility to provide any Lender (or Bank Product Provider) with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any Borrower or any other Person party to a Loan Document that may come into the possession of any of the Agent-Related Persons. Each Lender acknowledges (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that Agent does not have any duty or responsibility, either initially or on a continuing basis (except to the extent, if any, that is expressly specified herein) to provide such Lender (or Bank Product Provider) with any credit or other information with respect to any Borrower, its Affiliates or any of their respective business, legal, financial or other affairs, and irrespective of whether such information came into Agent's or its Affiliates' or representatives' possession before or after the date on which such Lender became a party to this Agreement (or such Bank Product Provider entered into a Bank Product Agreement).

15.7 **Costs and Expenses; Indemnification.** Agent may incur and pay Lender Group Expenses to the extent Agent reasonably deems necessary or appropriate for the performance and fulfillment of its functions, powers, and obligations pursuant to the Loan Documents, including court costs, attorneys fees and expenses, fees and expenses of financial accountants, advisors, consultants, and appraisers, costs of collection by outside collection agencies, auctioneer fees and expenses, and costs of security guards or insurance premiums paid to maintain the Collateral, whether or not Borrowers are obligated to reimburse Agent or Lenders for such expenses

pursuant to this Agreement or otherwise.  Agent is authorized and directed to deduct and retain sufficient amounts from payments or proceeds of the Collateral received by Agent to reimburse Agent for such out-of-pocket costs and expenses prior to the distribution of any amounts to Lenders (or Bank Product Providers).  In the event Agent is not reimbursed for such costs and expenses by Parent, any Borrower, or any of their Subsidiaries, each Lender hereby agrees that it is and shall be obligated to pay to Agent such Lender's ratable share thereof.  Whether or not the transactions contemplated hereby are consummated, each of the Lenders, on a ratable basis, shall indemnify and defend the Agent-Related Persons (to the extent not reimbursed by or on behalf of Borrowers and without limiting the obligation of Borrowers to do so) from and against any and all Indemnified Liabilities; provided, that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting solely from such Person's gross negligence or willful misconduct nor shall any Lender be liable for the obligations of any Defaulting Lender in failing to make a Revolving Loan or other extension of credit hereunder.  Without limitation of the foregoing, each Lender shall reimburse Agent upon demand for such Lender's ratable share of any costs or out of pocket expenses (including attorneys, accountants, advisors, and consultants fees and expenses) incurred by Agent in connection with the preparation, execution, delivery, administration, modification, amendment, or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement or any other Loan Document to the extent that Agent is not reimbursed for such expenses by or on behalf of Borrowers.  The undertaking in this Section shall survive the payment of all Obligations hereunder and the resignation or replacement of Agent.

15.8     **Agent in Individual Capacity.**  Wells Fargo and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, provide Bank Products to, acquire Equity Interests in, and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with Parent, any Borrower, or any of their Subsidiaries or Affiliates and any other Person party to any Loan Document as though Wells Fargo were not Agent hereunder, and, in each case, without notice to or consent of the other members of the Lender Group.  The other members of the Lender Group acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, pursuant to such activities, Wells Fargo or its Affiliates may receive information regarding any Loan Party or its Affiliates or any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of such Person and that prohibit the disclosure of such information to the Lenders (or Bank Product Providers), and the Lenders acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver Agent will use its reasonable best efforts to obtain), Agent shall not be under any obligation to provide such information to them.  The terms "Lender" and "Lenders" include Wells Fargo in its individual capacity.

15.9     **Successor Agent**.  Agent may resign as Agent upon 30 days (10 days if an Event of Default has occurred and is continuing) prior written notice to the Lenders (unless such notice is waived by the Required Lenders) and Borrowers (unless such notice is waived by Borrowers) and without any notice to the Bank Product Providers.  If Agent resigns under this Agreement, the Required Lenders shall be entitled, with (so long as no Event of Default has occurred and is continuing) the consent of Borrowers (such consent not to be unreasonably withheld, delayed, or conditioned), appoint a successor Agent for the Lenders (and the Bank Product Providers).  If, at the time that Agent's resignation is effective, it is acting as Issuing Bank or the Swing Lender, such resignation shall also operate to effectuate its resignation as Issuing Bank or the Swing Lender, as applicable, and it shall automatically be relieved of any further obligation to issue Letters of Credit, or to make Swing Loans.  If no successor Agent is appointed prior to the effective date of the resignation of Agent, Agent may appoint, after consulting with the Lenders and Borrowers, a successor Agent.  If Agent has materially breached or failed to perform any material provision of this Agreement or of applicable law, the Required Lenders may agree in writing to remove and replace Agent with a successor Agent from among the Lenders with (so long as no Event of Default has occurred and is continuing) the consent of Borrowers (such consent not to be unreasonably withheld, delayed, or conditioned).  In any such event, upon the acceptance of its appointment as successor Agent hereunder, such successor Agent shall succeed to all the rights, powers, and duties of the retiring Agent and the term "Agent" shall mean such successor Agent and the retiring Agent's appointment, powers, and duties as Agent shall be terminated.  After any retiring Agent's resignation hereunder as Agent, the provisions of this Section 15 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.  If no successor Agent has accepted appointment as Agent by the date which is 30 days following a retiring Agent's notice of resignation,

- 60 -

the retiring Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of Agent hereunder until such time, if any, as the Lenders appoint a successor Agent as provided for above.

15.10   **Lender in Individual Capacity.**  Any Lender and its respective Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, provide Bank Products to, acquire Equity Interests in and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with any Loan Party and its Subsidiaries and Affiliates and any other Person party to any Loan Documents as though such Lender were not a Lender hereunder without notice to or consent of the other members of the Lender Group (or the Bank Product Providers).  The other members of the Lender Group acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, pursuant to such activities, such Lender and its respective Affiliates may receive information regarding a Loan Party or its Affiliates or any other Person party to any Loan Documents that is subject to confidentiality obligations in favor of such Person and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to acknowledge) that, in such circumstances (and in the absence of a waiver of such confidentiality obligations, which waiver such Lender will use its reasonable best efforts to obtain), such Lender shall not be under any obligation to provide such information to them.

15.11   **Collateral Matters.**

(a)   The Lenders hereby irrevocably authorize (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to authorize) Agent to release any Lien on any Collateral (i) upon the termination of the Commitments and payment and satisfaction in full by Borrowers of all of the Obligations, (ii) constituting property being sold or disposed of if a release is required or desirable in connection therewith and if Borrowers certify to Agent that the sale or disposition is permitted under Section 6.4 (and Agent may rely conclusively on any such certificate, without further inquiry), (iii) constituting property in which a Loan Party owned any interest at the time Agent's Lien was granted nor at any time thereafter, (iv) constituting property leased or licensed to Parent or its Subsidiaries under a lease or license that has expired or is terminated in a transaction permitted under this Agreement, or (v) in connection with a credit bid or purchase authorized under this Section 15.11.  The Loan Parties and the Lenders hereby irrevocably authorize (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to authorize) Agent, based upon the instruction of the Required Lenders, to (a) consent to the sale of, credit bid, or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code, (b) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any sale or other disposition thereof conducted under the provisions of the Code, including pursuant to Sections 9-610 or 9-620 of the Code, or (c) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the Collateral at any other sale or foreclosure conducted or consented to by Agent in accordance with applicable law in any judicial action or proceeding or by the exercise of any legal or equitable remedy.   In connection with any such credit bid or purchase, (i) the Obligations owed to the Lenders and the Bank Product Providers shall be entitled to be, and shall be (provided, however, that Agent may elect in its sole discretion to credit bid ratably among the Obligations other than Obligations relating to the Term Loan without credit bidding with respect to the Obligations relating to the Term Loan), credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not impair or unduly delay the ability of Agent to credit bid or purchase at such sale or other disposition of the Collateral and, if such contingent or unliquidated claims cannot be estimated without impairing or unduly delaying the ability of Agent to credit bid at such sale or other disposition, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the Collateral that is the subject of such credit bid or purchase) and the Lenders and the Bank Product Providers whose Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) in the Collateral that is the subject of such credit bid or purchase (or in the Equity Interests of the any entities that are used to consummate such credit bid or purchase), and (ii) Agent, based upon the instruction of the Required Lenders, may accept non-cash consideration, including debt and equity securities

- 61 -

issued by any entities used to consummate such credit bid or purchase and in connection therewith Agent may reduce the Obligations owed to the Lenders and the Bank Product Providers (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) based upon the value of such non-cash consideration. Except as provided above, Agent will not execute and deliver a release of any Lien on any Collateral without the prior written authorization of (y) if the release is of all or substantially all of the Collateral, all of the Lenders (other than the Term Loan Lenders, and without requiring the authorization of the Bank Product Providers), or (z) otherwise, the Required Lenders (without requiring the authorization of the Bank Product Providers). Upon request by Agent or Borrowers at any time, the Lenders will (and if so requested, the Bank Product Providers will) confirm in writing Agent's authority to release any such Liens on particular types or items of Collateral pursuant to this Section 15.11; provided, that (1) anything to the contrary contained in any of the Loan Documents notwithstanding, Agent shall not be required to execute any document or take any action necessary to evidence such release on terms that, in Agent's opinion, could expose Agent to liability or create any obligation or entail any consequence other than the release of such Lien without recourse, representation, or warranty, and (2) such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly released) upon (or obligations of Borrowers in respect of) any and all interests retained by any Borrower, including, the proceeds of any sale, all of which shall continue to constitute part of the Collateral. Each Lender further hereby irrevocably authorizes (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to irrevocably authorize) Agent, at its option and in its sole discretion, to release any Lien granted to or held by Agent under any Loan Document to the holder of any Permitted Lien on such property if such Permitted Lien secures Permitted Purchase Money Indebtedness.

(b)     Agent shall have no obligation whatsoever to any of the Lenders (or the Bank Product Providers) (i) to verify or assure that the Collateral exists or is owned by any Loan Party or its Subsidiaries or is cared for, protected, or insured or has been encumbered, (ii) to verify or assure that Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, or enforced or are entitled to any particular priority, (iii) to verify or assure that any particular items of Collateral meet the eligibility criteria applicable in respect thereof, (iv) to impose, maintain, increase, reduce, implement, or eliminate any particular reserve hereunder or to determine whether the amount of any reserve is appropriate or not, or (v) to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to Agent pursuant to any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, subject to the terms and conditions contained herein, Agent may act in any manner it may deem appropriate, in its sole discretion given Agent's own interest in the Collateral in its capacity as one of the Lenders and that Agent shall have no other duty or liability whatsoever to any Lender (or Bank Product Provider) as to any of the foregoing, except as otherwise expressly provided herein.

15.12    **Restrictions on Actions by Lenders; Sharing of Payments.**

(a)     Each of the Lenders agrees that it shall not, without the express written consent of Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the written request of Agent, set off against the Obligations, any amounts owing by such Lender to Parent or its Subsidiaries or any deposit accounts of Parent or its Subsidiaries now or hereafter maintained with such Lender. Each of the Lenders further agrees that it shall not, unless specifically requested to do so in writing by Agent, take or cause to be taken any action, including, the commencement of any legal or equitable proceedings to enforce any Loan Document against any Borrower or any Guarantor or to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

(b)     If, at any time or times any Lender shall receive (i) by payment, foreclosure, setoff, or otherwise, any proceeds of Collateral or any payments with respect to the Obligations, except for any such proceeds or payments received by such Lender from Agent pursuant to the terms of this Agreement, or (ii) payments from Agent in excess of such Lender's Pro Rata Share of all such distributions by Agent, such Lender promptly shall (A) turn the same over to Agent, in kind, and with such endorsements as may be required to negotiate the same to Agent, or in immediately available funds, as applicable, for the account of all of the Lenders and for application to the Obligations in accordance with the applicable provisions of this Agreement, or (B) purchase, without recourse or warranty, an undivided interest and participation in the Obligations owed to the

- 62 -

other Lenders so that such excess payment received shall be applied ratably as among the Lenders in accordance with their Pro Rata Shares; <u>provided</u>, that to the extent that such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment.

15.13    **Agency for Perfection.**    Agent hereby appoints each other Lender (and each Bank Product Provider) as its agent (and each Lender hereby accepts (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to accept) such appointment) for the purpose of perfecting Agent's Liens in assets which, in accordance with Article 8 or Article 9, as applicable, of the Code can be perfected by possession or control.  Should any Lender obtain possession or control of any such Collateral, such Lender shall notify Agent thereof, and, promptly upon Agent's request therefor shall deliver possession or control of such Collateral to Agent or in accordance with Agent's instructions.

15.14    **Payments by Agent to the Lenders.**    All payments to be made by Agent to the Lenders (or Bank Product Providers) shall be made by bank wire transfer of immediately available funds pursuant to such wire transfer instructions as each party may designate for itself by written notice to Agent.  Concurrently with each such payment, Agent shall identify whether such payment (or any portion thereof) represents principal, premium, fees, or interest of the Obligations.

15.15    **Concerning the Collateral and Related Loan Documents.**    Each member of the Lender Group authorizes and directs Agent to enter into this Agreement and the other Loan Documents.  Each member of the Lender Group agrees (and by entering into a Bank Product Agreement, each Bank Product Provider shall be deemed to agree) that any action taken by Agent in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral and the exercise by Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders (and such Bank Product Provider).

15.16    **Field Examination Reports; Confidentiality; Disclaimers by Lenders; Other Reports and Information.**    By becoming a party to this Agreement, each Lender:

(a)    is deemed to have requested that Agent furnish such Lender, promptly after it becomes available, a copy of each field examination report respecting any Loan Party (each, a "<u>Report</u>") prepared by or at the request of Agent, and Agent shall so furnish each Lender with such Reports,

(b)    expressly agrees and acknowledges that Agent does not (i) make any representation or warranty as to the accuracy of any Report, and (ii) shall not be liable for any information contained in any Report,

(c)    expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that Agent or other party performing any field examination will inspect only specific information regarding Loan Parties and will rely significantly upon Loan Parties' books and records, as well as on representations of Loan Parties' personnel,

(d)    agrees to keep all Reports and other material, non-public information regarding Loan Parties and their operations, assets, and existing and contemplated business plans in a confidential manner in accordance with <u>Section 17.9</u>, and

(e)    without limiting the generality of any other indemnification provision contained in this Agreement, agrees:  (i) to hold Agent and any other Lender preparing a Report harmless from any action the indemnifying Lender may take or fail to take or any conclusion the indemnifying Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying Lender has made or may make to Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a loan or loans of Borrowers, and (ii) to pay and protect, and indemnify, defend and hold Agent, and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs,

expenses, and other amounts (including, attorneys fees and costs) incurred by Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

(f)    In addition to the foregoing, (x) any Lender may from time to time request of Agent in writing that Agent provide to such Lender a copy of any report or document provided by Parent or its Subsidiaries to Agent that has not been contemporaneously provided by Parent or such Subsidiary to such Lender, and, upon receipt of such request, Agent promptly shall provide a copy of same to such Lender, (y) to the extent that Agent is entitled, under any provision of the Loan Documents, to request additional reports or information from Parent or its Subsidiaries, any Lender may, from time to time, reasonably request Agent to exercise such right as specified in such Lender's notice to Agent, whereupon Agent promptly shall request of Borrowers the additional reports or information reasonably specified by such Lender, and, upon receipt thereof from Parent or such Subsidiary, Agent promptly shall provide a copy of same to such Lender, and (z) any time that Agent renders to Borrowers a statement regarding the Loan Account, Agent shall send a copy of such statement to each Lender.

15.17    **Several Obligations; No Liability.**    Notwithstanding that certain of the Loan Documents now or hereafter may have been or will be executed only by or in favor of Agent in its capacity as such, and not by or in favor of the Lenders, any and all obligations on the part of Agent (if any) to make any credit available hereunder shall constitute the several (and not joint) obligations of the respective Lenders on a ratable basis, according to their respective Commitments, to make an amount of such credit not to exceed, in principal amount, at any one time outstanding, the amount of their respective Commitments.  Nothing contained herein shall confer upon any Lender any interest in, or subject any Lender to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of any other Lender.  Each Lender shall be solely responsible for notifying its Participants of any matters relating to the Loan Documents to the extent any such notice may be required, and no Lender shall have any obligation, duty, or liability to any Participant of any other Lender.  Except as provided in Section 15.7, no member of the Lender Group shall have any liability for the acts of any other member of the Lender Group.  No Lender shall be responsible to any Borrower or any other Person for any failure by any other Lender (or Bank Product Provider) to fulfill its obligations to make credit available hereunder, nor to advance for such Lender (or Bank Product Provider) or on its behalf, nor to take any other action on behalf of such Lender (or Bank Product Provider) hereunder or in connection with the financing contemplated herein.

15.18    **Term Loan Lenders.**    Notwithstanding any provision in this Article 15, this Agreement or any other Loan Document to the contrary, each Borrower, the Agent, each Lender and each other member of the Lender Group acknowledges and agrees that no Term Loan Lender shall have any right to grant or withhold consent, or vote to grant or withhold consent, for Agent to take any action described in or contemplated by this Agreement or any other Loan Document.

16.    **WITHHOLDING TAXES.**

16.1    **Payments.**    All payments made by Borrowers hereunder or under any note or other Loan Document will be made without setoff, counterclaim, or other defense.  In addition, all such payments will be made free and clear of, and without deduction or withholding for, any present or future Indemnified Taxes, and in the event any deduction or withholding of Indemnified Taxes is required, Borrowers shall comply with the next sentence of this Section 16.1.  If any Indemnified Taxes are so levied or imposed, Borrowers agree to pay the full amount of such Indemnified Taxes and such additional amounts as may be necessary so that every payment of all amounts due under this Agreement, any note, or Loan Document, including any amount paid pursuant to this Section 16.1 after withholding or deduction for or on account of any Indemnified Taxes, will not be less than the amount provided for herein.  Borrowers will furnish to Agent as promptly as possible after the date the payment of any Indemnified Tax is due pursuant to applicable law, certified copies of tax receipts evidencing such payment by Borrowers.  Borrowers agree to pay any present or future stamp, value added or documentary taxes or any other excise or property taxes, charges, or similar levies that arise from any payment made hereunder or from the execution, delivery, performance, recordation, or filing of, or otherwise with respect to this Agreement or any other Loan Document.

