## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
:
In re:                                                    :  Chapter 11
:
PROMISE HEALTHCARE GROUP, LLC, *et al.*,[1]  :  Case No. 18-12491 (CSS)
:
Debtors.                                   :  (Joint Administration Requested)
------------------------------------------------------------x

## DECLARATION OF ANDREW HINKELMAN
## IN SUPPORT OF FIRST DAY RELIEF

I, Andrew Hinkelman, hereby declare under the penalty of perjury:

1.      I am the Chief Restructuring Officer ("**CRO**") and Interim Chief Financial Officer

("***Interim CFO***") of Promise Healthcare Group, LLC and certain of its subsidiaries and affiliates,

each a debtor and debtor-in-possession (each, individually, a "***Debtor***" and, collectively, the

"***Debtors***") in the above-captioned chapter 11 cases.

2.      I have served as CRO since June 29, 2018 and as Interim CFO since October 15,

2018.[2]   In such capacity, I am generally familiar with the Debtors' day-to-day operations,

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Professional Rehabilitation Hospital, L.L.C. (5340), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179),  Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc. (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc. (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), St. Alexius Hospital Corporation #1 (2766), St. Alexius Properties, LLC (4610), Success Healthcare 1, LLC (6535), Success Healthcare 2, LLC (8861), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766).  The mailing address for the Debtors, solely for purposes of notices and communications, is 999 Yamato Road, 3rd FL, Boca Raton, FL  33431.

business and financial affairs, and books and records.  I am above 18 years of age, and I am competent to testify.

3.     I am a Senior Managing Director at FTI Consulting, Inc. ("**FTI**") and have more than twenty years of experience in restructuring matters.  During that time, I have advised clients on business strategy and planning, financial analysis, cash management, crisis management, market analysis, and operational improvement, both in and out of court.  I have extensive experience working with debtors and creditors in bankruptcy and out-of-court restructurings, providing pre-lending due diligence on behalf of parties in interest, negotiating new financing agreements and amendments, waivers and forbearances relating thereto, and performing estate wind-down and trustee-related services.  I have extensive experience with in-court and out-of-court restructurings, including serving as Chief Restructuring Officer for Adeptus Health Inc., the oldest and largest network of freestanding emergency rooms in the United States, Vertellus Specialties Inc., a global chemical manufacturer, and IMRIS, Inc., a global medical device company, Classic Party Rentals, Inc., a national provider of party rental services, Trident Microsystems Inc., a global designer and manufacturer of microchips, Fairfield Residential LLC, a fully integrated multifamily housing company.  Additionally, I have served as post-confirmation plan administrator and Vice President of Operations for Metricom, Inc., Fairfield Residential, and Trident Microsystems, Inc. I have also been retained as financial advisor in numerous chapter 11 cases, including, but not limited to, the following: Orchard Supply Hardware Stores Corporation; Mervyn's LLC; Sportsman's Warehouse, Inc.; Silicon Graphics, Inc.; Redback Networks Inc.; and Planet Hollywood.  Prior to joining FTI, I worked as a Managing Director at PricewaterhouseCoopers in its business recovery services practice.  I have

---

[2] FTI was first retained by the Debtors on June 22, 2017 to provide certain financial and operational assessments.

a Bachelor's Degree in Business Administration from California State University, San Luis Obispo, and I am a Certified Public Accountant.

4.      I submit this declaration to assist this Court and parties in interest in understanding the circumstances leading to the commencement of these chapter 11 cases, the capital structure of the Debtors', the Debtor's prepetition debt facilities and the Debtors' prepetition marketing efforts and in support of: (a) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") filed on the date hereof (the "***Petition Date***"); and (b) the emergency "first day" relief that the Debtors have requested from the Court pursuant to the motions and applications described herein.

5.      Except as otherwise indicated herein, all facts set forth in this declaration are based on my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, and my review of the relevant documents and information concerning the Debtors' operations, financial affairs, and refinancing and restructuring initiatives.  If called upon to testify, I could and would testify competently to the facts set forth herein.

### **Introduction**[3]

6.      The Debtors operate short-term acute care hospitals ("***STACHs***"), long-term acute care hospitals ("***LTACHs***"), and skilled nursing facilities ("***SNFs***") across nine (9) states.  The Debtors currently operate two (2) STACHs, fourteen (14) LTACHs, and two (2) co-located SNFs, consisting of 424 licensed STACH beds, 950 licensed LTACH beds, and 131 licensed SNF beds.  The Debtors' LTACHs consist of twelve (12) freestanding hospitals and two (2)

---

[3] Capitalized terms used but not defined in this Introduction shall have the same meanings given to them elsewhere in this Declaration.

hospital-in-hospital units.  The Debtors have grown to be one of the largest stand-alone LTACH providers in the United States and are known for their clinical quality and patient satisfaction.

7.      While I believe that the Debtors' overall business is fundamentally strong, the Debtors have been operating with an unsustainable balance sheet due to current industry dynamics and certain underperforming facilities within the Debtors' portfolio.  In light of these developments, the Debtors engaged restructuring advisors to develop and implement an operational restructuring plan and assist in either: (a) the development and negotiation of a plan to restructure the Debtors' debt obligations around certain of the Debtors' strongest performing assets, while selling the Debtors' non-core or underperforming assets; or (b) a strategic sale of the Debtors core assets to a third-party buyer.  To fund these chapter 11 cases, the DIP Lenders have agreed to provide $85 million in postpetition financing on a superpriority basis, comprising a roll-up of their $65 million prepetition asset based revolving loan facility and a new money commitment of $20 million, all as more fully described herein.  This financing is the result of arms'-length negotiations between the Debtors and the DIP Lenders and provides the Debtors with the necessary liquidity to conduct these chapter 11 cases and expeditiously implement the best strategy for the Debtors, their estates, their creditors, and other parties in interest.

8.      As detailed more fully herein, the Debtors intend to (a) sell certain non-core assets, including, without limitation, the Silver Lake Facility (as defined herein), the St. Alexius Facility (as defined herein), and certain real estate owned by the Debtors in San Diego, California and leased to a third party (the "***San Diego Property***") during the first three months of this case, and use the proceeds from those sales to pay down parties with liens on such non-core assets; (b) conclude a sales process being managed by Houlihan Lokey Capital, Inc. ("***Houlihan***") with a sale or sales of substantially all of the rest of the Debtors' assets or, if an

4

equity sponsor emerges, a restructuring of some or all of the Debtors' assets (subject to the process garnering the highest and best bids), and (c) exit from these Chapter 11 Cases in approximately six months.

9.      This declaration is organized into three sections.  The first section describes the Debtors' history and operational and capital structure.   The second section details the circumstances surrounding the commencement of these chapter 11 cases.  The third section sets forth the evidentiary basis for the relief requested in each of the pleadings filed in connection with these chapter 11 cases.

## Background

### I.      The Debtors' History and Operations

#### A.      The Debtors' Corporate History and Business Operations

10.     In connection with the resolution of the receivership (the "***Founding Partners SEC Receivership***") of Founding Partners Stable-Value Fund, L.P. ("***Stable-Value***"), a fund operating under the umbrella of Founding Partners Capital Management Company, and certain other funds (collectively, the "***Receivership Funds***"), the ownership interests in Promise Healthcare Group, LLC ("***PHG***"), originally held by Stable-Value, were granted to investors in the Receivership Funds.  As such, the existing shareholders are primarily legacy investors in a medical receivables fund who ultimately, and involuntarily, came to own equity in an operating hospital enterprise by virtue of the Debtors' exit from the Founding Partners SEC Receivership. The existing shareholders of the Debtors, many of whom are very small investors, are not traditional hospital investors but instead are victims of the acts that precipitated the Founding Partners SEC Receivership.

11.     In addition, in connection with the resolution of the Founding Partners SEC Receivership, a senior loan and security agreement (as amended, restated, supplemented, or

modified from time to time, the "**$75MM Intercompany Loan Agreement**") was executed by Promise Healthcare, Inc. ("**PHI**"), as borrower, and certain subsidiaries of PHI, as guarantors (the "**Intercompany Loan Guarantors**"), and Promise Holdings, as lender, evidencing a $75 million senior secured term loan (the "**$75MM Intercompany Loan**")[4] that was deemed fully funded upon the exit from the Founding Partners SEC Receivership.  A subordinated term note (as amended, restated, supplemented, or modified from time to time, the "**$125MM Intercompany Note**") was also executed by PHI, as borrower, and certain subsidiaries of PHI, as guarantors, in favor of Promise Holdings, as lender, evidencing a $125 million subordinated term loan (the "**$125MM Intercompany Loan**" and, with the $75MM Intercompany Loan, collectively, the "**Intercompany Loans**") that was deemed fully funded upon the exit from the Founding Partners SEC Receivership.

### B.    The Debtors' Corporate and Capital Structure

12.    The Debtors' current corporate organizational structure is depicted on the chart attached hereto as <u>**Exhibit A**</u>.[5]  PHG serves as the ultimate parent entity of the Debtors through its 100 percent equity ownership of Promise Healthcare Holdings, Inc. ("**Promise Holdings**") and Success Healthcare, LLC ("**Success**").  Promise Holdings and Success, in turn, own, directly or indirectly, each of the remaining fifty-six (56) entities in the PHG enterprise, forty-six (46) of which are Debtors in these chapter 11 cases.

13.    As of the Petition Date, the debt obligations of the Debtors totaled in excess of $565 million, excluding accrued and unpaid interest in the amount of approximately $103 million, accrued expenses and accounts payable of approximately $94 million, and capitalized

---

[4] Concurrently with the execution of the $75MM Intercompany Loan Agreement and the related Loan Documents (as defined in the $75MM Intercompany Loan Agreement), Promise Holdings executed a promissory note (the "**PHG $75MM Note**") in favor of PHG, evidencing a $75 million unsecured loan.

[5] The chart attached hereto as <u>**Exhibit A**</u> does not include dormant Debtor Promise Behavioral Health Hospital of Shreveport, Inc., which is wholly-owned by PHI.

leases of approximately $13 million.    One primary component of the debt obligations outstanding as of the Petition Date is a credit facility with Wells Fargo Bank, National Association, as administrative agent (in such capacity, the "***Agent***") on behalf of the Lenders (as defined herein).    The Debtors listed on **Exhibit B** hereto are borrowers (the "***Borrowers***") and the Debtors listed on **Exhibit C** hereto are guarantors (the "***Guarantors***") under that certain Credit Agreement, dated as of March 21, 2016 (as amended, restated, supplemented, and otherwise modified from time to time, the "***Credit Agreement***"), by and among the Borrowers, the Guarantors, the Agent, and the lenders party thereto (the "***Lenders***").[6]    The Credit Agreement provides for credit facilities consisting of a revolving loan facility (the "***Revolver***") and a term loan facility (the "***Term Loan***" and, with the Revolver, collectively, the "***Credit Facility***").    As of the Petition Date, the principal amount outstanding under the Revolver and Term Loan is $61,657.557.26 and $15,000,000, respectively.    As of the Petition Date, there is approximately $14,000 in accrued and unpaid interest under the Credit Facility.    The commitments under the Revolver terminate and the Term Loan matures on March 14, 2019.    The Credit Facility is secured by a security interest in substantially all of the Borrowers' and Guarantors' assets (the "***Collateral***").    The other primary component of the debt obligations outstanding as of the Petition Date is the Intercompany Loans, which are subordinated in priority and payment to the Credit Facility.    As of the Petition Date, no principal payments have been made in respect of the Intercompany Loans.    As of the Petition Date, there is approximately $11.2 million and $92.8 million in accrued and unpaid interest under the $75MM Intercompany Loan[7] and the $125MM

---

[6] As of the Petition Date, the Lenders are, collectively, Wells Fargo Bank, National Association (the "***Revolving Lender***"), Credit Value Fund III, LP ("***CVF III***"), CCVF SPV Series I Holdings LLC ("***CCVF***"), and Bell Atlantic Master Trust ("***Bell***" and, with CVF III and CCVF, collectively, the "***Term Loan Lenders***").    The Term Loan Lenders are affiliates of CVP SPV LLC Series I ("***CVP Series I***") and CVP SPV LLC Series III ("***CVP Series III***"), each of which are holders of certain of the equity interests of PHG as more fully detailed herein.

