# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x
                            :

In re:                     :  Chapter 11
                            :

PROMISE HEALTHCARE GROUP, LLC, *et al.*,[1]  :  Case No. 18-12491 (CSS)
                            :

          Debtors.         :  (Joint Administration Requested)
-------------------------------------------------------------x

**DEBTORS' MOTION FOR ENTRY OF ORDERS (I)(A) ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE OF CERTAIN OF THE DEBTORS' ASSETS, INCLUDING APPROVING A BREAK-UP FEE AND EXPENSE REIMBURSEMENT, (B) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (C) APPROVING FORM AND MANNER OF NOTICE RELATING THERETO, AND (D) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE; (II)(A) APPROVING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) AUTHORIZING SUCCESS HEALTHCARE 1, LLC TO GRANT LIENS; AND (III) GRANTING RELATED RELIEF**

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Professional Rehabilitation Hospital, L.L.C. (5340), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179),  Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc. (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc. (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), St. Alexius Hospital Corporation #1 (2766), St. Alexius Properties, LLC (4610), Success Healthcare 1, LLC (6535), Success Healthcare 2, LLC (8861), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766).  The mailing address for the Debtors, solely for purposes of notices and communications, is 999 Yamato Road, 3rd FL, Boca Raton, FL  33431.

The debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby move (the "Motion"), pursuant to sections 105(a), 363(b), (f), and (m), 364,[2] 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for entry of (a) an order substantially in the form annexed hereto as **Exhibit A** (the "Bidding Procedures Order") (i) approving the proposed auction and bidding procedures attached hereto as **Exhibit B** (the "Bidding Procedures") for the sale of substantially all of the Silver Lake Medical Center assets (the "Purchased Assets")[3] of Success Healthcare, LLC, Success Healthcare 1, LLC, and HLP of Los Angeles, LLC (collectively, the "Silver Lake Debtors"), (ii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "Assumption and Assignment Procedures"), (iii) approving the form and manner of notice of all procedures, protections, schedules, and agreements, and (iv) scheduling a hearing (the "Sale Hearing") to approve the sale transaction (the "Sale Transaction"); and (b) following the Sale Hearing, an order in the form annexed hereto as **Exhibit C** (the "Sale Order"): (i) approving the sale of the Purchased Assets free and clear of all liens, claims, interests, and encumbrances ("Interests"), (ii)

---

[2] As described herein and in the attached Exhibits, pursuant to the Stalking Horse APA, Success 1 is required to grant a lien to the Stalking Horse Bidder's lender on certain Purchased Assets that are Deferred Assets proposed to be transferred to the Stalking Horse Bidder post-Closing.  The Silver Lake Debtors will have received the Purchase Price for such Deferred Assets at Closing, and no portion of the Purchase Price, rights under the Stalking Horse APA, the Silver Lake Debtors' cash or cash equivalents, or proceeds of any of the foregoing shall constitute Collateral for the Stalking Horse Bidder's lender (all capitalized terms used but not defined in this footnote are defined elsewhere in this Motion).

[3] For the avoidance of doubt, the assets of St. Alexius Hospital are not included in the "Purchased Assets" and are not the subject of this Motion.

2

authorizing the assumption and assignment of certain executory contracts and unexpired leases, and (iii) authorizing Success Healthcare 1, LLC ("Success 1") to grant liens; and (c) granting related relief.  In support of this Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT[4]

1.      The goal of the Silver Lake Debtors' chapter 11 cases is to effectuate a transfer of their ongoing business in a manner that allows them to maximize value and resolve claims in an equitable and efficient manner.  Approval of the Bidding Procedures is a critical and necessary step, which is designed to permit a fair and reasonable marketing process and obtain the highest and best offer for the Silver Lake Debtors' business.

2.      As detailed in the *Declaration of Jay A. Shiland* attached hereto as **Exhibit D** and incorporated herein by reference (the "Sale Declaration"), the Debtors, with the assistance of their advisors, considered all strategic options and concluded that a sale in accordance with the protections afforded by the Bankruptcy Code is the best way to maximize the value of the Silver Lake Debtors' assets and yield the best possible recovery for creditors.  Through the Bidding Procedures, the Debtors, with the assistance of the Silver Lake Debtors' financial advisor and investment banker, MTS Health Partners L.P. ("MTS"), seek to conclude the marketing process for the Purchased Assets that began in March of 2017.

3.      Following the Silver Lake Debtors' and MTS's extensive marketing efforts, which are detailed in the Sale Declaration, on October 24, 2018, the Silver Lake Debtors executed an agreement (the "Stalking Horse APA") with L.A. Downtown Medical Center LLC (the "Stalking Horse Bidder") for the sale, transfer, and assignment of the Purchased Assets.  The

---

[4] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Stalking Horse APA, as defined herein.

Stalking Horse APA is attached hereto as **Exhibit E**.  As described in greater detail below, the

Stalking Horse APA contemplates aggregate cash consideration of up to $84,150,000, subject to

certain adjustments[5] as set forth therein (the "Purchase Price") for the Purchased Assets, as well

as the assumption of certain specified liabilities, and reflects the Stalking Horse Bidder's

agreement to act as a stalking horse bidder in a Court-supervised bidding and auction process.

4.      As required by the Stalking Horse APA, the Bidding Procedures contemplate a

postpetition marketing process culminating in a closing of a transaction by no later than the

ninetieth day after the Petition Date (defined below).  The Closing Date may be extended under

certain circumstances pursuant to the Stalking Horse APA, but in no event may the Closing Date

be later than March 16, 2019.  Speed is critical here because of the Silver Lake Debtors' limited

liquidity.  Thus, an expeditious sale of the Silver Lake Debtors' assets is a reasonable exercise of

the Debtors' business judgment and is in the best interests of all of the Silver Lake Debtors'

stakeholders.

5.      Finally, as set forth in more detail in the Sale Declaration, an extended marketing

process should not be necessary to maximize the value of the Silver Lake Debtors' assets

because potentially interested parties have been aware of the Silver Lake Debtors' interest in

selling their assets for over a year and a half.  As a result, an extended marketing process would

likely only deteriorate the value available to the Silver Lake Debtors' stakeholders.  Accordingly,

the Debtors have filed this Motion seeking a prompt sale process that will maximize value for the

Silver Lake Debtors' stakeholders.

---

[5] The Purchase Price adjustments are described in greater detail herein and in the Sale Declaration.  After adjustments, the total consideration to be conveyed to the Silver Lake Debtors is expected to be approximately $77.5 million, which includes an $8.1 million Seller Note (defined below).

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (M), (N), and (O). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory bases for the relief requested herein are sections 105(a), 363(b), (f), and (m), 364, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, 6006, 9007 and 9014, and Local Rule 6004-1.

## BACKGROUND

8.      On the date hereof (the "Petition Date"), the Debtors commenced their respective bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.      No request has been made for the appointment of a trustee or examiner in these Chapter 11 Cases, and no committee has been appointed in these Chapter 11 Cases as of the date hereof.

10.      The events leading up to the Petition Date are set forth in the Declaration of Andrew Hinkelman, Chief Restructuring Officer of the Debtors, filed substantially contemporaneously herewith.

## RELIEF REQUESTED

11.     By this Motion, the Debtors seek entry of the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**: (a) approving the proposed Bidding Procedures attached hereto as **Exhibit B**, including approval of the Break-Up Fee and the Expense Reimbursement (as such terms are defined below) as allowed superpriority administrative expenses pursuant to sections 503(b) and 507 of the Bankruptcy Code; (b) establishing the Assumption and Assignment Procedures, including notice of proposed cure amounts; (c) approving the form and manner of notice of all procedures, protections, schedules, and agreements; and (d) scheduling the Sale Hearing to approve the Sale Transaction.

12.     The Debtors also seek entry of the Sale Order, substantially in the form attached hereto as **Exhibit C**: (a) approving the sale of the Silver Lake Debtors' assets free and clear of all Interests; (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (c) authorizing Success 1 to grant liens.

## THE PROPOSED SALE

### A.      The Marketing Process

13.     As described in the Sale Declaration, the Silver Lake Debtors began exploring asset sales in March of 2017.  As part of this marketing effort, the Silver Lake Debtors, through their financial advisor and investment banker MTS, conducted a broad marketing process targeting buyers based on a variety of factors, including a potential buyer's perceived interest in the Purchased Assets, its familiarity with the Silver Lake Debtors' business, and its financial ability to consummate a transaction.

14.     The Debtors' advisors have contacted and/or sent initial marketing materials to approximately forty-one financial and strategic parties with potential interest in an acute care

6

hospital facility and related assets.  Thirty-six of those entities signed confidentiality agreements, received offering memoranda, and received virtual data room access.  The Silver Lake Debtors, with the assistance of MTS, their attorneys, and other representatives, assembled data and documents to facilitate the diligence process and prepared business presentations to provide for an organized and efficient transmission of a large amount of data related to the Purchased Assets.

15.    The Silver Lake Debtors received thirteen first round bids for the Purchased Assets in May 2017.  MTS worked with the parties who submitted bids to provide more detailed diligence information and advance their bids, including by participating in in-person management presentations with the Silver Lake Debtors' management, which resulted in the submission of seven second round bids for the Purchased Assets in July 2017.  The final net enterprise value bid submitted by the Stalking Horse Bidder exceeded that of the next closest "well-diligenced" bidder by $9.5 million.  Following receipt of second round bids, MTS continued to work with both the Stalking Horse Bidder and other potential bidders to elicit improved proposed transaction valuations and increase the level of certainty associated with their respective bids.

B.    **Negotiations Surrounding the Stalking Horse APA**

16.    The Silver Lake Debtors, MTS, and the Silver Lake Debtors' other professional advisors engaged in extensive arm's-length negotiations regarding the terms of a purchase and sale agreement and other ancillary agreements, and the due diligence necessary to execute such agreements.  Both the Silver Lake Debtors and the Stalking Horse Bidder were represented by counsel in connection with these negotiations.  On February 7, 2018, the Debtors executed an agreement (the "Original Purchase Agreement") with the Stalking Horse Bidder for the sale,

transfer, and assignment of the Purchased Assets.  The Original Purchase Agreement provided for a sale outside of bankruptcy.

