# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
:
In re:                                                            :   Chapter 11
                                                                  :
PROMISE HEALTHCARE GROUP, LLC, *et al.*,[1]   :   Case No. 18-12491 (CSS)
                                                                  :
              Debtors.                                            :   (Jointly Administered)
---------------------------------------------------------------x   **Re: D.I. 17, 18**

## SUPPLEMENTAL DECLARATION OF ANDREW HINKELMAN
## IN SUPPORT OF THE DIP FINANCING MOTION

I, Andrew Hinkelman, hereby declare under the penalty of perjury:

1.      I am the Chief Restructuring Officer and Chief Financial Officer of Promise Healthcare Group, LLC and certain of its subsidiaries and affiliates, each a debtor and debtor-in-possession (each, individually, a "***Debtor***" and, collectively, the "***Debtors***") in the above-captioned chapter 11 cases. I am above 18 years of age, and I am competent to testify.

2.      I submit this declaration to supplement the *Declaration of Andrew Hinkelman in Support of First Day Relief* [D.I. 18] (the "***First Day Declaration***") as it relates to the DIP

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Professional Rehabilitation Hospital, L.L.C. (5340), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179),  Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc. (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc. (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), St. Alexius Hospital Corporation #1 (2766), St. Alexius Properties, LLC (4610), Success Healthcare 1, LLC (6535), Success Healthcare 2, LLC (8861), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766).  The mailing address for the Debtors, solely for purposes of notices and communications, is 999 Yamato Road, 3rd FL, Boca Raton, FL  33431.

Financing and in support of the *Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Postpetition Secured Financing Pursuant to Section of the Bankruptcy Code, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition ABL Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [D.I. 17] (the "***DIP Motion***").[2] On November 6, 2018, the Court approved the DIP Motion on an interim basis [D.I. 54] (the "***Interim DIP Order***").    The substance of this declaration was proffered at the hearing in these cases on November 6, 2018.

3.    Except as otherwise indicated herein, all facts set forth in this declaration are based on my personal knowledge, my discussions with other members of the Debtors' management team and the Debtors' advisors, and my review of the relevant documents and information concerning the Debtors' operations, financial affairs, and refinancing and restructuring initiatives.

4.    The Debtors are liquidating through going concern asset sales.  Here, unlike many other situations, the assets of the company may be sold in pieces at various points in time in order to maximize the value and opportunities resulting from prepetition and postpetition marketing efforts.  The first of which is the sale of the Silver Lake facility by the Silver Lake Debtors.  The Debtors filed sale papers on November 6, 2108 to set up this process before the Court [D.I. 37].  Without these sale efforts, the Debtors would have been cut off by their lenders months ago and the proposed DIP Facility is a necessary bridge to the consummation of the proposed asset sales.

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the DIP Motion.

5.      The DIP Facility is structured as a rolled-up revolver and a new money term loan. The Debtors agreed to roll up the Prepetition Revolving Lenders' claims because (i) the prepetition secured parties are well oversecured and there would be no detriment to creditors in these Chapter 11 Cases because Wells Fargo will be paid in full, and (ii) the Debtors will benefit from the availability of a revolving line of credit. Without access to the liquidity provided by the DIP Facility, both the $20 million new money term loan and the revolving line of credit, the Debtors would have no option but to cease operations.

6.      As of the Petition Date, the Debtors had approximately $145 million of billed receivables, plus another $70 million of unbilled claims. Most of the receivables are owed by governmental payors. The prepetition secured parties are well over-secured by the receivables alone.  Additionally, the appraisals and the expressions of interest of potential buyers for the Debtors' other assets reflect that the Debtors' real estate has value in excess of at least $30 million over the current mortgage obligations encumbering those properties. Based on the receivables base and other property, the DIP Facility is fully secured and there is no detriment to unsecured creditors or the estates resulting from the proposed roll up.

