# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x
:
In re: : Chapter 11
:
PROMISE HEALTHCARE GROUP, LLC, *et al.*,[1] : Case No. 18-12491 (CSS)
:
Debtors. : (Jointly Administered)
:
: **Hearing Date: Dec. 4, 2018 at 11:00 a.m. (ET)**
: **Objection Deadline: Nov. 27, 2018 at 4:00 p.m. (ET)**
-------------------------------------------------------------x

## MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING THE SALE OF CERTAIN REAL PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, AND (II) AUTHORIZING THE DEBTORS TO REJECT UNEXPIRED LEASE OF NONRESIDENTIAL REAL PROPERTY

Promise Healthcare Group, LLC ("***Promise***") and its affiliated debtors and debtors in

possession (collectively, the "***Debtors***") in the above-captioned chapter 11 cases (the "***Chapter***

***11 Cases***") file this motion (this "***Motion***") pursuant to sections 105(a), 363, and 365 of Title 11

of the United States Code (the "***Bankruptcy Code***"), Rules 2002, 6004, and 6006 of the Federal

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Professional Rehabilitation Hospital, L.L.C. (5340), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179), Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc. (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc. (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), St. Alexius Hospital Corporation #1 (2766), St. Alexius Properties, LLC (4610), Success Healthcare 1, LLC (6535), Success Healthcare 2, LLC (8861), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766). The mailing address for the Debtors, solely for purposes of notices and communications, is 999 Yamato Road, 3rd FL, Boca Raton, FL 33431.

Rules of Bankruptcy Procedure (the "**_Bankruptcy Rules_**"), and Local Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**_Local Rules_**"), for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**_Proposed Order_**"), (i) approving a sale by the Debtors of that certain mental health rehabilitation center known as Crestwood - San Diego located at 5500 University Avenue, San Diego, California 92105 (the "**_Facility_**") and all easements and rights appurtenant thereto (collectively, the "**_Real Property_**") as designated in that certain Purchase and Sale Agreement (the "**_PSA_**")[2] between Debtor Quantum Properties, L.P., as seller (the "**_Seller_**"), and National Health Investors, Inc., a Maryland corporation, or its assignee, nominee, or designee, as purchaser (the "**_Purchaser_**"), free and clear of Encumbrances (as defined in the PSA) and interests (except as set forth in the PSA), and (ii) authorizing Debtors to reject that certain Lease, dated February 17, 2017 (the "**_Lease_**"), between Debtor Quantum Properties, L.P., as landlord, and Crestwood Behavioral Health, Inc., as tenant (the "**_Tenant_**").  In support of the Motion, the Debtors rely on the _Declaration of Kevin Roy in Support of the Sale of Real Property of Quantum Health, Inc._ attached hereto as **Exhibit B** and incorporated herein by reference (the "**_Roy Declaration_**").  In further support of the Motion, the Debtors respectfully represent:

## PRELIMINARY STATEMENT

1.      With the assistance of Healthcare Finance Partners Corp. (the "**_Broker_**"), the Debtors have conducted a thorough marketing process for the Real Property.  In the months leading up to the Petition Date (as defined herein), the Debtors sought to obtain a stalking horse for sale of the Real Property.  The Debtors' marketing efforts yielded two bids for the Real Property, as well as one potentially interested party who contacted the Debtors directly.  However, the Debtors determined that

---

[2] A copy of the PSA is attached as Exhibit 1 to the Proposed Order.

4838-4952-8441.8

32591170 v2
EAST\162459625.1

the bid of the Purchaser was the only bid for the Real Property that could close within the time allotted under the milestones set forth in the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition ABL Parties, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (D.I. 54) (the "***Interim DIP Order***"), and was otherwise the highest and best bid for the Real Property.  As such, the Debtors believe, in their business judgment, that the marketing process has demonstrated that it is unlikely an auction would lead to a higher and better bid for the Real Property and seek to sell the Real Property to the Purchaser pursuant to a private sale free and clear of all Encumbrances and interests.

## JURISDICTION AND VENUE

2.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.      Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

4.      On November 5, 2018 (the "***Petition Date***"), each of the Debtors commenced cases under chapter 11 of the Bankruptcy Code (the "***Chapter 11 Cases***"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee

or examiner has been made in the Chapter 11 Cases, and no committees have been appointed or designated.

