## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PROMISE HEALTHCARE GROUP, LLC, *et al.*, | Case No. 18-12491 (CSS) |
| | (Jointly Administered) |
| Debtors.[1] | **Hearing Date: December 4, 2018 at 11:00 a.m. ET**<br>**Objection Deadline: November 27, 2018 at 4:00 p.m. ET** |
| | **Ref. No. 37** |

**OBJECTION OF STRATEGIC GLOBAL MANAGEMENT, INC. TO DEBTORS' MOTION FOR ENTRY OF ORDERS (I)(A) ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE OF CERTAIN OF THE DEBTORS' ASSETS, INCLUDING APPROVING A BREAK-UP FEE AND EXPENSE REIMBURSEMENT, (B) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (C) APPROVING FORM AND MANNER OF NOTICE RELATING THERETO, AND (D) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE; (II)(A) APPROVING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) AUTHORIZING SUCCESS HEALTHCARE 1, LLC TO GRANT LIENS; AND (III) GRANTING <u>RELATED RELIEF</u>**

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Professional Rehabilitation Hospital, L.L.C. (5340), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179), Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc. (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc. (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), St. Alexius Hospital Corporation #1 (2766), St. Alexius Properties, LLC (4610), Success Healthcare 1, LLC (6535), Success Healthcare 2, LLC (8861), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766). The mailing address for the Debtors, solely for purposes of notices and communications, is 999 Yamato Road, 3rd FL, Boca Raton, FL 33431.

Strategic Global Management, Inc. ("Strategic") hereby objects to the *"Debtors' Motion for Entry of Orders (I)(A) Establishing Bidding Procedures Relating to the Sale of Certain of the Debtors' Assets, Including Approving a Break-Up Fee and Expense Reimbursement, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, (C) Approving Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing to Consider the Proposed Sale; (II)(A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Authorizing Success Healthcare 1, LLC to Grant Liens; and (III) Granting Related Relief"* [D.I. 37] (the "Sale Motion"),[2] and respectfully represents as follows:

## INTRODUCTION

1.    Strategic and its affiliates own and/or manage seven hospitals in Southern California.[3]  Strategic plans to submit a Bid, and participate in the Auction, for the purchase of substantially all of the assets of Silver Lake Medical Center.[4]  Silver Lake Medical Center is a 234-bed, 2-campus short term acute care hospital located in Downtown Los Angeles and Rosemead, California.

---

[2] Capitalized terms not defined herein have the meanings set forth in the Sale Motion.

[3] Strategic and its affiliates own and/or manage the following hospitals:  Victor Valley Global Medical Center (Victorville, CA); Hemet Valley Medical Center (Hemet, CA); Menifee Valley Medical Center (Sun City, CA); Orange County Global Medical Center (Santa Ana, CA); South Coast Global Medical Center (Santa Ana, CA); Chapman Global Medical Center (Orange, CA); and Anaheim Global Medical Center, (Anaheim, CA).

[4] Strategic has previously disclosed to the Debtors, and hereby discloses to the Court and parties in interest, that Peter Baronoff joined Strategic as its Chief Executive Officer in May 2018. Mr. Baronoff was one of the three founders, and the former Chief Executive Officer and Chairman of the Board, of the Debtors.  He resigned his position as Chief Executive Officer of the Debtors in March 2018 and resigned from the Board of Directors of the Debtors in May 2018.

2.      Notwithstanding Strategic's desire and intention to participate in the bidding, certain of the Bidding Procedures set forth in the Sale Motion unfairly and improperly favor the Stalking Horse Bidder and are likely to chill bidding.  The most egregious of these provisions, until it was remedied on November 21, 2018, was the "no shop" provision of the Stalking Horse APA, which prohibited the Debtors from soliciting, inducing or knowingly encouraging an Acquisition Proposal from the date of the Stalking Horse APA (October 24, 2018) until the earlier of (i) twenty-five (25) days after the Petition Date (November 30, 2018),[5] or (ii) entry of the Bidding Procedures Order (Stalking Horse APA §§ 7.1(b), (c) at 38 and Appendix 1.1 (Definition of Acquisition Proposal) [D.I. 37-5, pp. 46, 78]).

