**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>PROMISE HEALTHCARE GROUP, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 18-12491-CSS<br><br>(Jointly Administered)<br><br>Re: Docket No. 17<br>Obj. Deadline: November 29, 2018 at 12:00 p.m.<br>(extended by agreement by the Debtors) |

**UNITED STATES' OBJECTION TO THE MOTION OF THE DEBTORS FOR ENTRY
OF A FINAL ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN
POSTPETITION SECURED FINANCING PURSUANT TO SECTION 364 OF THE
BANKRUPTCY CODE, (II) AUTHORIZING THE DEBTORS TO USE CASH
COLLATERAL, (III) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION ABL PARTIES, (V) MODIFYING THE AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Professional Rehabilitation Hospital, L.L.C. (5340), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179), Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc. (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc. (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), St. Alexius Hospital Corporation #1 (2766), St. Alexius Properties, LLC (4610), Success Healthcare 1, LLC (6535), Success Healthcare 2, LLC (8861), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766).

The United States of America (the "United States"), on behalf of the Department of Health and Human Services ("HHS"), acting through its designated component, the Centers for Medicare & Medicaid Services ("CMS"), hereby objects to the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition ABL Parties, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (Docket No. 17) (the "DIP Motion").[2] The United States objects as follows:

## REGULATORY BACKGROUND

1. The Debtors are "providers" of hospital and skilled nursing services under the Social Security Act, 42 U.S.C. § 1395-1395lll and 42 C.F.R. Chapter IV and CMS policies and procedures (collectively, the "Medicare Program"). To be eligible to be reimbursed for services to Medicare beneficiaries, certain Debtors are party to separate Medicare Part A provider agreements ("Provider Agreements"). 42 U.S.C. § 1395cc; 42 C.F.R. § 400.202 (defining "provider").

2. Title XVIII of the Social Security Act (the "Medicare Statute") explicitly defines amounts that should be paid to providers:

> [t]he Secretary shall periodically determine the amount which should be paid under this part to each provider of services with respect to the services furnished by it, and the provider of services shall be paid, at such time or times as the Secretary believes appropriate (but not less often than monthly) and prior to audit or settlement . . . the amounts so determined, with necessary

---

[2] Any capitalized terms not defined herein shall have the meanings ascribed to them in the DIP Motion.

2

adjustments on account of previously made overpayments or underpayments.

U.S.C. § 1395g(a).

3.  HHS contracts with Medicare Administrative Contractors ("MACs") to administer payment to providers for Medicare covered services. MACs make interim payments to providers in accordance with the Medicare Statute and regulations and perform the day-to-day administration of Medicare, *e.g.*, audit and reimbursement activities. 42 U.S.C. § 1395kk-1; 42 C.F.R. §§ 421.400–.404.

4.  Once enrolled in the Medicare program, "providers and suppliers must agree to receive Medicare payments via EFT [Electronic Funds Transfer], if not already receiving payment through EFT. In order to receive Medicare payments via EFT, providers and suppliers must submit the CMS-588 form." 42 C.F.R. § 424.510(d)(2)(iii); *see also id.* § 424.510(e).[3] The CMS-588 form applies both to new EFT enrollment and changes to current EFT enrollment. The form requires identification of both the account holder and the financial institution (including routing number and account number) to which payment will be made. *Id.* at 1. The form "must be signed and dated by the same Authorized Representative or a Delegated Official named on the CMS-855 Medicare enrollment application which the Medicare contractor has on file." *Id.* at 3. Under the agreement "CMS will continue to send the direct deposit to the Financial Institution indicated above until notified by [the provider] that [it] wish[es] to change the Financial Institution receiving the direct deposit." *See id.* at 3. The authorization agreement also requires that the provider certify that it has sole control over the deposit accounts. *Id.*

---

[3] The CMS-588 form is available at: https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms588.pdf.

