## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PROMISE HEALTHCARE GROUP, LLC, *et al.*[1] | Case No. 18-12491 (CSS) |
| Debtors. | Jointly Administered |
| | Re: Docket No. 87 |

## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
## OBJECTION TO THE DEBTORS' SALE MOTION

The Official Committee of Unsecured Creditors (the "Committee") in the chapter 11

cases of Promise Healthcare Group, LLC (together with its affiliated debtors in possession, the

"Debtors") objects (the "Objection") to the *Motion of the Debtors for Entry of an Order (I)*

*Authorizing the Sale of Certain Real Property Free and Clear of All Liens, Claims, Interests, and*

*Encumbrances, and (II) Authorizing the Debtors to Reject Unexpired Lease of Nonresidential*

*Real Property* [Docket No. 87] (the "Sale Motion"), and respectfully states as follows:[2]

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Professional Rehabilitation Hospital, L.L.C. (5340), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179), Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc. (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc. (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), St. Alexius Hospital Corporation #1 (2766), St. Alexius Properties, LLC (4610), Success Healthcare 1, LLC (6535), Success Healthcare 2, LLC (8861), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766). The mailing address for the Debtors, solely for purposes of notices and communications, is 999 Yamato Road, 3rd FL, Boca Raton, FL 33431.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Motion.

## PRELIMINARY STATEMENT

1.      Upon its appointment, the Committee advised the Debtors of its many concerns with the Sale Motion, including the Debtors' request to conduct a private sale process, rather than a competitive auction.  The Debtors addressed certain of these concerns by agreeing to provide additional notice to potential bidders regarding the proposed sale and their opportunity to bid on the Real Property (as defined below).[3]  As a result of such additional notice and the Committee's request for an open sale process, the Committee has been advised that at least one other party has expressed an interest in acquiring the Real Property and an auction may be conducted.  The Committee, however, remains concerned that: (a) the Debtors' proposed December 3, 2018 bid deadline may not provide adequate time for all potential bidders to conduct diligence and formulate a bid (especially given the recent intervention of the Thanksgiving holiday weekend), and (b) an expedited sale process may be unnecessary, given that the Real Property is not a "melting ice cube."[4]

2.      The Committee hopes to resolve these and the other remaining concerns on a consensual basis and will work diligently with the Debtors and National Health Investors, Inc. ("National Health") to achieve those goals.  In the event a consensual resolution proves unobtainable, however, the Committee files this Objection because, as detailed below: (a) numerous grounds exist for the Court to deny the proposed sale and, in its place, provide for a competitive, value-maximizing auction, and (b) the SPA (as defined below) suffers numerous defects (*e.g.*, providing improper expense reimbursement and indemnification rights) and should not be approved as currently proposed.

---

[3] A copy of the *Notice of Opportunity to Buy Real Estate Free and Clear of All Liens, Claims and Encumbrances* is attached hereto as Exhibit A.

[4] The Committee is certainty cognizant of the milestones in the debtor-in-possession financing agreed to by the Debtors in these cases.

**BACKGROUND**

3. On November 5, 2018 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtors' cases are being jointly administered and no trustee or examiner has been appointed.

4. The Committee was appointed on November 14, 2018 [Docket No. 91].

5. On November 13, 2018, the Debtors filed the Sale Motion, seeking authorization to consummate the transaction embodied in that certain Purchase and Sale Agreement (the "PSA") between Debtor Quantum Properties, L.P. (the "Seller") and National Health. The PSA and Sale Motion contemplate the private sale of that certain facility known as Crestwood - San Diego, located at 550 University Avenue, San Diego, California 92105, and all easements and rights appurtenant thereto (collectively, the "Real Property") to National Health, free and clear of all liens, claims, interests, and encumbrances.

6. Although the Debtors' prepetition marketing efforts yielded multiple additional bids and a new bidder recently expressed an interest in acquiring the Real Property, the Debtors seek approval of a private sale to National Health (and to forego an auction) because they believe that National Health's bid is "the only bid for the Real Property that could close within the time allotted under the milestones set forth in the [Interim DIP Order]." See Sale Motion, pp. 2-3.

**OBJECTION**

**I.   The Proposed Private Sale Should Be Rejected in Favor of an Open, Competitive Auction Process.**

7. Although section 363 of the Bankruptcy Code does not specify a standard for authorization of a debtor's use, sale, or lease of property, bankruptcy courts authorize sales of debtor's assets only if the sale is based upon the sound business judgment of the debtor. See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Dai-Ichi Kangyo Bank

Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R.

147, 153 (D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991).

8.      When determining whether a proposed sale satisfies this standard, courts typically

consider: (i) whether a sound business justification exists for the sale; (ii) whether interested

parties received adequate and reasonable notice of the sale; (iii) whether the sale produces a fair

and reasonable price for the property; and (iv) whether the parties acted in good faith.  See Del.

& Hudson Ry., 124 B.R. at 176; In re Phx. Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del.

1987); In re United Healthcare Sys., Inc., No. 97-01159, 1997 WL 176574, at *4 n.2 (D.N.J.

March 26, 1997).  Importantly, the "sound business judgment" standard does not permit a court

to simply "rubberstamp" a debtor's proposal.  See, e.g., Key3Media Grp. v. Pulver.com (In re

Key3Media Grp.), 336 B.R. 87, 93 (Bankr. D. Del. 2005).  Rather, a debtor must always act in a

manner that maximizes the value of its estate for all interested parties.  In re Reliant Energy

Channelview LP, 594 F.3d 200, 210 (3d Cir. 2010).

9.      Here, the Debtors cannot satisfy the standards for approval of the proposed sale to

National Health, as such sale is not supported by a sound business judgment, is not reasonably

calculated to maximize the value of the Debtors' estates, and only inures to the benefit of

National Health, the DIP lenders (who seek to liquidate their collateral) and City National Bank

of Florida (together with the DIP lenders, the "Debtors' Lenders"), who holds a first-priority

deed of trust against the Real Property.

10.     The Debtors' sole justification for foregoing a competitive auction is a bald

assertion that no other potential bidder "could close within the time allotted under the milestones

set forth in the [Interim DIP Order]."  Sale Motion, p. 3.  However, the Debtors' desire to

appease their lenders cannot, as a matter of law, justify the sale under the business judgment

standard.  See, e.g., In re Encore Healthcare Assocs., 312 B.R. 52, 55 (Bankr. E.D. Pa. 2004)

4

(requiring "some business justification, *other than appeasement of major creditors*" for the terms of an asset sale) (emphasis added) (citing <u>Comm. of Equity Sec. Holders v. Lionel Corp. (In re The Lionel Corp.)</u>, 722 F.2d 1063, 1071 (2d Cir. 1983) (creditor appeasement "is insufficient as a matter of fact because it is not a sound business reason and insufficient as a matter of law because it ignores the equity interests required to be weighed and considered under Chapter 11")); <u>see</u> <u>also</u> <u>In re Mid-State Raceway, Inc.</u>, 323 B.R. 40, 59 (Bankr. N.D.N.Y. 2005) (courts refuse "to allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender.") (citation omitted); <u>In re Pinnacle Brands</u>, 259 B.R. 46, 53-54 (Bankr. D. Del. 2001) ("A debtor's fiduciary duty is to maximize the value of the estate for distribution to creditors, not to minimize the exposure of an individual creditor").

11.    Rather than a closed sale process that benefits only National Health and the Debtors' Lenders, this Court should approve an open and competitive sale process to maximize value for all creditors.[5]  <u>See</u> <u>Simantob v. Claims Prosecutor, LLC (In re Lahijani)</u>, 325 B.R. 282, 288-89 (B.A.P. 9th Cir. 2005) ("The court's obligation in § 363(b) sales is to assure that optimal value is realized by the estate under the circumstances . . . The price achieved by an auction is ordinarily assumed to approximate market value when there is competition by an appropriate number of bidders.  When competition is constrained, however, the price is less likely to be reliable and should be examined more carefully"); <u>In re Harwald</u>, 497 F.2d 433, 444 (7th Cir. 1974) ("sale by public auction, where all interested parties can be brought together for open, competitive bidding, will result in the highest prices which could be obtained on behalf of the creditors for the bankrupt's property.") (citation omitted).

---

[5] The PSA expressly allows the Seller to "seek approval of a public sale/auction . . . [i]n the event that the Bankruptcy Court does not approve a private sale . . ." <u>See</u> <u>PSA</u> §6(j).

## II.    Specific Provisions of the SPA Are Inappropriate.

12.    The Court should not approve the Sale Motion based on the currently proposed SPA.  As discussed below, the SPA suffers numerous defects, including providing National Health: (i) reimbursement for up to $350,000 of its costs and expenses, (ii) broad indemnification rights that extend to conduct beyond the Seller's control.

13.    More specifically, among the numerous problems with the proposed SPA are the following, certain of these are the subject current discussions between and among the Debtors, the Committee and National Health:[6]

- Section 6(i) (Expense Reimbursement).  Under Section 6(i) of the SPA, upon the closing of the proposed sale to National Health or the termination of the SPA for various reasons, National Health is entitled to reimbursement of up to $350,000 of its costs and expenses.  This provision is objectionable because, under the circumstances, no bid protections are warranted.  National Health's bid is not a traditional "stalking horse bid" that sets a "bidding floor" for the Debtors' assets and promotes a robust auction.  Here, there is no proposed auction.  Moreover, what bidding floor does National Health possibly set if it can "walk away" from the proposed sale simply by stating that it was unable to reach an agreement regarding the lease with its tenant (which is discussed in greater detail below)?  National Health should not receive the benefits of serving as a stalking horse bidder when its bid does not entail the "bid-promoting" benefits stalking horse bids are designed to produce.  And, just as importantly, what *necessity* can there be to provide such a bid protection to National Health when it has already conducted more due diligence than any other party?

- Section 20(a) (Indemnity).  Section 20(a) provides, in pertinent part, that "Seller shall indemnify, defend, reimburse and hold harmless [National Health] from and against any claims, causes of action, judgments, losses, liabilities, penalties, damages, costs and expenses, including reasonable attorneys' fees and other costs of defense . . . suffered or incurred by [National Health] and caused by, resulting from or arising by reason of (i) any breach of any representation of warranty by Seller, (ii) any breach of any covenant by Seller, (iii) Seller's Default hereunder, (iv) the use or ownership of the Facility prior to the Closing Date, (v) any Excluded Asset or Excluded Liability, and (vi) any failure of the Project to comply with any statute, law, ordinance or regulation relating to zoning or

---

[6] Additional comments to the proposed SPA have been included in the Committee's mark-up of the proposed SPA (the "Committee Mark-up"), attached hereto as Exhibit B.

conditional use permitting for the permitted use of a 125-bed mental health rehabilitation center, including but not limited to any costs and expenses incurred by [National Health] or Crestwood to obtain proper zoning or a current zoning letter for the Project after the Closing in form and substance satisfactory to [National Health]." This provision is objectionable because: (a) romanettes (i) and (ii) should be limited to "material" breaches by the Seller, and (b) romanettes (iv)-(vi) should be deleted in their entirety because the Seller should not be obligated to indemnify National Health for actions that are not within its control.

- Section 5 (Third-Party Reports). Under the SPA, National Health is entitled to order and obtain, and the Seller is obligated to pay for, a multitude of "Third-Party Reports" (including a "Property Inspection," an "Environmental Report," a "Purchase Price Allocation Study," an "Erosion Report," a "Title Commitment," a "Survey," a "Zoning Report" and "Lien Searches" (as each of these items is defined in the SPA)). This is objectionable because National Health should be responsible for the costs of its own due diligence.

- Section 10 (Seller's Representations and Warranties). The SPA, as currently drafted, is objectionable because the Seller should only be required to make representations and warranties as to facts within its knowledge and control.

- Section 17(xi) (Conditions Precedent). Section 17(xi) of the SPA provides that "[t]he obligation of [National Health] to close the transaction contemplated hereby shall be subject to the satisfaction of the following conditions prior to, or concurrently with, the Closing: . . . (xi) Purchaser shall have entered into the new Lease, and all related transaction documents for the Project with Crestwood and/or Tenant on terms acceptable to Purchaser within thirty (30) days of the date of this Agreement." This is objectionable because National Health and the new tenant should agree on a new lease *prior to* National Health signing the SPA. The new lease could be contingent upon National Health closing title on the Real Property.

14.     Only if all of the above problems with the SPA and the other issues identified in the Committee Mark-up are addressed can the sale process be allowed to proceed.

## **RESERVATION OF RIGHTS**

15.     The Committee reserves its right to amend or supplement this Objection or join any objection to the Sale Motion and to seek discovery and/or present evidence at any hearing in connection therewith.

**WHEREFORE**, the Committee respectfully requests that the Court deny or modiy the

Sale Motion consistent with the foregoing and grant the Committee such other and further relief

as is just and proper.

