## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PROMISE HEALTHCARE GROUP, LLC, *et al.*[1] | Case No. 18-12491 (CSS) |
| Debtors. | Jointly Administered |
| | Re: Docket No. 37 |

**OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR ENTRY OF ORDERS (I) (A) ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE OF CERTAIN OF THE DEBTORS' ASSETS, INCLUDING APPROVING A BREAK-UP FEE AND EXPENSE REIMBURSEMENT, (B) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (C) APPROVING FORM AND MANNER OF NOTICE RELATING THERETO, AND (D) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE; (II) (A) APPROVING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) AUTHORIZING SUCCESS HEALTHCARE 1, LLC TO GRANT LIENS; AND (III) GRANTING RELATED RELIEF**

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Professional Rehabilitation Hospital, L.L.C. (5340), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179), Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc. (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc. (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), St. Alexius Hospital Corporation #1 (2766), St. Alexius Properties, LLC (4610), Success Healthcare 1, LLC (6535), Success Healthcare 2, LLC (8861), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766). The mailing address for the Debtors, solely for purposes of notices and communications, is 999 Yamato Road, 3rd FL, Boca Raton, FL 33431.

The Official Committee of Unsecured Creditors (the "Committee") of Promise

Healthcare Group, LLC, *et al.* (collectively, the "Debtors"), by and through its undersigned

counsel, hereby files this objection (the "Objection") to the *Debtors' Motion For Entry Of*

*Orders (I) (A) Establishing Bidding Procedures Relating To The Sale Of Certain Of The*

*Debtors' Assets, Including Approving A Break-Up Fee And Expense Reimbursement, (B)*

*Establishing Procedures Relating To The Assumption And Assignment Of Certain Executory*

*Contracts And Unexpired Leases, Including Notice Of Proposed Cure Amounts, (C) Approving*

*Form And Manner Of Notice Relating Thereto, And (D) Scheduling A Hearing To Consider The*

*Proposed Sale; (II) (A) Approving The Sale Of Certain Of The Debtors' Assets Free And Clear*

*Of All Liens, Claims, Encumbrances, And Interests(B) Authorizing The Assumption And*

*Assignment Of Certain Executory Contracts And Unexpired Leases, And (C) Authorizing Success*

*Healthcare 1, LLC To Grant Liens; And (III) Granting Related Relief* [Docket No. 37] (the

"Motion").[2]  In support of the Objection, the Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

Bankruptcy jurisprudence has long established that the paramount goal of any auction

process is to maximize the sale proceeds for the benefit of a debtor's estate.  The auction process

set forth in the Motion neither meets that goal nor provides a level playing field for the benefit of

all stakeholders in these cases.

As such, while the Committee does not generally object to the establishment of bidding

procedures for the sale of the Silver Lake Debtors' assets (the "Purchased Assets"), the

Committee objects to the Debtors' currently proposed Bidding Procedures.  The Committee

requests that this Court approve bidding procedures consistent with the standards established by

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or the
Stalking Horse APA, as appropriate.

the United States Court of Appeals for the Third Circuit such that the process to sell the Purchased Assets maximizes value and does not chill bidding or otherwise eliminate potential offers that could enhance creditor recoveries and value for the Debtors' estates.

First, the Bidding Procedures are devoid of a clear explanation of the Purchase Price and the net realizable cash consideration to the estates from the sale of the Purchased Assets under the Stalking Horse APA (the "Net Realizable Value").  The Debtors should be required to share the Net Realizable Value with prospective bidders sufficiently in advance of the Bid Deadline and any bidding at an auction should be based on the Net Realizable Value as a financial benchmark.  As currently contemplated, the Net Realizable Value is unclear and can change substantially based on a number of factors.  The Stalking Horse APA contains various Purchase Price adjustments and requires the Debtors to assume responsibility for various unliquidated and unquantified payment obligations including, among other things (collectively, the "Debtor Obligations"): (i) the Cure Costs for all the contracts assumed and assigned to the Stalking Horse Bidder and (ii) the insurance Tail Policy.  Neither the Stalking Horse APA nor the Motion provide any information regarding the projected amounts of the Debtor Obligations, which the Debtors advised the Committee could exceed $10 million.  The Debtors must therefore estimate the Purchase Price adjustments and the Debtor Obligations for the purpose of determining the Net Realizable Value under the Stalking Horse APA and qualifying competing bids.  Without accounting for the Purchase Price adjustments and the Debtor Obligations, using the current inflated Purchase Price as the threshold for competing bids creates a barrier to entry for other potentially interested bidders and defeats the purpose of selecting a stalking horse purchaser.

Second, the Bid Protections requested in the Stalking Horse APA are inconsistent with precedent established by the United States Court of Appeals for the Third Circuit.  The Third

Circuit has consistently held that bid protections are only appropriate where they are necessary to preserve the value of a debtor's estate as required pursuant to section 503 of the Bankruptcy Code.  Value may be preserved when bid protections induced a bidder to enter a bid it would not have entered absent such protections.  Here, the Stalking Horse Bidder entered into the Original Purchase Agreement with the Silver Lake Debtors on February 7, 2018 after two rounds of bidding for the Purchased Assets.  Thereafter, the Debtors and the Stalking Horse Bidder negotiated the Stalking Horse APA after it was apparently determined that the filing of a bankruptcy petition could facilitate the sales process.  The Stalking Horse Bidder was thus already committed to buying the Purchased Assets and the Bid Protections in the Stalking Horse APA did not induce the post-petition bid by the Stalking Horse Bidder.  There is no evidence supporting the administrative nature of the expenses requested through the Bid Protections and those expenses should be rejected by this Court.

Further, given the ambiguity regarding the Net Realizable Value, the Stalking Horse APA does not set a floor for other prospective bidders in these cases.  Rather than serve as a catalyst to higher bids—a requirement in the Third Circuit for allowance of bid protections—the inflated Purchase Price in the Stalking Horse APA impedes competitive bidding.  The Bidding Procedures in these cases allow the Stalking Horse Bidder to bid the amount of the Bid Protections at the Auction,[3] reimbursing the Stalking Horse Bidder for pre-petition efforts to acquire the Purchased Assets with no concomitant benefit to the estates by the Stalking Horse APA.  The Bid Protections therefore create additional barriers for entry, chill the bidding process and harm the Debtors' estates.

---

[3] "In the event of a competing Qualified Bid, the Stalking Horse Bidder will be entitled, but not obligated, to submit overbids and will be entitled in any and all such overbids to include the full amount of the Bid Protections in lieu of cash and for purposes of evaluating the overbid equal to cash in the same amount."  Bidding Procedures, page 9.

Even if this Court finds that bid protections are appropriate in these cases, the currently contemplated Bid Protections are excessive.  The Stalking Horse APA contemplates a Breakup Fee of three percent (3.0%) of the Base Cash Amount ($84,150,000) and an Expense Reimbursement Fee of $2,000,000.  Even if 3.0% is reasonable as a breakup fee, this percentage should be applied to the Net Realizable Value, rather than the Base Cash Amount.  The Motion recognizes that the Base Cash Amount is subject to certain adjustments resulting in a Purchase Price of $77.5 million, which includes an $8.1 million subordinated Seller Note payable over 4.5 years that is not guaranteed by a credit-worthy entity.  The Purchase Price must be further reduced to account for the potentially millions of dollars of Debtor Obligations under the Stalking Horse APA.  The Seller Note also should not be included in the calculation of the Breakup Fee, as the realizable value to the Debtors' estates from such note is highly speculative.[4]

Similarly, if an expense reimbursement is appropriate in these cases, the Stalking Horse Bidder should only receive reimbursement for actual and necessary expenses related to the negotiation and documentation of the Stalking Horse APA; not expenses related to the Original Purchase Agreement.  Further, the Expense Reimbursement should be capped at reasonable fees and expenses not to exceed 1.0% of the Net Realizable Value, for a combined bid protection value not to exceed 4.0% of the Net Realizable Value, which is consistent with Third Circuit law.

