**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>PROMISE HEALTHCARE GROUP, LLC, *et al.*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 18-12491 (CSS)<br><br>Jointly Administered<br><br>Re: Docket No. 37, 173 |

**SUPPLEMENTAL OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR ENTRY OF ORDERS (I) (A) ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE OF CERTAIN OF THE DEBTORS' ASSETS, INCLUDING APPROVING A BREAK-UP FEE AND EXPENSE REIMBURSEMENT, (B) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (C) APPROVING FORM AND MANNER OF NOTICE RELATING THERETO, AND (D) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE; (II) (A) APPROVING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) AUTHORIZING SUCCESS HEALTHCARE 1, LLC TO GRANT LIENS; AND (III) GRANTING RELATED RELIEF**

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Professional Rehabilitation Hospital, L.L.C. (5340), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179), Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc. (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc. (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), St. Alexius Hospital Corporation #1 (2766), St. Alexius Properties, LLC (4610), Success Healthcare 1, LLC (6535), Success Healthcare 2, LLC (8861), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766). The mailing address for the Debtors, solely for purposes of notices and communications, is 999 Yamato Road, 3rd FL, Boca Raton, FL 33431.

5914718

The Official Committee of Unsecured Creditors (the "Committee") of Promise Healthcare Group, LLC, *et al.* (collectively, the "Debtors"), by and through its undersigned counsel, hereby files this supplemental objection (the "Supplemental Objection") to the *Debtors' Motion For Entry Of Orders (I) (A) Establishing Bidding Procedures Relating To The Sale Of Certain Of The Debtors' Assets, Including Approving A Break-Up Fee And Expense Reimbursement, (B) Establishing Procedures Relating To The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, Including Notice Of Proposed Cure Amounts, (C) Approving Form And Manner Of Notice Relating Thereto, And (D) Scheduling A Hearing To Consider The Proposed Sale; (II) (A) Approving The Sale Of Certain Of The Debtors' Assets Free And Clear Of All Liens, Claims, Encumbrances, And Interests(B) Authorizing The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, And (C) Authorizing Success Healthcare 1, LLC To Grant Liens; And (III) Granting Related Relief* [Docket No. 37] (the "Motion").[2]  In support of the Supplemental Objection, the Committee respectfully represents as follows:

## INTRODUCTION

As noted in the Committee's original objection to the Motion, filed on November 29, 2018 [D.I. 173] (the "Original Objection"), the Debtors' proposed process for the Sale of the Silver Lake Debtors' assets (the "Purchased Assets") does not encourage competitive bidding for the benefit of all the stakeholders in these cases.  To better understand the Silver Lake Debtors' pre-Petition and post-Petition sale processes in these cases and determine whether the currently proposed Bidding Procedures maximize value for the Debtors' estates, on November 21, 2018,

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion, the Original Objection or the Stalking Horse APA, as appropriate.  The Committee incorporates by reference herein all of the Committee's arguments made in the Original Objection.

the Committee propounded discovery upon the Debtors regarding the Motion.[3] The Debtors replied to the document demands on November 27, 2018, producing some of the requested documents (the "<u>Produced Documents</u>").[4] On November 30, 2018, counsel for the Committee conducted a deposition of Jay A. Shiland, the partner at MTS Health Partners L.P. ("<u>MTS</u>"), proposed investment banking advisor to the Silver Lake Debtors (the "<u>Shiland Deposition</u>"), who had supervisory responsibility for the process leading to the selection of the proposed Stalking Horse Bidder.

The Produced Documents and Shiland Deposition corroborate the concerns set forth in the Original Objection and provide further evidence that the Debtors' proposed sale process is not designed to maximize the value of the assets of the Debtors' estates herein. Specifically, the Produced Documents and Shiland Deposition demonstrate that:

- The Sale timeline should be extended by at least thirty (30) days to allow interested bidders sufficient time to prepare competing bids in light of the no shop provisions in the Original Purchase Agreement and the Stalking Horse APA, and the Stalking Horse Bidder's exclusive access to the Debtors' data room for a substantial period of time;

- The Bid Protections did not induce the Stalking Horse Bidder to enter into the Stalking Horse APA; rather the Stalking Horse Bidder had been sufficiently induced to enter into the Stalking Horse APA by (i) its desire to purchase the Purchased Assets, (ii) the risk that it might lose its $5 million deposit from the Original Purchase Agreement, (iii) the significant time and money it had already expended in an attempt to purchase the Purchased Assets, and (iv) the guaranty by its parent that the sale would close; and

---

[3] Informal discovery was propounded on November 16, 2018.

