IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
:
In re: : Chapter 11
:
PROMISE HEALTHCARE GROUP, LLC, *et al.*,[1] : Case No. 18-12491 (CSS)
:
Debtors. : Jointly Administered
:
---------------------------------------------------------------x Related D.I.: 37, 158, 166, 173 & 195

**DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO MOTION FOR ENTRY OF ORDERS (I)(A) ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE OF CERTAIN OF THE DEBTORS' ASSETS [SILVER LAKE ASSETS], INCLUDING APPROVING A BREAK-UP FEE AND EXPENSE REIMBURSEMENT, (B) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (C) APPROVING FORM AND MANNER OF NOTICE RELATING THERETO, AND (D) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE; (II)(A) APPROVING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) AUTHORIZING SUCCESS HEALTHCARE 1, LLC TO GRANT LIENS;**

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Professional Rehabilitation Hospital, L.L.C. (5340), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179), Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc. (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc. (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), St. Alexius Hospital Corporation #1 (2766), St. Alexius Properties, LLC (4610), Success Healthcare 1, LLC (6535), Success Healthcare 2, LLC (8861), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766). The mailing address for the Debtors, solely for purposes of notices and communications, is 999 Yamato Road, 3rd FL, Boca Raton, FL 33431.

1

## AND (III) GRANTING RELATED RELIEF

The debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors") file this omnibus reply to the objections (the "Objections") filed by Strategic Global Management, Inc. ("Strategic")[2] [D.I. 158 & 166] and the Official Committee of Unsecured Creditors (the "UCC") [D.I. 173] to the *Debtors' Motion for Entry of Orders (I)(A) Establishing Bidding Procedures Relating to the Sale of Certain of the Debtors' Assets [Silver Lake Assets], Including Approving a Break-Up Fee and Expense Reimbursement, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, (C) Approving Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing to Consider the Proposed Sale; (II)(A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Authorizing Success Healthcare 1, LLC to Grant Liens; and (III) Granting Related Relief* [D.I. 37] (the "Sale Procedures Motion"), and respectfully state as follows:

## PRELIMINARY STATEMENT

1. The Sale Procedures Motion seeks authority from this Court permitting Success Healthcare, LLC, Success Healthcare 1, LLC, and HLP of Los Angeles, LLC (collectively, the "Silver Lake Debtors") to sell substantially all of the assets of the Silver Lake Medical Center (the "Silver Lake Medical Center Assets") pursuant to Section 363 of the Bankruptcy Code. To facilitate the sale of the Silver Lake Medical Center Assets, the Sale Procedures Motion requests entry of an order: (a) establishing L.A. Downtown Medical Center LLC (the "Stalking Horse

---

[2] Strategic is not a party in interest in these chapter 11 cases, and therefore *does not* have standing to object, but asserts that it intends to participate in the bidding process for the Silver Lake Medical Center Assets.

2

Bidder") as the stalking horse bidder for the Silver Lake Medical Center Assets, as more completely described in the Sale Procedures Motion, for a gross aggregate cash purchase price of $84,150,000, as offset by certain adjustments; (b) setting bidding procedures to establish guidelines for parties interested in making an overbid; (c) setting an auction to be held in January, 2019; (d) setting a hearing for the Court to approve the winning bidder; and (e) approving procedures for the assumption and assignment of executory contracts and leases in connection with the sale.

2. The proposed sale of the Silver Lake Medical Center Assets pursuant to the procedures described in the Sale Procedures Motion is the result of a vigorous marketing effort by the Silver Lake Debtors and their advisors to obtain the highest and best offer for the Silver Lake Medical Center Assets. Not only does the Stalking Horse Bidder have the financial wherewithal to complete the purchase, but the Silver Lake Debtors believe that the Stalking Horse Bidder is well-positioned to maintain the healthcare characteristics of the Silver Lake Medical Center Assets, continue the employment of the employees at the Silver Lake Medical Center and continue the Silver Lake Debtors' mission of providing patient care for the communities served by the Silver Lake Medical Center.

