## <u>EXHIBIT A</u>

## THE COMPANIES

1.      St. Alexius Hospital Corporation #1, d/b/a St. Alexius Hospital

2.      St. Alexius Properties, LLC

## <u>EXHIBIT B</u>

## ASSIGNMENT, ASSUMPTION AND DISTRIBUTION AGREEMENT

See attached.

## ASSIGNMENT, ASSUMPTION AND DISTRIBUTION AGREEMENT

THIS ASSIGNMENT, ASSUMPTION AND DISTRIBUTION AGREEMENT (this "Agreement") is entered into on _____ __, 2018 by and among **SUCCESS HEALTHCARE, LLC**, a California limited liability company ("Seller"), **SUCCESS HEALTHCARE 2, LLC**, a California limited liability company ("Holdco"), **ST. ALEXIUS PROPERTIES, LLC**, a Missouri corporation ("Properties") and **ST. ALEXIUS HOSPITAL CORPORATION #1, D/B/A ST. ALEXIUS HOSPITAL**, a Missouri corporation ("St. Alexius," and, together with Properties, each, a "Company" and, collectively, the "Companies"). Capitalized terms used but not otherwise defined herein shall have the same meanings herein as ascribed to such terms in that certain Purchase Agreement dated as of November 13, 2018 (the "Purchase Agreement"), by and among Seller and **AMERICORE HOLDINGS, LLC**, a Delaware limited liability company ("Buyer").

### WITNESSETH:

**WHEREAS**, Seller owns all of the limited liability company membership interests issued by Holdco, and Holdco owns all of the limited liability company membership interests issued by Properties and all of the common stock issued by St. Alexius;

**WHEREAS**, subject to the terms and provisions of this Agreement effective as of the Initial Assignment Effective Time (as hereinafter defined), (A) the Companies desire to transfer, convey, assign and deliver all of each Company's rights, title and interest in and to the Excluded Assets as a distribution with respect to Holdco's equity interests in the Companies, (B) the Companies desire to transfer, convey, assign and deliver all of each Company's obligations with respect to the Excluded Liabilities to Holdco and (C) Holdco desires to accept such Excluded Assets and assume such obligations with respect to the Excluded Liabilities;

**WHEREAS**, subject to the terms and provisions of this Agreement, effective as of the Final Assignment Effective Time (as hereinafter defined), (A) Holdco desires to transfer, convey, assign and deliver all of Holdco's rights, title and interest in and to the Excluded Assets as a distribution with respect to Seller's membership interest in Holdco, (B) Holdco desires to transfer, convey, assign and deliver all of Holdco's obligations with respect to the Excluded Liabilities to Seller and (C) Seller desires to accept such Excluded Assets and assume such obligations with respect to the Excluded Liabilities; and

**WHEREAS**, the Companies, Holdco and the Seller are interested in documenting the terms and conditions under which such assignments, assumptions and distributions shall occur.

**NOW, THEREFORE**, in consideration of the foregoing premises and the mutual covenants of the parties set forth herein, the parties hereby agree as follows:

### AGREEMENT

1.     *Initial Assignment and Assumption*.  Effective as of 11:00:00 p.m. on the Closing Date (the "Initial Assignment Effective Time"), (i) each Company hereby transfers, conveys, assigns and delivers to Holdco and Holdco hereby acquires, all of each Company's rights, title and interest in and to the Excluded Assets as a distribution with respect to Holdco's equity interests in the Companies, and (ii) each Company hereby assigns to Holdco, and Holdco hereby takes, assumes and agrees to perform, discharge and pay all of the obligations and liabilities of such Company that are Excluded Liabilities**.**

2.     *Final Assignment and Assumption*.  Effective as of 11:30:00 p.m. on the Closing Date (the "Final Assignment Effective Time"), (i) Holdco hereby transfers, conveys, assigns and delivers to Seller and Seller hereby acquires, all of Holdco's rights, title and interest in and to the Excluded Assets as a distribution with respect to Seller's membership interest in Holdco, and (ii) Holdco hereby assigns to

Seller, and Seller hereby takes, assumes and agrees to perform, discharge and pay all of the obligations and liabilities of Holdco that are Excluded Liabilities.

3.      ***Entirety***.  This Agreement together with the Purchase Agreement represents the entire and final agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior negotiations, discussions or agreements.  This Agreement may not be amended or modified except by written instrument signed by the parties hereto.

4.      ***Counterparts***.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute but one and the same instrument. Facsimile and .PDF signatures shall be treated as if they are original signatures.

5.      ***Third Party Beneficiary***.  Each of Buyer and its owners and affiliates is hereby expressly made a third party beneficiary of this Agreement.

6.      ***Governing Law***.  This Agreement shall be governed by and interpreted under the laws of the State of Delaware.

*[Signature pages follow]*

4825-9840-0121.3

**IN WITNESS WHEREOF**, the parties hereby execute this Assignment, Assumption and Distribution Agreement as of the day and year first set forth above.

<u>**SELLER**</u>:

**SUCCESS HEALTHCARE, LLC**

By: _____
Name: _____
Its: _____

<u>**HOLDCO**</u>:

**SUCCESS HEALTHCARE 2, LLC**

By: _____
Name: _____
Its: _____

<u>**COMPANIES**</u>:

**ST. ALEXIUS PROPERTIES, LLC**

By: _____
Name: _____
Its: _____

**ST. ALEXIUS HOSPITAL CORPORATION #1, D/B/A ST. ALEXIUS HOSPITAL**

By: _____
Name: _____
Its: _____

4825-9840-0121.3

[Signature Page to Assignment Assumption and Distribution Agreement]

### EXHIBIT C

**ASSIGNMENT OF MEMBERSHIP INTEREST**

See attached.

## ASSIGNMENT OF MEMBERSHIP INTERESTS

FOR VALUE RECEIVED, the undersigned, Success Healthcare, LLC, a California limited liability company, does hereby sell, assign and transfer to Americore Holdings, LLC, a Delaware limited liability company, all of the equity interests of Success Healthcare 2, LLC, a California limited liability company (the "Company"), standing in the name of the undersigned on the books and records of the Company.

The undersigned does hereby irrevocable constitute and appoint _____ to transfer the said equity interests on the books of said Company, with full power of substitution.

Dated: _____, 2018

**[signature page follows]**

Success Healthcare, LLC


By:_____

Name:_____

Title:_____

**<u>EXHIBIT D</u>**

**TRANSITION SERVICES AGREEMENT**

See attached.

## TRANSITION SERVICES AGREEMENT

**THIS TRANSITION SERVICES AGREEMENT** (this "**Agreement**") is made and entered into as of _____, 2018 (the "**Effective Date**"), by and among **SUCCESS HEALTHCARE, LLC**, a California limited liability company ("**Seller**"), **AMERICORE HOLDINGS, LLC**, a Delaware limited liability company ("**Buyer**"), **ST. ALEXIUS PROPERTIES, LLC**, a Missouri corporation ("**Properties**") and **ST. ALEXIUS HOSPITAL CORPORATION #1, D/B/A ST. ALEXIUS HOSPITAL**, a Missouri corporation ("**St. Alexius**," and, together with Properties, each, a "**Company**" and, collectively, the "**Companies**"). Capitalized terms used but not otherwise defined herein shall have the same meanings herein as ascribed to such terms in that certain Purchase Agreement dated as of November 13, 2018 (the "**Purchase Agreement**"), by and among Seller and Buyer.

## WITNESSETH:

**WHEREAS**, Seller owns all of the equity interests (the "**Purchased Interests**") of Success Healthcare 2, LLC, a California limited liability company ("**Holdco**"), and Holdco owns all of the limited liability company membership interests in Properties and all of the common stock in St. Alexius;

**WHEREAS**, the Companies own and operate an acute care hospital known as St. Alexius Medical Center located in St. Louis, Missouri (the "**Hospital**"), together with certain related businesses, including medical office buildings, outpatient care facilities, physician clinics, and the Lutheran School of Nursing (collectively with the Hospital, the "**Facilities**");

**WHEREAS**, pursuant to the terms of the Purchase Agreement, Buyer shall purchase from Seller all of the Purchased Interests contemporaneously herewith;

**WHEREAS**, to assist in the transition of the indirect ownership and operation of the Facilities from Seller to Buyer pursuant to the Purchase Agreement, Seller has agreed to provide to Buyer and Companies certain services, and Buyer has agreed to provide or cause the Companies to provide Seller certain services, in accordance with the terms and conditions of this Agreement.

