# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
                                 :

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| PROMISE HEALTHCARE GROUP, LLC, *et al.*,[1] | : | Case No. 18-12491 (CSS) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | **Hearing Date: Jan. 22, 2019, at 10:00 a.m. (ET)** |
| | : | **Obj. Deadline: Jan. 9, 2019 at 4:00 p.m. (ET)** |

---------------------------------------------------------------x

## DEBTORS' MOTION FOR ORDERS: (I)(A) AUTHORIZING ENTRY INTO STALKING HORSE PURCHASE AGREEMENT FOR THE SALE OF SUBSTANTIALLY ALL ASSETS OF CERTAIN OF THE DEBTORS, (B) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS, (C) SCHEDULING A HEARING TO CONSIDER APPROVAL OF THE SALE OF ASSETS, (D) APPROVING FORM AND MANNER OF NOTICE OF SALE, AND (E) GRANTING RELATED RELIEF; AND (II)(A) AUTHORIZING AND APPROVING SALE OF SUBSTANTIALLY ALL ASSETS OF CERTAIN OF THE DEBTORS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Professional Rehabilitation Hospital, L.L.C. (5340), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179), Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc. (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc. (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), St. Alexius Hospital Corporation #1 (2766), St. Alexius Properties, LLC (4610), Success Healthcare 1, LLC (6535), Success Healthcare 2, LLC (8861), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766). The mailing address for the Debtors, solely for purposes of notices and communications, is 999 Yamato Road, 3rd FL, Boca Raton, FL 33431.

Promise Healthcare Group, LLC ("***Promise***") and its affiliated debtors and debtors in possession (collectively, the "***Debtors***") in the above-captioned chapter 11 cases (the "***Chapter 11 Cases***") file this motion (this "***Motion***") for entry of orders substantially in the form attached to this Motion as **Exhibit A** (the "***Bidding Procedures Order***") and following the conclusion of an Auction (as defined below), in the form attached to this Motion as **Exhibit B** (the "***Sale Order***"): (a) authorizing and approving the Bidding Procedures attached to the Bidding Procedures Order as **Exhibit 2** (the "***Bidding Procedures***"), authorizing and approving certain assumption and assignment procedures, scheduling an auction and a hearing to consider approval of the sale of certain assets of the Debtors, in accordance with and subject to the Bidding Procedures, approving the form and manner of notice of the foregoing (the "***Notice Procedures***"), authorizing and approving Bid Protections in the form of (i) a break-up fee in the amount of $1,890,000, (ii) expense reimbursement in an amount up to $250,000, (iii) an initial overbid at least greater than $2,750,000 higher than the Purchase Price (collectively, "***Bid Protections***"), and granting related relief; and (b) authorizing the sale of certain assets of the Debtors free and clear of all liens, claims, interests, and encumbrances, authorizing the assumption, sale and assignment of certain executory contracts and unexpired leases, and granting related relief. In support of the Motion, the Debtors rely on the *Declaration of Andrew Hinkelman in Support of Bidding Procedures and Sale of Select Assets* attached to this Motion as **Exhibit C** and incorporated by reference (the "***Hinkelman Declaration***"). In further support of the Motion, the Debtors respectfully represent:

## PRELIMINARY STATEMENT

1.      Since July 23, 2018, the Debtors have engaged in a robust marketing process, which has resulted in formal bids for various of the Debtors' assets.

2.      To date, the Debtors have negotiated and executed, subject to approval by this Court, an asset purchase agreement (the "*Select Purchase Agreement*") with Select Medical Corporation (the "*Select Purchaser*") for substantially all assets (collectively, the "*Select Assets*") of Promise Hospital of Florida at the Villages, Inc., HLP Properties at the Villages, L.L.C., Promise Properties of Lee, Inc., Promise Hospital of Lee, Inc., Promise Hospital of Dade, Inc., and Promise Properties of Dade, Inc. (collectively, the "*Select Sellers*").

3.      The Select Purchase Agreement contemplates the Select Purchaser's offer will remain subject to higher and better bids, in accordance with and subject to the Bidding Procedures.

4.      In addition, to incentivize the Select Purchaser to serve as the "stalking horse" bidder in the sale process in respect of the Select Assets, the Debtors have agreed to the Bid Protections, as set forth in more detail below.

5.      The relief requested in this Motion will best position the Debtors to successfully effect sales resulting in the sale of the Select Assets for the benefit of the Debtors, the Debtors' estates, creditors of the Debtors' estates, and other parties in interest.

6.      As set forth below, the Select Purchase Agreement represents the highest or otherwise best offer for the Select Assets; but, the Debtors believe it is prudent and in the best interest of the Debtors, the Debtors' estates, creditors of the Debtors' estates, and other parties in interest to market-test the Select Purchase Agreement to assure the Debtors obtain the highest or otherwise best recovery from the Select Assets as possible.

7.      For these reasons and as set forth in greater detail below, the relief sought by this Motion should be granted.

## JURISDICTION, VENUE, AND STATUTORY BASES FOR RELIEF

8.      The Court has jurisdiction over the Debtors and property of the Debtors' estates and jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to the Motion, if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9.      Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

10.      The statutory bases for the relief requested by this Motion are sections 105, 363, 365, 503, and 507 of title 11 of the United States Code (the "***Bankruptcy Code***"), Rules 2002, 6004, 6006, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Local Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***").

## BACKGROUND

11.      On November 5, 2018 (the "***Petition Date***"), each of the Debtors commenced the Chapter 11 Cases. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases. An official committee of unsecured creditors (the "***Committee***") was appointed on November 14, 2018.

12.     A detailed background of the Debtors' businesses and operations, as well as the events leading to the filing of the Chapter 11 Cases is set forth in the *Declaration of Andrew Hinkelman in Support of First Day Relief* (D.I. 18).

## RELIEF REQUESTED

13.     By this Motion, the Debtors seek entry of: (i) the Bidding Procedures Order (a) authorizing the Debtors to enter into the Select Purchase Agreement, (b) approving the Bidding Procedures and Bid Protections, (c) scheduling an auction, (d) setting a hearing to consider approval of a sale of the Select Assets, (e) approving the Assumption Procedures (as defined below), (f) approving the form of Notices and Notice Procedures, and (g) granting related relief; and (ii) the Sale Order (x) authorizing the sale of all or a portion of the Select Assets free and clear of all liens, claims, interests, and encumbrances, (y) authorizing the assumption, sale and assignment of executory contracts and unexpired leases designated by the bidder submitting the highest or otherwise best bid to acquire assets and assume and purchase related contracts and leases, and (z) granting related relief.

## BACKGROUND REGARDING MARKETING AND SALE EFFORTS

14.     The Debtors have undertaken robust marketing efforts with respect to the Select Assets and the Debtors' proposed Bidding Procedures will market-test the results of the Debtors' efforts to sell the Select Assets, ensuring maximum recoveries for the Debtors, Debtors' estates, creditors of the Debtors' estates, and all parties in interest.

**I.     The Select Assets.**

15.     By this Motion, the Debtors seek authority to sell the Select Assets.

16.     As set forth above, the Select Assets consist of substantially all assets of the Select Sellers – Promise Hospital of Florida at the Villages, Inc., HLP Properties at the Villages,

L.L.C., Promise Properties of Lee, Inc., Promise Hospital of Lee, Inc., Promise Hospital of Dade, Inc., and Promise Properties of Dade, Inc..

17.     The purchase price for the Select Assets under the Select Purchase Agreement is $63,000,000, subject to certain adjustments as provided in the Select Purchase Agreement, which will be subject to higher or otherwise better offers pursuant to and in accordance with the Bidding Procedures.

**II.      The Debtors' marketing efforts have been robust.**

18.     Prior to the Petition Date, the Debtors engaged Houlihan Lokey ("**Houlihan**") to market for sale, among other things, the Select Assets. As set forth in this Motion and further described in the Hinkelman Declaration, Houlihan has undertaken a robust marketing process to obtain purchasers and potential bids for all or a portion of the Select Assets.

