**Exhibit A**
**Proposed Bidding Procedures Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------- X
                                            :
In re:                                      :   Chapter 11
                                            :
PROMISE HEALTHCARE GROUP, LLC, et al.,¹     :   Case No. 18-12491 (CSS)
                                            :
        Debtors.                            :   (Jointly Administered)
                                            :
-------------------------------------------------------- x   Re: D.I. ___
```

**ORDER: (I) AUTHORIZING AND APPROVING (A) DEBTORS' ENTRY INTO STALKING HORSE PURCHASE AGREEMENT, (B) BIDDING PROCEDURES, (C) BID PROTECTIONS, (D) ASSUMPTION PROCEDURES, AND (E) FORM AND MANNER OF NOTICE OF THE BIDDING PROCEDURES, ASSUMPTION PROCEDURES, AND SALE HEARING; (II) SCHEDULING A HEARING TO CONSIDER THE SALE, PURSUANT TO AND IN ACCORDANCE WITH THE BIDDING PROCEDURES; AND (III) GRANTING RELATED RELIEF**

Upon consideration of the motion (D.I. [___]) (the "***Motion***")² for entry of an order (this "***Order***") approving, among other things, the Bidding Procedures and Bid Protections, scheduling the Auction, and scheduling a hearing to consider the sale of substantially all the

---

¹ The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Professional Rehabilitation Hospital, L.L.C. (5340), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179), Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc. (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc. (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), St. Alexius Hospital Corporation #1 (2766), St. Alexius Properties, LLC (4610), Success Healthcare 1, LLC (6535), Success Healthcare 2, LLC (8861), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766). The mailing address for the Debtors, solely for purposes of notices and communications, is 999 Yamato Road, 3rd FL, Boca Raton, FL 33431.

² Capitalized terms used in this Order and not otherwise defined shall have the meanings ascribed to them in the Motion.

Select Assets, pursuant to and in accordance with the Bidding Procedures; and this Court having considered the Motion, the arguments of counsel and the evidence presented at the hearing to consider the Motion, and the entire record; and due and sufficient notice of the Motion, hearing to consider the Motion, and the relief sought in the Motion having been given under the particular circumstances; and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion and all objections to the Motion (the "***Objections***"); and it appearing that the relief requested in the Motion is in the best interest of the Debtors, their estates, their creditors and other parties in interest; and after due deliberation and good and sufficient cause appearing for the relief sought, it is hereby

<u>**FOUND AND DETERMINED THAT:**</u>

I.      <u>**Determination with Respect to the Findings of Fact and Conclusions of Law**</u>

A.      The findings of fact and conclusions of law set forth in this Order constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this case pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are hereby adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are hereby adopted as such. Any findings of fact or conclusions of law stated by the Court on the record at the hearing to consider the Motion are hereby incorporated, to the extent they are not inconsistent with this Order.

II.     <u>**Jurisdiction, Final Order, and Statutory Predicates**</u>

B.      This Court has jurisdiction to hear and determine the Motion and over the Debtors, their estates, and the Debtors' assets that are the subject of the relief sought in the Motion.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of this case and the Motion in the District of Delaware is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2

C.      The statutory and legal predicates for the relief requested in this Motion are sections 105(a), 363(b), (f), and (m), 365, 503, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

D.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth in this Order.

III.      **Notice of Proposed Bidding Procedures, Assumption Procedures and Sale of the Select Sellers' Assets**

E.      Actual written notice of the Motion and a reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein have been afforded to all known interested persons and entities, including, but not limited to the following parties: (a) all entities known to have expressed an interest in a transaction with respect to some or all of the Select Assets during the past twenty-four (24) months; (b) all entities known to have asserted any interest in or upon any of the Select Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (d) known counterparties to any unexpired leases or executory contracts that could potentially be assumed and assigned to a Successful Bidder; (e) the Office of the United States Trustee for the District of Delaware and the Patient Care Ombudsman;

(f)  counsel to the Committee; (g) counsel to the DIP Agent; (h) the Office of the United States Attorney General for the District of Delaware; (i) the Internal Revenue Service; (j) the U.S. Department of Justice; (k) the offices of the attorneys general for the states in which the Debtors operate; (1) all of the Debtors' insurers; (m) all parties entitled to notice pursuant to Rule 2002 of the Bankruptcy Rules or Local Rule 2002-1(B); (n) to the extent not already included above, all parties in interest listed on the Debtors' creditor matrices, excluding current, former or future patients; and (o) other persons reasonably requesting notice of a potential purchase of the Select Assets (collectively, the "***Notice Parties***").

F.      As evidenced by the affidavits of service previously filed with the Court, proper, timely, adequate and sufficient notice of the Motion, Bidding Procedures, and Assumption Procedures has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006 and 9014 of the Bankruptcy Rules, and Rules 2002-1, 6004-1, and 9014-1 of the Local Rules. The notice provided was adequate, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, Bidding Procedures, or Assumption Procedures is necessary or required, other than as set forth in this Order.

G.      The Notice of Auction and Sale Hearing and Notice of Potential Assumption are reasonably calculated to provide all interested parties with timely and proper notice of the proposed sale of the Select Assets, including, without limitation: (i) the date, time, and place of the Auction, if any; (ii) the Bidding Procedures governing participation in the Auction; (iii) the deadline for filing objections to the sale of the Select Assets; (iv) the date, time, and place of the hearing to consider the sale of the Select Assets; (v) instructions for obtaining copies of the Select Purchase Agreement; (vi) clearly identifying the sale of the Select Assets is free and clear

of any and all liens, claims, interest, and other encumbrances, other than as set forth in the Select Purchase Agreement; and (v) the proposed assumption and assignment of certain contracts and leases, and the procedures and deadlines for objecting to any assumption and assignment.

H.      The Assumption Procedures will provide the Select Purchaser, any Qualified Bidder, and each counterparty to a potentially assumed executory contract or unexpired lease with proper notice of the potential assumption and assignment of any executory contract or unexpired lease and any cure costs relating thereto, and the procedures set forth therein with regard to any such cure costs satisfy section 365 of the Bankruptcy Code and Rule 6006 of the Bankruptcy Rules.

I.      The disclosures made by the Debtors concerning the Motion, Bidding Procedures and Assumption Procedures were good, complete and adequate.

J.      Notice of the Motion, Bidding Procedures, and Assumption Procedures was adequate, fair, and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code, Rules 2002, 6004, and 6006 of the Bankruptcy Rules, and Rules 2202-1 and 6004-1 of the Local Rules.

## IV.    The Select Purchase Agreement, Bid Procedures, and Bid Protections.

K.      The Select Purchase Agreement and its terms were negotiated in good faith and at arm's length.

L.      The terms of the Bidding Procedures and Bid Protections were negotiated in good faith and at arm's length.

M.      Good and sufficient business reasons exist for this Court to authorize the Debtors to enter into the Select Purchase Agreement, substantially in the form attached to this Order as **Exhibit 1**.

5

N.      The Bidding Procedures are reasonably designed to maximize the value to be achieved for the Select Assets.

O.      The Debtors have demonstrated that the Bid Protections in the form of (i) a break-up fee in the amount of $1,890,000; (ii) expense reimbursement in an amount up to $250,000; and (iii) an initial overbid at least greater than $2,750,000 higher than the Purchase Price are actual and necessary costs and expenses of preserving the Debtors' estates, within the meaning of sections 503(b) and 507(a) of the Bankruptcy Code, and are of substantial benefit to the Debtors' estates by inducing the Select Purchaser to enter into the Select Purchase Agreement and subject its offer to higher and better bids, thereby ensuring the Debtors receive the highest or of Florie best possible bid for the Select Assets.

P.      Good and sufficient business reasons exist for this Court to: (i) approve the Bidding Procedures, in the form attached to this Order as **Exhibit 2**; (ii) approve the payment to the Select Purchaser of the Bid Protections (as set forth in the Select Purchase Agreement and as described in the Bidding Procedures); (iii) schedule the auction and hearing to consider the results of the auction and sale of the Select Assets; and (iv) establish the Assumption Procedures, to fix cure amounts to be paid pursuant to section 365 of the Bankruptcy Code, in connection with the assumption and assignment of executory contracts and unexpired leases.

Q.      The Debtors have articulated good and sufficient reasons for this Court to approve the Bidding Procedures and Assumption Procedures.

R.      The entry of this Order is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The relief sought in the Motion is GRANTED AND APPROVED to the extent set forth in this Order.

6

2.      All objections to the relief granted in this Order that have not been withdrawn, waived, or settled as announced to the Court at the hearing to consider the Motion or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits or otherwise have been satisfied or adequately provided for pursuant to this Order.

3.      The Debtors' entry into the Select Purchase Agreement, substantially in the form attached to this Order as **Exhibit 1**, is expressly approved, and the Debtors' remedies for any claims, if any, against the Select Purchaser arising out of or relating to the Select Purchase Agreement and the transactions contemplated by the Select Purchase Agreement shall be limited to those remedies set forth in the Select Purchase Agreement.

4.      The Select Purchaser shall constitute a Qualified Bidder for all purposes and in all respects under the Bidding Procedures.

5.      The Bidding Procedures, substantially in the form attached to this Order as **Exhibit 2**, are approved in their entirety and are incorporated in this Order as if fully set forth at length in this paragraph; and, the Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

6.      As set forth in the Bidding Procedures, the deadline for submitting bids for the Select Assets is **[February 15, 2019 at 4:00 p.m. (prevailing Eastern time)]** (the "***Bid Deadline***"); provided, however, no bid shall be deemed a Qualified Bid until such time as the Debtors determine, in their reasonable business judgment, that such bid meets the requirements set forth in the Bidding Procedures.

7.      If the Debtors timely receive one or more Qualified Bids (other than the bid of the Select Purchaser), the Debtors shall conduct an auction (the "***Auction***") on **[February 20, 2019**

**at 10:00 a.m. (prevailing Eastern time)**] at the offices of DLA Piper LLP, 1201 North Market Street, Suite 2100, Wilmington, Delaware 19801 (or at such other location as the Debtors may designate upon written notice to all parties entitled to participate in the auction under the Bidding Procedures); provided, however, if no other Qualified Bid is received by the Bid Deadline (other than the Select Purchaser's bid), then the Debtors shall not be required to conduct an auction and may promptly seek this Court's approval of the sale of the Select Assets to the Select Purchaser, in accordance with the terms of the Select Purchase Agreement.

8.    Each Qualified Bidder participating in the Auction shall be required to certify it has not engaged in any collusion with respect to the potential purchase of the Select Assets.

9.    At such time as the Debtors determine the Successful Bid(s) in accordance with the Bidding Procedures, the Debtors shall file on this Court's docket in these Chapter 11 Cases a notice disclosing the identity of the Successful Bidder(s) and, if the Debtors deem there to be one, the identity of the Back-up Bidder(s) (the "*Successful Bidder Notice*").

10.    The hearing to consider approval of the sale of the Select Assets (the "*Sale Hearing*") shall be conducted on **[_____], 2019 at [____] (prevailing Eastern time)** before the Honorable Christopher S. Sontchi, Chief United States Bankruptcy Judge for the District of Delaware, 824 North Market Street, 5th Floor, Courtroom 6, Wilmington, Delaware 19801; provided, that, the Sale Hearing may be adjourned by this Court or by the Debtors from time to time without further notice other than by announcement in open court or through the filing of a notice on this Court's docket.

11.    The deadline to object to the remaining relief requested in the Motion, including entry of the Sale Order, is **[February 22, 2019 at 4:00 p.m. (prevailing Eastern time)**] (the "*Sale Objection Deadline*").

12.     Any party opposing the remaining relief sought in the Motion must file an objection prior to the Sale Objection Deadline, and such objection must: (i) be in writing; (ii) conform to the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules; (iii) state with particularity the legal and factual basis for the objection and the specific grounds for objecting; and (iv) filed with this Court and served **so as to be actually received** no later than the Sale Objection Deadline by the Objection Notice Parties.

13.     Not later than two (2) business days after entry of this Order, the Debtors shall cause: (a) notice substantially in the form attached to this Order as **Exhibit 3** (the "***Notice of Auction and Sale Hearing***") and a copy of this Order to be sent by first-class mail, postage prepaid, to the Notice Parties; and (b) electronic notice of the Motion, this Order, and the Notice of Auction and Sale Hearing to be posted on (i) this Court's website (http://www.deb.uscourts.gov) and (ii) the case website maintained by the Debtors' claims and noticing agent, Prime Clerk LLC.

14.     Not later than five (5) business days after entry of this Order, the Debtors shall serve by first-class mail, postage prepaid, a notice of potential assumption, assignment, and/or transfer of executory contracts and unexpired leases to which the Select Sellers are party, substantially in the form attached to this Order as **Exhibit 4** (the "***Notice of Potential Assumption***") on all non-Debtor parties to the executory contracts and unexpired leases.

15.     Upon filing the Successful Bidder Notice with this Court, the Debtors shall serve the Successful Bidder Notice on all parties that received service of the Notice of Potential Assumption.

16.     Unless the non-Debtor party to an executory contract or unexpired lease files an objection to (a) its cure amount or (b) the proposed assumption, assignment, and/or transfer of

such executory contract or unexpired lease to the Select Purchaser or to any Successful Bidder by **[February 8, 2019 at 4:00 p.m. (prevailing Eastern time)]** (the "*Assumption Objection Deadline*") and serves such objection **so as to be actually received** by the Objection Notice Parties by no later than the Assumption Objection Deadline, such non-Debtor party shall be (x) forever barred from objecting to the cure amount and from asserting against the Debtors, the Select Purchaser, or any Successful Bidder any additional cure or other amounts with respect to such executory contract or unexpired lease, and the Select Purchaser and any Successful Bidder shall be entitled to rely upon such cure amounts and (y) deemed to have consented to the assumption, assignment, and/or transfer of such executory contract or unexpired lease to the Select Purchaser or Successful Bidder and shall be forever barred and estopped from asserting or claiming against any party that any additional amounts are due, defaults exist, conditions to assumption, assignment, and/or transfer must be satisfied, or that any right or benefit under such executory contract or unexpired lease cannot or will not be available to the Select Purchaser or Successful Bidder.

17.     If a contract counterparty files a Contract Objection in a manner consistent with the Assumption Procedures, and the Debtor and the contract counterparty, in consultation with the Select Purchaser or Successful Bidder, are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid or reserved with respect to such objection will be determined at the Sale Hearing, such later hearing date that the Debtors determine in their discretion, in consultation with the Committee and the Successful Bidder(s), or such other date determined by this Court.  With respect to any Contract Objection that remains outstanding as of the Closing, the maximum claimed cure amount will be deposited into escrow to support the payment of the final cure amount at such time as the Contract Objection is resolved.

EAST\163461954.2

18.     No later than five (5) calendar days prior to the Closing (as defined in the Select Purchase Agreement), the Debtors shall serve a notice, substantially in the form attached to this Order as **Exhibit 5**, identifying the executory contracts and unexpired leases that will be assumed and assigned to the Select Purchaser or Successful Bidder, as applicable.

19.     The applicable Select Purchaser or Successful Bidder, as applicable, may determine to exclude any executory contract or unexpired lease from the list of Select Assets, in accordance with the applicable asset purchase agreement; provided, that, if any executory contracts or unexpired leases are excluded from the applicable list of Select Assets, the Debtors shall notify the non-Debtor party or parties to any such executory contracts or unexpired leases of such exclusion, by written notice as soon as practicable after such determination, which may be after the Sale Hearing.

20.     The notices attached to this Order as **Exhibit 3**, **Exhibit 4**, and **Exhibit 5** are approved in their entirety.

21.     The Bid Protections, as set forth in the Bidding Procedures, are expressly approved, and the Debtors are authorized and directed to promptly pay, as they become due, any amounts owed to the Select Purchaser on account of such Bid Protections, in accordance with the Bidding Procedures.

22.     The obligation of the Debtors to pay the Bid Protections shall: (a) constitute administrative expense claims against each of the applicable Debtor's estate; (b) be entitled to administrative expense priority status under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code: (c) survive the termination of the Select Purchase Agreement; and (d) be paid by the applicable Debtors to the Select Purchaser in cash, on the terms of and in accordance with the Select Purchase Agreement.

23.     Notwithstanding anything in the Motion or Select Purchase Agreement to the contrary, nothing in this Order shall be construed as authorizing the sale, transfer, or assignment of any Medicare provider agreement to the Select Purchaser or any Successful Bidder free and clear of successor liability for any liability arising from such provider agreements, nor as restricting the United States' right of setoff and recoupment. Any assumption and assignment of the Medicare provider agreements shall be authorized only in accordance with 11 U.S.C. § 365, all applicable Medicare statutes and regulations, and the Anti-Assignment Act.

24.     **Failure to timely file an objection in accordance with this Order shall forever bar the assertion of any objection to the Motion, entry of the Sale Order, or consummation of the sale of the Select Assets, and such failure shall be deemed to constitute consent to entry of the Sale Order and consummation of the sale of the Select Assets**.

25.     The stays provided by Rules 6004(h) and 6006(d) of the Bankruptcy Rules and the requirements of Local Rule 6004-1(c)(2) are waived, and this Order shall be effective immediately upon its entry.

26.     This Court retains jurisdiction over any and all matters related to or arising from the interpretation or implementation of this Order.

Dated: _____, 2019
         Wilmington, Delaware


_____
THE HONORABLE CHRISTOPHER S. SONTCHI
CHIEF UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1 to Bidding Procedures Order**
**<u>Select Purchase Agreement</u>**

**EXECUTION VERSION**

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**PROMISE HEALTHCARE, INC.,**

**THE SUBSIDIARIES THEREOF
LISTED ON <u>EXHIBIT 1</u>,**

**AND**

**SELECT MEDICAL CORPORATION**

**December 23, 2018**

## TABLE OF CONTENTS

ARTICLE I - DEFINITIONS ...................................................................................................... 1

    1.1    Definitions. .................................................................................................... 1

ARTICLE II – TRANSACTIONS AT THE CLOSING ......................................................... 8

    2.1    Purchase and Sale. ......................................................................................... 8

    2.2    Excluded Assets. ............................................................................................ 9

    2.3    Assumed Liabilities. ..................................................................................... 11

    2.4    Excluded Liabilities. ..................................................................................... 13

    2.5    Purchase Price and Cure Amounts. .............................................................. 13

    2.6    Closing. ......................................................................................................... 14

    2.7    Actions of Sellers' Parent at Closing. ........................................................... 15

    2.8    Actions of Buyers' Parent at Closing. ........................................................... 16

    2.9    Real Estate Closing Matters. ......................................................................... 16

    2.10    Risk of Loss. ................................................................................................ 17

ARTICLE III - REPRESENTATIONS AND WARRANTIES OF SELLERS AND SELLERS' PARENT ............................................................................................................................... 17

    3.1    Corporate Capacity, Authority and Governmental Consents. ...................... 18

    3.2    Binding Agreement. ...................................................................................... 18

    3.3    Assets. ........................................................................................................... 19

    3.4    Financial Statements. .................................................................................... 19

    3.5    Licenses and Accreditations ......................................................................... 19

    3.6    Regulatory Compliance. ............................................................................... 20

    3.7    Compliance Program .................................................................................... 21

    3.8    Material Contracts. ........................................................................................ 21

    3.9    Real Property. ................................................................................................ 22

    3.10    Insurance. ..................................................................................................... 22

    3.11    Employee Benefit Plans. .............................................................................. 23

    3.12    Employee Relations. .................................................................................... 24

    3.13    Litigation and Proceedings. ......................................................................... 24

    3.14    Third Party Reimbursement. ........................................................................ 25

    3.15    Tax Liabilities. ............................................................................................. 26

    3.16    Absence of Changes. ................................................................................... 26

    3.17    Intellectual Property ..................................................................................... 27

    3.18    Environmental Matters ................................................................................. 27

4822-2950-0804.2
25094706.19.BUSINESS

3.19  Material Suppliers and Material Payors.................................................................27

3.20  Brokers.................................................................................................................27

3.21  Affiliate Transactions ..........................................................................................28

3.22  Privacy and Security ............................................................................................28

3.23  Disclaimer of Warranties .....................................................................................28

ARTICLE IV - REPRESENTATIONS AND WARRANTIES OF BUYERS AND BUYERS'
PARENT ...........................................................................................................................28

4.1  Capacity, Authority and Consents ........................................................................28

4.2  Binding Agreement................................................................................................29

4.3  Litigation and Proceedings. ..................................................................................29

4.4  Availability of Funds ............................................................................................29

4.5  Representations of Sellers .....................................................................................29

ARTICLE V - COVENANTS OF THE PARTIES PRIOR TO CLOSING ...........................29

5.1  Access ....................................................................................................................29

5.2  Update of Schedules ..............................................................................................30

5.3  Consents and Approvals ........................................................................................31

5.4  Operating Covenants..............................................................................................31

5.5  Negative Covenants ...............................................................................................31

5.6  Bankruptcy Court Approval; Executory Contracts; Sale Procedures; and Stalking
Horse Provisions. ...................................................................................................33

5.7  Confidentiality .......................................................................................................35

5.8  Public Announcements ..........................................................................................36

5.9  Incorporation of Buyers ........................................................................................36

ARTICLE VI - CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYERS...............36

6.1  Representations and Warranties; Covenants..........................................................36

6.2  Required Governmental Approvals and Consents .................................................37

6.3  Title and Survey.....................................................................................................37

6.4  Actions and Proceedings........................................................................................37

6.5  Material Adverse Effect .........................................................................................37

6.6  Closing Certificate .................................................................................................37

6.7  Bankruptcy Court Approval...................................................................................37

6.8  Closing Deliveries..................................................................................................37

6.9  Objection Deadline ................................................................................................37

6.10  Maintenance of LTCH Classification ...................................................................38

ARTICLE VII - CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS ............38

ii

7.1    Representations and Warranties; Covenants ...................................................38

7.2    Pre-Closing Confirmations ...............................................................................38

7.3    Actions and Proceedings..................................................................................38

7.4    Closing Certificate ............................................................................................39

7.5    Closing Deliveries.............................................................................................39

7.6    Cure Amounts ...................................................................................................39

ARTICLE VIII - ADDITIONAL AGREEMENTS .....................................................................39

8.1    Termination Prior to Closing ............................................................................39

8.2    Post-Closing Filings and Access to Information...............................................41

8.3    Employee Matters.............................................................................................42

8.4    Medical Staff.....................................................................................................44

8.5    Refunds and Remittances.................................................................................44

8.6    Insurance ..........................................................................................................44

8.7    Assurances........................................................................................................44

8.8    Terminating Cost Reports.................................................................................45

8.9    Waiver of Bulk Sales Law Compliance ............................................................45

8.10   Closing Of Financials .......................................................................................45

8.11   Medicare Bad Debts .........................................................................................46

8.12   Non-Solicitation ...............................................................................................46

8.13   Straddle Patients ..............................................................................................46

8.14   Transitional Trademark License .......................................................................46

ARTICLE IX - GENERAL PROVISIONS ...............................................................................47

9.1    Survival.............................................................................................................47

9.2    Additional Assurances ......................................................................................47

9.3    [RESERVED] ....................................................................................................47

9.4    [RESERVED] ....................................................................................................47

9.5    Choice of Law; Venue ......................................................................................47

9.6    Benefit, Assignment and Third Party Beneficiaries..........................................47

9.7    Cost of Transaction ..........................................................................................48

9.8    Waiver of Breach ..............................................................................................48

9.9    Notice................................................................................................................48

9.10   Severability.......................................................................................................49

9.11   Interpretation ....................................................................................................49

9.12   Entire Agreement, Amendments and Counterparts .........................................49

4822-2950-0804.2
25094706.19.BUSINESS

9.13    Disclosure Generally........................................................................................................50

9.14    Time of Essence...............................................................................................................50

4822-2950-0804.2
25094706.19.BUSINESS

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement is entered into as of December 23, 2018 (the " *Effective Date*"), by and among **Promise Healthcare, Inc.**, a Florida corporation ("*Sellers' Parent*"), each of the direct or indirect subsidiary of Sellers' Parent listed on Exhibit 1 (each, a "*Seller*" and, collectively, the "*Sellers*"), **Select Medical Corporation**, a Delaware corporation ("*Buyers' Parent*"), and each Buyer that joins this Agreement pursuant to Section 5.9. Sellers' Parent, Sellers, Buyers' Parent and Buyers are collectively referred to as the "*Parties*" and each individually as a "*Party*".

## BACKGROUND

**WHEREAS**, Sellers own and operate those certain long-term acute care hospitals identified on Exhibit 1 (the "*Seller Facilities*") and the other businesses and assets incident thereto;

**WHEREAS**, on or about November 5, 2018, Sellers' Parent and each of the Sellers filed voluntary petitions (collectively, the "*Bankruptcy Case*") pursuant to chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*");

**WHEREAS**, the Parties intend that the Buyers be designated as the initial bidder for the Seller Facilities and the Purchased Assets; and

**WHEREAS**, each of the Sellers desires to sell and assign to the applicable Buyer, and applicable Buyer desires to purchase from the applicable Seller, all of the Purchased Assets relating to the applicable Seller Facility on the terms and conditions set forth herein, free and clear of all encumbrances (other than Permitted Encumbrances) in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

**NOW, THEREFORE**, in consideration of the promises, covenants, representations and warranties hereinafter set forth, the Parties agree as follows:

## ARTICLE I - DEFINITIONS

**1.1**    **Definitions.**  As used in this Agreement, the following terms have the following meanings (unless otherwise expressly provided herein):

"*Accounts Receivable*" means all accounts, notes, interest and other receivables of each Seller, and all claims, rights, interests and proceeds related thereto, arising from the rendering of services to patients at the Seller Facilities, billed and unbilled, recorded and unrecorded (including any accounts previously written off or charged off as bad debts), for services provided at or by Seller Facilities whether payable by private pay patients or Third Party Payors, or by any other source, including the right to receive an amount equal to the value of all accounts receivable arising from the rendering of services and provision of medicine, drugs and supplies to patients at the Seller Facilities relating to Medicare, Medicaid, TRICARE and other third party patient claims of Sellers due from beneficiaries or governmental Third Party Payors.

"*Accrued PTO*" means the dollar amount of all accrued but unused paid time off for vacation and sick time for each Transferred Employee (including employer FICA and any other estimated employer Taxes thereon) recorded by a Seller as of immediately prior to the Closing pursuant to the Seller's standard policies and as set forth on a schedule delivered to Buyers' Parent at least two (2) Business Days prior to the Closing.

1

"***Actions***" means any claim, cause of action, litigation, action, suit, arbitration, proceeding, hearing, audit or right in action.

"***Affiliate***" means, with respect to a Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person. The term "***control***" used in the preceding sentence means the possession, directly or indirectly, of the power to either (a) direct or cause the direction of the management and policies of a Person whether through ownership of equity interests, by contract or otherwise or (b) vote 10% or more of the securities having ordinary voting power for the election of directors of a Person.

"***Agreement***" means this Asset Purchase Agreement, as from time to time amended, modified or supplemented in accordance with its terms, including the Exhibits and Schedules attached hereto.

"***Ancillary Agreements***" means, with respect to any Party, all agreements to which such Party is or will become a party pursuant to this Agreement.

"***Applicable State***" means each State listed on Exhibit 1 with respect to the applicable Seller Facility.

"***Assumed Cure Amounts***" means those Cure Amounts set forth on Schedule 2.3(b) (as updated in accordance with Section 2.3(b)) solely with respect to any Proposed Assigned Contract that becomes an Assigned Contract, but excluding any Disputed Cure Amounts.

"***Bankruptcy Code***" means Title 11 of the United States Code, Sections 101 et seq.

"***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedures.

"***Business Day***" means any day other than a Saturday, Sunday or day on which banks are authorized or required to be closed in New York, New York.

"***CMS***" means the Centers for Medicare and Medicaid Services.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Contract***" means any written agreement, license, lease, contract, arrangement, understanding or commitment to which a Person or its assets is legally bound.

"***Cost Reports***" means all cost and other reports filed pursuant to the requirements of Government Reimbursement Programs, and similar or successor programs with or for the benefit of Governmental Authorities for payment or reimbursement of amounts due from them.

"***Cure Amounts***" means the amounts, if any, determined by the Bankruptcy Court to be necessary to cure all defaults and to pay all actual losses that have resulted from defaults by the applicable Seller pursuant to the Proposed Assigned Contracts (including any amounts delivered into escrow accounts to pay any claim for Cure Amounts that remain disputed as of the Closing).

"***Disputed Cure Amounts***" means the potential maximum Cure Amounts that could be payable with respect to any Disputed Contract based on objections received from non-debtor counterparties to such Disputed Contract in accordance with Section 5.6(b), in each case for which the dispute has not been fully resolved as of the Closing.

"***Encumbrances***" means any and all mortgages, liens, pledges, security interests, leases, subleases, licenses, rights of way, easements, rights of first refusal, options, restrictions, covenants, reservations or similar matters, whether or not of record, or encroachments of any nature whatsoever, or any conditional sale contracts, title retention contracts or other agreements or arrangements to give or to refrain from giving any of the foregoing, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, contingent or non-contingent, material or non-material, known or unknown.

"***Environmental Laws***" means all applicable foreign, federal, state or local Laws, governing pollution, protection of human health from exposure to Hazardous Materials or protection of the environment or natural resources, including, without limitation, any of the foregoing relating to the use, generation, transport, treatment, storage, Release or disposal of Hazardous Materials.

"***Environmental Liabilities***" means any obligation, expense, or liabilities arising out of or related to (a) environmental conditions, including without limitation, (i) the presence, Release, or threat of Release of, or exposure to, Hazardous Materials first occurring, or as a result of facts, circumstances or events first existing or occurring, prior to the Closing at, on, in or under or migrating from the Seller Facilities, whether into the air, soil, soil gas, ground or surface waters on-site or off-site, or (ii) arising from the off-site or on-site transportation, storage, treatment, recycling or disposal of Hazardous Materials managed or Released by or on behalf of Sellers in connection with the Seller Facilities or the Healthcare Business; or (b) any violation of any Environmental Law by Seller with respect to the Seller Facilities prior to the Closing.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended.

"***ERISA Affiliate***" means each trade or business (whether or not incorporated) which is treated as a single employer with any Seller under Section 414 of the Code or Section 4001(b) of ERISA.

"***Excluded Cure Amounts***" means those Cure Amounts with respect to any Contract that does not become an Assigned Contract.

"***Facility Employees***" means the employees of each Seller and any Affiliate of any Seller that perform substantially all of their services at one or more of the Seller Facilities, including any such employees who are on a leave of absence.

"***Facility IP***" means all of the Intellectual Property exclusively used in the operation of the Seller Facilities, including Intellectual Property owned by the Sellers and Intellectual Property which is exclusively used by the Sellers in the operation of the Seller Facilities but owned by a third party.

"***Final Order***" means an Order of the Bankruptcy Court (or any other court of competent jurisdiction) which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (ii) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such action or Order shall have become final in accordance with Bankruptcy Rule 8002; <u>provided</u> that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"*Fundamental Representations*" means Section 3.1(a), Section 3.2, the first sentence of Section 3.3(a), the last sentence of Section 3.9(a), and Section 3.20.

"*GAAP*" means generally accepted accounting principles in the United States, consistently applied.

"*Governing Documents*" means, for the Person in question, that Person's Articles of Incorporation, Certificate of Formation, Certificate of Limited Partnership, Bylaws, Partnership Agreement, Limited Liability Company Agreement or other similar documents relating to the formation and/or governance of the business and affairs of such Person.

"*Government Reimbursement Programs*" means any programs funded or administered by a Governmental Authority, or contractor(s) thereof, for the purposes of paying for health care services. Such programs include Medicare, each state Medicaid program, TRICARE, each other federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)), and all similar or successor programs with or for the benefit of designated federal or state residents.

"*Governmental Authority*" means any federal, state, local or municipal government, including any subdivision, court, commission or regulatory agency; any governmental or quasi-governmental authority; and any Person exercising or entitled to exercise any administrative, executive, judicial, legislative, regulatory or taxing authority.

"*Hazardous Materials*" means any petroleum or petroleum products, radioactive materials or wastes, friable asbestos, medical, pathological, infectious or biological wastes, polychlorinated biphenyls, and any pollutant, contaminant, or other chemical, material, substance or waste that is prohibited, limited or regulated under any Environmental Law due to its hazardous or toxic nature.

"*Healthcare Business*" means, collectively, the businesses operated by the Sellers, including Sellers' ownership and operation of the Seller Facilities.

"*Healthcare Laws*" means, collectively, any and all Laws governing the licensure or regulation of healthcare providers, professionals, or facilities, or payors or otherwise governing or regulating the provision of, or payment for, healthcare services, the sale of controlled substances or other pharmaceuticals, medical devices or supplies and the like. Without limiting the generality of the foregoing, Healthcare Laws include Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395hhh (the Medicare statute), including specifically, the Ethics in Patient Referrals Act, as amended, 42 U.S.C. § 1395nn; Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v (the Medicaid statute); the Federal Health Care Program Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b); the False Claims Act, 31 U.S.C. §§ 3729-3733 (as amended); the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; the Anti-Kickback Act of 1986, 41 U.S.C. §§ 8701–8707; the Civil Monetary Penalties Law, 42 U.S.C. §§ 1320a-7a and 1320a-7b; the Exclusion Laws, 42 U.S.C. § 1320a-7; the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. §§ 1320d-1329d-8, as amended by the Health Information Technology for Economic and Clinical Health Act, enacted as Title XIII of the American Recovery and Reinvestment Act of 2009, Public Law 111-5 ("*HIPAA*"); the Patient Protection and Affordable Care Act; the Health Care Fraud Enforcement Act of 2009; the Federal Controlled Substances Act, 21 U.S.C. §§ 801 et seq.; the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 301 et seq.,; any state or local statutes or regulations concerning the dispensing and sale of controlled substances; all Laws relating to the provision of, or billing or payment for health care items or services, or relating to health care information and all applicable amendments, implementing regulations, rules, ordinances, judgments, and orders; and any similar state and local statutes, regulations, rules, ordinances, judgments, and orders; and

4

all applicable federal, state, and local licensing, certificate of need, regulatory and reimbursement statutes, corporate practice of medicine and physician fee splitting regulations, rules, ordinances, orders, and judgments applicable to healthcare service providers.

"**HHS**" means the U.S. Department of Health and Human Services.

"**Intellectual Property**" means all of the following in any jurisdiction throughout the world (i) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissues, divisions, continuations, continuations-in-part, renewals, extensions, and foreign counterparts and equivalents thereof, (ii) all trademarks, service marks, logos, trade names, corporate names, and other source identifiers whether registered or unregistered (as the case may be), as well as all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (iii) registrations for internet domain names, (iv) all rights protected by copyright law, including rights in registered and unregistered works of authorship, all rights to copy, distribute, modify, publicly perform, and publicly display such works, and all applications, registrations, and renewals in connection therewith, and (v) trade secrets, technologies, databases, software, and other proprietary information.

"**Inventory**" means all inventories of supplies, drugs, food, janitorial and office supplies and other disposables and consumables located at the Seller Facilities or used in connection with the operation of the Seller Facilities.

"**IRS**" means the Internal Revenue Service.

