# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>PROMISE HEALTHCARE GROUP, LLC,<br>*et al.*,<br>Debtors. | Chapter 11<br><br>Case No. 18-12491 (CSS)<br><br>(Jointly Administered)<br><br>**Hearing Date:** Jan. 22, 2019 at 10:00 a.m.<br>**Objection Deadline:** Dec. 28, 2019 at 4:00 p.m.<br>**Related to Docket Nos. 37 and 296** |

## DECLARATION OF BARRY BEITLER IN SUPPORT OF OBJECTION BY AFG INVESTMENT FUND 5, LLC TO THE PROPOSED: (1) ASSUMPTION AND ASSIGNMENT OF LEASE; AND (2) CURE AMOUNT

I, Barry Beitler, declare and state:

1.     I am the manager of AFG Investment Fund 5, LLC (the "Landlord" or "AFG"). I have held that position at all relevant times herein. All facts set forth herein are true and correct, of my own personal knowledge, or based upon the books and records under my custody and control. If called upon as a witness, I could and would testify competently hereto.

2.     I submit this declaration (the "Declaration") in support of AFG Investment Fund 5, LLC's (the "Landlord" or "AFG") objection (the "Objection") to the Debtors': (1) proposed assumption and assignment of the *Amended And Restated Master Lease Agreement*" dated November 14, 2008 (the "Lease"); and (2) proposed cure amount due with respect to the Lease.

3.     The Landlord is the owner of certain real property located at 7500 East Hellman Avenue, Rosemead, California (the "Premises") leased to Success Healthcare 1, LLC (the "Debtor") pursuant to the Lease. A true and correct copy of the Lease is attached as **Exhibit "1"** hereto.

4.     Also on November 14, 2008, the Landlord and the Debtor's parent-affiliate, Success Healthcare, LLC entered into the "*Pledge Agreement*." A true and correct copy of the Pledge Agreement is attached as **Exhibit "4"** hereto.

5.     On December 11, 2018, the debtors in the above-captioned jointly administered Chapter 11 cases (the "Debtors") filed the "*Notice Of Potential Assumption And Assignment Of Business Contracts And Related Cure Amounts*" [Doc. No. 296] (the "Cure Notice"). The Cure Notice identifies the Lease as one of the contracts that the Debtors seek to assume and assign to L.A. Downtown Medical Center LLC (the "Purchaser"), and asserts that there are no cure obligations with respect to the Lease. *See* (Cure Notice, Doc. No. 296, pg. 9).

6.     The proposed cure amount of "$0" in the Cure Notice (the "Proposed Cure Amount") is incorrect. Attached as **Exhibit "2"** hereto is an account balance summary showing the calculation of the outstanding Basic Rent amount, as well as other amounts currently due and owing to the Landlord under the Lease.

7.     With regards to non-monetary defaults under the Lease, the Debtor has failed to comply with its obligations to provide various documents and information to the Landlord during the Lease term (the "Required Documents"). At my request and at my direction, the Landlord's counsel made a request for, among other things, the Required Documents to Debtor's counsel most recently via a letter that was sent on, and dated November 15, 2018 (the "November 15 Letter"). A true and correct copy of the November 15 Letter is attached as **Exhibit "3"** hereto.

8.     Moreover, the Landlord recently discovered that the Debtor had allowed several liens to be recorded against the Premises resulting from the Debtor's (or its affiliate's) failure to pay for certain work done on the Premises (the "Liens"), in violation of the Lease.

9.     Despite the Debtors' request for Court authorization for the assumption and assignment of the Lease to the Purchaser, they have not provided to the Landlord any evidence to show adequate assurance of future performance, regarding the Purchaser's financial wherewithal and ability to perform the obligations under the Lease.

10.     The Debtors have failed to submit any evidence to show adequate assurance of future performance regarding the Purchaser to the Landlord, the Purchaser's financial viability and prospects have, therefore, not been established.    In connection with the Lease, the Landlord was given a security deposit, a pledge of the equity interest of Success Healthcare LLC in the Tenant and guaranties.  Accordingly, for this proposed assignment the Landlord would similarly require a security deposit, collateral and guaranties for the performance of the assignee's obligations under the Lease.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 27 day of December 2018, at Los Angeles California.

_____
                    Barry Beitler



EXHIBIT "1"

# AMENDED AND RESTATED MASTER LEASE AGREEMENT

Dated as of November 14, 2008

between

**AFG Investment Fund 5, LLC**
a California limited liability company

Landlord

and

**Success Healthcare 1, LLC,**
a California limited liability company

Tenant

# AMENDED AND RESTATED MASTER LEASE AGREEMENT

THIS AMENDED AND RESTATED MASTER LEASE AGREEMENT (this "Master Lease") is made and entered into as of November 14, 2008 to be effective as of the Effective Date (defined below), between AFG Investment Fund 5, LLC, a California limited liability company (the "Landlord"), and Success Healthcare 1, LLC, a California limited liability company (the "Tenant").

## RECITALS

A.      Landlord, as landlord, and InterCare Health Systems, Inc., a California corporation, as tenant ("InterCare"), entered in that certain Master Lease Agreement dated September 29, 2006 (the "Original Lease"), pursuant to which Landlord leased to InterCare that certain real property commonly known as 7500 East Hellman Avenue, Rosemead, California (the "Site"), as more particularly described on Exhibit A attached hereto and incorporated herein.

B.      InterCare assigned its estate, right, title and interest in and to the Original Lease to Tenant, pursuant to that certain Consent, Assignment and Assumption of Lease dated of even date herewith, between Landlord, InterCare and Tenant (the "Assignment of Lease").

C.      Landlord and Tenant wish to amend and restate the Original Lease in its entirety, upon the terms and conditions more particularly set forth herein.

D.      Concurrently herewith, Mr. Peter R. Baronoff, an individual, Mr. Howard B. Koslow, an individual, and Mr. Lawrence Leder, an individual (collectively, the "Guarantors"), are executing a Guaranty of Lease ("Guaranty"), a form of which is attached hereto as Exhibit B to this Master Lease, guaranteeing the obligations of Tenant in connection with this Master Lease, together with the certification attached to the Guaranty as Exhibit A (the "Certification") executed by each Guarantor. In consideration of the execution of this Master Lease by Landlord and as a material inducement to Landlord to execute this Master Lease, Success Healthcare, LLC has concurrently herewith executed a Pledge Agreement ("Pledge Agreement"), a form of which is attached hereto as Exhibit F to this Master Lease, granting to Landlord a continuing security interest in and to certain Pledged Collateral (as defined in the Pledge Agreement) to secure the payment obligations of Tenant under this Master Lease and the Guaranty. Landlord would not enter into this Master Lease without the execution of the Guaranty, the Certifications and the Pledge Agreement.

NOW, THEREFORE, in consideration of the premises and of other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto agree as follows:

## SECTION 1. DEFINITIONS; CONSTRUCTION OF REFERENCES

In this Master Lease and in each Operative Document, unless the context otherwise requires:

(a)      Rules of Construction. In each Operative Document, unless a clear contrary intention appears:

(i)        the singular number includes the plural number and <u>vice versa</u>;

(ii)      reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are permitted by the Operative Documents, and reference to a Person in any particular capacity excludes such Person in any other capacity or individually;

(iii)     reference to a gender includes the other gender;

(iv)     reference to any agreement (including any Operative Document), document or instrument means such agreement, document or instrument as amended, supplemented or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms of the other Operative Documents;

(v)      reference to Applicable Law means such Applicable Law as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder, and reference to any section or other provision of any Applicable Law means that provision of such Applicable Law from time to time in effect and constituting the substantive amendment, modification, codification, replacement or reenactment of such section or other provision,

(vi)     reference in any Operative Document to any Article, Section, Appendix, Schedule; or Exhibit means such Article or Section thereof or Appendix, Schedule or Exhibit thereto;

(vii)    "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term and the failure to include the specific after a general term shall not mean that the specific is excluded therefrom unless the context otherwise specifically requires;

(viii)    "or" is not exclusive; and

(ix)    relative to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding."

In each Operative Document, unless expressly otherwise provided, accounting terms shall be construed and interpreted, and accounting determinations and computations shall be made, in accordance with GAAP.

The Operative Documents were negotiated by the parties with the benefit of legal representation and any rule of construction or interpretation that would otherwise require any provision of the Operative Documents to be construed or interpreted against any party shall not apply.

(b)    <u>Definitions</u>. All capitalized terms used herein and not otherwise defined herein has the meanings set forth below:

"<u>Abatements</u>" has the meaning set forth in <u>Section 4</u> of this Master Lease.

"Accounting Year" means each calendar year during the Term.

"Additional Insureds" has the meaning set forth in Section 11(b) of this Master Lease.

"Affiliate" means, as to any particular Person, another Person which directly or indirectly through one or more intermediaries (i) controls, or is controlled by, or is under common control with, such particular Person; (ii) beneficially owns or holds 15% or more of any class of the voting securities of such particular Person, or (iii) beneficially owns or holds 15% or more of any class of the voting securities or equity interest beneficially owned or held by such particular Person. As used herein, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise; the terms "controlling," "controlled by," and "under common control with" shall have meanings correlative to the foregoing.

"A.M. Best" has the meaning set forth in Section 11(a) of this Master Lease.

"Applicable Law" means all applicable laws, statutes, ordinances, judgments, decrees, injunctions, writs, orders, rules, regulations, interpretations, licenses, and permits of any Governmental Body, including all Environmental Law, as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder.

"Asset Purchase Agreement" has the meaning set forth in Section 2(b).

"Bankruptcy Default" means any event or condition that either constitutes a Lease Default which would with the giving of notice and/or the passage of time become a Lease Event of Default under Section 15(e), (f), (g), or (h) of this Master Lease, or a Lease Event of Default under Section 15(e), (f), (g), or (h).

"Basic Rent" means the annual amount of Two Million Eight Hundred Seventy-One Thousand Five Hundred Four Dollars and 00/100 ($2,871,504.00) payable in the aggregate monthly amount of Two Hundred Thirty-Nine Thousand Two Hundred Ninety-Two Dollars and 00/100 ($239,292.00), as increased annually by any Basic Rent Adjustment and any Financial Performance Adjustment.

"Basic Rent Adjustment" means an increase of two percent (2%).

"Basic Rent Dates" means (i) during the Basic Term, the first day of each calendar month and (ii) during the Renewal Term, if any, the dates established prior to the commencement thereof, or if no dates are established, the first day of each calendar month.

"Basic Term" means the period commencing on the Basic Term Commencement Date and ending on the Basic Term Expiration Date.

"Basic Term Commencement Date" means the Effective Date.

"Basic Term Expiration Date" means September 30, 2026, and if such date is not a Business Day, then the first Business Day immediately following such date.

"Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York, New York or Los Angeles, California are authorized or required to be closed.

"Certification" has the meaning set forth in the Recitals to this Master Lease.

"Dollars" or the sign "$" means United States dollars or other lawful currency of the United States.

"EBITDA" means earnings before the payment of interest, taxes, depreciation, and/or amortization; all calculated in accordance with GAAP.

"EBITDAR" means earnings before the payment of interest, taxes, depreciation, amortization, and/or rent, all calculated in accordance with GAAP.

"Effective Date" has the meaning set forth in Section 2(b).

"Environmental Claims" means any notice, claim, administrative, regulatory or judicial action, suit, lien, order, consent decree, judgment, or demand alleging or asserting liability or responsibility for investigatory costs, legal or other fees, costs of legal proceedings, cleanup costs, costs of monitoring or post-closure costs, remediation costs, mitigative action, corrective action, removal costs, response costs, damages to natural resources, personal injuries, contribution, indemnification, cost recovery, compensation, injunctive relief, losses, fines, or penalties (whether civil or criminal) arising out of, based on, or resulting from: (i) the presence or Release or threat of Release of any Hazardous Materials at or from the Site, or (ii) any Environmental Law, or (iii) any alleged injury or threat of injury to health, safety or the environment.

"Environmental Event" means any or all of the following (or the receipt of notice alleging that the following has occurred or may occur): (i) a "recognized environmental condition" within the meaning of ASTM Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process E 1527, as amended from time to time; (ii) a violation of any Environmental Law; (iii) an Environmental Claim; or (iv) any instance where continued operation in accordance with industry practice would result in a violation of Environmental Law or give rise to an Environmental Claim.

"Environmental Law" means any and all applicable Federal, state or local laws, rules, orders, permits, regulations, statutes, ordinances, codes, or decrees of any Governmental Body or common law imposing liability or standards of conduct concerning human health, natural resources, or the environment, which now is or that may at any time hereafter be in effect, including without limitation the Clean Water Act, the Clean Air Act, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, the Superfund Amendments and Reauthorization Act of 1986, the Emergency Planning and Community Right-to-Know Act, the Resource Conservation and Recovery Act, the Safe Drinking Water Act, the Hazardous and Solid Waste Amendments of 1984, the Federal Insecticide, Fungicide and Rodenticide Act, the

Toxic Substances Control Act and the Waste Disposal Act of 1965, in each case with each amendment, supplement, or modification thereto and as each shall be amended, supplemented, or modified in the future, and will all regulations promulgated thereunder.

"Environmental Study" has the meaning set forth in Section 5(b) of this Master Lease.

"Fair Market Rental Value" means, with respect to the Site, the rent which would be obtained in an arm's-length transaction between a hypothetical informed and willing tenant and a hypothetical informed and willing landlord, in either case under no compulsion to lease, and neither of which is related to Tenant or Landlord, for this Master Lease of the Site, assuming that (i) except for purposes of Section 16 of this Master Lease, the Site is in the condition and repair required to be maintained pursuant to this Master Lease and (ii) the Site will be used for its highest and best use.

"Fair Market Value" means, with respect to the Site, the price which would be obtained in an arm's-length transaction between an informed and willing buyer and an informed and willing seller, in either case under no compulsion to buy or sell, as the case may be, and neither of which is related to Tenant or Landlord, for the sale or purchase of the Site, assuming that (i) except for purposes of Section 16 of this Master Lease, the Site is in the condition and repair required to be maintained pursuant to this Master Lease, and all conditions to the return of the Site set forth in Section 5 of this Master Lease have been satisfied and (ii) the Site will be used for its highest and best use.

"Federal" means of or pertaining to the government of the United States of America.

"Financial Performance Adjustment" has the meaning set forth in Section 3(e) of this Master Lease.

"GAAP" means, at any time, the then applicable generally accepted accounting principles in the United States of America consistently applied for the time periods involved.

"Governmental Body" means and includes any Federal, state, municipal or other governmental department, commission, board, bureau, court, legislature, agency, instrumentality or authority, domestic, foreign, transnational or international.

"Guarantors" has the meaning set forth in the Recitals to this Master Lease.

"Guaranty" has the meaning set forth in the Recitals to this Master Lease.

"Hazardous Material" means (i) petroleum products, petroleum, crude oil or any fraction thereof, asbestos, asbestos-containing materials, radon, explosives, radioactive materials, hazardous wastes or substances (including polychlorinated biphenyls), toxic wastes or substances; (ii) any other wastes, materials or pollutants defined as or included in the definition under any Environmental Law of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous waste," "restricted hazardous waste," or "toxic substances"; or (iii) any pollutants or contaminants which are regulated under any Environmental Law.

"Holdover Rent Date" means, during any holdover period pursuant to Section 5(e) of this Master Lease, the first day of each month beginning with the month immediately following the beginning of such holdover period pursuant to Section 5(e).

"Improvement" means any improvement, modification, alteration or addition to the Site, including all Mandatory Alterations.

"Indemnified Person" means Landlord, Lender, the successors, assigns and Affiliates of each of the foregoing, and the members, directors, trustees, officers, employees and agents of each of the foregoing.

"Interest Rate" means 10%.

"Landlord" has the meaning set forth in the preamble to this Master Lease.

"Landlord's Interest" means all of Landlord's right, title and interest in and to the Site.

"Landlord's Liens" means any Lien affecting or in respect of the Site or this Master Lease arising as a result of claims against Landlord which are not related to the transactions contemplated by the Operative Documents.

"Lease Default" means an event or condition that with the giving of notice and/or the passage of time would become a Lease Event of Default.

"Lease Event of Default" has the meaning set forth in Section 15 of this Master Lease.

"Lease Year" means a year during the Term of this Master Lease commencing on a date that is an anniversary date of the Basic Term Commencement Date and expiring on the next anniversary date of the Basic Term Commencement Date.

"Lender" means the holder or holders of a Mortgage encumbering the Site.

"Lien" means any lien, security interest, mortgage, deed of trust, encumbrance, easement, covenant or condition or restriction to title, pledge, conditional sale or trust receipt or a lease, consignment or bailment for security purposes, lease, sublease, defect of title, survey defect, servitude or charge of any kind.

"Loan" means the loan made by Lender to Landlord secured by the Mortgage pursuant to the Loan Agreement.

"Loan Agreement" means the loan agreement between Landlord and Lender to evidence Landlord's obligation to repay the Loan.

"Majority in Interest of Holders" as of particular day of determination means the holders of at least 66.67% in aggregate unpaid principal amount of the Loan outstanding as of such date, excluding any interests in the Loan held by Landlord.

"Mandatory Alteration" has the meaning set forth in Section 8(f) of this Master Lease.

"Master Lease" has the meaning set forth in the preamble hereof. Where relevant the term "Master Lease" shall include the aforesaid Master Lease and an amendment entered into pursuant to the terms of this Master Lease.

"Material Adverse Effect" means any material adverse effect on: (a) the business, assets, operations, results of operations, or financial or other condition of the Site or of Tenant (as the context requires) that materially affects the ability of Tenant to pay or perform its obligations under the Operative Documents, or (b) the validity or enforceability of any material provision of the Operative Documents or the rights of Landlord or Lender thereunder.

"Material Environmental Event" has the meaning set forth in Section 8(b) of this Master Lease.

"Minimum Increase" means an amount equal to the Basic Rent in effect on the date immediately preceding the first day of the applicable Renewal Period as increased on each anniversary day of the Basic Term Commencement Date by an amount equal to two percent (2%) from the Basic Term Commencement Date until the first day of the applicable Renewal Term.

"Mortgage" means, collectively, each mortgage, made by Landlord in favor of Lender encumbering the Site as security for the obligations secured by the Loan Agreement.

"Nonseverable Improvement" means any Improvement the removal of which from the Site would cause material damage to the Site.

"Operative Documents" means this Master Lease, the Guaranty, the Loan Agreement, the Mortgage, and all other agreements, documents, certificates, or instruments delivered in connection with the transactions contemplated thereby.

"Overdue Rate" means a rate per annum equal to the greater of (i) the sum of the Interest Rate plus 4%, and (ii) the sum of the Prime Rate plus 4%, but in no event at a rate per annum greater than that permitted by Applicable Law.

"Parts" means all appliances, parts, instruments, appurtenances, accessories and other equipment of whatever nature, which are incorporated or installed in or attached to and become a part of the Site as constituted as of the date of this Master Lease.

"Payment Default" means an event or condition described in Section 15(a) of this Master Lease that with the giving of notice and/or the passage of time would constitute a Lease Event of Default.

"Percentage Increase" means an amount equal to the Basic Rent in effect the day before the applicable Renewal Period multiplied by a fraction, the numerator of which is the CPI figure for the third calendar month preceding the first day of the applicable Renewal Term and the denominator of which is the CPI figure for the month occurring three (3) calendar months prior to either the Basic Term Commencement Date or the first day of the prior Renewal Term, whichever last occurred. As used in this paragraph, the "CPI" means the Consumer Price Index for Consumer Price Index (base year 1982-84 = 100) (the "Index") [All Items] published by the

United States Department of Labor, Bureau of Labor Statistics, or if such index is no longer published, the U.S. Department of Labor's most comprehensive official index then in use that most nearly corresponds to the index named above. If it is calculated from a base different from the base period 1982-84 = 100, figures used for calculating the adjustment shall first be converted to the base period used under a formula supplied by the Bureau. If the described index shall no longer be published, another index generally recognized as authoritative shall be substituted by Landlord.

"Permits Compliance" has the meaning set forth in Section 5(c) of this Master Lease.

"Permitted Contest" means a good faith contest of either (i) the legality or validity of any of the taxes, assessments, levies, fees, or other governmental charges, or other charges, claims, or Liens which, under the terms of this Master Lease are, but for such contest, required to be paid or discharged by Tenant or Landlord, as the case may be, or (ii) the legality, validity or necessity for compliance with Applicable Law, which good faith contest is being diligently pursued by appropriate proceedings without any material risk of foreclosure, sale, forfeiture, or loss of, or loss or interference with use or possession of, or diminution of value, utility or useful life of, the Site or any interest therein, without any risk of interference with the payment of Basic Rent, and without any risk that such good faith contest will result in the imposition of any material penalty or criminal liability on Tenant or any Indemnified Person.

"Permitted Liens" means, as to the Site, (i) the respective rights of Landlord, Lender, and Tenant as provided in the Operative Documents, (ii) Landlord's Liens, (iii) Liens for taxes of Tenant not yet due, being contested by a Permitted Contest, or not involving any risk of the sale, forfeiture, or loss of the Site, (iv) mechanics', workmen's, repairmen's, employees', carriers', warehousemen's, or other like Liens arising in the ordinary course of business of Tenant, securing obligations not overdue for more than 30 days or being contested by a Permitted Contest, (v) Liens which arise out of judgments or awards against Tenant with respect to which (A) at the time an appeal or proceeding for review is being diligently prosecuted in good faith, (B) there has been secured a stay of execution pending such appeal or proceeding for review, (C) during such proceedings, there is not, and such proceedings do not involve a risk of the sale, forfeiture or loss of the Site and (D) are being contested by a Permitted Contest, and (vi) the matters set forth on Schedule B of the policies of title insurance.

"Person" means any individual, partnership, corporation, limited liability company, limited liability partnership, trust, unincorporated association or joint venture, a government or any instrumentality, department or agency thereof, or any other entity.

"Personal Property Taxes" means all taxes assessed against and levied upon trade fixtures, furnishings, equipment and all other personal property of Tenant contained in the Site or elsewhere.

