## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| PROMISE HEALTHCARE GROUP, LLC., *et al.*, | : | Case No. 18-12491 (CSS) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | [Request for Waiver from Rule 2016-2(d)] |
| | : | |
| | : | **Obj. Deadline: Jan. 25, 2019 @ 4:00 p.m.** |
| | : | **Hearing Date: February 1, 2019 @ 2:00 p.m.** |

## APPLICATION OF CREDITOR FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE PURSUANT TO TITLE 11 OF THE UNITED STATES CODE SECTION 503(b)(3)(D)

| | |
|---|---|
| Name of Applicants: | Healthcare Finance Partners Corp. ("**Healthcare Finance**") |
| Professional services provided by: | Healthcare Finance Partners Corp. |
| Dates of retention: | Healthcare Finance – September 2016 |
| Period for which compensation and reimbursement is sought: | September 2016 through December 2018 |
| Amount of fees for which reimbursement is sought as actual, reasonable, and necessary: | $395,375.00 |
| Amount of expenses for which reimbursement is sought as actual, reasonable, and necessary: | None |

This is an application for reimbursement of fees in making a substantial contribution in these cases. No prior application has been filed.

**Local Form 101 (Fee Application Cover Sheet)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| PROMISE HEALTHCARE GROUP, LLC., *et al.*,[1] | : Case No. 18-12491 (CSS) |
| | : |
| Debtors. | : Jointly Administered |
| | : [Request for Waiver from Rule 2016-2(d)] |
| | : |
| | : **Obj. Deadline: Jan. 25, 2019 @ 4:00 p.m.** |
| | : **Hearing Date: February 1, 2019 @ 2:00 p.m.** |

## MOTION OF CREDITOR FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE PURSUANT TO TITLE 11 OF THE UNITED STATES CODE SECTION 503(b)(3)(D)

Healthcare Finance Partners Corp. ("**Healthcare Finance**") files this motion ("**Motion**") pursuant to 11 USCS § 503(b)(3)(D) of the United States Bankruptcy Code seeking payment of its broker's fees as an administrative expense based upon Healthcare Finance's substantial contribution to the estate.

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Professional Rehabilitation Hospital, L.L.C. (5340), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179), Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc. (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc. (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), St. Alexius Hospital Corporation #1 (2766), St. Alexius Properties, LLC (4610), Success Healthcare 1, LLC (6535), Success Healthcare 2, LLC (8861), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766). The mailing address for the Debtors, solely for purposes of notices and communications, is 999 Yamato Road, 3rd FL, Boca Raton, FL 33431.

## PRELIMINARY STATEMENT

For more than two years Healthcare Finance worked on behalf of Quantum Properties, LP ("**Quantum**") a Debtor in these Chapter 11 Cases, to evaluate financing and/or sale options and market a mental health rehabilitation center in San Diego, California.  Healthcare Finance secured a stalking horse bidder at Fifteen Million Dollars ($15,000,000.00) and the pertinent contract called for Healthcare Finance to be paid Two and One-Half Percent (2.5%) of the gross sale proceeds ("**Broker's Fee**").  After notice of opportunity to bid, the property was sold to the third-party bidder.  During the course of the auction, a caveat was added to Healthcare Finance's Broker's Fee provision in the Purchase and Sale Agreement; as amended, the Broker's Fees are due to Healthcare Finance "if ordered to do so by an order of the bankruptcy court."

Healthcare Finance worked extensively on Debtor's behalf – both pre-petition and post-petition - in order to complete due diligence, market the property, secure a purchase contract, clear zoning impediments, attend a hearing on December 4, 2018 at the Debtor's request (and at Healthcare Finance's own expense), re-market the Property at Debtor's request after the bankruptcy petition was filed, facilitate receipt of post-petition overbids, and engage in extensive discourse with all counsel and committee members as necessary via email, telephone, and in-person conferences. ***But-for the original bid and the due diligence that the third-party bidder was able to rely upon there would have been no overbid in excess of Sixteen Million Dollars ($16,000,000.00).***  Healthcare Finance made a substantial contribution to the estate and is entitled to the compensation as requested herein.

## JURISDICTION AND VENUE

The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of this Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(1) and (b)(2)(B).

## NOTICE

Notice was provided to all necessary parties on January 11, 2019 as required by Local Rule 9006-1 which mandates that all motion and papers shall be filed and served in accordance with Local Rule 2002-1(b) at least twenty-one (21) days if service is by first class mail.

