XAVIER BECERRA
Attorney General of California
JENNIFER M. KIM
Supervising Deputy Attorney General
KENNETH K. WANG
Deputy Attorney General
California State Bar No. 201823
 300 South Spring Street, Suite 1702
 Los Angeles, CA 90013
 Telephone: (213) 269-6217
 Fax: (213) 897-2805
 E-mail: Kenneth.Wang@doj.ca.gov
*Attorneys for Creditor*
*California Department of Health Care Services*

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:**<br><br>**PROMISE HEALTHCARE GROUP, LLC, et al.,**<br><br>Debtors. | Chapter 11<br><br>CASE NO. 18-12491 (CSS)<br><br>(Jointly Administered)<br><br>**CREDITOR CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES'S OBJECTION TO (1) DEBTORS' MOTION FOR THE ENTRY OF AN ORDER APPROVING THE SALE OF CERTAIN OF DEBTORS' ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, ENCUMBRANCES, AND INTERESTS (D.I. 374); AND (2) SUPPLEMENTAL NOTICE OF POTENTIAL ASSUMPTION AND ASSIGNMENT OF BUSINESS CONTRACTS AND RELATED CURE AMOUNTS (D.I. 410)**<br><br>**Hearing:** **February 1, 2019**<br>**Time:** **2:00 P.M.**<br>**Judge:** **Hon. Christopher S. Sontchi** |

1

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................. 2

PROCEDURAL BACKGROUND.......................................................................................... 3

STATUTORY BACKGROUND............................................................................................. 4

    I.       Administration of the Medi-Cal Program ............................................... 4

    II.      Medi-Cal Financing                                                    4

    III.     Delivery of Medi-Cal Services................................................................ 6

    IV.    Payments to Hospitals for Medi-Cal Services ....................................... 6

    V.      Hospital Quality Assurance Fee.............................................................. 7

    VI.    Statutory Scheme for the Collection of HQA Fees................................ 8

    VII.   Reimbursement of Medi-Cal Overpayments ......................................... 9

    VIII.  The Department's Recoupment Right..................................................... 9

FACTUAL BACKGROUND ................................................................................................ 11

    I.       Success's Agreement .............................................................................. 11

    II.      Success's HQA Fee Debt to Medi-Cal................................................... 11

    III.   Success Continues as a Medi-Cal Provider After the Petition Date ...................... 12

ARGUMENT ........................................................................................................................ 12

    I.       Medi-Cal Agreements Are Executory Contracts ................................... 12

    II.      Case Law Affirms that the Agreement Is an Executory Contract......................... 15

    IV.    The Agreement Cannot Be Sold Free and Clear of Debt Owed to Medi-Cal Under 11 U.S.C. § 363                                          17

           The Agreement, as an Executory Contract, Requires Cure of Defaults and Debt............ 21

    V.      The Agreement Requires Successor Liability by the Buyer ................................. 22

CONCLUSION ..................................................................................................................... 23

# TABLE OF AUTHORITIES

**Page**

CASES

*Atkin v. Parker*
472 U.S. 115 (1985)........................................................................................................18

*Bell v. Burson*
402 U.S. 535 (1971)........................................................................................................18

*Cervoni v. Secretary of Health, Education and Welfare*
581 F.2d 1010 (1st Cir. 1978)........................................................................................18

*Devine v. Cleland*
616 F. 2d 1080 (9th Cir. 1980)......................................................................................18

*Erickson v. United States Department of Health and Human Services*
67 F. 3d 858 (9th Cir. 1995)..........................................................................................18

*Goldberg v. Kelly*
397 U.S. 254 (1970)........................................................................................................17

*In re Berks Behavioral Health, LLC*
2010 WL 4922173 (Bankr. E.D. Pa. 2010)..................................................................19

*In re Gardens Regional Hospital and Medical Center, Inc.*
2018 WL 135334 (BAP 9th Cir. 2018)..............................................................10, 14

*In re Gardens Regional Hospital and Medical Center, Inc.*
569 B.R. 788 (Bankr. C.D. Cal. 2017)................................................10, 13, 15, 17

*In re Hefferman Memorial Hospital District*
192 B.R. 228 (S.D. Cal. 1996).................................................................................16, 17

*In re Holland Enterprises, Inc. (In re Holland)*
25 B.R. 301 (Bankr. E.D. N.C. 1982)....................................................................13, 22

*In re Holyoke Nursing Home, Inc.*
372 F.3d 1 (1st Cir. 2004)........................................................................................15, 16

*In re Memorial Hosp. of Iowa County, Inc.*
82 B.R. 478 (W. D. Wis. 1988)...............................................................................17, 21

*In re Monsour Medical Center*
8 B.R. 606 (Bankr. W.D. Pa. 1981).................................................................12, 13, 17

*In re Octagon Roofing*
123 B.R. 583 (Bankr. N.D. Ill. 1991)...............................................................................21

*In re Slater Health Center, Inc.*
294 B.R. 423 (Bankr. D. RI. 2003) ........................................................................................16

*In re St. Johns Home Health Agency Co.*
173 B.R. 238 (S.D. Fl. 1994) .................................................................................................16

*In re St. Mary Hospital*
89 B.R. 503 (E.D. Pa. 1988) .................................................................................................22

*In re: Thane International, Inc. v. 9472541 Canada Inc.*
586 B.R. 540 (Bankr. D. Del. 2018) ....................................................................................21

*In re Tidewater Memorial Hospital, Inc.*
106 B.R. 876 (Bankr. E.D. Va. 1989) ..................................................................................23

*In re University Medical Center*
973 F.2d 1065 (3rd Cir. 199) ..........................................................................................15, 16

*In re Vitalsigns Homecare, Inc.*
396 B.R. 232 (Bankr. D. Mass. 2008) ..................................................................................15

*Koerpel v. Heckler*
797 F.2d 858 (10th Cir. 1986) ..............................................................................................18

*Lin v. State of California*
78 Cal. App. 4th 931 (Ct. App. 2012) ..................................................................................18

*Mednik v. State Department of Health Care Services*
175 Cal. App. 4th 631 (Ct. App. 2009) ................................................................................14

*Richmond Leasing Co. v. Capital Bank, N.A.*
762 F.2d 1303 (5th Cir. 1985) .........................................................................................26, 27

*Southeast Kansas Community Action Program v. Secretary of Agriculture of the
United States*
967 F.2d 1452 (10th Cir. 1992) ............................................................................................22

*University Medical Center*, 122 B.R. 919, 930 (E.D. Pa. 1990)                15, 16

**STATUTES**

11 U.S.C.
§ 363 .......................................................................................................................................19
§ 363(f) ..............................................................................................................................20, 21
§ 365 .......................................................................................................................................23
§ 365(b) ..................................................................................................................................21

