IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
In re:
:
:
PROMISE HEALTHCARE GROUP, LLC, *et al.*,[1]
:
Debtors.
:
---------------------------------------------------------------x

: Chapter 11
:
: Case No. 18-12491 (CSS)
:
: Jointly Administered
:
: **Related D.I.: 37, 83, 257, 464, 296, 301, 383, 410, 459, 478, 493, 494, 505**

**DEBTORS' OMNIBUS REPLY TO CURE OBJECTIONS AND REPLY IN SUPPORT OF ENTRY OF ORDER ON MOTION FOR ENTRY OF AN ORDER (I)(A) APPROVING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) AUTHORIZING SUCCESS HEALTHCARE 1, LLC TO GRANT LIENS; AND (II) GRANTING RELATED RELIEF [SILVER LAKE DEBTORS]**

The debtors and debtors-in-possession in the above-captioned cases (collectively, the

"Debtors") file this omnibus reply to cure objections relating to the *Notice of Potential*

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Professional Rehabilitation Hospital, L.L.C. (5340), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179), Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc. (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc. (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), St. Alexius Hospital Corporation #1 (2766), St. Alexius Properties, LLC (4610), Success Healthcare 1, LLC (6535), Success Healthcare 2, LLC (8861), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766). The mailing address for the Debtors, solely for purposes of notices and communications, is 999 Yamato Road, 3rd FL, Boca Raton, FL 33431.

*Assumption and Assignment of Business Contracts and Related Cure Amounts* [D.I. 296] and *Supplemental Notice of Potential Assumption and Assignment of Business Contracts and Related Cure Amounts* [D.I. 410] (collectively, the "Cure Notice") and reply in support of entry of order on *Debtors' Motion for Entry of Orders (I)(A) Establishing Bidding Procedures Relating to the Sale of Certain of the Debtors' Assets, Including Approving a Break-Up Fee and Expense Reimbursement, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, (C) Approving Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing to Consider the Proposed Sale; (II)(A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Authorizing Success Healthcare 1, LLC to Grant Liens; and (III) Granting Related Relief* [D.I. 37] (the "Sale Motion"), and respectfully state as follows:

## PRELIMINARY STATEMENT

1. On December 7, 2018, this Court entered an order approving bidding procedures for the sale of substantially all of the assets of Success Healthcare, LLC, Success Healthcare 1, LLC, and HLP of Los Angeles, LLC (collectively, the "Silver Lake Debtors") [D.I. 257] (the "Bidding Procedures Order"). The Bidding Procedures Order established January 11, 2019 at 5:00 p.m. prevailing Eastern time as the deadline to submit bids. No bids proposing an alternate transaction were received by the Bid Deadline[2] and, as a result, on January 14, 2019, the Silver

---

[2] Capitalized terms used but not defined herein shall have the meanings given to them in the Sale Motion.

Lake Debtors filed a *Notice of Cancellation of Auction and Designation of Stalking Horse Bidder as the Successful Bidder* [D.I. 478].

2.      As described herein (and, with respect to the objection filed by the California Department of Health Care Services (the "Department"), as described in the following paragraph), the Silver Lake Debtors have resolved all formal and informal cure objections except for the cure objection filed by AFG Investment Fund 5, LLC ("AFG") relating to the Amended and Restated Master Lease Agreement (the "Lease") dated as of November 14, 2008 for the Silver Lake Debtors' Rosemead facility [D.I. 365] (the "AFG Objection"). So as not to delay entry of the Sale Order, and consistent with the procedure set forth in the Bidding Procedures Order, the Silver Lake Debtors propose to escrow sale proceeds in an amount sufficient to adequately protect AFG's interests until the AFG Objection can be resolved.[3]

3.      The Silver Lake Debtors, in consultation with the Committee and DIP Agent, have also worked with attorneys for the Department of Justice, Department of Health and Human Services, and Oracle America, Inc. to incorporate their comments into an agreed form of Sale Order, thus resolving their informal and formal (in the case of Oracle) objections to the Sale. In addition, the Silver Lake Debtors, in consultation with the Committee and DIP Agent, have engaged in discussions with attorneys for the California Attorney General regarding the objection they filed on behalf of the California Department of Health Care Services and, while the Silver Lake Debtors do not yet have the agreement of those parties, as described herein, the Silver Lake Debtors believe that the additional language they have proposed to add to the Sale Order will resolve the Attorney General's objection and any cure issues. Finally, as described

