IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------x
:
In re:                                                 :    Chapter 11
:
PROMISE HEALTHCARE GROUP, LLC, et al.,[1]              :    Case No. 18-12491 (CSS)
:
Debtors.                                    :    (Jointly Administered)
:
:    Related D.I.: 374
-------------------------------------------------------x

**ORDER: (I)(A) APPROVING BIDDING PROCEDURES AND BID PROTECTIONS RESPECTING THE REMAINING ASSETS, (B) PERMITTING DEBTORS TO DESIGNATE STALKING HORSE PURCHASER(S) AND GRANT BID PROTECTIONS, (C) SCHEDULING A HEARING TO CONSIDER APPROVAL OF THE SALE OF ASSETS, (D) APPROVING FORM AND MANNER OF NOTICE OF SALE, AND (E) GRANTING RELATED RELIEF; AND (II)(A) AUTHORIZING AND APPROVING THE SALE OF SUBSTANTIALLY ALL ASSETS OF CERTAIN OF THE DEBTORS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Professional Rehabilitation Hospital, L.L.C. (5340), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179), Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc. (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc. (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), St. Alexius Hospital Corporation #1 (2766), St. Alexius Properties, LLC (4610), Success Healthcare 1, LLC (6535), Success Healthcare 2, LLC (8861), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766). The mailing address for the Debtors, solely for purposes of notices and communications, is 999 Yamato Road, 3rd FL, Boca Raton, FL 33431.

Upon consideration of the motion [D.I. 374] (the "*Motion*")[2] for entry of an order (this "*Order*") approving, among other things, the Bidding Procedures and Bid Protections, scheduling the Auction, and scheduling a hearing to consider the sale of substantially all the Remaining Assets, pursuant to and in accordance with the Bidding Procedures, and authorizing the Debtors to designate stalking horse purchaser(s); and this Court having considered the Motion, the arguments of counsel and the evidence presented at the hearing to consider the Motion, and the entire record; and due and sufficient notice of the Motion, hearing to consider the Motion, and the relief sought in the Motion having been given under the particular circumstances; and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion and all objections to the Motion (the "*Objections*"); and it appearing that the relief requested in the Motion is in the best interest of the Debtors, their estates, their creditors and other parties in interest; and after due deliberation and good and sufficient cause appearing for the relief sought, it is hereby:

## FOUND AND DETERMINED THAT:

I.    **Determination with Respect to the Findings of Fact and Conclusions of Law**

A.    The findings of fact and conclusions of law set forth in this Order constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this case pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are hereby adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are hereby adopted as such. Any findings of fact or conclusions of law stated by the Court on the record at the hearing to

---

[2] Capitalized terms used in this Order and not otherwise defined shall have the meanings ascribed to them in the Motion.

2

consider the Motion are hereby incorporated, to the extent they are not inconsistent with this Order.

## II.     Jurisdiction, Final Order, and Statutory Predicates

B.     This Court has jurisdiction to hear and determine the Motion and over the Debtors, their estates, and the Debtors' assets that are the subject of the relief sought in the Motion. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this case and the Motion in the District of Delaware is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     The statutory and legal predicates for the relief requested in this Motion are sections 105(a), 363(b), (f), and (m), 365 of title 11 of the United States Code (the "*Bankruptcy Code*"), Rules 2002, 6004, 6006, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*"), and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "*Local Rules*").

D.     This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth in this Order.

## III.     Notice of Proposed Bidding Procedures, Assumption Procedures, and Sale of the Remaining Assets

E.     Actual written notice of the Motion and a reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein have been afforded to all known interested persons and entities, including, but not limited to the following parties: (a) all entities

known to have expressed an interest in a transaction with respect to some or all of the Remaining Assets during the past twenty-four (24) months; (b) all entities known to have asserted any interest in or upon any of the Remaining Assets; (c) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (d) known counterparties to any unexpired leases or executory contracts that could potentially be assumed and assigned to a Successful Bidder; (e) the Office of the United States Trustee for the District of Delaware and the Patient Care Ombudsman; (f) counsel to the Committee; (g) counsel to the DIP Agent; (h) the Office of the United States Attorney General for the District of Delaware; (i) the Internal Revenue Service; (j) the U.S. Department of Justice; (k) the offices of the attorneys general for the states in which the Debtors operate; (l) all of the Debtors' insurers; (m) all parties entitled to notice pursuant to Rule 2002 of the Bankruptcy Rules or Local Rule 2002-1(B); (n) to the extent not already included above, all parties in interest listed on the Debtors' creditor matrices, excluding current, former or future patients; and (o) other persons reasonably requesting notice of a potential purchase of the Remaining Assets (collectively, the "*Notice Parties*").

F.      As evidenced by the affidavits of service previously filed with the Court, proper, timely, adequate and sufficient notice of the Motion, Bidding Procedures, and Assumption Procedures has been provided in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006 and 9014 of the Bankruptcy Rules, and Rules 2002-1, 6004-1, and 9014-1 of the Local Rules. The notice provided was adequate, sufficient and appropriate under the circumstances, and no other or further notice of the Motion, Bidding Procedures, or Assumption Procedures is necessary or required, other than as set forth in this Order.

G.     The Notice of Auction and Sale Hearing and Notice of Potential Assumption are reasonably calculated to provide all interested parties with timely and proper notice of the proposed sale of the Remaining Assets, including, without limitation: (i) the date, time, and place of the Auction, if any; (ii) the Bidding Procedures governing participation in the Auction; (iii) the deadline for filing objections to the sale of the Remaining Assets; (iv) the date, time, and place of the hearing to consider the sale of the Remaining Assets; (v) instructions for obtaining copies of the template asset purchase agreement; (vi) clearly identifying the sale of the Remaining Assets is free and clear of any and all liens, claims, interest, and other encumbrances, other than as set forth in any applicable asset purchase agreements; and (v) the proposed assumption and assignment of certain contracts and leases, and the procedures and deadlines for objecting to any assumption and assignment.

H.     The Assumption Procedures will provide any Designated Stalking Horse Bidder, any Qualified Bidder, and each counterparty to a potentially assumed executory contract or unexpired lease with proper notice of the potential assumption and assignment of any executory contract or unexpired lease and any cure costs relating thereto, and the procedures set forth therein with regard to any such cure costs satisfy section 365 of the Bankruptcy Code and Rule 6006 of the Bankruptcy Rules.

I.     The disclosures made by the Debtors concerning the Motion, Bidding Procedures, and Assumption Procedures were good, complete, and adequate.

J.     Notice of the Motion, Bidding Procedures, and Assumption Procedures was adequate, fair, and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code, Rules 2002, 6004, and 6006 of the Bankruptcy Rules, and Rules 2202-1 and 6004-1 of the Local Rules.

EAST\164463932.4

## IV.    The Bid Procedures, and Bid Protections

K.    The terms of the Bidding Procedures and Bid Protections are reasonably calculated to induce a Potential Bidder to seek Designated Stalking Horse Bidder status and are within the market standards.

L.    The Bidding Procedures are reasonably designed to maximize the value to be achieved for the Remaining Assets.

M.    The Debtors have demonstrated that, subject to the terms of this Order (including paragraph 3 of this Order), the Bid Protections in the form of (i) a break-up fee in the amount of up to 3% of the Purchase Price; (ii) expense reimbursement in an amount up to 1.5% of the Purchase Price; and (iii) an initial overbid at least greater than $100,000 higher than the sum of the Purchase Price plus break-up fee plus expense reimbursement, are actual and necessary costs and expenses of preserving the Debtors' estates, within the meaning of sections 503(b) and 507(a) of the Bankruptcy Code, and are of substantial benefit to the Debtors' estates by inducing any Designated Stalking Horse Bidder to enter into an asset purchase agreement and subject its offer to higher and better bids, thereby ensuring the Debtors receive the highest or otherwise best possible bid for the Remaining Assets.

N.    Good and sufficient business reasons exist for this Court to: (i) approve the Bidding Procedures, in the form attached to this Order as **Exhibit 2**; (ii) approve the amounts of the Bid Protections, subject to the terms of this Order and as set forth in any applicable asset purchase agreement and Bidding Procedures; (iii) schedule the auction and hearing to consider the results of the auction and sale of the Remaining Assets; and (iv) establish the Assumption Procedures, to fix cure amounts to be paid pursuant to section 365 of the Bankruptcy Code, in connection with the assumption and assignment of executory contracts and unexpired leases.

EAST\164463932.4

O.      The Debtors have articulated good and sufficient reasons for this Court to approve the Bidding Procedures and Assumption Procedures.

P.      The entry of this Order is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

## IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:

1.      The relief sought in this Motion is GRANTED and APPROVED to the extent set forth in this Order.

2.      All objections to the relief granted in this Order that have not been withdrawn, waived, or settled as announced to the Court at the hearing to consider the Motion or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits or otherwise have been satisfied or adequately provided for pursuant to this Order.

3.      The Debtors, in consultation with the Committee and the DIP Agent (together, the "*Consultation Parties*"), are authorized to designate one or more Designated Stalking Horse Bidders and provide Bid Protections, subject to and in accordance with the Stalking Horse Objection Process (defined below). To the extent the Debtors designate a Potential Bidder as a Designated Stalking Horse Bidder, the Debtors shall file on the docket a notice (a) identifying the Designated Stalking Horse Bidder; (b) identifying the Remaining Assets that are subject to such Designated Stalking Horse Bidder's asset purchase agreement; (c) attaching a copy of such Designated Stalking Horse Bidder's asset purchase agreement; and (d) describing the key terms of the asset purchase agreement, including the Bid Protections provided to such Designated Stalking Horse Bidder, if any (the "*Stalking Horse Notice*"). Notwithstanding anything in this Order or the Bidding Procedures to the contrary, all parties in interest (including the Consultation

Parties) shall have seven (7) business days to object to the Stalking Horse Notice (the "*Stalking Horse Objection Period*"). If no objections are filed prior to the expiration of the Stalking Horse Objection Period, the Debtors shall be authorized to enter into the asset purchase agreement with the applicable Designated Stalking Horse Bidder and grant any Bid Protections included in such Designated Stalking Horse Bidder's asset purchase agreement without further order of this Court. If an objection is filed during the Stalking Horse Objection Period, Court approval will be necessary to provide Bid Protections to the Designated Stalking Horse Purchaser, which approval may be sought prior to the Auction or at the Sale Hearing (collectively, the "*Stalking Horse Objection Process*").

4.      Any Designated Stalking Horse Bidder approved pursuant to and in accordance with the Stalking Horse Objection Process shall constitute a Qualified Bidder for all purposes and in all respects under the Bidding Procedures.

5.      The Bidding Procedures, substantially in the form attached to this Order as **Exhibit 2**, are approved in their entirety and are incorporated in this Order as if fully set forth at length in this paragraph; and, the Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

6.      As set forth in the Bidding Procedures, the deadline for submitting bids for the Remaining Assets is **February 19, 2019 at 12:00 p.m. (ET)** (the "*Bid Deadline*"); <u>provided, however,</u> no bid shall be deemed a Qualified Bid until such time as the Debtors determine, in their business judgment and in consultation with the Consultation Parties, that such bid meets the requirements set forth in the Bidding Procedures.

7.      If the Debtors timely receive two or more Qualified Bids for the same Remaining Assets (including any bid by a Designated Stalking Horse Bidder), the Debtors shall conduct an

8

auction for such Remaining Assets (the "*Auction*") on **February 21, 2019 at 10:00 a.m. (prevailing Eastern time)** at DLA Piper LLP (US), 1201 North Market Street, Suite 2100, Wilmington, Delaware 19801 (or at such other location as the Debtors may designate upon written notice to all parties entitled to participate in the auction under the Bidding Procedures); provided, however, if only one Qualified Bid is received by the Bid Deadline with respect to some or all of the Remaining Assets (including any Designated Stalking Horse Bidder's bid), then the Debtors shall not be required to conduct an auction and may promptly seek this Court's approval of the sale of the Remaining Assets to any Designated Stalking Horse Bidder or other Successful Bidder.

8.    Each Qualified Bidder participating in the Auction shall be required to certify it has not engaged in any collusion with respect to the potential purchase of the Remaining Assets.

9.    At such time as the Debtors determine, in consultation with the Consultation Parties, the Successful Bid(s) in accordance with the Bidding Procedures, the Debtors shall file on this Court's docket in these Chapter 11 Cases a notice disclosing the identity of the Successful Bidder(s) and, if the Debtors, in consultation with the Consultation Parties, deem there to be one, the identity of the Back-up Bidder(s) (the "*Successful Bidder Notice*").

10.    The hearing to consider approval of the sale of the Remaining Assets (the "*Sale Hearing*") shall be conducted on **February 26, 2019 at 1:00 p.m. (prevailing Eastern time)** before the Honorable Christopher S. Sontchi, Chief United States Bankruptcy Judge for the District of Delaware, 824 North Market Street, 5th Floor, Courtroom 6, Wilmington, Delaware 19801; provided, that, the Sale Hearing may be adjourned by this Court or by the Debtors, after consultation with the Consultation Parties, from time to time without

9

further notice other than by announcement in open court or through the filing of a notice on this Court's docket.

11.     The deadline to object to the remaining relief requested in the Motion, including entry of the Sale Order, is **February 25, 2019 at 10:00 a.m. (ET)** (the *"Sale Objection Deadline"*).

12.     Any party opposing the remaining relief sought in the Motion must file an objection prior to the Sale Objection Deadline, and such objection must: (i) be in writing; (ii) conform to the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules; (iii) state with particularity the legal and factual basis for the objection and the specific grounds for objecting; and (iv) filed with this Court and served **so as to be actually received** no later than the Sale Objection Deadline by the Objection Notice Parties.

13.     Not later than three (3) business days after entry of this Order, the Debtors shall cause: (a) notice substantially in the form attached to this Order as **Exhibit 3** (the *"Notice of Auction and Sale Hearing"*) and a copy of this Order to be sent by first-class mail, postage prepaid, to the Notice Parties; and (b) electronic notice of the Motion, this Order, and the Notice of Auction and Sale Hearing to be posted on (i) this Court's website (http://www.dcb.uscourts.gov) and (ii) the case website maintained by the Debtors' claims and noticing agent, Prime Clerk LLC.

14.     Not later than three (3) business days after entry of this Order, the Debtors shall serve by first-class mail, postage prepaid, a notice of potential assumption, assignment, and/or transfer of executory contracts and unexpired leases to which the Sellers are party, substantially in the form attached to this Order as **Exhibit 4** (the *"Notice of Potential Assumption"*) on all non-Debtor parties to the executory contracts and unexpired leases.

10

EAST\164463932.4

15.    Upon filing of the Successful Bidder Notice with this Court, the Debtors shall serve the Successful Bidder Notice on all parties that received service of the Notice of Potential Assumption.

16.    Unless the non-Debtor party to an executory contract or unexpired lease files an objection to (a) its cure amount or (b) the proposed assumption, assignment, and/or transfer of such executory contract or unexpired lease to any Designated Stalking Horse Bidder or to any Successful Bidder by **February 18, 2019 at 4:00 p.m. (ET)** (the "*Assumption Objection Deadline*") and serves such objection **so as to be actually received** by the Objection Notice Parties by no later than the Assumption Objection Deadline, such non-Debtor party shall be (x) forever barred from objecting to the cure amount and from asserting against the Debtors, any Designated Stalking Horse Bidder, or any Successful Bidder any additional cure or other amounts with respect to such executory contract or unexpired lease, and any Designated Stalking Horse Bidder and any Successful Bidder shall be entitled to rely upon such cure amounts and (y) deemed to have consented to the assumption, assignment, and/or transfer of such executory contract or unexpired lease to any Designated Stalking Horse Bidder or Successful Bidder and shall be forever barred and estopped from asserting or claiming against any party that any additional amounts are due, defaults exist, conditions to assumption, assignment, and/or transfer must be satisfied, or that any right or benefit under such executory contract or unexpired lease cannot or will not be available to any Designated Stalking Horse Bidder or Successful Bidder.

17.    If a contract counterparty files a Contract Objection in a manner consistent with the Assumption Procedures, and the Debtor and the contract counterparty, in consultation with any Designated Stalking Horse Bidder or Successful Bidder and the Consultation Parties, are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid or

11

reserved with respect to such objection will be determined at the Sale Hearing, such later hearing date that the Debtors determine in their discretion, in consultation with the Committee and the Successful Bidder(s), or such other date determined by this Court. With respect to any Contract Objection that remains outstanding as of the Closing, the maximum claimed cure amount will be deposited into escrow to support the payment of the final cure amount at such time as the Contract Objection is resolved.

18.    Notwithstanding anything to the contrary in any asset purchase agreement, any Designated Stalking Horse Bidder or Successful Bidder, as appropriate, shall consult with the Debtors and the Committee with respect to the terms of the assumption of any executory contracts or unexpired leases under section 365 of the Bankruptcy Code, and the rights of each of the Debtors and the Committee to object to any assumption are expressly reserved and preserved.

19.    No later than five (5) calendar days prior to the Closing (as defined in the eventual, finalized asset purchase agreement), the Debtors shall serve a notice, substantially in the form attached to this Order as **Exhibit 5**, identifying the executory contracts and unexpired leases that will be assumed and assigned to any Designated Stalking Horse Bidder or Successful Bidder, as applicable.

20.    Any Designated Stalking Horse Bidder or Successful Bidder, as applicable, may determine to exclude any executory contract or unexpired lease from the list of Remaining Assets, in accordance with the applicable asset purchase agreement; provided, that, if any executory contracts or unexpired leases are excluded from the applicable list of Remaining Assets, the Debtors shall notify the non-Debtor party or parties to any such executory contracts or unexpired leases of such exclusion, by written notice as soon as practicable after such determination, which may be after the Sale Hearing but prior to any applicable Closing.

12

21.    The form of notices attached to this Order as **Exhibit 3**, **Exhibit 4**, and **Exhibit 5** are approved in their entirety.

22.    Subject to the Stalking Horse Objection Process, the amounts of any Bid Protections, as set forth in this Order and the Bidding Procedures, are approved. However, notwithstanding anything contained in the preceding sentence, a Designated Stalking Horse Bidder shall not be entitled to Bid Protections if (a) this Court approves a sale of all or some of the applicable Remaining Assets to a buyer other than the Designated Stalking Horse Bidder or (b) the Debtors enter into a definitive agreement for an alternative transaction with a buyer other than the Designated Stalking Horse Bidder, if (a) or (b) above is the result of either (y) the Designated Stalking Horse Bidder's breach of its asset purchase agreement or (z) the failure of a condition to closing that is under the control of the Designated Stalking Horse Bidder.

23.    Subject to the Stalking Horse Objection Process, the obligation of the Debtors to pay the Bid Protections shall: (a) constitute administrative expense claims against each of the applicable Debtor's estate; (b) be entitled to administrative expense priority status under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code: (c) survive the termination of the Asset Purchase Agreement; and (d) be paid by the applicable Debtors to any Designated Stalking Horse Bidder in cash, on the terms of such Designated Stalking Horse Bidder's asset purchase agreement. For the avoidance of doubt, notwithstanding anything to the contrary in any asset purchase agreement, no Bid Protections shall be entitled to superpriority administrative expense status pursuant to section 364(c)(1) of the Bankruptcy Code.

24.    Notwithstanding anything to the contrary in any asset purchase agreement, no set of "Purchased Assets" shall include (a) any cause of action or the proceeds of such causes of action arising under chapter 5 of the Bankruptcy Code or applicable state law equivalents (the

13

"*Avoidance Actions*"); (b) any commercial tort claims (as such term is defined in the Uniform Commercial Code as in effect in the State of New York) arising on or before the applicable closing date or the proceeds thereof, including, without limitation, any and all causes of action (i) against present and former directors and officers of the Debtors and/or any of their affiliates, (ii) against direct and indirect equity holders of the Debtors and/or any of their affiliates, and (iii) of the Debtors and/or any of their affiliates against any other Debtors (collectively, the "*Commercial Tort Claims*"); and (c) any claims or causes of action against the Debtors' contract counterparties (other than claims or causes of action arising under any Assumed Contract) or the proceeds of such claims or causes of action.

25.     Notwithstanding anything to the contrary in any asset purchase agreement, after any closing, each applicable Designated Stalking Horse Bidder or Successful Bidder, as applicable, shall permit, for a period of not less than six (6) years, each of the Sellers, any direct or indirect successor to the Seller and their respective professionals, and the Committee and its professionals (collectively, the "*Permitted Parties*") access to all Books and Records that are in connection with or that otherwise relate to the applicable Remaining Assets and their operations prior to the applicable closing and that are in control or the possession of the Designated Stalking Horse Bidder or Successful Bidder, as applicable, or any of its affiliates or their respective agents or representatives (collectively, the "*Business Records*") for the purposes of (a) pursuing, assessing, settling, or otherwise dealing with any Excluded Assets or Excluded Liabilities, (b) pursuing, assessing, defending, settling, or otherwise dealing with (including, without limitation, exercising rights and remedies with respect to) any claim, action, or cause of action, including, without limitation, any objection or motion, that any Permitted Party has the right to pursue, (c) performing and/or otherwise dealing with any obligations of the Sellers pursuant to

14

any asset purchase agreement, including the Excluded Liabilities, (d) assisting any one or more of the Permitted Parties in connection with or otherwise relating to the claims reconciliation process relating to any of the Debtors, including, without limitation, with respect to claims against any person, including, without limitation, assessing, resolving, settling, and/or otherwise dealing with priority and administrative claims and any general unsecured claims that accrue prior to the Closing Date, and (e) without limiting the generality of the immediately preceding clauses (i) through (iv), otherwise administering the Debtors' estates, including, without limitation, the preparation and confirmation of a plan relating to any of the Debtors and the preparation of the accompanying disclosure statement, and compliance with any subpoena, document request, or order of any court compelling any Permitted Party to produce documents to third parties, winding down the Debtors' estates, preparing or filing tax returns and causing audits to be performed and/or for any other reasonable purpose.

26.    The right of access for the Permitted Parties shall include, without limitation, (a) the right of such Permitted Party to copy at the Permitted Party's premises or the location of the Remaining Assets at each requesting Permitted Party's expense, such documents and records as they may request in furtherance of any of the purposes referred to herein and (b) the Successful Bidder's copying and delivering, at the Permitted Party's cost, to such Permitted Party such documents and records as may be requested, but only to the extent such Permitted Party furnishes the Successful Bidder with a reasonable written description of the materials to be so copied. The Successful Bidder shall not dispose of or destroy any of the Business Records before the sixth (6th) anniversary of the applicable closing date and will provide the Permitted Parties and this Court pursuant to a filing with this Court at least ninety (90) days written notice before doing so and will provide each Permitted Party that requests copies of any Business

15

Records within such ninety (90) day period copies of all requested Business Records at the cost of the requesting Permitted Party.

27.    The Successful Bidder shall use commercially reasonable efforts to make reasonably available to Permitted Parties employees of the business to assist the Debtors in connection with the administration of the Debtors' estates as set forth herein, including, without limitation, in connection with Excluded Assets and/or Excluded Liabilities.