- 64 -

16.2    **Exemptions.**

(a)    If a Lender or Participant is entitled to claim an exemption or reduction from United States withholding tax, such Lender or Participant agrees with and in favor of Agent, to deliver to Agent (or, in the case of a Participant, to the Lender granting the participation only) one of the following before receiving its first payment under this Agreement:

(i)    if such Lender or Participant is entitled to claim an exemption from United States withholding tax pursuant to the portfolio interest exception, (A) a statement of the Lender or Participant, signed under penalty of perjury, that it is not a (I) a "bank" as described in Section 881(c)(3)(A) of the IRC, (II) a 10% shareholder of a Loan Party (within the meaning of Section 871(h)(3)(B) of the IRC), or (III) a controlled foreign corporation related to Borrowers within the meaning of Section 864(d)(4) of the IRC, and (B) a properly completed and executed IRS Form W-8BEN-E or Form W-8IMY (with proper attachments);

(ii)    if such Lender or Participant is entitled to claim an exemption from, or a reduction of, withholding tax under a United States tax treaty, a properly completed and executed copy of IRS Form W-8BEN-E;

(iii)    if such Lender or Participant is entitled to claim that interest paid under this Agreement is exempt from United States withholding tax because it is effectively connected with a United States trade or business of such Lender or Participant, a properly completed and executed copy of IRS Form W-8ECI;

(iv)    if such Lender or Participant is entitled to claim that interest paid under this Agreement is exempt from United States withholding tax because such Lender or Participant serves as an intermediary, a properly completed and executed copy of IRS Form W-8IMY (with proper attachments); or

(v)    a properly completed and executed copy of any other form or forms, including IRS Form W-9, as may be required under the IRC or other laws of the United States as a condition to exemption from, or reduction of, United States withholding or backup withholding tax.

(b)    Each Lender or Participant shall provide new forms (or successor forms) upon the expiration or obsolescence of any previously delivered forms and to promptly notify Agent (or, in the case of a Participant, to the Lender granting the participation only) of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

(c)    If a Lender or Participant claims an exemption from withholding tax in a jurisdiction other than the United States, such Lender or such Participant agrees with and in favor of Agent, to deliver to Agent (or, in the case of a Participant, to the Lender granting the participation only) any such form or forms, as may be required under the laws of such jurisdiction as a condition to exemption from, or reduction of, foreign withholding or backup withholding tax before receiving its first payment under this Agreement, but only if such Lender or such Participant is legally able to deliver such forms, provided, that nothing in this Section 16.2(c) shall require a Lender or Participant to disclose any information that it deems to be confidential (including its tax returns). Each Lender and each Participant shall provide new forms (or successor forms) upon the expiration or obsolescence of any previously delivered forms and to promptly notify Agent (or, in the case of a Participant, to the Lender granting the participation only) of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

(d)    If a Lender or Participant claims exemption from, or reduction of, withholding tax and such Lender or Participant sells, assigns, grants a participation in, or otherwise transfers all or part of the Obligations of Borrowers to such Lender or Participant, such Lender or Participant agrees to notify Agent (or, in the case of a sale of a participation interest, to the Lender granting the participation only) of the percentage amount in which it is no longer the beneficial owner of Obligations of Borrowers to such Lender or Participant. To the extent of such percentage amount, Agent will treat such Lender's or such Participant's documentation provided pursuant to Section 16.2(a) or 16.2(c) as no longer valid. With respect to such percentage amount, such Participant or Assignee may provide new documentation, pursuant to Section 16.2(a) or 16.2(c), if applicable.

Borrowers agree that each Participant shall be entitled to the benefits of this <u>Section 16</u> with respect to its participation in any portion of the Commitments and the Obligations so long as such Participant complies with the obligations set forth in this <u>Section 16</u> with respect thereto.

16.3  **Reductions.**

(a)    If a Lender or a Participant is subject to an applicable withholding tax, Agent (or, in the case of a Participant, the Lender granting the participation) may withhold from any payment to such Lender or such Participant an amount equivalent to the applicable withholding tax.  If the forms or other documentation required by <u>Section 16.2(a)</u> or <u>16.2(c)</u> are not delivered to Agent (or, in the case of a Participant, to the Lender granting the participation), then Agent (or, in the case of a Participant, to the Lender granting the participation) may withhold from any payment to such Lender or such Participant not providing such forms or other documentation an amount equivalent to the applicable withholding tax.

(b)    If the IRS or any other Governmental Authority of the United States or other jurisdiction asserts a claim that Agent (or, in the case of a Participant, to the Lender granting the participation) did not properly withhold tax from amounts paid to or for the account of any Lender or any Participant due to a failure on the part of the Lender or any Participant (because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify Agent (or such Participant failed to notify the Lender granting the participation) of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason) such Lender shall indemnify and hold Agent harmless (or, in the case of a Participant, such Participant shall indemnify and hold the Lender granting the participation harmless) for all amounts paid, directly or indirectly, by Agent (or, in the case of a Participant, to the Lender granting the participation), as tax or otherwise, including penalties and interest, and including any taxes imposed by any jurisdiction on the amounts payable to Agent (or, in the case of a Participant, to the Lender granting the participation only) under this <u>Section 16</u>, together with all costs and expenses (including attorneys fees and expenses).  The obligation of the Lenders and the Participants under this subsection shall survive the payment of all Obligations and the resignation or replacement of Agent.

16.4  **Refunds.**  If Agent or a Lender determines, in its sole discretion, that it has received a refund of any Indemnified Taxes to which Borrowers have paid additional amounts pursuant to this <u>Section 16</u>, so long as no Default or Event of Default has occurred and is continuing, it shall pay over such refund to Borrowers (but only to the extent of payments made, or additional amounts paid, by Borrowers under this <u>Section 16</u> with respect to Indemnified Taxes giving rise to such a refund), net of all out-of-pocket expenses of Agent or such Lender and without interest (other than any interest paid by the applicable Governmental Authority with respect to such a refund); provided, that Borrowers, upon the request of Agent or such Lender, agrees to repay the amount paid over to Borrowers (plus any penalties, interest or other charges, imposed by the applicable Governmental Authority, other than such penalties, interest or other charges imposed as a result of the willful misconduct or gross negligence of Agent hereunder) to Agent or such Lender in the event Agent or such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything in this Agreement to the contrary, this <u>Section 16</u> shall not be construed to require Agent or any Lender to make available its tax returns (or any other information which it deems confidential) to Borrowers or any other Person.

17.    **GENERAL PROVISIONS.**

17.1  **Effectiveness.**  This Agreement shall be binding and deemed effective when executed by each Loan Party, Agent, and each Lender whose signature is provided for on the signature pages hereof.

17.2  **Section Headings.**  Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

17.3  **Interpretation.**  Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against the Lender Group or any Loan Party, whether under any rule of construction or otherwise.  On the contrary,

this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

17.4    **Severability of Provisions.**  Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

17.5    **Bank Product Providers.**  Each Bank Product Provider in its capacity as such shall be deemed a third party beneficiary hereof and of the provisions of the other Loan Documents for purposes of any reference in a Loan Document to the parties for whom Agent is acting.  Agent hereby agrees to act as agent for such Bank Product Providers and, by virtue of entering into a Bank Product Agreement, the applicable Bank Product Provider shall be automatically deemed to have appointed Agent as its agent and to have accepted the benefits of the Loan Documents.  It is understood and agreed that the rights and benefits of each Bank Product Provider under the Loan Documents consist exclusively of such Bank Product Provider's being a beneficiary of the Liens and security interests (and, if applicable, guarantees) granted to Agent and the right to share in payments and collections out of the Collateral as more fully set forth herein. In addition, each Bank Product Provider, by virtue of entering into a Bank Product Agreement, shall be automatically deemed to have agreed that Agent shall have the right, but shall have no obligation, to establish, maintain, relax, or release reserves in respect of the Bank Product Obligations and that if reserves are established there is no obligation on the part of Agent to determine or insure whether the amount of any such reserve is appropriate or not.  In connection with any such distribution of payments or proceeds of Collateral, Agent shall be entitled to assume no amounts are due or owing to any Bank Product Provider unless such Bank Product Provider has provided a written certification (setting forth a reasonably detailed calculation) to Agent as to the amounts that are due and owing to it and such written certification is received by Agent a reasonable period of time prior to the making of such distribution.  Agent shall have no obligation to calculate the amount due and payable with respect to any Bank Products, but may rely upon the written certification of the amount due and payable from the applicable Bank Product Provider.  In the absence of an updated certification, Agent shall be entitled to assume that the amount due and payable to the applicable Bank Product Provider is the amount last certified to Agent by such Bank Product Provider as being due and payable (less any distributions made to such Bank Product Provider on account thereof).  Borrowers may obtain Bank Products from any Bank Product Provider, although Borrowers are not required to do so.  Each Borrower acknowledges and agrees that no Bank Product Provider has committed to provide any Bank Products and that the providing of Bank Products by any Bank Product Provider is in the sole and absolute discretion of such Bank Product Provider.  Notwithstanding anything to the contrary in this Agreement or any other Loan Document, no provider or holder of any Bank Product shall have any voting or approval rights hereunder (or be deemed a Lender) solely by virtue of its status as the provider or holder of such agreements or products or the Obligations owing thereunder, nor shall the consent of any such provider or holder be required (other than in their capacities as Lenders, to the extent applicable) for any matter hereunder or under any of the other Loan Documents, including as to any matter relating to the Collateral or the release of Collateral or Guarantors.

17.6    **Debtor-Creditor Relationship.**  The relationship between the Lenders and Agent, on the one hand, and the Loan Parties, on the other hand, is solely that of creditor and debtor.  No member of the Lender Group has (or shall be deemed to have) any fiduciary relationship or duty to any Loan Party arising out of or in connection with the Loan Documents or the transactions contemplated thereby, and there is no agency or joint venture relationship between the members of the Lender Group, on the one hand, and the Loan Parties, on the other hand, by virtue of any Loan Document or any transaction contemplated therein.

17.7    **Counterparts; Electronic Execution.**  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  The foregoing shall apply to each other Loan Document *mutatis mutandis*.

17.8  **Revival and Reinstatement of Obligations; Certain Waivers.**  If any member of the Lender Group or any Bank Product Provider repays, refunds, restores, or returns in whole or in part, any payment or property (including any proceeds of Collateral) previously paid or transferred to such member of the Lender Group or such Bank Product Provider in full or partial satisfaction of any Obligation or on account of any other obligation of any Loan Party under any Loan Document or any Bank Product Agreement, because the payment, transfer, or the incurrence of the obligation so satisfied is asserted or declared to be void, voidable, or otherwise recoverable under any law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent transfers, preferences, or other voidable or recoverable obligations or transfers (each, a "Voidable Transfer"), or because such member of the Lender Group or Bank Product Provider elects to do so on the reasonable advice of its counsel in connection with a claim that the payment, transfer, or incurrence is or may be a Voidable Transfer, then, as to any such Voidable Transfer, or the amount thereof that such member of the Lender Group or Bank Product Provider elects to repay, restore, or return (including pursuant to a settlement of any claim in respect thereof), and as to all reasonable costs, expenses, and attorneys fees of such member of the Lender Group or Bank Product Provider related thereto, (i) the liability of the Loan Parties with respect to the amount or property paid, refunded, restored, or returned will automatically and immediately be revived, reinstated, and restored and will exist and (ii) Agent's Liens securing such liability shall be effective, revived, and remain in full force and effect, in each case, as fully as if such Voidable Transfer had never been made. If, prior to any of the foregoing, (A) Agent's Liens shall have been released or terminated or (B) any provision of this Agreement shall have been terminated or cancelled, Agent's Liens, or such provision of this Agreement, shall be reinstated in full force and effect and such prior release, termination, cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligation of any Loan Party in respect of such liability or any Collateral securing such liability.

17.9  **Confidentiality.**

(a)  Agent and Lenders each individually (and not jointly or jointly and severally) agree that material, non-public information regarding Parent and its Subsidiaries, their operations, assets, and existing and contemplated business plans ("Confidential Information") shall be treated by Agent and the Lenders in a confidential manner, and shall not be disclosed by Agent and the Lenders to Persons who are not parties to this Agreement, except: (i) to attorneys for and other advisors, accountants, auditors, and consultants to any member of the Lender Group and to employees, directors and officers of any member of the Lender Group (the Persons in this clause (i), "Lender Group Representatives") on a "need to know" basis in connection with this Agreement and the transactions contemplated hereby and on a confidential basis, (ii) to Subsidiaries and Affiliates of any member of the Lender Group (including the Bank Product Providers), provided that any such Subsidiary or Affiliate shall have agreed to receive such information hereunder subject to the terms of this Section 17.9, (iii) as may be required by regulatory authorities so long as such authorities are informed of the confidential nature of such information, (iv) as may be required by statute, decision, or judicial or administrative order, rule, or regulation; provided that (x) prior to any disclosure under this clause (iv), the disclosing party agrees to provide Borrowers with prior notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior notice to Borrowers pursuant to the terms of the applicable statute, decision, or judicial or administrative order, rule, or regulation and (y) any disclosure under this clause (iv) shall be limited to the portion of the Confidential Information as may be required by such statute, decision, or judicial or administrative order, rule, or regulation, (v) as may be agreed to in advance in writing by Borrowers, (vi) as requested or required by any Governmental Authority pursuant to any subpoena or other legal process, provided, that, (x) prior to any disclosure under this clause (vi) the disclosing party agrees to provide Borrowers with prior written notice thereof, to the extent that it is practicable to do so and to the extent that the disclosing party is permitted to provide such prior written notice to Borrowers pursuant to the terms of the subpoena or other legal process and (y) any disclosure under this clause (vi) shall be limited to the portion of the Confidential Information as may be required by such Governmental Authority pursuant to such subpoena or other legal process, (vii) as to any such information that is or becomes generally available to the public (other than as a result of prohibited disclosure by Agent or the Lenders or the Lender Group Representatives), (viii) in connection with any assignment, participation or pledge of any Lender's interest under this Agreement, provided that prior to receipt of Confidential Information any such assignee, participant, or pledgee shall have agreed in writing to receive such Confidential Information either subject to the terms of this Section 17.9 or pursuant to

confidentiality requirements substantially similar to those contained in this <u>Section 17.9</u> (and such Person may disclose such Confidential Information to Persons employed or engaged by them as described in clause (i) above), (ix) in connection with any litigation or other adversary proceeding involving parties hereto which such litigation or adversary proceeding involves claims related to the rights or duties of such parties under this Agreement or the other Loan Documents; <u>provided</u>, that, prior to any disclosure to any Person (other than any Loan Party, Agent, any Lender, any of their respective Affiliates, or their respective counsel) under this clause (ix) with respect to litigation involving any Person (other than any Borrower, Agent, any Lender, any of their respective Affiliates, or their respective counsel), the disclosing party agrees to provide Borrowers with prior written notice thereof, and (x) in connection with, and to the extent reasonably necessary for, the exercise of any secured creditor remedy under this Agreement or under any other Loan Document.

(b)    Anything in this Agreement to the contrary notwithstanding, Agent may disclose information concerning the terms and conditions of this Agreement and the other Loan Documents to loan syndication and pricing reporting services or in its marketing or promotional materials, with such information to consist of deal terms and other information customarily found in such publications or marketing or promotional materials and may otherwise use the name, logos, and other insignia of any Borrower or the other Loan Parties and the Commitments provided hereunder in any "tombstone" or other advertisements, on its website or in other marketing materials of the Agent.

(c)    The Loan Parties hereby acknowledge that Agent or its Affiliates may make available to the Lenders materials or information provided by or on behalf of Borrowers hereunder (collectively, "<u>Borrower Materials</u>") by posting the Borrower Materials on IntraLinks, SyndTrak or another similar electronic system (the "<u>Platform</u>") and certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Loan Parties or their securities) (each, a "<u>Public Lender</u>"). The Loan Parties shall be deemed to have authorized Agent and its Affiliates and the Lenders to treat Borrower Materials marked "PUBLIC" or otherwise at any time filed with the SEC as not containing any material non-public information with respect to the Loan Parties or their securities for purposes of United States federal and state securities laws. All Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor" (or another similar term). Agent and its Affiliates and the Lenders shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" or that are not at any time filed with the SEC as being suitable only for posting on a portion of the Platform not marked as "Public Investor" (or such other similar term).

(d)    During the course of field examinations and other visits, inspections, examinations and discussions, representatives of the Agent and the Lenders may encounter individually identifiable healthcare information as defined under HIPAA, or other confidential information relating to healthcare patients (collectively, the "<u>Confidential Healthcare Information</u>"). The Loan Party maintaining such Confidential Healthcare Information shall, consistent with HIPAA's "minimum necessary" provisions, permit such disclosure for their "healthcare operations" purposes. Unless otherwise required by law, the Agents, the Lenders and their respective representatives shall not require or perform any act that would cause the Loan Parties or any of their Subsidiaries to violate any laws, regulations or ordinances intended to protect the privacy rights of healthcare patients, including HIPAA.

17.10    **Survival.** All representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that Agent, Issuing Bank, or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of, or any accrued interest on, any Loan or any fee or any other amount payable under this Agreement is outstanding or unpaid or any Letter of Credit is outstanding and so long as the Commitments have not expired or been terminated.

17.11   **Patriot Act.**  Each Lender that is subject to the requirements of the Patriot Act hereby notifies Borrowers that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies each Borrower, which information includes the name and address of each Borrower and other information that will allow such Lender to identify each Borrower in accordance with the Patriot Act.  In addition, if Agent is required by law or regulation or internal policies to do so, it shall have the right to periodically conduct (a) Patriot Act searches, OFAC/PEP searches, and customary individual background checks for the Loan Parties and (b) OFAC/PEP searches and customary individual background checks for the Loan Parties' senior management and key principals, and each Borrower agrees to cooperate in respect of the conduct of such searches and further agrees that the reasonable costs and charges for such searches shall constitute Lender Group Expenses hereunder and be for the account of Borrowers.

17.12   **Integration.**   This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.   The foregoing to the contrary notwithstanding, all Bank Product Agreements, if any, are independent agreements governed by the written provisions of such Bank Product Agreements, which will remain in full force and effect, unaffected by any repayment, prepayments, acceleration, reduction, increase, or change in the terms of any credit extended hereunder, except as otherwise expressly provided in such Bank Product Agreement.