[7] Accrued and unpaid interest in respect of the PHG $75MM Note is also approximately $11.2 million.

Intercompany Loan, respectively.  While interest in respect of the $125MM Intercompany Loan is paid-in-kind, interest in respect of the $75MM Intercompany Loan is paid in cash.   The Intercompany Loans mature on March 17, 2019.

14.    As depicted on **Exhibit A**, approximately seventy percent (70%) of the membership interests in PHG, which in turn directly or indirectly owns 100 percent of the interests in all of the Debtors (except PHI), are owned by FP Offshore, Ltd., CVP Series I, CVP Series III, and Belmont Strategic Income Fund, LP.  The remaining approximately thirty percent (30%) of membership interests in PHG are owned by certain claimants who held claims against the Receivership Funds, each of which individually holds less than two percent (2%) of such membership interests.

## II.     Events Leading to the Chapter 11 Cases

15.    While the Debtors' have established a market leadership position in post-acute care, internal and external factors have lead the Debtors to an unmanageable level of debt service obligations and an untenable liquidity position.   In 2015, Medicare's establishment of patient criteria to qualify as an LTACH-compliant patient facility led to significant reimbursement rate declines over the course of 2015 and 2016 as changes were implemented.    Average reimbursement rates for non-qualifying patients were estimated to drop from $41,000 per stay to $10,000 across the industry.   When rates declined sharply, the Debtors were unable to adjust operating cost structures at the facilities, leading to a direct impact on profitability.   Additionally, during this period of declining profitability, the Debtors took on several new business projects that required significant upfront capital requirements, all of which have since been abandoned. A summary of the Debtors' recent financial performance is outlined in the table below.[8]

---

[8] Without the foregoing adjustments, the Debtors' EBITDA could be materially different.

| (USD in millions) | FY15 | FY16 | FY17 | YTD 9/30/2018 |
|---|---|---|---|---|
| Net Revenue | $489.5 | $512.2 | $462.5 | $320.4 |
| Operating Expenses | $489.1 | $517.4 | $487.7 | $328.6 |
| Operating Income/(Loss) | $0.4 | ($5.2) | ($25.2) | ($8.2) |
| Adjusted EBITDA | $28.1 | $23.7 | $7.8 | $14.0 |

### A.  Liquidity Constraints

16.     Shortly after exiting the Founding Partners SEC Receivership, the Debtors commenced a process to find new capital.  The Debtors obtained a revolving loan (the "**MidCap Revolver**") from MidCap Funding IV Trust ("**MidCap**") in the original principal amount of $49 million.  While the Debtors' initial availability under the MidCap Revolver was approximately $20-25 million, the Debtors' availability began to drop due to payments on account of expenses resulting from the Founding Partners SEC Receivership, changes to reimbursement rates, certain capital investments, and industry-wide distress.  As a result, the MidCap Revolver became insufficient for the capital needs and obligations of the Debtors over time.

17.     On March 21, 2016, the Debtors refinanced the MidCap Revolver with a revolving loan with Wells Fargo Bank, N.A. in the original principal amount of $75 million.  The Debtors initially had availability of more than $13 million under the Credit Agreement.  By the middle of 2017, the Debtors were in default under the Credit Agreement and, by the end of the year, were in an over-advanced position.  A situation of limited availability has persisted throughout 2018, notwithstanding certain equity holders injecting $15 million of debt pursuant to a "last out participation" under the Credit Agreement in March 2018.

9

18.    In October 2017, the PHG's board of directors hired FTI to engage in certain operational process improvements.  Between November 2017 and March 2018, the Debtors implemented a cost improvement strategy that included the closure of two facilities and the reduction of another 147 full-time equivalent employees, which reduced expenses by at least $20 million on an annualized basis.  Costs of $6.5 million were incurred with the closure of the two facilities.  These efforts improved profitability of the business, but did not generate enough cash flow to offset the increasing demands of a vendor base that had been stretched well beyond terms for several years.

19.    The Debtors' STACHs, one located in the Silver Lake neighborhood of Los Angeles (the "*Silver Lake Facility*") and the other located in Saint Louis (the "*St. Alexius Facility*"), have required significant physical plant investments in recent years.  These capital costs, coupled with seismic compliance costs at the Silver Lake Facility and a largely Medicaid patient population at both the Silver Lake Facility and the St. Alexius Facility, have led to sustained negative cash flows and losses in 2018 year-to-date.

20.    The Debtors' liquidity has also been hampered by the timing in receiving supplemental payments from Hospital Quality Assurance Fees ("*HQAFs*") collected by the California Department of Health Care Services (the "*California DHCS*").  The California DHCS collects HQAFs from certain providers and managed care organizations and uses the HQAFs to provide supplemental payments to hospitals serving Medicaid and uninsured patient populations. The Debtors rely on these HQAF payments to bridge the gap in reimbursement created by serving such populations.  As of the Petition Date, the Silver Lake Facility had an HQAF receivable balance of over $30 million.

### B.  Management Changes

21.     In early 2018, Peter Baronoff resigned as Chief Executive Officer.  In May 2018, he resigned from the board of directors.  He has subsequently joined KPC Health System as its CEO and KPC Global Management as a managing director (collectively, "***KPC***").  An affiliate of KPC had previously made a bid in connection with the sale of the Silver Lake Facility.  In July 2018, Richard Gold resigned as President and Chief Operating Officer.  In October 2018, James Hopwood resigned as Chief Financial Officer.

22.     In connection with these departures, the PHG's board of directors promoted Dr. Charles Posternack to the role of President and Chief Medical Officer.  I was appointed by the board as Interim CFO.

### C.  Forbearance Agreements and Restructuring and Sale Negotiations

23.     The Borrowers defaulted under certain financial covenants under the Credit Agreement as of August 15, 2017.  Notwithstanding efforts to cut costs to satisfy financial covenants, such defaults persisted.  The Debtors began restructuring negotiations with the Agent, culminating with the Borrowers, the Guarantors,[9] the Agent, and the Lenders entering into that certain Forbearance Agreement, First Amendment to Credit Agreement and Joinder, dated as of March 14, 2018 (the "***First Forbearance Agreement***").  The First Forbearance Agreement provided that the Agent and Lenders would forbear from exercising their rights and remedies through April 6, 2018.  In order to remedy the Debtors' constrained liquidity position, as part of the First Forbearance Agreement, the Term Loan Lenders agreed to make a $15 million term

---

[9] Certain Borrowers and Guarantors were joined to the Credit Agreement in such capacities in connection with the First Forbearance Agreement and Second Forbearance Agreement.  All references herein to "Borrowers," "Guarantors," or "Debtors" in relation to the Credit Agreement, First Forbearance Agreement, or Second Forbearance Agreement refer to the Borrowers, Guarantors, or Debtors, and any joining Borrower, Guarantor, or Debtor, party to the Credit Agreement, First Forbearance Agreement, or Second Forbearance Agreement at the relevant time.

loan to the Borrowers, which term loan is contractually subordinated to the priority and payment of the loans made by the Revolving Lender, in exchange for the agreements of the Borrowers and Guarantors contained in the First Forbearance Agreement, including, *inter alia*, to grant a mortgage on the real property owned by Debtor St. Alexius Properties, LLC to secure the Obligations (as defined in the Credit Agreement).

24.    The Debtors continuously negotiated with the Agent and Lenders on a further forbearance arrangement.  On October 26, 2018, the Debtors, Agent, and Lenders entered into that certain Second Forbearance Agreement, Second Amendment to Credit Agreement (the "***Second Forbearance Agreement***").  The Second Forbearance Agreement provided that the Agent and Lenders would forbear from exercising their rights and remedies through November 4, 2018.  In addition, to provide the Debtors with additional liquidity, the Agent and Lenders agreed to advance up to $3 million through a temporary reduction in a reserve maintained by Agent and within the formula provided for under the Revolver.

25.    Concurrently with the negotiations with the Agent and Lenders, the Debtors have also made extensive progress in negotiations regarding the sale of certain non-core assets and beginning a sales process being managed by Houlihan with respect to a sale or sales of substantially all of the rest of the Debtors' assets or, if an equity sponsor emerges, a restructuring of some or all of the Debtors' assets (subject to the process garnering the highest and best bids), all with the aim to exit these Chapter 11 Cases in six months.

26.    At the beginning of 2017, the Debtors engaged MTS Health Partners, L.P. ("***MTS***") to manage the marketing efforts related to the Silver Lake Facility.  MTS contacted forty-one financial and strategic partners with potential interest in the Silver Lake Facility.  Thirty-six of those entities signed confidentiality agreements, received offering memoranda, and

received virtual data room access.  The Debtors received thirteen first round bids for the Silver Lake Facility in May 2017 and seven second round bids for the Silver Lake Facility in July 2017. The Debtors ultimately signed an asset purchase agreement with L.A. Downtown Medical Center LLC (the "***Silver Lake Stalking Horse Purchaser***") in February 2018 and signed a new asset purchase agreement with the Silver Lake Stalking Horse Purchaser on October 24, 2018.  The Silver Lake Stalking Horse Purchaser has agreed to purchase the Silver Lake Facility for $84,150,000 (subject to certain purchase price adjustments), and the Debtors plan to undertake a bidding process and close on a sale of the Silver Lake Facility in the January or February of 2019.

27.     For the past eighteen to twenty-four months, the Debtors have informally sought a buyer for the St. Alexius Facility.  On August 9, 2018, the Debtors received a letter from the United States Department of Health & Human Services, Centers for Medicare & Medicaid Services ("***CMS***") stating that the St. Alexius Facility no longer met the conditions of participation as a provider of services in the Medicare program.  The letter also stated that CMS was extending the previously indicated termination date of the St. Alexius Facility's participation in the Medicare program to the close of business on November 7, 2018.  Given the impending termination of the St. Alexius Facility's Medicare program and the substantial capital improvements needed at the facility, the Debtors' then-Chief Executive Officer immediately contacted the three large hospital systems operating in the St. Louis area.  While those systems did not express interest in the St. Alexius Facility, the Debtors received interest from another party that had previously been interested in purchasing the St. Alexius Facility and are in the process of negotiating an stock purchase agreement with Debtor Success Healthcare, LLC.  The St. Alexius Facility has historically surveyed poorly.  In addition, on average, the Debtors lost

13

$250,000 to $500,000 per month operating the St. Alexius Facility.  The Debtors intend to file a motion to approve the private sale of the St. Alexius Facility as soon as reasonably practicable after the Petition Date and close the sale of the St. Alexius Facility no later than the end of 2018.

28.    At the beginning of 2018, the Debtors engaged Healthcare Finance Partners, Corp. ("*HFP*") to market the San Diego Property.  HFP contacted numerous potential buyers of healthcare real estate in southern California.  The Debtors received two bids for the San Diego Property, each with the same purchase price, which exceeds the value ascribed to the San Diego Property by a recent appraisal.  The Debtors have determined that one of the offers has less execution risk and are in final negotiations of a purchase and sale agreement.  The Debtors intend to file a motion to approve the private sale of the San Diego Property as soon as reasonably practicable after the Petition Date and close the sale of the San Diego Property no later than the end of 2018.