17.     In connection with the negotiation of the Original Purchase Agreement, the parties agreed that it could take up to one year from the date of filing change of ownership applications for the Stalking Horse Bidder to obtain California state licensing approvals. Because of the Silver Lake Debtors' need for a more expeditious closing, given their cash needs, the parties discussed putting into place an interim management structure pursuant to which the Silver Lake Debtors would sell certain of the Purchased Assets to the Stalking Horse Bidder, and such Purchased Assets would then be leased back to Success 1, which is the entity that currently holds the California licenses to operate the Silver Lake Medical Center facilities.  Under this structure, the Stalking Horse Bidder would pay the full purchase price in an expedited initial closing, and thereafter provide management services to Success 1 until such time as the Stalking Horse Bidder could obtain its own licenses to operate the facilities.

18.     However, it became apparent during the course of implementing this structure under the Original Purchase Agreement that the Stalking Horse Bidder's ability to obtain a loan to finance its purchase of the Purchased Assets required it to pledge to its lender, Ally Bank ("Ally"), Hospital Quality Assurance Fee payments ("QAF Payments") to be received from the Medi-Cal supplemental payments program (the "QAF Program") by Success 1 from the California Department of Health Care Services and other assets retained by Success 1 during the term of the management services agreement.  The Stalking Horse Bidder and Ally had significant concerns about (i) the impact that a bankruptcy filing by or against Success 1 would have on (a) the Stalking Horse Bidder's ability to obtain its management fee, including such QAF Payments from Success 1, during the interim period in which the Stalking Horse Bidder

8

was providing management services and (b) the Stalking Horse Bidder's ability to manage the

facilities during the licensing transition, and (ii) the value of various indemnities by the Silver

Lake Debtors' parent entity due to the parent entity's increasing financial difficulties.  The

parties discussed potential alternatives to allay these concerns, all of which would result in

material risk or ultimate reductions to proceeds ultimately delivered to the Silver Lake Debtors.

Accordingly, the Silver Lake Debtors notified the Stalking Horse Bidder that the sale should,

instead, best be implemented pursuant to section 363 of the Bankruptcy Code.

19.    Because the Original Purchase Agreement did not contemplate a potential

bankruptcy filing by the Silver Lake Debtors, the Silver Lake Debtors and the Stalking Horse

Bidder negotiated a new agreement to incorporate the impact of a bankruptcy filing and

ultimately entered into a new Asset Purchase Agreement dated as of October 24, 2018 (the

"Stalking Horse APA").  The Stalking Horse APA provides for the Stalking Horse Bidder to act

as the stalking horse bidder for the sale of the Purchased Assets for a gross aggregate cash

purchase price of $84,150,000, as offset by adjustments as set forth therein, including the

following adjustments to reflect the impact of events subsequent to the Original Purchase

Agreement:  (i) approximately $4.9 million in negative changes to the QAF Program (as offset

by $2.5 million of QAF Program-related cash received by the Silver Lake Debtors to date), (ii)

approximately $1.3 million in penalties associated with the Silver Lake Debtors' failure to

achieve "meaningful use" health information technology compliance, and (iii) up to $441,000

associated with the need for the Stalking Horse Bidder to procure representation and warranty

insurance given the elimination of indemnities associated with the previous guarantee by the

Silver Lake Debtors' parent in the Original Purchase Agreement.  Accordingly, the consideration

to be conveyed to the Silver Lake Debtors is expected to be approximately $77.5 million, which

includes an $8.1 million seller note (the "Seller Note") to be provided by the Stalking Horse

Bidder (the "Purchase Price"), and further including the assumption of certain specified

liabilities (and before payment of transaction costs and expenses and liabilities retained by the

Silver Lake Debtors).  The gross purchase price of $84,150,000 reflects, as compared to the

Original Purchase Agreement, an increase in cash proceeds at closing of $4,050,000 in exchange

for a reduction of the initial principal balance of the Seller Note to $8.1 million.  Payments by the

Stalking Horse Bidder under the Seller Note are anticipated to be allocated 75% to Success 1 and

25% to HLP of Los Angeles, LLC.

> **C.** **Granting of Liens By Success Healthcare 1, LLC to Successful**
> **Bidder's Lender**

20.     In order to finance the Stalking Horse Bidder's purchase of the Purchased Assets

and fund working capital following the Sale, Ally is requiring that, at Closing, Success 1 as an

accommodation party enter into new security agreements (the "Security Agreements") with Ally

Bank, in its capacity as administrative agent ("Agent") for the Lenders (as defined in the Security

Agreements), granting Ally post-closing liens in QAF Payments that are paid to Success 1 and

certain assets maintained by Success 1 during the term of the management services agreement.

The forms of Security Agreements are attached hereto as **Exhibit F**.  Ally requires that language

be incorporated into the Sale Order to the effect that the post-closing liens and security interests

in the collateral granted to Ally pursuant to the Security Agreements shall be valid, perfected,

and entitled to first priority.

21.     In particular, following the entry of the Sale Order and substantially

contemporaneously with the Closing of the Sale, the Stalking Horse Bidder, Agent, and Lenders

intend to enter into (a) that certain Amended and Restated Credit Agreement (the "Non-HUD

Credit Agreement"), (b) that certain Term Loan Agreement (the "Term Loan Agreement,"), and

(c) that certain Credit Agreement (the "HUD Credit Agreement" and together with the Non-HUD Credit Agreement, the Term Loan Agreement, and all related loan documents, the "Acquisition Financing Agreements"), pursuant to which the Lenders will make certain loans and other financial accommodations to the Stalking Horse Bidder and other affiliated entities (collectively, "Borrowers") to enable the Stalking Horse Bidder to fund the Purchase Price.  To induce Lenders and as a condition precedent to Agent and Lenders entering into the Acquisition Financing Agreements and making the loans to the Borrowers, Success 1 proposes to  (i) grant first priority Liens on the Collateral[6] (the "Seller Liens") in favor of Agent, for the benefit of Lenders, to further secure Borrower's obligations under the Acquisition Financing Agreements, with recourse against Success 1 limited to the Collateral, and (ii) enter into three Subordination Agreements (the "Subordination Agreements") with Agent and Borrowers, pursuant to which Success 1 will, among other things, subordinate the indebtedness owed by the Successful Bidder to Success 1 in connection with the Seller Note to the indebtedness owed by the Successful Bidder to Agent and Lenders.  The forms of Subordination Agreements are attached hereto as **Exhibit G**.

---

[6] "Collateral" as defined in the Security Agreements includes, without limitation, the following property of Success 1:  Accounts (including, without limitation, all Health-Care-Insurance Receivables and any Account or portion of an Account arising under the QAF Program), Chattel Paper, certain Commercial Tort Claims, Deposit Accounts, Documents, General Intangibles, including Payment Intangibles, Software and Intellectual Property, Inventory, Equipment, fixtures and other Goods, Instruments, Investment Property, all letters of credit, Letter-of-Credit Rights, Supporting Obligations and Government Authorizations, all monies, Medicare and Medicaid provider agreements and numbers owned or used by Success 1 in connection with the operation of the Hospitals, all of Success 1's rights under the QAF Program, all books and records pertaining to the foregoing, and all other assets, personal property and rights of success 1, all Proceeds and products of each of the foregoing.  The Collateral is in large part a subset of the Purchased Assets; however, there are certain pieces of the Collateral that are not included in the Purchased Assets because of the nature of those assets and the Silver Lake Debtors' inability to transfer them outright to the Successful Bidder at Closing.  It is intended that the remaining assets (the "Deferred Assets" as defined in the APA) will be transferred to the Successful Bidder on the Transition Date.  Notwithstanding anything to the contrary, Collateral does not include the Purchase Price, Cash Consideration, the Seller Note, the Silver Lake Debtors' rights under the Stalking Horse APA, or any proceeds of any of the foregoing.

### D.   The Primary Terms of the Stalking Horse APA

22.   The Stalking Horse APA contemplates the sale of the Purchased Assets to the

Stalking Horse Bidder, subject to higher or better bids, on the following material terms:[7]

| Stalking Horse APA Provision | Summary Description |
|---|---|
| **APA Parties** | L.A. Downtown Medical Center LLC, as Buyer and Success Healthcare, LLC, Success Healthcare 1, LLC and HLP of Los Angeles, LLC, as Sellers |
| **Consideration**<br><br>**APA § 3.1** | The aggregate consideration to be paid for the Purchased Assets and in consideration of the Transactions (the "Purchase Price") will consist of (a) an amount (the "Cash Consideration") equal to (i) $84,150,000 (the "Base Cash Amount"); plus (ii) the Final Working Capital Adjustment, if the Final Working Capital Adjustment is a positive amount; minus (iii) the absolute value of the Final Working Capital Adjustment, if the Final Working Capital Adjustment is a negative amount; plus (iv) the Final QAF4 Adjustment; minus (v) the Final QAF5 Adjustment; minus (vi) the Final Meaningful Use Adjustment; and (b) the assumption of the Assumed Liabilities.<br><br>The Stalking Horse Bidder proposes to fund $8,100,000 of the Purchase Price in the form of a Seller Note. |
| **Purchased Assets; Avoidance Actions**<br><br>**APA § 2.1** | The Purchased Assets will include the following assets, properties and rights of Sellers (other than Excluded Assets):<br><br>(a)   all real property that any Seller owns in fee (together with all buildings and other structures, facilities or improvements located thereon, including construction in progress, all fixtures attached or appurtenant thereto, and all easements, licenses, rights and appurtenances relating to the foregoing, collectively, the "Owned Real Property").<br><br>(b)   all leasehold interests in and to the real property and improvements leased by any Seller (collectively, the "Leased Real Property"), if the lease for such Leased Real Property becomes a Purchased Contract.<br><br>(c)   all rights, benefits and interests of the applicable Seller under the Purchased Contracts.<br><br>(d)   all Inventory and other tangible personal property owned by any Seller, including all equipment (including all medical equipment, |

---

[7] The summary of the terms contained in this Motion is qualified in its entirety by reference to the provisions of the Stalking Horse APA. In the event of any inconsistencies between the provisions of the Stalking Horse APA and the summary set forth herein, the terms of the Stalking Horse APA shall govern. Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings ascribed to them in the Stalking Horse APA. The summary of terms highlights certain terms in accordance with Local Rule 6004-1.