7.      The Debtors' management and FTI prepared the Budget, attached as Schedule 1 to the Interim DIP Order, based upon their personal knowledge of the Debtors' expenses and revenues and their experience with the Debtors' expenditures and cash flow. The Budget shows that the Debtors will engage in a series of asset sales in order to provide for recoveries to creditors.  The Budget further reflects the Debtors' expectations that by the time the first two asset sales are expected to be consummated on or before December 31, 2018, the Debtors will have fully drawn on availability under the DIP Revolving Loans and will have drawn $16,903,000 on the new money DIP Term Loans.  Without access to the DIP Loans, the Debtors

3

would be forced to sell their assets on a liquidation or non-going-concern basis, which would result in substantially reduced recoveries to creditors. Thus, the DIP Facility provides the ability for all creditors to maximize their recoveries.

8.      The Debtors obtained two proposals for debtor-in-possession financing. After negotiating term sheets with Wells Fargo Bank, National Association ("***Wells Fargo***") and another potential lender, both proposed lenders provided the Debtors with definitive documents and proposed orders. Through the negotiating process, the Debtors were able to get significant concessions from Wells Fargo related to the interest rate and fees it would charge and I believe those rates and fees are reasonable given the state of the company and the process proposed. The second lender had also previously expressed an interest in participating in the sales or restructuring process. The Debtors concluded that given the competitive fees and rates and the fact that Wells Fargo was offering a combination of a revolver and a new money term loan, and Wells Fargo is not a competitor for the Debtors' assets, Wells Fargo as DIP Lender would make the process for sales more likely to generate higher sales for creditor and possibly equity recoveries. In light of the competitive rates and fees, the liquidity provided to the company, and the access to a revolving line of credit that would benefit the Debtors' postpetition operations, the Debtors, in their business judgment, determined that providing Wells Fargo with a roll-up of its prepetition debt was acceptable and appropriate.

9.      Wells Fargo is not requiring a priming lien on any assets, except its prepetition collateral. It has determined that the $20 million new money DIP Term Loan, above its borrowing base revolver, is appropriately and fully secured by junior liens against the prepetition collateral and the Debtors' real estate.

4

10.     Based upon FTI's initial review of claims, I estimate that the Debtors' may be subject to approximately $3.5 million in section 503(b)(9) claims to vendors and other creditors extending credit to the Debtors for goods delivered within twenty days of this filing. Based upon the collateral position of Wells Fargo, and my understanding of potential recoveries from asset sales, I believe that there will be sufficient proceeds following the completion of the Debtors' asset sales to pay such 503(b)(9) claims in full.

11.     The DIP Facility requires that the collateral for the Prepetition Revolving Loan cross-collateralize with the DIP Term Loan, and that the collateral provided for under the DIP Term Loan secure the repayment of the Prepetition Revolving Loan. The Debtors believe this is appropriate for several reasons. First, the collateral for the DIP Term Loan is a junior lien to existing lien holders. Thus, there is no priming or impairment of lien holders by the cross-collateralization. Second, as stated earlier, the prepetition collateral of Wells Fargo fully secures Wells Fargo's revolver. I believe that the junior liens have significant value above the value of Wells Fargo's debt; thus Wells Fargo is oversecured on both the revolver and term loan. Third, the DIP Facility is paid out through the asset sales intended in this case. Fourth, the proposed DIP Order has a limited marshalling concept which will allow for creditors to have access to this collateral after Wells Fargo is paid in full. Finally, in exchange for this cross-collateralization, Wells Fargo is allowing for future availability under the revolver. As the revolver is paid down, the Debtors will have availability to operate and pay administrative claims during the course of the case, including after some of the asset sales.

12.     The Budget has been prepared by FTI and the Debtors in accordance with these terms. Accordingly, the Debtors have determined that the cross-collateralization provisions, in

exchange for this flexible lending arrangement, is an overall benefit to the creditors of the Debtors' estates.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: November 9, 2018                    Respectfully submitted,

                                           By: _____
                                           Name:  Andrew Hinkelman
                                           Title:  Chief  Restructuring  Officer  and
                                                   Interim Chief Financial Officer

6