5.      A description of the Debtors' businesses, the reasons for commencing the Chapter 11 Cases, the relief sought from the Court, and the facts and circumstances supporting this Motion are set forth in the *Declaration of Andrew Hinkelman in Support of First Day Relief* [D.I. 18].

6.      The Broker has worked on behalf of the Debtors since early 2016. With respect to the marketing of the Real Property, the Broker believed in 2016 the highest and best use was to market the Real Property to behavioral health firms that would not be subject to California's Office of Statewide Health Planning and Development ("*OSHPD*") given the high costs that would need to be incurred to improve the Real Property to meet OSHPD standards. The ownership and leasing of the Real Property is not integral to the Debtors' core business of operating post-acute facilities.

7.      The Broker identified potential purchasers primarily in the behavioral health field that were not subject to the OSHPD requirements. After the Broker identified interested parties who were seeking additional space in San Diego with the ability to pay the targeted purchase price, and had a capital backing sufficient to close in a short period, the Broker contacted ten of the largest providers of these services in 2016 and another six in 2018.

8.      Of the parties contacted between 2016 and 2018, two emerged as serious potential purchasers. The Broker obtained two letters of interest ("*LOIs*") for the Real Property during this timeframe.[3] Ultimately, the Purchaser was chosen because of its understanding of this asset class, more assurance of closing based on previous similar completed transactions, and

---

[3] During this time, one potential purchaser also approached the Debtors directly.

its ability to understand the unique market that the Real Property serves for the county as a mental health rehabilitation facility.

9.      In the past few months, the Debtors had the Real Property appraised and the suggested price was approximately $13.6 million.

10.     After multiple discussions and underwriting the opportunity with the potential buyers, the Broker identified Purchaser as the best potential buyer for the Real Property. The Purchase Price reflects a sub-8.00% capitalization rate, which is 100 basis points lower than a recent comparable California sale with an 8.7% capitalization rate completed in May 2017 by another REIT of similar behavioral health assets.

## RELIEF REQUESTED

11.     By this Motion, the Debtors seek (i) approval of a private sale (the "*Sale*") of the Real Property to the Purchaser for cash consideration equal to $15 million (the "*Purchase Price*") as set forth in the PSA, and (ii) to terminate the Lease, pursuant to sections 105(a) and 365 of the Bankruptcy Code, to allow the Purchaser and Tenant to execute a substitute lease.

## BASIS FOR RELIEF REQUESTED

### I.      The PSA is Typical, Customary, and Reasonable, and Entering into the PSA is an Exercise of the Debtors' Reasonable Business Judgment.

12.     The Debtors believe, and respectfully submit, that the terms of the PSA are typical, customary, and reasonable under the circumstances, and in the exercise of their business judgment.  However, Debtors request authorization to accept such modifications and edits to the PSA as may be submitted by and agreed upon between Purchaser and Debtors in their discretion and in Debtors' business judgment.

13.     Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction. The paramount goal in any

proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See*

*In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (noting that the debtor in

possession "had a fiduciary duty to protect and maximize the estate's assets").  *See also*

*Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1985) (debtor in

possession has the duty to maximize the value of the estate); *Cadle Co. v. Mims (In re Moore)*,

608 F.3d 253, 263 (5th Cir. 2010) (same).

14.    In accordance with Local Rule 6004-1, the PSA, in summary fashion, provides as

follows[4]:

(a)    Sale of Real Property.  The Debtors are seeking approval for the Sale of the Real Property to Purchaser by private sale for the Purchase Price and upon the terms and conditions set forth in the PSA.  No liability, executory contracts, or unexpired leases will be assumed by Purchaser.

(b)    Free of Any and All Encumbrances.  The Sale will be free and clear of all Encumbrances and interests, with such Encumbrances and interests to attach to the net proceeds of the sale.

(c)    Holdback Deposit.  Debtors shall withhold a deposit of Three Hundred Fifty Thousand and No/100 Dollars ($350,000.00) (the "***Holdback Deposit***") in cash from the Purchase Price and deposit such sum in an escrow account.