3.      A no shop provision "violates the underlying policy of the Bankruptcy Code to maximize the value of the estate for the creditors by stifling the bidding process for the assets of the debtor." *Pacificorp Ky. Energy Corp. v. Big Rivers Elec. Corp (In re Big Rivers Elec. Corp.)*, 232 B.R. 739, 753 (D. Ky. 1998). *See also Fox Sports Net West 2, LLC v. Los Angeles Dodgers LLC (In re Los Angeles Dodgers LLC)*, 465 B.R. 18, 28-29 (D. Del. 2011) (suggesting that a contract containing a no shop clause that was executed in anticipation of bankruptcy and conditioned on approval of the bankruptcy court may be invalid as a violation of fiduciary duty); *Prime Healthcare Mgmt. v. Valley Health Sys. (In re Valley Health Sys.)*, 429 B.R. 692 71-16 (Bankr. C.D. Cal. 2010) (holding that a Chapter 9 debtor, unlike a Chapter 11 debtor, has no fiduciary obligations and may enter into a no shop agreement that prevents competitive bidding).

4.      The Sale Motion was filed with the Court on November 6, 2018, and Strategic requested due diligence materials from the Silver Lake Debtors on November 12, 2018.  Citing the no shop provision of the Stalking Horse APA, counsel for the Silver Lake Debtors initially refused Strategic's request, but on November 19, 2018, they informed Strategic that they had obtained a waiver of the no shop provision by the Stalking Horse Bidder.  Thereafter, on

---

[5] The Petition Date for the Silver Lake Debtors was November 5, 2018.

November 21, 2018 (the day before Thanksgiving), the Silver Lake Debtors provided Strategic with access to the Silver Lake data room, together with copies of the Exhibits, Annexes and Schedules to the Stalking Horse APA. Strategic appreciates the efforts of the Silver Lake Debtors in obtaining the waiver but notes that it will have only 30 days in which to conduct its due diligence, obtain financing, and formulate its bid before the proposed Bid Deadline of December 21, 2018. Meanwhile, the Stalking Horse Bidder has had more than a year to in which to conduct due diligence and obtain financing.[6]

5.    There are numerous other issues with the Bidding Procedures and Bid Protections which are designed to structurally favor the Stalking Horse Bidder and discourage competitive bidding. As discussed below, these provisions are unfair and improper and need to be revised in order to level the playing field, encourage bidding, and maximize the proceeds of sale.

## **OBJECTION**

### I.    **The Minimum Bid And Deposit Provisions Are Unclear And Should Be Equal For All Bidders.**

6.    Section 5.a of the proposed Bidding Procedures [D.I. 37-2, p. 6] defines the Minimum Bid for participation in the Auction as follows:

> **Purchase Price.** Each Bid must clearly set forth the purchase price to be paid (the "Purchase Price"). The Purchase Price must propose a purchase price for all or substantially of the Purchased Assets, including any assumption of liabilities, that has a value that equals or exceeds the sum of the following (a "Minimum Bid"), *as determined one week prior to the Bid Deadline* in consultation with the DIP Agent, the Secured Lender, and the Committee: (i) the Cash Purchase Price, (ii) the Bid Protections, and (iii) $1,000,000 (i.e., $87,150,000), subject to the adjustments set forth in the Stalking Horse APA.

(emphasis supplied).

---

[6] The Sale Motion states that the final round of pre-petition bids was conducted in July 2017, and the Silver Lake Debtors executed the Original Purchase Agreement with the Stalking Horse Bidder on February 7, 2108 (Sale Motion ¶¶ 15-16 [D.I. 37, p. 7]).