5.	At their request, certain of the Debtors' facilities receive Medicare Periodic Interim Payments ("PIP"). 42 U.S.C. § 1395g(e)(2); 42 C.F.R. § 418.307, 42 C.F.R. § 413.64(h)(2)(v). PIPs are biweekly payments that the MAC computes in advance to approximate the cost of services that will be furnished by the provider during the upcoming fiscal year. The MAC adjusts PIPs when it obtains evidence that the provider's utilization of Medicare has changed. The PIP is adjusted to make it consistent with current claim levels, and to determine an overpayment for the current fiscal year. Alternatively, the MAC may adjust payments to assure that total payments at the end of the fiscal year approximate, as closely as possible, the reimbursement determined to be due after review and audit of the provider's cost report. 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.64(h)(6-7).

6.	Within five months after the end of the cost year, the provider must submit a report of its costs to verify the actual reimbursements owed to it for the past cost year. 42 C.F.R. §§ 413.1, 413.20, 413.24(f); *see* 42 U.S.C. §§ 1395g and 1395hh (giving the Secretary authority to require submission of cost reports). Once the cost report is submitted, the MAC audits the cost report and determines the provider's actual, rather than estimated, reimbursement amount for the year. 42 U.S.C. §§ 1395g; 1395x(v)(1)(A)(ii); 42 C.F.R. § 413.24.

7.	The MAC subsequently issues a "Notice of Amount of Medicare Program Reimbursement" ("NPR"), which determines whether the provider was overpaid or underpaid for that cost year. 42 C.F.R. §§ 413.60, 405.1803. The NPR's assessment is final unless it is revised by the intermediary or appealed to the Provider Reimbursement Review Board. 42 C.F.R. § 405.1807.

8.	If a provider meets the required amount in controversy, it may, within 180 days of the date the NPR is issued, contest the MAC's determination of program reimbursement by

requesting a hearing before the Provider Reimbursement Review Board. 42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835. After that decision is reviewed by the Secretary, the provider may seek review in federal district court. 42 U.S.C. § 1395oo(f)(1). Such review is appellate in nature.

9.  In addition, by motion of the MAC or the provider, or at the direction of CMS, final cost report determinations in NPRs are subject to reopening for corrections at any time up to three years[4] from their issuance. 42 C.F.R. § 405.1885.

## FACTUAL AND PROCEDURAL BACKGROUND

10. On November 5, 2018 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

11. Prior to and after the Petition Date, Debtor Success Healthcare 1, LLC (f/k/a Silver Lake Medical Center) (the "SH1") participated in the Medicare Program as a Medicare Part A provider under its Provider Agreement. CMS determined prepetition overpayments owed by SH1 in the amounts of: $6,577,678.45 for the fiscal year ending December 31, 2014; $2,436,570.00 for the fiscal year ending December 31, 2015; $1,038,757.63 for the fiscal year ending December 31, 2016; and $237,464.00 for the fiscal year ending December 31, 2017 (together, the "Silver Lake Overpayment Claim"). Prior to the Petition Date, SH1 was making payments to satisfy the Silver Lake Medicare Overpayment Claim as required under Extended Repayment Schedules. As of the Petition Date, $4,019,014.40 remained outstanding on the Silver Lake Medicare Overpayment Claim

12. CMS has also determined prepetition overpayments in the amount of $45,880.45 to Baton Rouge, Inc. (the "Baton Rouge Medicare Overpayment Claim"), $3,393.71 to St. Alexius

---

[4] An NPR may be reopened "at any time if it is established that the determination … was procured by fraud or similar fault of any party to the determination or decision." 42 C.F.R. § 405.1885(b)(3).

Hospital Corporation 1 (the "St. Alexius Medicare Overpayment Claim"), and $1,603,762.60 to Quantum Health Inc. (the "Quantum Medicare Overpayment Claim"). In the ordinary course of business, CMS and/or its MACs may determine additional Medicare overpayments owed by the Debtors relating to prepetition service dates and postpetition service dates under the Medicare Program.