Dated: November 29, 2018    PACHULSKI STANG ZIEHL & JONES LLP

         */s/ Bradford J. Sandler*
         Jeffrey N. Pomerantz, Esq.
         Bradford J. Sandler, Esq.
         Colin R. Robinson, Esq.
         919 N. Market Street, 17th Floor
         Wilmington, DE  19801
         Telephone:  (302) 652-4100
         Facsimile:  (302) 652-4400
         E-mail:  jpomerantz@pszjlaw.com
            bsandler@pszjlaw.com
            crobinson@pszjlaw.com

         - and -

         Andrew H. Sherman
         Boris I. Mankovetskiy
         SILLS CUMMIS & GROSS P.C.
         One Riverfront Plaza
         Newark, NJ 07102
         Telephone:  973-643-7000
         Facsimile:  973-643-6500
         Email:  asherman@sillscummis.com
            bmankovetskiy@sillscummis.com

         *Proposed Counsel to the Official Committee of*
         *Unsecured Creditors*

## **EXHIBIT A**

(Notice of Opportunity to Buy Real Estate
Free and Clear of All Liens, Claims and Encumbrances)

DOCS_DE:222110.1 72551/002

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
-------------------------------------------------------------x
                                                             :
In re:                                                       :   Chapter 11
                                                             :
PROMISE HEALTHCARE GROUP, LLC, et al.,¹                      :   Case No. 18-12491 (CSS)
                                                             :
            Debtors.                                         :   (Jointly Administered)
-------------------------------------------------------------x
```

### NOTICE OF OPPORTUNITY TO BUY REAL ESTATE
### FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES

## Opportunity to Purchase Crestwood – San Diego Rehabilitation Center:
## Located at 5550 University Avenue, San Diego, CA 92105 (the "Property")

This is to notify you that the Property will be available for purchase no later than December 4, 2018. The seller of the Property, Quantum Properties, L.P. ("Quantum"), is a debtor in a bankruptcy case filed in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case No. 18-12497. The Bankruptcy Court will hold a hearing on **December 4, 2018 at 11:00 a.m. (Eastern Time)** to select a winning bidder for the Property.

---

[1]     The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Professional Rehabilitation Hospital, L.L.C. (5340), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179),   Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc.  (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc.  (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, Inc. (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), St. Alexius Hospital Corporation #1 (2766), St. Alexius Properties, LLC (4610), Success Healthcare 1, LLC (6535), Success Healthcare 2, LLC (8861), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766).  The mailing address for the Debtors, solely for purposes of notices and communications, is 999 Yamato Road, 3rd FL, Boca Raton, FL  33431.

There is an opportunity for you to participate in an auction for the Property, if you choose. Attached is final version of the Purchase and Sale Agreement between Quantum and a current bidder (the "PSA").  Any bid for the Property must exceed $_____.

Parties interested in participating in an auction for the Property will need to submit a binding version of a revised PSA (showing marked changes), along with a cash deposit of $450,000 (the "Deposit") by **1:00 p.m. (Eastern Time) Monday, December 3, 2018** to this office and auction will be conducted _____.

Wire transfer and cashier's checks made payable to Healthcare Finance Partners Corporation will be the only form of currency accepted for the Deposit. To the extent changes are made to the PSA, only changes that improve the financial terms of the PSA will be accepted.

Please contact Kevin Roy at NFP at _____ if you have questions.


Kevin Roy

# **EXHIBIT B**

(SPA Mark-up)

DOCS_DE:222110.1 72551/002

**Purchase and Sale Agreement**

4838-4952-8441.8
32591170 v2
EAST\162459625.1

5896419 v1 v2 Purschase and Sale Agreement
between Quantum Properties and National
Health Investors

EXECUTION VERSION

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "**Agreement**"), dated as of November 12_____, 2018, is by and between Quantum Properties, L.P., a California limited partnership ("**Seller**"), and National Health Investors, Inc., a Maryland corporation, or its assignee, nominee or designee on the terms as permitted herein ("**Purchaser**").

## RECITALS

A.      Seller is the owner of record of the real property and all improvements used in connection with the mental health rehabilitation center known as Crestwood - San Diego located at 5550 University Avenue, San Diego, California 92105 (the "**Facility**") and all easements and rights appurtenant thereto (collectively, the "**Real Property**"), which Real Property is legally described on Exhibit A attached hereto. The Facility, the Real Property, and the Purchased Assets (as defined below) are referred to herein collectively as the "**Project**".

B.      Seller filed a voluntary Chapter 11 petition on November 4, 2018 (the "**Petition Date**"), Case No. 18-12497 (the "**Bankruptcy Case**"), under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). Seller intends to continue to operate as a debtor-in-possession under the Bankruptcy Code.

C.      Subject to Bankruptcy Court approval and approval of the Final Private Sale Order (as hereinafter defined), Purchaser desires to purchase from Seller and Seller desires to sell to Purchaser all of Seller's right, title and interest in and to the Project and other Purchased Assets (as defined below) on the terms and conditions set forth herein free and clear of any charge, claim, community or other marital property interest, condition, equitable interest, lien, encumbrance, option, pledge, security interest, mortgage, right of way, easement, encroachment, servitude, right of first option, right of first refusal or similar restriction, including any restriction on use, voting (in the case of any security or equity interest), transfer, receipt of income or exercise of any other attribute of ownership (individually an "**Encumbrance**" and collectively, the "**Encumbrances**"), and interests (except for Permitted Exceptions) in accordance with the Final Private Sale Order and sections 105, 363, and 365 and other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure. This Agreement contemplates a private bankruptcy sale and not a public auction.

D.      Crestwood Behavioral Health, Inc., a Delaware corporation ("**Crestwood**"), is currently leasing the Facility from Seller (the "**Existing Lease**") and upon consummation of this transaction, University Partners, LLC, a California limited liability company ("**Tenant**"), will lease the Facility and Real Property from Purchaser in accordance with the terms and provisions of that certain lease to be entered into on or prior to the Closing Date (as hereinafter defined) by and between Purchaser and Tenant, and then Tenant will sublease the Facility and Real Property to Crestwood in accordance with the terms and provisions of that certain sublease to be entered into on or prior to the Closing Date (as hereinafter defined) (the to be executed lease and sublease shall be collectively referred to herein as the "**Lease**").

4829-3214-7309.25

E.      Following Bankruptcy Court approval of this Agreement and entry of the Final Private Sale Order, the parties intend to consummate the transactions contemplated by this Agreement as further described herein.

**NOW, THEREFORE**, for and in consideration of the mutual promises, covenants and conditions herein contained, the receipt, sufficiency and adequacy of which are hereby mutually acknowledged, and other good and valuable consideration, the parties hereto agree as follows:

1.      **Purchase and Sale Agreement**.

(a)      Purchased Assets. On the terms and conditions set forth herein, on the Closing Date, Seller shall sell, or cause to sell, to Purchaser, and Purchaser shall purchase from Seller, the following assets, properties and rights, all free and clear of all Encumbrances and interests (to the full extent permitted by the Bankruptcy Code, as determined by Bankruptcy Court in the Final Private Sale Order) except for Permitted Exceptions:

(i)      fee simple title to the Project;

(ii)      all of the right, title and interest accruing to the owner of any portion of the Project in, to and under: all guaranties, warranties and agreements from contractors, subcontractors, vendors and suppliers regarding their performance, quality of workmanship and quality of materials supplied in connection with the construction, manufacture, development, installation and operation of any and all of the Project (collectively the "**Warranties**"); and any certificates of occupancy, certificates of need, if any, licenses, permits, government authorizations, accreditations, authorizations, certifications, consents and approvals (collectively, including any pending applications or renewals thereof, the "**Permits**") related to the ownership (as compared to the operation) of any portion of the Project and only to the extent the same are assignable to the Purchaser; and

(iii)      all manuals and other records attributable to the Project.

The assets described above in this Section 1(a) shall hereinafter be collectively referred to as the "**Purchased Assets**."

(b)      Excluded Assets. Notwithstanding any other provision of this Agreement to the contrary, Seller and Purchaser acknowledge and agree that the Purchased Assets shall not include any of Seller's, or any of its Affiliates', cash, cash equivalents, accounts receivable, bank accounts, financial books and records, proprietary computer software, minute books, or proprietary materials (collectively, the "**Excluded Assets**").

(c)      Excluded Liabilities. Purchaser shall not assume or otherwise be responsible for any liabilities or obligations of Seller of any kind, whether known or unknown, contingent, matured or otherwise, whether currently existing or hereinafter created, including but not limited to (i) any personal property tax liability or related personal property account with San Diego County and (ii) any and all applicable

brokerage fees arising under this transaction, including but not limited to, fees arising under that certain agreement between Seller and Healthcare Finance Partners, Corp. dated January 19, 2018 (collectively, the "**Excluded Liabilities**"). All liabilities and obligations of Seller, including the Excluded Liabilities, shall be retained by and remain obligations of Seller after the Closing subject to and in accordance with applicable law, including, without limitation, applicable bankruptcy law. For the avoidance of doubt, Purchaser shall be responsible only for liabilities and obligations incident to ownership of the Project to the extent arising after the Closing. The provisions of this Section 1(c) shall survive the Closing indefinitely.

As used herein, "**Affiliate**" shall mean any Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control, as the case may be. For the purposes of this definition, "**control**" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. As used herein, "**Person**" shall mean any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or other enterprise.

2.  **Purchase Price; Closing Consideration; Seller Escrow**.

(a)  <u>Closing Consideration</u>. The purchase price payable by Purchaser to Seller for the Purchased Assets shall be Fifteen Million and No/100 Dollars ($15,000,000.00) (the "**Purchase Price**"). The Purchase Price shall be paid in cash or other immediately available funds, plus or minus prorations, credits and adjustments as provided in this Agreement.

(b)  <u>Purchase Price Allocation</u>. The Purchase Price and all other amounts constituting consideration, within the meaning of, and for purposes of, Section 1060 of the Internal Revenue Code, for the Purchased Assets shall be allocated as set forth in <u>Exhibit B</u> attached hereto, which exhibit shall be reasonably determined in good faith by an independent third party engaged by Purchaser.

(c)  <u>Intentionally Deleted</u>.

(d)  <u>Holdback Deposit</u>. Purchaser shall deposit into an escrow account established with the Title Company a holdback deposit amount of Three Hundred Fifty Thousand and No/100 Dollars ($350,000.00) (the "**Holdback Deposit**") in cash for a period of six (6) months after the Closing. The Holdback Deposit shall be credited toward the Purchase Price and shall be subject to and governed by that certain Escrow Agreement attached hereto as <u>Exhibit C</u> which shall, among other things, grant a security interest to Purchaser in the Holdback Deposit and provide for the satisfaction of any and all indemnification claims of the Purchaser pursuant to Section 20.

3.  **Closing**. The closing of the purchase and sale of the Purchased Assets pursuant to this Agreement (the "**Closing**") shall take place on a date mutually acceptable to Seller and Purchaser, which shall in any event occur within five (5) business days from entry of a Final Private Sale Order, provided all of the deliveries in Section 16 and the conditions precedent set forth in Section 17 have either been satisfied or waived by the applicable party (the "**Closing**

Date"), and further provided that the Closing Date may be changed upon the written mutual agreement of Seller and Purchaser. The Closing shall take place at or through the offices of the First American Title Insurance Company (the "**Title Company**") in Nashville, Tennessee or at such other place as Seller and Purchaser shall mutually agree in writing. The Closing shall be consummated through an escrow in accordance with the general provisions of the customary form of deed and money escrow instructions then in use by the Title Company for the closing of commercial real estate transactions and with such other provisions as are necessary to effectuate this Agreement (the "**Closing Escrow**"). Seller shall deliver possession of the Purchased Assets to Purchaser at the Closing free and clear of any and all Encumbrances and interests, subject only to the Permitted Exceptions (as defined below).

As used herein "**Final Private Sale Order**" shall mean an order or judgment, the operation or effect of which is not stayed, and as to which order or judgment (or any revision, modification or amendment thereof), the time to appeal or seek review or rehearing has expired, and as to which no appeal or petition for review or motion for re-argument has been taken or been made and is pending for argument.

**4.** **Environmental Report; Property Inspection; Appraisal and Erosion Report**. Purchaser shall, in its discretion, order and obtain: (a) a written structural and physical condition report of the Project, including all improvements thereof (the "**Property Inspection**"), (b) a Phase I environmental report for the Project, and Phase II if so recommended by the Phase 1, (the "**Environmental Report**"), (c) a purchase price allocation study of the Project (the "**Purchase Price Allocation Study**"), and (d) an analysis and recommendation regarding erosion remediation for the Project (the "**Erosion Report**"). The Property Inspection, the Environmental Report, the Purchase Price Allocation Study, and the Erosion Report shall be prepared by third-party providers, and shall be in form, content and substance, satisfactory to Purchaser, in its sole and absolute discretion.

**5.** **Third-Party Reports**. It is understood and acknowledged between the parties that both parties may rely upon the Property Inspection, the Environmental Report, the Purchase Price Allocation Study, the Erosion Report, the Title Commitment (as defined below), the Survey (as defined below), the Zoning Report (as defined below), and the Lien Searches (as defined below), (all collectively the "**Third-Party Reports**"). Purchaser and its agents and representatives shall be entitled during normal business hours to enter upon the Project accompanied by a representative of Seller for purposes of inspecting the Project, including, without limitation, patient/resident areas and all structural, mechanical and other systems within the Facility, provided that such inspections shall not cause damage to the Facility or unduly disturb the occupants thereof. Purchaser agrees to provide Seller copies of the Third-Party Reports upon obtaining copies of the reports in form, content, and substance satisfactory to Purchaser in its sole discretion. ~~Notwithstanding the foregoing and anything to the contrary contained herein, the Third Party Reports will not be released or otherwise provided to Seller unless and until all costs associated therewith are paid by or on behalf of Seller to Purchaser or the relevant third party~~Purchaser shall be responsible to pay the cost of all Third Party Reports.

**6.** **Bankruptcy Matters**.

      (a)    <u>Intentionally Deleted</u>.