The proposed overbid increments are also excessive.  The Stalking Horse APA currently contemplates an initial overbid of $1,000,000 plus the Bid Protections and subsequent overbid increments of $2,500,000.  These numbers are too high for a transaction of this size and will

---

[4] It is unclear whether the note represents actual consideration to the estates or is a vehicle to secure potential indemnification obligations of the Debtors' to the Stalking Horse Bidder through an exercise of setoff rights.

have a chilling effect on bidding.  The initial overbid should be reduced to $500,000 plus Bid

Protections (as reduced to be a percentage of the Net Realizable Value not to exceed 4.0%) and

the subsequent overbid increments should be no more than $1,000,000.

The currently contemplated sale process is designed to benefit the Stalking Horse Bidder,

to the detriment of the Debtors' estates.  First, the "no shop" provision in the Stalking Horse

APA (which does not include a fiduciary out),[5] prevents the Debtors from providing information

to prospective purchasers or entering an agreement with such potential purchasers through the

earlier of twenty-five (25) days from the Petition Date or the entry of the Bidding Procedures

Order, which is in violation of the Debtors' fiduciary duties to maximize value of their estates.

Second, the proposed timeline is unreasonably condensed, especially in light of the no shop

provision, hampering an open and competitive bidding process.  As currently contemplated,

interested parties will have approximately two weeks to submit bids from the date of entry of the

Bidding Procedures Order.  As such, all dates in the Bidding Procedures should be extended by

thirty (30) days and all interested parties should be afforded equal access to the Debtors'

information.  Third, the proposed Bidding Procedures allow the Debtors to provide the Stalking

Horse Bidder greater access to information than other Potential Bidders, while simultaneously

not requiring the Stalking Hose Bidder to submit the same information as other bidders, creating

an uneven playing field.  The Bidding Procedures must be amended to provide an even playing

field for all interested bidders.

Although the Bidding Procedures provide the Committee consultation rights with respect

to qualifying bids, given the potential that each bid will contain different purchase price

adjustments and disparity with respect to assumed assets and obligations, the Committee should

---

[5] Stalking Horse APA, ¶ 7.1(b).

have the right to challenge to the Debtors' qualification determination and seek to have the challenge heard by the Court on an expedited basis. This process will foster transparency and competitive bidding, helping generate value for the Debtors' estates. Also, given that the Debtors are liquidating their assets, the Committee, as a significant stakeholder, should play a significant role in the sale process.

Finally, the Committee has other specific comments to the Bidding Procedures which will further facilitate the maximization of value for the benefit of the Debtors' estates, as described further below.

The Stalking Horse APA, as currently drafted conflicts with Medicare regulations and exposes the Debtors' estates to significant liability during the Interim Management Period (defined below). For example, among other things, the Stalking Horse APA provides that the Stalking Horse Bidder will not assume any Liabilities with respect to the Deferred Contracts, including the Medicare and Medi-Cal provider agreements, until the Transition Date, at which time it will only assume the Liabilities with respect to the Deferred Contracts arising *after* the Transition Date. This provision is contrary to 42 C.F.R. § 489.18(d), which obligates a purchaser of provider agreements to assume successor liability for any overpayments. Further, the indemnities contained in the Interim Management Agreement in favor of the Silver Lake Debtors do not adequately protect the Debtors because such indemnifies do not appear to be guaranteed by a credit-worthy entity.

The Committee's comments with respect to the Stalking Horse APA are set forth below and are also designed to maximize value in the Sale process.

On November 21, 2018, the Committee propounded discovery upon the Debtors

regarding the Motion and also scheduled a deposition for November 30, 2018.[6]  The Debtors

replied to the document demands on November 27, 2018, producing some of the requested

documents and asserting certain objections, including that certain documents are subject to

possible confidentiality concerns, to which the Committee does not agree.  Because the

Committee is currently reviewing the documents produced, the Committee reserves the right to

file a supplemental objection to the Motion.

## BACKGROUND

### I.    The Debtors' Pre-Petition Marketing Process

1.    The Debtors selected MTS Health Partners L.P. ("MTS") to lead the Debtors' pre-

petition marketing efforts for the Purchased Assets beginning in March 2017.  Declaration of Jay

A. Shinland in Support of the Debtors' Bidding Procedures and Sale Motion (the "Shinland

Declaration"), ¶ 8.

2.    According to the Shinland Declaration, MTS contacted and/or sent initial

marketing materials to approximately forty-one financial and strategic parties, thirty-six of whom

signed confidentiality agreements, received offering memoranda and received virtual data room

access.  Shinland Declaration, ¶ 9.

3.    The Silver Lake Debtors received thirteen first round bids in May 2017 and seven

second round bids for the Purchased Assets in July 2017.  Shinland Declaration, ¶ 10.

According to the Shinland Declaration, the bid submitted by L.A. Downtown Medical Center

LLC—the Stalking Horse Bidder—exceeded that of the next closest "well-diligenced" bidder by

$9.5 million.  Shinland Declaration, ¶ 10.

---

[6] The Committee sent the Debtors an informal document request and issue list on November 16, 2018, only 2 days after the Committee's appointment.

4.    On February 7, 2018, the Debtors executed an agreement (the "Original Purchase Agreement") with the Stalking Horse Bidder for the sale of the Purchased Assets outside of bankruptcy.  Shinland Declaration, ¶ 11.

5.    In connection with the negotiation of the Original Purchase Agreement, the parties recognized that it would take time for the Stalking Horse Bidder to obtain California state licensing approvals.  As such, the parties put into place an interim management structure pursuant to which the Silver Lake Debtors would sell certain of the Purchased Assets to the Stalking Horse Bidder which would then lease those assets back to Success 1, the entity currently holding the licenses.  Shinland Declaration, ¶ 12.

6.    However, as noted in the Shinland Declaration:

The Stalking Horse Bidder and Ally [its lender] had significant concerns about (i) the impact that a bankruptcy filing by or against Success 1 would have on (a) the Stalking Horse Bidder's ability to obtain its management fee, including such QAF Payments from Success 1, during the interim period in which the Stalking Horse Bidder was providing management services and (b) the Stalking Horse Bidder's ability to manage the facilities during the licensing transition, and (ii) the value of various indemnities by the Silver Lake Debtors' parent entity due to the parent entity's increasing financial difficulties.

Shinland Declaration, ¶ 13.

7.    The parties discussed ways to alleviate the Stalking Horse Bidder's concerns and ultimately concluded that the sale would be best implemented pursuant to section 363 of the Bankruptcy Code.  Shinland Declaration, ¶ 13.

8.    "At such time [Debtors] advised [the Stalking Horse Bidder] about their intention to commence the Bankruptcy Cases, [Stalking Horse Bidder] allege[d] it had incurred over $2,400,000 in due diligence and professional fees and expenses in connection with these transactions."  Stalking Horse APA, Recitals, ¶ A.  According to the Stalking Horse APA, the

Stalking Horse Bidder thus already incurred $2,400,000 in expenses before the parties

contemplated revising the Original Purchase Agreement to account for the bankruptcy filing.

9.      "*Because the Original Purchase Agreement did not contemplate a potential*

*bankruptcy filing by the Silver Lake Debtors*, the Silver Lake Debtors and the Stalking Horse

Bidder negotiated a new agreement to incorporate the impact of a bankruptcy filing and

ultimately entered into a new Asset Purchase Agreement dated as of October 24, 2018 (the

"Stalking Horse APA")."  Shinland Declaration, ¶ 14.