[4] For example, the Debtors have yet to produce any communications requested by the Committee.

- The Bid Protections (to the extent the Debtors are able to meet their burden and establish that any breakup fee and/or expense reimbursement are actually necessary to preserve the value of the estates herein)[5] and the minimum initial overbid should be applied to the net cash proceeds of $69,158,448 (less the compulsory expense for tail coverage) under the Stalking Horse APA rather than the gross purchase price of $84,150,000.

## OBJECTION

### I. The Sale Timeline Must Be Extended by at Least Thirty Days

1. Mr. Shiland's testimony confirmed that the currently contemplated approximately two-week period from the entry of the Bidding Procedures Order to the Bid Deadline is not enough time to properly market the Debtors' assets and foster a competitive sale process that maximizes value of the Debtors' estates. All Sale dates should therefore be extended by at least thirty (30) days to give potential bidders a reasonable amount of time to perform diligence, obtain financing and formulate bids. As stated during the Shiland Deposition, Mr. Shiland, the Debtors' investment banker tasked with running the Sale process, agreed that thirty (30) days was a reasonable amount of time in these cases in which to conduct diligence and submit a bid:

> Q. How much time will potential competing bidders get once you finalize and issue your marketing package?
>
> . . .
>
> Q. My recollection is it's around thirty days or so.
>
> Q. Is that a reasonable amount of time?
>
> A. I believe with the information people have at their disposal and the nature of the asset itself, that it is.

---

[5] *In re Energy Future Holdings Corp.*, 904 F.3d 298, 313-14 (3d Cir. 2018)

November 30, 2018 Shiland Deposition Transcript ("Dep. Tr.") at 161:10-17 (attached hereto as "Exhibit A"). Despite Mr. Shiland's recollection, the currently proposed Sale timeline only affords interested bidders approximately two weeks to submit a bid, which is not a reasonable amount of time.

2. The truncated Sale timeline is especially problematic in light of the Stalking Horse Bidder's exclusive access to the Debtors' data room for a substantial period of time. First, between July 2017 and February 2018, the number of parties with access to the data room was reduced to less than seven. *Id.* at 30:10-32:3. At some point after July 2017, the only two parties with access to the data room were the Stalking Horse Bidder (referred to as an affiliate of Rollins Nelson for all periods prior to execution of the Stalking Horse APA on October 24, 2018) and KPC. *Id.* at 32:4-21. Further, KPC's access to the data room terminated sometime in 2017 before execution of the Original Purchase Agreement in February 2018. *Id.* at 46:2-4 ("Q. At some point in 2017 KPC no longer had access to the data room? A. Correct.").

3. After KPC's data room access terminated, the no shop provisions in the Original Purchase Agreement and Stalking Horse APA came into effect, which precluded the Debtors from soliciting other bids, entering into any other asset purchase agreement, or even providing information to any other potential bidder from February 7, 2018 through November 30, 2018[6]—an almost ten month period.

---

[6] The no shop provision in the Stalking Hose APA might run later than November 30, 2018. Section 7.1(c) of the Stalking Horse APA provides that "**following the entry of the Bidding Procedures Order**, Sellers, their Representatives and Affiliates may take the actions prohibited by section 7.1(b)." Thus, although section 7.1(b) states that the no shop period ends on the earlier of November 30, 2018 and the date of entry of the Bidding Procedures Order, section 7.1(c) might still prevent the Debtors from soliciting other bids and/or entering into any other asset purchase agreement until the Bidding Procedures Order is entered, which will not be before the Bidding Procedures hearing on December 4, 2018.