3. Nonetheless, the Silver Lake Debtors are committed to vigorously soliciting additional bids from potential competing purchasers for the Silver Lake Medical Center Assets in order to achieve the highest and best consideration for the benefit of the Silver Lake Debtors' bankruptcy estates. To that end, the bidding and sale procedures embodied in the Sale Procedures Motion are intended to foster a competitive auction process and provide an opportunity for potential purchasers to offer bids in excess of the Stalking Horse Bidder's bid. At the same time, recognizing the time, expense and effort expended by the Stalking Horse Bidder to enter into the

Stalking Horse APA, the proposed bidding and sale procedures offer reasonable bidding protections to the Stalking Horse Bidder to compensate it in the event that it is not ultimately chosen as the successful purchaser for the Silver Lake Medical Center Assets.

4. For the reasons detailed in the Sale Procedures Motion, the Silver Lake Debtors submit that the bidding and sale procedures proposed for the auction, especially as the time considerations may be adjusted by agreement of the parties, and sale of the Silver Lake Medical Center Assets are reasonable and necessary under the circumstances and reflect the proper exercise of the Debtors' business judgment. Moreover, the procedures are consistent with bidding and sale procedures approved in this District and in other bankruptcy cases throughout the country and, therefore, should be approved.

## SUMMARY OF OBJECTIONS

5. Strategic and the UCC do not object, generally, to the establishment of bidding procedures for the sale of the Silver Lake Medical Center Assets, but rather raise various objections to the bidding procedures as currently proposed.[3] The Silver Lake Debtors have incorporated many of the comments set forth in the Objections, as described herein; however, the objections to the allegedly unreasonable Breakup Fee and Expense Reimbursement should be overruled.[4]

## RESOLVED ISSUES

6. Although the Silver Lake Debtors acknowledge that there are always interested parties that want a "better deal" or take issue with specific terms of an agreement, the Sale Procedures Motion embodies the results of intense, complicated negotiations among the Silver

---

[3] As described herein, the Debtors believe that certain of the UCC's objections pertain to the proposed sale itself, rather than the bidding procedures, and thus are not ripe for consideration by the Court at this time.

[4] Capitalized terms used but not defined herein shall have the meanings given to them in the Sale Procedures Motion.

Lake Debtors, the Stalking Horse Bidder, the Stalking Horse Bidder's lender, and other stakeholders, including the Silver Lake Debtors' secured lender, and reflects an integrated and comprehensive compromise of various entities' interests. In addition, the Silver Lake Debtors have proactively negotiated with the objectors and others (including the United States Trustee and the Department of Justice) and have consensually resolved, to the extent they were able, many of the parties' concerns in order to promote a robust Auction process. In particular, the Bidding Procedures Order will be revised to reflect the following agreements:

- The initial bid increment and Minimum Overbid Increment amounts proposed in the Sale Procedures Motion will be reduced from $1,000,000 to $500,000 and from $2,500,000 to $1,000,000, respectively. UCC Objection, ¶ 38; Strategic Objection, ¶ 11.

- The Silver Lake Debtors have removed reference in Section 5.c. of the Bidding Procedures to the Minimum Bid amount as being determined one week prior to the Bid Deadline. *See* Strategic Objection, ¶¶ 6-7.

- The Silver Lake Debtors have corrected the unintentional mathematical error with respect to the Minimum Bid Amount. The Minimum Bid is the sum of (i) $84,150,000,[5] (ii) the Bid Protections, and (iii) $500,000 (reflecting the Silver Lake Debtors' agreement to reduce the initial bid increment from $1,000,000), subject to the adjustments set forth in the Stalking Horse APA. Presuming the Bid Protections are approved by this Court in the amount requested (i.e., $4,524,500), the Minimum Bid for the Silver Lake Medical Center Assets will be $89,174,500, subject to the adjustments set forth in the Stalking Horse APA. *See* Strategic Objection, ¶ 7.