**NOW, THEREFORE**, for and in consideration of the premises, and the agreements, covenants, representations and warranties set forth in the Purchase Agreement and hereinafter set forth, and other good and valuable consideration, the receipt and adequacy of all of which are forever acknowledged and confessed, the parties hereby agree as follows:

1.     **Buyer Support Services**. Buyer shall provide (itself or through its subsidiaries or affiliates including the Companies) Seller with the services and support listed on Exhibit A attached hereto (the "**Buyer Services**") for a period not to exceed _____ (___) months after the date hereof in exchange for the payment(s) set forth on Exhibit A. In the event that the cost of providing such Buyer Services exceeds the payments set forth on Exhibit A, Buyer reserves the right to request additional payments from Seller. In the event that the parties cannot agree on the terms of such additional payment request within **[ten (10)]** days after such request is made in writing, Buyer shall have the right to cease providing such Buyer Services on **[fourteen (14)]** days prior written notice to Seller.

2.     **Seller Services.** Seller shall provide (itself or through its subsidiaries or affiliates) Buyer and Companies with the services and support listed on Exhibit B attached hereto (the "**Seller Services**" and, together with the Buyer Services, the "**Services**") for a period not to exceed _____ (___) months after Closing in exchange for the payment(s) set forth on Exhibit B. In the event that the cost of providing such Seller Services exceeds the payments set forth on Exhibit B, Seller reserves the right to request additional payments by Buyer and Companies. In the event that the parties cannot agree on the

terms of such additional payment request within **[ten (10)]** days after such request is made in writing, Seller shall have the right to cease providing such Seller Services on **[fourteen (14)]** days prior written notice to Buyer and Companies.

      **3.**    <u>Books and Records</u>.

      **(a)**    <u>Availability to Secretary and Others</u>.  If required by applicable law, the parties agree that until the expiration of four (4) years after the furnishing of Services pursuant to this Agreement, each party will make available to the Secretary of the United States Department of Health and Human Services and the United States Comptroller General, and their duly authorized representatives, this Agreement and all books, documents and records necessary to certify the nature and extent of the costs of the goods and services provided under this Agreement.  No attorney-client, accountant-client or other legal privilege shall be deemed to have been waived by the parties by virtue of this provision.

      **(b)**    <u>Right to Inspect</u>.  Each party shall have the right, at its expense, during normal business hours and with reasonable advance notice, to review and photocopy the other party's books and records that pertain directly to the accounts of such party, the fees payable to such party under this Agreement or the services provided by such party hereunder.

      **4.**    <u>Force Majeure</u>.  Neither party shall be responsible for performance of any of its obligations to the extent that it is delayed or hindered by warfare, riot, strike, lockout, boycott, act of God, natural calamity or any other cause beyond its reasonable control which cannot be overcome by reasonable diligence.

      **5.**    <u>Compliance with Laws</u>.  Each party shall perform its Services, duties and obligations hereunder in material compliance with all applicable federal, state and local laws, ordinances and regulations.

      **6.**    <u>Submission to Jurisdiction; Consent to Service of Process</u>.  Without limiting any party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court (as defined in the Purchase Agreement) shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in the Purchase Agreement; <u>provided</u>, <u>however</u>, that if the Bankruptcy Case (as defined in the Purchase Agreement) has closed or not been filed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the **[District of Delaware]** and any appellate court from any thereof, for the resolution of any such claim or dispute.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

      **7.**    <u>Waiver of Right to Trial by Jury</u>.  Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

      **8.**    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts made and performed in such State.

**9.**      **Notices**.  Any notice, demand or communication required, permitted or desired to be given hereunder shall be in accordance with the notice provisions set forth in the Purchase Agreement.

**10.**      **Severability**.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby are not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties so closely as possible in an acceptable manner in order that the contemplated transactions are consummated as originally contemplated to the greatest extent possible.

**11.**      **Binding Effect; Assignment**.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below.  No assignment of this Agreement or of any rights or obligations hereunder may be made by Buyer (by operation of law or otherwise) without the prior written consent of Seller and any attempted assignment without the required consents shall be void.  No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations.  Upon any such permitted assignment, the references in this Agreement to Buyer shall also apply to any such assignee unless the context otherwise requires.

**12.**      **Independent Contractor**.  Each party shall perform its Services, duties and obligations hereunder in the capacity of an independent contractor and not as an employee of such party.  Nothing contained in this Agreement shall be construed to create a partnership or joint venture between any of the parties hereto.

**13.**      **Waiver**.  Failure by either party at any time to exercise any right or remedy granted herein or established by law shall not be deemed to operate as a waiver of its right to exercise such right or remedy at any other future time.

**14.**      **Entire Agreement/Amendment**.  This Agreement supersedes all prior agreements, whether written or oral, between the parties with respect to its subject matter and constitutes a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter.

**15.**      **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

SIGNATURE PAGE FOLLOWS

3

**IN WITNESS WHEREOF,** the parties have each caused this Agreement to be executed by their respective officers as of the date above written.

<u>**BUYER**</u>**:**

**AMERICORE HOLDINGS, LLC**

By: _____

Name: _____

Its: _____

<u>**SELLER**</u>**:**

**SUCCESS HEALTHCARE, LLC**

By: _____

Name: _____

Its: _____

<u>**COMPANIES**</u>**:**

**ST. ALEXIUS PROPERTIES, LLC**

By: _____

Name: _____

Its: _____

**ST. ALEXIUS HOSPITAL CORPORATION #1, D/B/A ST. ALEXIUS HOSPITAL**

By: _____

Name: _____

Its: _____

## EXHIBIT A

**Buyer Services**

**[Provide specific Services, scope and compensation]**

## EXHIBIT B

**Seller Services**

**[Provide specific services, scope and compensation]**

# **EXHIBIT E**

## **SILVERLAKE TRANSITION SERVICES AGREEMENT**

See attached.

**TRANSITION SERVICES AGREEMENT**

THIS TRANSITION SERVICES AGREEMENT (this "Agreement") is entered into effective as of [●] (the "Effective Date") by and between L.A. Downtown Medical Center LLC, a California limited liability company ("LADMC"), on the one hand, and Promise Healthcare, Inc., a Florida corporation ("Promise"), Success Healthcare, LLC, a California limited liability company ("Success"), and St. Alexius Hospital Corporation #1, a Missouri corporation ("St. Alexius" and together with Promise and Success the "Promise Parties"), on the other hand.

# R E C I T A L S

A.    Reference is made to that certain Asset Purchase Agreement dated as of [●], 2018, as amended (the "Purchase Agreement") between LADMC, Success, Success Healthcare 1, LLC, a California limited liability company ("SH1"), HLP of Los Angeles, LLC, a California limited liability company ("HLP" together with SH1 and Success, the "Seller Parties").

B.    The Promise Parties (directly or through their affiliates or third party vendors that the Seller Parties have disclosed to LADMC) provide certain information technology services used in connection with the operation of the acute care hospital known as Silver Lake Medical Center, which has campuses in each of Los Angeles, California and Rosemead, California (collectively, the "Acute Care Hospital"), which information technology services are also made available to other acute care hospitals operated by affiliates of Success.

C.    To assist in the orderly transition of the operation of the Acute Care Hospital following the Effective Date, the Promise Parties (through certain affiliates and various third party vendors) will provide to LADMC, in connection with the operation of the Acute Care Hospital certain information technology services on the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises and covenants contained in this Agreement and in the Purchase Agreement, and for their mutual reliance, the parties hereto agree as follows:

## SECTION 1
## SERVICES

1.1    **Transition Services.**  The Promise Parties will provide to LADMC the services described in this Agreement and the <u>Schedules</u> attached to this Agreement (collectively, the "Transition Services"). The Promise Parties will provide the Transition Services on at least the same level (including timeliness, responsiveness and quality) as the Promise Parties provide their Affiliates; using reasonable care; and in compliance with applicable law. The Promise Parties agree to respond in good faith to any reasonable request by LADMC for additional services ("Additional Services"), and the parties will in good faith negotiate terms (including additional fees) for the provision of Additional Services. Upon agreement by both parties, the terms for any Additional Services will be set forth in an amendment to this Agreement and thereafter will be included in the Transition Services. Any or all of the Transition Services may be terminated or reduced in scope by LADMC on thirty (30) days' prior written notice to the Promise Parties as provided pursuant to Section 5.3.

1.2    **IT Services.**  The Promise Parties agree to provide to LADMC the information technology services and reports, including provision of the Supported Software Applications (as defined below), described on <u>Schedule 1.2</u> attached hereto and incorporated herein by this reference (the "IT Services"). LADMC's use and receipt of the IT Services shall conform to the procedures, requirements and limitations contained in any written documentation relating to the IT Services and other reasonable instructions provided from time-to-time by the Promise Parties. In addition, LADMC will comply with any procedures, requirements and limitations with respect to the IT Services that are required by the Licensors (as defined below) or the then current operator of the data center from which the IT Services are provided, located at St. Alexius Hospital, 3933 South Broadway, St. Louis, Missouri (the "Data Center"). The Data Center's centralized computer processors and systems are collectively referred to herein as the "Data Center System." Effective 15 business days after delivery of written notice to LADMC providing reasonable detail concerning proposed changes in the IT Services, the Promise Parties may change their standards and procedures for performing the IT Services from time to time as necessary to comply with the requirements of the applicable Supported Software Application or as required by changes of law. LADMC acknowledges and agrees that certain of the IT Services may be provided by the Promise Parties directly, or by Licensors, the Data Center operator or other third parties, in each case at the Promise Parties' reasonable discretion.