19.     On July 23, 2018, Houlihan commenced outreach to potential interested parties comprising financial sponsors, strategic operators, and healthcare REITs.

20.     In total, eighty-three (83) parties were contacted—fifty-eight (58) financial sponsors, nineteen (19) strategic operators, and six (6) REITs, in addition to discussions between Houlihan and certain prepetition lenders to and interest holders in the Debtors.

21.     As a result of the initial outreach, twenty-eight (28) parties executed non-disclosure agreements (each, an "**NDA**").

22.     Each party that executed an NDA then received: (a) a confidential information memorandum (the "**CIM**"); (b) a process letter; and (iii) access to an online data room, to facilitate due diligence.

23.     In the process letter, the Debtors requested that interested parties submit an indication of interest on or before August 22, 2018.

24.     Upon executing an NDA and receiving the process letter and CIM, nineteen (19) parties passed on the opportunity to purchase, among other things, the Select Assets and ten (10) parties submitted an indication of interest (an "***IOI***") for various combinations of the Debtors' assets.

25.     Following receipt of the IOIs, the Debtors sent an additional letter, inviting parties to submit any revised proposals for the sale of, among other things, the Select Assets on or before October 4, 2018.

26.     Of the ten parties that submitted an IOI, two (2) have since passed on the opportunity, five (5) continue to perform due diligence, and three (3) engaged in active negotiations of an asset purchase agreement for various combinations of the Debtors' assets.

### III.      Negotiation of the Select Purchase Agreement; Market-Testing.

27.     The Select Purchaser is one of the three parties engaged in actively negotiating an asset purchase agreement with the Debtors for various groups of the Debtors' assets.

28.     The negotiations between the Debtors, on the one hand, and the Select Purchaser and other potential purchasers, on the other hand, have included extensive business discussions, including telephone calls, in-person meetings between and among senior management, the parties' legal teams, and the parties' various advisors, which negotiations to date have culminated in the Select Purchase Agreement.

29.     The negotiations for the Select Assets centered around, among other things, the purchase price, bid protections, and the scope of assets and liabilities to be purchased and assumed by the Select Purchaser.

30.     Based on the extensive negotiations between the Debtors and the Select Purchaser, and considering the Debtors' extensive marketing process, the Debtors, in consultation with their advisors, have determined that the Select Purchase Agreement represents

the highest or otherwise best offer for Select Assets, entry into the Select Purchase Agreement, subject to the Bidding Procedures and Bid Protections, and the continued marketing of the Select Assets is the best and most efficient way to maximize the value of the Select Assets for the Debtors, their estates, creditors of their estates, and all parties in interest.

31.    Given the significant marketing efforts undertaken and significant time spent negotiating with the Select Purchaser, the Debtors seek authority to proceed with a bidding and auction process, in order to market-test the Select Purchase Agreement, and sell, pursuant to and in accordance with the Bidding Procedures, the Select Assets. As set forth in the Bidding Procedures, to the extent the Debtors receive one or more Qualified Bids (as defined below) for the Select Assets or any portion thereof, an auction will be conducted subject to approval by this Court.

32.    Based upon the Debtors' reasonable business judgment, after consultation with the Debtors' various advisors, the Debtors believe the proposed process will maximize recoveries from the Select Assets for the Debtors, the Debtors' estates, creditors of the Debtors' estates, and all parties in interest.

## SUMMARY OF PROPOSED BIDDING, AUCTION, AND SALE PROCESS

**I.**    **Material terms of the Select Purchase Agreement.**

33.    In accordance with Local Rule 6004-1(b)(i), a true and correct copy of the Select Purchase Agreement is attached to the Bidding Procedures Order as **Exhibit 1**.

34.    In accordance with Local Rule 6004-1(b)(iv) the Debtors disclose the following:[2]

(a)    <u>Sale to insider.</u> The Select Purchaser is not an insider of the Debtors, within the meaning of section 101(31) of the Bankruptcy Code.

---

[2] This summary is qualified in its entirety by reference to the provisions of the Select Purchase Agreement itself. In the event of any inconsistencies between this summary and the Select Purchase Agreement, the terms of the Select Purchase Agreement shall govern. Unless otherwise defined, capitalized terms shall have the meanings ascribed to them in the Select Purchase Agreement.

(b)     <u>Agreements with management.</u> The Select Purchaser has not discussed or entered into any agreements with Debtors' management or key employees regarding future compensation or employment.

(c)     <u>Releases.</u> The Select Purchase Agreement does not include a release in favor of any entity.

(d)     <u>Sale of the Select Assets will be by auction.</u>   The Debtors are seeking approval for the sale of the Select Assets to the Select Purchaser or Successful Bidder, as applicable, pursuant to and in accordance with the proposed Bidding Procedures, which provide for an auction. The Select Purchase Agreement and Bidding Procedures do not contain any provisions pursuant to which the Debtors have agreed not to solicit competing offers for the Select Assets, any portion of the Select Assets, or to otherwise limit marketing of the Select Assets or any portion of the Select Assets.

(e)     <u>Closing and other deadlines.</u> The consummation of the transactions contemplated by the Select Purchase Agreement shall take place no later than (i) the third business day immediately following the day on which the last of the conditions to closing set forth in Article VI and Article VII of the Select Purchase Agreement are satisfied or waived, or (ii) such other date as the Select Purchaser and Debtors may mutually agree upon; <u>provided</u>, <u>however</u>, that notwithstanding the satisfaction or waiver of the conditions to closing set forth in Article VI and Article VII of the Select Purchase Agreement, the Select Purchaser shall not be obligated to consummate the transactions contemplated by the Select Purchase Agreement until the date that is thirty (30) days following entry of the Sale Order.

(f)     <u>Good Faith Deposit.</u> The Select Purchase Agreement contemplates a good faith deposit in the amount of $3,780,000 (6% of the Purchase Price).

(g)     <u>Interim arrangements with the Select Purchaser.</u> The Debtors do not have any interim management or other agreement with the Select Purchaser.

(h)     <u>Use of sale proceeds.</u> The Select Purchase Agreement and related funds flow agreed to by the Select Sellers and Select Purchaser contemplate a distribution of the proceeds of the sale of the Select Assets in accordance with the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition ABL Parties, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (D.I. 218) (the "***Final DIP Order***").

(i)     <u>Tax exemption.</u> The Debtors are not seeking pursuant to this Motion to have the sale of the Select Assets declared exempt from taxes under section 1146(a) of the Bankruptcy Code.

(j)     <u>Record retention.</u> The Debtors will retain, or have reasonable access to, all records needed to administer these Chapter 11 Cases and in compliance with HIPAA.

(k)     Sale of avoidance actions. The Select Assets do not include causes of action under chapter 5 of the Bankruptcy Code.

(l)     Requested findings as to successor liability. The Debtors are seeking to sell the Select Assets free and clear of successor liability claims.

(m)     Free of any and all encumbrances.  The proposed sale of the Select Assets will be free and clear of all liens, claims, encumbrances and interests, with such liens, claims, encumbrances and interests attaching to the net proceeds of the sale of the Select Assets with the same validity and in the same priority, subject to any and all rights, claims, defenses, and objections of the Debtors, the Debtors' estates, and the Committee with respect to such asserted liens, claims, encumbrances, and interests and all such rights, claims, defenses and objections of the Debtors, the Debtors' estates, and the Committee with respect to such asserted liens, claims, encumbrances, and interests are expressly reserved and preserved.

(n)     Sale free and clear of unexpired leases. The Debtors do seek to sell the Select Assets free and clear of any unexpired leasehold interests or other rights encumbering assets otherwise owned by the Select Sellers.