"**Knowledge of Sellers**" (and any similar expression, including the expression "**Sellers' Knowledge**") means, as to a particular matter, the actual knowledge of Suzanne K. Sterling, Dr. Charles Posternack, and the CEO, CFO, Chief Nursing Officer and Compliance Officer of any Seller or Seller Facility in each case after reasonable inquiry of the applicable personnel at the Seller Facility.

"**Law**" means any federal, state, local or other statute, law, ordinance, regulation, rule, code, decree, Order or similar requirements of any Governmental Authority.

"**Leave Employee**" means each Facility Employee who, as of the Closing Date, is on disability, maternity, military or any other leave of absence that is approved in writing by his or her employer and from which the Facility Employee's return to active employment is protected by applicable Law.

"**Material Adverse Effect**" means a change, event, development or occurrence that, individually or in the aggregate, (a) would or would reasonably be expected to prevent or materially delay consummation of the transactions contemplated by this Agreement or (b) has or would reasonably be expected to have a material adverse effect on the financial condition, properties, assets, liabilities, business, or results of operations of the Purchased Assets, taken as a whole.  Notwithstanding the foregoing, none of the following changes, events, developments or occurrences shall be deemed to constitute or be taken into account in determining whether there has been or may be a Material Adverse Effect under clause (b): (i) any actual or proposed change in Law or accounting standards or the interpretation or implementation thereof; (ii) any change that is generally applicable to the healthcare industry in the Applicable State; (iii) the entry into this Agreement or the announcement, commencement, pendency or consummation of the transactions contemplated hereby, (iv) any action taken by Sellers' Parent, Sellers or their Affiliates that is required to be taken by this Agreement; (v) any omission to act or action taken with the prior written consent of Buyers' Parent; (vi) any change in general business, economic, geopolitical or financial market conditions; (vii) any national or international political event or occurrence, including acts of war or terrorism; (viii) any natural disaster or calamity; (ix) the filing or

5

prosecution of the Bankruptcy Case; (x) failure of the Sellers to meet financial projections (provided that the exception in this clause (x) shall not prevent or otherwise affect a determination that any change, event, development or occurrence underlying or relating to such failure has resulted in or contributed to a Material Adverse Effect); and (xi) any seasonal fluctuations in the operations of the Seller Facilities consistent in all material respects with prior fiscal years, except, in the case of clauses (i), (ii), (vi), (vii) and (viii) to the extent such changes, events, occurrences or developments have a disproportionate effect on the Seller Facilities and the Purchased Assets, taken as a whole, relative to other Persons owning and/or operating long-term acute care hospitals in the United States or any Applicable State.

"***Order***" means any award, writ, injunction, judgment, order, ruling, decision, decree, directive, or similar determination entered, issued, made or rendered by any Governmental Authority (whether judicial, administrative or arbitral).

"***Outside Date***" means the date that is the ninetieth (90th) day following the Effective Date; provided, however, that if as of such ninetieth (90th) day (a) the Post-Order Period is ongoing and (b) all of the conditions to Closing set forth in <u>ARTICLE VI</u> and <u>ARTICLE VII</u> (other than those conditions which are to be satisfied at Closing, but subject to such conditions being satisfied at the Closing) are satisfied or waived, then the Outside Date shall be the date that is three (3) Business Days following the final day of the Post-Order Period.

"***Permits***" means all licenses, permits, franchises, privileges, certificates, rights, registrations, approvals, authorizations, consents, provider numbers, waivers, exemptions, releases, variances, certificates of authority, accreditations, or Orders issued by any Governmental Authority.

"***Permitted Encumbrances***" means (i) statutory liens that relate to Taxes, assessments and charges or levies imposed by a Governmental Authority that are not yet due or payable or that are being contested in good faith and for which appropriate reserves have been established in accordance with GAAP; (ii) leasehold interests of the owners of Leased Real Property, (iii) zoning regulations and other Laws affecting the Real Property which are not violated by the current use and occupancy of such Real Property; (iv) easements, covenants, conditions, restrictions and other similar matters of record on real property or leasehold estates that do not in any material respect detract from the value thereof and do not interfere with the operation of the Seller Facilities or impair the usefulness thereof; (v) liens arising as a result of the acts of Buyer or its Affiliates; (vi) other than monetary liens, any matter disclosed in the Title Commitments or Surveys; and (vii) those Encumbrances listed on <u>Schedule 1.1(b)</u>, in each case other than any liens existing as of the Closing with respect to the Owned Real Property that relate to Taxes, assessments, charges or levies imposed by a Governmental Authority.

"***Person***" means an individual, corporation, partnership, limited liability company, limited liability partnership, trust, association, or organization, including any Governmental Authority.

"***Post-Order Period***" means the period beginning on the date of the final entry of the Sale Order and ending on the thirtieth (30th) day thereafter.

"***Prepaid Assets***" means all advance payments, prepayments, prepaid expenses and deposits which were made by or on behalf of Sellers with respect to the operation of the Seller Facilities.

"***Purchase Price***" means an amount equal to Sixty Three Million Dollars ($63,000,000) <u>less</u> the Assumed Cure Amounts.

"***Release***" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, depositing, disposing, dispersing, or migrating of Hazardous

6

Materials into or through the environment or within any building, structure, facility or fixture (including the abandonment or discarding of any barrels, containers or other closed receptacles containing any Hazardous Material).

"*Representatives*" means, with respect to any Person, the officers, directors, principals, employees, agents, auditors, advisors and bankers of such Person.

"*Sale Order*" means a Final Order of the Bankruptcy Court approving, *inter alia*, (i) the sale of the Purchased Assets to the applicable Buyer free and clear of any Encumbrances (other than Permitted Encumbrances), and (ii) the assumption and assignment of the Assigned Contracts to the applicable Buyer, in the form of Sale Order attached as Exhibit 3 hereto or otherwise in form and substance satisfactory to each of Buyers' Parent and Sellers' Parent.

"*Sale Procedures Order*" means a Final Order of the Bankruptcy Court approving the procedures for the sale of the Purchased Assets, in the form of the Sale Procedures Order attached as Exhibit 4 hereto or otherwise in form and substance satisfactory to each of Buyers' Parent and Sellers' Parent.

"*Seller's Transfer Taxes*" means fifty percent (50%) of Transfer Taxes.

"*Tax Returns*" means all reports, returns, declarations, statements or other information returns or statements filed or required to be filed with any Governmental Authority in connection with Taxes (including any attachments thereto or amendments thereof).

"*Taxes*" means (i) all taxes, charges, fees, levies, duties, or other similar assessments or liabilities in the nature of a tax, including income, gross receipts, net proceeds, alternative or add-on minimum, ad valorem, value-added, excise, stamp, lease, real property, personal property (tangible or intangible), sales, use, service, transfer, excess profits, withholding (including employee's income withholding), unemployment or other social security, occupational, employment, disability, payroll, registration, environmental, capital stock, capital gains, franchise, and escheat or unclaimed property taxes, in each case imposed by any Governmental Authority; (ii) any interest, fines, penalties, assessments or additions to tax resulting from, attributable to or incurred in connection with any tax described in clause (i) or any contest or dispute thereof; and (iii) any liability for the payment of amounts described in clauses (i) or (ii) as a result of any tax sharing, tax indemnity or tax allocation agreement or any agreement to pay or indemnify any other Person for such matters.

"*Third Party Payor*" means any Person (other than the beneficiary) that pays for or reimburses at least a portion of the health care expenses of its beneficiaries including each Government Reimbursement Program, any entity authorized to provide health insurance (or property, casualty, or life insurance covering health benefits), any health maintenance organization, preferred provider organization, or other managed care program, and any employer authorized in accordance with applicable Law to self-insure its workers' compensation risk.

"*Title Company*" means Fidelity National Title Insurance Company.

"*Transfer Taxes*" means any sales, use, transfer, excise, stamp, conveyance, mortgage, intangible, documentary recording, license and registration, and value added Taxes imposed by any Governmental Authority upon the Purchased Assets.

4822-2950-0804.2
25094706.19.BUSINESS

## ARTICLE II – TRANSACTIONS AT THE CLOSING

**2.1** **Purchase and Sale.** Subject to the terms and conditions of this Agreement, at the Closing and effective as of the Effective Time, each Seller shall sell, convey, assign, transfer and deliver to the applicable Buyer, and the applicable Buyer shall acquire, all of the following assets owned, exclusively used or held for use by Sellers in connection with the operation of the Seller Facilities, other than the Excluded Assets (all such assets other than the Excluded Assets, the "***Purchased Assets***"), free and clear of all Encumbrances other than the Permitted Encumbrances:

(a)     all interests of Sellers in the real property owned by Sellers that is described in Schedule 2.1(a) (the "***Owned Real Property***"), including all rights of Sellers or its Affiliates in the land, buildings, fixtures, parking lots, construction in progress, and other improvements located thereon as to each parcel of real property included in such Owned Real Property;

(b)     subject to Section 2.3(b), all leasehold interests (together with any amendments, renewals, guaranties or other agreements with respect thereto, the "***Proposed Tenant Leases***") of Sellers used exclusively in connection with the operation of the Healthcare Business in and to the real property (the real property that is subject to the Proposed Tenant Leases being referred to as the "***Leased Real Property***"), (the term "***Real Property***" means collectively the Owned Real Property and the Leased Real Property) that are described in Schedule 2.1(b);

(c)     all interests of Sellers in and to all real property leases, subleases, licenses, use and other occupancy agreements relating exclusively to the operation of the Seller Facilities or the Healthcare Business described in Schedule 2.1(c) (each, a "***Proposed Lessor Lease***");

(d)     all equipment, furniture, furnishings, machinery, tools, supplies, telephones, office equipment, leasehold improvements and other tangible personal property used by Sellers in connection with the operations of the Seller Facilities;

(e)     all Inventory owned by Sellers and exclusively used in connection with the operation of the Seller Facilities (other than the portions of Inventory disposed of, or expended, as the case may be, by Sellers after the Effective Date and prior to the Closing in the ordinary course of business);

(f)     reserved;

(g)     all Prepaid Assets related to the Healthcare Business other than any Prepaid Assets exclusively relating to any of the Excluded Assets;

(h)     all intangible personal property owned by Sellers and exclusively used in connection with the operation of the Seller Facilities, including all right, title and interest in and to all Facility IP, including the names set forth on Schedule 2.1(h), but excluding (A) the right to use any names, trade names, trademarks and service marks including the name "Promise" and (B) all proprietary software, data processing programs, or source codes used by Sellers or its Affiliate;

(i)     all financial, medical staff and personnel records (including those related to the preparation of Cost Reports) owned by Sellers and used in connection with the operation of the Seller Facilities or the Purchased Assets (including all equipment records, construction plans and specifications, medical and administrative libraries, documents, catalogs, books, records, files, operating manuals and current personnel records) and all patient and medical records used in connection with the operation of the Purchased Assets (provided that personnel records not relating to the Transferred Employees shall not be treated as Purchased Assets);

8

(j)      subject to Section 2.10, all of a Seller's rights to receive insurance proceeds relating to the physical condition of the Seller Facilities and the Purchased Assets, to the extent not expended on the repair or restoration of the Purchased Assets prior to the Closing;

(k)      subject to Sections 2.3(b) and 5.6(b), the Contracts of Sellers (i) designated in Schedule 2.1(k) as Material Contracts to be assumed by Buyers or (ii) which exclusively relate to the operation of the Seller Facilities but are not required to be listed in Schedule 3.8, and in any event including the Medicare and Medicaid provider agreements for the Seller Facilities ((i) and (ii), collectively the "***Proposed Assumed Contracts***");

(l)      to the extent assignable, all Permits held by Sellers relating exclusively to the ownership, development and operation of the Seller Facilities and the Purchased Assets;

(m)      all claims or causes of action relating to or arising from the Healthcare Business other than claims that arise under Chapter 5 of Title 11 of the United States Code;

(n)      subject to Section 2.3(a)(iv), except for any positive amounts with respect to Medicare reimbursement for bad debts of the Seller Facilities under 42 C.F.R. § 413.89 associated with services furnished prior to the Effective Time, which shall be governed pursuant to Section 8.11 of this Agreement, rights to positive cost report settlements and retroactive adjustments on Seller Cost Reports in respect of time periods prior to the Closing ("***Seller Agency Settlements***");

(o)      subject to Section 2.3(a)(iv), except for any positive amounts with respect to Medicare reimbursement for bad debts of the Seller Facilities under 42 C.F.R. § 413.89 relating to services furnished prior to the Closing, which shall be governed pursuant to Section 8.11 of this Agreement, any amounts receivable and any amounts received on or after the Closing Date with respect to any extraordinary payments and payment adjustments from any Third Party Payor, including payments and payment adjustments: (i) relating to outlier reconciliation, supplemental, disproportionate share or waiver payments, or Medicaid GME funding with respect to time periods prior to the Effective Time; (ii) relating to the Seller Cost Reports or Seller Agency Settlements (whether resulting from an appeal of a disallowance or otherwise) and other risk settlements with respect to time periods prior to the Effective Time; (iii) which result any appeals pertaining to Medicare, Medicaid (including disproportionate share hospital program payments), TRICARE or other Third Party Payors for services furnished during periods prior to the Effective Time; (iv) relating to participation in any group purchasing organization (including any rebates or fee sharebacks for purchases made and paid for prior to the Effective Time) with respect to periods prior to the Effective Time; or (v) arising from Meaningful Use attestations with respect to time periods prior to the Effective Time;

(p)      the goodwill generated by or associated with Sellers and the Seller Facilities;

(q)      all telephone and facsimile numbers, post office boxes and directory listings used exclusively in connection with the Seller's operation of the Healthcare Business; and

(r)      any other tangible asset located within the Seller Facilities as of (x) the Effective Date or (y) the Closing Date, in each case not otherwise articulated in the foregoing (a) through (o) and not otherwise an Excluded Asset.

**2.2      Excluded Assets**. The following assets of Sellers shall not be conveyed to Buyers (collectively, the "***Excluded Assets***"):

9

(a)        all intercompany receivables between Sellers' Parent, Sellers and any of their respective Affiliates;

(b)        all cash and cash equivalents, securities, investments, endorsements, bond funds and other funds created by bond indentures (but not including any Prepaid Assets that are related to the Healthcare Business);

(c)        assets and liabilities under medical malpractice risk pools and workers compensation and employee retirement programs;

(d)        all of Seller's or any of its Affiliates' proprietary manuals, marketing materials, policy and procedure manuals, standard operating procedures and marketing brochures, data and studies or analyses not used exclusively at the Seller Facilities;

(e)        the Contracts of Seller that (i) relate exclusively to the Excluded Liabilities or the Excluded Assets, (ii) do not relate to either the Purchased Assets or the Seller Facilities, (iii) are not Assigned Contracts or (iv) are listed on Schedule 2.2(e) (the "***Excluded Contracts***");

(f)        all United States and worldwide inventions, trade secrets, know-how, whether or not patentable, mask work rights, patents, patent applications, trademarks, service marks, trade names, trade dress, copyrights, and all applications, registrations and renewals in connection with any of the above including the names "***Promise***", and any other trade names, trademarks, service marks, trade dress, logos, symbols (as well as all abbreviations, variations or derivations thereof), copyrights and applications therefor of Seller or its Affiliates or world-wide web addresses not used exclusively at the Seller Facilities, any promotional material, educational material, signage, stationery, supplies or other items of inventory bearing such names, marks, trade dress, logos, or symbols or abbreviations, variations or derivations thereof, and any URLs, sites, blogs or pages hosted on Sellers' Parent's system websites, including associated content embodied within the foregoing;

(g)        computer software, programs and hardware or data processing equipment, data processing system manuals and licensed software materials which are proprietary to Sellers' Parent, Sellers or their Affiliates or used in connection with the operation of one or more of Sellers' or its Affiliates' health care facilities other than the Seller Facilities;

(h)        all Employee Benefit Plans maintained by, sponsored in whole or in part by, contributed to by, or required to be contributed to by, any Seller or any of its Affiliates (including, without limitation, each Facility Employee Benefit Plan) or with respect to which any Seller or any of its Affiliates has any actual or contingent liability (each such Employee Benefit Plan described in this Section 2.2(h), a "***Seller Plan***") and all Contracts, assets and insurance policies relating to any Seller Plan;

(i)        all minute books and organizational records relating to Sellers and their Affiliates and all other books and records that a Seller is required by Law to retain in its possession (provided that Sellers shall provide Buyers copies of such books and records that a Seller is required by Law to retain in its possession);

(j)        except as set forth in Section 2.1(j), all insurance policies and rights thereunder;

(k)        those pharmaceuticals that cannot by Law be sold by Sellers to Buyers;

4822-2950-0804.2
25094706.19.BUSINESS

(l)        all claims, rights, interests and proceeds with respect to federal, state or local Tax payments, refunds and credits (including property Tax refunds) to the extent such amounts relate to Taxes that are Excluded Liabilities;

(m)        all claims, causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment of Sellers and their Affiliates with respect to periods prior to the Effective Time, and any payments, awards or other proceeds resulting therefrom;

(n)        all claims, causes of action, choses in action, rights of recovery of Sellers and their Affiliates that arise under Chapter 5 of Title 11 of the United States Code;

(o)        peer review materials and any writings, documents and other items that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other cognizable privilege or protection, in each case, except to the extent related to the Assumed Liabilities;

(p)        Sellers' National Provider Identifiers;

(q)        any assets or businesses used exclusively in the operations of any hospitals or facilities owned or operated by Sellers' Parent or its subsidiaries other than the Seller Facilities;

(r)        the rights of Sellers' Parent, Sellers and their Affiliates under this Agreement;

(s)        all Accounts Receivable as of the Closing Date (other than those described in Sections 2.1(n) and (o)); and

(t)        all other assets of Sellers that are not Purchased Assets, including those set forth in Schedule 2.2(t).

**2.3        Assumed Liabilities**.

(a)        In connection with the sale of the Purchased Assets to Buyers at the Closing and effective as of the Effective Time, Buyers shall assume and be responsible only for Accrued PTO and the following liabilities, obligations and duties of Seller to the extent (x) relating to operation of the Seller Facilities (and not to the extent arising from or related to any Excluded Asset, Excluded Liability or any breach, violation or infringement of Contract, tort or Law) and (y) arising on or after the Closing Date (all such liabilities other than the Excluded Liabilities, collectively, the "***Assumed Liabilities***"):

(i)        subject to Section 2.3(b), liabilities, obligations and duties of Sellers under the Assigned Contracts as and to the extent any such liability, obligation or duty arises on or after the Closing Date;

(ii)        all liabilities and obligations to the extent arising out of the operation of the Owned Real Property and Leased Real Property on or after the Closing Date;

(iii)        capital lease obligations of Seller under the Assumed Contracts set forth on Schedule 2.3(a)(iii);

(iv)        claims, recoupments, set-offs, adjustments and other liabilities relating to the Medicare and Medicaid provider agreements of the Seller Facilities;

(v)        the Assumed Cure Amounts; and

11

(vi)     other specifically assumed liabilities set forth in Schedule 2.3(a)(vi).

(b)     Schedule 2.3(b) attached hereto sets forth Sellers' Parents' good faith estimate as of the Effective Date (the "***Effective Date Cure Amount Schedule***") of the Cure Amount for each Proposed Assumed Contract, Proposed Tenant Lease and Proposed Lessor Lease (collectively, the "***Proposed Assigned Contracts***").  With respect to any Proposed Assigned Contract, Buyers' Parent shall have the right to designate any such Contract as an Excluded Contract that shall thereafter cease to be a Proposed Assigned Contract and be deemed to be listed on Schedule 2.2(e) and any Cure Amount in respect thereof shall be deemed an Excluded Cure Amount.  Following the Bid Deadline, Buyers' Parent may not designate any Excluded Contract as a Proposed Assigned Contract.  Without limiting the obligations of Sellers' Parent and Sellers pursuant to Section 5.6(b), prior to any bid deadline ("***Bid Deadline***") set by the Bankruptcy Court to approve a sale pursuant to this Agreement (the "***Sale Hearing***"), Sellers' Parent shall commence appropriate proceedings before the Bankruptcy Court and otherwise take all reasonably necessary actions requested by Buyers' Parent to determine the actual amount of the Cure Amounts, including resolving any disputes as to Cure Amounts prior to or at the Sale Hearing, such that all Proposed Assigned Contracts may be assumed by the applicable Seller and assigned to the applicable Buyer in accordance with Section 365 of the Bankruptcy Code (each such Contract, an "***Assigned Contract***").  Sellers' Parent shall deliver an updated version of Schedule 2.3(b) (i) at least two (2) Business Days prior to the Bid Deadline reflecting any increase in the Cure Amounts set forth on the Effective Date Cure Amount Schedule resulting from any filed objections (the updated version of Schedule 2.3(b) delivered in accordance with this clause (i), the "***Bid Deadline Cure Amount Schedule***") and (ii) at least two (2) Business Days prior to the Closing setting forth the Assumed Cure Amount for each Proposed Assigned Contract determined in accordance with the Sale Order and the maximum claimed amount of any Disputed Cure Amount with respect to each Disputed Contract that is not resolved prior to the Sale Hearing (the updated version of Schedule 2.3(b) delivered in accordance with this clause (ii), the "***Final Cure Amount Schedule***"); provided that the Cure Amounts set forth on the Final Cure Amount Schedule shall not exceed the corresponding amount set forth on the Bid Deadline Cure Amount Schedule and Buyers' Parent shall be solely responsible for the payment of any Assumed Cure Amount in respect of an Assigned Contract.  Sellers' Parent shall facilitate Buyers' Parent's negotiation of any Cure Amounts with the applicable third parties.

(c)     Nothing in this Agreement shall be construed as an attempt to assign, and Buyers shall not assume any liabilities or obligations with respect to, any Contract, lease, agreement or Permit intended to be included in the Purchased Assets that by applicable Law is non-assignable, or that by its terms is non-assignable without the consent of the other party or parties thereto to the extent such party or parties assert in writing that such assignment is a breach of such Contract, lease or agreement or Permit as to which all the remedies for the enforcement thereof enjoyed by any Seller would not, as a matter of Law, pass to the applicable Buyer as an incident of the assignments provided for by this Agreement unless the Bankruptcy Court shall have determined that such Contract, lease, agreement or Permit may be assigned notwithstanding the claim or objection of the counterparty that the Contract or Permit may not be assigned without its consent or approval.  Sellers' Parent and each Seller shall, at the request and under the direction of Buyers' Parent, take all reasonable actions (including, without limitation, the appointment of Buyers' Parent or any Buyer as attorney-in-fact for each Seller) and do or cause to be done all such things as shall in the reasonable judgment of Buyers' Parent be necessary or proper (i) to assure that the rights and benefits of each Seller under such Contracts or Permits shall be preserved for the benefit of the applicable Buyer, and (ii) to facilitate receipt of the consideration to be received by the Sellers in and under every such Contract or Permit, which consideration shall be held for the benefit of, and shall be delivered to, the applicable Buyer.

4822-2950-0804.2
25094706.19.BUSINESS

**2.4**    **Excluded Liabilities**.    Buyers shall not assume, and under no circumstances shall Buyers be obligated to pay, discharge, perform or assume any debt, obligation, expense or liability of Sellers or any Affiliates thereof that is not an Assumed Liability (collectively, the "***Excluded Liabilities***"), including the following:

(a)    any liabilities owed by a Seller to an Affiliate of Seller;

(b)    all trade payables, accounts payable and other current liabilities of Sellers or relating to the Seller Facilities, including without limitation any patient credit balances;

(c)    all liabilities and obligations to the extent not arising out of the operation of the Seller Facilities;

(d)    all liabilities and obligations relating to or arising from any Excluded Asset;

(e)    all liabilities arising out of or relating to any Seller Plan;

(f)    all liabilities, other than Accrued PTO and the liabilities specifically set forth on Schedule 2.3(a)(vi), with respect to employment, termination of employment, compensation, severance and employee benefits of any nature owed to any Facility Employee or any other current or former officer, manager, director, member, employee or independent contractor (or any of their respective dependents or beneficiaries) of any Seller or any of its Affiliates relating to or arising out of such individual's employment or service (or the termination of employment or service) with such Seller or any of its Affiliates or any of their respective predecessors, whether or not such individual becomes a Transferred Employee, including, without limitation, any obligation to pay or provide any Facility Employee or other current or former officer, manager, director, member, employee or independent contractor (or any of his or her respective dependents or beneficiaries) of any Seller or any of its Affiliates any severance or change in control payments, transaction bonuses, retiree benefits, salary, wages or commissions;

(g)    any and all (i) Taxes of Sellers' Parent, Sellers or any of their respective Affiliates and any Tax related to the operations of the Seller Facilities or the Purchased Assets and (ii) Seller's Transfer Taxes;

(h)    any Environmental Liabilities;

(i)    any Excluded Cure Amounts;

(j)    any and all fees, costs and expenses (including legal fees and accounting fees) that have been incurred or that are incurred by Sellers' Parent or any Seller in connection with the transactions contemplated by this Agreement or any prior attempted sale transaction or the Bankruptcy Case, including all fees, costs and expenses incurred in connection with or by virtue of the negotiation, preparation and review of this Agreement and all Ancillary Agreements and the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements; provided however this provision shall not prohibit any fees, costs or expenses from being paid from the proceeds received by or on behalf of the Sellers at Closing; and

(k)    any liabilities or other obligations set forth on Schedule 2.4(k).

**2.5**    **Purchase Price and Cure Amounts**.

13

(a)    Buyers' Parent shall deposit $3,780,000 within two (2) Business Days following the Effective Date (the "*Deposit*") into an escrow account established pursuant to that certain Escrow Agreement of even date herewith among U.S. Bank National Association (the "*Escrow Agent*"), Sellers' Parent and Buyers' Parent (the "*Escrow Agreement*").  At the Closing, the Deposit shall be credited towards payment of the Purchase Price and released to Sellers.  If the Closing does not occur and this Agreement is terminated, the Deposit shall be released as provided in Section 8.1(c).

(b)    At the Closing, Buyers shall pay all Assumed Cure Amounts for Assigned Contracts in accordance with the Sale Order and any Disputed Cure Amounts shall be paid when resolved (if not at Closing) subject to Section 5.6(b).  Buyers will have no responsibility for the Excluded Cure Amounts.

(c)    At the Closing, Sellers will assign and transfer the Purchased Assets to Buyers, and Buyers' Parent (on behalf of Buyers) will pay, or shall cause to be paid, by wire transfer of immediately available funds, (x) an amount of cash equal to (i) the Purchase Price (as may be reduced in respect of any Non-Compliant Facility pursuant to Section 2.6(b)) less (ii) the amount of the Deposit and (iii) less the aggregate amount of the Disputed Cure Amounts (the "*Aggregate Disputed Amount*") to Sellers' Parent (on behalf of Sellers) to the account set forth in wiring instructions provided by Sellers' Parent at least three (3) Business Days prior to the Closing and (y) an amount of cash equal to the Aggregate Disputed Amount into an escrow account established pursuant to the Escrow Agreement (the "*Cure Amount Escrow Account*").

(d)    Sellers' Parent and Buyers' Parent shall agree upon an allocation of the Purchase Price among the Purchased Assets for tax reporting and other purposes consistent with the allocation methods and principles required by the Code.  Buyers and Sellers shall report, act and file all tax returns, including IRS Form 8594, with their respective federal income tax returns for the tax year in which the Closing Date occurs consistent with such agreed upon allocation.

(e)    Buyers' Parent shall be entitled to deduct and withhold from any payment under this Agreement any Taxes required to be deducted and withheld by Buyers' Parent under applicable Law, and Buyers' Parent shall pay such amounts to the appropriate Governmental Authority.

(f)    Sellers and Sellers' Parent shall pay Seller's Transfer Taxes incurred in connection with the purchase and sale of the Purchased Assets and Buyer shall pay the remainder of the Transfer Taxes. The Parties hereto will cooperate in all reasonable respects in timely making all filings, returns, reports and forms as may be required to comply with the provisions of applicable Law relating to any such Transfer Taxes, fees or charges and in executing and delivering certificates that accurately set forth relevant facts to entitle the Parties hereto to exemptions from the payment of such Transfer Taxes, fees or charges (if applicable).

**2.6    Closing**.

(a)    Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated pursuant to this Agreement (the "*Closing*") shall take place electronically no later than on the third (3rd) Business Day immediately following the day on which the last of the conditions to Closing set forth in ARTICLE VI and ARTICLE VII (other than those conditions which are to be satisfied at Closing, but subject to such conditions being satisfied at the Closing) are satisfied or waived; provided, however, that, notwithstanding the satisfaction or waiver of the conditions set forth in ARTICLE VI and ARTICLE VII (other than those conditions which are to be satisfied at Closing, but subject to such conditions being satisfied at the Closing), if the Post-Order Period has not ended at least three (3) Business Days prior to such time, then Buyers' Parent and Buyers shall not be required to effect

14

the Closing until the earliest of (subject to the continued satisfaction or waiver of the conditions set forth in <u>ARTICLE VI</u> at such time), (i) any Business Day during the Post-Order Period as may be specified by Buyers' Parent on no less than three (3) Business Days' prior written notice to Sellers' Parent, (ii) the third (3rd) Business Day after the final day of the Post-Order Period or (iii) such other date as the Sellers' Parent and Buyers' Parent may mutually agree upon (the day the Closing actually occurs, the "***Closing Date***").  The Closing shall be deemed to have occurred and to be effective as between the parties as of 12:01 a.m. (determined by reference to the local time zone in which the applicable Seller Facility is located) on the Closing Date (the "***Effective Time***").  Except as otherwise may be required by the Title Company or as agreed by Buyers' Parent and Sellers' Parent, the Closing will take place remotely by electronic mail or other electronic exchange of documents, among and between the parties and/or their respective counsel.

(b)    In the event that the Closing has not occurred prior to the Outside Date and the only condition remaining to be satisfied is the condition set forth in <u>Section 6.10</u> with respect to a Seller Facility (the "***Non-Compliant Facility***") (other than those conditions which are to be satisfied at Closing, but subject to such conditions being satisfied at the Closing), the applicable Buyers shall consummate the purchase and sale of the Seller Facilities (and related Purchased Assets) that satisfy such condition (the "***Partial Closing***") on the Outside Date in accordance with this Agreement and the Purchase Price shall be reduced by the Allocated Portion of the Purchase Price with respect to the Non-Compliant Facility.  In the event of a Partial Closing, the Sellers shall not transfer to the Buyers any assets owned, exclusively used or held for use by Sellers in connection with the operation of the Non-Compliant Facility (and such assets shall be Excluded Assets for purposes of this Agreement) and the Buyers shall not assume any liabilities relating to the operation of the Non-Compliant Facility (and such liabilities shall be Excluded Liabilities for purposes of this Agreement).

**2.7**    <u>**Actions of Sellers' Parent at Closing**</u>.  At the Closing or within such other timeframes as specified below and unless otherwise waived in writing by Buyers' Parent, Sellers' Parent shall deliver or cause to be delivered to Buyers' Parent the following:

(a)    A Bill of Sale and Assignment in the form attached as <u>Exhibit 6</u> (each, a "***Bill of Sale***") executed by each applicable Seller in favor of each applicable Buyer;

(b)    An Assignment and Assumption Agreement in the form attached as <u>Exhibit 7</u> (each, an "***Assignment and Assumption***") executed by each applicable Seller in favor of each applicable Buyer;

(c)    An Assignment and Assumption of Lease for Real Property which is leased by, or to, the applicable Seller in the form attached as <u>Exhibit 8</u> (each, an "***Assignment and Assumption of Lease***") executed by each applicable Seller in favor of each applicable Buyer;

(d)    The Drug Enforcement Administration (DEA) Power of Attorney in the form attached hereto as <u>Exhibit 10</u> and executed by or on behalf of each applicable Seller in favor of each applicable Buyer;

(e)    Certificates of existence and good standing of each Seller and Sellers' Parent from the state of its incorporation or formation, each dated the most recent practicable date prior to the Closing Date;

(f)    A Special Warranty Deed in the form attached as <u>Exhibit 11</u> (each, a "***Special Warranty Deed***") with respect to each parcel of Owned Real Property executed by each applicable Seller in favor of each applicable Buyer;

(g)    A non-foreign affidavit of the applicable Seller, dated as of the Closing Date, in form and substance consistent with the Treasury Regulations issued pursuant to Section 1445 of the Code stating that such Seller is not a "foreign person" as defined in Section 1445 of the Code;

(h)    With respect to each Seller that owns a parcel of Owned Real Property and with respect to each Seller that is the lessee of Leased Real Property on which a long term acute care hospital is located, a duly executed affidavit in the form attached hereto as Exhibit 12 and other documents reasonably required by the Title Company to issue an extended coverage ALTA Owner's and Lessee's Policy of Title Insurance consistent with each Title Commitment (the "**Title Policy**"), subject only to the Permitted Encumbrances;

(i)    Certificates of title with respect to any vehicles included in the Purchased Assets duly executed by the applicable Seller;

(j)    The certificate contemplated by Section 6.6; and

(k)    A certified copy of the Sale Order.

**2.8    Actions of Buyers' Parent at Closing**.  At the Closing and unless otherwise waived in writing by Sellers' Parent, Buyers' Parent shall deliver or cause to be delivered to Sellers' Parent the following:

(a)    The Purchase Price by wire transfer of immediately available funds to an account designated in writing by Sellers' Parent;

(b)    A Bill of Sale executed by each applicable Buyer;

(c)    An Assignment and Assumption executed by each applicable Buyer;

(d)    An Assignment and Assumption of Lease executed by each applicable Buyer;

(e)    Certificates of existence and good standing of each Buyer and Buyers' Parent from the state of its incorporation or formation, each dated the most recent practicable date prior to the Closing Date; and

(f)    The certificate contemplated by Section 7.4.

**2.9    Real Estate Closing Matters**.

(a)    Title Commitments and Surveys.  Prior to the Effective Date, Sellers' Parent has made available to Buyers' Parent, (i) those certain title commitments for the Owned Real Property and Leased Real Property issued by the Title Company (collectively, the "**Title Commitments**") described on Schedule 2.9(a)(i), together with the exception documents referenced therein and (ii) certain ALTA/ACSM surveys of the Owned Real Property described on Schedule 2.9(a)(ii) ("**Seller Surveys**"). Buyers' Parent and each Buyer hereby approve all title exception matters set forth in the Title Commitments and Seller Surveys as Permitted Encumbrances.

(b)    Environmental Assessments.  Prior to the Effective Date, Sellers' Parent has made available to Buyers' Parent copies of those certain environmental site assessments performed by Partner Engineering and Science, Inc. (collectively, the "**Phase I's**") described on Schedule 2.9(b). Buyers' Parent and each Buyer hereby agree and acknowledge to accept the Real Property subject to any and all limitations, recommendations or potential violations of applicable Law reflected therein.

16

(c)    Property Condition Reports.    Prior to the Effective Date, Sellers' Parent has made available to Buyers' Parent copies of those certain property condition reports performed by Partner Engineering and Science, Inc. (collectively, the **"PCRs"**) described on Schedule 2.9(c).  Buyers' Parent and each Buyer hereby agree and acknowledge to accept the Real Property subject to any and all limitations, recommendations or potential violations of applicable Law reflected therein.

**2.10    Risk of Loss.**

(a)    The risk of loss or damage to any of the Purchased Assets, including the Owned Real Property or any personal property used in connection with the Healthcare Business by the Sellers, shall remain with the Sellers until the Effective Time and Sellers shall maintain their respective insurance policies covering such property through the Effective Time.

(b)    With respect to the Owned Real Property, if prior to the Closing, all or any part of such Owned Real Property is destroyed or damaged by fire or the elements or by any other cause, the applicable Seller shall assign, transfer and set over to the applicable Buyer all of the Seller's right, title and interest in and to any insurance proceeds on account of such damage or destruction and, if such insurance policy proceeds are insufficient to repair, restore and/or replace the Owned Real Property, the Purchase Price shall be reduced by the amount equal to the difference between the cost to repair, restore and/or replace and the amount of such proceeds.

(c)    If prior to the Closing, all or any part of a parcel of the Real Property is made subject to an eminent domain or condemnation proceeding which would in Buyers' Parent's commercially reasonable judgment materially adversely impair access to the Real Property or be materially adverse to the operations of the Real Property, notwithstanding anything to the contrary in this Agreement, Buyers may elect to (i) purchase the applicable Seller Facility and the Closing with respect to the applicable Seller Facility shall proceed as scheduled (provided, however, at the Closing Sellers shall assign, transfer and set over to the applicable Buyer all of the applicable Seller's right, title and interest in and to any award in such eminent domain or condemnation proceeding) or (ii) not purchase the applicable Seller Facility (and Purchased Assets solely related thereto) and, in such event, the Purchase Price shall be reduced by an amount equal to the Allocated Portion applicable to such Seller Facility.

(d)    With respect to any Purchased Assets other than Owned Real Property which is destroyed or damaged by fire or the elements prior to the Closing, Sellers shall assign, transfer and set over to Buyers all of Sellers' right, title and interest to any insurance proceeds on account of such damage or destruction and shall reimburse Buyers for any deductible a Buyer is required to pay in connection with the receipt of such insurance proceeds.

(e)    Solely for the purposes set forth in this Section 2.10 and Section 2.6(b), the Purchase Price allocated to each Seller Facility and its related Purchased Assets are set forth on Schedule 2.10(e) (each such amount, the **"Allocated Portion"**).

**ARTICLE III - REPRESENTATIONS AND WARRANTIES
OF SELLERS AND SELLERS' PARENT**

Except to the extent a representation or warranty speaks as of another date, as of the Effective Date and as of the Closing Date, when read in light of any corresponding sections of the Schedules to this ARTICLE III (**"Article III Schedules"**) as may be updated prior to Closing in accordance with Section 5.2, Sellers' Parent and Sellers represent and warrant to Buyers' Parent and Buyers the following:

17

**3.1**     **Corporate Capacity, Authority and Governmental Consents**.

(a)     Sellers' Parent and each Seller are duly organized and validly existing in good standing under the Laws of the state of their formation or incorporation with the requisite organizational power and authority to enter into this Agreement, to perform its respective obligations hereunder and to conduct its business as now being conducted.  Sellers' Parent and each Seller is duly licensed or qualified to do business and is in good standing in the jurisdictions where the nature of the property owned or leased by it or the nature of the business conducted makes such qualification necessary, except where failure to so qualify would not have a Material Adverse Effect.  Copies of the Governing Documents of each Seller, each as in effect as of the date of this Agreement, have been made available to Buyers.  Subject to the entry of the Sales Procedure Order and Sale Order, the execution, delivery and performance of this Agreement and all Ancillary Agreements to which Sellers' Parent or any Seller are or will become a party and the actions to be taken by Sellers' Parent and each Seller in connection with the consummation of the transactions contemplated hereby and thereby, and the consummation of the transactions contemplated hereby and thereby:

(i)     are within the organizational powers of each of Sellers' Parent and each Seller, are not in contravention of applicable Law or the terms of the applicable Governing Documents;

(ii)     have been duly authorized by all actions and proceedings on behalf of Sellers' Parent and each Seller, and no other actions or proceedings on the part of Sellers' Parent, Sellers, their respective boards of directors (or similar governing body) or equity holders are necessary;

(iii)     except as otherwise expressly herein provided or as set forth in Schedule 3.1(a)(iii) do not require any approval or consent of, or filing with, any Governmental Authority; and

(iv)     will not violate any Law to which Sellers' Parent or any Seller is subject.

(b)     Subject to the entry of the Sales Procedure Order and Sale Order, the execution, delivery and performance by Sellers' Parent and Sellers of this Agreement and all Ancillary Agreements to which any of Sellers' Parent or a Seller is or will become a party, consummation of the transactions contemplated by this Agreement or such Ancillary Agreements and compliance with the terms of this Agreement or such Ancillary Agreements will not result in the creation of, or require the creation of, any Encumbrance upon any properties or assets of Sellers' Parent or Sellers or conflict with, constitute or result in any violation or default (with or without notice or passage of time, or both) under, require the consent of any Person under, or give rise to a right of termination, modification, cancellation or acceleration of any obligation under any Permits or any Contract to which Sellers' Parent or any Seller is a party (including any Proposed Assumed Contracts) or any Permit.

**3.2**     **Binding Agreement**.  Subject to the entry of the Sales Procedure Order and Sale Order, this Agreement and all Ancillary Agreements to which any of Sellers' Parent or a Seller is or will become a party are and will constitute the valid and legally binding obligations of Sellers' Parent and Sellers, and are and will be enforceable against Sellers' Parent and Sellers in accordance with the respective terms hereof or thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

4822-2950-0804.2