"Prime Rate" means the per annum rate of interest publicly announced from time to time (effective on the day announced) as the corporate base rate (or its successor rate) by Citibank, N.A., or its successor or the survivor in the event of a bank merger. Prime Rate shall not be construed to mean the best rate of interest made available by said bank for loans to its customers.

8

"Procurable Licenses" means Required Licenses the assignment of which is prohibited by Applicable Law but which may be procured by a third party on a commercially reasonable basis within 120 days after application therefor.

"Real Property Taxes" shall include any form of real estate tax or assessment, general, special, ordinary or extraordinary, and any license fee, commercial rental tax, improvement bond or bonds, levy or tax (other than inheritance, personal income or estate taxes) imposed on the Site by any Governmental Body having the direct or indirect power to tax, including any city, state or Federal government, or any school, agricultural, sanitary, fire, street, drainage or other improvement district thereof, as against any legal or equitable interest of Landlord in the Site or in the real property of which the Site is a part, as against Landlord's right to rent or other income therefrom, and as against Landlord's business of leasing the Site.

"Release" means the release, spill, emission, leak, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migrating through or into the indoor or outdoor environment, including, without limitation, the air, soil, surface water, ground water or any structure.

"Renewal Option" means each option to extend this Master Lease pursuant to Section 14 thereof.

"Renewal Term" has the meaning set forth in Section 14 of this Master Lease.

"Renewal Term Expiration Date" means the last day of any Renewal Term as set forth in Section 14 of this Master Lease.

"Replacement Parts" has the meaning set forth in Section 8(d) of this Master Lease.

"Required Licenses" means, with respect to the Site, as of any date, all licenses, permits, authorizations, registrations and rights required or reasonably necessary for the commercial operation of the Site, excluding licenses specific to operation of a medical hospital, as the Site is constituted on such date in accordance with the terms of this Master Lease, by any operator other than Tenant or its Affiliates.

"Retained Property" has the meaning set forth in Section 3(f) of this Master Lease.

"Responsible Officer" means, as to any corporation, the Chairman of the Board, the President, any Vice President, the Treasurer, or any Assistant Treasurer of such corporation; as to any other entity, the Responsible Officer will be the person most responsible for the day-today operation of the entity or the assets owned or managed by such entity, and, as applicable for any entity other than a corporation, the owner, manager, managing partner, or managing member of such entity.

"Restoration" has the meaning set forth- in Section 10(a)(i) of this Master Lease.

"Scheduled Return Date" has the meaning set forth in Section 5(a) of this Master Lease.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

9

"Security Deposit" has the meaning set forth in Section 3(g) of this Master Lease.

"Severable Improvement" means any Improvement which is not a Nonseverable Improvement, but excluding any Replacement Parts.

"Site" has the meaning set forth in the recitals to this Master Lease.

"Tenant" has the meaning set forth in the preamble to this Master Lease.

"Term" means the period during which this Master Lease is in effect, whether it be during the Basic Term or a Renewal Term.

"Title Defect" means, with respect to the Site, any Lien (other than a Permitted Lien) thereon or any defect, deficiency or title exception with respect thereto which Lien, defect, deficiency or title exception does or would be reasonably likely to materially impair the marketability, economic value, utility or economic useful life of the Site.

"Transferred Property" has the meaning set forth in Section 3(f) of this Master Lease.

"Transferee" has the meaning set forth in Section 3(f) of this Master Lease.

SECTION 2. LEASE OF SITE; EFFECTIVE DATE

(a)    Demise. Subject to the satisfaction of the terms and conditions hereof, Landlord hereby agrees to lease to Tenant, and Tenant hereby agrees to lease from Landlord the Site. Tenant hereby agrees that execution and delivery of this Master Lease by Tenant shall, without further act, irrevocably constitute acceptance by Tenant of the Site for all purposes of this Master Lease. Except for events caused by Landlord's gross negligence or willful misconduct, all risk of loss of the Site shall pass to Tenant as of the Effective Date.

(b)    Effective Date. Notwithstanding anything herein to the contrary, this Master Lease shall not become effective until the closing occurs under that certain Asset Purchase Agreement dated November 14, 2008 ("Asset Purchase Agreement"), between Tenant and InterCare (the date such closing occurs shall be referred to herein as the "Effective Date"); provided, however, that in the event that the closing under such Asset Purchase Agreement does not occur by December 31, 2008, this Master Lease shall automatically be null and void and neither party shall have any rights or obligations hereunder except as otherwise expressly set forth herein.

SECTION 3. TERM; RENT

(a)    Basic Term. The Basic Term of this Master Lease with respect to the Site shall commence on the Basic Term Commencement Date and end on the Basic Term Expiration Date unless this Master Lease has been earlier terminated in accordance with the terms hereof.

(b)    Basic Rent. Tenant shall pay to Landlord:

BN 2414692v2

(i)     on each Basic Rent Date occurring during the first year of the Basic Term, the amount of Basic Rent for such Basic Rent Date;

(ii)     on the first (1st) anniversary of the Basic Term Commencement Date, and on the anniversary date of the Basic Term Commencement Date in each successive year during the Basic Term (each an "Adjustment Date"), the Basic Rent in effect immediately preceding the Adjustment Date shall be increased by the Basic Rent Adjustment.

(iii)     on each Basic Rent Date occurring during a Renewal Term (if any), an amount determined in accordance with the provisions of Section 14.

(c)     Tenant's Financial Performance. Tenant agrees that the amount of the Basic Rent set forth above is conditioned upon Tenant meeting both of the financial tests set forth in items (i) and (ii) below (the "Financial Performance Tests"). Subject to the terms of this Section 3, if for any calendar quarter during any Lease Year Tenant's financial performance fails to meet one or both of the Financial Performance Tests, then commencing as of the first day of the next calendar quarter (i) the Basic Rent will increase by ten percent (10%) (such adjustment being a "Financial Performance Adjustment"), and (ii) Tenant will thereafter be prohibited from delivering to any Guarantor or to any Affiliate or Affiliates of any Guarantor in the aggregate more than One Hundred Thousand and 00/100 Dollars ($100,000.00) per month, irrespective of whether by salary, wages, fees, dividends, distributions, or otherwise, either directly or indirectly. Accordingly, if Tenant fails one or both of the Financial Performance Tests, then Tenant will be prohibited from paying any funds in excess of $100,000 per month (whether by salary, wages, fees, dividends, distributions, or otherwise), either directly or indirectly, individually or cumulatively, to any Guarantor or any Affiliate of any Guarantor, until both of the Financial Performance Tests are satisfied, and the changes identified in items (i) and (ii) above will remain in effect until the first day of the calendar quarter after the next calendar quarter in which Tenant satisfies both of the Financial Performance Tests. The Financial Performance Tests are:

(i)     Tenant's earnings to rent ratio ("Earnings to Rent Ratio") must equal or exceed 2:1. The Earnings to Rent Ratio will be the ratio of (i) Tenant's EBITDAR as compared to (ii) Tenant's Basic Rent payable under the terms of this Master Lease (but not any additional rent payable because of a Financial Performance Adjustment); and

(ii)     Tenant's fixed charge coverage ratio ("Fixed Charge Coverage Ratio") may not be less than 1.1:1. The Fixed Charge Coverage Ratio will be the ratio of (i) Tenant's EBITDA to (ii) the sum of Tenant's required debt service payments (which will include any payments due under Tenant's credit facility and any other short or long-term loans); payments required under Tenant's plan of reorganization; and capital expenditures made or otherwise required under the terms of this Master Lease (excluding those capital expenditures discussed in Section 8(a) below).

Tenant will not be required under this Master Lease to satisfy the Financial Performance Tests until the calendar quarter beginning on January 1, 2010. Commencing at the end of that calendar quarter and in each calendar quarter thereafter, Tenant's compliance with the Financial Performance Tests will be determined based on three months of financial performance.

11

Promptly at the end of each period during which Tenant is required to satisfy the Financial Performance Tests, but in no event later than 15 days after the end of such period, Tenant shall submit in writing to Landlord, or a third-party consultant designated by Landlord, Tenant's financial data relevant to the Financial Performance Tests and a calculation that demonstrates whether Tenant has satisfied the Financial Performance Tests. The data submitted by Tenant will be sufficient to allow Landlord to verify Tenant's compliance or non-compliance with the Financial Performance Tests. If Tenant fails to satisfy one or more of the Financial Performance Tests in any quarter, and as a result its rent is increased, then the additional rent (imposed as a result of the failure of one or more of the Financial Performance Tests) will not be considered in subsequent quarters when the Financial Performance Tests are being evaluated. Any Financial Performance Adjustment shall increase Basic Rent in addition to all other Basic Rent Adjustments during the Term, and shall not limit any of Landlord's rights or remedies under this Master Lease. Any increase in rent as a result of a Financial Performance Adjustment will not limit any of Landlord's rights or remedies under this Master Lease.

(d)     Prepayment. Tenant agrees not to prepay any payment of Basic Rent except as specifically provided by the terms hereof.

(e)     Payments. All payments of Basic Rent shall be made so that Landlord or other recipient shall have immediately available funds (in such currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts) no later than 1:00 p.m. Los Angeles time on the date payable hereunder. Any payment of Basic Rent that is stated to be payable on a day that is not a Business Day shall instead be payable on the next succeeding Business Day (without interest); provided that nothing in this subsection (e) shall postpone the due date of any amount hereunder which is expressed to be payable within a stated period following a specified date or event. All Basic Rent payable to Landlord shall be paid by Tenant through automatic payment by wire transfer or other method of delivery of immediately available funds at such bank account as Landlord shall designate, in its sole discretion, with information for such account to be provided to Tenant in a prior written notice by Landlord. If any payment of Basic Rent is not received by Landlord by the date on which payment is due hereunder, Tenant acknowledges that Landlord will experience additional management, administrative and other costs that are impracticable or extremely difficult to determine, and that such costs are likely to increase with repeated non-payment by Tenant. Therefore, a fee ("Late Fee") will be added to any amount due and payable by Tenant hereunder from and after the Effective Date that remains unpaid five (5) days after such amount was due and payable, with the first Late Fee to be Five Percent (5%) of the unpaid amount, the second Late Fee to be Ten Percent (10%) of the unpaid amount, and each subsequent Late Fee to be Fifteen Percent (15%) of the unpaid amount, and the Late Fee shall constitute Basic Rent hereunder; provided, however, that Tenant shall not be required to pay a Late Fee in the case of the first instance in any calendar year that a payment is not made by Tenant within the foregoing five (5) day period, so long as such delinquency is cured within two (2) business days after written notice from Landlord.

(f)     Sales or Transfers by Landlord. Landlord may sell, convey or otherwise transfer from time to time all or less than all of Landlord's Interest in the Site (such transferred interest, the "Transferred Property"), without the consent of Tenant. The portion of the Site, if any, reserved by Landlord following such transfer shall be referred to herein as the "Retained

12

<u>Property</u>." Both the Transferred Property and Retained Property shall remain subject to this Master Lease. Each transferee ("<u>Transferee</u>") of a Transferred Property shall assume any obligations of Landlord with respect to the Transferred Property, and such Transferee shall be entitled to all Rent payable by Tenant with respect to such Transferred Property. In connection with any transfer, Landlord may allocate whatever portion of the Basic Rent Landlord determines, in its sole discretion, is attributable to the Transferred Property, and Tenant shall pay Basic Rent to the Transferee and Landlord at the same time and manner provided in this Master Lease for the payment of Basic Rent; provided that in no event shall the aggregate amount of Basic Rent payable by Tenant to any and all Transferees and Landlord exceed the total amount of Basic Rent payable under this Master Lease to a single owner of the Site. Upon the transfer of any Transferred Property, Landlord shall give Tenant written notice of the name and address of each Transferee, the percentage of the Site held by such Transferee, a description of the Transferred Property and Retained Property, and any other information regarding the transfer that Tenant may reasonably require. Tenant shall, within ten (10) days of Landlord's written request, execute any amendments to this Master Lease or other documents reasonably required by Landlord, any Transferee, or any mortgagee in connection with a transfer of any Transferred Property, including without limitation a new lease with a Transferee, on the same terms and conditions of this Master Lease, with respect to the Transferred Property. Failure of Tenant to execute any such documents shall not affect the rights and obligations of Landlord, Tenant, and any Transferee as described in this <u>Section 3(f)</u>, but shall constitute a Lease Event of Default. Following a transfer, Landlord shall have no further rights or interests (except to the extent Landlord retains an express interest), and no responsibility whatsoever, with respect to such Transferred Property, under this Master Lease.

(g)     <u>Security Deposit</u>. Commencing on the first day of the next consecutive calendar month following the month in which the Effective Date occurs, Tenant shall pay Landlord the first month's payment of Basic Rent, in the amount of Two Hundred Thirty-Nine Thousand Two Hundred Ninety-Two Dollars and 00/100 ($239,292.00). Landlord is currently holding the amount of Six Hundred Ninety Thousand and 00/100 Dollars ($690,000.00) ("<u>Security Deposit</u>") previously deposited by InterCare pursuant to the Original Lease and assigned to Tenant pursuant to the Assignment of Lease. Landlord will continue to hold the Security Deposit during the Term of this Master Lease for the benefit of Tenant, but may apply such amount toward the payment of Basic Rent on any date that is five days after written notice by Landlord to Tenant that Tenant has not paid the Basic Rent by a Basic Rent Date. If Landlord applies all or any portion of the Security Deposit toward the payment of Basic Rent, then Tenant must replenish the Security Deposit by delivering to Landlord the amount used by Landlord for the payment of Basic Rent. If Tenant fails to replenish the Security Deposit to its full amount within 21 days after the date that Landlord applies any portion of the Security Deposit toward the payment of Basic Rent, then such failure by Tenant will be a Lease Event of Default under the terms of this Master Lease.

## SECTION 4. ABSOLUTE-NET LEASE

This Master Lease is an absolute-net, bond-type lease, and Tenant is responsible for all costs associated with the property during the Term, including without limitation operating costs, insurance, property taxes, maintenance expenses, repairs, and other expenses associated with the operation of the property. Tenant acknowledges and agrees that Tenant's obligation to pay all

13

Basic Rent hereunder, and the rights of Landlord in and to such Basic Rent, shall be independent, absolute, unconditional and irrevocable and, except as otherwise expressly provided herein, shall not be subject to any abatement, reduction, set-off, defense, delay, counterclaim, recoupment, suspension, deferment or diminution ("Abatements") for any reason whatsoever, including, without limitation, Abatements due to any present or future claims of Tenant against Landlord under this Master Lease or otherwise, or against any other Person for whatever reason. Except as otherwise expressly provided herein, including the provisions of Section 10 hereof, the obligations and liabilities of Tenant hereunder shall, to the fullest extent permitted by Applicable Law, in no way be released, discharged, or otherwise affected for any reason, including without limitation: (a) any defect in the condition, merchantability, design, quality or fitness for use of the Site or any part thereof, or the failure of the Site to comply with Applicable Law, including any inability to occupy or use the Site by reason of such non-compliance; (b) any damage to, removal, abandonment, salvage, loss, contamination of or Release at or from, scrapping or destruction of or condemnation or taking of the Site or any part thereof; (c) any restriction, prevention or curtailment of or interference with any use of the Site or any part thereof including eviction; (d) any defect in title to or rights to the Site or any Lien on such title or rights or on the Site; (e) any change, waiver, extension, indulgence or other action or omission or breach in respect of any obligation or liability of or by Landlord or Lender; (f) any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceedings relating to Tenant, Landlord, Lender or any other Person, or any action taken with respect to this Master Lease by any trustee or receiver of Tenant, Landlord, Lender or any other Person, or by any court, in any such proceeding; (g) any claim that Tenant has or might have against any Person, including without limitation Landlord, Lender, any vendor, manufacturer or contractor of or for the Site or any buildings or improvements thereon, or any other Person; (h) any failure on the part of Landlord to perform or comply with any of the terms of this Master Lease, any other Operative Document or of any other agreement whether or not related to the transactions contemplated by the Operative Documents; (i) any invalidity or unenforceability or disaffirmance of this Master Lease against or by Tenant or any provision hereof or any of the other Operative Documents or any provision of any thereof; (j) the impossibility of performance by Landlord, Tenant or both; (k) any action by any court, administrative agency or other Governmental Body; (l) any environmental condition on, at, from or affecting the Site or (m) any other occurrence whatsoever, whether similar or dissimilar to the foregoing, whether or not Tenant shall have notice or knowledge of any of the foregoing. Except as specifically set forth herein, this Master Lease shall be noncancellable by Tenant for any reason whatsoever and, except as expressly provided in this Master Lease or any other Operative Document, Tenant waives all rights now or hereafter conferred by statute or otherwise to quit, terminate or surrender this Master Lease, or to any diminution, abatement or reduction of Basic Rent payable by Tenant hereunder. If for any reason whatsoever this Master Lease shall be terminated in whole or in part by operation of law or otherwise, except as expressly provided in this Master Lease, Tenant shall, to the fullest extent permitted by Applicable Law, be obligated to pay to Landlord an amount equal to each installment of Basic Rent at the time and in the manner that such payment would have become due and payable under the terms of this Master Lease if it had not been terminated in whole or in part. To the fullest extent permitted by Applicable Law, each payment of Basic Rent made by Tenant hereunder shall be final and Tenant shall not seek or have any right to recover all or any part of such payment from Landlord or any Person for any

BN 2414692v2

reason whatsoever. Tenant hereby waives the provisions of subsection 2 of section 1932 and subsection 4 of section 1933 of the California Civil Code, as amended from time to time.

Tenant shall pay all costs, expenses and charges of every kind and nature relating to the operation and maintenance of the Site except for any costs and expenses relating to any debt incurred by Landlord that is secured by a lien on the Site or caused by Landlord's gross negligence or willful misconduct. The parties to this Master Lease acknowledge that, by execution of this Master Lease, Tenant shall assume with respect to the Site every obligation relating to the use, possession, control and operation of the Site. Notwithstanding anything in this Lease to the contrary, Landlord shall have no right to control or direct Tenant's operations at the Site, including without limitation, the operations of any hospital, clinic, or other healthcare service at the Site.

SECTION 5. RETURN OF SITE

(a)     Scheduled Return Date. Subject to the following provisions of this Section 5, (i) upon the scheduled expiration or termination of the Basic Term or a Renewal Term, as the case may be, for the Site (the "Scheduled Return Date") or (ii) upon the earlier termination of this Master Lease, Tenant, at its own risk and expense, shall return possession of the Site to Landlord.

(b)     Environmental Compliance. Not less than 180 days prior to the Scheduled Return Date, Tenant shall, at its sole cost and expense, provide Landlord with a written assessment of the environmental condition and compliance of the Site, upon which Landlord and Lender may rely, prepared by an independent third party environmental engineer reasonably satisfactory to Landlord (an "Environmental Study"). Such Environmental Study must be in scope, form, and substance reasonably satisfactory to Landlord and shall include all inspection reports, tests, and other data required to substantiate any and all conclusions set forth therein. If the Environmental Study discloses (i) the existence of any "recognized environmental condition" within the meaning of the then-current ASTM-Standard Practice E1527, or other similar condition, (ii) that the Site is not in compliance with any Environmental Law, (iii) that the ownership or operation of the Site in accordance with industry practice could reasonably be expected to result in a violation of any Environmental Law, or (iv) the existence of an environmental condition that could reasonably be expected to reduce (by more than a de minimis amount) the Site's Fair Market Value, the remaining economic useful life of the buildings or improvements thereon, or the estimated residual value of the Site, then Tenant shall, at its sole cost and expense, cure such condition or matter on or before the Scheduled Return Date, except that Tenant shall have the right to postpone the Scheduled Return Date for up to six additional months so long as Tenant continues to pay Basic Rent and is diligently pursuing a cure for such conditions or matter (whether or not Applicable Law would allow a longer period in which to cure). Tenant's cure of such condition or matter shall be confirmed by a written report, delivered to Landlord not less than 10 days prior to the Scheduled Return Date, and such report shall be prepared by the same third party environmental engineer that prepared the Environmental Study, shall be sufficiently detailed so that Landlord may rely upon the report, and shall be in form, scope, and substance reasonably satisfactory to Landlord. If Tenant fails to satisfy such cure obligations, Landlord may require Tenant to purchase the Site for a price equal to the Site's Fair Market Value as of the Scheduled Return Date, except that Fair Market Value shall be determined by ignoring the

15

environmental contamination but otherwise reflecting the then-existing condition of the Site. Such purchase shall close on or before the Scheduled Return Date, whether or not Applicable Law would allow cure to occur at a later date.

(c)     Permits Compliance.  On the Scheduled Return Date, at Tenant's cost, Tenant shall deliver to Landlord (or Landlord's designee) all Required Licenses (to the extent assignable) other than Procurable Licenses applicable to the Site (collectively, "Permits Compliance"), all of which shall be issued in the name of Landlord (or Landlord's designee) or duly assigned to Landlord (or Landlord's designee).  In addition, at Tenant's cost, Tenant will assist Landlord (or Landlord's designee) in obtaining all Procurable Licenses.

(d)     Other Conditions.  Tenant shall ensure that, on the Scheduled Return Date or at the time of earlier return to Landlord, if applicable, the Site and each component and system thereof shall be in the configuration, condition, and repair required under Section 8 of this Master Lease.  The Site shall, upon such return, be free and clear of all Liens, other than Liens described in clause (i) of the definition of Permitted Liens (except with respect to Tenant or Lender), Landlord's Liens, Liens for taxes not yet due and Liens described in clause (vi) of the definition of Permitted Liens (except taxes and assessments past due as of the date of such return).  Notwithstanding the preceding sentence of this Section 5(d), the Site shall be returned free of any right or claim of any franchisees, whether by contract or under law.  On or before the Scheduled Return Date, at Tenant's cost, Tenant shall deliver to Landlord date-down endorsements to Landlord's title insurance policies with respect to the Site, and (if requested by Landlord) originals or copies (with originals to Landlord, if available) of all documents, instruments, plans, specifications, drawings, lists, operating and repair manuals, environmental reports, underground storage tank records, maintenance and inspection records and similar papers relating to the Site in Tenant's possession or control and as may be reasonably necessary for the continued operation of the Site by an operator other than Tenant or its Affiliates, including, without limitation, a list of all Required Licenses and all Procurable Licenses.  Tenant may (and at the request of Landlord if this Master Lease is not in effect as to the Site, shall) remove any signs or other identifying marks or logos by the Scheduled Return Date, as long as such removal can be completed without causing material damage to the Site and in all cases Tenant promptly repairs any damage caused by such removal.  Tenant shall be solely responsible for the costs of any removal pursuant hereto, including all costs and expenses associated with repairs necessitated as a result of damages effected by such removal.  At any time during the six months prior to the Scheduled Return Date, Landlord shall be afforded the opportunity to inspect the Site and Tenant shall make such repairs as are necessary to bring the Site into compliance with this Section 5(d).  If as the result of Landlord's inspection the Site is found to be not in material compliance with this Section 5(d), Tenant shall pay the reasonable cost of Landlord's inspection of the Site.  The Site shall not be deemed to have been returned for purposes of this Master Lease unless and until it is in compliance with the conditions set forth in this Section 5(d).