## NO PRIOR REQUEST

No prior request for the relief sought in this Motion has been made to this or any other Court.

## REQUEST FOR WAIVER RE: RULE 2016-2(d)

Moving party requests that the Court waive the requirements of 2016-2(d) and Local Form 102 for good cause.  Healthcare Finance brokers real estate transactions in the niche area of inpatient healthcare properties. As is common practice in the real estate industry, it does not track time in a manner that would allow it to categorically present activities/time in tenths of an hour increments.  For this reason, good cause exists to waive this requirement.

## PRAYER FOR RELIEF

Healthcare Finance seeks an order authorizing payment of Three Hundred Ninety-Five Thousand Three Hundred Seventy-Five Dollars ($395,375.00) representing Two and One-Half Percent (2.5%) in brokerage fees as applied to the *original* Purchase and Sale Agreement which – but for its existence – would not have garnered the overbid.

## BACKGROUND

Kevin Roy is the Managing Partner of Healthcare Finance Partners Corp. ("**Healthcare Finance**") which has its principal office at 1811 McKee Street, San Diego, California 92110.  See, Declaration of Kevin Roy in Support of Motion ("**Declaration**") in support of the Motion for Allowance of Administrative Expense Pursuant to Title 11 of the United States Code Section 503(b)(3)(D), ¶ 1.  Kevin Roy has over fifteen years (15) years of inpatient healthcare real estate and finance experience.  Id., ¶ 3.  Kevin Roy serves an extremely niche area of the real estate market and there are very few individuals with comparable skill sets. Id.

Kevin devote the entirety of my working efforts to Healthcare Finance and work an average of forty (40) hours each week.  Id., ¶ 4.   Given the complexity of the transactions Mr. Roy specializes in, his annual workload consists of only 1-4 assignments per year; with some assignments – like this one – taking more than two years to consummate.  Id.  As is standard in the real estate industry, I do not monitor or track my time in billable increments but rather on a success fee basis. Id.

Initially, in September 2016, Quantum Properties, LP ("**Quantum**"), a Debtor in these Chapter 11 Cases, retained Healthcare Finance to, among other things, advise and assist Quantum in evaluating a potential sale transaction of their San Diego asset. Id., ¶ 5.  Healthcare Finance was asked to approach owner/users or investors who may be interested in purchasing the mental health rehabilitation center known as Promise Hospital San Diego which is located at 5500 University Avenue, San Diego, California 92105 together with all easements and rights appurtenant thereto ("**Property**"). Id.

During this initial engagement, Healthcare Finance was asked to secure a Letter of Intent ("**LOI**") from a Buyer which Health Finance believed to be able to close quickly and would assume

the property "as-is" including the closure of the existing hospital operations. Id., ¶ 6. Healthcare Finance initially secured a LOI in the amount of Twelve Million Dollars ($12,000,000). Id. Through further negotiations, Healthcare Finance secured a LOI in the amount of Fifteen Million Dollars ($15,000,000). Id. Ultimately in or about November-December 2016, Debtor elected *not* to move forward with the sale, opting instead to lease the Property to the existing subtenant with a long-term lease. Id.

In or around November 2017, Healthcare Finance and Debtor revived communications regarding a sale of the Property with Debtor, now as an investment property to be marketed for sale. Id., ¶ 7.

Thereafter, working in good faith, Healthcare Finance immediately commenced marketing efforts which continued until January 2018. Id., ¶ 8.

## MARKETING EFFORTS

Healthcare Finance's pre-engagement marketing efforts between November 2017 and January 2018 were extensive. Id., ¶ 9. Debtor made it clear that it wanted a quick transaction and given the business operation in place at the Property, this naturally meant that the pool of potential purchasers was small. Id. Additional details of these marketing efforts are outlined below.

Healthcare Finance searched to identify potential buyers of behavioral hospitals on a national basis. Id., ¶ 10. Not only would these buyers be purchasing an in-patient single purpose hospital asset, but also a niche behavioral health asset which would not be reimbursed by Medicaid or Medicare, which is the industry norm. Id. Instead, Crestwood (the Tenant at the Property) had a very unique operating model which was paid by an annually renewable contract with the County of San Diego; in the event that this contract lapsed, the building could not be used for any in-patient services in the future due to the building requirements of California's Office of Statewide

Health Planning and Development ("**OSHPD**").  Id.  This unique operating model *greatly* increased the difficulty of locating a suitable buyer and *hundreds* of hours were spent on these efforts to ensure that each interested buyer had full disclosure of the nature of these operations. Id.