42 U.S.C.
   § 1396a ...........................................................................................................4
   § 1396b(a).......................................................................................................4
   § 1396d(b)                                                                                      4
   § 1396b(w) ......................................................................................................5
   § 1396d..............:...........................................................................................4

Cal. Code Regs. Title 22
   § 50004(b)(1) ..................................................................................................4
   §§ 51016-51048 .............................................................................................9
   § 51047...........................................................................................................9

Cal. Welf. & Inst. Code
   § 10740............................................................................................................4
   § 14016.5(b))...................................................................................................6
   § 14063 ...........................................................................................................4
   §§ 14087.3-14089.8 ........................................................................................6
   § 14132 et seq. ...............................................................................................6
   §§ 14133 and 14170 .......................................................................................9
   § 14169.50.......................................................................................................8
   § 14169.50(b)...................................................................................................8
   § 14169.50(d)...................................................................................................8
   §§ 14169.50 through 14169.76 ........................................................................8
   § 14169.51(*l*) ...................................................................................................5
   § 14169.52(a) ..................................................................................................8
   § 14169.52(h)...............................................................................................8, 12
   § 14169.53(b)...................................................................................................7
   § 14170(a)(1)...................................................................................................9
   § 14171 ...........................................................................................................9
   § 14301.1.........................................................................................................6

**CONSTITUTIONAL PROVISIONS**

Cal. Const., Article 16, § 3.5..................................................................................8

**OTHER AUTHORITIES**

42 C.F.R. §§ 433.50 – 433.74 (2016) ....................................................................5

42 C.F.R. § 433.51 (2010)......................................................................................5

Countryman, *Executory Contracts in Bankruptcy:* Part 1                         13

HTTP://WWW.DHCS.CA.GOV/PROVGOVPART/PAGES/HOSPITALQUALITYASSURANCEF
   EEPROGRAM.ASPX................................................................................................8

http://www.lao.ca.gov/BallotAnalysis/Proposition?number=52&year=2016 ..................................5

*https://lao.ca.gov/ballot/2013/130602.aspx*..............................................................................6, 7

http://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=200920100AB1383&search_k

eywords=          7

64 Minn. L. Rev. 341, 344 (1980) ....................................................................................................12

57 Minn. L. Rev. 439, 460 (1973)          13

# INTRODUCTION

California Department of Health Care Services (Department) hereby objects to Debtors Promise Healthcare Group, L.L.C, et al.'s Motion for Orders: (I)(A) approving bidding procedures and bid protections, (D) approving form and manner of notice of sale, (E) granting related relief, and (II)(A) authorizing and approving the sale of substantially all assets of certain of the debtors free and clear of liens, claims, interests, and encumbrances, (B) authorizing the assumption and assignment of certain executory contracts, and (C) granting related relief (Motion) (D.I. 374) and Supplemental Notice of Potential Assumption and Assignment of Business Contracts and Related Cure Amounts (Notice) (D.I. 410). If this sale is approved as currently proposed by Debtors, the Department will be precluded from meeting its statutory obligations to collect over $45 million in Hospital Quality Assurance Fees (HQA Fees) and overpayments.

As shown by Schedule 1 to the Notice, Debtors Promise Healthcare Group, L.L.C. and its affiliates (collectively, Debtors) intend to assume and assign the Medi-Cal Provider Agreements (Agreement) of Success Healthcare 1, LLC (Success), doing business as Silver Lake Medical Center (Silver Lake Medical Center), retroactively to November 2018. For the intended assumption and assignment to occur, either Debtors must pay all HQA Fees incurred by Success before the closing of the sale or any outstanding HQA Fees on Success's account must be paid by the stalking horse bidder or the successful bidder (Buyer) through joint and severally liability. Debtors erroneously claim that the Agreement can be assumed and assigned free and clear of any debt to the Department. Debtors misrepresent that the cure and default amount for the assumption and assignment of the Agreement is zero. For HQA Fee liabilities alone, Success owes the Department approximately $45 million.

Debtors must be ordered to pay all outstanding HQA Fee liabilities incurred by Success to the Department. Otherwise, the Buyer must be ordered to be held jointly and severally liable for that debt under assumption and assignment of the Agreement. If Debtors propose to pay the debt through the proceeds of the sale of their assets, the Department will agree to accept payment of the entire HQA Fee debt incurred by Success within five days of the closing of the sale.

Moreover, Debtor must establish and maintain a trust account for a period of 18 months from the Department's acceptance date of the final cost report to provide the funds necessary, if any, for reimbursement to the Department of any Medi-Cal overpayment to Success and for any Electronic Health Record and Disproportionate Share Hospital program debt owed by Success.[1]

## PROCEDURAL BACKGROUND

On November 5, 2018 (Petition Date), Debtors filed their voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code. Debtors' cases are jointly administered with their affiliates and, pursuant to 11 U.S.C. §§ 1107(a) and 1108, Debtors continue to operate their businesses and manage their affairs as debtors-in-possession.

Debtors filed the Motion to sell their property free and clear of any claims, liens, and encumbrances. Motion, D.I. 374. Among other things, the Motion seeks the Court's approval of the sale of substantially all of Debtors' assets with certain exceptions, free and clear of liens, claims, encumbrances, and other interests. The Motion further seeks approval of the assumption and assignment of certain executory contracts and unexpired leases.

---

[1] The Department will provide a projected figure at a later date for reimbursement to the Department of any Medi-Cal overpayment to Success and for any Electronic Health Record and Disproportionate Share Hospital program debt owed by Success. Because the Department has not been properly served in this case, the Department has not had sufficient time to calculate the projected figure.

On January 7, 2019, Debtors filed their Notice (D.I. 410) identifying the Agreement as an executory contract to be assumed and assigned by Debtors and the proposed cure amount of $0 for the assumption and assignment of the Agreement.

Despite their identification of the Agreement as an executory contract to be assumed and assigned and their knowledge of the Department as a signatory to the Agreement, Debtors never provided any notice to the Department of their Motion (D.I. 374) or the Notice (D.I. 410). In fact, as evidenced by the Affidavit of Service, the Department is not even on Debtors' service list. Affidavit of Service, D.I. 416.

## STATUTORY BACKGROUND

### I. ADMINISTRATION OF THE MEDI-CAL PROGRAM

The federal Medicaid Act, enacted in 1965 as title XIX of the Social Security Act, is a federal-state administered Spending Clause program designed to provide medical assistance to eligible low-income individuals. 42 U.S.C. § 1396a & b (2016). The financing and administration of the Medicaid program are a cooperative effort between the federal government and participating states, as authorized under a federally approved State Medicaid Plan. Title 42 U.S.C. § 1396a, et seq., authorizes federal financial support to states for medical assistance provided to certain low-income persons. In California, this program is the California Medical Assistance Program, which is commonly known as Medi-Cal. Cal. Welf. & Inst. Code § 14063 (West 2017). The Department is the single state agency authorized to administer the Medi-Cal program. Cal. Welf. & Inst. Code § 10740 (West 2017); Cal. Code Regs. tit. 22, § 50004(b)(1) (2017).