---

[3] There are a number of factual disputes at issue in the AFG Objection and, absent a consensual resolution, the Silver Lake Debtors believe that discovery and an evidentiary hearing will likely be needed.

herein, because the Silver Lake Debtors were not able to provide notice of the Sale to one holder of an Interest in the Purchased Assets whose Interest is in bona fide dispute, the Silver Lake Debtors propose to escrow sale proceeds in an amount sufficient to adequately protect such holder until the dispute can be resolved.

4. For the reasons set forth herein and in the Sale Motion, the Silver Lake Debtors request that this Court enter the Sale Order approving the sale of the Silver Lake Debtors' assets to the Stalking Horse Bidder pursuant to the terms of the Stalking Horse APA.

## TREATMENT OF CURE OBJECTIONS

5. The Silver Lake Debtors received both formal and informal objections to the proposed cure amounts set forth in the Cure Notice, including the AFG Objection and objections by MedCoast Medservices, Inc. dba MedCoast Ambulance ("MedCoast") [D.I. 364], California Physicians' Service, dba Blue Shield of California ("Blue Shield") [D.I. 361], and LEAF, as successor to Toshiba Financial Services (the objection filed on behalf of California Department of Health Care Services, which was partially directed towards cure and partially directed towards the sale, is addressed below in the sale objections section of this reply).

A. *Resolved Cure Objections*

6. The Silver Lake Debtors, in consultation with the Committee and DIP Agent, have resolved the informal and formal cure objections (except for the AFG Objection) as follows:

    a. MedCoast. The Silver Lake Debtors agree that $130,076.25 is the amount required to cure the defaults under MedCoast's Patient Transportation Agreement with Success Healthcare 1, LLC dated as of June 1, 2016. Such amount will be paid at Closing of the Sale in connection with assumption and assignment of the Patient Transportation Agreement.

4

b. <u>Blue Shield</u>. Blue Shield's objection was resolved by the filing of their *Notice of Conditional Withdrawal of Limited Objection of California Physicians' Service DBA Blue Shield of California to Notice of Potential Assumption and Assignment of Business Contracts and Related Cure Amounts* [D.I. 435]. The Silver Lake Debtors agree that the Cure Notice pertains to contracts to which one or more of the Silver Lake Debtors is party and is not intended to affect the assets, estate or creditors of other non-Silver Lake debtors. The Silver Lake Debtors make no representation as to whether amounts may be owed to Blue Shield by non-Silver Lake Debtors.

c. <u>LEAF</u>. LEAF is successor to Toshiba Financial Services under the Office Tech Lease Agreement with Success 1 dated as of August 31, 2015. The Silver Lake Debtors agree that the Cure Cost thereunder is $10,809.84 as of January 25, 2019, plus $2,956.50 per month thereafter, which amount shall be prorated through and paid at Closing.

d. The Notice of Termination between Success 1 and Aetna Health of California, Inc. and Aetna Health Management, LLC dated as of May 30, 2012 and the Confidential and Proprietary Agreement between Success 1 and Morrison Management Specialists, Inc. dated as of December 1, 2011 will not be, and do not constitute, Purchased Contracts.