28.    Notwithstanding anything in the Motion or any asset purchase agreement to the contrary, nothing in this Order shall be construed as authorizing the sale, transfer, or assignment of any Medicare provider agreement to any Designated Stalking Horse Bidder or any Successful Bidder free and clear of successor liability for any liability arising from such provider agreements, nor as restricting the United States' right of setoff and recoupment. Any assumption and assignment of the Medicare provider agreements shall be authorized only in accordance with 11 U.S.C. § 365, all applicable Medicare statutes and regulations, and the Anti-Assignment Act.

29.    Notwithstanding anything in the Motion or any asset purchase agreement to the contrary, to the extent any Successful Bid or Backup Bid includes the assignment of a Medicare provider agreement, such bid must include a provision that requires the agreement be assumed and assigned pursuant to and in accordance with section 365 of the Bankruptcy Code, all applicable Medicare statutes and regulations, and the Anti-Assignment Act. No Successful Bid or Backup Bid may include a requirement that any Medicare provider agreement be sold, assigned, or transferred "free and clear" pursuant to section 365(f) of the Bankruptcy Code.

30.    **Failure to timely file an objection in accordance with this Order shall forever bar the assertion of any objection to the Motion, entry of the Sale Order, or consummation**

16

of the sale of the Remaining Assets, and such failure shall be deemed to constitute consent to entry of the Sale Order and consummation of the sale of the Remaining Assets.

31.    The stays provided by Rules 6004(h) and 6006(d) of the Bankruptcy Rules and the requirements of Local Rule 6004-1(c)(2) are waived, and this Order shall be effective immediately upon its entry.

32.    This Court retains jurisdiction over any and all matters related to or arising from the interpretation or implementation of this Order.

2/1/19

EAST\164463932.4

**EXHIBIT 1 to Bidding Procedures Order**

(Asset Purchase Agreement)

AUCTION BID DRAFT 12/31/18

ASSET PURCHASE AGREEMENT

BY AND BETWEEN

PROMISE HEALTHCARE, INC.,

THE SUBSIDIARIES THEREOF
LISTED ON EXHIBIT 1,

BUYERS LISTED ON EXHIBIT 2,

AND

[BUYERS' PARENT]

_____, 2019

**TABLE OF CONTENTS**

Page

**ARTICLE I - DEFINITIONS** ......................................................................................... 1
   1.1     Definitions. ......................................................................................................... 1

**ARTICLE II – transactions at the closing** ............................................................... 1
   2.1     Purchase and Sale. ............................................................................................. 1
   2.2     Excluded Assets ................................................................................................. 1
   2.3     Assumed Liabilities. ........................................................................................... 1
   2.4     Excluded Liabilities. .......................................................................................... 1
   2.5     Purchase Price. ................................................................................................... 1
   2.6     Closing. .............................................................................................................. 1
   2.7     Actions of Sellers' Parent at Closing. ............................................................... 1
   2.8     Actions of Buyers' Parent at Closing. ............................................................... 1
   2.9     Real Estate Closing Matters. ............................................................................. 1
   2.10   Risk of Loss. ...................................................................................................... 1
   2.11   Straddle Patients ................................................................................................ 1

**ARTICLE III - REPRESENTATIONS AND WARRANTIES OF SELLERS.** ............... 1
   3.1     Corporate Capacity, Authority and Consents .................................................... 1
   3.2     Binding Agreement. ........................................................................................... 1
   3.3     Assets. ................................................................................................................ 1
   3.4     Financial Statements. ......................................................................................... 1
   3.5     Licenses and Accreditations. ............................................................................. 1
   3.6     Regulatory Compliance. .................................................................................... 1
   3.7     Compliance Program .......................................................................................... 1
   3.8     Material Contracts ............................................................................................. 1
   3.9     Real Property. .................................................................................................... 1
   3.10   Insurance. .......................................................................................................... 1
   3.11   Employee Benefit Plans. ................................................................................... 1
   3.12   Employee Relations ........................................................................................... 1
   3.13   Litigation and Proceedings. ............................................................................... 1
   3.14   Third Party Reimbursement. .............................................................................. 1
   3.15   Tax Liabilities. ................................................................................................... 1
   3.16   Absence of Changes. ......................................................................................... 1
   3.17   Intellectual Property .......................................................................................... 1
   3.18   Disclaimer of Warranties. ................................................................................. 1

**ARTICLE IV REPRESENTATIONS AND WARRANTIES**
**OF BUYERS AND BUYERS' PARENT** ...................................................................... 1
   4.1     Capacity, Authority and Consents. .................................................................... 1
   4.2     Binding Agreement. ........................................................................................... 1
   4.3     Litigation and Proceedings. ............................................................................... 1
   4.4     Availability of Funds ......................................................................................... 1
   4.5     Representations of Sellers. ................................................................................. 1

**ARTICLE V - COVENANTS OF THE PARTIES PRIOR TO CLOSING** .......................................... 1
5.1     Access. ........................................................................................................... 1
5.2     Third Party Consents ..................................................................................... 1
5.3     Updates of Schedules. .................................................................................... 1
5.4     Operating Covenants. ..................................................................................... 1
5.5     Negative Covenants. ....................................................................................... 1
5.6     Reserved. ........................................................................................................ 1

**ARTICLE VI - CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYERS** ................... 1
6.1     Representations and Warranties; Covenants. ................................................. 1
6.2     Required Governmental Approvals Consents. ............................................... 1
6.3     Actions and Proceedings. ............................................................................... 1
6.4     Material Adverse Effect. ................................................................................ 1
6.5     Closing Deliveries. ......................................................................................... 1

**ARTICLE VII - CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS** ............. 1
7.1     Representations and Warranties; Covenants. ................................................. 1
7.2     Pre-Closing Confirmations. ........................................................................... 1
7.3     Actions and Proceedings. ............................................................................... 1
7.4     Closing Deliveries. ......................................................................................... 1
7.5     Cure Amounts ................................................................................................ 1

**ARTICLE VIII - ADDITIONAL AGREEMENTS** ................................................................. 1
8.1     Termination Prior to Closing. ........................................................................ 1
8.2     Post-Closing Filings and Access to Information. .......................................... 1
8.3     Employee Matters. ......................................................................................... 1
8.4     Medical Staff. ................................................................................................. 1
8.5     Refunds and Remittances. .............................................................................. 1
8.6     Terminating Cost Reports. ............................................................................. 1
8.7     Waiver of Bulk Sales Law Compliance. ........................................................ 1
8.8     Closing Of Financials. ................................................................................... 1
8.9     Medicare Bad Debts. ...................................................................................... 1

**ARTICLE IX - GENERAL PROVISIONS** ............................................................................. 1
9.1     Survival .......................................................................................................... 1
9.2     Additional Assurances. .................................................................................. 1
9.3     Consents, Approvals and Discretion. ............................................................ 1
9.4     Legal Expenses. ............................................................................................. 1
9.5     Choice of Law; Venue. ................................................................................... 1
9.6     Benefit, Assignment and Third Party Beneficiaries. ..................................... 1
9.7     Cost of Transaction. ....................................................................................... 1
9.8     Waiver of Breach. .......................................................................................... 1
9.9     Notice. ............................................................................................................ 1
9.10    Severability. ................................................................................................... 1
9.11    Interpretation. ................................................................................................ 1
9.12    Entire Agreement, Amendments and Counterparts. ...................................... 1
9.13    Personal Liability. .......................................................................................... 1
9.14    Disclosure Generally. .................................................................................... 1
9.15    Time of Essence. ............................................................................................ 1

4844-3270-9764.4

ii

**Exhibits**

Exhibit 1 — Direct and Indirect Subsidiaries of Sellers' Parent
Exhibit 2 — Direct and Indirect Subsidiaries of Buyers' Parent
Exhibit 3 — Reserved
Exhibit 4 — Reserved
Exhibit 5 — Reserved
Exhibit 6 — Form of Bill of Sale and Assignment
Exhibit 7 — Form of Assignment and Assumption Agreement
Exhibit 8 — Form of Transition Services Agreement
Exhibit 9 — Form of Drug Enforcement Administration (DEA) Power of Attorney
Exhibit 10 — Form of Special Warranty Deed

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this *"Agreement"*) is entered into as of _____, 2019 (the *"Effective Date"*), by and among **Promise Healthcare**, Inc., a Florida corporation (*"Sellers' Parent"*), each of the direct or indirect subsidiary of Sellers' Parent listed on Exhibit 1 (each, a *"Seller"* and, collectively, the *"Sellers"*), _____, a _____ (*"Buyers' Parent"*), and each direct or indirect subsidiary of Buyers' Parent listed on Exhibit 2 (each, a *"Buyer"* and, collectively, the *"Buyers"*). Sellers' Parent, Sellers, Buyers' Parent and Buyers are collectively referred to as the *"Parties"* and each individually as a *"Party"*).

### BACKGROUND

**WHEREAS,** Sellers own and operate those certain long-term acute care hospitals and skilled nursing facilities and the other businesses incident thereto identified on Exhibit 1 (the *"Seller Facilities"*);

**WHEREAS,** on or about November 5, 2018, Sellers' Parent and each of the Sellers filed voluntary petitions (collectively, the *"Bankruptcy Case"*) pursuant to chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the *"Bankruptcy Court"*);

**WHEREAS,** each of the Sellers desires to sell and assign to the applicable Buyer, and applicable Buyer desires to purchase from the applicable Seller, all of the Purchased Assets relating to the applicable Seller Facility on the terms and conditions set forth herein, free and clear of all encumbrances (other than Permitted Encumbrances) in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code and the Bankruptcy Rules; and

**WHEREAS,** Buyers' Parent has executed and delivered to Sellers' Parent a guaranty of the payment and performance obligations of Buyers of even date herewith.

**NOW, THEREFORE,** in consideration of the promises, covenants, representations and warranties hereinafter set forth, the Parties agree as follows:

### ARTICLE I - DEFINITIONS

1.1    **Definitions.** As used in this Agreement, the following terms have the following meanings (unless otherwise expressly provided herein):

*"Accounts Receivable"* means, other than items included in the definition of Excluded Assets, all accounts, notes, interest and other receivables of each Seller, and all claims, rights, interests and proceeds related thereto, arising from the rendering of services to inpatients and outpatients at the Seller Facilities, billed and unbilled, recorded and unrecorded (including any accounts previously written off or charged off as bad debts), for services provided by Sellers Facilities, whether payable by private pay patients or Third Party Payors, or by any other source, including the right to receive an amount equal to the value of all accounts receivable arising from the rendering of services and provision of medicine, drugs and supplies to patients at the Seller Facilities relating to Medicare, Medicaid, TRICARE and other third party patient claims of Sellers due from beneficiaries or governmental Third Party Payors.

*"Actions"* means any pending claim, cause of action, litigation, action, suit, arbitration, proceeding, or right in action that has been brought by any Person.

*"Agreement"* means this Asset Purchase Agreement, as from time to time amended, modified or supplemented in accordance with its terms, including the Exhibits and Schedules attached hereto.

4844-3270-9764.4

1

"*Affiliate*" means, with respect to a Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person and any successor and assignee of such Person. The term "*control*" used in the preceding sentence means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person whether through ownership of equity interests, by contract or otherwise.

"*Accrued PTO*" means obligations and liabilities with respect to accrued but unused paid time off, including any sick, vacation and holiday pay hours (including employer FICA and any other estimated employer taxes thereon), recorded by a Seller, pursuant to the Seller's standard policies with respect to those Employees accepting employment with Buyers in accordance with Section 8.3 of this Agreement.

"*Applicable State*" means each State listed on Exhibit 1 with respect to the applicable Seller Facility.

"*Avoidance Actions*" means any claim or cause of action under Sections 502, 510, 541, 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code or under related state or federal statutes or common law, including fraudulent transfer or fraudulent conveyance law.

"*Bankruptcy Code*" means title 11 of the United States Code, Sections 101 et seq.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedures.

"*Baton Rouge Facility*" means that certain long term acute care hospital and skilled nursing facility of Promise Hospital of Ascension, Inc., a Florida corporation dba Promise Hospital Baton Rouge and the assets and liabilities incident thereto.

"*Break-Up Fee*" means the Break-Up Fee, if any, designated by the Sellers' Parent in accordance with the Sales Procedure Order but solely to the extent the Buyers are designated as Stalking Horse Bidders.

"*Claim*" shall have the meaning set forth in Section 101(5) of the Bankruptcy Code.

"*CMS*" means the Centers for Medicare and Medicaid Services.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Consent*" means, with respect to any Person, any consent, approval, authorization, permission or waiver of, or registration, declaration or other action or filing with or exemption by such Person.

"*Cost Reports*" means all cost and other reports filed pursuant to the requirements of Government Reimbursement Programs, and similar or successor programs with or for the benefit of Governmental Authorities for payment or reimbursement of amounts due from them.

"*Cure Amount*" means the amount, if any, determined by the Bankruptcy Court to be necessary to cure all defaults and to pay all actual losses that have resulted from defaults by the applicable Seller pursuant to the Proposed Assumed Contracts; provided that to the extent the Cure Amount exceeds $_____ _____, the Estimated Purchase Price shall be reduced on a dollar for dollar basis by such excess; provided, further, that in the event Buyers' Parent or Sellers' Parent is able to negotiate a reduction in the Cure Amount set forth on Schedule 2.3(b), such reduction shall reduce the Cure Amount component of the Estimated Purchase Price (and the Purchase Price) on a dollar for dollar basis.

"*Encumbrances*" means any and all Claims, charges, equitable interests, encumbrances, servitudes, mortgages, liens, pledges, security interests, leases, subleases, rights of way, easements, rights of first refusal, options, restrictions, covenants, reservations or similar matters of record, or encroachments of any nature whatsoever, or any conditional sale contracts, title retention contracts or other agreements or arrangements to give or to refrain from giving any of the foregoing.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*Escrow Agent*" shall have the meaning set forth in Section 2.5(a).

"*Escrow Agreement*" shall have the meaning set forth in Section 2.5(a).

"*Escrow Amount*" means $_____ [7% of the cash portion of the Purchase Price].

""*Expense Reimbursement*" means the Expense Reimbursement, if any, designated by the Sellers' Parent in accordance with the Sales Procedure Order but solely to the extent the Buyers are designated as Stalking Horse Bidders.

"*Facility Employees*" means employees at the Seller Facilities, including employees who are on leaves of absence and staff that may be employed by an Affiliate of Sellers but are allocated to the Seller Facilities for substantially all of the services they perform.

"*Facility IP*" means all of the Intellectual Property set forth on Schedule 1.1(a).

"*Final Order*" means an Order of the Bankruptcy Court (or any other court of competent jurisdiction) which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (ii) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such action or Order shall have become final in accordance with Bankruptcy Rule 8002; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"*GAAP*" means generally accepted accounting principles, consistently applied.

"*Governing Documents*" means, for the Person in question, that Person's Articles of Incorporation, Certificate of Formation, Certificate of Limited Partnership, Bylaws, Partnership Agreement, Limited Liability Company Agreement or other similar documents relating to the formation and/or governance of the business and affairs of such Person.

"*Governmental Authority*" means any federal, state, local or municipal government; any governmental or quasi-governmental authority; any body exercising or entitled to exercise, any administrative, executive, judicial, legislative or taxing authority.

"*Government Reimbursement Programs*" shall mean any programs funded or administered by a Governmental Authority, or contractor(s) thereof, for the purposes of paying for health care services. Such programs include Medicare, Medicaid, TRICARE, and similar or successor programs with or for the benefit of designated federal or state residents.

4844-3270-9764.4

3

"*Healthcare Businesses*" means, collectively, the businesses owned and operated by the Sellers in connection with the Seller Facilities.

"*Healthcare Laws*" means, collectively, any and all Laws governing the licensure or regulation of healthcare providers, professionals, or facilities, or payors or otherwise governing or regulating the provision of, or payment for, healthcare services, the sale of controlled substances or other pharmaceuticals, medical devices or supplies and the like. Without limiting the generality of the foregoing, Healthcare Laws include Section 1128B(b) of the Social Security Act, as amended, 42 U.S.C. § 1320a-7(b), commonly referred to as the "*Federal Anti-Kickback Statute*", Section 1877 of the Social Security Act, as amended, 42 U.S.C. § 1395nn and related regulations, commonly referred to as "*Stark Law*", the federal False Claims Act, 31 U.S.C. § 3729 et seq., and the Health Insurance Portability and Accountability Act of 1996, as amended, all applicable rules of the Laws of the Applicable State.

"*HHS*" means the U.S. Department of Health and Human Services.

"*Intellectual Property*" means all of the following in any jurisdiction throughout the world (i) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissues, divisions, continuations, continuations-in-part, renewals, extensions, and foreign counterparts and equivalents thereof, (ii) all trademarks, service marks, logos, trade names, corporate names, and other source identifiers whether registered or unregistered (as the case may be), as well as all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (iii) registrations for internet domain names, and (iv) all rights protected by copyright law, including rights in registered and unregistered works of authorship, all rights to copy, distribute, modify, publicly perform, and publicly display such works, and all applications, registrations, and renewals in connection therewith.

"*Inventory*" means all inventories of supplies, drugs, food, janitorial and office supplies and other disposables and consumables located at the Seller Facilities or used in connection with the operation of the Seller Facilities.

"*IRS*" means the Internal Revenue Service.

"*Knowledge of Sellers*" (and any similar expression, including the expression "*Sellers' Knowledge*") means, as to a particular matter, the actual knowledge of the CEO, CFO, Chief Nursing Officer and Compliance Officer of the applicable Seller Facility.

"*Law*" means any federal, state, local or other statute, law, ordinance, regulation, rule, or Order of any Governmental Authority.

"*Material Adverse Effect*" means any fact, condition, change, event or occurrence that has, individually or in the aggregate, or is reasonably likely to have, a material and adverse effect on the financial condition, properties, assets, liabilities, business, Purchased Assets, or results of operations of the Seller Facilities, taken as a whole, or results in any Seller Facility ceasing or closing all or any material portion of its operations, including inpatient services (other than in connection with the Salt Lake Facility and Baton Rouge Facility) or otherwise impairs or affects in any adverse and material manner the value or to the extent permitted by applicable law, transferability or use of, or causes any Permits, approvals, agreements, consents and/or filings specifically identified on Schedule 6.2 to lapse, or materially impedes, delays, or is reasonably likely to materially impede or delay, the consummation of the transactions contemplated by this Agreement. Notwithstanding the foregoing, a Material Adverse Effect shall not include any fact, condition, change, event or occurrence resulting from: (i) any actual or proposed change in Law or accounting standards or the interpretation or implementation thereof; (ii) any

change that is generally applicable to the healthcare industry or such industry in the Applicable State; (iii) the entry into this Agreement or the announcement, pendency or consummation of the transactions contemplated hereby; (iv) any action taken by Sellers' Parent, Sellers or their Affiliates that is required to be taken by this Agreement; (v) any omission to act or action taken with the prior written consent of Buyers' Parent or its Affiliates; (vi) any change in general business, economic, geopolitical or financial market conditions; (vii) any national or international political event or occurrence, including acts of war or terrorism; (viii) any natural disaster or calamity; (ix) any seasonal fluctuations in the operations of the Seller Facilities consistent in all material respects with prior fiscal years; (x) failure of the Sellers to meet financial projections; and (xi) any matters arising in connection with the filing or prosecution of the Bankruptcy Case.

"*Order*" means any award, writ, injunction, judgment, order, ruling, decision, directive, or similar determination entered, issued, made or rendered by any Government Entity.

"*Permits*" means all licenses, permits, franchises, certificates, rights, registrations, approvals, authorizations, consents, provider numbers, waivers, exemptions, releases, variances, certificates of authority, accreditations, or Orders issued by any Governmental Authority.

"*Permitted Encumbrances*" means those Encumbrances (i) that do not in the aggregate materially impair the usefulness or value of the Purchased Assets, taken as a whole; (ii) that relate to taxes, assessments and governmental charges or levies not yet due or payable or that are being contested in good faith; (iii) mechanic's, materialman's and similar statutory liens for sums not yet due and payable or that are being contested in good faith; (iv) leasehold interests of the owners of Leased Real Property; (v) zoning regulations and other Laws affecting the Real Property; (vi) matters arising as a result of the acts or omissions of Buyers or any of its Affiliates, or with the permission or consent of Buyers; (vii) standard printed exceptions customarily set forth in title reports, title commitments or title policies; (viii) any other matters disclosed by the Title Commitments or Seller Surveys or otherwise recorded in the applicable real property records; and (ix) those Encumbrances listed on Schedule 1.1(b).

"*Person*" means an individual, corporation, partnership, limited liability company, limited liability partnership, trust, association, or organization, including any Governmental Authority.

"*Prepaid Assets*" means all advance payments, prepayments, prepaid expenses and deposits which were made with respect to the operation of the Seller Facilities.

"*Purchase Price*" means an amount equal to (i) $_____, plus (ii) the Cure Amount.

"*Representatives*" means, with respect to any Person, the officers, directors, principals, employees, agents, auditors, advisors, bankers and other representatives of such Person.

"*Sale Order*" means a Final Order of the Bankruptcy Court approving, *inter alia*, (i) the sale of the applicable Purchased Assets to the applicable Buyer free and clear of any encumbrances (other than Permitted Encumbrances), and (ii) the assumption and assignment of the Assumed Contracts by the applicable Buyer.

"*Sale Procedures Order*" means a Final Order of the Bankruptcy Court approving the procedures for the sale of the Purchased Assets.

"*Salt Lake Facility*" means that certain long-term acute care hospital and skilled nursing facility of Promise Hospital of Salt Lake, Inc., a Louisiana corporation and the assets and liabilities incident thereto.

4844-3270-9764.4

5

"*Stalking Horse Bidder(s)*" means the Stalking Horse Bidder(s) if any, designated by the Sellers' Parent in accordance with the Sales Procedure Order.

"*Third Party Payor*" means any Person (including the Government Reimbursement Programs, any entity authorized to provide health insurance (or property, casualty, or life insurance covering health benefits) in the Applicate States, any health maintenance organization, or any employer authorized in accordance with applicable Law to self-insure its workers' compensation risk), other than a beneficiary, that pays for or reimburses at least a portion of the health care expenses of its beneficiaries.

"*Title Company*" means the Nashville, Tennessee office of First American Title Insurance Company.

"*Transfer Taxes*" means any sales, use, documentary, recording, stamp, transfer or similar taxes arising from the sale of the Purchased Assets and the transactions contemplated by this Agreement.