17.13   **Borrower Representative.**  Each Borrower hereby irrevocably appoints PHI  as the borrowing agent and attorney-in-fact for all Borrowers (the "Borrower Representative") which appointment shall remain in full force and effect unless and until Agent shall have received prior written notice signed by each Borrower that such appointment has been revoked and that another Borrower has been appointed Borrower Representative.  Each Borrower hereby irrevocably appoints and authorizes the Borrower Representative (a) to provide Agent with all notices with respect to Revolving Loans and Letters of Credit obtained for the benefit of any Borrower and all other notices and instructions under this Agreement and the other Loan Documents (and any notice or instruction provided by Borrower Representative shall be deemed to be given by Borrowers hereunder and shall bind each Borrower), (b) to receive notices and instructions from members of the Lender Group (and any notice or instruction provided by any member of the Lender Group to the Borrower Representative in accordance with the terms hereof shall be deemed to have been given to each Borrower), and (c) to take such action as the Borrower Representative deems appropriate on its behalf to obtain Revolving Loans and Letters of Credit and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement.  It is understood that the handling of the Loan Account and Collateral in a combined fashion, as more fully set forth herein, is done solely as an accommodation to Borrowers in order to utilize the collective borrowing powers of Borrowers in the most efficient and economical manner and at their request, and that Lender Group shall not incur liability to any Borrower as a result hereof.  Each Borrower expects to derive benefit, directly or indirectly, from the handling of the Loan Account and the Collateral in a combined fashion since the successful operation of each Borrower is dependent on the continued successful performance of the integrated group.  To induce the Lender Group to do so, and in consideration thereof, each Borrower hereby jointly and severally agrees to indemnify each member of the Lender Group and hold each member of the Lender Group harmless against any and all liability, expense, loss or claim of damage or injury, made against the Lender Group by any Borrower or by any third party whosoever, arising from or incurred by reason of (i) the handling of the Loan Account and Collateral of Borrowers as herein provided, or (ii) the Lender Group's relying on any instructions of the Borrower Representative, except that Borrowers will have no liability to the relevant Agent-Related Person or Lender-Related Person under this Section 17.13 with respect to any liability that has been finally determined by a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of such Agent-Related Person or Lender-Related Person, as the case may be.

[Signature pages to follow.]

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**PARENT:**                    **PROMISE HEALTHCARE GROUP, LLC**,
                               a Delaware limited liability company

                               By:_____
                               Name: _____
                               Title: _____

**BORROWERS:**                 **PROMISE HOSPITAL OF ASCENSION, INC.**, a
                               Florida corporation

                               By:_____
                               Name: _____
                               Title: _____

                               **PROMISE HOSPITAL OF BATON ROUGE, INC.**, a
                               Louisiana corporation

                               By:_____
                               Name: _____
                               Title: _____

                               **PROMISE HOSPITAL OF DADE, INC.**, a Delaware
                               corporation

                               By:_____
                               Name: _____
                               Title: _____

                               **PROMISE HOSPITAL OF EAST LOS ANGELES,
                               L.P.**, a California limited partnership

                               By:  Promise Hospital of California, Inc., its General
                                    Partner

                                    By:_____
                                    Name: _____
                                    Title: _____

**PROMISE HOSPITAL OF FLORIDA AT THE VILLAGES, INC.**, a Florida corporation

By:_____
Name: _____
Title: _____

**PROMISE HOSPITAL OF LEE, INC.**, a Delaware corporation

By:_____
Name: _____
Title: _____

**PROMISE HOSPITAL OF LOUISIANA, INC.**, a Louisiana corporation

By:_____
Name: _____
Title: _____

**PROMISE HOSPITAL OF PHOENIX, INC.**, a Florida corporation

By:_____
Name: _____
Title: _____

**PROMISE HOSPITAL OF SALT LAKE, INC.**, a Louisiana corporation

By:_____
Name: _____
Title: _____

**PROMISE HOSPITAL OF VICKSBURG, INC.**, a Louisiana corporation

By:_____
Name: _____
Title: _____

**PROFESSIONAL REHABILITATION HOSPITAL, L.L.C.**, a Louisiana limited liability company

By:  Promise Healthcare, Inc., its Managing Member

By:_____
Name: _____
Title: _____


**QUANTUM HEALTH, INC.**, a California corporation

By:_____
Name: _____
Title: _____


**SUCCESS HEALTHCARE 1, LLC**, a California limited liability company

By:_____
Name: _____
Title: _____


**ST. ALEXIUS HOSPITAL CORPORATION #1**, a Missouri corporation

By:_____
Name: _____
Title: _____


**PROMISE HOSPITAL OF DALLAS, INC.**, a Texas corporation

By:_____
Name: _____
Title: _____


**PROMISE HOSPITAL OF WICHITA FALLS, INC.**, a Texas corporation

By:_____
Name: _____
Title: _____

**PROMISE HOSPITAL OF OVERLAND PARK, INC.,** a Kansas corporation

By:_____
Name: _____
Title: _____

**PROMISE SKILLED NURSING FACILITY OF WICHITA FALLS, INC.,** a Texas corporation

By:_____
Name: _____
Title: _____

**PROMISE SKILLED NURSING FACILITY OF OVERLAND PARK, INC.,** a Kansas corporation

By:_____
Name: _____
Title: _____

**GUARANTORS:**[2]

**PROMISE HEALTHCARE GROUP, LLC,** a Delaware limited liability company

By:_____
Name: _____
Title: _____

**PROMISE HEALTHCARE HOLDINGS, INC.,** a Delaware corporation

By:_____
Name: _____
Title: _____

**PROMISE HEALTHCARE, INC.,** a Florida corporation

By:_____
Name: _____

_____

[2] [to confirm all Guarantors are included]

Title: _____

**PROMISE HEALTHCARE OF CALIFORNIA, INC.**, a California corporation

By: _____
Name: _____
Title: _____

**HLP HEALTHCARE, INC.**, a California corporation

By: _____
Name: _____
Title: _____

**PH-ELA, INC.**, a California corporation

By: _____
Name: _____
Title: _____

**SUCCESS HEALTHCARE, LLC**, a California limited liability company

By: _____
Name: _____
Title: _____

**ST. ALEXIUS PROPERTIES, LLC**, a Missouri limited liability company

By:_____

Name: _____

Title: _____

**HLP OF LOS ANGELES, LLC**, a California limited liability company

By:_____

Name: _____

Title: _____

**QUANTUM PROPERTIES, L.P.**, a California limited partnership

By:_____

Name: _____

Title: _____

**BOSSIER LAND ACQUISITION CORP.**, a Florida corporation

By:_____

Name: _____

Title: _____

**HLP OF SHREVEPORT, INC.**, a Florida corporation

By:_____

Name: _____

Title: _____

**PROMISE PROPERTIES OF DADE, INC.**, a Florida corporation

By: _____

Name: _____

Title: _____


**PROMISE PROPERTIES OF LEE, INC.**, a Florida corporation

By: _____

Name: _____

Title: _____


**HLP PROPERTIES OF PORT ARTHUR, LLC**, a Texas limited liability company

By: _____

Name: _____

Title: _____


**PROMISE PROPERTIES OF SHREVEPORT, LLC**, a Louisiana limited liability company

By: _____

Name: _____

Title: _____


**LH ACQUISITION, LLC**, a Texas limited liability company

By: _____

Name: _____

Title: _____


**HLP PROPERTIES AT THE VILLAGES, L.L.C.**, a
Florida limited liability company

By: _____

Name: _____

Title: _____


**VIDALIA REAL ESTATE PARTNERS, LLC**, a
Louisiana limited liability company

By: _____

Name: _____

Title: _____


[Signatures continued on following page]

**WELLS FARGO BANK, NATIONAL ASSOCIATION,**
a national banking association, as Agent and as a Lender

By:_____

Name: _____
      Its Authorized Signatory

**Schedule 1.1**

As used in the Agreement, the following terms shall have the following definitions:

"<u>Account</u>" means an account (as that term is defined in the Code), including all health-care-insurance receivables (as that term is defined in the Code).

"<u>Account Debtor</u>" means any Person who is obligated on an Account, chattel paper, or a general intangible.

"<u>Accounting Changes</u>" means changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants (or successor thereto or any agency with similar functions).

"<u>Additional Documents</u>" has the meaning specified therefor in <u>Section 5.12</u> of the Agreement.

"<u>Adequate Protection Lien</u>" has the meaning specified therefor in the Interim Order or the Final Order, as applicable.

"<u>Administrative Questionnaire</u>" has the meaning specified therefor in <u>Section 13.1(a)</u> of the Agreement.

"<u>Affected Lender</u>" has the meaning specified therefor in <u>Section 2.13(b)</u> of the Agreement.

"<u>Affiliate</u>" means, as applied to any Person, any other Person who controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" means the possession, directly or indirectly through one or more intermediaries, of the power to direct the management and policies of a Person, whether through the ownership of Equity Interests, by contract, or otherwise; <u>provided</u>, that, for purposes of the definition of Eligible Accounts and <u>Section 6.10</u> of the Agreement: (a) any Person which owns directly or indirectly 10% or more of the Equity Interests having ordinary voting power for the election of directors or other members of the governing body of a Person or 10% or more of the partnership or other ownership interests of a Person (other than as a limited partner of such Person) shall be deemed an Affiliate of such Person, (b) each director (or comparable manager) of a Person shall be deemed to be an Affiliate of such Person, and (c) each partnership in which a Person is a general partner shall be deemed an Affiliate of such Person.

"<u>Affiliate Indebtedness</u>" means unsecured Indebtedness owing by one or more Loan Parties to one or more Subsidiaries of Parent that are not Loan Parties.

"<u>Agent</u>" has the meaning specified therefor in the preamble to the Agreement.

"<u>Agent-Related Persons</u>" means Agent, together with its Affiliates, officers, directors, employees, attorneys, and agents.

"<u>Agent's Account</u>" means the Deposit Account of Agent identified on <u>Schedule A-1</u> to this Agreement (or such other Deposit Account of Agent that has been designated as such, in writing, by Agent to Borrowers and the Lenders).

"Agent's Liens" means the Liens granted by a Loan Party to Agent under the Loan Documents and securing the Obligations.

"Agreement" means the Senior Secured, Priming and Superpriority Debtor-In-Possession Credit Agreement to which this Schedule 1.1 is attached.

"Applicable Margin" means (a) in the case of a Base Rate Loan that is a Revolving Loan, 2.00 percentage points (the "Revolving Loan Base Rate Margin"), and (b) in the case of a Base Rate Loan that is a Term Loan, 4.25 percentage points (the "Term Loan Base Rate Margin").

"Application Event" means the occurrence of (a) a failure by Borrowers to repay all of the Obligations in full on the Maturity Date, or (b) an Event of Default and the election by Agent or the Required Lenders to require that payments and proceeds of Collateral be applied pursuant to Section 2.4(b)(iii) of the Agreement.

"Approved Budget" means the aggregate, without duplication, of all items approved by Agent in its reasonable discretion that are set forth in the 13-week budget attached to the Interim Order submitted to the Bankruptcy Court or otherwise provided to and approved by Agent, as modified or supplemented from time to time in accordance with Section 5.1.

"Assignee" has the meaning specified therefor in Section 13.1(a) of the Agreement.

"Assignment and Acceptance" means an Assignment and Acceptance Agreement substantially in the form of Exhibit A-1 to the Prepetition Credit Agreement, with appropriate modifications necessary to make it reference this Agreement.

"Authorized Person" means any one of the individuals identified on Schedule A-2 to the Agreement, as such schedule is updated from time to time by written notice from Borrowers to Agent.

"Availability" means, as of any date of determination, the amount that Borrowers are entitled to borrow as Revolving Loans under Section 2.1 of the Agreement (after giving effect to the then outstanding Revolver Usage).

"Avoidance Actions" means the Loan Parties' claims and causes of action under chapter 5 of the Bankruptcy Code and similar laws, and any proceeds thereof and property received thereby whether by judgment, settlement or otherwise; provided that Avoidance Actions shall not include any claims and causes of action under section 549 of the Bankruptcy Code and any proceeds thereof and property received thereby whether by judgment, settlement or otherwise.

"Bank Product" means any one or more of the following financial products or accommodations extended to Parent, a Borrower or any of their Subsidiaries by a Bank Product Provider: (a) credit cards (including commercial cards (including so-called "purchase cards", "procurement cards" or "p-cards")), (b) credit card processing services, (c) debit cards, (d) stored value cards, (e) Cash Management Services, or (f) transactions under Hedge Agreements.

"Bank Product Agreements" means those agreements entered into from time to time by Parent, a Borrower or any of their Subsidiaries with a Bank Product Provider in connection with the obtaining of any of the Bank Products.

"Bank Product Collateralization" means providing cash collateral (pursuant to documentation reasonably satisfactory to Agent) to be held by Agent for the benefit of the Bank Product

- 2 -

Providers (other than the Hedge Providers) in an amount determined by Agent as sufficient to satisfy the reasonably estimated credit exposure with respect to the then existing Bank Product Obligations (other than Hedge Obligations).

"Bank Product Obligations" means (a) all obligations, liabilities, reimbursement obligations, fees, or expenses owing by Parent, a Borrower and their Subsidiaries to any Bank Product Provider pursuant to or evidenced by a Bank Product Agreement and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, (b) all Hedge Obligations, and (c) all amounts that Agent or any Lender is obligated to pay to a Bank Product Provider as a result of Agent or such Lender purchasing participations from, or executing guarantees or indemnities or reimbursement obligations to, a Bank Product Provider with respect to the Bank Products provided by such Bank Product Provider to Parent, a Borrower or one of their Subsidiaries.

"Bank Product Provider" means Wells Fargo or any of its Affiliates, including each of the foregoing in its capacity, if applicable, as a Hedge Provider.

"Bank Product Reserves" means, as of any date of determination, those reserves that Agent deems necessary or appropriate to establish (based upon the Bank Product Providers' determination of the liabilities and obligations of Parent, Borrowers and their Subsidiaries in respect of Bank Product Obligations) in respect of Bank Products then provided or outstanding.

"Bankruptcy Code" means title 11 of the United States Code, as in effect from time to time, or other applicable bankruptcy, insolvency or similar laws.

"Bankruptcy Court" has the meaning ascribed to it in the recitals to the Agreement.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Cases.

"Base Rate" means the greatest of (a) the Federal Funds Rate *plus* ½%, (b) the LIBOR Index Rate (which rate shall be calculated based upon an interest period of one month and shall be determined on a daily basis), *plus* one percentage point, and (c) the rate of interest announced, from time to time, within Wells Fargo at its principal office in San Francisco as its "prime rate", with the understanding that the "prime rate" is one of Wells Fargo's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo may designate (and, if any such announced rate is below zero, then the rate determined pursuant to this clause (d) shall be deemed to be zero).

"Base Rate Loan" means each portion of the Revolving Loans or Term Loan that bears interest at a rate determined by reference to the Base Rate.

"Benefit Plan" means a "defined benefit plan" (as defined in Section 3(35) of ERISA) for which Parent, any Borrower or any of their Subsidiaries or ERISA Affiliates has been an "employer" (as defined in Section 3(5) of ERISA) within the past six years.

"Board of Directors" means, as to any Person, the board of directors (or comparable managers) of such Person, or any committee thereof duly authorized to act on behalf of the board of directors (or comparable managers).

- 3 -

"<u>Board of Governors</u>" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"<u>Borrower</u>" and "<u>Borrowers</u>" have the respective meanings specified therefor in the preamble to the Agreement.

"<u>Borrower Materials</u>" has the meaning specified therefor in <u>Section 17.9(c)</u> of the Agreement.

"<u>Borrower Representative</u>" has the meaning specified therefor in <u>Section 17.13</u> of the Agreement.

"<u>Borrowing</u>" means a borrowing consisting of Revolving Loans made on the same day by the Lenders (or Agent on behalf thereof), or by Swing Lender in the case of a Swing Loan, or by Agent in the case of an Extraordinary Advance.

"<u>Borrowing Base</u>" means, as of any date of determination, the result of:

(a)    85% of the amount of Eligible Accounts (other than Eligible Unbilled Accounts) that are aged not more than 180 days after the most recent date on which Medical Services were provided, multiplied by the Expected Net Value, *less* the Credit and Unapplied Collection Amount with respect to such Eligible Accounts,

*plus*

(b)    *the lesser of* (i) 85% of the amount of Eligible Accounts (other than Eligible Unbilled Accounts) that are aged more than 180 days but not more than 210 days after the most recent date on which Medical Services were provided, multiplied by the Expected Net Value, *less* the Credit and Unapplied Collection Amount with respect to such Eligible Accounts and (ii) $3,000,000,

*plus*

(c)    *the lesser of* (i) 85% of the amount of Eligible Unbilled Accounts multiplied by the Expected Net Value, and (ii) $25,000,000,

*minus*

(d)    the aggregate amount of reserves, if any, established by Agent pursuant to <u>Section 2.1(c)</u> of the Agreement.

"<u>Borrowing Base Certificate</u>" means a certificate in the form of <u>Exhibit B-1</u> to the Prepetition Credit Agreement, with appropriate modifications necessary to make it reference this Agreement.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the State of New York, except that, if a determination of a Business Day shall relate to a LIBOR Index Rate Loan, the term "Business Day" also shall exclude any day on which banks are closed for dealings in Dollar deposits in the London interbank market.

"Capitalized Lease Obligation" means that portion of the obligations under a Capital Lease that is required to be capitalized in accordance with GAAP.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Carve-Out" shall have the meaning assigned to the term "Carve-Out", as such term is defined in the Interim Order or the Final Order, as applicable.

"Cash Equivalents" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within 1 year from the date of acquisition thereof, (b) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within 1 year from the date of acquisition thereof and, at the time of acquisition, having one of the two highest ratings obtainable from either Standard & Poor's Rating Group ("S&P") or Moody's Investors Service, Inc. ("Moody's"), (c) commercial paper maturing no more than 270 days from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, (d) certificates of deposit, time deposits, overnight bank deposits or bankers' acceptances maturing within 1 year from the date of acquisition thereof issued by any bank organized under the laws of the United States or any state thereof or the District of Columbia or any United States branch of a foreign bank having at the date of acquisition thereof combined capital and surplus of not less than $500,000,000, (e) Deposit Accounts maintained with (i) any bank that satisfies the criteria described in clause (d) above, or (ii) any other bank organized under the laws of the United States or any state thereof so long as the full amount maintained with any such other bank is insured by the Federal Deposit Insurance Corporation, (f) repurchase obligations of any commercial bank satisfying the requirements of clause (d) of this definition or recognized securities dealer having combined capital and surplus of not less than $500,000,000, having a term of not more than seven days, with respect to securities satisfying the criteria in clauses (a) or (d) above, (g) debt securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the criteria described in clause (d) above, and (h) Investments in money market funds substantially all of whose assets are invested in the types of assets described in clauses (a) through (g) above.