29.    In addition to the sale of the foregoing non-core assets, on June 1, 2018, the Debtors engaged Houlihan to manage the marketing process for a sale or sales of the remaining assets or a potential reorganization of the Debtors with an equity sponsor.  Houlihan contacted seventy-seven financial and strategic partners with potential interest in a sale or sales of the remaining assets or an equity sponsorship.  The Debtors have received several indications of interest.  The Debtors, with the assistance of Houlihan, have continued to negotiate with and provide diligence information to the potentially interested parties.  The Debtors intend to choose a stalking horse bidder or bidders for the remaining assets and file a motion to approve bidding procedures before the end of 2018, with the aim of closing a sale of the remaining assets by April 2019.

### D.  DIP Financing

30.     With the additional liquidity provided by the Second Forbearance Agreement, the Debtors undertook to solicit offers for and negotiate a debtor-in-possession financing facility. The Debtors made inquiry into their alternatives for financing and solicited proposals for debtor in possession financing from two financial institutions. The Debtors and their advisors received two indicative term sheets that were fully negotiated prior to selecting the highest and best proposal.  The Debtors evaluated the prospective lenders and their bids on a number of factors, which included economic terms, financing certainty, proposed restrictions on the operation of the business and the use of proceeds and the collateral and security packages requested. Given their current financial condition, financing arrangements and capital structure, the Debtors determined the proposal submitted by certain of the Lenders under the Debtors' prepetition Credit Facility constituted the highest and best offer.  The Lenders' proposal contained economically and operationally advantageous terms compared the competing term sheet.  Additionally, as parties to the Credit Agreement, the Lenders and Agent are familiar with the Debtors' operations and capital structure, giving them the ability to act more quickly and limiting diligence risk, both of which are crucial in light the Debtors' imminent need for liquidity as discussed further below.

31.     Following extensive good faith, arms' length negotiations, the Debtors agreed to enter into that certain Senior Secured, Priming and Superpriority Debtor-In-Possession Credit Agreement (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "*DIP Agreement*"), by and among the Debtors, as borrowers and Guarantors, Wells Fargo Bank, National Association, as administrative agent (in such capacity, the "*DIP Administrative Agent*") for and on behalf of itself and the other lenders party thereto (such lenders, collectively with the DIP Administrative Agent, the "*DIP Lenders*").

15

32.     Pursuant to the DIP Agreement, the Debtors will have access to an $85 million DIP Facility (as defined and more fully described below), composed of a roll-up of their $65 million prepetition asset based revolving loan facility and a new money term loan commitment of $20 million. The DIP Facility is secured by superpriority liens that will prime the existing prepetition liens under the Credit Agreement.

33.     I believe that the filing of these Chapter 11 Cases and the incurrence of indebtedness under the DIP Facility offers the best available option for the Debtors, as it provides the necessary liquidity and forum to effectively market and sell the Debtors' assets and resolve certain contingent liabilities in a comprehensive manner. Accordingly, I believe that these chapter 11 cases are in the best interests of the Debtors' estates and will maximize value for all parties in interest.

### III.     Evidentiary Support for First Day Motions.[10]

34.     The Debtors have filed or will file a number of "first day" and "second day" motions seeking orders granting various forms of relief.  I believe the forms of relief requested are necessary to enable the Debtors to operate with minimal disruption during the pendency of the chapter 11 cases and to ensure the best outcome for the Debtors, their estates, their creditors, and all other parties in interest.  A description of the relief requested and the facts supporting each of the first day motions is set forth below.

35.     I have reviewed each of the first day motions, including the exhibits thereto.  The Debtors believe, and I agree, that the Debtors have satisfied the applicable standards for the relief requested in each of the first day motions and that the Court's grant of the requested relief is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

---

[10] Capitalized terms used in this section but not defined have the meaning ascribed to them in the applicable motion.

Accordingly, on behalf of the Debtors, I respectfully submit that the first day motions should be approved.

A.     ***Motion of the Debtors for Entry of an Order Directing Joint Administration of Chapter 11 Cases* (the "*Joint Administration Motion*")**

36.     Pursuant to the Joint Administration Motion, the Debtors seek entry of an order (a) authorizing consolidation and joint administration of the Debtors' chapter 11 cases, for procedural purposes only, and (b) directing parties in interest to use a consolidated caption, indicating that any pleading they file relates to the jointly administered bankruptcy cases of "Promise Healthcare Group, LLC, *et al.*" Many of the motions, hearings and other matters involved in the Chapter 11 Cases will affect all of the Debtors. Therefore, I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications and orders, thereby saving considerable time and expense for the Debtors and resulting in substantial savings for their estates. Accordingly, I believe the Court should approve the joint administration of these Chapter 11 Cases.

B.     ***Debtors' Application For Appointment of Prime Clerk, LLC as Claims and Noticing Agent* (the "*Claims Agent Application*")**

37.     Pursuant to the Claims Agent Application, the Debtors seek entry of an order appointing Prime Clerk as the Claims and Noticing Agent for the Debtors and their chapter 11 cases, including assuming full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Debtors' chapter 11 cases. The Debtors' selection of Prime Clerk to act as the Claims and Noticing Agent has satisfied the Court's ***Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)*** (the "***Claims Agent Protocol***"), in that the Debtors have obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection through a competitive process.   Moreover, the Debtors submit, based on all engagement

17

proposals obtained and reviewed, that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.  The terms of Prime Clerk's retention are set forth in the Engagement Agreement attached to the Claims Agent Application as **Exhibit C** (the "***Engagement Agreement***"); provided, however, that the Debtors are seeking approval solely of the terms and provisions as set forth in this Section 156(c) Application and the proposed Retention Order attached to the Claims Agent Application.

38.    Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be in excess of 13,500 entities to be noticed.  Local Rule 2002-1(f) provides that "[i]n all cases with more than 200 creditors or parties in interest listed on the creditor matrix, unless the Court orders otherwise, the debtor shall file [a] motion [to retain a claims and noticing agent] on the first day of the case or within seven (7) days thereafter."  In view of the number of anticipated claimants and the complexity of the Debtors' businesses, I submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Office of the Clerk of the Bankruptcy Court of the administrative burden of, noticing, administering claims, and soliciting and balloting votes and is in the best interests of both the Debtors' estates and their creditors. Accordingly, I believe that appointed Prime Clerk as the claims, noticing and balloting agent in these Chapter 11 Cases will maximize the value of the Debtors' estates for all of their stakeholders.

C.    ***Motions of the Debtors for Entry of an Order (I) Extending the Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs, (II) Extending the Time to File Initial Rule 2015.3 Financial Reports, and (III) Granting Related Relief*** (**the "*Schedule Extension Motion*"**)

39.    Pursuant to the Schedules Extension Motion, the Debtors seek entry of an order (i) extending the deadline by which the Debtors must file their schedules of assets and liabilities

18

and statements of financial affairs (collectively, the "***Schedules and Statements***") by thirty (30) days, for a total of sixty (60) days from the Petition Date, without prejudice to the Debtors' rights to request additional time; (ii) extending the deadline by which the Debtors must file their initial reports of financial information, or to file a motion seeking a modification of such reporting requirements for cause, with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in Bankruptcy Rule 2015.3 (the "***2015.3 Reports***") to the later of: (a) 30 days after the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code (the "***341 Meeting***") or (b) 60 days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions for cause shown; and (iii) granting such other and further relief as is just and proper.

40. I believe cause exists to extend the Debtors' time to file the Schedules and Statements beyond the Initial Deadline. Given the size and complexity of the Debtors' operations, a significant amount of information must be accumulated, reviewed, and analyzed to properly prepare the Schedules and Statements. The Debtors and their professionals have been consumed with a multitude of critical administrative and operational decisions arising in conjunction with the commencement and early administration of these Chapter 11 Cases, including preparing for the Debtors' entry into chapter 11, and addressing multiple critical operational and strategic matters. In addition, the Debtors have prepared and filed a number of motions and applications to ensure that the Debtors successfully prosecute these cases in a timely and efficient manner.

41. Moreover, due to the complexity of the Debtors' businesses, compiling and consolidating the data required for the Schedules and Statements presents a complex and time-consuming task. Although the Debtors and their professionals have been working diligently on

completing the Schedules and Statements as early as possible, it will be extremely challenging to complete this undertaking prior to the expiration of the Initial Deadline.

42.     In light of the above, an extension of the Initial Deadline for an additional thirty (30) days, for a total of sixty (60) days from the Petition Date, without prejudice to the Debtors' right to seek further extensions if necessary, is appropriate because the Debtors believe, and I agree, that this extension will provide the necessary time for the Debtors to complete accurate Schedules and Statements.

43.     Each of the Debtors own certain non-Debtor subsidiaries that fall under the ambit of Bankruptcy Rule 2015.3 and, as such, they are required to file 2015.3 Reports. Cause exists to extend the deadline for filing the 2015.3 Reports as requested herein based on (i) the size and complexity of the Debtors' business, and (ii) the substantial burdens imposed by compliance with Bankruptcy Rule 2015.3 in the early days of these Chapter 11 Cases. Consequently, the Debtors are not in a position to complete the initial 2015.3 Reports within the time required under Bankruptcy Rule 2015.3.

44.     Extending the deadline for the initial 2015.3 Reports also will enable the Debtors to work with their financial advisors and the U.S. Trustee to determine the appropriate nature and scope of the reports and any proposed modifications to the reporting requirements established by Bankruptcy Rule 2015.3. Accordingly, the Debtors respectfully request that the Court grant an extension of the time by which the Debtors must file their initial 2015.3 Reports to the later of: (i) 30 days after the 341 Meeting, or (ii) 60 days from the Petition Date pursuant to Bankruptcy Rule 2015.3(d).

45.     The relief requested herein will not prejudice any party in interest. The Debtors intend to work cooperatively with the U.S. Trustee and any other necessary parties in these

Chapter 11 Cases to provide access to relevant information regarding the business and financial affairs of the Debtors and their non-Debtor subsidiaries.

46.     The Debtors and their professionals have been consumed with a multitude of critical administrative and operational decisions arising in conjunction with the commencement and early administration of these Chapter 11 Cases, including preparing for the Debtors' entry into chapter 11, and addressing multiple critical operational and strategic matters.  In addition, the Debtors have prepared and filed a number of motions and applications to ensure that the Debtors successfully prosecute these cases in a timely and efficient manner. The Debtors are working expeditiously to prepare and file their Schedules and Statements, and I believe they will be filed as soon as possible, however, in an abundance of caution, it is in the best interests of Debtors to request an extension of thirty days.

**D.**     ***Motion of the Debtors for Entry of an Order Authorizing Certain Procedures to Maintain the Confidentiality of Patient Information as Required by Applicable Privacy Rules* (the "*Patient Confidentiality Motion*")**

47.     Pursuant to the Patient Confidentiality Motion, the Debtors seek entry of an order authorizing certain procedures to maintain the confidentiality of patient information as required by the Health Insurance Portability and Accountability Act of 1996 ("***HIPAA***"), while providing required disclosure in these Chapter 11 Cases.

48.     HIPAA and its corresponding regulations impose stringent standards on health care providers and establish significant penalties for any health care provider that uses or discloses patient information. *See* 42 U.S.C. § 1302d, et. seq. and 45 C.F.R. § 164.502.

49.     Because the Debtors qualify as health care providers that transmit health information, they are considered "covered entities" under 45 C.F.R. § 160.103. This designation prevents the Debtors from disclosing, except in limited circumstances, "individually identifiable

21

health information." 45 C.F.R. § 164.502. HIPAA defines "individually identifiable health information" as any information relating to the individual's "past, present or future physical or mental health or condition, the provision of health care to the individual, or the past, present or future payment for the provision of health care to the individual" that also "identifies the individual or for which there is a reasonable basis to believe that the information can be used to identify the individual." 42 U.S.C. § 1302d(6). Individually identifiable health information is referred to as PHI under HIPAA.