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | computers and other data processing equipment and related software), furniture, fixtures, machinery, vehicles and rolling stock, office furnishings, and leasehold improvements (the "Personal Property"), together with any express or implied warranty by the manufacturers or sellers of any item or component part thereof to the extent transferable and all maintenance records and other documents relating thereto.<br><br>(e)    except as otherwise set forth in the Stalking Horse APA, all rights relating to Prepaid Expenses.<br><br>(f)    all Accounts Receivable and payments from, or otherwise in connection with, the QAF Program.<br><br>(g)    any current assets of any Seller with respect to the operations of the Business not otherwise specifically described herein.<br><br>(h)    all depository accounts in which amounts received from payment of Accounts Receivable and from the QAF Program have customarily been deposited by any Seller with respect to the operations of the Business ("Depository Accounts").<br><br>(i)    all telephone numbers and facsimile numbers used exclusively in the operations of the Business.<br><br>(j)    except as excluded under the Stalking Horse APA, all documents, records, operating manuals, files, computers, hardware, data processing equipment, and computer software (including licenses thereto, to the extent assignable or transferable) relating or with respect to the operations of the Business, including all patient records, medical records, employee records, financial records relating or with respect to the operations of the Business, equipment records, construction plans and specifications, and medical and administrative libraries.<br><br>(k)    except as excluded under the Stalking Horse APA, all intangible rights and property, including all inventions (whether or not patentable), trade secrets, know-how, mask work rights, patents, trademarks, service marks, trade names, trade dress, domain names, websites (including contents thereof) and copyrights (collectively, "Intellectual Property") that are used primarily in connection with the operations of the Business (all such items of Intellectual Property together with the Purchased Assets described in Section 2.1(j) of the Stalking Horse APA are referred to collectively as the "Transferred Intellectual Property").<br><br>(l)    to the extent assignable or transferable, all Government Authorizations, and all pending applications for Government Authorizations.<br><br>(m)    all rights under or pursuant to all representations, warranties and guarantees made by suppliers and contractors to the extent relating to |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | services provided to any Seller.<br><br>(n)  all goodwill associated with the Business.<br><br>(o)  all rights of Sellers under non-disclosure or confidentiality, non-compete, non-solicitation or no-hire agreements relating to any Purchased Assets or Assumed Liabilities (or any portion of the foregoing).<br><br>(p)  all insurance proceeds relating to the physical condition of the Purchased Assets, to the extent not expended on the repair or restoration of the Purchased Assets and subject to the terms of any Business Contract.<br><br>(q)  any rights, claims or causes of action of any Seller against Third Parties relating to any Purchased Asset or Assumed Liability as of the Closing, and all rights of indemnity, warranty rights, rights of contribution, rights to refunds (other than Tax refunds), rights of reimbursement and other rights of recovery, including insurance proceeds, possessed by Sellers as of the Closing (regardless of whether such rights are currently exercisable) to the extent related to any Purchased Asset or Assumed Liability.<br><br>(r)  all Avoidance Actions (whether known or unknown, contingent or otherwise) accruing or arising prior to the Closing Date against (a) any counterparty to a Purchased Contract; (b) any vendor, supplier, or lessor; or (c) any Hired Employee (collectively, the "Purchased Avoidance Actions").<br><br>(s)  personnel records of all Business Employees. |
| **Excluded Assets**<br><br>**APA § 2.2** | The Excluded Assets are:<br><br>(a)  cash, cash equivalents and short-term investments, other than Prepaid Expenses.<br><br>(b)  all intercompany receivables due to any Seller from any of its Affiliates.<br><br>(c)  the computer software, programs, hardware, data processing equipment, and related documentation that is proprietary to Parent or its Affiliates.<br><br>(d)  except to the extent used primarily in the operations of the Business, all of Parent's or its Affiliates' proprietary manuals, marketing materials, policy and procedure manuals, standard operating procedures and marketing brochures, data and studies or analyses.<br><br>(e)  all funds and accounts of all employee retirement, deferred compensation, health, welfare or benefit plans and programs, including assets representing a surplus or overfunding of any Seller Plan. |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | (f)      the Excluded Contracts. |
| | (g)      all Intellectual Property of Parent or its Affiliates not used primarily at the Business, including the names "Success Healthcare," "Promise Healthcare," the world wide web addresses www.successhealthcare.com and www.promisehealthcare.com, the other names and web addresses set forth on Annex 2.2(g) to the Stalking Horse APA, and, with respect to any of the foregoing, all abbreviations and variations thereof, and trademarks, trade names, service marks, copyrights and any applications therefor, and symbols and logos related thereto, together with any promotional material, educational material, signage, stationery, supplies or other items of inventory bearing such names, marks, logos or symbols or abbreviations, variations or derivations thereof. |
| | (h)      personnel records of all Business Employees, except for those portions of the personnel records of all Hired Employees solely pertaining to the administration of employee benefits to the Hired Employees. |
| | (i)      the content of the Business' websites. |
| | (j)      all claims, rights, interests and proceeds with respect to state or local tax refunds (including property tax) resulting from periods prior to the Effective Time, and the right to pursue appeals of same. |
| | (k)      all of Sellers' organizational record books, minute books and tax records. |
| | (l)      all unclaimed property of any third party as of the Effective Time, including property which is subject to applicable escheat laws. |
| | (m)      all claims, rights, interests and proceeds (whether received in cash or by credit to amounts otherwise due to a third party) with respect to amounts overpaid by any Seller to any third party with respect to periods prior to the Effective Time (e.g., such overpaid amounts may be determined by billing audits undertaken by any Seller or its consultants), other than payments from, or otherwise in connection with, the QAF Program with respect to the operations of the Business. |
| | (n)      all bank accounts of any Seller, except for the Depository Accounts. |
| | (o)      claims, causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment of Parent and its Affiliates with respect to periods prior to the Effective Time, and any payments, awards or other proceeds resulting therefrom, that are not described in Section 2.1(q) (rights against Third Parties relating to any purchased Asset or Assumed Liability as of the Closing) or 2.1(r) (Avoidance Actions) of the Stalking |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | Horse APA.<br><br>(p)      all writings and other items that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other cognizable privilege or protection, it being understood that Buyer will have the right to assert such privileges with respect to discovery by Third Parties.<br><br>(q)      all documents, records, correspondence, work papers and other documents exclusively relating to the Seller Cost Reports or Agency Settlements; excluding, for example, records relating to the provision of patient care.<br><br>(r)      all tangible personal property located outside the State of California, and all intangible assets (including rights, privileges or interests associated therewith) owned by any Seller which are located outside the State of California.<br><br>(s)      any Owned Real Property not purchased by, or any Leased Real Property not assigned to, Buyer (collectively, the "Retained Real Property").<br><br>(t)      all insurance proceeds arising in connection with property damage to any Retained Real Property.<br><br>(u)      the Pre-Closing Government Receivables.<br><br>(v)      all rights to (i) the HITECH Payments for federal fiscal years ending prior to the Closing Date, and (ii) a prorated portion of the HITECH Payments for the federal fiscal year during which the Closing occurs.<br><br>(w)      the rights of Sellers under the Stalking Horse APA and the Transaction Documents (including, for the avoidance of doubt, the Purchase Price, Cash Consideration, and Seller Note, and any proceeds of the foregoing).<br><br>(x)      all equity securities of Parent, SH1, HLP and their Affiliates.<br><br>(y)      all Government Authorizations that are not transferable to Buyer.<br><br>(z)      except for the Lessor Leases, all real property leases under which SH1 is the lessor or sublessor.<br><br>(aa)      any other assets, properties and rights that are not primarily related to or used or held for use in connection with the Business.<br><br>(bb)      all retainers or prepaid charges and expenses for Sellers' |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | professional advisors.<br><br>(cc)    all adequate assurance deposits authorized by the Bankruptcy Court in the Bankruptcy Cases and funded pursuant to Section 366 of the Bankruptcy Code that are held by or for the benefit of utilities in connection with the Business.<br><br>(dd)    Other Excluded Assets listed on Annex 2.2(dd) to the Stalking Horse APA. |
| **Assumed Liabilities**<br><br>**APA § 2.3** | On the terms and subject to the conditions set forth in the Stalking Horse APA, at the Closing, the applicable Sellers will assign, and Buyer will, on and after the Effective Time, assume from such Seller, the following Liabilities of such Seller (collectively, the "Assumed Liabilities") and no other Liabilities of any Seller:<br><br>(a)    the Purchased Contracts, but only to the extent of the Liabilities that arise thereunder with respect to events or periods on and after the Effective Time and that do not relate to any failure to perform or other breach, default or violation by any Seller prior to the Effective Time.<br><br>(b)    all Liabilities with respect to Buyer's or any Affiliate of Buyer's ownership or operation of the Real Property arising and attributable to the period on and after the Effective Time.<br><br>(c)    the WARN Obligations.<br><br>(d)    those obligations arising in the Ordinary Course to make payments to the QAF4 Program and the QAF5 Program.<br><br>(e)    all real and personal property taxes, if any, that are attributable to the Purchased Assets, subject to certain proration provisions in the Stalking Horse APA.<br><br>(f)    all utilities being furnished to the Purchased Assets, subject to certain proration provisions in the Stalking Horse APA. |
| **Excluded Liabilities**<br><br>**APA § 2.4** | Buyer will not assume and will not be obligated to assume or be obliged to pay, perform or otherwise discharge, and Sellers (and their respective bankruptcy estates) will be solely and exclusively liable with respect to, any Liability of any Seller that is not an Assumed Liability (collectively, the "Excluded Liabilities"), including all Liabilities relating to:<br><br>(a)    all Liabilities of any Seller in connection with the Excluded Assets, including under the Excluded Contracts.<br><br>(b)    all Debt of any Seller.<br><br>(c)    all Claims against any Seller arising prior to the Closing |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | Date. |
| | (d)      amounts required to be paid by Sellers under the Transaction Documents. |
| | (e)      all Liabilities of Sellers relating to legal services, accounting services, financial advisory services, investment banking services or any other professional services or other Third-Party costs or expenses performed in connection with the Transaction Documents, Transactions or Bankruptcy Cases. |
| | (f)      all Liabilities of any Seller arising out of, relating to or with respect to any Seller Plans, employment or performance of services, and (subject to WARN Obligations) termination of employment or services by any Seller of any individual, in each case prior to the Effective Time. |
| | (g)      all Liabilities of any Seller related to or arising in connection with any pending or threatened Proceeding arising out of, relating to or otherwise in respect of the operations of the Business or the Purchased Assets related to periods prior to the Effective Time. |
| | (h)      all Cure Costs. |
| | (i)      all Liabilities of any Seller arising out of or relating to any act, omission, event or occurrence connected with the use, ownership or operation by any Seller of the Business or any of the Purchased Assets prior to the Effective Time, other than as specifically set forth in the Stalking Horse APA. |
| | (j)      all Liabilities of any Seller in connection with claims of professional malpractice to the extent arising out of or relating to acts, omissions, events or occurrences prior to the Effective Time. |
| | (k)      all Liabilities of any Seller relating to the Seller Cost Reports or Agency Settlements with respect to periods ending prior to the Effective Time. |
| | (l)      all Liabilities of any Seller for violations of any Law to the extent arising from acts or omissions prior to the Effective Time, including those pertaining to Medicare and Medicaid fraud or abuse, and Environmental Laws. |
| | (m)      all Liabilities under or in connection with the Seller Plans or any plans ever maintained by or contributed to by any Seller or an ERISA Affiliate or in which the employees or former employees of any Seller or an ERISA Affiliate participate or have ever participated, including (i) all benefits and administrative costs associated with any such plans, and (ii) any Liabilities imposed by Law or Contract, including withdrawal liability |