(d)    Broker's Commission.  The Broker shall be entitled to a commission of 2.5% of the total gross sale proceeds (the "***Broker Fee***") upon the closing of the Sale.  Other than Broker, there are no other brokers, investment bankers, or similar service providers due a commission or any other sum of money in connection with the PSA.  The Broker Fee shall be deemed an allowed super-priority administrative expense claim subject to and in accordance with Section 6(i) of the PSA.

(e)    Indemnification.  The PSA contains reciprocal indemnification provisions.

(f)    Consent to Jurisdiction.  Purchaser will be deemed to have consented to the core and exclusive jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any and all disputes relating to, arising from or connected with the purchase and sale of the Real Property, and the construction and enforcement of the PSA.

---

[4] This summary does not recite all terms of the PSA and is qualified in its entirety by reference to the provisions of the PSA itself. In the event of any inconsistencies between this summary and the PSA, the terms of the PSA shall govern. Unless otherwise defined, capitalized terms shall have the meanings ascribed to them in the PSA.

15.    Pursuant to Local Rule 6004-1, a copy of the Proposed Order is attached to this

Motion as **Exhibit A** and the executed PSA is attached to the Proposed Order as **Exhibit 1**.  In

compliance with Local Rule 6004-1(b)(iv), Debtors further show:

(a)    Sale to Insider.  The Purchaser is not an insider of the Debtors within the meaning of section 101(31) of the Bankruptcy Code.

(b)    Agreements with Management.  The Purchaser has not discussed or entered into any agreements with Debtors' management or key employees regarding future compensation or employment.

(c)    Release.  The PSA does not include a release in favor of any entity.

(d)    Private Sale/No Competitive Bidding.  The Debtors are seeking approval for a proposed sale of the Real Property to Purchaser by private sale free and clear of all Encumbrances and interests for the Purchase Price and upon the terms and conditions set forth in the PSA.  In the event that the Bankruptcy Court does not approve a private sale or the Seller determines that it cannot, consistent with its fiduciary duties, seek Bankruptcy Court approval of the Private Sale Motion over any objections thereto, then Seller shall, at the Purchaser's election, seek approval of a public sale/auction and related bid procedures and bid protections for the Seller in accordance with and subject to the terms of Section 6(j) of the PSA.  In the event that Purchaser elects not to act as stalking horse purchaser in the public sale/auction, the Seller may seek approval of a public sale/auction without the Purchaser as stalking horse purchaser, and the Purchaser shall not be entitled to any Break-Up Fee (as defined in the PSA) as set forth in Section 6(j) of the PSA.

(e)    Closing and Other Deadlines.  The closing date of the Sale shall take place on a date mutually acceptable to Debtors and Purchaser, which shall in any event occur within five (5) business days from the entry of a final sale order by the Court provided that the conditions set forth in Sections 3, 16 and 17 of the PSA have occurred.

(f)    Good Faith Deposit.  The PSA does not contemplate a good faith deposit.

(g)    Interim Arrangements with Proposed Buyer.  The Debtors do not currently have any interim management or other agreement with Purchaser.

(h)    Use of Proceeds.  The PSA and related funds flow agreed to by the Seller and Purchaser contemplate a distribution of the proceeds of the Sale in accordance with the Interim DIP Order.

(i)    Tax Exemption.  The Debtors are not seeking pursuant to this Motion to have the Sale declared exempt from taxes under section 1146(a) of the Bankruptcy Code.

(j)    Record Retention.  This is not a sale of substantially all of the Debtors' assets.

(k)    Sale of Avoidance Actions.  The Debtors are not seeking to sell avoidance actions.

(l)    <u>Requested Findings as to Successor Liability</u>.  The Debtors are seeking to sell the Real Property free and clear of successor liability claims.

(m)    <u>Sale Free and Clear of Unexpired Leases</u>.  The Debtors are seeking to sell the Real Property free and clear of all Encumbrances and interests to the fullest extent permitted by section 363 the Bankruptcy Code.  The Debtors will be rejecting the Lease as a condition precedent to Closing and understand that the Purchaser will enter into a new lease with the Tenant.