7.      This requirement for the Minimum Bid makes no sense. Firstly, it is unfair for the Debtors to be able to change the amount of the Minimum Bid one week prior to the Bid Deadline. The amount of the Minimum Bid should be fixed now so that all potential bidders can plan accordingly. Secondly, the $87,150,000 amount cannot be accurate. The Cash Purchase Price (an undefined term) presumably means the Stalking Horse Bidder's nominal Purchase Price of $84,150,000 before adjustments. However, the nominal Purchase Price of $84,150,000, plus the Bid Protections ($4,524,500) and the $1,000,000 minimum overbid amount, equals $89,674,500, not $87,150,000. The Minimum Bid amount in the Bidding Procedures should be clarified, should be the same for all bidders, and should not be subject to change.

8.      Section 5.d of the proposed Bidding Procedures [D.I. 37-2, p. 6] requires each bidder to tender a Deposit, as follows:

> **Deposit.** With its Bid, each Potential Bidder must submit by wire transfer of immediately available funds, a cash deposit in the amount equal to six percent (6%) of the aggregate Purchase Price set forth in the Bid, to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "Deposit").

9.      This Deposit amount is both unclear and discriminatory. It is unclear whether the Deposit amount is required to be 6% of the nominal Purchase Price before adjustments, or whether it can be 6% of the Purchase Price after adjustments.[7] It is discriminatory because the Deposit by the Stalking Horse Bidder is $5,000,000 (Stalking Horse APA § 3.2 at 11 [D.I. 37-5, p. 19]), which is only 5.94% of the Stalking Horse Bidder's nominal Purchase Price of $84,150,000. If the Deposit for other bidders is 6% of a nominal Purchase Price of $89,674,500 (the Minimum Bid), the Deposit for competing bidders will be $5,380,470, or $380,470 more than the Deposit by the Stalking Horse Bidder.

---

[7] There is a significant difference between the nominal Purchase Price before adjustments and the Purchase Price after adjustments. In the Stalking Horse Bid, the nominal Purchase Price is $84,150,000 before adjustments, but is expected to be only $77.5 million after adjustments (which amount includes the $8.1 million Seller Note). *See* Sale Motion ¶ 19 [D.I. 37, pp. 9-10].

10.    To be fair, the Deposit should be $5,000,000 for all bidders. Alternatively, the Stalking Horse Bidder should be required to increase its Deposit to $5,049,000, which is 6% of its nominal Purchase Price of $84,150,000.

**II.    The Minimum Overbid Increment And The Bid Protections Are Excessive.**

11.    The proposed Auction procedure contemplates that the Debtors will review all competing Qualified Bids and will select the best Qualified Bid as a Baseline Bid one day prior to the Auction (Bidding Procedures § 7 at 10 [D.I. 37-2 , p. 11]). The Minimum Overbid Increment for the first Overbid at the Auction is then set at $2,500,000 above the Baseline Bid (Bidding Procedures § 7.b(i) at 11 [D.I. 37-2, p. 11]). This Minimum Overbid Increment is unreasonably high. It is 2.97% of the Stalking Horse Bidder's nominal Purchase Price of $84,150,000 before adjustments, and 3.2% of the Stalking Horse Bidder's expected $77.5 million Purchase Price after adjustments. In order to promote spirited bidding, the Minimum Overbid Increment should be reduced to no more than $1,000,000, the same amount as the minimum overbid amount (above the Bid Protections) required to participate in the Auction.