13. CMS has placed an administrative freeze on payments related to prepetition services provided by SH1, Baton Rouge, Inc., and St. Alexius Hospital Corporation 1 in order to preserve its prepetition setoff rights.

14. On the Petition Date, the Debtors filed the DIP Motion. The DIP Motion seeks approval of a postpetition credit facility (the "DIP Facility") of up to $85 million from Wells Fargo Bank, N.A. and other lenders ("DIP Lenders"). The DIP Facility will be secured by senior priming liens on substantially all of the Debtors' assets, including Medicare receivables and reimbursements, with priority over all other liens, except the Prepetition Lenders' Replacement Liens, certain Permitted Liens, and a small carve-out for professional fees and U.S. Trustee fees. DIP Motion at 11. Additionally, the Debtors seek authority to have their Cash Collection Accounts placed under the dominion and control of the DIP Administrative Agent. *See* DIP Motion, Exhibit 1 at 44-45. The DIP Motion also seeks approval of adequate protection provisions in favor of the Prepetition ABL Parties. DIP Motion at 18-19. The DIP Motion is silent with respect to the United States' setoff and recoupment rights.

15. At a "first day" hearing on November 6, 2018, the United States expressed concerns about the effect of the requested relief on (i) the United States' setoff and recoupment rights, and (ii) accounts that receive Medicare reimbursements from the MACs. At the hearing, Debtors' counsel made representations on the record that the proposed interim relief was not intended to

modify the United States' recoupment or setoff rights in any way. Furthermore, Debtors' counsel stated that the Cash Collection Accounts did not include accounts that receive Medicare reimbursements, and that all Medicare reimbursements accounts would continue to be collected into the same Debtors' accounts and then later deposited in Cash Collection Accounts. The United States reserved its right to seek clarifying language in a final order granting the DIP Motion.

16. On November 6, 2018, the Court entered an interim order granting the DIP Motion (Docket No. 54) (the "Interim DIP Order").

17. The United States, the Debtors and the DIP Administrative Agent have agreed to clarifying language to resolve the United States' objection to the final relief sought by the DIP Motion. Because the United States' proposed language has not been approved by the Official Committee of Unsecured Creditors, the United States files this objection to preserve its rights.

## ARGUMENT

**A. The Debtors May Not Obtain an Injunction against the United States' Exercise of Recoupment and Setoff Rights Through a DIP Motion.**

17. The DIP Motion and the Interim DIP Order are silent as to whether the requested relief affects the recoupment and setoff rights of the United States. While the Debtors have made verbal assurances that they do not intend to limit or enjoin the United States' recoupment and setoff rights through the DIP Motion, the order should be revised to clarify this issue and avoid any inadvertent limiting effects on the United States.

18. The Debtors cannot obtain an injunction against the exercise of the United States' recoupment or setoff rights in a motion seeking approval of postpetition financing. Instead, they must file an adversary proceeding to seek an injunction. Fed. R. Bankr. Pro. 7001(7) (defining an adversary proceeding as "a proceeding to obtain an injunction"). *See Matter of Zale Corp.*, 62 F.3d 746, 762 (5th Cir. 1995) ("Under Rule 7001, an injunction requires an adversary

proceeding."); *In re Lyons*, 995 F.2d 923, 924 (9th Cir. 1993) (explaining that relief falling under one of the categories listed in Rule 7001 may only be obtained through an adversary proceeding); *In re Continental Airlines, Inc.*, 236 B.R. 318, 326-27 (Bankr. D. Del. 1999) (noting that proposition that injunctive relief requires an adversary proceeding is "generally correct"). Because the Debtors have not filed an adversary proceeding, the Court's order approving the DIP loan should clearly state that it should not be interpreted as enjoining CMS' recoupment and setoff rights.

**B.     The Debtors Cannot Limit or Impair the United States' Setoff and Recoupment Rights Under the Bankruptcy Code.**

19.     Even if Debtors could obtain injunctive relief with a motion for DIP financing, the Bankruptcy Code does not empower the Debtors or the Court to limit the United States' setoff and recoupment rights.