4829-3214-7309.25

- 4 -

(b)    Delivery of Documents. Prior to filing, the Seller shall deliver or cause to be delivered to Purchaser for review and comment all documents to be filed by the Seller with the Bankruptcy Court that relate to the transactions contemplated by this Agreement, as soon as commercially reasonable and in any event not less than (1) business day prior to filing, including all motions, proposed orders, applications, supporting papers, and any and all amendments related thereto, prepared by the Seller. All motions, proposed orders, applications, supporting papers, and any and all amendments related thereto, prepared by the Seller and relating to the transactions contemplated by this Agreement to be filed by the Seller must be in form and substance acceptable to both the Purchaser and the Seller.

(c)    Intentionally Deleted.

(d)    363 Sale Motion. Promptly upon all parties executing this Agreement, but in no event later than five (5) business days thereafter, the Seller shall file a motion with the Bankruptcy Court ("**Private Sale Motion**") requesting entry of an order of the Bankruptcy Court that will, among other things, approve the private sale of the Purchased Assets pursuant to this Agreement ("**Private Sale Order**"). The Private Sale Order shall be substantially in the form of Exhibit D (with such changes to such form as the Seller and the Purchaser shall mutually approve). The Seller shall use reasonable best efforts to seek Bankruptcy Court approval of the Private Sale Motion notwithstanding any objections thereto.

(e)    Notice. The Seller and the Purchaser shall give prompt notice to each other of (i) any written notice or other written communication from any Person alleging that the consent of such Person which is or may be required in connection with the transactions contemplated hereby is not likely to be obtained prior to Closing, and (ii) any written objection or proceeding that challenges such transactions or the entry of the Private Sale Order.

(f)    Intentionally Deleted.

(g)    Private Sale Order. The Private Sale Order approving this Agreement and authorizing and approving the transactions contemplated hereby, shall be consistent with the intentions of the parties stated in this Agreement, and provide for, among other things, in terms reasonably acceptable to the parties: (A) that the Seller shall sell, transfer, and assign the Purchased Assets to the Purchaser pursuant to this Agreement and Bankruptcy Code sections 105 and 363, and that the Purchased Assets are free and clear of any and all Encumbrances and interests except for Permitted Exceptions; (B) that the Purchaser shall not assume any of the Seller's liabilities, including, without limitation, the Excluded Liabilities; (C) that the Existing Lease to Crestwood is rejected; and (D) the Purchaser is a good-faith purchaser and is thereby entitled to the protections of section 363(m) of the Bankruptcy Code. For the avoidance of doubt, the rejection of the Existing Lease to Crestwood may be effectuated by a separate order of the Bankruptcy Court. The parties shall act in cooperation to adduce adequate evidence to support a good faith finding pursuant to section 363(m) of the Bankruptcy Code.

(h)  Appeal. In the event the entry of the Private Sale Order shall be appealed, the Seller shall use its reasonable best efforts to defend such appeal. Notwithstanding anything to the contrary set forth herein, nothing herein shall negate or limit the requirement of a finding that the Purchaser is entitled to the protections afforded to good faith purchasers under Section 363(m) of the Bankruptcy Code.

(i)  Expense Reimbursement. Upon the occurrence of the earlier of the Closing or a Compensable Termination Event (as defined herein), the Purchaser shall be entitled, in consideration of its rights under this Agreement, to reimbursement by the Seller (in cash or other immediately available funds) for all reasonable out-of-pocket costs and expenses, including but not limited to, Third Party Reports, extended coverage title policy, transfer taxes and recording of the deed and Purchaser's legal fees and expenses and other professional fees and expenses, incurred by the Purchaser in connection with the Bankruptcy Case, the acquisition (or attempted acquisition) of the Purchased Assets, and the negotiation, execution, and delivery of this Agreement in an aggregate amount not to exceed Three Hundred Fifty Thousand and No/100 Dollars ($350,000.00) (the "**Expense Reimbursement**"). The Expense Reimbursement shall be paid, in immediately available funds, to the Purchaser concurrently with the earlier of the occurrence of a Compensable Termination Event or the Closing. The Seller agrees that it has or will obtain an allowed super-priority lien position, subject only to any carve-out for the Debtors' and any committee's professionals, in any post-petition financing or cash collateral agreement for the Expense Reimbursement and, if applicable, the Break Up Fee (as defined below) (the "**Purchaser Carve-Out**"). The Seller agrees that it will not enter into any post-petition financing or cash collateral agreement under Sections 363 or 364 of the Bankruptcy Code that does not preserve the Purchaser Carve-Out. Seller shall pay any and all applicable brokerage fees arising under this transaction to Healthcare Finance Partners, Corp. in the amount of 2.5% of the Purchase Price as recited under that certain agreement between Seller and Healthcare Finance Partners Corp. dated January 19, 2018. The Expense Reimbursement and the brokerage fees payable to Healthcare Finance Partners Corp. shall be deemed an allowed super-priority administrative expense claim of the Purchaser under Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of any kind, other than any carve-out for the Debtors' and any committee's professionals, including, without limitation, those specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and shall be paid upon the earlier of a Compensable Termination Event or the Closing. If the Closing occurs before the occurrence of a Compensable Termination Event, the Expense Reimbursement shall be paid from the sale proceeds prior to the payment of any other amounts.

(i)  Intentionally Deleted.

(j)  Alternative Sale Process. The Seller shall use reasonable best efforts to seek Bankruptcy Court approval of the Private Sale Motion notwithstanding any objections thereto. In the event that (i) the Bankruptcy Court does not approve a private sale pursuant to the Private Sale Motion and/or does not enter the Private Sale Order, or (ii) the Seller determines that it cannot, consistent with its fiduciary duties, seek Bankruptcy Court approval of the Private Sale Motion over any objections thereto, then Seller shall, at Purchaser's written election made within a reasonable time after any such occurrence (the "**Stalking Horse Election**"), seek Bankruptcy Court approval of a public

sale/auction and bid procedures requesting approval of (a) this Agreement with Purchaser as stalking horse, (b) bid procedures in a form and substance acceptable to both Seller and Purchaser (or as ordered by the Bankruptcy Court), (c) the Break-Up Fee (as defined below), and (d) the Expense Reimbursement (as defined herein). Upon a Stalking Horse Election, Seller and Purchaser shall work diligently and use reasonable best efforts to amend this Agreement to contemplate a public sale/auction and to prepare the other necessary documents and filings, including without limitation the bid procedures and related motions, to consummate the public sale/auction. The amendment to this Agreement and any other document or filing related to the public sale/auction shall be in form and substance satisfactory to the both Seller and Purchaser. Upon a Stalking Horse Election, Purchaser shall be entitled to, and Seller shall seek Bankruptcy Court approval of, a break-up fee (not dependent on amounts actually expended or incurred by the Purchaser) in cash or other immediately available funds in the amount of Four Hundred Fifty Thousand and No/100 Dollars ($450,000.00) (the "**Break-Up Fee**"), which shall be paid, in immediately available funds, to the Purchaser upon the occurrence of a Compensable Termination Event, and shall seek approval of the Expense Reimbursement, which shall be paid upon the earlier of the Closing or a Compensable Termination Event. The Break-Up Fee has been or shall be included in the Purchaser Carve-Out. The Break-Up Fee shall be deemed an allowed super-priority administrative expense claim of the Purchaser under Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of any kind, other than any carve-out for the Debtors' and any committee's professionals, including, without limitation, those specified in Sections 503(b) and 507(b) of the Bankruptcy Code. Assuming there is a Stalking Horse Election, if a closing or the Closing occurs, the Break-Up Fee and the Expense Reimbursement shall be paid at that closing or the Closing from the sale proceeds of any sale of any portion of the Purchased Assets prior to the payment of any other amounts. The Break-Up Fee will be in addition to, and not in lieu of, the Expense Reimbursement.

As used herein "**Compensable Termination Event**" shall have occurred if (i) the Bankruptcy Court approves a sale of any part of Purchased Assets to any other person or entity other than the Purchaser, (ii) the Seller subsequently liquidates or otherwise disposes of the Purchased Assets in one or a series of transactions, (iii) a Seller's Default occurs or this Agreement is terminated pursuant to Sections 21(b)(i)-(viii) or 21(c), (iv) the Court does not approve this Agreement or the transactions contemplated hereby, (v) the Seller withdraws or modifies the Private Sale Motion for any reason, (vi) an operating trustee is appointed over the Seller without the Purchaser's consent, (vii) the Seller terminates this Agreement for any reason, or (viii) a timely Closing does not occur for any reason whatsoever except in the event of a Purchaser's Default. Purchaser may use any amount of the Break-Up Fee and/or the Expense Reimbursement, in such order and manner as Purchaser may deem in its sole discretion, as a credit bid in the event of any sale/auction of any part of the Purchased Assets.

7.     **Intentionally Deleted**.

8.    **Seller's Deliveries**. Seller represents, warrants, acknowledges and agrees that it has provided Purchaser with access to each of the following items relating to the Project (collectively, the "**Seller's Deliveries**"):

(a)    all architectural and engineering plans, drawings and specifications for the Project (including plans, drawings and specifications for any renovations or additions thereto) (collectively, the "**Plans**") that are in Seller's possession or control;

(b)    copies of any appraisals, feasibility or engineering studies, reports or surveys, including, without limitation, environmental reports that are in Seller's possession or control;

(c)    copies of the most recent ALTA survey and title policy that are in Seller's possession or control;

(d)    all books and records maintained by the Seller relating to the Purchased Assets and any evidence in the Seller's possession or control that the Project (and the current use thereof) complies with all applicable zoning laws, ordinances, rules and regulations, and that the Project is not a legal non-conforming use or structure under such laws, ordinances, rules or regulations;

(e)    a list and summary description of all insurance policies maintained by the Seller and Crestwood in connection with the ownership, use or operation of the Project, including liability insurance, fire and extended coverage insurance, boiler insurance and business interruption insurance (collectively, the "**Insurance Policies**"); and

(f)    final proposed copies of the following documents that the Seller intends to submit to the Bankruptcy Court: Private Sale Motion, Private Sale Order, and any and all other documents related to the sale of the Purchased Assets through the Bankruptcy Case as may reasonably be requested by Purchaser.

9.    **Seller's Covenants**. During the period between the date of this Agreement and the Closing, Seller covenants and agrees as follows:

(a)    Seller shall maintain, or shall cause Crestwood to maintain, the Project (i) free from waste and neglect and in substantially the same or better repair, order and condition, normal wear and tear excepted, as it is on the date of this Agreement, and (ii) maintain and conduct the Facility's operations and business in the usual, regular and ordinary manner on a basis consistent with current practice and in accordance with the requirements of the Existing Lease and all applicable laws;

(b)    Seller shall maintain, or shall cause Crestwood to maintain, the Insurance Policies;

(c)    Seller shall not (i) enter into any amendment to the Existing Lease, (ii) cause or permit any material change in the operation of the businesses conducted at the Facility, (iii) without the prior written consent of the Purchaser, fail to exercise any

rights of renewal with respect to the Existing Lease that by its terms would otherwise expire, or (iv) enter into any agreements materially affecting the Purchased Assets;

(d)    Seller shall file or cause to be filed all returns, reports and filings of any kind or nature required to be filed by Seller, and will timely pay all taxes and other obligations which are due and payable with respect to Purchased Assets;

(e)    Seller shall not take any actions which are inconsistent with its obligations under this Agreement or which could hinder or delay the consummation of the transactions contemplated by this Agreement;

(f)    Seller shall perform all of its respective obligations in all material respects under the Existing Lease or other agreements related to the Project or any part of either thereof;

(g)    at Closing, Seller will not be indebted to any Person for work performed on the Project for which any Person could claim a lien on any part of the Project;

(h)    at all times prior to Closing, Seller shall and shall cause Crestwood to comply in all material respects with the terms and conditions of the Existing Lease; and

(i)    from the date of this Agreement until the earlier of the termination of this Agreement or the Closing, Seller shall immediately provide written notice to the Purchaser upon the occurrence of any of the following: (i) any change, circumstance, event, fact, or condition that causes or constitutes a breach of any of the representations or warranties of the Seller set forth in this Agreement that would reasonably be expected to cause a Material Adverse Effect (hereinafter defined); and/or (ii) any change, circumstance, event, fact, or condition that prevents or is reasonably likely to prevent the Seller from complying with any of its obligations hereunder.