10.      The Stalking Horse APA provides that the Debtors cannot "solicit, initiate or

induce the making, submission or announcement of, or knowingly encourage, an Acquisition

Proposal . . . or enter into any Contract relating to an Acquisition Proposal" from October 24,

2018 until the earlier of (i) twenty-five (25) days from the Petition Date, or (ii) the entry of the

Bidding Procedures Order by the Bankruptcy Court.  Stalking Horse APA, ¶ 7.1(b).  There

appears to be no "fiduciary out" provision in the agreement.

11.      According to the Shinland Declaration, neither the Debtors nor MTS have

marketed the Silver Lake Debtors' assets since February 7, 2018 (and possibly earlier) and

instead have been restricted from doing so for the past months.  After the Debtors decided to

commence these chapter 11 cases, there have not been any renewed efforts to solicit a new

stalking horse bidder (apparently due to the "no shop" provision).  Rather, the Original Purchase

Agreement was revised to take into account the Debtors' bankruptcy filing and compensate the

Stalking Horse Bidder for its costs incurred to date, along with a break-up fee as further

compensation.

**II.      The Chapter 11 Cases**

12.      On November 5, 2018 (the "Petition Date"), each of the Debtors filed a voluntary

petition in this Court commencing a case for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

13.    The United States Trustee formed the Committee on November 14, 2018 [Docket No. 91].  The Committee will seek retention of Sills Cummis & Gross P.C. and Pachulski Stang Ziehl & Jones LLP as co-counsel to the Committee.

14.    On November 6, 2018, the Debtors filed the Motion to approve, among other things, (a) the Bidding Procedures and (b) authorization of the sale of the Purchased Assets in accordance with the Bidding Procedures.

15.    The Debtors have identified L.A. Downtown Medical Center LLC (the "Stalking Horse Bidder") as the prospective purchaser with the alleged current best and highest offer for the Purchased Assets at a Purchase Price of $77.5 million.

16.    The Silver Lake Debtors and the Stalking Horse Bidder have negotiated the terms of an asset purchase agreement for the Purchased Assets (the "Stalking Horse APA").  Certain key terms of the Stalking Horse APA are as follows:

a. **Consideration:** Base Cash Amount of $84,150,000, subject to certain adjustments as set forth more specifically in the Stalking Horse APA, resulting in consideration to be conveyed to the Silver Lake Debtors in the amount of $77.5 million, which includes an $8.1 million Seller Note.

b. **Excluded Liabilities:**  All Cure Costs.  Sellers will pay all Cure Costs in accordance with the Sale Order.  Buyer will have no responsibility for any Cure Costs.

c. **Closing Date:** 10:00 a.m. Eastern Time on the date that is no later than ten Business Days following the satisfaction of the conditions to Closing.  The Stalking Horse APA may be terminated by Sellers or Buyer if the Closing has not occurred on or prior to the 90th day after the Petition Date (the "Outside Date").

d. **Deferred Assets and Liabilities**:  Debtors will not transfer the Deferred Assets until the Transition Date.  Transition Date means the last to occur of the following dates:  (a) the date when Buyer is issued a hospital license from the State of California Department of Public

11

Health for operation of the Hospitals or (b) the date when Buyer is issued the necessary hospital pharmacy permits from the State of California Board of Pharmacy for the operation of the pharmacies located at the Hospital.  Effective at the Transition Date, the Stalking Horse Bidder will be deemed to have assumed the Liabilities of SHI with respect to the Deferred Contracts but only to the extent of the Liabilities arising thereunder with respect to events or periods on or after the date of such assignment and assumption.

e. **Agreements with Management**:  At Closing, the Parties will execute an Interim Management Agreement.

f. **Break-up Fee:** $2,524,500 (which is equal to three percent (3.0%) of the Base Cash Amount).

g. **Expense Reimbursement**:  $2,000,000.

h. **Minimum Initial Overbid:** $1,000,000 plus Bid Protections.

i. **Bid Increments:** $2,500,000.

j. **Competing Transaction**:  From the Agreement Date [October 24, 2018] until the earlier of (i) twenty-five (25) days from the Petition Date, or (ii) the entry of the Bidding Procedures Order by the Bankruptcy Court, Sellers will not, and will cause their respective Affiliates and Representatives to not, directly or indirectly, (i) solicit, initiate or induce the making, submission or announcement of, or knowingly encourage, an Acquisition Proposal; or (ii) enter into any Contract relating to an Acquisition Proposal.

17.    Consistent with the terms of the Stalking Horse APA, the Motion seeks authorization of, among other things, (i) the Debtors' selection of the Stalking Horse Bidder as the stalking horse purchaser for the Purchased Assets, (ii) the Stalking Horse APA, (iii) the Bidding Procedures, (iv) the Bid Protections and overbid increments, and (v) the Debtors' proposed Auction process.

18.    On November 27, 2018, Strategic Global Management, Inc. ("Strategic") filed an objection to the Motion [Docket No. 158] (the "Strategic Objection"), stating, among other things, that it "plans to submit a Bid, and participate in the Auction, for the purchase of substantially all of the assets of Silver Lake Medical Center."  Strategic Objection, ¶ 1.

19.    The Strategic Objection further states that on November 12, 2018, Strategic requested due diligence materials from the Debtors.  The Debtors cited the no shop provision in

the Stalking Horse APA and initially refused Strategic's request.  Subsequently, the Debtors

provided Strategic with access to the data room on November 21, 2018.  Strategic Objection, ¶ 4.

Strategic noted, however, that even with access to the data room "it will have only 30 days in

which to conduct its due diligence, obtain financing, and formulate its bid before the proposed

Bid Deadline of December 21, 2018 . . . [while] the Stalking Horse Bidder has had more than a

year in which to conduct due diligence and obtain financing."  Strategic Objection, ¶ 4.

20.    Further, the Committee understands that the information in the data room is stale

and incomplete, lacking, among other things, any year end 2017 data, data from 2018,

information on the QAF payments, and Medicare and Medi-Cal information.  As set forth in the

email exchange between counsel to Strategic and counsel to the Debtors, attached hereto as

Exhibit A (the "Strategic Emails"), when Strategic inquired about the information in the data

room (and the lack thereof) the Debtors responded that they could not currently provide such

information, as doing so would be in violation of the no shop provision in the Stalking Horse

APA.

**OBJECTION**

**I.    The Net Realizable Cash Consideration to the Estates from the Sale of the
Purchased Assets to the Stalking Horse Bidder is Unclear**

21.    The Debtors  must determine the Net Realizable Value of the proposed sale of the

Purchased Assets under the Stalking Horse APA and share it with  prospective bidders

sufficiently in advance of the Bid Deadline, so potential bidders can determine how to bid on the

Purchased Assets.  As currently contemplated, the Net Realizable Value is unclear and not

quantified.

22.    The Stalking Horse APA includes a gross aggregate cash purchase price of

$84,150,000.  After accounting for various adjustments, the Motion provides that "the

consideration to be conveyed to the Silver Lake Debtors is expected to be approximately $77.5 million, which includes an $8.1 million seller note (the "Seller Note") to be provided by the Stalking Hose Bidder (the "Purchase Price")[.]" Motion, ¶ 19.  The Stalking Horse APA requires the Debtors assume responsibility for, among other things, all Cure Costs[7] and the Tail Policy.[8]  Stalking Horse APA, §§ 2.4(h), 8.14.