4.  The Original Purchase Agreement contained the following no shop provision:

> From and after the Effective Date until the earlier of the Closing Date or the termination of this Agreement, **the Seller Parties shall not** (and shall cause their respective Affiliates and each of their respective officers, directors, employees, agents, attorneys, investment bankers and other representatives not to), without the prior written consent of Purchaser: (i) **offer for sale the Assets** (or substantially all of the Assets) or any ownership interest in any entity owning any of the Assets (by merger, consolidation, sale of assets, or other form of transaction that results in a change in control) or that would make the Transactions impractical or unfeasible, (ii) **solicit offers for any such transaction**, (iii) **hold discussions with any Person** (other than Purchaser or any Affiliate of Purchaser) **related to any such transaction** or (iv) **enter into any agreement or other understanding with any Person** (other than Purchaser or any Affiliate of Purchaser) **with respect to any such transaction**.

Original Purchase Agreement, § 4.6 (emphasis added).

5.  The no shop provision (without a fiduciary out) pursuant to the Original Purchase Agreement thus came into effect on February 7, 2018 and terminated on October 24, 2018, after which date the no shop provision in the Stalking Horse APA contemporaneously came into effect and lasted until at least November 30, 2018. *See* Stalking Horse APA, Recitals, ¶ F; Dep. Tr. at 105:12-16; 105:24-106:5 ("Q. So that no shop clause was honored continuously from February of 2018 to October 24, 2018? A. To my knowledge, that's correct . . . A. My understanding is by operation of the contract, it was terminated and the stalking horse bid replaced that contract in terms of the - - the APA was no longer in force and effect and the stalking horse bid was then put in place.").

6.  During this almost ten month no shop period, an affiliate of Rollins Nelson (who became the Stalking Horse Bidder) had exclusive access to the Debtors' information:

> Q. Of Rollins, of the forty-one potential financial and strategic partners that you initially contacted other than Rollins, which, if any, have had access to the data room since February 7, 2018?
>
> A. None. Pursuant to the terms of the APA, we were not allowed to give access to anybody else to the data room.

> Q. So is it fair to say that access to the data room between February 7, 2018 and October 24, 2018 - - we can talk about what happened after October 24 - - was limited to the debtors and their professionals and consultants and Rollins and its professionals and consultants?
>
> A. That's correct. And to be clear, that was pursuant to the contractual obligations of the debtors under the APA.
>
> Q. Contractual obligations which precluded the debtors from having any even conversations with anybody else about a potential transaction with regard to the assets; is that correct?
>
> A. Pursuant to the terms of the document, we were prohibited from talking to anybody else about the transaction.
>
> Q. Can we call that the no shop clause?
>
> A. Yes.
>
> Q. Is that fair?
>
> A. Yes.
>
> Q. Would you prefer a different name?
>
> A. I think it's well stated.

Dep. Tr. at 25:4–26:17.

7.     Even on a post-Petition basis, as noted in the Original Objection, the Strategic Objection and Strategic's supplemental objection to the Motion [D.I. 166] (the "Strategic Supplemental Objection"), when Strategic, an affiliate of KPC, requested information from the Debtors to use in formulating its bid, the Debtors cited the no shop provision in the Stalking Horse APA and did not cooperate with KPC in providing up-to-date financial information. Recent financial information was only added to the data room as of November 30, 2018. *Id.* at 122:7-15 ("Q. And is the data room up-to-date? A. **It is as of today**, yes. Q. Was it up-to-date as of two days ago? A. Additional information was still coming from the company quite slowly but yes, **it is up-to-date as of today.**") (emphasis added).

8. Without access to the Debtors' recent financial information, it appears that Strategic was clearly disadvantaged in performing due diligence and preparing a bid, especially given the condensed Sale timeline in these cases. *See* Dep. Tr. at 21:22-22:1 ("[A]s part of getting to an APA and filling out schedules and agreeing upon the underlying data in the schedules, constant updating [of the data room] was required to get to that APA.").