---

[5] This number is defined in the Stalking Horse APA as the "Base Cash Amount" and is referred to in the Motion as the Base Cash Amount or the cash purchase price.

5

- The Deposit required by all Potential Bidders will be $5,000,000, which is the same as the Deposit of the Stalking Horse Bidder. *See* Strategic Objection, ¶¶ 8-10. All bidders will be treated equally.

- Qualified Bids will remain confidential and will only be shared with counsel to the UCC and counsel to Wells Fargo Bank, National Association ("Wells"), which is the administrative agent for the Silver Lake Debtors' secured lenders and the debtor-in-possession financing lenders (except with respect to the Baseline Bid, which will be shared with the Stalking Horse Bidder and all Qualified Bidders, as provided in the Bidding Procedures). *See* Strategic Objection, ¶ 15(a). Once again, all bidders will be treated equally.

- References to "DIP Agent" and the "Secured Lender" have been corrected to reference Wells. Bidder financial information will not be shared with counsel for any lender other than Wells or with the Stalking Horse Bidder or any other bidders. *See* Strategic Objection, ¶ 15(b).

- Due diligence for all Potential Bidders, including the Stalking Horse Bidder, will end on the Bid Deadline, which is now proposed to be January 9 or 14, 2019, depending on the outcome of final discussions between the Stalking Horse Bidder, the Silver Lake Debtors and Wells. As part of their due diligence, Potential Bidders will be afforded reasonable access and inspection rights with respect to the Silver Lake Medical Center Assets. *See* Strategic Objection, ¶ 15(c), UCC Objection, ¶ 46. All bidders will receive equal treatment in a desire to induce a competitive sale process and Auction.

- The Assumption and Assignment Procedures set forth in the Bidding Procedures Order apply with equal force to a Successful Bidder that is not the Stalking Horse Bidder. For

example, Paragraph 16 of the proposed Bidding Procedures Order provides that "[t]he Assumption and Assignment Procedures, which are set forth below, regarding the assumption and assignment of the executory contracts proposed to be assumed by the Silver Lake Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the Stalking Horse Bidder (*or other Successful Bidder, following the Auction, if any*) pursuant to section 365(f) of the Bankruptcy Code and in accordance with the Stalking Horse APA are hereby approved to the extent set forth herein." *See* Bidding Procedures Order, ¶ 16 (emphasis added). The Debtors have added additional references in the Bidding Procedures Order to make clear that the Assumption and Assignment Procedures will apply with respect to a Successful Bidder other than the Stalking Horse Bidder. *See* Strategic Objection, ¶ 15(e).[6]

- It was and is the Silver Lake Debtors' intent to provide the Committee with consultation rights throughout the sale process. *See* Bidding Procedures, § 5 ("A proposal, solicitation, or offer (each, a "Bid") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements (collectively, the "Bid Requirements"), as determined by the Debtors in their reasonable business judgment (after consultation with Wells and the Committee) shall constitute a "Qualified Bid.").

---

[6] The UCC asserts that the Bidding Procedures do not require the Stalking Horse Bidder to submit the same information as other Potential Bidders because each Bid is required to include a schedule of executory contracts and unexpired leases proposed to be assumed and assigned, whereas the Stalking Horse Bidder did not submit this information. *See* UCC Objection, ¶ 47. The Stalking Horse Bidder did, in fact, submit a schedule of contracts that it intends to take assignment of, which was attached as Annex 2.6(a) to the Stalking Horse APA. While the Stalking Horse Bidder reserved certain rights to alter such schedule pursuant to Section 2.6(a) of the Stalking Horse APA, the Debtors note that nothing prevents other bidders from seeking similar terms. In addition, the Stalking Horse Bidder is prevented from adding new contracts for assumption and assignment within 10 business days of the Sale Hearing in circumstances where the contract was disclosed to the Stalking Horse Bidder prior to its entry into the Stalking Horse APA.