1.3    **Scope of IT Services.**  LADMC may receive and use the IT Services solely for purposes of the Acute Care Hospital.  LADMC may access and use the Data Center System [only from the computer equipment at the Acute Care Hospital and] only utilizing the Supported Software Applications.  LADMC may access and use the Data Center System solely for the internal information processing needs of LADMC. The IT Services will be provided on a remote basis, provided that LADMC may request the Promise Parties to provide IT Services on location at the Acute Care Hospital, and the Promise Parties will provide such services when requested by LADMC.  Notwithstanding the foregoing sentence, LADMC and the Promise Parties will agree in advance on the scope and fees for such IT Services, which will include a reasonable hourly rate for personnel providing such on-site IT Services as well as reimbursement for actual, documented and reasonable travel expenses incurred by the Promise Parties.  The Promise Parties will allow LADMC to copy and migrate a copy of any data stored on LADMC's behalf within the Supported Software Applications (in the form such data exists) to a system of LADMC's choice, including a server located at the Acute Care Hospital or to one or more data centers or co-location sites designated used by LADMC.

1.4    **Supported Software Applications.**

(a)    Defined Terms

"Licensor" means the third party that licenses a Third Party Application to one or more of the Promise Parties.

"Supported Software Applications" means the software applications that are listed in Schedule 1.4.

"Third Party Application" means a Supported Software Application that is licensed to one or more of the Promise Parties by a third party.

2

"Third Party License Agreement" means the license agreement between the Promise Parties and the applicable Licensor relating to the license of a Third Party Application.

References to a third party mean a person or entity other than any of the Promise Parties or any of their respective affiliates.

(b)    Schedule 1.4 attached hereto and incorporated herein by this reference, sets forth a list of the software applications used in connection with the operation of the Acute Care Hospital that will be provided to LADMC as part of the IT Services. The Promise Parties will provide LADMC with continued access, use and support of the Supported Software Applications in accordance with the terms of this Agreement. Notwithstanding anything to the contrary set forth in this Agreement, LADMC acknowledges and agrees that: (i) access to, use of and support for any Third Party Application will be provided subject to the terms of the applicable Third Party License Agreement and (ii) the Promise Parties will have no obligation to provide any access, use or support for such Third Party Applications beyond what is provided or permitted pursuant to the Third Party License Agreements. The Promise Parties warrant that they have delivered complete and accurate copies of all Third Party License Agreements to LADMC (including the Paragon Master Agreement and the Data Center System Agreement) on or prior to the Effective Date, and the Promise Parties will deliver to LADMC any amendments to the Third Party License Agreements that occur after the Effective Date and that affect LADMC's rights to any Third Party Application. The Promise Parties warrant that (x) all of the Third Party License Agreements are binding on the Licensor, are enforceable in accordance with their terms, and are in full force and effect, and (y) none of the Promise Parties nor (to the Promise Parties' knowledge) any Licensor is in breach of any Third Party License Agreement. The Promise Parties will use commercially reasonable efforts to maintain the Third Party License Agreements in full force and effect during the Term. LADMC agrees not to violate all the terms of such Third Party License Agreements that have been delivered to LADMC and that are applicable to LADMC's use of the Third Party Applications.

(c)    The Promise Parties agree to use commercially reasonable efforts to:  (i) maintain in full force and effect during the term of this Agreement all rights and licenses to the Supported Software Applications necessary to enable the Promise Parties to provide the IT Services to LADMC throughout the term of this Agreement; (ii) maintain and update the Supported Software Applications as provided in the applicable Third Party License Agreement; (iii) maintain the Data Center to the extent necessary to provide the IT Services; and (iv) provide the Supported  Software Applications in a manner consistent with the obligations set forth in Section 1.3.

(d)    The Promise Parties will exercise commercially reasonable efforts to obtain any third-party consents or licenses for software or services that are necessary to provide the IT Services to LADMC. LADMC will not pay any royalty fees that are not included in the IT Services Fee. The Promise Parties agree that all of their employees and any third-party personnel performing Transition Services, when on the property of LADMC or when given access to any equipment, computer, software, network or files owned or controlled by LADMC, will conform to all of the reasonable policies and procedures of LADMC, including all reasonable policies and procedures concerning health, safety and security, in each case as such policies and procedures are provided to the Promise Parties in writing in advance.

3

(e)     If the systems or hardware from which the Supported Software Applications are provided become damaged, corrupted or are otherwise materially adversely affected, then the Promise Parties will use commercially reasonable efforts to restore or repair such systems and hardware. If the Promise Parties do not restore or repair such systems and hardware within 24 hours after notice of such damage, corruption or material adverse effect, then LADMC may do so and deduct all related expenses from any amounts owed to any of the Promise Parties under this Agreement and from any Deferred Payments (as defined in the Purchase Agreement).

(f)     The Promise Parties will bear all costs and expenses associated with any restoration or repair contemplated by Section 1.4(e), provided, however, that:

(i)     If the Promise Parties show that such damage or corruption was caused primarily by the willful misconduct of LADMC, then LADMC will bear the out-of-pocket costs of such restoration or repair.

(ii)     If the Promise Parties show that such damage or corruption was caused equally by the willful misconduct of LADMC and the willful misconduct of one or more of the Promise Parties, then the out-of-pocket costs for such restoration and repair will be allocated as follows: (x) the first fifty thousand dollars ($50,000) will be borne by the Promise Parties; (y) out-of-pocket costs in excess of fifty thousand dollars ($50,000) will be shared equally by the Promise Parties, on the one hand, and LADMC, on the other hand, until the Promise Parties have incurred aggregate costs (including the costs described in Section 1.4(f)(ii)(x)) of two hundred thousand dollars ($200,000); and (z) after Promise Parties have incurred such aggregate costs of two hundred thousand dollars ($200,000), all additional out-of-pocket costs for such restoration and/or repair will be borne solely by LADMC.

1.5     **Data Integrity Measures.**  In connection with the IT Services provided under this Agreement, the Promise Parties and LADMC shall mutually agree to implement reasonable and appropriate safeguards necessary to segregate (electronically or physically, as appropriate) data that is provided to the Promise Parties (including through the Supported Software Applications) by LADMC for purposes of receiving the IT Services (the "LADMC Data") from other data stored within the Data Center or the Supported Software Applications.  LADMC acknowledges that it has read and shall comply with the Promise Parties' Systems Security Policy, attached hereto as Schedule 1.5 and incorporated herein by this reference.

1.6     **LADMC Cooperation.**  In order for the Promise Parties to provide the IT Services, LADMC agrees to make available the four (4) full time equivalent employees hired by LADMC as part of the Transactions (as defined in the Purchase Agreement), or their replacements, who work on-site at the Acute Care Hospital to provide the same information technology support services which such employees provided to the Acute Care Hospital immediately prior to the Effective Date.  The wages, benefits and other costs associated with LADMC's employment of such personnel shall be borne solely by LADMC (and, for avoidance of doubt, are not included in the IT Services Fee).

4841-7985-4193v.10 0110030-000002

## SECTION 2
## TERM

2.1    **Term.**  This Agreement shall remain in effect for a period of twelve (12) months after the Effective Date (the "Term"), unless sooner terminated in accordance with the provisions hereof.

2.2    **Termination Without Cause.**  LADMC shall have the right to terminate this Agreement at any time, without cause and for any or no reason, by providing the Promise Parties with at least thirty (30) days' prior written notice; provided, however, that LADMC shall not be permitted to provide any such notice to the Promise Parties prior to the date which is two (2) months after the Effective Date.

2.3    **Termination For Cause.**  Either LADMC, on the one hand, or the Promise Parties, on the other hand, may terminate this Agreement upon written notice to the other party if the other party commits a material breach of this Agreement and fails to cure such breach within thirty (30) days after written notice of such breach is provided by the nonbreaching party to the breaching party. For clarity, any Promise Party may cure a breach of this agreement by another Promise Party. For purposes of this Section 2.3, a material breach of this Agreement shall include, without limitation, failure to pay any amounts due under this Agreement; the breaching party becoming insolvent or admitting in writing its insolvency or inability to pay its debts as they become due; being unable or not paying its debts as they become due; making or proposing an assignment for the benefit of creditors; convening or proposing to convene a meeting of its creditors or any class thereof, for purposes of effecting a moratorium upon or extension or composition of its debts; proposing any such moratorium, extension or composition; or commencing or having filed against it any bankruptcy, reorganization, liquidation or insolvency proceeding under any law in any jurisdiction for the relief of debtors; or if any receiver, trustee, liquidator or custodian is appointed to take possession of any substantial portion of the breaching party's assets.