(o)     Credit bidding. The Debtors are not seeking to disallow or affect in any manner credit bidding pursuant to section 363(k) of the Bankruptcy Code.

(p)     Relief from Rule 6004(h) of the Bankruptcy Rules. The Debtors are seeking relief from the fourteen day stay imposed by Rule 6004(h) of the Bankruptcy Rules.

(q)     Indemnification. The Select Purchase Agreement does not provide for indemnification by either party.

(r)     Consent to jurisdiction. The Select Purchaser has consented to the core and exclusive jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any and all disputes relating to, arising from or connected with the purchase and sale of the Select Assets, and the construction and enforcement of the Select Purchase Agreement.

## II.     **The Bidding Procedures and Bid Protections.**

35.     To market-test the Select Purchase Agreement and ensure the Debtors obtain the highest and otherwise best offer for the Select Assets, the Select Purchase Agreement will be subjected to higher and better offers. If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids from potential buyers that constitute the highest or otherwise best offer for the Select Assets.

36.     A true and correct copy of the proposed Bidding Procedures is attached as

**Exhibit 2** to the Bidding Procedures Order.

37.     In accordance with Local Rule 6004-1(c)(i), the Debtors disclose the following:

(a)     <u>Provisions governing qualification of Bidders.</u> To participate in the bidding process or otherwise be considered for any purpose under the Bidding Procedures, a person or entity interested in consummating a sale for any portion of the Select Assets (each, a "*Potential Bidder*") must deliver or have previously delivered an executed confidentiality agreement on terms acceptable to the Debtors (a "*Confidentiality Agreement*"), in consultation with the Committee and DIP Agent, and the most current audited and latest unaudited financial statements (collectively, the "*Financials*") of the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Select Assets, (i) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors and their advisors, in consultation with the Committee and DIP Agent, (ii) a written commitment acceptable to the Debtors and their advisors, in consultation with the Committee and DIP Agent, of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable sale, and (iii) copies of any documents evidencing any financing commitments necessary to consummate the transaction). A "*Qualified Bidder*" is a Potential Bidder: (i) whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate a sale for the Select Assets, as determined in the Debtors' reasonable business judgment (in consultation with the Committee and DIP Agent); and (ii) whose Bid (as defined below) is a Qualified Bid (as defined below). On or before the date that is one (1) Business Day after the Bid Deadline (defined below), the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder, and shall provide a copy of each Qualified Bid to counsel to the DIP Agent, counsel to the Committee, and counsel to the Select Purchaser. The Select Purchaser shall be deemed a Qualified Bidder that has submitted a Qualified Bid at all times. For the avoidance of doubt, two or more Potential Bidders may submit a Bid for any or all of the Select Assets, provided that such Bids, when taken as a whole (collectively, a "*Joint Bid*"), are determined by the Debtors, in consultation with the Committee and DIP Agent and in accordance with Section 3(a) of the Bidding Procedures, to constitute a Qualified Bid; provided, however, that any Joint Bid must comply with section 363(n) of the Bankruptcy Code and Potential Bidders must first seek the Debtors' permission before they contact each other. The Debtors shall consult with the Committee and DIP Agent regarding any request for permission to contact another Potential Bidder. In addition, any Potential Bidder may submit a Bid for any or all of the Select Assets, provided that such Bid is determined by the Debtors, in consultation with the Committee and DIP Agent and in accordance with Section 3(a) of the Bidding Procedures, to constitute a Qualified Bid. If any Potential Bidder is determined by the Debtors not to be a Qualified Bidder, in consultation with the Committee and DIP Agent, the Debtors will refund such Potential Bidder's Deposit (as defined below) and all accumulated interest thereon, if any, the later of on or within three (3) Business Days after the Bid Deadline and the date the Debtors

determine, in consultation with the Committee and DIP Agent, such Potential Bidder not to be a Qualified Bidder.

(b)    <u>Provisions governing due diligence.</u> Only Potential Bidders that have entered into a Confidentiality Agreement shall be eligible to receive due diligence information and access to the Debtors' electronic data room and to additional non-public information regarding the Debtors, including the Select Sellers. **No Potential Bidder will be permitted to conduct any due diligence without entering into a Confidentiality Agreement.** The Debtors will provide to each Potential Bidder that has entered into a Confidentiality Agreement reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request, and the Debtors shall post all written due diligence provided to any Potential Bidder to the Debtors' electronic data room. For all Potential Bidders (other than the Select Purchaser),[3] the due diligence period will end on the Bid Deadline and subsequent to the Bid Deadline the Debtors shall have no obligation to furnish any due diligence information. The Debtors shall not furnish any confidential information relating to the Select Assets, the Debtors' liabilities, or the sale of any or all of the Select Assets ("***Confidential Sale Information***") to any person, except to a Potential Bidder that has entered into a Confidentiality Agreement or to such Potential Bidder's duly-authorized representatives, in each case, to the extent provided in the applicable Confidentiality Agreement. The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; <u>provided</u> <u>that</u> the Debtors may decline to provide such information to Potential Bidders who, at such time and in the Debtors' reasonable business judgment have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the sale of all or a portion of the Select Assets. The Debtors also reserve the right to withhold from Potential Bidders any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure to a Potential Bidder, who the Debtors determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not approved by the Debtors as a Potential Bidder. All due diligence requests shall be directed to Scott Kremeier, <u>SKremeier@HL.com</u>.

(c)    <u>Provisions governing Qualified Bids</u>.  A proposal, solicitation, or offer (each, a "***Bid***") by a Potential Bidder that is submitted in writing and satisfies each of the following requirements (collectively, the "***Bid Requirements***"), as determined by the Debtors in their reasonable business judgment (after consultation with the Committee and DIP Agent) shall constitute a "***Qualified Bid***." The Bid Requirements are as follows:

i.    **Assets**. Each Bid must provide for the purchase of all or a portion of the Select Assets, and must clearly state (i) which Select Assets the Potential Bidder is offering to purchase and (ii) whether the Potential Bidder intends to

---

[3] The duration of the due diligence period for the Select Purchaser shall be governed by the Select Purchase Agreement.

operate all or a portion of the Debtors' business as a going concern, or to liquidate the business.

ii.      **Assumption of liabilities**. Each Bid must expressly identify the liabilities it proposes to (i) assume or (ii) satisfy with cash consideration, including Cure Amounts, as defined in the Select Purchase Agreement.

iii.      **Purchase Price**. Each Bid must clearly set forth the purchase price to be paid (the "***Purchase Price***"). The Bid must propose a Purchase Price for all or a portion of the Select Assets, including any assumption of liabilities, that has a value that equals or exceeds the sum of the following (a "***Minimum Bid***"), as determined one week prior to the Bid Deadline in consultation with the Committee and DIP Agent: (i) the net value to the Debtors' estates provided by the Select Purchase Agreement; and (ii) $2,750,000; provided, however, in the event that a Bid is for a combination of Select Assets different from those set forth in the Select Purchase Agreement, such consideration shall reasonably represent a premium, as determined by the Debtors in consultation with the Committee and DIP Agent, to an approximate allocation of the Select Purchase Agreement; provided, further, that in determining the value of any such Bid, the Debtors will not be limited to evaluating the dollar value of the consideration but may also consider other factors, including, without limitation, the speed, certainty, and value of the proposed transaction. Subject to the immediately preceding sentence, the Purchase Price contained in a Bid may be structured in whatever form the Potential Bidder desires (*e.g.*, a Potential Bidder may propose an all cash Bid).

iv.      **Deposit**. With a Bid, a Potential Bidder must submit by wire transfer of immediately available funds, a cash deposit in the amount equal to six percent (6%) of the aggregate Purchase Price set forth in the Bid, to be held in a noninterest-bearing escrow account to be identified and established by the Debtors (the "***Deposit***").