25094706.19.BUSINESS

**3.3**    __Assets__.

(a)    Sellers own valid title to, or possesses valid leasehold interests in, all of the Purchased Assets.  Sellers have sole custody and control of all of the Purchased Assets, except with respect to any Permitted Encumbrances or as otherwise set forth on __Schedule 3.3(a)(i)__.  __Schedule 3.3(a)(ii)__ identifies all Purchased Assets that are subject to a lease or not otherwise owned by Sellers.

(b)    Subject to the entry of the Sale Order, the Purchased Assets are free and clear of all Encumbrances except Permitted Encumbrances and, subject to the entry of the Sale Procedure Order or any Sale Order, Sellers have the power and the right to sell, assign and transfer the Purchased Assets, free and clear of all Encumbrances except Permitted Encumbrances.

(c)    Except as set forth on __Schedule 3.3(c)__, there are no tangible or intangible assets used in the operation of the Seller Facilities and owned by any Person other than Sellers that are not currently leased or licensed to Sellers pursuant to a Contract.

(d)    Except as set forth on __Schedule 3.3(d)__, no portion of the operations of the Seller Facilities is conducted through any partnership in any joint venture or similar arrangement.

**3.4**    **Financial Statements**.    Attached as __Schedule 3.4__ are copies of the consolidated unaudited balance sheets and statements of income of Sellers with respect to the operation of the Seller Facilities for the years ended December 31, 2017 and December 31, 2016 and statements of income of Sellers with respect to the operation of the Seller Facilities for the period ended November 4, 2018 and the unaudited balance sheet of the Sellers as of November 4, 2018 (the "***Balance Sheet Date***") (collectively, the "***Financial Statements***").  Except as set forth on __Schedule 3.4__, the Financial Statements present fairly in all material respects the financial condition and results of operations of Sellers and the Seller Facilities as of the dates and for the periods indicated therein in accordance with GAAP consistently applied throughout the periods indicated, except that the Financial Statements (i) that are not for a fiscal year-end do not reflect normal recurring year-end adjustments (that would not, individually or in the aggregate, be material in amount), (ii) do not contain footnotes that may be required by GAAP, (iii) were prepared without physical inventories, (iv) do not contain a statement of cash flow, (v) are not restated for subsequent events, (vi) may not reflect any adjustments for impairment of long-lived assets, or restructuring charges or the reclassification of assets held for sale on the applicable balance sheet, and (vii) that are balance sheets reflect the following liabilities in intercompany liabilities: (A) accruals in respect of Sellers' self-insured employee health benefits, (B) liabilities payable in connection with workers' compensation claims, (C) liabilities payable pursuant to any employee welfare benefit plan (within the meaning of Section 3(1) of ERISA) maintained by Sellers or any Affiliate of Sellers on account of any of the Facility Employees, and (D) payroll and bonuses payable and vacation, holiday and similar accruals with respect to some but not all Facility Employees.  The Financial Statements were prepared based on the historical accounting records of Sellers.  Federal, state and local income or franchise taxes accruals are not reflected on the balance sheets or income statements.  Except as set forth on __Schedule 3.4__, there are no material obligations or liabilities, whether absolute, accrued, contingent or otherwise, of Sellers that would be required to be set forth on a balance sheet in accordance with GAAP except for obligations or liabilities (a) reflected or disclosed in the Financial Statements and (b) incurred in the ordinary course of business since the Balance Sheet Date.

**3.5**    **Licenses and Accreditations**.    Sellers hold all Permits required to be held by them to own, occupy and operate the Healthcare Business, as they are currently being operated.  __Schedule 3.5__ sets forth a list of all such Permits that are material to the operation of the Healthcare Business, true and complete copies of which have been made available to Buyers, and all of which are valid and in full force and

effect. All of such Permits are valid, binding and in full force and effect and none of Sellers is in breach in any material respect of any of the Permits set forth on <u>Schedule 3.5</u>, and no Action is pending, or to the Knowledge of Sellers threatened, to revoke or limit any of the Permits set forth on <u>Schedule 3.5</u>. Sellers have made available to Buyers complete and accurate copies of (a) the most recent accreditation survey reports for the Seller Facilities; (b) the most recent Statement and Deficiencies and Plan of Correction on Form CMS-2567 issued by CMS or the state survey agency on behalf of CMS for the Seller Facilities; (c) the most recent state licensing report and list of deficiencies relating to any of the Permits for the Seller Facilities; and (d) the most recent fire marshal's survey and deficiency list for the Seller Facilities, and (e) all material plans of correction relating to each of the foregoing.

**3.6** **<u>Regulatory Compliance</u>**.

(a)    Except as set forth on <u>Schedule 3.6(a)</u>, (i) Sellers are, and during the six (6) years preceding the date hereof, have been in compliance in all material respects with all applicable Laws including the Healthcare Laws and (ii) none of the Sellers has received during the last six (6) years any written notice from any Governmental Authority regarding any actual or alleged violation of, or failure to comply with, any Laws including the Healthcare Laws.

(b)    Except as otherwise set forth on <u>Schedule 3.6(b)</u>, during the preceding six (6) years, neither Sellers nor, to the Knowledge of Sellers, any of their respective Affiliates, officers, directors, agents, or employees have been convicted of or charged with, or, to the Knowledge of Sellers, investigated by any Governmental Authority with respect to any alleged violation of any Law including the Healthcare Laws, or with respect to any activities that are cause for criminal or civil penalties or mandatory or permissive exclusion from Medicare or Medicaid.

(c)    Without limiting the generality of the foregoing, neither Sellers nor, to the Knowledge of Sellers, any of their respective officers, directors, agents, or employees has, directly or indirectly (i) offered, paid or received, or made arrangements to offer, pay or receive, any remuneration, in cash or in kind, to any past, present or potential customers, past or present suppliers, patients, medical staff members, contractors or Third Party Payors of the Seller Facilities in order to obtain business, referrals or payments from such Persons in violation of any Healthcare Laws, (ii) established or maintained any unrecorded fund or asset for any improper purpose or made any misleading, false, or artificial entries on any of its books or records for any reason; or (iii) made any payment for or agreed to make any payment for any goods, services, or property in excess of fair market value in violation of any Healthcare Laws. All of the Sellers' contracts with physicians, healthcare facilities, and other persons or entities in a position to make or influence referrals to or generate business for the Seller Facilities are in writing, provide for fair market value compensation and comply in all material respects with all Laws. With respect to the Seller Facilities, none of the officers, directors, agents, managing employees (as such term is defined in 42 U.S.C. §1320a-5(b)), employees, contractors, or members of the medical staff of any Seller Facility (w) has been excluded or suspended from participation in any federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)) or been disbarred, suspended or otherwise determined ineligible to participate in federal programs, nor to the Knowledge of Seller is any such exclusion threatened in writing; (x) has had a civil monetary penalty assessed against it under Section 1128A of the Social Security Act or any regulations promulgated thereunder; or (y) has been convicted of, charged with, or indicted for a federal health care program related offense, or convicted of, charged with, or indicted for a violation of federal or state law relating to fraud, theft, embezzlement, breach of fiduciary responsibility, financial misconduct, obstruction of an investigation or controlled substances.

(d)    With respect to the Seller Facilities, there are no pending or, to the Knowledge of Seller, threatened disciplinary or corrective actions or appeals involving physician applicants, medical staff

4822-2950-0804.2
25094706.19.BUSINESS

members or affiliated health professionals under the medical staff bylaws at any Seller Facility.  Sellers have made available to Buyers copies of the bylaws, rules and regulations of the medical staff and its medical executive committee at each Seller Facility, as well as a list of all current members of the medical staff of each Seller Facility.

(e)    With respect to the Seller Facilities, Sellers have not, during the preceding six (6) years, made and are not in the process of making a voluntary self-disclosure under the Self-Referral Disclosure Protocol established by the Secretary of HHS pursuant to Section 6409 of the Patient Protection and Affordable Care Act, or under the self-disclosure protocol established and maintained by the HHS Office of the Inspector General, or to any United States Attorney or other Governmental Authority.

## 3.7    Compliance Program.

(a)    Except as set forth on Schedule 3.7, during the preceding six (6) years, with respect to the operations of the Seller Facilities, no Seller (i) has been a party to a Corporate Integrity Agreement, Certification of Compliance Agreement or similar government-mandated compliance program or obligations; (ii) has had reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority; (iii) has been served with or received any search warrant, subpoena, civil investigation demand, or contact letter from any Governmental Authority; or (iv) to the Knowledge of Sellers, has been a defendant in any qui tam/False Claims Act litigation.

(b)    The Sellers have adopted and maintained a compliance program that is in all material respects consistent with the OIG's compliance program guidance for hospitals, and includes: (i) appointing a dedicated compliance officer; (ii) developing policies and procedures designed to ensure any referral source arrangement complies with applicable Healthcare Laws; (iii) conducting training sessions for employees and contractors with respect to the Compliance Program; and (iv) establishing a process to allow for anonymous reporting of compliance concerns (altogether, the "***Compliance Program***").

## 3.8    Material Contracts.

(a)    Schedule 3.8 sets forth a list of the following Contracts of Sellers, in each case relating to the Seller Facilities or the Purchased Assets:  (a) Contracts involving the lease of equipment or personal property that require payments by a Seller of greater than $50,000 during the remaining term or on an annual basis; (b) leases or subleases with respect to the Owned Real Property; (c) employment contracts; (d) Contracts with respect to patents, trademarks, trade names or service names; (e) collective bargaining agreements; (f) partnership or joint venture agreements and Contracts involving the sharing of profits, losses, costs or liability with any other Person; (g) Contracts limiting the freedom of the Sellers to engage in any line of business, acquire any entity or compete with any Person or in any market or geographical area, including any non-competition, non-solicit or other restrictive covenant agreement; (h) Contracts with any hospitals, ambulatory surgery centers or other healthcare facilities; (i) Contracts with any physicians or other providers of healthcare services; (j) Contracts with recipients of referrals from the Seller Facilities and Contracts with sources of referrals to the Seller Facilities; (k) Contracts (A) providing for exclusivity, preferred treatment or any similar requirement, (B) containing a "requirements" obligation requiring any Seller to purchase a designated portion of any type of material, product or other supplies, (C) with a "most favored nations" clause or other similar provision or (D) with take-or-pay obligations; (l) Contracts with Governmental Authorities; (m) Contracts with any Material Suppliers and any Material Payors; (n) Contracts relating to capital expenditures that involves total remaining payments of more than $50,000; and (o) any other Contracts that involve payments, performance of services or provision of items in an amount exceeding $50,000 or that cannot be canceled by the applicable Seller, without penalty on 90 days' notice or less (collectively, the "***Material Contracts***").  Sellers have made available to Buyers

21

true and complete copies of all of the Material Contracts (and all amendments or other modifications thereto) and a complete summary of all material terms of each oral Material Contract is set forth on Schedule 3.8.

(b)       The Sellers, in each case relating to the Seller Facilities or the Purchased Assets, are not party to any oral agreement, license, lease, contract, arrangement, obligation, undertaking, indenture or commitment to which such Seller or its assets is bound, except as designated as an oral contract and summarized on Schedule 3.8.

**3.9      Real Property**.  (a)  The Owned Real Property constitutes all real property owned by Sellers that is primarily used in connection with the operation of the Seller Facilities.  There are no tenants or other Persons occupying any space in the Owned Real Property, other than pursuant to leases or subleases to third party tenants under any Proposed Lessor Lease listed on Schedule 2.1(c). The applicable Seller has good, valid and marketable title to such Owned Real Property, free and clear of all Encumbrances except Permitted Encumbrances.

(b)       Except as otherwise set forth on Schedule 3.9(b), Schedule 2.1(b) contains a list of all Proposed Tenant Leases.  Sellers have made available to Buyers true and complete copies of all of such Proposed Tenant Leases.  With respect to each Proposed Tenant Lease, (i) to the Knowledge of Sellers, no such Proposed Tenant Lease has been breached or canceled by the other parties thereto, (ii) except for defaults that will be cured through payment of the Cure Amounts, no Seller is in default or breach under the terms of any Proposed Tenant Lease, and (iii) no Seller has assigned, subleased or otherwise transferred to any Person any of its rights, title or interest under any Proposed Tenant Lease (other than subleases).

(c)       With respect to each parcel of Real Property, except as disclosed on Schedule 3.9(c): (i) none of Sellers' Parent or any Seller has received written notice of any pending or, to the Knowledge of Sellers, threatened expropriation, condemnation or eminent domain proceedings or their local equivalent affecting or relating to such Real Property; (ii) to the Knowledge of Sellers, such Real Property, and its continued use, occupancy and operation as currently used, occupied and operated, does not constitute a nonconforming use under all applicable Laws; (iii) none of Sellers' Parent or any Seller has received written notice from any Governmental Authority or other Person that the use and occupancy of such Real Property, as currently used and occupied, and the conduct of the business thereon, as currently conducted, violates in any material respect any applicable Law; and (iv) the applicable Seller (or landlord) holds current and valid certificates of occupancy for each Seller Facility located on such Real Property.

(d)       To the Knowledge of Sellers, each parcel of Real Property is adequately served by proper utilities and other building services as necessary for its current use by the applicable Seller and, to the Knowledge of Sellers and except as set forth in the PCRs, all of the buildings and structures located at each Real Property are structurally sound with no material defects that are not being addressed in the ordinary course of business and are otherwise in operating condition in all material respects, ordinary wear and tear excepted.

**3.10     Insurance**.  Attached as Schedule 3.10 is a list and description of all insurance policies, including all self-funded plans or trusts, maintained by or for the benefit of the Seller Facilities or the Purchased Assets (including coverage amounts and expiration dates).  All of such policies and plans or trusts are in full force and effect with no premium or contribution arrearage, and none of Sellers' Parent or any Seller has received any written notice of cancellation, termination or non-renewal of any such insurance policy.

22

**3.11** **Employee Benefit Plans**.

(a)       Schedule 3.11(a) sets forth a list of each Employee Benefit Plan maintained by, sponsored in whole or in part by, contributed to by, or required to be contributed to by, any Seller or any of its Affiliates for the benefit of any Facility Employee or any of their respective dependents, spouses, or other beneficiaries (each, a "***Facility Employee Benefit Plan***").  The term "***Employee Benefit Plan***" means (i) each "employee benefit plan" as defined in Section 3(3) of ERISA (whether or not subject to ERISA), and (ii) each other retirement, pension, stock option or equity-based compensation, employee stock ownership, deferred compensation, severance pay, change in control, retention, transaction bonus, time off, bonus, commission or other incentive, health, life, disability, group insurance or other welfare or fringe benefit agreement, arrangement, plan, contract or policy.

(b)       As applicable to each Facility Employee Benefit Plan, Seller has made available to Buyers copies of (i) the complete plan document (and all amendments thereto) or in the case of an unwritten Facility Employee Benefit Plan, a written description thereof, (ii) the current summary plan description, and (iii) the most recent IRS determination, advisory or opinion letter.

(c)       Except as set forth on Schedule 3.11(c), no Seller nor any ERISA Affiliate has any actual or contingent liability with respect to (i) a "multiemployer plan" (as defined in Section 4001(a)(3) or 3(37) of ERISA), (ii) an employee pension benefit plan subject to Title IV of ERISA or the minimum funding requirements of Section 412 or 430 of the Code or Section 302 of ERISA, (iii) a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA) or (iv) a "multiple employer plan" (as defined in Section 413(c) of the Code).

(d)       Each Facility Employee Benefit Plan has been maintained, operated and administered in all material respects in compliance with its terms and all applicable Laws, including the applicable provisions of ERISA and the Code.

(e)       Each Facility Employee Benefit Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination, opinion or advisory letter from the IRS on which it may currently rely and nothing has occurred that would be reasonably expected to materially adversely affect the qualification of such plan.

(f)       No Facility Employee Benefit Plan is subject to any audit, investigation or examination by any Governmental Authority and there are no pending or, to the Knowledge of Sellers, threatened claims (except for individual claims for benefits in the normal operation of the Employee Benefit Plans) suits or proceedings involving any Facility Employee Benefit Plan that are material to the business or operations of the Sellers.

(g)       Neither the execution of, nor the consummation of the transactions contemplated by, this Agreement will, either alone or in connection with any other event, (i) result in any payment becoming due to any Facility Employee, (ii) increase any amount of compensation or benefits otherwise payable to any Facility Employee or (iii) result in the acceleration of the time of payment, funding or vesting of any benefits owed to any Facility Employee.

(h)       Neither the execution of, nor the consummation of the transactions contemplated by this Agreement, either alone or in connection with any other event (including without limitation, a termination of employment) will result in the receipt or retention by any person who is a "disqualified individual" (within the meaning of Section 280G of the Code) of any payment or benefit that is or could be characterized as a "parachute payment" (within the meaning of Section 280G of the Code), determined without regard to the application of Section 280G(b)(5) of the Code.

(i)      No Facility Employee Benefit Plan provides death, medical, dental, vision, life insurance or other welfare benefits beyond termination of service or retirement other than coverage mandated by Law and none of Sellers or their ERISA Affiliates has made a written or oral representation promising the same.

**3.12    Employee Relations**.

(a)      Schedule 3.12(a) contains: a complete and accurate list of all Facility Employees as of the date of this Agreement, which list includes each such employee's job title, job location, base salary or wage rate, bonus or other incentive compensation, date of hire, status as full-time or part-time, status as exempt or non-exempt for purposes of the Fair Labor Standards Act and similar state and local laws.  No later than the Closing Date, Sellers shall provide Buyer with a list of all Facility Employees who have experienced an employment loss within the meaning of the Worker Adjustment and Retraining Notification Act or similar state or local laws within ninety (90) days prior to the Closing Date.

(b)      There is no pending or, to the Knowledge of Sellers, threatened employee strike, lockout, work stoppage or other labor dispute concerning the Facility Employees.  Except as set forth on Schedule 3.12(b), (i) no collective bargaining agreement exists or is currently being negotiated in respect of the Facility Employees; (ii) no written demand has been made in the preceding four (4) years for recognition by a labor organization by or with respect to any Facility Employees; (iii) no union organizing activities by or with respect to any Facility Employees are taking place or, to the Knowledge of Sellers, have taken place during the preceding four (4) years; (iv) none of the Facility Employees is represented by any labor union or organization; and (v) no unfair labor practice charge or complaint is pending or, to the Knowledge of Sellers, threatened by or on behalf of any Facility Employees.

(c)      With respect to the operation of the Seller Facilities and the Facility Employees, Sellers are at all, and at all time during the past three (3) years have been, in compliance in all material respects with all Laws respecting labor employment and employment practices, including all applicable Laws relating to terms and conditions of employment, wages and hours, unemployment insurance, workers' compensation, equal employment opportunity, fair employment practices, employment discrimination, retaliation, misclassification of employees and independent contractors, plant closure and mass layoff issues, collective bargaining, leaves of absence, occupational safety and health and immigration control.

(d)      Except as disclosed on Schedule 3.12(d), there are no outstanding claims, suits, charges, complaints or other Actions against any Seller asserted by, on behalf of, or with respect to any present or former Facility Employees or any applicant for employment at any Seller Facility pending or, to the Knowledge of Sellers, threatened in writing.

(e)      Except as disclosed on Schedule 3.12(e), as of the date hereof, no management or supervisory employee at any of the Seller Facilities has submitted his or her resignation or, to the Knowledge of Sellers, intends to resign.

**3.13    Litigation and Proceedings**.  Except as set forth on Schedule 3.13, there are no, and in the past four (4) years there have been no, (a) Actions pending or, to the Knowledge of Sellers, threatened or (b) to the Knowledge of Sellers, examinations or investigations pending or threatened in writing, in each case, against Sellers or involving any of the Seller Facilities, at law or in equity, before or by any Governmental Authority.  No Seller is as of the date hereof subject to any Order other than Orders of the Bankruptcy Court.  There is no Action pending or, to the Knowledge of Sellers, threatened against Sellers' Parent, Sellers or their Affiliates which seeks to prevent or delay consummation of the

24

transactions contemplated herein, seeks damages in connection with transactions contemplated herein or would impair the ability of Sellers' Parent or Sellers to perform their obligations under this Agreement.

**3.14**    **Third Party Reimbursement**.

(a)    The Seller Facilities are certified to participate in the Medicare, Medicaid and TRICARE programs with valid and current provider or supplier agreements under such programs.  Except as set forth on Schedule 3.14(a) or as would not result in a Material Adverse Effect, the Seller Facilities are in compliance with the terms and conditions of participation in the Medicare, Medicaid and TRICARE programs and are not subject to any pending or, to Sellers' Knowledge, threatened Actions with respect to participation in such programs, other than routine audits and investigations conducted through the Medicare Recovery Audit Contractor programs.

(b)    For the six (6) years preceding the Effective Date, Sellers and their Affiliates have timely filed all Cost Reports in respect of the Seller Facilities; such reports accurately reflect, in all material respects, the information required to be included thereon and have been prepared and filed in all material respects in compliance with applicable Laws; and all amounts shown on such cost reports as owed by any Seller Facility have been timely paid.  Except as set forth on Schedule 3.14(b), there are no pending Actions, adjustments or audits relating to such Cost Reports.  To the Knowledge of Sellers, Sellers are not subject to any pending but unassessed Medicare or Medicaid claim payment adjustments arising from the Seller Facilities, except (i) to the extent Sellers have established reserves for such adjustments in accordance with Sellers' accounting policy for establishing any such reserves and that are reflected on the Financial Statements and (ii) such claims that have arisen in the ordinary course of business.

(c)    Schedule 3.14(c) sets forth is a list of all National Provider Identifiers and all provider numbers of the Seller Facilities under the Government Reimbursement Programs (including the Medicare CMS Certification Number (CCN)) and other Third Party Payor programs, all of which are in full force and effect.

(d)    All billing by or on behalf of the Sellers to Third Party Payors has been conducted, and all claims submitted in connection with such billing have been made, in compliance in all material respects with all applicable Laws and billing guidelines of such Third Party Payors. Except as set forth on Schedule 3.14(d), other than incidental and routine overpayments that may occur in the ordinary course of the operations of the Seller Facilities, the Sellers have not billed or received any payment or reimbursement in excess of amounts allowed by Laws or the billing guidelines of any Third Party Payor. Except as set forth on Schedule 3.14(d), other than random post-payment audits conducted in the normal course by a Third Party Payors, there is no proceeding, audit review, investigation, survey, or other action pending, or, to the Seller's Knowledge, threatened, involving any Third Party Payor programs, including the participation in and the reimbursement received by the Sellers from any such Third Party Payor program.  No Seller has committed a material violation of any Laws relating to payments and reimbursements under any Third Party Payor program, including the Medicare and Medicaid fraud and abuse provisions.

(e)    Except as listed on Schedule 3.14(e), each Seller Facility satisfies in all material respects and has satisfied in all material respects the requirements for exclusion from the Medicare hospital inpatient prospective payment system specified in 42 C.F.R. § 412.1(a)(1) by complying with the requirements set forth at 42 C.F.R. §412.23(e), including the requirements concerning the average length of stay at each Seller Facility set forth at 42 C.F.R. §412.23(e)(2).  No Seller Facility is a "hospital-within-hospital" as described at 42 C.F.R. § 412.22(e) nor a "satellite facility" as described at 42 C.F.R. § 412.22(h). No Seller Facility operates any satellite facilities, off-campus provider-based locations or other

remote locations. Each Seller Facility meets the conditions for payment under the Medicare prospective payment system for long-term care hospitals at 42 C.F.R. §§ 412.500 et seq. in all material respects.

(f)    Each Seller Facility has submitted, in all material respects, the quality data required under the Medicare Long Term Care Hospital Quality Reporting Program (QRP) to CMS or its agent, and all material quality data required to The Joint Commission, for all full calendar quarters prior to the date hereof.  All such submissions have been made in all material respects in accordance with applicable reporting deadlines and as required by CMS and The Joint Commission.

**3.15**    **Tax Liabilities**.

(a)    Sellers and their subsidiaries have timely filed, or will timely file, all Tax Returns, including in respect of the Purchased Assets and the operations of the Seller Facilities, and each Tax Return is true, correct, and complete in all material respects.

(b)    Except as set forth on Schedule 3.15(b), all Taxes shown as due on any Tax Return, and any assessments in respect of Tax Returns have been timely paid, there is no pending Tax examination or audit of, nor any action, investigation or claim asserted against Sellers by any Governmental Authority in respect of the Sellers.

(c)    No Seller has requested or obtained any extension of time within which to file any Tax Return in respect of the Purchased Assets and the operations of the Seller Facilities or in which any Tax may be assessed or collected by any Governmental Authority (other than any extension which is no longer in effect).

(d)    The Sellers have withheld and collected all material Taxes, including any sales, use, and similar Taxes, that they were required by applicable Law to withhold and collect in respect of the Purchased Assets and the operations of the Seller Facilities, and all such Taxes have been paid over to the proper Governmental Authority or, if not yet due, are being held by the Sellers for payment.

(e)    Except as set forth on Schedule 3.15(e), there are no Encumbrances with respect to Taxes upon any of the Purchased Assets or related to the operations of the Seller Facilities, other than Permitted Encumbrances.

**3.16**    **Absence of Changes**.  Except as expressly required by this Agreement or as set forth on Schedule 3.16 or as required in connection with the Bankruptcy Case, no Seller has, since the Balance Sheet Date, (a) written off as uncollectible, or established any extraordinary reserve with respect to, any material account receivable or other material indebtedness of such Seller; (b) amended or restated, or approved the amendment or restatement of, the Governing Documents of such Seller; (c) made or changed any material tax election, entered into any settlement or compromise of any material Tax liability or surrendered any right to claim a material Tax refund; (d) settled or compromised any pending or threatened Action; (e) sold, transferred, leased, optioned or otherwise disposed of any material assets except in the ordinary course of business consistent with past practice; (f) granted or incurred any obligation for any increase in the compensation or benefits of any of the Facility Employees except in the ordinary course of business consistent with past practice; (g) received any written notice from any Governmental Authority of any material liability, potentially material liability or claimed material liability based on any violation of Law by a Seller; (h) instituted any material change in a Seller's accounting practices or methods; (i) established, adopted, terminated or materially amended any Facility Employee Benefit Plan; (j) hired or terminated, or given a notice of termination to or received a notice of termination from, any Facility Employee that receives annual base compensation in excess of $100,000, or (k) agreed or committed to take any of the foregoing actions.

26

**3.17    Intellectual Property**.  Except as set forth on Schedule 3.17, with respect to the Seller Facilities: (a) the conduct of the Healthcare Business does not and has not infringed, misappropriated or otherwise violated any Intellectual Property of any Person; (b) Sellers have not received any written notice that they are infringing on or has misappropriated or otherwise violated the Intellectual Property rights of any Person; and (c) to Sellers' Knowledge, there is no infringement or misappropriation, or other violation by any Person of the Facility IP.  The Sellers own or hold a valid license to use all Facility IP free and clear of all Encumbrances other than Permitted Encumbrances and, excluding (A) the right to use any names, trade names, trademarks and service marks including the name "Promise" and (B) all proprietary software, data processing programs, or source codes used by Sellers or its Affiliate, Facility IP constitutes all Intellectual Property currently used in the operation of the Healthcare Business in the ordinary course of business.  The Sellers maintain commercially reasonable confidentiality, security, disaster recovery and business continuity plans, procedures and facilities with respect to the operation of the Healthcare Business (including in respect of any data stored or contained in connection with the operation of the Healthcare Business) and in the last three (3) years there have been no material failures or unauthorized access of the information technology systems used in the operation of the Healthcare Business, including any data stored or transmitted therein.

**3.18    Environmental Matters.**  Except as otherwise set forth in the Phase I's: (a) the Seller Facilities and the Healthcare Business and operations conducted thereon are and for the past four (4) years have been in compliance in all material respects with all applicable Environmental Laws, except for such noncompliance that has been fully and finally resolved; (b) with respect to the Seller Facilities and the Healthcare Business, the Sellers have obtained and possess all Permits required by applicable Environmental Laws (collectively referred to as "***Environmental Permits***"); (c) all such Environmental Permits are valid and in full force and Sellers are and for the past four (4) years have been in compliance in all material respects with the terms and conditions of such Environmental Permits; (d) Sellers have not received written notice of any Action or written notice of potential responsibility alleging material liability under any Environmental Law, except for such notices or Actions that have been fully and finally resolved; and (e) there has been no Release of or exposure to Hazardous Materials on, in, at, under or migrating from the Seller Facilities by any of the Sellers or, to Sellers' Knowledge, any other Person, in material violation of applicable Environmental Laws or that would reasonably be expected to result in any material liability or obligation pursuant to Environmental Law.  To the Knowledge of Sellers, the Sellers have made available to Buyers' Parent true and complete copies of all material environmental reports of investigations, audits, site assessments, risk assessments and sampling reports in their possession.

**3.19    Material Suppliers and Material Payors**.

(a)    Schedule 3.19(a) sets forth (i) the top ten (10) suppliers of the Seller Facilities based on the total paid consideration to each such supplier for goods or services rendered for each of the year ended December 31, 2017 and the period beginning January 1, 2018 and ended December 12, 2018 (collectively, the "***Material Suppliers***") and the corresponding amount of such total paid consideration. All Material Suppliers continue to be suppliers of the applicable Seller Facility.

(b)    Schedule 3.19(b) sets forth (i) the top ten (10) Third Party Payors of the Seller Facilities based on the total paid consideration by each such Third Party Payor in respect of services provided at the Seller Facilities during each of the year ended December 31, 2017 and the period beginning January 1, 2018 and ended December 12, 2018 (collectively, the "***Material Payors***") and the corresponding amount of such total paid consideration.

**3.20    Brokers**.  Except as disclosed on Schedule 3.20, none of Sellers' Parent, Sellers or any of their respective Affiliates has employed or retained any broker, finder or agent to act on their behalf in

connection with this Agreement or the transactions contemplated hereby, or incurred any liability to any broker, finder or agent for any brokerage fees, finder's fees, commissions or other amounts with respect to this Agreement or the transactions contemplated hereby.

**3.21**    **Affiliate Transactions**.    Schedule 3.21 sets forth all Contracts between Sellers' Parent or any of its Affiliates or Representatives, on the one hand, and any Seller, on the other hand, with respect to the Seller Facilities or the Purchased Assets.

**3.22**    **Privacy and Security**.    Each Seller Facility has complied in all material respects with the administrative simplification provisions required under HIPAA, including the electronic data interchange regulations and the health care privacy regulations, as of the applicable effective dates for such requirements.  No Seller has agreed or committed to pay or otherwise provide all or any portion of any meaningful use payments to any physician or other individual employed in connection with, providing services to or otherwise associated with the applicable Seller Facility.

**3.23**    **Disclaimer of Warranties**.    Notwithstanding anything in this Agreement to the contrary, and except as expressly set forth in <u>ARTICLE III</u> hereof, the Article III Schedules or in any Ancillary Agreement to which Sellers' Parent or Seller is a party, the Purchased Assets will be sold by Sellers and purchased by Buyers "<u>AS IS, WHERE IS AND WITH ALL FAULTS AND NONCOMPLIANCE WITH LAWS" WITH NO WARRANTY OF HABITABILITY OR FITNESS FOR HABITATION</u>, with respect to the Owned Real Property or Leased Real Property, and <u>WITH NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE</u>, with respect to the physical condition of the personal property and Inventory, any and all of which warranties (both express and implied) Sellers hereby disclaim.  Buyers' Parent and each Buyer acknowledges that Buyers' Parent has examined, reviewed and inspected all matters which in Buyers' Parent's judgment bears upon the Purchased Assets and their value and suitability for Buyers' purposes and, except as affirmatively represented and warranted by Sellers' Parent or Sellers, is relying solely on its own examination, review and inspection of the Purchased Assets.

## ARTICLE IV - REPRESENTATIONS AND WARRANTIES
## OF BUYERS AND BUYERS' PARENT

   Except to the extent a representation or warranty speaks as of another date, as of the Effective Date and as of the Closing Date, when read in light of any corresponding sections of the Schedules to this <u>ARTICLE IV</u>, Buyers' Parent and each Buyer represents and warrants to Sellers' Parent and Sellers the following:

**4.1**    **Capacity, Authority and Consents**.    Buyers' Parent and each Buyer is duly organized and validly existing in good standing under the Laws of the state of its incorporation or formation with the requisite power and authority to enter into this Agreement, to perform its respective obligations hereunder and to conduct its business as now being conducted.  The execution, delivery and performance of this Agreement and all Ancillary Agreements to which Buyers' Parent or a Buyer is or will become a party and the actions to be taken by Buyers' Parent or a Buyer in connection with the consummation of the transactions contemplated herein:

   (a)  are within the powers of Buyers' Parent or a Buyer, are not in contravention of applicable Law or the terms of the Governing Documents of Buyers' Parent or a Buyer and have been duly authorized by all appropriate action;

(b)      have been duly authorized by all actions and proceedings on behalf of Buyers' Parent and each Buyer, and no other actions or proceedings on the part of Buyers' Parent, Buyers, their respective boards of directors (or similar governing body) or equity holders are necessary

(c)      except as otherwise expressly herein provided or as set forth on <u>Schedule 4.1(c)</u> and subject to the entry of the Sale Procedure Order or any Sale Order, do not require any approval or consent of, or filing with, any third party or any Governmental Authority;

(d)      except as otherwise expressly provided herein, will not result in any material breach or contravention of, nor permit the acceleration of the maturity of or termination of or constitute a default under, the terms of any material indenture, mortgage, contract, agreement or other instrument to which Buyers is a party or otherwise bound that, in each case, could be reasonably expected to materially impair Buyers' ability to fulfill its obligations under this Agreement; and

(e)      will not violate any Law to which Buyers' Parent or a Buyer is subject.

**4.2**      <u>**Binding Agreement**</u>.  This Agreement and all Ancillary Agreements to which Buyers' Parent or a Buyer is or will become a party are and will constitute the valid and legally binding obligations of Buyers Parent or a Buyer, and are and will be enforceable against Buyers' Parent and each Buyer in accordance with the respective terms hereof or thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

**4.3**      <u>**Litigation and Proceedings**</u>.  There are no Actions pending or, to Buyers' knowledge, threatened against Buyers' Parent or a Buyer, or any governing Persons thereof, at Law or in equity, or before or by any Governmental Authority, that if adversely determined could be reasonably expected to materially impair Buyers' Parent or a Buyers' ability to fulfill its obligations under this Agreement.

**4.4**      <u>**Availability of Funds**</u>.  Buyers' Parent has the ability to obtain funds in cash in amounts equal to the Purchase Price by means of credit facilities or otherwise and will at the Closing have immediately available funds in cash which are sufficient to pay the Purchase Price in accordance with <u>Section 2.5(b)</u> and to pay any other amounts payable pursuant to this Agreement and to consummate the transactions contemplated by this Agreement.

**4.5**      <u>**Representations of Sellers**</u>.  Except as expressly set forth in <u>ARTICLE III</u> of this Agreement or the Article III Schedules or provided by Sellers' Parent or any Seller in any Ancillary Agreement, Buyer's Parent and each Buyer acknowledges that it is purchasing the Purchased Assets on an "AS IS, WHERE IS" basis (as more particularly described in <u>Section 3.23</u>), and that neither Buyers' Parent nor a Buyer is relying on any representation or warranty (expressed or implied, oral or otherwise) made on behalf of Sellers other than as expressly set forth in this Agreement.

## ARTICLE V- COVENANTS OF THE PARTIES PRIOR TO CLOSING

**5.1**      <u>**Access**</u>.

(a)      From and after the Effective Date until the Closing or the earlier termination of this Agreement (the "***Interim Period***"), Sellers and Sellers' Parent shall (i) provide Buyers and their Representatives reasonable access to and, as applicable, the right to inspect, the plants, properties, assets, Contracts, data, books and records of or relating to the Seller Facilities and the Purchased Assets, (ii) the personnel of Sellers and Sellers' Parent involved in the operation or management of the Seller Facilities and the Purchased Assets, and (iii) furnish Buyers with such additional financial and operating data and

other information as to the business and properties of or relating to the Seller Facilities and the Purchased Assets as reasonably requested, including copies of the updated Financial Statements following each calendar month during the Interim Period; provided however that such access shall be coordinated through such persons as may be designated in writing by Sellers' Parent.  Furthermore, during the Interim Period, Buyers' Parent and Buyers, as coordinated by Sellers' Parent and subject to Sellers' Parent's reasonable input, may communicate with the Transferred Employees concerning the terms of employment for such Transferred Employees following the Closing; provided that, until the entry of the Sale Order, Buyers' Parent and Buyers may only have such communications with the Transferred Employees set forth on Schedule 5.1(a); provided, further, that the failure of such persons to agree upon the terms and conditions of such employment shall not be a condition to the obligations of the Buyers' Parent and Buyers to consummate the transactions contemplated hereby and shall not constitute a Material Adverse Effect. Notwithstanding the foregoing, all disclosures of information shall be consistent with all joint defense agreements and any other nondisclosure agreements entered into between the Parties.

(b)      Buyers' right of access and inspection shall be exercised during normal business hours and in such a manner as not to interfere unreasonably with the operations of the Seller Facilities. Notwithstanding the foregoing, Buyers understand that (i) with respect to documents and information deemed by Sellers' Parent in good faith to be market sensitive or competitive in nature, Sellers' shall provide Buyers with access to such information, and Buyers shall use such information solely, in accordance with that certain letter agreement dated as November 16, 2018 which amends the Confidentiality Agreement, dated July 30, 2018, by and between Sellers' Parent and Buyers' Parent, (ii) litigation and other materials (including internal/external legal audit letters or reviews, PRO information, National Data Bank reports, quality review information and other physician specific confidential information) that are deemed privileged or confidential by Sellers' Parent will not be made available to Buyers, and (iii) Sellers shall not be obligated to generate or produce information in any prescribed format not customarily produced by Sellers.

**5.2**      **Update of Schedules**.  After the Effective Date, and no later than five (5) Business Days prior to the Closing Date, Sellers' Parent may deliver to Buyers' Parent a written notice with respect to any matter first arising or occurring after the Effective Date that, if existing as of the Effective Date, would have been required to be set forth or described in the Article III Schedules (a "***Schedule Supplement***").  Any Schedule Supplement shall set forth in reasonable detail the nature and circumstances of the matter being disclosed.  If Sellers' Parent provides Buyers' Parent with a Schedule Supplement relating to an event or circumstance that first occurred or arose following the Effective Date and prior to the Closing Date, such Schedule Supplement shall be deemed to have amended the Article III Schedules and to have qualified the particular representations and warranties contained in ARTICLE III that relate to such event or circumstance and are specifically referenced in the Schedule Supplement; provided, however, that any Schedule Supplement setting forth an event or circumstance that (a) has had, and would reasonably be expected to have, individually or in the aggregate with all other breaches of this Agreement, a Material Adverse Effect, (b) relates to a breach of any of the Fundamental Representations or any Healthcare Laws or (c) involves a crime punishable as a felony (such circumstances identified in clauses (a), (b) or (c), "***Excluded Occurrences***") shall not be deemed to have amended the Article III Schedules or to have qualified any representations and warranties contained in ARTICLE III, including for purposes of Section 6.1.  If the events or circumstances included in such Schedule Supplement constitute an Excluded Occurrence, Buyers' Parent has the unqualified right to terminate this Agreement pursuant to ARTICLE VIII hereof; provided that, in order to exercise such termination right, Buyers' Parent shall be required to deliver such notice within five (5) Business Days after receipt of such Schedule Supplement setting forth an Excluded Occurrence.

30