(e)     Holdover.  If for any reason Tenant has not returned the Site on the Scheduled Return Date, or is deemed not to have done so by reason of a failure of any condition thereto, Tenant shall be deemed to be occupying the Site as a tenant at sufferance.  Any such occupancy by Tenant shall be subject to all of the terms, covenants, and conditions of this Master Lease insofar as the same are applicable to such a tenancy, except that Tenant shall pay Landlord

16

holdover rent for the Site on a per-diem basis for each day after the Scheduled Return Date until the Site is returned. Such per-diem holdover rent shall be in an amount equal to 150% of the higher of (i) the per diem Fair Market Rental Value of the Site at such time, and (ii) the average per diem Basic Rent payable during the immediately preceding Basic Term or Renewal Term. All such holdover rent shall be payable on each Holdover Rent Date occurring during any such holdover period. Such holdover rent shall be in addition to and not as a substitute for any and all liability that Tenant may have as a result of Tenant's failure to return the Site. Tenant shall be liable for any damages, costs, and expenses incurred by Landlord as a result of Tenant's failure to duly perform and comply with any of the terms of this Section 5(e). Nothing in this Section 5(e) shall be construed to limit or modify in any respect the obligations of Tenant to maintain, use, and operate the Site in the manner set forth in Section 8 of this Master Lease. The provisions of this Section 5(e) shall not be deemed to grant to Tenant the right to, or otherwise be deemed to, extend the Term beyond the expiration or earlier termination of this Master Lease. Neither the payment by Tenant to Landlord nor the acceptance by Landlord from Tenant of any amount in payment for Tenant's occupancy of the Site beyond the expiration or earlier termination of this Master Lease shall (a) be deemed to convert Tenant's occupancy into any interest other than a tenancy at sufferance, (b) revoke or otherwise impair the validity of any notice to quit, ejectment notice, unlawful detainer notice, or any notice or proceeding that Landlord may have served or commenced, or (c) prohibit or otherwise impair Landlord's right to immediately obtain an order of ejectment or unlawful detainer against Tenant. Tenant irrevocably waives, to the fullest extent permitted by Applicable Law, any benefit of Applicable Law that may grant to Tenant any rights inconsistent with the provisions of this Section 5(e). The provisions of this Section 5(e) shall not be deemed to constitute a waiver of Landlord's right of re-entry or right to regain possession by actions at law or in equity or any other rights hereunder, and any receipt of payment by Landlord shall not be deemed a consent by Landlord to Tenant's remaining in possession or be construed as creating or renewing any lease or right of tenancy between Landlord and Tenant.

(f)     Property Report. On a date that is between 45 and 90 days prior to the Scheduled Return Date, Tenant shall deliver to Landlord (or Landlord's designee) a report of a Responsible Officer of Tenant who is familiar with the status and condition of the Site, which report will describe the current status and condition of the Site and provide details regarding (i) any improvements (including Severable Improvements) then located on the Site, (ii) any warranty claims or potential claims against any supplier of goods or services in connection with the Site which in the aggregate exceed $20,000, (iii) any continuing material violation of Applicable Law involving the Site or the operation thereof, and (iv) any notice from any Governmental Body or Person with respect to an alleged pending or threatened violation of or liability under any Environmental Law, in each case along with Tenant's business plan to cure same and Tenant's acknowledgment of its obligation to complete the cure thereof in all events prior to the Scheduled Return Date, and Tenant's other obligations as required elsewhere under this Master Lease.

## SECTION 6. NONINTERFERENCE; WARRANTIES OF LANDLORD AND TENANT; MEMBERSHIP ON TENANT'S BOARD OF GOVERNORS

(a)     Quiet Enjoyment. Subject to Section 8(h) of this Master Lease but notwithstanding any other provision of this Master Lease, as long as no Lease Event of Default

17

shall have occurred and be continuing, as between Tenant and Landlord, Tenant will have the exclusive right to possession and control of the Site, and neither Landlord nor any Person acting or claiming through Landlord (including Lender) may take any action to interfere with the peaceful and quiet enjoyment of the use or nonuse of the Site by Tenant in accordance with this Master Lease, except as expressly provided in this Master Lease.

(b)    Limitation. THE COVENANT SET FORTH IN SECTION 6(A) SHALL NOT BE DEEMED TO HAVE MODIFIED IN ANY RESPECT THE OBLIGATIONS OF TENANT PURSUANT TO SECTION 4 OF THIS MASTER LEASE, WHICH OBLIGATIONS ARE ABSOLUTE AND UNCONDITIONAL.

(c)    Tenant Warranties and Disclaimer of Landlord. TENANT HEREBY REPRESENTS, WARRANTS, ACKNOWLEDGES AND AGREES THAT TENANT HAS EXAMINED THE SITE AND TITLE TO THE SITE AND THAT (i) THE SITE IS OF THE SIZE, DESIGN, CAPACITY AND MANUFACTURE SELECTED BY AND ACCEPTABLE TO TENANT, (ii) TENANT IS SATISFIED THAT THE SITE IS SUITABLE FOR ITS AND THEIR PURPOSES, (iii) LANDLORD IS NOT A MANUFACTURER OR A DEALER IN PROPERTY OF SUCH KIND, (iv) THE SITE IS LEASED HEREUNDER SUBJECT TO ALL APPLICABLE LAWS AND GOVERNMENTAL REGULATIONS NOW IN EFFECT OR HEREAFTER ADOPTED AND (v) LANDLORD LEASES AND TENANT TAKES THE SITE "AS IS", "WHERE IS" AND "WITH ALL FAULTS" AND IN THE SAME STATE AND CONDITION AS AND WHEN TITLE TO THE SITE WERE FIRST CONVEYED, TRANSFERRED AND ASSIGNED TO LANDLORD, WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND BY LANDLORD, EXPRESS OR IMPLIED, AS TO THE TITLE, MERCHANTABILITY, COMPLIANCE WITH SPECIFICATIONS, VALUE, CONDITION, DESIGN, OPERATION, FREEDOM FROM PATENT OR TRADEMARK INFRINGEMENT, ABSENCE OF LATENT DEFECTS OR FITNESS FOR USE OF THE SITE (OR ANY PART OF ANY THEREOF), OR ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THE SITE (OR ANY PART THEREOF) ALL OF WHICH WARRANTIES ARE EXPRESSLY DISCLAIMED BY LANDLORD, AND TENANT HEREBY ACKNOWLEDGES AND ACCEPTS SUCH DISCLAIMER. It is agreed that except as expressly provided herein all risks incident to the matters discussed in the preceding sentence, as between Landlord, on the one hand, and Tenant, on the other, are to be borne solely and entirely by Tenant. The provisions of this paragraph have been negotiated, and the foregoing provisions are intended to be a complete exclusion and negation of any representations or warranties by Landlord, express or implied, with respect to the Site, or any part thereof, whether arising pursuant to the Uniform Commercial Code or any similar law now or hereafter in effect, or otherwise. As long as no Lease Event of Default has occurred and is continuing, Landlord authorizes Tenant, at Tenant's expense, to assert for Landlord's account in Tenant's name or, to the extent necessary, in Landlord's name, during the Term, all of Landlord's rights under any applicable seller's, manufacturer's, or contractor's warranty, and Landlord agrees to cooperate with Tenant in asserting such rights. As long as no Lease Event of Default has occurred and is continuing, Landlord covenants not to terminate any applicable any applicable seller's, manufacturer's, or contractor's warranty relating to the Site without Tenant's written consent, which will not be unreasonably withheld. Any amount received by Tenant as payment under any such warranty shall be applied to restore the Site to the condition required by Section 8 and any excess shall be paid to Tenant, unless a

18

Payment Default or a Lease Event of Default has occurred and is continuing, in which event such excess shall be paid to Landlord as collateral for Tenant's obligations under the Operative Documents.

SECTION 7. TITLE DEFECTS; LIENS

(a)     Title Defects. Tenant will not directly or indirectly create, incur, assume or suffer to exist any Title Defect on or with respect to the Site or any part thereof, Landlord's title thereto, or any interest of Landlord therein, and Tenant will promptly, at its own expense, take such action as may be necessary to remove or discharge any such Title Defect.

(b)     Liens. Tenant will not directly or indirectly create, incur, assume, or suffer to exist any Liens, other than Permitted Liens, on or with respect to the Site or any part thereof, Landlord's title thereto, or any interest of Landlord therein, and Tenant will promptly, at its own expense, take such action as may be necessary to remove or discharge any such Lien.

SECTION 8. MAINTENANCE AND OPERATION, COMPLIANCE AND USE; REPLACEMENT PARTS; IMPROVEMENTS; EQUIPMENT AND FIXTURES; INSPECTION.

(a)     [Intentionally Deleted]

(b)     Maintenance and Operation. Tenant shall maintain the Site in a condition that is at least as good as the condition of the Site as of the Effective Date, ordinary wear and tear excepted, and Tenant shall operate, maintain, inspect, service, repair, and overhaul the Site and each of the various portions and components thereof in accordance with all of the following: (i) standards applicable to prudent operators in the industry, (ii) maintenance and operating standards applied by Tenant with respect to comparable or similar property that is owned, leased or operated by Tenant in the United States, (iii) Applicable Laws and insurance requirements or policies, to the extent such insurance policies expressly require certain maintenance, repair or overhaul activities, and (iv) all manufacturers' warranties with respect to items valued at more than $15,000. Throughout the Term, the possession, service, repair, overhaul, operation, and maintenance, including the payment of utilities and other expenses, of the Site shall be at the sole risk and expense of Tenant and, subject to Permitted Contests, shall be in compliance in all material respects with Applicable Laws and all applicable easements and other matters of title applicable to the Site. Tenant shall not adversely discriminate as to the use or maintenance of the Site as compared to any similar property which Tenant owns or leases. Tenant shall maintain all records, logs, and other materials for the Site required by any Governmental Body having jurisdiction over the Site, and in doing so shall act generally in accordance with relevant industry standards, all as if Tenant were the owner of the Site, regardless of whether any such requirements, by their terms, are nominally imposed on Landlord.

Tenant shall promptly take, or cause to be taken, at its sole cost and expense, all actions as are necessary to comply in all material respects with all Environmental Law to fully resolve any Environmental Event and to alleviate any unreasonable risk to human health, natural resources, or the environment, if the same arises from a condition or operation on or in connection with the Site. Further, Tenant shall provide prompt written notice to Landlord of the

BN 24146923.2

occurrence of any Environmental Event which individually or in the aggregate could reasonably be expected to have a Material Adverse Effect (each a "Material Environmental Event") and Tenant's notice shall provide reasonable detail as to the circumstances giving rise to such Material Environmental Event and Tenant's proposed course of action and timeframe for resolving such Material Environmental Event. Tenant shall further promptly provide Landlord and Lender with all additional information concerning such Material Environmental Event as either may reasonably request.

In the event that Tenant is unable to comply in all material respects with all Environmental Law to fully resolve any Material Environmental Event and to alleviate any unreasonable risk to human health, natural resources, or the environment pursuant to the preceding paragraph of this Section 8(b) with respect to the Site, in all cases after using commercially reasonable efforts to so comply and being given a reasonable time to accomplish such task but in no event longer than 180 days, Landlord will be entitled to require Tenant to cure such breach of this Section 8(b) by purchasing the Site for a purchase price equal to the Site's Fair Market Value, except that Fair Market Value shall be determined without taking into consideration the devaluation caused by any Material Environmental Event. Tenant's purchase of the Site shall follow written notice from Landlord given following the applicable cure period with respect to a default under this Section 8(b), which notice will be delivered in Landlord's sole discretion.

In addition to the foregoing, Tenant hereby agrees to defend, indemnify and hold harmless any Indemnified Person from and against all loss, damage, liability, and expense (including reasonable attorney's fees and expenses) which any Indemnified Person may sustain by reason of any Environmental Claim filed against the Site or any portion thereof or against any Indemnified Person. Tenant shall be liable to any Indemnified Person for the foregoing notwithstanding any exculpatory provisions contained in this Master Lease or any other Operative Document.

(c)     Use. Subject to the provisions of Section 13 of this Master Lease, the Site will at all times (i) be used solely in the conduct of Tenant's business, and (ii) be and remain in the possession and under the control of Tenant.

(d)     Replacement Parts. Tenant, at its own cost and expense, will promptly replace all Parts which may from time to time become worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use, or which may be required to maintain the quality of the relevant Site. All replacement parts are hereinafter called "Replacement Parts". In the ordinary course of maintenance, service, repair, overhaul or testing, Tenant may, without consent of Landlord, at its own cost and expense, remove any Parts, whether or not worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use, provided that Tenant shall, at its own cost and expense, replace such Parts with Parts of similar nature and quality as promptly as practicable and in any event not later than the Scheduled Return Date. All Parts at any time removed from the Site shall remain the property of Landlord, no matter where located, until such time as such Parts shall be replaced by Parts which have been incorporated or installed in or attached to and become a part of the Site from which originally removed and which meet the requirements for Replacement Parts specified in this Master Lease. All Replacement Parts shall be free and clear

20

of all Liens (except Permitted Liens), and shall be in as good operating condition as, and shall have a value and utility at least equal to, the Parts replaced assuming such replaced Parts were in the condition and repair required to be maintained by the terms hereof. Immediately upon any Replacement Part becoming incorporated or installed in or attached to and becoming a part of the Site as above provided, without further act, (i) title to the removed Part shall thereupon vest in Tenant, free and clear of all rights of Landlord, and shall no longer be deemed a Part hereunder, (ii) title to such Replacement Part shall thereupon vest in Landlord, and (iii) such Replacement Part shall become subject to this Master Lease and be deemed part of the Site for all purposes hereof to the same extent as the Parts originally incorporated or installed in or attached to the Site.

(e)     Improvements.  To the extent that any Improvements identified on the schedule entitled "Immediate and Short Term Repairs Cost Estimate" (attached hereto and incorporated herein as Exhibit D) remain incomplete as of the Effective Date ("Incomplete Improvements"), Tenant shall perform the Incomplete Improvements in accordance with this paragraph. The Incomplete Improvements shall be performed in accordance with Exhibit D and with the terms of the Property Condition Evaluation Report attached hereto as Exhibit E.  Tenant shall commence the Incomplete Improvements promptly following the Effective Date, shall diligently pursue completion of such Incomplete Improvements following commencement, and shall complete such Incomplete Improvements within twelve (12) months following the Effective Date.  Tenant specifically acknowledges that time is of the essence in completion of the psychiatric ward on the fifth (5th) floor of the hospital building leased by Tenant (or its affiliate) located 1711 West Temple Street in Los Angeles, California.  Landlord acknowledges that the roof membrane of the building at the Site has been replaced by InterCare prior to the Effective Date, which replacement included a fifteen (15) year unlimited warranty; Tenant agrees to take all steps necessary, including periodic inspection, to ensure enforceability of such warranty.  Tenant also agrees to use its best efforts to extend the warranty period beyond fifteen (15) years, up to twenty (20) years.

(f)     Mandatory Alterations.  Subject to a Permitted Contest, Tenant shall, at its expense, make such additional Improvements to the Site as may be required from time to time to meet the requirements of Applicable Law or applicable insurance policy ("Mandatory Alteration").  Tenant shall not make any alteration to the Site that would impair the Site's structural integrity without obtaining Landlord's prior written consent.  If an alteration will not impair the Site's structural integrity, and so long as no Payment Default, Bankruptcy Default, or Lease Event of Default shall have occurred and be continuing, Tenant may, without obtaining the prior written consent of Landlord, but solely at Tenant's expense, affix, install, or make any Nonseverable Improvement or Severable Improvement as Tenant may deem desirable in the proper conduct of its business, provided that such Improvement (i) does not diminish the Fair Market Value, remaining economic useful life, or estimated residual value of the Site below the Fair Market Value, remaining economic useful life, or estimated residual value of the Site immediately prior to the making, affixing, or installing of such Improvement, assuming the Site was then in the condition required to be maintained by the terms of this Master Lease, (ii) is made in accordance with Applicable Law and all insurance requirements (if any), and (iii) will not cause the Site to become a "limited use" property as contemplated by Rev. Proc. 2001-28.

Without limiting the generality of the foregoing:

A.      Tenant shall not make any Improvement or Mandatory Alteration in violation of the terms of any restriction, covenant or easement or other matter affecting title to the Site or in any way that would subject Landlord or Lender to any criminal or civil liability;

B.      Tenant shall timely obtain all required permits and consents for any Improvement or Mandatory Alteration and Landlord shall cooperate with Tenant in connection therewith;

C.      subject to Permitted Contests, Tenant shall timely pay for all improvements and Mandatory Alterations so that the Site remain free of liens for labor and materials supplied in connection therewith, except for Permitted Liens; and

D.      Tenant shall complete all Improvements and Mandatory Alterations in a good and workmanlike manner and in compliance with Applicable Laws and insurance requirements.

(g)     Title to Improvements and Alterations. Title to each Nonseverable Improvement and each Mandatory Alteration shall, upon installation or affixation to the Site, vest in Landlord (if not theretofore vested in Landlord), and thereupon such Nonseverable Improvement or Mandatory Alteration shall become a part of the Site for all purposes hereof and become subject to this Master Lease.

Title to any Severable Improvement (other than a Mandatory Alteration) shall remain in, and be acquired at the expense of, Tenant. Tenant may remove any Severable Improvement (other than a Mandatory Alteration or a Severable Improvement with respect to which Tenant has received notice of Landlord's intent to purchase) as of the date of expiration of the Term, as long as any damage caused by such removal is repaired at the cost and expense of Tenant. Landlord has the right upon 30 days' prior written notice to Tenant to purchase for its fair market value any Severable Improvement (other than a Mandatory Alteration) remaining on the Site at the end of the Term. Upon Landlord's purchase of any Severable Improvement, Tenant, at Landlord's sole cost and expense, shall furnish Landlord with (i) a full warranty bill of sale or a deed (or other additional instrument as may be necessary pursuant to Applicable Law) in form and substance reasonably satisfactory to Landlord, conveying title thereto to Landlord, and (ii) any such other relevant documents as Landlord may reasonably request. Landlord may, upon 30 days' prior written notice, require Tenant to remove, at Tenant's expense, any Severable Improvements which remain at the Site at the end of the Term.

The construction by Tenant of any Improvements on the Site during the Term is not and shall not be deemed Basic Rent, and does not constitute consideration for the privilege of use or occupancy of the Site or the right to use or occupy the Site.

(h)     Inspection. Upon not less than five days' advance notice to Tenant, each of Landlord and Lender, in each case, or the authorized representatives thereof (at their respective sole cost, risk, and expense, including without limitation the risk of personal injury, unless (A) a Lease Event of Default shall have occurred and be continuing or (B) there has been a Material Environmental Event for which Tenant has failed to commence and diligently pursue a cure, in which event at the sole cost, risk, and expense of Tenant), shall have the right (but not the

22

obligation) from time to time during normal business hours to inspect the Site (including, without limitation, the environmental condition of the Site) and any financial and operating records and contracts (including, without limitation, those relating to any matters set forth in clauses (i) and (ii) of Section 5(f)) directly relating to the Site wherever such records and contracts are located, and to make copies and take extracts therefrom, and to discuss with Tenant's officers the affairs, finances and operations of Tenant (including, without limitation, those relating to any matters set forth in clauses (i) and (ii) of Section 5(f)) specifically as the same relate to the Site. No inspection pursuant to this Section 8(h) shall interfere in any material respect with the use, operation, or maintenance of the Site or the normal conduct of the business of Tenant or any applicable permitted subtenant. No person entitled to make any inspection or inquiry referred to in this Section 8(h) shall have any duty to make any such inspection or inquiry, or shall incur any obligation or liability by reason of not making any such inspection or inquiry. Tenant shall cause any permitted subtenant to allow inspections contemplated by this Section 8(h).

(i)     Equipment and Trade Fixtures. Tenant may provide, install, and maintain all equipment and trade fixtures (together with any substitution therefor or alteration thereof) which were not included in the Site as originally constituted and which Tenant deems appropriate for its business. All such equipment and trade fixtures (other than equipment and trade fixtures required by Applicable Law or insurance requirements (if any) or which are Nonseverable Improvements or Mandatory Alterations) shall remain the property of Tenant and if no Lease Event of Default exists may be removed by Tenant at any time prior to the expiration of the Term; provided that (1) such removal does not cause the Site to become "limited use" property, and (2) any damage from such removal shall be repaired by Tenant prior to the expiration of the Term in a manner reasonably satisfactory to Landlord. Landlord shall have the right upon 30 days' prior written notice to Tenant to purchase for its fair market value any equipment and trade fixtures remaining on the Site at the end of the Term. Upon Landlord's purchase of any equipment and trade fixtures, Tenant, at the sole cost and expense of Landlord, shall furnish Landlord with (i) a full warranty bill of sale or a deed (or other additional instrument as may be necessary pursuant to Applicable Law) in form and substance reasonably satisfactory to Landlord, conveying title thereto to Landlord and (ii) such other relevant documents as Landlord may reasonably request. Landlord may, upon 30 days' prior written notice, require Tenant to remove, at Tenant's expense, any equipment and trade fixtures remaining on the Site at the end of the Term.