Healthcare Finance corresponded via telephone, email and text messages and attended in-person meetings with various REITS and private investors from all across the country in order to gauge their interest in the Property. Id., ¶ 11.  Healthcare Finance initially developed a list of forty (40) potential purchasers. Id., ¶ 12.  Thereafter, taking into consideration Debtors' desire to quickly close a sale transaction with an able buyer who understood the specific asset class and condition of their contract, Healthcare Finance further narrowed the list to sixteen (16) potential purchasers. Id., ¶ 13.

Correspondence and in-person meetings continued in which Healthcare Finance collected additional detailed information as requested by the buyer pool regarding the asset as well as the State of California and the County (regarding the contract with Tenant). Id., ¶ 14.  Healthcare Finance carefully analyzed the group of sixteen (16) possible buyers and applying its skill and expertise along with confidential market data, identified National Health Investors, Inc. ("**NHI**") as the buyer that would be best suited for Debtors needs. Id., ¶ 15.  Not only was NHI financially capable but they had a clear understanding and history of investing in that market and based on prior experience worked well with these types of assets. Id.

Healthcare Finance provided Debtor with its analysis and findings. Id., ¶ 16.  On or about January 19, 2018 Debtor engaged Healthcare Finance by executing a Non-Exclusive Finder's Fee Agreement which was similar to the previously agreement executed in 2016; Although Healthcare Finance requested a traditional real estate engagement agreement Debtor sought only to move forward with the single buyer given timing needs and the desire to keep this matter confidential

without disturbing the Tenant.  Id., ¶ 17.  A copy the Non-Exclusive Finder's Fee Agreement is attached to the **Declaration** as **Exhibit A**.  Id.

## POST ENGAGEMENT EFFORTS

Healthcare Finance worked directly with the Debtor, Debtor's counsel, and NHI to negotiate and finalize the LOI.  Id., ¶ 18.  Extensive time and effort went into negotiation of the LOI for reasons which include but are not limited to the fact that Debtor had outstanding capital expenditure issues related to the initial closing of the facility with the Tenant that needed to be resolved.  Id., ¶ 19.  Debtor did not give Healthcare Finance authority to disclose that bankruptcy was a possibility until June 2018 and therefore terms in the LOI that were submitted by Debtor as early as May 2018 were not normal and customary and therefore necessitated additional and unnecessary delays with negotiations to further clarify the intent of the language.  Id.

Between January and July 2018, there were at least five different versions of the LOI that Healthcare Finance negotiated for Debtor with NHI, all of which included the purchase price of $15,000,000 but varying language regarding good faith negotiations and due diligence timelines. The LOI between Debtor and NHI was finalized on July 9, 2018.  Id., ¶ 20.

Shortly after executing the LOI on July 9, 2018 and until Debtor filed its Petition on November 5, 2018, Healthcare Finance's involvement/activities include but are not limited to the following:

a.  Engage in countless conference calls and emails with Debtor and Debtor's counsel;

b.  Collect data and prepare a central document deposit for due diligence documents;

c.  Compile and continue to update due diligence documents as necessary;

d.  Engage in various phone calls and emails with Debtor and NHI regarding LOI terms and conditions and then working towards converting the LOI to a Purchase Agreement ("**PA**");

e.  Prepare and delivered **PA** to Debtor;

f.  Assist with the introduction of NHI to Tenant to which would be where Debtor gained maximum value in the effort to improve on and revise the existing lease;

g.  Analyze due diligence documents and engage NHI and Debtor on various calls regarding same;

h.  Provide contact and coordinate industry experts for Debtors third party reporting needs;

i.  Assist and coordination of all Third-Party Reporting needs from NHI including on-sire property reviews and information collection from Debtor;

j.  Analyze lender issues and strategize to identify work around so that NHI could acquire the property free and clear;

k.  Engage with NHI, Debtor and newly hired representative of CRO from FTI Consulting as necessary once Bankruptcy was determined necessary;

l.  Ensured that NHI, once being notified of the Bankruptcy would be necessary, was kept as the stalking horse and would not walk away from the deal;

m.  Weekly calls from July-November with NHI and Debtor to maintain consistency of communication as well as travel to Nashville, TN to meet with NHI on the Debtors behalf after several terms nearly killed the deal; and

       n.   Coordinate with all parties as necessary to prepare documents for filing with the Bankruptcy Court to accompany the motion[2] for the sale of the Property to NHI in accordance with the **PA**.