### II. MEDI-CAL FINANCING

The costs of the Medicaid Program are generally shared between states and the federal government based on a set formula. 42 U.S.C. §§ 1396b(a) and 1396d(b) (2016). Except for

4

certain coveted populations or discrete service expenditures specified in 42 U.S.C. §§ 1396b or 1396d, the federal government reimburses medical assistance expenditures under California's State Medicaid Plan at a rate of 50%. Accordingly, when the Department makes expenditures for medical assistance covered under Medi-Cal, the Department claims the appropriate federal share of those costs at the appropriate federal medical assistance percentage. *Id.*

Federal Medicaid law permits states to finance the non-federal share of Medicaid costs through several sources, including but not limited to:

> State General Funds. State general funds are revenues collected primarily through personal income, sales, and corporate income taxes.

42 C.F.R. § 433.51 (2010).

> Charges on Health Care Providers. Federal Medicaid law permits states to (1) levy various types of charges – including taxes, fees, or assessments – on health care providers and (2) use the proceeds to draw down FFP (federal financial participation) to support the non-federal share of state Medicaid expenditures. These charges must meet certain requirements and be approved by CMS (Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services) for revenues from these charges to be eligible to draw down FFP. A number of different types of providers can be subject to these charges, including hospitals.

42 U.S.C. § 1396b(w) (2017); 42 C.F.R. §§ 433.50 – 433.74 (2016).

The HQA Fee is a charge imposed by the Department on non-exempt hospitals to finance the non-federal share of specified Medi-Cal costs. Cal. Welf. & Inst. Code § 14169.51(*l*) (West 2018). The quarterly HQA Fee imposed upon non-exempt hospitals has been collected by the Department in similar form since 2009. The collected HQA Fees are used to support Medi-Cal expenditures and maximize available federal participation for Medi-Cal costs. *See* http://www.lao.ca.gov/BallotAnalysis/Proposition?number=52&year=2016

## III. DELIVERY OF MEDI-CAL SERVICES

The vast majority of Medi-Cal benefits are delivered through one of two systems: (i) the fee-for-service system or (ii) the managed care plan system. Cal. Welf. & Inst. Code § 14016.5(b) (West 2014). In the fee-for-service system, Medi-Cal contracts with and pays health care providers (such as physicians, hospitals, and clinics) directly for covered services provided to Medi-Cal beneficiaries. Cal. Welf. & Inst. Code § 14132 et seq. (West 2014).

The Department also administers Medi-Cal through various managed care plans operated by public and private entities under contract pursuant to various statutory authorities. *See generally* Cal. Welf. & Inst. Code §§ 14087.3-14089.8; 14200, et. seq. (West 2014). In the managed care system, the Department contracts with managed care plans to provide the vast majority of covered services for enrolled Medi-Cal beneficiaries within a fixed geographic location. *See generally id.* at § 14087.3 et seq. (setting forth standards governing contracts between the Department and managed care providers) and § 14169.51(ab) (West 2014) (defining "managed health care plan" for purposes of the HQA Fee program). Medi-Cal managed care enrollees may obtain non-emergency services from contracted providers – including hospitals – that accept payments from their health plans. The Department develops and pays an actuarially sound (capitation) rate per Medi-Cal beneficiary enrollee per month to contracted managed care plans. Cal. Welf. & Inst. Code § 14301.1 (West 2017).

## IV. PAYMENTS TO HOSPITALS FOR MEDI-CAL SERVICES

The Department provides payments to approximately 400 licensed general acute care hospitals. *https://lao.ca.gov/ballot/2013/130602.aspx.* These hospitals are divided into three general categories (private hospitals, designated public hospitals (county and University of California), and non-designated public hospitals (district hospitals) based on whether the hospital

is privately or publicly owned, and who operates the hospital. *Id.* Silver Lake Medical Center is a private hospital.

Hospitals may receive several types of payments based on their participation in Medi-Cal, including direct payments from the Department, managed care payments from managed care plans, and supplemental payments from both the Department and managed care plans. https://lao.ca.gov/ballot/2013/130602.aspx.

Direct payments are payments to providers such as Success for providing covered services to Medi-Cal beneficiaries through the fee-for-service system. Managed care payments are payments from managed care plans to providers (including hospitals such as Debtor) for services delivered to Medi-Cal beneficiaries enrolled in these plans. The plans receive funds from the Department to pay the providers. *Id.*

Quality assurance payments are supplemental payments, supported by the HQA Fee revenue and federal matching funds, providing additional payments to Medi-Cal hospitals to supplement the Department's direct, fee-for service payments or the managed care plans' payments to hospitals, including Debtor. Cal. Welf. & Inst. Code § 14169.53(b) (West 2014).

V.     HOSPITAL QUALITY ASSURANCE FEE

California Assembly Bill 1383 established a program, that imposed a quarterly HQA Fee to be paid by non-exempt hospitals, which would be used to increase federal financial participation in order to make supplemental payments to hospitals including private hospitals (such as Debtors), and to help pay for health care coverage for low-income children, for the period of April 1, 2009 through December 31, 2010. http://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=200920100AB1383&search_keywords=

The California Legislature extended the HQA Fee program several times, through December 31, 2016. Then on November 8, 2016, California voters passed Proposition 52 that continues the HQA Fee program indefinitely from January 1, 2017, onward. *See* Cal. Const., art 16, § 3.5; HTTP://WWW.DHCS.CA.GOV/PROVGOVPART/PAGES/HOSPITALQUALITYASSURANCEFEE PROGRAM.ASPX.

Specifically, the Medi-Cal Hospital Reimbursement Improvement Act of 2013 (the Act) extended the imposition of the HQA Fee from January 1, 2014, through December 31, 2016. The Act was signed into law in October 2013, and is codified at California Welfare and Institutions Code sections 14169.50 through 14169.76, and was later made permanent pursuant to Proposition 52. Cal. Const., art 16, § 3.5. The Act requires non-exempt hospitals to pay a quarterly HQA Fee, which is assessed regardless of whether a hospital participates in the Medi-Cal program. Cal. Welf. & Inst. Code § 14169.52(a) (West 2014).