  B. *AFG Objection*

7. With respect to the AFG Objection, the Silver Lake Debtors, in consultation with the Committee and DIP Agent, propose to escrow Sale proceeds in the amount of $946,116.09 until such time as the AFG Objection is consensually resolved by the parties (in consultation with the Committee and DIP Agent) or determined by the Court. The proposed reserve amount includes AFG's claimed damages for (i) failure to pay property taxes ($206,116.09), (ii) the

security deposit ($690,000), and (iii) an estimate of AFG's professional fees ($50,000), but does not reserve for damages on account of (a) liens on the Premises ($16,658.62), (b) the Financial Performance Adjustment ($1,406,340.91), and (c) the late penalty on account of failure to timely pay November rent ($14,754.91) (each as described in the AFG Objection).

      i.     <u>Liens Will Be Paid or Provided For at Closing</u>

8. Pursuant to the Stalking Horse APA, the Silver Lake Debtors are required to convey the leasehold interest in the Rosemead property free and clear of all Liens, except for certain Permitted Exceptions. *See* Stalking Horse APA, § 5.7(b). Among the Liens that will be paid at Closing are "Mandatory Payoff Liens" which include Liens on the Purchased Assets that secure the payment of money, including mechanics, carriers', workmen's, repairmen's and other statutory liens. *See* Stalking Horse APA, Annex 1.1. Because the liens on the Premises that AFG complains of in the AFG Objection will be paid or provided for at Closing, the Silver Lake Debtors should not also be required to escrow funds sufficient to pay such liens.[4]

      ii.     <u>Pursuant to Bankruptcy Code Sections 365(b)(2)(A) and (D), the Financial Performance Adjustment is Not Required to Be Cured</u>

9. The Silver Lake Debtors should not be required to escrow proceeds on account of the Financial Performance Adjustment (as defined in the Lease) in the AFG Objection because, as a matter of law, Bankruptcy Code sections 365(b)(2)(A) and 365(b)(2)(D) do not require that the Financial Performance Adjustment be cured.

10. Bankruptcy Code section 365(b)(2) sets forth certain exceptions to the general rule that a debtor may not assume a contract or lease unless it cures or provides adequate

---

[4] The Silver Lake Debtors reserve all rights to challenge such liens, including perfection, validity, force, priority and effect of same.

assurance that it will promptly cure any defaults thereunder. Section 365(b)(2) is broad in scope and applies not only to defaults triggered by a bankruptcy filing, but also to defaults triggered by events or conditions that are likely to occur or exist around the time that a case is commenced. *See* 3 Collier on Bankruptcy ¶ [365.06[4]] (Richard Levin & Henry J. Sommer eds., 16th ed.) ("For example, a default measured by the debtor's financial condition need not be cured, whether the default is related directly to the bankruptcy filing or merely occurred on the road to bankruptcy.").

11. As applicable here, section 365(b)(2)(A) provides an exception for a default that is a breach of a provision relating to "the insolvency or financial condition of the debtor at any time before the closing of the case." 11 U.S.C. § 365(b)(2)(A).

12. Section 3(c) of the Lease sets forth the Financial Performance Adjustment, and states as follows:

> (c) <u>Tenant's Financial Performance</u>. Tenant agrees that the amount of the Basic Rent set forth above is conditioned upon Tenant meeting both of the financial tests set forth in items (i) and (ii) below (the "<u>Financial Performance Tests</u>"). Subject to the terms of this <u>Section 3</u>, if for any calendar quarter during any Lease Year Tenant's financial performance fails to meet one or both of the Financial Performance Tests, then commencing as of the first day of the next calendar quarter (i) the Basic Rent will increase by ten percent (10%) (such adjustment being a "<u>Financial Performance Adjustment</u>") . . . .
>
> (i) Tenant's earnings to rent ratio ("<u>Earnings to Rent Ratio</u>") must equal or exceed 2:1. The Earnings to Rent Ratio will be the ratio of (i) Tenant's EBITDAR as compared to (ii) Tenant's Basic Rent payable under the terms of this Master Lease (but not any additional rent payable because of a Financial Performance Adjustment); and
>
> (ii) Tenant's fixed charge coverage ratio ("<u>Fixed Charge Coverage Ratio</u>") may not be less than 1:1. The Fixed Charge Coverage Ratio will be the ratio of (i) Tenant's EBITDA to (ii) the sum of Tenant's required debt service payments (which will include any payments due under Tenant's credit facility and any other short or long-term loans); payments required under Tenant's plan of reorganization; and capital expenditures made or otherwise required under the

7

EAST\164409255.1

terms of this Master Lease (excluding those capital expenditures discussed in Section 8(a) below).