## ARTICLE II– TRANSACTIONS AT THE CLOSING

**2.1    Purchase and Sale.**  Subject to the terms and conditions of this Agreement, including the final paragraph of Section 2.2, at the Closing and effective as of the Effective Time, each Seller shall sell, assign, transfer and deliver to the applicable Buyer, and the applicable Buyer shall acquire, all of each Seller's right, title and interest in and to all of the assets owned, used or held for use by Sellers primarily or exclusively in connection with the operation of the Seller Facilities, whether tangible or intangible, whether or not specifically referred to herein or in any instrument or conveyance delivered pursuant hereto, other than the Excluded Assets (all such assets other than the Excluded Assets, the "*Purchased Assets*"), subject to no Encumbrances other than the Permitted Encumbrances, including, without limitation:

(a)     all interests of Sellers in the real property owned by Sellers that is described in Schedule 2.1(a) (the "*Owned Real Property*"), including all rights of Sellers or its Affiliates in the land, buildings, fixtures, parking lots, construction in progress, and other improvements located thereon as to each parcel of real property included in such Owned Real Property;

(b)     all leasehold interests (the "*Proposed Tenant Leases*") of Sellers used in connection with the operation of the Healthcare Businesses in and to the real property (the real property that is subject to the Proposed Tenant Leases being referred to as the "*Leased Real Property*"), (the term "*Real Property*" means collectively the Owned Real Property and the Leased Real Property) that are described in Schedule 2.1(b);

(c)     all interests of Sellers in and to all real property leases, subleases, licenses, use and other occupancy agreements relating to the operation of the Healthcare Businesses described in Schedule 2.1(c) (each, a "*Proposed Lessor Lease*");

(d)     all equipment, furniture, furnishings, machinery, tools, supplies, telephones, office equipment, leasehold improvements;

(e)     all Inventory owned by Sellers and used in connection with the operation of the Seller Facilities (other than the portions of Inventory disposed of, or expended, as the case may be, by Sellers after the Effective Date and prior to the Closing in the ordinary course of business);

(f)     all Prepaid Assets of the Sellers (including, for the avoidance of doubt, all deposits under Leased Real Property or personal property Leases);

4844-3270-9764.4

6

(g)    all intangible personal property owned by Sellers and used primarily in connection with the operation of the Seller Facilities, including all right, title and interest in and to all Facility IP, including the names set forth on Schedule 2.1(g), but excluding the right to use any names, trade names, trademarks and service marks including the name *"Promise"*;

(h)    all financial, medical staff and personnel records used in connection with the operation of the Seller Facilities (including all equipment records, construction plans and specifications, medical and administrative libraries, documents, catalogs, books, records, files, operating manuals and current personnel records) and all current patient medical records (*"Purchased Medical Records"*) in connection with the operation of the Seller Facilities;

(i)    subject to Section 2.10, all insurance proceeds relating to the physical condition of the Purchased Assets, to the extent not expended on the repair or restoration of the Purchased Assets prior to the Closing;

(j)    subject to Section 2.3(b), the commitments, contracts, leases and agreements of Sellers designated in Schedule 2.1(j) as Material Contracts (the *"Proposed Assumed Material Contracts"*) or which relate to the operation of the Seller Facilities but are not required to be listed in Schedule 3.8 (collectively the *"Proposed Assumed Contracts"*);

(k)    to the extent assignable, all Permits held by Sellers relating to the ownership, development and operation of the Seller Facilities, including the Medicare and Medicaid provider agreements for the Seller Facilities;

(l)    reserved;

(m)    reserved;

(n)    all telephone and facsimile numbers, post office boxes and directory listings used in connection with the Seller Facilities; and

(o)    **[all of Promise Hospital of Baton Rouge, Inc.'s rights, title and interest in and to that certain Non-Transferable and Non-Negotiable Promissory Note, dated September 14, 2017, made by VSH2008, L.L.C.]**

**2.2    Excluded Assets.** The following assets of Sellers shall not be conveyed to Buyers (collectively, the *"Excluded Assets"*):

(a)    all Accounts Receivable as of the Closing Date;

(b)    all intercompany receivables from and between Sellers' Parent, Sellers and any of their respective Affiliates;

(c)    all current and non-current cash and cash equivalents, securities, investments, endorsements, bond funds and other funds created by bond indentures;

(d)    rights to positive or negative cost report settlements or retroactive adjustments on Seller Cost Reports in respect of time periods prior to the Closing (*"Seller Agency Settlements"*);

4844-3270-9764.4

(e)    all of Seller's or any of its Affiliates' proprietary manuals, marketing materials, policy and procedure manuals, standard operating procedures and marketing brochures, data and studies or analyses not primarily used at the Seller Facilities;

(f)    the commitments, contracts, leases and agreements of Seller that (i) relate to the Excluded Liabilities or the Excluded Assets, (ii) do not relate to either the Purchased Assets or the Seller Facilities, (iii) are not Assumed Contracts or (iv) that are listed on Schedule 2.2(f);

(g)    all United States and worldwide inventions, trade secrets, know-how, whether or not patentable, mask work rights, patents, patent applications, trademarks, service marks, trade names, trade dress, copyrights, and all applications, registrations and renewals in connection with any of the above including the names *"Promise"*, and any other trade names, trademarks, service marks, trade dress, logos, symbols (as well as all abbreviations, variations or derivations thereof), copyrights and applications therefor of Seller or its Affiliates or world-wide web addresses not used primarily at the Seller Facilities, any promotional material, educational material, signage, stationery, supplies or other items of inventory bearing such names, marks, trade dress, logos, or symbols or abbreviations, variations or derivations thereof , and any URLs, sites, blogs or pages hosted on Sellers' Parent's system websites, including associated content embodied within the foregoing;

(h)    all funds and accounts of all employee retirement, deferred compensation, health, welfare or benefit plans and programs, including assets representing a surplus or overfunding of any Employee Benefit Plan;

(i)    all minute books and organizational records relating to Sellers and their Affiliates and all other books and records that a Seller is required by Law to retain in its possession;

(j)    all insurance policies and rights thereunder except to the extent described in Section 2.10;

(k)    those pharmaceuticals that cannot, by Law, be sold by Sellers to Buyers;

(l)    all claims, rights, interests and proceeds with respect to state or local tax payments, refunds, and credits (including but not limited to property tax refunds and charity tax credits) related to the operations of the Seller Facilities or the Purchased Assets with respect to periods ending prior to the Effective Time, and the right to pursue appeals of same;

(m)    peer review materials and any writings, documents and other items that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other cognizable privilege or protection, in each case, except to the extent related to the Assumed Liabilities;

(n)    any receipts (i) relating to supplemental, disproportionate share or waiver payments, or Medicaid GME funding with respect to time periods prior to the Effective Time; (ii) relating to the Seller Cost Reports or Agency Settlements (whether resulting from an appeal by Sellers or otherwise) and other risk settlements with respect to time periods prior to the Effective Time, (iii) which result from Sellers' pursuit of one or more appeals pertaining to Medicare, Medicaid (including, without limitation, disproportionate share hospital program payments) or TRICARE with respect to periods prior to the Effective Time or (iv) relating to participation in any group purchasing organization (including any tax refunds, rebates or fee sharebacks for purchases made prior to Closing) with respect to periods prior to the Effective Time or (v) with respect to Meaningful Use attestations (*"Excluded Payments"*);

(o)     all documents, records, correspondence, work papers and other documents other than patient records, relating to the Seller Cost Reports or Agency Settlements, but excluding records relating to the provision of patient care;

(p)     any assets or businesses related to the operations of (i) St. Alexius Hospital in St. Louis, Missouri, (ii) Silverlake Medical Center in Los Angeles, California, (iii) 5550 University Avenue, San Diego, California or any of their ancillary facilities or businesses;

(q)     the rights of Sellers' Parent, Sellers and their Affiliates under this Agreement;

(r)     all patient and medical records that are not Purchased Medical Records; provided that Buyers' shall hold and destroy such records located at the applicable Seller Facility in accordance with the terms and conditions of the Medical Records Custodian Agreement (as hereinafter defined);

(s)     all claims, rights, credits or causes of action and rights of set off of Sellers, whether known or unknown, contingent or otherwise; and

(t)     other assets set forth in Schedule 2.2(t).

## 2.3    Assumed Liabilities.

(a)     In connection with the sale of the Purchased Assets to Buyers at the Closing and effective as of the Effective Time and subject to Buyers' obligation to pay Cure Amounts and the final paragraph of Section 2.2, Buyers shall assume and be responsible only for all following liabilities, obligations and duties of Seller relating to operation of the Seller Facilities (all such liabilities other than the Excluded Liabilities, collectively, the "*Assumed Liabilities*"), including without limitation:

(i)     all trade payables relating to the Seller Facilities arising on or after the Closing Date;

(ii)     subject to Section 2.3(b), liabilities, obligations and duties of Sellers under the Assumed Contracts as and to the extent any such liability, obligation or duty arises on or after the Closing Date;

(iii)     all liabilities and obligations with respect to the Owned Real Property and Leased Real Property and operations thereon as and to the extent any such liability or obligation arises on or after the Closing Date;

(iv)     capital lease obligations of Seller under the Assumed Contracts;

(v)     patient credit balances accruing post-Closing and Accrued PTO;

(vi)     claims, recoupments, set-offs, adjustments and other liabilities (accruing post-Closing) relating to the Medicare and Medicaid provider agreements of the Seller Facilities;

(vii)     Cure Amounts; and

(viii)     other specifically assumed liabilities set forth in Schedule 2.3(a)(viii).

(b)     Schedule 2.3(b) attached hereto (and which, to the extent permitted by applicable Law, shall remain confidential) sets forth Sellers' Parents' good faith estimate of the Cure Amount for each

4844-3270-9764.4

Proposed Assigned Contract, Proposed Tenant Lease and Proposed Lessor Lease (collectively, the "***Proposed Assigned Contracts***"). Prior to any hearing set by the Bankruptcy Court to approve a sale pursuant to this Agreement (the "***Sale Hearing***"), (i) Sellers' Parent shall commence appropriate proceedings before the Bankruptcy Court and otherwise take all reasonably necessary actions to determine the actual amount of the Cure Amounts, including resolving any disputes as to Cure Amounts prior to or at the Sale Hearing, such that all Proposed Assigned Contracts may be assumed by the applicable Seller and assigned to the applicable Buyer in accordance with Section 365 of the Bankruptcy Code (each such Contract, an "***Assigned Contract***") and (ii) Buyers' Parent shall, on or after the date of this Agreement, have the right to commence discussions and negotiations with the non-debtor parties to any Proposed Assigned Contracts and Government Reimbursement Programs regarding the terms of and modification of such Proposed Assigned Contacts and Government Reimbursement Programs; provided that (A) Buyers and Buyers' Parent shall be solely responsible for the payment of any Cure Amount(s) that are, in the aggregate, less than $_____ (or shall deliver into escrow amounts sufficient to pay any claim for Cure Amounts that remain disputed as of the Closing as the Bankruptcy Court shall determine); (B) any such discussions shall be coordinated with a Representative designated by Seller; (C) the substance of any such discussions shall be promptly communicated to Seller's designated Representative; and (D) a Representative of Seller shall have the right, but not the obligation, to participate in any such discussion. Notwithstanding anything herein to the contrary, at any time at least five (5) business days prior to the Sale Hearing, Buyers' Parent, in its sole discretion by written notice to Sellers' Parent, may (1) exclude from being assigned pursuant hereto any Proposed Assigned Contracts, and such Proposed Assigned Contracts shall not constitute Assigned Contracts, and Buyers shall not acquire any rights or assume any liabilities with respect thereto, and (2) include as being assigned pursuant hereto any Proposed Assigned Contracts, and such Proposed Assigned Contracts shall constitute Assigned Contracts, and Buyers shall acquire all rights and assume liabilities with respect thereto. Upon Buyers' Parent's reasonable request, Sellers' Parent shall provide additional detailed information in its possession as to the liabilities under the Proposed Assigned Contracts.

(c)    To the extent that the assignment to a Buyer of any Proposed Assigned Contract is not permitted by Law or is not permitted without the consent of another Person, and such restriction cannot be effectively overridden or canceled by the Sale Order or other related Order of the Bankruptcy Court prior to the Closing, then, at Buyers' Parent's option, Buyers' Parent may designate any such Proposed Assigned Contract as an Excluded Contract and, in such event, the applicable Seller shall use its commercially reasonable efforts to obtain any such consents to assign any such Proposed Assigned Contract. This Section 2.3(c) does not (i) require any Seller or Sellers' Parent to provide any financial accommodation to any applicable counterparty to any Proposed Assigned Contract in order to obtain its consent or (ii) prohibit any Seller or Sellers' Parent from ceasing operations or winding up its affairs following the Closing.

**2.4    Excluded Liabilities.**  Buyers shall not assume, and under no circumstances shall Buyers be obligated to pay, discharge, perform or assume any debt, obligation, expense or liability of Sellers or any Affiliates thereof that are not Assumed Liabilities, including without limitation (collectively, the "***Excluded Liabilities***"):

(a)    any liabilities owed by a Seller to an Affiliate of Seller;

(b)    all general unsecured claims, interest bearing debt, mortgages and advances, dividends payable, guarantees, letters of credit, retirement plan liabilities and other benefit plan contributions, back wages and commissions, credit card liabilities, other capital debt, income taxes payable, other taxes accruing pre-Closing, any capital expenditure (including, but not limited to, capital leases that are not Assigned Contracts), profit sharing plan liabilities, severance liabilities, management or Sellers' transaction related bonuses, deferred employee compensation, professional fees, other liabilities incurred

4844-3270-9764.4

outside the ordinary course of business or any similar obligation, including all accrued and unpaid interest, and any costs, prepayment penalties, premiums, consent or other fees and costs in connection with any payment of the foregoing; and

(c)    patient credit balances arising prior to the Closing.

The Parties intend that, except for the Assumed Liabilities, upon the Closing none of the Buyers will, and will not be deemed to, (a) be the successor of, or successor to, any Seller; (b) have, de facto or otherwise, merged with or into any Seller; (c) be a mere continuation or substantial continuation of any Seller or the enterprise(s) of any Seller; or (d) be liable for any acts or omissions of any Seller in the conduct of the Healthcare Business or arising under or related to the Purchased Assets other than as set forth in this Agreement.  The Parties agree that the provisions substantially in the form of this Section 2.4 will be reflected in the Sale Order along with other customary successor liability findings and declarations.

**2.5    Purchase Price.**

(a)    Buyers' Parent has deposited the Escrow Amount (the "***Deposit***") into an escrow account pursuant to that certain Escrow Agreement dated _____, 2019 among U.S. Bank National Association (the "***Escrow Agent***"), Sellers' Parent and Buyers' Parent (the "***Escrow Agreement***").  At the Closing, the Deposit shall be credited towards payment of the Purchase Price and paid to Sellers.  If the Closing does not occur and this Agreement is terminated by Sellers' Parent pursuant to Section 8.1(a)(iii), the Deposit shall be paid to Sellers' Parent.  If the Closing does not occur for any reason other than termination of this Agreement by Sellers' Parent pursuant to Section 8.1(a)(ii) the Deposit shall be returned immediately, but no later than three (3) days, to Buyers' Parent.

(b)    Reserved.

(c)    At the Closing, Buyers will pay to Sellers the Purchase Price, payable in immediately available funds by wire transfer to the account of Sellers as set forth in wiring instructions provided by Sellers' Parent to Buyers' Parent.  In addition, Buyers shall (i) cause the Escrow Agent to deliver the Deposit to Sellers' Parent and (ii) pay any and all Cure Amounts to the applicable party pursuant to the Sale Order.

(d)    Reserved.

(e)    Reserved.

(f)    Sellers' Parent and Buyers' Parent shall agree upon an allocation of the Purchase Price among the various categories of Purchased Assets for tax reporting and other purposes consistent with the allocation methods and principles required by the Code.  Buyers and Sellers shall report, act and file all tax returns, including IRS Form 8594, with their respective federal income tax returns for the tax year in which the Closing Date occurs consistent with such agreed upon allocation.

**2.6    Closing.**  Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated pursuant to this Agreement (the "***Closing***") shall take place electronically on the later of (a) the last business day of the month on which all of the conditions to Closing set forth in ARTICLE VI (other than those conditions which are to be satisfied at Closing, but subject to such conditions being satisfied at the Closing) are satisfied or waived, or (b) such other date as the Sellers' Parent and Buyers' Parent may mutually agree upon (the "***Closing Date***").  The Closing shall be deemed to have occurred and to be effective as between the parties as of 12:01 a.m. (determined by reference to the local time zone in which the applicable Seller Facility is located) on the first calendar day of the

4844-3270-9764.4

month after the Closing Date (the "**Effective Time**").  Except as otherwise may be required by the Title Company, the Closing will take place remotely by electronic mail or other electronic exchange of documents, among and between the parties and/or their respective counsel.

**2.7    Actions of Sellers' Parent at Closing.**    At the Closing or within such other timeframes as specified below and unless otherwise waived in writing by Buyers' Parent, Sellers' Parent shall deliver or cause to be delivered to Buyers' Parent the following:

    (a)    A Bill of Sale and Assignment in the form attached as Exhibit 6 (each, a "**Bill of Sale**") executed by each applicable Seller in favor of each applicable Buyer;

    (b)    An Assignment and Assumption Agreement in the form attached as Exhibit 7 (each, an "**Assignment and Assumption**") executed by each applicable Seller in favor of each applicable Buyer;

    (c)    A Transition Services Agreement in the form attached as Exhibit 8 (each, a "**Transition Services Agreement**") executed by each applicable Seller in favor of each applicable Buyer;

    (d)    Reserved;

    (e)    The Drug Enforcement Administration (DEA) Power of Attorney (each, a "**Power of Attorney**") in the form attached hereto as Exhibit 9 and executed by or on behalf of each applicable Seller in favor of each applicable Buyer;

    (f)    Certificates of existence and good standing of each Seller and Sellers' Parent from the state of its incorporation or formation, each dated the most recent practicable date prior to the Closing Date;

    (g)    A Special Warranty Deed in the form attached as Exhibit 10 (each, a "**Special Warranty Deed**") with respect to each parcel of Owned Real Property executed by each applicable Seller in favor of each applicable Buyer;

    (h)    A non-foreign affidavit of the applicable Seller, dated as of the Closing Date, in form and substance consistent with the Treasury Regulations issued pursuant to Section 1445 of the Code stating that such Seller is not a "foreign person" as defined in Section 1445 of the Code;

    (i)    With respect to each Seller that owns a parcel of Owned Real Property and with respect to each Seller that is the Lessee of leased Real Property on which a long term acute care hospital is located, a duly executed affidavit in the form attached hereto as Exhibit 10 and other documents reasonably required by the Title Company to issue the applicable Title Policy, subject only to the Permitted Encumbrances;

    (j)    Certificates of title with respect to any vehicles included in the Purchased Assets duly executed by the applicable Seller;

    (k)    A medical records custodian agreement in a form reasonably satisfactory to the Parties ("**Medical Records Custodian Agreement**") executed by the Sellers;

    (l)    Certificates of an officer of the Sellers' Parent certifying the satisfaction of the conditions to Closing set forth in Sections 6.1;

(m)    Certificates of incumbency for the respective officers of Sellers and Sellers' Parent executing this Agreement or making certifications for the Closing dated as of the Closing Date;

(n)    A copy of the Sale Order;

(o)    UCC-3 financing statement amendment (a) terminating any and all financing statements filed with respect to the Purchased Assets, other than those financing statements which correspond to an Assumed Liability and (b) assigning any and all financing statements which corresponded to a personal property lease that is among the Assumed Liabilities; and

(p)    Any such other instruments, certificates, consents or other documents which the Parties mutually deem reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

**2.8    Actions of Buyers' Parent at Closing.**  At the Closing and unless otherwise waived in writing by Sellers' Parent, Buyers' Parent shall deliver or cause to be delivered to Sellers' Parent the following:

(a)    The Estimated Purchase Price by wire transfer of immediately available funds to an account designated in writing by Sellers' Parent;

(b)    A Bill of Sale executed by each applicable Buyer;

(c)    An Assignment and Assumption executed by each applicable Buyer;

(d)    A Transition Services Agreement executed by each applicable Buyer;

(e)    Copies of resolutions duly adopted by the Board of Directors (or similar governing body) of each Buyer and Buyers' Parent authorizing and approving such Party's execution and delivery of this Agreement and the consummation of the transactions by this Agreement certified by an officer of Buyers' Parent;

(f)    Certificates of existence and good standing of each Buyer and Buyers' Parent from the state of its incorporation or formation, each dated the most recent practicable date prior to the Closing Date;

(g)    Certificates of an officer of the Buyers' Parent certifying the satisfaction of the conditions to Closing set forth in Section 7.1;

(h)    Certificates of incumbency for the respective officers of Buyers and Buyers' Parent executing this Agreement or making certifications for the Closing dated as of the Closing Date;

(i)    Reserved;

(j)    The Medical Records Custodian Agreement executed by the Buyers; and

(k)    Any such other instruments, certificates, consents or other documents which the Parties mutually deem reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

**2.9    Real Estate Closing Matters.**

4844-3270-9764.4

13

(a)    Title Commitments and Surveys.  Prior to the Effective Date, Sellers' Parent has made available to Buyers' Parent, (i) those certain title commitments for the Owned Real Property or Leased Real Property issued by the Title Company (collectively, the *"Title Commitments"*) described in Schedule 2.9(a), together with the exception documents referenced therein and (ii) certain ALTA/ACSM surveys of the Owned Real Property described in Schedule 2.9(a)(ii) (*"Seller Surveys"*). Buyers' Parent and each Buyer hereby approves all title exception matters set forth in the Title Commitments and Seller Surveys.

(b)    Environmental Assessments.    Prior to the Effective Date, Sellers' Parent has made available to Buyers' Parent, (i) those certain environmental site assessments performed by Partner Engineering and Science, Inc. (collectively, the *"Phase I's"*) described in Schedule 2.9(b).  Buyers' Parent and each Buyer hereby agree and acknowledge to accept the Real Property subject to any and all limitations, recommendations or potential violations of applicable Law reflected therein.

(c)    Property Condition Reports.  Prior to the Effective Date, Sellers' Parent has made available to Buyers' Parent, those certain property condition reports performed by Partner Engineering and Science, Inc. (*"PCRs"*) described in Schedule 2.9(c).  Buyers' Parent and each Buyer hereby agree and acknowledge to accept the Real Property subject to any and all limitations, recommendations or potential violations of applicable Law reflected therein.

**2.10    Risk of Loss.**

(a)    The risk of loss or damage to any of the Owned Real Property or Leased Real Property or any personal property used in connection with the Healthcare Business by the Sellers shall remain, as between Buyers and Sellers, with the Sellers until the Effective Time and Sellers shall maintain their respective insurance policies covering such property through the Effective Time.

(b)    With respect to the Owned Real Property and Leased Real Property, if prior to the Closing, all or any part of such Owned Real Property or Leased Real Property is destroyed or damaged by fire or the elements or by any other cause where such damage or destruction is in the aggregate (the *"Aggregate Damage"*) less than Five Hundred Thousand Dollars ($500,000) (the *"Casualty Termination Threshold"*), the Parties' duties and obligations pursuant to this Agreement with respect to such Seller Facility shall not be affected and the Closing shall proceed as scheduled; provided, however, the applicable Seller shall assign, transfer and set over to the applicable Buyer all of the applicable Seller's right, title and interest in and to any insurance proceeds on account of such damage or destruction and, if such insurance policy proceeds are insufficient to repair, restore and/or replace the Owned Real Property or Leased Real Property, as applicable, the difference between the cost to repair, restore and/or replace and the amount of such proceeds shall be deducted from the Purchase Price allocated to the applicable Seller Facility.