"Cash Management Services" means any cash management or related services including treasury, depository, return items, overdraft, controlled disbursement, merchant store value cards, e-payables services, electronic funds transfer, interstate depository network, automatic clearing house transfer (including the Automated Clearing House processing of electronic funds transfers through the direct Federal Reserve Fedline system) and other cash management arrangements.

"CHAMPVA" means, collectively, the Civilian Health and Medical Program of the Department of Veterans Affairs, and all laws, rules, regulations, manuals, orders, guidelines or requirements (whether or not having the force of law) pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"Change in Law" means the occurrence after the date of the Agreement of: (a) the adoption or effectiveness of any law, rule, regulation, judicial ruling, judgment or treaty, (b) any change in any law, rule, regulation, judicial ruling, judgment or treaty or in the administration, interpretation, implementation or application by any Governmental Authority of any law, rule, regulation, guideline or treaty, or (c) the making or issuance by any Governmental Authority of any request, rule, guideline or directive, whether or not having the force of law; provided that notwithstanding anything in the

- 5 -

Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities shall, in each case, be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"Change of Control" means that:

(a) Permitted Holders or their Affiliates fail to own and control, directly or indirectly, 61.0%, or more, of the Equity Interests of Parent entitled (without regard to the occurrence of any contingency) to vote for the election of members of the Board of Directors of Parent,

(b) any "person" or "group" (within the meaning of Sections 13(d) and 14(d) of the Exchange Act), other than Permitted Holders or their Affiliates, becomes the beneficial owner (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of 20%, or more, of the Equity Interests of Parent entitled (without regard to the occurrence of any contingency) to vote for the election of members of the Board of Directors of Parent,

(c) a majority of the members of the Board of Directors of Parent do not constitute Continuing Directors,

(d) Parent fails to own and control, directly or indirectly, (i) 100% of the Equity Interests of Holdings or (ii) 100% of the Equity Interests of each Success Loan Party,

(e) Holdings fails to own and control, directly or indirectly, 96% of the Equity Interests of PHI, or

(f) PHI fails to own and control, directly or indirectly, (i) 78% of the Equity Interests of Professional Rehabilitation or (ii) 100% of the Equity Interests of each other Loan Party other than Parent, Holdings or the Success Loan Parties.

"Chapter 11 Case" and "Chapter 11 Cases" each have the meaning ascribed to them in the Recitals.

"Closing Date" means November [__], 2018.

"CMS" means The Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services, and any Governmental Authority successor thereto.

"CMS Cost Report Settlement" means a settlement between a Borrower and CMS with respect to overpayments made to such Borrower under any Government Reimbursement Program, which overpayments are to be repaid by such Borrower as either a single payment or pursuant to a scheduled payment plan.

"Code" means the New York Uniform Commercial Code, as in effect from time to time.

"Collateral" means all assets and interests in assets and proceeds thereof now owned or hereafter acquired by a Loan Party in or upon which a Lien is granted by such Loan Party in favor of Agent or the Lenders under any of the Loan Documents, including, without limitation, the Term Loan Priority Collateral and any claims and causes of action under section 549 of the Bankruptcy Code and any

proceeds thereof and property received thereby, whether by judgment, settlement or otherwise, and, subject to entry of the Final Order, Avoidance Actions.

"Collections" means, all cash, checks, notes, instruments, and other items of payment (including insurance proceeds, cash proceeds of asset sales, rental proceeds and tax refunds).

"Commitment" means, with respect to each Lender, its Revolver Commitment or its Term Loan Commitment, as the context requires, and, with respect to all Lenders, their Revolver Commitments or their Term Loan Commitments, as the context requires, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on Schedule C-1 to the Agreement or in the Assignment and Acceptance pursuant to which such Lender became a Lender under the Agreement, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of Section 13.1 of the Agreement.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C-1 to the Prepetition Credit Agreement, with appropriate modifications necessary to make it reference this Agreement, delivered by the chief financial officer of Borrower Representative to Agent.

"Committees" shall mean collectively, the official committee of unsecured creditors and any other official committee appointed or approved in any Chapter 11 Case and each of such Committees shall be referred to herein as a Committee.

"Confidential Information" has the meaning specified therefor in Section 17.9(a) of the Agreement.

"Continuing Director" means (a) any member of the Board of Directors who was a director (or comparable manager) of Parent on the Closing Date, and (b) any individual who becomes a member of the Board of Directors of Parent after the Closing Date if such individual was approved, appointed or nominated for election to the Board of Directors by either the Permitted Holders or a majority of the Continuing Directors.

"Control Agreement" means a control agreement, in form and substance reasonably satisfactory to Agent, executed and delivered by one or more Loan Parties, Agent, and the applicable securities intermediary (with respect to a Securities Account) or bank (with respect to a Deposit Account other than a Government Receivables Lockbox Account).

"Credit and Unapplied Collection Amount" means, at any time, the sum of (a) any credit charges of any Account Debtors of Eligible Accounts (other than Eligible Unbilled Accounts) that are aged greater than 210 days from the service date and (b) any collections that have been received by a Borrower but have not yet been applied to the invoice.

"Dawson" means Mark Dawson.

"Default" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"Defaulting Lender" means any Lender that (a) has failed to fund any amounts required to be funded by it under the Agreement on the date that it is required to do so under the Agreement (including the failure to make available to Agent amounts required pursuant to a Settlement or to make a required payment in connection with a Letter of Credit Disbursement), (b) notified Borrowers, Agent, or any Lender in writing that it does not intend to comply with all or any portion of its funding obligations

- 7 -

under the Agreement, (c) has made a public statement to the effect that it does not intend to comply with its funding obligations under the Agreement or under other agreements generally (as reasonably determined by Agent) under which it has committed to extend credit, (d) failed, within 1 Business Day after written request by Agent, to confirm that it will comply with the terms of the Agreement relating to its obligations to fund any amounts required to be funded by it under the Agreement, (e) otherwise failed to pay over to Agent or any other Lender any other amount required to be paid by it under the Agreement on the date that it is required to do so under the Agreement, unless the subject of a good faith dispute, or (f) (i) becomes or is insolvent or has a parent company that has become or is insolvent or (ii) becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian or appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment.

"Defaulting Lender Rate" means (a) for the first 3 days from and after the date the relevant payment is due, the Base Rate, and (b) thereafter, the interest rate then applicable (or which would otherwise be applicable) to Revolving Loans that are Base Rate Loans (inclusive of the Revolving Loan Base Rate Margin applicable thereto).

"Deposit Account" means any deposit account (as that term is defined in the Code).

"Designated Account" means the Deposit Account of Borrower Representative identified on Schedule D-1 to the Agreement (or such other Deposit Account of Borrower Representative located at Designated Account Bank that has been designated as such, in writing, by Borrowers to Agent).

"Designated Account Bank" has the meaning specified therefor in Schedule D-1 to the Agreement (or such other bank that is located within the United States that has been designated as such, in writing, by Borrowers to Agent).

"Disqualified Equity Interests" shall mean any Equity Interest that, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 91 days after the Maturity Date set forth in the Prepetition Credit Agreement.

"Dollars" or "$" means United States dollars.

"Drawing Document" means any Letter of Credit or other document presented for purposes of drawing under any Letter of Credit.

"EBITDA" means, with respect to any fiscal period, in each case determined on a consolidated basis in accordance with GAAP,

(a)     Parent's and its Subsidiaries' consolidated net income (or loss),

>       *minus*

(b)     without duplication, the sum of the following amounts of Parent and its Subsidiaries for such period to the extent included in determining consolidated net income (or loss) for such period:

>       (i)     extraordinary gains,

>       (ii)    interest income, and

>       (iii)   electronic health record payments received by Parent or any of its Subsidiaries,

>       *plus*

(c)     without duplication, the sum of the following amounts of Parent and its Subsidiaries for such period to the extent such amounts were deducted in calculating consolidated net income (or loss) for such period:

>       (i)     non-cash extraordinary losses,

>       (ii)    documented fees and expenses paid in respect of the Settlement Agreement during such period in an amount not to exceed $1,000,000 for any fiscal year (including related to changes in ownership with respect thereto),

>       (iii)   Interest Expense,

>       (iv)    income taxes,

>       (v)     depreciation and amortization for such period,

>       (vi)    Other non-recurring charges and expenses, but in no event to exceed 5% of EBITDA, and

>       (vii)   any other non-cash items reducing consolidated net income approved by Agent in its reasonable discretion, but only to the extent not reasonably expected to result in a cash item in any future period.

"Eligible Accounts" means those Accounts created by a Borrower in the ordinary course of its business, that arise out of such Borrower's sale of goods or rendition of Medical Services, that comply with each of the representations and warranties respecting Eligible Accounts made in the Loan Documents, and that are not excluded as ineligible by virtue of one or more of the excluding criteria set forth below; provided, that such criteria may be revised from time to time by Agent in Agent's Permitted Discretion to address the results of any field examination performed by (or on behalf of) Agent from time to time after the Closing Date.  In determining the amount to be included, Eligible Accounts shall be calculated net of customer deposits, unapplied cash, taxes, discounts, credits, allowances, and rebates. Eligible Accounts shall not include the following:

- 9 -

(a)  Accounts that the Account Debtor has failed to pay within (i) except as provided in clause (ii) hereof, 210 days after the date set forth in the related invoice or statement as the most recent date on which Medical Services were provided by such Borrower to the related patient or (ii) 60 days after the most recent interim bill date with respect to a patient with a length of stay greater than 75 days,

(b)  Accounts owed by an Account Debtor (or its Affiliates) (other than Accounts owed by a Government Account Debtor) where 50% or more of all Accounts owed by that Account Debtor (or its Affiliates) are deemed ineligible under clause (a) above,

(c)  Accounts with respect to which the Account Debtor is a natural person, an Affiliate of any Borrower, or an employee or agent of any Borrower or any Affiliate of any Borrower,

(d)  Accounts arising in a transaction wherein goods are placed on consignment or are sold pursuant to a guaranteed sale, a sale or return, a sale on approval, a bill and hold, or any other terms by reason of which the payment by the Account Debtor may be conditional,

(e)  Accounts that are not payable in Dollars,

(f)  Accounts with respect to which the Account Debtor either (i) does not maintain its chief executive office in the United States, or (ii) is not organized under the laws of the United States or any state thereof, or (iii) is the government of any foreign country or sovereign state, or of any state, province, municipality, or other political subdivision thereof, or of any department, agency, public corporation, or other instrumentality thereof,

(g)  Accounts with respect to which the Account Debtor is not a Third Party Payor,

(h)  Accounts with respect to which the Account Debtor is a creditor of a Borrower, has or has asserted a right of recoupment or setoff, or has disputed its obligation to pay all or any portion of the Account, to the extent of such claim, right of recoupment or setoff, or dispute,

(i)  Accounts with respect to an Account Debtor (other than Accounts owed by a Government Account Debtor) whose total obligations owing to Borrowers exceed 10% (such percentage, as applied to a particular Account Debtor, being subject to reduction by Agent in its Permitted Discretion if the creditworthiness of such Account Debtor deteriorates) of all Eligible Accounts, to the extent of the obligations owing by such Account Debtor in excess of such percentage; provided, that, in each case, the amount of Eligible Accounts that are excluded because they exceed the foregoing percentage shall be determined by Agent based on all of the otherwise Eligible Accounts prior to giving effect to any eliminations based upon the foregoing concentration limit,

(j)  Accounts that are pending Medicaid approval by the applicable Governmental Authority for a period in excess of 30 days;

(k)  Accounts with respect to which the Account Debtor is subject to an Insolvency Proceeding, is not Solvent, has gone out of business, or as to which any Borrower has received notice of an imminent Insolvency Proceeding or a material impairment of the financial condition of such Account Debtor,

(l)  Accounts, the collection of which, Agent, in its Permitted Discretion, believes to be doubtful, including by reason of the Account Debtor's financial condition,

(m)  Accounts that are not subject to a valid and perfected first priority Agent's Lien,

- 10 -

(n)  Accounts (other than Eligible Unbilled Accounts) with respect to which the Medical Services giving rise to such Account have not been performed and billed to the Account Debtor,

(o)  Accounts with respect to which the Account Debtor is a Sanctioned Person or Sanctioned Entity,

(p)  Accounts that represent the right to receive progress payments or other advance billings that are due prior to the completion of performance by the applicable Borrower of the subject contract for goods or Medical Services, or

(q)  Accounts arising out of a cost report settlement or expected settlement.

"Eligible Unbilled Accounts" means Accounts that otherwise qualify as Eligible Accounts except that an invoice, statement or other billing document has not been sent to the applicable Account Debtor (which, for the avoidance of doubt must be a Third Party Payor); provided, that any such Account shall cease to be an Eligible Unbilled Account on the date that (a) an invoice, statement or other billing document is sent to the applicable Account Debtor, (b) except as provided in clause (c) hereof, is more than 45 days after the most recent date on which Medical Services were provided by a Borrower to the related patient, or (c) is more than 60 days after the most recent interim bill date with respect to a patient with a length of stay greater than 75 days.

"Employee Benefit Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, (a) that is or within the preceding six (6) years has been sponsored, maintained or contributed to by any Loan Party or ERISA Affiliate or (b) to which any Loan Party or ERISA Affiliate has, or has had at any time within the preceding six (6) years, any liability, contingent or otherwise.

"Environmental Action" means any written complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter, or other written communication from any Governmental Authority, or any third party involving violations of Environmental Laws or releases of Hazardous Materials (a) from any assets, properties, or businesses of any Loan Party, or any of their predecessors in interest, (b) from adjoining properties or businesses, or (c) from or onto any facilities which received Hazardous Materials generated by any Loan Party, or any of their predecessors in interest.

"Environmental Law" means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, to the extent binding on a Loan Party, relating to the environment, the effect of the environment on employee health, or Hazardous Materials, in each case as amended from time to time.

"Environmental Liabilities" means all liabilities, monetary obligations, losses, damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred as a result of any claim or demand, or Remedial Action required, by any Governmental Authority or any third party, and which relate to any Environmental Action.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities.

- 11 -

"Equipment" means equipment (as that term is defined in the Code).

"Equity Interest" means, with respect to a Person, all of the shares, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in such Person, whether voting or nonvoting, including capital stock (or other ownership or profit interests or units), preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

"ERISA Affiliate" means (a) any Person subject to ERISA whose employees are treated as employed by the same employer as the employees of Parent, any Borrower, or any of their Subsidiaries under IRC Section 414(b), (b) any trade or business subject to ERISA whose employees are treated as employed by the same employer as the employees of Parent, any Borrower, or any of their Subsidiaries under IRC Section 414(c), (c) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any organization subject to ERISA that is a member of an affiliated service group of which Parent, any Borrower, or any of their Subsidiaries is a member under IRC Section 414(m), or (d) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any Person subject to ERISA that is a party to an arrangement with Parent, any Borrower, or any of their Subsidiaries and whose employees are aggregated with the employees of Parent, any Borrower, or any of their Subsidiaries under IRC Section 414(o).

"Event of Default" has the meaning specified therefor in Section 8 of the Agreement.

"Exchange Act" means the Securities Exchange Act of 1934, as in effect from time to time.

"Excluded Taxes" means (i) any tax imposed on the net income or net profits of any Lender or any Participant (including any branch profits taxes), in each case imposed by the jurisdiction (or by any political subdivision or taxing authority thereof) in which such Lender or such Participant is organized or the jurisdiction (or by any political subdivision or taxing authority thereof) in which such Lender's or such Participant's principal office is located in each case as a result of a present or former connection between such Lender or such Participant and the jurisdiction or taxing authority imposing the tax (other than any such connection arising solely from such Lender or such Participant having executed, delivered or performed its obligations or received payment under, or enforced its rights or remedies under the Agreement or any other Loan Document); (ii) taxes resulting from a Lender's or a Participant's failure to comply with the requirements of Section 16.2 of the Agreement, (iii) any United States federal withholding taxes that would be imposed on amounts payable to a Foreign Lender based upon the applicable withholding rate in effect at the time such Foreign Lender becomes a party to the Agreement (or designates a new lending office), except that Taxes shall include (A) any amount that such Foreign Lender (or its assignor, if any) was previously entitled to receive pursuant to Section 16.1 of the Agreement, if any, with respect to such withholding tax at the time such Foreign Lender becomes a party to the Agreement (or designates a new lending office), and (B) additional United States federal withholding taxes that may be imposed after the time such Foreign Lender becomes a party to the Agreement (or designates a new lending office), as a result of a change in law, rule, regulation, order or other decision with respect to any of the foregoing by any Governmental Authority, and (iv) any United States federal withholding taxes imposed under FATCA.

"Expected Net Value" means percentages that Agent deems necessary or appropriate, in its Permitted Discretion, adjusted from time to time to reduce or increase Eligible Accounts by payor

- 12 -

class (e.g., Medicare, Medicaid, commercial insurance, etc.) based upon Borrower's historical collection history, contractual allowances, returns, rebates, discounts, credits and other allowances that may result in the non-payment or diminution in value of Eligible Accounts.  The Expected Net Value of Eligible Accounts will be disclosed to Borrowers by Agent whenever the Borrowing Base is calculated.

"Extraordinary Advances" has the meaning specified therefor in Section 2.3(d)(iii) of the Agreement.

"FATCA" means Sections 1471 through 1474 of the IRC, as of the date of the Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof.

"FDA" means the U.S. Food and Drug Administration and any Governmental Authority successor thereto.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by Agent from three Federal funds brokers of recognized standing selected by it.

"Fee Letter" means that certain fee letter, dated as of even date with the Agreement, among Borrowers and Agent, in form and substance reasonably satisfactory to Agent.

"Final Order" means, collectively, one or more orders of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing in accordance with Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be satisfactory in form and substance to Agent and Borrowers, and which order is in effect and not stayed, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to Agent and Borrower, which, among other matters (but not by way of limitation), authorizes the Borrowers to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, provides for the super priority of Agent's claims and authorizes the use of cash collateral.

"Financial Advisor" means FTI Consulting, Inc.

"Foreign Lender" means any Lender or Participant that is not a United States person within the meaning of IRC section 7701(a)(30).

"FPD Secured Note Indebtedness" means all Indebtedness of certain of Borrowers and other parties pursuant to the terms of the FPD Secured Note Documents, in an original principal amount of $125,000,000.