50.     The Debtors could be subjected to significant monetary penalties for the unauthorized disclosure of PHI. 45 C.F.R. § 160.402. Such penalties can be imposed even if a person "did not know and, by exercising reasonable diligence, would not have known" that a violation occurred. 45 C.F.R. § 160.404(b)(2)(i).

51.     The Debtors believe, and I agree, that the requirements to maintain patient confidentiality under HIPAA conflict with the requirements to disclose information under the Bankruptcy Code, specifically the duty to file a list of all creditors under Bankruptcy Code section 521(a)(1)(A) and the duty to file schedules of all assets and liabilities under Bankruptcy Code section 521(a)(1)(B)(i). The Debtors therefore respectfully request that such patient information be protected through the proposed Privacy Procedures herein pursuant to Bankruptcy Code section 107(c), which allows a bankruptcy court, for cause, to protect an individual if disclosure would create an undue risk of unlawful injury. *See also* Bankruptcy Rule 9018 (allowing a bankruptcy court to protect governmental matters that are made confidential by statute or regulation).

52.     I that the relief requested herein appropriately balances the need to maintain confidential patient information under HIPAA with the need for adequate disclosure under the

Bankruptcy Code. Given the nature of any information that may reveal even the identity of patients, confidentiality in this context is of paramount importance.

E.    ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Existing Cash Management System and Bank Accounts, (II) Extending the Time to Comply with, or Seek a Waiver of, Certain United States Trustee Requirements and Section 345(b) of the Bankruptcy Code, (III) Authorizing Continued Performance of Intercompany Transactions, (IV) Granting Administrative Expense Priority to Postpetition Intercompany Claims, and (V) Granting Related Relief*** (the "***Cash Management Motion***")

53.    Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing the Debtors to continue to use their cash management system (the "***Cash Management System***") and bank accounts, as set forth below; (ii) extending the time to comply with, or seek a waiver of, certain bank account and related requirements of the Office of the United States Trustee (the "***U.S. Trustee***") and Section 345(b) of the Bankruptcy Code; (iii) authorizing the Debtors to continue their existing deposit practices under the Cash Management System (subject to certain reasonable changes to the Cash Management System that the Debtors may implement); and (iv) authorizing the Debtors to continue to perform Intercompany Transactions (as defined below) consistent with historical practice and granting administrative expense priority to Intercompany Claims (as defined below).

54.    The Cash Management System is an integrated network of bank accounts that is critical to the Debtors' operations during these cases and, in turn, maximizing the value of the Debtors' estates. The Debtors have designed the Cash Management System to meet their operating needs, enable management to control and monitor corporate funds, comply with the requirements of their financing agreements, reduce administrative expenses by facilitating the movement of funds, and enhance the development of accurate account balances. The Debtors have maintained their Cash Management System since its inception, and the cash management

23

system has served as the primary funds flow mechanism for the Debtors' ordinary, usual, and essential business operations.

55.    As of the Petition Date, the Cash Management System includes 120 bank accounts listed on **Exhibit C**, attached to the Cash Management Motion, (each a "***Bank Account***" and collectively the "***Bank Accounts***") located at five commercial banks (collectively, the "***Banks***") used in the ordinary course of the Debtors' businesses. The Debtors routinely deposit, withdraw, and otherwise transfer money to, from, and between the Bank Accounts by various methods (collectively, the "***Ordinary Transfer Methods***"), including by checks, drafts, ACH transfers, and other electronic funds transfers. A general overview of the movement of cash through the Debtors' Cash Management System is illustrated by the flow of funds charts attached to the Cash Management Motion as **Exhibit D**. The following is an overview of the Cash Management System and related Bank Accounts.

56.    The Company's primary accounts are held at City National Bank. These include the government and non-government lockbox accounts for each operating entity, master collection and disbursement accounts, payroll disbursement accounts, and operating disbursement accounts. Payor receipts are deposited into either the lockbox or resident fund management service accounts, as applicable, and non-payor receipts are deposited into operating accounts and café deposit accounts, as applicable. All payor receipts are then aggregated into three master collection accounts. Non-payor receipts are then aggregated into the three master disbursement accounts. Cash on hand in the master collection accounts is swept daily to the administrative agent (the "***Agent***") under the Debtors' (the "***Debtor Borrowers***") prepetition senior secured revolver to pay down such revolver. The Debtor Borrowers then submit revolver advance requests to the Agent daily, and revolver proceeds are funded into the master

24

disbursement account held in the name of Promise Healthcare, Inc. (the "***Promise Master Disbursement Account***").    Intercompany transfers are then made through the master disbursement accounts. Cash transfers to the master disbursement accounts via zero balance accounts, while cash transfers to accounts held by Promise Healthcare Group, LLC or Promise Healthcare Holdings, Inc. or to petty cash accounts via intercompany transfers.

57.    In the ordinary course of business, the Debtors use a variety of checks, correspondence, and business forms. To minimize expenses to their estates and avoid unnecessarily confusing their employees and creditors, I believe it is appropriate to continue to use the existing stock of checks, correspondence, and other business forms (including, without limitation, letterhead, purchase orders, and invoices) (collectively, the "***Business Forms***") as such forms were in existence immediately before the Petition Date—without reference to the Debtors' statuses as debtors-in-possession—rather than disposing of the existing forms and delaying operations until new Business Forms are obtained, or requiring the Debtors to include a legend on their Business Forms that would cause unnecessary confusion. After existing Business Forms are depleted, the Debtors' Business Forms will identify the Debtors' statuses as debtors-in-possession.

58.    The Debtors incur periodic service charges and other fees in connection with the maintenance of the Cash Management System, which fees and services are generally paid each month (the "***Bank Fees***"). The Debtors have historically incurred Bank Fees of approximately $50,000 per month, which are debited from the respective Bank Account for which the Bank Fee was incurred. As of the Petition Date, the Debtors estimate that approximately $25,000 in Bank Fees have accrued and remain unpaid and seek permission to pay these Bank Fees and continue paying the Bank Fees in accordance with past practices.

59.     Debtors maintain bank accounts at Wells Fargo Bank, N.A., City National Bank, Concordia, Bank of America and JPMorgan Chase Bank.  Of those Banks, City National Bank and Concordia are not on the list of approved depository banks in this District.  Furthermore, while all of the Bank Accounts are insured by the FDIC, but the Bank Accounts are not bonded as required by Section 345(b) of the Bankruptcy Code.  As set forth below, the Debtors seek an extension of the time to comply with, or seek a waiver of, certain U.S. Trustee guidelines and Section 345(b) of the Bankruptcy Code with respect to the Bank Accounts held at City National Bank and Concordia to forty-five (45) days from the Petition Date.

60.     Debtors have historically and in the ordinary course of business engaged in routine business relationships with each other and certain of their affiliates. For example, each operating entity has its own lockbox accounts to collect cash receipts which are then aggregated into a master collection account held by that operating entity's parent. Likewise, the Promise Master Disbursement Account receives proceeds of the Debtors' prepetition revolver and distributes the cash to various other disbursement accounts, including petty cash accounts held by its subsidiaries. The Debtors track all fund transfers in their accounting systems and can ascertain, trace, and account for all Intercompany Transactions.   If the Intercompany Transactions were discontinued, the Cash Management System and the Debtors' operations could be unnecessarily disrupted to the detriment of the Debtors' estates, their creditors, and other stakeholders.

61.     As the foregoing overview reflects, I believe the Cash Management System is specifically designed for administering the Debtors' businesses, and cannot be altered without significant disruption to the Debtors' business operations and material distraction to the Debtors' management. Therefore, I believe it is in the best interests of the Debtors to request that the

Court authorize them to continue using the existing Cash Management System, and to transfer funds into, out of, and through the Cash Management System using the Ordinary Transfer Methods in accordance with the agreements governing the Bank Accounts.

62.    The Cash Management System is an ordinary course, customary and essential business practice, the continued use of which is essential to the Debtors' business operations during the Chapter 11 Cases and their goal of maximizing value for the benefit of all parties in interest. I believe that requiring the Debtors to adopt a new cash management system at this early and critical stage would be expensive, impose needless administrative burdens, and cause undue disruption. Any disruption in the collection of funds as currently implemented would adversely affect the Debtors' ability to maximize estate value. Moreover, such a disruption would be wholly unnecessary because the Cash Management System provides a valuable and efficient means for the Debtors to address their cash management requirements and, to the best of the Debtors' knowledge, the Bank Accounts are held at financially stable institutions insured in the United States by the FDIC. Furthermore, requiring the Debtors to transfer any Bank Accounts not listed on the U.S. Trustee's authorized depository list to a designated authorized depository would place a needless administrative burden on the Debtors that would unnecessarily divert the attention of the Debtors' management at a critical junction in these Chapter 11 Cases.

63.    For the aforementioned reasons, I believe that maintaining the existing Cash Management System without disruption is in the best interests of the Debtors, their estates, and all interested parties. Accordingly, the Debtors request that they be allowed to maintain and continue use of the Cash Management System, including maintenance of their existing Bank Accounts. The Debtors further request a forty-five day extension to comply with the U.S. Trustee guidelines and Section 345(b) of the Bankruptcy Code, a waiver of the U.S. Trustee guidelines

and Section 345(b), or be allowed to make other acceptable arrangements, subject to the Court's approval.

> **F.** ***Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Certain Prepetition Wages, Benefits and Other Compensation, and (B) Continue Employee Compensation and Employee Benefits Programs, and (II) Granting Related Relief* (the "*Employees and Wages Motion*")**

64.      Pursuant to the Employees and Wages Motion, the Debtors request entry of the Proposed Orders authorizing the Debtors to (i) pay, in their discretion, all prepetition amounts required under or related to Employee Compensation, Deductions and Payroll Taxes, and Employee Benefits (each as defined below and together with all fees, costs, and expenses incident thereto, including amounts owed to third-party administrators, the "*Employee Obligations*"); and (ii) maintain, and continue honoring and paying, in their discretion, all amounts with respect to the Employee Obligations as such were in effect as of the commencement of these Chapter 11 Cases and as such may be modified, amended, or supplemented from time to time in the ordinary course of business, including amounts owed to third-party administrators.

65.      As of the Petition Date, the Debtors employ approximately 4,466 employees (the "*Employees*"), on full, part-time, and per diem (as needed) bases. In the ordinary course of business, the Debtors pay Employees, among other things, salary, expense reimbursements, and certain other forms of compensation described herein, depending on the services provided by the Employee to the Debtors.

66.      The Employees perform a variety of critical functions including operating the Debtors' medical treatment centers, providing acute, post-acute, and primary care, and recruiting and training physicians and technicians. Employees also engage in various functions to manage

and support the operations of the Debtors' medical facilities, including various administrative, marketing, legal, accounting, finance, and management-related tasks. A majority of Employees are highly skilled physicians and nurses. The skills and experience of the Employees are essential to the Debtors' ongoing operations.

67.     The following summarizes the various types of Employee compensation offered by the Debtors (collectively, the "***Employee Compensation***").

68.     <u>Wages.</u> The Debtors pay the majority of their Employees' wage and salary obligations (collectively, the "***Wages***") on either a salaried or hourly basis. Nearly all of the Employees receive their wages, salaries, and other compensation by direct deposit, with the remaining Employees receiving checks. Employees are paid one week in arrears.

69.     In the ordinary course of business, Employees generally are paid on a bi-weekly basis in two different pay cycles. Payroll paid in the even weeks includes Promise Hospital of Ascension, Promise Hospital of Miss Lou, Promise Hospital of Salt Lake, Promise Hospital of Shreveport, Promise Hospital of Bossier City, Promise Hospital of Lee - Ft. Myers, Promise Hospital of Dade - Miami, Silver Lake, St. Alexius and Corporate. On average, the Debtors' gross wages for an even week is approximately $3.7 million.