18

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | arising under or with respect to such plans.<br><br>(n)      all Liabilities of any Seller for real and personal property Taxes, other than for real and personal property taxes attributable to the Purchased Assets, subject to proration, all liabilities of any Seller for any other Taxes, and any Taxes incurred as a result of the consummation of the Transactions.<br><br>(o)      except to the extent specifically included in the WARN Obligations, all Liabilities of any Seller arising, accruing or existing prior to the Effective Time with respect to the Business Employees including any matters arising under Laws governing wages and hours, employment discrimination, occupational safety and health, workers' compensation (to the extent of treatment received by a workers' compensation plaintiff or claimant prior to the Effective Time for injuries sustained prior to the Effective Time), the payment and withholding of employment taxes and any alleged violations of the Law.<br><br>(p)      any and all Liabilities of any Seller relating to any failure to perform or other breach, default or violation of any of the Purchased Contracts by any Seller prior to the Effective Time.<br><br>(q)      any and all Liabilities of any Seller with respect to the Real Property arising and attributable to the period prior to the Effective Time, other than for real and personal property taxes attributable to the Purchased Assets and utilities being furnished to the Purchased Assets, in each case subject to proration.<br><br>(r)      Those Excluded Liabilities of any Seller listed on Annex 2.4(r) to the Stalking Horse APA. |
| **Deferred Assets and Liabilities**<br><br>**APA § 2.8** | On the Closing Date SH1 will not assign, transfer, convey and deliver the following Purchased Assets (the "<u>Deferred Assets</u>"): (i) the third party payor contracts, and any renewals or replacements thereof (the "<u>Deferred Contracts</u>"); (ii) all Government Authorizations; (iii) the drug inventory included in the Inventory; and (iv) the Depository Accounts. SH1 will retain all Deferred Assets until the Transition Date. Effective at the Transition Date, without any further action by SH1 or Buyer, SH1 will be deemed to have assigned, transferred, conveyed and delivered the Deferred Assets to Buyer, free and clear of Liens, as such Deferred Assets exist at such time. The Deferred Assets, upon their assignment, transfer, conveyance and delivery to Buyer in accordance with this Section of the Stalking Horse APA, will be treated as "<u>Purchased Assets</u>" for purposes of the Stalking Horse APA.<br><br>Transition Date means the last to occur of the following dates: (a) the date when Buyer is issued a hospital license from the California Department of |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | Public Health for operation of the Hospitals or (b) the date when Buyer is issued the necessary hospital pharmacy permits from the State of California Board of Pharmacy for the operation of the pharmacies located at the Hospitals.<br><br>On the Closing Date SH1 will not assign, and Buyer will not assume, any Liabilities with respect to the Deferred Contracts. The Interim Management Agreement describes which party bears responsibility for Liabilities of SH1 associated with the Deferred Assets for the period of time on and after the Effective Time until the Transition Date. Effective at the Transition Date, upon assignment of the Deferred Contracts, without any further action by SH1 or Buyer, SH1 will be deemed to have assigned, and Buyer will be deemed to have assumed, the Liabilities of SH1 with respect to the Deferred Contracts, but (i) only to the extent of the Liabilities arising thereunder with respect to events or periods on and after the date of such assumption and assignment and (ii) other than Excluded Liabilities. Those Liabilities of SH1 that are assumed by Buyer, upon such assumption, will be treated as "Assumed Liabilities" for purposes of the Stalking Horse APA. |
| **Assumption of Transferred Contracts and Assignment**<br><br>**APA § 2.6(a)** | At the Closing and pursuant to Section 365 of the Bankruptcy Code and the Sale Order, Sellers will assume and assign to Buyer, and Buyer will assume from Sellers, the Business Contracts. Buyer may designate any Business Contract as a Purchased Contract by listing such Contract on Annex 2.6(a) to the Stalking Horse APA.  Annex 2.6(a) may be supplemented or revised by Buyer as follows: (i) with respect to adding Business Contracts, (x) if the Business Contract has an effective date on or before the Agreement Date and was disclosed to Buyer prior to the Agreement Date, ten Business Days prior to the Bankruptcy Court's hearing on the Sale Motion, (y) if the Business Contract has an effective date after the Agreement Date and is disclosed to Buyer at least twenty Business Days prior to the day of the Closing and otherwise in accordance with the terms of this Agreement, ten Business Days prior to the day of the Closing and (z) for any other Business Contract, two days prior to the day of the Closing; and (ii) with respect to the removal of a Business Contract, two days prior to the day of the Closing. Any Business Contracts that are not set forth on Annex 2.6(a) to the Stalking Horse APA will be deemed to be Excluded Contracts. Sellers will neither assume nor assign any Excluded Contracts to Buyer. With respect to any particular Purchased Contract, the effective date of the assignment to Buyer will be no sooner than the later to occur of (i) the Closing Date or (ii) the date the Bankruptcy Court authorizes and approves the assignment of such Purchased Contract to Buyer. |
| **Payment of Cure Costs**<br><br>**APA § 2.6(b)** | Subject to the Assumption and Assignment Procedures, at or as soon as practicable after the Closing, Sellers will pay all Cure Costs in accordance with the Sale Order. Buyer will have no responsibility for any Cure Costs. |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | |
| **Employment Provisions**<br><br>**APA § 9.1(b)** | Subject to exclusion of individuals on the No-Hire List, Buyer covenants and agrees to make offers of employment (with the same or better job title, responsibilities, salary and seniority) (i) as of the date that the individual reports back to work at the Business on an active basis within ninety (90) days after the Effective Time (or such longer time as is required by Law), to all individuals who are employees of any Seller with respect to the operations of the Business and are on short-term or long-term disability or on leave of absence pursuant to any Seller's policies, the Family and Medical Leave Act of 1993 or other similar local Law as of the Effective Time (each, an "Employee on Leave") and (ii) not later than the Closing Date and effective as of the Effective Time, to all individuals who are not an Employee on Leave and are "at will" employees in good standing of any Seller with respect to the operations of the Business as of the Closing Date (the employees in subsections (i) and (ii) above collectively, the "Business Employees"). |
| **Agreements with Management**<br><br>**APA §4.2(r)** | At Closing, the Parties will execute an Interim Management Agreement in the form of Exhibit 4.2(r) to the Stalking Horse APA. |
| **Good Faith Deposit**<br><br>**APA § 3.2** | A deposit of $5,000,000 (together with all interest and earnings thereon, the "Deposit Amount") was delivered to Title Company on behalf of Buyer in accordance with the Original Deposit Agreement. |
| **Closing Deadlines**<br><br>**APA § 4.1** | The consummation of the Transactions (the "Closing") will take place remotely via the exchange of documents, signature pages, and payments at 10:00 a.m. Eastern Time on the date that is no later than ten Business Days following the satisfaction (or waiver by the Party entitled to waive that condition) of the conditions to Closing (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction (or waiver by the Party entitled to waive that condition) of such conditions), unless another time or date, or both, are agreed to in writing by the Parties. The Stalking Horse APA may be terminated by Sellers or Buyer if the Closing has not occurred on or prior to the 90th day after the Petition Date (the "Outside Date"), which date may be extended under certain circumstances pursuant to the Stalking Horse APA, but in any event not later than March 16, 2019. |
| **Sale Milestones**<br><br>**APA § 10.1(g)** | The following events must occur by the date indicated, unless waived by written consent of Buyer in each instance in its sole discretion:<br><br>(a)      On or before November 16, 2018, each Seller will have commenced its Bankruptcy Cases.<br><br>(b)      On or before the date that is no later than one (1) day after |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | the Petition Date, Sellers will have filed the Sale Motion.<br><br>(c)     On or before the date that is twenty five (25) days after the Petition Date (subject to continuance or postponement in accordance with the Stalking Horse APA), the Bankruptcy Court will have entered the Bidding Procedures Order.<br><br>(d)     On or before the date that is seventy five (75) days after the Petition Date, Sellers will have conducted the Auction.<br><br>(e)     On or before the date that is ninety (90) days after the Petition Date, the Bankruptcy Court will have entered the Sale Order. |
| **Conduct of Business Prior to Closing**<br><br>**APA § 8.6** | During the Interim Period, except as otherwise consented to or approved by an authorized officer of Buyer or as specifically required by the Stalking Horse APA, Sellers agree that each Seller will, with respect to the operations of the Business, do each of the following:<br><br>(a)     carry on its respective businesses in substantially the same manner as presently conducted and not make any material change in personnel, operations, real or personal property, finance or accounting policies (unless a Seller is required to adopt such changes (with respect to finance or accounting policies) under GAAP or Sellers' Affiliates adopt such changes (with respect to finance or accounting policies) on a company-wide basis).<br><br>(b)     use its commercially reasonable efforts to maintain the Business and all parts thereof and all other Purchased Assets in operating condition in a manner consistent with past practices, casualty, condemnation and ordinary wear and tear excepted, and inclusive of substitutions and retirements in the Ordinary Course.<br><br>(c)     perform all of its material obligations under agreements relating to or affecting the Business, its operations or the Purchased Assets.<br><br>(d)     keep in full force and effect present insurance policies or other comparable self-insurance.<br><br>(e)     use its commercially reasonable efforts to (i) maintain and preserve its respective business organizations intact, (ii) retain its respective present employees at the Business and (iii) maintain its respective relationships with physicians, suppliers, customers and others having business relationships with the Business. |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| **Record Retention**<br><br>**APA § 13.2** | From the Closing Date until (i) seven (7) years following discharge of the applicable patient or such longer period as required by Law with respect to medical records and patient records and (ii) seven (7) years after the Closing Date with respect to all medical staff records and other books and records which are among the Assets as of the Effective Time (each applicable period referred to herein as the "<u>Document Retention Period</u>"), Buyer will keep and preserve in the ordinary course of business all such records described above in this sentence (the "<u>Records</u>"), but excluding any records which are among the Excluded Assets. |
| **Bid Protections**<br><br>**APA §§ 4.6(a) and 8.1** | Sellers agree, on a joint and several basis, to pay Buyer the Breakup Fee and the Expense Reimbursement in accordance with Section 4.6(a) of the Stalking Horse APA.<br><br>The Breakup Fee is a cash amount equal to $2,524,500 (which is equal to three percent (3.0%) of the Base Cash Amount).<br><br>The Expense Reimbursement is a cash amount of $2,000,000, which represents a portion of the out-of-pocket costs, fees and expenses of Buyer and its Affiliates incurred before or after the Agreement Date (including reasonable expenses of legal, financial advisory, accounting and other similar costs, fees and expenses and all filing fees under applicable Laws) related to the Transactions (including those incurred in connection with the diligence, negotiation, documentation, bidding and auction process).<br><br>Sellers will, within three (3) Business Days after the closing of an Alternative Transaction, pay to Buyer by wire transfer of immediately available funds both the Breakup Fee and the Expense Reimbursement if the Stalking Horse APA is terminated by Sellers or Buyer:<br><br>1) in the event that Buyer is not the winning bidder at the Auction and Buyer has not been selected by the Sellers as the Backup Bidder at the Auction.<br><br>2) if (x) any Seller enters into a definitive agreement with respect to an Alternative Transaction, (y) the Bankruptcy Court enters an order approving an Alternative Transaction and (z) the Alternative Transaction is consummated.<br><br>Sellers will, within three (3) Business Days after the closing of an Alternative Transaction, pay to Buyer by wire transfer of immediately available funds only the Expense Reimbursement (but not the Breakup Fee) if the Stalking Horse APA is terminated by Buyer, if there will be a breach by Sellers of any representation or warranty, or any covenant, agreement or obligation, in each case made by Sellers, which would result in a failure of a condition precedent to the obligation of Buyer to close and which breach cannot be cured or has not been cured (or waived by Buyer) by the earlier of |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | (i) ten Business Days after the giving of written notice by Buyer to Sellers of such breach or (ii) the Outside Date; provided, however, that Buyer may terminate the Stalking Horse APA pursuant to this provision only if Buyer is not in material breach.<br><br>Sellers will, within three (3) Business Days after the closing of an Alternative Transaction, pay to Buyer by wire transfer of immediately available funds only the Expense Reimbursement (but not the Breakup Fee) if this Agreement is terminated by Sellers or Buyer, by giving written notice to the other Party, if the Bankruptcy Court enters an order that precludes the consummation of the Transactions on the terms and conditions set forth in the Stalking Horse APA and (A) the Bankruptcy Court enters an order approving an Alternative Transaction and (B) the Alternative Transaction is consummated within nine months after the Stalking Horse APA is terminated.<br><br>If no Alternative Transaction closes, neither the Breakup Fee nor the Expense Reimbursement will be due or paid.<br><br>In the event that payment of any amount of the Bid Protections becomes due and payable, and such amounts are actually paid to the Stalking Horse Bidder, such amounts will constitute liquidated damages. |
| **Buyer's Termination Rights**<br><br>**APA § 4.4** | Sellers or Buyer may terminate the Stalking Horse APA if the Closing has not occurred on or prior to the 90th day after the Petition Date (the "Outside Date").<br><br>The Stalking Horse APA may be terminated by mutual written consent of Sellers and Buyer.<br><br>The Stalking Horse APA may be terminated by Buyer:<br><br>if any event or condition has resulted in one or more of the conditions to the obligations of Buyer to close becoming impossible to be fulfilled and such event or condition has not been waived by Buyer by the Outside Date; provided, however, that Buyer may terminate the Stalking Horse APA only if Buyer is not in material breach of the Stalking Horse APA as of the date of such termination.<br><br>if there will be a breach by Sellers of any representation or warranty, or any covenant, agreement or obligation, in each case made by Sellers in the Stalking Horse APA, which would result in a failure of a condition to the obligation of Buyer to close and which breach cannot be cured or has not been cured (or waived by Buyer) by the earlier of (i) ten Business Days after the giving of written notice by Buyer to Sellers of such breach or (ii) the Outside Date; provided, however, that Buyer may terminate the Stalking Horse APA only if Buyer is not in material breach of the Stalking Horse APA as of the date of such termination. |