(n)    <u>Credit Bid</u>.  The PSA does not contemplate a right to credit bid in a private sale.

(o)    <u>Relief from Bankruptcy Rule 6004(h)</u>.  The Debtors are seeking relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h) for any sale.

## II.    A Sale of the Real Property is Appropriate under Section 363(b)(1) of the Bankruptcy Code.

16.    The Debtors respectfully submit that the Sale meets the standard set forth in section 363(b) for sales outside of the ordinary course of a debtor's business. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

17.    This Court's power under section 363 is supplemented by section 105(a), which provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title . . ." § 105(a). As set forth below, the Debtors submit that they have satisfied the requirements of sections 105 and 363 as those sections have been construed by courts in the Third Circuit.

18.    A debtor should be authorized to sell assets out of the ordinary course of business pursuant to section 363 of the Bankruptcy Code and prior to obtaining a confirmed plan of reorganization if it demonstrates a sound business purpose for doing so.  *See In re Delaware & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991) (finding that the sale of substantially all of debtor's assets outside of a plan of reorganization is appropriate when a sound business reason justifies such a sale); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 394–95 (3d Cir. 1996) (citing *Fulton*

*State Bank v. Schipper (In re Schipper)*, 933 F.2d 513 (7th Cir. 1991)); *Committee of Equity Sec.*

*Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983).

19.    Courts have applied the following four factors in determining whether a sound

business justification exists: (a) whether a sound business reason exists for the proposed

transaction; (b) whether fair and reasonable consideration is provided; (c) whether the transaction

has been proposed and negotiated in good faith; and (d) whether adequate and reasonable notice is

provided. *See In re Delaware & Hudson Ry. Co.*, 124 B.R. at 175–76 (adopting *Lionel* factors to

consider in determining whether sound business purpose exists for sale outside ordinary course of

business in this District); *Committee of Equity Shareholders v. Lionel Corp.* (*In Re Lionel Corp.*),

722 F.2d 1063, 1071 (2d Cir. 1983) (setting forth the "sound business" purpose test); *In re Abbotts*

*Dairies of Penn., Inc.*, 788 F.2d 143, 147–49 (3d Cir. 1986) (implicitly adopting the articulated

business justification test set forth in *Lionel* and adding the "good faith" requirement).

20.    Once the Debtors articulate a valid business justification, their decision to sell

property out of the ordinary course of business enjoys a strong "presumption that in making a

business decision the directors of a corporation acted on an informed basis, in good faith and in

an honest belief that the action taken was in the best interests of the company." *In re Integrated*

*Res. Inc.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

Therefore, any party objecting to a debtor's proposed asset sale must make a showing of "bad

faith, self-interest, or gross negligence" as courts are loath to interfere with corporate decisions

absent such a showing. *See id*. at 656.

21.    The Debtors have exercised sound business justifications for pursuing a private

sale of the Real Property pursuant to the factors discussed above. The Debtors engaged in a

comprehensive marketing of the Real Property and believe that the Purchaser is the only bidder

for the Real Property that can close within the milestones set forth in the Interim DIP Order. *See* Roy Decl. ¶ 6.  The Real Property is not integral to the Debtors' on-going business.

22.    As discussed above, between 2016 and 2018, the Broker identified sixteen potential purchasers seeking additional space in San Diego with the ability to pay the targeted purchase price, and had a capital backing sufficient to close in a short period. Of those, two submitted LOIs.[5] Ultimately, the Purchaser was chosen because of its understanding of this asset class, more assurance of closing based on previous completed transactions, and its ability to understand the unique market that the Real Property serves for the county as a mental health rehabilitation facility.

23.    The Debtors believe that a private sale of the Real Property will allow for the greatest possible consideration for their Real Property without time and estate resources being expended on a further marketing process that the Debtors, in consultation with the Broker, do not believe will yield a higher purchase price for the Real Property. Accordingly, the Debtors believe that the Purchase Price is a fair and reasonable value for the Real Property.

## III.    Any Sale Should be Approved Free and Clear of Liens, Claims, Interests and Encumbrances.

24.    Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property free and clear of any lien, claim, interest or encumbrance in such property if, among other things:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;

---

[5] During this time, one potential purchaser also approached the Debtors directly; however, the Debtors have determined that such potential purchaser is unlikely to close before the applicable milestone in the Interim DIP Order.