12.    The aggregate Bid Protections ($2,524,500 as a break-up fee and $2,000,000 as an expense reimbursement) are also excessive. Together, they constitute almost 5.4% of the Stalking Horse Bidder's nominal Purchase Price of $84,150,000 before adjustments, and more than 5.8% of the Stalking Horse Bidder's expected $77.5 million Purchase Price after adjustments.[8]

---

[8] Notably, the Debtors are also proposing to pay other large amounts from the proceeds of the sale of Silver Lake Medical Center: (a) $2.4 million to McDermott Will & Emery LLP for pre-petition work as attorneys for the Silver Lake Debtors in connection with the sale [D.I. 102]; (b) a success fee of $1.8 million to MTS Health Partners, L.P. as investment banker to the Silver Lake Debtors [D.I. 103], and (c) a bonus to Dr. Charles Posternack of $500,000 if the Successful Bid is $5 million to $9,999,999 in excess of the Stalking Horse Bid, or $1 million if the Successful Bid is $10 million or more in excess of the Stalking Horse Bid [D.I. 106]. When combined with the Bid Protections, the total amount to be paid from the sale proceeds (prior to any payments to creditors) could total $9,724,500 (11.6% of the Stalking Horse Bidder's nominal Purchase Price of $84,150,000 before adjustments, and 12.5% of the Stalking Horse Bidder's expected $77.5 million Purchase Price after adjustments).

13.     Recent studies of break-up fees and expense reimbursements in bankruptcy cases demonstrate that the aggregate Bid Protections in this case are extremely high.  Attached hereto as Exhibit A is the Declaration of Cynthia A. Nelson of FTI Consulting, Inc. filed in the *Verity Health System of California, Inc.* Chapter 11 cases in the United States Bankruptcy Court for the Central District of California (the "Verity Cases") on October 12, 2018.  The study of break-up fees and expense reimbursements compiled therein for bankruptcy sales ranging from $50 million and $250 million from 2017 to the present reflects that the median break-up fee is 3%, and the median expense reimbursement is $500,000.  Attached hereto as Exhibit B is the Declaration of Benjamin Ilhardt of Houlihan Lokey Capital, Inc. filed in the Verity Cases on October 17, 2018.  The study of break-up fees and expense reimbursements compiled therein for bankruptcy sales ranging from $125 million to $350 million (significantly larger than the sale in this case) with petition dates after January 1, 2016, reflects that the median break-up fee is 3%, and the median expense reimbursement is 0.6% or $1.2 million.[9]

14.     In view of these studies, the proposed break-up fee in this case of $2,524,500 (3% of the Stalking Horse Bidder's nominal Purchase Price of $84,150,000 before adjustments, and 3.3% of the Stalking Horse Bidder's expected $77.5 million Purchase Price after adjustments) should be reduced to $2,325,000, which is 3% of the Stalking Horse Bidder's expected $77.5 million Purchase Price after adjustments.  The proposed expense reimbursement of $2,000,000 far exceeds the median expense reimbursement in bankruptcy sales of this size and should be reduced to no more than $500,000 (0.59% of the Stalking Horse Bidder's nominal Purchase Price of $84,150,000 before adjustments, and 0.65% of the Stalking Horse Bidder's expected $77.5 million Purchase Price after adjustments).

---

[9] Strategic requests that the Court take judicial notice of the Declarations attached hereto as Exhibits A and B.

III.   **The Bidding Procedures Should Be The Same For All Bidders And Should Protect The Confidentiality Of Bidders' Financial Information.**

15.    The proposed Bidding Procedures and proposed Bidding Procedures Order contain a number of other provisions that unfairly and improperly favor the Stalking Horse Bidder:

(a)    **Disclosure of Qualified Bids.**  The proposed Bidding Procedures state that the Debtors shall provide copies of each Qualified Bid to the Stalking Horse Bidder and notify the Stalking Horse Bidder as to the identify of all bidders making Qualified Bids (Bidding Procedures §§ 3.a, 7 at 3, 10 [D.I. 37-2, pp. 4, 11]).  In contrast, the Debtors are only required to provide a copy of the Baseline Bid to other Qualified Bidders (Bidding Procedures § 7 at 10 [D.I. 37-2, p. 11]).  This procedure unfairly favors the Stalking Horse Bidder, who will be the only Bidder to have copies of all Qualified Bids.  Other Qualified Bidders, who will not receive copies of the other Qualified Bids, will be at a bidding disadvantage because unlike the Stalking Horse Bidder, they will not know the terms of any Qualified Bids other than the Baseline Bid or even the identify of other Qualified Bidders.  The Bidding Procedures should be changed so that all Qualified Bidders receive copies of all Qualified Bids, together with the redlines against the Stalking Horse Bid that all Bidders are required to submit with their Bids, in each case at the same time such documents and information are provided to the Stalking Horse Bidder.