20.     Well-settled Third Circuit case law recognizes the United States' authority to recoup Medicare overpayments during bankruptcy if the overpayments and outgoing payments are from the same cost year. *See University Med. Ctr. v. Sullivan (In re University Med. Ctr.)*, 973 F.2d 1065, 1079-82 (3d Cir. 1992). Accordingly, CMS may reduce its payments to bankrupt debtors on account of prior overpayments owed to CMS for the same cost year.

21.     Moreover, section 553 of the Bankruptcy Code preserves the United States' setoff rights under statutes and common law, arising from mutual pre-petition debts and claims. *See* 11 U.S.C. § 553; 42 U.S.C. § 1395g(a); 26 U.S.C. § 6402(d)(1). The United States presently has claims aggregating over $5.5 million against certain Debtors for Medicare overpayments for past fiscal years, and has a contingent and unliquidated claim against the Debtors for additional

prepetition overpayments not yet determined.[5] The United States also may pay the Debtors post-petition for services provided pre-petition. *See In re Metro. Hosp.*, 110 B.R. 731, 737 (Bankr. E.D. Pa. 1990) (holding that underpayment arose prepetition where "[a]ll the Medicare services and the costs attendant … occurred prepetition," even though HHS's "final determination [as to the underpayment] was made postpetition"). In addition, the Debtors could be owed prepetition tax refunds, which would be subject to setoff because the United States, as a unitary creditor, has the right to set off any of its agencies' claims against debts owed by different agencies. *See In re Semcrude, L.P.*, 399 B.R. 388, 399 n.10 (Bankr. D. Del. 2009). Moreover, "[s]etoff … elevates an unsecured claim to secured status, to the extent that the debtor has a mutual, pre-petition claim against the creditor." *Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir. 1984).

22. The DIP Motion grants liens on all estate assets and provides that these liens will be senior to all other liens and other claims and interests (except for Prepetition Lenders' Replacement Liens, Permitted Liens, and the professional fee and U.S. Trustee fee carve-out). Its broad language could be interpreted to strip setoff and recoupment rights from the United States. However, with limited exceptions unrelated to a DIP Motion, the Bankruptcy Code "does not affect any right of a creditor to offset a mutual debt." 11 U.S.C. § 553(a). Nothing in sections 363 or 364 of the Bankruptcy Code – the provisions allowing the use of estate property and DIP financing – permits the Debtors to limit setoff or recoupment. Section 364 may permit the Debtors to grant superpriority liens and claims, but it does not permit Debtors to affect setoff, recoupment, or related rights. *See* 11 U.S.C. §§ 364, 553(a). Section 363 provides no basis for the Debtors to use Medicare trust funds because those trust funds are not property of the estate. *Cf. In re Tri Cty.*

---

[5] Overpayments may arise from the 2018 cost report, which is not yet due, as well as from prior cost years.

*Home Health Servs., Inc.*, 230 B.R. 106, 110 (Bankr. W.D. Tenn. 1999) ("The automatic stay in bankruptcy is inapplicable to recoupment because the funds subject to recoupment are not the debtor's property."). Moreover, even if the United States were to release funds to the Debtors subject to setoff and recoupment rights, section 363 only permits the Debtors to use those funds if the United States receives adequate protection. *See* 3 Collier on Bankruptcy P 362.03 (16th ed. 2018) ("A creditor's setoff right is viewed as a secured claim under section 506(a)," and "[f]unds subject to setoff are cash collateral under section 363(a) and may be used … only as provided in section 363(c)(2)."). Because the Debtors have not provided the United States with adequate protection under section 363(e), they may not grant liens that could be interpreted to impair the United States' setoff or recoupment rights. *See* 11 U.S.C. § 363(e); *In re Colonial Center, Inc.*, 156 B.R. 452, 463 (Bankr. E.D. Pa. 1993).