As used herein, "**Material Adverse Effect**" means any event, circumstance, fact, state of facts, occurrence, development, result, change or effect that individually or in the aggregate is, or would reasonably be expected to have, a material adverse effect on the business, operations, results of operations of the business as a whole, condition (financial or otherwise) or of assets of the Project, taken as a whole, except to the extent such material adverse effect is the result of the following: (a) changes in economic, social or political conditions or the financing, banking, currency or capital markets in general; (b) changes in laws or changes in accounting requirements or principles or interpretations thereof by any governmental authority; (c) changes in economic, social or political conditions in the market or geographical area in which the Project is situated or changes in the healthcare industry generally; (d) the negotiation, execution, announcement, pendency or performance of this Agreement or any communication by Purchaser or any of its Affiliates of their plans or intentions with respect to the Project; (e) the consummation of the transaction contemplated herein or any actions by the parties taken pursuant to this Agreement or in connection with the transaction contemplated herein; (f) actions taken by Seller or its Affiliates with the written consent of, or at the request of, Purchaser (including those actions required or permitted by this Agreement); (g) any acts of terrorism, sabotage, military action, armed hostilities or war (whether or not declared) or any escalation or worsening thereof, whether or

- 9 -

not occurring or commenced before or after the date of this Agreement ~~or~~; (h) natural disasters, acts of God, force majeure events, epidemics or pandemics; except in the case of (a), (b), (c), (g), or (h) above where the same has a materially disproportionate effect on Seller as compared to other Persons; (i) seasonal fluctuations of Seller's business consistent with prior fiscal years; (j) any changes in GAAP; (k) requirements, reimbursement rates, policies or procedures of third party payors or accreditation commissions or organizations that are generally applicable to hospitals or healthcare facilities; (l) the pendency of the Bankruptcy cases, compliance with the Bankruptcy Code and the developments and circumstances concerning the financial condition of Seller for periods leading up to the filing of the Bankruptcy cases; or (m) the ability of Seller to complete the transactions contemplated by this Agreement or to perform its obligations under this Agreement or any of the documents contemplated herein.

   10. **Seller's Representations and Warranties**. Except as set forth on the disclosure schedule attached hereto as Exhibit G ("**Seller Disclosure Schedule**"), Seller represents and warrants to the best of its knowledge, (which representations and warranties shall survive up to and including the Closing as provided herein) to Purchaser as of the date hereof and as of the Closing Date that:

(a) Real Property. Seller's fee simple title to the Project will, as of the Closing Date, be free and clear of any and all Encumbrances and interests except for (i) liens for taxes, assessments and other governmental charges not yet due and payable, and (ii) those other items identified in the Title Commitment (as defined below) or the Survey (as defined below) which are otherwise waived by Purchaser in accordance with this Agreement (collectively, the "**Permitted Exceptions**") or Defects (as defined in Section 15 hereof. Neither Seller nor any Affiliate of Seller owns any additional real property adjoining any portion of the Project. Except for the Existing Lease, Seller has not leased or otherwise granted to any Person the right to use or occupy such Project or any portion thereof. ~~There~~ Except as may be set forth in the Existing Lease, there are no unrecorded outstanding options, rights of first offer or rights of first refusal to purchase the Project or any portion thereof or interest therein to which Seller or the members of Seller are a party. Seller has not received any written notice of (i) violations of building codes and/or zoning ordinances or other governmental or regulatory laws affecting the Project during the period of operation under the Existing Lease, (ii) existing, pending or threatened condemnation proceedings affecting the Project, or (iii) existing, pending or threatened zoning, building code or other moratorium proceedings, or similar matters which could reasonably be expected to adversely affect the ability to operate the Project as currently operated. Neither the whole nor any material portion of any Real Property has been destroyed by fire or other casualty.

(b) Personal Property. Seller does not own any furniture, fixtures or equipment, personalty or other personal property at the Project.

(c) Permitted Exceptions. Other than the Permitted Exceptions and any leases, contracts and/or agreements which Crestwood holds with third-party vendors, there are no other leases, contracts or agreements entered into by Seller in effect with respect to the Purchased Assets which will survive the Closing and be binding upon Purchaser or the Purchased Assets.

(d) Claims or Litigation. Other than the Bankruptcy Case, Seller has no Knowledge of any pending or proposed litigation or proceedings, against the whole or any part of the Purchased Assets.

(e)     Option. Sublease, lease, grant options or rights to purchase (except as it relates to the Existing Lease), sublease or manage all or any portion of the Purchased Assets.

(f)     Intentionally Deleted.

(g)     Intentionally Deleted.

(h)     Intentionally Deleted.

(i)     Compliance with Laws. Seller has not received written notice of any violation of any statute, law, ordinance or regulation of any governmental authority that would require remedial action by Seller or would require repairs or alterations to the Project or any portion of the Purchased Assets. To Seller's Knowledge, the Project is not in violation of any statute, law, ordinance or regulation of any governmental authority.

(j)     Taxes. All To Seller's Knowledge, all returns, reports and filings of any kind or nature, required to be filed with respect to Purchased Assets have been completed and filed in compliance with all applicable requirements, and all taxes or other obligations which are shown as due and payable thereon have been paid. Seller will pay or cause to be paid promptly when due all sewer and water charges and all other governmental charges levied or imposed upon or assessed against any portion of the Project which are due and payable as of the Closing Date and will pay or cause to be paid all expenses incurred in the use, occupancy and operation of the Project which are Seller's obligation to pay or cause to be paid, and which are due and payable as of the Closing Date.

(k)     Persons in Possession. As of the date of this Agreement, Crestwood is in possession of the Facility pursuant to the Existing Lease. Except for the residents of the Facility with valid contracts or any other Persons granted access by Crestwood, to Seller's Knowledge, there are no Persons in possession or occupancy of the Project or any part thereof, nor are there any other Persons who have possessory rights with respect to the Project or any part thereof.

(l)     Intentionally Deleted.

(m)     Condemnation. To Seller's Knowledge, there are no pending or threatened condemnation or eminent domain proceedings, zoning enforcement actions (including building or other local enforcement actions), proposed zoning changes, special assessments, or proposed changes in assessed value relating to or affecting the Project. Seller has not received any notice that any state or municipal authority has performed or will perform any work which would form the basis for a special assessment on the Project. To Seller's Knowledge, the Project is not subject to or threatened with any hold on admissions or other sanction and there are no outstanding or threatened notices of material deficiencies resulting from any survey of the Project.

(n)    ~~Environmental Matters.~~ Sellers has not released or discharged, placed or disposed of any Hazardous Substances or caused the same to be so released into the environment or discharged, placed or disposed of in, at, on or under the Project, except (a) to the extent the same will not have a material and adverse effect on the condition, financial or otherwise, of Seller or Project and (b) to Seller's Knowledge, in accordance, and in compliance, with any and all applicable Environmental Laws.

~~No Hazardous Substances are located on or at the Project or have been released into the environment or discharged, placed or disposed of in, at, on or under the Project, except to the extent permitted by applicable Environmental Laws. To Seller's Knowledge, the Project complies with, and at all times during the period of its operation by Seller, has~~4829-3214-7309.25

~~-11-~~

~~Case 18-12491-CSS Doc 87-2 Filed 11/13/18 Page 33 of 88~~

~~complied with, all Environmental Laws in all material respects.~~ Seller has not received from any Governmental Authority or third party written notice or a written complaint alleging the failure of the Project to comply with, or the potential liability of Seller as a result of the noncompliance of the Project with, any Environmental Laws. Seller has made available to Purchaser all written assessments that have been prepared by or on behalf of Seller and that are in Seller's possession or under Seller's reasonable control with respect to the environmental conditions at the Project.

(o)    <u>Insurance</u>. Seller has maintained, or has caused Crestwood to maintain, insurance policies that insure the Facility and the other Purchased Assets continuously since the date Seller or any of its Affiliates first owned or operated the Project as required by the holder(s) of all mortgage loan(s) encumbering the Project, if any, ~~or as would otherwise be customarily carried by prudent owners or operators of properties similar to the Project in markets in which the Project is located~~ and each of such insurance policies is in full force and effect and all premiums due and payable thereunder have been paid. Seller has received no written notice of any casualty or liability claim involving any portion of the Real Property.

(p)    <u>Intentionally Deleted</u>.

(q)    <u>No Material Adverse Effect</u>. Other than the future commencement of the Bankruptcy Case and changes, facts, circumstances, occurrences, events, effects or conditions related to the Bankruptcy Case, there has not been any Material Adverse Effect on the business, assets, condition (financial or otherwise) of the Purchased Assets~~, and Seller has caused the Project to be operated by Crestwood in the ordinary course and in substantially the same manner as previously operated in accordance with the Existing Lease~~.

(r)    <u>Seller's Deliveries</u>. The Seller's Deliveries provided, or otherwise made available, to Purchaser are accurate in all material respects and do not omit any information which would cause any of Seller's Deliveries to be materially misleading. No representation or warranty by or on behalf of Seller contained in this Agreement contains or will contain any untrue statement of a material fact, or omits or will omit to state any material facts that are necessary in order to make the statements contained herein or therein, in light of the circumstances under which they were made, not misleading.

(s)    <u>Status of Seller</u>. Seller is a limited partnership duly organized, validly existing and in good standing under the laws of the State of California and is duly qualified to consummate the transactions contemplated by this Agreement.

(t)    Validity of this Agreement and all documents and agreements executed and delivered in accordance herewith by Seller, are valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to the enforcement of creditors' rights generally and by general principles of equity. The execution of this Agreement and the consummation of the transactions

4829-3214-7309.25

- 12 -

contemplated in this Agreement in accordance with their terms have been approved by all necessary action of Seller under its organizational documents and does not and will not result in a breach of the terms and conditions of, nor constitute a default under or violation of, Seller's organizational documents or any law, regulation, court order, mortgage, note, bond, indenture, agreement, license or other instrument or obligation to which Seller is now a party or by which any of Purchased Assets may be bound or affected.

(u)    Authority. Seller has full power and authority to execute and to deliver this Agreement and all other documents contemplated herein and to carry out the transactions contemplated herein and therein. Seller has duly and properly taken or obtained or caused to be taken or obtained all action necessary for it (i) to enter into and to deliver this Agreement and any and all documents and agreements executed by Seller in connection herewith, and (ii) to carry out the terms of this Agreement and the transaction contemplated by it. Except as otherwise provided for herein, no other action by or on behalf of Seller is or will be necessary to authorize the execution, delivery and performance of this Agreement and any documents and agreements executed or to be executed by Seller in connection herewith or to authorize the transactions contemplated by this Agreement. Except for entry of the Private Sale Order, no consent of any third party is or will be necessary in connection with the execution, delivery and performance of this Agreement and any documents and agreements executed or to be executed by Seller in connection herewith or in connection with the consummation of the transactions contemplated by this Agreement. Seller has full power and authority (a) to own or operate the Facility and Real Property as the same currently are owned and operated and (b) to conduct its business as the same currently is being conducted.

(v)    Binding Obligations. The execution and delivery of this Agreement and the other Closing Documents required to be executed by Seller, and the performance of Seller's obligations under this Agreement and the other Closing Documents required to be executed by Seller, have been duly authorized by all requisite action, and this Agreement has been duly executed and delivered by Seller. Subject to entry of the Private Sale Order, this Agreement and the Closing Documents when executed and delivered by Seller constitute the valid and binding obligation of Seller subject, however, to bankruptcy and similar laws affecting the rights and remedies of creditors generally. The execution and delivery of this Agreement and the other Closing Documents to be executed and delivered by Seller and the performance by Seller of such entity's duties and obligations under this Agreement and the other Closing Documents to be executed and delivered by Seller are consistent with and not in violation of, and will not create any adverse condition or result in the creation of any Encumbrance or interest of any kind on the Purchased Assets under, any contract, agreement or other instrument to which Seller is a party, any judicial order or judgment of any nature by which Seller is bound, or the organizational documents of Seller.

(w)    Arm's Length Transaction. The Purchase Price represents fair and adequate consideration for the Project. The sale of the Project on the terms and conditions set forth in this Agreement, together with the other transactions contemplated herein, are

the result of arm's length transactions among Seller and Purchaser and/or their respective Affiliates.