23.     The Stalking Horse APA provides no cap on these Debtor Obligations.  For example, with respect to Cure Costs, under the Stalking Horse APA, the Stalking Horse Bidder can continue to assume certain contracts up to two days prior to the day of the Closing.  Stalking Horse APA, § 2.6(a).  Based on discussions between the Committee's advisors and the Debtors' advisors, the Committee understands that the Cure Costs associated with the contracts the Stalking Horse Bidder currently intends to assume are equal to approximately $2 million, but could increase to $7 million if the Stalking Horse Bidder elects to assume additional contracts under the Stalking Horse APA.  The Committee inquired about the projected costs associated

---

[7] "Notwithstanding any provision in this Agreement to the contrary, Buyer will not assume and will not be obligated to assume or be obliged to pay, perform or otherwise discharge, and Sellers (and their respective bankruptcy estates) will be solely and exclusively liable with respect to, any Liability of any Seller that is not an Assumed Liability (collectively, the "Excluded Liabilities"), including all Liabilities relating to: . . . (h) all Cure Costs."  Stalking Horse APA, § 2.4(h).

[8] "Prior to the Closing, Sellers will obtain and fully pay for "tail" insurance policies with a claims period of at least two years from the Effective Time with respect to (i) Sellers' claims made insurance policies (except for the Promise Healthcare, Inc. excess liability policies from (A) Steadfast Insurance Company and (B) Ironshore Specialty Insurance Company) with at least the same coverage and amount and containing terms and conditions that are not less advantageous to Sellers as their existing claims made policies of insurance and (ii) an excess umbrella insurance policy in the amount of Five Million Dollars ($5,000,000), in each case with respect to claims arising out of or relating to events which occurred before or at the Effective Time (including in connection with the Transactions) (the "Tail Policy"). Sellers will bear the cost of the Tail Policy. Sellers will cause such policy to be maintained in full force and effect for such two-year period following the Closing Date."  Stalking Horse APA, § 8.14.

with the Tail Policy but has not yet received a figure.[9]  The Debtor Obligations can thus total

over $10 million to be incurred by the estates.

24.    In addition, $8.1 million of the Purchase Price is in the form of the Seller Note.

There is no clear indication of the maturity date of the Seller Note, although a draft received by

the Committee indicates the maturity date may be 4.5 years from the Closing Date.  The Seller

Note does not appear to be guaranteed by a credit-worthy entity and thus, if the Stalking Horse

Bidder cannot make payments under the Seller Note, the Debtors have no recourse against a

party with the financial wherewithal to satisfy the obligations thereunder.  Further, the Seller

Note is subordinated to the Senior Indebtedness to the extent set forth in the Subordination

Agreement.  Finally, each Deferred Payment under the Seller Note remains subject to offset

under the terms of the Seller Note and the Transition Services Agreement.  Stalking Horse APA,

§ 3.4.  The Seller Note thus contains many contingencies which are not reflected in the current

Purchase Price and may be used to offset indemnification obligations, to the extent such

obligations arise under the Stalking Horse APA.

25.    The Debtors' responsibility for the Debtor Obligations and the uncertainty

associated with the Seller Note have an impact on the Net Realizable Value to the Debtors'

estates from the Sale of the Purchased Assets to the Stalking Horse Bidder.  As such, the Debtors

must determine the Net Realizable Value and share this calculation with prospective bidders

sufficiently in advance of the Bid Deadline to foster competitive bidding.

II.    **The Stalking Horse Bidder is Not Entitled to the Bid Protections**

26.    A bidder requesting bid protections must do so pursuant to section 503(b)(1) of

the Bankruptcy Code, which requires that the bidder establish that the bid protections are an

---

[9] It is unclear whether the Debtors calculated this expense in connection with any bidding
analysis.

actual and necessary cost of preserving the estate. *Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999) ("O'Brien"); *In re Reliant Energy Channelview LP*, 594 F.3d 200, 202 (3d Cir. 2010) ("Reliant").  In *O'Brien* and *Reliant*, the Third Circuit held that a bidder must seek bid protections under section 503(b) of the Bankruptcy Code, rather than under the business judgment standard.  Section 503(b) of the Bankruptcy Code only permits payment for the *actual and necessary* costs and expenses of preserving the estate.  *Reliant*, 594 F.3d at 206.  The Third Circuit stated that the business judgment rule was not appropriate in considering bid protections in the bankruptcy context.  *Id.* at 209 ("Furthermore, the role of the business judgment rule is of limited use on this appeal because in *O'Brien* we stated that 'we conclude that the business judgment rule should not be applied as such in the bankruptcy context.'").

27.    The Third Circuit in *In re Energy Future Holdings Corp.,* recently explained how bid protections could provide an actual and necessary benefit to the estate:

> How can a termination fee provide such a benefit to a debtor's estate? In *O'Brien*, we recognized two possible ways. First, we said that "such a benefit could be found if assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second,  "if the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may . . . provide[] a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.* A decade after *O'Brien*, we identified a third way a termination fee could preserve the value of an estate: by assuring that a bidder "adhered to its bid rather than abandoning its attempt to purchase . . . in the event that the Bankruptcy Court required an auction for [the] sale" of the relevant asset. *In re Reliant Energy*, 594 F.3d at 207.
>
> It bears emphasis, however, that  we have always said these are ways a termination fee *might* confer a benefit on an estate. *See, e.g.*, *O'Brien*, 181 F.3d at 537 (explaining that these were instances "where a benefit could be found" or "may" be found). We have never held that bankruptcy courts must allow fees whenever they find that one of the above features is present. Rather, it is ultimately within a bankruptcy court's discretion to approve or deny a termination

16

fee based on the totality of the circumstances of the particular case. *See In re Reliant Energy*, 594 F.3d at 205. Exercising that discretion and taking into account all of the relevant circumstances, the bankruptcy court must make what is ultimately a judgment call about whether the proposed fee's potential benefits to the estate outweigh any potential harms, such that the fee is "actually necessary to preserve the value of the estate," *O'Brien*, 181 F.3d at 535. *See In re Reliant Energy*, 594 F.3d at 208 (holding that the bankruptcy court did not abuse its discretion in denying a proposed fee when the "potential harm to the estate the break-up fee would cause by deterring other bidders from entering the bid process outweighed" the benefit the fee might have conferred by securing a bidder's adherence to its bid).

*In re Energy Future Holdings Corp.*, 904 F.3d 298, 313-14 (3d Cir. 2018).

28.     Here, the Bid Protections are not an actual and necessary cost of preserving the estates.  First, they did not induce the Stalking Horse Bidder to enter into the Stalking Horse APA.  Rather, the Motion explains that "[o]n February 7, 2018, the Debtors executed an agreement (the "Original Purchase Agreement") with the Stalking Horse Bidder for the sale, transfer, and assignment of the Purchased Assets."  Motion, ¶ 16.  Subsequently, in light of timing issues with the Stalking Horse Bidder's ability to obtain licenses from the State:

> the Silver Lake Debtors notified the Stalking Horse Bidder that the sale should, instead, best be implemented pursuant to section 363 of the Bankruptcy Code. Because the Original Purchase Agreement did not contemplate a potential bankruptcy filing by the Silver Lake Debtors, the Silver Lake Debtors and the Stalking Horse Bidder negotiated a new agreement to incorporate the impact of a bankruptcy filing and ultimately entered into a new Asset Purchase Agreement dated as of October 24, 2018 (the "Stalking Horse APA").

Id. at ¶¶ 18-19; Stalking Horse APA, Recitals ¶ A.  As such, the Bid Protections did not induce the Stalking Horse Bidder to enter into the Staling Horse APA as it had previously entered into the Original Purchase Agreement and entered the revised Stalking Horse APA to account for the filing of the Debtors' chapter 11 cases.

29.     Second, the Bid Protections do not provide a benefit to the estates by increasing the likelihood that the price at which the Purchased Assets are sold will reflect their true worth. Rather, as explained above, the Purchase Price is completely amorphous and does not induce

other bidders to research the value of the Debtors.  Put simply, the Stalking Horse Bidder has not established a floor because parties in interest cannot assess the Debtor Obligations or the contingencies associated with the Seller Note and thus cannot determine the Net Realizable Value.