9. Especially troubling in the Debtors' failure to provide Strategic with up-to-date information, is that Strategic is a very interested bidder, Strategic Objection, ¶ 1, that submitted a pre-Petition bid with a higher net enterprise value than that submitted by an affiliate of Rollins Nelson. Mr. Shiland explained the concept of "net enterprise value" in the Shiland Deposition:

> Q. What does [the phrase "net enterprise value"] mean? What does that mean in your declaration?
>
> A. . . . It was the net proceeds to the company after adjustments that varied among the bidders. So for example, some bidders said we're not going to take care of certain liabilities, they're yours to deal with. Others said we'll take care of all liabilities. As you can see in the waterfall on Exhibit 2, Shiland 2, we made adjustments for those.
>
> . . . .
>
> Q. So in comparing bids, what is the significance of what you called net enterprise value and here you call net cash before defalcation Wells Fargo and Success payables which were a constant against all the bids? So what was the significance of that in comparing the bids, the net cash or the net enterprise value, depending on how you want to call it?
>
> A. To allow the board to make a like-to-like comparison of the bids that had otherwise different terms.
>
> Q. Why is that important?
>
> A. To assist in their decision-making to understand what they're actually looking at normalized, if you will, for the variations that there are between bids.

*Id.* at 37:4-21; 38:18-39:11.

10. In the Summary Bid Analysis, dated July 26, 2017, attached to the Dep. Tr. as Exhibit 2, the net enterprise value for the Rollins Nelson affiliate bid was $51.8 million, while

the net enterprise value for the KPC bid was $60.3 million.  The Debtors ultimately discounted the KPC bid because they did not believe that KPC performed the same level of diligence as Rollins Nelson.  *See id.* at 39:20 – 40:12 ( Q. What would those other metrics be? A. The level of work done by each of the bidders as part of the process as an indication of both their seriousness, their knowledge of what they're bidding for, and ultimately our confidence in their ability to get to a signed purchase agreement and close.").  However, KPC, unlike Rollins Nelson, was currently in the business of managing hospitals and may not have needed to perform the same level of diligence to understand certain aspects of the transaction. *See id.* at 60:4-8 ("Q. Is it fair to say that KPC is an experienced hospital operator? A. They have been doing it for a long time. If that's experienced, yes, they would be experienced . . . Q. What about Rollins-Nelson? How many hospitals does Rollins-Nelson operate? A. At this time, none.").

11.     Further, the Debtors recognized that KPC had the financial ability to close, yet still labelled KPC's bid "speculative" and selected Rollins Nelson's affiliate as the purchaser. *See id.* at 53:24- 54:4; 54:16-20 (A. To be very blunt, KPC was in the running throughout because they had interest in the hospital, they had an ability to pay, not a demonstrated ability in the past to pay but an ability to pay per se . . . Q. Why did you not consider KPC to be a valid competitor to Rollins-Nelson? A. They did no work in the second round."); *Id.* at 67:22-68:1 ("Q. I asked you which one had the better financial resources. A. I would believe that the KPC.").

12.     Post-Petition, Strategic filed the Strategic Objection and the Strategic Supplemental Objection, stating that "Strategic is a serious bidder, but it needs at least 30 days in which to conduct due diligence and properly formulate its bid."  Supplemental Strategic Objection, ¶ 10.  The Committee supports a request for a thirty (30) day extension of the Sale

dates so all interested parties can formulate a bid with the potential to generate value for the Debtors' estates and a level playing field be established.[7]

13. Further, as of the date of filing this Supplemental Objection, the Debtors have still not begun the marketing process with respect to the Purchased Assets nor are the marketing materials complete:

> A. We have not begun our marketing process which includes a set of materials updated, a CIM, if you will, a confidential information memorandum which has detailed information as to the company and as to the stalking horse bid and how it from this document here translates that to numbers.

Dep. Tr. at 123:14-22.

> Q. So the material exists but you said it wasn't finished?
>
> A. Well, the company continues to update that information for us.
>
> Q. So it's not finished?
>
> A. Well, it is 97.5 percent finished.

*Id.* at 124:6-12.

> A. . . . We've not started outreach to folks providing them with Materials from us that lay out the business and lay out the bogey for them to it.

*Id.* at 137:9-13.

14. As such, all the Sale deadlines should be extended by at least thirty (30) days to give the Debtors time to complete their marketing process and give interested bidders adequate time to perform due diligence, obtain financing and submit bids.