- References to the Bid Protections as being entitled to "superpriority" administrative expense status have been removed from the Bidding Procedures Order to address concerns of the UCC and the United States Trustee. Bid Protections, if approved, will be paid from the proceeds of the sale at closing. *See* UCC Objection, ¶ 36.

- Section 7.d.(i) of the Bidding Procedures contains language that acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Bankruptcy Court of the Successful Bid. *See* UCC Objection, ¶ 50.

- The UCC's requested changes to Sections 4.a., 5, and 7.d.(ii) of the Bidding Procedures were incorporated. *See* UCC Objection, ¶ 50.

- To address comments received from the United States Department of Justice, the Silver Lake Debtors added language to Paragraph 28 of the Bidding Procedures Order stating as follows:

> Notwithstanding anything in the Motion or the Stalking Horse APA to the contrary, nothing in this Order shall be construed as authorizing the sale, transfer or assignment of any Medicare provider agreement to the Successful Bidder free and clear of successor liability for any liability arising from such provider agreements, nor as restricting the United States' right of setoff and recoupment. Any assumption and assignment of the Medicare provider agreements shall be authorized only in accordance with 11 U.S.C. § 365, all applicable Medicare statutes and regulations, and the Anti-Assignment Act.

## ARGUMENT

**A.    The Bid Deadline will Be Extended to January 9 or 14, 2019, to Allow Potential Bidders Additional Time to Conduct Diligence**

7.    In acknowledgment of the fact that the Stalking Horse APA is subject to approval by the Court and the consideration by the Silver Lake Debtors of higher or better competing bids, the Stalking Horse APA contains a limited provision in Section 7.1(b) prohibiting the Silver Lake

8

Debtors from soliciting, initiating or inducing an Acquisition Proposal[7] or entering into any contract relating to an Acquisition Proposal until the earlier of twenty-five days from the Petition Date or entry of the Bidding Procedures Order. *See* Stalking Horse APA, § 7.1(b). Such provision was heavily negotiated by the Silver Lake Debtors and was required by the Stalking Horse Bidder as an inducement for entering into the Stalking Horse APA and subjecting its offer to higher and better bids. Nonetheless, the Stalking Horse Bidder agreed to a limited waiver of Section 7.1(b) to permit Strategic to access the electronic data room prior to the expiration of the contemplated timeframe.

8. The Silver Lake Debtors, in consultation with the Stalking Horse Bidder, agree to extend the proposed Bid Deadline to January 9, 2019 (the Committee has requested that the date be set at January 14), to allow Potential Bidders more than thirty days after entry of the Bidding Procedures Order to conduct diligence.

9. The Debtors contend that the extension of the Bid Deadline renders consideration of arguments pertaining to the enforceability of "no shop" provisions unnecessary and moot. To the extent that Strategic and the UCC disagree, however, and continue to argue that "no shop" provisions are per se improper, the Silver Lake Debtors note that the authority they have cited in support of this proposition is distinguishable and not applicable in this jurisdiction or under these limited circumstances.

10. In *Pacificorp Kentucky Energy Corporation v. Big Rivers Electric Corporation (In re Big Rivers Electric Corporation)*, the Court found invalid as contrary to public policy a "no

---

[7] "Acquisition Proposal" is defined in the Stalking Horse APA as "any inquiry, proposal or offer from any Person (other than Buyer or any of its Affiliates) concerning an Alternative Transaction, in each case, other than pursuant to the Bidding Procedures following entry of the Bidding Procedures Order." Stalking Horse APA, Annex 1.1 – Page 1.

shop" provision in a lease agreement that *entirely* prevented the debtor from entertaining competing offers for the sale or lease of its assets. 233 B.R. 739, 752 (W.D. Ky. 1998). In that case, a competing bidder had approached the debtor with an offer to lease or purchase the debtor's assets at a value that exceeded the value offered by the lease counterparty. *Id.* at 743. Citing the "no shop" provision, the debtor would not even discuss, let alone entertain, the competing offer. *Id.* Furthermore, bidding procedures and an auction process were not contemplated under the lease agreement at issue in *Big Rivers*. *Id.* As a result, the *Big Rivers* circumstances are very different from the temporary pause in solicitation proposed here, which is meant to allow time for the Court to enter an order providing for comprehensive bidding procedures and a robust solicitation process.