2.4    **Effect of Termination.**  Termination of this Agreement in whole or in part, for cause, shall be without prejudice to any other remedy otherwise available to the innocent party.

## SECTION 3
## THIRD PARTY PROVIDERS

It is expressly understood that the Promise Parties have and may in the future use third party providers (including Licensors and the Data Center operator) reasonably acceptable to LADMC to provide any or all of the IT Services provided that prior notice is given to LADMC. The Promise Parties do not guarantee the availability of any IT Services provided by a third party; however, subject to Section 11.1, in the event of a disruption in any IT Services provided by a third party that is not caused by the acts or omissions of LADMC or its' personnel, the Promise Parties will use commercially reasonable efforts to procure an alternative provider or to provide such service directly on the same basis which the Promise Parties arrange for such alternative provider or direct provision of service to similarly situated hospitals owned by the Promise Parties or an affiliate of the Promise Parties.

5

## SECTION 4
## SERVICE FEES & TAXES

4.1    **IT Services Fee.**  LADMC shall pay to the Promise Parties fees for IT Services provided under this Agreement in the amounts and on the payment terms provided in Schedule 4.1, attached hereto and incorporated herein by this reference (the "IT Services Fee").

4.2    **Additional Service Fees.**  If LADMC requests Additional Services, the parties will mutually agree on the fees related to such services prior to the provision of any such services and list them in an amendment to Schedule 4.1 (when added, the "Additional Services Fee" and collectively with the IT Services Fee, the "Fees").

4.3    **Taxes.**  LADMC shall pay all sales and use taxes due from the purchase of the Transition Services under applicable law; the Promise Parties shall pay all other taxes.

4.4    **Payment.**  The Promise Parties will invoice LADMC for Fees for each month during the Term on or prior to the first (1st) day of such month. Payment in full shall be made by LADMC to the Promise Parties no later than the date which is 30 days after receipt of such invoice. Fees will be prorated where applicable. LADMC shall not have the right to offset amounts payable to the Promise Parties under this Agreement as a result of outstanding claims, liabilities or obligations asserted by LADMC against the Promise Parties under the Purchase Agreement.

## SECTION 5
## USE OF THE DATA CENTER SYSTEM
## AND SUPPORTED SOFTWARE APPLICATIONS

5.1    **Rights in Data Center System and Supported Software Applications.**  As between the parties, the Promise Parties and their Licensors own all rights, title and interest (including all intellectual property rights) in and to the Supported Software Applications, the Data Center System and all technology and infrastructure used to provide the IT Services, including all updates, upgrades, enhancements and modifications thereto. LADMC shall obtain no rights in any of the foregoing other than the limited right to use the Supported Software Applications as specifically granted in this Agreement. Except for the foregoing, no other right is granted, no other use is permitted, and all other rights are expressly reserved.

5.2    **Supported Software Applications Use License.**  Subject to the Third Party License Agreements, and subject to all of the terms and conditions of this Agreement, the Promise Parties hereby grant to LADMC a limited, nonexclusive, nontransferable, nonsublicensable right and license to access and use the Supported Software Applications during the term of this Agreement solely for purposes of operating the Acute Care Hospital.  Such license shall expire contemporaneously with the expiration or earlier termination of this Agreement.  LADMC shall not copy, decompile or otherwise reverse engineer the Supported Software Applications.  Upon the expiration or the earlier termination of this Agreement, or upon discontinuation as set forth in Section 5.3, LADMC's access to the Supported Software Applications and use of the Data Center System (as applicable) shall be discontinued and

6

LADMC shall return to the Promise Parties or at the Promise Parties' option destroy any software and documentation provided to LADMC by the Promise Parties under this Agreement.

5.3 **Discontinuation of Supported Software Applications**. LADMC may discontinue any of the Transition Services by providing written notice (a "Discontinue Notice") to the Promise Parties. Discontinuation of any IT Service will include discontinuation of payment for any Data Center personnel involved in providing such IT Service during the Term. The date for discontinuation of the Transition Service (the "Discontinuation Date") will be the later of the date specified in the Discontinue Notice or 30 days after delivery of the Discontinue Notice. If no date is specified in the Discontinue Notice, then the Discontinuation Date will be 30 days after delivery of the Discontinue Notice. The Promise Parties will discontinue providing each Transition Service set forth in the Discontinue Notice on the Discontinuation Date, and LADMC will have no obligation to pay for any Transition Service set forth in the Discontinue Notice after the Discontinuation Date. Notwithstanding the foregoing, following the two (2) month period after the Effective Date, LADMC will have the right to discontinue use of the 3M software, Kronos Work Force Management software, Paragon software or Relay Clearance & Insurance software (each in its entirety and as described in Schedule 1.4) or any combination thereof, but not all of them, immediately upon providing written notice to the Promise Parties. For the avoidance of doubt, this Section 5.3 does not permit LADMC to discontinue specific modules or applications within the four software applications listed in the previous sentence of this Section 5.3.

### SECTION 6
### BOOKS AND RECORDS

6.1 **Availability to HHS Secretary and Others**. If required by applicable law, the parties agree that until the expiration of four years after the furnishing of services under this Agreement, the Promise Parties will make available to the Secretary of the United States Department of Health and Human Services (the "Secretary") and the United States Comptroller General, and their duly authorized representatives, this Agreement and all books, documents and records necessary to certify the nature and extent of the costs of the goods and services provided under this Agreement. No attorney-client, accountant-client or other legal privilege shall be deemed to have been waived by the parties by virtue of this provision.

6.2 **Survival.** LADMC's rights under this Section 6 shall survive for a period of five years after expiration or the earlier termination of this Agreement.

### SECTION 7
### LIMITED WARRANTY; DISCLAIMER

7.1 **Limited Warranty.** The Promise Parties represent and warrant that: (a) the Promise Parties will provide the Transition Services in a professional and workmanlike manner, using personnel who are qualified by education, training and/or experience to perform their respective tasks, and (b) the Promise Parties will provide the IT Services (i) in a manner consistent with the level that such IT Services are provided by the Promise Parties for other acute care hospitals operated by affiliates of Success, and (ii) in a manner consistent with the level that such IT Services were provided to the Acute Care Hospital prior to the Effective Date.

7

7.2    **DISCLAIMER.    EXCEPT AS SET FORTH IN SECTION 7.1, THE PROMISE PARTIES MAKE NO OTHER WARRANTIES WITH RESPECT TO THE TRANSITION SERVICES, AND THE PROMISE PARTIES HEREBY DISCLAIM ALL OTHER WARRANTIES, ORAL OR WRITTEN, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR ANY WARRANTIES ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE IN TRADE.**

## SECTION 8
## LIMITATION OF LIABILITY.

8.1    **Limitation of Liability**.

(a)    NONE OF THE PARTIES SHALL HAVE ANY LIABILITY FOR CONSEQUENTIAL, EXEMPLARY, INDIRECT, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT, INCLUDING LOSS OF PROFITS, REVENUES, DATA OR USE, INCURRED BY ANY OTHER PARTY OR ITS AFFILIATES (EVEN IF ANY SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), WHETHER BASED ON CONTRACT, TORT OR ANY OTHER LEGAL THEORY.    THE PROMISE PARTIES' MAXIMUM AGGREGATE LIABILITY TO LADMC, ON THE ONE HAND, AND LADMC'S MAXIMUM AGGREGATE LIABILITY TO THE PROMISE PARTIES, ON THE OTHER HAND, UNDER THIS AGREEMENT SHALL NOT EXCEED AN AMOUNT EQUAL TO THE FEES PAID BY LADMC UNDER THIS AGREEMENT. IN ADDITION, NOTWITHSTANDING THE FOREGOING, WITH RESPECT TO PRIVACY OR SECURITY BREACHES, THE PROMISE PARTIES' MAXIMUM AGGREGATE LIABILITY TO LADMC, ON THE ONE HAND, AND LADMC'S MAXIMUM AGGREGATE LIABILITY TO THE PROMISE PARTIES, ON THE OTHER HAND, SHALL NOT EXCEED TWO MILLION DOLLARS ($2,000,000).

(b)    Section 8.1 above will not apply to (i) the Excluded Liabilities under the Purchase Agreement or (ii)  any claim by a third party (i.e., a person other than the parties to this Agreement or their respective affiliates or assignees) (except for claims relating to privacy or security breaches) or a claim of willful misconduct, gross negligence, criminal activity or fraud by a party to this Agreement or any of its respective affiliates or assignees.

8.2    **LADMC Mitigation.**  LADMC shall adopt such reasonable measures as it deems appropriate to limit its exposure with respect to the potential losses and damages set forth in Section 8.1 above, including, without limitation, examination and confirmation of IT Services results prior to use thereof, provision for identification and correction of errors and omissions, preparation and storage of backup data, replacement of lost or mutilated documents and reconstruction of data.