v.      **Same or better terms**. Each Bid must be on terms that are not more burdensome to the Debtors than the terms of the Select Purchase Agreement, as determined by the Debtors (in consultation with the Committee and DIP Agent). Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the sale contemplated by the Bid and shall include a schedule of executory contracts and unexpired leases proposed to be assumed by the Debtors and assigned and sold to the Potential Bidder ("***Assumed Contracts***"), and a copy of the purchase agreement representing the Bid clearly marked to show all changes requested by the Potential Bidder from the Select Purchase Agreement, including those related to the respective Purchase Price and assets to be acquired by such Potential Bidder, as well as all other material documents integral to such bid and a written commitment demonstrating to the satisfaction of the Debtors (in consultation with the Committee and DIP Agent) that the Potential Bidder will be able to close the transaction proposed in its Bid on the terms and conditions set forth therein (the "***Qualified Bid Documents***").

vi.      **Contingencies; No financing or diligence outs**. A Bid shall not be conditioned on (i) obtaining financing, (ii) shareholder, board of directors, or other internal approval, or (iii) the outcome or completion of a due diligence review by the Potential Bidder. Notwithstanding the foregoing, a Bid may be subject to (i) the accuracy at the closing of the sale of specified representations and warranties or (ii) the satisfaction at the closing of the sale of specified conditions, which shall not be more burdensome to the Debtors, as determined by the Debtors (in consultation with the Committee and DIP Agent), than those set forth in the Select Purchase Agreement.

vii.      **Identity**. Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating a sale of the Select Assets), and the complete terms of any such participation. Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid. Each Bid must also include contact information for the specific persons and counsel whom the Debtors and their advisors should contact regarding such Bid. Each Bid must also disclose any past or present connections or agreements with the Debtors, the Select Purchaser, any other Potential Bidder or Qualified Bidder and its affiliates, and/or any officer or director of the foregoing (including any current officer or director of the Debtors).

viii.      **Demonstrated financial capacity**. A Potential Bidder must have, in the Debtors' reasonable business judgment (in consultation with the Committee and DIP Agent), the necessary financial capacity to consummate the proposed transactions required by its Bid and provide adequate assurance of future performance under all Assumed Contracts to be assumed by such Bid. Each Bid must be accompanied by reasonable evidence of the Potential Bidder's ability to operate the business related to the applicable Select Assets and include a packet of information, including financial information that will be provided to the non-Debtor counterparties to Assumed Contracts sufficient to demonstrate adequate assurance of future performance.

ix.      **Committed financing**. To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include executed unconditional committed financing from a qualified source documented to the satisfaction of the Debtors (in consultation with the Committee and DIP Agent), which demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors (in consultation with the Committee and DIP Agent).

x.       **Binding and irrevocable**. A Potential Bid must include a signed writing stating that: (i) the Potential Bid is irrevocable until two (2) Business Days after the closing of the sale to a person or entity other than the Potential Bidder; and (ii) the Potential Bidder agrees to serve as a Backup Bidder upon the terms and conditions set forth in the Bidding Procedures, if such Potential Bidder is not a Successful Bidder.

xi.       **Expenses; Disclaimer of fees**. Each Potential Bid (other than the Select Purchase Agreement) must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation or bid protection. For the avoidance of doubt, no Potential Bidder (other than the Select Purchaser) will be permitted to request, or be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation or bid protection, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

xii.       **Authorization**. Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors in consultation with the Committee and DIP Agent) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

xiii.       **As-Is,   Where-Is**.   Each   Bid   must   include   a   written acknowledgement and representation that the Potential Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Select Assets prior to submitting the Bid; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Select Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Select Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid.

xiv.       **Adherence to Bidding Procedures**. By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction. Each Bid must expressly state that the Potential Bidder agrees to serve as a Backup Bidder (as defined below) if such bidder's Qualified Bid is selected as the next highest or otherwise next best bid after the Successful Bid.

xv.       **Regulatory Approvals and Covenants**. A Bid must set forth each regulatory and third-party approval needed to consummate the transaction contemplated by such Bid and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that

receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following the Bid Deadline, those actions the Potential Bidder will take to ensure receipt of such approvals as promptly as possible). A Bid must also state that all necessary filings under applicable regulatory, antitrust, and other laws will be made and that payment of the fees associated therewith shall be made by the Potential Bidder.

      xvi.      **Consent to Jurisdiction**. Each Potential Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, the Sale documents, and the closing of the sale, as applicable.

      xvii.      **Bid Deadline**. Each Bid must be transmitted via email (in .pdf or similar format) so as to be **actually received** on or before **4:00 p.m. (prevailing Eastern Time) on February 15, 2019** (the "***Bid Deadline***") by the Bid Notice Parties.

      (d)      <u>Provisions providing Bid Protections.</u> Pursuant to the Select Purchase Agreement and Bidding Procedures, in the event the Select Purchaser is not the Successful Bidder for all of the Select Assets (or otherwise does not purchase all of the Select Assets as a Backup Bidder), the Select Purchaser is to be provided an expense reimbursement for its actual, reasonable and documented expenses not to exceed $250,000 and a break-up fee in an amount equal to $1,890,000 (which is three percent (3%) of the Select Purchaser's Purchase Price), all as more specifically set forth in Section 5.6(i) of the Select Purchase Agreement.

      (e)      <u>Minimum Bid Increments.</u> During the Auction, the minimum bid increments shall be $500,000. When bidding, the Select Purchaser is entitled to a credit in an amount equal to $2,140,000, assuming the full extent of the Expense Reimbursement.

      (f)      <u>Modification of the Bidding Procedures.</u> Without prejudice to the rights of the Select Purchaser under the terms of the Select Purchase Agreement, or the rights of the DIP Agent in respect of any sale-related milestones set forth in the Debtors' debtor in possession credit agreement, the Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment (in consultation with the Committee and DIP Agent) in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Select Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction (including, without limitation, time limits for the submission of bids or changing the floor of bids); (d) canceling the Auction; and (e) rejecting any and all Bids.

      (g)      <u>Provisions governing closing with a Backup Bidder.</u> Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the

Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction for any portion of or all of the Select Assets, as determined by the Debtors in their discretion and in consultation with the Committee and DIP Agent (the "***Backup Bid***"), shall be required to serve as a backup bidder (the "***Backup Bidder***"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors, in consultation with the Committee and DIP Agent. The identity of the Backup Bidder(s) and the amount and material terms of the Backup Bid(s) shall be the highest or otherwise best bid submitted by the Backup Bidder and announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder(s). A Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable, until the closing of the sale of the applicable Select Assets with the Successful Bidder(s) for such Select Assets. A Backup Bidder's Deposit shall be held in escrow until the closing of such transaction with the Successful Bidder(s) and shall thereafter be returned within five (5) Business Days. If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select (in consultation with the Committee and DIP Agent) the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Backup Bid without further order of the Bankruptcy Court or notice to any party (counterparties to the Assumed Contracts shall receive notice of the closing with the Backup Bidder). In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors. The Debtors specifically reserve the right to seek all available remedies against any defaulting Successful Bidder, including with respect to specific performance. Notwithstanding anything to the contrary in this section or the Bidding Procedures Order, if the Select Purchaser is required to serve as Backup Bidder, the terms and conditions of such service shall be governed by the Select Purchase Agreement.

(h)    <u>Provisions governing the Auction.</u> If the Debtors receive one or more Qualified Bids (in addition to the Select Purchase Agreement), the Debtors will conduct an auction (the "***Auction***") on **February 20, 2019 commencing at 10:00 a.m. (prevailing Eastern time)** at the offices of DLA Piper LLP, 1201 North Market Street, Suite 2100, Wilmington, Delaware 19801 (or at such other location as the Debtors may designate upon written notice to all parties entitled to participate in the auction under the Bidding Procedures). Prior to and during the Auction, each Qualified Bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or otherwise in connection with the sale of the Select Assets. The Auction will be conducted openly and all creditors will be permitted to attend. Each round of bidding at the Auction will be transcribed.