**5.3**     **Consents and Approvals**.

(a)     Sellers shall use commercially reasonable efforts (i) at their sole cost and expense, to obtain all consents and approvals listed on <u>Schedule 5.3</u> and any other consents and approvals necessary to consummate the transactions contemplated hereby, (ii) to make, as reasonably requested by Buyers' Parent, all filings, applications, statements and reports to all Governmental Authorities that are required to be made prior to the Closing Date by or on behalf of Sellers or any of their Affiliates pursuant to any applicable Laws in connection with this Agreement and the transactions contemplated hereby, and (iii) to obtain, as reasonably requested by Buyers' Parent, all required consents and approvals (if any) necessary to assign and transfer Sellers' Permits to Buyers at Closing and, to the extent that one or more of Sellers' Permits (including all Environmental Permits) are not transferable, to reasonably assist Buyers in obtaining replacements therefor.

(b)     Each of the parties shall file or cause to be filed any notifications required to be filed with, and use commercially reasonable efforts to obtain any other authorizations, consents and approvals of, any Governmental Authority in connection with the matters contemplated by this Agreement.

(c)     Sellers's Parent and Buyers' Parent shall each keep the other fully advised with respect to any requests from or communications with any Governmental Authority in connection with the matters contemplated by this Agreement and shall consult with the other with respect to all filings and responses thereto.

**5.4**     **Operating Covenants**.  During the Interim Period, except with the prior written consent of Buyers' Parent or as required by this Agreement or a Bankruptcy Court Order, each Seller and Sellers' Parent shall:

(a)     carry on its businesses in respect of the Seller Facilities and the Purchased Assets in the ordinary course of business consistent with past practice;

(b)     perform its obligations relating to or affecting the Seller Facilities and the Purchased Assets in the ordinary course of business consistent with past practice;

(c)     keep in full force and effect current insurance policies, self-funded plans or trusts or other comparable insurance relating to or affecting the Seller Facilities and the Purchased Assets;

(d)     comply in all material respects with all Laws applicable to the Seller Facilities and the Purchased Assets; and

(e)     use its commercially reasonable efforts to: (i) maintain the Purchased Assets in the ordinary course of business consistent with past practice and not remove any such Purchased Assets from any Seller Facility outside the ordinary course of business; (ii) keep in force all Permits necessary for the operation of the Seller Facilities and the Purchased Assets; (iii) maintain and preserve its business organizations intact and retain the current Facility Employees; and (iv) maintain the goodwill of the business of the Seller Facilities and preserve its relationships with physicians, suppliers, customers and others having business relations with the Seller Facilities.

**5.5**     **Negative Covenants**.  During the Interim Period, except as required by Law or as ordered by the Bankruptcy Court, and without limiting the generality of <u>Section 5.4</u>, except as set forth on <u>Schedule 5.5</u>, Sellers and Sellers' Parent shall not, with respect to the Seller Facilities or the Purchased Assets, without the prior written consent of Buyers' Parent (which shall not be unreasonably withheld, conditioned or delayed):

(a)     amend, modify, reject or terminate (other than at its stated expiration date) any of its Contracts, or enter into any Contract or commitment, other than any such Contract or commitment that (i) is entered into in the ordinary course of business, (ii) would not have been a Material Contract if it were entered into on or prior to the Effective Date and (iii) over the term of such Contract or commitment involves less than $100,000 or can be terminated without cause by a Seller on 90 days' notice or less without penalty;

(b)     acquire (including by merger, consolidation, acquisition of stock or equity), or by purchasing a substantial portion of the assets of, any Person, or business or division thereof;

(c)     make any change in accounting methods, principles or practices or change any of the assumptions underlying, or methods of calculating, any bad debt, contingency or other reserve;

(d)     enter into any lease that would be categorized as a capital lease under GAAP, other than in the ordinary course of business consistent with past practice;

(e)     license, sell, transfer, acquire, abandon or permit to lapse any material Intellectual Property;

(f)     waive or cancel any material claim or right, account receivable or trade account outside of the ordinary course of business in excess of $50,000 in the aggregate;

(g)     enter into any commitment for capital expenditures;

(h)     make any loan, advance or capital contribution to, or investment in any Person;

(i)     (i) make, modify or revoke any Tax election, (ii) change its method of Tax accounting, (iii) amend any Tax Return, (iv) settle or compromise any Tax liability, claim or dispute, (v) enter into any Tax sharing agreement, (vi) surrender any right to claim a refund of Taxes or (vii) consent to any extension or waiver of the statute of limitations applicable to any Tax claim or assessment;

(j)     settle any Action, or threatened Action, that (i) imposes any limitation on the conduct of the Seller Facilities or the Purchased Assets or (ii) affects or would reasonably be expected to affect the transactions contemplated by this Agreement;

(k)     fail to use commercially reasonable efforts to cause its current insurance policies (other than directors' and officer's policies) or any of the coverage thereunder not to lapse, unless simultaneously with such termination, cancellation or lapse, replacement policies underwritten by insurance companies of nationally recognized standing providing coverage equal to or greater than the coverage under the cancelled, terminated or lapsed policies for substantially similar premiums are in full force and effect;

(l)     (i) increase the salary, wages, bonus opportunity, benefits, commission or other compensation of any Facility Employee other than increases in base salaries or hourly wage rates in the ordinary course of business consistent with past practice for any Facility Employee that earns less than $100,000 in annual compensation that do not exceed 3% per employee and which increases are not material in the aggregate, (ii) establish, adopt, terminate or materially amend any Employee Benefit Plan; (iii) hire any Facility Employee that receives (or is expected to receive) aggregate annual compensation in excess of $100,000; or (iv) terminate or give notice of termination to any Facility Employee (other than for cause) that receives (or is expected to receive) aggregate annual compensation in excess of $100,000.

(m)     sell, assign, lease, convey, mortgage, license, encumber or otherwise transfer or dispose of any Purchased Assets, property, plant or equipment used in connection with the operation of the Seller Facilities except in the ordinary course of business;

(n)     transfer or otherwise relocate any of the Purchased Assets as located in the Seller Facilities on the Effective Date, whether to other locations owned, directly or indirectly, by Sellers' Parent, or to locations owned by third parties other than in the ordinary course of business;

(o)     seek the return of any amount deposited under any real property lease unless Sellers obtain a written agreement from the applicable landlord in form and substance acceptable to Buyers' Parent specifying that none of Buyers' Parent or Buyers will be required to deliver a deposit in connection with the assignment of the lease or any pre-Closing defaults under the lease; or

(p)     authorize, agree, resolve or consent to any of the foregoing.

**5.6     Bankruptcy Court Approval; Executory Contracts; Sale Procedures; and Stalking Horse Provisions**.

(a)     Reserved.

(b)     Within three (3) Business Days after the execution of this Agreement, Sellers' Parent shall file and serve a motion (together with supporting papers and with proper notice thereof on interested parties as required by the Bankruptcy Code and the Bankruptcy Rules) seeking approval by the Bankruptcy Court of the purchase and sale of the Purchased Assets and the assumption and assignment of all Proposed Assumed Contracts contemplated hereby to the extent required by Sections 363 and 365 and all other applicable provisions of the Bankruptcy Code within the terms of the Sale Procedures Order and Sale Order (collectively, the "***Sale Motion***").  Sellers' Parent shall serve on all non-Seller counterparties to all of the Proposed Assumed Contracts a notice specifically stating that a Seller may be seeking the assumption and assignment of such Proposed Assumed Contracts and shall notify such non-Seller counterparties of the deadline for objecting to the proposed Cure Amounts stated in such notices, if any, which deadline shall not be less than five (5) Business Days prior to the Sale Hearing (such deadline, the "***Objection Deadline***").  Upon objection by any non-debtor counterparty to the Cure Amounts asserted by Sellers and Sellers' Parent with respect to any Proposed Assumed Contract (such contract, a "***Disputed Contract***"), Sellers and Sellers' Parent, in cooperation with Buyers' Parent and Buyers will either settle the objection of such party or will litigate such objection under procedures approved and proscribed by the Bankruptcy Court.  In no event will any Seller or Sellers' Parent settle such an objection with regard to any Proposed Assumed Contract without the express written consent of Buyers' Parent (with an email consent being sufficient).  Upon entry of an Order determining any Cure Amount regarding any Disputed Contract after the Closing (the "***Disputed Contract Order***"), Buyers' Parent will have the option, no later than five (5) Business Days after the entry of the Disputed Contract Order, to designate the Disputed Contract as an Excluded Asset (and, for the avoidance of doubt, Buyer will not assume the Disputed Contract and will not be responsible for the associated Cure Amount (if any) or liabilities with respect to such Disputed Contract).  If Buyers' Parent elects for any Buyer to assume a Disputed Contract, Sellers' Parent and Buyers' Parent shall promptly thereafter deliver written instructions directing the Escrow Agent to release an amount in cash from the Cure Amount Escrow Account to the Person set forth in such notice in an amount equal to the final Cure Amount in respect of such Disputed Contract.  In the event that, following the Closing, Buyers' Parent elects not to assume a Disputed Contract, Buyers' Parent and Sellers' Parent shall promptly deliver written instructions directing the Escrow Agent to disburse an amount in cash from the funds available in the Cure Amount Escrow Account equal to the Disputed Cure Amount allocated to such Disputed Contract; provided that the parties shall discuss every two (2) weeks,

commencing as of the Sale Hearing and ending as of the first date following the Closing on which there are no longer funds in the Cure Amount Escrow Account, the status of Buyers' Parent's decisions with respect thereto.  Once the Buyers have assumed or rejected all Disputed Contracts in accordance with this Section 5.6(b) and all Cure Amounts in respect of any Disputed Contracts assumed by Buyers' Parent or any Buyer have been paid, Sellers' Parent and Buyers' Parent shall promptly thereafter deliver written instructions directing the Escrow Agent to release all amounts (if any) remaining in the Cure Amount Escrow Account to Sellers' Parent.

(c)      Between the time the Sale Motion is filed and the Auction is held, the Sellers' Parent may contact, through whatever means are reasonable, other potential buyers for the Purchased Assets and engage in discussions with such potential buyers that would be higher and better than reflected in this Agreement.

(d)      The Sale Motion shall seek approval of the transactions contemplated by this Agreement and entry of the Sale Order and the Sale Procedures Order, substantially in the form set forth on Exhibits 3 and 4.  As promptly as practicable after the filing of the Sale Motion, Sellers' Parent and Buyers' Parent shall use reasonable efforts to obtain the entry of the Sale Procedures Order and the Sale Order. Sellers' Parent shall promptly provide Buyers' Parent with copies of any objections to the Sale Motion. Buyers' Parent shall take such actions as are reasonably requested by Sellers' Parent to assist Sellers's Parent and Sellers in obtaining a finding by the Bankruptcy Court that Buyers are deemed to have purchased the Seller Facilities and the Purchased Assets in good faith pursuant to Section 363(m) of the Bankruptcy Code.  The purchase and sale of the Purchased Assets will be in accordance with (and only in accordance with) the Sale Procedures Order.  Neither Sellers' Parent, Sellers, nor any of their respective Affiliates shall change or modify, or request that the Bankruptcy Court change or modify, any of the dates or procedures set forth in this Agreement or the Sale Procedures Order without the prior written consent of Buyers' Parent.

(e)      In the event an appeal is taken, or a stay pending appeal is requested or reconsideration is sought, from the Sale Order, and Buyers have not also been served with papers related to such appeal, stay or reconsideration, Sellers' Parent shall promptly notify Buyers' Parent of such appeal or stay request and shall provide to Buyers' Parent within one (1) Business Day a copy of the related notice of appeal or order of stay or application for reconsideration. Sellers' Parent shall also provide Buyers' Parent with written notice (and copies) of, any other or further notice of appeal, motion or application filed in connection with any appeal from or application for reconsideration of, either of such orders and any related briefs if Buyers are not also included on such additional documents and communications.

(f)      Counsel for Sellers' Parent shall promptly notify counsel for Buyers' Parent in writing and, as is required by the Bankruptcy Code, all parties entitled to notice pursuant to the Bankruptcy Code, the Bankruptcy Rules and orders of the Bankruptcy Court, of all motions, notices and orders required to consummate the transactions contemplated by this Agreement, including the Sale Order, as modified by orders in respect of notice which may be issued at any time and from time to time by the Bankruptcy Court.  At least three (3) Business Days prior to filing any papers or pleadings in the Bankruptcy Case that relate primarily to this Agreement or Buyers, Sellers' Parent shall provide Buyers' Parent with a copy of such papers or pleadings for review and comment.  Sellers' Parent shall consider such changes thereto as reasonably requested by Buyers' Parent or its Representatives.

(g)      If Buyers are the highest and best bidder as reasonably determined by Sellers' Parent along with such other parties as may be given the right to have input pursuant to the Sales Procedures Order at the auction which the Bankruptcy Court shall schedule pursuant to the Sales Procedures Order (the "*Auction*"), neither Sellers' Parent nor any Seller shall, directly or indirectly, take any action which

34

is intended to, or fail to take any action the intent of such failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order or this Agreement.

(h)    This Agreement is subject to approval by the Bankruptcy Court. Following completion of the Auction, in the event that the Buyers are designated as the highest and best bidder, neither Sellers' Parent nor any Seller shall initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person in connection with any sale or other disposition of the Seller Facilities or the Purchased Assets. In the event that the Buyers are designated as the highest and best bidder unless otherwise directed by the Bankruptcy Court, neither Sellers' Parent nor any Seller shall, after completion of the Auction, respond to or pursue any other proposed material transaction, including a refinancing or reorganization, involving any Seller Facility or all or any material portion of the Purchased Assets (each an "**Alternative Transaction**") or perform any other acts related thereto.

(i)    Sellers' Parent and Sellers shall use commercially reasonable efforts to ensure that the Sale Procedures Order shall provide, inter alia, that in the event (i) the Bankruptcy Court approves a sale of all or some of the Seller Facilities or the Purchased Assets to a buyer other than the Buyers or (ii) Sellers' Parent or a Seller enters into a definitive agreement for an Alternative Transaction, Sellers' Parent and Sellers shall be required to (x) pay Buyers a fee in the amount of One Million Eight Hundred Ninety Thousand Dollars ($1,890,000) (the "**Break-Up Fee**"), (y) reimburse Buyers' Parent and Buyers in cash an amount up to $250,000 of the reasonable and actual out-of-pocket and third-party costs and expenses (including expenses of counsel and other outside consultants) incurred and documented by Buyers' Parent and Buyers (and each of their designated Affiliate(s)) in connection with Buyers' Parent's due diligence investigation of Sellers's Parent, Sellers, the Seller Facilities and the Purchased Assets and the negotiation, execution and delivery of this Agreement and the transactions contemplated by this Agreement (the "**Expense Reimbursement**"), and (z) the Parties shall promptly take any and all actions pursuant to the Escrow Agreement or otherwise to release to Buyers' Parent the Deposit and any interest accrued thereon. The Break-Up Fee and Expense Reimbursement are an integral part of the transactions contemplated by this Agreement and is not a penalty but rather is a reasonable amount that will compensate Buyers' Parent and Buyers for the efforts and resources expended and opportunities foregone while negotiating this Agreement. The Break-Up Fee and Expense Reimbursement shall be allowed administrative expense claims of Sellers pursuant to Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of any kind, including those specified in Sections 503(b) or 507(b) of the Bankruptcy Code, and, if such amounts are to be paid pursuant to this Section 5.6(i), the Expense Reimbursement and the Break-Up Fee shall be paid at the closing of an Alternative Transaction including the sale of any Seller Facility to another buyer; provided that, if earlier, the Expense Reimbursement shall be paid to Buyers' Parent upon Sellers' Parent directly or indirectly receiving proceeds from the sale of any of its or its subsidiaries' assets following the Effective Date. The Sale Procedures Order shall provide, in the event of an Auction, for an initial overbid protection in an amount equal to $2,750,00 and minimum bid increments thereafter of $500,000. The Sale Procedures Order shall provide for qualified bidders to be identified by Sellers' Parent that may bid for all of the Purchased Assets and shall contemplate the same transaction form and structure as contemplated by this Agreement and the transactions contemplated herein.

**5.7    Confidentiality**. Following the Closing, Sellers' Parent and each Seller shall, and shall cause their subsidiaries to, keep confidential and not disclose to any other Person or use for its own benefit or the benefit of any other Person any confidential information, proprietary information, technology, know-how, trade secrets (including all results of research and development), industrial designs, customer lists, franchises, inventions or other intellecual property regarding Buyers' Parent, Buyer, the Seller Facilities, the Purchased Assets or the operation thereof ("**Buyer Confidential Information**") in its possession or control. The obligations of Sellers' Parent and each Seller under this Section 5.7 shall not apply to Buyer

Confidential Information which (a) is or becomes generally available to the public without breach of the commitment provided for in this <u>Section 5.7</u>; (b) is required to be disclosed by Law; provided, however, that, in any such case, Sellers' Parent shall notify Buyers' Parent (to the extent permitted by Law) prior to disclosure and agrees that Buyers' Parent and Buyer may take appropriate measures to preserve the confidentiality of such Buyer Confidential Information; (c) is received by Sellers or Sellers' Parent on a non-confidential basis from a source other than Buyers' Parent, Buyer or their respective subsidiaries or Representatives not in violation of a confidentiality obligation to Buyers' Parent, Buyer or their respective subsidiaries; (d) is independently developed by Sellers or Sellers' Parent, or their respective Affiliates or Representatives without reference to or use of any Buyer Confidential Information; or (e) is or was disclosed in connection with the Bankruptcy Case.

**5.8**    **Public Announcements.**  Prior to the Closing, no Party shall issue or release or make any news release, public statement or other similar public announcement, written or oral, whether relating to this Agreement or any of the other Ancillary Agreements or the existence of any arrangement between the Parties, without the prior written consent of the other Party whether or not named in such news release, public statement or other similar public announcement, except (x) the Parties shall no later than the submission of this Agreement to the Bankruptcy Court issue a joint press release, together with a communication to the Facility Employees in connection with the execution and delivery of this Agreement in form and substance agreed by the Parties prior to the Effective Date, and (y) any Party may issue or release or make any such news release, public statement or other similar public announcement (including a copy of this Agreement and any Ancillary Agreement) as may be required by Law, by the rules or regulations of any stock exchange or in connection with the Bankruptcy Case.  Notwithstanding the foregoing, in no event shall the foregoing be construed to restrict or prevent any Party or its Affiliates from making any internal announcements (including announcements to financing sources) regarding the transactions contemplated by this Agreement.  Any subsequent release, public statement or other similar public announcement by a Party that solely contains information included in a prior release, public statement or other similar public announcement made by such Party in accordance with this <u>Section 5.8</u> shall be deemed consented to by the other Parties.

**5.9**    **Incorporation of Buyers.**  Following the Effective Date and prior to the Closing, Buyers' Parent shall incorporate direct or indirect subsidiaries of Buyers' Parent (each, a "***Buyer***" and, collectively, the "***Buyers***") and deliver to Sellers' Parent a list in the form of <u>Exhibit 2</u> specifying for each Seller Facility and the related Purchased Assets the entity that will be the Buyer.  Prior to the Closing, each Buyer shall execute and deliver to Sellers' Parent a joinder to this Agreement and any provisions of this Agreement relating to any Buyer shall be effective only as of the execution and delivery of such joinder (including that any representations and warranties with respect to a Buyer shall be as of the execution and delivery of such joinder, as opposed to the Effective Date).

**ARTICLE VI- CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYERS**

Notwithstanding anything herein to the contrary, the obligations of Buyers' Parent and Buyers to consummate the transactions described herein are subject to the fulfillment, as of the Closing, of the following conditions precedent unless (but only to the extent) waived in writing by Buyers' Parent on or prior to the Closing:

**6.1**    **Representations and Warranties; Covenants**.

(a)    The Fundamental Representations shall be true and correct in all respects as of the Effective Date and the Closing Date, as though made as of the Closing Date (except for representations and warranties which address matters only as of a specific date, which representations and warranties

36

shall continue as of the Closing Date to be true and correct as of such specific date). The representations of the Sellers and Sellers' Parent contained in ARTICLE III hereof (other than the Fundamental Representations), shall be true and correct (without giving effect to any "materiality," "in all material respects," "Material Adverse Effect" or similar qualifiers) as of the Effective Date and the Closing Date when read in light of any Article III Schedules that are updated prior to the Closing Date in accordance with Section 5.2, as though made on the Closing Date (except for representations and warranties which address matters only as of a specific date, which representations and warranties shall continue as of the Closing Date to be true and correct as of such specific dates), except to the extent that the failure to be so true and correct has not had, and would not reasonably be expected to have, a Material Adverse Effect.

(b)    All of the covenants, agreements and other obligations in this Agreement to be complied with or performed by Sellers and Sellers' Parent on or before the Closing Date pursuant to the terms hereof shall have been duly complied with and performed in all material respects (without giving effect to any "materiality," "in all material respects," "Material Adverse Effect" or similar qualifiers).

**6.2    Required Governmental Approvals and Consents**. Buyers shall have obtained documentation or other evidence reasonably satisfactory to Buyers' Parent that the Parties have obtained from applicable Governmental Authorities the approvals and consents set forth on Schedule 6.2 to effect the transactions set forth in this Agreement and to enable Buyers to operate the Seller Facilities and Purchased Assets (the "***Required Governmental Approvals***").

**6.3    Title and Survey**. The Title Company shall be irrevocably committed to issue both the Title Policy insuring the applicable Buyer's valid and enforceable leasehold title in and to the Leased Real Property and good and marketable fee simple title to the Owned Real Property, subject to no Encumbrances other than the Permitted Encumbrances, together with such endorsements to such Title Policy as the applicable Buyer deems necessary in its reasonable discretion. Further, the Surveys shall not reflect any Encumbrance other than Permitted Encumbrances and shall otherwise be acceptable to the Title Company for purposes of providing "survey coverage" in the Title Policy.

**6.4    Actions and Proceedings**. No Governmental Authority shall have issued any Order or enacted any Law that is then in effect and that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement, and no Action, claim or investigation seeking to enjoin, restrain or prohibit the consummation of the transactions contemplated by this Agreement shall be pending.

**6.5    Material Adverse Effect**. There shall not have been any Material Adverse Effect since the Balance Sheet Date.

**6.6    Closing Certificate**. Sellers and Sellers' Parent shall have delivered to Buyers' Parent a certificate dated as of the Closing Date and executed by an authorized officer of each of Sellers and Sellers' Parent to the effect that each of the conditions specified in Section 6.1, Section 6.5 and Section 6.10 are satisfied in all respects.

**6.7    Bankruptcy Court Approval**. The Sale Order shall have been entered by the Bankruptcy Court.

**6.8    Closing Deliveries**. Sellers shall have executed and delivered, or caused to have been executed and delivered, to Buyers the documents and items described in Section 2.7.

**6.9    Objection Deadline**. The Objection Deadline shall have passed and Sellers' Parent shall have delivered to Buyers' Parent the Final Cure Amount Schedule.

37

**6.10**     **Maintenance of LTCH Classification**.

(a)     Each of the Seller Facilities shall have maintained an average Medicare inpatient length of stay of greater than 25 days (calculated in accordance with 42 C.F.R. section 412.23(e)(3)(i)) during the period of at least five (5) months of the six (6) months immediately preceding the Closing;

(b)     Each of Promise Hospital of Florida at The Villages and Promise Hospital of Fort Myers shall have maintained an average Medicare inpatient length of stay of greater than 25 days (calculated in accordance with 42 C.F.R. section 412.23(e)(3)(i)) during such Seller Facility's most recent complete cost reporting period; and

(c)     Promise Hospital of Miami shall have maintained an average Medicare inpatient length of stay greater than 25 days (calculated in accordance with 42 C.F.R. § 412.23(e)(3)(i)) during its LTCH requalification period (that is, at least five months of the six month period ending February 28, 2019) and shall not have received any notification from its Medicare Administrative Contractor that it has failed to requalify as an LTCH or that its LTCH classification has expired or been revoked.

## ARTICLE VII- CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS

Notwithstanding anything herein to the contrary, the obligations of Sellers' Parent and Sellers to consummate the transactions described herein are subject to the fulfillment, as of the Closing, of the following conditions precedent unless (but only to the extent) waived in writing by Sellers' Parent on or prior to the Closing:

**7.1**     **Representations and Warranties; Covenants**.

(a)     The representations and warranties of Buyers' Parent and Buyers contained in this Agreement shall be true and correct in all respects (without giving effect to any "materiality," "in all material respects," "material adverse effect" or similar qualifiers) as of the Effective Date and as of the Closing Date (except for representations and warranties which address matters only as of a specific date, which representations and warranties shall continue as of the Closing Date to be true and correct as of such specific date), except to the extent the failure of such representations and warranties to be true and correct would not materially and adversely affect Buyers' or Buyers' Parent's ability to consummate the transactions contemplated by this Agreement.

(b)     All of the covenants, agreements and other obligations in this Agreement to be complied with or performed by Buyers and Buyers' Parent on or before the Closing pursuant to the terms hereof shall have been duly complied with and performed in all material respects (without giving effect to any "materiality," "in all material respects," "material adverse effect" or similar qualifiers).

**7.2**     **Pre-Closing Confirmations**.     Sellers' Parent shall have obtained documentation or other evidence reasonably satisfactory to Sellers that the Parties have obtained the Required Governmental Approvals.

**7.3**     **Actions and Proceedings**.  No Governmental Authority shall have issued any Order or enacted any Law that is then in effect and that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement, and no Action, claim or investigation seeking to enjoin, restrain or prohibit the consummation of the transactions contemplated by this Agreement shall be pending.

4822-2950-0804.2
25094706.19.BUSINESS

**7.4    Closing Certificate**. Buyers and Buyers' Parent shall have delivered to Sellers' Parent a certificate dated as of the Closing Date and executed by an authorized officer of each of Buyers and Buyers' Parent to the effect that each of the conditions specified in Section 7.1 is satisfied in all respects.

**7.5    Closing Deliveries**. Buyers shall have executed and delivered, or caused to have been executed and delivered, to Sellers the documents and items described in Section 2.8.

**7.6    Cure Amounts**. Any and all Assumed Cure Amounts shall have been paid by or on behalf of Buyers or Buyers' Parent, except for (i) those Assumed Cure Amounts that are to be paid in full at the Closing (and subject to the payment of such Assumed Cure Amounts at the Closing) and (ii) any Disputed Cure Amounts.

## ARTICLE VIII- ADDITIONAL AGREEMENTS

**8.1    Termination Prior to Closing**.

(a)    Notwithstanding anything herein to the contrary, this Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing:

(i)    by the mutual written consent of Sellers' Parent and Buyers' Parent;

(ii)    by Buyers' Parent, if a Seller or Sellers' Parent breach or fail to perform in any respect any of its representations, warranties, agreements, covenants or other obligations contained in this Agreement and such breach or failure to perform would, if the Closing otherwise were to occur on the date of written notice of such breach or failure to perform, give rise to the failure of a condition set forth in Section 6.1 that is incapable of being cured by the Outside Date;

(iii)    by Sellers' Parent, if Buyers' Parent or a Buyer breaches or fails to perform in any respect any of its representations, warranties, agreements, covenants or other obligations contained in this Agreement and such breach or failure to perform would, if the Closing otherwise were to occur on the date of written notice of such breach or failure to perform, give rise to the failure of a condition set forth in Section 7.1 that is incapable of being cured by the Outside Date;

(iv)    by Sellers' Parent or Buyers' Parent after the Outside Date, provided that the right to terminate this Agreement under this Section 8.1(a)(iv) shall not be available to a Party if the breach of or inaccuracy in any representation or warranty or breach of or failure to perform any covenant, agreement or other obligation of such Party (or in the case of Buyers' Parent, of any Buyer, and, in the case of Sellers' Parent, of any Seller) set forth in this Agreement has been the primary cause of or resulted in the failure of the Closing to occur on or prior to such date;

(v)    by Sellers' Parent in the event the Bankruptcy Court approves an Alternative Transaction; and

(vi)    by Buyers' Parent pursuant to Section 5.2 hereof.

The Party seeking to terminate this Agreement pursuant to this Section 8.1(a) (other than Section 8.1(a)(i)) shall give prompt written notice of such termination to the other Parties.

(b)    In the event of any termination of this Agreement by either Buyers' Parent or Sellers' Parent as provided in Section 8.1(a), this Agreement shall forthwith become void, and there shall be no liability on the part of any Party or any of its or their Affiliates to any other Person resulting from, arising

39

out of, relating to, or in connection with this Agreement or any other document related to the transactions contemplated herein, except that (i) ARTICLE IX (Miscellaneous), Section 5.6 and this Section 8.1 shall survive any termination of this Agreement and each Party shall be entitled to all remedies available at Law or in equity in connection with any breach of any such provision and (ii) Sellers' and Sellers' Parent's obligations to pay Buyers' Parent the Break-Up Fee, if earned, in accordance with Section 5.6 shall survive any termination of this Agreement.

(c)     If this Agreement is terminated by Sellers' Parent pursuant to Section 8.1(a)(iii) at such time when Buyers' Parent is not otherwise entitled to terminate this Agreement pursuant to Section 8.1(a) (a "*Qualifying Termination*"), the Parties shall promptly take any and all actions pursuant to the Escrow Agreement or otherwise to release to Sellers' Parent the Deposit and any interest accrued thereon as a reverse termination fee (the "*Reverse Termination Fee*").  If this Agreement is terminated and such termination is not a Qualifying Termination, then Sellers' Parent will not be entitled to the Reverse Termination Fee and the Parties shall promptly take any and all actions pursuant to the Escrow Agreement or otherwise to release to Buyers' Parent the Deposit and any interest accrued thereon.

(d)     Notwithstanding anything in this Agreement to the contrary, (i) in no event shall Buyers or Buyers' Parent be required to pay or cause to be paid the Reverse Termination Fee on more than one occasion and (ii) in no event shall Sellers or Sellers' Parent be entitled to both (x) receive the Reverse Termination Fee and (y) specific performance of Buyers' obligation to pay the Purchase Price and effect the Closing.

(e)     Notwithstanding anything in this Agreement to the contrary, (i) in the event that Buyers and Buyers' Parent fail to effect the Closing for any reason or no reason or otherwise breach this Agreement (or any representation, warranty, covenant or agreement herein) prior to the Closing or otherwise fail to perform hereunder prior to the Closing (whether willfully, intentionally, unintentionally or otherwise), then Sellers' Parent's right (subject to the terms, conditions and limitations hereof) to terminate this Agreement pursuant to Sections 8.1(a)(iii), 8.1(a)(iv) or 8.1(a)(v) and, solely in the case of a Qualifying Termination, receive the Reverse Termination Fee pursuant to Section 8.1(c) shall be the sole and exclusive right and remedy (whether at law, in equity, in contract, in tort or otherwise) of Sellers and Sellers' Parent, their respective successors and permitted assigns, and any Person claiming by, through or on behalf of any of them (it being expressly agreed that no other Person shall have any right or remedy in such circumstances) against any Person, arising out of or relating to (A) this Agreement, (B) any breach by Buyers' Parent or any Buyer of any representation, warranty, covenant, obligation or agreement in this Agreement or Buyers' Parent's or any Buyer's failure to perform under this Agreement, (C) the failure of Buyers and Buyers' Parent to consummate the Closing, or (D) the transactions contemplated by this Agreement and (ii) upon payment of the Reverse Termination Fee, none of Sellers' Parent, Sellers, their respective successors and permitted assigns, or any Person claiming by, through or on behalf of any of them (it being expressly agreed that no other Person shall have any right or remedy in such circumstances) shall have any right or remedy (whether at law, in equity, in contract, in tort or otherwise) with respect to any of the matters described in clauses (A) through (D) of the immediately preceding subsection (i).

(f)     Notwithstanding anything to the contrary in this Agreement, in the event that Sellers' Parent is paid the Reverse Termination Fee, the receipt of the Reverse Termination Fee by Sellers' Parent shall not be deemed a penalty, but shall be deemed to be liquidated damages for any and all losses or damages suffered or incurred by Sellers' Parent, Sellers and any other Person with respect to the matters described in clauses (A) through (D) of Section 8.1(e), and none of Sellers' Parent, Sellers or any other Person shall have any other right or remedy (whether at law, in equity, in contract, in tort or otherwise)

40

against Buyers' Parent, Buyers or any other Person (it being expressly agreed that no other Person shall have any right or remedy in such circumstances).

(g)     The provisions of Sections 8.1(b) through 8.1(f) and this Section 8.1(g) are intended to be for the benefit of, and shall be enforceable by, Buyers' Parent, Buyers and any other Person against whom any right or remedy is sought.  The Parties agree that the agreements contained in this Section 8.1 are an integral part of this Agreement and the transactions contemplated hereby and, without these agreements, the parties would not enter into this Agreement.  In light of the difficulty of accurately determining actual damages with respect to the foregoing matters, the Reverse Termination Fee constitutes a reasonable estimate of the losses that will be suffered if this Agreement is terminated or the transactions contemplated by this Agreement are otherwise abandoned or not consummated and constitutes liquidated damages (and not a penalty).

**8.2     Post-Closing Filings and Access to Information.**

(a)     After the Closing, each Party shall promptly deliver to any other Party, upon reasonable request of such other Party, copies of any post-Closing filings, financial statements or reports regarding the Seller Facilities, the Purchased Assets, the Assumed Liabilities, the Excluded Assets or the Excluded Liabilities that may be reasonably necessary for such other Party to prepare and deliver any filings or reports required to be delivered to any Governmental Authority as a result of the consummation of the transactions described herein, in each case at the sole cost and expense of the requesting Party.

(b)     The Parties acknowledge that, subsequent to the Closing, Sellers may need access to information or documents in the control or possession of Buyers for the purposes of concluding the transactions herein contemplated, audits, compliance with Laws, and the prosecution or defense of third party claims. Accordingly, for a period of three (3) years following the Closing, Buyers shall make reasonably available to Sellers and their respective Representatives, upon written request, during normal business hours, without undue interruption of the operations of Buyers or their Affiliates, and at the expense of Sellers, such documents and information as may be available relating to the Seller Facilities for periods prior to the Closing Date to the extent necessary to facilitate concluding the transactions herein contemplated, audits, compliance with Laws and the prosecution or defense of claims (except where such access jeopardizes attorney-client privileged communications or is prohibited by applicable Law and other than in connection with a dispute, claim or Action between Buyers or Buyers' Parent, on the one hand, and Sellers or Sellers' Parent, on the other hand, or any of their respective Affiliates). Sellers' Parent agrees to reimburse Buyers for reasonable expenses incurred in connection with providing such access.

(c)     The Parties acknowledge that, subsequent to the Closing, Buyers may need access to information or documents in the control or possession of Sellers for the purposes of concluding the transactions herein contemplated, audits, compliance with Laws, and the prosecution or defense of third party claims.  Accordingly, for a period of three (3) years following the Closing, Sellers shall make reasonably available to Buyers and their Representatives, upon written request, during normal business hours, without undue interruption of the operations of Sellers or their Affiliates and at the expense of Buyers, such documents and information as may be available relating to the Seller Facilities to the extent necessary to facilitate concluding the transactions herein contemplated, audits, compliance with Laws and the prosecution or defense of claims (except where such access jeopardizes attorney-client privileged communications or is prohibited by applicable Law and other than in connection with a dispute, claim or Action between Buyers or Buyers' Parent, on the one hand, and Sellers or Sellers' Parent, on the other hand, or any of their respective Affiliates); provided that nothing herein shall require the Sellers' Parent to

41

continue the Bankruptcy Case or restrict the dissolution of any Seller.  Buyers' Parent agrees to reimburse Sellers for reasonable expenses incurred in connection with providing such access.

## 8.3    **Employee Matters.**

(a)    Upon the Closing Date, each Seller and each of its Affiliates shall terminate the employment of each Facility Employee that is not a Leave Employee and all such Facility Employees shall cease to participate in or accrue benefits under any Facility Employee Benefit Plan (except as required by Law or by the terms of such Facility Employee Benefit Plan). Subject to satisfactory results from background screening conducted pursuant to Buyers' personnel policies, one or more Buyers shall make offers of employment, effective as of the Closing, to each Facility Employee that is not a Leave Employee.  Each Facility Employee that accepts such an offer of employment shall be referred to as a "***Transferred Employee***."  With respect to each Transferred Employee, Buyers shall assume Sellers' or its Affiliates' liability to each Transferred Employee for such Transferred Employee's Accrued PTO.  Such Accrued PTO assumed by Buyers will be credited to the Transferred Employees and administered and used by the Transferred Employee in accordance with Buyers' employee policies and procedures.

(b)    In respect of each Leave Employee, the offer of employment to be made by Buyer (or its designated Affiliate) pursuant to Section 8.3 will not be made as of the Closing Date, but as otherwise provided in this Section 8.3(b).  If, within six months after the Closing Date, such Leave Employee notifies Buyer that he or she is capable of returning to work and, if applicable, is cleared for return to work, in each case in accordance with the normal policies of Buyer for employees returning to work following a disability leave or other approved leave (as applicable), then Buyer (or its designated Affiliate) will offer such Leave Employee employment and the effective date of such employment with Buyer (or its designated Affiliate) will be the date on which such employee returns to work with Buyer (or its designated Affiliate) (the "***Delayed Hire Date***").  Notwithstanding anything contained in this Agreement to the contrary, until such Leave Employee's Delayed Hire Date, such Leave Employee will remain employed by Sellers; such Leave Employee will not be considered a Transferred Employee for any purpose; and none of the Buyers nor any of their respective Affiliates will have any liability with respect to such Leave Employee with respect to any period prior to such Leave Employee becoming an employee of Buyer (or its designated Affiliate).  If such offer is accepted, then such Leave Employee will become a Transferred Employee from and after the Delayed Hire Date.  If such Leave Employee does not make such notification to Buyer (or, if applicable, is not cleared for work) within six months after the Closing Date, then none of the Buyers nor any of their respective Affiliates will be obligated to offer employment to such Leave Employee and such individual will not be treated as a Transferred Employee for any purpose under this Agreement.  In the event that a Leave Employee does not become a Transferred Employee until the Leave Employee's Delayed Hire Date, this Section 8.3 will be interpreted and applied accordingly with respect to such Leave Employee (such as, where appropriate, by substituting "***Delayed Hire Date***" for "***Closing***" or "***Closing Date***").

(c)    For purposes of vesting, eligibility to participate, and solely with respect to severance and paid time off plans, level of benefits under the employee benefit plans of the Buyers or their Affiliates providing benefits to any Transferred Employee after the Closing (the "***Buyer Benefit Plans***"), each Transferred Employee shall be credited with his or her years of service with any Seller and their respective predecessors to the same extent as such Transferred Employee received credit for such service under any similar Facility Employee Benefit Plan in which such Transferred Employee participated, or was eligible to participate, immediately prior to the Closing; provided that the foregoing shall not apply to the extent it would result in a duplication of benefits.  With respect to each Buyer Benefit Plan in which any Transferred Employee becomes eligible to participate following the closing that provides medical, dental, vision or prescription drug coverage, Buyer shall, or shall cause its Affiliates to, use commercially

reasonable efforts to waive all limitations as to pre-existing conditions and waiting periods (to the extent waived or satisfied under a comparable Facility Employee Benefit Plan immediately prior to Closing) with respect to participation and coverage requirements for any Transferred Employees and their eligible dependents.