SECTION 9.  OWNERSHIP

(a)     Ownership. Tenant acknowledges and agrees that it does not and will not have or obtain (except as expressly set forth herein upon consummation of a purchase by Tenant) any title to the Site, nor any property right or interest, legal or equitable, therein, except Tenant's right and interest as a tenant hereunder, in either case subject to all the terms hereof Tenant understands and acknowledges that Landlord owns the Site.

(b)     Plans and Specifications. Tenant shall maintain throughout the Term such plans and specifications as are customarily maintained by prudent operators in the industry. Upon the expiration of the Term (including any early termination thereof), Tenant shall deliver to Landlord or to Landlord's designee a complete set, current as of the date of such return or retaking

(including Parts incorporated, installed, or attached and any Improvement made within 60 days of and prior to the date of such return), of any plans, specifications, or manuals in Tenant's possession with respect to the Site.

SECTION 10.    LOSS OR DESTRUCTION

(a)    Damage or Destruction.

(i)    If the Site or any part thereof is damaged or destroyed by fire or other casualty (including any casualty for which insurance was not obtained or obtainable) of any kind or nature, ordinary or extra-ordinary, foreseen or unforeseen, Landlord shall, subject to clause (iv) below, pay over to Tenant, upon the terms set forth in subsection (ii) below, any moneys which may be recovered by Landlord from casualty insurance, in which event this Master Lease shall be unaffected thereby and shall continue in full force and effect, and Tenant shall, at Tenant's sole cost and expense, expeditiously and in a good and workmanlike manner, cause such damage or destruction to be remedied or repaired (the "Restoration") by restoring the Site to its condition immediately prior to such damage or destruction. All Restoration work shall be performed in accordance with the provisions of this Master Lease. Tenant hereby waives the provisions of any law or statute to the contrary and agrees that the provisions of this Article govern and control in lieu thereof. If Tenant fails or neglects to restore the Site with reasonable diligence, or having so commenced such Restoration, fails to complete the same with reasonable diligence, or if before the completion of any such Restoration by Tenant this Master Lease expires or terminates for any reason, Landlord may, after giving Tenant written notice and a reasonable opportunity to cure, but will not be obligated to, complete such Restoration at Tenant's cost and expense, and the reasonable cost thereof shall be payable to Landlord as rent, together with interest thereon at the Overdue Rate. In such event, Landlord will use good faith efforts to complete the Restoration in a cost-efficient manner. In addition, if Landlord completes the Restoration as provided hereunder, Landlord shall be entitled to a supervision fee in the amount of four percent (4%) of the cost of the Restoration work, from Tenant to reimburse Landlord for its administrative costs in overseeing the Restoration.

(ii)    Subject to the provisions of this Section 10(a), Landlord shall pay over to Tenant, from time to time and upon the following terms, any moneys which may be received by Landlord from casualty insurance provided by Tenant, but in no event and to no extent will Landlord be required to pay any sum exceeding the amount actually collected by Landlord upon the loss; provided, however, that Landlord, before paying such moneys over to Tenant, shall be entitled to reimburse itself therefrom to the extent, if any, of the expenses paid or incurred by Landlord in the collection of such moneys. Landlord shall pay to Tenant, as herein provided, the aforesaid insurance proceeds, for the purpose of Restoration to be made by Tenant to restore the Site to a value which shall be not less than their value prior to such fire or other casualty. Prior to making any Restoration, Tenant shall furnish Landlord with an estimate of the cost of such Restoration, prepared by a licensed architect approved by Landlord. Such insurance moneys shall be paid to Tenant from time to time thereafter in installments ("Installments") as the Restoration progresses no less frequently than monthly, upon application to be submitted by Tenant to Landlord showing the cost of labor and material incorporated in the Restoration, or incorporated therein since the last previous application, and paid for or incurred by Tenant. If any vendor's, mechanic's, laborer's, or materialman's Lien is filed against the Site or any part

24

x

x

thereof, or if any public improvement Lien is created or permitted to be created by Tenant and is filed against Landlord or any assets of or funds appropriated to Landlord, Tenant shall not be entitled to receive any Installments until such Lien is satisfied or otherwise discharged, unless such Lien is contested by Tenant in good faith and Tenant has obtained and delivered a bond issued by a surety in an amount and form reasonably satisfactory to Landlord. The amount of any Installment shall be such proportion of the total insurance moneys received by Landlord as the cost of labor and materials theretofore incorporated by Tenant in the Restoration bears to the total estimated cost of the Restoration by Tenant, less (a) all payments theretofore made to Tenant out of said insurance proceeds, and (b) ten percent (10%) of the amount so determined, as retention. Until completion of and payment for the Restoration by Tenant, including reimbursement to Tenant of such ten percent (10%) retention, the balance of any and all insurance proceeds held by Landlord are to be retained by Landlord. In the event that the insurance proceeds are insufficient for the purpose of paying for the Restoration, Tenant shall nevertheless be required to make the Restoration and pay any additional sums required for the Restoration in accordance with the provisions of subsection (iv) hereof. Notwithstanding the foregoing, if Landlord makes the Restoration at Tenant's expense, as provided in subsection (i) hereof, then Landlord shall use any amounts held by Landlord to pay for the cost of such Restoration.

      (iii)    The following shall be conditions precedent to each payment made to Tenant as provided in subsection (ii) above:

      a.    Tenant shall submit to Landlord the certificate of Tenant's architect stating (i) that the sum then requested to be withdrawn either has been paid by Tenant or is justly due to contractors, subcontractors, materialmen, engineers, architects, or other persons (whose names and addresses shall be stated) who have rendered or furnished certain services or materials for certain work, services, and materials which shall be described including the principal subdivisions or categories thereof and the several amounts so paid or due to each of such persons in respect thereof, along with a reasonably detailed description of the progress of the work up to the date of said certificate; (ii) that no part of such expenditures has been or is being made the basis of a previous or then pending request for the withdrawal of insurance money, or has been made out of the proceeds of insurance previously received by Tenant; (iii) that the sum then requested does not exceed the value of the services and materials described in the certificate; and (iv) that the balance of any insurance proceeds held by Landlord, together with such other sums, if any, which Tenant has made or will (for which evidence of Tenant's intention and ability shall be to Landlord's reasonable satisfaction) make available for the Restoration in accordance with subsection (iv) hereof will be sufficient to pay for the Restoration in full, and stating in reasonable detail an estimate of the cost of such completion;

      b.    Tenant shall furnish to Landlord an official search, or a certificate of a title insurance company satisfactory to Landlord, or other evidence satisfactory to Landlord, showing that there has not been filed any vendor's, mechanic's, laborer's or materialman's statutory or other similar Lien affecting the Site or any part thereof, or any public improvement Lien created or permitted to be created by Tenant affecting Landlord, or the assets of, or funds appropriated to, Landlord, which has not been discharged of record, except such as will be discharged upon payment of the amount then requested to be withdrawn, or unless any such Lien

is contested by Tenant in good faith and Tenant has obtained and delivered a bond issued by a surety, in an amount and form reasonably satisfactory to Landlord; and

        c.     at the time of making such payment, no Lease Event of Default shall have occurred and be continuing.

        (iv)     If the estimated cost of any Restoration, determined as provided in subsection (ii) hereof, exceeds the net insurance proceeds then, prior to the commencement of any Restoration, Tenant hereby covenants to deposit with Landlord a bond, cash, or other security satisfactory to Landlord in the amount of such excess, to be held and applied by Landlord in accordance with the provisions of subsections (ii) and (iii) above, as security for the completion of the work, free of public improvement, vendors', mechanics', laborers' or materialmen's statutory or other similar Liens.

        (v)     As material consideration to Landlord for its agreement to enter into this Master Lease, the parties agree that this Master Lease shall not terminate or be forfeited or be affected in any manner, and there shall be no reduction or abatement of the Basic Rent or other sums payable hereunder, by reason of damage to or total, substantial or partial destruction of the Site or any part thereof or by reason of the untenantability of the same or any part thereof, for or due to any damage or destruction of the Site from any cause whatsoever, and, notwithstanding any law or statute, present or future, Tenant waives any and all rights to quit or surrender the Site or any part thereof on account of any damage or destruction of the Site. Tenant expressly agrees that its obligations hereunder, including the payment of Basic Rent and other sums payable by Tenant hereunder, shall continue as though the Site had not been damaged or destroyed and without abatement, suspension, diminution or reduction of any kind, except and only to the extent that Landlord has received the proceeds of rental interruption insurance applicable thereto.

        (vi)     Anything contained herein to the contrary notwithstanding, any different procedure for the Restoration of the Site which may be required under any applicable Mortgage agreement shall take precedence over and be followed in lieu of any contrary procedure provided for in this Master Lease.

        (b)     <u>Condemnation.</u>

        (i)     If (a) the whole of the Site shall be taken by condemnation or other eminent domain proceedings pursuant to any law, general or special, or (b) substantially all of the Site (hereinafter defined) shall be taken in or by such proceedings, and in either case within thirty (30) days after receipt from Landlord of a notice of a pending condemnation Tenant shall have given notice to Landlord of its intention to terminate this Master Lease if such taking is effected, this Master Lease shall terminate as to the Site, in the case of a taking of the whole of the Site, on the date of such taking, and, in the case of the taking of substantially all of the Site, on the first Basic Rent Date occurring not less than thirty (30) days after such taking. All Basic Rent and other sums required to be paid by Tenant under this Master Lease shall be paid up to the date of such termination, and upon such termination this Master Lease shall be of no further force and effect, except to the extent any obligations expressly survive termination and except that any obligation or liability of either party, actual or contingent, which has accrued on or prior to such termination date shall survive and any prepayment of Basic Rent shall be prorated

between the parties. For purposes of this Section 10(b) "substantially all of the Site" shall be deemed to mean such portion of the Site as, when so taken, would leave remaining a balance of the Site which, due either to the area so taken or the location of the part so taken in relation to the part not so taken, would not under economic conditions and Applicable Laws readily accommodate Tenant's business existing prior to such taking.

(ii)     If only a portion of the Site shall be so taken and that portion does not amount to substantially all of the Site, this Master Lease shall be unaffected by such taking, and Tenant shall continue to pay the Basic Rent and comply with the terms of this Master Lease.

(iii)     Landlord shall be entitled to receive the entire award in any proceeding with respect to any taking provided for in this Section 10(b) without deduction therefrom for any estate vested in Tenant by this Master Lease, and Tenant shall receive no part of such award, except that, in the case of a partial taking which does not result in a termination of this Master Lease but does result in a material and adverse impact upon Tenant's ability to operate its business on the remaining balance of the Site, any such award shall be applied first to Landlord, to compensate Landlord for the value of the portion of the Site so taken, and thereafter to Tenant, to compensate Tenant for the taking of Tenant's inventory, movable trade fixtures, machinery and moving expenses, but excluding any value of Tenant's leasehold interest affected by such taking, which shall belong so long as any award so granted to Tenant does not in any manner whatsoever diminish the maximum award to which Landlord is entitled with respect to such taking. Notwithstanding the foregoing, in the event Section 10(b)(ii) is applicable, Landlord shall pay over to Tenant from time to time any moneys which may be received by Landlord on account of exercise of the power of eminent domain with respect to the Site; provided, that Landlord, before paying such moneys over to Tenant, shall be entitled to reimburse itself therefrom to the extent, if any, of the expenses paid or incurred by Landlord in the collection of such moneys. Such moneys shall be paid over to Tenant solely for purposes of the repair and restoration of the Site, on the terms and subject to the conditions set forth in Section 10(a) above, as if, for this purpose, such moneys were insurance proceeds resulting from casualty to the Site. Tenant agrees to undertake such repair and restoration on such terms and subject to such conditions.

(iv)     If the temporary use or occupancy of all or any part of the Site shall be lawfully taken by condemnation or in any other manner for any public or quasi-public use or purpose during the Term of this Master Lease, Tenant shall be entitled, except as hereinafter set forth, to receive that portion of any award for such taking which represents compensation for the use and occupancy of the Site and, if so awarded, for the taking of Tenant's inventory, movable trade fixtures, machinery and for moving expenses, and that portion that represents reimbursement for the cost of Restoration of the Site. This Lease shall be and remain unaffected by such taking and Tenant shall be responsible for all obligations hereunder not affected by such taking and shall continue to pay in full when due the Basic Rent and all other sums required to be paid by Tenant pursuant to the provisions of this Master Lease. If the period of temporary use or occupancy shall extend beyond the expiration of the Term, that part of the award which represents compensation for the use or occupancy of the Site (or a part thereof) shall be divided between Landlord and Tenant so that Tenant shall receive so much thereof as represents the period to and including the last day of the Term and Landlord shall receive so much as represents the period subsequent to the last day of the Term and Landlord shall be entitled to receive that

27

portion which represents reimbursement for the cost of Restoration of the Site. All moneys received by Tenant as, or as part of, an award for temporary use and occupancy for a period beyond the date to which the sums to be paid by Tenant hereunder have been paid by Tenant shall be received, held, and applied by Tenant as a trust fund for payment of all sums payable by Tenant hereunder.

(v)     In the event of any taking of the Site which does not result in a termination of this Master Lease, or in the event of a taking for the temporary use or occupancy of all or any part of the Site, Tenant at Tenant's expense, subject to the provisions of Articles 8 and 10(a) and whether or not any award or awards shall be sufficient for the purpose, shall proceed with reasonable diligence to repair, alter and restore the remaining parts of the Site to substantially the condition existing immediately prior to the date of taking to the extent that the same may be feasible and so as to constitute a complete and tenantable premises. If the proceeds of such award or awards are not sufficient to pay the full cost thereof, Tenant shall pay such deficit and shall deposit with Landlord a bond, cash, or other security reasonably satisfactory to Landlord and mortgagee in the amount of such deficiency to be held as security for the completion of such work.

(c)     Risk of Loss; No Release of Obligations.  Except (i) as provided in this Section 10, or (ii) if any damage or destruction to the Site is caused by Landlord's gross negligence or willful misconduct, Tenant shall bear the risk of loss and shall not be released from its obligations hereunder in the event of any damage to or destruction of the Site or any part thereof or any event of loss relating to the Site during the Term and before Tenant returns the Site to Landlord in accordance with this Master Lease.

(d)     Application During Lease Default.  Notwithstanding the foregoing provisions of this Section 10, if a Payment Default, Bankruptcy Default, or a Lease Event of Default has occurred and is continuing, any amount that would otherwise be payable to or for the account of, or that would otherwise be retained by, Tenant pursuant to this Section 10 shall be held, and may be invested by Landlord (or, as long as the Lien of the Loan Agreement shall not have been discharged, Lender) in Permitted Investments selected by Landlord and reasonably approved by Tenant, as security for the obligations of Tenant under this Master Lease until such time thereafter as no such event shall be continuing, unless this Master Lease theretofore has been declared in default pursuant to Section 16, in which event such amount may be applied in accordance with the provisions of Section 16. At such time as no such event is continuing, all such amounts at the time held by Landlord in excess of the amount, if any, that Landlord shall have elected to apply to obligations of Tenant under the Operative Documents shall be paid to Tenant.

SECTION 11.     INSURANCE

(a)     Coverage.  Tenant shall maintain in effect at all times during the Term with respect to the Site, at Tenant's sole expense, insurance (including, without limitation, all risk property insurance, and commercial general liability insurance with respect to third party personal injury and third party property damage at all times) and such other insurance as required by Lender, including without limitation:

28

(i)     Insurance on all buildings and improvements on the Site and on the fixtures and personal property included therein against loss by fire, and other hazards covered by the so-called "all-risk" form of policy without a co-insurance clause in an amount equal to the full replacement cost thereof without deduction for physical depreciation (and, if at any time any Improvement is in the course of being constructed or rebuilt on the Site, Tenant shall provide the aforesaid hazard insurance in builder's risk completed value form including coverage available on the so-called "all-risk" non-reporting form of policy for an amount equal to 100% of the insurable replacement cost of such building or other improvement);

(ii)     If the Site includes steam boilers or other equipment for the generation or transmission of steam, insurance against loss or damage by explosion, rupture or bursting of steam boilers, pipes, turbines, engines and other pressure vessels and equipment, in an amount satisfactory to Lender, without a co-insurance clause;

(iii)     If the Site or any part thereof is located in a designated official flood-hazardous area, flood insurance insuring all buildings or other improvements on the Site in an amount equal to the lesser of the principal balance secured by the Mortgage or the maximum limit of coverage made available with respect to such buildings or other improvements under the Federal Flood Disaster Protection Act of 1973, as amended, and the regulations issued thereunder;

(iv)     Commercial general liability insurance protecting against claims arising from any accident or occurrence in or upon the Site in the form and amount reasonably acceptable to Landlord (amounts required by Lender shall be acceptable to Landlord);

(v)     Worker's compensation insurance as is required by statute;

(vi)     Insurance against interruption of business in an amount sufficient to pay one (1) year's rent due under this Lease;

(vii)     Insurance against (or insurance which does not exclude from coverage) acts of terrorism if available at a commercially reasonable premium, at Lender's discretion; and

(viii)     Such other insurance policies and coverages as Lender may reasonably require from time to time.

All such insurance shall be of such types, on such terms and in at least such amounts as are maintained from time to time by the more comprehensive of (i) prudent operators similar to Tenant of similar facilities in the industry and (ii) Tenant on similar owned or leased assets, and with deductibles or self insured retentions which are not more than the deductibles or self-insured retentions maintained by the more stringent of (A) prudent operators similar to Tenant of similar facilities in the industry and (B) Tenant on similar owned or leased assets. Each insurer or reinsurer selected by Tenant shall be rated either (x) in the case of an insurer or reinsurer domiciled in the United States, by A.M. Best's Insurance Guide ("A.M. Best") or any successor thereto (or if no such successor, an organization reasonably acceptable to Landlord and having a similar reputation) or if there is no such rating by A.M. Best, by Standard & Poors or any successor thereto, and shall have a general policyholder rating of, in the case of A.M. Best, at least "A-" and a financial rating of at least "VII" (or, if A.M. Best has no successor, a

29

comparable policyholder and financial rating) or, in the case of Standards & Poors, at least BBB (or if there is no successor to Standard & Poors, a comparable policyholder and financial rating), or (y) in the case of an insurer or reinsurer domiciled outside of the United States, by Standard & Poors or any successor thereto (or if there is no successor, an organization reasonably acceptable to Landlord and having a similar reputation) and shall have a general policyholder rating of at least BBB (or if there is no successor to Standard & Poors, a comparable policyholder and financial rating). To the extent available on commercially reasonable terms, Tenant's property insurance shall maintain a deductible of not more than $25,000 per occurrence.

(b)     Additional Insureds; Notice. Any policies of property or liability insurance carried in accordance with this Section 11 and any policies taken out in substitution or replacement for any such policies: (i) shall include Landlord and Lender (in both its corporate and individual capacities) (the "Additional Insureds"), as their respective interests shall appear, as additional insureds, (ii) shall provide that if the insurers cancel such insurance for any reason whatever, or any change adverse to any Additional Insured is made in policy terms or provisions, or the same is allowed to lapse for nonpayment of premium or such insurance coverage is reduced below required amounts or such insurance coverage expires, such cancellation, change, lapse, reduction or expiration shall not be effective as to the Additional Insureds for 30 days after receipt by the Additional Insureds of written notice by such insurers of such cancellation, change, lapse, reduction or expiration, (iii) if available on commercially reasonable terms, at the time of renewal of the applicable insurance policy, shall provide that in respect of the interest of the Additional Insureds in such policies, the insurance shall not be invalidated by any act or omission of Tenant, any breach or violation of any warranties, declarations, or conditions, or any use of the Site for a purpose which is more hazardous than its intended use, or any action or inaction of Tenant (including through any Person having temporary possession of the Site while under contract with Tenant to perform maintenance, repair, alteration, or similar work on the Site), any subtenant, any franchisee or any other Additional Insured, and (iv) shall provide that the Additional Insureds shall have no obligation or liability for payment of any premiums, commissions, calls, or assessments. All such policies shall provide that the insurers shall waive any rights of subrogation against the Additional Insureds. Tenant shall instruct its independent insurance broker to (x) advise the Additional Insureds in writing promptly of any defaults in the payment of any premium and of any other act or omission on the part of Tenant or of any event of which they have knowledge and which might invalidate or render unenforceable, in whole or in part, any insurance in respect of the Site and (y) advise the Additional Insureds in writing at least 30 days prior to the expiration or termination of such insurance or promptly after any insurer cancels or gives notice of cancellation of such insurance. Each property or liability policy (i) shall be primary without right of contribution from any other insurance which is carried by the Additional Insureds to the extent that such other insurance provides contingent and/or excess insurance with respect to their respective interests as such in the Site, (ii) shall expressly provide that all of the provisions thereof, except the limits of liability, shall operate in the same manner as if there were a separate policy covering each insured and (iii) shall provide that the insurers shall waive any right of set-off, counterclaim, or other deduction against the Additional Insureds.

(c)     Other Insurance. In the event that Tenant shall fail to maintain insurance as herein provided, any Additional Insured may at its sole option provide such insurance and, in such event, Tenant shall upon demand reimburse such Additional Insured for the cost thereof

30

together with interest at the Overdue Rate from the date of demand to the date paid, without waiver of any other rights such Additional Insured may have. Nothing in this Master Lease shall be construed to prohibit any Additional Insured from insuring the Site or its interest therein at its own expense and for its exclusive benefit in an amount in excess of that required to be maintained by Tenant hereunder, provided that such excess insurance in no way increases the cost or limits the availability of any insurance required to be maintained by Tenant hereunder. Any insurance payments received from policies maintained by any Additional Insured pursuant to the previous sentence shall be retained by such Additional Insured without reducing or otherwise affecting Tenant's obligations hereunder. Tenant agrees that no insurer or reinsurer maintaining any insurance policy for any Additional Insured shall be obligated or liable to contribute to any loss hereunder on under any other document to this transaction.

(d) Certificate of Insurance. Tenant shall deliver to Landlord and Lender on the Effective Date and annually upon the renewal of any insurance policy maintained pursuant to this Section 11 certificates of insurance evidencing coverage in accordance with the provisions described in this Section 11 executed by the insurer or its duly authorized agent, and without limiting the foregoing, each such certificate shall state that such insurance is in full force and effect and that all premiums then due and payable thereon (or the monthly installments thereof then due and payable) have been paid.