Id., ¶ 21.

Additionally, Healthcare Finance facilitated negotiations with the Tenant. The existing lease did not conform with market standards so in order to maximize Debtor's real estate value, Healthcare Finance facilitated at all levels the negotiations with Tenant, from the initial introduction to discussions with the Tenant about standard lease structures which Debtors' exiting lease lacked, to facilitating all the negotiations, valuation and analysis for NHI with Tenant. Id., ¶ 22.

Negotiation of a lease with an existing Tenant is not standard practice when selling a leasehold interest as a pure investment to a buyer. Id., ¶ 23. However, Healthcare Finance made this suggestion to Debtor that as part of the strategy to obtain the desired $15,000,000 offer and was a key reason why Debtor and Healthcare Finance wanted to bring only one buyer to the table after pre-marketing. Id. Debtor trusted Healthcare Finance's professional expertise with this approach and was supportive of moving forward accordingly. Id. Healthcare Finance estimates that based upon the lease existing lease terms - and supported through the final appraisal that was previously submitted to this Court - the lease negotiation alone added at least One Million Two Hundred Thousand Dollars ($1,200,000) to the Debtor's real estate value. Id.

---

[2] Motion of Debtors for Entry of an Order (I) Authorizing The Sale of Certain Real Property Free and Clear of All Liens. Claims, Interests, and Encumbrances, and (II) Authorizing the Debtors to Reject Unexpired Lease of NonResidential Real Property, (D.I. No. 87) filed November 11, 2018.

## POST PETITION EFFORTS

After Debtor filed the Chapter 11 Bankruptcy Petition on November 4, 2018, Healthcare Finance continued to play an integral part of the process with regard to the Property and supporting the Debtor's requests from the United States Trustee, creditor committee and the Court. Id., ¶ 24.

As mentioned previously, Healthcare Finance assisted in the preparation of a declaration[3] to accompany the Motion which essentially attested to the marketing process and identification of NHI as the proposed buyer (the "**Sale Declaration**").  Id., ¶ 25.  On or about November 8 or 9, 2018, Healthcare Finance coordinated a call between all parties to finalize deal points on the Purchase Agreement with NHI to ensure this was done in a timely manner. Id., ¶ 26.

On November 9, 2018, Healthcare Finance participated in a call with counsel for Debtor regarding zoning issues with the Property which NHI was requiring be cleared in advance of closing (this issue had been pending with Debtor as an issue for it to resolve for more than four months).  Id., ¶ 27.  Kevin Roy thereafter traveled to the San Diego Planning Office to discuss zoning issues with an available planner and prepared an update to Debtor and NHI.  Id.

On November 10, 2018 Healthcare Finance continued the discussion regarding Property zoning issues and alternatives with Debtor's counsel and NHI; Healthcare Finance's efforts in regard to the zoning issues ultimately resulted in saving the Debtor Fifty Thousand Dollars ($50,000) as NHI had requested such a price reduction. Id., ¶ 28.  No one working for Debtor was able to complete this process since this required being filed in person. Id.  Without Healthcare Finance this would never have been completed and certainly a $50,000 price reduction would have occurred. Id.

---

[3] The Declaration of Kevin Roy in Support of the Sale of Real Property of Quantum Health, Inc., (D.I. No. 87-3) filed November 11, 2018, herein incorporated by reference.

On November 11, 2018, Healthcare Finance continued emailing, calling and conducting independent research regarding the language of the zoning letter needed from the City of San Diego in order to ensure that NHI would accept the significantly overdue due diligence item. Id., ¶ 29.

On November 12, 2018 the parties including Debtor's counsel, Healthcare Finance, and NHI, worked extensively to finalize the terms of the Purchase Agreement. Id., ¶ 30. The parties engaged in several conference calls, exchanged emails, and conducted research as necessary to work and rework the terms of the Purchase Agreement as necessary to meet all parties needs. Id. On this day, the parties *finally* finalized and signed the Purchase Agreement. Id. A true and correct copy of this Purchase Agreement is attached to the **Declaration** as **Exhibit B**. Id.