## VI. STATUTORY SCHEME FOR THE COLLECTION OF HQA FEES

California Welfare and Institutions Code section 14169.50 sets forth the legislative purpose and intent for the HQA Fee program. "It is the intent of the Legislature that funding provided to hospitals through a hospital quality assurance fee be continued with the goal of increasing access to care and to improving hospital reimbursement through supplemental Medi-Cal payments to hospitals." Cal. Welf. & Inst. Code § 14169.50(b) (West 2018). "It is [also] the intent of the Legislature to impose a quality assurance fee to be paid by hospitals, which would be used to increase federal financial participation in order to make supplemental Medi-Cal payments to hospitals, and to help pay for health care coverage for low-income children." Cal. Welf. & Inst. Code § 14169.50(d) (West 2014). (Emphasis added.)

California Welfare and Institutions Code section 14169.52(h) provides the Department with the statutory remedy to recover the unpaid HQA Fee debt from Medi-Cal payments until the entire debt is recovered (recoupment).

## VII. REIMBURSEMENT OF MEDI-CAL OVERPAYMENTS

Medi-Cal makes interim payments to an authorized Medi-Cal provider after it renders services and submits claims to Medi-Cal for payment. The Department later audits the claims for Medi-Cal payment submitted by Medi-Cal providers. Cal. Welf. & Inst. Code §§ 14133 and 14170 (West 2018). In that regard, the Department is statutorily authorized to audit and review a provider's cost report[2] within three years after the close of the period covered by the report, or after the date of submission of the original or amended report by the provider, whichever is later. Cal. Welf. & Inst. Code § 14170(a)(1) (West 2018).

If the audit indicates any overpayment, the provider must reimburse Medi-Cal for the overpayment. The Department may begin liquidation of any overpayment to a Medi-Cal provider 60 days after issuance of the first Statement of Accountability or demand for repayment. Cal. Code Regs. title 22, § 51047 (2018).

A provider can appeal the Department's audit findings. Cal. Code Regs. tit. 22, §§ 51016-51048 (2018). A Medi-Cal provider is entitled to a formal administrative hearing on any disputed overpayment. Cal. Welf. & Inst. Code § 14171 (West 2018).

## VIII. THE DEPARTMENT'S RECOUPMENT RIGHT

The Agreements state that "[a]s a condition for participation . . . in the Medi-Cal program, Provider agrees to comply with all of the following terms and conditions . . . ." Hanh

---

[2] Cost reports and other data submitted by Medi-Cal providers are submitted to the Department for the purpose of determining reasonable costs for Medi-Cal services or establishing rates of Medi-Cal payment. Cal. Welf. & Inst. Code § 14170(a)(1) (West 2018).

Vo Declaration (Vo Decl.), Ex. 1, at 1. Those terms and conditions include the requirement that

Debtors comply with applicable law:

> 2. Compliance with Laws and Regulations. Provider agrees to comply with all applicable provisions of Chapters 7 and 8 of the Welfare and Institutions Code (commencing with Sections 14000 and 14200), and any applicable rules or regulations promulgated by DHCS pursuant to these Chapters. Provider further agrees that if it violates any of the provisions of Chapters 7 and 8 of the Welfare and Institutions Code, or any other regulations promulgated by DHCS pursuant to these Chapters, it may be subject to all sanctions or other remedies available to DHCS. Provider further agrees to comply with all federal laws and regulations governing and regulating Medicaid providers.

*Id.*

California Welfare and Institutions Code section 14169.52(h) provides that "[w]hen a

hospital fails to pay all or part of the quality assurance fee on or before the date that payment is

due, the [Department] may immediately begin to deduct the unpaid assessment and interest from

any Medi-Cal payments owed to the hospital . . . ." Cal. Welf. & Inst. Code § 14169.52 (h)

(West 2014).

Both the Bankruptcy Court for the Central District of California and the Bankruptcy

Appellate Panel of the Ninth Circuit held that the imposition of the HQA Fees and the

Department's recovery of the unpaid HQA Fees from payments intended for a provider/debtor

satisfy the "same transaction" requirement for recoupment. *In re Gardens Regional Hospital*

*and Medical Center, Inc.*, 569 B.R. 788, 797 (Bankr. C.D. Cal. 2017); *In re Gardens Regional*

*Hospital and Medical Center, Inc.*, 2018 WL 135334 *5 (BAP 9th Cir. 2018).

Based upon case law and California statute, the Department can recover the unpaid HQA

Fees from Medi-Cal payments intended for Success. *In re Gardens Regional Hospital and*

*Medical Center, Inc.*, 569 B.R. at 796-797. Accordingly, the Department may choose to recoup,

offsetting any HQA Fee liabilities incurred by Success against any Medi-Cal payments intended

for it or to the Buyer through successor liability. However, the Department is not required to do so, nor can it be compelled to exercise this equitable remedy.

**FACTUAL BACKGROUND**

## I. SUCCESS'S AGREEMENT

Success executed the Agreement on or about March 6, 2009. Vo Decl., Ex. 1.

## II. SUCCESS'S HQA FEE DEBT TO MEDI-CAL

Success has HQA Fee liabilities for Phase V in the amount of **$45,300,842.32**, as shown below. Vo Decl., Ex. 3.

| SILVER LAKE MEDICAL CENTER (NPI No. 1427293216) (OSHPD No. 106190661) | | | | | |
|---|---|---|---|---|---|
| **PHASE V** | | | | | |
| **FISCAL YEAR** | **CYCLE (PERIOD)** | **AMOUNT** | **DUE DATE** | **WITHHELD** | **OUTSTANDING BALANCE** |
| 2016/17 | **MANAGED CARE 1** (01/01/2017 - 06/30/2017) | $2,986,912.07 | TBD | $0.00 | $2,986,912.07 |
| 2017/18 | **CYCLE 4** (10/01/2017 - 12/31/2017) | $4,561,880.49 | 4/11/2018 | $4,219,930.08 | $341,950.41 |
| | **CYCLE 5** (01/01/2018 - 03/31/2018) | $4,561,880.00 | 5/2/2018 | $0.00 | $4,561,880.00 |
| | **CYCLE 6** (04/01/2018 - 06/30/2018) | $4,561,880.00 | 7/11/2018 | $0.00 | $4,561,880.00 |
| | **MANAGED CARE 2** (07/01/2017 - 06/30/2018) | $6,597,886.45 | TBD | $0.00 | $6,597,886.45 |
| 2018/19 | **CYCLE 7** (07/01/2018 – 09/30/2018) | $4,737,055.00 | 10/3/2018 | $0.00 | $4,737,055.00 |
| | **CYCLE 8** (10/01/2018 – 12/31/2018) | $4,737,055.00 | 1/2/2019 | $0.00 | $4,737,055.00 |
| | **CYCLE 9** (01/01/2019 – 03/31/2019) | $4,737,055.00 | 4/3/2019 | $0.00 | $4,737,055.00 |

11

| | | | | | |
|---|---|---|---|---|---|
| | **CYCLE 10** (04/01/2019 – 06/30/2019) | $4,737,055.00 | 7/3/2019 | $0.00 | $4,737.055.00 |
| | **MANAGED CARE 3** (07/01/2018 – 06/30/2019) | $7,302,133.40 | TBD | $0.00 | $7,302,113.40 |
| **Total Outstanding Balance** | | | | | **$45,300,842.32** |

### III. SUCCESS CONTINUES AS A MEDI-CAL PROVIDER AFTER THE PETITION DATE

Since the Petition Date, Success has continued to provide Medi-Cal services, has continued to submit claims to Medi-Cal for payment, and has continued to receive Medi-Cal payment benefits. In other words, despite Success's bankruptcy filing which is jointly administered herein, Success has remained in the Medi-Cal system, enjoying its Medi-Cal provider benefits, such as direct payments from the Department, managed care payments from managed care plans, and supplemental payments from both the Department and managed care plans.