*See* Lease, § 3(c).

13. By its plain terms, Section 3(c) is a provision relating to the insolvency or financial condition of the Silver Lake Debtors. AFG acknowledges as much, stating in the AFG Objection that the "Financial Performance Adjustment to Basic Rent is tied to the Debtor's financial performance . . . ." Objection, ¶ 10; *see also In re Tobago Bay Trading Co.*, 112 B.R. 463, 467 (Bankr. N.D. Ga. 1990) (finding that lease provision that prohibited debtor from liquidating inventory was a provision "relating to the insolvency or financial condition of the debtor."); *In re Great Nw. Recreation Ctr., Inc.*, 74 B.R. 846, 855 (Bankr. D. Mont. 1987) (finding that breach of contract provision requiring dealer to maintain adequate working capital and lines of wholesale credit related to the insolvency of the debtor and was not required to be cured under section 365(b)(2)(A)). Because the Silver Lake Debtors allegedly failed to comply with the Financial Performance Tests set forth in Section 3(c) and failed to pay the corresponding Financial Performance Adjustment, AFG asserts that they have breached the Lease. This "breach of a provision relating to the financial condition of the debtor" falls squarely within the section 365(b)(2)(A) exception to cure.

14. In addition, section 365(b)(2)(D) provides an exception from cure for a default that is a breach of a provision relating to "the satisfaction of any penalty rate or penalty provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the unexpired lease." 11 U.S.C. § 365(b)(2)(D). At bottom, AFG asserts that the Silver Lake Debtors have failed to perform nonmonetary obligations; namely, to satisfy the Financial Performance Tests and to provide financial data to enable AFG to assess whether the Financial Performance Tests were satisfied. As a result of these nonmonetary breaches, AFG asserts that

8

the Silver Lake Debtors are required to pay the Financial Performance Adjustment. The Financial Performance Adjustment is a penalty provision that, when applicable, results in a 10% increase to Basic Rent. As a result, the Silver Lake Debtors are not required to cure the Financial Performance Adjustment under Bankruptcy Code section 365(b)(2)(D).

15. Even if this Court were to find that Bankruptcy Code sections 365(b)(2)(A) and (D) do not apply to the Financial Performance Adjustment, the Silver Lake Debtors should not be required to reserve for the claimed Financial Performance Adjustment because, on information and belief, AFG's assertion that the Silver Lake Debtors failed to deliver financial data and comply with the Financial Performance Tests is incorrect. As described in the declaration of Andrew Hinkelman attached as <u>Exhibit A</u> hereto (the "<u>Declaration</u>"), the Silver Lake Debtors delivered to AFG calculations and supporting data showing compliance with the Financial Performance Tests for, at a minimum, all four quarters of 2016, quarters one, two, and four of 2017, and quarters one and two of 2018, and may show substantial compliance with all periods in question.[5]

        iii.    <u>Pursuant to Bankruptcy Code Section 365(b)(2)(D), the Late Rent Penalty is Not Required to Be Cured</u>

16. Similarly, pursuant to Bankruptcy Code section 365(b)(2)(D), the Debtors are not required to cure the "Late Penalty" on account of failure to timely pay November, 2018 rent. Section 3(e) of the Lease provides that a Late Fee will be added to any amount due and payable that remains unpaid for five days thereafter, with the first Late Fee to be five percent of the unpaid amount. Lease, § 3(e). By AFG's own admission, the Late Fee is a "penalty" and, therefore, is not required to be cured under Bankruptcy Code section 365(b)(2)(D). *See* AFG

---

[5] The Silver Lake Debtors reserve all rights and arguments with respect to the AFG Objection.

9

EAST\164409255.1

Objection, p. 57, ¶ 4.a.; *see, also*, *In re ASHINC Corp.*, Case No. 12-11564 (CSS), 2015 WL 13646295 (Bankr. D. Del. Dec. 29, 2015) (ordering that "[p]ursuant to section 365(b)(2)(D) of the Bankruptcy Code, no Cure Claim shall be allowed for a penalty rate or other form of default rate of interest."); *In re Claremont Acquisition Corp., Inc.*, 113 F.3d 1029, 1034 (9th Cir. 1997) ("The first clause [of section 365(b)(2)(D)] addresses penalty rates which are commonly imposed where a debtor's breach was monetary in nature.").