(c)    If prior to the Closing, all or any part of the Owned Real Property or Leased Real Property is destroyed or damaged by fire or the elements or by any other cause where the Aggregate Damage exceeds the Casualty Termination Threshold (a *"Damaged Facility"*), Buyers' Parent may elect to (i) include the Purchased Assets relating to the Damaged Facility in the Purchased Assets relating to the Seller Facilities and the Closing shall proceed as scheduled (provided, however, at the Closing, the applicable Seller shall assign, transfer and set over to the applicable Buyer all of the applicable Seller's right, title and interest in and to any insurance proceeds on account of such damage or destruction loss plus the amount of any deductibles under such insurance policies) or (ii) not purchase the Damaged Facility (and related Purchased Assets), and, in such event, the Buyers shall be obligated to consummate the purchase of the Purchased Assets that are related to the other Seller Facilities and an appropriate adjustment to the Purchase Price allocated to the Damaged Facility shall be made.

(d)    With respect to any personal property which is destroyed or damaged by fire or the elements or by any other cause prior to the Closing, Sellers shall assign, transfer and set over to Buyers all of Sellers' right, title and interest to any insurance proceeds on account of such damage or destruction and shall reimburse Buyers for any deductible a Buyer is required to pay in connection with the receipt of such insurance proceeds and Buyers shall be obligated to consummate the purchase of the remaining Purchased Assets.

(e)    For purposes of this Section 2.10, the Purchase Price shall be allocated among the Seller Facilities (and related Purchased Assets) as set forth on Schedule 2.10(e).

**2.11    Straddle Patients.** To reimburse Sellers for funds that are received in relation to services rendered and medicine, drugs and supplies provided prior to the Effective Time (the "*Straddle Services*") with respect to patients who are admitted to the Seller Facilities prior to the Effective Time but who are not discharged until on or after the Effective Time (such patients being referred to herein as the "*Straddle Patients*"), the Parties shall take the following actions:

(a)    As soon as practicable after the Effective Time, Sellers shall deliver to Buyers a statement itemizing the Straddle Patients of the Seller Facilities whose medical care is paid for, in whole or in part, by any third party payor who pays on a DRG, case rate or other similar basis (the "*DRG Straddle Patients*"). For each DRG Straddle Patient, Sellers shall be allocated an amount equal to (i) the total DRG and outlier payments (including capital and any deposits, deductibles or co-payments received by the Buyers or Sellers that constitute Excluded Assets) per the remittance advice received by the Buyers on behalf of a DRG Straddle Patient, multiplied by a fraction, the numerator of which shall be the total days such DRG Straddle Patient was an inpatient prior to the Effective Time, and the denominator of which shall be the total days the DRG Straddle Patient was an inpatient at the Seller Facilities both prior to and on and after the Effective Time, minus (ii) any deposits, deductibles or co-payments made by such DRG Straddle Patient to Sellers that constitute Excluded Assets.

(b)    With respect to cost-based Straddle Patients, Sellers shall be allocated an amount equal to (i) the payments actually received by the Buyers post-Closing for a cost-based Straddle Patient (including any deposits, deductibles or co-payments that constitute the Excluded Assets) multiplied by a fraction, the numerator of which shall be the total number of days prior to the Effective Time which Sellers provided Straddle Services to such patient, and the denominator of which shall be the total number of days with respect to such patients' stay at the Seller Facilities prior to and following the Effective Time, minus (ii) any deposits, deductibles or co-payments made by such cost-based Straddle Patient to Sellers that constitute the Excluded Assets.

(c)    If Buyers receive any amounts (including, but not limited to, adjustments, retroactive lump sum credits or payments) from the Medicare, TRICARE or Medicaid (or from any other payor) programs for periodic interim payments ("*PIP*") or costs paid for on a pass-through basis, such as capital costs, associated with the operation of the Seller Facilities prior to the Effective Time, Buyers shall tender the amount applicable to the period prior to the Effective Time to Sellers within ten (10) business days of receipt. If Sellers receive any amounts from the Medicare, TRICARE or Medicaid (or from any other payor) program for PIP or pass-through costs, such as capital costs, associated with the operations of the Seller Facilities relating to periods on or subsequent to the Effective Time, Sellers shall tender the same to Buyers within ten (10) business days of receipt. It is the intent of the parties that Buyers and Sellers shall receive PIP payments and pass-through costs payments (including capital costs) applicable to the period of time the Seller Facilities are owned by such party.

(d)    All payments required by this Section 2.11 shall be made within ten (10) business days of a party's receipt of payment with respect to a Straddle Patient that are due to the other party, accompanied

4844-3270-9764.4

15

by copies of remittances and other supporting documentation as reasonably required by such other party. In the event that Sellers and Buyers are unable to agree on any amount to be paid pursuant to this <u>Section 2.11</u>, then such disputed amount shall be submitted to the Arbitrator for computation or verification in accordance with the provisions of this Agreement. The Arbitrator shall review the matters in dispute and shall promptly decide the proper amounts of such disputed entries. The submission of the disputed matter to the Arbitrator shall be the exclusive remedy for resolving accounting disputes relative to the determination of payments relating to Straddle Patients. The Arbitrator's determination shall be binding upon the Parties, absent manifest error. The Arbitrator's fees and expenses shall be allocated between Sellers and Buyers based upon the percentage which the portion of the contested amount not awarded to each party bears to the amount actually in dispute at the time of submission to the Arbitrator, as determined by the Arbitrator in its reasonable discretion. Notwithstanding anything in this Agreement to the contrary, in the event that, for whatever reason, any such dispute is not resolved within two hundred seventy (270) days after the Closing Date, then either Sellers or Buyers may submit such dispute to the Bankruptcy Court for resolution.

**2.12**     **Sale Free and Clear**. Notwithstanding anything herein to the contrary, Sellers acknowledge and agree that on the Closing Date, to the fullest extent permitted under applicable Law, the Purchased Assets will be transferred to the Buyers free and clear of all Encumbrances (including, for the avoidance of doubt, all forms of successor liability), other than the Permitted Encumbrances and the Assumed Liabilities, to be provided for in the Sale Order, which will be in form and substance satisfactory to Buyers and Sellers. The Parties agree that the provisions substantially in the form of this <u>Section 2.12</u> will be reflected in the Sale Order.

## ARTICLE III- REPRESENTATIONS AND WARRANTIES OF SELLERS

Except to the extent a representation or warranty speaks as of another date, as of the Effective Date and as of the Closing Date, when read in light of any Schedules to this <u>ARTICLE III</u> ("*Article III Schedules*") that are updated prior to the Closing in accordance with the provisions of this Agreement, Sellers represent and warrant to Buyers the following:

**3.1**     **Corporate Capacity, Authority and Consents**. Each of Sellers' Parent and each Seller are duly organized and validly existing in good standing under the Laws of the state of their formation or incorporation with the requisite organizational power and authority to enter into this Agreement, to perform its respective obligations hereunder and to conduct its business as now being conducted. Subject to the entry of the Sale Procedure Order or any Sale Order, the execution, delivery and performance of this Agreement and all other agreements referenced herein to which each of Sellers' Parent and each Seller are or will become a party and the actions to be taken by each of Sellers' Parent and each Seller in connection with the consummation of the transactions contemplated herein:

(a)     are within the organizational powers of each of Sellers' Parent and each Seller, are not in contravention of applicable Law or the terms of the applicable Governing Documents;

(b)     except as otherwise expressly herein provided or as set forth in <u>Schedule 3.1(b)</u>, do not require any approval, notice or consent of, or filing with, any Governmental Authority or other third party; and

(c)     will not violate any Law to which Sellers' Parent or any Seller is subject or result in a breach or violation of, or conflict with or allow any Person to exercise any rights under, any of the terms or provisions of any contracts or instruments to which a Seller is a party or pursuant to which any of the Purchased Assets may be affected.

**3.2** **Binding Agreement.** Subject to the entry of the Sale Order, this Agreement and all agreements to which any of Sellers' Parent or a Seller is or will become a party pursuant to this Agreement are and will constitute the valid and legally binding obligations of Sellers' Parent and Sellers, and are and will be enforceable against Sellers' Parent and Sellers in accordance with the respective terms hereof or thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

**3.3** **Assets.**

(a) Sellers own valid title to, or possesses valid leasehold interests in, all of the Purchased Assets. Sellers have sole custody and control of all of the Purchased Assets, except with respect to any Permitted Encumbrances or as otherwise set forth on Schedule 3.3(a).

(b) Subject to the entry of the Sale Order, the Purchased Assets are free and clear of all Encumbrances except Permitted Encumbrances.

**3.4** **Financial Statements.** Attached as Schedule 3.4 are copies of the unaudited balance sheets and statements of income of Sellers with respect to the operation of the Seller Facilities for the year ended December 31, 2017 and unaudited balance sheets and statements of income of Sellers with respect to the operation of the Seller Facilities for the period ended November 4, 2018 (the "**Balance Sheet Date**") (collectively, the "**Financial Statements**"). Except as set forth on Schedule 3.4, the Financial Statements are complete and present fairly in all material respects the financial condition and results of operations of Sellers and the Seller Facilities as of the dates and for the periods indicated therein in accordance with GAAP, except that the Financial Statements (i) that are not for a fiscal year-end do not reflect normal recurring year-end adjustments, (ii) do not contain footnotes, (iii) were prepared without physical inventories, (iv) do not contain a statement of cash flow, (v) omit substantially all the disclosures required by GAAP, (vi) are not restated for subsequent events, (vii) may not reflect any adjustments for impairment of long-lived assets, or restructuring charges or the reclassification of assets held for sale on the applicable balance sheet, and (viii) balance sheets reflect the following liabilities in intercompany liabilities: (A) accruals in respect of Sellers' self-insured employee health benefits, (B) liabilities payable in connection with workers' compensation claims, (C) liabilities payable pursuant to any employee welfare benefit plan (within the meaning of Section 3(1) of ERISA) maintained by Sellers or any Affiliate of Sellers on account of any of the Facility Employees, and (D) payroll and bonuses payable and vacation, holiday and similar accruals with respect to some but not all Facility Employees. Federal, state and local income or franchise taxes accruals are not reflected on the balance sheets or income statements. Except as set forth on Schedule 3.4, there are no known obligations or liabilities, whether absolute, accrued, contingent or otherwise, of Sellers that are required in accordance with GAAP to be reflected or disclosed in the Financial Statements except for obligations or liabilities (a) reflected or disclosed in the Financial Statements and (b) incurred in the ordinary course of business since the Balance Sheet Date, none of which have had a Material Adverse Effect.

**3.5** **Licenses and Accreditations.** Sellers hold all Permits required to be held by them to own, occupy and operate the Seller Facilities as they are currently being operated. Schedule 3.5 sets forth a list of such Permits, copies of which have been made available to Buyers, and all of which are valid and in full force and effect. All of such Permits are valid, binding and in full force and effect. Schedule 3.5 sets forth a list of any survey or inspection deficiencies of which a correction is in the process of being implemented. The Seller Facilities are duly accredited by The Joint Commission and Sellers have made available to Buyers complete and accurate copies of the most recent survey reports and lists of deficiencies, if any, from such accreditation agency.

**3.6**    **Regulatory Compliance.**

(a)    Except as set forth on Schedule 3.6, Sellers are, and in the two (2) years preceding the date hereof have been in compliance in all material respects with all applicable Laws including the Healthcare Laws.

(b)    With respect to the Seller Facilities, during the preceding two (2) years, Sellers have not, to Sellers' Knowledge, been investigated by any Governmental Authority with respect to any alleged violation of Law.

(c)    Without limiting the generality of the foregoing, Sellers have not, directly or indirectly, offered, paid or received, or made arrangements to offer, pay or receive, any remuneration, in cash or in kind, to any past, present or potential customers, past or present suppliers, patients, medical staff members, contractors or Third Party Payors of the Seller Facilities in order to obtain business or payments from such Persons that would reasonably be expected to subject Sellers to any material damage or penalty in any civil, criminal or governmental litigation or proceeding.  With respect to the Seller Facilities, to the Knowledge of Sellers, none of the current or former officers, directors, agents or managing employees (as such term is defined in 42 U.S.C. §1320a-5(b)) of the Sellers has been excluded from any Third Party Payor program or been subject to sanction or been convicted of a crime in connection with any state or federal healthcare program or under any Health Care Laws, nor is any such exclusion or conviction pending or threatened.

(d)    With respect to the Seller Facilities, there are no pending or, to the Knowledge of Seller, threatened disciplinary or corrective actions or appeals involving physician applicants, active medical staff members or affiliated health professionals under the medical staff bylaws at each Seller Facility. Sellers have made available to Buyers copies of the bylaws, rules and regulations of the medical staff at each Seller Facility and its executive committee.  Notwithstanding the foregoing provisions, Sellers shall not be required to disclose any information pursuant to this Section 3.6(d) where such disclosure is prohibited by Law or such disclosure would, or could reasonably be expected to, jeopardize any applicable privilege or protection including, without limitation, peer review or any other privilege which is available under applicable law.

(e)    With respect to the Seller Facilities, Sellers have not, during the preceding two (2) years, made and are not in the process of making a voluntary self-disclosure under the Self-Referral Disclosure Protocol established by the Secretary of HHS pursuant to Section 6409 of the Patient Protection and Affordable Care Act, or under the self-disclosure protocol established and maintained by the HHS Office of the Inspector General, or any United States Attorney or other Governmental Authority.

**3.7**    **Compliance Program.**  No Seller, with respect to the operations of the Seller Facilities, (a) is a party to a Corporate Integrity Agreement with the OIG; (b) has reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority; and (c) during the preceding two (2) years, has been served with any search warrant, subpoena, or civil investigation demand from any Governmental Authority related to the Seller Facilities' participation in any Governmental Reimbursement Program.

**3.8**    **Material Contracts.**  Schedule 3.8 sets forth a list of the following commitments, contracts, leases and agreements of Sellers, in each case relating to the Seller Facilities:  (a) contracts involving the lease of equipment or personal property that require payments by a Seller of greater than $50,000 during the remaining term or on an annual basis; (b) leases or subleases with respect to the Owned Real Property; (c) any agreement for the employment of any individual on a full time, part time, consulting or other basis; (d) contracts with respect to patents, trademarks, trade names or service names; (e) collective

4844-3270-9764.4

bargaining agreements; (f) partnership or joint venture agreements; (g) contracts containing a covenant on the part of the Seller not to compete with respect to the operation of the Seller Facilities; (h) contracts with any hospitals, ambulatory surgery centers or other healthcare facilities; (i) contracts with any physicians or other providers of healthcare services; (j) reserved; (k) any contract (or group of related contracts) under which any indebtedness for borrowed money or capitalized lease obligation has been created, incurred, assumed or guaranteed; (l) reserved; (m) reserved; and (n) any other contracts, commitments, leases or agreements that involve payments, performance of services or provision of items in an amount exceeding $100,000 or that cannot be canceled by the applicable Seller, without penalty on 90 days' notice or less (the "*Material Contracts*"). Sellers have made available to Buyers copies of all of the Material Contracts. The Sellers are not in any non-monetary default or alleged to be in any non-monetary default under any Proposed Tenant Lease, and to the Knowledge of the Sellers, there exists no event, condition or occurrence which, after notice or lapse of time, or both, would constitute a non-monetary default under any Proposed Tenant Lease. Except as set forth on Schedule 3.8, the transactions contemplated by this Agreement do not require any notice to or consent of any third party.

**3.9     Real Property.**

(a)      The Owned Real Property constitutes all real property owned by Sellers that is primarily used in connection with the operation of the Seller Facilities. The Sellers have fee simple title to all of the Owned Real Property. There are no tenants or other Persons occupying any space in the Owned Real Property, other than pursuant to leases or subleases to third party tenants under any Proposed Lessor Lease listed on Schedule 2.1(b).

(b)      Except as otherwise set forth on Schedule 3.9(b), Schedule 2.1(b) contains a list of all leases of real property leased by the Sellers as a tenant in connection with the operation of the Seller Facilities. Sellers have made available to Buyers true and complete copies of all of such leases. The Sellers have not subleased, assigned or otherwise granted to any Person the right to use or occupy such leased real property or any portion thereof.

(c)      Except as shown on Schedule 3.9(c) or as reflected in the PCRs or Phase I's, each parcel of Owned Real Property (collectively the "*Premises*") conforms in all material respects to all applicable Laws, including zoning regulations. The Sellers have not received during the preceding two (2) year period written notice of any pending or contemplated condemnation, expropriation or other proceeding in eminent domain affecting the Leased Real Property or any portion thereof or interest therein. The Sellers have not received during the preceding two (2) year period any written notice that the current use and occupancy of the Leased Real Property violates in any material respect any easement, covenant, condition, restriction or similar provision in any instrument of record or other unrecorded agreement affecting such leased real property.

**3.10     Insurance.** Attached as Schedule 3.10 is a list and description of all insurance policies, including all self-funded plans or trusts, maintained by or for the benefit of the Seller Facilities. All of such policies and plans or trusts are in full force and effect with no premium or contribution arrearage. Such policies are sufficient for compliance with all applicable Laws and contracts to which Sellers are a party or by which they are bound.

**3.11     Employee Benefit Plans.**

(a)      The term "*Employee Benefit Plans*" means collectively, each "employee pension benefit plan" and "employee welfare benefit plan" as those terms are defined in Section 3(3) of ERISA (whether or not subject to ERISA), stock option or equity-based compensation, employee stock ownership, deferred compensation, severance pay, vacation, bonus or other incentive agreement, arrangement, plan

4844-3270-9764.4

19

or policy, currently maintained by, sponsored in whole or in part by, or contributed to by Sellers or its Affiliates for the benefit of any current or former employees of the Seller Facilities and their respective dependents, spouses, or other beneficiaries.  Schedule 3.11(a) sets forth a list of each Employee Benefit Plan.  The term *"ERISA Affiliate"* means each trade or business (whether or not incorporated) which, together with Sellers, is treated as a single employer for any purpose under (i) Section 414(b), (c), (m) or (o) of the Code, or (ii) Section 302 or Title IV of ERISA.  Except as disclosed on Schedule 3.11(a), neither Sellers nor any ERISA Affiliate of Sellers currently has or has ever had an "obligation to contribute" (as defined in ERISA Section 4212) to a "multiemployer plan" (as defined in ERISA Sections 4001(a)(3) and 3(37)(A)), or any liability with respect to an employee pension benefit plan subject to Title IV of ERISA or the minimum funding requirements of Section 412 or 430 of the Code.

(b)     Except as disclosed on Schedule 3.11(b), all Employee Benefit Plans and the related trusts comply in all material respects with and have been administered in all material respects in compliance with (i) the applicable provisions of ERISA and the regulations promulgated thereunder, (ii) all applicable provisions of the Code relating to qualification and tax exemption under Code Sections 401(a) and 501(a) or otherwise applicable to secure tax-qualified treatment, and (iii) all applicable Laws. Except as disclosed on Schedule 3.11(b), no Employee Benefits Plan is subject to any audit, investigation or examination by any Governmental Authority (including IRS, Department of Labor and Pension Benefit Guaranty Corporation).  Each Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Code or otherwise for favorable tax treatment has (1) received a favorable determination letter from the IRS relating to the most recently completed IRS qualification cycle or (2) filed, or caused to be filed, an application for a determination letter for the most recently completed qualification cycle applicable to such plan, and, to the Knowledge of Sellers nothing has occurred since the date of such letter, filing or approval that would reasonably be expected to cause the loss of the qualified status of any such Employee Benefit Plan.

**3.12     Employee Relations.**  There is no pending or, to the Knowledge of Sellers, threatened employee strike, work stoppage or labor dispute concerning the Facility Employees.  Except as set forth on Schedule 3.12, (a) no collective bargaining agreement exists or is currently being negotiated in respect of the Facility Employees; (b) no written demand has been made in the preceding two (2) years for recognition by a labor organization by or with respect to any Facility Employees; (c) no union organizing activities by or with respect to any Facility Employees are taking place; and (d) none of the Facility Employees is represented by any labor union or organization. The Sellers are, in all material respects, in compliance with all Laws respecting employment and employment practices, terms and conditions of employment and wages and hours including, without limitation, the Fair Labor Standards Act, the Family and Medical Leave Act of 1993, the Americans with Disabilities Act of 1990, the Veterans Reemployment Rights Act, the Equal Employment Opportunities Act, as amended by the Civil Rights Act of 1991, the Occupational Safety and Health Act, the Employee Retirement Income Security Act of 1974, the Immigration Reform and Control Act of 1986, the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, the Older Workers Benefit Protection Act, and all other Laws, each as amended to date, relating to employer/employee rights and obligations.  Except as otherwise set forth on Schedule 3.12, Sellers have not terminated any employee of the Sellers during the three (3) month period prior to the date hereof.

**3.13     Litigation and Proceedings.**  Except as set forth on Schedule 3.13, there are no Actions pending or, to Sellers' Knowledge, threatened against Sellers or their Affiliates, at law or in equity, or before or by any Governmental Authority.  There is no Action pending or, to the Knowledge of Sellers, threatened against Sellers or their Affiliates which seeks to prevent or delay consummation of the transactions contemplated herein, seeks damages in connection with transactions contemplated herein or would impair the ability of Sellers to perform their obligations under this Agreement.

4844-3270-9764.4

20

**3.14    Third Party Reimbursement.**

(a)    The Seller Facilities are certified to participate in the Medicare, Medicaid and TRICARE programs with valid and current provider or supplier agreements under such programs.  Except as set forth on Schedule 3.14(a) or as would not result in a Material Adverse Effect, the Seller Facilities are in compliance with the terms and conditions of participation in the Medicare, Medicaid and TRICARE programs and are not subject to any pending or, to Sellers' Knowledge, threatened Actions with respect to participation in such programs, other than routine audits and investigations conducted through the Medicare Recovery Audit Contractor programs.

(b)    For the two (2) years preceding the Effective Date, Sellers and their Affiliates have timely filed all Cost Reports in respect of the Seller Facilities, and such reports accurately reflect in all material respects the information to be included thereon.  Except as set forth on Schedule 3.14(b) there are no pending Actions, adjustments or audits relating to such Cost Reports.  To the Knowledge of Sellers, Sellers are not subject to any pending but unassessed Medicare or Medicaid claim payment adjustments arising from the Seller Facilities, except to the extent Sellers have established reserves for such adjustments in accordance with Sellers' accounting policy for establishing any such reserves and that are reflected on the Financial Statements.