"FPD Secured Note Documents" means (i) that certain Subordinated Term Note, dated as of March 17, 2014 in the original principal amount of $125,000,000 and executed by PHI, as borrower, certain of the other Loan Parties and other subsidiaries of PHI, as guarantors, and accepted and agreed to by Holdings, (ii) that certain Security Agreement, dated as of March 17, 2014 by and among PHI, as borrower, and certain Affiliates of PHI, as guarantors, and Holdings and which secures the obligations under the Subordinated Term Note referenced in clause (i) hereof, and (iii) all other documents, instruments and certificates executed or delivered in connection therewith.

- 13 -

"<u>FPD Settlement Subordination Agreement</u>" means each of the following: (a) that certain Intercreditor and Subordination Agreement between Agent and Holdings dated as of March 21, 2016, with respect to obligations owing to Holdings by PHI and certain Affiliates of PHI as "Guarantors" in respect of the FPD Secured Note Indebtedness and the FPD Term Loan Indebtedness (b) that certain Intercreditor and Subordination Agreement among Agent and Parent dated as of March 21, 2016, in respect of the Success Indebtedness, and (c) that certain Intercreditor and Subordination Agreement among Agent and certain non-Loan Party Subsidiaries of Parent dated as of March 21, 2016, regarding Indebtedness owing by certain Loan Parties to such Subsidiaries, in each case as the same may apply to this Agreement pursuant to the Interim Order or Final Order.

"<u>FPD Term Loan Indebtedness</u>" means all Indebtedness of certain Loan Parties pursuant to the terms of the FPD Term Loan Documents, in an original principal amount of $75,000,000.

"<u>FPD Term Loan Documents</u>"  means that certain Loan and Security Agreement dated as of March 17, 2014 by and among PHI, as borrower, certain of the other Loan Parties and other subsidiaries of PHI, as guarantors, and Holdings, as lender, and all documents, instruments and certificates executed or delivered in connection therewith.

"<u>FPD Unsecured Term Note</u>" means that certain Unsecured Promissory Note dated March 17, 2014, in the original principal amount of $75,000,000, made by Holdings to the order of Parent.

"<u>Funding Date</u>" means the date on which a Borrowing occurs.

"<u>GAAP</u>" means generally accepted accounting principles as in effect from time to time in the United States, consistently applied.

"<u>Governing Documents</u>" means, with respect to any Person, the certificate or articles of incorporation, by-laws, or other organizational documents of such Person.

"<u>Government Account Debtor</u>" means the United States government or a political subdivision thereof, or any state, county or municipality or department, agency or instrumentality thereof, that is responsible for payment of an Account under any Government Reimbursement Program, or any agent, administrator, intermediary or carrier for the foregoing.

"<u>Government Receivable</u>" means any Account that is payable by a Government Account Debtor pursuant to a Government Reimbursement Program.

"<u>Government Receivables Lockbox Account</u>" means a Deposit Account of the Borrower that is used exclusively for the receipt of Collections of Government Receivables.

"<u>Government Receivables Lockbox Account Agreement</u>" means an agreement, in form and substance reasonably satisfactory to Agent, executed and delivered by a Borrower, Agent, and the applicable bank with respect to a Government Receivables Lockbox Account, in accordance with the terms and conditions of Section 7(k) of the Guaranty and Security Agreement.

"<u>Government Reimbursement Program</u>" means (a) Medicare, (b) Medicaid, (c) the Federal Employees Health Benefit Program under 5 U.S.C. §§ 8902 et seq., (d) TRICARE, (e) CHAMPVA, or (f) if applicable within the context of this Agreement, any agent, administrator, administrative contractor, intermediary or carrier for any of the foregoing.

- 14 -

"Governmental Authority" means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of, or pertaining to, government (including any supra-national bodies such as the European Union or the European Central Bank), including CMS and any Medicare or Medicaid administrative contractors, intermediaries or carriers.

"Guarantors" means (a) Parent, (b) the Subsidiaries of Parent that are identified as a Guarantor on the signature pages to the Agreement, and (c) any other Person that becomes a Guarantor after the Closing Date.

"Guaranty and Security Agreement" means a guaranty and security agreement, dated as of even date with the Agreement, in form and substance reasonably satisfactory to Agent, executed and delivered by each of the Borrowers and each of the Guarantors to Agent.

"Hazardous Materials" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"Health Care Facility" means each facility from which any Borrower provides or furnishes goods or Medical Services, including, without limitation, any long term acute care hospital or similar facility.

"Health Care Laws" means, collectively, any and all federal, state or local laws, rules, regulations, local coverage determinations, and administrative interpretations thereof having the force of law, relating to any of the following: (a) fraud and abuse (including the following statutes, as amended, modified or supplemented from time to time and any successor statutes thereto and regulations promulgated from time to time thereunder: the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), the Stark Law (42 U.S.C. § 1395nn and §1395(q)), the civil False Claims Act (31 U.S.C. § 3729 et seq.), the federal health care program exclusion provisions (42 U.S.C. § 1320a-7), the Civil Monetary Penalties Act (42 U.S.C. § 1320a-7a), and the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Pub. L. No. 108-173)); (b) any Government Reimbursement Program; (c) the licensure or regulation of healthcare providers, suppliers, professionals, facilities or payors (including all statutes and regulations administered by the FDA); (d) the operation of any Health Care Facilities or the provision of, or payment for, Medical Services, items or supplies; (e) quality, safety certification and accreditation standards and requirements; (f) the billing, coding or submission of claims or collection of accounts receivable or refund of overpayments; (g) HIPAA; (h) the practice of medicine and other health care professions or the organization of medical or professional entities; (i) fee-splitting prohibitions; (j) health planning or rate-setting laws, including laws regarding certificates of need and certificates of exemption; and (k) any and all other applicable federal, state or local health care laws, rules, codes, regulations, local coverage determinations, and administrative interpretations thereof having the force of law, as the same may be amended, modified or supplemented from time to time.

"<u>Health Care Permits</u>" means any and all permits, licenses, authorizations, certificates, certificates of need, accreditations and plans of third-party accreditation agencies (such as the Joint Commission for Accreditation of Healthcare Organizations) that are (a) necessary to enable any Loan Party to operate any Health Care Facility or provide Medical Services as currently provided or conducted, participate in and receive payment under any Government Reimbursement Program or other Third Party Payor Arrangement, as applicable, or otherwise continue to conduct its business as it is conducted on the Closing Date, or (b) required under any Health Care Law.

"<u>Health Care Proceeding</u>" means any inquiries, investigations, probes, audits, hearings, litigation or proceedings (in each case, whether civil, criminal, administrative or investigative) concerning any alleged or actual non-compliance by any Loan Party with any Health Care Laws or the requirements of any Health Care Permit or Third Party Payor Arrangement or the business affairs, practices, licensing or reimbursement entitlements of any Loan Party or Health Care Facility (including inquiries involving the Comprehensive Error Rate Testing and any inquiries, investigations, probes, audits or procedures initiated by a Fiscal Intermediary/Medicare Administrator Contractor, a Medicaid Integrity Contractor, a Recovery Audit Contractor, a Program Safeguard Contractor, a Zone Program Integrity Contractor, an Attorney General, the Office of Inspector General, the Department of Justice or any similar governmental agencies or contractors for such agencies).

"<u>Health Care Settlement Agreement</u>" means a settlement or other agreement with CMS or any other Governmental Authority in connection with any Health Care Law, including any CMS Cost Report Settlement.

"<u>Hedge Agreement</u>" means a "swap agreement" as that term is defined in Section 101(53B)(A) of the Bankruptcy Code.

"<u>Hedge Obligations</u>" means any and all obligations or liabilities, whether absolute or contingent, due or to become due, now existing or hereafter arising, of a Loan Party arising under, owing pursuant to, or existing in respect of Hedge Agreements entered into with one or more of the Hedge Providers.

"<u>Hedge Provider</u>" means Wells Fargo or any of its Affiliates.

"<u>Highest Marginal Rate</u>" means, with respect to any period, a tax rate equal to the highest effective marginal combined federal, state and local income tax rate during such period of an assumed taxpayer resident in the State of Florida, taking into account the deductibility of state and local income taxes for federal income tax purposes.

"<u>HIPAA</u>" means (a) the Health Insurance Portability and Accountability Act of 1996; (b) the Health Information Technology for Economic and Clinical Health Act (Title XIII of the American Recovery and Reinvestment Act of 2009); and (c) any state and local laws regulating the privacy and/or security of individually identifiable information, in each case as the same may be amended, modified or supplemented from time to time, any successor statutes thereto, and any and all rules or regulations promulgated from time to time thereunder.

"<u>Holding Company Loan Parties</u>" means, collectively, (a) Parent, (b) Holdings, (c) PHI, (d) Promise Healthcare #2, Inc., a Florida corporation, (e) HLP Healthcare, Inc., a California corporation, (f) Success Healthcare, LLC, a California limited liability company, and (g) Success Healthcare 2, LLC, a California limited liability company.

"<u>Holdings</u>" means Promise Healthcare Holdings, Inc., a Delaware corporation.

"Indebtedness" as to any Person means (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations of such Person as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all obligations of such Person to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices and, for the avoidance of doubt, other than royalty payments payable in the ordinary course of business in respect of non-exclusive licenses), (f) all monetary obligations of such Person owing under Hedge Agreements (which amount shall be calculated based on the amount that would be payable by such Person if the Hedge Agreement were terminated on the date of determination), (g) any Disqualified Equity Interests of such Person, and (h) any obligation of such Person guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (g) above.  For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness which is limited or is non-recourse to a Person or for which recourse is limited to an identified asset shall be valued at the lesser of (A) if applicable, the limited amount of such obligations, and (B) if applicable, the fair market value of such assets securing such obligation.

"Indemnified Liabilities" has the meaning specified therefor in Section 10.3 of the Agreement.

"Indemnified Person" has the meaning specified therefor in Section 10.3 of the Agreement.

"Indemnified Taxes" means, any Taxes other than Excluded Taxes.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other state or federal bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Intercompany Subordination Agreement" means that certain Intercompany Subordination Agreement, dated as of March 21, 2016, executed and delivered by Parent, each other Loan Party, and Agent, the form and substance of which is reasonably satisfactory to Agent, as the same may apply to this Agreement pursuant to the Interim Order or Final Order.

"Interest Expense" means, for any period, the aggregate of the interest expense of Parent and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP.

"Interim Order" means, collectively, one or more orders of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and of other applicable law or such other procedures as approved by the Bankruptcy Court), together with all extensions, modifications, substantially in the form of Exhibit I hereto, or otherwise in form and substance reasonably satisfactory to Agent, which, among other matters but not by way of limitation, authorizes, on an interim basis, the

- 17 -

Borrowers and Guarantors to execute and perform under the terms of this Agreement and the other Loan Documents.

"Inventory" means inventory (as that term is defined in the Code).

"Investment" means, with respect to any Person, any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances, capital contributions (excluding (a) commission, travel, and similar advances to officers and employees of such Person made in the ordinary course of business, and (b) *bona fide* accounts receivable arising in the ordinary course of business), or acquisitions of Indebtedness, Equity Interests, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), and any other items that are or would be classified as investments on a balance sheet prepared in accordance with GAAP. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustment for increases or decreases in value, or write-ups, write-downs, or write-offs with respect to such Investment. For the avoidance of doubt, the payment of rental expenses pursuant to operating leases shall not be considered Investments in the lessor entity.

"IRC" means the Internal Revenue Code of 1986, as in effect from time to time, as amended, and any successor statutes, and all regulations and guidance promulgated thereunder. Any reference to a specific section of the IRC shall be deemed to be a reference to such section of the IRC and any successor statutes, and all regulations and guidance promulgated thereunder.

"ISP" means, with respect to any Letter of Credit, the International Standby Practices 1998 (International Chamber of Commerce Publication No. 590) and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"Issuer Document" means, with respect to any Letter of Credit, a letter of credit application, a letter of credit agreement, or any other document, agreement or instrument entered into (or to be entered into) by a Borrower in favor of Issuing Bank and relating to such Letter of Credit.

"Issuing Bank" means Wells Fargo or any other Lender that, at the request of Borrowers and with the consent of Agent, agrees, in such Lender's sole discretion, to become an Issuing Bank for the purpose of issuing Letters of Credit pursuant to Section 2.11 of the Agreement, and Issuing Bank shall be a Lender.

"Joining Guarantor" means any "Guarantor" party to this Agreement that was not a "Guarantor" pursuant to the Prepetition Credit Agreement.

"Lease" means each lease agreement for real property used or occupied by a Borrower to operate a Health Care Facility.

"Lender" has the meaning set forth in the preamble to the Agreement, shall include each Revolving Lender, Term Lender, Issuing Bank and the Swing Lender, and shall also include any other Person made a party to the Agreement pursuant to the provisions of Section 13.1 of the Agreement and "Lenders" means each of the Lenders or any one or more of them.

"Lender Group" means each of the Lenders (including Issuing Bank and the Swing Lender) and Agent, or any one or more of them.

"Lender Group Expenses" means all (a) documented costs or expenses (including taxes and insurance premiums) required to be paid by Parent or its Subsidiaries under any of the Loan

- 18 -

Documents that are paid, advanced, or incurred by the Lender Group, (b) customary documented out-of-pocket fees or charges paid or incurred by Agent in connection with the Lender Group's transactions with Parent and its Subsidiaries under any of the Loan Documents, including, photocopying, notarization, couriers and messengers, telecommunication, public record searches, filing fees, recording fees, publication, real estate surveys, real estate title policies and endorsements, and environmental audits, (c) Agent's customary fees and charges imposed or incurred in connection with any background checks or OFAC/PEP searches related to Parent or its Subsidiaries, (d) Agent's customary fees and charges (as adjusted from time to time) with respect to the disbursement of funds (or the receipt of funds) to or for the account of any Borrower (whether by wire transfer or otherwise), together with any reasonable and documented out-of-pocket costs and expenses incurred in connection therewith, (e) customary charges imposed or incurred by Agent resulting from the dishonor of checks payable by or to any Loan Party, (f) reasonable and documented out-of-pocket costs and expenses paid or incurred by the Lender Group to correct any default or enforce any provision of the Loan Documents, or during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (g) field examination, appraisal, and valuation fees and expenses of Agent related to any field examinations, appraisals, or valuation to the extent of the fees and charges (and up to the amount of any limitation) provided in Section 2.10 of the Agreement, (h) Agent's and each Lender's reasonable and documented costs and expenses (including reasonable documented attorneys fees and expenses) relative to third party claims or any other lawsuit or adverse proceeding paid or incurred, whether in enforcing or defending the Loan Documents or otherwise in connection with the transactions contemplated by the Loan Documents, Agent's Liens in and to the Collateral, or the Lender Group's relationship with Parent or any of its Subsidiaries, (i) Agent's reasonable documented costs and expenses (including reasonable documented attorneys fees and due diligence expenses) incurred in advising, structuring, drafting, reviewing, administering (including travel, meals, and lodging), syndicating (including reasonable costs and expenses relative to CUSIP, DXSyndicate™, SyndTrak or other communication costs incurred in connection with a syndication of the loan facilities), or amending, waiving, or modifying the Loan Documents, and (j) Agent's and each Lender's reasonable documented out-of-pocket costs and expenses (including reasonable documented out-of-pocket attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a "workout," a "restructuring," or an Insolvency Proceeding concerning Parent or any of its Subsidiaries or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether a lawsuit or other adverse proceeding is brought, or in taking any enforcement action or any Remedial Action with respect to the Collateral; provided that the legal fees, costs and expenses constituting Lender Group Expenses in connection with the matters described in item (j) above shall be limited to the reasonable and documented out-of-pocket fees, costs and expenses of one counsel to the Agent and the Lenders and a single counsel for the Agent and the Lenders in each relevant jurisdiction and with respect to each relevant specialty, and in the case of an actual or perceived conflict of interest, one additional counsel in each relevant jurisdiction in the affected Lenders similarly situated.

"Lender Group Representatives" has the meaning specified therefor in Section 17.9 of the Agreement.

"Lender-Related Person" means, with respect to any Lender, such Lender, together with such Lender's Affiliates, officers, directors, employees, attorneys, and agents.

"Letter of Credit" means a letter of credit (as that term is defined in the Code) issued by Issuing Bank. For the avoidance of doubt, each Prepetition Letter of Credit shall be deemed issued as a Letter of Credit hereunder on the Closing Date.

"<u>Letter of Credit Collateralization</u>" means either (a) providing cash collateral (pursuant to documentation reasonably satisfactory to Agent, including provisions that specify that the Letter of Credit Fees and all commissions, fees, charges and expenses provided for in <u>Section 2.11(k)</u> of the Agreement (including any fronting fees) will continue to accrue while the Letters of Credit are outstanding) to be held by Agent for the benefit of the Revolving Lenders in an amount equal to 103% of the then existing Letter of Credit Usage, (b) delivering to Agent documentation executed by all beneficiaries under the Letters of Credit, in form and substance reasonably satisfactory to Agent and Issuing Bank, terminating all of such beneficiaries' rights under the Letters of Credit, or (c) providing Agent with a standby letter of credit, in form and substance reasonably satisfactory to Agent, from a commercial bank acceptable to Agent (in its sole discretion) in an amount equal to 103% of the then existing Letter of Credit Usage (it being understood that the Letter of Credit Fee and all fronting fees set forth in the Agreement will continue to accrue while the Letters of Credit are outstanding and that any such fees that accrue must be an amount that can be drawn under any such standby letter of credit).

"<u>Letter of Credit Disbursement</u>" means a payment made by Issuing Bank pursuant to a Letter of Credit.

"<u>Letter of Credit Exposure</u>" means, as of any date of determination with respect to any Lender, such Lender's Pro Rata Share of the Letter of Credit Usage on such date.

"<u>Letter of Credit Fee</u>" has the meaning specified therefor in <u>Section 2.6(b)</u> of the Agreement.

"<u>Letter of Credit Indemnified Costs</u>" has the meaning specified therefor in <u>Section 2.11(f)</u> of the Agreement.

"<u>Letter of Credit Related Person</u>" has the meaning specified therefor in <u>Section 2.11(f)</u> of the Agreement.

"<u>Letter of Credit Usage</u>" means, as of any date of determination, the aggregate undrawn amount of all outstanding Letters of Credit.