70.     Payroll paid in the odd weeks includes Promise Hospital of Vicksburg, Promise Hospital of Phoenix, Promise Hospital East LA dba Suburban Medical Center, Promise Hospital of Florida - Villages, Promise Hospital of Dallas, Promise Hospital of Wichita Falls, Promise SNF of Wichita Falls, Promise Hospital of Overland Park, Promise SNF of Overland Park. On average, the Debtors' gross wages for an odd week is approximately $2.1 million.

71.    As of the Petition Date, the Debtors estimate they owe approximately $5.4 million on account of accrued but unpaid Wages, all of which will become due and owing within the first 21 days of these Chapter 11 Cases.

72.    <u>Employee Incentive Programs</u>.    In the ordinary course of business, the Debtors have typically maintained performance-based incentive and bonus programs for certain categories of Employees (collectively, the "***Incentive Program(s)***"). The Incentive Programs are available to four categories of Employees: (i) eligible full-time leadership employees in good standing after their initial employment period at each Debtor hospital, (ii) physician relations and education (PRE), (iii) clinical evaluator, and admission coordinator employees at each Promise Hospital, and (iv) employees in the Collections and Billings Office. Compensation earned under the Incentive Programs is determined by achieving certain budget and EBITDA targets, attaining certain patient quality and clinical benchmark scores, achieving collection targets, and meeting certain revenue, admission, and professionalism expectations. Approximately 140 Employees are eligible to receive compensation under the Incentive Programs. In the month of September 2018, the Debtors paid approximately $215,000 across all Incentive Programs. As of the Petition Date, the Debtors estimate they owe approximately $300,000 on account of accrued but unpaid bonuses under all Incentive Programs, all of which will become due and owing within the first 21 days of these Chapter 11 Cases.

73.    For those Employees who receive them, bonuses earned under the Incentive Programs are an important aspect of their overall compensation. Maintaining historical prepetition practices with regard to the Incentive Programs is essential to ensuring that the Debtors can retain their Employees and continue to operate their business and maximize value through the duration of these Chapter 11 Cases. Therefore, the Debtors seek authority, but not

30

direction, to honor their obligations under the Incentive Programs and to maintain the Incentive Programs in the ordinary course of the Debtors' business.

74.    <u>Corporate Bonuses</u>. In addition to the Incentive Program, the Debtors have an incentive compensation bonus plan for certain eligible corporate Employees (the "Corporate Incentive Compensation Plan"). Employees eligible for the Corporate Incentive Compensation Plan earn bonus payments for achieving various, mutually agreed upon targets for individual and Company performance. As of the Petition Date, the Debtors have no accrued or unpaid amounts due under the PHI Incentive Compensation Plan and do not expect to seek relief to pay amounts in the future.

75.    <u>Reimbursable Expenses.</u> Prior to the Petition Date and in the ordinary course of business, the Debtors reimbursed Employees, subject to manager approval, for certain allowed expenses incurred on behalf of the Debtors while traveling on business (the "***Reimbursable Expenses***"). More specifically, Reimbursable Expenses include, among other things, business travel (e.g., airfare/rail, gas mileage, taxis, hotel and telephone/internet) and meals (e.g., business travel-related and onsite). Employees pay for such expenses directly from their own funds and are reimbursed upon the submission of an expense reimbursement form itemizing the applicable business expenses. Reimbursement is contingent on the Debtors' determination that the charges are for legitimate, reimbursable business expenses.

76.    Reimbursable Expenses approximate to $95,000 per month. As of the Petition Date, the Debtors estimate that they owe approximately $50,000 in outstanding prepetition Reimbursable Expenses. The Debtors' incurrence of Reimbursable Expenses varies from month to month. As a result, the Debtors cannot accurately estimate prepetition, unpaid Reimbursable Expenses.

77.     Employees incurred the Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that they would be reimbursed. To avoid harming Employees who incurred the Reimbursable Expenses, the Debtors request authority to (a) continue paying the Reimbursable Expenses in accordance with prepetition practices, including payment to and in adherence with the Debtors' policy for reimbursing Employees such expenses, and honor any prepetition obligations related thereto to the extent Employees have paid for such expenses directly from their own funds or are otherwise personally liable for such expenses; (b) modify their prepetition policy relating thereto as they deem appropriate without the need for further court approval; and (c) pay all Reimbursable Expenses to Employees that (i) accrued prepetition and (ii) accrue postpetition but relate to the prepetition period. The Debtors request authority to pay up to $50,000 on an interim basis and $95,000 on a final basis on behalf of the Reimbursement Expenses. The Debtors also seek authority to continue their reimbursement policy in the ordinary course during the administration of the Chapter 11 Cases.

78.     <u>Holidays/Paid Time-Off and Leaves of Absence.</u> The Debtors offer full-time Employees pay for predetermined holidays ("***Paid Holidays***"). In addition, Employees are eligible for paid time away from work based on the employee's length of service. These absences include personal illness, family illness, personal days, and vacation (collectively, "***Paid Time Off***"). Paid Time Off can be carried over from year to year up to a maximum number of eighty (80) hours per year. Non-managerial Employees have the option to redeem accrued Paid Time Off in excess of the 80 hour cap to a cash payment up to two times per year. The Debtors anticipate that certain Employees will seek to use or redeem for cash Paid Time Off accrued during the prepetition period after the Petition Date. At the Petition Date, the Debtors estimate that their accrued liability in connection with unused Paid Time Off equaled approximately $7.8

32

million. Of that amount, approximately $4.4 million is estimated to be eligible to be redeemed by the end of the year. No PTO Payouts will be honored unless the Employee separates from service with the Debtors or as otherwise required by applicable state law. The Debtors respectfully request to honor all unused Paid Time Off that accrued prior to the Petition Date, in accordance with their historical practices and in the ordinary course of business.[11] The Debtors also seek authority to continue to incur and pay eligible Employees for Paid Holidays consistent with past practices.

79.     During each applicable payroll period, the Debtors routinely deduct certain amounts from their Employees' gross pay, including, without limitation, (a) pre-tax and after-tax deductions payable pursuant to the Employee benefit plans discussed herein (e.g., contributions relating to health care benefits, insurance premiums and flexible spending programs) and (b) other miscellaneous deductions (collectively, the "***Deductions***"). On a monthly basis, the Debtors deduct and remit to appropriate third-party recipients approximately $2.0 million from the Employees' paychecks for the Deductions. As of the Petition Date, approximately $500,000 in employee Deductions have been withheld and not yet remitted to third-party recipients. Out of an abundance of caution, the Debtors request authority to remit any unpaid prepetition Deductions that exist. Additionally, the Debtors seek authority to continue deducting amounts from the applicable Employee's wages and salaries and forwarding Deductions to the appropriate third-party recipients on a postpetition basis, in the ordinary course of business, and consistent with past practices. The Deductions represent earnings that applicable authorities have

---

[11] In addition, the Debtors also provide all Employees with other leaves of absence as required by law (collectively, the "***Leaves of Absence***"). Leaves of Absence include jury duty, voting leave, medical leave, and bereavement leave. Employees do not accrue Leaves of Absence over time, and Leaves of Absence are not reflected as a liability on the Debtors' balance sheet.

designated for deduction from Employees' paychecks and, thus, may not be property of the Debtors' estates.

80.     In addition to the Deductions, the Debtors are required by law to withhold amounts related to federal income taxes, as well as Social Security and Medicare taxes for remittance to the appropriate taxing authority (collectively, the "***Withheld Amounts***"). The Debtors are also required to pay additional amounts for federal and state unemployment insurance (together with the Withheld Amounts, the "***Payroll Taxes***"). On a monthly basis, the Debtors remit approximately $4.5 million in Payroll Taxes, which amounts include employer taxes plus what is withheld and remitted on behalf of the employee. As of the Petition Date, the Debtors estimate approximately $1.8 million in accrued and unpaid Payroll Taxes (collectively, the "***Unremitted Payroll Taxes***"). Because the Deductions and Unremitted Payroll Taxes are not property of the Debtors' estates, the Debtors request that the Court authorize the Debtors to transmit these amounts, all of which will become due within the first 21 days of these Chapter 11 Cases, to the appropriate parties in the ordinary course of business.

79.     The Debtors offer their Employees the opportunity to participate in a number of insurance and benefit programs, including medical insurance, life and disability insurance, and other employee benefit plans as described below (collectively, the "***Employee Benefits***"). Maintaining these benefits and honoring obligations thereunder is necessary to preserve employee morale and maintain the stability of the Debtors' workforce during the Chapter 11 Cases.

80.     <u>Medical, Dental and Vision Plans</u>.  The Debtors provide health care coverage and dental care to all of their full-time Employees and their dependents under various benefit plans, as follows (collectively, the "***Medical, Dental and Vision Plans***"):

34

- *Medical Plan*. The Debtors pay medical claims submitted by Employee participants under the Blue Cross Blue Shield administered plans (the "***Health Benefit Claims***"). As self-funded plans, the Debtors withhold specified portions of Employee wages and apply such funds to the satisfaction of claims. Health Benefit Claims are typically paid on a weekly basis, but are not always timely submitted by participants. The average monthly amount of Health Benefit Claims is approximately $1.4 million. The Debtors pay approximately $100,000 per month in administration fees for the Blue Cross Blue Shield administered plans. Silver Lake Employees are covered under a separate plan administered by Kaiser Foundation Health Plan, Inc. Administration fees of approximately $160,000 per month are incurred for this plan. As of the Petition Date, the Debtors estimate that approximately $360,000 of prepetition administration fees are outstanding for the two medical plans and approximately $300,000 in prepayment of prepetition Health Benefit Claims are outstanding.

- *Pharmaceutical Plan*. All full-time Employees are eligible to enroll in a prescription benefit plan administered by RxBenefits Inc. The average monthly expense incurred for the prescription benefit plan is $450,000. As of the Petition Date, the Debtors estimate that approximately $1.7 million is owed to RxBenefits Inc.

- *Dental Plan*. All Employees are eligible to enroll in a dental PPO plan, administered by Guardian Life Insurance Company. Employees contribute 100% of the cost of their dental plans with pre-tax deductions from their paychecks. As of the Petition Date, the Debtors estimate that approximately $180,000 is owed to Guardian Life Insurance Company.

- *Vision Plan*. All full-time Employees are eligible to enroll in a vision plan, administered by EyeMed. Employees contribute 100% of the cost of their vision plans with pre-tax deductions from their paychecks. The average monthly expense incurred for the vision plan is $17,000. As of the Petition Date, the Debtors estimate that approximately $16,000 is owed to Combined Insurance of America.

81.     The Debtors estimate that they incur approximately $850,000 in aggregate monthly premiums and administrative costs associated with the Medical, Dental and Vision Plans described above.

82.     The Debtors request authority to (a) continue the Medical, Dental and Vision Plans in the ordinary course of business, (b) continue making the above-described contributions to the Medical, Dental and Vision Plans, and (c) pay any amounts related thereto, including premiums, claims amounts, and administration fees, to the extent that they remain unpaid as of

35

the Petition Date in the ordinary course of business. The Debtors request authority to pay $1,650,000 in prepetition administrative fees, monthly premiums and funding for Health Benefit Claims on an interim basis and $2,600,000 on a final basis.

83.     Insurance and Disability Benefits. The Debtors provide certain Employees with life insurance, accidental death and dismemberment and short-term and long-term disability coverage (collectively, the "***Insurance and Disability Benefits***"). The Insurance and Disability Benefits are provided through Reliance Standard Life Insurance Company. The Debtors pay one-hundred percent (100%) of premiums for this coverage. The combined monthly premium for the Debtors' Insurance and Disability Benefits is approximately $165,000. As of the Petition Date, the Debtors estimate approximately $165,000 is due in premiums for the Insurance and Disability Benefits.