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | The Stalking Horse APA may be terminated by Sellers or Buyer: |
| | if there will be in effect a final nonappealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions. |
| | in the event that Buyer is not the winning bidder at the Auction and Buyer has not been selected by the Sellers as the Back-Up Bidder at the Auction, by giving written notice at any time to the other Party after the conclusion of the Auction. |
| | by giving written notice to the other Party, if (x) any Seller enters into a definitive agreement with respect to an Alternative Transaction, (y) the Bankruptcy Court enters an order approving an Alternative Transaction and (z) the Alternative Transaction is consummated. |
| | by giving written notice to the other Party, if the Bankruptcy Court enters an order that precludes the consummation of the Transactions on the terms and conditions set forth in this Agreement. |
| **Requested Findings as to Good Faith, Successor Liability; Relief from Rule 6004(h)**<br><br>**APA § 5.23, 7.2(d)** | Neither Buyer nor Sellers will be required to accept a Sale Order that does not, and it will be deemed reasonable for Buyer or Sellers to find a Sale Order unsatisfactory if it does not, among other things, contain findings of fact and conclusions of law that the Transactions are undertaken by Buyer and Sellers at arm's length, without collusion and that Buyer has acted in "good faith" within the meaning and entitled to the protections of Section 363(m) of the Bankruptcy Code and hold that Buyer is a not a successor to Sellers or their estates by reason of any theory of law or equity with respect to any Claims or Liens against Sellers or the Purchased Assets and to the maximum extent permitted by applicable law permanently enjoining each and every holder of any claim for such liabilities from commencing, continuing or otherwise pursuing or enforcing any remedy, claim, cause of action or Lien against Buyer or the Purchased Assets related thereto.<br><br>Except as disclosed on Schedule 5.23 to the Stalking Horse APA, which lists matters affecting title or sufficiency of the Purchased Assets, at the Closing and subject to the Sale Order, Buyer will be vested with good and valid title to such Purchased Assets, free and clear of all Liens and Excluded Liabilities (including, for the avoidance of doubt, any claims for successor liability or similar theories under applicable state or federal law or otherwise, including any successorship obligations under any collective bargaining agreement or with respect to any Seller Plan), to the fullest extent permissible under Section 363(f) of the Bankruptcy Code and other applicable Law.<br><br>The Debtors seek a waiver of the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). |

E.     **The Bidding Procedures**

23.     The Bidding Procedures, which are attached hereto as **Exhibit B**, are designed to maximize value for the Silver Lake Debtors' estates, while effectuating an expeditious sale of the Silver Lake Debtors' assets.  Among other things, the Bidding Procedures set forth procedures for interested parties to access due diligence, the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of any auction, the selection and approval of any ultimately successful bidders, and the deadlines with respect to the foregoing.

24.     Certain of the salient terms of the proposed Bidding Procedures are highlighted below:[8]

- **Key Proposed Dates (subject to the Court's availability)**:

| Milestone | Proposed Date[9] |
|---|---|
| Deadline to Object to Approval of the Stalking Horse Bidder, Bidding Protections and the Bidding Procedures | 4:00 p.m. (prevailing Eastern Time) on November 19, 2018 |
| Entry of the Bidding Procedures Order | On or before November 30, 2018 |
| Assumption and Assignment Service Date (as defined in the Bidding Procedures Order) | Within three (3) Business Days after entry of the Bidding Procedures Order |
| Contract Objection Deadline (as defined in the Bidding Procedures Order) | Fourteen (14) days following the Assumption and Assignment Service Date |
| Bid Deadline | 4:00 p.m. (prevailing Eastern Time) on December 21, 2018 |
| Auction (if necessary) | 10:00 a.m. (prevailing Eastern Time) on January 4, 2019 |

---

[8] The summary of the terms contained in this Motion is qualified in its entirety by reference to the provisions of the Bidding Procedures.  In the event of any inconsistencies between the provisions of the Bidding Procedures and the summary set forth herein, the terms of the Bidding Procedures shall govern.  Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings ascribed to them in the Bidding Procedures.

[9] The proposed dates are consistent with the Sale deadlines set forth in the Stalking Horse APA.

| Deadline to Object to Sale and Adequate Assurance Deadline | 12:00 p.m. (prevailing Eastern Time) on January 14, 2019 |
| Sale Hearing | January 21, 2019 at 10:00 a.m. (prevailing Eastern Time) |
| Sale Closing | On or before February 1, 2019 [10] |
| Supplemental Contract Objection Deadline (as defined in the Bidding Procedures Order) | Fourteen (14) days following the date of service of Supplemental Notice of Assumption and Assignment (as defined in the Bidding Procedures Order) |

- **Bid Deadline**: The following parties must receive a Bid in writing, on or before December 21, 2018 at 4:00 p.m. (prevailing Eastern Time) or such other date as may be agreed to by the Debtors: (i) the Debtors, their counsel, and MTS, (ii) counsel to any administrative agent under the Debtors' debtor-in-possession financing facility (the "DIP Agent"), (iii) counsel to the Silver Lake Debtors' secured lender (the "Secured Lender"), and (iv) counsel to any committee of unsecured creditors appointed in the Silver Lake Debtors' Chapter 11 Cases (the "Committee").