> (3) such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

25.    Because section 363(f) is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to warrant approval of the proposed sale. *See In re Collins*, 180 B.R. 447, 450 (Bankr. E.D. Va. 1995) ("Section 363(f) is phrased in the disjunctive, such that only one of the enumerated conditions must be met in order for the Court to approve the proposed sale"); *Scherer v. Fed. Nat'l Mortg. Ass'n (In re Terrace Chalet Apts., Ltd.)*, 159 B.R. 821, 827 (N.D. Ill. 1993) (sale extinguishes liens under section 363(f) as long as one of the five specified exceptions applies).

26.    The Debtors will serve notice of the Motion to holders of all interests in the Real Property and each will have an opportunity to object to the Sale. The Debtors expect to obtain the consent of CNB and the DIP Administrative Agent (each as defined in the Interim DIP Order) such that section 363(f)(2) will apply. The Debtors contend that no other party holds a valid, perfected lien on the Real Property.  Accordingly, to the extent any party contends that it holds a valid lien on the Real Property, such lien is subject to bona fide dispute, and the Debtors may sell the Real Property free and clear of such purported lien under section 363(f)(4) of the Bankruptcy Code. Therefore, the Debtors request that the Sale be approved free and clear of all Encumbrances and interests with the proceeds of the Sale being distributed in accordance with the terms of the Interim DIP Order.

**IV.     The Sale is Proposed in Good Faith.**

27.      Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

28.      Section 363(m) "reflects the . . . 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'"  *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.*), 724 F.2d 52, 55 (7th Cir. 1983)).  *See also United States v. Salerno*,  932 F.2d 117, 123 (2d Cir. 1991) (noting that section 363(m) furthers the policy of finality in bankruptcy sales and "assists bankruptcy courts in maximizing the price for assets sold in such proceedings"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) (same).

29.      While the Bankruptcy Code does not define "good faith," some courts have held that a good faith purchaser is one who "purchases the assets for value, in good faith, and without notice of adverse claims." *Hardage v. Herring Nat'l Bank,* 837 F.2d 1319, 1323 (5th Cir. 1988) (quoting *Willemain v. Kivitz (In re Willemain),* 764 F.2d 1019, 1023 (4th Cir. 1985)). Furthermore, the good faith status of a purchaser can be destroyed with evidence of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *TMT Procurement Corp. v. Vantage Drilling Co.* (*In re TMT Procurement Corp.)*, 764 F.3d 512, 521 (5th Cir. 2014).

30.      The Sale has been proposed in good faith.  The PSA was the product of extensive good faith, arm's length negotiations between the Debtors, on the one hand, and Purchaser, on

the other, and was negotiated with the active involvement of the Debtors' officers and professionals. The Debtors believe and submit that the sale of the Real Property to the Purchaser pursuant to the terms and conditions of the PSA is not the product of collusion or bad faith. No evidence suggests that the PSA is anything but the product of arm's length negotiations between the Debtors, Purchaser, and their respective professional advisors. In connection with approval of the proposed Sale, the Debtors request that the Court make a finding that the Purchaser is a good faith purchaser and entitled to the protections of section 363(m) of the Bankruptcy Code.

## V.    The Debtors Should be Permitted to Pay the Broker Fee.

31.    Section 105(a) of the Bankruptcy Code empowers a court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code." The purpose of section 105(a) of the Bankruptcy Code is to ensure a bankruptcy court's "power to take whatever action is appropriate or necessary in aid of the exercise of [its] jurisdiction." Collier on Bankruptcy ¶ 2-105.01 (16th rev. ed. 2017); *see also Casse v. Key Bank Nat'l Ass'n (In re Casse)*, 198 F.3d 327, 336 (2d Cir. 1999) (same).  Further, under the "necessity of payment rule" or the "doctrine of necessity," courts often allow the immediate payment of prepetition claims. *See, e.g., In re Just for Feet, Inc.*, 242 B.R. 821, 824, 826 (Bankr. D. Del. 1999) (allowing payment of pre-petition vendor claims because such claims were "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (applying the necessity of payment doctrine in evaluating payment of prepetition obligations). Indeed, courts in this District and elsewhere have invoked the equitable powers available under section 105(a) and the doctrine of necessity to authorize the postpetition payment of prepetition claims where payment is necessary to preserve the going concern value of a debtor's business.