(b)    **Confidentiality of Bidder Financial Information.**    The proposed Bidding Procedures state that if requested by the Debtors, Bidders may be required to provide financial information to support their Bids (Bidding Procedures §§ 2.b, 4.b at 3, 5 [D.I. 37-2, pp. 4, 6]).  The Debtors are required to maintain the confidentiality of such financial information, but may share the information with counsel for the DIP Agent, counsel to the Secured Lender, and counsel for the Creditors' Committee.  The term "DIP Agent," although not defined, presumably means Wells Fargo Bank, National Association, as administrative agent for the Debtors' debtor-in-possession financing.  The term "Secured Lender," however, is not defined, and Strategic is

concerned that the term may refer to any number of secured creditors of the Debtors other than Wells Fargo Bank.[10]   In addition, Strategic is concerned that its financial information may be shared with the Stalking Horse Bidder as part of the Debtors' sharing of bid information with the Stalking Horse Bidder.   The Bidding Procedures should make clear that bidder financial information will not be shared with counsel for any lender other than Wells Fargo Bank or with the Stalking Horse Bidder or any other bidders, some or all of whom may be competitors of each other.

(c)    **Due Diligence and Physical Inspection Rights.**   The proposed Bidding Procedures state that "for all Potential Bidders other than the Stalking Horse Bidder, the due diligence period will end on the Bid Deadline" (Bidding Procedures § 4.a at 4 [D.I. 37-2, p. 5]). Strategic requests that this provision be modified to treat all bidders equally.  The Stalking Horse Bidder has already had more than a year to conduct its due diligence, and other bidders, who have had far less time, should also be able to continue their due diligence. In addition, the Stalking Horse APA gives the Stalking Horse Bidder rights of physical access and inspection, rights to consult with personnel of the Silver Lake Debtors, and the right to undertake non-invasive environmental, mechanical and structural surveys (Stalking Horse APA § 8.5 at 42 [D.I. 37-5, p. 50]).  The Bidding Procedures should also expressly grant these rights to other bidders.

(d)    **Stalking Horse Bidder as Backup Bidder.**   The proposed Bidding Procedures state that "if the Stalking Horse Bidder is required to serve as Backup Bidder, the terms and conditions of such service shall be governed by the Stalking Horse APA (Bidding Procedures § 8.d at 14 [D.I. 37-2, p. 15].  Section 7.3 of the Stalking Horse APA more explicitly states that "[n]otwithstanding anything to the contrary herein or in the Bid Procedures Order, in the event Sellers elect to proceed with an Alternative Transaction, Buyer will not be obligated to

---

[10] The term "Secured Lender" also appears without definition in Sections 1.f, 3.a, 3.d, 4.b, 5.a, 5.c, 7, 7.c , 8.a, and 9 of the proposed Bidding Procedures [D.I. 37-2] and Paragraph 4 of the proposed Bidding Procedures Order [D.I. 37-1, p. 11]).

serve as the Back-up Bidder at a higher Purchase Price or on terms and conditions less favorable to Buyer, than set forth in this Agreement" (Stalking Horse APA § 7.3 at 39-40 [D.I. 37-5, pp. 47-48]). The effect of these provisions is that the Stalking Horse Bidder can bid up other parties at the Auction, elect to be the Backup Bidder, and revert back to its original bid as its Backup Bid, even if another bidder would otherwise qualify as the Backup Bidder. This is not only unfair to other bidders, but potentially detrimental to creditors. If the Stalking Horse Bidder choses to bid at the Auction and is selected as the Backup Bidder, its Backup Bid should be its highest bid at the Auction, not its original Stalking Horse Bid.