23. Accordingly, any final order should be clarified to explicitly preserve the United States' recoupment and setoff rights:

> For the avoidance of doubt, nothing in this Order or the DIP Documents shall affect, modify or impair any governmental unit's recoupment or setoff rights, claims, or defenses, and/or the priority of such recoupment and setoff rights, claims and defenses. Nothing contained in this Order should be construed to relieve the Debtors of any legal duties or obligations to any governmental unit under applicable non-bankruptcy laws and regulations. Nothing contained in this Order should be construed to affect the exclusive jurisdiction of the U.S. Department of Health & Human Services ("HHS") to adjudicate and pay Medicare claims in the ordinary course; provided however that the Debtors the Committee, the Prepetition ABL Administrative Agent and the DIP Administrative Agent reserve the right to contest HHS's exclusive jurisdiction at a later date.

C. **The DIP Motion May Not Affect CMS's Ability to Make Reimbursements under the Medicare Program in the Ordinary Course.**

9. The Interim DIP Order is ambiguous as to whether deposit accounts that were used by the Debtors to receive Medicare reimbursements will be transferred to the DIP

Administrative Agent, even though the Debtors stated on the record that the accounts would be unaffected. For instance, the Interim DIP Order provides that the Debtors shall deposit "all collections and proceeds of any DIP Collateral or Prepetition Collateral . . . in the same lock-box and/or deposit accounts into which the collections and proceeds of the Prepetition Collateral were deposited under the Prepetition ABL Documents *(or in such other accounts as are designated by the DIP Administrative Agent from time to time)* (collectively, the "Cash Collection Accounts"), which accounts (except as otherwise set forth in the DIP Agreement) shall be *subject to the sole dominion and control of the DIP Administrative Agent*." Interim DIP Order, ¶22 (emphasis added). Pursuant to 42 C.F.R. § 424.510(d)(2)(iii) and 424.510(e), the Debtors agreed to the terms of the CMS-588 forms under which they agree to retain control over the accounts that receive Medicare payments and to not change the payment accounts without complying with the agreement and applicable Medicare regulations. Thus, CMS, through its MACs, can only deposit Medicare reimbursements into the designated accounts listed on Debtors' CMS-588 forms and cannot deposit Medicare reimbursements into the DIP Administrative Agent's accounts.

10. Accordingly, the Court should include clarifying language in the final order consistent with the Debtors' representations at the first day hearing:

> For the avoidance of doubt, nothing in this Order or the DIP Documents shall modify the accounts into which the U.S. Department of Health & Human Services ("HHS") and its component, the Centers for Medicare and Medicaid Services, provides reimbursement to the Debtors as payment for services rendered under the Medicare program. Furthermore, custody and control over those deposit accounts will remain consistent with the applicable Medicare laws, regulations, and enrollment agreements, including, but not limited to, the Electronic Funds Transfer (EFT) Authorization Agreement (Form CMS-588).

11

## CONCLUSION

For the foregoing reasons, unless the curative language proposed above is included in the final order granting the DIP Motion, the Court should deny the DIP Motion.

Dated:  November 29, 2018 	Respectfully submitted

	JOSEPH H. HUNT
	Assistant Attorney General


	/s/Danielle A. Pham
	RUTH A. HARVEY
	MARGARET M. NEWELL
	SETH B. SHAPIRO
	DANIELLE A. PHAM

	Department of Justice
	Commercial Litigation Branch,
	Civil Division
	P.O. Box 875, Ben Franklin Station
	Washington, DC 20044-0875
	TEL: (202) 514-7451
	FAX: (202) 514-9163
	Email: danielle.pham@usdoj.gov

	ATTORNEYS FOR THE UNITED STATES

## CERTIFICATE OF SERVICE

  I hereby certify that on this 29th day of November 2018, I caused a true and correct copy of the foregoing objection to be served via electronic mail upon all parties receiving electronic notice under the Court's CM/ECF system.

           /s/ Danielle A. Pham
           Danielle A. Pham