(x)     No Misrepresentations. Seller has not intentionally misstated or misrepresented any material fact, or intentionally failed to state facts in connection with this Agreement or in any other document delivered in connection with the transactions contemplated by this Agreement, the exclusion of which makes such statement or representation misleading.

(y)     Seller Status. Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the United States Internal Revenue Code of 1986 (as amended, and the regulations promulgated thereunder, the "**IRC**"). Neither Seller nor any of its Affiliates are (i) identified on any of the Lists (as defined below), (ii) a Designated National (as defined below), (iii) a Person (as defined below) designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation, any other similar Executive Order or any similar regulation, (iv) a Person who has been convicted of a felony involving moral turpitude in any state or federal court, or (v) a Person who is then the subject of any investigation by any governmental authority or any class action litigation in which it is alleged that it or any of its Affiliates has engaged in "predatory" or other improper lending or servicing or other unethical or improper business conduct.

(z)     Seller's Knowledge. For purposes of this Section 10, the term "Seller's Knowledge", "Knowledge of Seller", "Knowledge", and similar words or phrases shall mean the actual knowledge, with reasonable duty of inquiry, of Suzanne Sterling with regard to subsection (d) above and Andrew Hinkelman with regard to subsections (m) and (n) above. Seller represents and warrants that such individuals affiliated with Seller are in the best position to have knowledge of the matters addressed in this Section 10.

11.     **Representations and Warranties and Covenants of Purchaser**. Purchaser represents and warrants (which representations and warranties shall survive the Closing and deed recording as provided herein) to Seller as of the date of this Agreement and as of the Closing Date, and covenants with Seller that:

(a)     Status of Purchaser. Purchaser is a limited partnership duly organized, validly existing and in good standing under the laws of the State of California.

(b)     Validity and Conflicts. This Agreement and all documents and agreements executed and delivered in accordance herewith by Purchaser, are valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to the enforcement of creditors' rights generally and by general principles of equity. The execution of this Agreement and the consummation of the transactions contemplated in this Agreement in accordance with its terms have been approved by all necessary action of Purchaser under its organizational documents and does not and will not result in a breach of the terms and conditions of, nor constitute a default under or violation of, Purchaser's organizational

documents or any law, regulation, court order, mortgage, note, bond, indenture, agreement, license or other instrument or obligation to which a Purchaser is now a party.

(c)     Authority. Purchaser has full power and authority to execute and to deliver this Agreement and all other documents contemplated herein and to carry out the transactions contemplated herein and therein. Purchaser has duly and properly taken or obtained or caused to be taken or obtained all action necessary for it (i) to enter into and to deliver this Agreement and any and all documents and agreements executed by Purchaser in connection herewith, and (ii) to carry out the terms of this Agreement and the transaction contemplated by it. No other action by or on behalf of Purchaser is or will be necessary to authorize the execution, delivery and performance of this Agreement and any documents and agreements executed or to be executed by Purchaser in connection herewith or to authorize the transactions contemplated by this Agreement. No consent of any third party is or will be necessary in connection with the execution, delivery and performance of this Agreement and any documents and agreements executed or to be executed by Purchaser in connection herewith or in connection with the consummation of the transactions contemplated by this Agreement. There is no litigation, investigation or other proceeding pending or, to the best of Purchaser's knowledge, threatened against or relating to Purchaser which is material to this Agreement.

(d)     Binding Obligations. The execution and delivery of this Agreement and the other Closing Documents required to be executed by Purchaser, and the performance of Purchaser's obligations under this Agreement and the other Closing Documents required to be executed by Purchaser, have been duly authorized by all requisite action, and this Agreement has been duly executed and delivered by Purchaser. This Agreement and the Closing Documents when executed and delivered by Purchaser constitute the valid and binding obligation of Purchaser subject, however, to bankruptcy and similar laws affecting the rights and remedies of creditors generally. The execution and delivery of this Agreement and the other Closing Documents to be executed and delivered by Purchaser and the performance by Purchaser of such entity's duties and obligations under this Agreement and the other Closing Documents to be executed and delivered by Purchaser are consistent with and not in violation of any contract, agreement or other instrument to which Purchaser is a party, any judicial order or judgment of any nature by which Purchaser is bound, or the organizational documents of Purchaser.

(e)     Ineligible Purchaser. Purchaser is not an Ineligible Purchaser. "**Ineligible Purchaser**" means any Person who is, or whose Affiliate is, (i) identified on any of the Lists (defined below), (ii) a "**Designated National**" as defined in the Cuban Assets Control Regulations, 31 C.F.R. Part 515, (iii) a Person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation, any other similar Executive Order or any similar regulation, (iv) a Person who has been convicted of a felony involving moral turpitude in any state or federal court, or (v) a Person who is then the subject of any investigation by any governmental authority or any class action litigation in which it is alleged that it or any of its Affiliates has engaged in "predatory" or other improper lending or servicing or other unethical or improper business conduct. As used herein, "**Lists**" means any or all of (i) the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign

4829-3214-7309.25

Assets Control ("**OFAC**"), (ii) any similar list maintained by the Department of the Treasury, and (iii) any other similar list maintained by OFAC or any other agency or department of the United States Government pursuant to any authorizing statute, Executive Order No. 13224 (September 23, 2001), any related enabling legislation or other similar Executive Order or any other similar regulation.

**12.** **Eminent Domain**. In the event that prior to the Closing, any judicial, administrative or other proceeding relating to the threatened or proposed taking of the Project or any portion thereof by condemnation or eminent domain or any act in the nature of eminent domain affecting the Project is commenced or threatened by a governmental authority having the power of eminent domain, Seller shall immediately give Purchaser written notice thereof. If any such proceeding relates to a Substantial Portion (as defined below) of the Project or would adversely affect Purchaser's ability to lease such Project to an operator (or would give any such operator the right to terminate its lease), Purchaser may elect to terminate this Agreement by written notice to Seller prior to the Closing, in which event the parties shall have no further rights or liabilities hereunder. If Purchaser does not exercise its right to terminate under this Section 12, this Agreement shall remain in full force and effect, and, at the Closing, Purchaser shall be credited or assigned all of Seller's right, title and interest with respect to such proceeding and any proceeds or awards relating thereto. Unless or until this Agreement is terminated in its entirety pursuant to this Section 12, Seller shall not take any action with respect to any pending or threatened eminent domain proceeding without the prior written consent of Purchaser. If the proceeding does not involve a Substantial Portion of the Project and would not adversely affect Purchaser's ability to lease such Project to an operator (or give any such operator the right to terminate its lease), Purchaser shall not have the right to terminate this Agreement, but shall be credited or assigned, at the Closing, all of Seller's rights to the proceeds or awards relating thereto. For the purposes of this Section 12, the proceeding shall be deemed to involve the "**Substantial Portion**" of the Project if the proceeding (a) affects more than the equivalent of $150,000 in value, as reasonably determined by Purchaser, (b) causes a material deprivation of access to or from the Project, (c) involves a taking of parking areas located on the Project such that subsequent to such taking, the Project will be in violation of municipal zoning codes and ordinances, or (d) involves the relocation of utility facilities serving the Project that has a Material Adverse Effect on the transaction contemplated by this Agreement.

**13.** **Risk of Loss; Casualty**.

(a)     At all times prior to the Closing, the entire risk of loss or damage to the Project by fire or other casualty occurring prior to the Closing is and shall be borne and assumed by Seller.

(b)     If prior to the Closing Date, the Project or any portion thereof shall be destroyed or damaged in an amount in excess of the Material Damage Amount (as defined below), by fire or other casualty, or if the Project is damaged as a result of fire or other casualty to such extent that Purchaser is unable to lease such Project to an operator (or gives any such operator the right to terminate its lease), Purchaser shall have the option to terminate this Agreement, in which event the parties shall have no further rights or obligations hereunder. If Purchaser does not exercise its right to terminate this Agreement under this Section 13, this Agreement shall remain in full force and effect,

and at the Closing, Purchaser shall be credited or assigned all of Seller's right, title and interest with respect to the insurance proceeds arising from such fire or other casualty, plus an amount equal to Seller's deductible on its casualty insurance policies. Seller agrees to give Purchaser notice of any fire or other casualty within forty-eight (48) hours after any such event, and Purchaser may exercise its termination option by delivering written notice to Seller at any time prior to the Closing. In the event of fire or other casualty to the Project whereby Purchaser does not have the right to terminate this Agreement or has such right but elects not to do so, then Purchaser shall have the right prior to the Closing Date, to control the adjustment and settlement of any insurance claim relating to said damage, and, on the Closing Date, Seller shall assign to Purchaser Seller's interest in and to any insurance policies and/or proceeds with respect to said damage. In such event, Seller will also credit against the Purchase Price due Seller from Purchaser at the Closing the amount of any deductible on the casualty and insurance policies covering said damage. For the purposes hereof, the term "**Material Damage Amount**" shall mean: (a) damage reasonably determined by Purchaser to be in excess of $150,000 to repair or restore; (b) that causes a material deprivation of access to or from the Project; (c) that involves parking areas located on the Project such that subsequent to such damage, the Project will be in violation of municipal zoning codes and ordinances; (d) that involves the relocation of utility facilities serving the Project; or (e) that has a Material Adverse Effect on the transaction contemplated by this Agreement.

14.     **Title Commitment, Survey, Zoning Report and Searches**. Purchaser shall obtain the following items:

(a)     A title commitment (the "**Title Commitment**") for ALTA Owner's Title Insurance Policy (**2006 Form**) (or its local equivalent), for the Project, issued by the Title Company. The Title Commitment shall be in an amount equal to the Purchase Price, shall have an effective date on or after the Closing Date, shall show title to the Project in Seller subject only to the Permitted Exceptions, and shall be obtained at Seller's sole cost and expense, if customary in the State in which the Project is located. The Title Commitment shall include such endorsements as Purchaser may request (including without limitation, an ALTA 3.1 zoning endorsement with Parking, Comprehensive, Access, Tax Parcel, Same as Survey, Contiguity, and Utility Facility) and shall include full extended coverage over the standard exceptions contained in such policy;

(b)     Legible copies of all documents noted as exceptions to title on the Title Commitment;

(c)     A current survey of the Project (the "**Survey**") prepared by a land surveyor licensed by the State of California, which Survey shall: (i) be certified to Purchaser and the Title Company (ii) be prepared in accordance with the most recent survey standards adopted by ALTA/ACSM in 2016 (including "Table A" items 1, 2, 3, 4, 6(a), 6(b), 7(a), 7(b)(1), 7(c), 8, 9, 10(a) (if applicable), 11(a), 13, 14, 15 (if applicable), and 16 through 20), (iii) set forth the legal description of the Project, (iv) show all improvements (including fences), visible or recorded easements and building lines (together with recording information concerning the documents creating any such easements and building lines), curb cuts, sewage, water, electricity, gas and other utility

facilities, roads and means of physical and record ingress and egress to and from the Project by public roads (including the dimensions of abutting streets), and the net (after deduction of land dedicated or used or subject to easements for streets, roads, highways, fire lanes and drainage courses) and gross area (in each case, accurate to the one-thousandth of an acre) of the land included in the Project, (v) certify that the Project is not located in a wetlands area or in an area designated as a special flood hazard area by the U.S. Department of Housing and Urban Development, (vi) show improvements on adjoining property which are within five (5) feet of the property lines of the Project, and (vii) otherwise be satisfactory for purposes of obtaining extended coverage over all standard or general survey exceptions in the title insurance policies;

(d)     A zoning report for the Real Property (the "**Zoning Report**"), which shall show that (i) the use of the Real Property as it is proposed to be used is a permitted use or a legal non-conforming use under existing zoning and other land use ordinances and laws, and (ii) that the use of the Real Property and the improvements thereon conforms to all requirements of existing zoning and other land use ordinances and laws applicable thereto; and

(e)     UCC, judgment, bankruptcy, tax and other appropriate searches reasonably acceptable to Purchaser's attorney of appropriate records of the Secretary of State of California, and of the recorder, registrar, clerk (or other governmental office where real property documents are filed for recording) of the county in which the Project is located, on Seller, any current and prior tenants, owners and operators of the Project, including but not limited to Crestwood, the name of the Project and such other parties and in such other jurisdictions as Purchaser may request, showing the absence of any security interests, judgments, liens and bankruptcy proceedings affecting Seller, or Seller's title to or interest in Purchased Assets, other than the Permitted Exceptions, to the extent applicable thereto (collectively, the "**Lien Searches**").