30.     Third, the Bid Protections do not preserve the value of the estates by assuring that the Stalking Horse Bidder adhere to its bid rather than abandoning its attempt to purchase the assets if the Court requires an auction.  *Reliant*, 594 F.3d at 207.  This factor is inapplicable to the circumstances of these cases.  Rather than the court requiring an auction against the wishes of a debtor and stalking horse, as was the case in *Reliant*, in these cases the Debtors, with the approval of the Stalking Horse Bidder, filed the Motion requesting the Auction.  In fact, a sale pursuant to section 363 of the Bankruptcy Code helped alleviate the "significant concerns" that the Stalking Horse Bidder and Ally had regarding the interim period while the Stalking Horse Bidder obtained its licenses from California.  Motion, ¶¶ 17-18.

31.     Further, this factor must be weighed against whether the provision of bid protections would deter other possible purchasers from bidding, which is the case here.  *See Reliant*, 594 F.3d at 208.  As explained further below, the Bid Protections represent 5.9% of the Purchase Price, before any reductions to the Purchase Price for, among other things, the Seller Note and Debtor Obligations.  As such, this deterrent outweighs any benefit achieved for the estates by keeping the Stalking Horse Bidder committed to its purchase through the provision of the Bid Protections.

### III.     **If Bid Protections Are Appropriate in These Cases, the Currently Proposed Bid Protections are Unreasonable and Will Deter Competitive Bids**

32.     If the Court determines that bid protections are appropriate in these cases, such protections must be reasonable and applied to the Net Realizable Value.  Here, the requested

Breakup Fee is $2,524,500 (3% of the Base Cash Amount) and the Expense Reimbursement is $2,000,000 (2.4% of the Base Cash Amount). Thus, together, the Bid Protections equal 5.4% of the Base Cash Amount, which is 5.9% of the Purchase Price.

33.     The Debtors cite cases for the proposition that bid protections in the range of 3-3.5% are reasonable. Motion, ¶ 38. The Committee does not disagree with this assessment in the general. However, the Debtors overlook that the *combined* Bid Protections in these cases are above that range at 5.4% of the Base Cash Amount. Further, the Debtors apply the bid protection percentage to the Base Cash Amount. As this number is inflated, the Bid Protections are more appropriately applied to the Net Realizable Value, not including any amounts payable under the Seller Note because, as explained above, those amounts are subject to several contingencies. As such, the Breakup Fee should be limited to 3% of the Net Realizable Value (rather than the Base Purchase Price) and the Expense Reimbursement should be capped at reasonable fees and expenses not to exceed 1% of the Net Realizable Value, which is consistent with Third Circuit law. *See e.g.*, *In re Am. Apparel, LLC*, No. 16-12551 (BLS) (Docket No. No. 216) (Bankr. D. Del. Dec. 5, 2016) (approving breakup fee and expense reimbursement fee of 4.5%); *In re BPS US Holdings Inc., et al*., No. 16-12373 (KJC) (Docket No. 233) (Bankr. D. Del. Nov. 30, 2016) (approving breakup fee and expense reimbursement of approximately 4%); *In re Vertis Holdings, In*c., No. 12-12821 (CSS) (Docket No. 206) (Bankr. D. Del. Nov. 2, 2012) (approving a breakup fee and expense reimbursement of 4%).

34.     Further, the Expense Reimbursement as currently proposed appears to include expenses incurred in the diligence and negotiation of the Original Purchase Agreement. There was a period of eight months between the execution date of the Original Purchase Agreement and the Stalking Horse APA. It is unreasonable that in that eight month period, the Stalking

Horse Bidder incurred $2,000,000 of expenses.  Rather, the Stalking Horse APA explains that the Stalking Horse Bidder had incurred $2,400,000 in due diligence and professional fees at the time the Debtors advised the Stalking Horse Purchaser of their intension to commence the chapter 11 cases.  Stalking Horse APA, Recitals ¶ A.  As such, these expenses were already incurred and were therefore not necessary to induce the Stalking Horse Bidder to enter into the Stalking Horse APA.  To the extent Bid Protections are appropriate, the Expense Reimbursement should only cover expenses related to the current Stalking Horse APA.  Bid Protections should not be used as an opportunity for reimbursement of expenses incurred with respect to previous transactions.

35.    Further, the Stalking Horse Bidder should not be entitled to Bid Protections if the Sale Transaction with the Stalking Horse Bidder fails to close as a result of the Stalking Horse Bidder's breach of the Stalking Horse APA or the failure of a condition to closing that is under the control of the Stalking Horse Bidder and the Debtors subsequently enter into an Alternative Transaction with another party.  Similarly, the Stalking Horse Bidder should not be entitled to the Expense Reimbursement if the Bankruptcy Court enters an order precluding the consummation of the Transaction on the terms set forth in the Stalking Horse APA and enters an order approving an Alternative Transaction consummated within nine months of the Stalking Horse APA termination.  *See In re Energy Future Holdings Corp.*, 575 B.R. 616, 635 (Bankr. D. Del. 2017) ("Payment of a termination or break-up fee when a court (or regulatory body) declines to approve the related transaction cannot provide an actual benefit to a debtor's estate sufficient to satisfy the *O'Brien* standard.").

36.    Finally, to the extent Bid Protections are appropriate in these cases and owed to the Stalking Horse Bidder, the Stalking Horse Bidder should not receive allowed *superpriority*

administrative expense claims under sections 503(b) and 507 of the Bankruptcy Code.  *See*

Bidding Procedures, § 11.  Providing the Stalking Horse Bidder's administrative expense claim

superpriority status violates the interim order authorizing the Debtors to obtain post-petition

financing [D.I. 54] (the "Interim DIP Order"), which provides that "the DIP Administrative

Agent, on behalf of itself and the DIP Lenders is hereby granted, pursuant to section 364(c)(1) of

the Bankruptcy Code, an allowed superpriority administrative expense claim . . . subject only to

the Carve Out, *having priority over any and all administrative expense claims* and unsecured

claims against the Debtors or their estates."  Interim DIP Order, ¶ 7 (emphasis added).

## IV.    The Minimum Overbid Increments Are Too High and Will Deter Competing Bids

37.    A minimum initial overbid amount must not be arbitrary and unreasonably high.

*In re Hupp Indus.*, 140 B.R. 191, 195 (Bankr. N.D. Ohio 1992).  Bid increments must be

carefully scrutinized to insure that the debtor's estate is not unduly burdened and that the relative

rights of the parties in interest are protected.  *Id.*

38.    In these cases, the Bidding Procedures require that a Minimum Bid contain the

Bid Protections plus an additional $1,000,000 above the Cash Purchase Price (the "Initial Bid

Increment") and that the Minimum Overbid Increment not be less than $2,500,000.  These

amounts are unreasonably high and will serve to chill bidding.  Rather, to promote a robust

auction, the Committee proposes that the Initial Bid Increment be reduced to $500,000 plus, if

appropriate, the Bid Protections (as reduced to be a percentage of the Net Realizable Value).

The Minimum Overbid Increment should be reduced to no more than $1,000,000.  These

reduced bidding increments will not chill bidding and will allow the Debtors to run a value

maximizing sale process, while still providing adequate protection for the Stalking Horse Bidder

under the circumstances of these cases.

V.     **The Debtors' Sale Process is Designed to Benefit the Stalking Horse Bidder to the Detriment of the Debtors' Estates**

39.     The Debtors have designed the currently contemplated sale process to advantage the Stalking Horse Bidder, preventing other interested bidders from gaining equal access to information and denying interested bidders adequate time to evaluate any information received.