**II.   The Bid Protections Did Not Induce the Stalking Horse Bidder to Enter into the Stalking Horse APA**

15. As discussed in the Original Objection, the Bid Protections did not induce the Stalking Horse Bidder to enter into the Stalking Horse APA and thus the Stalking Horse Bidder

---

[7] To the extent possible, based on the no-shop provisions.

is not entitled to the Bid Protections. *See In re Energy Future Holdings Corp.*, 904 F.3d 298, 313 (3d Cir. 2018) (a breakup fee could provide a benefit to the debtor's estate "if assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited").

16. Here, the Stalking Horse Bidder was already committed to purchasing the Purchased Assets and seamlessly transitioned from the Original Purchase Agreement into the Stalking Horse APA to account for the Debtors' chapter 11 filings. *Id.* at 73:15-17 (A. The Rollins APA became the stalking horse bid over a period of time."). No gap period existed between the two purchase agreements:

> Q. So the stalking horse bid replaced the Rollins APA?
>
> . . . .
>
> THE WITNESS: My understanding is, and there may be some small carryover items, but my understanding is, in sum and substance, the stalking horse APA replaces the rights and obligations the debtors have under the original Rollins APA.
>
> Q. Was there a gap between the two? Was there a termination and then - - I'm not talking about a couple of minutes.
>
> A. Not to my knowledge.
>
> Q. No gap?
>
> A. Not to my knowledge.

*Id.* at 106:6-25.

17. Critically, the Stalking Horse Bidder willingly transitioned from the Original Purchase Agreement to the Stalking Horse APA (and would have done so without the Bid Protections) because (i) if it walked away from the deal, the Stalking Horse Bidder had the potential to lose its $5 million deposit from the Original Purchase Agreement, (ii) it wanted the Purchased Assets, as demonstrated by the amount of capital and time expended in negotiating the

Original Purchase Agreement, and (iii) its affiliated entity—Rollins Nelson—entered into an agreement, dated February 7, 2018, with Silver Lake Debtors, guaranteeing the closing of the Original Purchase Agreement (the "<u>Guaranty Agreement</u>," attached as <u>Exhibit 5</u> to the Dep. Tr.). Mr. Shiland explained these factors in the Shiland Deposition:

> Q. And they never left the table; did they?
>
> A. They did not.
>
> Q. In fact, they never terminated the Rollins February, 2018 APA and said we're out of here unless you give us bid protections; did they?
>
> A. They did not. And there's a reason for that.
>
> Q. What's the reason for that? I'll bite.
>
> A. Thank you. We have $5 million of their money which we had negotiated to receive into the estate and fight about it later if the deal was terminated. So we had essential a bit of a hammer over them to ensure their, at least for $5 million difference in value, ensure their attention and to the extent they want to buy this asset, that they would negotiate in good faith.
>
> . . . .
>
> Q. They probably could have [terminated] but they didn't. And you're saying well, one of the reasons maybe they didn't is we were holding five million and they didn't want to leave five million on the table?
>
> A. That's correct, and they want the asset.
>
> Q. They want the asset? How do you know they want the asset?
>
> A. Because nobody would expend the amount of capital and time, in my opinion, based upon my experience, unless they want the asset. This is not a casual fishing expedition to see if they can get a deal. This was a very earnest attempt to buy the asset.
>
> Q. Does it remain an earnest attempt to buy the asset?
>
> A. I believe so.

*Id.* at 148:17-149:13; 150:1-21.

> Q. And why was it important to have a guaranty?

> A. Because we believe that performance of their obligation of the contract, this was important to have as part of assuring ourselves they could perform. Just to further amend my answer, to be very clear, at the time of the signing of the APA their financing was still in process and so we felt like that was required to assure ourselves and hold their feet to the fire regarding performance.
>
> Q. Performance of what?
>
> A. The APA.

*Id.* at 89:3-18; *see also* Guaranty, ¶ 2 ("Guarantor hereby absolutely, unconditionally and irrevocably guaranties to the Seller Parties, and their successors and assigns, the full, prompt and complete performance when due of all obligations of Purchaser under the Asset Sale Agreement and each of the Transaction Documents . . . . The Obligations specifically include, without limitation . . . the obligation of Purchaser to complete the Closing on the terms, and subject to the conditions, of the Asset Sale Agreement.").