11. The other case cited by Strategic, *In re Los Angeles Dodgers*, notes that *Big Rivers* "is not binding precedent . . . and does not arise within the Third Circuit." 465 B.R. 18, 31 (D. Del. 2011). "More importantly, *Big Rivers* does not stand for the proposition that a no shop provision is *per se* unenforceable against a bankruptcy entity." *Id.* In fact, the court in *In re Los Angeles Dodgers* noted that "Delaware courts enforce 'lenient' and reasonable 'no shop' provisions." *Id.* at 32.

12. In contrast to the scenario in *Big Rivers*, rather than prohibit the Silver Lake Debtors from entertaining competing offers, Section 7.1(b) of the Stalking Horse APA is narrowly tailored to limit the Silver Lake Debtors' ability to solicit competing offers until the earlier of (i) November 30, 2018 or (ii) the date the Bidding Procedures Order is entered. Furthermore, pursuant to Section 7.1(c) of the Stalking Horse APA, following entry of the Bidding Procedures Order, the formerly prohibited actions are no longer prohibited. The Silver Lake Debtors will not be restricted in any way with respect to, among other things, communicating with, furnishing information to, and soliciting Alternative Proposals from other Potential Bidders.

10

### B. The Bid Protections are Appropriately Based on the Cash Purchase Price

13. As set forth in the declaration of Jay A. Shiland attached as Exhibit D to the Sale Procedures Motion (the "Declaration"), the gross aggregate cash purchase price under the Stalking Horse APA is $84,150,000, as offset by certain adjustments. The Declaration describes each of the adjustments, which include: (i) approximately $4.9 million in negative changes to the QAF Program (as offset by $2.5 million of QAF Program-related cash received by the Silver Lake Debtors to date), (ii) approximately $1.3 million in penalties associated with the Silver Lake Debtors' failure to achieve "meaningful use" health information technology compliance, and (iii) up to $441,000 associated with the need for the Stalking Horse Bidder to procure representation and warranty insurance given the elimination of indemnities associated with the previous guarantee by the Silver Lake Debtors' parent in the Original Purchase Agreement. After taking into account the adjustments, the consideration to be conveyed to the Silver Lake Debtors is expected to be approximately $77.5 million, $8.1 million of which will be in the form of a seller note to be provided by the Stalking Horse Bidder.

14. In response to document production requests propounded on the Silver Lake Debtors by the UCC, the Silver Lake Debtors provided a detailed waterfall analysis setting forth the anticipated purchase price adjustments, as well as expected costs to be incurred by the Silver Lake Debtors in connection with closing. The UCC also deposed Mr. Shiland on November 30, 2018, and had the opportunity to ask questions regarding the waterfall analysis.

15. Purchase price adjustments are common features of deals inside and outside of bankruptcy, and are used to account for the fact that certain assets may increase or decrease in value between the time of signing and closing. Further, it is frequently if not always the case that a debtor assumes responsibility for some amounts that are unliquidated and unquantified at the

time it enters into an asset purchase agreement, whether such responsibility is for payment of cure amounts, transfer taxes, insurance, or other obligations.

16. The Bid Requirements provide that Bids must "clearly set forth the purchase price to be paid" and include a Bid APA and redline comparing the Bid APA to the Stalking Horse APA. *See* Bidding Procedures, § 5. The redline will enable the Debtors, in consultation with Wells and the Committee, to assess the total consideration being offered in connection with a Bid. For example, if a Bid proposes for the purchaser to pay items such as taxes, insurance, and cure costs, or does not include a seller note, indemnity, or holdback, it may be deemed the highest and best Bid even though the cash purchase price offered is less. The Silver Lake Debtors are capable of evaluating various and different compensation packages that may be submitted as part of the solicitation process or at the Auction in an effort to properly maximize sale proceeds for the Silver Lake Debtors' estates and stakeholders.