## SECTION 9
## CONFIDENTIALITY

8

9.1    **Definition**. For the purposes of the Agreement, "Confidential Information" means any software, material, data or business, financial, operational, customer, vendor and other information disclosed by or on behalf of one party (in such capacity, the "Disclosing Party") to the other (in such capacity, the "Receiving Party") that relates to the Disclosing Party or its affiliates that is not available to the general public, whether disclosed before or after the Effective Date. The Supported Software Applications, and all data and information contained therein other than LADMC Data, shall be deemed the Promise Parties' Confidential Information. LADMC Data shall be deemed LADMC's Confidential Information. Notwithstanding anything herein to the contrary, Confidential Information shall not include information that the Receiving Party is: (a) already known to or otherwise in the possession of the Receiving Party at the time of receipt from the Disclosing Party and that was not known or received as the result of violation of any obligation of confidentiality; (b) publicly available or otherwise in the public domain prior to disclosure by a party; (c) rightfully obtained by the Receiving Party from any third party not known to the Receiving Party to be under any confidentiality obligation to the Disclosing Party to keep such information confidential; or (d) developed by the Receiving Party independent of any disclosure hereunder, as evidenced by written records.

9.2    **Obligations**. Each party, in its capacity as a Receiving Party, shall (a) protect the Disclosing Party's Confidential Information with the same degree of care that such party exercises with its own Confidential Information, but in no event less than a reasonable degree of care, (b) not use any of the Disclosing Party's Confidential Information without the express prior written consent of such party except for purposes of performing its obligations and exercising its rights under the Agreement, and (c) not disclose the Disclosing Party's Confidential Information to anyone other than those employees, persons within a party's organization or consultants, subcontractors or professional advisors who need to know such Confidential Information in connection with performance of the Agreement and who are bound by obligations with respect to such Confidential Information that are substantially similar to those set forth in the Agreement. The obligations set forth in this Section 9.2 will survive for a period of two (2) years following expiration or termination of the Agreement.

9.3    **Required Disclosure**. The obligations set forth in Section 9.2 will not prevent a party from complying with the order of a court or administrative body of competent jurisdiction or a government agency that compels disclosure of such Confidential Information, provided that the party receiving such order shall (a) notify the other prior to such disclosure, (b) cooperate with the other party in the event such party elects to legally contest, request confidential treatment, or otherwise seek to avoid or minimize such disclosure and (c) disclose only the information that, in the advice of legal counsel, is required to be disclosed.

9.4    **Return of Confidential Information**. All of a party's Confidential Information, and all copies thereof, shall be and remain the property of the Disclosing Party. Upon the expiration or termination of the Agreement or 15 days of a written request by the Disclosing Party, the Receiving Party shall promptly return or destroy all tangible Confidential Information of the Disclosing Party and any and all copies and reproductions thereof.

9.5    **Protected Health Information**. The terms of Schedule 9.5 (the "BAA") shall govern with respect to any use or disclosure of Protected Health Information (as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). In the event of any

conflict or inconsistency between the terms of the BAA and this Section 9, the terms of the BAA shall govern with respect to any such Protected Health Information (as defined by HIPAA) to the extent of such conflict or inconsistency.

## SECTION 10
## INDEPENDENT CONTRACTOR

The Promise Parties, in performance of this Agreement, are acting as an independent contractor and shall have the exclusive control of the manner and means of performing the work contracted for hereunder.  Personnel supplied by the Promise Parties, whether or not located on LADMC's premises, are not LADMC's employees or agents and shall not hold themselves out as such, and the Promise Parties assume full responsibility for their acts and for compliance with any applicable employment and tax laws with respect to such employees.  Nothing contained in this Agreement shall be construed to create a joint venture or partnership between the parties.

## SECTION 11
## MISCELLANEOUS

11.1  **Force Majeure and Manner of Service.**  If any party's performance is prevented, hindered or delayed by reason of any cause(s) beyond such party's reasonable control which cannot be overcome by reasonable diligence, including without limitation, war, labor disputes, civil disorders, governmental acts, epidemics, terrorist acts, quarantines, embargoes, fires, earthquakes, storms, power failures, equipment failures, transmission failures, or acts of God, such party shall be excused from performance to the extent that it is prevented, hindered or delayed thereby, during the continuance of such cause(s); and such party's obligations hereunder shall be excused so long as and to the extent that such cause(s) prevent or delay performance. The Promise Parties shall not be responsible for delays in connection with the IT Services that are attributable to causes beyond its reasonable control, including limitations upon the availability of telephone transmission facilities or failures of equipment (including but not limited to CPU, terminals, printers, or network equipment) or failure of LADMC to prepare data properly for input into equipment of the Promise Parties (or its affiliates) or applicable Supported Software Applications.

11.2  **Survival.**  Termination of this Agreement shall not affect the rights and obligations of the parties hereunder for any of their respective acts or omissions prior to or on the date of such termination.  After the effective date of such termination, only Section 2.4, Section 4, Section 6, Section 8, Section 9, and Section 11 shall continue to be in full force and effect.

11.3  **Entirety of Agreement.**  This Agreement (including the Schedules hereto) contains the entire understanding between the parties concerning the subject matter of this Agreement and such other documents and instruments and, except as expressly provided for herein or therein, supersede all prior understandings and agreements, whether oral or written, between them with respect to the subject matter hereof and thereof. Except for the incorporated provisions set forth in Section 11.6, this Agreement is intended to be a separate, independent agreement from the Purchase Agreement. In the event of any conflict or inconsistency between this Agreement and the Purchase Agreement with respect to the subject matter of this Agreement, this Agreement shall control.  There are no representations, warranties, agreements,

10

arrangements or understandings, oral or written, between the parties hereto relating to the subject matter of this Agreement and such other documents and instruments which are not fully expressed herein or therein.

11.4   **Successors and Assigns.**  All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; provided, however, that no party hereto may assign any of its rights under this Agreement without the prior written consent of the other party. Notwithstanding the foregoing to the contrary, (a) LADMC may assign (and its permitted assignees may assign) any or all of their rights, interests and obligations under this Agreement, without consent to one or more of their affiliates, and will provide written notice thereof to the Promise Parties, and (b) the Promise Parties may assign any or all of their rights, interests and obligations under this Agreement, without consent, upon providing written notice thereof to LADMC, to any entity which acquires substantially all of the assets of, or a majority of the equity in, St. Alexius. Notwithstanding any provision to the contrary contained in this Agreement, any such assignment described in the immediately preceding sentence shall not relieve the assigning party of any of its obligations to the other parties under this Agreement.

11.5   **Non-Solicitation**. During the term of this Agreement and for a period of one (1) year following the expiration or earlier termination of this Agreement, LADMC shall not, and shall not permit any of its affiliates to, directly or indirectly, solicit for employment or retention as an independent contractor or agent any employee or consultant of the Promise Parties to which LADMC was introduced pursuant to this Agreement, or encourage any such employee or consultant to leave such employment or consulting arrangement, except pursuant to a general solicitation which is not directed specifically to any such employee or consultant; provided, however, that nothing in this Section 11.5 shall prevent LADMC or any of its affiliates from (a) soliciting for employment any such employee or consultant whose employment or consulting arrangement with the Promise Parties has (i) been terminated by the Promise Parties or (ii) ceased due to such employee's resignation so long as such resignation is unrelated to LADMC's solicitation activities; (b) general solicitations for employment (including the use of employment agencies not solely directed to target employees of the Promise Parties) conducted by or on behalf of LADMC or any of its affiliates and any resulting employment; or (c) considering for hire or hiring or otherwise engaging any such employee or consultant who apply for employment or a consulting arrangement with LADMC or any of its affiliates without direct or indirect solicitation by LADMC or any of its affiliates.

11.6   **Governing Law**.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.  The parties hereby waive their right to claim in any proceeding involving this Agreement that the law of any jurisdiction other than the State of Delaware shall apply to such dispute; and the parties hereby covenant that they shall assert no such claim in any dispute arising under this Agreement.

11.7   **Amendments**.  This Agreement may not be amended other than by written instrument signed by the parties hereto.

11.8   **Notices.**  Any notice, demand or communication required, permitted, or desired to be given hereunder shall be deemed effectively given when personally delivered, when received

by facsimile or overnight courier, or five (5) calendar days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, to each party's address as set forth in or otherwise pursuant to Section 14.6 of the Purchase Agreement.

11.9    **Confidentiality of Agreement**. The information contained in this Agreement is confidential information under the terms of the Confidentiality Agreement (as defined in the Purchase Agreement).

11.10    **Usage**.    The rules of interpretation in Section 1.2 of the Purchase Agreement apply to the interpretation of this Agreement. This Agreement shall be construed according to its fair meaning and as if prepared by all parties hereto. The section and other headings contained in this Agreement and the Schedules to this Agreement are included for the purpose of convenient reference only and shall not restrict, amplify, modify or otherwise affect in any way the meaning or interpretation of this Agreement or such Schedules.