## III.    **The Notice Procedures.**

38.    Within two (2) business days following entry of the Bidding Procedures Order, the Debtors will provide notice to: (a) all entities known to have expressed an interest in a

transaction with respect to some or all of the Select Assets during the past twenty-four (24) months; (b) all entities known to have asserted any interest in or upon any of the Select Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (d) known counterparties to any unexpired leases or executory contracts that could potentially be assumed and assigned to a Successful Bidder; (e) the Office of the United States Trustee for the District of Delaware and the Patient Care Ombudsman; (f) counsel to the Committee; (g) counsel to the DIP Agent; (h) the Office of the United States Attorney General for the District of Delaware; (i) the Internal Revenue Service; (j) the U.S. Department of Justice; (k) the offices of the attorneys general for the states in which the Debtors operate; (1) all of the Debtors' insurers; (m) all parties entitled to notice pursuant to Rule 2002 of the Bankruptcy Rules or Local Rule 2002-1(B); (n) to the extent not already included above, all parties in interest listed on the Debtors' creditor matrixes, excluding current, former or future patients; and (o) other persons reasonably requesting notice of a potential purchase of the Select Assets (collectively, the "***Notice Parties***").

39.    To this end, the Debtors seek approval of the notice attached to the Bidding Procedures Order as **Exhibit 3** (the "***Notice of Auction and Sale Hearing***").

**IV.    The Assumption Procedures.**

40.    In connection with the sale of the Select Assets, the Debtors anticipate that they will assume and sell and assign to one or more Successful Bidders certain of their executory contracts and unexpired leases and propose the following Assumption Procedures:

(a)    Notice of Potential Assumption and Assignment. No later than five (5) business days after entry of the Bidding Procedures Order, the Debtors shall serve a notice of potential assumption, assignment, or transfer of executory contracts and unexpired leases, substantially in the form attached to the Bidding Procedures Order as **Exhibit 4** (a "***Notice of Potential Assumption***"), on all parties to executory contracts or unexpired leases that may be assumed in connection with the sale of the Select Assets.

(b)    Objection Period. Each Notice of Potential Assumption shall provide for the cure amounts the Debtors believe must be paid to cure all defaults outstanding under the applicable executory contracts or unexpired leases, and any objections to the assumption and assignment of such executory contracts or unexpired leases, including to the cure amount (a "***Contract Objection***"), must be in writing, filed with the Court, and **actually received** by the Objection Notice Parties (as defined below) no later than **February 18, 2019 at 4:00 p.m. (prevailing Eastern time)**, as noted in each Notice of Potential Assumption (the "***Assumption Objection Deadline***").

(c)    Objection Procedures. If a contract counterparty files a Contract Objection in a manner consistent with the requirements set forth above, and the Debtor and the contract counterparty are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid or reserved with respect to such objection will be determined at the Sale Hearing, such later hearing date that the Debtors determine in their discretion, in consultation with the Select Purchaser or a Successful Bidder, or such other date determined by this Court.

(d)    Notice of Assumption and Assignment. No later than five (5) calendar days prior to the closing of a sale of all or a portion of the Select Assets (a "***Closing***"), the Debtors shall serve a notice, substantially in the form attached to the Bidding Procedures Order as **Exhibit 5** (a "***Notice of Assumption and Assignment***"), identifying the Assumed Contracts, the executory contracts or unexpired leases that will be assumed and assigned to the applicable Successful Bidder upon the Closing; provided, however, to the extent a counterparty to an Assumed Contract has filed a Contract Objection and such Contract Objection is not resolved at or before the Sale Hearing, the Debtors shall be permitted to serve a Notice of Assumption and Assignment with respect to such Assumed Contract(s) at such time as the Contract Objection is resolved.

(e)    Excluded Contracts. A Successful Bidder may determine to exclude any executory contract or unexpired lease at any time prior to the applicable Closing, notwithstanding such executory contract or unexpired lease having been identified in a Notice of Potential Assumption. The Debtors will notify any non-Debtor party or parties to an excluded contract or lease by written notice as soon as practicable after such determination, which may be after the Sale Hearing or the Closing.

## V.    **Request for a Sale Hearing.**

41.    Regardless whether the Debtors conduct an auction, the Debtors request that this Court schedule a hearing to approve the sale of the Select Assets to the Select Purchaser to a Successful Bidder, as applicable (the "***Sale Hearing***").

42.    The Debtors currently propose February 26, 2019 for the Sale Hearing.

VI.        **Proposed Objection Procedures.**

43.        To the extent the Debtors conduct an Auction and select one or more Successful Bids, within one (1) business day of determining the Successful Bid(s) and completion of the Auction, the Debtors shall file on the Court's docket a notice setting forth the Successful Bidder(s), Backup Bidder(s) (if any), Successful Bid(s), and Backup Bid(s).

44.        The Debtors' request that this Court require all objections to the results of the Auction or otherwise to the sale of any portion of the Select Assets (a) be in writing, (b) be signed by counsel or *pro se* party, (c) conform to the requirements of the Bankruptcy Code, Bankruptcy Rules, and Local Rules, (d) state with particularity the legal and factual basis for the objection, (e) be filed with this Court by no later than **February 22, 2019 at 4:00 p.m. (prevailing Eastern time)** (the "*Sale Objection Deadline*"), and (e) be served in accordance with the Local Rules **so as to be actually received** on or before the Sale Objection Deadline by: (i) counsel to the Debtors, (a) John Tishler, Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, Tennessee 37219 and (b) Stuart M. Brown, DLA Piper LLP, 1201 N. Market Street, Suite 2100, Wilmington, Delaware 19801; (ii) counsel to the Committee, (a) Jeffrey N. Pomerantz, Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, Wilmington, Delaware 19801 and (b) Andrew H. Sherman, Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey 07102; (iii) counsel to the Select Purchaser, (a) Stephen M. Leitzell, Dechert LLP, Cira Centre, 2929 Arch Street, Philadelphia, Pennsylvania 19104-2808, (b) Brian Greer, Dechert LLP, Three Bryant Park, 1095 Avenue of the Americas, New York, New York 10036-6797, and (c) Jonathan Stott, Dechert LLP, Cira Centre, 2929 Arch Street, Philadelphia, Pennsylvania 19104-2808; (iv) counsel to Wells Fargo, National Association, (a) Brian I. Swett, McGuire Woods LLP, 77 West Wacker Drive, Suite 4100, Chicago, Illinois 60601-1818 and (b) John Knight, Richards, Layton & Finger, PA, 920 N. King

Street, Wilmington, Delaware 19801; (v) the Office of the United States Trustee, J. Caleb Boggs Federal Building, 844 King Street, Lockbox 35, Wilmington, Delaware 19801, Attn: Brya Keilson; and (vi) counsel to any Successful Bidder and Backup Bidder as identified in accordance with the Bidding Procedures (collectively, the "***Objection Notice Parties***").

45.    The failure of any objecting person or entity to file an objection by the Sale Objection Deadline and in accordance with the procedures above should act as a bar to the assertion of any objection to the sale of the Select Assets and should be deemed to constitute consent to entry of an order approving the sale of the Select Assets and consummation of such sale, pursuant to section 363 of the Bankruptcy Code, and assumption, sale and assignment of the Assumed Contracts, pursuant to sections 363 and 365 of the Bankruptcy Code.

## BASIS FOR RELIEF REQUESTED

**I.    The Select Purchase Agreement is Typical, Customary, and Reasonable, and Entering into the Select Purchase Agreement is a Proper Exercise of the Debtors' Business Judgment.**

46.    The Debtors believe, and respectfully submit, that the terms of the Select Purchase Agreement are typical, customary, and reasonable under the circumstances, and have been entered into in the proper exercise of their business judgment. However, Debtors request authorization to accept such modifications and edits to the Select Purchase Agreement as may be submitted by and agreed upon between the Select Purchaser and Debtors in their discretion and in Debtors' business judgment.