(d)     Following the Closing, Buyer or one of its Affiliates will permit each Transferred Employee to participate in a defined contribution Buyer Benefit Plan that is qualified under Section 401(a) of the Code ("***Buyer Savings Plan***"), subject to satisfying such plan's eligibility requirements (it being acknowledged that the first payroll period for which deferral elections will be processed may not be for several weeks after the Closing Date).  Following the Closing Date, to the extent permitted by applicable Law, Buyer and its Affiliates will allow the Buyer Savings Plan, to the extent so elected by a Transferred Employee within 60 days after the Closing Date, to accept "eligible rollover distributions" (within the meaning of Section 401(a)(31) of the Code) from any Facility Employee Benefit Plan that is qualified under Section 401(a) of the Code (each, a "***Seller Savings Plan***").  For purposes of this Section 8.3(d), the term "eligible rollover distribution" will also include the balance of any Transferred Employee's outstanding participant loan under any Seller Savings Plan.  Prior to the Closing, the Seller Savings Plan shall be amended to the extent necessary to allow any such rollover.

(e)     Sellers will, and will cause their respective Affiliates to, waive any non-competition, non-solicitation, confidentiality and other restrictive covenant that exists for the benefit of Sellers or their respective Affiliates, to which any Transferred Employee is subject that would prevent such Transferred Employee from being employed by any Buyer or any of their respective Affiliates or that otherwise would restrict any Transferred Employee from performing his or her duties or responsibilities for any Buyer or any of their respective Affiliates.

(f)     Sellers and Sellers' Parent will be solely responsible and liable for providing all coverage required by the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, to all current and former employees of any Seller or any ERISA Affiliate (and their dependents) with respect to any "qualifying event" (as defined in Treasury Regulation Section 54.4980B-4) occurring on or prior to the Closing Date under any Seller Plan but only to the extent such is required by applicable Law and nothing herein shall obligate any Seller or Sellers' Parent to maintain any health or other Seller Plan following the Closing.

(g)     The Sellers and the Buyers agree to use the "Standard Procedure" as described in IRS Revenue Procedure 2004-53, I.R.B. 2004-34, with respect to the Transferred Employees.

(h)     Except for the Accrued PTO assumed by Buyers pursuant to this Agreement, Buyers shall not assume any obligations of Sellers or any of their respective Affiliates related to any Employee Benefit Plan.

(i)     This Section 8.3 shall be binding upon and inure solely to the benefit of each of the Parties to this Agreement, and nothing in this Section 8.3 or this Agreement, express or implied, shall confer upon any Transferred Employee or any other Person any rights or remedies of any nature whatsoever under this Section 8.3.  Nothing contained herein, express or implied, shall be construed to establish, amend or modify any benefit plan, program, agreement or arrangement, nor shall this Section 8.3 be deemed to limit the right of Buyer or any of its Affiliates from modifying, terminating or amending any Buyer Benefit Plan.  The Parties acknowledge and agree that no provision of this Agreement shall create any right in any employee, any Transferred Employee or any other Person to any continued employment or compensation or benefits of any nature or kind whatsoever, or otherwise interfere with the right of Buyers or any of their respective Affiliates to terminate the employment of any

43

Person at any time and for any reason.  Sellers and Buyers, and their respective Affiliates, shall cooperate to effect the foregoing provisions of this Section 8.3.

**8.4** **Medical Staff**.  To ensure continuity of care in the applicable community, Buyers agree that the medical staff members of the Seller Facilities who are in good standing as of the Closing Date shall maintain medical staff privileges at the Seller Facilities as of the Closing.  After the Closing, the medical staff will be subject to the Medical Staff Bylaws of the Seller Facilities then in effect, as amended from time to time.

**8.5** **Refunds and Remittances**.  After the Closing:  (a) if Sellers or any of their Affiliates receive any refund or other amount that is a Purchased Asset or is otherwise properly due and owing to Buyers in accordance with the terms of this Agreement, Sellers promptly shall remit, or shall cause to be remitted, such amount to Buyers; and (b) if Buyers or any of their Affiliates receive any refund or other amount that is an Excluded Asset or is otherwise properly due and owing to Sellers or any of their Affiliates in accordance with the terms of this Agreement, Buyers promptly shall remit, or shall cause to be remitted, such amount to Sellers.

**8.6** **Insurance.**  Sellers' Parent and Sellers (as their sole cost and expense) shall (a) maintain their directors' and officers' liability insurance policies providing for terms and conditions that are not less advantageous to the directors, managers and officers (as applicable) of Sellers' Parent and Sellers than those set forth in the directors' and officers' insurance policies in effect as of the date of this Agreement until such time that Sellers' Parent and Sellers dissolve and (b) if Sellers' Parent or any Seller obtains a "tail" insurance policy applicable to any period following the Closing Date and covering Transferred Employees, Sellers' Parent and Sellers shall make such policy available to such Transferred Employees (to the extent applicable) with respect to claims arising out of or relating to events which occurred on or prior to the Closing Date (including in connection with the transactions contemplated by this Agreement).

**8.7** **Assurances**.

(a)    Subject to Section 2.3(c), at any time or from time to time following the Closing Date, if (a) any of the Parties or their respective Affiliates becomes aware that any of the Purchased Assets has not been transferred to the applicable Buyer or that any of the Excluded Assets has been transferred to a Buyer, or (b) Sellers' Parent, any Seller or any of their respective Affiliates receives or otherwise possesses any asset (including cash, accounts and notes receivable) that should have been transferred to a Buyer under this Agreement, such Person shall promptly notify the other and the Parties shall, as soon as reasonably practicable, ensure that such property is transferred with any necessary prior third-party consent or approval, to:

(i)    the applicable Buyer, in the case of any Purchased Asset which was not transferred at the Closing or otherwise as set forth above, at the sole cost and expense of the Sellers; or

(ii)    the applicable Seller, in the case of any Excluded Asset which was transferred at the Closing, at the sole cost and expenses of the Sellers.

Prior to any such transfer, the Person in receipt of or then possessing such asset shall hold such asset in trust for such other Person, shall exercise, enforce and exploit, only at the direction of and for the benefit of such other Person, any and all claims, rights and benefits arising in connection with such asset, shall promptly pay, assign and remit to such other Person when received all monies and other consideration relating to such asset in the period after the Closing Date, and, to the extent applicable, provide the Person that should possess such asset pursuant to the terms of this Agreement a royalty-free license to use or

44

shall otherwise be able to obtain the benefits from the asset and shall hold such asset in trust for such other Person.

(b)     In the event (i) Buyers' Parent requests that Sellers' Parent, Sellers or any of their respective Affiliates or (ii) Sellers' Parent requests that Buyers' Parent or Buyers provide any customary transition services or other services consistent with the past practice of Sellers' Parent (or any of its Affiliates) and the Seller Facilities, in each case reasonably necessary to the transition the operation of the Seller Facilities, Sellers' Parent or Buyers' Parent (as applicable) shall provide (or cause Sellers or Buyers to provide) such transition services to the requesting Party during the six (6) month period following the Closing.  In the event any such additional services are provided, the requesting Party shall pay, or cause to be paid, the providing Party or its designee a reasonable market rate for the performance of any such services and Buyers' Parent and Sellers' Parent shall work together in good faith to determine such market rate.

**8.8**     **Terminating Cost Reports**.

(a)     Buyers' Parent, at Buyers' Parent's expense, shall prepare and timely file all Cost Reports and related filings (including requests to reopen any such Cost Reports) relating to the periods ending on or prior to the Closing Date or required as a result of the consummation of the transactions contemplated herein (the "***Seller Cost Reports***").  To the extent relating to Sellers' Bad Debts, Buyers shall provide Sellers' Parent at least five (5) Business Days to review such Seller Cost Reports before they are filed and forward to Sellers' Parent any and all correspondence relating to such Seller Cost Reports and the Seller Agency Settlements within five (5) Business Days after receipt by Buyers' Parent or Buyers.  Subsequent to the Closing Date, neither Buyers' Parent nor Buyers shall reply to any such correspondence to the extent relating to Sellers' Bad Debts without Sellers' Parent's written approval (which approval shall not be unreasonably withheld, conditioned or delayed).  Except as contemplated by Section 8.11, Buyers shall hold all rights relating to the Seller Cost Reports and Seller Agency Settlements, including the right to appeal, reopen or otherwise challenge any Medicare determinations relating to the Seller Agency Settlements and the Seller Cost Reports.  Buyers shall possess the originals of the Seller Cost Reports, correspondence, work papers and other documents relating to the Seller Cost Reports and the Seller Agency Settlements, and furnish copies of such documents to Sellers' Parent upon reasonable request.

(b)     Sellers, upon reasonable notice, during normal business hours and at the sole cost and expense of Buyers' Parent, shall cooperate with Buyers in regard to the preparation, filing, handling and appeals of the Seller Cost Reports.  Such cooperation shall include the coordination with Buyers pursuant to adequate notice of Medicare and Medicaid exit conference or meetings.

**8.9**     **Waiver of Bulk Sales Law Compliance**.  Buyers' Parent and each Buyer hereby waives compliance by Sellers with the requirements, if any, of Article VI of the Uniform Commercial Code as in force in any state in which the Purchased Assets are located and all other similar laws applicable to bulk sales and transfers.

**8.10**     **Closing Of Financials**.  Buyers shall use commercially reasonable efforts to cause the individual(s) acting as the chief financial officer of the Seller Facilities after the Effective Time or such other person(s) as may be responsible for financial closings and reconciliations (the "***Finance Team***") to complete (or take such action as shall be necessary for Buyers or Sellers to complete) the standardized closing of Sellers' financial records for the Seller Facilities through the Closing Date including, without limitation, the closing of general ledger account reconciliations (collectively, the "***Closing of Financials***").  Buyers shall use commercially reasonable efforts to cause the Finance Team to use their

good faith efforts to complete the Closing of Financials by no later than the date which is thirty (30) days after the Closing Date. The Finance Team and other appropriate personnel shall be reasonably available to Sellers for the period ending sixty (60) days after the Closing Date as reasonably requested during normal business hours by Sellers.

**8.11** **Medicare Bad Debts**. Sellers shall be entitled to receive Medicare reimbursement for bad debts of the Seller Facilities under 42 C.F.R. § 413.89 associated with services furnished prior to the Effective Time ("***Sellers' Bad Debts***"). Sellers shall have the right, in their sole discretion, to require that Buyers submit a claim for reimbursement to the CMS for a Sellers' Bad Debts on Buyers' cost report(s) for the period in which Sellers' Bad Debt becomes uncollectible by Sellers; provided, however, that the Buyers shall not be required to submit any such claim to the extent that the Buyers reasonably determine that such claim is not a supportable, valid and permissible claim under applicable Medicare regulations and payment policies. If and to the extent that Buyers receive payment for Sellers' Bad Debts, Buyers shall remit such receipts to Sellers' Parent within ten (10) Business Days of receipt. The Buyers shall have the right to offset any such payments by any reduction in Buyers' Medicare reimbursement attributable to the collection of amounts claimed as Sellers' Bad Debts on prior Cost Reports.

**8.12** **Non-Solicitation**. Until the two (2) year anniversary of the Closing, Sellers' Parent and Sellers shall not, and shall cause their respective Affiliates not to, solicit or hire any employees of Buyers' Parent, any Buyer or any of their respective Affiliates (including any Transferred Employees); provided, that nothing in this Section 8.12 shall prohibit Seller's Parent, any Seller or any of their respective Affiliates from (x) soliciting any such employee as a result of a general solicitation to the public or general advertising (so long as not specifically directed at such employees) or (y) the solicitation or hiring of any individual whose employment with Buyers' Parent or its Affiliates has been terminated for at least six (6) months at the time of such solicitation or hiring.

**8.13** **Straddle Patients**. Payments received by a Party with respect to patients who are admitted to the Seller Facilities prior to the Closing Date but who are not discharged until on or after the Closing Date and whose medical care is paid for based on a diagnosis related group, case rate (such as under the Medicare LTCH-PPS) or other similar arrangement ("***Straddle Patients***") shall be prorated on a per diem basis. Based on the prorated per diem amount for each Straddle Patient, (i) if Buyers' Parent or any Buyer receives payment for such Straddle Patient, Buyers' Parent or the applicable Buyer shall pay Sellers' Parent for the number of each Straddle Patient's inpatient days at the applicable Seller Facility prior to the Closing Date to which such payment relates and (ii) if Sellers' Parent or any Seller receives payment for such Straddle Patient, Sellers' Parent or the applicable Seller shall pay Buyers' Parent for the number of each Straddle Patient's inpatient days at the applicable Seller Facility following the Closing Date to which such payment relates. Buyers' Parent and Sellers' Parent will reconcile the payments with respect to the treatment of Straddle Patients on a monthly basis.

**8.14** **Transitional Trademark License**. Effective as of the Closing Date, each Seller and Sellers' Parent hereby grants to Buyers' Parent and Buyers, and their Affiliates, for a period of ninety (90) days after the Closing Date a worldwide, royalty-free, fully-paid up, non-exclusive, irrevocable and sublicensable license to use any names, trade names, trademarks and service marks including the name "Promise" in connection with the operation of the Seller Facilities including the use of such names and marks on existing signage, business cards, letterhead, invoice forms, intranet, advertising materials, buildings, equipment, uniforms, inventory and other documents and materials bearing any such marks and names. Any and all goodwill arising from the use of such marks and names shall inure solely to such Seller's benefit.

## ARTICLE IX- GENERAL PROVISIONS

**9.1**     **Survival**.  The representations and warranties of the Parties set forth herein shall not survive the Closing.

**9.2**     **Additional Assurances**.  The provisions of this Agreement shall be self-operative and shall not require further agreement by the Parties except as may be herein specifically provided to the contrary; provided, however, at the request and expense of a Party, the other Party or Parties shall execute such additional instruments and take such additional action as the requesting Party may reasonably deem necessary to effectuate this Agreement.  In addition and from time to time after the Closing Date, Sellers and Buyers shall each execute and deliver such other instruments of conveyance and transfer, and take such other actions as any Party may reasonably request, to more effectively convey and transfer full right, title and interest to, vest in, and place Buyers in legal and actual possession of the Purchased Assets.

**9.3**     **[RESERVED]**

**9.4**     **[RESERVED]**

**9.5**     **Choice of Law; Venue**.

(a)     This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby (in contract or tort) shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to conflicts of law principles.

(b)     WITHOUT LIMITING ANY PARTY'S RIGHT TO APPEAL ANY ORDER OF THE BANKRUPTCY COURT, THE PARTIES HEREBY AGREE THAT ANY AND ALL CLAIMS, ACTIONS, CAUSES OF ACTION, SUITS, AND PROCEEDINGS RELATING TO THE TRANSACTION DOCUMENTS SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT, AND THE PARTIES HEREBY CONSENT TO THE JURISDICTION OF SUCH COURT; provided, however, that if the Bankruptcy Case has closed or the Bankruptcy Court lacks jurisdiction for whatever reason, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the state or federal courts situated in New Castle County, Delaware and any appellate court from any decision thereof, for the resolution of any such claim or dispute.  The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may have now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each Party agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment.

(c)     Each Party hereby consents to process being served by any party to this Agreement in any legal proceeding by delivery of a copy thereof in accordance with the provisions of Section 9.9.

(d)     EACH PARTY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING REGARDING THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY PROVISION HEREOF.

**9.6**     **Benefit, Assignment and Third Party Beneficiaries**.  Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the Parties and their respective legal representatives, successors and assigns; provided, however, that no Party may assign this Agreement without the prior written consent of the other Party except that (a) Buyers may assign this Agreement and/or any of their rights hereunder to a wholly owned (directly or indirectly) subsidiary of Buyers'

47

Parent or any purchaser of substantially all of Buyers' business and (b) each Buyer may collaterally assign its rights, but not its obligations, under this Agreement to any party that provides funding for the transactions hereunder as additional security for Buyers' obligations to such party without the prior written consent of Sellers.  The Parties acknowledge that Buyers may assign ownership and title to certain of the Purchased Assets to certain designees of Buyers, such that more than one entity may own the Purchased Assets at Closing.  This Agreement is intended solely for the benefit of the Parties and is not intended to, and shall not, create any enforceable third party beneficiary rights except as expressly provided herein.

**9.7**     **Cost of Transaction**.  Except as may be provided to the contrary elsewhere herein:  (a) Buyers shall pay the fees, expenses and disbursements incurred by Buyers' Parent, Buyers and its Representatives in connection with the subject matter hereof and any amendments hereto; (b) Sellers shall pay the fees, expenses and disbursements incurred by Sellers' Parent, Sellers and their Representatives in connection with the subject matter hereof and any amendments hereto; and (c) Buyers shall pay the costs of any Title Commitments, Title Policy, surveys and environmental site assessments, and any amounts due to a Governmental Authority to effect the change of ownership of the Seller Facilities contemplated hereby.

**9.8**     **Waiver of Breach**.  The waiver by any Party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or any other provision hereof.  Any agreement on the part of either Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

**9.9**     **Notice**.  Any notice, demand or communication required, permitted or desired to be given hereunder shall be in writing and deemed effectively given or made (a) when personally delivered, (b) on the date sent when delivered by facsimile or other electronic means (so long as written notice of such transmission is sent within two (2) Business Days thereafter by another delivery method hereunder) (unless not delivered on a Business Day or delivered after 5:00 p.m. Eastern Time on a Business Day, in which case such delivery shall be deemed effective on the next succeeding Business Day), (c) one (1) Business Day following the date sent if sent by overnight courier with signed receipt, or (d) when delivered by registered United States mail, with postage prepaid and return receipt requested, addressed to the addresses below or to such other address as any Party may designate, with copies thereof to the respective counsel thereof as notified by such Party:

     Buyers' Parent or Buyers:

               c/o Select Medical Corporation
               4714 Gettysburg Road
               Mechanicsburg, PA 17088
               Attention:  Michael E. Tarvin
               Facsimile No.:  (717) 412-9142
               Email:  MTarvin@selectmedical.com

     With a copy to:     Dechert LLP
               Cira Centre
               2929 Arch Street
               Philadelphia, PA 19104
               Attention:  Stephen M. Leitzell
               Facsimile No.: (215) 994-2222
               Email:  stephen.leitzell@dechert.com

4822-2950-0804.2
25094706.19.BUSINESS

Sellers:                    _____

                           _____

                           _____

                           _____

With Copies to:            Waller Lansden Dortch & Davis, LLP
                           Nashville City Center
                           511 Union Street, Suite 2700
                           Nashville, TN  37219
                           Attention:  John Tishler and Brian Browder
                           Facsimile No.: (615) 244-6804
                           Email: john.tishler@wallerlaw.com and brian.browder@wallerlaw.com

**9.10    Severability**.  In the event any provision of this Agreement is held to be invalid, illegal or unenforceable for any reason and in any respect, such invalidity, illegality, or unenforceability shall in no event affect, prejudice or disturb the validity of the remainder of this Agreement, which shall be and remain in full force and effect, enforceable in accordance with its terms.

**9.11    Interpretation**.  In the interpretation of this Agreement, except where the context otherwise requires, (a) "including" or "include" does not denote or imply any limitation and shall mean "including, without limitation," whether or not so specified, (b) "or" has the inclusive meaning "and/or", (c) "and/or" means "or" and is used for emphasis only, (d) "$" refers to United States dollars, (e) the singular includes the plural, and vice versa, and each gender includes each other gender, (f) captions or headings are only for reference and are not to be considered in interpreting this Agreement, (g) "*Section*" refers to a section of this Agreement, unless otherwise stated in this Agreement, (h) "*Exhibit*" refers to an exhibit to this Agreement (which is incorporated herein by reference), unless otherwise stated in this Agreement, (i) "*Schedule*" refers to a schedule to this Agreement and incorporates any attachments thereto (which are incorporated herein by reference), unless otherwise stated in this Agreement, (j) all references to times are times in Boca Raton, Florida, (k) "day" refers to a calendar day unless expressly identified as a Business Day, (l) the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other theory extends and such phrase shall not mean "if," (m) references to agreements and other documents shall be deemed to include all subsequent amendments and other modifications thereto, (n) references to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions consolidating, amending or replacing the statute or regulation, (o) capitalized terms shall have the meaning assigned to them herein, and (p) "made available to Buyers" or similar phrases means information included in a virtual data room maintained by Houlihan Lokey to which Buyers and their Representatives have had access as of five (5) Business Days prior to the Effective Date.  If any period under this Agreement expires on a day which is not a Business Day or any action is required by the terms of this Agreement to be taken on a day which is not a Business Day, such period shall expire on or such action may be deferred until, as the case may be, the next succeeding Business Day.

**9.12    Entire Agreement, Amendments and Counterparts**.  This Agreement supersedes all previous contracts, agreements and understandings between the Parties regarding the subject matter hereof and, together with the Ancillary Agreements and the Exhibits and Schedules hereto, constitutes the entire agreement existing between or among the Parties respecting the subject matter hereof and no Party shall be entitled to benefits other than those specified herein.  As between or among the Parties, no oral statements or prior written material not specifically incorporated herein shall be of any force and effect, and neither Party is relying on any such oral statements or prior written material.  All prior representations or agreements, whether written or oral, not expressly incorporated herein are superseded and no changes

49

in or additions to this Agreement shall be recognized unless and until made in writing and signed by all Parties.  This Agreement may be executed in counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument.  Signatures received via facsimile or other electronic transmission shall be accepted as originals.  Notwithstanding any oral agreement or course of conduct of the Parties or their Representatives to the contrary, no Party shall be under any legal obligation to enter into or complete the transactions contemplated hereby unless and until this Agreement shall have been executed and delivered by each Party.

9.13    **Disclosure Generally**.  Notwithstanding anything to the contrary contained in the Article III Schedules or in this Agreement, the information and disclosures contained in any Article III Schedule shall be deemed to be disclosed and incorporated by reference in any other Schedule as though fully set forth in such Article III Schedule for which applicability of such information and disclosure is reasonably apparent on its face.  The fact that any item of information is disclosed in any Article III Schedule shall not be construed to mean that such information is required to be disclosed by this Agreement.  Such information and the dollar thresholds set forth therein shall not be used as a basis for interpreting the terms "material" or "Material Adverse Effect" or similar terms in this Agreement.

9.14    **Time of Essence**.  Time is of the essence with regard to all dates and time periods set forth in this Agreement.

*[Signature Pages Follow]*

4822-2950-0804.2
25094706.19.BUSINESS

IN WITNESS WHEREOF, the Parties have caused this Asset Purchase Agreement to be executed by their authorized officers as of the Effective Date.

**SELLERS' PARENT:**

**PROMISE HEALTHCARE, INC.**

By: _____

Name: Andrew Hinkelman

Title:   Chief Restructuring Officer

**SELLERS:**

**PROMISE HOSPITAL OF FLORIDA AT THE VILLAGES, INC., a Florida corporation**

By: _____

Name:    Andrew Hinkelman

Title:   Chief Restructuring Officer

**HLP PROPERTIES AT THE VILLAGES, L.L.C., a Florida limited liability company**

By: _____

Name:    Andrew Hinkelman

Title:   Chief Restructuring Officer

**PROMISE PROPERTIES OF LEE, INC., a Florida corporation**

By: _____

Name: _____ Andrew Hinkelman _____

Title: _____ Chief Restructuring Officer _____

**PROMISE HOSPITAL OF LEE, INC., a Delaware corporation dba Promise Hospital of Ft. Myers**

By: _____

Name: _____ Andrew Hinkelman _____

Title: _____ Chief Restructuring Officer _____

**PROMISE HOSPITAL OF DADE, INC., a Delaware corporation dba Promise Hospital of Miami**

By:

Name:      Andrew Hinkelman

Title:      Chief Restructuring Officer


**PROMISE PROPERTIES OF DADE, INC., a Florida corporation**

By:

Name:      Andrew Hinkelman

Title:      Chief Restructuring Officer

**BUYERS' PARENT:**

**SELECT MEDICAL CORPORATION, a Delaware corporation**

By: _____

Name:  Martin F. Jackson

Title:    Executive Vice President and Chief Financial
          Officer

**Exhibit 1**

| Seller | Applicable Seller Facility | Applicable State |
|---|---|---|
| Promise Hospital of Florida at The Villages, Inc., a Florida corporation<br><br>HLP Properties at the Villages, L.L.C., a Florida limited liability company | Promise Hospital of Florida at The Villages 5050 County Road 472, Oxford, Florida | Florida |
| Promise Properties of Lee, Inc., a Florida corporation<br><br>Promise Hospital of Lee, Inc., a Delaware corporation dba Promise Hospital of Ft. Myers | Promise Hospital of Fort Myers 3050 Champion Ring Road, Fort Myers, Florida | Florida |
| Promise Hospital of Dade, Inc., a Delaware corporation dba Promise Hospital of Miami<br><br>Promise Properties of Dade, Inc., a Florida corporation | Promise Hospital of Miami 14001 NW 82nd Ave, Miami Lakes, Florida | Florida |

**Exhibit 2**

| Buyer | Applicable Seller Facility |
|-------|----------------------------|
|       |                            |
|       |                            |
|       |                            |

## Exhibit 3

**Sale Order**

**[The Sale Order is Exhibit B to the Motion]**

**Exhibit 4**

**Sale Procedures Order**

**[The Sale Procedures Order is Exhibit A to the Motion]**

**<u>Exhibit 5</u>**

**[RESERVED]**

**Exhibit 6**

**Bill of Sale**

**[See attached]**

**FORM**
**OF**
**GENERAL BILL OF SALE AND ASSIGNMENT**

      **THIS GENERAL BILL OF SALE AND ASSIGNMENT** ("Bill of Sale") is entered into as of _____, 201_, by and among the entities listed as Sellers on the signature pages hereto (each a "Seller" and collectively, the "Sellers") and the entities listed as Buyers on the signature pages hereto (each a "Buyer" and collectively, the "Buyers"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in that certain Asset Purchase Agreement, dated _____, 201_, by and among Sellers, Buyers and certain of their respective affiliates (the "Purchase Agreement").

**RECITALS**

      A.     Pursuant to the Purchase Agreement, Sellers have agreed to sell to Buyers and Buyers have agreed to purchase from Sellers, the Purchased Assets.

      B.     The parties are entering into this Bill of Sale to satisfy a condition to the Closing of the transactions contemplated by the Purchase Agreement.

      **NOW, THEREFORE**, in consideration of the foregoing premises, the mutual covenants and other agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sellers and Buyers hereby agree as follows:

      1.     Sale and Assignment.  Sellers hereby irrevocably and unconditionally sell, assign, convey, transfer and deliver to Buyers, their successors and assigns forever, all of Sellers' right, title and interest to the Purchased Assets (other than Purchased Assets that are Owned Real Property or Assigned Contracts, which are specifically identified in the Purchase  Agreement to be sold, conveyed, transferred or delivered to Buyers at the Closing pursuant to an instrument other than this Bill of Sale) (collectively the "Transferred Assets"), free and clear of all Encumbrances other than Permitted Encumbrances, to have and to hold the same and each and all thereof unto Buyers, their successors and assigns forever, to their own use and benefit forever. For the avoidance of doubt, the Excluded Assets are not Purchased Assets.

      2.     Additional Conveyance Instruments.  Notwithstanding the foregoing, this Bill of Sale is not applicable to any Seller's sale, assignment, conveyance, transfer or delivery of (a) the Owned Real Property, the conveyance of which is governed by one or more deeds being delivered by Sellers or their Affiliates to Buyers in connection with the Closing or (b) the Assigned Contracts, the assignment of which is governed by an assignment and assumption agreement being delivered by Sellers or their Affiliates to Buyers in connection with the Closing.

      3.     Further Assurances.  Sellers covenant that they will do or cause to be done all such further acts, and shall execute and deliver, or cause to be executed and delivered, all transfers, assignments and conveyances, evidences of title, notices and assurances reasonably necessary or appropriate to assure fully to Buyers and their respective successors or permitted assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges relating to the Transferred Assets intended to be conveyed to Buyers pursuant to the transactions contemplated by the Purchase Agreement.

      4.     Entire Agreement.  This Bill of Sale supersedes any and all prior agreements, either oral or written, between the parties with respect to the subject matter of this Bill of Sale (including any term sheet or similar agreement or document relating to the transaction contemplated hereby) other than the Purchase

Agreement, any such agreements contemplated by the Purchase Agreement, or the other transaction documents entered into pursuant to the terms and conditions of the Purchase Agreement (the "Transaction Documents"). This Bill of Sale, together with the Purchase Agreement and other Transaction Documents, constitutes the entire agreement between the parties with respect to the subject matter hereof.

5. <u>Waiver</u>. No waiver of any term or condition of this Bill of Sale shall be valid or enforceable unless and until made in writing and signed by all parties hereto. A waiver on one occasion shall not be deemed to be a waiver of the same or any other breach, provision or requirement on any other occasion.

6. <u>Amendment</u>. This Bill of Sale may be modified or amended only by a written instrument duly executed by each of the parties hereto.

7. <u>Counterparts and Facsimile Signatures</u>. This Bill of Sale may be executed in counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument. Signatures received via facsimile or other electronic transmission shall be accepted as originals.

8. <u>No Third Party Beneficiary</u>. The terms and provisions of this Bill of Sale are intended solely for the benefit of the parties hereto and their respective permitted successors and assigns or delegates, and are not intended to, and shall not, create any enforceable third party beneficiary.

9. <u>Binding Effect</u>. Subject to provisions herein to the contrary, this Bill of Sale shall inure to the benefit of and be binding upon the parties and their respective legal Representatives, successors and permitted assigns and delegates.

10. <u>Governing Law</u>.

(a) The parties agree that this Bill of Sale and all disputes or controversies arising out of or relating to this Bill of Sale or the transactions contemplated hereby (in contract or tort) shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to conflicts of law principles.

(b) WITHOUT LIMITING THE RIGHT OF ANY PARTY HERETO TO APPEAL ANY ORDER OF THE BANKRUPTCY COURT, THE PARTIES HERETO HEREBY AGREE THAT ANY AND ALL CLAIMS, ACTIONS, CAUSES OF ACTION, SUITS, AND PROCEEDINGS RELATING TO THIS BILL OF SALE SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT, AND THE PARTIES HEREBY CONSENT TO THE JURISDICTION OF SUCH COURT; provided, however, that if the Bankruptcy Case has closed or the Bankruptcy Court lacks jurisdiction for whatever reason, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the state or federal courts situated in New Castle County, Delaware and any appellate court from any decision thereof, for the resolution of any such claim or dispute. The parties hereto hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may have now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each party hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment.

(c) Each party hereto hereby consents to process being served by any party to this Bill of Sale in any legal proceeding by delivery of a copy thereof in accordance with the provisions of Section 9.9 of the Purchase Agreement.

(d)  EACH PARTY HERETO WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING REGARDING THIS BILL OF SALE, THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY PROVISION HEREOF.

11.    <u>Construction</u>.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, the feminine or the neuter gender shall include the masculine, feminine and neuter. No provision of this Bill of Sale shall be interpreted for or against any party hereto on the basis that such party was the draftsman of such provision, each party having participated equally in the drafting hereof, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Bill of Sale.

12.    <u>Headings</u>.  The divisions of this Bill of Sale into sections and the use of the captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Bill of Sale.

13.    <u>Severability; Invalid Provisions</u>. If any provision of this Bill of Sale is held to be illegal, invalid or unenforceable under any present or future Law and if the rights or obligations of Sellers or Buyers under this Bill of Sale will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Bill of Sale will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Bill of Sale will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom; and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Bill of Sale a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

14.    <u>Conflicts Between Agreements</u>. This Bill of Sale is made pursuant to the Purchase Agreement and is subject to the terms and conditions thereof.  If any conflicts exist between this Bill of Sale and the Purchase Agreement, the Purchase Agreement shall control.

*[SIGNATURE PAGE FOLLOWS]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Bill of Sale or caused this Bill of Sale to be executed by their duly authorized representatives as of the date first above written.

**SELLERS:**            [_____]

 

By:    _____
Name: _____
Title: _____


[_____]

 

By:    _____
Name: _____
Title: _____


**BUYERS:**            [_____]

By:    _____
Name: _____
Title: _____


[_____]

By:    _____
Name: _____
Title: _____

**Exhibit 7**

**Assignment and Assumption Agreement**

**[See attached]**

# FORM
## OF
## ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** ("*Assignment*") is entered into as of _____, 201_, by and among the entities listed as Assignors on the signature pages hereto (each an "*Assignor*" and collectively, the "*Assignors*") and the entities listed as Assignees on the signature pages hereto (each an "*Assignee*" and collectively, the "*Assignees*").  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in that certain Asset Purchase Agreement, dated _____, 201_, by and among Assignors, Assignees and certain of their respective affiliates  (the "*Purchase Agreement*").

## RECITALS

A.      Pursuant to the Purchase Agreement, Assignors have agreed to sell to Assignees, and Assignees have agreed to purchase from Assignors, the Purchased Assets, including the Assigned Contracts.

B.      Pursuant to the Purchase Agreement, Assignors have agreed to transfer to Assignees, and Assignees have agreed to accept and assume from Assignors, all of each Assignor's interest in and the future payment and performance of the Assigned Contracts.

C.      The parties hereto are entering into this Assignment to satisfy a condition to the Closing of the transactions contemplated in accordance with the Purchase Agreement.

**NOW, THEREFORE**, in consideration of the foregoing premises, the mutual covenants and other agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignors and Assignees hereby agree as follows:

1.      Assignment.  Each applicable Assignor, as set forth on Exhibit A hereto, hereby irrevocably sells, assigns, transfers, conveys and delivers to the corresponding applicable Assignee, as set forth on Exhibit A hereto, and its successors and assigns all of such Assignor's right, title and interests in, to and under any Assigned Contract effective as of 12:01 a.m. on _____, 201_, including any Disputed Contracts that subsequently become Assigned Contracts.

2.      Assumption.  By execution hereof, Assignees accept assignment of, agree to and hereby do assume all of the Assumed Liabilities.  For the avoidance of doubt, notwithstanding anything to the contrary contained herein, Assignees do not hereby assume or agree to perform or discharge, indemnify the Assignors against, or otherwise have any responsibility for, any Excluded Liabilities.  This Assignment does not release the Assignors from any, and the Assignors shall remain liable for all, Excluded Liabilities.

3.      Other Assignment and Assumption Agreements.  Notwithstanding any provision herein to the contrary, this Assignment does not apply to tenant leases or lessor leases, which are being transferred pursuant to a separate agreement.

4821-5014-3354.2

4.      <u>Cooperation</u>.   Each of Assignors and Assignees agree to execute such other documents and take such other actions as may be reasonably necessary or appropriate to confirm or effectuate the assignments and assumptions contemplated hereby or by the Purchase Agreement.

5.      <u>Remedies</u>.  Assignors' and Assignees' remedies with respect to any claim arising from a breach of this Assignment shall be subject to the Purchase Agreement.

6.      <u>Entire Agreement</u>.  This Assignment supersedes any and all prior agreements, either oral or written, between the parties with respect to the subject matter of this Assignment (including any term sheet or similar agreement or document relating to the transaction contemplated hereby) other than the Purchase Agreement, any such agreements contemplated by the Purchase Agreement, or the other transaction documents entered into pursuant to the terms and conditions of the Purchase Agreement (the "***Transaction Documents***").  This Assignment, together with the Purchase Agreement and the other Transaction Documents, constitutes the entire agreement between the parties with respect to the subject matter hereof.

7.      <u>Waiver</u>.  No waiver of any term or condition of this Assignment shall be valid or enforceable unless and until made in writing and signed by all parties hereto.  A waiver on one occasion shall not be deemed to be a waiver of the same or any other breach, provision or requirement on any other occasion.

8.      <u>Amendment</u>.   This Assignment may be modified or amended only by a written instrument duly executed by each of the parties hereto.

9.      <u>Counterparts and Facsimile Signatures</u>.   This Assignment may be executed in counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument.  Signatures received via facsimile or other electronic transmission shall be accepted as originals.

10.      <u>No Third Party Beneficiary</u>.  The terms and provisions of this Assignment are intended solely for the benefit of the parties hereto and their respective permitted successors and assigns or delegates, and are not intended to, and shall not, create any enforceable third party beneficiary.

11.      <u>Binding Effect</u>.  Subject to the provisions herein to the contrary, this Assignment shall inure to the benefit of and be binding upon the parties and their respective legal Representatives, successors and permitted assigns and delegates.

12.      <u>Governing Law</u>.

(a) The parties agree that this Assignment and all disputes or controversies arising out of or relating to this Assignment or the transactions contemplated hereby (in contract or tort) shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to conflicts of law principles.

(b) WITHOUT LIMITING THE RIGHT OF ANY PARTY HERETO TO APPEAL ANY ORDER OF THE BANKRUPTCY COURT, THE PARTIES HERETO HEREBY AGREE THAT ANY AND ALL CLAIMS, ACTIONS, CAUSES OF ACTION, SUITS, AND PROCEEDINGS RELATING TO THIS ASSIGNMENT SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT, AND THE PARTIES HEREBY CONSENT TO THE JURISDICTION OF SUCH COURT; provided, however, that if the Bankruptcy Case has closed or the Bankruptcy Court lacks

jurisdiction for whatever reason, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the state or federal courts situated in New Castle County, Delaware and any appellate court from any decision thereof, for the resolution of any such claim or dispute.  The parties hereto hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may have now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each party hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment.

(c)  Each party hereto hereby consents to process being served by any party to this Assignment in any legal proceeding by delivery of a copy thereof in accordance with the provisions of Section 9.9 of the Purchase Agreement.

(d)  EACH PARTY HERETO WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING REGARDING THIS ASSIGNMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY PROVISION HEREOF.

13.    <u>Construction</u>.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, the feminine or the neuter gender shall include the masculine, feminine and neuter. No provision of this Assignment shall be interpreted for or against any party hereto on the basis that such party was the draftsman of such provision, each party having participated equally in the drafting hereof, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Assignment.

14.    <u>Headings</u>.  The divisions of this Assignment into sections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Assignment.

15.    <u>Severability; Invalid Provisions</u>. If any provision of this Assignment is held to be illegal, invalid or unenforceable under any present or future Law and if the rights or obligations of Assignors or Assignees under this Assignment will not be materially and adversely affected thereby, (a) such provision will be fully severable; (b) this Assignment will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; (c) the remaining provisions of this Assignment will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom; and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Assignment a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

16.    <u>Conflicts Between Agreements</u>. This Assignment is made pursuant to the Purchase Agreement and is subject to the terms and conditions thereof.  If any conflicts exist between this Assignment and the Purchase Agreement, the Purchase Agreement shall control.

*[SIGNATURE PAGE FOLLOWS]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Assignment or caused this Assignment to be executed by their duly authorized representatives as of the date first above written.

**ASSIGNORS:**          [_____]

By:      _____
Name:  _____
Title:   _____


[_____]

By:      _____
Name:  _____
Title:   _____


**ASSIGNEES:**          [_____]

By:      _____
Name:  _____
Title:   _____


[_____]

By:      _____
Name:  _____
Title:   _____

**Exhibit A**

**Assigned Contracts**

| **Applicable Assignor** | **Applicable Assignee** |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |

**<u>Exhibit 8</u>**

**Assignment and Assumption of Lease for Real Property**

**[See attached]**

FORM OF
**ASSIGNMENT AND ASSUMPTION OF LEASE AGREEMENT**

THIS ASSIGNMENT AND ASSUMPTION OF LEASE AGREEMENT ("*Assignment*") is made and entered into as of the _____ day of _____, 201_ (the "*Effective Date*") by and between Promise Hospital of Dade, Inc., a Delaware corporation ("*Assignor*"), and _____, a _____ _____ ("*Assignee*").

RECITALS

A.    Assignor is the tenant under that certain Ground Lease dated July 25, 2012, by and between TGC LL8, LLC and Assignor, as amended, assigned and supplemented (the "*Lease*").

B.    A legal description of the land subject to such Lease is attached hereto and incorporated herein by reference as **Exhibit A**.