SECTION 12.    TAXES

Tenant shall pay or cause to be paid all taxes, including Real Property Taxes and Personal Property Taxes assessments or governmental charges levied, imposed, or assessed against, upon, with respect to, measured by, or applicable to the Site during the Term. All such payments shall be made at least ten (10) days prior to the delinquency date of such payment.

Upon request, Tenant shall promptly furnish Landlord with satisfactory evidence that such taxes have been paid. If Tenant shall fail to pay any such taxes, Landlord may pay the same, in which case such amount, together with interest thereon at the Overdue Rate, shall be payable upon demand to Landlord. Notwithstanding the foregoing, if a Lease Default or Event of Lease Default has occurred and is continuing, Tenant shall deposit with Landlord on a monthly basis together with Tenant's payment of rent an amount equal to 1/12th of all taxes described in this Lease required to be paid by Tenant for such tax year, and such payment shall be additional rent payable under this Lease, provided that such amounts shall be used for the payment of such taxes. If Tenant shall fail to deposit any such amounts with Landlord, such amounts shall accrue interest at the Overdue Rate until paid.

SECTION 13.    SUBLEASE; ASSIGNMENT

(a) Sublease. Tenant may not sublease all or any portion of its interest in this Master Lease, or the Site, without the prior written consent of Landlord and Lender. Landlord agrees that it will not unreasonably withhold its consent to any sublease by Tenant. Notwithstanding the foregoing, Landlord acknowledges that the County of Los Angeles currently occupies a portion of the Site pursuant to a sublease. Landlord hereby consents to Tenant's sublease with the County of Los Angeles (including any extensions or renewals thereof). Tenant agrees that it will use its best efforts to obtain commercially reasonable subordination, non-disturbance and

31

attornment agreements from its subtenants at the Site. Tenant also agrees that for any sublease affecting the Site, the subtenant may not use or occupy, or permit to be used or occupied, the Site: (i) (A) as a bar, tavern, or cocktail lounge, or as a business which derives 50% or more of its gross sales volume serving or selling alcoholic beverages, (B) as a dance hall, massage parlor, gaming parlor, adult book store, or adult video store, or for any other purpose associated with the satisfaction or titillation of prurient interests, (C) for any improper, unlawful, immoral, disreputable or objectionable purpose or for any use which would cause, maintain or permit any nuisance or offensive, noisy or dangerous trade, business, manufacture, or occupation in or about the Site or (D) for any use against public policy, or (ii) in any manner which would render the insurance thereon void or the insurance risk more hazardous than the operation of the Site as existing on the date of this Master Lease or in any manner which would violate any certificate of occupancy for the Site. Except as described in the second succeeding sentence below, any sublease (and the rights of any subtenant thereunder) shall by its terms be expressly subject and subordinate to this Master Lease and the rights and interests of Landlord and its successors and assigns hereunder, including, without limitation, the right of Landlord to repossess the Site and, in connection with such repossession, to avoid such sublease, and Tenant shall remain primarily and directly liable for the performance of its obligations hereunder. No sublease shall in any way discharge or diminish any of Tenant's obligations hereunder and under the other Operative Documents. No sublease shall extend beyond the Basic Term Expiration Date with respect to the Site or, if this Master Lease has been extended (other than through any holdover described in Section 5(e) above), the date of expiration of the Renewal Term; provided, however, that solely with respect to a sublease to a Person not Affiliated with Tenant and provided that not more than 10% of the Site is then subleased beyond the applicable Basic Term or Renewal Term, as the case may be, if Tenant delivers to Landlord a certificate of an independent real estate appraiser reasonably acceptable to Landlord stating that (i) the rent payable by a prospective subtenant during the period following the date of expiration of the Basic Term with respect to the Site or, if this Master Lease has been extended, the date of expiration of the Renewal Term, is at least equal to the anticipated Fair Market Rental Value of the Site for that period and (ii) the Site to be subleased is in the condition required to be maintained pursuant to this Master Lease, Landlord agrees that, at Landlord's election, either (A) such sublease may extend beyond the Basic Term Expiration Date with respect to the Site or, if this Master Lease has been extended, the date of expiration of the Renewal Term and, upon termination of this Master Lease, Landlord shall recognize the subtenant under such sublease as the direct tenant of Landlord, provided that at the time of the expiry of this Master Lease (i) no default exists under the sublease which at such time would allow Landlord to terminate the sublease and (ii) the subtenant delivers to Landlord an instrument in form and substance reasonably satisfactory to Landlord confirming the subtenant's agreement to recognize Landlord as its landlord under its sublease and be subject to all of the terms and provisions of this Master Lease or (B) Tenant may elect not to proceed with such prospective sublease. Within 10 days after entering into a sublease permitted hereunder, Tenant shall provide Landlord and Lender with a copy of the sublease documentation (excluding the economic terms thereof) for any sublease extending beyond the Term. If Tenant enters into a sublease with respect to the Site extending beyond the Term in accordance with this Section 13(a), at the end of the term under such sublease, Landlord shall, with respect to the Site, exercise or be deemed to have exercised its option to lease for a term ending on or after the expiration of such sublease. Each sublease shall prohibit further subleasing (but not assignment provided that such assignee both satisfies and expressly agrees to be bound by the provisions of

32

this Section 13) by the subtenant thereunder. No sublease shall permit the subtenant thereunder to take any action inconsistent with the terms of this Master Lease or any other Operative Document.

(b)     Assignment. Tenant may not assign all or any portion of its interest in this Master Lease, or the Site, without the prior written consent of Landlord and Lender, to any Person other than an Affiliate of Tenant. Landlord agrees not to unreasonably withhold its consent to an assignment. For purposes of this Master Lease, an assignment by Tenant includes any sale, merger, or other transfer of more than 50% of the ownership interests of Tenant to a person or entity that is not an Affiliate of Tenant. Such assignee may not use or occupy, or permit to be used or occupied, the Site (i) (w) as a bar, tavern, or cocktail lounge, or as a business which derives 50% or more of its gross sales volume serving or selling alcoholic beverages, (x) as a dance hall, massage parlor, gaming parlor, adult book store, or adult video store or for any other purpose associated with the satisfaction or titillation of prurient interests, (y) for any improper, unlawful, immoral, disreputable or objectionable purpose or for any use which would cause, maintain or permit any nuisance or offensive, noisy or dangerous trade, business, manufacture or occupation in or about the Site or (z) for any use against public policy or (ii) in any manner which would render the insurance thereon void or the insurance risk more hazardous than the operation of the Site as existing on the date of this Master Lease or in any manner which would violate any certificate of occupancy for the Site. In the event of an assignment to an Affiliate of Tenant, (i) Tenant shall deliver to Landlord and Lender, prior to such assignment, (x) an instrument in form and substance satisfactory to Landlord, and a Majority in Interest of Holders guaranteeing the Affiliate's obligations and confirming Tenant's continuing primary liability for all of the obligations hereunder and under the other Operative Documents notwithstanding any such assignment, and (y) an opinion of counsel in form and substance satisfactory to Landlord and a Majority in Interest of Holders as to the enforceability of such instrument against Tenant in accordance with its terms, and (ii) the parties to the Operative Documents shall enter into amendments, supplements and modifications to such Operative Documents requested by any such party to reflect the existence of such guaranty.

(c)     Tenant shall pay all Landlord's costs and expenses, including without limitation Landlord's legal fees, in connection with any proposed or actual assignment, sublease or other transfer by Tenant of the Site or this Master Lease, and such payment shall be a condition to the effectiveness of such assignment, sublease or other transfer.

SECTION 14.     RENEWAL OPTION

Upon irrevocable notice given at least 180 days prior to the Scheduled Return Date for the Site to Landlord and provided that no Bankruptcy Default, Payment Default or Lease Event of Default is then continuing, Tenant may elect to extend this Master Lease with respect to all, but not less than all, of the Site then subject to this Master Lease for up to two renewal periods (each, a "Renewal Term") of five years each. The Lease during a Renewal Term shall continue upon all of the same terms as existed in the Basic Term except that the monthly Basic Rent for the first 12 months of such Renewal Term shall be an amount equal to the greater of (a) the Minimum Increase or (b) the Percentage Increase, and Basic Rent shall increase thereafter in accordance with the same formula for increases during the Basic Term.

33

## SECTION 15.　LEASE EVENTS OF DEFAULT

The term "Lease Event of Default," wherever used herein, means any of the following events (whatever the reason for such Lease Event of Default and whether it shall be voluntary or involuntary, or come about or be effected by operation of law, or be pursuant to or in compliance with any judgment, decree or order of any court or any order, rule or regulation of any administrative or Governmental Body):

(a)    Tenant shall fail to make any payment of: (i) Basic Rent when due which failure continues for five (5) days after written notice of such failure has been received by Tenant from Landlord, or (ii) any other amounts due (other than Basic Rent) under this Lease or the Guaranty when due, which failure continues for 30 days after written notice of such failure has been received by Tenant from Landlord.

(b)    Tenant shall fail to carry and maintain insurance on or with respect to the Site in accordance with the provisions of Section 11.

(c)    Tenant shall fail to perform or observe any other material covenant, condition or agreement to be performed or observed by it under this Master Lease (which shall include the covenants contained in the second paragraph of Section 8(b) with respect to resolving a Material Environmental Event) or any other Operative Document, and such failure shall continue for 30 days after written notice thereof has been given by Landlord to Tenant; provided that if such failure is capable of being cured and if Tenant shall promptly commence to cure such failure and thereafter prosecute the curing thereof with diligence, the time within which such failure may be cured shall be extended to no later than the earlier of (i) the expiration of the Basic Term or the Renewal Term, as the case may be, and (ii) 180 days after such notice.

(d)    Any representation or warranty made by Tenant in any Operative Document or in any other document or certificate delivered pursuant to any provision thereof shall prove to have been false or incorrect in any respect when such representation or warranty was made or given, and remains a misrepresentation or breach of warranty which is materially adverse to Lender and/or Landlord at the time discovered; provided that if such misrepresentation or breach is capable of being cured, if Tenant shall promptly commence to cure such misrepresentation or breach and thereafter prosecute the curing thereof with diligence, the time within which such misrepresentation or breach may be cured shall be the earlier of (i) the expiration of the Basic Term or the Renewal Term, as the case may be, and (ii) 180 days after Tenant is given notice of such breach.

(e)    Tenant shall not pay, or shall generally be unable to pay or shall admit in writing its inability to pay, its debts generally as they come due or Tenant shall consent to the appointment of a receiver, trustee, liquidator, assignee, trustee, custodian, sequestrator (or similar official) of itself or a substantial part of its property, or shall make a general assignment for the benefit of creditors, or Tenant shall take any corporate action in furtherance of the foregoing.

(f)    Tenant shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar law (as now or hereafter in effect), or Tenant shall consent to the

34

BN 2414692v2

entry of an order for relief in an involuntary case under any such law, or Tenant shall take any corporate action in furtherance of the foregoing.

(g)     An order, judgment or decree shall be entered, by any court having jurisdiction, for relief in respect of Tenant in an involuntary case under any applicable bankruptcy, insolvency or other similar law (as now or hereafter in effect), or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator (or similar official) of Tenant or for any substantial part of its property, or sequestering any substantial part of the property of Tenant, or ordering the winding up or liquidating of the affairs of Tenant, and any such order, judgment or decree shall remain in force undismissed, unstayed, or unvacated for a period of 90 days after the date of entry thereof.

(h)     A petition against Tenant in a proceeding under applicable bankruptcy laws, insolvency laws or other similar laws, as now or hereafter in effect, shall be filed and shall not be withdrawn or dismissed within 90 days thereafter, or if, under the provisions of any law providing for reorganization or liquidation of corporations which may apply to Tenant, any court of competent jurisdiction shall assume jurisdiction, custody or control of Tenant or of any substantial part of its property and such jurisdiction, custody or control shall remain in force unrelinquished, unstayed, or unterminated for a period of 90 days.

(i)     The Guarantors shall fail to deliver a Financial Statement (as defined in the Guaranty) or make any payment when due or perform or observe any other material covenant, condition or agreement to be performed or observed by it under the Guaranty, subject to the notice and cure provisions therein.

(j)     Tenant and/or Guarantors shall fail to replenish the Security Deposit following any application of any portion of the Security Deposit toward the payment of Basic Rent hereunder.

(k)     If any of the representations in Section 1 of the Certification are incorrect in any manner whatsoever or a Guarantor fails to deliver to Landlord such Guarantor's Certification within ten (10) days after such Guarantor receives notice from Landlord that such Guarantor's Certification has not been delivered for the applicable year in accordance with the Guaranty, unless such failure is due to the death or incapacity of such Guarantor, in which event such failure shall not be a Lease Event of Default hereunder.

SECTION 16.     REMEDIES

If any Lease Event of Default shall have occurred and be continuing, then (i) in the case of a Bankruptcy Default, this Master Lease shall be in default without further act or notice of any kind (all of which are hereby waived), and for all purposes hereof and of the other Operative Documents such Bankruptcy Default shall be deemed a declaration of default hereunder, and (ii) in the case of any other Lease Event of Default under Section 15(a), (b), (c), (d) or (j), Landlord may, at its option, declare this Master Lease to be in default by providing Tenant with written notice to such effect. In the event of either (i) or (ii), at any time following the declaration of default, Landlord may exercise one or more of the following remedies, as Landlord in its sole discretion may lawfully elect:

35

(a)     Landlord may demand that Tenant, and Tenant shall upon receipt of a written demand of Landlord, deliver the Site promptly to Landlord in the manner and condition required by, and otherwise in accordance with all the provisions of, Section 5 as if the Site was being returned on a Scheduled Return Date, and Landlord shall not be liable for reimbursement of Tenant for any costs or expenses incurred by Tenant in connection therewith; or Landlord may enter upon the Site and take immediate possession (to the exclusion of Tenant) of the Site by summary proceedings or otherwise, all without the assumption of any liability by Landlord for or by reason of such entry or taking of possession, whether for the restoration of damage to property caused by such taking or otherwise;

(b)     Landlord may sell all or any part of the Site at public or private sale, as Landlord may determine in its sole discretion, in a commercially reasonable manner, free and clear of any rights of Tenant and without any duty to account to Tenant with respect to such action or inaction or any proceeds with respect thereto (except to the extent provided in Section 16(d) if Landlord shall elect to exercise its rights thereunder), in which event Tenant's obligation to pay Basic Rent hereunder for the affected Site for periods commencing after the date of such sale and assignment shall terminate (except to the extent that Basic Rent is to be included in computations under Section 16(d) if Landlord shall elect to exercise its rights thereunder);

(c)     Landlord may hold, keep idle, or lease to others all or any part of the Site as Landlord in its sole discretion may determine, free and clear of any rights of Tenant and without any duty to account to Tenant with respect to such action or inaction or for any periods with respect to such action or inaction, except that Tenant's obligation to pay Basic Rent hereunder for periods commencing after Tenant has been deprived of use of the Site pursuant to this Section 16(c) shall be reduced by the net proceeds, if any, received by Landlord from leasing the Site to any Person other than Tenant for the same period or any portion thereof;

(d)     Landlord may, whether or not Landlord shall have exercised or shall thereafter at any time exercise any of its rights under Section 16(a), (b) or (c), demand that, after 10 days prior written notice to Tenant, Tenant pay, and Tenant shall pay, on the Payment Date specified in such demand, the following: (A) any unpaid Basic Rent with respect to the Site due hereunder prior to such Payment Date, plus (B) all other amounts then due and payable by Tenant hereunder or under any other Operative Document with respect to the Site;

(e)     Landlord may terminate, cancel, or rescind this Master Lease with respect to the Site or may exercise any other right or remedy which may be available to it under Applicable Law, in equity or by statute, or proceed by appropriate court action to enforce the terms hereof or to recover damages for the breach hereof; provided that any termination of this Master Lease with respect to the Site pursuant to the exercise of any such rights and remedies shall not in any way be deemed to be a release or a waiver by Landlord of Tenant's obligation to pay the sums provided to be paid by Tenant under this Section 16; or

(f)     Notwithstanding anything to the contrary in the Operative Documents, in the event that Tenant shall fail to make any payment of Basic Rent when due which failure continues for ten (10) days after written notice of such failure has been received by Tenant from Landlord, Landlord, in its sole and absolute discretion, may at any time thereafter require any of the Guarantors to cure such default and, if the Guarantors fail to timely cure such default, the parties

36

agree that the damage to Landlord would be irreparable and Landlord may thereafter forthwith seek injunctive relief to recover under the Guaranty and accelerate the amounts due and owing from Tenant under this Lease.

No termination of this Master Lease, in whole or in part, or repossession of all or any part of all of the Site, or exercise of any remedy under this Section 16 shall, except as specifically provided herein, relieve Tenant of any of its liabilities and obligations hereunder, all of which shall survive such termination, repossession or exercise of remedy. In addition, Tenant shall be liable, except as otherwise provided above, for any and all unpaid Basic Rent due hereunder before, after, or during the exercise of any of the foregoing remedies, including all legal fees and other costs and expenses incurred by Landlord by reason of the occurrence of any Lease Event of Default or the exercise of Landlord's remedies with respect thereto, and including all costs and expenses of whatsoever kind incurred in connection with the return of the Site in the manner and condition required by, and otherwise in accordance with the provisions of, Section 5 as if the Site were being returned at the end of the Term. At any sale of the Site or any part thereof pursuant to this Section 16, Landlord may bid for and purchase such property.

To the extent permitted by, and subject to the mandatory requirements of, Applicable Law, and except as otherwise expressly provided in this Section 16, each and every right, power and remedy herein specifically given to Landlord or otherwise in this Master Lease shall be cumulative and shall be in addition to every other right, power, and remedy herein specifically given or now or hereafter existing under Applicable Law, at law or in equity, and each and every right, power and remedy whether specifically herein given or otherwise existing may be exercised from time to time and as often and in such order as may be deemed expedient by Landlord, and the exercise or the beginning of the exercise of any power or remedy shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other right, power or remedy. No delay or omission by Landlord in the exercise of any right, remedy or power or in the pursuit of any remedy shall impair any such right, remedy or power or be construed to be a waiver of any default on the part of Tenant or to be an acquiescence therein. No express or implied waiver by Landlord of any Lease Event of Default shall in any way be, or be construed to be, a waiver of any future or subsequent Lease Event of Default.

In the event a Guarantor fails to timely deliver its annual Certification, and such failure is not cured within ten (10) days after such Guarantor receives notice from Landlord that such Guarantor's Certification has not been delivered for the applicable year in accordance with the Guaranty, unless such failure is due to the death or incapacity of such Guarantor, a late fee in the amount of Ten Thousand Dollars ($10,000) shall be immediately due and payable by Tenant hereunder with respect to each such Certification that is not delivered within the applicable notice and cure period.

SECTION 17.        RIGHT TO PERFORM FOR TENANT

If Tenant fails to make any payment of Basic Rent required to be made by it hereunder or fails to perform or comply with any of its agreements contained herein, Landlord may make such payment or perform or comply with such agreement, without any notice to or demand upon Tenant, in each case without waiving any default hereunder or releasing Tenant from any obligation; provided that any such payment or performance by Landlord shall not constitute a

37

cure or waiver of such Lease Event of Default. The amount of such payment and the amount of the reasonable expenses incurred in connection with such payment or performance, as the case may be, together with interest thereon at the Overdue Rate, shall be owed by Tenant and payable upon demand by Landlord.

SECTION 18.    NOTICES

Any notice, statement, demand, consent, approval, or other communication required or permitted to be given, rendered or made by either party to the other, pursuant to this Master Lease or pursuant to any applicable law or requirement of public authority, shall be in writing (whether or not so stated elsewhere in this Master Lease) and shall be deemed to have been properly given, rendered or made only if hand-delivered or sent by commercial overnight carrier or by telecopy (with confirmation of receipt thereof and a copy sent by another means provided herein), addressed to the recipient(s) at the address set forth below. Such notices shall be deemed to have been given upon the earlier of actual receipt by the intended recipient and one day after deposit with commercial overnight carrier. By giving notice as provided above, any party may designate a different address for notices, statements, demands, consents, approvals or other communications intended for it.

| Landlord: | AFG Investment Fund 5, LLC |
| | c/o Asset Funding Group, LLC |
| | 825 South Barrington Avenue |
| | Los Angeles, CA 90049 |
| | Attention:  Mr. Jeffrey L. Hayden |
| | Mr. Barry A. Beitler |
| | Telephone:  (310) 447-7220 |
| | Telecopy:  (310) 447-8339 |

| With copies to: | Morgan, Lewis & Bockius LLP |
| | 300 South Grand Avenue, 22nd Floor |
| | Los Angeles, California 90071 |
| | Attention:  Michael John Miguel, Esq. |
| | Telephone:  (213) 612-7310 |
| | Telecopy:  (877) 432-9652 |

| Tenant: | Success Healthcare 1, LLC |
| | 999 Yamato Road, Third Floor |
| | Boca Raton, Florida 33431 |
| | Attention:  Howard B. Koslow |
| | Telephone:  (561) 869-3100 |
| | Telecopy:  (561) 994-4977 |

| With copy to: | Buchalter Nemer PC |
| | 1000 Wilshire Boulevard, Suite 1500 |
| | Los Angeles, California 90017 |

38

## SECTION 19.     SUCCESSORS AND ASSIGNS; ASSIGNMENTS

(a)     Binding Nature. This Master Lease, including without limitation all of its agreements, covenants, representations, and warranties, shall be binding upon and inure to the benefit of, and may be enforced by (A) Landlord and each of its successors, assigns, and agents, and, where the context so requires, (i) Lender and each of its successors, assigns, and agents, (ii) each Indemnified Person, and (iii) the successors, assigns and agents of such Indemnified Person, and (B) Tenant and its successors and, only to the extent expressly permitted hereby, assigns.

(b)     Assignments by Tenant. Except in accordance with Section 13(b) above, Tenant may not assign, transfer or encumber its leasehold interest or part with the possession of, or suffer or allow to pass out of its possession or control, the Site.

## SECTION 20.     AMENDMENTS AND MISCELLANEOUS

(a)     Amendments, Supplements. This Master Lease may not be amended, supplemented, waived, or modified, either orally or in writing, or terminated in any manner whatsoever except by written instrument signed by both Landlord and Tenant. As long as the Lien of the Loan Agreement is in effect, any amendments, supplements, waivers, or modifications hereto shall be subject to the provisions hereof and to the Loan Agreement.