Thereafter, also on November 12, 2018, at Debtor's counsel's request, Healthcare Finance provided Debtor's counsel with all previously interested buyers' contact information. Id., ¶ 31. Later, a "Notice of Opportunity to Buy Real Estate Free and Clear of all Liens, Claims and Encumbrances" was served on various parties, including those previously interested buyers that Healthcare Finance had identified. Id. Attached to the **Declaration** as **Exhibit C** is a true and correct copy of the aforementioned Notice. Id.

On November 20, 2018, Healthcare Finance was asked by Debtor counsel and FTI Consulting, as requested by the creditors' committee, to contact all previously interested parties and "re-market" the Property to the full extent, and to reach out to two additional potential buyers – 363 Capital and Odyssey. Id., ¶ 32. From November 20, 2018 – November 27, 2018 Healthcare Finance contacted all sixteen (16) parties including the additional two provided by Debtor's counsel and conducted conversations and sent multiple email correspondence regarding the

bankruptcy proceedings, the asset, and critical market information regarding any changes with said interested buyers. Id., ¶ 33.

On November 20, 2018, Healthcare Finance speaks directly with Odyssey to discuss the asset and the Property. Id., ¶ 34. Odyssey represents that it can close quickly so as a matter of supportive evidence, Healthcare Finance requests letters showing financial capability to close quickly. Id. Said letters are received on November 29th. Id. Attached to the **Declaration** as **Exhibit D** are the Market Value Letters. From November 20, 2018 - December 3, 2018 Healthcare Finance continues to field a variety of questions from Odyssey via calls and email correspondence regarding the Property and the process for the submittal of an offer. Id., ¶ 35.

On November 26, 2018, Healthcare Finance was asked to travel to Delaware in-person to attend the hearing on the motion to sell the Property given the Sale Declaration that it provided in support of the Motion as well as its continued involvement in the re-marketing of the property. Id., ¶ 36.

Between November 28-29, 2018, Odyssey advises Healthcare Finance that it intends to submit an offer hoping to out-bid NHI and purchase the Property. Id., ¶ 37. At and around that time, Healthcare Finance continues conversations with all interested parties. Id. Healthcare Finance instructs Debtor's counsel's that per the terms of the bid process that an additional escrow account and escrow instructions needs to be created. Debtor's counsel complies and commences the preparation of escrow instructions. Id.

On November 30, 2018, Healthcare Finance works independently with First American to generate a *new* escrow number in anticipation of a possible over-bid by Odyssey. Id., ¶ 38. Healthcare Finance took it upon itself to set up this new escrow number which takes at least 24 hours to obtain and create the account. Id. Without the escrow instructions or the account, there

would have been no place for the newly interested purchaser to deposit funds as was to be required by the Court in the event of an overbid. Id.

On December 4, 2018, as requested by the Debtor and other interested parties, Healthcare Finance travels to Delaware to attend the hearing on the Motion to sell the Property. Id., ¶ 39.  At that hearing, while the prior Notice of Hearing required that entities desirous of participating in the bid process take certain steps *in advance* of that hearing, the Court agreed to allow Odyssey two days to submit the required documents and good faith deposit. Id.

After the Court session concluded on December 4, 2018, Odyssey legal counsel requests for a conference call to occur in order to arrange the Purchase Agreement and collect additional information for the submission of an overbid offer. Id., ¶ 40.  Debtor's legal counsel asked Healthcare Finance to attend a conference call based upon its intricate knowledge of all details regarding the Property and Odyssey's desire to gain all relevant information for consideration given the very expedited basis. Id.  Odyssey had several information requests upon which they needed to assimilate information on the Property and Purchase Agreement in order to be in a place to participate in the upcoming auction.  Id.  Importantly, individuals and counsel that were previously involved with the Property on Debtor's behalf were no longer with their firm's/entity's at the time that this call took place and had not been for several weeks including the CFO. Id.  **Kevin Roy was the *only* individual knowledgeable with regard to the information that Odyssey needed to make an informed decision regarding its decision to potentially invest millions of dollars on the Property which they knew very little about, other than the fact there was an existing bid of Fifteen Million Dollars ($15,000,000).** Id.

On December 6, 2018, Healthcare Finance confirms with First American that Odyssey made the good-faith deposit of funds as required by the Court and relayed this information to

Debtor's counsel.  Id., ¶ 41.  This ensured that Odyssey had complied with bidding procedures, which they had not done on December 4, 2018, and that they were in a position to purchase the Property. Id.