### ARGUMENT

### I. MEDI-CAL AGREEMENTS ARE EXECUTORY CONTRACTS

Success entered into an executory contract – the Agreement – with the Department.

The Bankruptcy Code does not define the term "executory contract"; however, the legislative history of 11 U.S.C. § 365 leaves no doubt that an executory contract is one "in which neither side has fully performed at the commencement of bankruptcy." *In re Monsour Medical Center*, 8 B.R. 606, 612 (Bankr. W.D. Pa. 1981), aff'd 11 B.R. 1014 (W.D. Pa. 1981) (citing Fogel, *Executory Contracts and Unexpired Leases in the Bankruptcy Code*, 64 Minnesota Law Review 341, 344 (1980). The legislative history provides:

> Though there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides. A note is not usually an executory contract if the only performance that remains is

repayment. Performance on one side of the contract would have been completed and the contract is no longer executory.

*Id.*

This interpretation of the term "executory contract" is in accord with the view adopted by commentary and case law discussing Section 70(b) of the former Bankruptcy Act, the provision from which 11 U.S.C. § 365 is derived, that an executory contract is one "under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *In re Monsour Medical Center*, 8 B.R. at 612-613 (citing Countryman, *Executory Contracts in Bankruptcy: Part 1*, 57 Minn. L. Rev. 439, 460 (1973); *Chattanooga Mem. Park v. Still*, 574 F.2d 349, 352 (6th Cir.), cert. denied, 439 U.S. 929, 99 S. Ct. 316, 58 L. Ed. 2d 322 (1978).) In other words, executory contracts include contracts where, to some extent, performance remains due from both parties. *In re Holland Enterprises, Inc. (In re Holland)*, 25 B.R. 301 (Bankr. E.D. N.C. 1982) (citing *In re Rovine Corp.*, 5 B.R. 402, 404 (W.D. Tenn. 1980).

To become entitled to receive Medi-Cal payments as a Medi-Cal provider, Success was required to enter into the Agreement with the Department. *In re Gardens Regional Hospital and Medical Center, Inc.*, 569 B.R. at 792. Success's eligibility to participate in the Medi-Cal program is conditioned upon its consent to the terms of the Agreement. *In re Gardens*, 569 B.R. at 796-97. In that regard, the Agreements specifically emphasize:

**AS A CONDITION FOR PARTICIPATION OR CONTINUED PARTICIPATION AS A PROVIDER IN THE MEDI-CAL PROGRAM, PROVIDER AGREES TO COMPLY WITH ALL OF THE FOLLOWING TERMS AND CONDITIONS, AND WITH ALL OF THE TERMS AND CONDITIONS INCLUDED ON ANY ATTACHMENT(S) HERETO, WHICH IS/ARE INCORPORATED HEREIN BY REFERENCE.**

Vo Decl., Ex. 1, at 1 (original emphasis).

When Success contracted with the Department to participate in Medi-Cal, it not only agreed to comply with applicable law governing Medi-Cal providers, it also explicitly agreed to contractual obligations and terms that are expressly set forth in the Agreement. Success's voluntary consent to those contractual provisions is consideration for the Department to contract with it, allowing Success to participate in the Medi-Cal system and receive millions of dollars. As a governmental entity, the Department and Medi-Cal are guided by public policy considerations when contracting with providers to provide medical treatment and services to Medi-Cal beneficiaries. *In re Gardens Regional Hospital and Medical Center, Inc.*, 2018 WL 1354334 *6. As affirmed by the California Court of Appeal, the relationship between a Medi-Cal provider and the Department is contractual in nature. *Mednik v. State Department of Health Care Services* 175 Cal. App. 4th 631, 642 (Ct. App. 2009).

The Department's and Success's consideration for the Agreement is indisputably exemplified by the following terms and conditions specified in the Agreement:

(1)  Success must comply with all applicable state law and be subject to all sanctions available to the Department, if they fail to do so. Vo Decl., Ex. 1, at 1, ¶ 2.

(2)  Success cannot submit any treatment authorization requests or claims to the Department using a National Provider Identifier (NPI) unless that NPI is appropriately registered to Success and is in compliance with all NPI requirements. Vo Decl., Ex. 2, at 2, ¶ 3.

(3)  Success cannot engage in any conduct inimical to the public health, morals, welfare, and safety of any Medi-Cal beneficiary, or to the fiscal integrity of the Medi-Cal system." *Id.*, ¶ 4.

(4)  Success cannot "exclude or deny aid, care, service, or other benefits available under Medi-Cal or in any other way discriminate against a person because of that person's race, color, ancestry, marital status, national origin, gender, age, economic status, physical or mental disability . . . ." *Id.*, ¶ 5.

(5)  Success must provide aid, care, service, or other benefits available under Medi-Cal to Medi-Cal beneficiaries in the same manner, by the same

methods, and at the same scope, level, and quality as provided to the general public. *Id.*, ¶ 5.

(6) Health care services provided by Success must be by qualified personnel for conditions that cause "suffering, endanger life, result in illness or infirmity, interfere with capacity for normal activity, including employment, or for conditions which may develop into some significant handicap or disability." *Id.*, ¶ 6.

(7) Success is subject to certain automatic and permissive suspensions and mandatory and permissive exclusions. *Id.*, at 6-7, ¶¶ 26 - 27.

The Agreement is an executory contract given the continuing nature of the duties imposed upon Success and the Department by both the Agreement and applicable law. Under the Agreement, Success must continue to comply with the express terms of the Agreement with regard to providing care to Medi-Cal beneficiaries and for conducting itself as a Medi-Cal provider, in order to avoid breaching the Agreement and in order to remain in the Medi-Cal system as an authorized provider. The Agreement constitutes a single, ongoing, and integrated transaction (as the First Circuit found for Medicare provider agreements). *In re Holyoke Nursing Home, Inc.*, 327 F.3d 1, 5 (1st Cir. 2004).