17. For these reasons, the Silver Lake Debtors submit that an escrow funded at Closing in the amount of $946,116.09 is sufficient to adequately protect AFG's interests.

## TREATMENT OF SALE OBJECTIONS AND OTHER MATTERS CONCERNING THE SALE

*A. Resolved Sale Objections*

18. *Oracle's Limited Objection to and Reservation of Rights Regarding the Silver Lake Debtors' Sale Motion* [D.I. 479] has been resolved by the addition of language to the Sale Order.

19. Over the past month, the Silver Lake Debtors, along with the Successful Bidder and its lender, Ally Bank, have engaged in discussions and negotiations with the United States Department of Justice, on behalf of the Department of Health and Human Services, on language to be included in the Sale Order relating to treatment of the Silver Lake Debtors' Medicare provider agreement. The parties have agreed upon language to the effect that, among other things, the Medicare provider agreement is being assumed and assigned pursuant to Bankruptcy Code section 365 and successor liability will apply. As described below, the Silver Lake Debtors submit that the same language that has been agreed to with the Department of Justice and Department of Health and Human Services with respect to the Silver Lake Debtors'

Medicare agreements also addresses the Medi-Cal Objection with respect to the Medi-Cal Agreements (each as defined below).

  B. *Objection by California Department of Health Care Services*

20. California Department of Health Care Services (the "Department") filed an objection [D.I. 489] (the "Medi-Cal Objection") to the Sale Motion on the following grounds: (i) the Silver Lake Debtors' Medi-Cal provider agreements (the "Medi-Cal Agreements") are executory contracts and, therefore, require the Debtors to cure all defaults prior to any assumption and assignment; (ii) the Medi-Cal Agreements cannot be sold free and clear of debt owed to Medi-Cal pursuant to Bankruptcy Code section 363; (iii) the Medi-Cal Agreements require successor liability by the Successful Bidder; and (iv) the Silver Lake Debtors must establish, maintain, and place certain funds into a trust account for a period of 18 months. The Silver Lake Debtors have discussed the Medi-Cal Objection with the Attorney General of California (the "Attorney General"), who represents the Department, and have proposed language for inclusion in the Sale Order that the Silver Lake Debtors' submit addresses all points raised in the Medi-Cal Objection. The Attorney General and the Department have represented to the Silver Lake Debtors that they are considering this additional language, but have yet to agree to it.

    i. <u>The Medi-Cal Agreements are Treated as Executory Contracts Under the Stalking Horse APA and Sale Order</u>

21. The Department's argument that the Silver Lake Debtors' Medi-Cal Agreements are executory is moot, as the Silver Lake Debtors are not contesting the executory nature of the Medi-Cal Agreements. The Silver Lake Debtors have proposed to add language to the Sale Order stating that, "the Medicare and Medi-Cal provider agreements shall not be sold pursuant to section 363 of the Bankruptcy Code but shall be assumed and assigned pursuant to section 365 of

11

the Bankruptcy Code and all applicable Medicare and Medi-Cal statutes and regulations, and the Anti-Assignment Act, as applicable." The Debtors do not, however, agree that $45 million is the correct Cure Cost, as described in section iv below.

        ii.    <u>The Silver Lake Debtors are not Attempting to Sell the Medi-Cal Agreements Free and Clear; Successor Liability Will Apply</u>

22. Similarly, the Silver Lake Debtors do not intend to sell the Medi-Cal Agreements free and clear of all interests, liens, claims, and encumbrances pursuant to section 363 of the Bankruptcy Code, and do not contest that the Successful Bidder will be subject to successor liability. The Silver Lake Debtors have added language to the Sale Order stating, "[n]otwithstanding any provision in this Order, any other Order, or any agreement related to the sale of the Silver Lake Debtors' assets, nothing in this Order shall be construed as authorizing the sale, transfer or assignment of any Medicare or Medi-Cal provider agreements to the Stalking Horse Bidder, or any other Successful Bidder, free and clear of successor liability for any liability arising from such Medicare or Medi-Cal provider agreement, nor as restricting the United States' or the State of California's respective rights of setoff and recoupment." Accordingly, the Department's second and third arguments are also moot.