**3.15    Tax Liabilities.**

(a)    All tax returns, including income tax returns, payroll tax returns, unemployment tax returns and franchise tax returns, for periods prior to and including the Closing Date which are required to be filed by Sellers with any Governmental Authority in respect of the Sellers (collectively **"Returns"**) have been timely filed or will be timely filed in the manner provided by Law, and each Return does or will accurately reflect in all material respects the tax liabilities of Sellers for the periods or other matters covered by such Return. The Sellers have not waived any statute of limitations in respect of taxes or agreed to any extension of time with respect to a tax assessment or deficiency.

(b)    Except as set forth on Schedule 3.15(b), all taxes, penalties, interest, and any other statutory additions which have become due pursuant to the Returns, and any material assessments in respect of the Returns have been paid when due or adequately provided for by the reserves reflected in the Financial Statements and to the Knowledge of Sellers there is no pending tax examination or audit of, nor any action, investigation or claim asserted against Sellers by any taxing authority in respect of the Sellers. Except as set forth on Schedule 3.15(b), there are no Encumbrances for taxes upon any of the Purchased Assets nor, to the Knowledge of Sellers, is any taxing authority in the process of imposing any Encumbrances for taxes on any of the Purchased Assets.

(c)    Except as set forth on Schedule 3.15(c), the Sellers have, within the time and manner prescribed by Law, (i) withheld all required amounts from their employees, agents, contractors and nonresidents and remitted such amounts to the proper agencies; (ii) paid all employer payroll taxes; and (iii) filed all federal, state, local and foreign Returns and reports with respect to employee income tax withholding, and social security and unemployment taxes and premiums, all in compliance in all material respects with the withholding tax provisions of the Code, as in effect for the applicable year or any prior provision thereof and other applicable Laws.

**3.16    Absence of Changes.**  Except as expressly contemplated by this Agreement, as disclosed on the Financial Statements, as required in connection with the Bankruptcy Case or as otherwise disclosed on Schedule 3.16, no Seller has, since the Balance Sheet Date, (a) written off as uncollectible, or established any extraordinary reserve with respect to, any material account receivable or other material indebtedness of Seller; (b) amended or restated, or approved the amendment or restatement of, the Governing

4844-3270-9764.4

21

Documents of such Seller; (c) made or changed any material tax election, entered into any settlement or compromise of any material tax liability or surrendered any right to claim a material tax refund; (d) settled or compromised any material pending or threatened Action; (e) sold, transferred, leased, optioned or otherwise disposed of any material assets except in the ordinary course of business; (f) granted or incurred any obligation for any increase in the compensation of any of the Facility Employees except in the ordinary course of business; (g) received any written notice from any Governmental Authority of any material liability, potential liability or claimed liability based on any violation of Law by a Seller; (h) instituted any material change in a Seller's accounting practices or methods; or (i) agreed or committed to take any of the foregoing actions.

**3.17    Intellectual Property.**  Except as set forth on Schedule 3.17, with respect to the Seller Facilities: (a) Sellers have not received any written notice that they are infringing on or has misappropriated or otherwise violated the Intellectual Property rights of any Person and (b) to the Sellers' Knowledge, there is no infringement or misappropriation, or other violation by any Person of the Facility IP.  The Sellers own or hold a valid license to use all Facility IP.

**3.18    Disclaimer of Warranties.**  Except as expressly set forth in Article III hereof, the Purchased Assets will be sold by Sellers and purchased by Buyers "AS IS, WHERE IS AND WITH ALL FAULTS AND NONCOMPLIANCE WITH LAWS" WITH NO WARRANTY OF HABITABILITY OR FITNESS FOR HABITATION, with respect to the Owned Real Property or Leased Real Property, and WITH NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, with respect to the physical condition of the personal property and Inventory, any and all of which warranties (both express and implied) Sellers hereby disclaim.  All of the real and personal property included in the Purchased Assets shall be further subject to normal wear and tear and normal and customary use in the ordinary course of business up to the Effective Time.  Buyers' Parent and each Buyer acknowledges that Buyers' Parent has examined, reviewed and inspected all matters which in Buyers' Parent's judgment bears upon the Purchased Assets and their value and suitability for Buyers' purposes and, except as affirmatively represented and warranted by Sellers, is relying solely on its own examination, review and inspection of the Purchased Assets.

### ARTICLE IV - REPRESENTATIONS AND WARRANTIES
### OF BUYERS AND BUYERS' PARENT

As of the Effective Date and as of the Closing Date, when read in light of any Schedules to this ARTICLE IV, Buyers' Parent and each Buyer represents and warrants to Sellers' Parent and Sellers the following:

**4.1    Capacity, Authority and Consents.**  Each of Buyers' Parent and each Buyer is duly organized and validly existing in good standing under the Laws of the state of its incorporation or formation with the requisite power and authority to enter into this Agreement, to perform its respective obligations hereunder and to conduct its business as now being conducted.  The execution, delivery and performance of this Agreement and all other agreements referenced herein to which Buyers' Parent or a Buyer is or will become a party and the actions to be taken by Buyers' Parent or a Buyer in connection with the consummation of the transactions contemplated herein:

(a)    are within the powers of Buyers' Parent or a Buyer, are not in contravention of applicable Law or the terms of the Governing Documents of Buyer's Parent or a Buyer and have been duly authorized by all appropriate action;

4844-3270-9764.4

(b)      except as otherwise expressly herein provided or as set forth on Schedule 4.1(b), do not require any approval or consent of, or filing with, any third party or any Governmental Authority;

(c)      except as otherwise expressly provided herein, will not result in any material breach or contravention of, nor permit the acceleration of the maturity of or termination of or constitute a default under, the terms of any material indenture, mortgage, contract, agreement or other instrument to which Buyers is a party or otherwise bound that could be reasonably expected to materially impair Buyers' ability to fulfill its obligations under this Agreement; and

(d)      will not violate any Law to which Buyers' Parent or a Buyer is subject.

**4.2      Binding Agreement.**  This Agreement and all agreements to which Buyers' Parent or a Buyer is or will become a party pursuant to this Agreement are and will constitute the valid and legally binding obligations of Buyers' Parent or a Buyer, and are and will be enforceable against Buyers' Parent and each Buyer in accordance with the respective terms hereof or thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

**4.3      Litigation and Proceedings.**  There are no Actions pending or, to Buyers' knowledge, threatened against Buyers' Parent or a Buyer, or any governing Persons thereof, at Law or in equity, or before or by any Governmental Authority, that if adversely determined could be reasonably expected to materially impair Buyers' Parent or a Buyers' ability to fulfill its obligations under this Agreement.

**4.4      Availability of Funds.**  Buyers' Parent has the ability to obtain funds in cash in amounts equal to the Purchase Price by means of credit facilities or otherwise and will at the Closing have immediately available funds in cash which are sufficient to pay the Purchase Price and to pay any other amounts payable pursuant to this Agreement and to consummate the transactions contemplated by this Agreement.

**4.5      Representations of Sellers.**  Buyers' Parent and each Buyer acknowledges that it is purchasing the Purchased Assets on an "AS IS, WHERE IS" basis (except as set forth in ARTICLE III hereof and as more particularly described in Section 3.18), and that neither Buyers' Parent nor a Buyer is relying on any representation or warranty (expressed or implied, oral or otherwise) made on behalf of Sellers other than as expressly set forth in this Agreement

### ARTICLE V- COVENANTS OF THE PARTIES PRIOR TO CLOSING

**5.1      Access.**  From and after the Effective Date until the Closing or the earlier termination of this Agreement (the "*Interim Period*"), Sellers shall (a) provide Buyers and their Representatives reasonable access to and, as applicable, the right to inspect, the plants, properties, books and records and other documents and information relating to the Seller Facilities, the Purchased Assets and Assumed Liabilities and access, during normal business hours and upon reasonable notice, to the personnel of the Seller Facilities and (b) furnish Buyers with such additional financial and operating data and other information as to the business and properties of the Seller Facilities as reasonably requested, including copies of the updated Financial Statements following each calendar month during the Interim Period; provided, however, that such access shall be subject to prior approval by Sellers' Parent and shall be coordinated through persons as may be designated in writing by Sellers' Parent for such purpose. Notwithstanding the foregoing, all disclosures of information shall be consistent with all joint defense agreements and any other nondisclosure agreements entered into between the Parties. Buyers' right of access and inspection shall be exercised during normal business hours and in such a manner as not to interfere unreasonably with the operations of the Seller Facilities.

**5.2**    **Third Party Consents**. Sellers shall use commercially reasonable efforts to cooperate with Buyers to secure, before the Closing Date, any third party consents that Buyers reasonably deem necessary to consummate the transactions contemplated hereby, to the extent such consents are not provided for or satisfied by the Sale Order; provided that neither Sellers nor Buyers shall have any obligation to offer or pay any consideration in order to obtain any such consents, approvals or waivers except for such amounts as Sellers shall be obligated to pay, or otherwise satisfy, as a condition to any such assignment and assumption (including the payment or satisfaction of Cure Costs) pursuant to Section 365(b) of the Bankruptcy Code.

**5.3**    **Updates of Schedules.**  After the Effective Date, and no later than five (5) business days prior to the Closing Date, Sellers' Parent may supplement or update any and all Article III Schedules with respect to any matter arising after the Effective Date which if existing as of the Effective Date would have been required to be set forth or described in such Schedules and such updated Schedules shall be incorporated into this Agreement; provided that the foregoing shall not limit the Sellers' ability to update Schedule 3.8 which Sellers may do at any time prior to five (5) business days prior to the Closing Date. If Sellers' Parent provides Buyers with a written notice pursuant to this Section 5.3 relating to an event or circumstance that first occurred or arose following the Effective Date and prior to the Closing Date and such event or circumstance does not materially and adversely affect the Sellers and/or the Purchased Assets, such notice shall be deemed to have amended the Article III Schedules and to have qualified the particular representations and warranties contained in Article III which relate to such event or circumstance.  If the events or circumstances included in such notice do materially and adversely affect the Sellers and/or the Purchased Assets, Buyers' Parent has the unqualified right to terminate this Agreement pursuant to Article VIII hereof as a result thereof. If Buyers' Parent does not exercise such right to terminate this Agreement pursuant to Article VIII hereof within five (5) business days after receipt of such notice, then Buyers' Parent shall be deemed thereafter to have waived the right to terminate this Agreement as a result of the matters set forth in such disclosure and such written notice shall be deemed to have amended the Article III Schedules and to have qualified the particular representations and warranties contained in Article III which relate to such event or circumstance.

**5.4**    **Operating Covenants.**  During the Interim Period, except with the prior written consent of Buyers' Parent (which consent will not be unreasonably withheld, conditioned or delayed) or as required by this Agreement or a Bankruptcy Court Order, each Seller shall:

(a)    carry on its businesses in respect of the Seller Facilities in the ordinary course of business consistent with past practice in all material respects;

(b)    perform its obligations relating to or affecting the Seller Facilities in all material respects in the ordinary course of business consistent with past practice;

(c)    keep in full force and effect current insurance policies, self-funded plans or trusts or other comparable insurance relating to or affecting the Seller Facilities;

(d)    use its commercially reasonable efforts to: (i) comply in all material respects with all Laws applicable to the Seller Facilities, (ii) keep in force all Permits necessary for the operation of the Seller Facilities, (iii) maintain and preserve its business organizations intact and retain the current Facility Employees (excluding terminations of employment in the ordinary course); (iv) maintain its relationships with physicians, suppliers, customers and others having business relations with the Seller Facilities; and (v) satisfy all of the conditions precedent set forth in ARTICLE VI; and

(e)    Sellers shall use commercially reasonable efforts to maintain its Inventory in the ordinary course of business in a manner consistent with its past practices.

4844-3270-9764.4

**5.5** **Negative Covenants.** During the Interim Period, except as required by Law or as ordered by the Bankruptcy Court, Sellers shall not, with respect to the Seller Facilities, without the prior written consent of Buyers' Parent (which shall not be unreasonably withheld, conditioned or delayed):

(a) amend or terminate any of its contracts, enter into any contract or commitment, except with respect to any such contract or commitment that is amended, terminated or entered into in the ordinary course of business and that, over the terms of such contract or commitment involves less than $100,000 or can be terminated without cause by a Seller on 90 days' notice or less without penalty;

(b) increase compensation payable or to become payable, make any bonus payment to, or otherwise enter into one or more bonus agreements with, any Facility Employee, except in the ordinary course of business in accordance with existing personnel policies and consistent with prior practice or with respect to any retention bonuses which are to be paid in full prior to the Closing Date; or

(c) sell, assign, lease or otherwise transfer or dispose of any property, plant or equipment used in connection with the operation of the Seller Facilities except in the ordinary course of business.

**5.6** **Reserved.**

**5.7** **Reserved.**

### ARTICLE VI- CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYERS

Notwithstanding anything herein to the contrary, the obligations of Buyers' Parent and Buyers to consummate the transactions described herein are subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent unless (but only to the extent) waived in writing by Buyers on or prior to the Closing:

**6.1** **Representations and Warranties; Covenants.**

(a) The representations and warranties of Sellers contained in this Agreement shall be true and correct in all material respects (without giving duplicative effect to any limitation or qualification as to "materiality" set forth herein), when read in light of any Article III Schedules that are updated prior to the Closing Date in accordance with the this Agreement, as of the Effective Date and as of the Closing Date or, in the case of representations and warranties that are made as of a specified date, as of such specified date; provided that this condition shall be deemed satisfied if such failure would not reflect a material and adverse effect on the Sellers and the Purchased Assets taken as a whole. All of the covenants in this Agreement to be complied with or performed by Sellers on or before the Closing Date pursuant to the terms hereof shall have been duly complied with and performed. Buyers shall have received a certificate signed on behalf of Sellers by a duly authorized officer of Sellers to such effect.

(b) If the effect of any failure or alleged failure of any such representation or warranty of Sellers to be true and correct can be remedied by Sellers through the payment of money or the giving of an absolute first dollar indemnity to Buyers' Parent, and Sellers' Parent pays such money or gives such first dollar indemnity, the related failure or alleged failure shall be deemed waived by Buyers' Parent and Buyers as a Closing condition.

(c) For the avoidance of doubt, Buyers' Parent and each Buyer agree that (i) Buyers shall not be excused from consummating the transactions contemplated by this Agreement and (ii) Buyers' Parent and Buyers will not assert the failure or the alleged failure of a representation or warranty made by Sellers to be true as a basis for not consummating the transactions contemplated by this Agreement if the

4844-3270-9764.4

25

conditions set forth in <u>Section 6.1(b)</u> are satisfied in which event Buyers' Parent and Buyers' sole remedy shall be those set forth in <u>Section 6.1(b)</u>. In no event shall any dispute over a reduction in the Purchase Price based on the failure or alleged failure of any representation and warranty made by Sellers to be true and correct delay or postpone the Closing.

**6.2**    <u>**Required Governmental Approvals and Consents.**</u>  Buyers shall have obtained documentation or other evidence reasonably satisfactory to Buyers (or customary assurances that it will receive following the Closing but effective as of the Closing) that the Parties have obtained from applicable Governmental Authorities the approvals and consents set forth on <u>Schedule 6.2</u> (the "***Required Governmental Approvals***").

**6.3**    <u>**Actions and Proceedings.**</u>  No Governmental Authority shall have issued any Order that is then in effect and that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement.

**6.4**    <u>**Material Adverse Effect.**</u>  There shall not have been any Material Adverse Effect since the Balance Sheet Date.

**6.5**    <u>**Closing Deliveries.**</u>  Sellers shall have executed and delivered, or caused to have been executed and delivered, to Buyers the documents and items described in <u>Section 2.7</u>.

### ARTICLE VII- CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS

Notwithstanding anything herein to the contrary, the obligations of Sellers' Parent and Sellers to consummate the transactions described herein are subject to the fulfillment, on or prior to the Closing Date, of the following conditions precedent unless (but only to the extent) waived in writing by Sellers' Parent on or prior to the Closing:

**7.1**    <u>**Representations and Warranties; Covenants.**</u>  The representations and warranties of Buyers' Parent and Buyers contained in this Agreement shall be true and correct in all material respects (without giving effect to any duplicative limitation or qualification as to "materiality" set forth therein), as of the Effective Date and as of the Closing Date or, in the case of representations and warranties that are made as of a specified date, as of such specified date. All of the covenants in this Agreement to be complied with or performed by Buyers' Parent or Buyers on or before the Closing Date pursuant to the terms hereof shall have been duly complied with and performed. Sellers' Parent shall have received a certificate signed on behalf of Buyers' Parent by a duly authorized officer of Buyers' Parent to such effect.

**7.2**    <u>**Pre-Closing Confirmations.**</u>  Sellers' Parent shall have obtained documentation or other evidence reasonably satisfactory to Sellers that the Parties have obtained (or customary assurances that it will receive following the Closing but effective as of the Closing) the Required Governmental Approvals.

**7.3**    <u>**Actions and Proceedings.**</u>  No Governmental Authority shall have issued any Order that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement.

**7.4**    <u>**Closing Deliveries.**</u>  Buyers shall have executed and delivered, or caused to have been executed and delivered, to Sellers the documents and items described in <u>Section 2.8</u>.

**7.5**    <u>**Cure Amounts**</u>.  Any and all Cure Amounts shall have been paid by Buyer except for those Cure Amounts that are to be paid in full at or after the Closing in accordance with the Order(s) of the Bankruptcy Court.

4844-3270-9764.4

## ARTICLE VIII- ADDITIONAL AGREEMENTS

**8.1**    <u>**Termination Prior to Closing.**</u>

(a)    Notwithstanding anything herein to the contrary, this Agreement set forth in <u>Section 2.10</u>, this Agreement may be terminated at any time prior to the Closing:

(i)    by the mutual written consent of Sellers' Parent and Buyers' Parent;

(ii)    by Buyers' Parent, if Sellers breach or fail to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform would, if the Closing otherwise were to occur on the date of written notice of such breach or failure to perform, give rise to the failure of a condition set forth in <u>Section 6.1</u>;

(iii)    by Sellers' Parent, if Buyers' Parent or a Buyer breaches or fails to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform would, if the Closing otherwise were to occur on the date of written notice of such breach or failure to perform, give rise to the failure of a condition set forth in <u>Section 7.1</u>; and

(iv)    by either Party after the date that is the one hundred twentieth (120th) day following the Effective Date (provided that such date may be extended unilaterally by a Party up to an additional forty-five (45) days if necessary to obtain any Required Governmental Approvals) (the "**_Termination Date_**") if the conditions contained in <u>Article VI</u> or <u>Article VII</u>, as applicable, to which such Party's obligations hereunder are subject, have not been fulfilled or waived; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to this <u>Section 8.1(a)(iv)</u> shall not be available if the failure of the Party so requesting termination to fulfill any obligation under this Agreement shall have been the cause of the failure of such condition to be satisfied on or prior to such date.

The Party seeking to terminate this Agreement pursuant to this <u>Section 8.1(a)</u> (other than <u>Section 8.1(a)(i)</u>) shall give prompt written notice of such termination to the other Parties.

(b)    In the event of a termination of this Agreement pursuant to <u>Section 8.1(a)(i)</u>, each Party shall pay the costs and expenses incurred by it in connection with this Agreement.  Subject to the provisions of this <u>Section 8.1</u>, the rights of termination set forth above are in addition to any other rights a terminating party may have under this Agreement and the other document related to the transactions contemplated herein, and the exercise of a right of termination will not be an election of remedies.  Notwithstanding the foregoing sentence, in the event of any termination of this Agreement by either Buyers' Parent or Sellers' Parent as provided in <u>Section 8.1(a)</u>, this Agreement shall forthwith become void, and there shall be no liability on the part of any Party or any of its or their Affiliates to any other Person resulting from, arising out of, relating to, or in connection with this Agreement or any other document related to the transactions contemplated herein, except that (i) nothing in this Agreement or any other document related to the transactions contemplated herein will relieve any party from any material breach of this Agreement or any other document related to the transactions contemplated herein prior to such termination or for fraud, intentional misrepresentation or willful or criminal misconduct; (ii) ARTICLE IX (General Provisions) and any pre-termination breaches of such provisions shall survive any termination of this Agreement and each Party shall be entitled to all remedies available at Law or in equity in connection with any past or future breach of any such provision; and (iii) Sellers' obligations to pay Buyers the Break-Up Fee, if any, and the Expense Reimbursement, if any, in accordance with the Sales Procedure Order shall survive any termination of this Agreement.

4844-3270-9764.4

27

**8.2** **Post-Closing Filings and Access to Information.**

(a)     After the Closing, each Party shall promptly deliver to the other Party upon reasonable notice copies of any post-closing filings, financial statements or reports that may be required to be prepared and delivered to any Governmental Authority as a result of the consummation of the transactions described herein, in each case at the sole cost and expense of the requesting Party.

(b)     The Parties acknowledge that, subsequent to the Closing, Sellers may need access to information or documents in the control or possession of Buyers for the purposes of concluding the transactions herein contemplated, audits, compliance with Laws, and the prosecution or defense of third party claims. Each Party shall cooperate with the other in connection with the handling of any such post-closing matters as may reasonably be requested.

(c)     The Parties acknowledge that subsequent, to the Closing, Buyers may need access to information or documents in the control or possession of Sellers for the purposes of concluding the transactions herein contemplated, audits, compliance with Laws, and the prosecution or defense of third party claims. Each Party shall cooperate with the other in connection with the handling of any such post-closing matters as may reasonably be requested.

**8.3** **Employee Matters.**

(a)     Upon the Closing Date, Sellers or its Affiliates shall terminate the employment of all of the Facility Employees currently employed by Sellers or their Affiliates and Buyers, subject to satisfactory results from standard background screening conducted pursuant to Buyers' personnel policies, will make offers of employment to all such Facility Employees (whether in active or leave of absence status) currently in good standing into positions (including job title, reporting structure and responsibilities) with Buyers that are substantially equivalent to the positions with Sellers occupied by the respective Facility Employees on the Closing Date. Buyers shall provide each Facility Employee who accepts such offer (collectively, the "*Transferred Employees*") with a combined level of compensation and benefits that are comparable to such Facility Employee's combined level of compensation and benefits with Sellers as of the Closing Date through the three-month anniversary thereof. With respect to each Transferred Employee, Buyers shall assume Sellers' or its Affiliates' liability to such Transferred Employee for the Accrued PTO as of the Closing Date. Such Accrued PTO assumed by Buyers will be administered in accordance with Buyers' employee policies and procedures.

(b)     In respect of Transferred Employees employed by Buyers pursuant to offers made in accordance with Section 8.3(a), existing seniority or periods of service with Sellers or its Affiliates of all such Transferred Employees shall be recognized for plan benefits purposes and credited for eligibility and vesting purposes with respect to Buyers' Employee Benefit Plans. Buyers agree to adopt (or cause to be adopted) any necessary plan amendments to effectuate the foregoing provisions. Buyers shall cause each of its Employee Benefit plans in which any Transferred Employee becomes eligible to participate to waive all limitations as to pre-existing conditions and waiting periods with respect to participation and coverage requirements for any Transferred Employees and their eligible dependents. Buyers agree to accept direct rollovers of any electing Transferred Employees from Sellers' retirement savings plan and Buyers agree to cause the account balances of any electing Transferred Employees to be rolled over in cash to Buyers' defined contribution plan which satisfies the requirements of Code Section 401(k).