"<u>LIBOR Index Rate</u>" means, on any date of determination, the rate per annum equal to the rate per annum as published by ICE Benchmark Administration Limited (or any successor page or other commercially available source as the Agent may designate from time to time) as of 11:00 a.m., London time, 2 Business Days prior to such date of determination, for a term of one month (and, if any such rate is below zero, the LIBOR Index Rate shall be deemed to be zero).  Each determination of the LIBOR Index Rate shall be made by Agent and shall be conclusive in the absence of manifest error.

"<u>LIBOR Index Rate Loan</u>" means, if applicable, each portion of a Revolving Loan or the Term Loan that bears interest at a rate determined by reference to the LIBOR Index Rate.

"<u>Lien</u>" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or other), security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"<u>Loan</u>" shall mean any Revolving Loan, Term Loan, Swing Loan or Extraordinary Advance made (or to be made) hereunder.

- 20 -

"Loan Account" has the meaning specified therefor in Section 2.9 of the Agreement.

"Loan Documents" means the Agreement, the Control Agreements, the Government Receivables Lockbox Account Agreements, any Borrowing Base Certificate, the Fee Letter, the Guaranty and Security Agreement, the Intercompany Subordination Agreement, any Issuer Documents, the Letters of Credit, the Trademark Security Agreement, any note or notes executed by Borrowers in connection with the Agreement and payable to any member of the Lender Group, the Interim Order, the Final Order, and any other instrument or agreement entered into, now or in the future, by Parent, any Borrower or any of their Subsidiaries and any member of the Lender Group in connection with the Prepetition Credit Agreement or this Agreement.

"Loan Party" means any Borrower or any Guarantor.

"LTCH PPS" means the Medicare Long Term Care Hospital Prospective Payment System.

"Margin Stock" as defined in Regulation U of the Board of Governors as in effect from time to time.

"Material Adverse Effect" means (a) a material adverse effect in the business, operations, results of operations, assets, liabilities or financial condition of Parent and its Subsidiaries, taken as a whole, (b) a material impairment of Parent's and its Subsidiaries' ability to perform their obligations under the Loan Documents to which they are parties or of the Lender Group's ability to enforce the Obligations or realize upon the Collateral (other than as a result of as a result of an action taken or not taken that is solely in the control of Agent), or (c) a material impairment of the enforceability or priority of Agent's Liens with respect to all or a material portion of the Collateral; provided, that the filing of the Chapter 11 Cases and the facts, events, circumstances or conditions that arise after the Petition Date that customarily occur or arise in connection with the filing of a bankruptcy case shall not constitute a Material Adverse Effect for purposes of this Agreement.

"Maturity Date" means the date of the earliest to occur of (a) the Scheduled Commitment Termination Date, (b) the termination of the Commitments pursuant to Section 2.4 or Section 9.1, and (c) the date upon which the Interim Order expires, unless the Final Order shall have been entered and become effective on or prior to such date

"Maximum Revolver Amount" means $65,000,000.

"Medicaid" means, collectively, the healthcare assistance program established by Title XIX of the Social Security Act (42 U.S.C. §§ 1396 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, manuals, orders, guidelines or requirements (whether or not having the force of law) pertaining to such program, including all state statutes and plans for medical assistance enacted in connection with such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"Medical Services" means medical and health care items, services or supplies provided to a patient, including physician services, nurse and therapist services, dental services, hospital services, skilled nursing facility services, comprehensive outpatient rehabilitation services, home health care services, residential and out-patient behavioral healthcare services, and medicine or health care equipment provided by a Borrower to a patient for a valid and proper medical or health purpose.

- 21 -

"Medicare" means, collectively, the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 U.S.C. §§ 1395 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, manuals, orders, guidelines or requirements (whether or not having the force of law) pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"Moody's" has the meaning specified therefor in the definition of Cash Equivalents.

"Multiemployer Plan" means any multiemployer plan within the meaning of Section 3(37) or 4001(a)(3) of ERISA with respect to which any Loan Party or ERISA Affiliate has an obligation to contribute or has any liability, contingent or otherwise or could be assessed withdrawal liability assuming a complete withdrawal from any such multiemployer plan.

"Non-Consenting Lender" has the meaning specified therefor in Section 14.2(a) of the Agreement.

"Non-Defaulting Lender" means each Lender other than a Defaulting Lender.

"Non-Government Receivable" means an Account that is not a Government Receivable.

"Non-Government Receivables Lockbox Account" means a Deposit Account of the Borrower that is used exclusively for the receipt of Collections of Non-Government Receivables.

"Notification Event" means (a) the occurrence of a "reportable event" described in Section 4043 of ERISA for which the 30-day notice requirement has not been waived by applicable regulations issued by the PBGC, (b) the withdrawal of any Loan Party or ERISA Affiliate from a Pension Plan during a plan year in which it was a "substantial employer" as defined in Section 4001(a)(2) of ERISA, (c) the termination of a Pension Plan, the filing of a notice of intent to terminate a Pension Plan or the treatment of a Pension Plan amendment as a termination, under Section 4041 of ERISA, if the plan assets are not sufficient to pay all plan liabilities, (d) the institution of proceedings to terminate, or the appointment of a trustee with respect to, any Pension Plan by the PBGC or any Pension Plan or Multiemployer Plan administrator, (e) any other event or condition that would constitute grounds under Section 4042(a) of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, (f) the imposition of a Lien pursuant to the IRC or ERISA in connection with any Employee Benefit Plan or the existence of any facts or circumstances that could reasonably be expected to result in the imposition of a Lien, (g) the partial or complete withdrawal of any Loan Party or ERISA Affiliate from a Multiemployer Plan (other than any withdrawal that would not constitute an Event of Default under Section 8.15 of the Agreement), (h) any event or condition that results in the reorganization or insolvency of a Multiemployer Plan under Sections of ERISA, (i) any event or condition that results in the termination of a Multiemployer Plan under Section 4041A of ERISA or the institution by the PBGC of proceedings to terminate or to appoint a trustee to administer a Multiemployer Plan under ERISA, (j) any Pension Plan being in "at risk status" within the meaning of IRC Section 430(i), (k) any Multiemployer Plan being in "endangered status" or "critical status" within the meaning of IRC Section 432(b) or the determination that any Multiemployer Plan is or is expected to be insolvent or in reorganization within the meaning of Title IV of ERISA, (l) with respect to any Pension Plan, any Loan Party or ERISA Affiliate incurring a substantial cessation of operations within the meaning of ERISA Section 4062(e), (m) an "accumulated funding deficiency" within the meaning of the IRC or ERISA (including Section 412 of the IRC or Section 302 of ERISA) or the failure of any Pension Plan or Multiemployer Plan to meet the minimum funding standards within the meaning of the IRC or ERISA (including Section 412 of the IRC or Section 302 of ERISA), in each case, whether or not waived, (n) the

- 22 -

filing of an application for a waiver of the minimum funding standards within the meaning of the IRC or ERISA (including Section 412 of the IRC or Section 302 of ERISA) with respect to any Pension Plan or Multiemployer Plan, (o) the failure to make by its due date a required payment or contribution with respect to any Pension Plan or Multiemployer Plan, (p) any event that results in or could reasonably be expected to result in a liability by a Loan Party pursuant to Title I of ERISA or the excise tax provisions of the IRC relating to Employee Benefit Plans or any event that results in or could reasonably be expected to result in a liability to any Loan Party or ERISA Affiliate pursuant to Title IV of ERISA or Section 401(a)(29) of the IRC, or (q) any of the foregoing is reasonably likely to occur in the following 30 days.

"<u>Obligations</u>" means (a) all loans (including the Revolving Loans (inclusive of Extraordinary Advances and Swing Loans) and the Term Loan), debts, principal, interest (including any interest that accrues after the commencement of the Chapter 11 Cases, regardless of whether allowed or allowable in whole or in part as a claim in such Chapter 11 Cases), reimbursement or indemnification obligations with respect to Letters of Credit (irrespective of whether contingent), premiums, liabilities (including all amounts charged to the Loan Account pursuant to the Agreement), obligations (including indemnification obligations), fees (including the fees provided for in the Fee Letter), Lender Group Expenses (including any fees or expenses that accrue after the commencement of the Chapter 11 Cases, regardless of whether allowed or allowable in whole or in part as a claim in such Chapter 11 Cases), guaranties, and all covenants and duties of any other kind and description owing by any Loan Party arising out of, under, pursuant to, in connection with, or evidenced by the Agreement or any of the other Loan Documents and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid when due and all other expenses or other amounts that Borrowers are required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents, and (b) all Bank Product Obligations. Without limiting the generality of the foregoing, the Obligations of Borrowers under the Loan Documents include the obligation to pay (i) the principal of the Revolving Loans and the Term Loan, (ii) interest accrued on the Revolving Loans and the Term Loan, (iii) the amount necessary to reimburse Issuing Bank for amounts paid or payable pursuant to Letters of Credit, (iv) Letter of Credit commissions, fees (including fronting fees) and charges, (v) Lender Group Expenses, (vi) fees payable under the Agreement or any of the other Loan Documents, and (vii) indemnities and other amounts payable by any Loan Party under any Loan Document. Any reference in the Agreement or in the Loan Documents to the Obligations shall include all or any portion thereof and any extensions, modifications, renewals, or alterations thereof.

"<u>OFAC</u>" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"<u>Originating Lender</u>" has the meaning specified therefor in <u>Section 13.1(e)</u> of the Agreement.

"<u>Outstandings</u>" means, at any time, the aggregate principal amount of all outstanding Loans.

"<u>Overadvance</u>" means, as of any date of determination, that the Revolver Usage is greater than any of the limitations set forth in <u>Section 2.1</u> or <u>Section 2.11</u> of the Agreement.

"<u>Parent</u>" has the meaning specified therefor in the preamble to the Agreement.

"<u>Participant</u>" has the meaning specified therefor in <u>Section 13.1(e)</u> of the Agreement.

- 23 -

"Patent Security Agreement" has the meaning specified therefor in the Guaranty and Security Agreement.

"Pass-Through Entity" means a Person which is an "S corporation" within the meaning of Section 1361 of the IRC, a "qualified subchapter S subsidiary" within the meaning of Section 1361 (b)(3)(B) of the IRC, a partnership (including a limited liability company) within the meaning of Section 7701(a)(2) of the IRC (other than one electing to be taxed as a corporation), or an entity with a single owner that is disregarded pursuant to Treasury Reg. §301.7701-3.

"Patriot Act" has the meaning specified therefor in Section 4.13 of the Agreement.

"PBGC" means the Pension Benefit Guaranty Corporation or any successor agency.

"Pension Plan" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to the provisions of Title IV or Section 302 of ERISA or Sections 412 or 430 of the Code sponsored, maintained, or contributed to by any Loan Party or ERISA Affiliate or to which any Loan Party or ERISA Affiliate has any liability, contingent or otherwise.

"Permitted Discretion" means a determination made in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment.

"Permitted Dispositions" means, subject to the Borrowers obtaining Bankruptcy Court approval, as applicable:

(a) sales, abandonment, or other dispositions of Equipment that is substantially worn, damaged, or obsolete or no longer used or useful in the ordinary course of business and leases or subleases of Real Property not useful in the conduct of the business of Parent and its Subsidiaries,

(b) sales of Inventory to buyers or patients in the ordinary course of business,

(c) the use or transfer of money or Cash Equivalents in a manner that is not prohibited by the terms of the Agreement or the other Loan Documents,

(d) the licensing, on a non-exclusive basis, of patents, trademarks, copyrights, and other intellectual property rights in the ordinary course of business,

(e) the granting of Permitted Liens,

(f) the sale or discount, in each case without recourse, of accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof,

(g) any involuntary loss, damage or destruction of property,

(h) any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property,

(i) the leasing or subleasing of assets of a Loan Party in the ordinary course of business,

(j) the sale or issuance of Equity Interests (other than Disqualified Equity Interests) of Parent,

- 24 -

(k) (i) the lapse of registered patents, trademarks, copyrights and other intellectual property of a Loan Party to the extent not economically desirable in the conduct of its business or (ii) the abandonment of patents, trademarks, copyrights, or other intellectual property rights in the ordinary course of business so long as (in each case under clauses (i) and (ii)), (A) with respect to copyrights, such copyrights are not material revenue generating copyrights, and (B) such lapse is not materially adverse to the interests of the Lender Group,

(l) the making of Restricted Payments that are expressly permitted to be made pursuant to the Agreement,

(m) the making of Permitted Investments,

(n) transfers of assets from a Loan Party to another Loan Party,

(o) sales or dispositions of assets (other than Accounts, Inventory, Equity Interests of a Loan Party) not otherwise permitted in clauses (a) through (n) above so long as made at fair market value and the aggregate fair market value of all assets disposed of in fiscal year (including the proposed disposition) would not exceed $500,000, and

(p) sales or dispositions of assets contemplated by <u>Schedule 8.21</u> to the extent approved by the Agent.

"<u>Permitted Holder</u>" means each of the Persons listed on <u>Schedule P-2</u> to the Agreement.

"<u>Permitted Indebtedness</u>" means:

(a) Indebtedness evidenced by the Agreement or the other Loan Documents,

(b) Indebtedness set forth on <u>Schedule 4.14</u> to the Agreement and any Refinancing Indebtedness in respect of such Indebtedness,

(c) Permitted Purchase Money Indebtedness and any Refinancing Indebtedness in respect of such Indebtedness,

(d) endorsement of instruments or other payment items for deposit,

(e) Indebtedness consisting of (i) unsecured guarantees incurred in the ordinary course of business with respect to surety and appeal bonds, performance bonds, bid bonds, appeal bonds, completion guarantee and similar obligations; (ii) unsecured guarantees arising with respect to customary indemnification obligations to purchasers in connection with Permitted Dispositions; (iii) unsecured guarantees with respect to Indebtedness of Parent, any Borrower or one of their Subsidiaries, to the extent that the Person that is obligated under such guaranty could have incurred such underlying Indebtedness; and (iv) unsecured guarantees of operating lease obligations of a Loan Party (to the extent constituting Indebtedness) by another Loan Party in the ordinary course of business; and (v) unsecured guarantees by Parent or Holdings in favor of (i) a mortgage lender to a non-Loan Party Subsidiary of Parent that owns the location at which a Borrower operates a Health Care Facility,

(f) Indebtedness incurred in the ordinary course of business under performance, surety, statutory, or appeal bonds,

- 25 -

(g)   Indebtedness owed to any Person providing property, casualty, liability, or other insurance to any Loan Party, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the year in which such Indebtedness is incurred and such Indebtedness is outstanding only during such year,

(h)   the incurrence by any Loan Party of Indebtedness under Hedge Agreements that are incurred for the bona fide purpose of hedging the interest rate, commodity, or foreign currency risks associated with such Loan Party's operations and not for speculative purposes,

(i)   Indebtedness incurred in the ordinary course of business in respect of credit cards, credit card processing services, debit cards, stored value cards, commercial cards (including so-called "purchase cards", "procurement cards" or "p-cards"), or Cash Management Services,

(j)   unsecured Indebtedness of Parent owing to former employees, officers, or directors (or any spouses, ex-spouses, or estates of any of the foregoing) incurred in connection with the repurchase by Parent of the Equity Interests of Parent that has been issued to such Persons, so long as (i) no Default or Event of Default has occurred and is continuing or would result from the incurrence of such Indebtedness, (ii) the aggregate amount of all such Indebtedness outstanding at any one time does not exceed $750,000, and (iii) such Indebtedness is subordinated to the Obligations on terms and conditions reasonably acceptable to Agent, including, without limitation, pursuant to the Interim Order or the Final Order, as applicable,

(l)   Indebtedness composing Permitted Investments, and Indebtedness composing Permitted Liens (to the extent such Lien constitutes "Indebtedness" under clause (d) of the definition thereof),

(m)   unsecured Indebtedness incurred in respect of netting services, overdraft protection, and other like services, in each case, incurred in the ordinary course of business,

(n)   unsecured Indebtedness of Parent owing to employees, former employees, officers, former officers, directors, or former directors (or any spouses, ex-spouses, or estates of any of the foregoing) incurred in connection with the redemption by Parent of the Equity Interests of Parent that has been issued to such Persons, so long as (i) no Default or Event of Default has occurred and is continuing or would result therefrom, (ii) the aggregate amount of all such Indebtedness outstanding at any one time does not exceed $750,000, and (iii) such Indebtedness is subordinated in right of payment to the Obligations on terms and conditions reasonably acceptable to Agent, including, without limitation, pursuant to the Interim Order or the Final Order, as applicable,

(o)   accrual of interest, accretion or amortization of original issue discount, or the payment of interest in kind, in each case, on Indebtedness that otherwise constitutes Permitted Indebtedness,

(p)   the FPD Secured Note Indebtedness, the FPD Term Loan Indebtedness, the Success Indebtedness, and the Affiliate Indebtedness, in each case so long as the respective FPD Settlement Subordination Agreement is in full force and effect or any Liens securing such Indebtedness are subordinated on terms satisfactory to Agent, including, without limitation, pursuant to the Interim Order or the Final Order, as applicable,

(q)   the Secured Note Indebtedness and the obligations to Howard B. Koslow under the Prepetition Principal Consulting Agreements, so long as the Principal Subordination Agreement is in full force and effect,

- 26 -

(r)    Indebtedness arising from Permitted Intercompany Advances, so long as the Intercompany Subordination Agreement is in full force and effect,

(s)    Indebtedness scheduled on <u>Schedule T-1</u> to the Agreement that is subject to a Tax Settlement Agreement,

(t)    Indebtedness owing to CMS under the CMS Cost Report Settlements,

(u)    [reserved],

(v)    [reserved],

(w)    unsecured Indebtedness owing by a Borrower to a non-Loan Party Subsidiary of Parent arising from the accrual of rent in lieu of the cash payment thereof,

(x)    to the extent constituting Indebtedness, the aggregate unpaid amount under all CMS Cost Report Settlements that are permitted to be outstanding pursuant to the terms and conditions of the Agreement (including <u>Section 6.13</u> of the Agreement), and

(y)    any other unsecured Indebtedness incurred by Parent or any of its Subsidiaries in an aggregate outstanding amount not to exceed $750,000 at any one time.

"<u>Permitted Intercompany Advances</u>" means loans made by a Loan Party to another Loan Party other than Parent, including such intercompany loans in existence on the Closing Date as identified on <u>Schedule P-1</u> to the Agreement so long as the parties thereto are party to the Intercompany Subordination Agreement.  For the avoidance of doubt, Permitted Intercompany Advances include loans made by a Joining Guarantor to another Loan Party other than Parent and loans made by a Loan Party to a Joining Guarantor.