84.     The Debtors also provide voluntary insurance coverage to certain eligible Employees (the "***Supplemental Insurance Benefits***"), the premiums for which are satisfied solely by participating Employees. These benefits include: Voluntary Life with Accidental Death & Dismemberment coverage administered by Reliance Standard Life Insurance Company; Employee Assistance Program administered by ACI Specialty Benefits; Health Flexible Spending Accounts administered by HSA Bank; Cancer and Critical Illness benefits administered by Unum; and Hospital Indemnity coverage administered by Unum.  The Debtors withhold from participating Employees' paychecks amounts sufficient to pay these premiums, but the Debtors also pay certain costs related to the Supplemental Insurance Benefits themselves. The Debtors estimate that approximately 4,466 Employees receive at least one of the Supplemental Insurance Benefits, and the Debtors remit a total of approximately $175,000 per month in aggregate premiums for the Supplemental Insurance Benefits.

85.     The Debtors request authority to pay approximately $370,000 in prepetition unpaid Insurance and Disability Benefits and unremitted Supplemental Insurance Benefits premiums on an interim basis and approximately $600,000 on a final basis. Additionally, the Debtors hereby seek authority to maintain the Insurance and Disability Benefits and Supplemental Insurance Benefits on a postpetition basis.

86.     <u>Employee Savings Plans</u>. The Debtors maintain for the benefit of eligible Employees an employee savings plan, administered through OneAmerica, which is a tax-qualified plan within the meaning of, and administered in accordance with, the requirements of section 401(k) and other applicable sections of the Internal Revenue Code (the "***401(k) Plan***"). There are approximately 2,750 participants in the 401(k) Plan. The Debtors withhold certain amounts from participating Employees' paychecks and contribute such amounts to the 401(k) Plan (the "***Employee 401(k) Contributions***"). The Debtors estimate that they withhold a total of approximately $740,000 in Employee 401(k) Contributions each month. As of the Petition Date approximately $145,000 has been withheld and not yet remitted to the 401(k) Plan administrator. The Debtors request authority to continue the Employee 401(k) Contributions on a postpetition basis.

87.     As noted above, the Debtors utilize the services of the Payroll Processor to administer payroll funds made available to Employees through direct deposit. The Payroll Processor's responsibilities include processing payroll and transferring funds from the Debtors to their Employees and to the relevant taxing authorities. The Debtors utilize additional service providers for the purpose of administering payroll funds to Employees. Ultimate Software is used to calculate the wage and payroll tax remittance amount due. Kronos is used as the timekeeper system for hourly staff.  The Debtors utilize Ceridian to process checks and direct

deposit for Silver Lake Medical Center and St. Alexius Hospital. In addition, Silver Lake Medical Center and St. Alexius Hospital utilize CertiPay America, LLC to process payroll taxes and CTS to process wage attachments. The Debtors pay the Payroll Processor approximately $60,000 per year, $120,000 per year to Kronos, $600,000 per year to Ultimate Software, $15,000 per year to Ceridian, $12,000 per year to CertiPay, and $6,000 per year to CTS. As of the Petition Date, the Debtors owe approximately $73,000 to Kronos, $38,000 to Ultimate Software, and $24,000 to CertiPay. Because the services provided by the Payroll Processor are crucial to the smooth functioning of the Debtors' payroll system, the Debtors request permission to pay any unpaid Payroll Processor fees, Kronos and Ultimate Software and to continue to pay fees that accrue during the ordinary course of business.

88. The Debtors' ability to successfully operate is contingent on a reliable and loyal workforce. Competition for qualified employees is intense in the Debtors' industry, thus, it is essential to assure the Employees that the Debtors will honor the Employee Obligations and continue and maintain the Employee Benefits in the ordinary course of business throughout these Chapter 11 Cases. I believe that a failure to promptly do so will create concern and discontent among the Employees and could lead to resignations or accept future hiring proposals. I believe that the loss of even a few key personnel would immediately and irreparably harm the Debtors' ability to maintain operations to the detriment of all interested parties.

89. <u>IRS Payment Plan</u>. The Debtors owe certain amounts to the IRS and have been paying them off through a payment plan with certain taxing authorities. As of the Petition Date, the Debtors owe an estimated $222,000 for the payment obligation due in October 2018 to the taxing authorities, and, as of September 30, 2018, $6 million remains owing to the taxing authorities. I believe it is in the best interest of the Debtors' estates, their creditors, and all other

EAST\162240407.1

parties in interest to continue to make payments under the foregoing payment plan in the ordinary course of business.

G.    ***Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, and (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service* (the "*Utilities Motion*")***

90.    Pursuant to the Utilities Motion, the Debtors seek entry of an order (i) authorizing Debtors' proposed form of adequate assurance of payment to utility companies, (ii) establishing procedures for resolving objections by utility companies, and (iii) prohibiting utility companies from altering, refusing, or discontinuing service.

91.    In the ordinary course of business, the Debtors obtain traditional utility services related to the day-to-day operation and/or maintenance of their businesses from approximately seventy (70) different utility providers (each a "***Utility Company***" and collectively, the "***Utility Companies***"), for water, electricity, and telephone and internet services (the "***Utility Services***"). The Utility Companies include, without limitation, the entities set forth on the list attached to the Utilities Motion as **Exhibit C** (the "***Utility Companies List***"). Prepetition, the Debtors have consistently made payments to the Utility Companies on a regular and timely basis. To the Debtors' knowledge, there are no material defaults with respect to the Debtors' undisputed invoices for Utility Services other than the payment interruptions that may be caused by the commencement of these Chapter 11 Cases.

92.    Uninterrupted Utility Services are essential to the continued operation of the Debtors' businesses and, consequently, to the success of their Chapter 11 Cases. Should any Utility Company alter, refuse, or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, and such disruption would jeopardize the

39

Debtors' reorganization efforts and patient safety.  Accordingly, the Debtors seek to establish an orderly process for providing adequate assurance to their Utility Companies without hindering the Debtors' ability to function as a going concern.

93.     The Debtors estimate that the cost for the Utility Services during the next two weeks (not including any deposits to be paid) will be approximately $325,000.  Of the approximately seventy (70) Utility Providers, fourteen (14) of the Utility Providers hold deposits in the aggregated amount of approximately $1.0 million.

94.     The Debtors intend to pay their undisputed postpetition obligations to the Utility Companies on a timely basis, in accordance with their prepetition practices, and have the ability to do so. The Debtors have sufficient liquidity to make postpetition payments to the Utility Companies, assuming that the Debtors' request to obtain secured postpetition financing in these Chapter 11 Cases is granted and that these obligations are reflected in the Debtors' proposed budget submitted in connection therewith.

95.     I believe that uninterrupted Utility Services are essential to the Debtors' business operations during the pendency of these Chapter 11 Cases. Should any Utility Company alter, refuse, or discontinue service, even for a brief period, the Debtors' business operations could be disrupted, and such disruption could jeopardize the Debtors' reorganization efforts and patient safety. Therefore, the Debtors seek to establish an orderly process for providing adequate assurance to their Utility Companies without hindering the Debtors' ability to maintain operations. I am informed and believe that the proposed Adequate Assurance Procedures (as defined in the Utilities Motion) are consistent with procedures that are typically approved in chapter 11 cases in this District. Accordingly, based on the foregoing and those additional reasons set forth in the Utilities Motion, I believe that the relief requested in such motion is

necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors'

estates, their creditors, and all other parties in interest.

  **H.**  ***Motion of the Debtors for Entry of an Order (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief* (the "*Tax Motion*")**

  96.  Pursuant to the Tax Motion, the Debtors seek entry of interim and final orders (i)

authorizing, but not directing, the Debtors to remit and pay (or use tax credits to offset) Taxes

and Fees (as defined below) in the ordinary course of business, without regard to whether such

obligations accrued or arose before or after the Petition Date and (ii) granting related relief. The

Debtors collect, withhold, and incur franchise taxes, property taxes, sales and use taxes, trust

fund taxes, state and local income taxes, bed taxes and other taxes (each a "***Tax***" and

collectively, the "***Taxes***") and annual report filing fees, license and regulatory fees, and other

fees (each a "***Fee***" and collectively, the "***Fees***"). The Debtors remit the Taxes and Fees to

various state and local governments and taxing authorities, identified in the schedule attached to

the Tax Motion as **Exhibit B** (collectively, the "***Authorities***").  Taxes and Fees are remitted and

paid by the Debtors through checks and electronic funds transfers that are processed through

their banks and other financial institutions. The Debtors estimate that approximately $5,700,000

in Taxes and Fees relating to the prepetition period are due and owing to the Authorities as of the

Petition Date. The Debtors request authority to pay up to $500,000 in Taxes and Fees on an

interim basis and $5,700,000 on a final basis.

  97.  The Debtors pay the Taxes and Fees to the Authorities on a periodic basis,

remitting them monthly, quarterly, semiannually, or annually of each year, depending on the

nature and incurrence of a particular Tax or Fee.  The Debtors seek authority, pursuant to the Tax

Motion, to make such payments where: (a) Taxes and Fees accrue or are incurred postpetition;

<div align="center">41</div>

(b) Taxes and Fees accrued or were incurred prepetition but were not paid prepetition or were paid in an amount less than actually owed; (c) Taxes and Fees paid prepetition by the Debtors were lost or otherwise not received in full by any of the Authorities; or (d) Taxes and Fees incurred for prepetition periods may become due after the Petition Date.

98.     The Debtors have franchise tax obligations (the "***Franchise Taxes***") they must pay to the Taxing Authorities to remain in good standing and maintain the right to operate their business. The Franchise Taxes are assessed and due annually, and generally become delinquent during the following year.

99.     With regard to 2018 Franchise Taxes, the Debtors estimate that it will owe approximately $5,000. The Debtors request authority, but not direction, to continue to pay the Franchise Taxes if and when they become due and payable during the pendency of the Chapter 11 Cases.

100.     Under certain applicable laws, state or local authorities, or both, levy taxes based on the Debtors' income (the "***State and Local Income Taxes***"). In certain states, state and local authorities are entitled to statutory liens on the Debtors' property located in, or subject to tax, in the respective state if these income taxes are not paid. Moreover, in certain states, the Debtors' directors and officers have personal liability for failure to timely pay these taxes.

101.     The Debtors request the authority, but not direction, to pay all prepetition and postpetition State and Local Income Taxes in the ordinary course of business, as they become due.

102.     State and local laws in the jurisdictions where the Debtors operate generally grant Authorities the power to levy property taxes against the Debtors' real and personal property. To avoid the imposition of statutory liens on their real and personal property, the

42

Debtors typically pay property taxes in the ordinary course of business on an annual basis. This includes property taxes collected from certain third parties and paid to the applicable Authorities.

103.    In 2018, the Debtors paid approximately $1.8 million in property taxes to the applicable Authorities for the 2017 taxable year. The Debtors estimate that they have accrued approximately $4,100,000 in property taxes as of the Petition Date, including $3,300,000 in accrued property taxes for Silver Lake Medical Center, which are expected to be paid out of proceeds from the sale of that facility.  The Debtors seek authority to pay prepetition amounts outstanding on account of property taxes, and to continue to pay such taxes postpetition in the ordinary course of business.

104.    The Debtors are required to pay an annual report filing fees in Arizona, California, Delaware, Florida, Kansas, Louisiana, Mississippi, Missouri, Texas and Utah in order to continue conducting their businesses pursuant to laws in each respective state. The Debtors pay the annual report filing fees throughout each year.

105.    In 2017, the Debtors paid approximately $28,000 in annual report filing fees to the applicable Authorities. The Debtors estimate that they have accrued approximately $12,000 in annual report filing fees as of the Petition Date. The Debtors seek authority to pay prepetition amounts outstanding on account of the annual report filing fees, and to continue to pay such fees postpetition in the ordinary course of business.

106.    The Debtors are required to pay a hospital provider fee or "bed tax" in each state that they operate.  States use the funds from bed taxes to support Medicaid programs. According to the Debtors' books and records, the Debtors estimate that $1,500,000 or more in bed taxes are outstanding as of the Petition Date.