- **Auction Qualification Process**: As set forth in further detail in the Bidding Procedures, a Qualified Bidder must, among other requirements, (a) deliver financial statements demonstrating the financial capability of the bidder to consummate the sale; (b) propose a purchase price for all or substantially all of the Purchased Assets, including any assumption of liabilities, that has a value that equals or exceeds the sum of (i) the Purchase Price, (ii) the Bid Protections, and (iii) $100,000, as determined one week prior to the Bid Deadline by the Debtors in consultation with the Secured Lender, the DIP Agent, and the Committee; (c) provide a good faith deposit in the amount of six percent (6%) of the Purchase Price; (d) provide an executed non-contingent sale agreement on the same or better terms as those contained in the Stalking Horse APA filed with the Court, marked to show changes from the Stalking Horse APA; (e) specify any regulatory or third-party approvals required to consummate the Sale Transaction and the time period that obtaining such approvals is expected to require; (f) fully disclose the identity of each entity that will be bidding for the Purchased Assets or otherwise sponsoring, financing (including through the issuance of debt in connection with such bid), participating in, or benefitting from (including through license or similar arrangement with respect to the assets to be acquired in connection with such bid) such bid, and the complete terms of any such sponsorship, participation, financing, or benefit; (g) identify with particularity the executory contracts and unexpired leases to be assumed and assigned; and (h) state that it constitutes a good faith, bona fide offer and that the Qualified Bidder intends to consummate the proposed transaction if selected as the Successful Bidder or the Backup Bidder.  Bids must remain open offers

---

[10] The Closing Date pursuant to the Stalking Horse APA shall occur on a date that is no later ten (10) Business Days following the satisfaction (or waiver by the Party entitled to waive that condition) of the conditions set forth in the Stalking Horse APA, unless another time or date, or both, are agreed to in writing by the Parties.

capable of being accepted until entry of the Sale Order or, in the case of a Backup Bid, until the Backup Bidder closes the Sale Transaction.

- **Auction and Sale Procedures**: If the Debtors receive more than one Qualified Bid by the Bid Deadline, the Debtors shall conduct an Auction on January 4, 2019 at 10:00 a.m. (prevailing Eastern Time) at the offices of DLA Piper LLP (US), 1201 North Market Street, Suite 2100, Wilmington, Delaware 19801, or such other place and time as the Debtors shall notify in writing all Qualified Bidders that have submitted Qualified Bids. If the Debtors do not receive any Qualified Bid (other than the Stalking Horse Bid) on or prior to the Bid Deadline, the Debtors shall promptly cancel the Auction and seek approval of the Sale Transaction of the Purchased Assets to the Stalking Horse Bidder pursuant to the Stalking Horse APA at the Sale Hearing.

**F.    The Notice Procedures**

25.    Within three (3) business days after entry of an order approving the Bidding Procedures, or as soon practicable thereafter (the "Mailing Date"), in accordance with Bankruptcy Rule 2002(a) and (c), the Debtors (or their agents) shall serve the auction and sale notice (the "Auction and Sale Notice"), substantially in the form attached hereto as **Exhibit H**, by first-class mail or, for those parties who have consented to receive notice by the Electronic Case Files ("ECF") system, by ECF, upon: (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Silver Lake Debtors' assets during the past nine (9) months; (b) all entities known to have asserted any Interest in or upon any of the Silver Lake Debtors' assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) known counterparties to any unexpired leases or executory contracts that could potentially be assumed and assigned to the Stalking Horse Bidder or Successful Bidder; (e) the Office of the United States Trustee for the District of Delaware; (f) counsel to the Committee; (g) counsel to the DIP Agent; (h) the Office of the United States Attorney General for the District of Delaware; (i) the Internal Revenue Service; (j) the U.S. Department of Justice; (k) the offices of the attorneys general for the states in which the Silver Lake Debtors operate; (l) counsel to the Stalking Horse

28

Bidder; (m) all of the Silver Lake Debtors' insurers; (n) counsel to the Secured Lender; (o) all

parties entitled to notice pursuant to Local Rule 2002-1(B); (p) to the extent not already included

above, all parties in interest listed on the Debtor's creditor matrix; and (q) other persons

reasonably requested by the Stalking Horse Bidder (collectively, the "Notice Parties").

26.     The Auction and Sale Notice shall indicate that copies of the Motion, the Stalking

Horse APA, the Bidding Procedures Order, and all other documents filed with the Court can be

obtained on the website of the Debtors' claims and noticing agent, Prime Clerk,

https://cases.primeclerk.com/promisehealthcare/.  The Auction and Sale Notice will also indicate

the proposed deadline for objecting to the Sale Transaction to the Successful Bidder and the

anticipated date and time of the Sale Hearing, subject to the Court's availability.  In addition, the

Auction and Sale Notice shall provide notice that the Silver Lake Debtors will seek to assume

and assign certain executory contracts to be identified in accordance with the Assumption and

Assignment Procedures (as described further below) at the Sale Hearing.  The Debtors request

that such notice be deemed to be sufficient and proper notice of the Sale Transaction with respect

to known interested parties.

27.     As soon as reasonably practicable after the conclusion of the Auction, if any, the

Debtors shall file on the docket, but not serve, a notice identifying the Successful Bidder(s) and

Backup Bidder, substantially in the form attached hereto as **Exhibit I** (the "Post-Auction

Notice").

### G.     The Assumption and Assignment Procedures

28.     At the closing of the Sale Transaction, the Silver Lake Debtors anticipate that they

will assume certain executory contracts and unexpired leases designated by the Stalking Horse

Bidder (or other Successful Bidder(s)) ("Purchased Contracts") pursuant to section 365(b) of the

Bankruptcy Code and assign such Purchased Contracts to the Stalking Horse Bidder (or other

Successful Bidder(s)).  The Debtors accordingly are seeking approval of proposed procedures to

govern the assumption and assignment of all Purchased Contracts (the "Assumption and

Assignment Procedures").  Because the Assumption and Assignment Procedures are set forth in

detail in the attached Bidding Procedures Order, they are not restated herein.  Generally

speaking, however, the Assumption and Assignment Procedures: (a) outline the process by

which the Debtors will serve notice, in substantially the form attached hereto as **Exhibit J** (the

"Assumption and Assignment Notice"), to all counterparties to the Purchased Contracts

regarding the proposed assumption and assignment and related cure amounts, if any; and (b)

establish objection and other relevant deadlines and the manner for resolving disputes relating to

assumption and assignment of Purchased Contracts.

## BASIS FOR RELIEF

### A.    Approval of the Proposed Sale Transaction is Appropriate Under Section 363 of the Bankruptcy Code

29.    The Sale Transaction should be approved as a sound exercise of the Debtors'

business judgment.  Section 363 of the Bankruptcy Code provides that "[t]he trustee, after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of

the estate. . . ."  11 U.S.C. § 363(b)(1).  A debtor must demonstrate a sound business justification

for a sale or use of assets outside the ordinary course of business.  *See, e.g., Myers v. Martin (In

re Martin),* 91 F.3d 389, 395 (3d Cir. 1996); *Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward

Holding Corp. (In re Montgomery Ward Holding Corp.),* 242 B.R. 147, 153 (D. Del. 1999); *In re

Del. & Hudson Ry. Co.,* 124 B.R. 169, 175-76 (D. Del. 1991). Once a court determines that a

valid business justification exists for a sale outside of the ordinary course of business, the court

must determine whether (a) adequate and reasonable notice of the sale was given to interested

parties, (b) the sale will produce a fair and reasonable price for the property, and (c) the parties

have acted in good faith. *See In re Elpida Memory, Inc.,* No. 12-10947 (CSS), 2012 WL

6090194, at \*5 (Bankr. D. Del. Nov. 20, 2012); *In re Exaeris, Inc.,* 380 B.R. 741, 744 (Bankr. D.

Del. 2008).  As described below, the proposed Sale Transaction meets each of these

requirements.

**1.      The Sale Transaction Represents a Sound Exercise
of the Debtors' Business Judgment**

30.      Here, a strong business justification exists for the Sale Transaction.  As described

above and in the Sale Declaration, a sale of the Purchased Assets represents the best opportunity

for the Silver Lake Debtors to preserve their going concern value for the benefit of their

stakeholders.  The Stalking Horse Bidder is an arms'-length third party purchaser.  The Silver

Lake Debtors lack liquidity to operate their business; thus, an expeditious sale is necessary.  The

Sale Transaction is a reasonable exercise of the Debtors' business judgment and is in the best

interests of all of the Silver Lake Debtors' stakeholders.

**2.      The Bidding Procedures are Fair and Designed to
Maximize the Value Received For the Silver Lake Debtors'
Assets**

31.      The Debtors believe that the Bidding Procedures satisfy each of the remaining

requirements for approval of a sale under section 363 of the Bankruptcy Code by (a) providing

sufficient notice of each element of the proposed sale process, (b) facilitating a value-

maximizing sale, and (c) ensuring an unbiased and good faith sale process.  The detailed Bidding

Procedures outlined above and set forth in **<u>Exhibit B</u>** provide notice designed to fully inform all

parties with a stake in the sale process regarding the portions of the sale process most relevant to

their interests.  For example, the Bidding Procedures ensure that any entities asserting an Interest

in the Silver Lake Debtors' assets and parties to the Purchased Contracts will receive notice of

31

the proposed Sale Transaction, the procedures for objecting to the Sale Transaction, and the

proposed assumption and assignment of their respective contracts or leases.  Similarly, the

Bidding Procedures outline all material aspects of the potential purchaser notification, bid

qualification, due diligence, bid submission, bid selection, and auction process, including the

timing for each.  Thus, the Bidding Procedures provide assurance to each entity potentially

interested in purchasing the Silver Lake Debtors' assets that their respective rights will be

protected and the Sale Transaction process will be fair and reasonable.

32.    Further, the Bidding Procedures provide the Debtors with the opportunity to

consider all competing offers and to select, in their reasonable business judgment, the highest

and best offer for the Purchased Assets.  Moreover, the Bidding Procedures provide the Debtors

with the flexibility to modify the Bidding Procedures, if necessary, to maximize value for the

Silver Lake Debtors' estates.  Accordingly, the Debtors believe the Court should approve the

Bidding Procedures.

**3.    The Break-Up Fee and Expense Reimbursement are
Necessary to Preserve the Value of the Silver Lake Debtors' Estates**

33.    The Debtors believe that granting the Bid Protections to the Stalking Horse

Bidder will ensure the Debtors' ability to maximize the realizable value of the Silver Lake

Debtors' assets for the benefit of the Silver Lake Debtors' estates, their creditors, and other

parties in interest.  The Bidding Procedures and the Bid Protections were a material inducement

to, and express condition of, the willingness of the Stalking Horse Bidder to submit its bid

through execution of the Stalking Horse APA that will serve as a minimum or floor bid on which

the Debtors, their creditors, suppliers, vendors, and other bidders may rely.  The floor established

by the Stalking Horse Bidder is substantially higher than other offers that the Silver Lake

Debtors' have received to date; thus, the Silver Lake Debtors' estates have already received

value on account of the Stalking Horse Bidder's Bid. The Stalking Horse Bidder conditioned its willingness to serve as a stalking horse bidder on the inclusion of these provisions in the Stalking Horse APA. If approved by the Court, the Silver Lake Debtors would be required to pay from the consideration received from the consummation of an Alternative Transaction the Stalking Horse Bidder a Break-Up Fee totaling $2,524,500 (which is equal to three percent (3.0%) of the Base Cash Amount of the Purchase Price) and $2,000,000 in Expense Reimbursement[11] in the event that the Break-Up Fee and the Expense Reimbursement are payable under the terms of the Stalking Horse APA. The Expense Reimbursement itself is also payable under certain conditions enumerated in the Stalking Horse APA. In the event that payment of any amount of the Bid Protections becomes due and payable, and such amounts are actually paid to the Stalking Horse Bidder, such amounts will constitute liquidated damages.