4838-4952-8441.8

32591170 v2
EAST\162459625.1

32.     The Debtors submit that payment of the Broker Fee is essential to ensure that the Debtors are able to close the Sale, and thus is essential to the Debtors' efforts to maximize value with respect to the Real Property. Without the ability to close the Sale in short order, the Debtors would likely lose the Purchaser and would be forced to begin a search for a replacement purchaser (who may not be willing to make as favorable of an offer on the Real Property or close as expeditiously as the Purchaser).

## VI.     The Rejection of the Lease Should be Authorized.

33.     Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any . . . executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). This is a vital provision for debtors seeking to reorganize under Chapter 11 because "rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization." *Nat'l Labor Relations Bd. v. Bildisco & Bildisco (In re Bildisco)*, 465 U.S. 513, 528 (1984); *see also In re Exide Techs.*, 607 F.3d 957, 967 (3d Cir. 2010) ("Courts may use § 365 to free a [debtor] from burdensome duties that hinder its reorganization").

34.     A debtor's decision to reject a lease under section 365 of the Bankruptcy Code is governed by the business judgment test, which requires a debtor to have determined that the requested rejection would benefit its estate. *See, e.g., In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (*citing Grp. of Instit. Investors v. Chi., Milwaukee, St. Paul & Pac. R.R. Co.*, 318 U.S. 523, 550 (1943)); *In re Bildisco*, 682 F.2d 72, 79 (3d Cir. 1982), *aff'd*, 465 U.S. 513 ("The usual test for rejection of an executory contract is simply whether rejection would benefit the estate, the 'business judgment' test.").

35.     Under the business judgment standard, so long as a debtor's decision is reasonable and in the best interests of the bankruptcy estate, courts generally defer to the business judgment of the debtor's management. *See Stanziale v. Nachtomi (In re Tower Air, Inc.),* 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task. Delaware courts have said that it may be accomplished by showing either irrationality or inattention"); *In re Armstrong World Indus., Inc.,* 348 B.R. 136, 162 (Bankr. D. Del. 2006) ("Courts have uniformly deferred to the business judgment of the debtor to determine whether the rejection of an executory contract or unexpired lease by the debtor is appropriate under section 365(a) of the Bankruptcy Code"); *In re Trans World Airlines, Inc.,* 261 B.R. 103, 121 (Bankr. D. Del. 2001) ("A debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of 'bad faith, or whim or caprice'") (quoting *Wheeling-Pittsburgh Steel Corp. v. W. Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.),* 72 B.R. 845, 849–50 (Bankr. W.D. Pa. 1987)).

36.     Furthermore, the Court's inquiry must be focused on the business judgment of the debtor, rather than a standard that focuses on the impact of rejection on the contract counterparty. *See Trans World Airlines, Inc.,* 261 B.R. 103, 122–23 (holding that the Third Circuit does not consider the potential burden imposed on a non-debtor as a factor when considering whether or not to permit a rejection, as such consideration is irrelevant and unnecessary) (citing *In re Patterson,* 119 B.R. 59, 61 (E.D. Pa. 1990) (holding that fairness to a non-debtor party was irrelevant in determining whether debtor could reject a contract) and *In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. at 848 (holding that effect of rejection on a non-debtor party is unnecessary in determining propriety of debtor's decision to reject contract)).

37.     The focus of the Court's determination should be on the benefit of the proposed rejection to the debtor's estate. *See Trans World Airlines, Inc.*, 261 B.R. at 123; *see also In re Noranda Aluminum, Inc.,* 549 B.R. 725, 729 (Bankr. E.D. Mo. 2016) (holding that "it would contradict binding authority to read into the business judgment test a consideration of the interest of counterparties before allowing rejection of contracts"). A debtor merely needs to establish that rejection of the agreement in question will benefit the estate—a showing that the agreement is "burdensome" to the estate is not required before authorizing rejection under section 365(a). *See In re Old Carco, LLC,* 406 B.R. 180, 192 (Bankr. S.D.N.Y. 2009); *see also Sharon Steel Corp. v. Nat'l Fuel Gas Distribution Corp.*, 872 F.2d 36, 39–40 (3d Cir. 1989) (noting that the business judgment standard is not difficult to satisfy and only requires a showing that the rejection will benefit the estate).