      (e)    **Supplemental Assumption and Assignment.** Paragraphs 20 through 23 of the proposed Bidding Procedures Order specify procedures by which the Debtors will provide a supplemental notice of assumption and assignment of executory contracts and unexpired leases, and contract counterparties will be given an opportunity to object, in the event that the Stalking Horse Bidder modifies its Purchased Contract List (Bidding Procedures Order at 15-17 [D.I. 37-1, pp. 16-18]). There are no comparable provisions requiring the Debtors to provide a supplemental notice of assumption and assignment if a bidder other than the Stalking Horse Bidder is the Successful Bidder and (i) wishes to modify its Purchased Contract List, or (ii) includes Purchased Contracts in its Purchased Contract List that are not included in the Purchased Contracts List of the Stalking Horse Bidder. Paragraphs 20 through 23 of the Bidding Procedures Order should be modified to accommodate supplemental assumption and assignments of executory contracts and unexpired leases by a bidder other than the Stalking Horse Bidder who becomes the Successful Bidder.

## IV.    The Auction Should Be Held In Los Angeles.

    16.    The proposed Bidding Procedures, the proposed Auction and Sale Notice, and the proposed Assumption and Assignment Notice each specify that the Auction will be conducted at the offices of DLA Piper LLP (US) in Wilmington, Delaware (Bidding Procedures § 7 at 10 [D.I. 37-2, p. 11]; Auction and Sale Notice at 2 [D.I. 37-8, p. 3]; and Assumption and Assignment Notice at 2 [D.I. 37-10, p. 3]). To avoid unnecessary expense and inconvenience for interested

parties, Strategic submits that the Auction should instead be held in Los Angeles, California. The Silver Lake Debtors are all California limited liability companies, and Silver Lake Medical Center (the hospital to be sold) is located in Los Angeles.

17.    The Stalking Horse Bidder and its financial advisor and attorneys are located in or near Los Angeles (*see* Stalking Horse APA § 14.6 (Notices) at 65 [D.I. 37-5, p. 73]), and Strategic and its attorneys are located in or near Los Angeles. Other potential bidders are also likely to be located in or near Los Angeles. Moreover, the address of the Silver Lake Debtors' attorneys, McDermott Will & Emery LLP, as listed in the Stalking Horse APA, is located in Los Angeles (Stalking Horse APA § 14.6 (Notices) at 65 [D.I. 37-5, p. 73]).

18.    The Auction easily could and should be held at the offices of the Silver Lake Debtors' attorneys, McDermott Will & Emery LLP, at 2049 Century Park East, Suite 3800, Los Angeles, California 90067. If that location is unavailable, Strategic's attorneys, Buchalter, A Professional Corporation, with offices at 1000 Wilshire Blvd., Suite 1500, Los Angeles, California 90017, are willing to host the Auction at their offices.

[*Remainder of Page Intentionally Left Blank*]

## CONCLUSION

19.    In view of the foregoing, Strategic respectfully requests that the Court (a) modify the proposed Bidding Procedures and proposed Bidding Procedures Order as set forth herein, and (b) grant such other and further relief as is just.

Dated:  November 27, 2018
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
      mumford@lrclaw.com
      pierce@lrclaw.com

-and-

**BUCHALTER, A Professional Corporation**
Mary H. Rose (*pro hac vice pending*)
Paul S. Arrow (*pro hac vice pending*)
1000 Wilshire Boulevard, Suite 1500
Los Angeles, California 90017
Telephone: (213) 891-0700
Facsimile: (213) 896-0400
Email: mrose@buchalter.com
      parrow@buchalter.com

*Attorneys for Strategic Global Management, Inc.*