     15.     **Defects**. Purchaser will provide to Seller within seven (7) days of the date of this Agreement, written notice to the extent (i) the Title Commitment discloses any title exceptions not acceptable to Purchaser, (ii) the Survey discloses any matters not acceptable to Purchaser, (iii) the Zoning Report discloses any matters not acceptable to Purchaser, or (iv) the Lien Searches disclose any matters not acceptable to Purchaser (any such matters being referred to as a "**Defect**"). Thereafter, Purchaser shall have until the Closing Date in which to reexamine the Title Commitment, Survey, Zoning Report and Lien Searches in which to give Seller written notice of any additional objections for matters not existing as of the date of this Agreement and disclosed by such reexamination. If the Title Commitment, Survey, Zoning Report and/or the Lien Searches disclose Defects and Purchaser gives timely written notice of objections to the Defects as required herein ("**Objections**"), Seller shall have until five (5) business days after receipt of the Objections in which to indicate to Purchaser in writing which of the Defects that Seller will cure. If Seller has not notified Purchaser in writing of Seller's agreement to cure any Objection within five (5) business days after receipt of the Objections, Seller will be deemed to have elected not to cure the Objections. If Seller so declines to so cure or remove any and all Objections, then Purchaser may elect either to (i) terminate this Agreement, all rights and obligations of the parties under this Agreement shall expire, and this Agreement shall become null and void except with respect to any obligations which survive the termination of this

Agreement; (ii) if, but only if, such Objection is based upon either (A) a defect, claim, lien or encumbrance caused by Seller first arising and relating to the period after the date hereof, or (B) a judgment lien against Seller that encumbers the Project or a mortgage granted by Seller, satisfy the Objections, after deducting from the Purchase Price the cost of satisfying such Objections that can be satisfied by the payment of money; or (iii) waive such requirements, in which event such Defects shall be deemed Permitted Exceptions, and proceed to Closing. If Seller agrees to cure an Objection pursuant to this Section 15, but fails to cure such Objection on or before Closing, Seller shall be in default of its covenant to cure such Objection, and Purchaser shall be entitled to the remedies set forth in this Agreement, including, without limitation, recouping the Expense Reimbursement and the remedies set forth in Section 21 (Defaults; Termination). Notwithstanding the provisions of Section 30 (Notices), Purchaser or Purchaser's counsel may provide any written notices to Seller contemplated by this Section 15 by email to Seller's counsel Christy Pennington at christy.pennington@wallerlaw.com.

16.   **Closing Documents**.

(a)   At the Closing, Seller shall deposit or cause to be deposited in the Closing Escrow the following, in form and substance as mutually agreed upon between the parties:

(i)   a special warranty deed for the Project (the "**Deed**"), free and clear of any and all Encumbrances and interests, other than the Permitted Exceptions pertaining to the Project, in recordable form approved by Purchaser and executed by Seller conveying fee simple title to the Project to Purchaser;

(ii)   customary payoff letters from the holders of any outstanding liens on the Project or the Purchased Assets in form sufficient to allow the title company to remove such liens at Closing from the title commitment;

(iii)   bills of sale and/or assignments (to the extent such items are included in the Purchased Assets), in a form approved by Purchaser and executed by Seller conveying all of the items of Purchased Assets to Purchaser;

(iv)   originals or if unavailable, copies of all items set forth in subsections (a)(ii)-(iii) of Section 1 provided, however, that such originals shall be deemed delivered to Purchaser if they remain at the Facility following the Closing;

(v)   a certificate executed by a duly authorized representative of Seller certifying that all of the representations and warranties by Seller contained in this Agreement are remade and are true and correct as of the Closing Date (except to the extent they expressly relate to an earlier date) subject only to the Supplemental Disclosure Letter (as defined below);

(vi)   an affidavit executed by Seller stating that the sale of the Seller is a "United States Person" and the Project is not subject to the withholding tax requirement imposed by Section 1445A of the IRC and the rules and regulations promulgated thereunder;

4829-3214-7309.25

- 19 -

(vii)    a closing statement containing the prorations and adjustments to the Purchase Price described in Section 35 hereof, and otherwise summarizing the economic transactions contemplated by this Agreement;

(viii)    a certificate, executed by a duly authorized representative of Seller certifying true and correct copies of (1) its certificate of limited partnership (or equivalent thereof), (2) a certificate of good standing (or equivalent thereof) for Seller issued within ten (10) days of the Closing by the Secretary of State of the State of California (3) its partnership agreement (or equivalent thereof), and (4) resolutions of its partners, members, managers, directors or governing board, as applicable, authorizing the transactions contemplated by this Agreement;

(ix)    such discharges, releases and termination statements necessary to discharge, release and terminate any and all Encumbrances on the Purchased Assets other than the Permitted Exceptions;

(x)    a certified copy of the Final Private Sale Order; and

(xi)    such other documents, affidavits, certifications and instruments (including without limitation ALTA statements and "gap" undertakings) as may be reasonably required by the Title Company to issue its title insurance policy as required herein or as may be required by state or local law (including without limitation state, county and local transfer declarations), and such other documents and instruments as may reasonably be required by Purchaser and its counsel in order to consummate the transactions contemplated hereby and to otherwise effect the intentions and agreements of the parties hereto.

Without limiting the terms and provisions of Section 24 hereof, Seller hereby agrees that at any time prior to Closing, Purchaser may designate or nominate one or more Persons or entities to accept title to or receive one or more of the Purchased Assets, and upon any such nomination or designation by Purchaser to Seller, Seller shall: (i) cause the appropriate documents described above in this subsection (a) to name and run in favor of such nominated or designated Persons or entities, and (ii) deliver the appropriate Purchased Assets to such nominated or designated Persons or entities; provided, however, no such designation or nomination shall release Purchaser from its obligations hereunder.

(b)    At the Closing, Purchaser shall deposit or cause to be deposited in the Closing Escrow the following, in form and substance acceptable to Seller and its counsel;

(i)    the Purchase Price;

(ii)    a counterpart of the closing statement described in Section 16(a)(vii) hereof;

(iii)    a certificate executed by Purchaser stating that all of the representations and warranties by Purchaser contained in this Agreement are remade and are true and correct as of the Closing Date (except to the extent they expressly relate to an earlier date); and

(iv) such other documents and instruments as may reasonably be required by Seller.

(c)     After the Closing, each of Seller and Purchaser agree that it will take such actions and execute and deliver such further instruments of assignment, conveyance and transfer as may reasonably be requested by any other party to give effect to the transaction contemplated by this Agreement.

17.     **Conditions Precedent to Performance of Agreement by Purchaser and Seller**.

(a)     The obligation of Purchaser to close the transaction contemplated hereby shall be subject to the satisfaction of the following conditions prior to, or concurrently with, the Closing:

(i)     all of Seller's representations and warranties contained herein shall be true and correct at and as of the Closing Date (without regard to the Supplemental Disclosure Letter);

(ii)     all agreements, covenants and obligations which under this Agreement are required to be performed, delivered or complied with prior to or at the Closing, including but not limited to those matters described in Section 8 and Section 14, shall have been performed, delivered or complied with, as applicable;

(iii)     Crestwood, Tenant, and/or any of their Affiliates shall have all necessary licenses and other governmental and payor consents, approvals and certifications required in connection with the transactions contemplated by this Agreement and as a condition to or in connection with the operation of the Project by Crestwood, Tenant, and/or any of their Affiliates in a manner substantially similar to its operation prior to the Closing, and any and all necessary governmental inspections required in connection with the transactions contemplated hereby shall have been favorably completed;

(iv)     the service providers referenced in Section 14 have provided such reports, commitments and survey to Purchaser in form and substance reasonably satisfactory to Purchaser on and as of the Closing Date;

(v)     Purchaser shall be satisfied that there has been no Material Adverse Effect on the condition of the Purchased Assets;

(vi)     Purchaser shall not have terminated this Agreement pursuant to any other provision of this Agreement;

(vii)     no judgment or order that would prevent Seller from closing;

(viii)     the release of any and all Encumbrances and interests securing the payment of money encumbering the Purchased Assets;

(ix)    the Board of Directors of National Health Investors, Inc., parent and owner of Purchaser, shall have approved this transaction in its sole and absolute discretion;

(ix)    intentionally omitted;

(x)    Purchaser shall have delivered the Holdback Deposit pursuant to Section 2(d);

(xi)    Purchaser shall have entered into the new Lease, and all related transaction documents for the Project with Crestwood and/or Tenant on terms acceptable to Purchaser within thirty (30) days of the date of this Agreement;

(xii)    the Bankruptcy Court shall have entered a Final Private Sale Order in form and substance, including with respect to all findings of fact and conclusions of law, acceptable to the Seller and Purchaser; and

(xiii)    both the Purchaser and the Title Company obtain sufficient proof, including, without limitation, lien waivers, certificates of completion, and/or estoppel letters/certificates, in form and substance satisfactory to both Purchaser and Title Company, from any and all necessary parties, including, without limitation, contractors, subcontractors, material men, and suppliers, demonstrating that any and all Encumbrances related to the Project, have been waived or released;

(xiv)    proof of proper zoning for the Project in form and substance satisfactory to the Purchaser and Title Company; and

(xv)    the Bankruptcy Court shall have approved the Debtors' rejection of the Existing Lease and Crestwood shall have agreed to terminate the Existing Lease.

In the event that any of the foregoing conditions set forth in this Section 17(a) has not, in Purchaser's reasonable judgment, been satisfied prior to or as of the Closing, Purchaser may, at its option, elect at any time either (i) to terminate this Agreement upon written notice to Seller (without waiving or releasing any of its remedies for any Seller's Default); or (ii) to waive any one or more of the foregoing conditions contained in this Section 17(a).

(b)    The obligation of Seller to close the transaction contemplated hereby shall be subject to the satisfaction of the following conditions prior to, or concurrently with, the Closing:

(i)    Purchaser shall have performed and complied with all agreements, covenants and obligations which under this Agreement are required to be performed or complied with by Purchaser prior to or at the Closing, and all of Purchaser's representations and warranties contained herein shall be true and correct at and as of the Closing Date; and

(ii)    Seller shall not have terminated this Agreement pursuant to any other provision of this Agreement.

-22-

In the event that any of the foregoing conditions set forth in this Section 17(b) has not, in Seller's judgment, been satisfied prior to or as of the Closing, Seller may, at its option, elect at any time either (i) to terminate this Agreement upon written notice to Purchaser (without waiving or releasing any of its remedies for any Purchaser's Default); or (ii) to waive any one or more of the foregoing conditions contained in this Section 17(b).

**18.** **Intentionally Deleted**.

**19.** **Restrictive Covenants**.

(a)     Seller covenants and agrees that during the Restricted Period (as defined below), neither Seller nor any of its Affiliates will (A) directly or indirectly, own, manage, lease or operate a mental health rehabilitation facility, or similar type facility providing behavioral health, within the Protected Territory (as defined below) that competes or would reasonably be expected to compete with the Facility, (B) solicit for employment any person then employed at the Facility or encourage any such person to terminate his/her employment with the Facility, or (C) make disparaging remarks or similar communications regarding Crestwood, Tenant, Purchaser, or any owner, officer, director, employee, or agent of Crestwood, Tenant, or Purchaser, and/or the Facility (each a "**Covered Person**"). Seller, on behalf of itself and each other Covered Person, acknowledges and agrees that the violation of the covenants set forth in this Section 19 would cause irreparable harm to Purchaser, Tenant, and Crestwood and, as a result, Purchaser, Tenant, and Crestwood would be entitled to seek an injunction from any court of competent jurisdiction enjoining and restraining any act prohibited by this Section 19 Seller, on behalf of itself and each other Covered Person, acknowledges and agrees that the area and time limitations contained in this Section 19 are reasonable.

(b)     Seller, on behalf of itself and each other Covered Person, acknowledges and agrees that the area (Protected Territory) and time limitations (Restricted Period) are properly required for the protection of the business interests of Purchaser, Tenant, and Crestwood due to the status and reputation of Seller in the market in which the Facility is located.

(c)     The parties agree that nothing in this Section 19 shall be construed as prohibiting Purchaser, Tenant, or Crestwood from pursuing any other remedies available to it for any breach or threatened breach of this covenant not to compete, including the recovery of damages from any Covered Person or any other person or entity acting in concert with any Covered Person. Seller acknowledges and agrees that in the event of a breach of this covenant not to compete, it will pay reasonable attorney's fees and expenses incurred by Purchaser, Tenant, and/or Crestwood in enforcing this covenant not to compete.

(d)     It is further agreed that if at any time it shall be determined that any of the covenants set forth in this Section 19 are unreasonable as to time or area, or both, by any court of competent jurisdiction, Purchaser, Tenant, and Crestwood shall be entitled to enforce the applicable covenant for such period of time and within such area as such court may determine to be reasonable.

(e)     For purposes of this Section 19, the following definitions shall apply:

(i)     "**Protected Territory**" shall mean a ten (10) mile radius of the Facility; and