40.     First, the Stalking Horse APA contains a no shop provision without providing the Debtors any fiduciary out.  The Delaware Supreme Court[10] has held that when conducting a sale, directors have a fiduciary duty to obtain the best value reasonably available.  *Paramount Commc'ns v. Qvc Network*, 637 A.2d 34, 51 (Del. 1994); *Revlon, Inc. v. Macandrews & Forbes Holdings, Inc.*, 506 A.2d 173, 184 (Del. 1986) (when conducting an auction, the "board's primary duty becomes that of an auctioneer responsible for selling the company to the highest bidder").  No shop provisions which hinder an auction process and deter bidding thus violate the board's fiduciary duties.  *Revlon, Inc. v. Macandrews & Forbes Holdings, Inc.*, 506 A.2d at 184 ("The no-shop provision, like the lock-up option, while not per se illegal, is impermissible . . . [as] the agreement to negotiate only with Forstmann ended rather than intensified the board's involvement in the bidding contest.").  As such, a no shop provision which "purports to require a board to act or not act in such a fashion as to limit the exercise of fiduciary duties [] is invalid and unenforceable*." Paramount Commc'ns v. Qvc Network*, 637 A.2d at 51.  Even if no shop provisions are not *per se* invalid under Delaware law, they "may not validly define or limit [a] directors' fiduciary duties under Delaware law or prevent [] directors from carrying out their fiduciary duties under Delaware law . . .  [D]irectors [can]not contract away their fiduciary obligations"  *Id.* at 48, 51.

---

[10] The Stalking Horse APA is governed by the laws of the State of Delaware.  Stalking Horse APA, § 14.2.

41.    Here, Section 7.1(b) of the Stalking Horse APA provides:

From the Agreement Date until the earlier of (i) twenty-five (25) days from the Petition Date, or (ii) the entry of the Bidding Procedures Order by the Bankruptcy Court, Sellers will not, and will cause their respective Affiliates and Representatives to not, directly or indirectly, (i) solicit, initiate or induce the making, submission or announcement of, or knowingly encourage, an Acquisition Proposal; or (ii) enter into any Contract relating to an Acquisition Proposal.

42.    As such, under the Stalking Horse APA, since at least October 24, 2018 (and possibly earlier, which the Committee is in the process of investigating), the Debtors have been precluded from soliciting other bids and/or entering into any other asset purchase agreement with a potential bidder, even if such potential bidder offered a bid on better terms than the Stalking Horse APA.[11]  In addition to not soliciting potential bids, as set forth in the Strategic Emails, the Debtors have used the no shop provision as a means to limit sharing information with interested parties.  For example, although the Debtors opened up the data room to Strategic on November 21, 2018—only thirty (30) days before the proposed Bid Deadline—the Committee understands that the data room contains stale and incomplete information, lacking, among other things, any year end 2017 data, data from 2018, information regarding the QAF payments, and Medicare and Medi-Cal information.  When Strategic inquired about information in the data room, as well as requested the missing information, the Debtors cited the no shop provision as the reason they are currently unable to provide any additional information.  This is the exact type of no shop provision previously invalidated by the Delaware Supreme Court, as it is a clear violation of the Debtors' fiduciary duty to maximize the value of the Debtors' estates.

43.    Second, the currently contemplated two week period from the entry of the Bidding Procedures Order to the Bid Deadline is not enough time to properly market the

---

[11] The inclusion of such a restrictive no shop provision without any fiduciary out further highlights the unreasonableness of the requested Bid Protections, as the Stalking Horse Bidder and Debtors have created unreasonable hurdles to any competing bids.

Debtors' assets and foster a competitive sale process that maximizes value of the Debtors'

estates.  Although the Debtors conducted a pre-petition marketing process for the Purchased

Assets, this process began in March 2017 and concluded at least ten months prior to the

bankruptcy filing.  Motion, ¶¶ 13, 15.  As such, the pre-petition marketing process should not

allow for a truncated sale process in these chapter 11 cases.  This is especially true in light of the

no shop provision explained above.

44.    In addition to Strategic, there may be other parties who may be interested in

submitting bids for the Purchased Assets; it is unclear what efforts, if any, were made to locate a

purchaser in the context of the filing of a bankruptcy case.  The Motion states that in the last

round of bids for the Purchased Assets in July 2017, the next closest "well-diligenced" bidder

submitted a bid $9.5 million less than the Stalking Horse Bidder.  Motion, ¶ 15.  In light of the

various Debtor Obligations and the Seller Note contemplated in the Stalking Horse APA, if the

next closest bidder actually had a higher Net Realizable Value for the estates or was interested in

participating in the Auction, this might result in a better bid than the one proposed by the

Stalking Horse Bidder.  Given the potential interest in the Purchased Assets and the possibility of

obtaining a better bid, it is especially important in these cases to afford parties adequate time to

conduct diligence, obtain necessary financing and put together a competing bid.

45.    The proposed Bidding Procedures recognize the importance of providing

Potential Bidders access to information.  Section 4(a) provides:

> The Silver Lake Debtors will provide to each Potential Bidder that has entered
> into a Confidentiality Agreement reasonable due diligence information, as
> requested by such Potential Bidder in writing, as soon as reasonably practicable
> after such request, and the Silver Lake Debtors shall post all written due diligence
> provided to any Potential Bidder to the Silver Lake Debtors' electronic data room.

However, given the currently proposed condensed timeline, Potential Bidders will not have

adequate time to analyze the due diligence information provided by the Debtors.  All Sale

deadlines should therefore be extended by thirty (30) days, which has the added benefit of not

conflicting with the holidays as is currently contemplated by the proposed Sale dates.

46.    Third, the proposed Bidding Procedures do not require the Debtors to provide all

Potential Bidders with the same access to information as provided to the Stalking Horse Bidder.

As previously stated, the Stalking Horse Bidder has had access to information for over a year

that the Debtors are currently unwilling to provide to other Potential Bidders.  *See* Strategic

Emails.  However, even after the expiration of the no shop period, the Debtors can continue this

inequality on a go-forward basis under the proposed Bidding Procedures.  For example,

paragraph 4(a) provides (emphasis added):

> For all Potential Bidders **other than the Stalking Horse Bidder**, the due
> diligence period will end on the Bid Deadline and subsequent to the Bid Deadline
> the Debtors shall have no obligation to furnish any due diligence information.

This section should be removed and the Stalking Horse Bidder should not be entitled to more

information than that provided to other Potential Bidders.

47.    Fourth, the proposed Bidding Procedures do not require the Stalking Horse Bidder

to submit the same information as other Potential Bidders.  Section 5(e), for example, requires

that "[e]ach Bid must include duly executed, noncontingent transaction documents necessary to

effectuate the Sale **and shall include a schedule of executory contracts and unexpired leases**

**proposed to be assumed by the Silver Lake Debtors and assigned to the Qualified Bidder**

("Assumed Contracts")" (emphasis added).  The Stalking Horse Bidder did not submit this

information with the Stalking Horse APA.  The Stalking Horse Bidder should be required to

comply with the same requirements to submit a Qualified Bid as all other Potential Bidders.

## VI.  The Committee Should be Afforded a Challenge Period with Respect to Qualifying Bids

48.     Given the potential that each bid will contain different purchase price adjustments and disparity with respect to assumed assets and obligations, the Committee must be involved in the process of analyzing bids to determine which, if any, qualify as a Qualified Bid.  For example, the Stalking Horse Bidder is acquiring, among other things, all Accounts Receivable and payments from, or otherwise in connection with, the QAF Program.  Stalking Horse APA, §2.1(f).  However, if a bidder elects not to acquire Accounts Receivable and/or QAF payments, this may result in a lower cash bid, although it will not necessarily result in a lower net value for the estates, especially since the net realizable value of the Accounts Receivable is $8.7 million and the value of the QAF payments is estimated to equal $30 million.  Further, other bidders may assume the Cure Costs and/or the Tail Policy, which will have an impact on the net realizable value of such bid.  Finally, if other bids do not include a promissory note component, the estates may benefit from an immediate payment of a lesser amount rather than $8.1 million in the form of a note payable over 4.5 years without a credit-worthy guarantor.