### III. The Bid Protections, if Appropriate, and the Minimum Initial Overbid Should be Applied to the Value of the Net Cash Proceeds from the Stalking Horse APA

18.  As demonstrated in the September 4, 2018 Silver Lake Transaction Waterfall, attached as Exhibit 12 to the Dep. Tr. (the "Waterfall"), the "net cash proceeds at closing" from the Stalking Horse APA are $69,158,448. This is the maximum amount against which the Bid Protections, to the extent necessary and/or appropriate, and minimum initial overbid should be measured.

19.  The "net cash proceeds at closing" accounts for certain deductions to the $84,150,000 purchase price described in the Waterfall, such as purchase price adjustments and the $8.1 million Seller Note. As noted in the Shiland Deposition, the Seller Note "acts as a basket against reps and warranties in the document[,]" thus providing protection for the Stalking Horse Bidder. Dep. Tr. at 159:2-4; 160:5-7. ("Q. It's a protection for the buyer; correct? A. That's correct."). To use the value of the Seller Note as both a means of protection and a means

to increase the calculation of the Bid Protections and overbid increment is double-dipping by the Stalking Horse Bidder. The "net cash proceeds at closing" from the Stalking Horse APA thus reflects the most accurate number from which to base the Bid Protections, if necessary, and the minimum overbid.

20. As such, the Breakup Fee, to the extent necessary or appropriate in these cases, should be limited to not more than 3% of $69,158,448 ($2,074,753.44) – and should be substantially less taking into account all of the relevant circumstances as described herein, including that it did not serve as an inducement to the Stalking Horse Bidder to execute the Stalking Horse APA. The Expense Reimbursement should be capped at 1% of $69,158,448 ($691,584.48) for any reasonable, actual and necessary expenses related solely to the negotiation and documentation of the Stalking Horse APA; not expenses related to the Original Purchase Agreement.

21. Finally, if a potential bidder proposes to purchase the same assets as are the subject of Stalking Horse APA, the minimum initial overbid should be a combination of cash and assumed liabilities equal to: (i) $69,158,448, not subject to any downward purchase price adjustments, indemnity obligations of the Debtors, or the requirement that the Debtors purchase any tail policy, (ii) plus $500,000 overbid increment (rather than $1 million proposed by the Debtors), and (iii) plus the Bid Protections described above, to the extent necessary and in an amount appropriate in the discretion of this Court.

22. In addition, the bidding procedures should afford maximum flexibility for the Debtors, in consultation with the Committee and the DIP Lender, to analyze and value various bid structures as Qualified Bids. This is consistent with Mr. Shiland's description of the type of bids that should constitute Qualified Bids:

>Q. . . . I'm going to give you three hypotheticals and ask you if this would be a qualified bid. Hypothetical A: A bidder bids cash in the amount of $40 million with no purchase price adjustments, cure amounts paid by the buyer, QAF and AR excluded, and the seller is not required to pay an insurance tail. Is that a qualified bid?
>. . . .
>
>A. . . . I'll tell you that given the scenario you've given me, however, if your question is whether that would be in the neighborhood, I think it would be in the neighborhood.

*Id.* at 125:21-126:5; 127:12-16.

## RESERVATION OF RIGHTS

23.     The Committee reserves the right to raise further and other objections to the Motion prior to or at the hearing thereon based upon further discovery.

WHEREFORE, the Committee respectfully requests that the Court deny the Motion, or alternatively, approve modified Bidding Procedures that address the Committee's concerns.

Dated: December 3, 2018

/s/ Colin R. Robinson
Jeffrey N. Pomerantz (CA Bar No. 143717)
Bradford J. Sandler (DE Bar No. 4142)
Colin R. Robinson (DE Bar No. 5524)
Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
P O Box 8705
Wilmington, DE  19899 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:   (302) 652-4400
E-mail:  jpomerantz@pszjlaw.com
            bsandler@pszjlaw.com
            crobinson@pszjlaw.com

- and –

Andrew H. Sherman
Boris I. Mankovetskiy
Rachel E. Brennan
SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, NJ 07102
Telephone:  973-643-7000
Facsimile:  973-643-6500
Email:  asherman@sillscummis.com
            bmankovetskiy@sillscummis.com
            rbrennan@sillscummis.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*