## C. The Proposed Bid Protections Are Reasonable

17. The Stalking Horse APA proposes that the Stalking Horse Bidder is entitled to a Breakup Fee equal to 3% and an Expense Reimbursement equal to 2.38% of the Base Cash Amount of the Purchase Price (i.e., $84,150,000), as compensation and reimbursement for the Stalking Horse Bidder's diligence and negotiation efforts, payable at closing of the sale if the Stalking Horse Bidder is not the Successful Bidder (Stalking Horse APA, §§ 4.6(a), 8.1). The UCC asserts that the Breakup Fee is unwarranted because it is not necessary to preserve the value of the Silver Lake Debtors' estates. Strategic and the UCC argue that, even if the Stalking Horse Bidder is entitled to a Breakup Fee and Expense Reimbursement, the proposed Breakup Fee and Expense Reimbursement are too high in this case. Specifically, the UCC proposes that the Breakup Fee should be calculated based on the net realizable consideration to the estates (a term it defines

12

as the "Net Realizable Value"), while Strategic asks that the Breakup Fee be lowered to $2,325,000 and the Expense Reimbursement be lowered to $500,000, which are 3% and .65%, respectively, of the purchase price after taking into account expected adjustments.

18. As a preliminary matter, the Bid Protections are appropriate, as they are necessary to preserve the value of the Silver Lake Debtors' estates and promote a more competitive bidding process. Despite the UCC's contentions to the contrary, the Stalking Horse Bidder only committed to buying the Silver Lake Medical Center Assets outside of bankruptcy. After months of negotiating a failed out-of-court transaction, there was no assurance that the Stalking Horse Bidder would agree to yet another round of negotiations for an alternative transaction that would conclude with an auction subject to higher and better offers. At that point in time, the Stalking Horse Bidder could have walked away from the deal and may have had a claim against the Silver Lake Debtors for breach of the Original Purchase Agreement. The fact that the Stalking Horse Bidder ultimately executed the Stalking Horse APA is, in part, specifically premised upon the provision of such Bid Protections.[8]

19. The Bid Protections were, therefore, necessary to induce the Stalking Horse Bidder to proceed with a purchase of the Silver Lake Medical Center Assets in bankruptcy. The benefit to the estates is already evidenced by the fact that Strategic, a party that had initially expressed interest in the Silver Lake Medical Center Assets, appears to have renewed interest in a potential purchase.

20. The proposed Breakup Fee and Expense Reimbursement are reasonable and within the range of amounts approved by various courts, including in sales of healthcare entities. *See,*

---

[8] *See* Stalking Horse APA, §§ 7.2(b) and 8.1.

*e.g.*, *In re Verity Health Sys. of California, Inc., et al.* ("Verity"), No. 18-20151 (Bankr. C.D. Cal. Oct. 31, 2018) [D.I. 724] (court approved breakup fee equal to 4% and expense reimbursement equal to 1% of the cash purchase price); *In re Women First Healthcare, Inc.*, 332 B.R. 115 (Bankr. D. Del. 2005) (approving breakup fee and expense reimbursement that collectively totaled 4.7% of the purchase price); *In re Dan River, Inc.*, No. 04-10990 (Bankr. N.D. Ga. Dec. 17, 2004) [D.I. 955] (court approved breakup fee equal to 5.3% of the cash purchase price); *In re Lake Burton Dev., LLC*, No. 09-22830 (Bankr. N.D. Ga. Apr. 1, 2010) [D.I. 130] (court approved breakup fee equal to 4.75% of cash purchase price).