11.11    **Third Party Beneficiary**.    None of the provisions contained in this Agreement are intended by the parties, nor shall they be deemed, to confer any benefit on any person not a party to this Agreement.

11.12    **Counterparts**.    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement, binding on all of the parties hereto.    The parties agree that facsimile or electronic .PDF copies of signatures shall be deemed originals for all purposes hereof and that a party may produce such copies, without the need to produce original signatures, to prove the existence of this Agreement in any proceeding brought hereunder.

11.13    **No Waiver**.    Any term, covenant or condition of this Agreement may be waived at any time by the party which is entitled to the benefit thereof but only by a written notice signed by the party expressly waiving such term or condition.    The subsequent acceptance of performance hereunder by a party shall not be deemed to be a waiver of any preceding breach by any other party of any term, covenant or condition of this Agreement, other than the failure of such other party to perform the particular duties so accepted, regardless of the accepting party's knowledge of such preceding breach at the time of acceptance of such performance.    The waiver of any term, covenant or condition shall not be construed (a) as a waiver of any other term, covenant or condition of this Agreement or (b) as a waiver of any subsequent breach of the same term, covenant or condition.

11.14    **Severability**.    If any term, provision, condition or covenant of this Agreement or the application thereof to any party or circumstance is held to be illegal, invalid or unenforceable under any present or future Law, and if the rights or obligations of LADMC or the Promise Parties under this Agreement will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance here from, and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this

12

Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

   11.15  **Submission to Jurisdiction; Consent to Service of Process.**  Without limiting any party's right to appeal any order of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), (a) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, and (b) subject to any objections regarding the subject matter jurisdiction of the Bankruptcy Court and any objections to the constitutional authority of the Bankruptcy Court to enter a final order in a particular proceeding, any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and will receive notices at such locations as indicated in Section 14.6 of the Purchase Agreement; provided, however, that if the Bankruptcy Cases have closed or are not commenced, each of the parties (i) irrevocably agrees that all proceedings (whether in contract or tort, at law or in equity or otherwise) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement will be exclusively resolved in the United States District Court for the District of Delaware sitting in New Castle County or the courts of the State of Delaware sitting in New Castle County and any appellate court from any thereof, (ii) irrevocably agrees that, to the fullest extent permitted by applicable law, service of process, summons, notice or document by registered mail addressed to them at their respective addresses provided in Section 14.6 of the Purchase Agreement will be effective service of process against it for any such proceeding brought in any such court, and (iii) waives, to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of, and the defense of an inconvenient forum to the maintenance of, any such proceeding in any such court.  Each of the parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the Effective Date.

**LADMC:**

**L.A. Downtown Medical Center LLC**, a California limited liability company

By: _____

Name: _____

Its: _____

**PROMISE PARTIES:**

**Success Healthcare, LLC**, a California limited liability company

By:_____

Name:_____

Its:_____

**Promise Healthcare, Inc.**, a Florida corporation

By:_____

Name:_____

Its:_____

**St. Alexius Hospital Corporation #1**, a Missouri corporation

By:_____

Name:_____

Its:_____

## SCHEDULE 1.2

### IT SERVICES

The IT Services shall consist of the following services:

a.      Provision of the Supported Software Applications which the Promise Parties run from the Data Center;

b.      Support services with respect to the Supported Software Applications as set forth in Section 1.4(b);

c.      Oversight over LADMC's provision of the 2017 Security Risk Assessment Report, which regulates hospital compliance and the IT service requirements, including general operation, levels of IT complexity, software inventory and connectivity diagrams; and

d.      Oversight over the email exchange server details. To the extent the IT Services includes the provision of information and/or reports relating to the operation of the Acute Care Hospital, the Promise Parties shall not be required to provide any reports to LADMC which are different than the reports which the Promise Parties provided with respect to the Acute Care Hospital immediately prior to the Effective Date ("Custom Reports").  To the extent LADMC requires that the Promise Parties provide and/or prepare any Custom Reports, LADMC shall make such request in writing to the Promise Parties (which writing shall describe the categories of information to be included in any such report).  LADMC shall bear any and all costs associated with the provision and preparation of any Custom Reports (all such costs shall be in addition to any IT Services Fee described in Schedule 4.1 of this Agreement).

4841-7985-4193v.10 0110030-000002

## SCHEDULE 1.4

## SUPPORTED SOFTWARE APPLICATIONS

| Software Application Name | Function | Status |
|---|---|---|
| 3M Software | Coding, Classification and Reimbursement System. | Active |
| Paragon Accounts Payable | Provides management of multiple discount rates, minimum dollar order limits and payment cycles. | Active |
| Paragon Clinical Care Station | Automates the workflow for the patient care planning process and helps reduce the time required to create and document patient care interventions. Enables caregivers to collect and evaluate patient assessments, vitals and I&O as well as automating flow sheets and therapy assessments. | Active |
| Paragon Computerized Physician Order Entry | Integrated, physician-friendly solution providing direct order management and clinical decision support. | Active |
| Paragon Emergency Department Management | Provides Emergency Department documentation for physicians, nurses and mid-level providers, while also supplying tracking board, registration, triage and reporting capabilities. | Active |
| Paragon General Ledger | Provides inquiry, audit trails and automated entries to help organizations analyze current performance and project future trends. | Active |
| Paragon Laboratory Management | Helps manage workflow and automate test reporting and quality assurance information. | Active |
| Paragon Materials Management | Improves control over inventory management with tracking and comprehensive reporting. | Active |
| Paragon Medical Records | Offers an intuitive, cost-effective process for maintaining and updating medical records. | Active |
| Paragon Medication Administration | Offers a point-of-care solution that helps support medication safety while systematically documenting the administration process. | Active |
| Paragon Medication Reconciliation | Integrated solution to review medications, communicate changes and place orders. | Active |
| Paragon Microbiology | Helps manage the specialized department workflow in a paperless environment. | Active |

1

| Software Application Name | Function | Status |
|---|---|---|
| Paragon Operating Room Management | Provides OR and resource scheduling, real-time perioperative charting at the point of care; helps users manage surgical supply inventory; captures charges and provides robust reporting. | Active |
| Paragon Order Management, Patient View, Therapy Management | Facilitates order entry, charge capture, patient profile information and order interactions for all patient types. | Active |
| Paragon Patient Management | Offers a complete patient accounting application, including billing and collection that can interface with ambulatory EMRs and centralized collections. | Active |
| Paragon Patient Supply Charging | Helps reduce revenue loss from undocumented patient supplies and improve inventory management. | Active |
| Paragon Patient View | Patient View puts a full view of the patient's status at a clinician's fingertips. It is an innovative information viewing and analysis tool that provides on-line, real-time access to a repository of clinical and patient demographic information. Using this application, caregivers can view, trend, and graph patient information across visits from a hospital workstation, or a home or office PC. | Active |
| Paragon Pharmacy | Combines patient demographic and clinical information with specific drug information to help manage drug therapy. | Active |
| Paragon Physician Documentation | Integrated solution that supports care communication and charge capture via the physician's natural workflow. | Active |
| Paragon Radiology | Enables hospitals to manage and report on all radiology procedures performed within their organizations. | Active |
| Paragon Registration | Provides access to patient admission, registration and discharge information across episodes of care. | Active |
| Paragon Release of Information | Helps the Health Information Management department track the release of patient health information data. | Active |
| Paragon Resource Scheduling | Allows users to better manage and control resources through coordinated scheduling of patients for clinics, procedures or exams. | Active |
| Paragon Print Services | Printer, forms, document management. | Active |
| Paragon WebStation for Executives | Provides a personalized gateway and decision support tool to a broad array of enterprise-wide information. | Active |

2

| Software Application Name | Function | Status |
|---|---|---|
| Paragon WebStation for Physicians | Web-based information presentation and workflow management solution that allows clinicians to view clinical and administrative information, document care, and place orders for patients. | Active |
| Pathways Contract Management | Contracting solution that helps health plans minimize the financial risk of new care delivery and reimbursement strategies, expedite the contracting process, and reduce administration costs. It creates a single, electronic repository of contract information coupled with workflow tools for automating and streamlining the entire contract management lifecycle. | Active |
| Paragon Point of Care Interface | Data Innovations Instruments Interface, BioRad Unity Real-time. | Active |
| Paragon Automated Daily Close | Enables unattended backup and nighttime operation. | Active |
| Paragon Utilization Review | Automates proactive inpatient case management from admission through discharge to help reduce loss from unpaid patient days. | Active |
| Kronos Work Force Management | Payroll management system. | Active |
| Relay Clearance & Insurance | Insurance eligibility verification. | Active |

3

## SCHEDULE 1.5

## SYSTEMS SECURITY POLICY

See attached SLMC IS Policy-Procedure Manual (Approved 020818)