47.    Pursuant to Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by public auction. The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (noting that the debtor in possession "had a fiduciary duty to protect and maximize the estate's assets"). *See also*

*Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1985) (debtor in possession has the duty to maximize the value of the estate); *Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010) (same).

48.    At this juncture, the Select Purchase Agreement represents the highest and otherwise best offer for the Select Assets, and entry into the Select Purchase Agreement was the exercise of the Debtors' sound business judgment.

**II.    The Bidding Procedures are fair and equitable, and are designed to maximize recovery from the Select Assets.**

49.    The implementation of bidding and sale procedures, including bid protections, to facilitate the sale of a debtor's assets outside of the ordinary course of business is regularly approved by bankruptcy courts as a means of ensuring that a sale will generate the highest and best recovery for a debtor's estate.

50.    The Debtors submit that the Bidding Procedures are designed to maximize the value of the Select Assets and, as a result, will generate the highest or otherwise best offer for the Select Assets.

51.    The Bid Protections provided in the Select Purchase Agreement and Bidding Procedures are an integral part to the successful implementation of the Bidding Procedures and sale process contemplated by the Debtors.

52.    As noted above, pursuant to the Select Purchase Agreement and Bidding Procedures, in the event the Select Purchaser is not the Successful Bidder for all of the Select Assets (or otherwise does not purchase all of the Select Assets as a Backup Bidder), the Select Purchaser is to be provided protections by way of an expense reimbursement not to exceed $250,000 and a break-up fee in an amount equal to $1,890,000 (which is three percent (3%) of the

Select Purchaser's Purchase Price), as more specifically set forth in section 5.6(i) of the Select Purchase Agreement.

53.     The Bid Protections were necessary for the Select Purchaser to enter into the Select Purchase Agreement.  The work that the Select Purchaser performed through its diligence adds value to the Debtors' estates as the time required for other Potential Bidders to perform diligence should be shortened permitting more Potential Bidders to participate in the contemplated process under the proposed timetable.  In addition, the presence of the Select Purchaser sets a floor for the value of the Select Assets and attracts other potential buyers to bid for such assets, thereby maximizing the realizable value of the Select Assets for the benefit of the Debtors' estates, their creditors and all other parties in interest.

54.     Approval of the Bid Protections is governed by standards for determining the appropriateness and extent of bid protections in the bankruptcy context. Courts have identified at least two instances in which bid protections may benefit the estate. First, a break-up fee may be necessary to preserve the value of a debtor's estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Calpine Corp. v. O'Brien Envtl. Energy, Inc.* (*In re O'Brien Envtl. Energy, Inc.*), 181 F.3d 527, 537 (3d Cir. 1999). Second, "if the availability of a break-up fee was to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*; *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 206-08 (3d Cir. 2010) (reasoning that a break-up fee should be approved if it is necessary to entice a party to make the first bid or if it would induce a stalking horse bidder to remain committed to a purchase).

55.     Here, the Bid Protections were negotiated at arms' length and are designed to promote, not stifle, bidding for the Select Assets. The Select Purchaser and its advisors have expended, and will continue to expend, considerable time, energy and resources pursuing the purchase of the Select Assets, and have engaged in extended, good faith negotiations with the Debtors, in order to facilitate a transaction for the purchase of the Select Assets.

56.     Further, the Debtors and their advisors believe that a sale of the Select Assets through a stalking horse process and auction is the best and most efficient way to effectuate a sale of the Select Assets while assuring the Debtors obtain the highest or otherwise best offer for the Select Assets.

57.     The Bidding Procedures, including the Bid Protections, are typical and customary in this district and are designed to be fair and equitable, to encourage parties with adequate interest in the Select Assets to participate in a competitive bidding process. *See, e.g.,* Order Authorizing and Approving Bidding Procedures, *In re ATopTech, Inc.,* (No. 17- 10111-MFW) (Bankr. D. Del. Apr. 21, 2017), ECF No. 234 (approving break-up fee and expense reimbursement equal to 5% of the purchase price); Order Approving and Establishing Bidding and Sale Procedures, *In re Phoenix Brands LLC*, (No. 16-11242-BLS) (Bankr. D. Del. June 8, 2016), ECF No. 136 (approving break-up fee and expense reimbursement equal to 5.3% of the purchase price); Order Approving Procedures in Connection With the Sale of Substantially All of the Debtors' Assets, *In re American Hospice Management Holdings, LLC*, (No. 16-10670- LSS) (Bankr. D. Del. Apr. 7, 2016), ECF No. 75 (approving break-up fee and expense reimbursement equal to 5% of the purchase price); Order Establishing Bidding Procedures Related to the Sale of Substantially All of the Debtors' Assets, *In re F-Squared Investment Management LLC*, (No. 15-11469-LSS) (Bankr. D. Del. July 28, 2015), ECF No. 75 (approving break-up fee and expense reimbursement equal to

10% of the purchase price); Order Approving Stalking Horse Bid, *In re Citadel Watford City Disposal Partners, L.P.,* (No. 15-11323-KJC) (Bankr. D. Del. Jan. 14, 2016), ECF No. 184 (approving break-up fee and expense reimbursement equal to 9.90% of the purchase price); Order Approving and Authorizing Bidding Procedures, *In re Vertellus Specialties, Inc.*, (No. 16-11290-CSS) (Bankr. D. Del. June, 28, 2016) (approving 3% break-up fee and $500,000 expense reimbursement); Order Approving Procedures, *In re Trident Microsystems, Inc.*, (No. 12-10069-CSS) (Bankr. D. Del. Mar. 23, 2012) (approving $800,000 break-up fee and $350,000 expense reimbursement); Order Approving and Authorizing Bidding Procedures, *In re Orchard Supply Hardware Stores Corp.*, (No. 13-11565-CSS) (Bankr. D. Del. July 8, 2013) (approving 3% break-up fee and $850,000 expense reimbursement).

58.     Based upon the foregoing, the Debtors, in their reasonable business judgment, submit that the Bidding Procedures, including the Bid Protections, are fair, equitable, reasonably designed to facilitate a competitive marketing process, and are due to be approved by this Court.

III.    **A Sale of the Select Assets is Appropriate Under Section 363(b)(1) of the Bankruptcy Code.**

59.     The Debtors respectfully submit that the proposed sale of the Select Assets meets the standard set forth in section 363(b) for sales outside of the ordinary course of a debtor's business. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

60.     This Court's power under section 363 is supplemented by section 105(a), which provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title . . ." § 105(a). As set forth

below, the Debtors submit that they have satisfied the requirements of sections 105 and 363 as those sections have been construed by courts in the Third Circuit.

61.     A debtor should be authorized to sell assets out of the ordinary course of business pursuant to section 363 of the Bankruptcy Code and prior to obtaining a confirmed plan of reorganization if it demonstrates a sound business purpose for doing so. *See In re Del. & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991) (finding that the sale of substantially all of debtor's assets outside of a plan of reorganization is appropriate when a sound business reason justifies such a sale); *Myers v. Martin (In re Martin),* 91 F.3d 389, 394–95 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513 (7th Cir. 1991)); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983).

62.     Courts have applied the following four factors in determining whether a sound business justification exists: (a) whether a sound business reason exists for the proposed transaction; (b) whether fair and reasonable consideration is provided; (c) whether the transaction has been proposed and negotiated in good faith; and (d) whether adequate and reasonable notice is provided.  *See In re Del. & Hudson Ry. Co.*, 124 B.R. at 175–76 (adopting *Lionel* factors to consider in determining whether sound business purpose exists for sale outside ordinary course of business in this District); *Lionel Corp.*, 722 F.2d at 1071 (setting forth the "sound business" purpose test); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147–49 (3d Cir. 1986) (implicitly adopting the articulated business justification test set forth in *Lionel* and adding the "good faith" requirement).