C.    Assignor and Assignee are parties to that certain Asset Purchase Agreement dated as of December ___, 2018  (the "**Purchase Agreement**"), pursuant to which Assignor has agreed to assign the Lease to Assignee and Assignee has agreed to assume the Lease from Assignor.

D.    In connection with the Purchase Agreement, Assignor desires to assign, and Assignee desires to assume, the rights, duties, obligations, and liabilities of Assignor as landlord under the Lease.

NOW, THEREFORE, in consideration of the recitals set forth above, which are made a part of this Assignment, the mutual covenants hereinafter contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Assignment of Lease.  Effective as of the Effective Date, Assignor hereby assigns, sets over and transfers to Assignee all of its right, title and interest in, to and under the Lease.

2.    Assumption of Lease.  Effective as of the Effective Date, Assignee hereby assumes the performance of all of the terms, covenants, obligations and conditions imposed upon Assignor under the Lease accruing or arising on or after the Effective Date.

3.    Assignment Subject to the Purchase Agreement. This Assignment is made, executed and delivered pursuant to the Purchase Agreement, and is subject to all the terms, provisions and conditions thereof. Assignor and Assignee acknowledge and agree that neither the representations or warranties nor any of the rights, obligations or remedies of any party under the Purchase Agreement shall be deemed to be modified or altered in any way by this Assignment.  To the extent of any conflict between the terms of the Purchase Agreement and this Assignment, the Purchase Agreement shall control.

4.    Governing Law.  This Assignment shall be governed by and construed in accordance with the internal laws of the State of Florida, without giving effect to the conflict of law rules and principles of said state.

5.    Successors, etc., Bound by Assignment.  This Assignment shall apply to and bind the heirs, executors, administrators, successors and assigns of the parties hereto.

6.    Captions.   The marginal headings or titles to the sections and paragraphs of this Assignment and the title of this instrument are not part of the Assignment but are inserted for convenience only and shall have no effect upon the construction or interpretation of any part of this Assignment.

7.       Counterparts. This Assignment may be executed in counterparts, each of which shall be deemed an original, and all of which shall constitute one document. For convenience purposes, this Assignment may be executed in facsimile or portable document file (PDF) form, all of which shall be deemed, when taken together, to be originals.

(Remainder of Page Intentionally Left Blank)

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment and Assumption of  Lease as of the day and year first above written.

**<u>ASSIGNOR</u>**:


By: _____

Printed Name: ____ _____

Title: ____ _____

WITNESS my hand and official seal.


Signature _____


WITNESS my hand and official seal.


Signature _____

**<u>ASSIGNEE</u>**:

By: _____

Printed Name: _____

Title: _____

WITNESS my hand and official seal.

Signature _____

WITNESS my hand and official seal.

Signature _____

**Exhibit A**

Lease Land

## Exhibit 9

**[RESERVED]**

## Exhibit 10

**Drug Enforcement Administration (DEA) Power of Attorney**

**[See attached]**

# FORM
## OF
## LIMITED POWER OF ATTORNEY
## FOR USE OF PHARMACY LICENSES,
## DEA AND OTHER REGISTRATION NUMBERS,
## AND DEA ORDER FORMS

**[SELLER ENTITIES]** ("*Operator*"), operates **[a]** long term acute care **[facility/facilities]** located at **[INSERT FACILITY ADDRESS(ES)]** (the "[*Facility/Facilities*]"). In connection with the operation of the **[Facility/Facilities]**, Operator currently holds: (1) Pharmacy License Numbers _____; and (2) **[List all additional board of pharmacy related licenses, such as state controlled dangerous substance licenses, automated medication system registrations, etc., if applicable].** Operator is also authorized under DEA registration numbers _____ to sign the current applications for registration and licensure as the registrant under the Controlled Substances Act of the United States. This Limited Power of Attorney For Use Of Pharmacy Licenses, DEA And Other Registration Numbers, and DEA Order Forms (this "*Limited POA*") is executed on and effective as of _____ ("*Effective Date*").

Operator has made, constituted, and appointed, and hereby makes, constitutes and appoints **[BUYER ENTITY]** ("*Agent*"), as the Operator's agent and true and lawful attorney-in-fact for the limited purposes of utilizing Operator's pharmacy licenses, pharmacy health care entity licenses, DEA registrations, and any other registrations required under the laws of the United States or the State of _____ to continue pharmacy operations located at the **[Facility/Facilities]** (the "*Pharmacies*"). Agent may act in this capacity until such time as Agent or its designee obtains new pharmacy licenses, pharmacy health care entity licenses, DEA registrations and such other registrations for the Pharmacies but in no event shall this Limited POA continue more than one hundred eighty (180) calendar days after the Effective Date, unless, despite Agent's good faith efforts, the issuance of new pharmacy licenses, pharmacy health care entity licenses, DEA registrations and such other registrations for the Pharmacies are delayed by the applicable governmental agency. The Operator further grants this Limited POA to Agent to act as the true and lawful agent and attorney-in-fact of the Operator, and to act in the name, place, and stead of the Operator, to execute applications for books of official order forms, to sign such order forms in requisition for controlled substances, in accordance with Section 308 of the Controlled Substances Act (21 U.S.C. 828) and part 1305 of Title 21 of the Code of Federal Regulations, and to carry out the controlled substance activities of the Pharmacies under Operator's DEA registration(s).

The Operator recognizes that it remains legally responsible for the Pharmacies and controlled substance licenses and DEA and other registrations issued to it, during the period in which this Limited POA is in effect. Therefore, the Operator grants this Limited POA based upon the following covenants and warranties of Agent: (a) Agent shall follow and abide by and comply with all federal and state laws governing the regulation of controlled substances and pharmacy practice at all times while utilizing this Limited POA; and (b) Agent, or its designee, shall make application for and pursue its own pharmacy and controlled substance licenses and DEA and other registrations which are required for the distribution of pharmaceuticals, including but not limited to controlled substances, at the Pharmacies, as soon as practicable.

This Limited POA may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement, binding on all of the parties hereto.

**[signature page follows]**

IN WITNESS WHEREOF, Operator and Agent have executed this Limited POA as of the date first written above.

**OPERATOR:**

[_____]

By:_____

Name: _____

Title: _____

**AGENT:**

[_____]

By:_____

Name: _____

Title: _____

**WITNESSES:**

1._____

2._____

**WITNESSES:**

1._____

2._____

## Exhibit 11

**Special Warranty Deed**

**[See attached]**

THIS DOCUMENT PREPARED BY AND
AFTER RECORDING RETURN TO:


_____, Esq.
Waller Lansden Dortch & Davis, LLP
511 Union Street, Suite 2700
Nashville, TN  37219


Parcel Identification Number:  _____


## FORM
## OF
## SPECIAL WARRANTY DEED

STATE OF _____          )
                               )        KNOW ALL MEN BY THESE PRESENTS
COUNTY OF _____          )


      THIS SPECIAL WARRANTY DEED is made this _____ day of _____, 201_, by and between _____, a _____ _____, whose address is _____, ("*Grantor*"), and _____, a _____ _____, whose address is _____, ("*Grantee*"),

      WITNESSETH:  That Grantor, for and in consideration of the sum of Ten Dollars ($10.00), and other good and valuable considerations in hand paid by Grantee, the receipt whereof is hereby acknowledged, hereby grants, bargains, sells, aliens, remises, releases, conveys and confirms unto Grantee, its successors and assigns forever, all the right, title, interest and claim of the said Grantor in and to the following described land in _____ County, Florida (the "*Property*"), to-wit:

      See **Exhibit A** attached hereto and incorporated herein for legal description.

      TOGETHER with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

      To Have and to Hold, the same in fee simple forever.

      And the Grantor hereby covenants with said Grantee that it is lawfully seized of said land in fee simple, that it has good right and lawful authority to sell and convey said land, and hereby warrants the title to said land and will defend the same against the lawful claims of all persons claiming by, through, or under said Grantor; and that said land is free of all encumbrances except for matters shown on **Exhibit B** attached hereto and incorporated herein.

      IN WITNESS WHEREOF, the said Grantor has executed this deed under seal on the date aforesaid.

Signed, sealed and delivered in          **<u>GRANTOR</u>**:
the presence of:

_____          _____
Witness Signature
Print Name:

                                           By:_____
_____          Print Name: _____
Witness Signature                          Title: _____
Print Name:


STATE OF _____                    )
COUNTY OF _____                      )

     The foregoing instrument was acknowledged before me this ___ day of _____,
201_, by _____ as _____ of _____, a
_____ _____, on behalf of the _____. He/She is personally known to
me or has produced _____ as sufficient identification.


                                           _____
                                           Notary Public

                                           _____
                                           Printed Name

My Commission Expires:_____


Send tax bills to:
_____
_____

**<u>Exhibit A</u>**

Legal Description

**Exhibit B**

Permitted Encumbrances

**Exhibit 12**

**Affidavit**

**[See attached]**

**FORM**

**OF**

**FINAL AFFIDAVIT**

**TO BE SIGNED BY ENTITY SELLER**

State of _____    )                    File #:_____

                                                                    ) SS.

County of _____  )

                            _____

This Affidavit and the information contained herein pertain to the property commonly known as (the "***Property***"): _____,

The undersigned, being duly sworn, deposes and says that:

The limited liability company, corporation, limited partnership, general partnership, or trust ("***Entity***") signing this Affidavit has owned the Property continuously for _____ years last past, and its enjoyment thereof has been peaceable and undisturbed and the title to the Property has never been disputed or questioned, nor are there any facts by reason of which the title to, or possession of, the property might be disputed or questioned, or by reason of which any claim to any of the Property might be asserted adversely against the Entity;

Proceedings in bankruptcy have been instituted by the Entity, and the Entity made an assignment for the benefit of creditors;

To the undersigned's knowledge, there are no unpaid bills, actions or proceedings relating to Property which are now pending in federal, state or municipal courts in the United States which constitutes a lien or charge upon the Property;

Except as otherwise disclosed on the Commitment, No. _____, there are no tenancies, leases, or other occupancies with respect to the Property;

To the undersigned's knowledge, there are no written notices from any public authority, requiring any improvement, alteration or change to be made in or about the Property;

To the undersigned's knowledge, there are no unpaid bills or claims for labor or services performed or material furnished or delivered during the last 12 months for alterations, repair work or new construction on the Property, except (**if none, state "none"**);

To the undersigned's knowledge, there are currently no contracts for the making of repairs or improvements to the Property ~~and there have been no improvements made on the Property~~, except (**if none, state "none"**);

To the undersigned's knowledge, there are no chattel mortgages, conditional sale contracts, security agreements, financing statements, retention of title agreements, or personal property leases affecting any materials, fixtures, appliances, furnishings, or equipment placed upon or installed in or upon the Property

or the improvements thereon, and all plumbing, heating, lighting, refrigerating, and other equipment is fully paid for, including all bills for the repair thereof, except (**if none**, **state "none"**);

Except as otherwise disclosed on the Commitment, No. _____, there are no real estate taxes, special taxes, special assessments, sewer, water, or trustee assessments against the Property, which are now due and payable or delinquent; and

Except as otherwise disclosed on the Commitment, No. _____, the Property is not subject to any unrecorded rights-of-way, easements, or party walls.

This Affidavit is given to induce the title insurance underwriter ("*Title Company*") to issue its title insurance policy(ies) with respect to the Property.  Title Company will justifiably rely on the information provided herein in the closing of the purchase/sale or refinance of the Property and the issuance of its title insurance policy(ies) with respect to the Property.  The Entity shall indemnify, defend and hold Title Company harmless from and against any loss, cost, or damage (including court costs, attorney fees, and expenses) resulting from inaccurate information contained herein.

MAILING
ADDRESS:            _____


NAME OF SELLER:


By: _____
Name: _____
Title: _____




Subscribed and sworn before me on  this _____ day of _____, 201_.


_____
Notary Public: _____

My term expires: _____

EXECUTION VERSION

## ESCROW AGREEMENT

**THIS ESCROW AGREEMENT** ("*Agreement*"), dated effective as of December 23, 2018 ("*Effective Date*"), is by and among SELECT MEDICAL CORPORATION, a Delaware corporation ("*Buyers' Parent*"),  PROMISE HEALTHCARE, INC., a Florida corporation ("*Sellers' Parent*"), and U.S. BANK NATIONAL ASSOCIATION, a national banking association, as escrow agent hereunder ("*Escrow Agent*").

## BACKGROUND

A.  Buyers' Parent, Sellers' Parent and certain of their respective affiliates have entered into an Asset Purchase Agreement (the "*Underlying Agreement*"), dated as of December 23, 2018, pursuant to which affiliates of Buyers' Parent have agreed to purchase and affiliates of Sellers' Parent have agreed to sell the Purchased Assets (as defined in the Underlying Agreement).  The Underlying Agreement provides that, as of the date hereof, Buyers' Parent shall deposit the Deposit (defined below) and, as of the Closing, Buyers' Parent shall deposit the Cure Amount Escrow (as defined below), in each case in a segregated escrow account to be held by Escrow Agent as an earnest money deposit pursuant to the Underlying Agreement.

B.  Escrow Agent has agreed to accept, hold, and disburse the funds deposited with it and any earnings thereon in accordance with the terms of this Agreement.

C.  Buyers' Parent and Sellers' Parent have appointed the Representatives (as defined below) to represent them for all purposes in connection with the funds to be deposited with Escrow Agent and this Agreement.

D.  Buyers' Parent and Sellers' Parent acknowledge that (i) Escrow Agent is not a party to and has no duties or obligations under the Underlying Agreement; (ii) all references in this Agreement to the Underlying Agreement are solely for the convenience of Buyers' Parent and Sellers' Parent; and (iii) Escrow Agent shall have no implied duties beyond the express duties set forth in this Agreement.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, for themselves, their successors and assigns, hereby agree as follows:

1.      <u>Definitions</u>.  The following terms shall have the following meanings when used herein:

"*Applicable Party*"  have the meaning set forth in <u>Section 5</u>.

"*Bankruptcy Court*" shall mean the United States Bankruptcy Court for the District of Delaware.

"*Business Day*" shall mean any day other than a Saturday, Sunday or day on which banks are authorized or required to be closed in New York, New York.

"*Buyer Representative*" shall mean the person(s) so designated on <u>Schedule C</u> hereto or any other person designated in a writing signed by Buyers' Parent and delivered to Escrow Agent and a Seller Representative in accordance with the notice provisions of this Agreement, to act as its representative under this Agreement.

"*Closing*" shall have the meaning ascribed to such term in the Underlying Agreement.

"**_Deposit_**" shall have the meaning ascribed to such term in the Underlying Agreement.

"**_Escrow Funds_**" shall mean the funds deposited with Escrow Agent pursuant to <u>Section 3</u> of this Agreement in either the Deposit Escrow Account or the Cure Amount Escrow Account, together with any interest and other income thereon.

"**_Final Order_**" shall mean a final and nonappealable Order, which Order is delivered to Escrow Agent accompanied by a written instruction from Buyers' Parent or Sellers' Parent given to effectuate such Order and confirming that such Order is final and nonappealable, and Escrow Agent shall be entitled to conclusively rely upon any such confirmation and instruction and shall have no responsibility to review the Order to which such confirmation and instruction refers.

"**_Indemnified Party_**" shall have the meaning set forth in <u>Section 11</u>.

"**_Joint Written Direction_**" shall mean a written direction executed by a Buyer Representative and a Seller Representative, delivered to Escrow Agent in accordance with <u>Section 15</u> and directing Escrow Agent to disburse all or a portion of the Escrow Funds or to take or refrain from taking any other action pursuant to this Agreement.

"**_Order_**" shall mean a final nonappealable order of the Bankruptcy Court or any other court of competent jurisdiction.

"**_Receiving Party_**" shall have the meaning set forth in <u>Section 5</u>.

"**_Representatives_**" shall mean a Buyer Representative and a Seller Representative.

"**_Seller Representative_**" shall mean the person(s) so designated on <u>Schedule C</u> hereto or any other person designated in a writing signed by Sellers' Parent and delivered to Escrow Agent and a Buyer Representative in accordance with the notice provisions of this Agreement, to act as its representative under this Agreement.

"**_Termination Claim_**" shall mean a claim by an Applicable Party for payment of the Deposit pursuant to <u>Section 8.1</u> of the Underlying Agreement.

"**_Termination Notice_**" shall mean a written notification signed on behalf of an Applicable Party demanding payment of the Deposit in connection with a Termination Claim, and otherwise complying with the requirements of the Underlying Agreement.

"**_Termination Response_**" shall mean a written notification, signed on behalf of a Receiving Party, which shall set forth whether or not such Receiving Party disputes any matter with respect to a Termination Notice together with a reasonable level of detail regarding the basis for such dispute.

"**_Termination Response Period_**" shall mean the period from the delivery of a Termination Notice until 5 p.m. ET on the date that is three (3) Business Days following such delivery.

2.     <u>Appointment of and Acceptance by Escrow Agent</u>.  Buyers' Parent and Sellers' Parent hereby appoint Escrow Agent to serve as escrow agent hereunder.  Escrow Agent hereby accepts such appointment and, upon receipt by wire transfer of any of the Escrow Funds in accordance with <u>Section 3</u>, agrees to hold, invest and disburse the Escrow Funds in accordance with this Agreement.

3.        Deposit of Escrow Funds.

(a)        Within one (1) Business Day following the execution and delivery of this Agreement, Buyers' Parent will transfer $3,780,000 by wire transfer of immediately available funds to an account designated by Escrow Agent (the "***Deposit Escrow Account***").

(b)        At the Closing, Buyers' Parent will transfer an amount of cash equal to the Aggregate Disputed Amount (as defined in the Underlying Agreement) (the "***Cure Amount Escrow***") by wire transfer of immediately available funds to an account designated by the Escrow Agent (the "***Cure Amount Escrow Account***").

(c)        All Escrow Funds shall remain uninvested except as provided in Section 7.

4.        Disbursements of Escrow Funds.

(a)        Subject to compliance with the procedures of Section 5 hereof, Escrow Agent shall disburse the Escrow Funds at any time and from time to time, upon receipt of, and in accordance with, (i) a Joint Written Direction substantially in the form of Attachment 1 hereto, which shall contain complete payment instructions, including funds transfer instructions or an address to which a check in such amount shall be sent or (ii) a Final Order.

(b)        Upon receipt of notice from the Buyers' Parent and Sellers' Parent that the Closing has occurred, Escrow Agent shall distribute to Sellers' Parent, as promptly as practicable, any funds then remaining in the Deposit Escrow Account.

(c)        Prior to any disbursement, Escrow Agent must receive reasonable identifying information regarding the recipient so that Escrow Agent may comply with its regulatory obligations and reasonable business practices, including without limitation a completed United States Internal Revenue Service ("***IRS***") Form W-9 or Form W-8, as applicable.  All disbursements of Escrow Funds shall be subject to the fees and claims of Escrow Agent pursuant to Section 11 and Section 12.

(d)        Buyers' Parent and Sellers' Parent may each deliver written notice to Escrow Agent in accordance with Section 15 changing their respective funds transfer instructions, which notice shall be effective only upon receipt by Escrow Agent and after Escrow Agent has had a reasonable period of time to act upon such notice.

5.        Termination Claims.  Subject to Section 5(a) below, in the event the Closing does not occur Sellers' Parent or Buyers' Parent (the "***Applicable Party***") may deliver a Termination Notice to the other party (the "***Receiving Party***") and Escrow Agent directing that the Deposit be released to the Applicable Party and in so doing shall certify to Escrow Agent that the Termination Notice complies with the requirements of notice pursuant to the Underlying Agreement.

(a)        In the event the Closing does not occur due to a Qualifying Termination (as defined in the Underlying Agreement), Sellers' Parent may deliver a Termination Notice to Buyers' Parent and Escrow Agent directing Escrow Agent to release the Deposit to Sellers' Parent.  In the event the Closing does not occur due to any other termination of the Underlying Agreement in accordance with the terms thereof, Buyers' Parent may deliver a Termination Notice to Sellers' Parent and Escrow Agent directing Escrow Agent to release the Deposit to Buyers' Parent.

(b)        Within the Termination Response Period, the Receiving Party may deliver a Termination Response to the Applicable Party and Escrow Agent.  If the Receiving Party fails to provide the Applicable Party and Escrow Agent with a Termination Response within the Termination Response Period, then the Receiving Party shall be deemed to have consented  to the release by Escrow Agent of the Escrow Funds to the Applicable Party; and Escrow Agent shall promptly disburse to the Applicable Party the Escrow Funds in accordance with the Termination Notice.

(b)        In the event the Applicable Party and Escrow Agent are provided with a Termination Response during the Termination Response Period, Escrow Agent shall not disburse any Escrow Funds until Escrow Agent receives a Joint Written Direction or a Final Order.

(c)        Escrow Agent shall have no responsibility to determine whether any Termination Notice or Termination Response has been received by a Receiving Party or an Applicable Party, as applicable, or to provide any Termination Notice or Termination Response to a Receiving Party or an Applicable Party.

6.        Suspension of Performance; Disbursement into Bankruptcy Court.  If, at any time, (a)  a dispute exists with respect to any obligation of Escrow Agent hereunder, (b) Escrow Agent is unable to determine, to Escrow Agent's sole satisfaction,  Escrow Agent's proper actions with respect to its obligations hereunder, or (c) the Representatives have not, within 10 days of receipt of a notice of resignation, appointed a successor Escrow Agent to act hereunder, then Escrow Agent may, in its sole discretion, take the following actions:

(i)        suspend the performance of any of its obligations (including without limitation any disbursement obligations) under this Agreement until such dispute or uncertainty shall be resolved to the sole satisfaction of Escrow Agent or until a successor Escrow Agent shall have been appointed.

(ii)        petition (by means of an interpleader action or any other appropriate method) by the Bankruptcy Court, for instructions with respect to such dispute or uncertainty and, to the extent required or permitted by law, pay into the Bankruptcy Court, for holding and disposition in accordance with the instructions of the Bankruptcy Court, all Escrow Funds, after deduction and payment to Escrow Agent of all fees and expenses (including court costs and attorneys' fees) payable to, incurred by, or expected to be incurred by Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder.

Escrow Agent shall have no liability to Buyers' Parent or Sellers' Parent for suspension of performance or disbursement into court, specifically including any liability or claimed liability that may arise due to any delay in any other action required or requested of Escrow Agent.

7.        Investment of Funds.  (a) Based upon Buyers' Parent's and Sellers' Parent's prior review of investment alternatives, in the absence of further Joint Written Direction to the contrary at any time that an investment decision must be made, Escrow Agent is directed to invest and reinvest the Escrow Funds in the investment identified in Schedule A. Buyers' Parent and Sellers' Parent may deliver to Escrow Agent a Joint Written Direction changing the investment of the Escrow Funds, which direction Escrow Agent shall conclusively rely without inquiry or investigation; provided, however, that Buyers' Parent and Sellers' Parent warrant that no investment or reinvestment direction shall be given except the following:  (a) direct obligations of the United States of America or obligations the principal of and the interest on which are unconditionally guaranteed by the United States of America; (b) U.S. dollar

denominated deposit accounts and certificates of deposit issued by any bank, bank and trust company, or national banking association (including Escrow Agent and its affiliates), which are either (i) insured by the Federal Deposit Insurance Corporation ("*FDIC*") up to FDIC limits, or (ii) with domestic commercial banks which have a rating on their short-term certificates of deposit on the date of purchase of at least "*A-1*" by S&P or "*P-1*" by Moody's (ratings on holding companies are not considered as the rating of the bank); or (c) money market funds, including funds managed by Escrow Agent or any of its affiliates; provided further, however, that Escrow Agent will not be directed to invest in investments that Escrow Agent determines are not consistent with Escrow Agent's policies or practices.  Buyers' Parent and Sellers' Parent recognize and agree that Escrow Agent will not provide supervision, recommendations or advice relating to either the investment of Escrow Funds or the purchase or disposition of any investment and the Escrow Agent shall not have any liability for any loss in an investment made pursuant to the terms of this Agreement. Escrow Agent has no responsibility whatsoever to determine the market or other value of any investment and makes no representation or warranty as to the accuracy of any such valuations. To the extent applicable regulations grant rights to receive brokerage confirmations for certain security transactions, Buyers' Parent and Sellers' Parent waive receipt of such confirmations.

(b)     All investments shall be made in the name of Escrow Agent.  Escrow Agent may, without notice to Buyers' Parent and Sellers' Parent, sell or liquidate any of the foregoing investments at any time for any disbursement of Escrow Funds permitted or required hereunder and shall not be liable for any loss, cost or penalty resulting from any sale or liquidation of any such investment.  All investment earnings shall become part of the Escrow Funds and investment losses shall be charged against the Escrow Funds.  With respect to any Escrow Funds or investment instruction received by Escrow Agent after 11:00 a.m., U.S. Central Time, Escrow Agent shall not be required to invest applicable funds until the next Business Day.  Receipt of the Escrow Funds and investment and reinvestment of the Escrow Funds shall be confirmed by Escrow Agent by an account statement sent to Buyers' Parent and Sellers' Parent.  Failure to inform Escrow Agent in writing of any error or omission in any such account statement within 90 days after receipt shall conclusively be deemed confirmation and approval by Buyers' Parent and Sellers' Parent of such account statement.

8.     Tax Reporting.  Escrow Agent shall have no responsibility for the tax consequences of this Agreement. Except as otherwise agreed by Escrow Agent in writing, Escrow Agent has no tax reporting or withholding obligation except with respect to Form 1099-B reporting on payments of gross proceeds under Internal Revenue Code Section 6045 and Form 1099 and Form 1042-S reporting with respect to investment income earned on the Escrow Funds, if any. To the extent that U.S. federal imputed interest regulations apply, Buyers' Parent and Sellers' Parent shall, no later than five (5) Business Days after the Effective Date, so inform the Escrow Agent, provide the Escrow Agent with all imputed interest calculations and direct the Escrow Agent to disburse imputed interest amounts as Buyers' Parent and Sellers' Parent deem appropriate.  The Escrow Agent shall rely solely on such provided calculations and information and shall have no responsibility for the accuracy or completeness of any such calculations or information. Buyers' Parent and Sellers' Parent shall provide Escrow Agent a properly completed IRS Form W-9 or Form W-8, as applicable, for each payee.  If requested tax documentation is not so provided, Escrow Agent is authorized to withhold taxes as required by the United States Internal Revenue Code and related regulations. Buyers' Parent and Sellers' Parent have determined that any interest or income on Escrow Funds shall be reported on an accrual basis and deemed to be for the account of Seller.

9.     Resignation or Removal of Escrow Agent.  Escrow Agent may resign and be discharged from the performance of its duties hereunder at any time by giving thirty (30) days' prior written notice to Buyers' Parent and Sellers' Parent specifying a date when such resignation shall take effect and, after the date of such resignation notice, notwithstanding any other provision of this Agreement, Escrow Agent's sole obligation will be to hold the Escrow Funds pending appointment of a successor Escrow Agent.

Similarly, Escrow Agent may be removed at any time by Buyers' Parent and Sellers' Parent giving at least thirty (30) days' prior written notice to Escrow Agent specifying the date when such removal shall take effect. If Buyers' Parent and Sellers' Parent fail to jointly appoint a successor Escrow Agent prior to the effective date of such resignation or removal, Escrow Agent may petition the Bankruptcy Court to appoint a successor escrow agent, and all costs and expenses related to such petition shall be paid jointly and severally by Buyers' Parent and Sellers' Parent. The retiring Escrow Agent shall transmit all records pertaining to the Escrow Funds and shall pay all Escrow Funds to the successor Escrow Agent, after making copies of such records as the retiring Escrow Agent deems advisable and after deduction and payment to the retiring Escrow Agent of all fees and expenses (including court costs and attorneys' fees) payable to, incurred by, or expected to be incurred by the retiring Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder. After any retiring Escrow Agent's resignation or removal, the provisions of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Escrow Agent under this Agreement.

10.    Duties and Liability of Escrow Agent.

(a)    Escrow Agent undertakes to perform only such duties as are expressly set forth herein and no duties shall be implied. Escrow Agent has no fiduciary or discretionary duties of any kind. Escrow Agent's permissive rights shall not be construed as duties. Escrow Agent shall have no liability under and no duty to inquire as to the provisions of any document other than this Agreement, including without limitation the Underlying Agreement or any other agreement between any or all of the parties hereto or any other persons even though reference thereto may be made herein and whether or not a copy of such document has been provided to Escrow Agent. Escrow Agent's sole responsibility shall be for the safekeeping of the Escrow Funds in accordance with Escrow Agent's customary practices and disbursement thereof in accordance with the terms of this Agreement. Escrow Agent shall not be responsible for or have any duty to make any calculations under this Agreement, or to determine when any calculation required under the provisions of this Agreement should be made, how it should be made or what it should be, or to confirm or verify any such calculation. Escrow Agent shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein. This Agreement shall terminate upon the distribution of all the Escrow Funds pursuant to this Agreement, and Escrow Agent shall thereafter have no further obligation or liability whatsoever with respect to this Agreement or the Escrow Funds.

(b)    Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that the Bankruptcy Court or any other court of competent jurisdiction determines, which determination is not subject to appeal, that Escrow Agent's fraud, gross negligence or willful misconduct was the cause of any loss to Buyers' Parent or Sellers' Parent. Escrow Agent may retain and act hereunder through agents, and shall not be responsible for or have any liability with respect to the acts of any such agent retained by Escrow Agent in good faith.

(c)    Escrow Agent may rely upon any notice, instruction, request or other instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which Escrow Agent believes to be genuine and to have been signed or presented by the person or parties purporting to sign the same. In no event shall Escrow Agent be liable for (i) acting in accordance with or conclusively relying upon any instruction, notice, demand, certificate or document believed by Escrow Agent to have been created by or on behalf of Buyers' Parent or Sellers' Parent or (ii) incidental, indirect, special, consequential or punitive damages or penalties of any kind (including, but not limited to lost profits), even if Escrow Agent has been advised of the likelihood of such damages or penalty and regardless of the form of action.

(d)      Escrow Agent shall not be responsible for delays or failures in its performance hereunder resulting from acts of God, strikes, lockouts, riots, acts of war or terror, epidemics, governmental regulations, fire, communication line failures, computer viruses, attacks or intrusions, power failures, earthquakes or any other circumstance beyond its control.  Except for any action by a party hereto against Escrow Agent, Escrow Agent shall not be obligated to take any legal action in connection with the Escrow Funds, this Agreement or the Underlying Agreement or to appear in, prosecute or defend any such legal action or to take any other action that in Escrow Agent's sole judgment may expose it to potential expense or liability.

(e)      Escrow Agent may consult, at Buyers' Parent and Sellers' Parent's cost, legal counsel selected by it in the event of any dispute or question as to the construction of any of the provisions hereof or of any other agreement or of its duties hereunder, or relating to any dispute involving this Agreement, and shall incur no liability and shall be fully indemnified from any liability reasonably incurred in acting in accordance with the advice of such counsel; provided, however, that Buyers' Parent and Sellers' Parent agree, solely as between Buyers' Parent and Sellers' Parent, that all such amounts shall be paid one-half by Buyers' Parent and one-half by Sellers' Parent; provided further, however, that the Escrow Agent shall not be entitled to the payment or reimbursement of any such costs incurred to the extent determined by a court of competent jurisdiction to have resulted from the fraud, gross negligence or willful misconduct of the Escrow Agent.  Buyers' Parent and Sellers' Parent agree to perform or procure the performance of all further acts and things, and execute and deliver such further documents, as may be required by law or as Escrow Agent may reasonably request in connection with its duties hereunder. When any action is provided for herein to be done on or by a specified date that falls on a day other than a Business Day, such action may be performed on the next ensuing Business Day.

(f)      If any portion of the Escrow Funds is at any time attached, garnished or levied upon, or otherwise subject to any writ, order, decree or process of the Bankruptcy Court, or in case disbursement of Escrow Funds is stayed or enjoined by the Bankruptcy Court, Escrow Agent is authorized, in its sole discretion, to respond as it deems appropriate or to comply with all writs, orders, decrees or process so entered or issued, including but not limited to those which it is advised by legal counsel of its own choosing is binding upon it; and if Escrow Agent relies upon or complies with any such writ, order, decree or process, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance even if such order is reversed, modified, annulled, set aside or vacated.

(g)      Escrow Agent and any stockholder, director, officer or employee of Escrow Agent may buy, sell and deal in any of the securities of any other party hereto and contract and lend money to any other party hereto and otherwise act as fully and freely as though it were not Escrow Agent under this Agreement.  Nothing herein shall preclude Escrow Agent from acting in any other capacity for any other party hereto or for any other person or entity.

(h)      In the event instructions, including funds transfer instructions, address change or change in contact information are given to Escrow Agent (other than in writing at the time of execution of this Agreement), whether in writing, by facsimile or otherwise, Escrow Agent is authorized but shall not be required to seek confirmation of such instructions by telephone call-back to the applicable Representative, and Escrow Agent may rely upon the confirmation of anyone purporting to be the person so designated. The persons and telephone numbers for call-backs may be changed only in writing actually received and acknowledged by Escrow Agent and shall be effective only after Escrow Agent has a reasonable opportunity to act on such changes.  Buyers' Parent and Sellers' Parent agree that Escrow Agent may at its option record any telephone calls made pursuant to this Section.  Escrow Agent in any funds transfer may rely solely upon any account numbers or similar identifying numbers provided by Buyers' Parent or Sellers' Parent to identify (i) the beneficiary, (ii) the beneficiary's bank, or (iii) an intermediary bank,

even when its use may result in a person other than the beneficiary being paid, or the transfer of funds to a bank other than the beneficiary's bank or an intermediary bank so designated.  Buyers' Parent and Sellers' Parent acknowledge that these optional security procedures are commercially reasonable.

11.     <u>Indemnification of Escrow Agent</u>.  Buyers' Parent and Sellers' Parent, jointly and severally, shall indemnify and hold harmless Escrow Agent and each director, officer, employee and affiliate of Escrow Agent (each, an "***Indemnified Party***") upon demand against any and all claims (whether asserted by Buyers' Parent, Sellers' Parent or any other person or entity and whether or not valid), actions, proceedings, losses, damages, liabilities, penalties, costs and expenses of any kind or nature (including without limitation reasonable attorneys' fees, costs and expenses) (collectively, "***Losses***")  arising from this Agreement or Escrow Agent's actions hereunder, except to the extent such Losses are finally determined by the Bankruptcy Court or any other court of competent jurisdiction, to have been directly caused by the fraud, gross negligence or willful misconduct or breach of this Agreement of such Indemnified Party in connection with Escrow Agent's breach of this Agreement. Buyers' Parent and Sellers' Parent further agree, jointly and severally, to indemnify each Indemnified Party for all costs, including without limitation reasonable attorneys' fees, incurred by such Indemnified Party in connection with the enforcement of Buyers' Parent's and Sellers' Parent's obligations hereunder. Each Indemnified Party shall, in its sole discretion, have the right to select and employ separate counsel with respect to any action or claim brought or asserted against it, and the reasonable fees of such counsel shall be paid upon demand by Buyers' Parent and Sellers' Parent jointly and severally.  The obligations of Buyers' Parent and Sellers' Parent under this Section shall survive any termination of this Agreement and the resignation or removal of Escrow Agent.  Notwithstanding the foregoing, (i) as between Buyers' Parent and Sellers' Parent, each such party shall be responsible for one-half of any such amounts and (ii) in no event shall Buyers' Parent or Sellers' Parent be liable for incidental, indirect, special, consequential or punitive damages or penalties of any kind (including, but not limited to lost profits), even if Buyers' Parent or Sellers' Parent has been advised of the likelihood of such damages or penalty and regardless of the form of action.

12.     <u>Compensation of Escrow Agent</u>.

(a)     <u>Fees and Expenses</u>.  Buyers' Parent and Sellers' Parent agree, jointly and severally, to compensate Escrow Agent upon demand for its services hereunder in accordance with <u>Schedule B</u> attached hereto.  Without limiting the joint and several nature of their obligations to Escrow Agent, Buyers' Parent and Sellers' Parent agree between themselves that each will be responsible to the other for one-half of Escrow Agent's compensation.  The obligations of Buyers' Parent and Sellers' Parent under this Section shall survive any termination of this Agreement and the resignation or removal of Escrow Agent.

(b)     <u>Disbursements from Escrow Funds to Pay Escrow Agent</u>.  Escrow Agent is authorized to, and may disburse to itself from the Escrow Funds, from time to time, the amount of any compensation and reimbursement of expenses due and payable hereunder (including any amount to which Escrow Agent or any other Indemnified Party is entitled to seek indemnification hereunder).  Escrow Agent shall notify Buyers' Parent and Sellers' Parent of any such disbursement from the Escrow Funds to itself or any other Indemnified Party and shall furnish Buyers' Parent and Sellers' Parent copies of related invoices and other statements.

(c)     <u>Security and Offset</u>.  Buyers' Parent and Sellers' Parent hereby grant to Escrow Agent and the other Indemnified Parties a first priority security interest in, lien upon and right of sale and offset against the Escrow Funds with respect to any compensation or reimbursement due any of them hereunder (including any claim for indemnification hereunder).  If for any reason the Escrow Funds are insufficient

to cover such compensation and reimbursement, Buyers' Parent and Sellers' Parent shall promptly pay such amounts upon receipt of an itemized invoice.

13.    <u>Representations and Warranties</u>.  Buyers' Parent and Sellers' Parent each respectively make the following representations and warranties to Escrow Agent:

(a)    it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder; and this Agreement has been duly approved by all necessary action and (subject to approval by the Bankruptcy Court) constitutes its valid and binding agreement enforceable in accordance with its terms.

(b)    each of the applicable persons designated on <u>Schedule C</u> attached hereto has been duly appointed to act as its authorized representative hereunder and individually has full power and authority on its behalf to execute and deliver any instruction or direction, to amend, modify or waive any provision of this Agreement and to take any and all other actions as its authorized representative under this Agreement and no change in designation of such authorized representatives shall be effective until written notice of such change is delivered to each other party to this Agreement pursuant to <u>Section 15</u> and Escrow Agent has had reasonable time to act upon it.

(c)    the execution, delivery and performance of this Agreement by Escrow Agent does not and will not violate any applicable law or regulation and no printed or other material in any language, including any prospectus, notice, report, and promotional material that mentions "***U.S. Bank***" or any of its affiliates by name or the rights, powers, or duties of Escrow Agent under this Agreement shall be issued by any other parties hereto, or on such party's behalf, without the prior written consent of Escrow Agent.

14.    <u>Identifying Information</u>.  To help the Federal government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account.  For a non-individual person such as a business entity, a charity, a trust or other legal entity, Escrow Agent requires documentation to verify its formation and existence as a legal entity.  Escrow Agent may require financial statements, licenses or identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.  Buyers' Parent and Sellers' Parent agree to provide all information requested by Escrow Agent in connection with any legislation or regulation to which Escrow Agent is subject, in a timely manner. Escrow Agent's appointment and acceptance of its duties under this Agreement is contingent upon verification of all regulatory requirements applicable to Buyers' Parent, Sellers' Parent and any of their permitted assigns, including successful completion of a final background check. These conditions include, without limitation, requirements under the USA Patriot Act, the USA FREEDOM Act, the Bank Secrecy Act, and the U.S. Department of the Treasury Office of Foreign Assets Control. If these conditions are not met, Escrow Agent may at its option promptly terminate this Agreement in whole or in part, and refuse any otherwise permitted assignment by Buyers' Parent or Sellers' Parent, without any liability or incurring any additional costs.

15.    <u>Notices</u>.  All notices, approvals, consents, requests and other communications hereunder shall be in writing (provided that any communication sent to Escrow Agent hereunder must be in the form of a manually signed document or electronic copy thereof), in English, and shall be delivered (a) by personal delivery, or (b) by national overnight courier service, or (c) by certified or registered mail, return receipt requested, or (d) via facsimile transmission, with confirmed receipt or (e) via email by way of a PDF attachment thereto. Notice shall be effective upon receipt except for notice via email, which shall be effective only when the recipient, by return email or notice delivered by other method provided for in this

Section, acknowledges having received that email (with an automatically generated receipt or similar notice not constituting an acknowledgement of an email receipt for purposes of this Section).  Such notices shall be sent to the applicable party or parties at the address specified below:

If to Buyers' Parent or Buyer Representative, at:

c/o Select Medical Corporation
4717 Gettysburg Road
Mechanicsburg, PA 17088