(b)     Survival of Agreements. All agreements, indemnities, representations and warranties contained in this Master Lease or any of the Operative Documents shall survive the execution and delivery of this Master Lease and the expiration or other termination of this Master Lease, and shall be considered relied upon by the other party hereto regardless of any knowledge or investigation made by or on behalf of such party.

(c)     Enforcement. Any provision of this Master Lease which may be determined by competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by Applicable Law, Tenant hereby waives any provision of law which renders any provision hereof prohibited or unenforceable in any respect.

(d)     Entire Agreement. This Master Lease, together with the other Operative Documents, represents the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes any and all prior understandings. This Master Lease shall constitute an agreement of lease and nothing herein shall be construed as conveying to Tenant any right, title or interest in or to the Site, except as Tenant only.

(e)     Counterpart Execution. This Master Lease and any amendment hereto may be executed in any number of counterparts and by the different parties hereto on separate

39

counterparts, each executed counterpart, subject to <u>Section 21</u>, constituting an original and all such counterparts constituting but one and the same agreement.

(f) <u>Governing Law</u>. THIS MASTER LEASE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA. ANY LEGAL OR EQUITABLE ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS MASTER LEASE MAY BE INSTITUTED IN ANY STATE COURT OF COMPETENT JURISDICTION IN THE STATE OF CALIFORNIA OR FEDERAL COURT IN LOS ANGELES COUNTY.

(g) <u>Headings</u>. The headings of the sections and paragraphs of this Master Lease and the table of contents have been inserted for convenience of reference only and shall not affect the construction or interpretation of this Master Lease.

(h) <u>Memorandum of Lease</u>. Tenant and Landlord shall execute a memorandum of this Master Lease after the execution hereof, satisfactory in substance and form to Tenant and Landlord, for the purpose of recording evidence of this Master Lease and Tenant's option to purchase the Site thereunder in the official records of the county in which the Site is located. In the event of any conflict or inconsistency between any such memorandum and this Master Lease, the terms and provisions of this Master Lease shall govern.

(i) <u>Further Assurances</u>. From time to time each of Landlord and Tenant shall perform such acts and execute such instruments of further assurance (all at Tenant's expense) as shall reasonably be requested by the other party hereto to perform or execute for the purpose of carrying out and effectuating this Master Lease and the intent hereof. Landlord agrees that upon a sale of the Site by Landlord to Tenant in accordance with the terms hereof, Landlord shall, at Tenant's expense, execute and deliver such documents or other instruments that are reasonable and necessary and that are to be prepared, supplied and filed by Tenant, and take such other action as Tenant may reasonably request in order to release the Site from this Master Lease.

(j) <u>Business Day</u>. If the date on which any payment is to be made pursuant to this Master Lease or any other Operative Document is not a Business Day, the payment otherwise payable on such date shall be payable on the next succeeding Business Day, and, except as may otherwise be required herein, without any additional amount accruing with respect thereto, with the same force and effect as if made on the date when such payment is due.

(k) <u>Reproduction of Documents</u>. This Master Lease, all documents constituting exhibits hereto, and all documents relating hereto received by a party hereto, including, without limitation, (a) consents, waivers and modifications that may hereafter be executed, (b) documents received by Landlord in connection with Landlord's purchase of the Site, and (c) financial statements, certificates, and other information previously or hereafter furnished to Landlord may be reproduced by the party receiving the same by any photographic, photostatic, microfilm or other similar process. Each party hereto agrees and stipulates that, to the extent permitted by law, but subject to <u>Section 20(e)</u>, any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding (whether or not such reproduction was made by such party in the regular course of business) and that, to the extent

40

permitted by law, but subject to Section 20(e), any enlargement, facsimile, or further reproduction of such reproduction shall likewise be admissible in evidence.

(l)    True Lease.  Tenant intends for this Master Lease to be a "true lease" and not a financing lease, capital lease, mortgage, equitable mortgage, deed of trust, trust agreement, security agreement, or other financing or trust arrangement, and the economic realities of this Master Lease are those of a true lease.  The term of this Master Lease, including any term extensions provided for in this Master Lease, is less than the remaining economic life of the premises.  Tenant waives and releases any claim or defense based upon the characterization of this Master Lease as anything other than a true lease, and Tenant stipulates and agrees not to challenge the validity, enforceability, or characterization of this Master Lease as a true lease, and further stipulates and agrees that nothing contained in this Master Lease creates or is intended to create a joint venture, partnership, equitable mortgage, trust, financing device or arrangement, security interest, or the like.  Tenant shall support the intent of the parties that the lease of the Site pursuant to this Master Lease is a true lease and does not create a joint venture, partnership, equitable mortgage, trust, financing device or arrangement, security interest or the like, if, and to the extent that, any challenge occurs.

SECTION 21.       SECURITY FOR LANDLORD'S OBLIGATION TO LENDER.

In order to secure all amounts payable by and all obligations to be performed by Landlord under the Loan Agreement, Landlord will assign to Lender for Lender's benefit all of Landlord's rights under this Master Lease, and will grant security interests and a mortgage lien in favor of Lender in all of Landlord's right, title, and interest in and to the Site and in this Master Lease. Tenant hereby consents to such assignment and to the creation of such security interests and mortgage lien, and acknowledges receipt of copies of the Loan Agreement.  To the extent, if any, that this Master Lease constitutes chattel paper (as such term is defined in the Uniform Commercial Code as in effect in any applicable jurisdiction), no security interest in this Master Lease may be created through the transfer or possession of any counterpart hereof other than the original counterpart, which shall be identified as the counterpart containing the receipt therefor executed by Lender on the signature page thereof.  Tenant hereby acknowledges receipt of due notice that Landlord's interest in this Master Lease and all other components of Landlord's Interest will be assigned to Lender as security pursuant to the Loan Agreement to the extent provided in the Loan Agreement.  Unless and until Tenant shall have received written notice from Lender that the Lien of the Loan Agreement has been terminated, Lender may exercise the rights of Landlord under this Master Lease to the extent set forth in and subject in each case to the exceptions set forth in the Loan Agreement and copies of all notices and other deliveries to be delivered to Landlord shall also be delivered to Lender to be given in the same manner as notices under Section 18 to an address provided by Lender to Tenant from time to time in writing.  In further support of Landlord's obligations under the Loan Agreement or any future loan to Landlord secured by Landlord's Interest, Tenant shall, upon not less than 10 days' notice from Landlord, execute (i) any subordination, non-disturbance and attornment agreement, or reasonably equivalent document, reasonably requested by Landlord or any lender to Landlord, that addresses Tenant's and Lender's rights and obligations in connection with a foreclosure or deed in lieu of foreclosure under the terms of the Loan Agreement or any subsequent loan to Landlord; and (ii) any estoppel certificate requested by any Lender or a purchaser of the Site, confirming the material terms of this Master Lease and acknowledging that neither Tenant nor

BN 2414692v2

Landlord is in default under this Master Lease, or acknowledging the nature of any such default, all in form reasonably acceptable to Tenant and Landlord.

SECTION 22.     (INTENTIONALLY DELETED)

SECTION 23.     CONSENT TO JURISDICTION

Each of the parties hereto hereby irrevocably (i) agrees that any legal or equitable action, suit, or proceeding arising out of or relating to this Master Lease or any other Operative Document, or any transaction contemplated hereby or thereby, or the subject matter of any of the foregoing, may be instituted in any state court of competent jurisdiction in the County of Los Angeles, State of California or Federal court in the Central District of California; (ii) to the extent permitted by Applicable Law, waives any objection which it may now or hereafter have to the venue of any such action, suit, or proceeding, including, without limitation, inconvenient forum; and (iii) submits itself to the jurisdiction of any state court of competent jurisdiction in the County of Los Angeles, State of California or Federal court in the Central District of California for purposes of any such action, suit or proceeding. Nothing contained in this Section 23 shall be deemed to affect the rights of the parties hereto to serve process in any other manner permitted by law or to commence legal proceedings in any other jurisdiction.

SECTION 24.     OPTION TO PURCHASE

(a)     Tenant will have an option to purchase the Site (the "Purchase Option"). In order to exercise the Purchase Option, Tenant must (i) deliver to Landlord written notice of its intent to exercise the Purchase Option ("Option Notice") not less than three (3) months in advance of the date that the purchase will be consummated and (ii) comply with the terms set forth in this Section 24. Tenant must provide notice of its intent to exercise the Purchase Option, if at all, prior to the date that is twenty-four months after the Basic Term Commencement Date (the "Option Date"), and if Tenant does so its purchase of the Site must close within three (3) months after Tenant delivers the Option Notice to Landlord (the "Scheduled Option Closing Period").

In the event that Tenant elects to exercise the Purchase Option, Landlord hereby acknowledges and agrees that (i) Tenant shall not be required to make any deposit in connection therewith, (ii) Landlord previously received a non-refundable deposit in the amount of Fifty Thousand Dollars and 00/100 ($50,000.00) from InterCare in connection with an expired option to purchase the Site pursuant to the Original Lease, and (iii) such deposit shall be credited against the payment of closing costs and the purchase price that Tenant will pay for the Site. If Tenant timely delivers the Option Notice to Landlord, then, subject to the terms of this Section 24, Landlord and Tenant shall, within ten (10) days thereafter, open escrow with an escrow company acceptable to Landlord and sign such company's standard escrow instructions, which instructions will govern the terms of the sale of the Site to Tenant. Any such escrow instructions will, however, be modified to be consistent with this Section 24. Time is of the essence with respect to Tenant's right to exercise the Purchase Option.

Notwithstanding the foregoing, if Tenant provides valid written notice of its intent to exercise the Purchase Option and during the Scheduled Option Closing Period Tenant or the shareholders of Tenant are proceeding in good faith toward a pending sale of Tenant assets, a

42

pending sale of Tenant, a pending sale of Tenant's rights in the Site, or a pending loan secured against the Site, and if a letter of intent has been executed setting forth the terms of the pending transaction with a qualified third-party buyer or lender, then the Scheduled Option Closing Period may be extended to allow the transaction to close. If the Scheduled Option Closing Period is extended as described in the preceding sentence: (i) Tenant must continue to satisfy all of its obligations under this Master Lease during any postponement or extension of the closing date, including the payment of rent during such extension, (ii) the purchase price will be determined, as set forth below, based on the actual closing date, and (iii) in no event will the closing be extended for more than six (6) months to allow any transaction involving Tenant or its shareholders to be consummated. If Tenant has not closed the transaction by the date that is six (6) months after the Scheduled Option Closing Period, then the Purchase Option will terminate and be of no further force and effect.

The price that Tenant will pay to purchase the Site will be the price that enables Landlord to earn a 14.85% internal rate of return during the period that Landlord owns the Site, which price will be determined as of the closing date of Tenant's purchase. The internal rate of return will be calculated using an annual compounding of interest, based on the amount of Landlord's investment in the Site (which is deemed to be Landlord's purchase price of $23,000,000.00), and otherwise upon the terms and conditions set forth herein. The calculation of Landlord's internal rate of return will not provide any credit to Tenant for transaction expenses (including any underwriting fee or previous rent payments to Landlord), and will consider the payment of Basic Rent paid hereunder and under the Original Lease, but not escalations in rent due to the Basic Rent Adjustment or the Financial Performance Adjustment. By way of example, if Tenant exercised the Purchase Option and the closing occurred on the date that is 24 months after the Basic Term Commencement Date, then (assuming Tenant has made all Basic Rent payments during the Term and InterCare made all Basic Rent payments under the Original Lease) the price for Tenant to purchase the Site would be Twenty-Six Million Six Hundred Fifty Thousand Three Hundred Twenty-One Dollars ($26,650,321). This example shows a 14.85% return on the $23,000,000 paid for the Site, less the Basic Rent collected for the periods in question under this Lease and the Original Lease, and the amounts provided would change slightly if the closing dates were changed. If Tenant exercises the Purchase Option, Tenant must pay all of the closing costs associated with the purchase of the Site, including without limitation any costs associated with penalties, fees or charges, if any, that may be imposed under the Loan Agreement on Landlord by Lender based on or in association with the prepayment of the Loan, and Landlord may apply Tenant's deposit toward such costs.

(b)     The Purchase Option detailed in this Section 24 may be assigned by Tenant to any third party, provided that the terms of the Purchase Option may not be modified by reason of such assignment. In addition, Tenant will lose its right to exercise the Purchase Option and the Purchase Option will be of no further force and effect if, as of the date of the Option Notice or the date of closing, Tenant is in Payment Default under this Master Lease beyond any applicable notice and cure period.

(c)     The sale of the Site to Tenant shall be without any representations or warranties of Landlord and shall be on an "AS IS, WHERE IS" basis. All indemnification provisions of this Master Lease shall continue in full force and effect in favor of Landlord and shall survive the conveyance of the Site to Tenant and recording of any deed in connection therewith. The

43

Purchase Price for the Site shall be absolutely net to Landlord, and Tenant shall pay for all taxes, charges, fees and costs in connection with the sale of the Site to Tenant.

(d)  Notwithstanding anything to the contrary contained in this Master Lease, if the Purchase Option terminates or expires, or if Tenant defaults under its obligation to purchase the Site following Tenant's exercise of the Purchase Option, then this Master Lease shall nevertheless continue in full force and effect as if the Purchase Option had not been exercised (although Landlord and Tenant shall retain any rights they may have arising out of such termination).

(e)  The Purchase Option will automatically terminate and be of no further force and effect, and Landlord will have no further liability of any kind to Tenant regarding the sale of the Site to Tenant, if any of the following events occurs: (i) Tenant does not deliver the executed Option Notice and the entire amount of the deposit to Landlord within the time and manner provided in this Section 24; (ii) Tenant does not consummate the purchase of the Site for any reason on or before the closing date set forth in Section 24(a), excluding any failure of the purchase to be consummated solely as a result of a default by Landlord in its obligation to convey the Site to Tenant pursuant to the Purchase Option; or (iii) Tenant assigns or otherwise transfers its rights in this Master Lease or subleases all or substantially all of the Site to any third party.

(f)  If the Purchase Option has terminated or expired, then within five (5) business days after Landlord's written request, Tenant shall execute, acknowledge and deliver to Landlord all documents that Landlord or any title insurance company may reasonably request to evidence the termination of the Purchase Option, including, without limitation, escrow cancellation instructions. If Tenant fails to deliver to Landlord the documents relating to a termination within such five (5) business day period, such failure shall constitute a Lease Event of Default, and Tenant irrevocably appoints Landlord, with full power of substitution, as Tenant's attorney-in-fact, coupled with an interest to execute any or all such documents in the name of Tenant, including without limitation, a quitclaim deed (which shall expressly reserve this Master Lease). Any title insurance company may conclusively rely on the validity and enforceability of any document executed by Landlord as Tenant's attorney-in-fact pursuant to this subsection (f). Further, Tenant's failure to execute any such documents will not in any manner be construed as Tenant having a right to acquire the Site.

SECTION 25.  ACCOUNTING

(a)  Financial Data Reporting. Throughout the Term, Tenant must deliver to Landlord and a third party consultant to be agreed upon by Landlord and Tenant data that includes or reflects, without limitation, accounts receivable statements, accounts payable statements, and such other data produced in the ordinary course of business, related to Tenant's financial performance not less often than every calendar quarter (or at such longer intervals as requested by Landlord), as well as financial reports, in form reasonably requested by Landlord, not less often than quarterly. Landlord and Tenant shall cooperate with respect to the selection of the third-party consultant, and Tenant will pay all fees and costs charged by the third party consultant (not to exceed the aggregate sum of $6,000 per month) in accordance with a contract between Landlord and the third-party consultant. Either party may propose a new third-party

44

DN 2414692v2

consultant at any time during the Basic Term, and the other will not unreasonably withhold its consent to the substitution of the third-party consultant. A form of the initial contract between the third-party consultant and Landlord is attached as Exhibit C to this Master Lease. The data provided by Tenant to Landlord and third-party consultant must be sufficient to demonstrate Tenant's financial performance throughout the Term, to demonstrate Tenant's performance with respect to the Financial Performance Tests, to show Tenant's allocation and expenditure of funds (including the application of capital expenditures) as required under this Master Lease, to evidence any funds distributed or otherwise paid to the owners of Tenant, and to confirm that Tenant is in compliance with all financial regulations applicable to Tenant's business. Landlord and the third-party consultant will also receive a copy of all audited financial statements prepared by or for Tenant promptly after such audited financial statements are prepared, but not less often than annually.

(b)    Maintenance of Records and Accounting Method.  Tenant and all Subtenants shall at all times during the Term, and for twelve (12) months thereafter, keep, or cause to be kept, locally, to the reasonable satisfaction of Landlord, true, accurate, and complete records and double-entry books of account for the current and five (5) prior Accounting Years, such records to show all transactions relative to the Site's conduct of operations, and to be supported by data of original entry. Such records shall detail transactions conducted on or from the Site separate and apart from those in connection with Tenant's other business operations, if any. Tenant shall utilize the accrual method of accounting with respect to its preparation of the reports and maintenance of records required herein.

(c)    Statements.  No later than the one hundred twenty (120) days after the end of each fiscal year of Tenant, Tenant shall deliver to Landlord a balance sheet of Tenant and its consolidated subsidiaries, if any, a statement of changes in Tenant's financial position for such year, and a statement of operations and cash flows for such year. The statements shall all be certified by the chief financial officer of Tenant and shall be in comparative form showing the corresponding figures for the preceding fiscal year. Within forty-five (45) days after the end of each fiscal quarter of Tenant (other than the fourth fiscal quarter), Tenant shall deliver comparative quarterly balance sheets and statements of operations and cash flows certified by the chief financial officer of Tenant.

(d)    Availability of Records for Inspector's Audit.  Books of account and records hereinabove required shall be kept or made available at the Site, or at another location mutually agreed upon by Landlord and Tenant, and Landlord shall have the right at any reasonable times to examine and audit said books and records, without restriction, for the purpose of determining the accuracy thereof and the compliance of Tenants with the terms of this Master Lease. This Section 24(c) shall survive the expiration of the Term, or other termination of this Master Lease, for twelve (12) months after such expiration or termination.

(e)    Cost of Audit.  In the event that, for any reason, Tenant does not make available its (or its Subtenant's or licensee's) original records and books of account at the Site or at a location mutually agreed upon by Landlord and Tenant, Tenant agrees to pay all expenses incurred by Landlord in conducting any audit at the location where said records and books of account are maintained.  In the event that any audit discloses a discrepancy in Landlord's favor, which results in an increase in the revenue due Landlord for the period audited of five percent

45

(5%) or greater, then Tenant shall pay Landlord audit contract costs, together with the amount of any identified deficiency, with interest thereon calculated at the Overdue Rate.

(f)     Annual Financial Statements.  Upon reasonable notice and request by Landlord, Tenant shall furnish for each Accounting Year hereunder, a copy of Tenant's most recent federal income tax return, which Landlord agrees shall be held confidential, except (i) for disclosure to Landlord's consultants and attorneys, (ii) as may be necessary for the enforcement of Landlord's rights and Lessee's obligations under this Master Lease, or (iii) as required by Applicable Law.

(g)     Accounting Obligations of Subtenants.  Tenant shall cause all Subtenants, licensees, concessionaires and others conducting business operations on or from the Site to comply with all terms of this Section 24 with respect to the maintenance, form, availability and methodology of accounting records.

(h)     Inadequacy of Records.  In the event that Tenant or its Subtenants, licensees or concessionaires, as appropriate, fails to keep the records required by this Section 24 such that Landlord is unable, as reasonably determined by Landlord, to evaluate the financial performance of Tenant on an annual and quarterly basis, such failure shall be deemed a breach of this Master Lease by Tenant. In addition to the other remedies available to Landlord under this Master Lease, or at law or equity as a result of such breach, Tenant's failure to keep adequate financial records shall permit Landlord to immediately increase the Basic Rent by the Financial Performance Adjustment.

SECTION 26.     INDEMNITY

Except to the extent caused by the gross negligence or willful misconduct of any Indemnified Person, Tenant shall at all times relieve, defend, indemnify, protect, and save harmless any Indemnified Person from any and all claims, costs, losses, expenses or liability, including expenses and reasonable attorneys' fees incurred in defending against the same by an attorney selected by Tenant and reasonably satisfactory to Landlord, for the death of or injury to persons or damage to property, including property owned or controlled by or in the possession of any Indemnified Person, to the extent that such arises from or is caused by (a) the operation, maintenance, use, or occupation of the Site by Tenant or its agents, officers, employees, licensees, concessionaires, permittees, or subtenants, (b) the acts, omissions, or negligence of Tenant, its agents, officers, employees, licensees, concessionaires, permittees, or subtenants, or (c) the failure of Tenant, its agents, officers, employees, licensees, concessionaires, permittees, or subtenants to observe and abide by any of the terms or conditions of this Master Lease or Applicable Law. The obligation of Tenant to so relieve, indemnify, protect, and save harmless any Indemnified Person, shall extend to any claims, costs, losses, expenses, or liability arising from any periods of occupancy or of holding over by Tenant, its agents, officers, employees, licensees, concessionaires, permittees, or subtenants, beyond the expiration of the Term or other termination of this Master Lease. The foregoing indemnification obligations shall not include or be deemed to require any indemnification of liability by Tenant for any acts by InterCare.

[Signatures on following page]

46

IN WITNESS WHEREOF, the parties hereto have each caused this Master Lease Agreement to be duly executed by their respective officers thereunto duly authorized as of the date first above set forth.

Landlord:

AFG Investment Fund 5, LLC,
a California limited liability company

By:  Asset Funding Group, LLC
     a California limited liability
     company, its member

By: _____
    Name: Jeffrey Lee Hayden
    Its:   Member

Tenant:

Success Healthcare 1, LLC,
a California limited liability company

By: _____
    Name: _____
    Its:    Manager

1

IN WITNESS WHEREOF, the parties hereto have each caused this Master Lease Agreement to be duly executed by their respective officers thereunto duly authorized as of the date first above set forth.