Between December 6-9, 2018 Odyssey and Healthcare Finance were in regular communication as Odyssey got "up to speed" on all aspects of the Property in anticipation of the December 10, 2018 auction.  Id., ¶ 42.

On December 10, 2018, the auction for the purchase of the Property occurred.  Id., ¶ 43. At that auction, Odyssey was ultimately the successful bidder with a final bid of Sixteen Million One Hundred Sixty-Five Thousand Dollars ($16,165,000) with up to One Hundred Fifty Thousand Dollars ($150,000) indemnification for any brokerage fees that the Court may order due to Healthcare Finance (**See, D.I. 293-1 [Odyssey Purchase and Sale Agreement]**).

Kevin Roy, on behalf of Healthcare Finance, was the only individual who actively participated in the post-petition Bankruptcy with respect to the sale of the Property. Id., ¶ 44.  Mr. Roy was the only individual with technical and intimate real estate knowledge of the asset and all that had occurred since senior leadership departed several months earlier – not only specific to the inpatient healthcare industry, but real estate generally.  Id.  This is evidenced by the fact that Mr. Roy was the individual identified as the point of contact person drafted by Debtor counsel on the Notice providing an opportunity to bid. Id.  Mr. Roy was the individual that provided all critical information specific to the Property to Odyssey as it prepared to determine whether or not it would be interested in the purchase. Id.  Moreover, Debtor's counsel represented that Healthcare Finance and Kevin Roy was the "Broker" when Odyssey and Odyssey's counsel sought information on December 4, 2018 following the court hearing. Id

## <u>AUTHORITY IN SUPPORT OF RELIEF REQUESTED</u>

Under 11 U.S.C. § 503(b)(3)(D), the Court may allow, as administrative expenses, the "actual, necessary expenses, other than compensation and reimbursement specified in [section 503(b)(4)] incurred by … creditors … in making a substantial contribution in a case under chapter 9 or 11 of this title…"  The burden rests with the Movant to prove by a preponderance of the evidence that he made the requisite substantial contribution to the Debtors' case. <u>In re Buckhead Am. Corp.</u>, 161 B.R. 11, 15 (Bankr. D. Del. 1993). "The Bankruptcy Code does not define 'substantial contribution.'" <u>In re Summit Metals, Inc.</u>, 379 B.R. 40, 50 (Bankr. D. Del. 2007). A movant's activities constitute a substantial contribution if they "'resulted in an actual and demonstrable benefit to the debtor's estate and the creditors.'" <u>Lebron v. Mechem Fin. Inc.</u>, 27 F.3d 937, 944 (3d Cir. 1994) (quoting <u>Haskins v. United States (In re Lister)</u>, 846 F.2d 55, 57 (10th Cir. 1988)). As then Chief Judge Carey recently observed, a claimant's "activities must 'facilitate progress in the case, rather than . . . retard or interrupt.'" <u>Summit Metals</u>, 379 B.R. at 50 (quoting <u>In re Gurley</u>, 235 B.R. 626, 636 (Bankr. W.D. Tenn. 1999).  When determining whether a movant's activities amount to a substantial contribution, courts have examined "'whether the services were provided to benefit the estate itself or all of the parties in the bankruptcy case; whether the services conferred a direct benefit upon the estate; and whether services were duplicative of services performed by others.'" <u>Id</u>. at 51 (quoting <u>Gurley</u>, 235 B.R. at 636).

In this instance, Healthcare Finance worked for more than two years on Debtor's behalf to market the Property and identify a suitable buyer – which was no small feat given the unique nature of the business operated by the Tenant in that space.  In connection with that work, Debtor executed a Non-Exclusive Finders Fee Agreement with Healthcare Finance in 2016, and again in 2018. (See, Roy Decl., Exhibit A.)  Contractually, Healthcare Finance was entitled to Two and One-Half

Percent (2.5%) of the total Gross Sales Proceeds as recited in the definitive agreement between the Buyer and Seller ("Broker's Fees").  Id.  On November 12, 2018 – *after Debtor filed Bankruptcy* – Debtor and NHI signed the Purchase Agreement which not only reiterated those Broker's Fee terms but also specified that the Broker's Fees were to be given administrative expense priority. (See, Roy Decl., Exhibit B, ¶ 29.)