## II.   CASE LAW AFFIRMS THAT THE AGREEMENT IS AN EXECUTORY CONTRACT

The Agreement is similar in many respects to the Medicare Provider Agreement. *In re Gardens*, 569 B.R. at 799 n.12. "A majority of bankruptcy courts considering the Medicare-provider relationship conclude that the Medicare provider agreement, with its attendant benefits and burdens, is an executory contract.") *In re Vitalsigns Homecare, Inc.*, 396 B.R. 232, 239 (Bankr. D. Mass. 2008) (citing *In re University Medical Center*, 973 F.2d 1065, 1075 and n.13 (3rd Cir. 199). "The [Medicare] Provider Agreement is a unique type of contract." *In re University Medical Center*, 973 F.2d at 1081 (quoting *University Medical Center*, 122 B.R. 919, 930 (E.D. Pa. 1990). "The Medicare Provider Agreement is a contract providing for advance payments based on estimates and expressly permitting the withholding of overpayments from

future advances." *In re Hefferman Memorial Hospital District*, 192 B.R. 228, 231 n.4 (S.D. Cal. 1996). "Medicare provider agreements are executory in nature, calling for future performance by both parties until either party requests termination, and thus are subject to § 365." *University Medical Center*, 122 B.R. at 919.

In fact, the Third Circuit, which has appellate jurisdiction over the bankruptcy courts of Delaware, explicitly states:

> Although the Bankruptcy Code does not define "executory contract," the Code's legislative history states that this term "generally includes contracts on which performance remains due to some extent on both sides." H.R. Rep. No. 595, 95th Cong., 1st Sess. 347 (1978); S. Rep. No. 989, 95th Con. 2d. Sess. 58 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5844, 6303. *See* also *Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, 872 F.2d 26, 39 (3d Cir. 1989). A Medicare provider agreement easily fits within this definition.

*In re University Medical Center*, 973 F.2d 1065, 1075, fn. 3 (1992).

Accordingly, case law consistently holds that a Medicare provider agreement easily fits within this definition of executory contract. *In re Slater Health Center, Inc.*, 294 B.R. 423, 432 (Bankr. D. RI. 2003) (citing *In re University Medical Center*, 973 F.2d at 1075.) A Medicare provider agreement is an executory contract. *In re Hefferman Memorial Hospital District*, 192 B.R. at 231 n.4. Most courts have concluded that a provider agreement is an executory contract subject to assumption or rejection by a debtor-in-possession. [Internal citations omitted.]" *In re St. Johns Home Health Agency Co.*, 173 B.R. 238, 242 n.1 (S.D. Fl. 1994).

> As we conclude that Congress contemplated that the Medicare provider agreements would constitute a single, ongoing, and integrated transaction, the equitable powers of the bankruptcy court do not entitle it to second-guess Congress's implicit policy choices. *Both by statute and by contract* [emphasis added], the HCFA [Health Care Financing Administration] has the unqualified right to recoup those overpayments *in full* [original emphasis], and to return the funds to the public fisc, where they can be used to fund other facilities providing care to Medicare beneficiaries.

*In re Holyoke Nursing Home, Inc.*, 372 F.3d at 5.

*In re Monsour Medical Center* involved the determination of the Medicare contractual relationship between a medical center and the government. The bankruptcy court found that the medical center and the government were parties to two executory contracts as of the date of the filing of the petition and approved the medical center's assumption of the executory contracts. *In re Memorial Hosp. of Iowa County, Inc.*, 82 B.R. 478, 482-483 (W. D. Wis. 1988) (explaining *In re Monsour Medical Center*).

In *In re Hefferman*, the bankruptcy court of the Southern District of California stressed:

> The Medicare Provider Agreement is a contract, providing for advance payments based on estimates and expressly permitting the withholding of overpayments from future advances. Most recoupment cases involve the *type of contract involved in this case* . . . .

*In re Hefferman Memorial Hospital District*, 192 B.R. at 231 n.4 (emphasis added).

Accordingly, given that courts have consistently held that Medicare Provider Agreements are executory contracts, Medi-Cal Provider Agreements are also executory contracts as the two agreements are similar in many respects. *In re Gardens Regional Hospital and Medical Center, Inc.*, 569 B.R. at 800, n.12.

## III. THE AGREEMENT CANNOT BE SOLD FREE AND CLEAR OF DEBT OWED TO MEDI-CAL UNDER 11 U.S.C. § 363

Circuit courts, including the Ninth Circuit, have firmly held that providers are not entitled to continued participation in Medicare and Medicaid program (including Medi-Cal). Accordingly, the providers have no statutory entitlement to continue to bill Medi-Cal. They lack a protectable property interest to do so.

If a benefit is a "matter of statutory entitlement for persons qualified to receive them," a property interest in that benefit is created. *Goldberg v. Kelly*, 397 U.S. 254, 262, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970). Property interest arises from a statutory entitlement. *Southeast Kansas Community Action Program v. Secretary of Agriculture of the United States*, 967 F.2d 1452,

1457 (10th Cir. 1992). Food-stamp benefits are a matter of statutory entitlement for persons qualified to receive them, and thus are appropriately treated as a form of "property." *Atkin v. Parker*, 472 U.S. 115, 128, 105 S. Ct. 2520, 86 L. Ed. 2d 81 (1985). Statutory entitlement of eligible veterans to receipt of educational assistance constitute a property interest. *Devine v. Cleland*, 616 F. 2d 1080, 1086 (9th Cir. 1980). A state issued license for the continued pursuit of the licensee's livelihood creates a property interest. *Bell v. Burson*, 402 U.S. 535, 539, 91 S. Ct. 1586, 29 L. Ed. 2d 90 (1971).

The Tenth Circuit held that a Medicare provider such as a physician had no property interest in his eligibility for Medicare reimbursement. A provider is not the intended beneficiary of the Medicare program; thus, the provider has no protectable property interest in the Medicare program. *Koerpel v. Heckler*, 797 F.2d 858, 863-65 (10th Cir. 1986). Similarly, the First Circuit concluded that a provider has no protectable property interest in his participation in Medicare. *Cervoni v. Secretary of Health, Education and Welfare*, 581 F.2d 1010 (1st Cir. 1978).