        iii.    <u>Because the Medi-Cal Agreement is Being Assumed and Assigned and Successor Liability Applies, the Silver Lake Debtors Should Not Be Required to Pay HQA Fee Liabilities or Escrow Funds at Closing</u>

23. The only points that remain outstanding are what the correct Cure Cost for the Medi-Cal Agreements is and whether the Silver Lake Debtors should be required to "establish and maintain a trust account for a period of eighteen months from the Department's acceptance date of the final cost report to provide funds necessary, if any, for reimbursement to the Department of any Medi-Cal overpayment to Success and for any Electronic Record and Disproportionate Share Hospital program debt owed by Success." Medi-Cal Objection, p. 23.

24. As discussed herein, Bankruptcy Code section 365(b) provides that, if there has been a default in an executory contract, assumption and assignment cannot occur until the trustee (or debtor in possession) (A) cures such default, (B) compensates or provides adequate assurance that the debtor in possession will promptly compensate a party for any actual pecuniary loss resulting from such default, and (C) provides adequate assurance of future performance under such contract. 11 U.S.C. § 365(b).

25. While the Silver Lake Debtors have agreed to treat the Medi-Cal Agreements as executory contracts for these purposes, the Silver Lake Debtors do not agree that the $45,300,842.32 figure referenced in the Medi-Cal Objection is the correct Cure Cost under the Medi-Cal Agreements. As a preliminary matter, the Silver Lake Debtors do not believe that there is a default in need of cure. The Medi-Cal Objection itself acknowledges that a large portion of the amount claimed is not yet due. *See* Medi-Cal Objection, p. 21 ("Out of a total of $45,300,842.32 in HQA Fee liabilities, an amount of $28,524,618.90 is already past due. For the HQA Fee liabilities that are not past due, they have already been incurred by Success or will be incurred by Success and the Buyer.") Bankruptcy Code section 365(b) does not require the cure of *prospective* defaults. Further, using the Department's own chart, provided on pages 11 and 12 of the Medi-Cal Objection, a number of the alleged amounts due have "TBD" as the due date. Certainly, a party cannot be in default on a payment if there is no due date for such payment. Subtracting the payments not yet due, the total is reduced to $18,939,820.41.

26. However, because the Successful Bidder is taking assignment of the Medi-Cal Agreements and is subject to successor liability thereunder, the Silver Lake Debtors should not be required to pay or escrow this amount at Closing. In the normal course of business outside the bankruptcy process, a buyer who assumes the seller's Medi-Cal provider agreement assumes

13

the agreement with all of the benefits and burdens thereof, and there is no payment made at closing even if there are amounts due for HQA Fees (as defined in the Medi-Cal Objection).[6] Instead, the program withholding and payment mechanisms continue post-closing just as they did pre-closing.

27. Treatment of the Medi-Cal agreement should be no different here. The Successful Bidder is a more fiscally stable operator than the Silver Lake Debtors, is assuming all obligations under the Medi-Cal Agreements, and will be subject to successor liability, including for setoff and recoupment. This was a key negotiated deal point in the APA because, as a practical matter in light of the Debtors' liquidity situation, an escrow or payment to the Department of any dimension will jeopardize the viability of the Chapter 11 Cases.

C. *Notice Issue; Proposed Escrow*

28. The Sale Order contains findings and conclusions pursuant to Bankruptcy Code section 363(f) that the Purchased Assets are sold to the Stalking Horse Purchaser free and clear of all Liens and Excluded Liabilities. In order to ensure that the requirements of Bankruptcy Code section 363(f) are satisfied, and in accordance with the Bidding Procedures Order, the Silver Lake Debtors provided all parties asserting claims against the Purchased Assets, including, but not limited to, all creditors and interest holders of the Silver Lake Debtors, with notice of, and an opportunity to object to, the Sale Transaction.