(c)     Except for the Accrued PTO assumed by Buyers pursuant to this Agreement, Buyers shall not assume any obligations of Sellers related to any of Sellers' or their Affiliates' Employee Benefit Plans.

4844-3270-9764.4

28

**8.4** **Medical Staff.** To ensure continuity of care in the applicable community, Buyers agree that the medical staff members of the Seller Facilities who are in good standing as of the Closing Date shall maintain medical staff privileges at the Seller Facilities as of the Closing. After the Closing, the medical staff will be subject to the Medical Staff Bylaws of the Seller Facilities then in effect, as amended from time to time.

**8.5** **Refunds and Remittances.** After the Closing: (a) if Sellers or any of their Affiliates receive any refund or other amount that is a Purchased Asset or is otherwise properly due and owing to Buyers in accordance with the terms of this Agreement, Sellers promptly shall remit, or shall cause to be remitted, such amount to Buyers; and (b) if Buyers or any of their Affiliates receive any refund or other amount that is an Excluded Asset or is otherwise properly due and owing to Sellers or any of their Affiliates in accordance with the terms of this Agreement, Buyers promptly shall remit, or shall cause to be remitted, such amount to Sellers. Sellers shall cooperate with Buyers to execute appropriate Lock Box agreements and bank account sweep instructions to facilitate the transfer of Accounts Receivable to Buyers following the Closing as reasonably requested by Buyers and consistent with applicable Healthcare Laws.

**8.6** **Terminating Cost Reports.**

(a) Sellers shall prepare and, after allowing Buyers' Parent ten (10) business days to review and comment, timely file all Cost Reports relating to the periods ending on or prior to the Closing Date or required as a result of the consummation of the transactions contemplated herein. Buyers' Parent shall forward to Sellers' Parent any and all correspondence relating to such Seller Cost Reports or the Seller Agency Settlements within five (5) business days after receipt by Buyers. Buyers shall not reply to any such correspondence without Sellers' Parent's written approval. Sellers shall retain the originals of the Seller Cost Reports, correspondence, work papers and other documents relating to the Seller Cost Reports and the Seller Agency Settlements and furnish copies of such documents to Buyers' Parent upon reasonable request.

(b) Buyers shall, upon reasonable notice, during normal business hours and at the sole cost and expense of Sellers' Parent, and subject to applicable Law, provide Sellers reasonable access to all records of the Seller Facilities and shall allow Sellers to copy any documents relating to the Seller Cost Reports and appeals thereof.

**8.7** **Waiver of Bulk Sales Law Compliance.** Buyers' Parent and each Buyer hereby waives compliance by Sellers with the requirements, if any, of Article 6 of the Uniform Commercial Code as in force in any state in which the Purchased Assets are located and all other similar laws applicable to bulk sales and transfers.

**8.8** **Closing Of Financials.** Buyers shall cause the individual(s) acting as the chief financial officer of the Seller Facilities after the Effective Time or such other person(s) as may be responsible for financial closings and reconciliations (the "***Finance Team***") to complete (or take such action as shall be necessary for Buyers or Sellers to complete) the standardized closing of Sellers' financial records for the Seller Facilities through the Closing Date including, without limitation, the closing of general ledger account reconciliations (collectively, the "***Closing of Financials***"). Buyers shall cause the Finance Team to use their good faith efforts to complete the Closing of Financials by no later than the date which is thirty (30) days after the Closing Date. The Finance Team and other appropriate personnel shall be reasonably available to Sellers after the Closing Date as reasonably requested by Sellers.

**8.9** **Medicare Bad Debts.** Sellers shall be entitled to receive Medicare bad debt reimbursement associated with services furnished prior to the Effective Time ("***Sellers' Bad Debts***") upon receipt of the Notice of Program Reimbursement covering the Cost Report period in which the bad debt is claimed and

4844-3270-9764.4

to the extent for which it is allowed. Sellers shall have the right, in their sole discretion, to require that Buyers submit a claim for reimbursement to the CMS for a Sellers' Bad Debt on Buyers' cost report(s) for the period in which Sellers' Bad Debt becomes uncollectible by Sellers.

## ARTICLE IX- GENERAL PROVISIONS

**9.1**     **Survival**. The representations and warranties of the Sellers set forth herein shall not survive the Closing.

**9.2**     **Additional Assurances.** The provisions of this Agreement shall be self-operative and shall not require further agreement by the Parties except as may be herein specifically provided to the contrary; provided, however, at the request of a Party, the other Party or Parties shall execute such additional instruments and take such additional action as the requesting Party may deem necessary to effectuate this Agreement.  In addition and from time to time after the Closing Date, Sellers and Buyers shall each execute and deliver such other instruments of conveyance and transfer, and take such other actions as any Party may reasonably request, to more effectively convey and transfer full right, title and interest to, vest in, and place Buyers in legal and actual possession of the Purchased Assets.

**9.3**     **Consents, Approvals and Discretion.**  Except as herein expressly provided to the contrary, whenever this Agreement requires any consent or approval to be given by a Party or a Party must or may exercise discretion, such consent or approval shall not be unreasonably withheld, conditioned or delayed and such discretion shall be reasonably exercised.

**9.4**     **Legal Expenses.**  In the event a Party elects to incur legal expenses to enforce or interpret any provision of this Agreement by judicial proceedings, the prevailing Party will be entitled to recover such legal expenses in addition to any other relief to which the prevailing Party shall be entitled.

**9.5**     **Choice of Law; Venue.**  This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby (in contract or tort) shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to conflicts of law principles.

**9.6**     **Benefit, Assignment and Third Party Beneficiaries.**  Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the Parties and their respective legal representatives, successors and assigns; provided, however, that no Party may assign this Agreement without the prior written consent of the other Party except that Buyers may assign this Agreement and/or any of its rights hereunder to a wholly owned subsidiary of Buyers' Parent (***"Buyers Subsidiary"***), and Buyers may collaterally assign its rights, but not its obligations, under this Agreement to any party that provides funding for the transactions hereunder as additional security for Buyers' obligations to such party without the prior written consent of Sellers.  The Parties acknowledge that Buyers may assign ownership and title to certain of the Purchased Assets to certain designees of Buyers, such that more than one entity may own the Purchased Assets at Closing.  This Agreement is intended solely for the benefit of the Parties and is not intended to, and shall not, create any enforceable third party beneficiary rights.

**9.7**     **Cost of Transaction.**  Except as may be provided to the contrary elsewhere herein:  (a) Buyers shall pay the fees, expenses and disbursements incurred by Buyers and its agents, representatives, accountants and counsel thereof in connection with the subject matter hereof and any amendments hereto, together with the costs of any Title Commitments, Title insurance policies, Surveys, and environmental site assessments; and (b) Sellers shall pay the fees, expenses and disbursements incurred by Sellers and their agents, representatives, accountants and counsel thereof in connection with the subject matter hereof and any amendments hereto and all Transfer Taxes.

4844-3270-9764.4

30

**9.8**    **Waiver of Breach.**  The waiver by any Party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or any other provision hereof.  Any agreement on the part of either Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

**9.9**    **Notice.**  Any notice, demand or communication required, permitted or desired to be given hereunder shall be deemed effectively given when personally delivered with signed receipt, when delivered by facsimile or other electronic means with electronic confirmation of delivery (unless not delivered on a business day or delivered after 5:00 p.m. Eastern Time on a business day, in which case such delivery shall be deemed effective on the next succeeding business day), when delivered by overnight courier with signed receipt, or when delivered by registered United States mail, with postage prepaid and return receipt requested, addressed to the addresses below or to such other address as any Party may designate, with copies thereof to the respective counsel thereof as notified by such Party.

Buyers:    _____
           _____
           _____
           Attention: _____
           Facsimile No.: _____

With a Copy to:    _____
                   _____
                   _____
                   Attention: _____
                   Facsimile No.: _____

Sellers:    _____
            _____
            _____
            _____

With Copies to:    Waller Lansden Dortch & Davis, LLP
                   Nashville City Center
                   511 Union Street, Suite 2700
                   Nashville, TN 37219
                   Attention:  John Tishler and Brian Browder
                   Facsimile No.: (615) 244-6804

**9.10**    **Severability.**  In the event any provision of this Agreement is held to be invalid, illegal or unenforceable for any reason and in any respect, such invalidity, illegality, or unenforceability shall in no event affect, prejudice or disturb the validity of the remainder of this Agreement, which shall be and remain in full force and effect, enforceable in accordance with its terms.

**9.11**    **Interpretation.**  In the interpretation of this Agreement, except where the context otherwise requires, (a) "including" or "include" does not denote or imply any limitation, (b) "or" has the inclusive meaning "and/or", (c) "and/or" means "or" and is used for emphasis only, (d) "$" refers to United States dollars, (e) the singular includes the plural, and vice versa, and each gender includes each other gender, (f) captions or headings are only for reference and are not to be considered in interpreting this Agreement, (g) *"Section"* refers to a section of this Agreement, unless otherwise stated in this Agreement, (h) *"Exhibit"* refers to an exhibit to this Agreement (which is incorporated herein by reference), unless

otherwise stated in this Agreement, (i) *"Schedule"* refers to a schedule to this Agreement and incorporates any attachments thereto (which are incorporated herein by reference), unless otherwise stated in this Agreement, (j) all references to times are times in Boca Raton, Florida, (k) "day" refers to a calendar day unless expressly identified as a "business day," which means any day that is not a Saturday, Sunday, or official federal holiday in the United States, and (l) "made available to Buyers" or similar phrases means information included in a virtual data room maintained by Houlihan Lokey to which Buyers and their representatives have had access as of five (5) business days prior to the Effective Date or Closing Date, as applicable.

**9.12    Entire Agreement, Amendments and Counterparts.**  This Agreement supersedes all previous contracts, agreements and understandings between the Parties regarding the subject matter hereof and constitutes the entire agreement existing between or among the Parties respecting the subject matter hereof and no Party shall be entitled to benefits other than those specified herein.  As between or among the Parties, no oral statements or prior written material not specifically incorporated herein shall be of any force and effect, and neither Party is relying on any such oral statements or prior written material.  All prior representations or agreements, whether written or oral, not expressly incorporated herein are superseded and no changes in or additions to this Agreement shall be recognized unless and until made in writing and signed by all Parties.  This Agreement may be executed in counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument.  Signatures received via facsimile or other electronic transmission shall be accepted as originals.  Notwithstanding any oral agreement or course of conduct of the Parties or their Representatives to the contrary, no Party shall be under any legal obligation to enter into or complete the transactions contemplated hereby unless and until this Agreement shall have been executed and delivered by each Party.

**9.13    Personal Liability.**  This Agreement shall not create or be deemed to create or permit any personal liability or obligation on the part of any direct or indirect equity holder of any Party or any officer, director, employee, investor or other Representative of any Party.

**9.14    Disclosure Generally.**  Notwithstanding anything to the contrary contained in the Article III Schedules or in this Agreement, the information and disclosures contained in any Article III Schedule shall be deemed to be disclosed and incorporated by reference in any other Schedule as though fully set forth in such Article III Schedule for which applicability of such information and disclosure is reasonably apparent on its face.  The fact that any item of information is disclosed in any Article III Schedule shall not be construed to mean that such information is required to be disclosed by this Agreement.  Such information and the dollar thresholds set forth herein shall not be used as a basis for interpreting the terms "material" or *"Material Adverse Effect"* or other similar terms in this Agreement.

**9.15    Time of Essence.**  Time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the Parties have caused this Asset Purchase Agreement to be executed by their authorized officers as of the Effective Date.

**SELLERS' PARENT:**

**PROMISE HEALTHCARE, INC.**

By:_____
Name:_____
Title:_____

**SELLERS:**

**BOSSIER LAND ACQUISITION CORP., a Florida corporation**

By:_____
Name:_____
Title:_____

**PROMISE HEALTHCARE OF LOUISIANA, INC., a Louisiana corporation**

By:_____
Name:_____
Title:_____

**PROMISE HOSPITAL OF ASCENSION, INC., a Florida corporation dba Promise Hospital Baton Rouge**

By:_____
Name:_____
Title:_____

**PROMISE PROPERTIES OF SHREVEPORT, LLC a Louisiana limited liability company**

By:_____
Name:_____
Title:_____

**PROMISE HEALTHCARE OF LOUISIANA, INC.,**
**a Louisiana corporation**

By:_____
Name:_____
Title:_____


**PROFESSIONAL REHABILITATION HOSPITAL,**
**L.L.C., a Louisiana limited liability company dba**
**Promise Hospital of Miss Lou**

By:_____
Name:_____
Title:_____


**PROMISE HOSPITAL OF SALT LAKE, INC., a**
**Louisiana corporation**

By:_____
Name:_____
Title:_____


**PROMISE HOSPITAL OF EAST LOS ANGELES,**
**L.P., a California limited partnership dba Suburban**
**Medical Center**

**By: Promise Healthcare of California, Inc., general**
**partner**

By:_____
Name:_____
Title:_____


**PROMISE HOSPITAL OF PHOENIX, INC., a**
**Florida corporation**

By:_____
Name:_____
Title:_____


**PROMISE HOSPITAL OF WICHITA FALLS,**
**INC., a Texas corporation**

By:_____
Name:_____

Title:_____

**PROFESSIONAL REHABILITATION HOSPITAL, L.L.C., a Louisiana limited liability company dba Promise Hospital of Miss Lou**

By:_____
Name:_____
Title:_____

**PROMISE HOSPITAL OF OVERLAND PARK, INC., a Kansas corporation**

By:_____
Name:_____
Title:_____

**PROMISE HOSPITAL OF VICKSBURG INC., a Louisiana corporation**

By:_____
Name:_____
Title:_____

**PROMISE SKILLED NURSING FACILITY OF WICHITA FALLS, INC., a Texas corporation**

By:_____
Name:_____
Title:_____

**PROMISE SKILLED NURSING FACILITY OF OVERLAND PARK, INC., a Kansas corporation**

By:_____
Name:_____
Title:_____

**BUYERS' PARENT:**

_____

4844-3270-9764.4

By:_____
Name:_____
Title:_____

**BUYERS:**

_____

By:_____
Name:_____
Title:_____

**EXHIBIT 1**

| Seller | Applicable Seller Facility | Applicable State |
|---|---|---|
| Bossier Land Acquisition Corp., a Florida corporation<br><br>Promise Healthcare of Louisiana, Inc., a Louisiana corporation | Promise Hospital of Louisiana - Bossier City | Louisiana |
| Promise Hospital of Ascension, Inc., a Florida corporation  dba Promise Hospital Baton Rouge | Promise Hospital Baton Rouge (Ascension) | Louisiana |
| Promise Properties of Shreveport, LLC, a Louisiana limited liability company<br><br>Promise Healthcare of Louisiana, Inc., a Louisiana corporation | Promise Hospital of Louisiana - Shreveport | Louisiana |
| Professional Rehabilitation Hospital, L.L.C., a Louisiana limited liability company dba Promise Hospital of Miss Lou | Promise Hospital of Miss Lou | Louisiana |
| Promise Hospital of Salt Lake, Inc., a Louisiana corporation | Promise Hospital of Salt Lake | Utah |
| Promise Hospital of East Los Angeles, L.P., a California limited partnership dba Suburban Medical Center | Promise Hospital of East LA - Suburban Medical Center | California |
| Promise Hospital of Phoenix, Inc., a Florida corporation | Promise Hospital of Phoenix | Arizona |
| Promise Hospital of Wichita Falls, Inc., a Texas corporation | Promise Hospital of Wichita Falls | Texas |
| Professional Rehabilitation Hospital, L.L.C., a Louisiana limited liability company dba Promise Hospital of Miss Lou | Promise Hospital of Miss Lou | Louisiana |

| | | |
|---|---|---|
| Promise Hospital of Overland Park, Inc., a Kansas corporation | Promise Hospital of Overland Park | Kansas |
| Promise Hospital of Vicksburg, Inc., a Louisiana corporation | Promise Hospital of Vicksburg | Mississippi |
| Promise Skilled Nursing Facility of Wichita Falls, Inc., a Texas corporation | Promise Skilled Nursing Facility of Wichita Falls | Texas |
| Promise Skilled Nursing Facility of Overland Park, Inc., a Kansas corporation | Promise Skilled Nursing Facility of Overland Park | Kansas |

**EXHIBIT 2**

| Buyer | Applicable Seller Facility |
|---|---|
|  |  |
|  |  |
|  |  |

**EXHIBIT 3**

**Reserved**

**EXHIBIT 4**

**Reserved**

## EXHIBIT 5

**Reserved**

**<u>EXHIBIT 6</u>**

**Form of Bill of Sale and Assignment**

4844-3270-9764.4

**EXHIBIT 7**

Form of Assignment and Assumption Agreement

4844-3270-9764.4

## EXHIBIT 8

**Form of Transition Services Agreement**

## EXHIBIT 9

Form of Drug Enforcement Administration (DEA) Power of Attorney

## EXHIBIT 10

**Form of Special Warranty Deed**

**EXHIBIT 2 to Bidding Procedures Order**

(Bidding Procedures)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

----------------------------------------------x
:
In re:                                        :   Chapter 11
                                              :
PROMISE HEALTHCARE GROUP, LLC, *et al.*,[1]   :   Case No. 18-12491 (CSS)
                                              :
Debtors.                                      :   (Jointly Administered)
                                              :
----------------------------------------------x   Related D.I.: 374, ___

## BIDDING PROCEDURES FOR THE SALE OF
## THE REMAINING ASSETS

The above-captioned debtors and debtors-in-possession (collectively, the "***Debtors***")[2]

have filed chapter 11 cases pending in the United States Bankruptcy Court for the District of

Delaware (the "***Bankruptcy Court***"), jointly administered under Case No. 18-12491 (CSS).

On [_____], the United States Bankruptcy Court for the District of Delaware (the

"***Bankruptcy Court***") entered the *Order: (I)(A)   Approving Bidding Procedures and Bid*

*Protections Respecting the Remaining Assets, (B) Permitting Debtors to Designate Stalking*

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Professional Rehabilitation Hospital, L.L.C. (5340), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179), Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc. (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc. (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), St. Alexius Hospital Corporation #1 (2766), St. Alexius Properties, LLC (4610), Success Healthcare 1, LLC (6535), Success Healthcare 2, LLC (8861), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766).  The mailing address for the Debtors, solely for purposes of notices and communications, is 999 Yamato Road, 3rd FL, Boca Raton, FL  33431.

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

EAST\164463932.4

*Horse Purchaser(s) and Grant Bid Protections, (C) Scheduling a Hearing to Consider Approval of the Sale of Assets, (D) Approving Form and Manner of Notice of Sale, and (E) Granting Related Relief; and (II)(A) Authorizing and Approving the Sale of Substantially All Assets of Certain of the Debtors Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [D.I. ___] (the "**Bidding Procedures Order**"), pursuant to which the Bankruptcy Court approved the following procedures (the "**Bidding Procedures**") for the sale of the Remaining Assets. Capitalized terms used but not defined in these Bidding Procedures have the meanings given to them in the Bidding Procedures Order. These Bidding Procedures set forth the process by which the Debtors are authorized to conduct an auction (the "**Auction**") for one or more sales of the Remaining Assets in accordance with the Bidding Procedures Order.

1.  **Submissions to the Debtors.**

    All submissions to the Debtors required to be made under these Bidding Procedures must be directed to each of the following persons unless otherwise provided (collectively, the "**Bid Notice Parties**"):

    a.  **Debtors' Counsel.** John Tishler & Brian Browder, Waller Lansden Dortch & Davis, LLP, Nashville City Center, 511 Union Street, Suite 2700, Nashville, TN 37219, john.tishler@wallerlaw.com, brian.browder@wallerlaw.com; and Stuart Brown, Kaitlin MacKenzie Edelman & Matthew Sarna, DLA Piper LLP (US), 1201 North Market Street, Suite 2100, Wilmington, Delaware 19801, stuart.brown@dlapiper.com, kaitlin.edelman@dlapiper.com, matthew.sarna@dlapiper.com;

    b.  **Debtors' Financial Advisor and Investment Banker.** Matthew Ryan, Houlihan Lokey Capital, Inc., 123 North Wacker Drive, 4th Floor, Chicago, Illinois 60606, mryan@hl.com.

    c.  **Counsel to the DIP Agent.** Brian I. Swett, McGuire Woods LLP, 77 West Wacker Drive, Suite 4100, Chicago, Illinois 60601-1818, bswett@mcguirewoods.com.

2

d. **Counsel to the Official Committee of Unsecured Creditors**. Andrew H. Sherman & Boris I. Mankovetskiy, Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey 07102, asherman@sillscummis.com, bmankovetskiy@sillscummis.com; and Brad Sandler & Colin Robinson, Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, Suite 1700, Wilmington, Delaware 19801, bsandler@pszjlaw.com, crobinson@pszjlaw.com.

2. **Potential Bidders.**

a. The Debtors and their financial advisors have identified, and may in the future identify, parties they believe potentially may be interested in purchasing (and potentially may have the financial resources necessary to purchase) the Remaining Assets. To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a sale for any or all of the Remaining Assets (each, a "***Potential Bidder***") must deliver or have previously delivered an executed confidentiality agreement on terms acceptable to the Debtors (a "***Confidentiality Agreement***"), in consultation with the Consultation Parties.

3. **Qualified Bidders.**

a. A "***Qualified Bidder***" is a Potential Bidder: (i) whose most current audited and latest unaudited financial statements (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Remaining Assets, (i) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors and their advisors, in consultation with the Consultation Parties, (ii) a written commitment acceptable to the Debtors and their advisors, in consultation with the Consultation Parties, of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the proposed transaction (collectively, the "***Financials***"), demonstrate the financial capability to consummate a sale for any portion of the Remaining Assets, as determined in the Debtors' business judgment (in consultation with the Consultation Parties); and (ii) whose Bid (as defined below) is a Qualified Bid (as defined below). Promptly after the Bid Deadline (defined below), the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder, and shall provide a copy of each Qualified Bid to counsel to the DIP Agent, and counsel to the Committee. Any Designated Stalking Horse Bidder shall be deemed a Qualified Bidder that has submitted a Qualified Bid at all times.

b. For the avoidance of doubt, two or more Potential Bidders may submit a Bid for any or all of the Remaining Assets, provided that such Bid(s), when taken as a whole (collectively, a "***Joint Bid***"), is determined by the Debtors, in consultation with the Consultation Parties and in accordance with Section 3(a) of the Bidding Procedures, to constitute a Qualified Bid; provided, however, that any Joint Bid must comply with section 363(n) of the Bankruptcy Code and Potential Bidders must seek the Debtors' permission before they contact each other. The Debtors

3

shall consult with the Consultation Parties regarding any request for permission to contact another Potential Bidder. In addition, any Potential Bidder may submit a Bid for any or all of the Remaining Assets. The Debtors, in consultation with the Consultation Parties and in accordance with Section 3(a) of the Bidding Procedures, may thereafter determine the Bid constitutes a Qualified Bid.

c.      If any Potential Bidder is determined by the Debtors, in consultation with the Consultation Parties, not to be a Qualified Bidder, the Debtors will refund such Potential Bidder's Deposit (as defined below) and all accumulated interest thereon on or within three (3) Business Days after the Bid Deadline.

d.      Between the date the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, the Debtors, in consultation with the Consultation Parties, may discuss, negotiate, or seek clarification and / or improvement of any Qualified Bid from a Qualified Bidder. Without the written consent of the Debtors (in consultation with the Consultation Parties), a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; provided that any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures. Bids must remain open offers capable of being accepted until two (2) Business Days after the closing of the sale to a person or entity other than the applicable Qualified Bidder.

e.      Any disputes related to these Bidding Procedures shall be resolved by the Bankruptcy Court.