"<u>Permitted Investments</u>" means:

(a)    Investments in cash and Cash Equivalents (including any Cash Equivalents held in Securities Accounts),

(b)    Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business,

(c)    advances made in connection with purchases of goods or services in the ordinary course of business,

(d)    Investments received in settlement of amounts due to any Loan Party or any of its Subsidiaries effected in the ordinary course of business or owing to any Loan Party or any of its Subsidiaries as a result of Insolvency Proceedings involving an account debtor or upon the foreclosure or enforcement of any Lien in favor of a Loan Party or its Subsidiaries,

(e)    Investments owned by any Loan Party or any of its Subsidiaries on the Closing Date and set forth on <u>Schedule P-3</u> to the Agreement,

(f)    guarantees permitted under the definition of Permitted Indebtedness, and, to the extent constitution an Investment, any Lien permitted to be incurred under the definition of Permitted Liens,

- 27 -

(g) Permitted Intercompany Advances,

(h) Equity Interests or other securities acquired in connection with the satisfaction or enforcement of Indebtedness or claims due or owing to a Loan Party or its Subsidiaries (in bankruptcy of customers or suppliers or otherwise outside the ordinary course of business) or as security for any such Indebtedness or claims,

(i) deposits of cash made in the ordinary course of business to secure performance of operating leases,

(j) loans and advances to employees and officers of a Loan Party in the ordinary course of business for any other business purpose and in an aggregate amount not to exceed $500,000 in the aggregate at any one time,

(k) [reserved],

(l) Investments in the form of capital contributions and the acquisition of Equity Interests made by any Loan Party in any other Loan Party (other than capital contributions to or the acquisition of Equity Interests of Parent),

(m) Investments resulting from entering into (i) Bank Product Agreements, or (ii) agreements relative to Indebtedness that is permitted under clause (j) of the definition of Permitted Indebtedness,

(n) equity Investments by any Loan Party in any Subsidiary of such Loan Party which is required by law to maintain a minimum net capital requirement or as may be otherwise required by applicable law,

(o) [reserved],

(p) Investments by a Loan Party in another Loan Party, and

(q) Investments in an aggregate amount not to exceed $500,000 (on a cost basis) during the term of the Agreement; provided, that no Loan Party shall make any new or additional Investments at any time an Event of Default has occurred and is continuing or would result therefrom.

"Permitted Liens" means, subject to the Borrowers obtaining Bankruptcy Court approval, as applicable:

(a) Liens granted to, or for the benefit of, Agent to secure the Obligations and the Prepetition Obligations,

(b) Liens for unpaid taxes, assessments, or other governmental charges or levies that either (i) are not yet delinquent, or (ii) do not have priority over Agent's Liens and the underlying taxes, assessments, or charges or levies are the subject of Permitted Protests,

(c) judgment Liens arising solely as a result of the existence of judgments, orders, or awards that do not constitute an Event of Default under Section 8.3 of the Agreement,

- 28 -

(d) Liens set forth on Schedule P-4 to the Agreement; provided, that to qualify as a Permitted Lien, any such Lien described on Schedule P-4 to the Agreement shall only secure the Indebtedness that it secures on the Closing Date and any Refinancing Indebtedness in respect thereof,

(e) the interests of lessors under operating leases and non-exclusive licensors under license agreements,

(f) purchase money Liens or the interests of lessors under Capital Leases to the extent that such Liens or interests secure Permitted Purchase Money Indebtedness arising in the ordinary course of the Borrowers' business and so long as (i) such Lien attaches only to the asset purchased or acquired and the proceeds thereof, and (ii) such Lien only secures the Indebtedness that was incurred to acquire the asset purchased or acquired or any Refinancing Indebtedness in respect thereof,

(g) Liens arising by operation of law in favor of warehousemen, landlords, carriers, mechanics, materialmen, laborers, or suppliers, incurred in the ordinary course of business and not in connection with the borrowing of money, and which Liens either (i) are for sums not yet delinquent, or (ii) are the subject of Permitted Protests,

(h) Liens on amounts deposited to secure Parent's, any Borrower's and their Subsidiaries obligations in connection with worker's compensation or other unemployment insurance, or social security or similar laws,

(i) Liens on amounts deposited to secure Parent's, any Borrower's and their Subsidiaries obligations in connection with the making or entering into of bids, tenders, or leases in the ordinary course of business and not in connection with the borrowing of money,

(j) Liens on amounts deposited to secure Parent's, any Borrower's and their Subsidiaries reimbursement obligations with respect to surety or appeal bonds obtained in the ordinary course of business,

(k) with respect to any Real Property, easements, rights of way, and zoning restrictions that do not materially interfere with or impair the use or operation thereof,

(l) non-exclusive licenses of patents, trademarks, copyrights, and other intellectual property rights in the ordinary course of business,

(m) Liens that are replacements of Permitted Liens to the extent that the original Indebtedness is the subject of permitted Refinancing Indebtedness and so long as the replacement Liens only encumber those assets that secured the original Indebtedness,

(n) rights of setoff or bankers' liens upon deposits of funds in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such Deposit Accounts in the ordinary course of business,

(o) Liens granted in the ordinary course of business on the unearned portion of insurance premiums securing the financing of insurance premiums to the extent the financing is permitted under the definition of Permitted Indebtedness,

(p) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods,

- 29 -

(q) Liens on the Term Loan Priority Collateral that are reflected on the title policies to be delivered as described on Schedule 8.21, to the extent the same are reasonably acceptable to Agent (including as the same may be subordinated to the Liens of Agent pursuant to a subordination agreement or the Interim Order or Final Order),

Liens in favor of a Loan Party arising under a FPD Secured Note Document, a FPD Term Loan Document, or in respect of the Success Indebtedness, so long as such Liens are subject to a FPD Settlement Subordination Agreement or subordinated on terms satisfactory to Agent pursuant to the Interim Order (or Final Order, when applicable),

(s) Liens securing the Secured Note Indebtedness, the Principal Consulting Agreements and the Personal Guarantees, so long as such Liens are subject to the Prepetition Principal Subordination Agreement or subordinated on terms satisfactory to Agent pursuant to the Interim Order (or Final Order, when applicable),

(t) Liens arising in connection with Indebtedness evidenced by a Tax Settlement Agreement, so long as such Liens are subject to a Tax Lien Subordination Agreement,

(u) Liens arising under real property Leases in effect on the date hereof, so long as such Liens are subordinated to the payment in full of the Obligations on terms reasonably satisfactory to Agent,

(v) Liens on the Health Care Permits owned by Promise Hospital of Dade, Inc. and Promise Hospital of Lee, Inc., in favor of a mortgage lender to a non-Loan Party Subsidiary related to the construction of a new Health Care Facility, so long as such mortgage lender has entered into an intercreditor agreement with Agent that is in form and substance reasonably acceptable to Agent, including the right of Agent to use such Health Care Permits for the billing and collection of Accounts,

(w) [Reserved],

(x) [Reserved],

(y) other Liens which do not secure Indebtedness for borrowed money or letters of credit and as to which the aggregate amount of the obligations secured thereby does not exceed $750,000;

(z) deposits and pledges of cash securing the Loan Parties' obligations to provide adequate assurance to utility providers pursuant to section 366 of the Bankruptcy Code;

(aa) the Prepetition Lenders' Replacement Lien; and

(bb) Liens in respect of the Carve-Out.

"Permitted Protest" means the right of a Loan Party to protest any alleged Lien (other than any Lien that secures the Obligations), alleged taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien), or alleged rental payment, provided that (a) a reserve with respect to such obligation is established on such Loan Party's books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by such Loan Party, as applicable, in good faith, and (c) Agent is reasonably satisfied that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Agent's Liens or the Prepetition Lenders' Replacement Liens.

- 30 -

"<u>Permitted Purchase Money Indebtedness</u>" means, as of any date of determination, Indebtedness (other than the Obligations, but including Capitalized Lease Obligations), incurred after the Closing Date and at the time of, or within 180 days after, the acquisition of any fixed assets for the purpose of financing all or any part of the acquisition cost thereof, in an aggregate principal amount outstanding at any one time not in excess of $25,000,000; provided that, prior to incurring Capitalized Lease Obligations in excess of $1,000,000, Borrowers shall deliver a Compliance Certificate demonstrating they are in compliance with the financial covenants set forth in <u>Section 7</u> on a *pro forma* basis after giving effect to the incurrence of such Capitalized Lease Obligation.

"<u>Person</u>" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"<u>Personal Guarantees</u>" means the following personal guarantees of the Prepetition Principals to third parties: (a) Guaranty of Lease dated as of November 14, 2008 by the Prepetition Principals in favor of AFG Investment 5, LLC, pursuant to which the Prepetition Principals, jointly and severally, guarantee the obligations of Success Healthcare 1, LLC owing pursuant to that certain Amended and Restated Master Lease Agreement with respect to that certain real property located at 7500 East Hellman Avenue, Rosemead, California, up to an aggregate amount not to exceed $1,000,000; and (b) Limited Guaranty dated September 19, 2008 by the Prepetition Principals in favor of Concordia Bank & Trust, Co., pursuant to which the Prepetition Principals, jointly and severally, guarantee the obligations of Vidalia Real Estate Partners LLC owing to Concordia Bank & Trust, Co., pursuant to financings thereby, up to a maximum amount not to exceed $780,000.

"<u>Petition Date</u>" has the meaning ascribed to it in the recitals to this Agreement.

"<u>PHI</u>" means Promise Healthcare, Inc., a Florida corporation.

"<u>Platform</u>" has the meaning specified therefor in <u>Section 17.9(c)</u> of the Agreement.

"<u>Post-Petition</u>" means the time period beginning immediately upon the filing of the Chapter 11 Cases.

"<u>Prepetition</u>" means the time period ending immediately prior to the filing of the Chapter 11 Cases.

"<u>Prepetition Credit Agreement</u>" shall have the meaning assigned to it in the recitals to this Agreement.

"<u>Prepetition Lenders' Replacement Lien</u>" shall have the meaning ascribed to the term "Prepetition Lenders' Replacement Lien", as such term is defined in the Interim Order or the Final Order, as applicable.

"<u>Prepetition Loan Documents</u>" shall have the meaning assigned to the term "Loan Documents" in the Prepetition Credit Agreement.

"<u>Prepetition Indebtedness</u>" means all Indebtedness of the Borrower outstanding on the Petition Date immediately prior to the filing of the Chapter 11 Cases other than Indebtedness under the Prepetition Credit Agreement.

- 31 -

"Prepetition Letters of Credit" has the meaning ascribed to it in Section 2.11.

"Prepetition Obligations" shall mean the aggregate Revolving Loans (inclusive of Extraordinary Advances and Swing Loans), the Term Loan and all other "Obligations" (as each term is defined in the Prepetition Credit Agreement) outstanding on the Petition Date.

"Prepetition Principals" means, collectively, Peter R. Baronoff, Howard B. Koslow, and Lawrence Leder.

"Prepetition Principal Consulting Agreements" means, collectively, (a) that certain Consulting Agreement dated March 17, 2014, between PHI and Howard B. Koslow, and (b) that certain Consulting Agreement dated March 17, 2014, between PHI and Lawrence Leder.

"Prepetition Principal Subordination Agreement" means that certain Intercreditor and Subordination Agreement dated of March 21, 2016, by and among Agent, Prepetition Principals, Spouses, Dawson and Wilmington Trust, N.A., as collateral agent, as the same may be amended, restated, replaced or otherwise modified from time to time, and in each case as the same may apply to this Agreement pursuant to the Interim Order or Final Order.

"Prepetition Revolving Obligations" shall mean the aggregate Revolving Loans (inclusive of Extraordinary Advances and Swing Loans) and all other "Obligations" (as each term is defined in the Prepetition Credit Agreement) outstanding on the Petition Date other than the Term Loan and all other "Obligations" related thereto.

"Prepetition Term Loan" means the Term Loan extended pursuant to the Prepetition Credit Agreement.

"Professional Rehabilitation" means Professional Rehabilitation Hospital, L.L.C., a Louisiana limited liability company.

"Projections" means Parent's forecasted (a) balance sheets, (b) profit and loss statements, and (c) cash flow statements, all prepared on a basis consistent with Parent's historical financial statements, together with appropriate supporting details and a statement of underlying assumptions.

"Pro Rata Share" means, as of any date of determination:

(a)  with respect to a Lender's obligation to make all or a portion of the Revolving Loans, with respect to such Lender's right to receive payments of interest, fees, and principal with respect to the Revolving Loans, and with respect to all other computations and other matters related to the Commitments or the Revolving Loans, the percentage obtained by dividing (i) the Revolving Loan Exposure of such Lender by (ii) the aggregate Revolving Loan Exposure of all Lenders,

(b)  with respect to a Lender's obligation to participate in the Letters of Credit, with respect to such Lender's obligation to reimburse Issuing Bank, and with respect to such Lender's right to receive payments of Letter of Credit Fees, and with respect to all other computations and other matters related to the Letters of Credit, the percentage obtained by dividing (i) the Revolving Loan Exposure of such Lender by (ii) the aggregate Revolving Loan Exposure of all Lenders; provided, that if all of the Revolving Loans have been repaid in full and all Revolver Commitments have been terminated, but Letters of Credit remain outstanding, Pro Rata Share under this clause shall be determined as if the Commitments had not been terminated and based upon the Revolver Commitments as they existed immediately prior to their termination, and

- 32 -

(c)  with respect to all other matters and for all other matters as to a particular Lender (including the indemnification obligations arising under <u>Section 15.7</u> of the Agreement), the percentage obtained by dividing (i) the Revolving Loan Exposure of such Lender by (ii) the aggregate Revolving Loan Exposure of all Lenders, in any such case as the applicable percentage may be adjusted by assignments permitted pursuant to <u>Section 13.1</u> of the Agreement; <u>provided</u>, that if all of the Loans have been repaid in full, all Letters of Credit have been made the subject of Letter of Credit Collateralization, and all Commitments have been terminated, Pro Rata Share under this clause shall be determined as if the Revolving Loan Exposures had not been repaid, collateralized, or terminated and shall be based upon the Revolving Loan Exposures as they existed immediately prior to their repayment, collateralization, or termination.

"<u>Protective Advances</u>" has the meaning specified therefor in <u>Section 2.3(d)(i)</u> of the Agreement.

"<u>Public Lender</u>" has the meaning specified therefor in <u>Section 17.9(c)</u> of the Agreement.

"<u>Qualified Equity Interest</u>" means and refers to any Equity Interests issued by Parent (and not by one or more of its Subsidiaries) that is not a Disqualified Equity Interest.

"<u>Real Property</u>" means any estates or interests in real property now owned or hereafter acquired by a Loan Party and the improvements thereto.

"<u>Receivable Reserves</u>" means, as of any date of determination, those reserves that Agent deems necessary or appropriate, in its Permitted Discretion and subject to <u>Section 2.1(c)</u> of the Agreement, to establish and maintain with respect to the Eligible Accounts or the Maximum Revolver Amount, including (i) reserves for rebates, discounts, warranty claims, and returns  and (ii) reserves equal to all or a portion of the amounts owing or estimated to be owing to CMS or other Governmental Authority which, on the Closing Date, will be the sum of (A) the amount of retroactive settlements estimated to be due and owing to CMS or other applicable Governmental Authority where a final determination of the applicable Loan Party's liability has been made by CMS or such other Governmental Authority and an extended payment plan is no longer available for repayment of such liabilities <u>plus</u> (B) without duplication, 3 months of those amounts for which payment plans have been established with CMS or such other Governmental Authority, plus (C) 1 month of payments owing under each Tax Settlement Agreement.

"<u>Record</u>" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"<u>Refinancing Indebtedness</u>" means refinancings, renewals, or extensions of Indebtedness so long as:

(a) such refinancings, renewals, or extensions do not result in an increase in the principal amount of the Indebtedness so refinanced, renewed, or extended, other than by the amount of premiums paid thereon and the fees and expenses incurred in connection therewith and by the amount of unfunded commitments with respect thereto,

(b) such refinancings, renewals, or extensions do not result in a shortening of the average weighted maturity (measured as of the refinancing, renewal, or extension) of the Indebtedness so refinanced, renewed, or extended, nor are they on terms or conditions that, taken as a whole, are or could reasonably be expected to be materially adverse to the interests of the Lenders,

- 33 -

(c) if the Indebtedness that is refinanced, renewed, or extended was subordinated in right of payment to the Obligations, then the terms and conditions of the refinancing, renewal, or extension must include subordination terms and conditions that are at least as favorable to the Lender Group as those that were applicable to the refinanced, renewed, or extended Indebtedness, and

(d) the Indebtedness that is refinanced, renewed, or extended is not recourse to any Person that is liable on account of the Obligations other than those Persons which were obligated with respect to the Indebtedness that was refinanced, renewed, or extended.

"Related Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials required by Environmental Laws.

"Repayment in Full of the Revolving Loans" means that each of the following have occurred: (1) the payment in full in immediately available funds of (A) the principal amount of, and interest accrued and unpaid with respect to, all outstanding Revolving Loans, together with the payment of any premium applicable to the repayment of the Revolving Loans, (B) all Lender Group Expenses incurred by Agent or any Revolving Lender that have accrued and are unpaid regardless of whether demand has been made therefor, and (C) all fees, charges and other Obligations that have accrued under the Agreement or under any other Loan Document with respect to the Revolving Loans (including the Letter of Credit Fee and the Unused Line Fee), (2) all Letters of Credit have been made the subject of Letter of Credit Collateralization, (3) all Bank Product Obligations have been made subject to Bank Product Collateralization, (4) all Revolver Commitments have been terminated in accordance with the terms and conditions of the Agreement, and (5) Wells Fargo is no longer Agent and a successor Agent has been appointed in accordance with the terms and conditions of Section 15.9 of the Agreement.

"Replacement Lender" has the meaning specified therefor in Section 2.13(b) of the Agreement.

"Report" has the meaning specified therefor in Section 15.16 of the Agreement.

"Required Lenders" means, at any time, Revolving Lenders having or holding more than 50% of the aggregate Revolving Loan Exposure of all Revolving Lenders; provided, that (i) the Revolving Loan Exposure and of any Defaulting Lender shall be disregarded in the determination of the Required Lenders, (ii) at any time there are 2 or more Revolving Lenders, "Required Lenders" must include at least 2 Revolving Lenders (who are not Affiliates of one another), and (iii) no Term Loan Lender shall be a "Required Lender" for any purpose under this Agreement or the other Loan Documents.