43

107.     The Debtors are required to pay various state and local regulatory fees in order to operate as a healthcare company.  Examples of regulatory fees paid by the Debtors include hospital license fees, pharmacy license fees and lab license fees.  In addition, the Debtors pay state license fees, LTACH and SNF fees and other operating fees such as kitchen grease trap, large medical waste disposal and water treatment fees.  The Debtors estimate that $64,000 in regulatory fees are outstanding as of the Petition Date.

108.     I believe that any failure to pay the Taxes and Fees may materially disrupt the Debtors' business operations in several ways: (i) the Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from the restructuring process; (ii) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that will harm the estates; and (iii) certain of the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract those key employees from their duties related to the Debtors' restructuring. Moreover, unpaid Taxes and Fees may result in penalties, the accrual of interest, or both.

109.     I believe that it is in the best interests of the Debtors' estates that the Taxes and Fees be paid on time so as to avoid administrative difficulties. Prompt and regular payment of the Taxes and Fees will avoid any unnecessary governmental action.

I.     ***Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors to (I) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (III) Honor the Terms of the Premium Financing Agreements and Pay Premiums Thereunder, and (IV) Enter Into New Premium Financing Agreements in the Ordinary Course of Business* (the "*Insurance Motion*")***

110.     Pursuant to the Insurance Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to (i) continue insurance coverage entered into prepetition and

satisfy prepetition obligations related thereto; (ii) renew, amend, supplement, extend, or purchase Insurance Policies (as defined below); (iii) honor the terms of the Premium Financing Agreements (as defined below) and pay premiums thereunder; and (iv) enter into new Premium Financing Agreements in the ordinary course of business.

111.    In the ordinary course of business, the Debtors maintain approximately twenty-four (24) insurance policies that are administered by various third-party insurance carriers (collectively, the "***Insurance Carriers***"). These policies provide coverage for, among other things, the Debtors' property, general liability, automobile liability, excess umbrella liability, directors' and officers' liability, employer's liability, operator's liability, and pollution and environmental legal liability (collectively, the "***Insurance Policies***").    A schedule of the Insurance Policies is attached to the Insurance Motion as **Exhibit C**.

112.    The aggregate annual premium for the Insurance Policies is approximately $9,000,000, not including applicable taxes and surcharges, deductibles, and broker and consulting fees and commissions.

113.    The Debtors finance premiums under certain of their Insurance Policies (collectively, the "***Financed Policies***") because it is not economically advantageous for the Debtors to pay the premiums on the Financed Policies, in full, on a lump-sum, quarterly, or monthly basis. Accordingly, in the ordinary course of business, the Debtors finance the premiums on the Financed Policies pursuant to premium financing agreements with First Insurance (together, the "***Premium Financing Agreements***. In consideration for First Insurance's obligation to pay the Debtors' insurance premiums on account of the Financed Policies, the Premium Financing Agreements require the Debtors to pay First Insurance an initial down payment, followed by 10 monthly payments. A schedule setting forth the Financed

Policies, the primary terms of the respective Premium Financing Agreements, and the amount outstanding under each Financed Policy is attached to the Insurance Motion as **Exhibit D**.

114.    As of the Petition Date, the Debtors have paid approximately $7,400,000 on account of the Premium Financing Agreements. As of the Petition Date, there is approximately $480,000 in accrued but unpaid aggregate obligations under the Premium Financing Agreements, approximately $430,000 of which will become due and owing within the first 21 days of these Chapter 11 Cases. Pursuant to the Insurance Motion, the Debtors request authority to pay up to $480,000 in the aggregate, on an interim basis, on account of prepetition amounts outstanding under the non-financed Insurance Policies and the Premium Financing Agreements, and to continue honoring all obligations thereunder on a postpetition basis in the ordinary course of business.

115.    The Debtors' obligations under the Premium Financing Agreements are secured by all sums payable to the applicable Debtor under the Financed Policies, including, among other things, any gross unearned premiums and any payment on account of loss that results in a reduction of unearned premiums in accordance with the terms of the Financed Policies.

116.    If the Debtors were unable to continue honoring their obligations under the Premium Financing Agreements, First Insurance may seek relief from the automatic stay to terminate the Financed Policies to recoup their losses. The Debtors could then be required to obtain replacement insurance on an expedited basis and likely at significant cost to their estates. The Debtors likely would face great hardship if they were required to obtain replacement insurance and pay a lump-sum premium for the Financed Policies in advance. Even if the Financed Policies were not terminated, any interruption in the Debtors' payments could have a severe, adverse effect on the Debtors' ability to finance premiums for future policies.

46

117.    Continuation of the Debtors' Insurance Policies, and entry into new insurance policies, is essential to the preservation of the value of the Debtors' business and operations. Moreover, in many instances, insurance coverage is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the Office of the United States Trustee's (the "*U.S. Trustee*") requirement that a debtor maintain adequate coverage given the circumstances of its chapter 11 case. Accordingly, to ensure uninterrupted coverage, the Debtors request authority to maintain their existing Insurance Policies, pay any prepetition obligations related thereto, honor their obligations under the Premium Financing Agreements, and enter into new Insurance Policies in the ordinary course of business. In addition, to the extent that the Premium Financing Agreements expire during the course of these chapter 11 cases, the Debtors seek authority to renew their Premium Financing Agreements without further Court approval. The Debtors respectfully submit that renewal of the Premium Financing Agreements falls squarely within their ordinary course of business and, but for the constraints of section 364 of the Bankruptcy Code, the Debtors would not need the Court's prior approval to renew the Premium Financing Agreements. To reduce the administrative burden, as well as to confirm their ability to satisfy one of their obligations of operating as debtors in possession, the Debtors seek the Court's authority now to renew the Premium Financing Agreements when and as necessary in the Debtors' business judgment.

118.    Pursuant to the Insurance Policies, the Debtors may be required to pay various deductibles or retention amounts (the "*Insurance Deductibles*"), depending upon the type of claim and insurance policy involved. Under certain policies, the Insurance Carriers may pay claimants and then invoice the Debtors for any Insurance Deductible. In such situations, the Insurance Carriers may have prepetition claims against the Debtors. While the Debtors are not

47

aware of any Insurance Deductibles that are due and owing as of the Petition Date, the Debtors seek authority to honor any amounts owed to the Insurance Carriers to ensure uninterrupted coverage under their Insurance Policies.

119.    The Debtors utilize various insurance brokers, including Arthur J. Gallagher Risk Management Services and Hub International Midwest Limited (collectively, the "***Insurance Brokers***") to obtain their Insurance Policies. The Insurance Brokers primarily assist the Debtors with the procurement and negotiation of the Insurance Policies, enabling the Debtors to obtain the Insurance Policies on advantageous terms and at competitive rates. The Debtors pay fees (the "***Brokerage Fees***") to the Insurance Brokers in an annual amount of approximately $100,000. The Brokerage Fees are paid to the Insurance Brokers either on a quarterly basis or commission basis as policies are renewed. While the Debtors are not aware of any Brokerage Fees that are due and owing as of the Petition Date, the Debtors seek authority to honor any amounts owed to the Insurance Brokers to ensure uninterrupted coverage under their Insurance Policies.

120.    The coverage provided under the Insurance Policies is essential for preserving the value of the Debtors' assets and, such coverage is required by various regulations, laws, and contracts that govern the Debtors' business operations. If the Debtors fail to perform their obligations under the Insurance Policies, their coverage thereunder could be voided. Such a disruption of the Debtors' insurance coverage could expose the Debtors to serious risks that, I believe, would cause serious harm to the Debtors' business. Granting the relief requested in the Insurance Motion will enhance the likelihood of the Debtors' success in reorganizing.

**J.**      ***Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay or Honor Prepetition Obligations to Certain Critical Vendors and (II) Authorizing Banks to Honor and Process Checks and***

48

***Transfers Related to Such Critical Vendors Obligations* (the "*Critical Vendor Motion*")**

121.    Pursuant to the Critical Vendor Motion, the Debtors seek entry of an interim and final order (i) authorizing the Debtors to pay prepetition claims of certain critical vendors up to $2 million on an interim basis  (the "***Interim Cap***") prior to the date of the final hearing (the "***Final Hearing***") on the Motion (the "***Interim Period***") and up to $5 million in the aggregate (inclusive of the Interim Cap) on a final basis, following the Final Hearing on the Motion (the "***Final Cap***"), and (ii) authorizing and directing the applicable banks and financial institutions to honor all related checks and electronic payment requests.

122.    In the ordinary course of their business, the Debtors purchased goods and/or services from certain vendors or suppliers whose continued, uninterrupted provision of such goods and/or services will play a crucial role in maintaining the Debtors' ongoing business operations as a long-term, acute-care healthcare provider (such venders, the "***Critical Vendors***"). The Critical Vendors provide a variety of services, all of which are required to continue the daily operations of Debtors' businesses. In addition, certain Critical Vendors are essential in order to maintain patient care and safety at the Debtors' 16 facilities.

123.    Prior to the Petition Date, the Debtors and their advisors engaged in a process (the "***Critical Vendor Pre- Screening Process***") to (a) identify those trade vendors, suppliers, and/or service-providers that are most "critical" to the Debtors' business and (b) estimate the aggregate amounts owed to such vendors as of the Petition Date to establish the Critical Vendor Cap.

124.    The Debtors and their advisors spent significant time and effort reviewing and analyzing the Debtors' books and records, consulting operations management and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable laws,

49

regulations, and historical practices to identify business relationships which, if lost, could materially harm the Debtors' business, result in harm to patients, reduce their enterprise value, and/or affect their reorganization strategy. In this Critical Vendor Pre-Screening Process, the Debtors and their advisors considered a variety of factors as outlined in the Critical Vendor Motion.

125.    Based on their consideration of those factors, the Debtors anticipate that most Critical Vendors will be medical supply or service providers, IT providers, laboratories, staffing or ambulatory service providers that (i) do not have a contractual relationship with the Debtors and (ii) are either (a) sole-source providers or (b) cannot be replaced in a cost-efficient manner or without causing irreparable harm to the Debtors' operations.

126.    Through the Critical Vendor Pre-Screening Process, the Debtors reviewed a universe of approximately 4,200 separate accounts in their accounts payable system. Based on the Debtors' review, the Debtors believe, and I agree, that a $5 million Critical Vendor Cap will enable the Debtors to satisfy the prepetition claims of Critical Vendors. The Critical Vendor Cap is 8% of the Debtors' total vouchered accounts payables of approximately $63.5 million.

127.    Regardless of amount owed, the impact upon the Debtors' operations in the event that any of the Critical Vendors ceased providing services to the Debtors would be significant. Without the continued service of the Critical Vendors, the Debtors may be forced to suspend or even cease operations, which suspension or cessations would cripple the Debtors' business operations.

128.     The Debtors' failure to pay these Critical Vendors their prepetition claims, to the extent that such claims are fixed, non-contingent, liquidated, and undisputed (the "***Critical Vendor Claims***"), may extinguish the Debtors' access to necessary goods and services in the

event that a vendor (i) is unfamiliar with the bankruptcy process; (ii) may be put out of business by the Debtors' nonpayment; (iii) will refuse to continue doing business with the Debtors if its prepetition claim remains unpaid; or (iv) may choose to continue doing business with the Debtors only upon the condition that the Debtors provide trade term accommodations such as advance deposits or payment by wire transfer prior to delivery. Any disruption in the supply of goods or services from these Critical Vendors may not only substantially impair the Debtors' reorganization efforts but, due to the Debtors' business, may also risk patient safety.