34.     The United States Court of Appeals for the Third Circuit has held that break-up fees and expense reimbursements must meet the standards applicable to the allowance of administrative expenses under section 503(b) of the Bankruptcy Code. *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) (citing *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),* 181 F.3d 527 (3d Cir. 1999)). The Third Circuit has identified at least two instances in which bidding incentives may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if the assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *O'Brien,* 181 F.3d at 537. Second, "if the availability of break-up fees and expense

---

[11] The Expense Reimbursement represents a portion of the out-of-pocket costs, fees and expenses already incurred by the Stalking Horse Bidder and its affiliates related to the Sale Transaction (including those incurred in connection with the diligence, negotiation, documentation, bidding and auction process).

[reimbursements] were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

35.     The Bid Protections should be approved and afforded superpriority administrative expense status under sections 503(b) and 507 of the Bankruptcy Code because they provide a clear benefit to the Silver Lake Debtors' estates.  By conducting due diligence, participating in negotiations for a potential transaction and entering into the Stalking Horse APA, the Stalking Horse Bidder has established a bid standard, including a price floor, and initiated a sales process that will serve as a catalyst for other bidders to submit higher and better bids.  The Debtors submit that the amount of the Break-Up Fee and the Expense Reimbursement is reasonable and appropriate in light of the size and nature of the transaction and the efforts that have been and will be expended by the Stalking Horse Bidder, including conducting the legal and financial diligence necessary to negotiate and enter into the Stalking Horse APA and negotiating for financing to enable it to close the Sale Transaction, and will serve as the baseline for other bids for the Purchased Assets.

36.     Moreover, the Debtors believe that the execution of the Stalking Horse APA by the Stalking Horse Bidder provides an incentive for others who expressed interest initially, but did not take efforts to negotiate definitive documents or submit competitive bids, to consider expending the time and effort to do so now.  To the extent that the Stalking Horse APA entices other potentially interested purchasers to participate in the bidding and auction process, the Break-Up Fee will provide a material benefit to the Silver Lake Debtors' estates in the form of an increased sale price.  On the other hand, in the event that others are not encouraged by the

Stalking Horse Bid to undertake additional efforts and participate in the Auction, the Break-Up

Fee will not be paid and, thus, should not affect the value received by the Silver Lake Debtors for

the Purchased Assets.  Accordingly, the Debtors submit that it is appropriate to enter into the

Stalking Horse APA containing the Bid Protections pursuant to the Bidding Procedures.

37.     Here, the Stalking Horse Bidder has conditioned its willingness to enter into the

Stalking Horse APA on the Court's approval of, among other things, the Break-Up Fee and

Expense Reimbursement.  The proposed Break-Up Fee and Expense Reimbursement were the

result of arm's-length negotiations between representatives of the Silver Lake Debtors and the

Stalking Horse Bidder, which is not an insider of the Debtors.  The Debtors submit that the

Break-Up Fee and Expense Reimbursement are justified to induce the Stalking Horse Bidder to

enter into the Stalking Horse APA and to adequately compensate them for the risks they are

taking.  The proposed transaction with the Stalking Horse Bidder ensures that the Debtors will

have at least one substantial offer for the Purchased Assets.

38.     As set forth in the Sale Declaration, the aggregate consideration for the Purchased

Assets consists of the Purchase Price plus the assumption of assumed liabilities.  Based on the

Purchase Price, the proposed Breakup Fee is an amount totaling $2,524,500 (which is equal to

three percent (3.0%) of the Base Cash Amount of the Purchase Price).  The proposed Expense

Reimbursement is $2,000,000, or approximately 2.4% of the Base Cash Amount being offered

by the Stalking Horse Bidder.  The Bid Protections accordingly fall well within the range of bid

protections typically approved by bankruptcy courts in the Third Circuit.  *See, e.g., In re Am.*

*Apparel, LLC,* No. 16-12551 (BLS) (Bankr. D. Del. Dec. 5, 2016), ECF No. 216 (approving

break-up fee of 3.0% in connection with a $66 million sale of assets); *In re BPS US Holdings*

*Inc., et al.,* No. 16-12373 (KJC) (Bankr. D. Del. Nov. 30, 2016), ECF No. 233 (approving break-

up fee of 3.5% in connection with a $575 million sale of assets); *In re SynCardia Sys., Inc.,* No.

16-11599 (MFW) (Bankr. D. Del. Aug. 5, 2016), ECF No. 175 (approving break-up fee of 3.0%

in connection with a $19 million sale of assets); *In re Synagro Techs., Inc.,* No. 13-11041 (BLS)

(Bankr. D. Del. May 13, 2013), ECF No. 137 (approving break-up fee of 3.0% in connection

with a $455 million sale of assets); *In re Vertis Holdings, Inc.,* No. 12-12821 (CSS) (Bankr. D.

Del. Nov. 2, 2012), ECF No. 206 (approving break-up fee of 3.0% in connection with a $258

million sale of assets).  Therefore, the Debtors respectfully request that the Bid Protections be

approved.

**B.      The Proposed Sale Satisfies the Requirements of Section 363(f)
         of the Bankruptcy Code for a Sale Free and Clear of Interests**

      39.      The Sale Transaction also meets the requirements to be a sale free and clear of

Interests.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear

of liens, claims, interests, and encumbrances if:

> (1)  applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)  such entity consents;
>
> (3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)  such interest is in bona fide dispute; or
>
> (5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

      40.      A sale that meets the requirements for a sale free and clear of Interests pursuant to

section 363(f) of the Bankruptcy Code also bars claimants from asserting successor liability

against the successful purchaser.  *See, e.g., In re Trans World Airlines, Inc.,* 322 F.3d 283, 288-

90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for

employment discrimination and rights under travel voucher program); *In re NE Opco, Inc.,* 513

B.R. 871, 876 (Bankr. D. Del. 2014); *In re Ormet Corp.,* No. 13-10334 (MFW), 2014 WL

3542133, at *3 (Bankr. D. Del. July 17, 2014); *Amphenol Corp. v. Shandler (In re Insilco Techs.,*

*Inc.),* 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take

ownership of property without concern that a creditor will file suit based on a successor liability

theory).

41.    The Debtors submit that the Sale Transaction will satisfy the requirements of

section 363(f) of the Bankruptcy Code.  The Debtors will provide all parties asserting claims

against the Purchased Assets, including, but not limited to, all creditors and interest holders of

the Silver Lake Debtors, with notice of, and an opportunity to object to, the Sale Transaction.

Absent objection, each such party will be deemed to have consented to the Sale Transaction.

*See, e.g., FutureSource LLC v. Reuters, Ltd.,* 312 F.3d 281 (7th Cir. 2002) (failure to object may

constitute consent, if there was adequate notice); *In re Christ Hosp.,* No. CIV.A. 14-472 ES,

2014 WL 4613316, at *14 (D.N.J. Sept. 12, 2014) ("Silence by affected claim holders may

constitute consent for purposes of section 363(f)(2)").  In addition, the Debtors believe that

certain of the parties asserting claims against the Purchased Assets could be compelled to accept

a monetary satisfaction of such interests.  Accordingly, approval of the sale of the Purchased

Assets free and clear of all Interests is warranted.

**C.** **A Successful Bidder[12] Should Be Afforded the**
**Protections of Sections 363(m) and 363(n) of the Bankruptcy Code**

42.     Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *See In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143, 147 (3d Cir. 1986); *Mark Bell Furniture Warehouse, Inc. v. D.M. Reid Assocs., Ltd. (In re Mark Bell Furniture Warehouse, Inc.),* 992 F.2d 7, 8 (1st Cir. 1993).

43.     As required by section 363(m) of the Bankruptcy Code, the Bidding Procedures have been proposed in good faith and provide for both the Silver Lake Debtors and the potential purchaser to act in good faith in negotiating the terms of the Sale Transaction and the assignment of the Purchased Contracts related thereto.  Moreover, in the Sale Declaration, the Debtors have presented evidence that the terms of the Sale Transaction were negotiated at arm's length, with both parties represented by their own counsel.  Accordingly, the Debtors request that the Sale Order include a provision concluding that the Successful Bidder is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code.  The Debtors believe that providing the Successful Bidder with such protection will ensure that the maximum price will be received by the Silver Lake Debtors and the closing of the same will occur promptly.

44.     Moreover, neither the Debtors nor the Stalking Horse Bidder have engaged in any conduct that would cause or permit the Stalking Horse APA to be avoided under section 363(n) of the Bankruptcy Code.  If, following the Auction, the Stalking Horse is not the Successful Bidder, the Debtors will have negotiated an alternative asset purchase agreement with the

---

[12] The Debtors' references throughout this Motion to a "Successful Bidder" include the Stalking Horse Bidder, who is deemed to have submitted a Qualified Bid, or any other entity that is the Successful Bidder following the Auction, if any.

Successful Bidder in good faith and at arms'-length.  The Bidding Procedures are designed to

prevent the Debtors or the Successful Bidder from engaging in any conduct that would cause or

permit the Stalking Horse APA or the Sale Transaction to be avoided under section 363(n) of the

Bankruptcy Code.

45.    Accordingly, the Debtors request that the Court make a finding at the Sale

Hearing that the Stalking Horse Bidder or other Successful Bidder (or Successful Bidder(s))

(a) is purchasing the Purchased Assets in good faith, (b) is entitled to the full protections of

section 363(m) of the Bankruptcy Code, and (c) has not entered into an agreement with other

potential bidders or otherwise engaged in conduct that violates section 363(n) of the Bankruptcy

Code.