38.     The Debtors' proposed rejection of the Lease is within the Debtors' business judgment and will serve the best interests of their estates. The Purchaser has indicated that it wishes to retain the Tenant under a new lease, and the Court's approval of the rejection of the Lease and the termination of the Lease is a condition precedent to the closing of the Sale. For that reason, the Debtors seek authority to reject the Lease in conjunction with the Sale effective as of the date of the closing of the Sale. For the foregoing reasons, the Debtors, in the exercise of their sound business judgment, believe that rejection of the Lease is in the best interest of the Debtors, the Debtors' estates, and the creditors and other interested parties.

## WAIVER OF BANKRUPTCY RULE 6004(h)

39.     The Debtors request that the Court waive the fourteen (14) day stay period under Bankruptcy Rule 6004(h). Timely consummation of the Sale are of critical importance to both the Debtors and the Purchaser and the Debtors' efforts to maximize the value of the estates.  In

4838-4952-8441.8

32591170 v2
EAST\162459625.1

addition, the consummation of the Sale before December 31, 2018 is a milestone in the Interim

DIP Order.  Accordingly, the Debtors hereby request that the Court waive the fourteen-day stay

period under Bankruptcy Rules 6004(h).

## **RESERVATION OF RIGHTS**

40.     Nothing contained in this Motion or any actions taken by the Debtors pursuant to

relief granted in the Order is intended or should be construed as: (a) an admission as to the

validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the

Debtors' or any other party-in-interest's rights to dispute any particular claim on any grounds; (c)

a promise or requirement to pay any particular claim; (d) an implication or admission that any

particular claim is of a type specified or defined in this Motion; (e) a request or authorization to

assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f)

a waiver or limitation of the Debtors' or any other party-in-interest's right under the Bankruptcy

Code or any other applicable law.

## **NOTICE**

41.     The Debtors have provided notice of the filing of the Motion to: (i) the Office of

the United States Trustee; (ii) the Debtors' 30 largest unsecured creditors on a consolidated

basis; (iii) counsel to Wells Fargo, N.A., as administrative agent under the Debtors' prepetition

and debtor-in-possession credit facilities; (iv) the Internal Revenue Service; (v) the United States

Attorney for the District of Delaware; (vi) the United States Department of Justice; (vii) the State

Attorney General's Office in each state where the Debtors operate; (viii) all parties known to

have a lien on the Real Property; (ix) the counterparty to the Lease; (x) all parties who have

expressed an interest in the Real Property during the preceding twelve months; and (xi) any party

that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "***Notice Parties***").

The Debtors respectfully submit that no further notice of this Motion is required.

## <u>NO PRIOR REQUEST</u>

42.     No prior request for the relief sought in this Motion has been made to this or any

other court.

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE, the Debtors respectfully request entry of the Proposed Order, and granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: November 13, 2018
Wilmington, Delaware

DLA PIPER LLP (US)

/s/ *Stuart M. Brown*
Stuart M. Brown (#4050)
Kaitlin MacKenzie Edelman (#5924)
1201 N. Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: Stuart.Brown@dlapiper.com
        Kaitlin.Edelman@dlapiper.com

-and-

WALLER LANSDEN DORTCH & DAVIS, LLP
John Tishler (admitted *pro hac vice*)
Katie G. Stenberg (admitted *pro hac vice*)
Blake D. Roth (admitted *pro hac vice*)
Tyler N. Layne (admitted *pro hac vice*)
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone: (615) 244-6380
Facsimile: (615) 244-6804
Email: John.Tishler@wallerlaw.com
        Katie.Stenberg@wallerlaw.com
        Blake.Roth@wallerlaw.com
        Tyler.Layne@wallerlaw.com

*Proposed Attorneys for the Debtors and Debtors in Possession*