(ii)    "**Restricted Period**" shall mean a period of two (2) years after the Closing Date.

20.     **Indemnity**.

(a)     Subject to the provisions of this Section 20 and Bankruptcy Court approval, Seller shall indemnify, defend, reimburse and hold harmless Purchaser from and against any claims, causes of action, judgments, losses, liabilities, penalties, damages, costs and expenses, including reasonable attorneys' fees and other costs of defense (collectively, the "**Damages**"), suffered or incurred by Purchaser and caused by, resulting from or arising by reason of (i) any material breach of any representation or warranty by Seller, (ii) any material breach of any covenant by Seller, or (iii) Seller's Default hereunder, (iv) the operation, use or ownership of the Facility prior to the Closing Date, (v) any Excluded Asset or Excluded Liability, and (vi) any failure of the Project to comply with any statute, law, ordinance or regulation relating to zoning or conditional use permitting for the permitted use of a 125-bed mental health rehabilitation center, including but not limited to any costs and expenses incurred by Purchaser or Crestwood to obtain proper zoning or a current zoning letter for the Project after the Closing in form and substance satisfactory to Purchaser.

(b)     Subject to the provisions of this Section 20, Purchaser shall indemnify, defend, reimburse and hold harmless Seller from and against any Damages, suffered or incurred by Seller or any person or entity and caused by, resulting from or arising by reason of: (i) any inaccuracy or breach of any representation or warranty by Purchaser, (ii) any breach of any covenant by Purchaser, and (iii) Purchaser's Default hereunder.

(c)     A party entitled to be indemnified pursuant to subsections (a) or (b) above ("**Indemnified Party**") shall notify the party liable for such indemnification ("**Indemnifying Party**") in writing of any claim or demand which the Indemnified Party has determined, has given or could give rise to a right of indemnification under this Agreement, as soon as possible after the Indemnified Party becomes aware of such claim or demand; _provided, however_, that the Indemnified Party's failure to give such notice to the Indemnifying Party in a timely fashion shall not result in the loss of the Indemnified Party's rights with respect thereto except to the extent the Indemnifying Party is prejudiced by the delay, _provided, however_, that no such claim may be made by an Indemnified Party following the expiration of the Survival Period (as defined below). The Indemnifying Party shall satisfy its indemnification obligations within thirty (30) days after the receipt of written notice thereon from the Indemnified Party.

(d)     If the Indemnified Party shall notify the Indemnifying Party of any claim or demand pursuant to subsection (c) above, and if such claim or demand relates to a claim or demand asserted by a third party against the Indemnified Party, the

-24-

Indemnifying Party shall have the right to either (i) pay such claim or demand or (ii) employ counsel reasonably acceptable to the Indemnified Party to defend any such claim or demand asserted against the Indemnified Party. The Indemnified Party shall have the right to participate in the defense of any such claim or demand at its own expense. The Indemnifying Party shall notify the Indemnified Party in writing, as promptly as possible (but in any case before the due date for the answer or response to or payment of a claim) after the date of the notice of claim given by the Indemnified Party to the Indemnifying Party under subsection (c) above of its election to defend in good faith any such third party claim or demand. So long as the Indemnifying Party is defending in good faith any such claim or demand asserted by a third party against the Indemnified Party, the Indemnified Party shall not settle or compromise such claim or demand. The Indemnified Party shall make available to the Indemnifying Party or its agents all records and other materials in the Indemnified Party's possession reasonably required by the Indemnifying Party for its use in contesting such third party claim or demand. Whether or not the Indemnifying Party elects to defend any such claim or demand, the Indemnified Party shall have no obligations to do so.

(e)      No Indemnified Party may settle or compromise any claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party, unless (i) the Indemnifying Party fails to assume and timely maintain the defense of such claim or (ii) such settlement, compromise or consent includes an unconditional release of the Indemnifying Party from all liability arising out of such claim and does not contain any equitable order, judgment or term which in any manner affects, restrains or interferes with the business of the Indemnifying Party or any Affiliate of the Indemnifying Party. An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise or consent includes an unconditional release of the Indemnified Party from all liability arising out of such claim and does not contain any equitable order, judgment or term which in any manner affects, restrains or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(f)      After the Closing Date, except with respect to an inaccuracy in or breach resulting from fraud or intentional material misrepresentation in which the parties' remedies shall not be limited, indemnification pursuant to this Section 20 shall be each party's sole and exclusive remedy with respect to any inaccuracy in or breach of any representation or warranty contained in this Agreement, in any certificate or other document delivered at Closing, or otherwise given in connection with the transactions contemplated herein.

(g)      Notwithstanding any other provision in this Agreement to the contrary or any provision of applicable law, neither the Seller nor the Seller Indemnifying Parties shall be required to indemnify the Purchaser or Purchaser Indemnified Parties for Damages arising under Section 20(a)(i) unless and until the aggregate amount of such Damages for which the Purchaser or Purchaser Indemnified Parties are otherwise entitled to indemnification pursuant to this Section 20 exceeds Twenty-Five Thousand Dollars

($25,000) (the "**Basket**"). After the Basket is exceeded, the Purchaser and/or Purchaser Indemnified Parties shall be entitled to be paid the amount of all Damages from the first dollar, subject to the limitations on recovery and recourse set forth herein. In no event shall Seller or Seller Indemnifying Parties be liable to indemnify the Purchaser or Purchaser Indemnified Parties or otherwise have liability to the Purchaser Indemnified Parties if the matter forming the basis of the claim was disclosed in the Seller Disclosure Schedule or Supplemental Disclosure Letter. Additionally, in no event shall Seller or Seller Indemnifying Parties be liable to indemnify Purchaser or Purchaser Indemnified Parties for any Damages arising under Section 20(a)(i) in excess of One Million and No/100 Dollars ($1,000,000) in the aggregate (the "**Indemnification Cap**"), it being understood and agreed that the liability of Seller and the Seller Indemnifying Parties on account of any Damages shall collectively be limited to the Indemnification Cap except as otherwise provided herein. Finally, in no event shall Seller or Seller Indemnifying Parties be liable to indemnify Purchaser or Purchaser Indemnified Parties for any claims for Damages made after the expiration of the applicable Survival Period as set forth in Section 22. Notwithstanding the foregoing and for the avoidance of doubt, the Basket and Indemnification Cap shall not apply for any indemnification claims for Damages arising under (i) Section 20(a)(i) to the extent based on fraud or intentional misrepresentation, or (ii) Sections 20(a)(ii)-(v).

(h)     Notwithstanding any other provision in this Agreement to the contrary or any provision of applicable law, neither the Purchaser nor the Purchaser Indemnifying Parties shall be required to indemnify the Seller or Seller Indemnified Parties for Damages arising under Section 20(b)(i) unless and until the aggregate amount of such Damages for which the Seller or Seller Indemnified Parties are otherwise entitled to indemnification pursuant to this Section 20 exceeds the Basket. After the Basket is exceeded, the Seller and/or Seller Indemnified Parties shall be entitled to be paid the amount of all Damages from the first dollar, subject to the limitations on recovery and recourse set forth herein. Additionally, in no event shall Purchaser or Purchaser Indemnifying Parties be liable to indemnify Seller or Seller Indemnified Parties for any Damages arising under Section 20(b)(i) in excess of the Indemnification Cap, in the aggregate, it being understood and agreed, that the liability of Purchaser and Purchaser Indemnifying Parties on account of any Damages shall collectively be limited to the Indemnification Cap. Finally, in no event shall Purchaser or Purchaser Indemnifying Parties be liable to indemnify Seller or Seller Indemnified Parties for any claims for Damages made after the expiration of the applicable Survival Period as set forth in Section 22. Notwithstanding the foregoing and for the avoidance of doubt, the Basket and the Indemnification Cap shall not apply for any indemnification claims for Damages arising under (i) Section 20(b)(i) to the extent based on fraud or intentional misrepresentation, or (ii) Sections 20(b)(ii)-(iii).

21.     **Defaults; Termination**. The following, with any required notice and/or passage of time, shall give rise to either Seller's or Purchaser's ability to terminate this Agreement:

(a)     By Seller in the following situations:

*(i)*     ***Purchaser's Default***. In the event that Purchaser fails to perform any material covenant or agreement contained in this Agreement prior to the Closing and such failure is not cured within ten (10) days after written notice thereof to Purchaser, or if any of Purchaser's warranties or representations contained in this Agreement shall not be true and correct in any respect prior to the Closing (the foregoing being referred to as a "**Purchaser's Default**"), Seller may at its option elect to do any of the following: (i) waive such breach and proceed to close this Agreement; or (ii) terminate this Agreement by written notice to Purchaser (except in the event a Seller's Default has also occurred).

*(ii)*     ***Failure to Satisfy Conditions***. If the conditions of Section 17(b) are not timely satisfied on or before the Closing, or if satisfaction of such condition is or becomes impossible, other than through the failure of the Seller to comply with its obligations herein, and the Seller has not previously waived such condition.

(b)     <u>By Purchaser in the following situations</u>:

*(i)*     ***Seller's Default***. In the event Seller fails to perform any material covenant or agreement contained in this Agreement prior to the Closing and such failure is not cured within ten (10) days after written notice thereof to Seller, or if any of Seller's warranties or representations contained in this Agreement shall not be true and correct in any respect prior to the Closing (the foregoing being referred to herein as a "**Seller's Default**"), Purchaser may at its option elect to do any of the following: (i) waive such breach and proceed to close this Agreement under the provisions set forth herein; or (ii) terminate this Agreement by written notice to Seller and Seller shall pay the Expense Reimbursement and/or Break-Up Fee, as may be applicable pursuant to the terms stated herein; or (iii) maintain an action for specific performance.

*(ii)*     ***Failure to Satisfy Conditions***. If the conditions of Sections 17(a)(i)-(xv) are not timely satisfied on or before the Closing, or if satisfaction of such condition is or becomes impossible, other than through the failure of the Purchaser to comply with its obligations herein, and the Purchaser has not previously waived such condition.

*(iii)*     ***By Purchaser for Damage***. By Purchaser as provided for in Sections 12 or 13.

*(iv)*     ***By Passage of Time***. If a Final Private Sale Order approving a private sale has not been entered on or before sixty (60) days from the Petition Date, the Closing has not occurred on or before ninety (90) days from the Petition Date (or such later date as the parties may mutually agree in writing), or the timeline and milestones as set forth in Sections 6(a)-(c) are not timely satisfied and/or achieved.

*(v)*   ***Other Reasons***. For any other reason as provided for herein that gives rise to the Purchaser's ability to terminate this Agreement, including but not limited to the failure of the Seller to obtain necessary consents of creditors or the Bankruptcy Court to pay the Purchaser Carve Out, which shall include the Break-Up Fee and the Expense Reimbursement.

*(vi)*   ***Dismissal***. If the Bankruptcy Case is dismissed or converted into one or more cases under Chapter 7 of the Bankruptcy Code, or a trustee is appointed for the Seller.

*(vii)*   ***Intentionally Deleted***.

*(viii)*   ***Alternate Transaction***. The Bankruptcy Court does not approve a private sale to Purchaser or denies the Private Sale Motion to Purchaser, or the Seller determines that it cannot, consistent with its fiduciary duties, seek Bankruptcy Court approval of the Private Sale Motion over any objections thereto (and, in each case, the Purchaser does not make a Stalking Horse Election).

(c)   <u>Mutual Consent</u>. By mutual consent of Seller and Purchaser.

(d)   <u>Effect of Termination</u>. If this Agreement is terminated pursuant to Section(s) 21(a) or 21(b), all further obligations of the parties under this Agreement will terminate without liability, except for the obligations of either party pursuant to Sections 2(d), 6(h), 6(j), 13, 20, 21, 25-32, 34, 37, and 39 shall survive. For the avoidance of doubt and notwithstanding anything to the contrary contained herein, Seller shall pay the Expense Reimbursement whether the Closing occurs or not except in the event of a Purchaser's Default.

**22.**   **Survival**. Except as otherwise provided for herein, all the provisions of this Agreement (including, without limitation, the representations, covenants and warranties of Seller and Purchaser as set forth in this Agreement), shall survive the consummation of the purchase and sale of the Real Property on the Closing Date, the delivery and recording of the Deed and the payment of the Purchase Price for a period of twelve (12) months following the Closing Date (the "**Survival Period**"). Notwithstanding the foregoing, the Survival Period for any inaccuracy or breach of any tax and environmental representations and warranties of Seller in this Agreement shall mean a period of the applicable statute of limitations following the Closing Date. An Indemnified Party may make a claim for indemnification pursuant to Section 20 at any time prior to the expiration of the applicable Survival Period. The indemnification provisions of this Agreement shall survive the Closing for the Survival Period except in the event of fraud or intentional misrepresentation in which case the indemnification provisions of this Agreement shall survive indefinitely.

**23.**   **Further Assurances**. At Closing, and from time to time thereafter, Seller shall do all such additional and further acts, and shall execute and deliver all such additional and further instruments and documents, as or Purchaser's counsel may reasonably require fully to vest in and assure to Purchaser full right, title and interest in and to the Purchased Assets to the full extent

-28-

contemplated by this Agreement and otherwise to effectuate the purchase and sale of the Purchased Assets as contemplated by and provided for in this Agreement.