49.     Therefore, although the Bidding Procedures provide the Committee consultation rights with respect to qualifying bids, the Committee should have the right to challenge to the Debtors' qualification determination and seek to have the challenge heard by the Court on an expedited basis.  This will foster transparency and competitive bidding, helping generate value for the Debtors' estates.

## VII.  Additional Modifications to the Bidding Procedures Are Necessary to Ensure A Value Maximizing Sale Process

50.     The following modifications should be made to the Bidding Procedures to maximize value for the Debtors' estates through the Sale process:

- Each Qualified Bid must provide that the bidder, if successful, will either (i) assume the Debtor's Medicare and Medicaid provider agreements or (ii) obtain its own, in each instance within a timeframe acceptable to the Debtors in consultation with the Committee.

- A selected bid shall not be accepted as a Successful Bid unless and until such bid is approved by the Bankruptcy Court at the Sale Hearing.

- Section 7(d)(ii) should be amended as follows (revised language reflected in bold):  "**Subject to the Fiduciary Out in section 13 herein and as may be otherwise required by the Court,** the Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely and shall **not** ~~under no circumstances~~ constitute a Qualified Bid."

- Section 4(a) should be amended as follows (revised language reflected in bold):

    … provided that the Debtors **(in consultation with the Committee)** may decline to provide such information to Potential Bidders who, at such time and in the Debtors' reasonable business judgment **(in consultation with the Committee)** have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the Sale.

    The Debtors also reserve the right to withhold from Potential Bidders any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure to a Potential Bidder who the Debtors determine **(in consultation with the Committee)** is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not approved by the Debtors **(in consultation with the Committee)** as a Potential Bidder.

- Section 5 should be amended as follows (revised language reflected in bold):

    The Debtors reserve the right **(in consultation with the Committee)** to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid. The Debtors **(in consultation with the Committee)** may accept a single Qualified Bid or multiple Bids for non-overlapping material portions of the Silver Lake Debtors' assets that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid. The Debtors **(in consultation with the Committee)** may also permit otherwise Qualified Bidders who submitted Bids by the Bid Deadline for a material portion of the Silver Lake Debtors' assets but who are not identified as a component of a single Qualified Bid consisting of multiple Bids, to participate in the Auction and to submit higher and/or otherwise better Bids that in subsequent rounds of bidding may be considered, together with other Bids for non-overlapping portions of the Debtors' assets, as part of such a single Qualified Bid.

## VIII.    The Stalking Horse APA Conflicts with Medicare Regulations and Exposes the Debtors' Estates to Significant Liability

51.      The Stalking Horse APA is structured as a two-step sale to accommodate the Stalking Horse Bidder's efforts to obtain California licensing approvals.  Accordingly, pursuant to the Stalking Horse APA, on the Closing Date, the Debtors will sell certain of the Purchased Assets, excluding the Deferred Contracts, to the Stalking Horse Bidder and such Purchased Assets will then be leased back to the Debtors to operate the facilities.  Under this structure, the Stalking Horse Bidder will pay the Purchase Price at Closing and will then  provide interim management services to the Debtors under the Interim Management Agreement until the Stalking Horse Bidder can obtain its own licenses to operate the facilities (the "Interim Management Period").  Critically, there is no outside date with respect to how long it will take the Stalking Horse Bidder to obtain the licenses, so the Interim Management Period is indefinite.  During this indefinite period, the Stalking Horse Bidder will not assume any Liabilities with respect to the Deferred Contracts; such Liabilities will remain with the Debtors' estates.  On the Transition Date—the date when the Stalking Horse Bidder has obtained all its required licenses—the Stalking Horse Bidder will automatically assume the Liabilities with respect to the Deferred Contracts, but (i) *only to the extent of the Liabilities arising thereunder with respect to events or periods on and after the date of such assignment and assumption* and (ii) other than the Excluded Assets.  Stalking Horse APA, § 2.8

52.      First, this arrangement conflicts with Medicare regulations.  42 C.F.R. § 489.18(d) provides that where there is a change of ownership and the existing Medicare provider agreement is assigned to the new owner, it is assigned "subject to all applicable statutes and regulations and to the terms and conditions under which it was originally issued."  Such conditions include Medicare requirements to adjust payments to account for prior overpayments

and underpayments, even if they relate to a pre-acquisition period.  *See United States v. Vernon Home Health*, 21 F.3d 693, 694 (5th Cir. 1994) (new owner that accepted assignment of Medicare provider agreement was jointly and severally liable with original owner for the overpayments of prior owner despite attempt to purchase the provider agreement without assuming any liabilities).

53.    Second, this arrangement may expose the Debtors' estates to significant liability during and after the Interim Management Period.  The Stalking Horse Bidder will be required to use the Debtors' licenses to operate the hospital during the Interim Management Period which could expose the Debtors to administrative expense liability to third parties while it continues to operate the hospital.  Further, during the Interim Management Period, the Debtors remain liable for any Liabilities with respect to the Deferred Assets, including the Deferred Contracts, as well as the Excluded Assets.  The Debtors exposure continues even after the expiration of the Interim Management Period for any liabilities related to the period prior to the Transition Date.  Although the Interim Management Agreement contains certain indemnities from the Stalking Horse Bidder in favor of the Debtors during the Interim Management Period, such indemnities fall short of providing adequate protection against liability because such indemnifies do not appear to be guaranteed by a credit-worthy entity.  As such, the Stalking Horse APA exposes the Debtors' estates to significant risks for an undetermined amount of time during and after the Interim Management Period.

## IX.    The Stalking Horse APA Should Be Revised So As To Maximize Value for the Estates

54.    There are several aspects of the Stalking Horse APA that are unreasonable and should be revised to maximize value for the Debtors' estates (to the extent that the Stalking Horse Bidder is selected as the highest and best bidder), as summarized below:

- Excluded Assets should include the following:  All causes of action (i) under Chapter 5 of the Bankruptcy Code; (ii) against present and former D&Os of the Debtors; (iii) against any pre-petition professionals of the Debtors; (iv) against direct and indirect equity holders of the Debtors, including, but not limited to, Edge Capital Investments, LTD, other FPGF shareholders, FP Offshore Ltd. f/k/a Founding Partners Global Fund, Inc., Credit Value Partners, LP CVP SPV LLC Series, Belmont Strategic Income Fund, LP, and 118 Members; and (v) of the Debtor entities against each other. [§ 2.2]

- Sellers' representations should be consistent with a Section 363 sale and the recognition that the Buyer will purchase the assets free and clear pursuant to section 363 of the Bankruptcy Code.  As such, Sellers representations should be limited to representations regarding: (i) good standing as a corporation; (ii) ownership and title to the assets being sold; (iii) requisite corporate authorizations of the sale; (iv) accreditation of the hospital and (v) absence of litigation or other proceeding that will render the contemplated sale illegal. The remainder of the representations should be deleted.  There should be no reference to or inclusion of any Seller warranties.  [§ 5]

- There should be no limitation on Sellers' or Buyer's remedies for breach of the Stalking Horse APA.  [§ 4.6(b), (d)]

- Sellers should not bear costs of (i) documentary transfer Taxes and recording charges in connection with the conveyance of the Assets to Buyer, (ii) costs of surveys delivered to Buyer by Seller, (iii) costs of the environmental assessment reports obtained by Seller, and (iv) all premium and costs for the Title Policy attributable to a standard coverage Title Policy.  [§ 14.1(a)]

- Sale Order free and clear should be the only evidence necessary to establish delivery of assets free of encumbrances.  [§ 10.1(i)]

- Buyer should be responsible for paying all Cure Costs and should designate a final list of contracts to be assumed and assigned no later than ten (10) days before the Closing Date.  [§ 2.6(b), 7.2(c)]

- Sellers should not be responsible for paying the Tail Policy.  [§ 8.14]

- Buyer should be responsible for preparing all final cost reports and for any claims of overpayment by government payors.  [§ 2.8]

- Buyer's out based on lack of third-party consents to assignment of Contracts should be removed or limited to specific personal services contracts.  [§ 10.1(j)]

- Sellers should have reasonable access to books and records and Buyer's employees post-closing without paying for such access for the purposes of winding down the Estate.