21. Notably, in the Verity case on which Strategic relies for the proposition that the proposed Breakup Fee and Expense Reimbursement here is excessive, the court approved a break-up fee of $9,400,000 and an expense reimbursement of up to $2,350,000, which were 4% and 1%, respectively, of the $235,000,000 cash purchase price.[9] Furthermore, the court did *not* take into account adjustments to the purchase price in approving the proposed bid protections. The Verity asset purchase agreement provided for purchase price adjustments on account of, among other things, (i) changes in prepaid rentals, deposits, and expenses, (ii) changes in inventories, (iii) adjustments on account of taxes arising from the sale of the assets, and (iv) a potential $18,000,000 reduction in the purchase price if the sellers were unable to transfer a limited partnership interest. The sellers in Verity were also responsible for the payment of cure costs in connection with assumed and assigned contracts.

---

[9] The court in Verity considered the declarations that Strategic attached to its Objection, as well as the studies on bidding protections described therein. However, the court afforded those studies only minimal weight, noting that the sale transactions selected for the studies did not involve companies in the healthcare industry. The court found that the greater regulatory compliance obligations placed upon healthcare entities require more due diligence and justified higher bid protections. *See* Judge Ernest Robles Tentative Ruling for 10/24/2018, p. 38.

22. The UCC cites no case law in support of the proposition that the Breakup Fee and Expense Reimbursement should be based on the Net Realizable Value to the estate, nor have the Silver Lake Debtors been able to locate any such support despite a diligent search. In approving bid protections, courts do not appear to attempt to parse and quantify each and every obligation that a debtor undertakes under an asset purchase agreement. Instead, courts consider whether the debtor exercised reasonable business judgment in agreeing to the bidding protections. *See, e.g.*, *In re Integrated Res., Inc.*, 147 B.R. 650, 657 (S.D.N.Y. 1992). Here, for the reasons set forth in the Sale Procedures Motion, the Declaration, and herein, the Debtors exercised reasonable business judgment in deciding to agree to the Bidding Protections, taking into account the economics of the transaction as a whole.

23. Accordingly, the Court should approve the Bid Protections proposed in the Sale Procedures Motion and decline the UCC's and Strategic's invitations to substitute their judgment for the reasonable business judgment of the Debtors.

**D. Section 7.3 of the Stalking Horse APA is a Reasonable Exercise of the Debtors' Business Judgment**

24. Strategic objects to Section 7.3 of the Stalking Horse APA, which provides that, in the event the Silver Lake Debtors elect to proceed with an Alternative Transaction, the Stalking Horse Bidder will not be obligated to serve as the Backup Bidder at a higher purchase price, or on terms and conditions less favorable to the Stalking Horse Bidder, than set forth in the Stalking Horse APA. This provision was heavily negotiated and ultimately agreed to by the Debtors, in their business judgment. The Stalking Horse Bidder does not have the ability to elect to be the Backup Bidder; rather, the Silver Lake Debtors will determine, in their business judgment in consultation with Wells and the Committee, which Backup Bid will provide the best possible recovery for the Silver Lake Debtors' estates. If there are other Backup Bidders with higher and

15

better offers than the terms of the Stalking Horse APA, then the Debtors will select the offer that maximizes recovery. Alternatively, the Debtors (after consultation) may determine that the Stalking Horse Bidder's Backup Bid, even on the original terms set forth in the Stalking Horse APA, represents the best course for maximizing value to the estates. Furthermore, all interested parties retain their rights to object and be heard at the Sale Hearing if they take issue with the Debtors' selection of the Successful Bidder or the Backup Bid. Strategic's efforts to impose their own judgment on the Debtors should not be entertained by this Court.