4841-7985-4193v.10 0110030-000002

## SCHEDULE 4.1

## IT SERVICE FEE

| Vendor/Services | Monthly | Annual | Bi-annual | Comments |
|---|---|---|---|---|
| Data Center Staff (St. Louis, MO) | | | | |
| Traci Brown | 2,603.00 | 31,237.50 | 15,618.00 | |
| Wendy Willman | 1,741.00 | 20,892.50 | 10,446.00 | |
| Jacob Dunn | 2,612.00 | 31,355.00 | 15,677.00 | |
| Kathy Cancienne | 709.00 | 8,512.50 | 4,256.00 | |
| Chris Wilding | 979.00 | 11,756.25 | 5,878.00 | |
| Karen Mangicaro | 426.00 | 5,113.75 | 2,556.00 | |
| Data Center Staff (Boca Raton, FL) | | | | |
| Brad Hawes/Tony Nokta | 12,500.00 | 150,000.00 | 75,000.00 | Kronos Administration & Service |
| | | | | |
| | | | | |
| **Total SLMC Labor Burden** | **21,572.00** | **258,867.50** | **129,433.00** | **Total salary, benefits, company liabilities** |
| | | | | |
| Paragon | | | | |
|     Service Fee | 1,066.00 | 12,800.00 | 6,400.00 | |
|     License Fee | 16,666.00 | 200,000.00 | 100,000.00 | |
| | | | | |
| Relay (Clearance & Insurance) | | | | |
| License & Service Cost | SEE BELOW | SEE BELOW | SEE BELOW | |
| Subscription & Processing Fee | 10,615.00 | 127,389.60 | 63,694.00 | $0.5104 per additional transaction |
|     Printing Fees | | | | |
|     Standard Size | 795.00 | 9,547.20 | 4,773.00 | $0.17/Standard and minimum volume of 3600 ($612.00 is the monthly minimum) |
|     Letter Size | 520.00 | 6,242.50 | 3,121.00 | $0.16/Ltr and minimum volume of 2501 (400.16 is the monthly minimum) |
|     Additional Pages | 32.00 | 390.00 | 195.00 | Each additional page - requirement of less than or equal to 25,000 pages/month ($0.10/Page) |
|     Enclosures | 32.00 | 390.00 | 195.00 | Requirement of less than or equal to 25,000 pages/month ($0.04/Page |
| Transaction Fees | | | | |
|     RelayAssurance Plus MDE | 1,830.00 | 21,964.80 | 10,982.00 | $0.2816 per transaction and monthly minimum volume is 5000 |
|     RelayAssurance Plus paper claim | 72.00 | 873.60 | 436.00 | $0.2816 per transaction and monthly minimum volume is 0. Estimated 200 |
|     RelayAssurance Plus HCD | 100.00 | 1,201.20 | 600.00 | $0.3872 per transaction and monthly minimum volume is 0. Estimated 200 |
|     RelayClearance EDI - eligibility and support | 3,373.00 | 40,482.00 | 20,241.00 | Includes up to 10,000 transactions |
|     One Time Fees | 885.00 | 10,622.30 | 5,311.00 | |
| | | | | |
| Kronos Workforce | 390.00 | 4,680.00 | 2,340.00 | |

5

| Management | | | | |
|---|---|---|---|---|
| | | | | |
| CareBridge Service Connection | 500.00 | 6,000.00 | 3,000.00 | Allscripts Support Access to Paragon EMR |
| Windstream Data Services | 4,563.00 | 54,756.00 | 27,378.00 | Transport VPN for Paragon connectivity to data center in St. Louis, MO |
| | | | | |
| **Total Service Fees** | **40,378.00** | **484,539.20** | **242,269.00** | **Service Fees** |
| | | | | |
| | | | | |
| **Total Fee** | **61,950.00** | **743,406.70** | **371,703.00** | **Service Fees plus Labor Burden** |

6

**SCHEDULE 9.5**

**BUSINESS ASSOCIATE ADDENDUM**

1.    <u>Scope and Purpose</u>.  L.A. DOWNTOWN MEDICAL CENTER LLC, a California limited liability company ("Covered Entity"), and SUCCESS HEALTHCARE, LLC, a California limited liability company, and SUCCESS HEALTHCARE 1, LLC, a California limited liability company (collectively, "Business Associate"), have entered into a Transition Services Agreement dated on or about _____ ___, 2018 (the "TSA**"**). Pursuant to the TSA, Business Associate will create, receive, maintain, or transmit Protected Health Information from or on behalf of Covered Entity, which information is subject to protection under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the Health Information Technology for Economic and Clinical Health Act (the "HITECH Act"), and related regulations (the "HIPAA Regulations").  The terms and provisions of this addendum (the "<u>BA Provisions</u>") shall control with respect to such Protected Health Information and shall supersede any conflicting or inconsistent terms and provisions of the TSA, including all exhibits or other attachments thereto and all documents incorporated therein by reference, to the extent of such conflict or inconsistency.

<u>**Definitions**</u>

2.    <u>General</u>.  Terms used, but not otherwise defined, in these BA Provisions shall have the same meaning given to those terms by HIPAA, the HITECH Act, and HIPAA Regulations as in effect or as amended from time to time.

3.    <u>Specific</u>.

3.1    **Electronic Protected Health Information**.  "Electronic Protected Health Information" shall have the same meaning as the term "electronic protected health information" in 45 CFR § 160.103, limited to the information that Business Associate creates, receives, maintains, or transmits from or on behalf of Covered Entity.

3.2    **Individual.** "Individual" shall have the same meaning as the term "individual" in 45 CFR § 160.103 and shall include a person who qualifies as a personal representative in accordance with 45 CFR § 164.502(g).

3.3    **Privacy Rule.** "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 CFR Part 164, Subpart E.

3.4    **Protected Health Information**. "Protected Health Information" or "PHI" shall have the same meaning as the term "protected health information" in 45 CFR § 160.103, limited to the information created or received by Business Associate from or on behalf of Covered Entity.

3.5    **Secretary.** "Secretary" shall mean the Secretary of the Department of Health and Human Services or his designee.

7

3.6    **Security Rule.** "Security Rule" shall mean the Security Standards at 45 CFR Part 160 and Subparts A and C of Part 164.

3.7    **State Law**. "State Law" shall mean the statutes and regulations of the state of California relating to the privacy and security of Protected Health Information, personal information, or similar information.

### Obligations and Activities of Business Associate

4.1.    **Use and Disclosure**. Business Associate agrees not to use or disclose Protected Health Information other than as permitted or required by these BA Provisions or as Required By Law. Business Associate shall comply with these BA Provisions and all present and future provisions of HIPAA, the HITECH Act, the HIPAA Regulations and State Law that relate to the privacy and security of Protected Health Information and that are applicable to Business Associate. Without limiting the generality of the foregoing, Business Associate shall not directly or indirectly receive remuneration in exchange for disclosing PHI received from or on behalf of Covered Entity except as permitted by HITECH Act § 13405, the HIPAA Regulations and State Law, nor shall Business Associate use PHI for marketing purposes, attempt to re-identify PHI or Use or Disclose PHI in any manner that would violate State Law, HIPAA, the HITECH Act, or the HIPAA Regulations, regardless of whether such action is on behalf of or permitted by Covered Entity.

4.2.    **Appropriate Safeguards**. Business Associate agrees to use appropriate safeguards to prevent the use or disclosure of the Protected Health Information other than as provided for by these BA Provisions. Without limiting the generality of the foregoing sentence, Business Associate will:

(a)    Implement Administrative, Physical, and Technical Safeguards that reasonably and appropriately protect the Confidentiality, Integrity and Availability of Electronic Protected Health Information and shall comply with the Security Rule with respect to Electronic Protected Health Information;

(b)    Promptly report to Covered Entity any Security Incident of which Business Associate becomes aware;

(c)    Without unreasonable delay, but in no even later than five business days following Discovery, notify Covered Entity of a Breach of Unsecured Protected Health Information in accordance with 45 C.F.R. § 164.410. A Breach is considered "discovered" as of the first day on which the Breach is known, or reasonably should have been known, to Business Associate or any employee, officer or agent of Business Associate, other than the individual committing the Breach. In addition, Business Associate shall comply with applicable State Law regarding notification of data breaches.

4.3.    **Reporting**. Business Associate agrees to report to Covered Entity any use or disclosure of Protected Health Information not permitted by these BA Provisions of which Business Associate becomes aware without unreasonable delay, but in no event later than five

8

business days following such awareness.

4.4.    **Mitigation.** Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of Protected Health Information by Business Associate or its employees, officers, agents, or Subcontractors in violation of the requirements of these BA Provisions (including, without limitation, any Security Incident or Breach of Unsecured Protected Health Information). Business Associate agrees to reasonably cooperate and coordinate with Covered Entity in the investigation of any violation of the requirements of these BA Provisions and/or any Security Incident or Breach. Business Associate shall also reasonably cooperate and coordinate with Covered Entity in the preparation of any reports or notices to the Individual, a regulatory body or any third party required to be made under HIPAA, HIPAA Regulations, the HITECH Act, or any other Federal or State laws, rules or regulations, provided that any such reports or notices shall be subject to the prior written approval of Covered Entity.   This Section 4.4 shall survive the termination of these BA Provisions.