63.     Once debtors articulate a valid business justification, their decision to sell property out of the ordinary course of business enjoys a strong "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in

an honest belief that the action taken was in the best interests of the company." *In re Integrated Res. Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Therefore, any party objecting to a debtor's proposed asset sale must make a showing of "bad faith, self-interest, or gross negligence," as courts are loath to interfere with corporate decisions absent such a showing. *See id.* at 656.

64.     The Debtors have exercised sound business judgment and set forth sound business justifications for pursuing a sale of the Select Assets, pursuant to the factors discussed above. They have marketed the Select Assets extensively and believe that the Select Purchase Agreement presently represents the highest or otherwise best offer for the Select Assets. However, the Debtors believe the Select Purchase Agreement should be further market-tested, to assure that the highest or otherwise best offer for the Select Assets is obtained.

65.     In short, the Debtors believe that a sale of the Select Assets pursuant to and in accordance with the Bidding Procedures as outlined in this Motion will allow for the greatest possible consideration for the Select Assets while minimizing the potential downside for the Debtors' and their estates.

66.     Accordingly, the Debtors believe that the Select Purchase Agreement currently represents the highest and otherwise best offer for the Select Assets and the Bidding Procedures provide a fair, reasonable, and prudent method of subjecting the Select Purchase Agreement to the market to ensure the Debtors maximize their recovery for the benefit of their estates, creditors of their estates, and other parties in interest is a fair.

**IV.     Any Sale Should be Approved Free and Clear of Liens, Claims, Interests and Encumbrances.**

67.     Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property free and clear of any lien, claim, interest or encumbrance in such property if, among other things:

    (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

    (2)    such entity consents;

    (3)    such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

    (4)    such interest is in bona fide dispute; or

    (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

68.     Because section 363(f) is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to warrant approval of the proposed sale. *See In re Collins*, 180 B.R. 447, 450 (Bankr. E.D. Va. 1995) ("Section 363(f) is phrased in the disjunctive, such that only one of the enumerated conditions must be met in order for the Court to approve the proposed sale"); *Scherer v. Fed. Nat'l Mortg. Ass'n (In re Terrace Chalet Apts., Ltd.)*, 159 B.R. 821, 827 (N.D. Ill. 1993) (sale extinguishes liens under section 363(f) as long as one of the five specified exceptions applies).

69.     The Debtors will serve notice of the Motion to all creditors of the Debtors and each will have an opportunity to object to the relief sought in this Motion, including the Bidding Procedures, Assumption Procedures, Notice Procedures, and proposed sale of the Select Assets. The Debtors expect to obtain the consent of Wells Fargo, National Association, as administrative agent (the "***DIP Agent***") and the prepetition agent such that section 363(f)(2) will apply. The

Debtors contend that no other party holds a valid, perfected lien on the Select Assets, aside from

CNB, who holds a first mortgage lien against three specific properties. Accordingly, to the extent

any party contends that it holds a valid lien on the Select Assets, such lien is subject to bona fide

dispute, and the Debtors may sell the Select Assets free and clear of such purported lien, under

section 363(f)(4) of the Bankruptcy Code. Therefore, the Debtors request that the sale of the

Select Assets be approved free and clear of all liens, claims, encumbrances, and others interests,

with the proceeds of the sale of the Select Assets being distributed in accordance with the terms

of the Final DIP Order.

**V.        The Sale is Proposed in Good Faith.**

70.       Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection
> (b) or (c) of this section of a sale or lease of property does not affect the
> validity of a sale or lease under such authorization to an entity that purchased
> or leased such property in good faith, whether or not such entity knew of the
> pendency of the appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

71.       Section 363(m) "reflects the . . . 'policy of not only affording finality to the

judgment of the bankruptcy court, but particularly to give finality to those orders and judgments

upon which third parties rely.'" *Abbotts Dairies of Penn., Inc.*, 788 F.2d at 147 (quoting *Hoese

Corp. v. Vetter Corp. (In re Vetter Corp.*), 724 F.2d 52, 55 (7th Cir. 1983)).  *See also United

States v. Salerno*,  932 F.2d 117, 123 (2d Cir. 1991) (noting that section 363(m) furthers the

policy of finality in bankruptcy sales and "assists bankruptcy courts in maximizing the price for

assets sold in such proceedings"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y.

1990) (same).

72.       While the Bankruptcy Code does not define "good faith," some courts have held

that a good faith purchaser is one who "purchases the assets for value, in good faith, and without

notice of adverse claims." *Hardage v. Herring Nat'l Bank,* 837 F.2d 1319, 1323 (5th Cir. 1988) (quoting *Willemain v. Kivitz (In re Willemain),* 764 F.2d 1019, 1023 (4th Cir. 1985)). Furthermore, the good faith status of a purchaser can be destroyed with evidence of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *TMT Procurement Corp. v. Vantage Drilling Co.* (*In re TMT Procurement Corp.)*, 764 F.3d 512, 521 (5th Cir. 2014).

73.    The sale of the Select Assets has been proposed in good faith. The Select Purchase Agreement was the product of extensive good faith, arm's length negotiations between the Debtors, on the one hand, and Select Purchaser, on the other, and was negotiated with the active involvement of the Debtors' officers and professionals. The Debtors believe and submit that the sale of the Select Assets pursuant to the terms and conditions set forth in this Motion is not—and will not be—the product of collusion or bad faith. No evidence suggests that the Select Purchase Agreement is anything but the product of arm's length negotiations between the Debtors, Select Purchaser, and their respective professional advisors.

74.    Moreover, if an Auction is conducted, all Qualified Bidders will be required to confirm that no collusion has taken place with respect to the sale of or bidding on the Select Assets. In connection with approval of the sale of the Select Assets, the Debtors request that this Court make a finding that any Successful Bidder or Backup Bidder, as applicable, is a good faith purchaser and entitled to the protections of section 363(m) of the Bankruptcy Code.

**VI.     Assumption and Assignment of the Assumed Contracts Is Warranted Under Section 365 of the Bankruptcy Code.**

**A.     Assumption and Assignment of the Assumed Contracts Is Within Debtors' Business Judgment**

75.    Pursuant to the Select Purchase Agreement, the Debtors are required to seek to assume and assign certain executory contracts and unexpired leases and the obligations

thereunder, and to subsequently assign such executory contracts and unexpired leases to the Select Purchaser.

76.    Section 365 of the Bankruptcy Code provides as follows:

(a) Except as provided in . . . subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C. § 365(a), (b)(1). Accordingly, section 365 authorizes the proposed assumption of executory contracts and unexpired leases by debtors. The assumption of a contract by a debtor is subject to review under the business judgment standard. *In re Federated Dept. Stores, Inc.*, 131 B.R. 808, 811 (S.D. Ohio 1991) ("Courts traditionally have applied the business judgment standard in determining whether to authorize the rejection of executory contracts and unexpired leases"). If a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of the contracts. *See, e.g., NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 523 (1984); *Grp. of Institutional Investors v. Chicago M. St. P. & P.R.R. Co.*, 318 U.S. 523 (1943); *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (holding that the "resolution of [the] issue of assumption or rejection will be a matter of business judgment").

77.    The business judgment rule shields a debtor's management from judicial second-guessing. *Id.*; *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions."). Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). Indeed, when applying the business judgment rule, courts show great deference to

a debtor's decision to assume a contract. *See Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (absent extraordinary circumstances, court approval of a debtor's decision to assume an executory contract "should be granted as a matter of course"). Thus, this Court should approve the assumption of the executory contracts and unexpired leases identified by the Select Purchaser or a Successful Bidder, as applicable, if the Debtors are able to demonstrate a sound business justification for doing so. *See In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Delaware Hudson Ry. Co.*, 124 B.R. 169, 179 (Bankr. D. Del. 1991).