Attention:  Michael E. Tarvin
Facsimile No.:  (717) 412-9142
Email:  MTarvin@selectmedical.com

With a copy to (which shall not constitute notice):

Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Attention:  Stephen M. Leitzell
Telephone:  (215) 994-2621
Facsimile:  (215) 655-2621
Email:  Stephen.Leitzell@dechert.com

If to Sellers' Parent or Seller Representative, at:

_____
_____
_____

With a copy to (which shall not constitute notice):

Waller Lansden Dortch & Davis LLP
511 Union Street, Suite 2700
Nashville, Tennessee  37219
Attention:  John Tishler and Brian Browder
Telephone:  (615) 244-6380
Facsimile:  (615) 244-6804
Email:  John.Tishler@wallerlaw.com
            Brian.Browder@wallerlaw.com

If to Escrow Agent, at:

U.S. Bank National Association, as Escrow Agent
Attn: Global Corporate Trust
333 Commerce Street, Suite 800
Nashville, TN 37201
Telephone:        615-251-0733
Facsimile:         615-251-0737
E-mail:             wally.jones@usbank.com

and to:

U.S. Bank National Association
Attn: Melissa McClellion
Trust Finance Management
214 N Tryon Street, Suite 2700

Charlotte, NC  28202
Telephone:        704-335-4632
Facsimile:         855-354-0849
E-mail:             melissa.mcclellion@usbank.com

or to such other address as each party may designate for itself by like notice and unless otherwise provided herein shall be deemed to have been given on the date received.  Buyers' Parent and Sellers' Parent agree to assume all risks arising out of the use of electronic methods to submit instructions and directions to Escrow Agent, including without limitation the risk of Escrow Agent acting on unauthorized instructions, and the risk of interception and misuse by third parties.

16.    Amendment and Assignment.  None of the terms or conditions of this Agreement may be changed, waived, modified, discharged, terminated or varied in any manner whatsoever unless in writing duly signed by each party to this Agreement.  No course of conduct shall constitute a waiver of any of the terms and conditions of this Agreement, unless such waiver is specified in writing, and then only to the extent so specified.  No party may assign this Agreement or any of its rights or obligations hereunder without the written consent of the other parties, provided that if Escrow Agent consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business (including the escrow contemplated by this Agreement) to another entity, the successor or transferee entity without any further act shall be the successor Escrow Agent.

17.    Governing Law, Jurisdiction and Venue.

(A)  This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby (in contract or tort) shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to conflicts of law principles.

(B)  WITHOUT LIMITING THE RIGHT OF ANY PARTY HERETO TO APPEAL ANY ORDER OF THE BANKRUPTCY COURT, THE PARTIES HERETO HEREBY AGREE THAT ANY AND ALL CLAIMS, ACTIONS, CAUSES OF ACTION, SUITS, AND PROCEEDINGS RELATING TO THIS AGREEMENT SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT, AND THE PARTIES HEREBY CONSENT TO THE JURISDICTION OF SUCH COURT; provided, however, that if the Bankruptcy Case (as defined in the Underlying Agreement) has closed or the Bankruptcy Court lacks jurisdiction for whatever reason, the parties hereto agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the state or federal courts situated in New Castle County, Delaware and any appellate court from any decision thereof, for the resolution of any such claim or dispute.  The parties hereto hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may have now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each party hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment.

(C)  EACH PARTY HERETO WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING REGARDING THIS AGREEMENT OR ANY PROVISION HEREOF.

18.    Entire Agreement, No Third Party Beneficiaries.  This Agreement constitutes the entire agreement between the signatory parties hereto relating to the holding, investment and disbursement of Escrow Funds and sets forth in their entirety the obligations and duties of Escrow Agent with respect to

4822-7008-1658.5

25330363.4.BUSINESS

Escrow Funds.  This Agreement and any Joint Written Direction may be executed in two or more counterparts, which when so executed shall constitute one and the same agreement or direction.  To the extent any provision of this Agreement is prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. The Section headings appearing in this instrument have been inserted for convenience only and shall be given no substantive meaning or significance whatsoever in construing the terms and conditions of this Agreement.  Nothing in this Agreement, express or implied, is intended to or shall confer upon any person other than the signatory parties hereto and the Indemnified Parties any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

[signature page follows]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed under seal as of the date first above written.

**SELECT MEDICAL CORPORATION**

By: _____
Name:  Martin F. Jackson
Title:    Executive Vice President and Chief Financial
Officer

**PROMISE HEALTHCARE, INC.**

By: _____
Name: _____
Title: _____

**U.S. BANK NATIONAL ASSOCIATION
as Escrow Agent**

By: _____
Name: _____
Title: _____

**[Signature Page to Escrow Agreement]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed under seal as of the date first above written.

**SELECT MEDICAL CORPORATION**

By: _____
Name: _____
Title: _____

**PROMISE HEALTHCARE, INC.**

By: _____
Name: _____Andrew Hinkelman_____
Title: _____Chief Restructuring Officer_____

**U.S. BANK NATIONAL ASSOCIATION
as Escrow Agent**

By: _____
Name: _____
Title: _____

4822-7008-1658

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed under seal as of the date first above written.

SELECT MEDICAL CORPORATION

By: _____
Name: _____
Title: _____

PROMISE HEALTHCARE, INC.

By: _____
Name: _____
Title: _____

U.S. BANK NATIONAL ASSOCIATION
as Escrow Agent

By: _____
Name:   Wally Jones
Title:    Vice President

[Signature Page to Escrow Agreement]

**SCHEDULE A**

**U.S. BANK NATIONAL ASSOCIATION**
**Investment Authorization Form**

**U.S. BANK MONEY MARKET DEPOSIT ACCOUNT**

**Description and Terms**

The U.S. Bank Money Market Deposit Account is a U.S. Bank National Association ("**U.S. Bank**") interest-bearing money market deposit account designed to meet the needs of U.S. Bank's Corporate Trust Services Escrow Group and other Corporate Trust customers of U.S. Bank.  Selection of this investment includes authorization to place funds on deposit and invest with U.S. Bank.

U.S. Bank uses the daily balance method to calculate interest on this account (actual/365 or 366). This method applies a daily periodic rate to the principal balance in the account each day.  Interest is accrued daily and credited monthly to the account.  Interest rates are determined at U.S. Bank's discretion, and may be tiered by customer deposit amount.

The owner of the account is U.S. Bank as agent for its Corporate Trust customers.  U.S. Bank's Corporate Trust Services Escrow Group performs all account deposits and withdrawals. Deposit accounts are FDIC insured per depositor, as determined under FDIC Regulations, up to applicable FDIC limits.

U.S. BANK IS NOT REQUIRED TO REGISTER AS A MUNICIPAL ADVISOR WITH THE SECURITIES AND EXCHANGE COMMISSION FOR PURPOSES OF COMPLYING WITH THE DODD-FRANK WALL STREET REFORM & CONSUMER PROTECTION ACT.  INVESTMENT ADVICE, IF NEEDED, SHOULD BE OBTAINED FROM YOUR FINANCIAL ADVISOR.

**Automatic Authorization**

In the absence of specific written direction to the contrary, U.S. Bank is hereby directed to invest and reinvest proceeds and other available moneys in the U.S. Bank Money Market Deposit Account.  The customer(s) confirm that the U.S. Bank Money Market Deposit Account is a permitted investment under the operative documents and this authorization is the permanent direction for investment of the moneys until notified in writing of alternate instructions.

**SCHEDULE B**

**Schedule of Fees for Services as Escrow Agent**

| | |
|---|---|
| Acceptance Fee: | $Waived |
| Annual Escrow Fee: | $1,500.00 |
| Out-of-Pocket Expenses: | $Waived |
| Transactional Costs: | $Waived |
| Total due at Execution: | $1,500.00 |

***Wire Instructions***
RBK    U.S. Bank N.A.
ABA    091000022
BNF    US BANK TFM ESCROW
Beneficiary Account Number:    104793255431
Beneficiary Account Address:    777 E. Wisconsin Avenue
    Milwaukee, WI 53202-5300

Ref:  Select and Promise Escrow

The fees quoted in this schedule apply to services ordinarily rendered in the administration of an Escrow Account and are subject to reasonable adjustment based on final review of documents, or when the Escrow Agent is called upon to undertake unusual duties or responsibilities, or as changes in law, procedures, or the cost of doing business demand.  Services in addition to and not contemplated in this Agreement, including, but not limited to, document amendments and revisions, non-standard cash and/or investment transactions, calculations, notices and reports, and legal fees, will be billed as extraordinary expenses.

Unless otherwise indicated, the above fees relate to the establishment of one escrow account. Additional sub-accounts governed by the same Escrow Agreement may incur an additional charge.  Transaction costs include charges for wire transfers, checks, internal transfers and securities transaction

## SCHEDULE C

Each of the following person(s) is a **Buyer Representative** authorized to execute documents and direct Escrow Agent as to all matters, including fund transfers, address changes and contact information changes, on Buyers' behalf (only one signature required):

| Robert J. Bein | | 717-972-1125 |
| Name | Specimen signature | Telephone No. |

| Martin F. Jackson | | 717-972-3814 |
| Name | Specimen signature | Telephone No. |

| Scott A. Romberger | | 717-972-1130 |
| Name | Specimen signature | Telephone No. |

| Joel T. Veit | | 717-972-1101 |
| Name | Specimen signature | Telephone No. |

If only one person is identified above, the following person is authorized for call-back confirmations:

| | |
| Name | Telephone Number |

Each of the following person(s) is a **Seller Representative** authorized to execute documents and direct Escrow Agent as to all matters, including fund transfers, address changes and contact information changes, on Sellers' Parent's behalf (only one signature required):

| | | |
| Name | Specimen signature | Telephone No. |

| | | |
| Name | Specimen signature | Telephone No. |

| | | |
| Name | Specimen signature | Telephone No. |

If only one person is identified above, the following person is authorized for call-back confirmations:

| | |
| Name | Telephone Number |

**ATTACHMENT 1**

**FORM OF JOINT WRITTEN DIRECTION**

**[To be completed on closing]**


U.S. Bank National Association, as Escrow Agent
ATTN:  Global Corporate Trust Services
Address:          _____


RE:  ESCROW AGREEMENT made and entered into as of [      ] by and among [            ] ("***Buyers' Parent***"), Promise Healthcare, Inc. ("***Sellers' Parent***") and U.S. Bank National Association, in its capacity as escrow agent (the "***Escrow Agent***").

Pursuant to Section 4 of the above-referenced Escrow Agreement, Buyers' Parent and Sellers' Parent hereby instruct Escrow Agent to disburse the amount of [$_____] from the **[Deposit Escrow Account] [Cure Amount Escrow Account]** to **[Buyers' Parent][Sellers' Parent]**,  as provided below:

<u>Buyers' Parent</u>                              <u>Sellers' Parent</u>

Bank Name:      _____ Bank Name: _____
 Bank Address: _____ Bank Address: _____
ABA No.:         _____ ABA No. _____
Account Name: _____ Account Name: _____
Account No.:     _____ Account No.: _____


**Select Medical Corporation**
By: _____
Name:
Date: _____


**Promise Healthcare, Inc.**
By: _____
Name:
Date: _____

**Exhibit 2 to Bidding Procedures Order**
**<u>Bidding Procedures</u>**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------------x
                                    :
In re:                              :   Chapter 11
                                    :
PROMISE HEALTHCARE GROUP, LLC, *et al.*,[1]  :   Case No. 18-12491 (CSS)
                                    :
            Debtors.                :   (Jointly Administered)
-----------------------------------------------------------------x

## BIDDING PROCEDURES FOR
## THE SALE OF CERTAIN OF THE DEBTORS' ASSETS

The above-captioned debtors and debtors-in-possession (collectively, the "***Debtors***")

have filed chapter 11 cases pending in the United States Bankruptcy Court for the District of

Delaware (the "***Bankruptcy Court***"), jointly administered under Case No. 18-12491 (CSS).

On [_____], the United States Bankruptcy Court for the District of Delaware (the

"***Bankruptcy Court***") entered the *Order: (I) Authorizing and Approving (A) Debtors' Entry Into*

*Stalking Horse Purchase Agreement, (B) Bidding Procedures, (C) Bid Protections,*

*(D) Assumption Procedures, and (E) Form and Manner of Notice of the Bidding Procedures,*

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Professional Rehabilitation Hospital, L.L.C. (5340), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179),   Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc. (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc. (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), St. Alexius Hospital Corporation #1 (2766), St. Alexius Properties, LLC (4610), Success Healthcare 1, LLC (6535), Success Healthcare 2, LLC (8861), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766).  The mailing address for the Debtors, solely for purposes of notices and communications, is 999 Yamato Road, 3rd FL, Boca Raton, FL  33431.

*Assumption Procedures, and Sale Hearing; (II) Scheduling a Hearing to Consider the Sale, Pursuant to and in Accordance With the Bidding Procedures; and (III) Granting Related Relief* (D.I. [___]) (the "**Bidding Procedures Order**"), pursuant to which the Bankruptcy Court approved the following procedures (the "**Bidding Procedures**") relating to the sales contemplated by the Select Purchase Agreement for the sale of the Select Assets. Capitalized terms used but not defined in these Bidding Procedures have the meanings given to them in the Bidding Procedures Order. These Bidding Procedures set forth the process by which the Debtors are authorized to conduct an auction (the "**Auction**") for one or more sales of the Select Assets in accordance with and as described in the Select Purchase Agreement.

**1.**     **Submissions to the Debtors.**

All submissions to the Debtors required to be made under these Bidding Procedures must be directed to each of the following persons unless otherwise provided (collectively, the "**Bid Notice Parties**"):

a.    **Select Sellers**. Andrew Hinkelman & Jennifer Byrne, FTI Consulting, 214 North Tryon Street, Suite 1900, Charlotte, North Carolina 28202, andrew.hinkelman@fticonsulting.com, jennifer.byrne@fticonsulting.com.

b.    **Debtors' Counsel in connection with the Sale Transaction**. John Tishler & Brian Browder, Waller Lansden Dortch & Davis, LLP, Nashville City Center, 511 Union Street, Suite 2700, Nashville, TN 37219, john.tishler@wallerlaw.com, brian.browder@wallerlaw.com.

c.    **Debtors' Financial Advisor and Investment Banker**. Andrew Turnbull, Houlihan Lokey Capital, Inc., 123 North Wacker Drive, 5th Floor, Chicago, Illinois 60606, aturnbull@hlhz.com.

d.    **Counsel to the DIP Agent**. Brian I. Swett, McGuire Woods LLP, 77 West Wacker Drive, Suite 4100, Chicago, Illinois 60601-1818, bswett@mcguirewoods.com.

e.    **Counsel to the Official Committee of Unsecured Creditors in the Select Sellers' Chapter 11 Cases**. Andrew H Sherman & Boris I. Mankovetskiy, Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey 07102, asherman@sillscummis.com, bmankovetskiy@sillscummis.com.

2

2.      **Potential Bidders.**

The Debtors and their financial advisors have identified, and may in the future identify, parties they believe potentially may be interested in consummating (and potentially may have the financial resources necessary to consummate) a competing transaction. To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a sale for any or all of the Select Assets (each, a "**_Potential Bidder_**") must deliver or have previously delivered:

    a.      an executed confidentiality agreement on terms acceptable to the Debtors (a "**_Confidentiality Agreement_**"), in consultation with the Committee and DIP Agent; and

    b.      the most current audited and latest unaudited financial statements (collectively, the "**_Financials_**") of the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Select Assets, (i) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors and their advisors, in consultation with the Committee and DIP Agent, (ii) a written commitment acceptable to the Debtors and their advisors, in consultation with the Committee and DIP Agent, of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the proposed transaction, and (iii) copies of any documents evidencing any financing commitments necessary to consummate the transaction.

3.      **Qualified Bidders.**

    a.      A "**_Qualified Bidder_**" is a Potential Bidder: (i) whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate a sale for any portion of the Select Assets, as determined in the Debtors' reasonable business judgment (in consultation with the Committee and DIP Agent); and (ii) whose Bid (as defined below) is a Qualified Bid (as defined below). On or before the date that is one (1) Business Day after the Bid Deadline (defined below), the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder, and shall provide a copy of each Qualified Bid to counsel to the DIP Agent, counsel to the Committee, and counsel to the Select Purchaser. The Select Purchaser shall be deemed a Qualified Bidder that has submitted a Qualified Bid at all times.

    b.      For the avoidance of doubt, two or more Potential Bidders may submit a Bid for any or all of the Select Assets, provided that such Bid(s), when taken as a whole (collectively, a "**_Joint Bid_**"), is determined by the Debtors, in consultation with

the Committee and DIP Agent and in accordance with Section 3(a) of the Bidding Procedures, to constitute a Qualified Bid; provided, however, that any Joint Bid must comply with section 363(n) of the Bankruptcy Code and Potential Bidders must first seek the Debtors' permission before they contact each other. The Debtors shall consult with the Committee and DIP Agent regarding any request for permission to contact another Potential Bidder. In addition, any Potential Bidder may submit a Bid for any or all of the Select Assets, provided that such Bid is determined by the Debtors, in consultation with the Committee and DIP Agent and in accordance with Section 3(a) of the Bidding Procedures, to constitute a Qualified Bid.

c.  If any Potential Bidder is determined by the Debtors not to be a Qualified Bidder, the Debtors will refund such Potential Bidder's Deposit (as defined below) and all accumulated interest thereon on or within three (3) Business Days after the Bid Deadline.

d.  Between the date the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Except as otherwise set forth in Select Purchase Agreement, without the written consent of the Debtors (in consultation with the Committee and DIP Agent), a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; provided that any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures. Bids must remain open offers capable of being accepted until entry of the Sale Order or, in the case of a Backup Bid, until the Backup Bidder closes the Sale Transaction.

e.  Any disputes related to these Bidding Procedures shall be resolved by the Bankruptcy Court.

**4.  Due Diligence.**

a.  **Diligence Provided to Potential Bidders**.

Only Potential Bidders that have entered into a Confidentiality Agreement shall be eligible to receive due diligence information and access to the Debtors' electronic data room and to additional non-public information regarding the Select Sellers. **No Potential Bidder will be permitted to conduct any due diligence without entering into a Confidentiality Agreement.** The Debtors will provide to each Potential Bidder that has entered into a Confidentiality

4

Agreement reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request, and the Debtors shall post all written due diligence provided to any Potential Bidder to the Debtors' electronic data room. For all Potential Bidders other than the Select Purchaser,[2] the due diligence period will end on the Bid Deadline and subsequent to the Bid Deadline the Debtors shall have no obligation to furnish any due diligence information.

The Debtors shall not furnish any confidential information relating to the Select Assets, the Debtors' liabilities, or the sale of any or all of the Select Assets ("***Confidential Sale Information***") to any person, except to a Potential Bidder that has entered into a Confidentiality Agreement or to such Potential Bidder's duly-authorized representatives, in each case, to the extent provided in the applicable Confidentiality Agreement. The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; provided that the Debtors may decline to provide such information to Potential Bidders who, at such time and in the Debtors' reasonable business judgment have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the sale of all or a portion of the Select Assets.

The Debtors also reserve the right to withhold from Potential Bidders any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure to a Potential Bidder who the Debtors determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not approved by the Debtors as a Potential Bidder.

---

[2] The duration of the due diligence period for the Select Purchaser shall be governed by the Select Purchase Agreement.

**All due diligence requests must be directed to:**

Scott Kremeier, SKremeier@HL.com

b.        **Diligence Provided by Potential Bidders**.

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of the Potential Bidder to consummate a transaction for all or a portion of the Select Assets. Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine (in consultation with the Committee and DIP Agent) that such Potential Bidder is not a Qualified Bidder or that a bid made by such Potential Bidder is not a Qualified Bid.

The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures. Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids during the bidding process or otherwise in connection with the Chapter 11 Cases or in accordance with the terms of any applicable confidentiality agreement.

Notwithstanding the foregoing and the provisions contained in any applicable Confidentiality Agreement, the Debtors and the Debtors' advisors may disclose confidential information: (a) with the prior written consent of such bidder and the Debtors; (b) to the counsel to the Committee, (c) to the counsel to the DIP Agent, and (d) as otherwise required or allowed by any applicable confidentiality agreement with respect to a particular Potential Bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies. The terms of this section 4(b) shall not apply to the Select Purchaser, and

6

the treatment of the Select Purchaser's confidential information shall be governed by the confidentiality agreements previously entered between the Debtors and the Select Purchaser (the "***Select Purchaser's Confidentiality Agreement***"); <u>provided</u> <u>that</u> notwithstanding anything in the Select Purchaser's Confidentiality Agreement to the contrary, the Debtors and Debtors' advisors may disclose confidential information with respect to the Select Purchaser's bid to the Committee, the DIP Agent, and their respective advisors, subject to the agreement of such parties to treat such information as confidential pursuant to their respective confidentiality agreements with the Debtors.

5.    **Bid Requirements.**

A proposal, solicitation, or offer (each, a "***Bid***") by a Potential Bidder that is submitted in writing and satisfies each of the following requirements (collectively, the "***Bid Requirements***"), as determined by the Debtors in their reasonable business judgment (after consultation with the Committee and DIP Agent) shall constitute a "***Qualified Bid***." For the avoidance of doubt, notwithstanding the following, the Select Purchase Agreement will be deemed a Qualified Bid for all purposes and at all times. The form of a Bid must include a proposed asset purchase agreement (a "***Bid Purchase Agreement***") duly executed by the Potential Bidder and must also include a redline comparing the Bid Purchase Agreement to the Select Purchase Agreement. The Bid Requirements are as follows:

a.    **Assets**. Each Bid must provide for the purchase of all or a portion of the Select Assets, and must clearly state (i) which Select Assets the Potential Bidder is agreeing to purchase and (ii) whether the Potential Bidder intends to operate all or a portion of the Debtors' business as a going concern, or to liquidate the business.

b.    **Assumption of liabilities**. Each Bid must expressly identify the liabilities it proposes to (i) assume or (subject to the terms hereof) or (ii) satisfy with cash consideration.

c.    **Purchase Price**. Each Bid must clearly set forth the purchase price to be paid (the "***Purchase Price***"). The Bid must propose a Purchase Price for all or a portion of

the Select Assets, including any assumption of liabilities, that has a value that equals or exceeds the sum of the following (a "*Minimum Bid*"), as determined one week prior to the Bid Deadline in consultation with the Committee and DIP Agent: (i) the net value to the Debtors' estates provided by the Select Purchase Agreement; and (iii) $2,750,000, subject to the adjustments set forth in any applicable Select Purchase Agreement; provided, however, in the event that a Bid is for a combination of Select Assets different from those set forth in the Select Purchase Agreement, such consideration shall reasonably represent a premium, as determined by the Debtors in consultation with the Committee and DIP Agent, to an approximate allocation of the Select Purchase Agreement; provided, further, that in determining the value of any such Bid, the Debtors will not be limited to evaluating the dollar value of the consideration but may also consider other factors, including the speed, certainty, and value of the proposed transaction. Subject to the immediately preceding sentence, the Purchase Price contained in a Bid may be structured in whatever form the Potential Bidder desires (*e.g.*, a Potential Bidder may propose an all cash Bid).

d.      **Deposit**. With a Bid, a Potential Bidder must submit by wire transfer of immediately available funds, a cash deposit in the amount equal to seven percent (7%) of the aggregate Purchase Price set forth in the Bid, to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "*Deposit*").

e.      **Same or better terms**. Each Bid must be on terms that are not more burdensome to the Debtors than the terms of the Select Purchase Agreement, as determined by the Debtors (in consultation with the Committee and DIP Agent). Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the sale contemplated by the Bid and shall include a schedule of executory contracts and unexpired leases proposed to be assumed by the Debtors and assigned to the Potential Bidder ("*Assumed Contracts*"), and a copy of the purchase agreement representing the Bid clearly marked to show all changes requested by the Potential Bidder, including those related to the respective Purchase Price and assets to be acquired by such Potential Bidder, as well as all other material documents integral to such bid and a written commitment demonstrating to the satisfaction of the Debtors (in consultation with the Committee and DIP Agent) that the Potential Bidder will be able to close the transaction proposed in its Bid on the terms and conditions set forth therein (the "*Qualified Bid Documents*").

f.      **Contingencies; No financing or diligence outs**. A Bid shall not be conditioned on (i) obtaining financing, (ii) shareholder, board of directors, or other internal approval, or (iii) the outcome or completion of a due diligence review by the Potential Bidder. Notwithstanding the foregoing, a Bid may be subject to (i) the accuracy at the closing of the sale of specified representations and warranties or (ii) the satisfaction at the closing of the sale of specified conditions, which shall not be more burdensome to the Debtors, as determined by the Debtors (in

consultation with the Committee and DIP Agent), than those set forth in the Select Purchase Agreement.

g.   **Identity**. Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating a sale of the Select Assets), and the complete terms of any such participation. Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid. Each Bid must also include contact information for the specific persons and counsel whom the Debtors and their advisors should contact regarding such Bid. Each Bid must also disclose any past or present connections or agreements with the Debtors, the Select Purchaser, any other Potential Bidder or Qualified Bidder and its affiliates, and/or any officer or director of the foregoing (including any current officer or director of the Debtors).

h.   **Demonstrated financial capacity**. A Potential Bidder must have, in the Debtors' reasonable business judgment (in consultation with the Committee and DIP Agent), the necessary financial capacity to consummate the proposed transactions required by its Bid and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid. Each Bid must be accompanied by reasonable evidence of the Potential Bidder's ability to operate the business related to the applicable Select Assets and include a packet of information, including financial information that will be provided to the non-Debtor counterparties to Assumed Contracts sufficient to demonstrate adequate assurance of future performance.

i.   **Committed financing**. To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include executed unconditional committed financing from a qualified source documented to the satisfaction of the Debtors (in consultation with the Committee and DIP Agent), which demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors (in consultation with the Committee and DIP Agent).

j.   **Binding and irrevocable**. A Qualified Bid must include a signed writing stating that: (i) the Qualified Bid is irrevocable until the later of (a) two (2) Business Days after the closing of the sale to a person or entity other than the Potential Bidder and (b) thirty (30) days after the conclusion of the Sale Hearing (as defined below); and (ii) the Qualified Bidder agrees to serve as a Backup Bidder upon the terms and conditions set forth in these Bidding Procedures, if such Qualified Bidder is not a Successful Bidder.

k.   **Expenses; Disclaimer of fees**. Except with respect to the Select Purchaser, each Bid (other than the Select Purchase Agreement) must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Potential Bidder (other than the Select Purchaser) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

l.   **Authorization**. Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors in consultation with the Committee and DIP Agent) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

m.   **As-Is, Where-Is**. Each Bid must include a written acknowledgement and representation that the Potential Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Select Assets prior to submitting the Bid; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Select Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Select Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid.

n.   **Adherence to Bidding Procedures**. By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction. Each Bid must expressly state that the Potential Bidder agrees to serve as a Backup Bidder (as defined below) if such bidder's Qualified Bid is selected as the next highest or otherwise next best bid after the Successful Bid.

o.   **Regulatory Approvals and Covenants**. A Bid must set forth each regulatory and third-party approval needed to consummate the transaction contemplated by such Bid and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Potential Bidder will take to ensure receipt of such approvals as promptly as possible). A Bid must also state that all necessary filings under applicable regulatory, antitrust, and other laws will be made and that payment of the fees associated therewith shall be made by the Potential Bidder.

p.     **Consent to Jurisdiction**. Each Potential Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, the Sale documents, and the closing of the Sale, as applicable.

q.     **Bid Deadline**. Each Bid must be transmitted via email (in .pdf or similar format) so as to be **actually received** on or before **[4:00 p.m. (prevailing Eastern Time) on February 15, 2019]** (the "*Bid Deadline*") by the Bid Notice Parties.

The Debtors reserve the right to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid. The Debtors may accept a single Qualified Bid or multiple Bids for non-overlapping material portions of the Select Assets that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid. The Debtors may also permit otherwise Qualified Bidders who submitted Bids by the Bid Deadline for a material portion of the Select Assets but who are not identified as a component of a single Qualified Bid consisting of multiple Bids, to participate in the Auction and to submit higher and/or otherwise better Bids that in subsequent rounds of bidding may be considered, together with other Bids for non-overlapping portions of the Debtors' assets, as part of such a single Qualified Bid.

6.     **Auction.**

If the Debtors receive a Qualified Bid, other than the Select Purchase Agreement, the Debtors will conduct an Auction to determine (in consultation with the Committee and DIP Agent) the Successful Bidder(s) for the Select Assets. The Debtors shall notify the Select Purchaser if one or more Qualified Bids are received and provide the identity of the bidders making any such Qualified Bids. (To the extent that the Select Purchaser has not previously received a copy of any Bid, the Debtors shall promptly provide a copy thereof, or copies thereof, as the case may be, to the Select Purchaser, and prior to a determination by the Debtors as to whether a Bid is a Qualified Bid.) If the Debtors do not receive a Qualified Bid (other than the

11

Select Purchase Agreement), the Debtors will not conduct an Auction and shall designate the Select Purchaser's Bid as the applicable Successful Bid.

On the date that is one (1) Business Day after the Bid Deadline or such other time as is reasonably practicable, the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid, as determined in the Debtors' sole business judgment (the "***Baseline Bid***") for the Select Assets, after consultation with the Committee and DIP Agent, and provide copies of the applicable Qualified Bid Documents supporting the Baseline Bid to each Qualified Bidder. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors (in consultation with the Committee and DIP Agent) reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, which may include, among other things: (a) the number, type, and nature of any changes to the Select Purchase Agreement (or other applicable purchase agreement), if any, requested by the Qualified Bidder, including the type and amount of Select Assets sought to be acquired and obligations sought to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close the applicable purchase of the Select Assets and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; and (e) the tax consequences of such Qualified Bid (collectively, the "***Bid Assessment Criteria***"). Only the Select Purchaser and other Qualified Bidders will be entitled to make any subsequent bids at the Auction. At least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction and all Qualified Bidders wishing to

attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder in attendance at the Auction in person.

The Auction, if necessary, will be conducted on [**February 20, 2019 at 10:00 a.m.] (prevailing Eastern time)** at the offices of DLA Piper LLP, 1201 North Market Street, Suite 2100, Wilmington, Delaware 19801, or at such other time and location as designated by the Debtors. The Auction, if necessary, shall be conducted in a timely fashion according to the following procedures:

a. **The Debtors Shall Conduct the Auction**.

The Debtors and their professionals shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of each Baseline Bid. All incremental Bids made thereafter shall be Overbids (defined below) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Qualified Bids. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, the Successful Bid(s), and Backup Bid(s).

The Auction will be conducted openly and all creditors will be permitted to attend. The Qualified Bidders and the Select Purchaser may appear at the Auction in person or through duly authorized representatives.

b. **Terms of Overbids**.

"***Overbid***" means any bid made at the Auction by a Qualified Bidder[3] subsequent to the Debtors' announcement of the Baseline Bid. Each Overbid must comply with the following conditions:

---

[3] Or Qualified Bidders, in the event of a Joint Bid.

(i)     **Minimum Overbid Increment**. The initial Overbid, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the applicable Baseline Bid by an incremental amount that is not less than the $500,000 (a "***Minimum Overbid Increment***").

(ii)    **Conclusion of Each Overbid Round**. Upon the solicitation of each round of applicable Overbids, the Debtors may announce a deadline (as the Debtors may, in their reasonable business judgment, after consultation with the Committee and DIP Agent, extend from time to time, the "***Overbid Round Deadline***") by which time any Overbids must be submitted to the Debtors.

(iii)   **Overbid Alterations**. An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior applicable Bid or Overbid, as determined in the Debtors' reasonable business judgment (in consultation with the Committee and DIP Agent), but shall otherwise comply with the terms of these Bidding Procedures. Any Overbid must comply with the conditions for a Qualified Bid.

(iv)    **Announcing Highest Bid**. Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors have identified (in consultation with the Committee and DIP Agent) in the initial applicable Overbid round, an Overbid or Overbids as being higher or otherwise better than the applicable Baseline Bid(s) for the Select Assets, or in subsequent rounds, the Overbid(s) previously designated by the Debtors (after consultation with the Committee and DIP Agent) as the prevailing highest or otherwise best Bid for the Select Assets (the "***Prevailing Highest Bid***"). The Debtors shall describe to all Qualified Bidders the material terms of any new Overbids designated by the Debtors as the Prevailing Highest Bid(s) as well as the value attributable by the Debtors to such Prevailing Highest Bid(s).

c.      **Consideration of Overbids**.

The Debtors reserve the right, in their discretion (in consultation with the Committee and DIP Agent) to adjourn the Auction one or more times to, among other things: (i) facilitate discussions among the Debtors and any Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment (in consultation with the Committee and DIP Agent), may require, including that the Qualified

14

Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount; and (iv) to provide the Debtors with an opportunity to consider (in consultation with the Committee and DIP Agent) how to value each Overbid. The full amount of the Bid Protections shall be included as value of any bid made by the Select Purchaser in each round of bidding at the Auction, including for purposes of comparing the value of a Qualified Bidder's Overbid to the bid of the Select Purchaser in any round of bidding.

      d.     **Closing the Auction**.

        (i)     The Auction shall continue until there is only one Bid or Joint Bid, as applicable, that the Debtors determine, in their reasonable business judgment (in consultation with the Committee and DIP Agent), is the highest or otherwise best Bid for the Select Assets. Such Bid or Joint Bid, as applicable, shall be declared the "***Successful Bid***," and such Qualified Bidder (or Qualified Bidders, in the event of a Joint Bid) the "***Successful Bidder(s)***," at which point the Auction will be closed. The Debtors shall notify the Qualified Bidders of the Successful Bid within one Business Day following such selection. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid. Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Bankruptcy Court of the Successful Bid.

        (ii)     The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

        (iii)     As soon as reasonably practicable after closing the Auction, the Debtors shall file on the docket, but not serve, a notice with the Court identifying the Successful Bidder(s) and Backup Bidder(s).

      e.     **No Collusion; Good-Faith Offer**.

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Bid is a good-faith offer and it intends to consummate the transaction contemplated by such Bid if selected as the Successful Bidder(s). All Potential Bidders and all Qualified Bidders

will immediately disclose to the Debtors, the United States Trustee, the DIP Agent, and the

Committee any discussions regarding employment of or offers to retain or employ any officer or

insider of the Debtors.

7.    **Backup Bidder**.

a.    Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Bid for all or a portion of the Select Assets at the Auction, as determined by the Debtors in their discretion and in consultation with the Committee and DIP Agent (the "***Backup Bid***"), shall be required to serve as a backup bidder (the "***Backup Bidder***"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.

b.    The identity of the Backup Bidder(s) and the amount and material terms of the Backup Bid(s) shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder(s). The Backup Bidder(s) shall be required to keep the Backup Bid(s) open and irrevocable, until the closing of the sale with the Successful Bidder(s). Each Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the Successful Bidder(s) and shall thereafter be returned within five (5) Business Days.

c.    If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select (in consultation with the Committee and DIP Agent) the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Backup Bid without further order of the Bankruptcy Court or notice to any party. In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors. The Debtors specifically reserve the right to seek all available remedies against any defaulting Successful Bidder(s), including with respect to specific performance.

d.    Notwithstanding anything to the contrary in this section or the Bidding Procedures Order, if the Select Purchaser is required to serve as Backup Bidder, the terms and conditions of such service shall be governed by the Select Purchase Agreement.

8.    **Reservation of Rights**.

Without prejudice to the rights of the Select Purchaser under the terms the Select

Purchase Agreement, or the rights of any DIP Agent in respect of any sale-related milestones set

forth in the Debtors' debtor-in-possession credit agreement, the Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment (in consultation with the Committee and DIP Agent) in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Select Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any and all bids or Bids.

**9.    Sale Hearing**.

A hearing to consider approval of the Sale of the Select Assets to the Successful Bidder(s) (or to approve the sale of the Select Assets to the Select Purchaser, if no Auction is held) (the "***Sale Hearing***") is currently scheduled to take place at [        ] (prevailing Eastern Time) on [            ], before the Honorable Christopher S. Sontchi, at the Bankruptcy Court, 824 Market Street, 5th Floor, Courtroom No. 6, Wilmington, Delaware 19801.

**Subject to the rights and remedies of the Select Purchasers under Select Purchase Agreement, the Sale Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party (including the Select Purchaser).**

At the Sale Hearing, the Debtors shall present the Successful Bid(s) to the Bankruptcy Court for approval.

10.     **Bid Protections**.

To provide an incentive and to compensate the Select Purchaser for performing the substantial due diligence and incurring the expenses necessary and entering into the Select Purchase Agreement with the knowledge and risk that arises from participating in the sale and subsequent bidding process, the Debtors have agreed to pay the Select Purchaser, under the conditions and in the amount set forth in the Bidding Procedures Order and the Select Purchase Agreement:

> **Select Bid Protections.** Pursuant to the Select Purchase Agreement and Bidding Procedures, in the event the Select Purchaser is not the Successful Bidder for all of the Select Assets (or does not otherwise purchase all of the Select Assets as a Backup Bidder), the Select Purchaser is to be provided an expense reimbursement not to exceed $250,000 and a break-up fee in an amount equal to $1,890,000 (which is three percent (3%) percent of the Select Purchaser's Purchase Price) (together, the "***Bid Protections***"), as more specifically set forth in Section 5.6(i) of the Select Purchase Agreement.

The Debtors have agreed that their obligations to pay the Bid Protections from the consideration received from the consummation of a transaction with a Successful Bidder that is not the Select Purchaser, as set forth in the Select Purchase Agreement, shall survive termination of the Select Purchase Agreement, and shall be payable under the terms of the Select Purchase Agreement and the Bidding Procedures Order.

The Select Purchaser shall have standing to appear and be heard on all issues related to the Auction, including the right to object to the conduct of the Auction and interpretation of these Bidding Procedures.

11.     **Return of Deposit**.

The Deposit of the Successful Bidder(s) shall be applied to the Purchase Price of the transaction at closing. The Deposits for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtors in their reasonable business

judgment and shall be returned (other than with respect to the Successful Bidder(s) and the Backup Bidder) on or within five (5) Business Days after the Auction.

If any Successful Bidder fails to consummate the sale because of a breach by such Successful Bidder, the Debtors will not have any obligation to return the applicable Deposit deposited by the Successful Bidder (except as otherwise set forth in the Select Purchase Agreement, as to the Select Purchaser), which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors (and subject to the Select Purchase Agreement, as to the Select Purchaser), and the Debtors shall be free to consummate the sale with the applicable Backup Bidder without the need for an additional hearing or order of the Bankruptcy Court, in which case the Backup Bidder's Deposit shall be applied to the Purchase Price.

**12.    Fiduciary Out**.

Nothing in these Bidding Procedures shall require the Debtors' boards of directors to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent the Debtors' boards of directors determine, based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or their fiduciary obligations under applicable law; provided that in the event of any such action, all rights and remedies of the Select Purchaser in these Bidding Procedures, the Select Purchase Agreement, and/or applicable law shall be reserved and preserved.

**Exhibit 3 to Bidding Procedures Order**
**Notice of Auction and Sale Hearing**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------------x
                                                             :
In re:                                                       :  Chapter 11
                                                             :
PROMISE HEALTHCARE GROUP, LLC, et al.,[1]                    :  Case No. 18-12491 (CSS)
                                                             :
            Debtors.                                         :  (Jointly Administered)
                                                             :
-------------------------------------------------------------x  Re: D.I. ___
```