Landlord:

AFG Investment Fund 5, LLC,
a California limited liability company

By:   Asset Funding Group, LLC
a California limited liability
company, its member

By:_____
Name: Jeffrey Lee Hayden
Its:    Member

Tenant:

Success Healthcare 1, LLC,
a California limited liability company

By: _____
Name:  Howard Koslow
Its:    Manager

1

**EXHIBIT LIST:**

EXHIBIT A:      LEGAL DESCRIPTION OF THE SITE

EXHIBIT B:      FORM OF LEASE GUARANTY

EXHIBIT C:      FORM OF THIRD-PARTY CONSULTANT CONTRACT

EXHIBIT D:      IMMEDIATE AND SHORT TERM REPAIRS COST ESTIMATE

EXHIBIT E:      PROPERTY CONDITION EVALUATION REPORT

EXHIBIT F:      FORM OF PLEDGE AGREEMENT

1

EXHIBIT "2"

**Account Balance Summary - Elements of Damage**

| 1.  Failure to Pay Property Taxes | | Subtotals for Category |
|---|---|---|
| a.  Amount of Property Taxes (first of two installments) | $       171,287.60 | |
| b.  Penalty 10% (by LA County Assessor's Office, separate from interest assessed for non-payment) | $         17,128.76 | |
| c.  Interest Per Annum - 10% (by LA County Assessor's Office) in the amount of $17,128.76.  Amount Accruing Monthly ($1,427.40) is charged in full on the 1st day of each month, commencing in December 2018 | $           1,427.40 | |
| d.  Monthly 1/12th Installment Tax Payment shall be paid in the Event of Default, plus an Overdue Rate, which is  an interest rate of 10% plus 4% of the monthly  tax installment payment (Sections 1 & 12 of the Lease). Accordingly, the monthly tax installment payment is $14,273.97 plus $1,998.36 at the Overdue Rate. The installment payments are to commence at the time of an Event of Default, which occurred (a) in July 2018, when Tenant failed to meet financial covenants causing a default under Section 15(c) of the Lease, or (b) when Tenant did not pay taxes as required under Section 11 of the Lease, causing a default under Section 15(a) of the Lease.  In any event, assuming a default under Section 11 of the Lease, the monthly amount, commencing in December 2018 is $16,272.33. | $         16,272.33 | $           206,116.09 |
| | | |
| 2.  Liens on Property Caused by Tenant* | $         16,658.62 | |
| a.   Interest Charged | $                      - | |
| b.   Legal Cost e.g., paying for lienholders legal cost, if any, and review of recordable lien releases | $                      - | |
| c.  Legal Cost & Expense Incurred by Landlord | $                      - | $             16,658.62 |
| | | |
| | | |
| 3.  Outstanding Basic Rent Accounting For 10% Financial Performance Adjustment (Breach of Financial Covenants, NOD dated 6/16/18) | | |
| a.  December 2017 through June 2018 (10% of 7 months of Basic Rent of $289,312.26/month *7, or $2,025,185.82* .10) | $       202,518.58 | |

| | | |
|---|---|---|
| b. **December 2016 through November 2017** (10% of 12 months of Basic Rent of $283,526.11/month, or $3,402,313.35 *.10) | $ 340,231.34 | |
| c. **December 2015 through November 2016** (10% of 12 months of Basic Rent of $277,855.91/month, or $3,334,267.09 *.10) | $ 333,426.71 | |
| d. **December 2014 through November 2015** (10% of 12 months of Basic Rent of $272,298.48/month, or $3,267,581.74 *.10) | $ 326,758.17 | |
| | | |
| e. Additional Basic Rent for **June 2018 - October 2018** (based on monthly rent of $289,312.26, _plus_ 10% of Basic Rent in the amount of $28,931.26/month) | $ 144,656.43 | |
| f. Additional Basic Rent for **December 2018** (based on a monthly rent of $295,098.51), _plus_ 10% of Basic Rent in the amount of $29,509.85) | $ 29,509.85 | |
| g. Additional Basic Rent for **January 2019 and going forward** | TBD | $ 1,406,340.91 |
| | | |
| **4. Failure to Timely Pay November Rent** | | |
| a. Late Penalty (Section 3(e) of the Lease) of 5% based on monthly Basic Rent of $295,098.15 *.05 (The November 2018 Basic Rent payment was not the first late payment of Basic Rent by Tenant) | $ 14,754.91 | $ 14,754.91 |
| | | |
| **5. Security Deposit** | | |
| a. See Sections 3(g) and Section 15(j) of the Lease. | $ 690,000.00 | $ 690,000.00 |
| | | |
| **6. Breach Lease and Operative Documents, Including Landlord Loan Agreement** | | |
| a. Legal expense and costs incurred by Landlord, including, among other things, for Events of Default under Section 15 of the Lease, and causing a default under Landlord Loan Agreement | TBD | |
| b. Expenses and costs related to any changes of financial terms required by Lender | TBD | |
| c. Expenses and costs related to assignment and assumption agreement | TBD | TBD |
| | | |
| **Preliminary Totals** | $ 2,333,870.53 | $ 2,333,870.53 |

*As set forth in the Objection, the liens must be removed as a condition to any assumption, or assumption and assignment.

**The Debtor has failed to replenish the Security Deposit, as required under the Lease.

EXHIBIT "3"

November 21, 2018

Via Email

John Tishler                             Stuart Brown
Waller Lansden Dortch & Davis, LLP       DLA Piper LLP (US)
511 Union Street, Suite 2700             1201 N. Market  Street, Suite 2100
Nashville, TN  37219                     Wilmington, DE  19801
Email:  John.Tishler@wallerlaw.com       Email:  Stuart.Brown@dlapiper.com

Re:    AFG Investment Fund 5, LLC ("AFG") / Success Healthcare 1, LLC
       ("Tenant")
       Master Lease Agreement dated November 14, 2008
       7500 East Hellman Avenue, Rosemead, California (the "Property")

Gentlemen:

This firm represents AFG Investment Fund 5, LLC ("AFG5") with respect to the above-referenced lease (the "Lease").

We understand that the pending sale of the "Silverlake" properties includes the possible assignment of our client's Lease for the Property to either the current "Stalking Horse" or a qualified over bidder.  Since the Debtor's assumption and assignment of the Lease will require the Debtor to cure all defaults and to compensate AFG for damages resulting from defaults, we are providing the following to inform you of the existing defaults, which will need to be addressed in connection with any proposed assumption and assignment.  This list is not exclusive and our client reserves all of its rights to supplement it at the appropriate time for doing so.

Our client has previously and continuously requested from officers and employees of Promises Healthcare Group, LLC, Success Healthcare, LLC and Success Healthcare 1, LLC, among them, Peter Baranoff, Steve Helland and James Hopwood, financial information required under the Lease, which the Tenant has an affirmative obligation to provide.  Such financial information has not been forthcoming.  Our client has also requested that the Tenant interface with our client's accountant, Howard Lauterbach, CPA of Lazar & Co., who made several requests on our client's behalf for financial information for calendar years 2017 and 2018, to no avail.

Tenant is required under Section 3(c) of the Lease to provide each quarterly period by a date certain quarterly financial information to confirm Tenant's compliance with (a) Earnings to Rent Ratio of equal to or greater than 2:1, and (b) Fixed Charged Coverage Ratio of not less than 1:1 (collectively, "Financial Performance Tests").   The quarterly financial information is for the purpose of demonstrating compliance with each



of the Financial Performance Tests and to allow the landlord to verify or substantiate compliance.

Eliminating the period prior to calendar year 2014, Tenant has not thereafter delivered sufficient financial information to confirm its compliance with Financial Performance Tests. Further, Tenant's delivery of financial information has been generally limited to the Site, which is defined in the Lease as 7500 East Hellman Avenue, Rosemead, California (also "Ingleside Campus"). The Lease requires financial information for the operations by the Tenant, which includes its consolidated operations at 1711 West Temple Street, Los Angeles, California ("Downtown Campus") and the Rosemead campus, both of which constitutes the Silverlake Medical Center owned by Success Healthcare 1, LLC, identified as the Tenant in the Lease. The Lease makes no distinction between the Ingleside Campus and the Downtown Campus.

Compliance with Financial Performance Tests is to be determined after the end of each quarterly period. Separately, the Tenant is required to (a) deliver a balance sheet of its operations and its consolidated subsidiaries one hundred and twenty (120) days after the end of each fiscal year, (b) within forty-five (45) days after each quarter deliver comparative quarterly balance sheets and statements of operation and cash flows certified by the chief financial officer of the Tenant, (c) provide annual tax returns for each accounting year, upon request.

Based on the above, we are restating our client's request for all of financial information required to be provided under the Lease for calendar year 2014 to the present ("Financial Period"), and certified by the chief financial officer where required. To the extent that Tenant has not complied or has inadequately complied with its obligations regarding financial information for the Financial Period, the inadequacy or insufficiency of such prior financial disclosures by Tenant is itself a breach under Section 25(h) of the Lease.

Separate from Tenant's failure to provide sufficient financial information as required, any breach by Tenant's failure to satisfy Financial Performance Tests for each quarterly period, occurring during the Financial Period, resulting in an increase of ten percent (10%) to the Basic Rent, as provided in Section 3(c) of the Lease, is hereby reserved until reviewed and otherwise determined by AFG5.

In addition, the Basic Rent payment for November 2018 was due on November 1, 2018. It has not been paid, although we have been advised that the November "stub rent" will be paid. The failure to pay Basic Rent within a five (5) day grace period of its due date is a payment default. A five percent (5%) late fee ("Late Fee") can be assessed as permitted under the Lease. The obligation to pay the Basic Rent is an absolute obligation not subject to Abatement. This shall serve as notice that the Basic Rent for the month of


November may be increased by the amount of the Late Fee and the Overdue Rate for the month of November 2018 as a result of the monthly payment default. A calculation of the November Rent, with Late Fee and the Overdue Rate on a per diem basis will be sent under separate cover.

Further, it has come to our client's attention that Tenant has allowed several liens to be recorded against the Property resulting from Tenant's failure to pay certain work done on the Property. This is a breach under Section 7 of the Lease, which prohibits Tenant from directly or indirectly causing a title defect to the Property and not discharging a lien. We are requesting that you provide a title report to determine if any other liens have been recorded against the Property and confirmation that the existing liens have been released by lien releases recorded in the official records of Los Angeles County. It is our understanding that these liens relate to services provided by True Line Corporation, LA Lock & Sale and HIC Systems.

In addition to the request for a current title report on the Property and the lien releases, we are requesting that you provide the following information and documents with respect to the Tenant and the Property:

1. Any notice of any violation of Applicable Law,

2. Any notice from any Governmental Body,

3. Any environmental matter, whether threatened, alleged or pending,

4. Any log maintained regarding the maintenance and repair to the Property, or any component thereof,

5. Any property condition reports with respect to any Part (defined in the Lease) of the Property,

6. A list of any repairs of all Parts of the Property resulting from any property, equipment, system or component that is lost, stolen, destroyed, damaged rendered unfit or subject to quality standards requiring repair,

7. Any Mandatory Alterations (as defined in the Lease) required,

8. A list of several improvements to the Property, and

9. Copies of insurance certificates required by Section 11 of the Lease.



Also, this shall serve as notice or our client's intent to inspect the Property and its Parts. We would like to schedule it the week of November 26th. Please advise a date convenient and the person on site with whom we can coordinate an inspection.

The Lease provides that no delay or omission by AFG5 in the exercise of any right, remedy or power, or in pursuit thereof, shall impair any right, remedy or power or be construed to be a waiver of any default by the Tenant or an acquiescence thereto.

AFG5 reserves all rights and remedies under the Lease to declare any matter or thing that is a default under the Lease whether declared in this correspondence or subsequently declared. All costs and expenses related to any default or breach, including with respect to the filing of the bankruptcy proceeding by the Tenant shall be charged to Tenant as permitted in the Lease. Please note that capitalize terms not defined herein, whether or not expressly referred to as defined in the Lease, incorporate the definition in the Lease, unless otherwise noted.

Very truly yours,

Gary E. Klausner

EXHIBIT "4"

# PLEDGE AGREEMENT

THIS PLEDGE AGREEMENT (as amended (including any amendment and restatement hereof), supplemented or otherwise modified from time to time, this "Pledge Agreement") is made and entered into as of November 14, 2008 to be effective as of the Effective Date (defined below), by and between Success Healthcare, LLC, a California limited liability company ("Pledgor"), in favor of AFG Investment Fund 5, LLC, a California limited liability company ("Landlord").

WHEREAS, Landlord and Success Healthcare 1, LLC, a California limited liability company ("Tenant"), have entered into that certain Amended and Restated Master Lease Agreement (the "Lease") dated of even date herewith concerning the lease by Landlord to Tenant of that certain real property known as 7500 East Hellman Avenue, Rosemead, California and more particularly described in the Lease (the "Site");

WHEREAS, Peter R. Baronoff, an individual, Howard B. Koslow, an individual, and Lawrence Leder, an individual (collectively, the "Guarantors"), are together with Landlord parties to that certain Guaranty of Lease (the "Guaranty"), dated as of the date hereof, guaranteeing the obligations of Tenant in connection with the Lease, the terms of which Guaranty shall be fully incorporated herein;

WHEREAS, Pledgor is the owner of one hundred percent (100%) of the equity interests (the "Pledged Shares") of the Tenant;

WHEREAS, for and in consideration of the execution of the Lease by Landlord and as a material inducement to Landlord to execute the Lease, Pledgor desires to grant to Landlord a continuing security interest in and to the Pledged Collateral (as hereinafter defined) to secure the payment obligations of the Tenant under the Lease, and to secure the payment obligations of the Guarantors under the Guaranty; and

WHEREAS, Pledgor has a financial interest in Tenant, and Landlord is not willing to enter into the Lease with Tenant unless Pledgor executes and delivers to Landlord this Pledge Agreement;

NOW, THEREFORE, for and in consideration of the execution of the Lease by Landlord and as a material inducement to Landlord to execute the Lease, Pledgor hereby agrees with Landlord as follows:

SECTION 1.  **Defined Terms**.  The following terms shall have the following respective meanings:

"Asset Purchase Agreement" has the meaning specified in Section 16.15 hereof.

"Effective Date" has the meaning specified in Section 16.15 hereof.

"Event of Default" means one or more of the following: (1) the failure of the Tenant or the Guarantors to pay the Secured Obligations as and when due and any applicable cure

period has expired, and (2) the commencement of a voluntary case by Tenant under the Bankruptcy Code.

"Permitted Liens" means (i) the lien created by this Pledge Agreement in favor of Landlord, (ii) any lien in favor of any lender(s) providing secured financing to the Pledgor; provided that such lien is subordinate to the lien created by this Pledge Agreement in favor of Landlord; and (iii) liens for current taxes, assessments or other governmental charges which are not delinquent or remain payable without any penalty, or are being contested in good faith by appropriate proceedings and provided Pledgor has established adequate reserves in accordance with GAAP.

"Pledged Collateral" has the meaning specified in Section 2 hereof.

"Pledged Shares" has the meaning specified in the recitals hereof.

"Proxy" has the meaning specified in Section 4 hereof.

"Secured Obligations" has the meaning specified in Section 3 hereof.

"Securities Act" has the meaning specified in Section 13 hereof

"UCC" means the Uniform Commercial Code, as in effect from time to time in the State of California.

All other capitalized terms used herein and not otherwise defined herein shall have the meanings given in the Lease, or, if not defined therein, the meanings set forth in the UCC, except where the context otherwise requires.

SECTION 2. **Pledge.** Pledgor hereby pledges to Landlord and grants to the Landlord a continuing first priority and perfected security interest in, its right, title and interest in and to the following (collectively, the "Pledged Collateral"):

(a) the Pledged Shares and any certificates representing the Pledged Shares, and all products and proceeds of any of the Pledged Shares, including, without limitation, all dividends, cash, instruments, subscriptions, warrants and any other rights and options and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Pledged Shares; and

(b) all voting rights in respect of the Pledged Shares.

SECTION 3. **Security For Obligations.** This Pledge Agreement secures, and the Pledged Collateral of Pledgor is collateral security for, the obligation of the Tenant for prompt payment in full of the Basic Rent when and as due under the Lease, and the obligation of the Guarantors for prompt payment in full of any and all amounts when and as due under the Guaranty, including without limitation any obligations to replenish the Security Deposit in accordance with the terms of the Lease, as such amounts may be adjusted from time to time under the terms of the Lease and/or the Guaranty, and any other payment obligations now or hereafter existing under the Lease or Guaranty and all amendments, extensions or renewals

2

thereof (including, without limitation, payment of any Late Fee), whether or not from time to time decreased or extinguished and later increased, created or incurred (such payment obligations, as specified above, being collectively referred to herein as the "Secured Obligations").

SECTION 4.  **Delivery Of Pledged Collateral**.  All certificates or instruments representing or evidencing the Pledged Collateral shall be delivered to and held by or on behalf of the Landlord pursuant hereto.  Such certificates or instruments shall be in suitable form for transfer by delivery, or shall be accompanied by a duly executed acknowledgment of the Tenant of the Pledged Shares in substantially the form of Exhibit A hereto, and instruments of transfer or assignment in blank (or such other documents or agreements necessary to give the Landlord "control" within the meaning of the UCC), all in form and substance reasonably satisfactory to the Landlord.  Pledgor shall execute and deliver to the Landlord a proxy, substantially in the form of Exhibit B hereto (a "Proxy"), for Tenant of the Pledged Shares pledged by it.  Each Proxy shall be irrevocable until the security interests granted in the Pledged Collateral are terminated in accordance with this Pledge Agreement.

SECTION 5.  **Representations And Warranties**.  Pledgor represents and warrants as to the Pledged Collateral pledged by it as follows:

(a)     Its Pledged Shares have been duly authorized and validly issued and are fully paid and non-assessable.

(b)     Pledgor is the legal and beneficial owner of the Pledged Collateral, free and clear of any lien on the Pledged Collateral other than Permitted Liens.

(c)     Upon the delivery to the Landlord of the Pledged Collateral pledged by Pledgor and the filing of a UCC-1 financing statement, the pledge of such Pledged Collateral pursuant to this Pledge Agreement will create a valid and perfected first priority lien in such Pledged Collateral, subject only to Permitted Liens, securing the payment of the Secured Obligations,

(d)     No authorization, approval, or other action by, and no notice to or filing with, any Governmental Authority is required either (i) for the pledge by Pledgor of Pledged Collateral pursuant to this Pledge Agreement or for the execution, delivery or performance of this Pledge Agreement by Pledgor or (ii) for the exercise by the Landlord of the voting or other rights provided for in this Pledge Agreement or the remedies in respect of the Pledged Collateral pursuant to this Pledge Agreement (except for the filing of a UCC-1 Financing Statement describing the Pledged Collateral in accordance with the UCC, and as may be required in connection with any disposition of the Pledged Shares by laws affecting the offering and sale of securities generally).

(e)     Pledgor has full company power and authority to enter into this Pledge Agreement and has the right to vote, pledge and grant a security interest in the Pledged Shares and the other Pledged Collateral pledged by it, as provided by this Pledge Agreement.

(f)     This Pledge Agreement has been duly authorized, executed and delivered by Pledgor and constitutes its legal, valid and binding obligation, enforceable against it

3

in accordance with its terms except as enforceability may be limited by bankruptcy, insolvency, reorganization, receivership, moratorium or other laws affecting the rights and remedies of creditors generally and by general equitable principles.

(g)     The Pledged Shares constitute one hundred percent (100%) of the authorized, issued and outstanding membership interests of the Tenant.

SECTION 6.   **Further Assurances.**  Pledgor agrees that at any time and from time to time, at its expense, it will promptly execute and deliver, or cause to be executed and delivered, all stock powers, note powers, endorsements, proxies, assignments, acknowledgments, financing statements, instruments and documents and take all further action, at the Landlord's request, that the Landlord reasonably deems necessary or advisable in order to perfect any security interest granted or purported to be granted hereby or to enable the Landlord to exercise and enforce its rights and remedies hereunder with respect to any Pledged Collateral and to carry out the provisions and purposes hereof.  Pledgor will, promptly upon request, provide to the Landlord all information and evidence it may reasonably request concerning the Pledged Collateral to enable the Landlord to enforce the provisions of this Pledge Agreement.

SECTION 7.   **Voting Rights; Dividends; Etc.**

(a)     Until the Landlord terminates Pledgor's rights to exercise its voting and other consensual rights pursuant to Section 7(g) hereof, Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Pledged Shares or any part thereof for any purpose not inconsistent with the terms of this Pledge Agreement, the Guaranty or the Lease; provided, however, that Pledgor shall not exercise and shall refrain from exercising any such right if such action or inaction would reasonably be expected to adversely affect the validity, priority or perfection of the security interests granted hereunder or would otherwise be inconsistent with or violate any provisions of this Pledge Agreement, the Guaranty or the Lease.

(b)     [intentionally omitted]

(c)     So long as no Event of Default shall have occurred and be continuing, Pledgor shall be entitled to receive all dividends paid from time to time in respect of the Pledged Shares.

(d)     Any and all (i) dividends or other distributions and interest or principal paid or payable in the form of instruments and other property (other than cash dividends permitted under Section 7(c) hereof) received, receivable or otherwise distributed in respect of, or in exchange for, any Pledged Collateral, (ii) dividends and other distributions paid or payable in cash received, receivable or otherwise distributed in respect of any Pledged Shares in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid-in-surplus, and (iii) cash paid, payable or otherwise distributed in redemption of, or in exchange for, any Pledged Shares, shall in each case be delivered forthwith to the Landlord to hold as Pledged Collateral and shall, if received by a Pledgor, be received in trust for the benefit of the Landlord, be segregated from the other property or funds of such

4

Pledgor, and be forthwith delivered to the Landlord as Pledged Collateral in the same form as so received (with any necessary or requested endorsement).

(e)     The Landlord shall execute and deliver (or cause to be executed and delivered) to Pledgor all such proxies and other instruments as Pledgor may reasonably request for the purpose of enabling Pledgor to exercise the voting and other rights which it is entitled to exercise pursuant to Section 7(a) above.