A Motion to Sell the Property to NHI in accord with the Purchase Agreement was scheduled for December 4, 2018.  In advance of that date, a "Notice of Opportunity to Buy Real Estate" related to the Property was served on various parties, including those potential purchasers that Healthcare Finance had previously identified and then provided that information to Debtor's at their request. (See, Roy Decl., Exhibit C.)  Said Notice called for any interested party to submit a binding PSA, along with a cash deposit of Four Hundred Fifty Thousand Dollars ($450,000) ***directly to Kevin Roy of Healthcare Finance***.  Id.  The Notice further directed the potential interested parties to contact Kevin Roy if they had any questions – Mr. Roy was the *only* individual identified for interested parties to contact.

Separate from being identified as the contact person on the Notice, the Debtor asked that Healthcare Finance "re-market" the Property.  Healthcare Finance did as was requested and also fielded questions from potential purchasers in response to the Notice.

At Debtor's request, Mr. Roy personally attended the December 4, 2018 hearing.  This made sense since he not only submitted a declaration in support of the Motion set to be heard on that date, but he was the individual to whom documents and money was to be transmitted by parties interested in bidding on the Property.  Mr. Roy *did* attend the hearing, at his own expense.  At the hearing, the Court allowed Odyssey two extra days to submit the paperwork and funds required by the Notice.

After the hearing, Mr. Roy engaged with Odyssey, Debtor, and their respective counsel as necessary to provide Odyssey with critical information for its consideration in connection with the upcoming auction.  Due to turn-over of individuals on Debtor's side that were previously involved in the transaction, Mr. Roy was the *only* person capable of providing Odyssey with the information it needed on the Property on the expedited basis that Odyssey needed to have the information and meaningfully and intelligently participate in the auction.  The information Healthcare Finance provided to Odyssey includes but is not limited to: due diligence documents; technical information/specs on the property; photographs; appraisals; details regarding the Tenant including explanation of its unique business model and negotiated lease terms, and more.

On December 10, 2018 the auction of the Property took place and Odyssey was the successful bidder at Sixteen Million One Hundred Sixty-Five Thousand Dollars ($16,165,000).

To summarize the timeline:

- Odyssey notified Healthcare Finance of its intent to submit a bid on November 28 or 29, 2018;

- Submitted its Purchase Agreement and good faith deposit on December 6, 2018; and

- Odyssey then participated in an auction where it was the successful bidder of the Property for more than Sixteen Million Dollars ($16,000,000).

The substantial contribution Healthcare Finance made to the estate is clear on its face. Given the complexity of the sale of this Property and the purchase price, it defies reason to believe that Odyssey would have been able to gather the information it needed to participate in the auction *if it were not for the work of Healthcare Finance.*  In other words, but-for Healthcare Finance having done the roughly two years' work to market the property, complete due diligence, clear

zoning issues, negotiate a lease with the tenant, etc., there would never have been a Purchase Agreement at Fifteen Million Dollars ($15,000,000) – let alone, an opportunity for an *overbid*.

Also, Healthcare Finance brought a unique set of skills to the table which was not duplicative of those provided by any other professional that was participating in the process. Healthcare Finance was the only entity involved in the transaction with real estate specific knowledge – not only general real estate knowledge - but very importantly, inpatient healthcare facility specific real estate knowledge.

By this Motion, Healthcare Finance asks that its Broker's Fees be honored *in accord with the Purchase Agreement with NHI*. Specifically, Healthcare Finance asks for Three Hundred Ninety- Five Thousand Three Hundred Seventy-Five Dollars ($395,375.00) which is Two and One-Half Percent (2.5%) of Fifteen Million Eight Hundred Fifteen Thousand Dollars ($15,815,000.00) purchase price established between Debtor and NHI. Healthcare Finance did not identify Odyssey and bring that purchaser to the table. However, NHI equipped Odyssey with the information necessary for it to participate in the bid process *after it had already established the Fifteen Million Dollar ($15,000,000) real estate value.*

## CONCLUSION

WHEREFORE, Healthcare Finance respectfully requests entry of the Proposed Order, and granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Wilmington, DE
Date: January 11, 2019

Respectfully submitted:

By:    */s/ Daniel K. Hogan*
Daniel K. Hogan (DE Bar # 2814)
HOGAN MCDANIEL
1311 Delaware Avenue
Wilmington, Delaware 19806
Telephone: (302) 656-7540

Facsimile: (302) 656-7599
dkhogan@dkhogan.com

*Counsel for Healthcare Finance
Partners Corp.*