In *Erickson v. United States Department of Health and Human Services*, the district court granted an injunction to plaintiffs, a Medicare provider, to prohibit the Secretary of Health and Human Services from excluding them from federally-funded health care programs. On appeal, the Ninth Circuit followed the reasoning of the First and Tenth Circuits in *Koerpel* and *Cervoni* and held that plaintiffs were not entitled to the continued participation in Medicare/Medicaid programs. Plaintiffs failed to show entitlement, including statutory entitlement, for continued participation in those programs; therefore, they have no property interest in continued participation in those programs. *Erickson v. United States Department of Health and Human Services*, 67 F. 3d 858, 862 (9th Cir. 1995). Similarly, the California Court of Appeal in *Lin v. State of California*, 78 Cal. App. 4th 931 (Ct. App. 2012) held that providers of Medicare and

Medicaid services have no protected interests in continued participation in those programs. *Id.*, at 935. Accordingly, Success does not have any statutory entitlement to bill Medi-Cal. Instead, its ability to retain its Medi-Cal provider status and to provide Medi-Cal services and bill for those services, depends upon its ongoing fulfilment of duties and obligations required by the Agreement.

Consistent with the Ninth Circuit holding that providers have no property interests in their continued participation in Medicare or Medicaid, a bankruptcy court specifically declared that a Medicare Provider Agreement, and similarly, the Medi-Cal Provider Agreement, cannot be sold as an asset under 11 U.S.C. § 363, free and clear of any debt.

> Notwithstanding . . . anything in the Motion or Purchase Agreement to the contrary, *the Medicare Provider Agreement shall not be considered an "asset" that may be sold pursuant to section 363 of the Bankruptcy Code and shall be treated as an executory contract subject to the Assumption and Assignment Procedures.* Assumption and assignment of the Medicare Provider Agreement shall require, as a cure, successor liability on the part of the Buyer for liabilities under the Medicare Provider Agreement.

*In re Berks Behavioral Health, LLC*, 2010 WL 4922173, 7 (Bankr. E.D. Pa. 2010) (emphasis added).

Consistent with the First, Ninth, and Tenth Circuits as well as the California Court of Appeal, Success's Agreement explicitly asserts that no property interests exist in the providers' status (such that they can be sold as an asset under 11 U.S.C. § 363). Instead, the Agreement expressly states that any rights or obligations associated with the Agreement, as an executory contract, may only be assigned and assumed with successor liability.

> Provider agrees that it has no property right in or to its status as a Provider in the Medi-Cal program or in or to the provider number(s) assigned to it, and that Provider may not assign its provider number for use as a Medi-Cal provider, or any rights or obligations it has under this Agreement *except to the extent purchasing owner is joining this provider agreement with successor liability with joint and several liability.*

Vo Decl., Ex. 2, ¶ 37; emphasis added.

Aside from the fact that Success has no property interests to continued participation in Medi-Cal, 11 U.S.C. § 363(f) does not allow Success to sell its Agreement free and clear of any debt or successor liability. Under 11 U.S.C. § 363(f), property can be sold free and clear of any interest in that property of an entity other than the estate, only if:

   (1)   applicable nonbankruptcy law permits sale of such property free and clear of such interest;

   (2)   such entity consents;

   (3)   such interest is a lien and the price at which property is to be sold is greater than the aggregate value of all liens on such property;

   (4)   such interest is in bona fide dispute; or

   (5)   such entity can be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

Here, none of the above requisite elements of 11 U.S.C. § 363(f) apply. For the first criteria, as shown above, non-bankruptcy law does not permit sale of the Agreement as an asset, free and clear of any debt. The Ninth Circuit specifically held that providers have no property interest in their continued participation in Medi-Cal. Accordingly, the Agreement makes clear that Success has no property rights in or to its status as a Medi-Cal Provider. Rather than being assets that can be sold, the Agreement and any rights and obligations therein can only be assigned with successor liability. Vo Decl., Ex. 2, at 8, ¶ 37.

With regard to the second and third criteria, they are inapplicable because the Department has not consented to the sale of the Agreement as Success's assets or property and no lien interests are involved here.

For the fourth criteria, there is no bona dispute regarding the assumption and assignment of the Agreement with successor liability. "A bona fide dispute exists when there is an objective basis for either factual or legal dispute as to the validity of an interest in property." *In re Octagon Roofing*, 123 B.R. 583, 590 (Bankr. N.D. Ill. 1991). As shown above, pursuant to the terms of the Agreement, Success knows and agreed that the Agreement can only be assumed and assigned with successor joint and several liability.

For the fifth criteria, the Department cannot be compelled to accept a money satisfaction in exchange for its rights to prevent a sale of Success's Medi-Cal provider status or its benefits, duties, and obligations under the Agreement.

Accordingly, Debtors and Success cannot sell the Agreement, free and clear of any debt under 11 U.S.C. § 363(f). The Agreement can only be assumed and assigned with successor joint and several liability.

## IV. THE AGREEMENT, AS AN EXECUTORY CONTRACT, REQUIRES CURE OF DEFAULTS AND DEBT

It is well settled that the curing of all defaults is an essential pre-condition to assumption of a contract under 11 U.S.C. § 365(b). "Cure is a critical component of assumption." *In re: Thane International, Inc. v. 9472541 Canada Inc.*, 586 B.R. 540, 549 (Bankr. D. Del. 2018). When an executory contract is assumed, valid claims for default must be cured by the debtor. *In re Memorial Hospital of Iowa County, Inc.*, 82 B.R. at 481.

Out of a total of $45,300,842.32 in HQA Fee liabilities, an amount of $28,524,618.90 is already past due. For the HQA Fee liabilities that are not past due, they have already been incurred by Success or will be incurred by Success and the Buyer. Thus, they must be paid by Success and/or Debtors or be assumed jointly and severally by the Buyer.

## V. THE AGREEMENT REQUIRES SUCCESSOR LIABILITY BY THE BUYER

A party must accept the contract as a whole, meaning that a party cannot choose to accept the benefits of the contract and reject its burdens to the detriment of the other party to the agreement. *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) (citing *In re Holland*, 25 B.R. 301). It is axiomatic that an assumed contract under 11 U.S.C. § 365 is accompanied by its provisions and conditions. *In re Holland*, 25 B.R. at 303 (citing *Atchison, Topeka & Santa Fe Ry Co. v. Hurley*, 153 F. 403 (8th Cir. 1907), aff'd 213 U.S. 126, 29 S. Ct. 466, 53 L. Ed. 729 (1909)). "Assumption or rejection of an executory contract requires an all-or-nothing commitment going forward, and then a debtor cannot assume part of an executory contract in the future while rejecting another part." *In re St. Mary Hospital*, 89 B.R. 503, 509 (E.D. Pa. 1988).

An executory contract must be assumed or rejected *in toto*. *In re Holland*, 25 B.R. at 303. "To hold otherwise, would construe the bankruptcy law as providing a debtor in bankruptcy with greater rights and powers under a contract than the debtor had outside the bankruptcy." *Id.* (citing *In re Nashville White Trucks, Inc.*, 5 B.R. 112, 117 (Bankr. M.D. Tenn.)).