29. One such interest is a Deed of Trust dated as of August 12, 1975, and recorded on September 4, 1975, as instrument number 64 in the Official Records of Los Angeles County,

---

[6] In particular, Section 1(a) of the Medi-Cal Financial Responsibility form (which the Successful Bidder will sign in connection with the change of ownership (CHOW) paperwork) is clear that the new owner is responsible for paying the previous owner's unpaid HQAF fees. Section 3(a) of the form states that "the schedule for length and amount of repayments [that the new owner will be assuming from the old owner] will be at DHCS' discretion" and Section 3(c) contemplates that amounts due to the Department can be offset against amounts currently due to the hospital.

14

EAST\164409255.1

California (the "Mac Nitt Instrument") in favor of Bank of America National Trust and Savings Association ("Bank of America"), as trustee, and Philip D. Mac Nitt ("Mac Nitt"), as beneficiary, which purports to secure indebtedness in the principal amount of $35,000.00. Although the Mac Nitt Instrument has not been released, as set forth in the Declaration, the Silver Lake Debtors do not believe that any amounts are owed thereunder, noting that the origin of the debt precedes acquisition of the property by the Silver Lake Debtors.  However, the Silver Lake Debtors have been unable to confirm whether any debt is outstanding with either Bank of America or Mac Nitt.  Bank of America was served with notice of the Sale Motion, Bidding Procedures Order, and Sale Notice at 100 North Tyron Street, Charlotte, NC 28255, and has not filed a response or objection to the Sale.  The notice address provided in the Mac Nitt Instrument for Mac Nitt is the address of the Silver Lake Medical Center, and the Silver Lake Debtors were unable to locate an alternate address for Mac Nitt.

30. In order to make the requested "free and clear" finding under Bankruptcy Code section 363(f), the Silver Lake Debtors request that the Court find, pursuant to Bankruptcy Code sections 363(f) and 363(e), that the interests of Bank of America and Mac Nitt under the Mac Nitt Instrument are in bona fide dispute.  Until the Silver Lake Debtors are able to resolve the dispute (either through agreement with Bank of America and Mac Nitt, or through an objection to the claim and action for quiet title brought by the Silver Lake Debtors), the Silver Lake Debtors propose to escrow sale proceeds in the amount of $52,500.00.  This includes the $35,000 principal amount set forth in the Mac Nitt Instrument and assumes five percent non-compounded interest for ten years.  The Silver Lake Debtors submit that such an escrow adequately protects the potential interests of Bank of America and Mac Nitt under the Mac Nitt Instrument.

## CONCLUSION

WHEREFORE, for the reasons set forth in the Sale Motion and this pleading, the Debtors respectfully request that this Court (i) grant the Sale Motion and the relief requested therein; (ii) enter the Sale Order; and (iii) grant such other and further relief as it deems just and proper.

|  |  |
|---|---|
| Dated: January 29, 2019<br>Wilmington, Delaware | /s/ *Stuart M. Brown*<br>DLA Piper LLP (US)<br>Stuart Brown (DE Bar Number 4050)<br>1201 North Market Street, Suite 2100<br>Wilmington, Delaware 19801<br>Telephone:  302.468.5700<br>Facsimile: 302.778.7913<br>Email: stuart.brown@dlapiper.com<br><br>*Counsel to the Debtors and*<br>*Debtors in Possession, Promise Healthcare*<br>*Group, LLC, et al.*<br><br>   -and-<br><br>MCDERMOTT WILL & EMERY LLP<br>William P. Smith (admitted *pro hac vice*)<br>James W. Kapp (admitted *pro hac vice*)<br>Megan Preusker (admitted *pro hac vice*)<br>444 West Lake Street<br>Chicago, Illinois 60606<br>Telephone: 312.372.2000<br>Facsimile: 312.984.7700<br>Email: wsmith@mwe.com<br>jkapp@mwe.com<br>mpreusker@mwe.com<br><br>*Special Counsel for the Silver Lake Debtors in*<br>*Connection with the Sale of the Silver Lake Medical*<br>*Center* |