4.      **Due Diligence.**

a.      **Diligence Provided to Potential Bidders.**

Only Potential Bidders that have entered into a Confidentiality Agreement shall be eligible to receive due diligence information and access to the Debtors' electronic data room and to additional non-public information regarding the Sellers. **No Potential Bidder will be permitted to conduct any due diligence prior to entering into a Confidentiality Agreement.** The Debtors will provide to each Potential Bidder that has entered into a Confidentiality Agreement reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request, and the Debtors shall post written

4

due diligence provided to Potential Bidders to the Debtors' electronic data room. For all Potential Bidders, including any Designated Stalking Horse Bidder, the due diligence period will end on the Bid Deadline and subsequent to the Bid Deadline the Debtors shall have no obligation to furnish any due diligence information.

The Debtors shall not furnish any confidential information relating to the Remaining Assets, the Debtors' liabilities, or the sale of any or all of the Remaining Assets ("*Confidential Sale Information*") to any person, except to a Potential Bidder that has entered into a Confidentiality Agreement or to such Potential Bidder's duly-authorized representatives, in each case, to the extent provided in the applicable Confidentiality Agreement or in a subsequent written direction from the Potential Bidder. The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; provided that, in consultation with the Consultation Parties, the Debtors may decline to provide such information to Potential Bidders who, at such time and in the Debtors' business judgment have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the sale of all or a portion of the Remaining Assets.

In consultation with the Consultation Parties, the Debtors may withhold from Potential Bidders any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure to a Potential Bidder who the Debtors determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not approved by the Debtors as a Potential Bidder.

**All due diligence requests must be directed to:**

Scott Kremeier, SKremeier@HL.com; and Matt Ryan, MRyan@HL.com.

5

b. **Diligence Provided by Potential Bidders.**

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of the Potential Bidder to consummate a transaction for all or a portion of the Remaining Assets. Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine (in consultation with the Consultation Parties) that such Potential Bidder is not a Qualified Bidder or that a bid made by such Potential Bidder is not a Qualified Bid.

The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures. Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids during the bidding process or otherwise in connection with the Chapter 11 Cases or in accordance with the terms of any applicable confidentiality agreement.

Notwithstanding the foregoing and the provisions contained in any applicable Confidentiality Agreement, the Debtors and the Debtors' advisors may disclose confidential information: (a) with the prior written consent of such bidder and the Debtors; (b) to the counsel to the Committee, (c) to the counsel to the DIP Agent, and (d) as otherwise required or allowed by any applicable confidentiality agreement with respect to a particular Potential Bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

EAST\164463932.4

5.    **Bid Requirements.**

A proposal, solicitation, or offer (each, a "***Bid***") by a Potential Bidder that is submitted in writing and satisfies each of the following requirements (collectively, the "***Bid Requirements***"), as determined by the Debtors in their business judgment (after consultation with the Consultation Parties) shall constitute a "***Qualified Bid***." The form of a Bid must include a proposed asset purchase agreement (a "***Bid Purchase Agreement***") duly executed by the Potential Bidder and must also include a redline comparing the Bid Purchase Agreement to the template asset purchase agreement filed with the Motion and attached to this Order as **Exhibit 1**. The Bid Requirements are as follows:

    i.    **Assets.** Each Bid must clearly state (i) which Remaining Assets the Potential Bidder is offering to purchase and (ii) whether the Potential Bidder intends to operate all or a portion of the Debtors' business as a going concern, or to liquidate any portion of the business.

    ii.    **Assumption of liabilities.** Each Bid must expressly identify the liabilities it proposes to (i) assume or (ii) satisfy with consideration, including cure amounts.

    iii.    **Purchase Price.** Each Bid must clearly set forth the purchase price to be paid (the "***Purchase Price***"). The Bid must propose a Purchase Price for the subject Remaining Assets, including any assumption of liabilities. A Bid with respect to the Remaining Assets that are the subject of a Designated Stalking Horse Bidder's bid, must exceed the value of such Designated Stalking Horse Bidder's bid by: (a)(i) the amount of the Bid Protections and (ii) at least $100,000; or (b) such other combination of cash, assumed liabilities, and/or excluded assets as the Debtors, in consultation with the Consultation Parties, may determine to exceed the value to the Debtors' estates from the Designated Stalking Horse Bidder's bid by at least $100,000 (a "***Minimum Bid***"); provided, however, in the event that a Bid is for a combination of Remaining Assets different from those set forth in a Designated Stalking Horse Bidder's bid, such consideration shall reasonably represent a premium when considered in respect of the alternatives for the Debtors' assets, as determined by the Debtors in consultation with the Consultation Parties; provided, further, that in determining the value of any Bid, the Debtors, in consultation with the Consultation Parties, will not be limited to evaluating the dollar value of the consideration but may also consider other factors, including, without limitation, the speed, certainty, and value of the proposed transaction. Subject to the immediately preceding sentence,

the Purchase Price contained in a Bid may be structured in whatever form the Potential Bidder desires (*e.g.*, a Potential Bidder may propose an all cash Bid).

    iv.    **Deposit.** With a Bid, a Potential Bidder must submit by wire transfer of immediately available funds, a cash deposit in the amount not less than 5% of the aggregate Purchase Price set forth in the Bid, to be held in a noninterest-bearing escrow account to be identified and established by the Debtors (the "***Deposit***").

    v.    **Same or better terms.** The evaluation of each Bid will consider the terms and conditions to the Debtors relative to the terms and conditions of other Bids, as determined by the Debtors (in consultation with the Consultation Parties). Each Bid must be on terms that are not more burdensome to the Debtors than the terms of a prior Bid, including any bid submitted by a Designated Stalking Horse Bidder, as determined by the Debtors in consultation with the Consultation Parties. Each Bid must include (a) duly executed, non-contingent transaction documents necessary to effectuate the sale contemplated by the Bid, (b) a schedule of executory contracts and unexpired leases proposed to be assumed by the Debtors and assigned and sold to the Potential Bidder ("***Assumed Contracts***"), (c) a copy of the purchase agreement representing the Bid clearly marked to show all changes requested by the Potential Bidder from the template asset purchase agreement filed with the Motion or applicable Designated Stalking Horse Bidder's asset purchase agreement, including those related to the respective Purchase Price and assets to be acquired by such Potential Bidder, (d) all other material documents integral to such bid and (e) a written assurance or commitment demonstrating to the satisfaction of the Debtors (in consultation with the Consultation Parties) that the Potential Bidder will be able to close the transaction proposed in its Bid on the terms and conditions set forth therein (the "***Qualified Bid Documents***").

    vi.    **Contingencies; No financing or diligence outs.** A Bid shall not be conditioned on (a) obtaining financing, (b) shareholder, board of directors, or other internal approval, or (c) the outcome or completion of a due diligence review by the Potential Bidder. Notwithstanding the foregoing, a Bid may be subject to (x) the accuracy at the closing of the sale of specified representations and warranties and (y) the satisfaction at the closing of the sale of specified conditions, which shall not be more burdensome to the Debtors, as determined by the Debtors (in consultation with the Consultation Parties), than those set forth in a prior Bid and/or any bid submitted by a Designated Stalking Horse Bidder.

    vii.    **Identity.** Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating a sale of the Remaining Assets), and the complete terms of any such participation. Under no circumstances shall any undisclosed principals, equity holders, or

EAST\164463932.4

financial backers be associated with any Bid. Each Bid must also include contact information for the specific persons and counsel whom the Debtors and their advisors should contact regarding such Bid. Each Bid must also disclose any past or present connections or agreements with the Debtors, any other Potential Bidder and its affiliates, and/or any officer or director of the foregoing (including any current officer or director of the Debtors).

viii.     **Demonstrated financial capacity.** A Potential Bidder must have, in the Debtors' business judgment (in consultation with the Consultation Parties), the necessary financial capacity to consummate the proposed transactions required by its Bid and provide adequate assurance of future performance under all Assumed Contracts to be assumed by such Bid. Each Bid must be accompanied by reasonable evidence of the Potential Bidder's ability to operate the business related to the applicable Remaining Assets and include a packet of information, including financial information that will be provided to the non-Debtor counterparties to Assumed Contracts sufficient to demonstrate adequate assurance of future performance.

ix.     **Committed financing.** To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include either executed unconditional committed financing from a qualified source or other assurance, documented to the satisfaction of the Debtors (in consultation with the Consultation Parties), which demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid. Such funding commitments, assurance or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors (in consultation with the Consultation Parties).

x.     **Binding and irrevocable.** A Potential Bid must include a signed writing stating that: (i) the Potential Bid is irrevocable until two (2) Business Days after the closing of the sale to a person or entity other than the Potential Bidder; and (ii) the Potential Bidder agrees to serve as a Backup Bidder upon the terms and conditions set forth in the Bidding Procedures, if such Potential Bidder is not a Successful Bidder.

xi.     **Expenses; Disclaimer of fees.** Each Potential Bid (other than a bid by a Designated Stalking Horse Bidder) must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation or bid protection. For the avoidance of doubt, no Potential Bidder (other than any Designated Stalking Horse Bidder) will be permitted to request, or be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation or bid protection, and by submitting its Bid is

9

agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

xii.    **Authorization**. Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors in consultation with the Consultation Parties) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

xiii.    **As-Is, Where-Is**. Each Bid must include a written acknowledgement and representation that the Potential Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Remaining Assets prior to submitting the Bid; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Remaining Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Remaining Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid.

xiv.    **Adherence to Bidding Procedures**. By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction. Each Bid must expressly state that the Potential Bidder agrees to serve as a Backup Bidder (as defined below) if such bidder's Qualified Bid is selected as the next highest or otherwise next best bid after the Successful Bid.

xv.    **Regulatory Approvals and Covenants**. A Bid must set forth each regulatory and third-party approval needed to consummate the transaction contemplated by such Bid and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following the Bid Deadline, those actions the Potential Bidder will take to ensure receipt of such approvals as promptly as possible). A Bid must also state that all necessary filings under applicable regulatory, antitrust, and other laws will be made and that payment of the fees associated therewith shall be made by the Potential Bidder. Each Qualified Bid must provide that the Potential Bidder, if successful, will either (i) assume the Debtors' Medicare and Medicaid provider agreements or (ii) obtain its own, in each instance within a timeframe acceptable to the Debtors in consultation with the Consultation Parties.

xvi.    **Consent to Jurisdiction**. Each Potential Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the

Auction, the construction and enforcement of these Bidding Procedures, the Sale documents, and the closing of the sale, as applicable.

xvii.    **Bid Deadline.** Each Bid must be transmitted via email (in .pdf or similar format) as to be **actually received** on or before **February 19, 2019 at 12:00 p.m.** (the "***Bid Deadline***") by the Bid Notice Parties.

xviii.    **The SWC Properties.** Any bidder seeking to purchase Promise Hospital of Wichita Falls, Promise Skilled Nursing Facility of Wichita Falls (the "***Wichita Falls Properties***"), Promise Hospital of Overland Park, Promise Skilled Nursing Facility of Overland Park (the "***Overland Park Properties***"), and Promise Hospital of Dallas (the "***Dallas Property***," and, together with the Wichita Falls Properties and the Overland Park Properties, the "***SWC Properties***") should consider the *Order Approving the Amended Term Sheet Respecting Extension of Leases Between (I) Cam-Mid America, LLC and Promise Hospital of Wichita Falls, Inc., Promise Skilled Nursing Facility of Wichita Falls, Inc., Promise Hospital of Overland Park, Inc., and Promise Skilled Nursing Facility of Overland Park, Inc.; and (II) Cam-Dallas, LLC and Promise Hospital of Dallas, Inc.* [D.I. 333] signed on December 19, 2018.

The Debtors reserve the right, in consultation with the Consultation Parties, to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid. The Debtors, in consultation with the Consultation Parties, may accept a single Qualified Bid or multiple Bids for non-overlapping material portions of the Remaining Assets that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid. The Debtors, in consultation with the Consultation Parties, may also permit otherwise Qualified Bidders who submitted Bids by the Bid Deadline for a material portion of the Remaining Assets but who are not identified as a component of a single Qualified Bid consisting of multiple Bids, to participate in the Auction and to submit higher and/or otherwise better Bids that in subsequent rounds of bidding may be considered, together with other Bids for non-overlapping portions of the Debtors' assets, as part of such a single Qualified Bid.

11

6.      **Auction.**

If the Debtors receive two or more Qualified Bids for the same Remaining Assets (including the bid of any Designated Stalking Horse Bidder), the Debtors will conduct an Auction with respect to the applicable Remaining Assets to determine (in consultation with the Consultation Parties) the Successful Bidder(s) for the Remaining Assets. If the Debtors do not receive more than one Qualified Bid (including any bid submitted by a Designated Stalking Horse Bidder) for the same Remaining Assets, the Debtors may not conduct an Auction for such Remaining Assets and upon the conclusion of the Auction shall designate the sole Bid as the Successful Bid for the applicable Remaining Assets.

Prior to the commencement of the Auction, the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid, as determined in the Debtors' business judgment (the "*Baseline Bid*") for the Remaining Assets, after consultation with the Consultation Parties. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors (in consultation with the Consultation Parties) reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, which may include, among other things: (a) the number, type, and nature of any changes to the template asset purchase agreement (or other applicable purchase agreement), if any, requested by the Qualified Bidder, including the type and amount of Remaining Assets sought to be acquired and obligations sought to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close the applicable purchase of the Remaining Assets and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; (e) the tax consequences of such Qualified Bid, and (f) the number of transactions that the Debtors have relating to its operating facilities

12

(collectively, the *"Bid Assessment Criteria"*). Only a Designated Stalking Horse Bidder, if one is designated, and other Qualified Bidders will be entitled to make any subsequent bids at the Auction.  At least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction and all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder in attendance at the Auction in person.

The Auction, if necessary, will be conducted on **February 21, 2019 at 10:00 a.m. (prevailing Eastern time)** at the offices of DLA Piper LLP, 1201 North Market Street, Suite 2100, Wilmington, Delaware 19801, or at such other time and location as designated by the Debtors, in consultation with the Consultation Parties. The Auction, if necessary, shall be conducted in a timely fashion according to the following procedures:

a.    **The Debtors Shall Conduct the Auction.**

The Debtors and their professionals shall direct and preside over the Auction. At the start of the Auction, the Debtors shall generally describe the terms of each Baseline Bid. All incremental Bids made thereafter shall be Overbids (defined below) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Qualified Bids. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, the Successful Bid(s), and Backup Bid(s).

The Auction will be conducted openly and all creditors will be permitted to attend. The Qualified Bidders and any Designated Stalking Horse Bidder may appear at the Auction in person or through duly authorized representatives.

EAST\164463932.4

b.    **Terms of Overbids.**

"*Overbid*" means any bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid. Each Overbid must comply with the following conditions:

(i)    **Minimum Overbid Increment**. The initial Overbid, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the applicable Baseline Bid by an incremental amount that is not less than $100,000 (a "*Minimum Overbid Increment*").

(ii)   **Conclusion of Each Overbid Round**. Upon the solicitation of each round of applicable Overbids, the Debtors, in consultation with the Consultation Parties, may announce a deadline (as the Debtors may, in their reasonable business judgment, after consultation with the Consultation Parties, extend from time to time, the "*Overbid Round Deadline*") by which time any Overbids must be submitted to the Debtors.

(iii)  **Overbid Alterations**. An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior applicable Bid or Overbid, as determined in the Debtors' business judgment (in consultation with the Consultation Parties), but shall otherwise comply with the terms of these Bidding Procedures. Any Overbid must comply with the conditions for a Qualified Bid.

(iv)   **Announcing Highest Bid**. Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors have identified (in consultation with the Consultation Parties) in the initial applicable Overbid round, an Overbid or Overbids as being higher or otherwise better than the applicable Baseline Bid(s) for the Remaining Assets, or in subsequent rounds, the Overbid(s) previously designated by the Debtors (after consultation with the Consultation Parties) as the prevailing highest or otherwise best Bid for the Remaining Assets (the "*Prevailing Highest Bid*"). The Debtors shall describe to all Qualified Bidders the material terms of any new Overbids designated by the Debtors as the Prevailing Highest Bid(s) as well as the value attributable by the Debtors to such Prevailing Highest Bid(s).

c.    **Consideration of Overbids.**

The Debtors reserve the right, in their discretion (in consultation with the Consultation Parties) to adjourn the Auction one or more times to, among other things: (i) facilitate

14

discussions among the Debtors and any Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their business judgment (in consultation with the Consultation Parties), may require, including that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount; and (iv) to provide the Debtors with an opportunity to consider (in consultation with the Consultation Parties) how to value each Overbid. The full amount of the Bid Protections shall be included as value of any bid made by any Designated Stalking Horse Bidder in each round of bidding at the Auction, including for purposes of comparing the value of a Qualified Bidder's Overbid to the bid of such Designated Stalking Horse Bidder in any round of bidding.

d. **Closing the Auction.**

(i)     The Auction shall continue until there is only one Bid or combination of Bids, as applicable, that the Debtors determine, in their business judgment (in consultation with the Consultation Parties), is the highest or otherwise best Bid(s) for the Remaining Assets. Such Bid(s), as applicable, shall be declared the "*Successful Bid(s),*" and such Qualified Bidder(s) the "*Successful Bidder(s),*" at which point the Auction will be closed. The Debtors shall notify the Qualified Bidders of the Successful Bid(s) within one Business Day following such selection. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then prevailing highest Bid. Such acceptance by the Debtors, in consultation with the Consultation Parties, of the Successful Bid is conditioned upon approval by the Bankruptcy Court of the Successful Bid.

(ii)    Subject to the Fiduciary Out in section 12 of these Bidding Procedures and as may be otherwise required by the Court, the Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely.

(iii)   As soon as reasonably practicable after closing the Auction, the Debtors shall file on the docket, but not serve, a notice with the Court identifying the Successful Bidder(s) and Backup Bidder(s).

15

e.    **No Collusion; Good-Faith Offer.**

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Bid is a good-faith offer and it intends to consummate the transaction contemplated by such Bid if selected as the Successful Bidder(s). All Potential Bidders and all Qualified Bidders will immediately disclose to the Debtors, the United States Trustee, the DIP Agent, and the Committee any discussions regarding employment of or offers to retain or employ any officer or insider of the Debtors.

7.    **Backup Bidder.**

a.    Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder(s) with the next-highest or otherwise second-best Bid(s) for all or a portion of the Remaining Assets at the Auction, as determined by the Debtors in their discretion and in consultation with the Consultation Parties (the "*Backup Bid(s)*"), shall be required to serve as a backup bidder (the "*Backup Bidder(s)*"), and each Qualified Bidder(s) shall agree and be deemed to agree to be the Backup Bidder(s) if so designated by the Debtors.

b.    The identity of the Backup Bidder(s) and the amount and material terms of the Backup Bid(s) shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder(s). The Backup Bidder(s) shall be required to keep the Backup Bid(s) open and irrevocable, until the closing of the sale with the Successful Bidder(s). Each Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the Successful Bidder(s) and shall thereafter be returned within five (5) Business Days.

c.    If a Successful Bidder(s) fails to consummate the approved transactions contemplated by its Successful Bid(s), the Debtors may select (in consultation with the Consultation Parties) the applicable Backup Bidder(s) as the Successful Bidder(s), and such Backup Bidder(s) shall be deemed a Successful Bidder(s) for all purposes. The Debtors will be authorized, but not required, in consultation with the Consultation Parties, to consummate all transactions contemplated by the Backup Bid(s) without further order of the Bankruptcy Court or notice to any party (other than the Consultation Parties). In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors. The Debtors specifically reserve the right to seek all available remedies against any defaulting Successful Bidder(s), including with respect to specific performance.

16

d.   Notwithstanding anything to the contrary in this section or the Bidding Procedures Order, if any Designated Stalking Horse Bidder is required to serve as Backup Bidder, the terms and conditions of such service shall be governed by such Designated Stalking Horse Bidder's final Overbid (including such Designated Stalking Horse Bidder's asset purchase agreement, as the same may have been amended or otherwise revised during the Auction).

8.    **Reservation of Rights.**

Without prejudice to the rights of any Designated Stalking Horse Bidder, or the rights of any DIP Agent in respect of any sale-related milestones set forth in the Debtors' debtor-in-possession credit agreement, the Debtors reserve their rights to modify these Bidding Procedures in their business judgment (in consultation with the Consultation Parties) in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Remaining Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any and all bids or Bids.

9.    **Sale Hearing.**

A hearing to consider approval of the Sale of the Remaining Assets to the Successful Bidder(s) (or to approve the sale of the Remaining Assets to a Designated Stalking Horse Bidder, if one is designated, if no Auction is held) (the "*Sale Hearing*") is currently proposed to be scheduled to take place on **February 26, 2019 at 1:00 p.m. (prevailing Eastern time)**, before the Honorable Christopher S. Sontchi, at the Bankruptcy Court, 824 Market Street, 5th Floor, Courtroom No. 6, Wilmington, Delaware 19801.

**The Sale Hearing may be continued to a later date by the Debtors, in consultation with the Consultation Parties, by sending notice prior to, or making an announcement at,**

17

the Sale Hearing. No further notice of any such continuance will be required to be provided to any party (including to any Designated Stalking Horse Bidder).

At the Sale Hearing, the Debtors shall present the Successful Bid(s) to the Bankruptcy Court for approval.

**10.    Bid Protections**.

To provide an incentive and to compensate any Designated Stalking Horse Bidder for performing the substantial due diligence and incurring the expenses necessary and entering into a corresponding asset purchase agreement, with the knowledge and risk that arises from participating in the sale and subsequent bidding process, the Debtors have agreed to pay any Designated Stalking Horse Bidder, under the conditions and in the amount set forth in the Bidding Procedures Order:

> **Bid Protections.** Pursuant to the terms of the Bidding Procedures Order and these Bidding Procedures, and in accordance with the Stalking Horse Objection Process, in the event any Designated Stalking Horse Bidder is not the Successful Bidder for the subject Remaining Assets (or otherwise does not purchase the subject Remaining Assets as a Backup Bidder) and is not in default under the applicable asset purchase agreement, the Designated Stalking Horse Bidder is to be provided an expense reimbursement for its actual, reasonable and documented expenses not to exceed 1.5% of the Designated Stalking Horse Bidder's Purchase Price and a break-up fee in an amount not to exceed 3% of the Designated Stalking Horse Bidder's Purchase Price.