"Reserves" means, as of any date of determination, those reserves (other than Receivable Reserves and the Bank Product Reserves that Agent deems necessary or appropriate, in its Permitted Discretion and subject to Section 2.1(c) of the Agreement, to establish and maintain (including reserves with respect to (a) sums that Parent, any Borrower or any of their Subsidiaries are required to pay under

- 34 -

any Section of the Agreement or any other Loan Document (such as taxes, assessments, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases) and has failed to pay, and (b) amounts owing by Parent, any Borrower or any of their Subsidiaries to any Person to the extent secured by a Lien on, or trust over, any of the Collateral (other than a Permitted Lien), which Lien or trust, in the Permitted Discretion of Agent likely would have a priority superior to the Agent's Liens (such as Liens or trusts in favor of landlords, warehousemen, carriers, mechanics, materialmen, laborers, or suppliers, or Liens or trusts for ad valorem, excise, sales, or other taxes where given priority under applicable law) in and to such item of the Collateral) with respect to the Borrowing Base or the Maximum Revolver Amount. Without limiting the foregoing, the parties acknowledge and agree that, beginning on the later of (x) the first Business Day of the week ending February 9, 2019, or (y) the consummation of a sale of the Silver Lake Property, the Agent shall maintain a Reserve against Availability in the amount of 60% of the amount by which, as of the last Business Day of the preceding week, Availability was greater than $3,000,000.

"Restricted Payment" means to (a) declare or pay any dividend or make any other payment or distribution, directly or indirectly, on account of Equity Interests issued by Parent or any Loan Party (including any payment in connection with any merger or consolidation involving Parent or such Loan Party to the direct or indirect holders of Equity Interests issued by such Person in their capacity as such (other than dividends or distributions payable in Qualified Equity Interests issued by Parent), or (b) purchase, redeem, make any sinking fund or similar payment, or otherwise acquire or retire for value (including in connection with any merger or consolidation involving Parent or any Loan Party) any Equity Interests issued by Parent or any Loan Party, and (c) make any payment to retire, or to obtain the surrender of, any outstanding warrants, options, or other rights to acquire Equity Interests of Parent, or Loan Party now or hereafter outstanding.

"Revolver Commitment" means, with respect to each Revolving Lender, its Revolver Commitment, and, with respect to all Revolving Lenders, their Revolver Commitments, in each case as such Dollar amounts are set forth beside such Revolving Lender's name under the applicable heading on Schedule C-1 to the Agreement or in the Assignment and Acceptance pursuant to which such Revolving Lender became a Revolving Lender under the Agreement, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of Section 13.1 of the Agreement.

"Revolver Usage" means, as of any date of determination, the sum of (a) the amount of outstanding Revolving Loans (inclusive of Swing Loans and Protective Advances), *plus* (b) the amount of the Letter of Credit Usage.

"Revolving Lender" means a Lender that has a Revolver Commitment or that has an outstanding Revolving Loan.

"Revolving Loan Exposure" means, with respect to any Revolving Lender, as of any date of determination (a) prior to the termination of the Revolver Commitments, the amount of such Lender's Revolver Commitment, and (b) after the termination of the Revolver Commitments, the aggregate outstanding principal amount of the Revolving Loans of such Lender.

"Revolving Loan Base Rate Margin" has the meaning set forth in the definition of Applicable Margin.

"Revolving Loans" has the meaning specified therefor in Section 2.1(a) of the Agreement.

- 35 -

"Sale Procedure Order" means any order establishing procedures for the sale of the equity, or all or substantially all, of the assets of any Borrower and its estate, including a motion for an order and a notice of motion for an order, in form and substance satisfactory to Agent in its sole and absolute discretion.

"Sanctioned Entity" means (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, (d) a Person resident in or determined to be resident in a country, in each case, that is subject to a country sanctions program administered and enforced by OFAC.

"Sanctioned Person" means a person named on the list of Specially Designated Nationals maintained by OFAC.

"S&P" has the meaning specified therefor in the definition of Cash Equivalents.

"Scheduled Commitment Termination Date" means the date of the earliest to occur of (a) [____]³, 2019; (b) the effective date of a plan of reorganization confirmed in the Chapter 11 Cases; or (c) the date on which Borrower consummates a transaction for the sale or disposition of all or substantially all of its assets.

"SEC" means the United States Securities and Exchange Commission and any successor thereto.

"Secured Note" means, individually and collectively, those certain secured promissory notes in the aggregate original principal amount of $5,884,000, dated as of March 17, 2014, by PHI in favor of the Prepetition Principals, Spouses, and Dawson.

"Secured Note Indebtedness" means all Indebtedness of PHI pursuant to the terms of the Secured Note.

"Securities Account" means a securities account (as that term is defined in the Code).

"Securities Act" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"Settlement" has the meaning specified therefor in Section 2.3(e)(i) of the Agreement.

"Settlement Agreement" means that certain Settlement Agreement, dated as of January 9, 2013, by and among Sun Capital Healthcare, Inc. ("SCHI"), Sun Capital, Inc., certain Loan Parties, Prepetition Principals, Spouses and Dawson, and the subsidiaries and affiliates of SCHI, Sun Capital, Inc., the Loan Parties that are party thereto, and Parent, and Daniel S. Newman, as Receiver, as the same may be amended, modified, restated and/or supplemented from time to time to the extent so permitted hereunder.

"Settlement Date" has the meaning specified therefor in Section 2.3(e)(i) of the Agreement.

---

³ To be 180 days after the Closing Date

"Solvent" means, with respect to any Person as of any date of determination, that (a) at fair valuations, the sum of such Person's debts (including contingent liabilities) is less than all of such Person's assets, (b) such Person is not engaged or about to engage in a business or transaction for which the remaining assets of such Person are unreasonably small in relation to the business or transaction or for which the property remaining with such Person is an unreasonably small capital, and (c) such Person has not incurred and does not intend to incur, or reasonably believe that it will incur, debts beyond its ability to pay such debts as they become due (whether at maturity or otherwise), and (d) such Person is "solvent" or not "insolvent", as applicable within the meaning given those terms and similar terms under applicable laws relating to fraudulent transfers and conveyances.  For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"Spouses" means Malinda Baronoff, Jane Koslow, and Carole Leder.

"St. Alexius" means St. Alexius Hospital Corporation #1, a Missouri corporation.

"St. Alexius Real Property" means the Real Property located at 3933 S. Broadway, St. Louis, MO 63118, 2639 Miami Street, St. Louis, MO 63118, 3901 Ohio Avenue, St. Louis, MO [_____], 3838 Texas Avenue, St. Louis, MO [_____] and 3858 Texas Avenue, St. Louis, MO [_____].

"Standard Letter of Credit Practice" means, for Issuing Bank, any domestic or foreign law or letter of credit practices applicable in the city in which Issuing Bank issued the applicable Letter of Credit or, for its branch or correspondent, such laws and practices applicable in the city in which it has advised, confirmed or negotiated such Letter of Credit, as the case may be, in each case, (a) which letter of credit practices are of banks that regularly issue letters of credit in the particular city, and (b) which laws or letter of credit practices are required or permitted under ISP or UCP, as chosen in the applicable Letter of Credit.

"Subsidiary" of a Person means a corporation, partnership, limited liability company, or other entity in which that Person directly or indirectly owns or controls the Equity Interests having ordinary voting power to elect a majority of the Board of Directors of such corporation, partnership, limited liability company, or other entity.

"Success Healthcare" means Success Healthcare, LLC, a California limited liability company.

"Success Indebtedness" means Indebtedness owing to Parent by St. Alexius and Success Healthcare 1, LLC, in an outstanding principal amount of $26,052,974 as of March 21, 2016.

"Success Loan Party" means each of the following:  (a) Success Healthcare, LLC, a California limited liability company, (b) Success Healthcare 2, LLC, a California limited liability company, (c) Success Healthcare 1, LLC, a California limited liability company, (d) St. Alexius, and (e) each Subsidiary of any of the foregoing Persons that may from time to time be a Loan Party hereunder.

"Supermajority Lenders" means, at any time, Lenders having or holding more than 66 2/3% of the aggregate Revolving Loan Exposure of all Lenders; provided, that (i) the Revolving Loan Exposure of any Defaulting Lender shall be disregarded in the determination of the Required Lenders,

- 37 -

and (ii) at any time there are 2 or more Lenders, "Supermajority Lenders" must include at least 2 Lenders (who are not Affiliates of one another).

"Swing Lender" means Wells Fargo or any other Lender that, at the request of Borrowers and with the consent of Agent agrees, in such Lender's sole discretion, to become the Swing Lender under Section 2.3(b) of the Agreement.

"Swing Loan" has the meaning specified therefor in Section 2.3(b) of the Agreement.

"Swing Loan Exposure" means, as of any date of determination with respect to any Lender, such Lender's Pro Rata Share of the Swing Loans on such date.

"Taxes" means any taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein, and all interest, penalties or similar liabilities with respect thereto.

"Tax Lender" has the meaning specified therefor in Section 14.2(a) of the Agreement.

"Tax Settlement Agreements" means the agreements listed on Schedule T-1 to the Agreement.

"Tax Lien Subordination Agreements" means, collectively,

(a) those certain Form 669-D Certificates of Subordination of Property From Federal Tax Lien (including the additional terms and conditions to subordinate with respect thereto) dated on or after March 21, 2016, by the U.S. Department of Treasury – Internal Revenue Service in favor of Agent and Lenders with respect to tax obligations owing by Promise Hospital of East Los Angeles, L.P., Promise Healthcare, Inc., Quantum Health, Inc., and St. Alexius,

(b) that certain Subordination of Lien Agreement and associated letter, each dated February 18, 2014, and associated Installment Agreement, issued on March 11, 2014 and executed on April 25, 2014, made by the State of California Employment Development Department, as amended by that certain First Amendment to Subordination of Lien Agreement dated March 17, 2016, in favor of Agent and Lenders with respect to tax obligations owing by Promise Hospital of East Los Angeles, L.P.,

(c) that certain Subordination of Lien Agreement and associated letter, each dated February 18, 2014, and associated Installment Agreement, issued on March 11, 2014 and executed on April 25, 2014, made by the State of California Employment Development Department, as amended by that certain First Amendment to Subordination of Lien Agreement dated March 17, 2016, in favor of Agent and Lenders with respect to tax obligations owing by Success Healthcare 1, LLC,

(d) that certain Subordination of Lien Agreement and associated letter, each dated February 18, 2014, and associated Installment Agreement, issued on March 11, 2014 and executed on April 25, 2014, made by the State of California Employment Development Department, as amended by that certain First Amendment to Subordination of Lien Agreement dated March 17, 2016, in favor of Agent and Lenders with respect to tax obligations owing by Quantum Health, Inc., and

(e) that certain Agreement for Satisfaction of Tax Liability, Subordination of Liens, Claims and Encumbrances; and Mutual Release dated December 31, 2013, by and among the State of Missouri Department of Revenue, Forest Park Hospital Corporation #1, and St. Alexius, as amended by that certain Amendment No. 1 to Agreement for Satisfaction of Tax Liability, Subordination of Liens,

- 38 -

Claims and Encumbrances; and Mutual Release, dated on or about March 21, 2016, in favor of Agent and Lenders, with respect to tax obligations owing by Forest Park Hospital Corporation #1 and St. Alexius.

"Term Loan" has the meaning specified therefor in Section 2.2(a) of the Agreement.

"Term Loan Base Rate Margin" has the meaning set forth in the definition of Applicable Margin.

"Term Loan Commitment" means, with respect to each Lender, its Term Loan Commitment, and, with respect to all Lenders, their Term Loan Commitments, in each case as such Dollar amounts are set forth beside such Lender's name under the applicable heading on Schedule C-1 to this Agreement or in the Assignment and Acceptance pursuant to which such Lender became a Term Loan Lender under this Agreement, as such amounts may be reduced or increased from time to time pursuant to assignments made in accordance with the provisions of Section 13.1 of this Agreement.

"Term Loan Lender" means a Lender that has a Term Loan Commitment or that holds a portion of the Term Loan.

"Term Loan Priority Collateral" means all Real Property owned by the Loan Parties other than the St. Alexius Real Property.

"Third Party Payor" means (i) a commercial medical insurance company, health maintenance organization, professional provider organization or other third party payor that reimburses providers for Medical Services provided to individual patients, (ii) a nonprofit medical insurance company (such as the Blue Cross, Blue Shield entities), and (iii) a Government Account Debtor making payments under a Government Reimbursement Program.

"Third Party Payor Arrangement" shall mean a written agreement or arrangement with a Third Party Payor pursuant to which the Third Party Payor pays all or a portion of the charges of any Loan Party or its Subsidiaries for providing Medical Services.

"Trademark Security Agreement" has the meaning specified therefor in the Guaranty and Security Agreement.

"TRICARE" means, collectively, the program of medical benefits covering former and active members of the uniformed services and certain of their dependents, financed and administered by the United States Department of Defense, Health and Human Services and Transportation, and all laws, rules, regulations, manuals, orders, guidelines or requirements (whether or not having the force of law) pertaining to such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"UCP" means, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits 2007 Revision, International Chamber of Commerce Publication No. 600 and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"United States" means the United States of America.

"Unused Line Fee" has the meaning specified therefor in Section 2.10(b) of the Agreement.

"<u>Voidable Transfer</u>" has the meaning specified therefor in <u>Section 17.8</u> of the Agreement.

"<u>Wells Fargo</u>" means Wells Fargo Bank, National Association, a national banking association.

"<u>Withdrawal Liability</u>" means liability with respect to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in part I of Subtitle E of Title IV of ERISA.

EAST\162241995.1

**Schedule A-1**

Agent's Account

| | |
|---|---|
| Bank Name: | Wells Fargo Bank, National Association |
| Bank Address: | 420 Montgomery Street, San Francisco, CA |
| ABA Number: | 121-000-248 |
| Account Name: | Wells Fargo Bank, N.A. |
| Account Number: | 37235547964502870 |
| Reference: | PROMISE HEALTHCARE GROUP, LLC |

**Schedule A-2**

Authorized Persons

[TBD]

**Schedule C-1**

Commitments

| Lender | Revolver Commitment | Term Loan Commitment | Total Commitment |
|---|---|---|---|
| **Wells Fargo Bank, National Association** | $[65,000,000] | $[20,000,000] | $[85,000,000] |
| **Total** | $[65,000,000] | $[20,000,000] | $[85,000,000] |

**Schedule 8.21**

Sale Transaction Milestones

| | |
|---|---|
| 11/5/18 | Petition Date |
| | |
| 11/5/18 | Filing of DIP financing motion; cash management motion; Silver Lake bid procedures and sale motion |
| | |
| 11/7/18 | Entry of interim DIP financing order |
| | |
| 11/9/18 | Delivery to Wells Fargo of title reports with respect to agreed list of owned real property parcels |
| | |
| 11/16/18 | Delivery to Wells Fargo by all affiliates and shareholders of subordination agreements as to encumbrances against owned real property parcels on agreed list [discuss whether all non-Bossier lienholders are DIP borrowers or guarantors] |
| | |
| 11/30/18 | Filing of San Diego bid procedures and sale motion; filing of St. Alexius bid procedures and sale motion |
| | |
| 11/30/18 | Entry of final DIP financing order |
| | |
| 12/20/18 | Filing of general bid procedures and sale motion that includes designation of one or more stalking horse bids for substantially all of the debtors' assets and seeks approval of debtors' entry into one or more stalking horse asset purchase |

| | |
|---|---|
| | agreements and/or restructuring agreement (motion also to include procedures for designation of assumed and rejected leases and contracts and for setting cure amounts); in any and all events, for any sale or restructuring agreement(s) to meet Wells Fargo's approval, such agreement or agreement(s), taken in the aggregate, must provide sufficient cash at closing to satisfy at that time the debtors' obligations with respect to DIP financing in full in cash or otherwise be acceptable to Wells Fargo in its sole discretion |
| | |
| 12/31/18 | Closing of San Diego, St. Alexius sales (paydown of DIP financing from closing proceeds, on closing flow of funds) |
| | |
| 1/10/19 | Entry of general bid procedures order |
| | |
| 2/5/19 | Closing of Silver Lake sale (paydown of DIP financing from closing proceeds, on closing flow of funds) |
| | |
| 2/5/19 | General auction |
| | |
| 2/15/19 | General sale hearing |
| | |
| 4/30/19 | Closing of general sale(s) (repayment of DIP financing from closing proceeds, on closing flow of funds) |
| | |
| 4/30/19 | DIP financing maturity date |

**Schedule 3.1**

The obligation of each Lender to make its initial extension of credit provided for in the Agreement is subject to the fulfillment, to the satisfaction of each Lender (the making of such initial extension of credit by any Lender being conclusively deemed to be its satisfaction or waiver of the following), of each of the following conditions precedent:

(a)     The Bankruptcy Court shall have entered the Interim Order, certified by the Clerk of the Bankruptcy Court as having been duly entered, and the Interim Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the Agent and the Lenders;

(b)     Agent shall have received each of the following documents, in form and substance reasonably satisfactory to Agent, duly executed and delivered, and each such document shall be in full force and effect:

        (i)     the Agreement,

        (ii)     a completed Borrowing Base Certificate,

        (iii)     the Fee Letter, and

        (iv)     the Flow of Funds Agreement;

(c)     Agent shall have received a copy of the Approved Budget for the 13-week period beginning on the Petition date and ending on [_____] in form and substance satisfactory to the Agent;

(d)     Agent shall have completed (i) Patriot Act searches, OFAC/PEP searches and customary individual background checks for each Loan Party, and (ii) OFAC/PEP searches and customary individual background searches for each Loan Party's senior management and key principals, the results of which shall be reasonably satisfactory to Agent;

(e)     Agent and Lenders shall have received credit committee approval;

(f)     no Default or Event of Default under the Loan Documents will result from the making of the Loans and other extension of credit by Agent;

(g)     Borrowers shall have paid all Lender Group Expenses incurred in connection with the transactions evidenced by the Agreement and the other Loan Documents;

(h)     Borrowers shall have received all licenses, approvals or evidence of other actions required by any Governmental Authority in connection with the execution and delivery by Loan Parties of the Loan Documents or with the consummation of the transactions contemplated thereby;

(i)     all other documents and legal matters in connection with the transactions contemplated by the Agreement shall have been delivered, executed, or recorded and shall be in form and substance reasonably satisfactory to Agent.