129.    I believe that the Critical Vendors are so essential to the Debtors' business that the absence of any of their particular goods or services, even for a short duration, could disrupt the Debtors' operations and cause irreparable harm to the Debtors' business, goodwill, and client satisfaction. I believe that this irreparable harm to the Debtors and to the recovery of all of the Debtors' creditors will far outweigh the cost of payment of the Critical Vendor Claims.

**K.**    ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Secured Superpriority Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, and 364, (II) Granting Adequate Protection to Prepetition Secured Creditor, and (III) Scheduling a Final Hearing Pursuant to Rules 4001(b) and 4001(c) of the Federal Rules of Bankruptcy Procedure (the "DIP Motion")***

130.    Pursuant to the DIP Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to obtain a senior secured superpriority credit facility in the aggregate principal amount of up to $85,000,000 (the "***DIP Facility***") consisting, in turn, of (a) $65,000,000 in aggregate principal amount of revolving loans and commitments and (b) $20,000,000 in aggregate principal amount of term loans, pursuant to the terms and conditions of the DIP Agreement. The Debtors further seek the Court's authorization to (a) use Cash Collateral (b) grant the Prepetition ABL Parties the forms of Adequate Protection

described in the DIP Motion, and (c) modify the automatic stay to the extent necessary to effectuate the terms of the proposed interim and final orders.

131.     The DIP Facility will supply the Debtors with critical and necessary postpetition debtor-in-possession financing and consent to the use of Cash Collateral. Obtaining access to the DIP Facility, including the use of Cash Collateral, on the first day of these chapter 11 cases is critical for the success of the Debtors' reorganization efforts. With the consent of the Prepetition ABL Parties, the Debtors will use Cash Collateral to fund working capital, capital expenditures, and other general corporate purposes. Cash Collateral alone, however, will be insufficient to fund the costs associated with the Debtors' restructuring. Absent an ability to demonstrate that the Debtors have the means available to operate in the ordinary course and procure supplies and services that are vital to ongoing business operations, patients may seek alternative care, third-party payors may take actions to terminate their arrangements with the Debtors, and vendors and suppliers may refuse to do business with the Debtors. Moreover, absent access to capital under the DIP Facility, the Debtors may not have sufficient liquidity to continue their business operations in the ordinary course, which would be materially detrimental to the Debtors' patients, creditors, employees, and other parties in interest, jeopardizing the success of the Debtors' reorganization.

132.     I believe that the DIP Facility pending approval before the Court represents the Debtors' best available financing option and is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, I respectfully submit that the DIP Motion should be approved.

**L.**     ***Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors to (I) Maintain, Administer, Modify, and Renew Their Refund***

**Programs and Practices and (II) Honor Obligations Related Thereto (the "*Refunds Motions*")**

133.    Pursuant to the Refunds Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors (i) to maintain, administer, modify, and renew their Refund Program (as defined herein) and make payments to patients and allow offsets by Third-Party Payors (as defined herein) or to otherwise honor accrued prepetition obligations owed under their Refund Program (collectively, and as identified herein, the "***Refund Program Obligations***") and (ii) to continue, replace, modify, or terminate any Refund Program in the ordinary course of business, (b) authorizing and directing financial institutions to receive, process, honor, and pay all related checks and electronic payment requests for payment of Refund Program Obligations, (c) scheduling a final hearing to consider approval of the Refunds Motion on a final basis, and (d) granting related relief.

134.    Various state and federal laws require the Debtors to refund patients and third-party payors, including healthcare insurers, managed care organizations, workers' compensation programs, contract management services, private pay sources, Medicare, and Medicaid (collectively, "***Third-Party Payors***"), when overpayments are identified.  In the ordinary course of business, the Debtors routinely issue refunds or are subject to offsets for reimbursement of overpayments made by or on behalf of patients resulting from the interaction between the Debtors' billing procedures, patient medical insurance deductibles, and third-party payments (the "***Refund Program***").

135.    The case-by-case nature of the Debtors' medical services makes the process of determining each patient's insurance coverage particularly complex. As a result, whether due to data input errors during claims processing, or overpayments arising from coordination-of-benefits issues among multiple insurers, patient accounts—once fully processed—may contain

credit balances. Once the Debtors receive payments from patients or insurers, the Debtors review accounts that have credit balances and refund any surplus to the patient or are subject to an offset to the Third-Party Payor's receivable balance based on an overpayment.

136.    When the Debtors discover and verify an overpayment from a patient or Third Party Payor, the amount of the overpayment is reviewed in the Debtors' billing system, which then administers refunds to the patient as appropriate.   Offsets by Third-Party Payors are reconciled by the Debtors after the offset occurs. There is typically a significant lag between when the patient is treated, when the overpayment is recognized or determined, and when the overpayment is reviewed in the Debtors' billing system. After the overpayment amount is determined, either the Debtors issue a check or other form of payment to the patient or the Third Party Payor offsets future receivables in the amount of the overpayment.

137.    At any given time, it is difficult to determine the amount of outstanding overpayments that have been made and identified, but for which a refund check or offset has not yet been issued. Moreover, some refund checks issued to patients before the petition date may not have been presented for payment or may not have cleared the Debtors' banking system or accounting system and, accordingly, have not been honored and paid as of the petition date. Nonetheless, the Debtors are required, under the laws of various states, to reimburse patients and Third-Party Payors as overpayments are identified. The Debtors estimate that approximately $300,000 in refunds to patients or Third-Party Payor offsets are processed in a given month, although larger amounts of refunds may be due and owing at any given time.

138.    As of the Petition Date, the Debtors estimate that approximately $4.5 million in refunds and credit balances may be due and owing under the Refund Program, of which approximately $300,000 could become due and owing during the first 21 days of these Chapter

11 Cases. The Debtors request authority to pay and allow offsets up to $300,000 in Refund Program Obligations, in the ordinary course of business on an interim basis, pending entry of the Final Order granting the relief requested herein, and to continue to issue and pay and allow offsets for the Refund Program Obligations to patients and Third-Party Payors, including refunds for overpayments made prepetition or resulting from prepetition services in the ordinary course of business, on a postpetition basis.

139.    The necessity of the Refund Program in the medical services industry cannot be overstated. Failure to honor the Refund Program Obligations would likely cause the Debtors to lose a significant number of payors and patients, which would damage their reputation for reliability, thereby resulting in a long-term decline in business. Additionally, if the Refund Program Obligations are not honored, the Debtors may face legal sanctions or be liable for fines in the jurisdictions in which they operate. Thus, the Refund Program is necessary for the Debtors to remain competitive and maintain their patient base at this critical juncture.

140.    I believe that failure to honor the Refund Program could erode the Debtors' hard-earned reputation, adversely affecting the Debtors' prospects for a successful reorganization.

> **M.**    ***Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to File a Consolidated Creditor Matrix, (II) Authorizing the Debtors to File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors, and (III) Establishing Patient Notice Procedures* (the "*Consolidation Motion*")**

141.    Pursuant to the Consolidation Motion, the Debtors seek entry of an order (i) authorizing the Debtors to file a consolidated list of creditors (the "***Creditor Matrix***"), (ii) authorizing the Debtors to file a consolidated list of the Debtors' 30 largest unsecured creditors, and (iii) establishing patient notice procedures.

142.    Given the affiliated nature of the Debtors, the Debtors submit that permitting them to maintain a single consolidated Creditor Matrix, in lieu of filing a separate creditor matrix for each Debtor, is warranted. Segregating the Debtors' records to a specific creditor matrix format, in particular given the size and scope of these chapter 11 cases and the number of the Debtors' creditors, would be an unnecessarily burdensome task and, because many creditors are creditors of more than one Debtor, failure to maintain a single consolidated Creditor Matrix would result in duplicate mailings.  In addition, filing a single consolidated Creditor Matrix would facilitate the U.S. Trustee's review of creditors' claims and its appointment of a single creditors' committee in these cases Under these circumstances, the exercise of satisfying the literal requirements of Bankruptcy Rule 1007(d) would only serve to frustrate its intended purpose.

143.    Accordingly, the Debtors submit that filing separate creditor matrices would serve no practical purpose. Therefore, in the absence of any corresponding benefit, the Debtors request authority to file the consolidated Creditor Matrix in lieu of filing separate lists for each Debtor. I believe that such relief is appropriate under the circumstances for the efficient and orderly administration of these cases.

144.    Furthermore, the Debtors respectfully request authority to file a single consolidated list of their 30 largest general unsecured creditors (the "***Top 30 List***"). As explained above, a large number of creditors are shared amongst the Debtors. Therefore, the Top 30 List will help alleviate administrative burdens, costs, and the possibility of duplicative service.

145.    In addition, although it is possible for the Debtors to identify which creditors have actual claims against the Debtors, it is impracticable for them to identify former patients

56

that may have unknown claims that have not yet manifested. Providing individual notice to every current and former patient of the Debtors from the past two years would be impractical and unnecessarily expensive given that the Debtors have had over 30,000 patients in the last three years. I therefore believe that it is in the best interests of the Debtors' estates and all creditors and other interested parties to adopt the foregoing patient notice procedures.

**N.**      ***Motion of the Debtors for Entry of an Order Authorizing Debtors to File Under Seal Portions of Its Creditor Matrix Containing Certain Individual Creditor Information* (the "*Motion to Seal*")**

146.      Pursuant to the Motion to Seal, the Debtors seek entry of an order (a) authorizing the Debtors to file a redacted version of the creditor matrix, (b) authorizing the Debtors to file under seal an unredacted version of the creditor matrix, and (c) granting such other and further relief as the Court deems just and proper.

147.      I believe that the Debtors should to redact the address information of individual creditors—many of whom are the Debtors' employees—from the creditor matrix because such information could be used to perpetrate identity theft.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: November 5, 2018                              Respectfully submitted,

By:  _____
Name:  Andrew Hinkelman
Title:  Chief  Restructuring  Officer  and
        Interim Chief Financial Officer

**<u>Exhibit A</u>**

**Current Organizational Chart**



# Promise & Success Structure Chart (as of August 1, 2017)

## and Accompanying Ownership

¹ Dr. Barry Tillman and Dr. C. Randolph Tillman hold an 11% interest in these entities, totaling a 22% interest in each entity overall.
² The Limited Partners include Mohammed Bari Trust, Saleem Ishaque Trust, Roy Rodriguez Trust, Robert Bradley Sanders Trust and Tan The Nguyen Trust.
³ Jim Riley owner of iCare.com, LLC holds 64 2/3% interest in iCare.com, Inc.
⁴ There is a 3% interest in iCare.com, Inc. reserved for the Board.

## Exhibit B

### Debtor Borrowers

- Professional Rehabilitation Hospital, L.L.C.
- Promise Hospital of Ascension, Inc.
- Promise Hospital of Baton Rouge, Inc.
- Promise Hospital of Dade, Inc.
- Promise Hospital of Dallas, Inc.
- Promise Hospital of East Los Angeles, L.P.
- Promise Hospital of Florida at the Villages, Inc.
- Promise Hospital of Lee, Inc.
- Promise Hospital of Louisiana, Inc.
- Promise Hospital of Overland Park, Inc.
- Promise Hospital of Phoenix, Inc.
- Promise Hospital of Salt Lake, Inc.
- Promise Hospital of Vicksburg, Inc.
- Promise Hospital of Wichita Falls, Inc.
- Promise Skilled Nursing Facility of Wichita Falls, Inc.
- Promise Skilled Nursing Facility of Overland Park, Inc.
- Quantum Health, Inc.
- Success Healthcare 1, LLC
- St. Alexius Hospital Corporation #1

## Exhibit C

**Debtor Guarantors**

- Promise Healthcare Group, LLC
- Promise Healthcare Holdings, Inc.
- Promise Healthcare, Inc.
- HLP Healthcare, Inc.
- PH-ELA, Inc.
- Promise Healthcare #2, Inc.
- Promise Healthcare of California, Inc.
- Success Healthcare, LLC
- Success Healthcare 2, LLC
- St. Alexius Properties, LLC