**D.    Success 1 Should Be Authorized, Pursuant to Sections 105(a) and 364 of the Bankruptcy Code, to Execute and Deliver the Security Agreements and Subordination Agreements**

46.    Good cause exists for authorizing Success 1 to enter into the Security Agreements

and Subordination Agreements as an accommodation party, as these agreements are necessary

for the Stalking Horse Bidder to finance its purchase of the Purchased Assets under the Stalking

Horse APA and to preserve and maintain the value of the Silver Lake Debtors' assets and

maximize the return for all creditors.  The Stalking Horse Bidder is unable to obtain credit to

finance its acquisition of the Purchased Assets otherwise.

47.    In addition, the interests of any holders of Interests on the Collateral are

adequately protected because the Collateral is in large part a subset of the Purchased Assets, and

such Interests will attach to the proceeds of the Sale.  To the extent the Collateral constitutes

Deferred Assets, such Deferred Assets will be assigned, transferred, conveyed and delivered to

the Successful Bidder on the Transition Date pursuant to the Stalking Horse APA.  In each case,

the Stalking Horse Bidder has consented to the Seller Liens.

48.    For these reasons, Success 1 should be permitted to grant the Agent senior priority

priming liens and security interests in the Collateral, pursuant to sections 105(a) and 364(d)(1) of

the Bankruptcy Code.

**E.    Assumption and Assignment of the Purchased Contracts Should be Authorized**

49.    Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor in

possession "subject to the court's approval, may assume or reject any executory contract or

unexpired lease of the debtor."  11 U.S.C. § 365(a).  Further, section 365(f) of the Bankruptcy

Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes

such contract . . . and adequate assurance of future performance . . . is provided . . . ."  11 U.S.C.

§ 365(f)(2).  Assumption and assignment of the Purchased Contracts in connection with the Sale

Transaction is appropriate.

**1.    Assumption of the Purchased Contracts is a Reasonable Exercise of the Debtors' Business Judgment**

50.    Assumption or rejection of a contract is a matter of the debtor's business

judgment.  *See Nat'l Labor Relations Bd. v. Bildisco and Bildisco (In re Bildisco),* 682 F.2d 72,

79 (3d Cir. 1982), *aff'd sub nom., N.L.R.B. v. Bildisco & Bildisco,* 465 U.S. 513 (1984) ("The

usual test for rejection of an executory contract is simply whether rejection would benefit the

estate, the `business judgment' test."); *In re Physiotherapy Holdings, Inc.,* 506 B.R. 619, 622

(Bankr. D. Del. 2014) (citing *In re Federal Mogul Global, Inc.,* 293 B.R. 124, 126 (D. Del.

2003)).  A debtor's decision in this regard is "entitled to great deference from the Court."  *See In

re Armstrong World Indus.,* 348 B.R. 136, 162 (Bankr. D. Del. 2006).  In order to satisfy the

business judgment test, a debtor must only show that assumption or rejection of an executory

contract will benefit the estate.  *See Bildisco,* 682 F.2d at 79; *see also In re HQ Global Holdings, Inc.,* 290 B.R. 507, 511 (Bankr. D. Del. 2003) ("Under the business judgment standard, the sole issue is whether the rejection benefits the estate.").

51.    To facilitate the Sale Transaction and to maximize the value received for the Silver Lake Debtors' assets, the Debtors request approval under section 365 of the Bankruptcy Code of the Silver Lake Debtors' assumption and assignment of the Purchased Contracts to the Successful Bidder.  Certain of the Silver Lake Debtors' executory contracts and unexpired leases will be necessary for the Successful Bidder's continued operation of the Silver Lake Debtors' assets.

52.    The Debtors further request that the Sale Order provide that the Purchased Contracts will be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder, notwithstanding any provisions in the Purchased Contracts, including those described in sections 365(b)(2), 365(f)(1), and 365(f)(3) of the Bankruptcy Code that prohibit such assignment.

53.    The Debtors also request that the Sale Order provide that to the extent any provision in any Purchased Contract assumed and assigned (a) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, such assumption or assignment (including, without limitation, any "change of control" provision), or (b) is modified, breached, or terminated, or deemed modified, breached, or terminated by any of the following: (i) the commencement of the Chapter 11 Cases, (ii) the insolvency or financial condition of the Debtors at any time before the closing of the Chapter 11 Cases, (iii) the Silver Lake Debtors' assumption and assignment of such Purchased Contract, or (iv) the consummation of the Sale Transaction, then such provisions shall be deemed modified so as to not entitle the non-Debtor party thereto to prohibit, restrict or

condition such assumption or assignment, to modify, terminate or declare a breach or default

under such Purchased Contract, or to exercise any other default-related rights or remedies with

respect thereto, including, without limitation, any such provision that purports to allow the non-

Debtor party thereto to recapture such Purchased Contracts, impose any penalty thereunder,

condition any renewal or extension thereof, impose any rent acceleration or assignment fee, or

increase or otherwise impose any other fees or other charges in connection therewith.  The

Debtors request that all such provisions be deemed to constitute unenforceable anti-assignment

provisions and are void and of no force and effect pursuant to sections 365(b), 365(e), and 365(f)

of the Bankruptcy Code.

**2.      Any Defaults Under the Purchased Contracts Will be
Cured and Evidence of Adequate Assurance of Future
Performance by the Successful Bidder Will be Provided**

54.      Once an executory contract or unexpired lease is assumed, the trustee or debtor in

possession may generally elect to assign such contract, so long as it cures any defaults and

provides adequate assurance of future performance.  *See* 11 U.S.C. § 365(f)(2)(B) (a debtor may

assign an executory contract or unexpired lease of nonresidential property if "adequate assurance

of future performance by the assignee of such contract or lease is provided . . . .").  The

requirements to show "adequate assurance of future performance" will depend on the facts and

circumstances of each case, but should be given a "practical, pragmatic construction."  *In re*

*DBSI, Inc.,* 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also Cinicola v.  Scharffenberger,* 248

F.3d 110, 120 n.10 (3d Cir. 2001); *In re Decora Indus.,* No. 00-4459 (JJF), 2002 WL 32332749,

at *8 (D. Del. May 20, 2002) ("[A]dequate assurance falls short of an absolute guaranty of

payment.").  Adequate assurance may be provided by demonstrating the assignee's financial

health and experience in managing the type of enterprise or property assigned.  *See, e.g., In re*

*Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

55.     The Debtors contemplate that the Successful Bidder will be able to provide adequate assurance of future performance in connection with any Purchased Contracts because such Successful Bidder must submit evidence sufficient to demonstrate its financial wherewithal and ability to consummate the Sale Transaction.  The Debtors will present facts at the Sale Hearing to show the financial credibility, willingness, and ability of the Successful Bidder to perform under the Purchased Contracts.  The Sale Hearing thus will afford the Court and other interested parties the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance under the Purchased Contracts, as required under section 365(f)(2)(B) of the Bankruptcy Code.

56.     Moreover, as set forth above, the Debtors have proposed to file a Purchased Contract List containing a list of the Purchased Contracts and the Cure Amounts that the Debtors believes are due under each such Purchased Contract.  The Debtors will serve a Cure Notice on all counterparties to Purchased Contracts and provide them with an opportunity to be heard.  In the absence of an objection by a non-Debtor party to a Purchased Contract, the counterparty to the Purchased Contract will receive the specified Cure Amount, if any, at the closing of the Sale Transaction with funds paid by the Successful Bidder, which will be required under the terms of any asset purchase agreement entered into between the Silver Lake Debtors and the Successful Bidder.  The Stalking Horse APA provides that the Silver Lake Debtors will pay all Cure Amounts in connection with the Purchased Contracts.

43

57.     Accordingly, the Debtors submit that implementation of the Assumption and Assignment Procedures regarding assumption and assignment of the Purchased Contracts is appropriate in these cases.  The Court, therefore, will have a sufficient basis to authorize the Silver Lake Debtors to assume and assign the Purchased Contracts under the Stalking Horse APA or any alternative asset purchase agreement with the Successful Bidder.

**WAIVER OF BANKRUPTCY RULE 6004(H) AND 6006(D); AUTOMATIC STAY**

58.     To implement the foregoing immediately, the Debtors seek a waiver of the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) and the assumption and assignment of the Purchased Contracts under Bankruptcy Rule 6006(d). Here, a waiver of the stay is appropriate because the Sale Transaction was extensively marketed and notice of the Sale Transaction was and will be adequately provided to all parties-in-interest. Likewise, the non-Debtor parties to the Purchased Contracts will be provided with adequate notice of, and opportunity to object to, the assumption and assignment of the Purchased Contracts.

**NOTICE**

59.     Notice of this Motion shall be provided to (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Silver Lake Debtors' assets during the past nine (9) months; (b) all entities known to have asserted any Interest in or upon any of the Silver Lake Debtors' assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) known counterparties to any unexpired leases or executory contracts that could potentially be assumed and assigned to the Stalking Horse Bidder or Successful Bidder; (e) the Office of the United States Trustee for the District of Delaware; (f) counsel to the Committee; (g) counsel to

the DIP Agent; (h) the Office of the United States Attorney General for the District of Delaware; (i) the Internal Revenue Service; (j) the U.S. Department of Justice; (k) the offices of the attorneys general for the states in which the Silver Lake Debtors operate; (l) counsel to the Stalking Horse Bidder; (m) all of the Silver Lake Debtors' insurers; (n) all parties entitled to notice pursuant to Local Rule 2002-1(B); (o) counsel to the Secured Lender; (p) to the extent not already included above, all parties in interest listed on the Silver Lake Debtors' creditor matrix; and (q) other persons reasonably requested by the Stalking Horse Bidder.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

60.    No prior motion for the relief requested herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed Bidding Procedures Order and the Sale Order; and (iii) grant such other and further relief as it deems just and proper.

Dated: November 6, 2018
      Wilmington, Delaware

/s/ Stuart Brown
DLA Piper LLP (US)
Stuart Brown (DE Bar Number 4050)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone:  302.468.5700
Facsimile: 302.778.7913
Email: stuart.brown@dlapiper.com

*Proposed Counsel to the Debtors and Debtors in Possession, Promise Healthcare Group, LLC, et al.*

-and-

McDermott Will & Emery LLP
William P. Smith (*pro hac vice* pending)
James W. Kapp (*pro hac vice* pending)
Megan Preusker (*pro hac vice* pending)
444 West Lake Street
Chicago, Illinois 60606
Telephone: 312.372.2000
Facsimile: 312.984.7700
Email: wsmith@mwe.com
jkapp@mwe.com
mpreusker@mwe.com

*Proposed Special Counsel for the Silver Lake Debtors in Connection with the Sale of the Silver Lake Medical Center*