**24.**    **Successors and Assigns**. Purchaser may, without Seller's consent, assign its rights under this Agreement, in whole or in part, to one or more general or limited partnerships, corporations, limited liability companies, or other entities that are Affiliates of or that are formed by any of the officers, directors or shareholders of Purchaser. Upon any such assignment, the original Purchaser shall not be relieved or released from any covenants, obligations and liabilities under this Agreement, whether accruing before, on or after such assignment. Seller may not assign this Agreement or any of its rights hereunder (voluntarily, involuntarily or by operation of law) without the prior written consent of Purchaser. Subject to the provisions of this Section 24, the terms, conditions and covenants of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

**25.**    **Time of the Essence**. Time is of the essence of all undertakings and agreements of the respective parties hereto, and all undertakings and agreements will be promptly performed by the respective parties within the time and in the manner herein provided.

**26.**    **Entire Agreement**. This Agreement constitutes the entire understanding between the parties with respect to the transactions contemplated herein, and all prior or contemporaneous agreements, understandings, representations and statements, oral or written, between the parties are merged into this Agreement. Neither this Agreement nor any provisions hereof may be waived, modified, amended, discharged or terminated except by an instrument in writing signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

**27.**    **Non-Business Days**. If any date herein set forth for the performance of any obligations either by Seller or by Purchaser or for the delivery of any instrument or notice as herein provided should be on a non-business day, the compliance with such obligations or delivery shall be deemed acceptable on the next business day following such non-business day.

**28.**    **Brokers' Commissions**. Seller represents and warrants to Purchaser that, except for Healthcare Finance Partners, Corp., it has not dealt with any broker, investment banker or similar service provider with respect to this Agreement or the purchase of Purchased Assets. Seller shall indemnify, defend, reimburse and hold harmless Purchaser from and against any claims for commissions, fees, charges or other compensation made by any party claiming to have been a broker of Seller in connection with this Agreement or the transactions contemplated hereby. Purchaser shall indemnify, defend, reimburse and hold harmless Seller from and against any claims for commissions, fees, charges or other compensation made by any party claiming to have been a broker of Purchaser in connection with this Agreement or the transactions contemplated hereby. Notwithstanding any provision of this Agreement to the contrary, the obligations of the parties under this Section 28 shall survive the Closing and any termination of this Agreement indefinitely.

**29.**    **Section Headings**. The section headings used herein are descriptive only and shall have no legal force or effect whatsoever.

**30.** **Notices**. Any notice, demand or request which may be permitted, required or desired to be given in connection herewith shall be given in writing and directed to Seller and Purchaser as follows:

If to Seller:          Quantum Properties, L.P.
c/o Promise Healthcare Group, LLC
999 Yamato Road, 3rd Floor
Boca Raton, FL 33431
Attention: Suzanne Sterling
Facsimile: (561) 995-9845

*with copy to (which shall not constitute notice):*

Waller Lansden Dortch & Davis, LLP
100 Congress Avenue
Suite 1800
Austin, Texas 78701
Attention: Christy L. Pennington
Facsimile: (512) 685-6417

If to Purchaser:      National Health Investors, Inc.
222 Robert Rose Drive
Murfreesboro, Tennessee 37129
Attention: Chief Executive Officer
Facsimile: (615) 225-3030

*with copy to (which shall not constitute notice):*

Stites & Harbison, PLLC
401 Commerce Street, Suite 800
Nashville, TN 37219
Attention: Ed Burrell
Facsimile: (615) 782-0712

Notices shall be either (i) personally delivered to the offices set forth above, in which case they shall be deemed delivered on the date of delivery to said offices, (ii) sent by certified mail return receipt requested, in which case they shall be deemed delivered on the date set forth in the return receipt, (iii) sent by facsimile to the telephone numbers indicated above, in which case they shall be deemed received on the confirmation date indicated on such facsimile or (iv) sent by air courier (Federal Express or like service), in which case they shall be deemed received on the date of delivery set forth in the courier's receipt.

**31.** **Governing Law; Jurisdiction and Venue**. This Agreement shall be governed by and construed in accordance with the laws of the United States of America and the State of Tennessee, without giving effect to choice of law principles. Each party hereto agrees that the Bankruptcy Court shall have exclusive jurisdiction over all disagreements, disputes or claims arising out of or relating to this Agreement or the transactions contemplated hereby. If the Bankruptcy Case has closed or if the Bankruptcy Court otherwise declines to exercise

jurisdiction, each party hereto agrees that all disagreements, disputes or claims arising out of or relating to this Agreement or the transactions contemplated hereby shall be brought in a state court located in Davidson County, Tennessee or a federal court located in Nashville, Tennessee. Each party hereto hereby consents to personal jurisdiction in any such action brought in the Bankruptcy Court or any Davidson County, Tennessee state court or federal court, consents to service of process by registered mail made upon such party and such party's agent and waives any objection to venue in the Bankruptcy Court or any Davidson County, Tennessee state court or federal court and any claim that the Bankruptcy Court or any Davidson County, Tennessee state court or federal court is an inconvenient forum.

**32.** **Litigation**. In the event of litigation between the parties with respect to this Agreement, the transaction contemplated hereby, the performance of their obligations (in whole or in part) hereunder or the effect of a termination hereunder, the parties agree that the court may allocate costs and expenses incurred by the parties in connection with such litigation, including reasonable attorneys' fees as part of any verdict or related judgment. Notwithstanding any provision of this Agreement to the contrary, the obligations of the parties under this Section 32 will survive the Closing or any termination of this Agreement.

**33.** **Supplemental Disclosure Letter**. From time to time prior to the Closing, Seller may, upon written notice to Purchaser, supplement or amend the Seller Disclosure Schedule relating to the representations and warranties, if any (the "**Supplemental Disclosures**"), and such Supplemental Disclosure Letter shall be deemed to be incorporated into and to supplement and amend the Seller Disclosure Schedule as of the Closing Date. Notwithstanding anything to the contrary contained in this Agreement, Seller may not update: (i) negative representations and warranties; or (ii) matters which existed at signing of this Agreement, after Purchaser's receipt of a Supplemental Disclosure. Seller may not cure a Seller's Default of this Agreement which existed at signing of this Agreement and Purchaser shall be entitled to exercise its remedies hereunder. In addition, if Purchaser determines, in its reasonable discretion, that the information contained in the Supplemental Disclosure will have a Material Adverse Effect on the transaction contemplated by this Agreement, Purchaser may elect to terminate this Agreement by providing written notice to Seller within three (3) business days after Purchaser's receipt of such Supplemental Disclosure Letter, in which event this Agreement shall be terminated and of no further force and effect (except for those expressly specified to survive termination of this Agreement). If the Closing is to occur during the 3-business day period, the Closing Date, may, at Purchaser's option, be delayed to allow Purchaser the entire 3-business day period to determine if it elects to terminate this Agreement as herein provided.

**34.** **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Counterparts may be executed in either original or electronically transmitted form (e.g., faxed or emailed portable document format (PDF) form), and the parties hereby adopt as original any signatures received via electronically transmitted form.

**35.** **Prorations and Adjustments**. General and special real estate and other ad valorem taxes and assessments levied or assessed against the Project and/or any other Purchased Assets shall be prorated as of the Closing Date on the basis of the most recent ascertainable tax bill(s), and the net credit to Purchaser or Seller shall be credited against the Purchase Price.

**36.** **Acquisition Proposals**. "**Acquisition Proposal**" shall mean any offer or proposal to acquire the operations or a significant portion of the assets of the Facility or the Project or an equity interest in Seller or otherwise to provide financing with respect to a similar transaction involving the Facility or the Project. Seller, and any officer, director, employee, advisor or others authorized to act on its behalf, (i) will not, directly or indirectly, initiate, solicit, authorize or encourage discussions relating to any Acquisition Proposal; (ii) will not participate in negotiations in connection with or in furtherance of any Acquisition Proposal or permit any person other than the Purchaser and their respective representatives to have any access to the Facility or Project, or furnish to any person other than Purchaser and its respective representatives any non-public information with respect to Purchased Assets; (iii) will immediately cease and cause to be terminated any existing activities, discussions or negotiations with any parties, other than the Purchaser, conducted on or before the date of this Agreement with respect to any Acquisition Proposal; and (iv) will immediately provide to Purchaser written notice of any Acquisition Proposal, including the name of the party seeking to initiate, continue or renew activities, discussions or negotiations regarding an Acquisition Proposal.

**37.** **Confidentiality**. All information regarding Purchaser, Seller and the Project which have been provided by Seller and Purchaser to each other in connection with the negotiation, execution, and performance of this Agreement are confidential, and will be treated as such by each party and their respective mangers, members, agents, and employees, who will not make use of such confidential information or reveal any such information to any other Persons other than parties who need to know the information for the purpose of performing due diligence or evaluating the transaction contemplated by this Agreement on behalf of the parties hereto or unless ordered by a court of competent jurisdiction or otherwise compelled to do so. This confidentiality provision shall not apply to information which is generally available to the public or becomes generally available to the public from sources other than as a result of disclosure by either party hereto in violation of the terms hereof. If this Agreement is terminated, upon written notice from the disclosing party the other party shall immediately return such confidential information or destroy such information as requested. Notwithstanding the foregoing, (i) Seller and Purchaser (or any of their respective Affiliates) shall be able to disclose any such information as is, in the good faith judgment of such Person's counsel, accountants or advisors, required or reasonably advisable to be disclosed by operation of law, rule, regulation or legal process, a governmental agency such as the Internal Revenue Service or Securities and Exchange Commission, or a stock exchange such as the New York Stock Exchange, court order or requirement of any governmental authority, and (ii) Seller and Purchaser shall be entitled to disclose any such information as is, in the good faith judgment of such Person's counsel, accountants or advisors, required or reasonably advisable to be disclosed in connection with such party's (or any of its Affiliates') quarterly earnings results or financing activities, including the name of the non-disclosing party and any other required terms under this Agreement. The foregoing shall survive the Closing or any termination of this Agreement. Notwithstanding the foregoing, disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and the filings related thereto shall not constitute a breach of this Agreement.

**38.** **Intentionally Deleted**.

**39.** **Enforceability**. The parties agree that each and every provision of this Agreement is severable, and if any term or provision of this Agreement shall be held invalid or

unenforceable to any extent, the remaining terms and provisions of this Agreement (including, without limitation, the remaining terms and provisions of the affected Section) shall not be affected thereby, and each term and provision shall be valid and enforceable to the fullest extent permitted by law.

**[Remainder of this page intentionally left blank]**

The parties hereto have executed this Agreement as of the date first above written.

**SELLER:**

**QUANTUM PROPERTIES, L.P.,**
a California limited partnership

By: _____
Name:    Andrew Hinkelman
Its:             Chief Restructuring
                             Officer

**PURCHASER:**

**NATIONAL HEALTH INVESTORS, INC.,**
a Maryland corporation

By: _____
Name: _____

21244N:181009:1289015:14:NASHVILLE

The parties hereto have executed this Agreement as of the date first above written.

**SELLER:**

**QUANTUM PROPERTIES, L.P.,** a
California limited partnership


By: _____
Name: _____
Its: _____


**PURCHASER:**

**NATIONAL HEALTH INVESTORS, INC.,** a
Maryland corporation


By: _____
Name: Kristin S. Gaines
Its:      Chief Credit Officer

| Comparison Details | |
|---|---|
| Title | **compareDocs Comparison Results** |
| Date & Time | 11/20/2018 4:57:12 PM |
| Comparison Time | 2.21 seconds |
| compareDocs version | v4.3.2.6 |

| Sources | |
|---|---|
| Original Document | [SCGiManageDB][#5896419] [v1] Purschase and Sale Agreement between Quantum Properties and National Health Investors.docx |
| Modified Document | [SCGiManageDB][#5896419] [v2] Purschase and Sale Agreement between Quantum Properties and National Health Investors.docx |

| Comparison Statistics | |
|---|---|
| Insertions | 19 |
| Deletions | 42 |
| Changes | 7 |
| Moves | 0 |
| Font Changes | 0 |
| Paragraph Style Changes | 0 |
| Character Style Changes | 0 |
| TOTAL CHANGES | 68 |
| | |
| | |
| | |
| | |
| | |

| Word Rendering Set Markup Options | |
|---|---|
| Name | |
| Insertions | |
| Deletions | |
| Moves / Moves | |
| Font Changes | |
| Paragraph Style Changes | |
| Character Style Changes | |
| Inserted cells | |
| Deleted cells | |
| Merged cells | |
| Changed lines | Mark left border. |
| Comments color | By Author. |
| Balloons | True |

| compareDocs Settings Used | Category | Option Selected |
|---|---|---|
| Open Comparison Report after Saving | General | Always |
| Report Type | Word | Formatting |
| Character Level | Word | False |
| Include Headers / Footers | Word | True |
| Include Footnotes / Endnotes | Word | True |
| Include List Numbers | Word | True |
| Include Tables | Word | True |
| Include Field Codes | Word | True |
| Include Moves | Word | False |
| Show Track Changes Toolbar | Word | True |
| Show Reviewing Pane | Word | True |
| Update Automatic Links at Open | Word | False |
| Summary Report | Word | End |
| Include Change Detail Report | Word | Separate |
| Document View | Word | Print |
| Remove Personal Information | Word | False |
| Flatten Field Codes | Word | True |