- Buyer's obligations under the Stalking Horse APA and all documents related thereto, including, but not limited to, the Interim Management Agreement and Seller Note, should be guaranteed by a credit-worthy entity.

## RESERVATION OF RIGHTS

55.     The Committee reserves the right to raise further and other objections to the

Motion prior to or at the hearing thereon based upon further discovery.

WHEREFORE, the Committee respectfully requests that the Court deny the Motion, or

alternatively, approve modified Bidding Procedures that address the Committee's concerns.


Dated: November 29, 2018

/s/ Bradford J. Sandler
Jeffrey N. Pomerantz, Esq.
Bradford J. Sandler, Esq.
Colin R. Robinson, Esq.
PACHULSKI STANG ZIEHL & JONES LLP
919 N. Market Street, 17th Floor
Wilmington, DE  19801
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:  jpomerantz@pszjlaw.com
           bsandler@pszjlaw.com
           crobinson@pszjlaw.com

- and –

Andrew H. Sherman
Boris I. Mankovetskiy
Rachel E. Brennan
SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, NJ 07102
Telephone:  973-643-7000
Facsimile:  973-643-6500
Email: asherman@sillscummis.com
           bmankovetskiy@sillscummis.com
           rbrennan@sillscummis.com

*Proposed Counsel to the Official Committee of
Unsecured Creditors*

# EXHIBIT A

## Rachel E. Brennan

| | |
|---|---|
| **From:** | Smith, William <wsmith@mwe.com> |
| **Sent:** | Wednesday, November 28, 2018 12:56 PM |
| **To:** | Rose, Mary H. |
| **Cc:** | Lawrence, Paul; Preusker, Megan; Kapp III, James |
| **Subject:** | RE: Silver Lake |

I'm not ignoring you but waiting to hear back from my stalking horse buyer on whether it will allow me to respond to factual inquiries without violating Section 7.1(b) in its mind.  Of course, his initial inclination was that for me to reply to an email violated the section, but I think we have moved past that.

Hope to be back to you shortly.

Regards, Bill

**William P. Smith**
Partner
**McDermott Will & Emery LLP**  |  444 West Lake Street, Suite 4000  |  Chicago, IL 60606-0029
Tel +1 312 984 7588  |  Mobile +1 312 848 2141  |  Fax +1 312 277 9069
Biography | Website | vCard | Email | Twitter | LinkedIn | Blog

---

**From:** Rose, Mary H. <mrose@buchalter.com>
**Sent:** Tuesday, November 27, 2018 3:03 PM
**To:** Smith, William <wsmith@mwe.com>
**Cc:** Lawrence, Paul <plawrence@mwe.com>; Preusker, Megan <Mpreusker@mwe.com>
**Subject:** RE: Silver Lake

The information in the data room is from 2017 or earlier.  Are you telling me that the Debtors will not respond to any questions or update any of the data room information until November 30?  Will you do so then?

*Mary H. Rose*
*Shareholder*
**Buchalter**
A Professional Corporation
1000 Wilshire Boulevard, Suite 1500 | Los Angeles, CA 90017-1730
Direct Dial: (213) 891-5727 | Cell Phone: (310) 415-9087 | Direct Fax: (213) 630-5629 | Main Number: (213) 891-0700
Email: mrose@buchalter.com | www.buchalter.com

---

**From:** Smith, William [mailto:wsmith@mwe.com]
**Sent:** Tuesday, November 27, 2018 12:40 PM
**To:** Rose, Mary H.
**Cc:** Lawrence, Paul; Preusker, Megan
**Subject:** Re: Silver Lake

No, they waived the bar to letting you into the data room but otherwise affirmed their bargained for rights, to coin a phrase.

Regards, Bill

**William P. Smith**  |  Tel: 312.984.7588  |  Fax: 312.277.9069 | Cell: 312.848.2141  |  wsmith@mwe.com
**McDermott Will & Emery LLP**  |  444 West Lake Street, Chicago, IL  60606-0029

On Nov 27, 2018, at 2:34 PM, Rose, Mary H. <mrose@buchalter.com> wrote:

> I thought they waived the no shop provision.
>
>
> *Mary H. Rose*
> *Shareholder*
> **Buchalter**
> A Professional Corporation
> 1000 Wilshire Boulevard, Suite 1500 | Los Angeles, CA 90017-1730
> Direct Dial: (213) 891-5727 | Cell Phone: (310) 415-9087 | Direct Fax: (213) 630-5629 |
> Main Number: (213) 891-0700
> Email: mrose@buchalter.com | www.buchalter.com

> **From:** Smith, William [mailto:wsmith@mwe.com]
> **Sent:** Tuesday, November 27, 2018 12:28 PM
> **To:** Rose, Mary H.
> **Cc:** Lawrence, Paul; Preusker, Megan
> **Subject:** Re: Silver Lake
>
> We got both. Paul Lawrence and his team are the right people, but let me check with our buyer first that it won't have a fit and view our response to your factual inquiries as encouraging a competing bid. Will revert soonest.
>
> regards, Bill
>
> **William P. Smith**  |  Tel: 312.984.7588  |  Fax: 312.277.9069 | Cell: 312.848.2141  |  wsmith@mwe.com
> **McDermott Will & Emery LLP**  |  444 West Lake Street, Chicago, IL  60606-0029
>
> On Nov 27, 2018, at 2:06 PM, Rose, Mary H. <mrose@buchalter.com> wrote:
>
>> I have some questions regarding the terms of the Stalking Horse APA.  My questions relate to (a) QAF, (b) DSH, (c) HITECH, (d) Medicare and Medi-Cal, (e) the LA City Attorney settlement, and (f) R&W insurance.
>>
>> Which one of you should I speak with?
>>
>>
>> *Mary H. Rose*
>> *Shareholder*
>> **Buchalter**
>> A Professional Corporation
>> 1000 Wilshire Boulevard, Suite 1500 | Los Angeles, CA 90017-1730
>> Direct Dial: (213) 891-5727 | Cell Phone: (310) 415-9087 | Direct Fax: (213) 630-5629 | Main Number: (213) 891-0700
>> Email: mrose@buchalter.com | www.buchalter.com

Notice To Recipient: This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message and any and all duplicates of this message from your system. Thank you in advance for your cooperation. For additional policies governing this e-mail, please see http://www.buchalter.com/about/firm-policies/.

********************************************************************************************************************

This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Our Privacy Policy explains how we may use your personal information or data and any personal information or data provided or made available to us. Thank you.
********************************************************************************************************************

Please visit http://www.mwe.com/ for more information about our Firm.

Notice To Recipient: This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message and any and all duplicates of this message from your system. Thank you in advance for your cooperation. For additional policies governing this e-mail, please see http://www.buchalter.com/about/firm-policies/.

Notice To Recipient: This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message and any and all duplicates of this message from your system. Thank you in advance for your cooperation. For additional policies governing this e-mail, please see http://www.buchalter.com/about/firm-policies/.