### E. The Committee Should Not Be Granted Additional Rights to Challenge the Silver Lake Debtors' Determination as to Qualified Bids

25. The Silver Lake Debtors agree that the UCC should be involved in the Auction process and have consultation rights with respect to, among other things, the determination of Qualifying Bids. However, the UCC also seeks an express right to challenge the Debtors' qualification determination and seeks to have the challenge heard by the Court on an expedited basis. *See* UCC Objection, ¶¶ 48-49. An express challenge right would invade upon the powers and responsibilities of the Silver Lake Debtors, as debtors in possession, to exercise their reasonable business judgment in identifying the Bid that best benefits their estates and creditors. The UCC has made no showing whatsoever that the Silver Lake Debtors are unable to make such a determination. If the UCC disagrees with the Silver Lake Debtors' business judgment in identifying the highest and best offer, the UCC may object at the Sale Hearing. Thus, the UCC's rights in this regard are adequately preserved and protected. Any additional rights, however, are inappropriate and unnecessary in these circumstances.

26. The Silver Lake Debtors look forward to working with and consulting with the UCC throughout the sale process—a commitment that is contained in the proposed Bidding

16

Procedures. As noted herein, the Bidding Procedures have been revised to reflect such commitment.

### F. The UCC's Sale-Related Objections Are Premature

27. The UCC also argues that the Stalking Horse APA conflicts with Medicare regulations and exposes the estates to liability. *See* UCC Objection, pp. 28-29. As a result, the UCC requests a multitude of changes to the Stalking Horse APA "to the extent that the Stalking Horse Bidder is selected as the highest and best bidder." UCC Objection, pp. 29-30. These objections are not directed at the proposed Bidding Procedures. Rather, such concerns are sale objections that may be raised and addressed in conjunction with the Sale Hearing, assuming that the Stalking Horse Bidder is selected and approved as the Successful Bidder.

28. Further, as it relates to the Bidding Procedures, the Silver Lake Debtors have already added language to Paragraph 28 of the Bidding Procedures Order, at the request of the Department of Justice, which makes clear that nothing in the Bidding Procedures Order or Stalking Horse APA authorizes transfer of any Medicare provider agreement free and clear of successor liability and that any transfer must comply with law. The Silver Lake Debtors agree and acknowledge that the UCC's rights to object in this regard are fully preserved and the Silver Lake Debtors commit to working with the UCC to address its concerns, to the extent feasible, in advance of the Sale Hearing in the event the Stalking Horse Bidder is selected as the Successful Bidder at the Auction.

## **CONCLUSION**

WHEREFORE, for the reasons set forth in the Sale Procedures Motion and this pleading, the Debtors respectfully request that this Court (i) grant the Sale Procedures Motion and the

17

relief requested therein; (ii) overrule the Objections; and (iii) grant such other and further relief as it deems just and proper.

| | |
|---|---|
| Dated: December 3, 2018<br>Wilmington, Delaware | Respectfully submitted,<br><br>DLA PIPER LLP (US)<br><br>/s/ *Stuart M. Brown*<br>Stuart M. Brown (#4050)<br>Kaitlin MacKenzie Edelman (#5924)<br>1201 North Market Street, Suite 2100<br>Wilmington, Delaware 19801<br>Telephone: 302.468.5700<br>Facsimile: 302.778.7913<br>Email: Stuart.Brown@dlapiper.com<br>　　　　Kaitlin.Edelman@dlapiper.com<br><br>*Proposed Counsel to the Debtors and Debtors in Possession, Promise Healthcare Group, LLC, et al.*<br><br>　-and-<br><br>MCDERMOTT WILL & EMERY LLP<br>William P. Smith (admitted *pro hac vice*)<br>James W. Kapp (admitted *pro hac vice*)<br>Megan Preusker (admitted *pro hac vice*)<br>444 West Lake Street<br>Chicago, Illinois 60606<br>Telephone: 312.372.2000<br>Facsimile: 312.984.7700<br>Email: wsmith@mwe.com<br>jkapp@mwe.com<br>mpreusker@mwe.com<br><br>*Proposed Special Counsel for the Silver Lake Debtors in Connection with the Sale of the Silver Lake Medical Center* |

EAST\162835977.1