4.5.    **Subcontractors**. Business Associate shall ensure that any Subcontractor (including, without limitation, a Subcontractor that is an agent under applicable law) that creates, receives, maintains, or transmits Protected Health Information on behalf of Business Associate enters into a written agreement meeting the requirements of 45 C.F.R. §§ 164.504(e) and 164.314(a)(2) that obligates the Subcontractor to comply with the same restrictions and conditions that apply through these BA Provisions to Business Associate with respect to such Protected Health Information.

4.6.    **Access to Designated Record Sets**. To the extent that Business Associate possesses or maintains Protected Health Information in a Designated Record Set, Business Associate agrees to provide access, at the request of Covered Entity, and in the time and manner designated by Covered Entity, to Protected Health Information in a Designated Record Set, to such Covered Entity or, as directed by Covered Entity, to an Individual in order to meet the requirements under HIPAA Regulations. If an Individual makes a request for access to Protected Health Information directly to Business Associate, Business Associate shall notify Covered Entity of the request within three (3) business days of such request and will cooperate with Covered Entity and allow Covered Entity to send the response to the Individual.

4.7.    **Amendments to Designated Record Sets**. To the extent that Business Associate possesses or maintains Protected Health Information in a Designated Record Set, Business Associate agrees to make any amendment(s) to Protected Health Information in a Designated Record Set that Covered Entity directs or agrees to pursuant to HIPAA Regulations at the request of Covered Entity or an Individual, and in the time and manner designated by such Covered Entity. If an Individual makes a request for an amendment to Protected Health Information directly to Business Associate, Business Associate shall notify Covered Entity of the request within three business (3) days of such request and will cooperate with Covered Entity and allow Covered Entity to send the response to the Individual.

4.8.    **Access to Books and Records**. Business Associate agrees to make its internal practices, books, and records, including policies and procedures and Protected Health Information, relating to the use and disclosure of Protected Health Information received from, or

9

created or received by Business Associate on behalf of, Covered Entity available to the Secretary, in a time and manner designated by the Secretary, for purposes of the Secretary determining Covered Entity's compliance with the Privacy Rule.

4.9.    **Accountings**. Business Associate agrees to document such disclosures of Protected Health Information and information related to such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with HIPAA, HIPAA Regulations and the HITECH Act.

4.10.    **Requests for Accountings**. Business Associate agrees to provide to Covered Entity or an Individual, in the time and manner designated by Covered Entity, information collected in accordance with Section 4.9 of these BA Provisions, to permit Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with HIPAA, HIPAA Regulations and the HITECH Act. If an Individual makes a request for an accounting directly to Business Associate, Business Associate shall notify Covered Entity of the request within three (3) business days of such request and will cooperate with Covered Entity and allow Covered Entity to send the response to the Individual.

4.11.    **Minimum Necessary Standard**. To the extent required by the "minimum necessary" requirements of HIPAA, Business Associate shall only request, use and disclose the minimum amount of PHI necessary to accomplish the purpose of the request, use or disclosure.

4.12.    **Covered Entity's Obligations**. To the extent that Business Associate is to carry out one or more of Covered Entity's obligations under the Privacy Rule, Business Associate shall comply with the requirements of the Privacy Rule that apply to the Covered Entity in the performance of such obligations.

## Permitted Uses and Disclosures by Business Associate

5.1.    **TSA**. Except as otherwise limited in these BA Provisions, Business Associate may use or disclose Protected Health Information to perform functions, activities, or services for, or on behalf of, Covered Entity as specified in the TSA, provided that such use or disclosure would not violate HIPAA, HIPAA Regulations, the HITECH Act or State Law if done by Covered Entity or the minimum necessary policies and procedures of Covered Entity.

5.2.    **Use for Administration of Business Associate**. Except as otherwise limited in these BA Provisions, Business Associate may use Protected Health Information for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate.

5.3.     **Disclosure for Administration of Business Associate**. Except as otherwise limited in these BA Provisions, Business Associate may disclose Protected Health Information for the proper management and administration of the Business Associate, provided that (i) disclosures are Required by Law, or (ii) Business Associate obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as Required by Law or for the purpose for which it was disclosed to the person, and the person notifies the Business Associate of any instances of which it is aware in

10

which the confidentiality of the information has been breached.

## **Obligations of Covered Entity**

6.1.    **Notice of Privacy Practices.** Covered Entity shall provide Business Associate with a copy of its Notice of Privacy Practices, as well as any amendments to such notice that such Covered Entity may adopt from time to time.

6.2.    **Changes in Authorization or Permission.** Covered Entity shall provide Business Associate with any changes in or revocation of any permission by an individual to disclose the individual's PHI, if such changes affect Business Associate's permitted or required uses and or disclosures.

6.3.    **Permissible Requests**. Covered Entity shall not request Business Associate to use or disclose PHI in any manner that would not be permissible under HIPAA if done directly by Covered Entity (except as provided in 5.2 and 5.3 of the BA Provisions).

6.4.    **Minimum Necessary**. When Covered Entity discloses PHI to Business Associate, Covered Entity shall provide the minimum amount of PHI necessary for the accomplishment of Business Associate's purpose.

6.5.    **Permissions; Restrictions**. Covered Entity warrants that it has obtained and will obtain any consents, authorizations and/or other legal permissions required under HIPAA and other applicable law for the disclosure of PHI to the Business Associate. Covered Entity shall notify the Business Associate of any changes in, or revocation of, the permission by an Individual to use or disclose his or her PHI, to the extent that such changes may affect the Business Associate's use or disclosure of PHI.

## **Term and Termination**

7.1.    **Term**. These BA Provisions shall be effective as of the date of the TSA and shall terminate upon the earlier of (i) the expiration or termination of the TSA or (ii) termination in accordance with Section 7.2.

7.2.    **Termination for Cause**. Upon Covered Entity's knowledge of a material breach by Business Associate of the terms of these BA Provisions, Covered Entity shall either:

(a)    Provide an opportunity for Business Associate to cure the breach or end the violation. If Business Associate does not cure the breach or end the violation within the time specified by Covered Entity, Covered Entity shall terminate: (i) these BA Provisions; (ii) all of the provisions of the TSA that involve the creation, receipt, maintenance, or transmission of Protected Health Information by Business Associate; and (iii) such other provisions, if any, of the TSA as Covered Entity designates in its sole discretion; or

(b)    If Business Associate has breached a material term of these BA Provisions and cure is not possible, immediately terminate: (i) these BA Provisions; (ii) all of the provisions of the TSA that involve the creation, receipt, maintenance, or transmission of Protected Health Information by Business Associate; and (iii) such other provisions, if any, of the TSA as Covered

4841-7985-4193v.10 0110030-000002

Entity designates in its sole discretion.

### 7.3. Effect of Termination.

(a)    Except as provided in this Section 7, upon termination of these BA Provisions, for any reason, Business Associate shall return or destroy all Protected Health Information received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision shall apply to Protected Health Information that is in the possession of Subcontractors or agents of Business Associate. Business Associate shall retain no copies of the Protected Health Information.

(b)    In the event that Business Associate determines that returning or destroying the Protected Health Information is infeasible, Business Associate shall provide to Covered Entity notification of the conditions that make return or destruction infeasible. Upon mutual agreement of the Parties that return or destruction of Protected Health Information is infeasible, Business Associate shall extend the protections of these BA Provisions to such Protected Health Information and limit further uses and disclosures of such Protected Health Information to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such Protected Health Information.  This Section 7.3(b) shall survive the termination of these BA Provisions.

### Miscellaneous

8.1.    **Regulatory References.** A reference in these BA Provisions to a section in HIPAA, HIPAA Regulations, the HITECH Act or State Law means the section as in effect or as amended or modified from time to time, including any corresponding provisions of subsequent superseding laws or regulations.

8.2.    **Amendment**. The Parties agree to take such action as is necessary to amend the TSA from time to time as is necessary for Covered Entity to comply with the requirements of HIPAA, the HIPAA Regulations and the HITECH Act.

8.3.    **Interpretation.** Any ambiguity in these BA Provisions shall be resolved to permit Covered Entity and Business Associate to comply with HIPAA, the HIPAA Regulations, the HITECH Act and State Law. If there is any conflict between the HIPAA Regulations and State Law, the most stringent requirements shall control the Parties' obligations under the TSA and these BA Provisions.

8.4.    **Miscellaneous**. In the event of a conflict or inconsistency between these BA Provisions and the terms of the TSA, these BA Provisions shall prevail to the extent of such conflict or inconsistency. These BA Provisions supersede and replaces any former business associate agreement or addendum entered into by the parties.

8.5.    **No Third Party Beneficiaries**. The parties have not created and do not intend to create by this Agreement any third party rights, including, but not limited to, third party rights for Covered Entity's patients.