78.     As set forth above, the assumption of certain executory contracts and unexpired leases is required so that they may be assigned to the Select Purchaser or Successful Bidder, pursuant to the Select Purchase Agreement or other Successful Bid or Backup Bid. In addition, the Select Purchaser is—and any other Successful Bidder likely will be—responsible for cure amounts associated with assuming any executory contracts and unexpired leases, as more specifically set forth in the Select Purchase Agreement or Successful Bidder's Successful Bid. The Debtors have carefully reviewed the economic benefits of assumption and assignment of the executory contracts and unexpired leases identified to date and believe that their decision to assume those executory contracts and unexpired leases is within the Debtors' sound business judgment, as such assumption and assignment will permit the consummation of a sale of the Select Assets, thereby benefiting the Debtors and their estates, while avoiding any further liability under the executory contracts and unexpired leases that are assumed. Accordingly, Debtors believe that assuming the executory contracts and unexpired leases identified by the Select Purchaser or Successful Bidder is in the best interests of the Debtors, the Debtors' estates, their creditors, and all other parties in interest.

**B.      The Select Purchaser Will Pay Certain Cure Amounts.**

79.      The Select Purchase Agreement provides the Select Purchaser will pay certain

Cure Amounts, as set forth in the Select Purchase Agreement. Section 365 of the Bankruptcy

Code provides as follows:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee:
>
>> (A) cures, or provides adequate assurance that the trustee will promptly cure such default;
>>
>> (B) compensates or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>>
>> (C) provides adequate assurance of future performance under such contract or lease. . . .

11 U.S.C. § 365(b)(1).

80.      Accordingly, section 365 authorizes the proposed assumption of executory

contracts and unexpired leases, provided that any defaults under the executory contracts and

unexpired leases are cured, or adequate assurance is given by the debtor that the default will be

promptly cured. As set forth above, the Debtors have proposed the Assumption Procedures,

which will provide a fair and equitable way of determining the proper Cure Amounts and

providing for the payment of such Cure Amounts, to the extent an Assumed Contract is assumed

and assigned to the Select Purchaser or a Successful Bidder. All non-Debtor parties to the

executory contracts and unexpired leases that may be assumed and assigned are being served

with this Motion and, upon entry of the Bidding Procedures Order, will be served with a copy of

the Bidding Procedures Order and Notice of Potential Assumption. Therefore, all non-Debtor

parties to a potentially assumed executory contract or unexpired lease will have the opportunity

to object and be heard with respect to the relief sought in this Motion, including the assumption and assignment of executory contracts and unexpired leases.

### C.    Debtors Can Demonstrate Adequate Assurance of Future Performance

81.    Section 365 of the Bankruptcy Code provides that the trustee may assign an executory contract or unexpired lease if (i) such contract or lease is assumed in accordance with the Bankruptcy Code and (ii) adequate assurance of future performance by the assignee is provided. 11 U.S.C. § 365(f)(2).

82.    The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in "light of the proposed assumption." *In re Fleming Cos.*, 499 F.3d 300, 307 (3d Cir. 2007) (quoting *Cinicola v. Scharffenberger*, 248 F.3d 110, 120 n. 10 (3d Cir. 2001); *see Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[A]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

83.    Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of a lease from debtor has financial resources and has expressed a willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

84.     As set forth above, Debtors will be assuming and assigning the Assumed Contracts to the Select Purchaser or Successful Bidder. The Select Purchaser has been selected due to its financial condition and ability to consummate a sale of the Select Assets, and the Bidding Procedures require the Debtors, in consultation with the Committee and DIP Agent, to determine that a Potential Bidder has the financial ability to close a sale of the Select Assets prior to such Potential Bidder being considered a Qualified Bidder. Further, the Bidding Procedures require any Qualified Bidder to provide adequate assurance information to contract counter-parties.  Therefore, Debtors submit that the financial condition of the Select Purchaser or any Successful Bidder will provide sufficient adequate assurance of future performance, and that the assignment of any executory contracts or unexpired leases to the Select Purchaser or a Successful Bidder should be approved.

## WAIVER OF BANKRUPTCY RULE 6004(h) AND 6006(d)

85.     The Debtors request that the Court waive the fourteen (14) day stay period under Bankruptcy Rules 6004(h) and 6006(d). Timely consummation of the sale of the Select Assets is of critical importance to the Debtors' efforts to maximize the value of the estates. In accordance with the Final DIP Order, the Debtors must conduct one or more sales of the Debtors' assets generating sufficient capital to repay the Debtors' postpetition financing, on or before April 30, 2019. Because of the deadlines set forth in the Final DIP Order and potential repercussions of failing to meet such deadlines, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## RESERVATION OF RIGHTS

86.     Nothing contained in this Motion or any actions taken by the Debtors pursuant to relief granted in the Order is intended or should be construed as: (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the

Debtors' or any other party-in-interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) an admission that any contract is executory or any lease is unexpired or a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver or limitation of the Debtors' or any other party-in-interest's right under the Bankruptcy Code or any other applicable law.

## NOTICE

87.    Notice of this Motion has been provided to: (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Select Assets during the past twenty-four (24) months; (b) all entities known to have asserted any interest in or upon any of the Select Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (d) known counterparties to any unexpired leases or executory contracts that could potentially be assumed and assigned to a Successful Bidder; (e) the Office of the United States Trustee for the District of Delaware and the Patient Care Ombudsman; (f) counsel to the Committee; (g) counsel to the DIP Agent; (h) the Office of the United States Attorney General for the District of Delaware; (i) the Internal Revenue Service; (j) the U.S. Department of Justice; (k) the offices of the attorneys general for the states in which the Debtors operate; (1) all of the Debtors' insurers; (m) all parties entitled to notice pursuant to Rule 2002 of the Bankruptcy Rules or Local Rule 2002-1(B); and (n) to the extent not already included above, all parties in interest listed on the Debtors' creditor matrixes.

88.    The Debtors respectfully submit that no further notice of this Motion is required.

## **NO PRIOR REQUEST**

89.    No prior request for the relief sought in this Motion respecting the assets that are the subject of this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request: (a) entry an order, substantially in the form attached to this Motion as **Exhibit A**, (i) authorizing the Debtors to enter the Select Purchase Agreement, (ii) approving the Bidding Procedures and Bid Protections, (iii) scheduling the Auction and setting a hearing to consider approval of the sale of the Select Assets, in accordance with and subject to the Bidding Procedures, (iv) approving the Assumption Procedures, (v) approving the Notice Procedures, and (vi) granting related relief; and (b) entry of an order, substantially in the form attached to this Motion as **Exhibit B**, (i) authorizing the sale of the Select Assets free and clear of all liens, claims, interests, and encumbrances, (ii) authorizing the assumption and assignment of certain related executory contracts and unexpired leases, and (iii) granting related relief; and (c) entry of such other and further relief as this Court deems just and proper.

Dated: December 26, 2018
Wilmington, Delaware

DLA PIPER LLP (US)

/s/ *Stuart M. Brown*

Stuart M. Brown (#4050)
Kaitlin MacKenzie Edelman (#5924)
Matthew S. Sarna (#6578)
1201 N. Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: Stuart.Brown@dlapiper.com
      Kaitlin.Edelman@dlapiper.com
      Matthew.Sarna@dlapiper.com

-and-

WALLER LANSDEN DORTCH & DAVIS, LLP
John Tishler (admitted *pro hac vice*)
Katie G. Stenberg (admitted *pro hac vice*)
Blake D. Roth (admitted *pro hac vice*)
Tyler N. Layne (admitted *pro hac vice*)
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone: (615) 244-6380
Facsimile: (615) 244-6804
Email: John.Tishler@wallerlaw.com
      Katie.Stenberg@wallerlaw.com
      Blake.Roth@wallerlaw.com
      Tyler.Layne@wallerlaw.com

*Attorneys for the Debtors and*
*Debtors in Possession*