## NOTICE OF AUCTION AND SALE HEARING

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "***Debtors***") sought relief from the United States Bankruptcy Court for the District of Delaware to effectuate one or more sales for the sale of substantially all of the Debtors' assets.

**PLEASE TAKE FURTHER NOTICE** that on [_____], 2019, the United States Bankruptcy Court for the District of Delaware (the "***Court***") entered the *Order: (I) Authorizing and Approving (A) Debtors' Entry Into Stalking Horse Purchase Agreement, (B) Bidding Procedures, (C) Bid Protections, (D) Assumption Procedures, and (E) Form and Manner of Notice of the Bidding Procedures, Assumption Procedures, and Sale Hearing; (II) Scheduling a Hearing to Consider the Sale, Pursuant to and in Accordance With the Bidding Procedures; and*

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Professional Rehabilitation Hospital, L.L.C. (5340), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179),   Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc. (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc. (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), St. Alexius Hospital Corporation #1 (2766), St. Alexius Properties, LLC (4610), Success Healthcare 1, LLC (6535), Success Healthcare 2, LLC (8861), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766).  The mailing address for the Debtors, solely for purposes of notices and communications, is 999 Yamato Road, 3rd FL, Boca Raton, FL  33431.

*(III) Granting Related Relief* (D.I. [___]) (the "***Bidding Procedures Order***"),[2] pursuant to which the Court approved the Bidding Procedures, which establish key dates and times related to the Debtors' efforts to sell certain assets of the Debtors' estates.

**PLEASE TAKE FURTHER NOTICE** that the summary of the Bidding Procedures contained in this notice is provided for convenience only, all interested bidders should carefully read the Bidding Procedures Order and Bidding Procedures, and, to the extent of any inconsistencies between this notice and the Bidding Procedures Order or Bidding Procedures, the terms of the Bidding Procedures Order and Bidding Procedures shall control.

**PLEASE TAKE FURTHER NOTICE** that the deadline by which all Qualified Bids must be **actually received** by the parties specified in the Bidding Procedures is **[February 15, 2019 at 4:00 p.m. (prevailing Eastern time)]**.

**PLEASE TAKE FURTHER NOTICE** that copies of the Bidding Procedures Order, Bidding Procedures, all related exhibits, and any other filings related to the foregoing are available for free on the website of the court-appointed claims and noticing agent in these cases, Prime Clerk LLC, at https://cases.primeclerk.com/promisehealthcaregroup/, or can be requested by calling: (a) 844-822-9230 (domestic, toll-free); or (b) 347-338-6503 (international).

**PLEASE TAKE FURTHER NOTICE** that, if the Debtors timely receive one or more Qualified Bids (in addition to the Select Purchase Agreement), the Debtors will conduct the Auction on **[February 20, 2019 at 10:00 a.m. (prevailing Eastern time)]** at the offices of DLA Piper LLP, 1201 North Market Street, Suite 2100, Wilmington, Delaware 19801 or at such other location as the Debtors may later designate, to determine the highest or otherwise best Bids for the Select Assets.

**PLEASE TAKE FURTHER NOTICE** that, if the Debtors do not timely receive one or more Qualified Bids (in addition to the Select Purchase Agreement), the Debtors will not conduct the Auction and, instead, will (a) file a notice with the Court identifying the Select Purchaser as a Successful Bidder for the Select Assets and (b) promptly seek the Court's approval of the sale of the Select Assets.

**PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the sale of the Select Assets before the Honorable Christopher S. Sontchi, Chief United States Bankruptcy Judge for the District of Delaware, 824 North Market Street, 5th Floor, Wilmington, Delaware 19801, on **[_____], 2019 at [_____] (prevailing Eastern time)**.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, must (i) be in writing, (ii) conform to the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules, (iii) state with particularity the legal and factual basis for the objection and the specific grounds for such objection, and (iv) be filed with the Court and served so as to be **actually received** no later than **[February 22, 2019 at 4:00 p.m. (prevailing Eastern time)]** by the following parties: (i) counsel to the Debtors, (a) John Tishler, Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, Tennessee 37219 and (b) Stuart M. Brown, DLA

---

[2] Capitalized terms used but not defined in this notice shall have the meanings ascribed to them in the Bidding Procedures Order and Bidding Procedures, as applicable.

Piper LLP, 1201 N. Market Street, Suite 2100, Wilmington, Delaware 19801; (ii) counsel to the Committee, (a) Jeffrey N. Pomerantz, Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, Wilmington, Delaware 19801 and (b) Andrew H. Sherman, Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey 07102; (iii) counsel to the Select Purchaser, (a) Stephen M. Leitzell, Dechert LLP, Cira Centre, 2929 Arch Street, Philadelphia, Pennsylvania 19104-2808, (b) Brian Greer, Dechert LLP, Three Bryant Park, 1095 Avenue of the Americas, New York, New York 10036-6797, and (c) Jonathan Stott, Dechert LLP, Cira Centre, 2929 Arch Street, Philadelphia, Pennsylvania 19104-2808; (iv) counsel to Wells Fargo, National Association, (a) Brian I. Swett, McGuire Woods LLP, 77 West Wacker Drive, Suite 4100, Chicago, Illinois 60601-1818 and (b) John Knight, Richards, Layton & Finger, PA, 920 N. King Street, Wilmington, Delaware 19801; (v) the Office of the United States Trustee, J. Caleb Boggs Federal Building, 844 King Street, Lockbox 35, Wilmington, Delaware 19801, Attn: Brya Keilson; and (vi) counsel to any Successful Bidder and Backup Bidder as identified in accordance with the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE THAT ANY PARTY OR ENTITY WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE(S), INCLUDING WITH RESPECT TO THE TRANSFER OF THE SELECT ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS.**

**PLEASE TAKE FURTHER NOTICE THAT THE PROPOSED SALE ORDER PROVIDES THAT A PURCHASER OF THE SELECT ASSETS WILL HAVE NO RESPONSIBILITY FOR, AND THE SELECT ASSETS WILL BE SOLD FREE AND CLEAR OF, ANY SUCCESSOR LIABILITY, INCLUDING THE FOLLOWING:**

a.  To the greatest extent allowable by applicable law, any Successful Bidder shall not be deemed, as a result of any action taken in connection with the Select Purchase Agreement or other competing purchase agreement, the consummation of a sale of the Select Assets contemplated by the Select Purchase Agreement or other competing purchase agreement, or the transfer or operation of any part of the Select Assets, to: (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than, for any Successful Bidder, with respect to any obligations as an assignee under the executory contracts or unexpired leases assumed and assigned pursuant to 11 U.S.C. § 365 arising after the applicable closing); (b) have, *de facto* or otherwise, merged with or into the Debtors; or (c) be an alter ego or mere continuation or substantial continuation of the Debtors, including, without limitation, within the meaning of any foreign, federal, state or local revenue law, pension law, the Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act, the WARN Act (29 U.S.C. §§ 2101, et seq.), the Comprehensive Environmental Response Compensation and Liability Act ("*CERCLA*"), the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), the National Labor Relations Act (29 U.S.C. § 151, et seq.), environmental liabilities, debts, claims or obligations arising from conditions first existing on or prior to the applicable closing (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under CERCLA, any liabilities, debts or obligations of or required to be paid by the Debtors for any taxes of any kind for any period, labor, employment, or other law, rule or regulation (including without limitation filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

b. All rights of any party to set off any claims, debts or obligations owed by or to a Successful Bidder in connection with the Select Assets shall be extinguished on the applicable closing date pursuant to the proposed Sale Order, with such rights attaching to the proceeds of the applicable sale. Other than as expressly set forth in the Select Purchase Agreement or competing purchase agreement with respect to assumed liabilities, a Successful Bidder shall not have any responsibility for (a) any liability or other obligation of the Debtors or related to the Select Assets or (b) any claims (as such term is defined in section 101(5) of the Bankruptcy Code) against the Debtors or any of their predecessors or affiliates.

c. To the greatest extent allowed by applicable law, a Successful Bidder shall have no liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations based, in whole or in part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, *de facto* merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the applicable closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Select Assets prior to the applicable closing.

Dated: December 26, 2018
Wilmington, Delaware

DLA PIPER LLP (US)

/s/ *Stuart M. Brown*
Stuart M. Brown (#4050)
Kaitlin MacKenzie Edelman (#5924)
Matthew S. Sarna (#6578)
1201 N. Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: Stuart.Brown@dlapiper.com
         Kaitlin.Edelman@dlapiper.com
         Matthew.Sarna@dlapiper.com

-and-

WALLER LANSDEN DORTCH & DAVIS, LLP
John Tishler (admitted *pro hac vice*)
Katie G. Stenberg (admitted *pro hac vice*)
Blake D. Roth (admitted *pro hac vice*)
Tyler N. Layne (admitted *pro hac vice*)
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone: (615) 244-6380
Facsimile: (615) 244-6804
Email: John.Tishler@wallerlaw.com
         Katie.Stenberg@wallerlaw.com
         Blake.Roth@wallerlaw.com
         Tyler.Layne@wallerlaw.com

*Attorneys for the Debtors and*
*Debtors in Possession*

**Exhibit 4 to Bidding Procedures Order**
**<u>Notice of Potential Assumption</u>**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------x
                                              :
In re:                                        :   Chapter 11
                                              :
PROMISE HEALTHCARE GROUP, LLC, et al.,¹       :   Case No. 18-12491 (CSS)
                                              :
              Debtors.                        :   (Jointly Administered)
                                              :
------------------------------------------------------------x   Re: D.I. ___
```

### NOTICE OF (I) CURE AMOUNT WITH RESPECT TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO POTENTIALLY BE ASSUMED AND ASSIGNED AND (II) POTENTIAL ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

      **PLEASE TAKE NOTICE** that, pursuant to the *Order: (I) Authorizing and Approving (A) Debtors' Entry Into Stalking Horse Purchase Agreement, (B) Bidding Procedures, (C) Bid Protections, (D) Assumption Procedures, and (E) Form and Manner of Notice of the Bidding Procedures, Assumption Procedures, and Sale Hearing; (II) Scheduling a Hearing to Consider the Sale, Pursuant to and in Accordance With the Bidding Procedures; and (III) Granting Related Relief* (D.I. [___]) (the "***Bidding Procedures Order***")[2] entered by the United States Bankruptcy Court for the District of Delaware (the "***Court***"), the above-captioned debtors and debtors in possession (collectively, the "***Debtors***") provide this notice that you and one or more

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Professional Rehabilitation Hospital, L.L.C. (5340), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179),   Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc. (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc. (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), St. Alexius Hospital Corporation #1 (2766), St. Alexius Properties, LLC (4610), Success Healthcare 1, LLC (6535), Success Healthcare 2, LLC (8861), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766).  The mailing address for the Debtors, solely for purposes of notices and communications, is 999 Yamato Road, 3rd FL, Boca Raton, FL  33431.

[2] Capitalized terms used but not defined in this notice shall have the meanings ascribed to them in the Bidding Procedures Order and Bidding Procedures, as applicable.

of the Debtors are party to one or more of the various executory contracts and unexpired leases set forth on **Exhibit 1** to this notice (the "***Executory Contracts***" and "***Unexpired Leases***," as applicable), which Executory Contracts and Unexpired Leases may be assumed and assigned to a Successful Bidder in connection with the proposed sale of the Select Assets.

 **PLEASE TAKE FURTHER NOTICE** that set forth on **Exhibit 1** is the amount the Debtors' records reflect is owing to cure any and all defaults under each Executory Contract and Unexpired Lease (each amount, a "***Cure Amount***") to permit the assumption and assignment of each Executory Contract and Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

 **PLEASE TAKE FURTHER NOTICE** that the Debtors' books and records reflect that all postpetition amounts owing under each Executory Contract and Unexpired Lease have been paid and will continue to be paid and no other defaults exist under any of the Executory Contracts and Unexpired Leases and, therefore, amounts due and owing since the Petition Date are not included in the Cure Amount for each Executory Contract and Unexpired Lease.

 **PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Cure Amounts set forth on **Exhibit 1** or to the possible assumption and assignment of any Executory Contract or Unexpired Lease to a Successful Bidder, as applicable, must be filed with the Court and served so as to be **actually received** on or before **[February 8, 2019 at 4:00 p.m. (prevailing Eastern time)]** (the "***Objection Deadline***"). Service of any objections should be made to: (i) counsel to the Debtors, (a) John Tishler, Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, Tennessee 37219 and (b) Stuart M. Brown, DLA Piper LLP, 1201 N. Market Street, Suite 2100, Wilmington, Delaware 19801; (ii) counsel to the Committee, (a) Jeffrey N. Pomerantz, Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, Wilmington, Delaware 19801 and (b) Andrew H. Sherman, Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey 07102; (iii) counsel to the Select Purchaser, (a) Stephen M. Leitzell, Dechert LLP, Cira Centre, 2929 Arch Street, Philadelphia, Pennsylvania 19104-2808, (b) Brian Greer, Dechert LLP, Three Bryant Park, 1095 Avenue of the Americas, New York, New York 10036-6797, and (c) Jonathan Stott, Dechert LLP, Cira Centre, 2929 Arch Street, Philadelphia, Pennsylvania 19104-2808; (iv) counsel to Wells Fargo, National Association, (a) Brian I. Swett, McGuire Woods LLP, 77 West Wacker Drive, Suite 4100, Chicago, Illinois 60601-1818 and (b) John Knight, Richards, Layton & Finger, PA, 920 N. King Street, Wilmington, Delaware 19801; (v) the Office of the United States Trustee, J. Caleb Boggs Federal Building, 844 King Street, Lockbox 35, Wilmington, Delaware 19801, Attn: Brya Keilson; and (vi) counsel to any Successful Bidder and Backup Bidder as identified in accordance with the Bidding Procedures.

 **PLEASE TAKE FURTHER NOTICE** that all objections to the Cure Amount or possible assumption and assignment of any Executory Contract or Unexpired Lease must (i) be in writing, (ii) conform to the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules, (iii) state with particularity the legal and factual basis for the objection and the specific grounds for such objection, and (iv) if challenging the Cure Amount, set forth the prepetition cure amount being claimed with appropriate documentation in support of such amount.

 **PLEASE TAKE FURTHER NOTICE** that any timely filed objections that cannot be resolved will be heard at a hearing to be held before the Honorable Christopher S. Sontchi, Chief

United States Bankruptcy Judge for the District of Delaware, 824 North Market Street, 5th Floor, Wilmington, Delaware 19801 on [_____] at [  ] **(prevailing Eastern time)** unless otherwise agreed by the Debtors and any applicable Successful Bidder or otherwise ordered by the Court.

**PLEASE TAKE FURTHER NOTICE** that the failure to file an objection on or before the Objection Deadline shall (i) forever bar any objections to the Cure Amount or the assertion that any additional or other amounts are due and owing, (ii) be deemed as consent to the assumption, assignment, and/or transfer of each Executory Contract and Unexpired Lease to the applicable Successful Bidder, and (iii) forever bar and estop any assertion or claim against the Debtors or Successful Bidder that any additional amounts are due or defaults exist, or conditions to assumption, assignment, and/or transfer must be satisfied, or that any right or benefit under each Executory Contract or Unexpired Lease cannot or will not be available to the Successful Bidder.

**PLEASE TAKE FURTHER NOTICE** that the Debtors shall present evidence necessary to demonstrate adequate assurance of future performance by any Successful Bidder.

**PLEASE TAKE FURTHER NOTICE** that the presence of an Executory Contract or Unexpired Lease on **Exhibit 1** to this notice does not constitute an admission that such contract, lease, or other agreement is an executory contract or unexpired lease or that such contract, lease, or other agreement will be assumed by the Debtors and assigned to any Successful Bidder.

**PLEASE TAKE FURTHER NOTICE** that, if an Executory Contract of Unexpired Lease is finally determined to be assumed and assigned to a Successful Bidder, a separate notice of such assumption and assignment will be provided to you.

**PLEASE TAKE FURTHER NOTICE** that all documents filed with the Court in connection with the above-captioned cases are available for free on the website of the court-appointed claims and noticing agent in these cases, Prime Clerk LLC, at https://cases.primeclerk.com/promisehealthcaregroup/.

3

Dated: December 26, 2018
Wilmington, Delaware

DLA PIPER LLP (US)

/s/ *Stuart M. Brown*
Stuart M. Brown (#4050)
Kaitlin MacKenzie Edelman (#5924)
Matthew S. Sarna (#6578)
1201 N. Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: Stuart.Brown@dlapiper.com
        Kaitlin.Edelman@dlapiper.com
        Matthew.Sarna@dlapiper.com

-and-

WALLER LANSDEN DORTCH & DAVIS, LLP
John Tishler (admitted *pro hac vice*)
Katie G. Stenberg (admitted *pro hac vice*)
Blake D. Roth (admitted *pro hac vice*)
Tyler N. Layne (admitted *pro hac vice*)
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone: (615) 244-6380
Facsimile: (615) 244-6804
Email: John.Tishler@wallerlaw.com
        Katie.Stenberg@wallerlaw.com
        Blake.Roth@wallerlaw.com
        Tyler.Layne@wallerlaw.com

*Attorneys for the Debtors and*
*Debtors in Possession*

EAST\163461954.2

**Exhibit 5 to Bidding Procedures Order**
**Notice of Assumption and Assignment**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------------x
                                        :
In re:                                  :  Chapter 11
                                        :
PROMISE HEALTHCARE GROUP, LLC, et al.,¹ :  Case No. 18-12491 (CSS)
                                        :
            Debtors.                    :  (Jointly Administered)
                                        :
------------------------------------------------------------x  Re: D.I. ___
```

**NOTICE OF ASSUMPTION AND ASSIGNMENT
OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

> **PLEASE TAKE NOTICE** that on [_____], 2019, the United States Bankruptcy Court for the District of Delaware (the "***Court***") entered the *Order: (I) Authorizing and Approving (A) Debtors' Entry Into Stalking Horse Purchase Agreement, (B) Bidding Procedures, (C) Bid Protections, (D) Assumption Procedures, and (E) Form and Manner of Notice of the Bidding Procedures, Assumption Procedures, and Sale Hearing; (II) Scheduling a Hearing to Consider the Sale, Pursuant to and in Accordance With the Bidding Procedures; and (III) Granting Related Relief* (D.I. [___]) (the "***Bidding Procedures Order***").²

> **PLEASE TAKE FURTHER NOTICE** that on [_____], 2019, the Court entered the *Order (I) Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (II) Authorizing the Assumption and Assignment of*

---

¹ The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Professional Rehabilitation Hospital, L.L.C. (5340), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179),   Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc. (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc. (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), St. Alexius Hospital Corporation #1 (2766), St. Alexius Properties, LLC (4610), Success Healthcare 1, LLC (6535), Success Healthcare 2, LLC (8861), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766).  The mailing address for the Debtors, solely for purposes of notices and communications, is 999 Yamato Road, 3rd FL, Boca Raton, FL  33431.

² Capitalized terms used but not defined in this notice shall have the meanings ascribed to them in the Bidding Procedures Order and Bidding Procedures, as applicable.

*Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* (D.I. [___]) (the "**Sale Order**").

**PLEASE TAKE FURTHER NOTICE** that, in accordance with the Bidding Procedures Order, Bidding Procedures, and Sale Order, the Debtors have identified [_____] as a Successful Bidder.

**PLEASE TAKE FURTHER NOTICE** that attached to this notice as **Exhibit 1** is a schedule of executory contracts and unexpired leases the Debtors will assume and assign to the Successful Bidder, in accordance with and subject to the Bidding Procedures Order and Sale Order.

**PLEASE TAKE FURTHER NOTICE** that all documents filed with the Court in connection with the above-captioned cases are available for free on the website of the court-appointed claims and noticing agent in these cases, Prime Clerk LLC, at https://cases.primeclerk.com/promisehealthcaregroup/.

Dated: December 26, 2018
Wilmington, Delaware

DLA PIPER LLP (US)

/s/ *Stuart M. Brown*
Stuart M. Brown (#4050)
Kaitlin MacKenzie Edelman (#5924)
Matthew S. Sarna (#6578)
1201 N. Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: Stuart.Brown@dlapiper.com
        Kaitlin.Edelman@dlapiper.com
        Matthew.Sarna@dlapiper.com

-and-

WALLER LANSDEN DORTCH & DAVIS, LLP
John Tishler (admitted *pro hac vice*)
Katie G. Stenberg (admitted *pro hac vice*)
Blake D. Roth (admitted *pro hac vice*)
Tyler N. Layne (admitted *pro hac vice*)
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone: (615) 244-6380
Facsimile: (615) 244-6804
Email: John.Tishler@wallerlaw.com
        Katie.Stenberg@wallerlaw.com
        Blake.Roth@wallerlaw.com
        Tyler.Layne@wallerlaw.com

*Attorneys for the Debtors and
Debtors in Possession*

EAST\163461954.2