(f)     [intentionally omitted]

(g)     Upon the occurrence and during the continuance of an Event of Default, except as provided in Section 7(i), the Landlord may terminate Pledgor's rights to exercise the voting and other consensual rights which Pledgor would otherwise be entitled to exercise pursuant to Section 7(a) either by giving written notice of such termination to Pledgor or by transferring such Pledged Collateral into the name of the Landlord or its nominee and the Landlord shall thereupon have the sole right to exercise such voting and other consensual rights.

(h)     Upon the occurrence and during the continuance of an Event of Default, except as provided in Section 7(i), all dividends or other distributions payable in respect of the Pledged Shares shall be paid directly to the Landlord for application to the Secured Obligations, and, if received by Pledgor, shall be received in trust for the benefit of the Landlord, shall be segregated from other funds of Pledgor, and shall be forthwith paid over to the Landlord as Pledged Collateral in the same form as so received (with any necessary or requested endorsements) and Pledgor's right to receive such dividends pursuant to Section 7(c) hereof shall immediately cease.

(i)     Prior to exercising any rights, remedies or powers under this Pledge Agreement against the Pledged Collateral that may arise upon the occurrence of any Event of Default, Landlord shall provide notice to Pledgor of such Event of Default, and Pledgor shall have fifteen (15) days to cure (the "Initial Cure Period"). Notwithstanding the foregoing, if Landlord has applied the Security Deposit toward the payment of Basic Rent in accordance with the Lease, and has cured an Event of Default through the application of sufficient funds from the Security Deposit toward the payment of Basic Rent, including any Late Fee (as such capitalized terms are defined in the Lease), then Tenant, Guarantors, and Pledgor shall have twenty-one (21) days following such application of the Security Deposit to replenish the Security Deposit in accordance with the terms of the Lease (the "Security Deposit Cure Period"), but Landlord shall not be required to provide Pledgor with any additional cure period hereunder following the expiration of the Security Deposit Cure Period prior to Landlord's exercise of any rights, remedies or powers under this Pledge Agreement. Unless (A) a cure is effected to the reasonable satisfaction of Landlord during the Initial Cure Period, and no Event of Default is continuing at the expiration of such Initial Cure Period, or (B) Landlord applies sufficient funds from the Security Deposit prior to the expiration of the Initial Cure Period to cure any Event of Default and Tenant, Guarantors, or Pledgor thereafter replenish the Security Deposit prior to the expiration of the Security Deposit Cure Period in accordance with the terms of the Lease and this subsection (i), then Landlord may proceed to exercise any rights, powers or remedies it may have pursuant to this Pledge Agreement.

5

# SECTION 8.  **Transfers And Other Liens; Additional Shares.**

(a)      Pledgor agrees that it will not (i) sell or otherwise dispose of, or grant any option with respect to (each, a "Transfer"), any of the Pledged Collateral, except to an Affiliate with Landlord's prior written consent and subject to the terms and conditions below, which consent shall not be unreasonably withheld, conditioned or delayed,  (ii) create or permit to exist any lien upon or with respect to any of the Pledged Collateral, except for Permitted Liens; or (iii) enter into any agreement or understanding that purports to or may restrict or inhibit the Landlord's rights or remedies hereunder, including, without limitation, the Landlord's right to sell or otherwise dispose of the Pledged Collateral.  If Pledgor shall desire to Transfer the Pledged Collateral to an Affiliate, Pledgor shall first notify Landlord in writing, which notice shall include:  (x) the proposed effective date of the Transfer (which shall not be less than thirty (30) nor more than ninety (90) days after Pledgor's notice), (y) the terms of the proposed Transfer and the consideration therefor (if any), the name, address and background information concerning the proposed transferee, and a true and complete copy of all proposed Transfer documentation, and (z) the most recent annual financial statement for the proposed transferee and such additional information as may be reasonably necessary to enable Landlord to determine the financial responsibility, character, and reputation of the proposed transferee.  Any consent by Landlord to a request for a proposed Transfer shall be conditioned upon (1) the Pledged Collateral remaining subject to the first priority perfected lien of Landlord following such transfer, and (2) the transferee and Landlord entering into such documentation reasonably satisfactory to Landlord, including, but not limited to, a new pledge agreement in substantially the same form as this Pledge Agreement, the provision to Landlord of a solvency certificate from the transferee that confirms that the transferee is solvent (after giving effect to the Transfer and the pledge by the transferee of the Pledged Collateral in favor of Landlord), and a legal opinion from independent legal counsel to the transferee (in form and substance reasonably satisfactory to Landlord).  In addition to other reasonable grounds for withholding consent, the parties hereby agree that it shall be reasonable under this Pledge Agreement and under any applicable law for Landlord to withhold consent to any proposed Transfer where the proposed transferee's financial condition (after giving effect to the Transfer and pledge of the Pledged Collateral) is not reasonably satisfactory to Landlord.

(b)      Pledgor agrees that it will pledge and deliver to the Landlord hereunder, promptly upon its acquisition (directly or indirectly) thereof, any and all additional shares of stock or other equity interests of the Tenant and all other Pledged Collateral.

# SECTION 9.  **Landlord Appointed Attorney-In-Fact.**  Following the expiration of any Initial Cure Period or Security Deposit Cure Period, and provided that an Event of Default is continuing, Pledgor hereby appoints the Landlord as Pledgor's attorney-in-fact, with full authority in the place and stead of Pledgor and in the name of Pledgor or otherwise, from time to time in the Landlord's discretion to take any action and to execute any instrument which the Landlord may reasonably deem necessary or advisable to further perfect and protect the security interest granted hereby, including, without limitation, to receive, endorse and collect all instruments made payable to Pledgor representing any dividend, interest or principal payment or other distribution in respect of the Pledged Collateral or any part thereof and to give full discharge for the same.

6

SECTION 10. **Landlord May Perform**. If Pledgor fails to perform any material agreement contained herein, after notice, demand and a cure period equal to the Initial Cure Period specified in Section 7(i) hereof, the Landlord may itself perform, or cause performance of, such agreement, and the reasonable expenses of the Landlord incurred in connection therewith shall be payable by Pledgor under Section 14 hereof.

SECTION 11. **No Assumption Of Duties; Reasonable Care**. The rights and powers granted to the Landlord hereunder are being granted in order to preserve and protect the Landlord's security interest in and to the Pledged Collateral granted hereby and shall not be interpreted to, and shall not, impose any duties on the Landlord in connection therewith except the duty to exercise reasonable care in the custody and preservation of the Pledged Collateral in its possession. The Landlord shall be deemed to have exercised reasonable care in the custody and preservation of the Pledged Collateral in its possession if the Pledged Collateral is accorded treatment substantially equal to that which the Landlord accords its own property, it being understood that the Landlord shall not have any responsibility for (i) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Pledged Collateral, whether or not the Landlord has or is deemed to have knowledge of such matters, or (ii) taking any necessary steps to preserve rights against any parties with respect to any Pledged Collateral.

SECTION 12. **Subsequent Changes Affecting Pledged Collateral**. Pledgor represents to the Landlord that it has made its own arrangements for keeping informed of changes or potential changes affecting the Pledged Collateral (including, but not limited to, rights to convert, rights to subscribe, payment of dividends, payments of interest and/or principal, reorganization or other exchanges, tender offers and voting rights), and Pledgor agrees that the Landlord shall have no responsibility or liability for informing Pledgor of any such changes or potential changes or for taking any action or omitting to take any action with respect thereto.

SECTION 13. **Remedies Upon Default**. If any Event of Default shall have occurred and be continuing and any applicable Initial Cure Period or Security Deposit Cure Period, as applicable, has expired, (a) the Landlord shall have, in addition to all other rights given by law or by this Pledge Agreement, the Guaranty or the Lease or otherwise, (i) all of the rights and remedies with respect to the Pledged Collateral of a secured party under the UCC, and (ii) all rights and remedies of a secured creditor under any other applicable laws, and (b) the Landlord may, without additional notice and at its option, transfer or register, and Pledgor shall register or cause to be registered upon request therefor by the Landlord, the Pledged Collateral or any part thereof on the books of the Tenant into the name of the Landlord or the Landlord's nominee(s), indicating that such Pledged Collateral is subject to the security interest hereunder. In addition, with respect to any Pledged Collateral which shall then be in or shall thereafter come into the possession or custody of the Landlord, the Landlord may sell or cause the same to be sold at any broker's board or at any public or private sale in accordance with the UCC, in one or more sales or lots, at such price or prices as the Landlord may deem best, for cash or on credit or for future delivery, without assumption of any credit risk, all in accordance with the terms and provisions of this Pledge Agreement. The purchaser of any or all Pledged Collateral so sold shall thereafter hold the same absolutely, free from any claim, encumbrance, lien or right of any kind whatsoever. The Landlord will give the Pledgor reasonable notice of the time and place of any public sale thereof, or of the time after which any private sale or other intended disposition is to

7

be made. Any sale of the Pledged Collateral conducted in conformity with reasonable commercial practices of secured parties disposing of property similar to the Pledged Collateral shall be deemed to be commercially reasonable. Any requirements of reasonable notice shall be met if such notice is sent to Pledgor by commercial overnight carrier as provided in Section 16.1 below, at least ten (10) days before the time of the sale or disposition. The Landlord may, in its own name or in the name of a designee or nominee, buy any of the Pledged Collateral at any public sale and, if permitted by applicable law, at any private sale. All expenses (including court costs and reasonable attorneys' fees, expenses and disbursements) of, or incident to, the enforcement of any of the provisions hereof shall be recoverable from the proceeds of the sale or other disposition of the Pledged Collateral. The Landlord shall be under no obligation to delay a sale of any of the Pledged Collateral for the period of time necessary to permit the Tenant to register such securities for public sale under the Securities Act of 1933, as from time to time amended (the "Securities Act"), or under any other applicable securities laws, even if the Tenant would agree to do so. In view of the fact that the Securities Act and other applicable securities laws may impose certain restrictions on the method by which a sale of the Pledged Collateral may be effected after an Event of Default, Pledgor agrees that upon the occurrence and during the continuation of any Event of Default, Pledgor may, from time to time, attempt to sell all or any part of the Pledged Collateral by means of a private sale, restricting the prospective purchasers to those who will represent and agree that they are purchasing for investment only and not for distribution. Pledgor acknowledges that any such private sales may be at prices and on terms less favorable to the Landlord than those obtainable through a public sale without such restrictions (including, without limitation, a public offering made pursuant to a registration statement under the Securities Act or other applicable securities laws) and, notwithstanding such circumstances, Pledgor agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that the Landlord shall have no obligation to engage in public sales and no obligation to delay the sale of any Pledged Collateral for the period of time necessary to permit the Tenant to register it for a form of public sale requiring registration under the Securities Act or under any other applicable securities laws. So long as the private sale is conducted in accordance with this Section 13, Pledgor waives any claims against the Landlord arising by reason of the fact that the price at any private sale was less than the price that might have been obtained at a public sale, or was less than the Secured Obligations, even if the Landlord shall accept the first offer received and does not offer the Pledged Collateral to more than one prospective purchaser.

In addition, upon the occurrence and during the continuance of an Event of Default, except for as set forth in Section 7(i), all rights of Pledgor to exercise the voting and other rights which it would otherwise be entitled to exercise may cease, and all such rights shall thereupon become vested in the Landlord as provided in and subject to the terms of Section 7(g) hereof.

SECTION 14. **Expenses.** The Pledgor will, upon demand, pay to the Landlord the amount of any and all reasonable expenses, including, without limitation, the reasonable fees, expenses and disbursements of its counsel, of any investment banking firm or business broker and of any other experts and agents retained by the Landlord, which the Landlord may incur in connection with (i) the exercise or enforcement of any of the rights of the Landlord hereunder or (ii) the failure by Pledgor to perform or observe any of the material provisions hereof. In addition, in the event of any dispute or litigation with regard to a default by Tenant under the Lease or a default by Pledgor under this Pledge Agreement, or with regard to the enforcement or

8

validity of the Lease, the Guaranty or this Pledge Agreement, Pledgor shall be obligated to pay all customary charges, costs and expenses (including, without limitation, reasonable attorneys' fees) actually incurred by Landlord in connection therewith, whether or not any action or proceeding is commenced regarding such dispute and whether or not such litigation is prosecuted to judgment, including without limitation, any actual and documented costs and expenses (including reasonable attorneys' fees) incurred in connection with the enforcement or collection of any judgment against Tenant and/or Pledgor.

SECTION 15. **Security Interest Absolute.** All rights of the Landlord and the security interests hereunder, and all obligations of the Pledgor hereunder, shall be absolute and unconditional irrespective of, and unaffected by:

(a) any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from this Pledge Agreement, the Guaranty or the Lease;

(b) any exchange, surrender, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Secured Obligations; or

(c) any other circumstance which might otherwise constitute a defense available to, or a discharge of, Pledgor in respect of the Secured Obligations or of this Pledge Agreement except for the defense of termination of this Pledge Agreement in accordance with Section 16.11.

SECTION 16. **Miscellaneous Provisions.**

Section 16.1    Notices. Any notice, statement, demand, consent, approval, or other communication required or permitted to be given, rendered or made by either party to the other, pursuant to this Pledge Agreement or pursuant to any applicable law or requirement of public authority, shall be in writing (whether or not so stated elsewhere in this Pledge Agreement) and shall be deemed to have been properly given, rendered or made only if hand-delivered or sent by commercial overnight carrier or by telecopy (with confirmation of receipt thereof and a copy sent by another means provided herein), addressed to Pledgor at the addresses set forth for notices to Tenant under the Lease, and addressed to Landlord at the same addresses for notices to Landlord under the Lease. Such notices shall be deemed to have been given upon the earlier of actual receipt by the intended recipient and one day after deposit with commercial overnight carrier. By giving notice as provided above, any party may designate a different address for notices, statements, demands, consents, approvals or other communications intended for it.

Section 16.2    Headings. The headings in this Pledge Agreement are for purposes of reference only and shall not affect the meaning or construction of any provision of this Pledge Agreement.

Section 16.3    Severability. Every provision of this Pledge Agreement is intended to be severable. In the event any term or provision hereof is declared to be illegal or invalid for any reason whatsoever by a court of competent jurisdiction, such illegality or

9

invalidity shall not affect the balance of the terms and provisions hereof which terms and provisions shall remain binding and enforceable.

Section 16.4 <u>Amendments, Waivers and Consents</u>. Any amendment of this Pledge Agreement shall not be effective unless the same shall be in writing and signed by the Landlord and the Pledgor. Any waiver of any provision of this Pledge Agreement and any consent to any departure by the Pledgor from any provision of this Pledge Agreement shall not be effective unless the same shall be in writing and signed by the Landlord and then such amendment or waiver shall be effective only in the specific instance and for the specific purposes for which given.

Section 16.5 <u>Interpretation of Agreement</u>. Time is of the essence in each provision of this Pledge Agreement of which time is an element. Acceptance of or acquiescence in a course of performance rendered under this Pledge Agreement shall not be relevant in determining the meaning of this Pledge Agreement even though the accepting or acquiescing party had knowledge of the nature of the performance and opportunity for objection.

Section 16.6 <u>Continuing Security Interest; Transfer of Secured Obligations</u>. This Pledge Agreement shall create a continuing security interest in the Pledged Collateral and shall (i) remain in full force and effect until (a) full and final payment and performance (including after the expiration of the Lease) of the Secured Obligations (other than contingent indemnification obligations as to which no claim has been made), or (b) the closing occurs on a purchase of the Site from Landlord pursuant to the terms of Tenant's purchase option as set forth in the Lease, or (c) the last day of the quarter in which Tenant satisfies the Financial Performance Tests (as defined in the Lease) for eight (8) consecutive quarters, provided that at least two (2) years have passed since the Tenant was first subject to the Financial Performance Tests under the Lease, (ii) be binding upon Pledgor, its successors, transferees and assigns, and (iii) inure, together with the rights and remedies of the Landlord hereunder, to the benefit of the successors, transferees and assigns of the Landlord. Without limiting the generality of clause (iii), above, the Landlord may assign or otherwise transfer any Secured Obligation held by it to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to the Landlord herein.

Section 16.7 <u>Reinstatement</u>. To the maximum extent permitted by law, this Pledge Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any amount received by the Landlord in respect of the Secured Obligations is rescinded or must otherwise be restored or returned by the Landlord upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Pledgor or any other Person or upon the appointment of any receiver, intervenor, conservator, trustee or similar official for Pledgor or any other Person or any substantial part of its assets, or otherwise, all as though such payments had not been made.

Section 16.8 <u>Survival of Provisions</u>. All representations, warranties and covenants of the Pledgor contained herein shall survive the execution and delivery of this Pledge Agreement, and shall terminate only upon the full payment and performance by the Pledgor of the Secured Obligations (other than contingent indemnification obligations as to which no claim has been made).

Section 16.9   No Waiver; Entire Agreement.

(a)     No Waiver.  No failure or delay on the part of Landlord to exercise any power, right or privilege under this Pledge Agreement shall impair any such power, right or privilege, or be construed to be a waiver of any default or any acquiescence therein, nor shall any single or partial exercise of such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

(b)     Entire Agreement.  This Pledge Agreement shall constitute the entire agreement between Pledgor and Landlord with respect to the subject matter hereof.

Section 16.10   Authority of the Landlord.  The Landlord shall have and be entitled to exercise all powers hereunder which are specifically granted to the Landlord by the terms hereof.  Each of the Landlord and the Pledgor may perform any of its duties hereunder or in connection with the Pledged Collateral by or through agents or employees and shall be entitled to retain counsel and to act in reliance upon the advice of counsel concerning all such matters.  Each of the Landlord and the Pledgor, and its respective directors, officers, managers, employees, attorneys and agents, shall be entitled to rely an any communication, instrument or document reasonably believed by it or them to be genuine and correct and to have been signed or sent by the proper person or persons.

Section 16.11   Release; Termination of Agreement.  Subject to the provisions of Section 16.6, Section 16.7 and Section 16.8 hereof, this Pledge Agreement shall terminate upon full payment and performance of all the Secured Obligations (other than contingent indemnification obligations as to which no claim has been made).  At such time, the Landlord shall, at the request and expense of the Pledgor, promptly reassign and redeliver to the Pledgor all of the Pledged Collateral hereunder which has not been sold, disposed of, retained or applied by the Landlord in accordance with the terms hereof and any and all proxies and other materials related thereto.  Such reassignment and redelivery shall be without warranty by or recourse to the Landlord, except as to the absence of any prior assignments by the Landlord of its interest in the Pledged Collateral, and shall be at the expense of the Pledgor.

Section 16.12   Counterparts.  This Pledge Agreement may be executed in any number of counterparts each of which shall be deemed an original and all of which together shall constitute one and the same Pledge Agreement with the same effect as if all parties had signed the same signature page.  Any signature page of this Pledge Agreement may be detached from any counterpart of this Pledge Agreement and re-attached to any other counterpart of this Pledge Agreement identical in form hereto but having attached to it one or more additional signature pages.

Section 16.13   Governing Law.  This Pledge Agreement shall be governed by and construed in accordance with the laws of the State of California.

BN 2414671v2

Section 16.14  Limitation Of Liability.  No claim may be made by Pledgor against the Landlord, or the affiliates, directors, officers, officers, managers, employees, or agents of the Landlord for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement, the Guaranty or the Lease, or any act, omission or event occurring in connection therewith, and Pledgor hereby waives, releases and agrees not to sue upon any claim for such special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor.

Section 16.15  Effective Date.  Notwithstanding anything herein to the contrary, this Pledge Agreement shall not become effective until the closing occurs under that certain Asset Purchase Agreement dated November 14, 2008 ("Asset Purchase Agreement"), between Tenant and InterCare Health Systems, Inc., a California corporation (the date such closing occurs shall be referred to herein as the "Effective Date"); provided, however, that in the event that the closing under such Asset Purchase Agreement does not occur by December 31, 2008, this Pledge Agreement shall automatically be null and void and neither party shall have any rights or obligations hereunder except as otherwise expressly set forth herein.

[SIGNATURE PAGES FOLLOW]

BN 2414671v2

IN WITNESS WHEREOF, the Landlord and the Pledgor have each caused this Pledge Agreement to be duly executed as of the date first above set forth.

SUCCESS HEALTHCARE, LLC,
a California limited liability company

By _____
Name: Howard Koslow
Title: Manager

AFG INVESTMENT FUND 5, LLC,
a California limited liability company

By _____
Name:
Title:

IN WITNESS WHEREOF, the Landlord and the Pledgor have each caused this Pledge Agreement to be duly executed as of the date first above set forth.

**SUCCESS HEALTHCARE, LLC,**
a California limited liability company

By_____
Name:
Title:

**AFG INVESTMENT FUND 5, LLC,**
a California limited liability company

By_____
Name:
Title:

# EXHIBIT A

## FORM OF ACKNOWLEDGMENT

The undersigned hereby acknowledges receipt of a copy of that certain Pledge Agreement, dated November 14, 2008 by and between Success Healthcare, LLC, a California limited liability company, as Pledgor, in favor of AFG Investment Fund 5, LLC, a California limited liability company, as Landlord (the "Pledge Agreement") and agrees as follows:

1.     The undersigned will promptly note on its books and records the liens granted under the Pledge Agreement, and waives any rights or requirements at any time hereafter to receive a copy of such Pledge Agreement in connection with the registration of the Pledged Collateral in the name of the Landlord or the exercise of voting rights by the Landlord.

2.     The undersigned will be bound by the terms of the Pledge Agreement and will comply with such terms to the extent such terms are applicable to the undersigned.

SUCCESS HEALTHCARE 1, LLC,
a California limited liability company

By: _____
Name: _Howard Koslow_____
Title: _Manager_____

**EXHIBIT B**

**IRREVOCABLE PROXY**

The undersigned hereby irrevocably appoints AFG Investment Fund 5, LLC, a California limited liability company ("Landlord"), as proxy with full power of substitution, and hereby authorizes the Landlord to represent and vote all of the membership interests of Success Healthcare 1, LLC held of record by the undersigned on the date of exercise hereof or at any meeting or at any other time chosen by the Landlord in its sole discretion.

SUCCESS HEALTHCARE, LLC,
a California limited liability company

Date: _November 14, 2008_

By: _____
Name: _HOWARD KOSLOW_
Title: _Manager_