> The Court remains cognizant of the legislative purpose behind section 365. This provision vests the bankruptcy court with a unique power designed to facilitate the rehabilitation of debtors. Nevertheless, a debtor may not retreat to this provision, derived from the inherent equitable powers of the bankruptcy courts, to avoid an obligation while it enjoys a benefit which arises in conjunction with that obligation.

*In re Holland*, 25 B.R. at 303.

Accordingly, if the Buyer assumes the Agreement, then the Buyer will be held jointly and severally liable for any debt owed by Success to the Department, including unpaid HQA Fees and any Medi-Cal overpayments to Success, as the Agreement specifically mandates. In

22

addition, under the Agreement, the Buyer will be subject to Department's recoupment for any unpaid HQA Fees and Medi-Cal overpayments owed by Success. 11 U.S.C. § 365. "It is hornbook law that a debtor cannot assume the benefits of an executory contract while rejecting the burdens." *In re Tidewater Memorial Hospital, Inc.*, 106 B.R. 876, 884 n.9 (Bankr. E.D. Va. 1989) (citing *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985)).

If Success and/or Debtors are allowed to sell, transfer, and assign the Agreement without requiring Success to pay its HQA Fee liabilities or the Buyer to assume those liabilities on joint and several liability, then Success, Debtors, and the Buyer would be allowed to divorce the benefits from the burdens of the Agreement and undermine the HQA Fee system. Success, Debtors, and the Buyer would receive the benefits of the Agreement including Medi-Cal service payments as well as quality assurance payments, while disregarding the obligations of the same Agreement, including successor liability for any debt incurred by Success to the Department.

## CONCLUSION

For the foregoing reasons, the Department requests that this Court order that all outstanding HQA Fee liabilities, incurred by Success before the sale closing, to be paid within five business days after the sale closing. Otherwise, the Buyer must be ordered to be held jointly and severally liable for Success's HQA Fee debt under assumption and assignment of the Agreement. The Department also requests that this Court order that Success and Debtors establish and maintain a trust account for a period of 18 months from the Department's acceptance date of the final cost report to provide the funds necessary, if any, for reimbursement to the Department of any Medi-Cal overpayment to Success and for any Electronic Health Record and Disproportionate Share Hospital program debt owed by Success. The Department will provide a projected figure that needs to be placed into the trust account at a later time.

23

In compliance with Local Rule 9013-1(h), the Department hereby states that it does not consent to the entry of final orders or judgments by this Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

Dated: January 18, 2019

Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
JENNIFER M. KIM
Supervising Deputy Attorney General


/s/ Kenneth K. Wang
KENNETH K. WANG (CA SBN 201823)
Deputy Attorney General
*Attorneys for Creditor*
California Department of Health Care Services

Kenneth K. Wang (CA SBN 201823)
  300 South Spring Street, Suite 1702
  Los Angeles, CA 90013
  Telephone: (213) 269-6217
  Fax: (213) 897-2805
  E-mail: Kenneth.Wang@doj.ca.gov

LA2019600032
63099792.docx

# CERTIFICATE OF SERVICE

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.

My business address is: California Office of the Attorney General, 300 South Spring Street, Suite

1702, Los Angeles, CA 90013.

A true and correct copy of the foregoing document entitled:

**CREDITOR CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES'S OBJECTION TO (1) DEBTORS' MOTION FOR THE ENTRY OF AN ORDER APPROVING THE SALE OF CERTAIN OF DEBTORS' FREE AND CLEAR OF ALL CLAIMS, LIENS, ENCUMBRANCES, AND INTERESTS (D.I. 374); AND (2) SUPPLEMENTAL NOTICE OF POTENTIAL ASSUMPTION AND ASSIGNMENT OF BUSINESS CONTRACTS AND RELATED CURE AMOUNTS (D.I. 410)**

**DECLARATION OF HANH VO IN SUPPORT OF CREDITOR CALIFORNIA DEPARTMENT OF HEALTH CARE SERVICES'S OBJECTION TO (1) DEBTORS' MOTION FOR THE ENTRY OF AN ORDER APPROVING THE SALE OF CERTAIN OF DEBTORS' FREE AND CLEAR OF ALL CLAIMS, LIENS, ENCUMBRANCES, AND INTERESTS (D.I. 374); AND (2) SUPPLEMENTAL NOTICE OF POTENTIAL ASSUMPTION AND ASSIGNMENT OF BUSINESS CONTRACTS AND RELATED CURE AMOUNTS (D.I. 410)**

will be served or was served in the manner stated below:

**SERVED BY U.S. MAIL AND ELECTRONIC MAIL**: Pursuant to F.R.Civ.P. 5 and/or

controlling LBR, on January 18, 2019, I served the following persons and/or entities by

electronically through the Court's case filing system, overnight mail, and electronic mail as

follows.

1. Counsel for the Debtors, William P. Smith, Esq. and James Kapp, Esq. at McDermott Will & Emery, LLP, 444 West Lake Street, Chicago, Illinois, 60606, wsmith@mwe.com and jkapp@mwe.com

2. Counsel for the Debtors, Stuart Brown, Esq. at DLA Piper LLP, 1201 North Market Street, Suite 2100, Wilmington, Delaware 19801, stuart.brown@dlapiper.com

3. Debtor, Success Healthcare 1, LLC, Attn: Charles Posternack, M.D., 999 Yamato Road, Third Floor, Boca Raton, Florida 33431

4. Counsel for the Stalking Horse Bidder, Gary F. Torrell, Esq. at Valensi Rose PLC, 1888 Century Park East, Suite 1100, Los Angeles, CA 90067, gft@vrmlaw.com

5. Counsel for the Stalking Horse Bidder, Jeremy W. Ryan, Esq. at Potter Anderson & Corroon, 1313 North Market Street, Sixth Floor, P.O. Box 951, Wilmington, DE 19801, jryan@potteranderson.com

6. Counsel to Wells Fargo Bank, National Association, Brian Swett, Esq. at McGuire Woods, LLP, 1251 6th Avenue, 20th Floor, New York, NY 10020, bswett@mcguirewoods.com

7. Counsel for Wells Fargo Bank, National Association, John Knight, Esq. at Richards, Layton & Finger, PA, 920 N. King Street, Wilmington, Delaware 19801, knight@rlf.com

8. Counsel for the Committee, Andrew H. Sherman, Esq. at Sills Cummis & Gross, PC., One Riverfront Plaza, Newark, New Jersey 07102, asherman@sillscummis.com

9. Counsel for the Committee, Bradford J. Sandler, Esq. at Pachulski Stang Ziehl & Jones, LLP, 919 N. Market Street, 17th Floor, Wilmington, DE 19801, bsandler@pszjlaw.com

10. Office of the United States Trustee for the District of Delaware, Brya Keilson, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, brya.keilson@usdoj.gov.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Date: 1/18/19

Stacy McKellar