Subject to the Bidding Procedures Order and the Stalking Horse Objection Process, the Debtors have agreed that their obligations to pay the Bid Protections from the consideration received from the consummation of a transaction with a Successful Bidder that is not a Designated Stalking Horse Bidder, shall survive termination of any Designated Stalking Horse Bidder's asset purchase agreement, and shall be payable under the terms of such asset purchase agreement and the Bidding Procedures Order.

EAST\164463932.4

Any Designated Stalking Horse Bidder shall have standing to appear and be heard on all issues related to the Auction, including the right to object to the conduct of the Auction and interpretation of these Bidding Procedures.

11.     **Return of Deposit.**

The Deposit of the Successful Bidder(s) shall be applied to the Purchase Price of the transaction at closing. The Deposits for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtors in their business judgment and shall be returned (other than with respect to the Successful Bidder(s) and the Backup Bidder(s)) on or within five (5) Business Days after the Auction.

If any Successful Bidder fails to consummate the sale because of a breach by such Successful Bidder, the Debtors will not have any obligation to return the applicable Deposit deposited by the Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the sale with the applicable Backup Bidder(s) without the need for an additional hearing or order of the Bankruptcy Court, in which case the Backup Bidder's Deposit shall be applied to the Purchase Price.

12.     **Fiduciary Out.**

Nothing in these Bidding Procedures shall require the Debtors' boards of directors to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent the Debtors' boards of directors determine, based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or their fiduciary obligations under applicable law; _provided_ that in the event of any such action, all rights and remedies of any Designated Stalking Horse Bidder in these Bidding Procedures and/or applicable law shall be reserved and preserved.

19

**EXHIBIT 3 to the Bidding Procedures Order**

(Notice of Auction and Sale Hearing)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------------x
                                       :

In re:                       :   Chapter 11

                                       :

PROMISE HEALTHCARE GROUP, LLC, *et al.*,[1] :   Case No. 18-12491 (CSS)

                                       :

      Debtors.               :   (Jointly Administered)

                                       :

-----------------------------------------------------------------x  Re: D.I.: 374, ___

## NOTICE OF AUCTION AND SALE HEARING

     **PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "***Debtors***") sought relief from the United States Bankruptcy Court for the District of Delaware to effectuate one or more sales for the sale of substantially all of the Debtors' assets.

     **PLEASE TAKE FURTHER NOTICE** that on [_____], 2019, the United States Bankruptcy Court for the District of Delaware (the "***Court***") entered the *Order: (I)(A) Approving Bidding Procedures and Bid Protections Respecting the Remaining Assets, (B) Permitting Debtors to Designate Stalking Horse Purchaser(s) and Grant Bid Protections, (C) Scheduling a Hearing to Consider Approval of the Sale of Assets, (D) Approving Form and Manner of Notice of Sale, and (E) Granting Related Relief; and (II)(A) Authorizing and Approving the Sale of Substantially All Assets of Certain of the Debtors Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Authorizing the Assumption and Assignment of*

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Professional Rehabilitation Hospital, L.L.C. (5340), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179), Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc. (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc. (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), St. Alexius Hospital Corporation #1 (2766), St. Alexius Properties, LLC (4610), Success Healthcare 1, LLC (6535), Success Healthcare 2, LLC (8861), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766). The mailing address for the Debtors, solely for purposes of notices and communications, is 999 Yamato Road, 3rd FL, Boca Raton, FL 33431.

EAST\164463932.4

*Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [D.I. ___] (the "**Bidding Procedures Order**"),[2] pursuant to which the Court approved the Bidding Procedures, which establish key dates and times related to the Debtors' efforts to sell certain assets of the Debtors' estates.

      **PLEASE TAKE FURTHER NOTICE** that the summary of the Bidding Procedures contained in this notice is provided for convenience only, all interested bidders should carefully read the Bidding Procedures Order and Bidding Procedures, and, to the extent of any inconsistencies between this notice and the Bidding Procedures Order or Bidding Procedures, the terms of the Bidding Procedures Order and Bidding Procedures shall control.

      **PLEASE TAKE FURTHER NOTICE** that the deadline by which all Potential Bids must be **actually received** by the parties specified in the Bidding Procedures is **[_____], 2019 at 4:00 p.m. (prevailing Eastern time)**.

      **PLEASE TAKE FURTHER NOTICE** that copies of the Bidding Procedures Order, Bidding Procedures, all related exhibits, and any other filings related to the foregoing are available for free on the website of the court-appointed claims and noticing agent in these cases, Prime Clerk LLC, at https://cases.primeclerk.com/promisehealthcaregroup/, or can be requested by calling: (a) 844-822-9230 (domestic, toll-free); or (b) 347-338-6503 (international).

      **PLEASE TAKE FURTHER NOTICE** that, if the Debtors timely receive more than one Qualified Bid, the Debtors will conduct the Auction on **[_____], 2019 at 10:00 a.m. (prevailing Eastern time)** at the offices of DLA Piper LLP, 1201 North Market Street, Suite 2100, Wilmington, Delaware 19801 or at such other time and location as the Debtors may later designate, to determine the highest or otherwise best Bids.

      **PLEASE TAKE FURTHER NOTICE** that, if the Debtors do not timely receive more than one Qualified Bid, the Debtors will not conduct the Auction and, instead, will (a) file a notice with the Court identifying the sole Qualified Bid as a Successful Bidder and Successful Bid for the Remaining Assets and (b) promptly seek the Court's approval of the sale of the Remaining Assets.

      **PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the sale of the Remaining Assets before the Honorable Christopher S. Sontchi, Chief United States Bankruptcy Judge for the District of Delaware, 824 North Market Street, 5th Floor, Wilmington, Delaware 19801, on **[_____], 2019 at [___] (prevailing Eastern time)**.

      **PLEASE TAKE FURTHER NOTICE** that objections, if any, must (i) be in writing, (ii) conform to the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules, (iii) state with particularity the legal and factual basis for the objection and the specific grounds for such objection, and (iv) be filed with the Court and served so as to be **actually received** no later than **[_____], 2019 at 4:00 p.m. (prevailing Eastern time)** by the following parties: (i) counsel to the Debtors, (a) John Tishler, Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, Tennessee 37219 and (b) Stuart M. Brown, DLA

---

[2] Capitalized terms used but not defined in this notice shall have the meanings ascribed to them in the Bidding Procedures Order and Bidding Procedures, as applicable.

Piper LLP, 1201 N. Market Street, Suite 2100, Wilmington, Delaware 19801; (ii) counsel to the Committee, (a) Jeffrey N. Pomerantz, Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, Wilmington, Delaware 19801 and (b) Andrew H. Sherman, Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey 07102; (iii) counsel to the Select Purchaser, (a) Stephen M. Leitzell, Dechert LLP, Cira Centre, 2929 Arch Street, Philadelphia, Pennsylvania 19104-2808, (b) Brian Greer, Dechert LLP, Three Bryant Park, 1095 Avenue of the Americas, New York, New York 10036-6797, and (c) Jonathan Stott, Dechert LLP, Cira Centre, 2929 Arch Street, Philadelphia, Pennsylvania 19104-2808; (iv) counsel to Wells Fargo, National Association, (a) Brian I. Swett, McGuire Woods LLP, 77 West Wacker Drive, Suite 4100, Chicago, Illinois 60601-1818 and (b) John Knight, Richards, Layton & Finger, PA, 920 N. King Street, Wilmington, Delaware 19801; (v) the Office of the United States Trustee, J. Caleb Boggs Federal Building, 844 King Street, Lockbox 35, Wilmington, Delaware 19801, Attn: Brya Keilson; and (vi) counsel to any Successful Bidder and Backup Bidder as identified in accordance with the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE THAT ANY PARTY OR ENTITY WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE(S), INCLUDING WITH RESPECT TO THE TRANSFER OF THE REMAINING ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS.**

**PLEASE TAKE FURTHER NOTICE THAT THE PROPOSED SALE ORDER PROVIDES THAT A PURCHASER OF THE REMAINING ASSETS WILL HAVE NO RESPONSIBILITY FOR, AND THE REMAINING ASSETS WILL BE SOLD FREE AND CLEAR OF, ANY SUCCESSOR LIABILITY, INCLUDING THE FOLLOWING:**

a.  To the greatest extent allowable by applicable law, any Successful Bidder shall not be deemed, as a result of any action taken in connection an asset purchase agreement, the consummation of a sale of the Remaining Assets, or the transfer or operation of any part of the Remaining Assets, to: (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than, for any Successful Bidder, with respect to any obligations as an assignee under the executory contracts or unexpired leases assumed and assigned pursuant to 11 U.S.C. § 365 arising after the applicable closing); (b) have, *de facto* or otherwise, merged with or into the Debtors; or (c) be an alter ego or mere continuation or substantial continuation of the Debtors, including, without limitation, within the meaning of any foreign, federal, state or local revenue law, pension law, the Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act, the WARN Act (29 U.S.C. §§ 2101, et seq.), the Comprehensive Environmental Response Compensation and Liability Act ("*CERCLA*"), the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), the National Labor Relations Act (29 U.S.C. § 151, et seq.), environmental liabilities, debts, claims or obligations arising from conditions first existing on or prior to the applicable closing (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under CERCLA, any liabilities, debts or obligations of or required to be paid by the Debtors for any taxes of any kind for any period, labor, employment, or other law, rule or regulation (including without limitation filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

3

b. All rights of any party to set off any claims, debts or obligations owed by or to a Successful Bidder in connection with the Remaining Assets shall be extinguished on the applicable closing date pursuant to the proposed Sale Order, with such rights attaching to the proceeds of the applicable sale. A Successful Bidder shall not have any responsibility for (a) any liability or other obligation of the Debtors or related to the Remaining Assets or (b) any claims (as such term is defined in section 101(5) of the Bankruptcy Code) against the Debtors or any of their predecessors or affiliates.

c. To the greatest extent allowed by applicable law, a Successful Bidder shall have no liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations based, in whole or in part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, *de facto* merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the applicable closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Remaining Assets prior to the applicable closing.

Dated: [__], 2019
Wilmington, Delaware

DLA PIPER LLP (US)

/s/ *Stuart M. Brown*
Stuart M. Brown (#4050)
Kaitlin MacKenzie Edelman (#5924)
Matthew S. Sarna (#6578)
1201 N. Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: Stuart.Brown@dlapiper.com
          Kaitlin.Edelman@dlapiper.com
          Matthew.Sarna@dlapiper.com

-and-

WALLER LANSDEN DORTCH & DAVIS, LLP
John Tishler (admitted *pro hac vice*)
Katie G. Stenberg (admitted *pro hac vice*)
Blake D. Roth (admitted *pro hac vice*)
Tyler N. Layne (admitted *pro hac vice*)
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone: (615) 244-6380
Facsimile: (615) 244-6804
Email: John.Tishler@wallerlaw.com
          Katie.Stenberg@wallerlaw.com
          Blake.Roth@wallerlaw.com
          Tyler.Layne@wallerlaw.com

*Attorneys for the Debtors and*
*Debtors in Possession*

4

**EXHIBIT 4 to Bidding Procedures Order**

**(Notice of Potential Assumption)**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------x
                                      :

In re:                             :  Chapter 11
                                        :

PROMISE HEALTHCARE GROUP, LLC, *et al.*,[1] :  Case No. 18-12491 (CSS)
                                        :

        Debtors.                :  (Jointly Administered)
                                        :

---------------------------------------------------------------x **Re: D.I.: 374, \_\_\_**

**NOTICE OF (I) CURE AMOUNT WITH RESPECT TO
EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO POTENTIALLY BE
ASSUMED AND ASSIGNED AND (II) POTENTIAL ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

     **PLEASE TAKE FURTHER NOTICE** that on [_____], 2019, the United States Bankruptcy Court for the District of Delaware (the "*Court*") entered the *Order: (I)(A) Approving Bidding Procedures and Bid Protections Respecting the Remaining Assets, (B) Permitting Debtors to Designate Stalking Horse Purchaser(s) and Grant Bid Protections, (C) Scheduling a Hearing to Consider Approval of the Sale of Assets, (D) Approving Form and Manner of Notice of Sale, and (E) Granting Related Relief; and (II)(A) Authorizing and Approving the Sale of Substantially All Assets of Certain of the Debtors Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [D.I. \_\_\_]

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Professional Rehabilitation Hospital, L.L.C. (5340), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179),   Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc. (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc. (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), St. Alexius Hospital Corporation #1 (2766), St. Alexius Properties, LLC (4610), Success Properties 1, LLC (6535), Success Healthcare 2, LLC (8861), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766).  The mailing address for the Debtors, solely for purposes of notices and communications, is 999 Yamato Road, 3rd FL, Boca Raton, FL 33431.

(the "*Bidding Procedures Order*").[2] The above-captioned debtors and debtors in possession (collectively, the "*Debtors*") provide this notice that you and one or more of the Debtors are party to one or more of the various executory contracts and unexpired leases set forth on **Exhibit 1** to this notice (the "*Executory Contracts*" and "*Unexpired Leases*," as applicable), which Executory Contracts and Unexpired Leases may be assumed and assigned to a Successful Bidder in connection with the proposed sale of the Remaining Assets.

    **PLEASE TAKE FURTHER NOTICE** that set forth on **Exhibit 1** is the amount the Debtors' records reflect is owing to cure any and all defaults under each Executory Contract and Unexpired Lease (each amount, a "*Cure Amount*") to permit the assumption and assignment of each Executory Contract and Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

    **PLEASE TAKE FURTHER NOTICE** that the Debtors' books and records reflect that all postpetition amounts owing under each Executory Contract and Unexpired Lease have been paid and will continue to be paid and no other defaults exist under any of the Executory Contracts and Unexpired Leases and, therefore, amounts due and owing since the Petition Date are not included in the Cure Amount for each Executory Contract and Unexpired Lease.

    **PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Cure Amounts set forth on **Exhibit 1** or to the possible assumption and assignment of any Executory Contract or Unexpired Lease to a Successful Bidder, as applicable, must be filed with the Court and served so as to be **actually received** on or before **[_____], 2019 at 4:00 p.m. (prevailing Eastern time)** (the "*Objection Deadline*"). Service of any objections should be made to: (i) counsel to the Debtors, (a) John Tishler, Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, Tennessee 37219 and (b) Stuart M. Brown, DLA Piper LLP, 1201 N. Market Street, Suite 2100, Wilmington, Delaware 19801; (ii) counsel to the Committee, (a) Jeffrey N. Pomerantz, Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, Wilmington, Delaware 19801 and (b) Andrew H. Sherman, Sills Cummis & Gross P.C., One Riverfront Plaza, Newark, New Jersey 07102; (iii) counsel to Wells Fargo, National Association, (a) Brian I. Swett, McGuire Woods LLP, 77 West Wacker Drive, Suite 4100, Chicago, Illinois 60601-1818 and (b) John Knight, Richards, Layton & Finger, PA, 920 N. King Street, Wilmington, Delaware 19801; (iv) the Office of the United States Trustee, J. Caleb Boggs Federal Building, 844 King Street, Lockbox 35, Wilmington, Delaware 19801, Attn: Brya Keilson; and (v) counsel to any Designated Stalking Horse Bidder as identified in accordance with the Bidding Procedures.

    **PLEASE TAKE FURTHER NOTICE** that all objections to the Cure Amount or possible assumption and assignment of any Executory Contract or Unexpired Lease must (i) be in writing, (ii) conform to the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules, (iii) state with particularity the legal and factual basis for the objection and the specific grounds for such objection, and (iv) if challenging the Cure Amount, set forth the cure amount being claimed with appropriate documentation in support of such amount.

    **PLEASE TAKE FURTHER NOTICE** that any timely filed objections that cannot be resolved will be heard at a hearing to be held before the Honorable Christopher S. Sontchi, Chief

---

[2] Capitalized terms used but not defined in this notice shall have the meanings ascribed to them in the Bidding Procedures Order and Bidding Procedures, as applicable.

United States Bankruptcy Judge for the District of Delaware, 824 North Market Street, 5th Floor, Wilmington, Delaware 19801 on [＿＿＿＿＿] at [ ]  (prevailing Eastern time) unless otherwise agreed by the Debtors and any applicable Successful Bidder or otherwise ordered by the Court.

    PLEASE TAKE FURTHER NOTICE that the failure to file an objection on or before the Objection Deadline shall (i) forever bar any objections to the Cure Amount or the assertion that any additional or other amounts are due and owing, (ii) be deemed as consent to the assumption, assignment, and/or transfer of each Executory Contract and Unexpired Lease to the applicable Successful Bidder, and (iii) forever bar and estop any assertion or claim against the Debtors or Successful Bidder that any additional amounts are due or defaults exist, or conditions to assumption, assignment, and/or transfer must be satisfied, or that any right or benefit under each Executory Contract or Unexpired Lease cannot or will not be available to the Successful Bidder.

    PLEASE TAKE FURTHER NOTICE that the Debtors shall present evidence necessary to demonstrate adequate assurance of future performance by any Successful Bidder.

    PLEASE TAKE FURTHER NOTICE that the presence of an Executory Contract or Unexpired Lease on **Exhibit 1** to this notice does not constitute an admission that such contract, lease, or other agreement is an executory contract or unexpired lease or that such contract, lease, or other agreement will be assumed by the Debtors and assigned to any Successful Bidder.

    PLEASE TAKE FURTHER NOTICE that, if an Executory Contract of Unexpired Lease is finally determined to be assumed and assigned to a Successful Bidder, a separate notice of such assumption and assignment will be provided to you.

    PLEASE TAKE FURTHER NOTICE that all documents filed with the Court in connection with the above-captioned cases are available for free on the website of the court-appointed claims and noticing agent in these cases, Prime Clerk LLC, at https://cases.primeclerk.com/promisehealthcaregroup/.

3

Dated: [__], 2019
Wilmington, Delaware

DLA PIPER LLP (US)

*/s/ Stuart M. Brown*
Stuart M. Brown (#4050)
Kaitlin MacKenzie Edelman (#5924)
Matthew S. Sarna (#6578)
1201 N. Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: Stuart.Brown@dlapiper.com
        Kaitlin.Edelman@dlapiper.com
        Matthew.Sarna@dlapiper.com

-and-

WALLER LANSDEN DORTCH & DAVIS, LLP
John Tishler (admitted *pro hac vice*)
Katie G. Stenberg (admitted *pro hac vice*)
Blake D. Roth (admitted *pro hac vice*)
Tyler N. Layne (admitted *pro hac vice*)
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone: (615) 244-6380
Facsimile: (615) 244-6804
Email: John.Tishler@wallerlaw.com
        Katie.Stenberg@wallerlaw.com
        Blake.Roth@wallerlaw.com
        Tyler.Layne@wallerlaw.com

*Attorneys for the Debtors and
Debtors in Possession*

4

**EXHIBIT 5 to Bidding Procedures Order**

**(Notice of Assumption and Assignment)**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------x
                                      :

In re:                           :  Chapter 11

                           :

PROMISE HEALTHCARE GROUP, LLC, *et al.*,[1] :  Case No. 18-12491 (CSS)

                           :

Debtors.                 :  (Jointly Administered)

                           :

----------------------------------------------------------x **Re: D.I.: 374, ___**

**NOTICE OF ASSUMPTION AND ASSIGNMENT**
**OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

     **PLEASE TAKE FURTHER NOTICE** that on [_____], 2019, the United States Bankruptcy Court for the District of Delaware (the **"*Court*"**) entered the *Order: (I)(A) Approving Bidding Procedures and Bid Protections Respecting the Remaining Assets, (B) Permitting Debtors to Designate Stalking Horse Purchaser(s) and Grant Bid Protections, (C) Scheduling a Hearing to Consider Approval of the Sale of Assets, (D) Approving Form and Manner of Notice of Sale, and (E) Granting Related Relief; and (II)(A) Authorizing and Approving the Sale of Substantially All Assets of Certain of the Debtors Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Authorizing the Assumption and Assignment of*

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Professional Rehabilitation Hospital, L.L.C. (5340), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179), Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc. (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc. (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), St. Alexius Hospital Corporation #1 (2766), St. Alexius Properties, LLC (4610), Success Healthcare 1, LLC (6535), Success Healthcare 2, LLC (8861), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766). The mailing address for the Debtors, solely for purposes of notices and communications, is 999 Yamato Road, 3rd FL, Boca Raton, FL 33431.

*Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [D.I. ___] (the "***Bidding Procedures Order***").[2]

> **PLEASE TAKE FURTHER NOTICE** that on [_____], 2019, the Court entered the *Order (I) Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [D.I. ___] (the "*Sale Order*").

> **PLEASE TAKE FURTHER NOTICE** that, in accordance with the Bidding Procedures Order, Bidding Procedures, and Sale Order, the Debtors have identified [_____] as a Successful Bidder.

> **PLEASE TAKE FURTHER NOTICE** that attached to this notice as **Exhibit 1** is a schedule of executory contracts and unexpired leases the Debtors will assume and assign to the Successful Bidder, in accordance with and subject to the Bidding Procedures Order and Sale Order.

> **PLEASE TAKE FURTHER NOTICE** that all documents filed with the Court in connection with the above-captioned cases are available for free on the website of the court-appointed claims and noticing agent in these cases, Prime Clerk LLC, at https://cases.primeclerk.com/promisehealthcaregroup/.

*[Remainder of Page Intentionally Left Blank]*

---

[2] Capitalized terms used but not defined in this notice shall have the meanings ascribed to them in the Bidding Procedures Order and Bidding Procedures, as applicable.

EAST\164463932.4

Dated: [__], 2019
Wilmington, Delaware

DLA PIPER LLP (US)

*/s/ Stuart M. Brown*

Stuart M. Brown (#4050)
Kaitlin MacKenzie Edelman (#5924)
Matthew S. Sarna (#6578)
1201 N. Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: Stuart.Brown@dlapiper.com
      Kaitlin.Edelman@dlapiper.com
      Matthew.Sarna@dlapiper.com

-and-

WALLER LANSDEN DORTCH & DAVIS, LLP
John Tishler (admitted *pro hac vice*)
Katie G. Stenberg (admitted *pro hac vice*)
Blake D. Roth (admitted *pro hac vice*)
Tyler N. Layne (admitted *pro hac vice*)
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone: (615) 244-6380
Facsimile: (615) 244-6804
Email: John.Tishler@wallerlaw.com
      Katie.Stenberg@wallerlaw.com
      Blake.Roth@wallerlaw.com
      Tyler.Layne@wallerlaw.com

*Attorneys for the Debtors and*
*Debtors in Possession*

3

**EXHIBIT 1**

(Schedule of Executory Contracts and Unexpired Leases)

| Contract/Lease Name | Date | Debtor | Contract Counterparty | Cure Amount |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |