## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| PROMISE HEALTHCARE GROUP, LLC., *et al.*, [1] | : | Case No. 18-12491 (CSS) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

## DISCLOSURE STATEMENT FOR THE AMENDED JOINT PLAN OF LIQUIDATION OF PROMISE HEALTHCARE GROUP, LLC AND ITS DEBTOR AFFILIATES

**DLA PIPER LLP (US)**
Stuart M. Brown (#4050)
Matthew S. Sarna (#6578)
1201 N. Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: Stuart.Brown@dlapiper.com
      Matthew.Sarna@dlapiper.com

June 24, 2020

**WALLER LANSDEN DORTCH & DAVIS, LLP**
John Tishler (admitted *pro hac vice*)
Katie G. Stenberg (admitted *pro hac vice*)
Blake D. Roth (admitted *pro hac vice*)
Tyler N. Layne (admitted *pro hac vice*)
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone: (615) 244-6380
Facsimile: (615) 244-6804
Email: John.Tishler@wallerlaw.com
      Katie.Stenberg@wallerlaw.com
      Blake.Roth@wallerlaw.com
      Tyler.Layne@wallerlaw.com

*Counsel for the Debtors*

---

[1] The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: HLP HealthCare, Inc. (8381), PH-ELA, Inc. (9180), Promise Healthcare #2, Inc. (1913), Promise Healthcare Group, LLC (1895), Promise Healthcare Holdings, Inc. (2601), Bossier Land Acquisition Corp. (6644), HLP of Los Angeles, LLC (9102), HLP of Shreveport, Inc. (1708), HLP Properties at The Villages Holdings, LLC (0006), HLP Properties at the Villages, L.L.C. (1938), HLP Properties of Vidalia, LLC (4255), HLP Properties, Inc. (0068), Promise Healthcare of California, Inc. (9179),   Promise Healthcare, Inc. (7953), Promise Hospital of Ascension, Inc. (9219), Promise Hospital of Baton Rouge, Inc. (8831), Promise Hospital of Dade, Inc. (7837), Promise Hospital of Dallas, Inc.  (0240), Promise Hospital of East Los Angeles, L.P. (4671), Promise Hospital of Florida at The Villages, Inc.  (2171), Promise Hospital of Louisiana, Inc. (4886), Promise Hospital of Lee, Inc. (8552), Promise Hospital of Overland Park, Inc. (5562), Promise Hospital of Phoenix, Inc. (1318), Promise Hospital of Salt Lake, Inc. (0659), Promise Hospital of Vicksburg, Inc. (2834), Promise Hospital of Wichita Falls, Inc. (4104), Promise Properties of Dade, Inc. (1592), Promise Properties of Lee, Inc. (9065), Promise Properties of Shreveport, LLC (9057), Promise Skilled Nursing Facility of Overland Park, Inc. (5752), Promise Skilled Nursing Facility of Wichita Falls, Inc. (1791), Quantum Health, Inc. (4298), Quantum Properties, L.P. (8203), Success Healthcare 1, LLC (6535), Success Healthcare, LLC (1604), Vidalia Real Estate Partners, LLC (4947), LH Acquisition, LLC (2328), Promise Behavioral Health Hospital of Shreveport, Inc. (1823), Promise Rejuvenation Centers, Inc. (7301), Promise Rejuvenation Center at the Villages, Inc. (7529), and PHG Technology Development and Services Company, Inc. (7766).  The mailing address for the Debtors, solely for purposes of notices and communications, is 999 Yamato Road, 3rd FL, Boca Raton, FL  33431.

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz, Esq.
Bradford J. Sandler, Esq.
Colin R. Robinson, Esq.
919 N. Market Street, 17th Floor
Wilmington, DE  19801
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:  jpomerantz@pszjlaw.com
            bsandler@pszjlaw.com
            crobinson@pszjlaw.com

June 24, 2020

SILLS CUMMIS & GROSS P.C.
Andrew H. Sherman (admitted *pro hac vice*)
Boris I. Mankovetskiy (admitted *pro hac vice*)
One Riverfront Plaza
Newark, NJ 07102
Telephone:  973-643-7000
Facsimile:  973-643-6500
Email:  asherman@sillscummis.com
            bmankovetskiy@sillscummis.com

*Counsel to the Official Committee of Unsecured Creditors*

**THE DEADLINE BY WHICH EACH HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE ON THE PLAN MUST CAST A PROPERLY COMPLETED AND DELIVERED BALLOT FOR ITS VOTE TO ACCEPT OR REJECT THE PLAN TO BE COUNTED IS [_____] AT 4:00 P.M. (PREVAILING EASTERN TIME), UNLESS EXTENDED.**

**Summary of Important Deadlines**
**(All times are Prevailing Eastern Time)**

**Voting Deadline:** [_____] at 4:00 p.m.

**Confirmation Objection Deadline:** [_____] at 4:00 p.m.

**Confirmation Hearing:** [_____] at [_____].

These dates are subject to extension as provided in the Solicitation Procedures Order (as defined herein).[2]

---

[2] Capitalized terms related to the solicitation procedures for voting to accept or reject the Plan that are not otherwise defined herein, are defined in the Solicitation Procedures Order.

**Questions and Answers About the Plan**

**What are Holders of Claims being asked to approve?**

Holders of Claims are being asked to vote to accept the Plan. Pursuant to the Plan, among other things, the Debtors will (1) liquidate certain assets of the Debtors and (2) distribute Cash.

**What will I receive under the Plan?**

You will receive a distribution in accordance with the Class in which you have an Allowed Claim or Allowed Equity Interest. Section II of this Disclosure Statement, entitled "Executive Summary," summarizes the classification and treatment of Claims and Equity Interests under the Plan and also estimates the recovery for each Class.

**Who is entitled to vote?**

Only Impaired Classes of Claims that are not deemed to have accepted or rejected the Plan are entitled to vote to accept or reject the Plan. See Article I.A of this Disclosure Statement, entitled "Holders of Claims Entitled to Vote," for a summary of which Classes of Claims are entitled to vote.

**What vote is required for approval of the Plan?**

Under the Bankruptcy Code, unless the "cram down" provisions of the Bankruptcy Code are used, a plan can only be confirmed if votes to accept the Plan are received from: (1) two-thirds in dollar amount *and* a simple majority in number of claimants for each Impaired Class of Claims; and (2) two-thirds in amount for each Impaired Class of Equity Interests. In addition, the Bankruptcy Code provides that only the votes of those Holders of Claims entitled to vote who actually submit votes on a plan are counted in determining whether the necessary majorities have been received. **YOUR VOTE IS VERY IMPORTANT.**

**How do the Plan Proponents recommend that constituents vote?**

The Plan Proponents urge Holders of Claims to vote to <u>accept</u> the Plan. The Plan Proponents believe that confirmation and implementation of the Plan is preferable to the other alternatives available to the Debtors, which are described in Article VIII, entitled "Alternatives to Confirmation and Consummation of the Plan," because the Plan Proponents believe the Plan will provide the greatest recoveries to Holders of Claims. Other alternatives could involve consideration with a lower value, significant delay, uncertainty, and substantial additional administrative costs.

**What are the United States federal income tax consequences of the Plan for Holders of Claims?**

The tax consequences of distributions under the Plan to the Holders of Allowed Claims will vary based on a number of factors. See Article VII of this Disclosure Statement, entitled "Certain Federal Income Tax Consequences of the Plan," for a Summary of the federal income tax consequences of the Plan. However, all Holders of Claims are urged to consult their own tax advisors for the federal, state, local, and other tax consequences of the transactions contemplated by the Plan.

**How do I vote?**

Please use the enclosed ballot to vote to accept or reject the Plan and return the completed ballot to Prime Clerk LLC (the "<u>Solicitation Agent</u>") at the address listed below, or if your securities are held through an intermediary, to such intermediary. To be counted, your original ballot must be received by the Solicitation

Agent no later than the Voting Deadline (as defined in the Disclosure Statement Order) as described herein. If you hold Claims in more than one Class, you must submit a separate ballot for each Class in which you are entitled to vote. Prior to completing your ballot, please carefully read and consider the information contained in this Disclosure Statement, the Plan, any Plan Supplement, the exhibits attached to, and the agreements and documents described in, each of the foregoing.

**What are the risks related to the Plan?**

You should carefully review Article VI of this Disclosure Statement, entitled "Risk Factors," for a discussion of the risks relating to the Plan.

**When will the Plan become effective?**

The Plan will become effective when all of the pre-confirmation and post-confirmation conditions are satisfied or waived. The conditions to the Plan becoming effective are set forth in this Disclosure Statement. See Article IV.D entitled "Conditions Precedent" for a list of certain additional conditions to confirmation and effectiveness of the Plan.

**Who can help answer my questions?**

If you have any questions regarding this Disclosure Statement or the Plan, you should contact counsel to the Debtors via telephone or email to Stuart M. Brown, (302) 394-2341 or Stuart.Brown@dlapiper.com, or John Tishler, (615) 244-6380 or John.Tishler@wallerlaw.com. Debtors' counsel will attempt to respond to you in a timely manner. If you have any questions relating to voting on the Plan or if you need a new ballot, you should contact the Solicitation Agent at:

Promise Healthcare Ballot Processing, c/o Prime Clerk LLC,
One Grand Central Place,
60 East 42nd Street Suite 1440
New York, NY 10165
promisehealthcareballots@primeclerk.com

# TABLE OF CONTENTS

**Page**

ARTICLE I. ............................................................................................................................... 3

   A.   Holders of Claims Entitled to Vote ............................................................................. 3

   B.   Voting Procedures ........................................................................................................ 5

   C.   Confirmation Hearing .................................................................................................. 7

ARTICLE II. .............................................................................................................................. 7

   A.   Overview of the Amended Joint Plan of Liquidation ................................................. 7

ARTICLE III. ........................................................................................................................... 11

   A.   Overview of Chapter 11 ............................................................................................ 11

   B.   Description and History of the Debtors' Businesses ................................................ 11

   C.   Events Leading to the Chapter 11 Filings ................................................................ 14

   D.   Material Events of the Chapter 11 Cases ................................................................. 17

ARTICLE IV. ........................................................................................................................... 31

   A.   Means of Implementation of the Plan ....................................................................... 31

   B.   Administrative and Priority Claims .......................................................................... 45

   C.   Classification and Treatment of Claims under the Plan ............................................ 47

   D.   Estimation of Claims ................................................................................................. 51

   E.   Disputed Claims and Claim Objections ................................................................... 52

   F.   Special Provision Governing Unimpaired Claims .................................................... 54

   G.   Treatment of Executory Contracts and Unexpired Leases ....................................... 54

   H.   Conditions Precedent ................................................................................................ 56

   I.   Indemnification, Release, Injunctive, and Related Provisions .................................. 57

ARTICLE V .............................................................................................................................. 61

   A.   Solicitation and Voting Procedures .......................................................................... 61

   B.   Plan Confirmation Objection Deadline ..................................................................... 66

   C.   Confirmation ............................................................................................................. 67

   D.   Consummation .......................................................................................................... 71

ARTICLE VI. ........................................................................................................................... 71

   A.   Bankruptcy Law Considerations and Other Legal Risks ......................................... 72

   B.   Disclosure Statement Disclaimer ............................................................................. 75

ARTICLE VII. .......................................................................................................................... 76

   A.   Introduction ............................................................................................................... 76

   B.   Certain Material United States Federal Income Tax Consequences to the Debtors ....................... 78

C.    Certain Material United States Federal Income Tax Consequences With Respect to the Liquidating Trust 79

D.    Certain Material United States Federal Income Tax Consequences to U.S. Holders of Claims Against the Debtors ........................................................................................... 80

E.    Certain United States Federal Income Tax Consequences to Non-U.S. Holders of Claims ......... 82

F.    Information Reporting and Backup Withholding ........................................................... 84

G.    Importance of Obtaining Professional Legal Assistance ................................................. 84

ARTICLE VIII. ............................................................................................................. 85

A.    Liquidation Under Chapter 7 ............................................................................... 85

B.    Alternative Plan ............................................................................................. 85

ARTICLE IX ................................................................................................................ 85

A.    Modification of Plan ........................................................................................ 85

B.    Extension of Time ........................................................................................... 86

C.    Post-Effective Date Notice List ............................................................................ 86

D.    Revocation of the Plan ...................................................................................... 86

E.    Binding Effect ............................................................................................... 86

F.    Successors and Assigns ...................................................................................... 87

G.    Governing Law ............................................................................................... 87

H.    Reservation of Rights ....................................................................................... 87

I.    Article 1146 Exemption ..................................................................................... 87

J.    Section 1125(e) Good Faith Compliance .................................................................... 87

K.    Further Assurances .......................................................................................... 87

L.    Service of Documents ........................................................................................ 87

M.    Filing of Additional Documents ............................................................................. 89

N.    Severability ................................................................................................. 89

O.    Entire Agreement ............................................................................................ 89

P.    No Stay of Confirmation Order .............................................................................. 89

ARTICLE X .................................................................................................................. 89

ARTICLE XI. ................................................................................................................ 91

**TABLE OF CONTENTS**
(continued)

| | |
|---|---|
| EXHIBIT A | Plan |
| EXHIBIT B | Solicitation Procedures Order (without exhibits) |
| EXHIBIT C | The Plan Proponents' Liquidation Analysis |
| EXHIBIT D | Promise Healthcare Group LLC's Corporate Organizational Structure |

Nothing contained in this Disclosure Statement (this "<u>Disclosure Statement</u>") shall constitute an offer, acceptance, or a legally binding obligation of the Debtors, any of the Debtors' affiliates or any other person. This Disclosure Statement is subject to approval by the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") and other customary conditions. Absent approval by the Bankruptcy Court, this Disclosure Statement is not a solicitation of acceptances or rejections of the *Amended Joint Plan of Liquidation* under chapter 11 of the Bankruptcy Code (the "<u>Plan</u>"), as the same may be amended or modified from time to time in accordance with the terms thereof, a copy of which is attached to this Disclosure Statement as <u>Exhibit A</u>. Acceptances or rejections with respect to the Plan may not be solicited until this Disclosure Statement has been approved by the Bankruptcy Court. Such a solicitation will only be made in compliance with applicable provisions of securities and/or bankruptcy laws. Future developments relating to the matters described herein may require modifications, additions, or deletions to this Disclosure Statement.

## <u>IMPORTANT NOTICE</u>

Only documents, including this Disclosure Statement and its related documents that are approved by the Bankruptcy Court pursuant to section 1125(b) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), may be used in connection with soliciting votes on the Plan. No statements have been authorized by the Bankruptcy Court concerning Promise Healthcare Group, LLC ("<u>PHG</u>") and certain of its affiliates and subsidiaries that are debtors and debtors in possession (collectively, the "<u>Debtors</u>") or the value of their assets, except as explicitly set forth in this Disclosure Statement.

Please refer to the Plan (or, where indicated, certain motions filed with the Bankruptcy Court) for definitions of the capitalized terms that are used but not defined in this Disclosure Statement.

The Debtors and the Committee (the "<u>Plan Proponents</u>") reserve the right to file amendments to the Plan and Disclosure Statement from time to time. The Plan Proponents urge you to read this Disclosure Statement carefully for a discussion of voting instructions; recovery information; classification of claims; the history of Debtors and the Chapter 11 Cases; the Debtors' businesses, properties, and results of operations; historical and projected financial results; and a summary and analysis of the Plan.

The Plan and this Disclosure Statement are not required to be prepared in accordance with the requirements of federal or state securities laws or other applicable non-bankruptcy law. This Disclosure Statement is being submitted for approval, but has not yet been approved, by the Bankruptcy Court. Any such approval by the Bankruptcy Court of this Disclosure Statement as containing "adequate information" will not constitute endorsement of the Plan by the Bankruptcy Court, and none of the Securities Exchange Commission (the "<u>SEC</u>"), any state securities commission or similar public, governmental or regulatory authority has approved this Disclosure Statement, the Plan, or has passed on the accuracy or adequacy of the statements in this Disclosure Statement. Any representation to the contrary is a criminal offense. Persons trading in or otherwise purchasing, selling or transferring securities of the Debtors should evaluate this Disclosure Statement in light of the purposes for which it was prepared.

This Disclosure Statements contains only a summary of the Plan and certain other documents. It is not intended to replace a careful and detailed review and analysis of the Plan and other documents, but only to aid and supplement such review. This Disclosure Statement is qualified

in its entirety by reference to the Plan, any supplements to the Plan filed with the Bankruptcy Court subsequent to the filing date of this Disclosure Statement (collectively, the "<u>Plan Supplement</u>") and the exhibits attached hereto and thereto and the agreements and documents described herein and therein. If there is a conflict between the Plan and this Disclosure Statement, the provisions of the Plan will govern. You are encouraged to review the full text of the Plan and the Plan Supplement and to read carefully the entire Disclosure Statement, including all exhibits hereto, before deciding how to vote with respect to the Plan.

Except as otherwise indicated, the statements in this Disclosure Statement are made as of the date on which this Disclosure Statement was filed, and the delivery of this Disclosure Statement does not imply that the information contained in this Disclosure Statement is correct at any time after such date. Any estimates of claims or interests in this Disclosure Statement may vary from the final amounts of claim or interests allowed by the Bankruptcy Court.

You should not construe this Disclosure Statement as providing any legal, business, financial, or tax advice, and you should consult with your own legal, business, financial, and tax advisors regarding the transactions contemplated by the Plan.

As to contested matters, adversary proceedings and other actions or threatened actions, whether now pending or initiated in the future, this Disclosure Statement is not, and is in no event to be construed as, an admission, or stipulation of the Debtors, the Committee, the Debtor Representative, or the Liquidating Trustee. Instead this Disclosure Statement is, and is for all purposes to be construed as, solely and exclusively, a statement made by the Debtors in settlement negotiations.  Any statements or descriptions contained in Article III of this Disclosure Statement, or any other statements or descriptions regarding the factual background of the Debtors or descriptions of events arising prior to or during these Chapter 11 Cases, solely represent the views of the Debtors' management, and shall not constitute admissions of, or have any estoppel or other prejudicial effect on, the Debtor Representative or Liquating Trustee, including with respect to any position the Debtor Representative or Liquidating Trustee may take in any future litigation.

THE PLAN PROPONENTS URGE<br>HOLDERS OF CLAIMS TO VOTE TO ACCEPT THE PLAN.

# ARTICLE I.

## INTRODUCTION

The Plan Proponents submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Equity Interests in the Debtors in connection with: (1) the solicitation of acceptances of the Plan, filed by the Plan Proponents with the Bankruptcy Court; and (2) the hearing to consider confirmation of the Plan (the "Confirmation Hearing"), scheduled to commence on [_____], 2020 at [_____] (prevailing Eastern time). **Unless otherwise indicated or defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan.**

Attached as exhibits to this Disclosure Statement are:

- The Plan (Exhibit A);

- Order of the Bankruptcy Court, dated [_____], 2020 (the "Solicitation Procedures Order"), which, among other things, approves this Disclosure Statement and establishes certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (without exhibits, Exhibit B);

- The Debtors' Liquidation Analysis (Exhibit C); and

- Promise Healthcare Group LLC's Corporate Organizational Structure (Exhibit D).

In addition, unless otherwise noted, a ballot for the acceptance or rejection of the Plan is enclosed with each copy of this Disclosure Statement that is submitted to the Holders of Claims that are entitled to vote to accept or reject the Plan.

On [_____], 2020, after notice and a hearing, the Bankruptcy Court entered the Solicitation Procedures Order, approving the Disclosure Statement as containing adequate information of a kind, and in sufficient detail, to enable hypothetical, reasonable persons typical of the Debtors' creditors and equity holders to make an informed judgment regarding the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The Solicitation Procedures Order sets forth in detail the deadlines, procedures, and instructions for voting to accept or reject the Plan and filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating votes. In addition, detailed voting instructions accompany each ballot. Each Holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Plan Supplement, and the exhibits attached to all of the foregoing documents, and the agreements and documents described herein and therein, the Solicitation Procedures Order, and the instructions accompanying the ballot in their entirety before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

A.      **Holders of Claims Entitled to Vote**

Under the Bankruptcy Code, only holders of allowed claims in impaired classes of claims that are not deemed to have accepted or rejected a proposed plan are entitled to vote to accept or reject a proposed chapter 11 plan.

A class of claims is "impaired" under a plan unless, with respect to each claim of such class, the plan:

- leaves unaltered the legal, equitable, or contractual rights to which the holder of the claim is entitled; or

- notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment on account of a default, cures any default, reinstates the original maturity of the obligation, compensates the holder for any damages incurred as a result of reasonable reliance on such provision or law and does not otherwise alter the legal, equitable, or contractual rights of such holder based on such claim.

Classes of claims that are unimpaired under a chapter 11 plan conclusively are presumed to have accepted the plan and are not entitled to vote to accept or reject the plan. Classes of claims in which the holders of otherwise unsatisfied claims will receive no recovery under a chapter 11 plan are deemed to have rejected the plan and are also not entitled to vote to accept or reject the plan.

---

**What Classes of Claims Are Entitled to Vote on the Plan?**[1]

The following classes of Claims are Impaired and entitled to vote on the Plan:

- Class 4 Settlement Claims
- Class 5 Alleged Legal Expense Indemnification Claims
- Class 6 General Unsecured Claims
- Class 7 Convenience Class Claims

**Which Classes of Claims and Equity Interests are Not Entitled to Vote on the Plan?**

The following Classes of Claims are not Impaired and deemed to accept the Plan:

- Class 1 Other Secured Claims
- Class 2 Other Priority Claims
- Class 3 Alleged Lease Indemnification Claims

As a result, Holders of Claims in the foregoing classes conclusively are presumed to have accepted the Plan and will not be entitled to vote to accept or reject the Plan. If the Plan Proponents obtain a Bankruptcy Court

---

[1] The Plan Proponents reserve the right to classify and seek an order of the Bankruptcy Court designating these Claims (as applicable) as unimpaired and not entitled to vote, and any impairment designation contained herein shall have no probative value with respect to any request for such classification order.

4847-0265-3116.11

4

Order designating other Classes of Claims as unimpaired, those classes will also not be entitled to vote to accept or reject the Plan.

The following Classes of Claims and Equity Interests are deemed to reject the Plan and are also not entitled to vote:

- Class 8 Intercompany Claims
- Class 9 Equity Interests

The Bankruptcy Code defines "acceptance" of a plan by a class of impaired claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan. In the event that the Plan Proponents obtain an order of the Bankruptcy Court holding that any Class of Claims is unimpaired, each Holder of an Allowed Claim in any such Class will be conclusively presumed to have accepted the Plan and any votes to accept or reject the Plan submitted by Holders of Claims in any such Class will be null, void, and have no effect.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. See Section V.C, entitled "Confirmation."

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Plan Proponents reserve the right to amend the Plan, request confirmation of the Plan under section 1129(b) of the Bankruptcy Code, or both. Section 1129(b) permits the confirmation of a chapter 11 plan notwithstanding the non-acceptance of a plan by one or more impaired classes of claims through a procedure known as "cram-down." See Section V.C.4, entitled "Cram Down." Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class. See Section V.C.4, entitled "Cram Down."

If a Class of Claims entitled to vote does not vote to accept the Plan, the Plan Proponents will announce their determination on whether to request confirmation of the Plan under section 1129(b) of the Bankruptcy Code prior to or at the Confirmation Hearing.

### B.    Voting Procedures

---

**Procedures for Voting on the Plan**

*How do I vote on the Plan?* For a vote to be counted, the Solicitation Agent must receive an original, signed ballot in a form approved by the Bankruptcy Court. Faxed and emailed copies will *not* be accepted.

*When does the vote need to be received?* **The Voting Deadline for the receipt by the Solicitation Agent of properly completed ballots is [_____] (prevailing Eastern Time) on [_____], 2020. The Voting Deadline is subject to extension as provided in the Solicitation Procedures Order.**

*Which members of the Impaired Classes may vote?* Within an Impaired Class, only Holders of Claims entitled to vote who held their Claims on the Voting Record Date may vote to accept or reject the Plan. The Voting Record Date for determining members of Impaired Classes that may vote on the Plan is [_____]. In addition, Holders of Claims that are temporarily allowed for voting purposes, pursuant to an order of the Bankruptcy Court, may vote to accept or reject the Plan. If you hold Claims in more than one Class, you must submit a separate ballot for each Class in which you are entitled to vote.

---

***Whom should I contact if I have questions or need a ballot?*** You may contact the Solicitation Agent at 1-844-822-9230 (US toll-free) or (212) 257-5450 (local) or promisehealthcareballots@primeclerk.com, with questions or requests related to voting on the Plan.

If you are entitled to vote to accept or reject the Plan, unless otherwise noted herein and/or in the Solicitation Procedures Order, a ballot is enclosed for voting on the Plan. The ballots have been specifically designed for the purpose of soliciting votes on the Plan from each Class entitled to vote. For this reason, when voting on the Plan, **please use only the ballot sent to you with this Disclosure Statement or one sent to you by the Solicitation Agent. If you hold Claims in more than one Class, you <u>must</u> use a separate ballot for voting with respect to each Class of Claims that you hold.** Please vote and return your ballot(s) in accordance with the instructions set forth in your ballots(s): (a) in the pre-addressed envelope accompanying each ballot to the Solicitation Agent, or (b) by electronic, online submission through the Solicitation Agent's E-ballot platform.

**Any executed ballot received that does not indicate either an acceptance or rejection of the Plan will not be counted. Any ballots received after the Voting Deadline will not counted. All ballots must contain an original signature unless submitted electronically in accordance with the Solicitation Procedures Order to be counted. No other ballots, including those received by facsimile, will be counted.**

The Solicitation Agent will tabulate results of the voting on the Plan on a Class-by-Class basis and will prepare an affidavit for filing with the Bankruptcy Court detailing the methodology used in tabulating such votes, as well as the results of the voting.

**Any Claim in an Impaired Class as to which an objection or request for estimation is pending or which is scheduled by the Debtors as unliquidated, disputed or contingent and for which no proof of claim has been filed is not entitled to vote (except to the extent so indicated in any such objection or request for estimation) unless the Holder has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan.**

If you are a Holder of a Claim entitled to vote on the Plan and did not receive a ballot, received an incorrect or damaged ballot or lost your ballot, or if you have any questions concerning this Disclosure Statement, the Plan or the procedures for voting on the Plan, please contact the Solicitation Agent at 1-844-822-9230 (US toll-free) or (212) 257-5450 (local) or promisehealthcareballots@primeclerk.com.

This Disclosure Statement, the Plan, the Plan Supplement, the Solicitation Procedures Order and any other documents approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code and the exhibits attached hereto and thereto and the agreements and documents described herein and therein are the only materials that you should use in determining how to vote on the Plan.

---

**Voting Recommendation**

The Plan Proponents believe that confirmation and implementation of the Plan is preferable to any of the other alternatives available to the Debtors, which are described in Article VIII, titled "Alternatives to Confirmation and Consummation of the Plan," because the Plan Proponents believe the Plan will provide the greatest recoveries to Holders of Allowed Claims. Other alternatives could involve significant delay, uncertainty, and substantial additional administrative costs. **The Plan Proponents encourage Holders of Claims to vote to *<u>accept</u>* the Plan.**

---

C.     **Confirmation Hearing**

> **When and where is the Confirmation Hearing and what is the deadline for objections?**
>
> - Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will commence on [_____], 2020 at [_____] (prevailing Eastern Time), before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge, in Courtroom #6 of the United States Bankruptcy Court for the District of Delaware, 824 Market St N, 3rd Floor, Wilmington, DE 19801. The Confirmation Hearing may be adjourned from time to time by the Plan Proponents without further notice, except for the announcement of the adjournment date made at or before the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.
>
> - Any objection to confirmation of the Plan must be filed with the Bankruptcy Court and served in accordance with the Solicitation Procedures Order on or before [_____] (prevailing Eastern Time) on [_____], 2020. Objections to confirmation of the Plan are governed by Rule 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"). Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection, and the amount and description of the Claim or Equity Interest held by the objector.

# ARTICLE II.

# EXECUTIVE SUMMARY

A.     **Overview of the Amended Joint Plan of Liquidation**

1.     **Estimated Recoveries**

Under the terms of the Plan, Holders of Allowed Claims will receive the following treatment[2]:

1.     Other Secured Claims (Class 1): In full and final satisfaction, settlement, release, and discharge of each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim, on or as soon as practicable after the later of the Effective Date or the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, will, at the sole election of the Liquidating Trustee, (i) either be paid the full amount of such Holder's Allowed Other Secured Claim, or such lesser amount as the Liquidating Trustee and the Holder of the Other Secured Claim may agree to in writing, in Cash; (ii) receive the collateral securing such Allowed Other Secured Claim; or (iii) receive the indubitable equivalent of such Allowed Other Secured Claim.

2.     Other Priority Claims (Class 2): In full and final satisfaction, settlement, release, and discharge of each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim, on or as soon as practicable after the later of the Effective Date or the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, will either be paid the full amount of such Holder's Allowed Other Priority Claim, or such

---

[2] This summary is qualified in its entirety by the terms of the Plan.

lesser amount as the Liquidating Trustee and the Holder of the Other Priority Claim may agree to in writing, in Cash.

**3.**      Alleged Lease Indemnification Claims (Class 3): In full and final satisfaction, settlement, release, and discharge of each Allowed Alleged Lease Indemnification Claim, each Allowed Alleged Lease Indemnification Claim shall be deemed fully satisfied as a result of the Lease Indemnification Estimation.

**4.**      Settlement Claims (Class 4): In full and final satisfaction, settlement, release, and discharge of each Allowed Settlement Claim, each Holder of an Allowed Settlement Claim, on or as soon as practicable after the Effective Date, shall receive its Pro Rata share of the Class A Interest, which shall entitle each such holder to share Pro Rata in the Class A Trust Recovery.

**5.**      Alleged Legal Expense Indemnification Claims (Class 5): In full and final satisfaction, settlement, release, and discharge of each Allowed Alleged Legal Expense Indemnification Claim, each Holder of an Allowed Alleged Legal Expense Indemnification Claim, on or as soon as practicable after the later of the Effective Date or the date on which such Alleged Legal Expense Indemnification Claim becomes an Allowed Alleged Legal Expense Indemnification Claim, shall receive its Pro Rata share of the Legal Expense Indemnification Recovery.

**6.**      General Unsecured Claims (Class 6): Except to the extent that a Holder of an Allowed General Unsecured Claim and the Liquidating Trustee agree to a less favorable treatment in writing, in full and final satisfaction, settlement, release, and discharge of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim, on or as soon as practicable after the later of the Effective Date or the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, shall receive its Pro Rata share of the Class B Interest, which shall entitle each such Holder to share Pro Rata in the Class B Trust Recovery.

**7.**      Convenience Claims (Class 7): Except to the extent that a Holder of an Allowed Convenience Class Claim and the Liquidating Trustee agree to a less favorable treatment in writing, in full and final satisfaction, settlement, release, and discharge of each Allowed Convenience Class Claim, each Holder of an Allowed Convenience Class Claim, on or as soon as practicable after the later of the Effective Date or the date on which such Convenience Class Claim becomes an Allowed Convenience Class Claim, shall receive Cash in an amount equal to 14% of the amount of such Holder's Allowed Convenience Class Claim.

**8.**      Intercompany Claims (Class 8): On the Effective Date, all Intercompany Claims shall be deemed extinguished.

**9.**      Equity Interests (Class 9): On the Effective Date, all Equity Interests shall be deemed extinguished.

The following table briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan. The summary also identifies the Classes that are entitled to vote on the Plan under the Bankruptcy Code. This summary is qualified in its entirety by reference to the Plan, the Plan Supplement and the exhibits attached hereto and thereto and the agreements and documents described herein and therein.

**Important Note on Estimates**

The estimates in the tables and summaries in this Disclosure Statement may differ materially from actual distributions under the Plan. These differences may be due to a number of factors, including:

- the resolution through compromise or judicial determination of disputes among different stakeholders;
- the asserted or estimated amounts of Allowed Claims;
- the existence and ultimate resolution of Disputed Claims;
- the timing of distributions; and
- the timing of the Debtors' emergence from bankruptcy.

Statements regarding projected amounts of Allowed Claims or distributions (or the value of such distributions) are estimates by the Debtors based on current information and are not representations or commitments as to the accuracy of these amounts. See Section VI, titled "Risk Factors," for a discussion of factors that may affect the value of recoveries under the Plan.

Except as otherwise indicated, these statements and estimates are made as of the date of this Disclosure Statement, and the delivery of this Disclosure Statement does not imply that the information contained in this Disclosure Statement is correct at any time after such date.

| Class | Claim | Status | Voting Rights | Low Estimated Total Claims | High Estimated Total Claims | Low Estimated Recovery | High Estimated Recovery |
|---|---|---|---|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Deemed to Accept | $4,554,399 | $4,554,399 | 100% | 100% |
| 2 | Other Priority Claims | Unimpaired | Deemed to Accept | $1,055,664 | $2,033,556 | 100% | 100% |
| 3 | Alleged Lease Indemnification Claims | Unimpaired | Deemed to Accept | $0 | $1,780,000 | 0% | 100% |
| 4 | Settlement Claims | Impaired | Entitled to Vote | $391,531,208 | $391,531,208 | 1% | 2% |
| 5 | Alleged Legal Expense Indemnification Claims | Impaired | Entitled to Vote | $0 | $3,000,000 | 0% | 100% |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote | $51,805,419 | $110,771,534 | 11% | 36% |
| 7 | Convenience Class Claims | Impaired | Entitled to Vote | $5,143,116 | $5,041,158 | 14% | 14% |
| 8 | Intercompany Claims | Impaired | Deemed to Reject | $0 | $ 0 | 0% | 0% |
| 9 | Equity Interests | Impaired | Deemed to Reject | $22,582,287 | $22,582,287 | 0% | 0% |

4847-0265-3116.11

7163194 v4
EAST\175019097.2

# ARTICLE III.

# GENERAL INFORMATION[3]

## A.      Overview of Chapter 11

Chapter 11, the principal business reorganization chapter of the Bankruptcy Code, permits a debtor to reorganize or liquidate its business for the benefit of itself, its creditors, and equity interest holders. In addition to the rehabilitation or liquidation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and equity interest holders in the distribution of a debtor's assets. The commencement of a chapter 11 case creates an estate comprised of all of the legal and equitable interests of the debtor as of the date the chapter 11 petition is filed. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan is the principal objective of a chapter 11 case. A plan of reorganization or liquidation both set forth the means for satisfying claims against and equity interests in a debtor. Confirmation of a plan by the bankruptcy court binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other person or entity subject to the terms of the Plan. Subject to certain limited exceptions, the order approving confirmation of a plan of reorganization discharges a debtor from any debt, equity interest, or other claim that arose prior to the date of confirmation of the plan and substitutes in place of such debts and other claims the obligations specified in the confirmed plan. Unlike a plan of reorganization, confirmation of a plan of liquidation does not discharge the debtor. A plan of liquidation is a sub-type of chapter 11 plan, pursuant to which a debtor sells or transfers all or substantially all of its assets and winds down all of its operations in orderly fashion under supervision of the bankruptcy court.

Certain holders of claims against, and sometimes equity interests in, a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical, reasonable claimant or holder of an equity interest to make an informed judgment regarding the plan. The Plan proponents are submitting this Disclosure Statement, pursuant to section 1124 of the Bankruptcy Code, to holders of Claims against the Debtors that are entitled to vote to accept or reject the Plan.

## B.      Description and History of the Debtors' Businesses

### 1.      Summary of Debtors' Operations

The Debtors operated short-term acute care hospitals ("STACHs"), long-term acute care hospitals ("LTACHs"), and skilled nursing facilities ("SNFs") across nine (9) states [and were [headquartered] in Boca Raton, Florida.] As of the Petition Date, the Debtors operated two (2) STACHs, fourteen (14) LTACHs, and two (2) co-located SNFs, consisting of 424 licensed STACH beds, 950 licensed LTACH beds, and 131 licensed SNF beds. The Debtors' LTACHs consisted of twelve (12) freestanding hospitals

---

[3] As set forth above, any statements or descriptions contained in Article III of this Disclosure Statement, or any other statements or descriptions regarding the factual background of the Debtors or descriptions of events arising prior to or during these Chapter 11 Cases, solely represent the views of the Debtors' management, and shall not constitute admissions of, or have any estoppel or other prejudicial effect on, the Liquating Trustee or Debtor Representative, including with respect to any position the Liquidating Trustee or Debtor Representative may take in any future litigation.

4847-0265-3116.11

and two (2) hospital-in-hospital units. The Debtors grew to be one of the largest stand-alone LTACH providers in the United States.

## 2.    The Sun Capital Settlement Agreement[4]

On January 9, 2013, various parties, including each of the Debtors (or predecessors thereof), Peter R. Baronoff ("Baronoff"), Howard B. Koslow ("Koslow"), and Lawrence Leder ("Leder" and together with Baronoff and Koslow, the "Principals")—former owners of the Debtors—entered into a settlement agreement (the "Sun Capital Settlement Agreement") resolving, among other things, a lawsuit brought by a court-appointed receiver of certain investment funds who made alleged loans to certain of the Debtor-entities (or predecessors thereof) (the "Receivership Action"). The Sun Capital Settlement Agreement resulted in, among other things, a multi-step ownership transfer process whereby the Principals transferred their interests in the Debtor entities to a newly created entity—Founding Partners Designee, LLC, now known as PHG. PHG serves as the ultimate parent entity of the Debtors through its 100 percent equity ownership of PHHI and Success. PHHI and Success, in turn, own, directly or indirectly, each of the remaining fifty-six (56) entities in the PHG enterprise, forty-six (46) of which are Debtors in these Chapter 11 Cases.

In connection with the settlement, PHHI, as lender, PHI, as borrower, and certain subsidiaries of PHI, as guarantors (the "Intercompany Loan Guarantors"), executed a senior loan and security agreement (as amended, restated, supplemented, or modified from time to time, the "$75MM Intercompany Loan Agreement") evidencing a purported $75 million senior secured term loan (the "$75MM Intercompany Loan") that was deemed fully funded upon the closing date from alleged existing indebtedness. Additionally, PHI, as borrower, and the Intercompany Loan Guarantors executed a subordinated term note (as amended, restated, supplemented, or modified from time to time, the "$125MM Intercompany Note") in favor of PHHI, as lender, evidencing a purported $125 million subordinated term loan (the "$125MM Intercompany Loan," and together with the $75MM Intercompany Loan, collectively, the "PHHI Intercompany Loans") that was also deemed fully funded upon the issuance date from alleged existing indebtedness. PHHI executed a promissory note (the "Unsecured PHG Intercompany Note") in favor of PHG, evidencing an alleged $75 million unsecured loan (the "PHG Unsecured Loan," and together with the PHHI Intercompany Loans, the "Intercompany Loans").

As part of the Sun Capital Settlement Agreement, the Principals received an alleged indemnification from certain of the Debtor entities relating to the Principals' incurrence of certain legal fees and expenses (the "Alleged Legal Expense Indemnification"). In addition, PHI assumed the alleged lease guarantee obligations (the "Alleged Lease Indemnification") of the Principals under the (i) Guaranty of Lease, dated as of November 14, 2008 by the Principals in favor of AFG Investment 5, LLC, pursuant to which the Principals, jointly and severally, guaranteed the obligations of Success Healthcare 1, LLC owing to AFG Investment 5, LLC pursuant to that certain Amended and Restated Master Lease Agreement with respect to that certain real property located at 7500 East Hellman Avenue, Rosemead, California (the "Rosemead Lease"), up to an aggregate amount not to exceed $1,000,000; and (ii) Limited Guaranty, dated September 19, 2008 by the Principals in favor of Concordia Bank & Trust, Co., pursuant to which the Principals, jointly and severally, guaranteed the obligations of Vidalia Real Estate Partners LLC owing to Concordia Bank & Trust, Co., pursuant to financings thereby (the "Concordia Lease"), up to a maximum amount not to exceed $780,000 (the "Principal Guarantees"). The Principals were the recipients of certain

---

[4] Statements in this section shall not constitute admissions of, or have any estoppel or other prejudicial effect on, the Committee or the Beneficiaries of the Intercompany Loans, and all rights of the Committee and Beneficiaries of the Intercompany Loans with respect to such statements are expressly reserved and preserved.

4847-0265-3116.11

other transfers under the Sun Capital Settlement Agreement, including, but not limited to, receiving payments from the Debtors under certain secured notes and consulting and employment agreements.

### 3.    The Debtors' Prepetition Debt Obligations and Corporate Structure

As of the Petition Date, the debt obligations of the Debtors totaled in excess of $565 million, excluding accrued and unpaid interest in the amount of approximately $103 million, accrued expenses and accounts payable of approximately $94 million, and capitalized leases of approximately $13 million.

One primary component of the secured debt obligations outstanding as of the Petition Date was that certain Credit Agreement, dated as of March 21, 2016 (as amended, restated, supplemented, and otherwise modified from time to time, the "Credit Agreement"), by and among the Borrowers[5], the Guarantors[6] (each as defined in the Credit Agreement), and the lenders party thereto (the "Lenders"), with Wells Fargo Bank, National Association, serving as administrative agent (in such capacity, the "Agent") on behalf of the Lenders.[7] The Credit Agreement provided for credit facilities consisting of a revolving loan facility (the "Revolver") and a term loan facility (the "Term Loan" and, with the Revolver, collectively, the "Credit Facility"). As of the Petition Date, the principal amount outstanding under the Revolver and Term Loan was $61,657.557.26 and $15,000,000, respectively. As of the Petition Date, there was approximately $14,000 in accrued and unpaid interest under the Credit Facility. The commitments under the Revolver terminated and the Term Loan matured on March 14, 2019. The Credit Facility was secured by a security interest in substantially all of the Borrowers' and Guarantors' assets (the "Collateral").

The other primary component of the secured debt obligations outstanding as of the Petition Date was the alleged PHHI Intercompany Loans, which were subordinated in priority and payment to the Credit Facility.  As of the Petition Date, no principal payments had been made in respect of the PHHI Intercompany Loans. As of the Petition Date, there was approximately $11.2 million and $92.8 million in alleged accrued and unpaid interest under the $75MM Intercompany Loan[8] and the $125MM Intercompany Loan, respectively. While alleged interest in respect of the $125MM Intercompany Loan is paid-in-kind, alleged interest in respect of the $75MM Intercompany Loan is paid in cash. The PHHI Intercompany Loans matured on March 17, 2019.

As of the Petition Date, the Debtors also had approximately $92 million in general unsecured debt and $3 million in priority unsecured debt.

---

[5] The Borrowers include: Professional Rehabilitation Hospital, L.L.C., Promise Hospital of Ascension, Inc., Promise Hospital of Baton Rouge, Inc., Promise Hospital of Dade, Inc., Promise Hospital of Dallas, Inc., Promise Hospital of East Los Angeles, L.P., Promise Hospital of Florida at the Villages, Inc., Promise Hospital of Lee, Inc., Promise Hospital of Louisiana, Inc., Promise Hospital of Overland Park, Inc., Promise Hospital of Phoenix, Inc., Promise Hospital of Salt Lake, Inc., Promise Hospital of Vicksburg, Inc., Promise Hospital of Wichita Falls, Inc., Promise Skilled Nursing Facility of Wichita Falls, Inc., Promise Skilled Nursing Facility of Overland Park, Inc., Quantum Health, Inc., Success Healthcare 1, LLC, and St. Alexius Hospital Corporation #1.

[6] The Guarantors include: Promise Healthcare Group, LLC, Promise Healthcare Holdings, Inc., Promise Healthcare, Inc., HLP Healthcare, Inc., PH-ELA, Inc., Promise Healthcare of California, Inc., Success Healthcare, LLC, Success Healthcare 2, LLC, and St. Alexius Properties, LLC.

[7] As of the Petition Date, the Lenders are, collectively, Wells Fargo Bank, National Association (the "Revolving Lender"), Credit Value Fund III, LP ("CVF III"), CCVF SPV Series I Holdings LLC ("CCVF"), and Bell Atlantic Master Trust ("Bell" and, with CVF III and CCVF, collectively, the "Term Loan Lenders"). The Term Loan Lenders are affiliates of CVP SPV LLC Series I ("CVP Series I") and CVP SPV LLC Series III ("CVP Series III"), each of which are holders of certain of the equity interests of PHG as more fully detailed herein.

[8] Alleged accrued and unpaid interest in respect of the Unsecured PHG Intercompany Note is also approximately $11.2 million.

4847-0265-3116.11

7163194 v4
EAST\175019097.2

The Debtors' corporate organizational structure as of the Petition Date (as defined herein) is depicted in summary format on the chart attached hereto as Exhibit D.  As depicted on Exhibit B, approximately seventy percent (70%) of the membership interests in PHG, which in turn directly or indirectly owns 100 percent of the interests in all of the Debtors (except PHI, in which it owns 96%), are owned by FP Offshore, Ltd., CVP Series I, CVP Series III, and Belmont Strategic Income Fund, LP. The remaining approximately thirty percent (30%) of membership interests in PHG are owned by certain claimants who held claims against funds in the Receivership Action, each of which claimant individually holds less than two percent (2%) of such membership interests.

### C.       Events Leading to the Chapter 11 Filings

While the Debtors' established a market leadership position in post-acute care, certain factors, including internal factors, lead the Debtors to an unmanageable level of debt service obligations and an untenable liquidity position. In 2015, Medicare's establishment of patient criteria to qualify as an LTACH-compliant patient facility led to significant reimbursement rate declines over the course of 2015 and 2016 as changes were implemented. Average reimbursement rates for non-qualifying patients were estimated to drop from $41,000 per stay to $10,000 across the industry. When rates declined sharply, the Debtors were unable to adjust operating cost structures at the facilities, leading to a direct impact on profitability. Additionally, during this period of declining profitability, the Debtors took on several new business projects that required significant upfront capital requirements, all of which have since been abandoned. A summary of the Debtors' prepetition financial performance is outlined in the table below.[9]

| USD (in millions) | FY '15 | FY '16 | FY '17 | Year-to-Date 9/30/2018 |
|---|---|---|---|---|
| Net Revenue | $489.50 | $512.20 | $462.50 | $320.40 |
| Operating Expenses | $489.10 | $517.40 | $487.70 | $328.60 |
| Operating Income/(Loss) | $0.40 | ($5.20) | ($25.20) | ($8.20) |
| Adjusted EBITDA | $28.10 | ($23.70) | $7.80 | $14.00 |

### 1.       Liquidity Restraints

On [March 17, 2014], the Debtors obtained a revolving loan (the "MidCap Revolver") from MidCap Funding IV Trust ("MidCap") in the original principal amount of $49 million. While the Debtors' initial availability under the MidCap Revolver was approximately $20-25 million, the Debtors' availability began to drop due to, among other things, payments resulting from the Receivership Action, changes to reimbursement rates, and certain capital investments. As a result, the MidCap Revolver became insufficient for the capital needs and obligations of the Debtors over time.

On March 21, 2016, the Debtors refinanced the MidCap Revolver with a revolving loan with Wells Fargo Bank, N.A. in the original principal amount of $75 million. The Debtors initially had availability of more than $13 million under the Credit Agreement. By the middle of 2017, the Debtors were in default under the Credit Agreement and, by the end of the year, were in an over-advanced position. A situation of

---

[9] Without the foregoing adjustments, the Debtors' EBITDA could be materially different.

limited availability persisted throughout 2018, notwithstanding certain equity holders injecting $15 million of debt pursuant to a "last out participation" under the Credit Agreement in March 2018.

In October 2017, PHG's board of directors hired FTI Consulting, Inc. to engage in certain operational process improvements. Between November 2017 and March 2018, the Debtors implemented a cost improvement strategy that included the closure of two facilities and the reduction of another 147 full-time equivalent employees, which reduced expenses by at least $20 million on an annualized basis. Costs of $6.5 million were incurred with the closure of the two facilities. These efforts improved profitability of the business, but did not generate enough cash flow to, among other things, pay the Debtors' vendors, who had been stretched well beyond terms for several years.

The Debtors' STACHs, one located in the Silver Lake neighborhood of Los Angeles (the "Silver Lake Facility") and the other located in Saint Louis (the "St. Alexius Facility"), required significant physical plant investments in recent years. These capital costs, coupled with seismic compliance costs at the Silver Lake Facility and a largely Medicaid patient population at both the Silver Lake Facility and the St. Alexius Facility, led to sustained negative cash flows and losses in 2018.

The Debtors' liquidity was also hampered by the timing in receiving supplemental payments from Hospital Quality Assurance Fees ("HQAFs") collected by the California Department of Health Care Services (the "California DHCS"). The California DHCS collects HQAFs from certain providers and managed care organizations and uses the HQAFs to provide supplemental payments to hospitals serving Medicaid and uninsured patient populations. The Debtors rely on these HQAF payments to bridge the gap in reimbursement created by serving such populations. As of the Petition Date, the Silver Lake Facility had an HQAF receivable balance of over $30 million.

### 2.      Management Changes

In early 2018, Baronoff resigned as Chief Executive Officer, and in May 2018, he also resigned from the board of directors. He has subsequently joined KPC Health System as its CEO and KPC Global Management as a managing director (collectively, "KPC"). An affiliate of KPC had previously made a bid in connection with the sale of the Silver Lake Facility. As further set forth in section D.8(g) below, KPC also unsuccessfully bid on the Debtors' Louisiana Facilities, and successfully purchased the Remaining Assets, other than the East LA Facility, Miss Lou Facility and the Louisiana Facilities (each as defined below). In July 2018, Richard Gold resigned as President and Chief Operating Officer. In October 2018, James Hopwood resigned as Chief Financial Officer. In connection with these departures, PHG's board of directors promoted Dr. Charles Posternack to the role of President and Chief Medical Officer, and Andrew Hinkelman was appointed by the board as Interim Chief Financial Officer.

### 3.      Forbearance Agreements and Restructuring and Sale Negotiations

The Debtors defaulted under certain financial covenants under the Credit Agreement as of August 15, 2017. Notwithstanding efforts to cut costs to satisfy financial covenants, such defaults persisted. The Debtors began restructuring negotiations with the Agent, culminating with the Debtors, the Agent, and the Lenders entering into that certain Forbearance Agreement, First Amendment to Credit Agreement and Joinder, dated as of March 14, 2018 (the "First Forbearance Agreement"). The First Forbearance Agreement provided that the Agent and Lenders would forbear from exercising their rights and remedies through April 6, 2018. In order to remedy the Debtors' constrained liquidity position, as part of the First Forbearance Agreement, the Term Loan Lenders agreed to make a $15 million term loan to the Debtor-borrowers, which term loan is contractually subordinated to the priority and payment of the loans made by the Revolver Lender, in exchange for the agreements of the Debtors contained in the First Forbearance Agreement,

including, *inter alia*, to grant a mortgage on the real property owned by Debtor St. Alexius Properties, LLC to secure the Obligations (as defined in the Credit Agreement).

The Debtors continuously negotiated with the Agent and Lenders on a further forbearance arrangement. On October 26, 2018, the Debtors, Agent, and Lenders entered into that certain Second Forbearance Agreement, Second Amendment to Credit Agreement (the "Second Forbearance Agreement"). The Second Forbearance Agreement provided that the Agent and Lenders would forbear from exercising their rights and remedies through November 4, 2018. In addition, to provide the Debtors with additional liquidity, the Agent and Lenders agreed to advance up to $3 million through a temporary reduction in a reserve maintained by Agent and within the formula provided for under the Revolver.

At the beginning of 2017, the Debtors engaged MTS Health Partners, L.P. ("MTS") to manage the marketing efforts related to the Silver Lake Facility. MTS contacted forty-one financial and strategic partners with potential interest in the Silver Lake Facility. Thirty-six of those entities signed confidentiality agreements, received offering memoranda, and received virtual data room access. The Debtors received thirteen first round bids for the Silver Lake Facility in May 2017 and seven second round bids for the Silver Lake Facility in July 2017. The Debtors ultimately signed an asset purchase agreement with L.A. Downtown Medical Center LLC (the "LADMC") in February 2018 and signed a new asset purchase agreement with LADMC on October 24, 2018.

While shopping the Silver Lake Facility, the Debtors also informally sought a buyer for the St. Alexius Facility. On August 9, 2018, the Debtors received a letter from the United States Department of Health & Human Services, Centers for Medicare & Medicaid Services ("CMS") stating that the St. Alexius Facility no longer met the conditions of participation as a provider of services in the Medicare program. The letter also stated that CMS was extending the previously indicated termination date of the St. Alexius Facility's participation in the Medicare program to the close of business on November 7, 2018. Given the impending termination of the St. Alexius Facility's Medicare program and the substantial capital improvements needed at the facility, the Debtors' then-Chief Executive Officer immediately contacted the three large hospital systems operating in the St. Louis area. While those systems did not express interest in the St. Alexius Facility, the Debtors received interest from another party that had previously been interested in purchasing the St. Alexius Facility. The St. Alexius Facility has historically surveyed poorly. In addition, on average, the Debtors lost $250,000 to $500,000 per month operating the St. Alexius Facility.

At the beginning of 2018, the Debtors engaged Healthcare Finance Partners, Corp. ("HFP") to market the San Diego Real Property (defined below). HFP contacted numerous potential buyers of healthcare real estate in southern California. The Debtors received two bids for the San Diego Real Property, each with the same purchase price, both of which exceeded the value ascribed to the San Diego Real Property by a then-recent appraisal.

In addition to the sale of the foregoing non-core assets, on June 1, 2018, the Debtors engaged Houlihan Lokey Capital, Inc. ("Houlihan") to manage the marketing process for a sale or sales of the remaining assets or a potential reorganization of the Debtors with an equity sponsor. Houlihan contacted seventy-seven financial and strategic partners with potential interest in a sale or sales of the remaining assets or an equity sponsorship. The Debtors received several indications of interest.

### D.        Material Events of the Chapter 11 Cases

### 1.        Chapter 11 Filings

On November 5, 2018 (the "Petition Date"), each of the Debtors filed a petition for relief commencing the Chapter 11 Cases. The Chapter 11 Cases of the Debtors are jointly administered for procedural purposes.

### 2.        First and Second Day Pleadings

To facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, the Debtors filed certain motions and applications with the Bankruptcy Court on the Petition Date or soon thereafter seeking certain relief summarized below. The relief sought in the "first day" and "second day" pleadings facilitated the Debtors' seamless transition into chapter 11 and aided in the preservation of the Debtors' going-concern value. The first and second day pleadings included the following:

### a)        Cash Management.

On November 6, 2018, the Bankruptcy Court entered an *Interim Order (I) Authorizing Continued Use of Existing Cash Management System and Bank Accounts, (II) Extending the Time to Comply with, or Seek a Waiver of, Certain United States Trustee Requirements and Section 345(b) of the Bankruptcy Code, (III) Authorizing Continued Performance of Intercompany Transactions, (IV) Granting Administrative Expense Priority to Postpetition Intercompany Claims, and (V) Granting Related Relief* [Docket No. 52] authorizing the Debtors to continue using their established cash management system, bank accounts, and documents related to the bank accounts, in lieu of closing existing accounts and establishing an entirely new post-petition cash management system, to avoid disruption. On December 4, 2018, the Bankruptcy Court entered a second Interim Order granting such relief [Docket No. 215]. On January 3, 2019, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 393].

### b)        DIP and Cash Collateral.

On November 6, 2018, the Bankruptcy Court entered an *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition ABL Parties, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Docket No. 54] (the "First Interim DIP Financing Order") The First Interim DIP Financing Order, among other things, authorized the Debtors to obtain post-petition financing of up to $85,000,000 (the "DIP Facility") on an interim basis and use cash collateral on a consensual basis, and further provided the Prepetition Lenders (as defined in the First Interim DIP Financing Order) with adequate protection in exchange for the use of such cash collateral. This relief was necessary to ensure that the Debtors had adequate liquidity to continue to operate in the ordinary course during the Chapter 11 Cases. On December 4, 2018, the Bankruptcy Court entered a Final Order authorizing the Debtors to use the DIP Facility on a final basis [Docket No. 218], as amended on May 1, 2019 by the *Order Amending Final Debtor-in-Possession Financing Order and Approving Amendment to Debtor-in-Possession Credit Agreement* [Docket No. 1028] (the "Final DIP Financing Order"). On May 2, 2019, the Bankruptcy Court issued an *Order Incorporating Final DIP Financing Order to Extend Period of Consensual Use of Cash Collateral of Prepetition Lenders* [Docket No. 1036] (the "DIP Extension Order"). On May 29, 2019, June 20, 2019, and August 20, 2019 the Bankruptcy Court entered orders further extending the period of consensual use of cash collateral of the prepetition lenders [Docket Nos. 1133, 1217, and 1372].

c)      **Insurance.**

On November 6, 2018, the Bankruptcy Court entered an *Interim Order Authorizing the Debtors to (I) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto; (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies; (III) Honor the Terms of the Premium Financing Agreements and Pay Premiums Thereunder; and (IV) Enter into New Premium Financing Agreements in the Ordinary Course of Business* [Docket No. 45] authorizing the Debtors to continue their insurance program in the ordinary course of business. On December 3, 2018, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 201].

d)      **Taxes.**

On November 6, 2018, the Bankruptcy Court entered an *Interim Order (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief* [Docket No. 49] authorizing the payment of certain pre and post-petition taxes in the ordinary course of business. On December 3, 2018, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 202].

e)      **Utilities.**

On November 6, 2018, the Bankruptcy Court entered an *Interim Order (I) Authorizing Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, and (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service* [Docket No. 53] approving the Debtors' proposed adequate assurance of future performance and related procedures, and barring utility providers from discontinuing, altering, or refusing service. On December 4, 2018, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 219].

f)      **Wages.**

On November 6, 2018, the Bankruptcy Court entered an *Interim Order (I) Authorizing the Debtors to (A) Pay Certain Prepetition Wages, Benefits and Other Compensation, and (B) Continue Employee Compensation and Employee Benefits Programs, and (II) Granting Related Relief* [Docket No. 46] authorizing the payment of certain pre- and post-petition employee and other obligations. On December 4, 2018, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 217].

g)      **Critical Vendors.**

On November 6, 2018, the Bankruptcy Court entered an *Interim Order (I) Authorizing the Debtors to Pay or Honor Prepetition Obligations to Certain Critical Vendors and (II) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Critical Vendors Obligations* [Docket No. 43] authorizing the payment of certain prepetition trade claims to vendors critical to the Debtors' ongoing business and going-concern value in an amount up to $2 million on an interim basis. On December 4, 2018, the Bankruptcy Court entered a Final Order granting such relief on a final basis in an aggregate amount up to $5 million [Docket No. 216].

h)      **Refund Program.**

On November 6, 2018, the Bankruptcy Court entered an *Interim Order Authorizing the Debtors to (I) Maintain, Administer, Modify, and Renew their Refund Programs and Practices and (II) Honor Obligations Related thereto* [Docket No. 42] authorizing the Debtors to honor prepetition refunds and

continue their patient refund system in the ordinary course of business. On December 3, 2018, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 200].

### 3.    Procedural and Administrative Motions

To facilitate the efficient administration of the Chapter 11 Cases and to reduce the administrative burden associated therewith, the Debtors also filed and received authorization to implement several procedural and administrative motions including orders:

- authorizing the joint administration of the Chapter 11 Cases [Docket No. 40];

- extending the time during which the Debtors may file certain schedules of assets and liabilities, statements of financial affairs, and Bankruptcy Rule 2015.3 financial reports, and granting related relief [Docket Nos. 48, 537, and 567];

- authorizing the Debtors to file both a consolidated list of creditors and a consolidated list of the Debtors' thirty (30) largest unsecured creditors, and establishing patient notice procedures [Docket No. 41];

- approving procedures to maintain the confidentiality of patient information as required by applicable privacy rules [Docket No. 47]

- allowing the Debtors to retain and compensate certain Professionals utilized in the ordinary course of business [Docket No. 199];

- approving the procedures for the compensation and reimbursement of expenses of retained Professionals in the Chapter 11 Cases [Docket No. 198, 1085, 1089, 1090, 1450, 1451, and 1452];

- extending the time to assume or reject unexpired leases of nonresidential real property pursuant to Section 365(d)(4) of the Bankruptcy Code [Docket Nos. 903, 991, 1211, and 1277];

- establishing and approving certain bidding procedures pursuant to Section 363 of the Bankruptcy Code [Docket Nos. 257, 258, 570, 571, and 748]; and

- granting a joint motion for the entry of an order authorizing the filing of a class proof of claim [Docket No. 1134].

### 4.    Retention of Chapter 11 Professionals

The Debtors also filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during the Chapter 11 Cases. These professionals include:

- Prime Clerk LLC as claims and noticing agent and administrative advisor [Docket Nos. 44 and 893];

- Waller Lansden Dortch & Davis, LLP, as counsel to the Debtors [Docket No. 249];

- MTS Health Partners, L.P. as investment banker for the Debtors [Docket No. 250];

- McDermott Will & Emory LLP as special counsel for Success Healthcare, LLC, Success Healthcare 1, LLC, and HLP of Los Angeles, LLC (collectively, the "Silver Lake Debtors" in connection with the sale of the Silver Lake Medical Center [Docket No. 251];

- DLA Piper LLP (US) as counsel to the Debtors [Docket No. 252];

- FTI Consulting, Inc. to provide the Debtors an interim chief financial officer and chief restructuring officer (Andrew Hinkelman in both capacities) and certain additional personnel [Docket No. 273];

- M. Jacob Renick of M.J. Renick & Associates LLC as fee examiner [Docket No. 274];

- Houlihan as financial advisor and investment banker for the Debtors [Docket No. 285];

- Healthcare Finance Partners Corp. as broker for the Debtors [Docket No. 894]; and

- Crowe LLP as audit and tax advisor for the Debtors [Docket No. 1081].

### 5. Appointment of the Statutory Committee of Unsecured Creditors

On November 14, 2018, the U.S. Trustee selected the members of the official committee of unsecured creditors (the "Committee") and filed a notice of appointment of the Committee pursuant to section 1102 of the Bankruptcy Code [Docket No. 91]. Currently, the members of the Committee are: (a) HEB Ababa, Ronaldoe Guiterrez and Yolanda Penney; (b) Cardinal Health; (c) Wound Care Management, LLC d/b/a MEDCENTRIS; (d) Freedom Medical, Inc.' (e) Morrison Management Specialists, Inc.; (f) Efficient Management Resources Systems, Inc.; and (g) Surgical Program Development.

The Committee filed applications and obtained authority to retain Sills Cummis & Gross P.C. [Docket No. 423] and Pachulski Stang Ziehl & Jones LLP, each as co-counsel [Docket No. 421], and Province, Inc., as financial advisor [Docket No. 422].

### 6. Appointment of the Patient Care Ombudsman

On November 21, 2018, the Bankruptcy Court entered an order directing the appointment of a patient care ombudsman (the "Patient Care Ombudsman") [Docket No. 144]. On November 27, 2018, the U.S. Trustee appointed Melanie L. Cyganowski as Patient Care Ombudsman pursuant to section 333 of the Bankruptcy Code [Docket No. 159].

On January 2, 2019, the Bankruptcy Court entered an order authorizing the retention and employment of Otterbourg P.C. as counsel and Gibbons P.C. as Delaware counsel to the Patient Care Ombudsman [Docket Nos. 377 and 378].

### 7. Schedules and Bar Dates

On February 4, 2019, the Debtors filed their Schedules. Any creditor whose Claim is not scheduled in the Schedules or whose Claim is scheduled as disputed, contingent, or unliquidated must file a proof of claim in accordance with the terms of the Bar Date Order (as defined herein).

On April 17, 2019, the Bankruptcy Court entered an order approving, among other things: (1) May 31, 2019, at 4:00 p.m. (prevailing Eastern Time), as the deadline for all non-Governmental Units to file Claims in the Chapter 11 Cases based on claims against any Debtor arising prior to the Petition Date that

remain unpaid; (2) July 15, 2019, at 4:00 p.m. (prevailing Eastern Time), as the deadline for all Governmental Units to file Claims in the Chapter 11 Cases based on claims against any Debtor arising prior to the Petition Date that remain unpaid; (3) July 15, 2019, at 4:00 p.m. (prevailing Eastern Time), as the deadline for all persons and entities to file applications for allowance based on claims against any Debtor that accrued on and after the Petition Date through and including April 30, 2019 that remain unpaid [Docket No. 984] (the "Bar Date Order"). On June 3, 2019, the Bankruptcy Court entered an *Order Approving Joint Stipulation Between Debtors and Blue Cross Blue Shield of Texas Regarding Extension of General Bar Date* [Docket No. 1150], whereby the Debtors and Blue Cross Blue Shield of Texas agreed to extend the applicable bar date by one (1) week. On December 4, 2019, the Bankruptcy Court entered an order establishing January 31, 2020 at 4:00 p.m. (prevailing Eastern time) as the deadline with respect to Administrative Claims accruing on and after May 1, 2019 through and including September 1, 2019 that remain unpaid [Docket No. 1627] (the "Second Bar Date Order").

## 8.    Other Postpetition Matters

### a)    Payroll Defalcation Payment Plan

Certain of the Debtor entities are allegedly liable to the IRS and other state and local taxing authorities for unpaid payroll taxes for periods in 2010, 2011 and 2012 due to a theft of amounts set aside for the payment of these taxes (the "Payroll Defalcation"). The Debtors responsible for the Payroll Defalcation entered into installment agreements with the taxing authorities pursuant to which the unpaid payroll taxes would be paid over a certain period of time. As set forth in the Wages Motion, as of September 30, 2018, the Debtors owed, collectively, $6 million to the taxing authorities for the unpaid payroll taxes. *See* Wages Motion, ¶ 32. In connection therewith, the Wages Order authorized the Debtors to "place $241,000 per month into a separate account for the respective benefit of the payroll tax payments owed to the IRS and other state taxing authorities and shall be paid to any such entity, respectively, after such entity demonstrates its entitlement thereto upon further order of the Court after notice and a hearing." Wages Order, ¶ 6. Similarly, the DIP Extension Order provides that "[w]ith respect to the Debtors' prepetition payroll tax defalcation repayment plan with certain taxing authorities (the "Tax Payment Plan"), the Debtors shall continue to place $241,000 per month (the "Monthly Deposits") into a separate account for the respective benefit of the payroll tax payments owed to the IRS and other state taxing authorities, and amounts shall be paid to any such entity after such entity demonstrates its entitlement thereto upon further order of the Court after notice and a hearing[.]" DIP Extension Order, ¶ 9.

[Pursuant to the terms of the Wages Order and the DIP Extension Order, the Debtors timely placed $241,000 per month into an escrow account for the benefit of the IRS and other taxing authorities with respect to repayment of certain of the Debtors' Payroll Defalcation.]

### b)    Stay Relief and Adequate Protection

The Bankruptcy Court has entered multiple Orders authorizing relief from or the modification of the automatic stay to allow litigation claimants to seek monetary relief to the extent of available insurance [Docket Nos. 143, 538, 558, 762, 789, 889, 890, 972, 977, 978, 1194, 1212, 1223, 1227, 1275, 1403, 1448, 1449, 1481, 1524, 1607, and 1653] or regarding certain lease agreements [Docket Nos. 1269, 1302, and 1695].

On December 3, 2018, the Bankruptcy Court entered an *Order Approving Stipulation for Adequate Protections Between Debtors and the United States of America* [Docket No. 197], as amended by an *Order Approving Amended Stipulation for Adequate Protections Between Debtors and the United States of America* [Docket No. 332], pursuant to which the Debtors agreed to provide assurance that the Debtors would satisfy debts owed to CMS, a component of the United States Department of Health and Human

4847-0265-3116.11

Services, due to CMS overpayment to the Debtors in connection with the Debtors' claims for reimbursement under their provider agreements. The Debtors and CMS stipulated and agreed that any asset purchase agreement for any material portion or all of the Silver Lake Debtors' assets or equity will include a provision that requires the payment to CMS of the full outstanding amount of certain Silver Lake overpayment claims in cash immediately upon closing the sale, along with recoupment rights concerning other provider facilities owned and/or operated by the Debtors.

On January 24, 2019, the Debtors filed a *Motion for Authority to Enter into Insurance Premium Finance Agreements with First Insurance Funding and to Provide Adequate Protection* [Docket No. 501]. On February 1, 2019 the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 562].

### c)       Lease Rejection, Extension, and Sublease Motions

The Bankruptcy Court has entered multiple Orders authorizing the Debtors to reject certain executory contracts and unexpired leases [Docket Nos. 185, 426, 891, 892, 1074, 1075, 1189, 1190, 1216, and 1418] and establishing rejection procedures regarding the same [Docket No. 1215].  The Bankruptcy Court has also entered Orders authorizing the Debtors to extend certain leases [Docket Nos. 260 and 333] and to enter into certain subleases [Docket No. 1086].

### d)       Key Employee Incentive and Retention Plans

On November 15, 2018, the Debtors filed a *Motion of the Debtors for Entry of an Order Approving the Key Employee Incentive Plan* [Docket No. 106], pursuant to which the Debtors sought to incentivize Dr. Charles Posternack to work above and beyond his typical roles as President and Chief Medical Officer in order to maximize recoveries under these Chapter 11 Cases for all parties in interest. On January 14, 2019, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 475], certain of which was filed under seal [Docket Nos. 471 and 474].

On March 3, 2019, the Debtors filed a *Motion Pursuant to Sections 363 and 503 of the Bankruptcy Code for Entry of an Order Approving Debtors' Key Employee Retention Plan* [Docket No. 916], pursuant to which the Debtors sought to keep Debtors' core corporate staff in place in order to fulfill the Debtor's obligations with respect to the asset sales and the winding down of the Chapter 11 Cases. On April 17, 2019, the Bankruptcy Court entered a Final Order granting such relief on a final basis [Docket No. 982], certain of which was redacted [Docket Nos. 987, 1093, and 1374] and supplemented or modified [Docket Nos. 1087 and 1373].

### e)       Exclusivity

On March 3, 2018, the Debtors filed a *Motion for Entry of an Order Extending the Exclusive Periods Pursuant to Section 1121(d) of the Bankruptcy Code* [Docket No. 839] (the "Exclusivity Extension Motion"), pursuant to which the Debtors requested an extension of the exclusive periods to file a Chapter 11 plan through May 20, 2019 and to solicit acceptances thereof through July 19, 2019.  On March 20, 2019, the Bankruptcy Court entered an Order granting the relief requested in the Exclusivity Extension Motion [Docket No. 904].

On May 16, 2019, the Debtors filed a *Motion for Entry of an Order Further Extending the Exclusive Periods Pursuant to Section 1121(d) of the Bankruptcy Code* [Docket No. 1103] (the "Second Exclusivity Extension Motion"), pursuant to which the Debtors requested an extension of the exclusive periods to file a Chapter 11 plan through August 5, 2019 and to solicit acceptances thereof through October 4, 2019. On

May 17, 2019, the Bankruptcy Court entered an Order granting the relief requested in the Second Exclusivity Extension Motion [Docket No. 1106].

On July 30, 2019, the Debtors filed a *Third Motion for Entry of an Order Further Extending the Exclusive Periods Pursuant to Section 1121(d) of the Bankruptcy Code* [Docket No. 1304] (the "Third Exclusivity Extension Motion"), pursuant to which the Debtors requested an extension of the exclusive periods to file a Chapter 11 plan through October 7, 2019 and to solicit acceptances thereof through December 2, 2019. On September 4, 2019, the Bankruptcy Court entered an Order granting the relief requested in the Third Exclusivity Extension Motion [Docket No. 1420].

On October 2, 2019, the Debtors filed a *Fourth Motion for Entry of an Order Further Extending the Exclusive Periods Pursuant to Section 1121(d) of the Bankruptcy Code* [Docket No. 1502] (the "Fourth Exclusivity Extension Motion"), pursuant to which the Debtors requested an extension of the exclusive periods to file a Chapter 11 plan through November 15, 2019 and to solicit acceptances thereof through January 14, 2020. On October 21, 2019, the Bankruptcy Court entered an Order granting the relief requested in the Fourth Exclusivity Extension Motion [Docket No. 1533].

On November 15, 2019, the Debtors filed a *Fifth Motion for Entry of an Order Further Extending the Exclusive Periods Pursuant to Section 1121(d) of the Bankruptcy Code* [Docket No. 1586] (the "Fifth Exclusivity Extension Motion"), pursuant to which the Debtors requested an extension of the exclusive periods to file a Chapter 11 plan through January 31, 2020 and to solicit acceptances thereof through March 31, 2020. On December 18, 2019, the Bankruptcy Court entered an Order granting the relief requested in the Fifth Exclusivity Extension Motion [Docket No. 1647].

On February 25, 2020, the Debtors filed a *Sixth Motion for Entry of an Order Further Extending the Exclusive Periods Pursuant to Section 1121(d) of the Bankruptcy Code* [Docket No. 1745] (the "Sixth Exclusivity Extension Motion"), pursuant to which the Debtors requested an extension of the exclusive periods to file a Chapter 11 plan through March 24, 2020 and to solicit acceptances thereof through May 26, 2020.

On March 24, 2020, the Debtors filed a *Seventh Motion for Entry of an Order Further Extending the Exclusive Periods Pursuant to Section 1121(d) of the Bankruptcy Code* [Docket No. 1789] (the "Seventh Exclusivity Extension Motion"), pursuant to which the Debtors requested an extension of the exclusive periods to file a Chapter 11 plan through May 5, 2020 and to solicit acceptances thereof through July 5, 2020. On April 13, 2020, the Bankruptcy Court entered an Order granting the relief requested in the Seventh Exclusivity Extension Motion [Docket No. 1815].

### f)      De Minimis Claims

On January 24, 2019, the Debtors filed a *Motion of the Debtors to Approve Procedures for Settlement of De Minimis Claims Held by or Against Debtors* [Docket No. 504]. On March 20, 2019, the Bankruptcy Court entered an Order granting such relief on a final basis [Docket No. 901].

On May 14, 2019, the Debtors filed a *Motion of the Debtors for Entry of an Order Authorizing and Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets Free and Clear of Liens, Claims, Interests, and Encumbrances without Further Order of Court* [Docket No. 1095]. On June 4, 2019, the Bankruptcy Court entered an Order granting such relief on a final basis [Docket No. 1195].

### g)    Sale Transactions

Prior to and after the Petition Date, the Debtors, with the assistance of their advisors, explored a sale of their assets as the best mechanism for maximizing the value of the Debtors' estates. During the pendency of these Chapter 11 Cases, the Debtors have successfully marketed substantially all of their assets, obtained court approval for multiple sales, and consummated each sale.

### (1)    The Silver Lake Facility Sale

On November 6, 2018, the Debtors filed the *Debtors' Motion for Entry of Orders (I)(A) Establishing Bidding Procedures Related to the Sale of Certain of the Debtors' Assets, Including Approving a Break-Up Fee and Expense Reimbursement, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, (C) Approving Form and Manner of Notice Relating Thereto, and (D) Scheduling a Hearing to Consider the Proposed Sale; (II)(A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Authorizing Success Healthcare 1, LLC to Grant Liens; and (III) Granting Related Relief* [Docket No. 37] (the "Silver Lake Bidding Procedures Motion"), pursuant to which the Debtors sought to implement bidding procedures related to the sale of the Silver Lake Facility.

On December 7, 2018, the Court entered the *Order (A) Establishing Bidding Procedures Related to the Sale of Certain of the Debtors' Assets, Including Approving a Break-Up Fee and Expense Reimbursement, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, (C) Approving Form and Manner of Notice Relating Thereto, (D) Scheduling a Hearing to Consider the Proposed Sale, and (E) Granting Related Relief* [Docket No. 257] (the "Silver Lake Bidding Procedures Order"), pursuant to which the Court approved the Silver Lake Bidding Procedures Motion as well as certain protections for the stalking horse bidder, LADMC.

The Debtors did not receive any Qualified Bids (as defined in the Silver Lake Bidding Procedures Order) for the Silver Lake Facility, other than LADMC's bid, and, as such, cancelled the Auction (as defined in the Silver Lake Bidding Procedures Order) of the Silver Lake Facility. On February 13, 2019, the Court entered the *Order (A) Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases,(C) Authorizing Success Healthcare 1, LLC to Grant Liens, and (D) Granting Related Relief* [Docket No. 740] (the "Silver Lake Sale Order"), pursuant to which the sale of the Silver Lake Facility to LADMC was approved for cash consideration of $84.15 million, subject to certain adjustments as set forth in more detail in the Silver Lake Sale Order. Among other provisions, the Silver Lake Sale Order provided that the Rosemead Lease was assumed and assigned to LADMC and found that LADMC provided adequate assurance of future performance thereunder. Silver Lake Sale Order, ¶ EE. The Debtors closed the sale of the Silver Lake Facility to LADMC at 12:01 a.m. (Pacific Time) on March 5, 2019. *See* Docket No. 921.

### (2)    The San Diego Real Property Sale

On November 13, 2018, the Debtors filed the *Motion of the Debtors for Entry of an Order (I) Authorizing the Sale of Certain Real Property Free and Clear of All Liens, Claims, Interests, and Encumbrances, and (II) Authorizing the Debtors to Reject Unexpired Lease of Nonresidential Real Property* [Docket No. 87] (the "San Diego Sale Motion"), pursuant to which the Debtors sought to conduct

a private sale of certain real property owned by the Debtors in San Diego, California (the "San Diego Real Property") to National Health Investors, Inc. ("NHI") for cash consideration equal to $15 million.

After filing the San Diego Sale Motion, the Debtors were contacted by a competing bidder, 5550 University Holdings, LLC ("5550 University"). Rather than proceed with the private sale to NHI, the Debtors submitted an order to the Court (the "San Diego Bidding Procedures Order") approving bidding procedures related to the sale of the San Diego Real Property and approving certain protections for NHI, as stalking horse bidder. On December 7, 2018, the Court entered the San Diego Bidding Procedures Order.

On December 10, 2018, the Debtors conducted an auction pursuant to the San Diego Bidding Procedures Order and declared 5550 University as the Successful Bidder (as defined in the San Diego Bidding Procedures Order). On December 11, 2018, the Court entered its *Order Authorizing the Sale of Certain Real Property [San Diego Real Estate] Free and Clear of All Liens, Claims, Interests, and Encumbrances* [Docket No. 293] (the "San Diego Sale Order"), pursuant to which the Court approved the sale of the San Diego Real Estate to 5550 University for cash consideration equal to $16.165 million. The Debtors closed the sale of the San Diego Real Property to 5550 University at 11:59 p.m. (Eastern Time) on December 20, 2018. *See* Docket No. 920.

### (3)    The St. Alexius Equity Sale

On December 7, 2018, the Debtors filed the *Motion of the Debtors for Entry of an Order (I) Authorizing the Sale of the Equity Interests in Success Healthcare 2, LLC [St. Alexius Facility] Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Authorizing the Seller to Assume and Assign Certain Executory Contracts, and (III) Granting Other Related Relief* [Docket No. 263] (the "St. Alexius Sale Motion"), pursuant to which the Debtors sought to conduct a private sale of the equity interests (the "St. Alexius Equity") owned by Debtor Success Healthcare, LLC in Debtor Success Healthcare 2, LLC ("Success 2"), which, in turn, owned the equity interests in St. Alexius Hospital Corporation #1 ("St. Alexius") and St. Alexius Properties, LLC ("St. Alexius Properties") to Americore Holdings, LLC ("Americore") for cash consideration equal to $10 million as well as the assumption of substantially all of the liabilities of Success 2, St. Alexius, and St. Alexius Properties.

As a result of the transaction contemplated by the St. Alexius Sale Motion being structured as a sale of equity interests, and not assets, the Debtors filed a *Motion of the Debtors for an Order (I) Dismissing the Chapter 11 Cases of Success Healthcare 2, LLC, St. Alexius Hospital Corporation #1, and St. Alexius Properties, LLC and (II) Granting Related Relief* [Docket No. 349] (the "St. Alexius Dismissal Motion"), pursuant to which the Debtors requested that the Chapter 11 Cases of Success 2, St. Alexius, and St. Alexius Properties be dismissed contemporaneously with the closing of the sale of the St. Alexius Equity.

On January 8, 2019, the Court entered the *Order (I) Authorizing the Sale of the Equity Interests in Success Healthcare 2, LLC Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Authorizing the Seller to Assume and Assign Certain Executory Contracts, and (III) Granting Other Related Relief* [Docket No. 426] (the "St. Alexius Sale Order"), approving the sale of the St. Alexius Equity to Americore on the terms outlined in the St. Alexius Sale Motion. On February 1, 2019, the Court entered orders [Docket Nos. 565, 573, 574] (collectively, the "St. Alexius Dismissal Orders") dismissing the Chapter 11 Cases of Success 2, St. Alexius, and St. Alexius Properties, with such dismissal to take effect upon the closing of the sale of the St. Alexius Equity. The Debtors closed the sale of the St. Alexius Equity to Americore, and the St. Alexius Dismissal Orders became effective, at 11:59 p.m. (Central Time) on March 8, 2019. *See* Docket Nos. 879, 895, 922.

On June 28, 2019, after several breaches of the Purchase Agreement and TSA (each as defined in the Americore Enforcement Motion (as defined below)), the Debtors filed the *Debtors' Motion for Entry of an Order (I) Enforcing the Purchase Agreement Against Americore Holdings, LLC, and (II) Compelling Turnover of Amounts Owed to the Debtors* [Docket No. 1239] (the "Americore Enforcement Motion"). The Court granted the Americore Enforcement Motion by order [Docket No. 1285] dated July 19, 2019, and the Debtors are attempting to execute on certain assets of Americore in order to satisfy (in part) the amounts owed by Americore to the Debtors.

### (4)    The Florida Facilities Sale

On December 26, 2018, the Debtors filed the *Debtors' Motion for Orders: (I)(A) Authorizing Entry into Stalking Horse Purchase Agreement for the Sale of Substantially All Assets of Certain of the Debtors, (B) Approving Bidding Procedures and Bid Protections, (C) Scheduling a Hearing to Consider Approval of the Sale of Assets, (D) Approving Form and Manner of Notice Sale, and (E) Granting Related Relief; and (II)(A) Authorizing and Approving Sale of Substantially All Assets of Certain Debtors Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 355] (the "Select Bidding Procedures Motion"), pursuant to which the Debtors sought to implement bidding procedures related to the sale of the Debtors' Florida facilities (collectively, the "Florida Facilities"). On February 1, 2019, the Court entered the *Order: (I)(A) Authorizing Entry into Stalking Horse Purchase Agreement for the Sale of Substantially All Assets of Certain of the Debtors, (B) Approving Bidding Procedures and Bid Protections, (C) Scheduling a Hearing to Consider Approval of the Sale of Assets, (D) Approving Form and Manner of Notice Sale, and (E) Granting Related Relief* [Docket No. 571] (the "Select Bidding Procedures Order"), pursuant to which the Court approved the Select Bidding Procedures Motion as well as certain protections for the stalking horse bidder, Select Medical Corporation ("Select").

The Debtors did not receive any Qualified Bids (as defined in the Select Bidding Procedures Order) for the Florida Facilities, other than Select's bid, and, as such, cancelled the Auction (as defined in the Select Bidding Procedures Order) of the Florida Facilities. On February 13, 2019, the Court entered the *Order (I) Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Granting Related Relief [Select]* [Docket No. 826] (the "Select Sale Order"), pursuant to which the sale of the Florida Facilities to Select was approved for cash consideration of $63 million, less Assumed Cure Amounts (as defined in the Select Sale Order). The Debtors closed the sale of the Florida Facilities to Select at 12:01 a.m. (Eastern Time) on April 3, 2019. *See* Docket No. 954.

On May 6, 2019 and July 15, 2019, in order to deliver certain equipment required by the asset purchase agreement with Select, the Debtors filed motions [Docket Nos. 1057, 1267] (collectively, the "Select Equipment Motion"), pursuant to which the Debtors sought authority to purchase certain equipment from Varilease Finance, Inc. ("Varilease") for $720,759.21 and AVT Florida, L.P. for $693,425.60 and deliver such equipment to Select. The Select Equipment Motions were approved by orders [Docket Nos. 1224, 1283] dated June 21, 2019 and July 19, 2019.

### (5)    The Remaining Assets Sale

On January 1, 2019, the Debtors filed the *Debtors' Motion for Orders: (I)(A) Approving Bidding Procedures and Bid Protections, (B) Permitted Debtors to Designate Stalking Horse Purchaser(s) and Grant Bid Protections, (C) Scheduling a Hearing to Consider Approval of the Sale of Assets, (D) Approving Form and Manner of Notice Sale, and (E) Granting Related Relief; and (II)(A) Authorizing and Approving Sale of Substantially All Assets of Certain Debtors Free and Clear of Liens, Claims, Interests, and*

4847-0265-3116.11

*Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 374] (the "Remaining Assets Bidding Procedures Motion"), pursuant to which the Debtors sought to implement bidding procedures related to the sale of certain of the Debtors' remaining facilities (collectively, the "Remaining Assets").  On February 1, 2019, the Court entered the *Order: (A) Approving Bidding Procedures and Bid Protections, (B) Permitted Debtors to Designate Stalking Horse Purchaser(s) and Grant Bid Protections, (C) Scheduling a Hearing to Consider Approval of the Sale of Assets, (D) Approving Form and Manner of Notice Sale, and (E) Granting Related Relief* [Docket No. 570] (the "Remaining Assets Bidding Procedures Order"), granting the relief requested in the Remaining Assets Bidding Procedures Motion.

Pursuant to the Remaining Assets Bidding Procedures Order, on February 11, 2019, the Debtors filed the *Expedited Motion to Designate Stalking Horse Purchaser, Approve Stalking Horse Purchase Agreement, and Provide Bid Protections* [Docket No. 709] (the "Kindred Stalking Horse Motion"), pursuant to which the Debtors sought to designate KND Real Estate 40, L.L.C. and Kindred Healthcare Operating, LLC (collectively, "Kindred") as the stalking horse bidder for the Debtors' facility located in East Los Angeles, California (the "East LA Facility") and to provide Kindred with certain bid protections. On February 14, 2019, the Court entered an order [Docket No. 748] approving the relief requested in the Kindred Stalking Horse Motion.

On February 21 and 22, 2019, the Debtors conducted an auction for the Remaining Assets.  The Debtors declared Kindred as the Successful Bidder (as defined in the Remaining Assets Bidding Procedures Order) for the East LA Facility, Sentry Concordia Real Estate, LLC and Sentry Concordia, LLC (collectively, "Sentry Concordia") as the Successful Bidder (as defined in the Remaining Assets Bidding Procedures Order) for the Debtors' equity interests (the "PRH Equity") in Debtor Professional Rehabilitation Hospital, L.L.C. ("PRH") and substantially all of the assets (the "Vidalia Assets") of Debtor Vidalia Real Estate Partners, LLC ("Vidalia"), each related to the Debtors' facility located in Vidalia, Louisiana (the "Miss Lou Facility"), and KPC Promise Healthcare, LLC ("KPC Promise") as the Successful Bidder (as defined in the Remaining Assets Bidding Procedures Order) for the Remaining Assets other than the East LA Facility, Miss Lou Facility and the Louisiana Facilities (defined below), including the option to purchase the Debtors' facility located in Dallas, Texas (the "Dallas Facility").

On February 26, 2019, the Court entered the *Order (I) Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (III) Granting Related Relief [Kindred]* [Docket No. 821] (the "Kindred Sale Order"), approving the sale of the East LA Facility to Kindred for cash consideration equal to $19,747,096.00 plus the Assumed Cure Amounts (as defined in the Kindred Sale Order) plus the Accrued PTO (as defined in the Kindred Sale Order) up to the PTO Cap (as defined in the Kindred Sale Order).  The Debtors closed the sale of the East LA Facility to Kindred at 12:01 a.m. (Pacific Time) on May 2, 2019.  *See* Docket No. 1035.

On March 1, 2019, the Court entered the *Order (I) Approving the Sale of Certain of the Debtors' (A) Equity Interests in Professional Rehabilitation Hospital, L.L.C. and (B) Assets of Vidalia Real Estate Partners, LLC Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (III) Granting Related Relief* [Docket No. 831] (the "Miss Lou Sale Order"), pursuant to which the sale of the PRH Equity and the Vidalia Assets to Sentry Concordia was approved for cash consideration equal to $6.5 million plus the Cure Amount (as defined in the Miss Lou Sale Order).  Among other provisions, the Miss Lou Sale Order provided that the Concordia Lease was assumed and assigned to Sentry Concordia and found that Sentry Concordia provided adequate assurance of future performance thereunder.  Miss Lou Sale Order, ¶ DD.

As a result of the transaction contemplated by the Miss Lou Sale Order being structured, in part, as a sale of equity interests, and not assets, the Debtors filed a *Motion of the Debtors for an Order (I) Dismissing the Chapter 11 Case of Professional Rehabilitation Hospital, L.L.C. and (II) Granting Related Relief* [Docket No. 929] (the "PRH Dismissal Motion"), pursuant to which the Debtors requested that the Chapter 11 Case of PRH be dismissed contemporaneously with the closing of the sale of the PRH Equity. On April 17, 2019, the Court entered an order [Docket No. 983] (the "PRH Dismissal Order") dismissing the Chapter 11 Case of PRH, with such dismissal to take effect upon the closing of the sale of the PRH Equity. The Debtors closed the sale of the PRH Equity and Vidalia Assets to Sentry Concordia, and the PRH Dismissal Order became effective, at 12:01 a.m. (Central Time) on May 16, 2019. *See* Docket Nos. 1102, 1104, 1107.

Also on March 1, 2019, the Court entered the *Order (I) Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (III) Granting Related Relief [Remaining Assets]* [Docket No. 832] (the "Remaining Assets Sale Order"), pursuant to which the sale of the Remaining Assets, other than the East LA Facility, Miss Lou Facility and the Louisiana Facilities, to KPC Promise was approved for cash consideration equal to seven dollars (including the exercise of KPC Promise's option to purchase the Dallas Property) plus the Cure Amounts (as defined in the Remaining Assets Sale Order) under the Assigned Contracts (as defined in the Remaining Assets Sale Order) plus Accrued PTO (as defined in the Remaining Assets Sale Order).

On May 22, 2019, the Debtors filed the *Motion of the Debtors for an Order (I) Authorizing the Debtors to Grant Liens to Credit Suisse AG, New York Branch, and to Subsidiaries of KPC Promise Healthcare, LLC in Connection with the Remaining Assets Sale, and (II) Granting Related Relief* [Docket No. 1118] (the "KPC Lien Motion"), pursuant to which the Debtors sought to grant a lien to Credit Suisse AG, New York Branch to allow KPC Promise to obtain working capital financing. The KPC Lien Motion also sought authority for the Debtors to enter into a reconciliation agreement with KPC Promise, certain of its subsidiaries, and CVP Loan Servicing LLC. On May 29, 2019, the Court entered an order [Docket No. 1135] granting the relief requested in the KPC Lien Motion. The Debtors closed the sale of the Remaining Assets, other than the East LA Facility, Miss Lou Facility and the Louisiana Facilities, to KPC Promise at 12:01 a.m. (determined by reference to the local time zone in which the applicable Seller Facility (as defined in the Remaining Assets Sale Order) is located) on June 15, 2019. *See* Docket No. 1195.[10]

*(6)    The Louisiana Sale*

On February 4, 2019, the Debtors filed the *Motion of the Debtors for Entry of an Order (I) Authorizing the Sale of Certain Louisiana Facilities and Related Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Authorizing the Seller to Assume and Assign Certain Executory Contracts and Unexpired Leases, and (III) Granting Other Related Relief* [Docket No. 672] (the "Louisiana Sale Motion"), pursuant to which the Debtors sought to conduct a private sale of two facilities located in Shreveport and Bossier City, Louisiana (collectively, the "Louisiana Facilities") to an affiliate of Lexmark Holdings, LLC ("Lexmark") for cash consideration equal to $34.65 million plus cure amounts for the Assumed Contracts (as defined in the Louisiana Sale Motion). The Louisiana Facilities had previously been marketed as part of the sale process for the Remaining Assets.

On January 25, 2019, when the Louisiana Facilities were still being marketed as part of the sale process for the Remaining Assets, Koslow filed a limited objection to the Remaining Assets Bidding

---

[10] The Debtors also entered into a stipulation, which was approved by order [Docket No. 1302] of the Court dated July 29, 2019, with the Committee and Varilease, which permitted Varilease to take back its equipment at facilities purchased by KPC Promise in order to sell such equipment to KPC Promise.
4847-0265-3116.11

Procedures Motion [Docket No. 511] (the "Koslow Objection"), asserting that he and the other Principals were secured creditors in these Chapter 11 Cases as a result of the Alleged Legal Expense Indemnification and Alleged Lease Indemnification, which indemnification obligations Koslow asserted where secured by the Louisiana Facilities.  The Koslow Objection argued that the Remaining Assets Bidding Procedures Motion did not include a mechanism for setting aside proceeds from the sale of the Louisiana Facilities to satisfy such alleged secured indemnification obligations owed to the Principals, including Koslow.  On February 14, 2019, the Court held a hearing on the sale of the Louisiana Facilities, at which time the Committee preliminarily objected to the Principals' asserted secured indemnification claims.  However, at that time, the Committee had not had the opportunity to review the documents allegedly forming the basis of the Principals' secured claims or the Principals' proofs of claim, filed in May 2019 (described further below).

On February 19, 2019, the Court entered the *Amended Order (I) Authorizing the Sale of Certain Louisiana Facilities and Related Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Authorizing the Seller to Assume and Assign Certain Executory Contracts and Unexpired Leases, and (III) Granting Other Related Relief* [Docket No. 788] (the "Louisiana Sale Order"), pursuant to which the relief requested in the Louisiana Sale Motion was approved.

In addition to granting the relief requested in the Louisiana Sale Motion, the Louisiana Sale Order provided for the establishment of (i) a "Tax Escrow" in an amount of $5,699,141.19, representing the unpaid balances that are alleged to be owed to certain taxing authorities under the Debtors' payment plan with such taxing authorities, (ii) a "Guarantees Escrow" in an amount of $1,780,000, on account of the Alleged Lease Indemnification, and (iii) a "Legal Expense Escrow" in an amount of $3,000,000, on account of the Alleged Legal Expense Indemnification ((i)-(iii) collectively, the "Escrows").  The Louisiana Sale Order provided that "[t]he sole purpose of the Escrow[s] is to allow the Sale of the Purchased Assets to be consummated while providing the Collateral Agent, on behalf of itself and the [Principals], with adequate protection of the asserted interests in the Purchased Assets."  Louisiana Sale Order, ¶ 21.   The Louisiana Sale Order further provides that "nothing contained herein shall impact, expand, contract or otherwise affect any such alleged contractual obligations as set forth in the [2013] Settlement Agreement."  *Id.* at ¶ 20(c).

On May 23, 2019, Baronoff filed proofs of claim against Bossier Land Acquisition Corp. ("Bossier"), Promise Properties of Shreveport, LLC ("Shreveport"), Promise Hospital of Louisiana Inc. ("Louisiana Hospital"), PHI and Success asserting a secured claim against each of the above-mentioned Debtors in the amount of $10,506,641.91 (the "Baronoff Proofs of Claim"), representing the amounts allegedly owed to Baronoff under the Alleged Legal Expense Indemnification (which consists of the amounts in the Tax Escrow and Legal Expense Escrow) and the Alleged Lease Indemnification (which consists of the amounts in the Guarantees Escrow).  On May 28, 2019 and May 30, 2019, Koslow and Leder, respectively, filed proofs of claim against PHI, Vidalia, Louisiana Hospital, Success Healthcare 1, LLC ("Success 1"), Bossier, Shreveport, and Success asserting a secured claim against each of the above-mentioned Debtors in the amount of $4,780,000 (collectively, the "Koslow & Leder Proofs of Claim," and together with the Baronoff Proofs of Claim, the "Principal Proofs of Claim"), representing the amounts allegedly owed to Koslow and Leder, respectively, under the Alleged Legal Expense Indemnification (which consists of the amounts in the Legal Expense Escrow) and the Alleged Lease Indemnification (which consists of the amounts in the Guarantees Escrow).  The Principal Proofs of Claim include a statement that the alleged indemnification obligations are secured as a result of the Louisiana Sale Order, despite the language in the Louisiana Sale Order that states nothing therein affects the underlying rights of the parties.

On June 13, 2019, as a result of delays in closing the transaction contemplated by the Louisiana Sale Order, the Debtors filed the *Debtors' Motion for Entry of an Order Approving Amendment to Asset Purchase Agreement Entered into with Lexmark Holdings LLC* [Docket No. 1173] (the "Lexmark

Amendment Motion"), pursuant to which the Debtors sought authority to amend the asset purchase agreement contemplated by the Louisiana Sale Order by, among other things, reducing the cash component of the purchase price from $34.65 million to $25 million.  The Court approved the Lexmark Amendment Motion by order [Docket No. 1222] dated June 21, 2019.

On August 9, 2019, as a result of still more delays in closing the transaction contemplated by the Louisiana Sale Order and the Lexmark Amendment Motion, the Debtors began exploring alternatives to the sale to Lexmark, culminating in the filing of the *Motion of the Debtors for Entry of an Order (I) Authorizing the Sale of Certain Louisiana Facilities and Related Assets Free and Clear of All Liens, Claims, Interest, and Encumbrances, (II) Authorizing the Sellers to Assume and Assign Certain Executory Contracts and Unexpired Leases, (III) Granting Liens, and (IV) Granting Other Related Relief* [Docket No. 1323] (the "KPC Promise Louisiana Sale Motion"), pursuant to which the Debtors sought to sell the Louisiana Facilities to KPC Promise for cash consideration equal to $22 million plus the payment certain cure amounts and assumption of certain liabilities, as set forth more specifically in the KPC Promise Louisiana Sale Motion.  The KPC Promise Louisiana Sale Motion contemplated a process by which Lexmark could participate in an auction for the Louisiana Facilities with KPC Promise.  Lexmark did not place an Alternative Bid (as defined in the KPC Promise Louisiana Sale Motion) by the bid deadline, and the Debtors cancelled the auction.

On August 16, 2019, the Committee filed a limited objection to the KPC Promise Louisiana Sale Motion [Docket No. 1353] (the "Committee KPC Sale Objection"), whereby the Committee objected to the inclusion of the Escrows in any sale order of the Louisiana Facilities to KPC Promise because, among other reasons, the alleged indemnification claims (a) are not obligations of the seller entities of the Louisiana Facilities; (b) relate to obligations which had already been satisfied; and (c) are, at best, unsecured claims.

In light of the filing of the KPC Promise Louisiana Sale Motion, Lexmark agreed to pay a purchase price consisting of $24.5 million plus the Cure Amount (as defined in the Louisiana Sale Motion) and agreed to make certain deposits to secure its obligations to the Debtors.  The Debtors determined that the modified Lexmark transaction represented the best opportunity to maximize the value of the Debtors' estates, and the Court approved the modified transaction with Lexmark by order [Docket No. 1410] dated August 29, 2019.  The Debtors closed the sale of the Louisiana Facilities to Lexmark at 12:01 a.m. (determined by reference to the local time zone in which the applicable Seller Facility (as defined in the Louisiana Sale Order) is located) on August 31, 2019 [Docket No. 1423].  As a result of the sale closing with Lexmark, the Committee KPC Sale Objection was not decided.

h)      **Dismissal of Cases**

On December 21, 2018, the Debtors filed a *Motion of the Debtors for an Order (I) Dismissing the Chapter 11 Cases of Success Healthcare 2, LLC, S. Alexius Hospital Corporation #1, and St. Alexius Properties, LLC and (II) Granting Related Relief* [Docket No. 349] requesting the dismissal of cases for which the Debtors had successfully sold the equity interests of the at issue Debtors. On February 4, 2019, the Bankruptcy Court granted Orders granting the relief requested therein [Docket Nos. 565, 573, and 574]. On March 19, 2019, the Bankruptcy Court issued an order effecting the dismissal and closing of the Chapter 11 Cases of St. Alexius Properties, LLC, St. Alexius Hospital Corporation #1, and Success Healthcare 2, LLC [Docket No. 895].

On March 29, 2019 the Debtors filed a *Motion of the Debtors for an Order (I) Dismissing the Chapter 11 Case of Professional Rehabilitation Hospital, LLC and (II) Granting Related Relief* [Docket No. 929]. On April 17, 2019, the Bankruptcy Court granted an Order granting the relief requested therein [Docket No. 983]. On March 19, 2019, the Bankruptcy Court issued an order effecting the dismissal and closing of the Chapter 11 Case of St. Professional Rehabilitation Hospital [Docket No. 1107].

### i)      The Intercompany Loan Settlement Agreement

The beneficial holders of interests in PHHI, as beneficiaries of the PHHI Intercompany Loans (collectively, the "Beneficiaries of the PHHI Intercompany Loans")[11] asserted a secured claim in these Chapter 11 Cases of over $300 million on behalf of PHHI against PHI and the Debtor-entity Intercompany Loan Guarantors (the "Debtor Loan Guarantors") arising under the PHHI Intercompany Loans.  The Committee, however, disputed the validity, extent, enforceability, perfection and priority of the PHHI Intercompany Loans and any and all alleged claims and liens in respect thereof based on, among other things, (i) the plain language of the PHHI Intercompany Loans, which includes a broad excluded collateral definition, (ii) lapses of and failure to file UCC financing statements, (iii) lack of consideration and/or recharacterization in light of the deemed funded nature of the alleged loans, (iv) the value of the alleged collateral as determined by the asset sales in these Chapter 11 Cases, and (v) the elimination of intercompany debt as a result of substantive consolidation of the Debtors' estates.  The Beneficiaries of the PHHI Intercompany Loans dispute the Committee's assertions.  To resolve issues relating to the PHHI Intercompany Loans, the Parties negotiated for several months, with the assistance of mediator, Retired Bankruptcy Judge Kevin Carey.  As a result of the mediation, the parties agreed to support the Plan on the terms thereof, as set forth in the *Order Approving the Settlement Agreement among Debtors, the Committee, and the Beneficiaries of the Intercompany Loans* [Docket No. __].

### ARTICLE IV.

### SUMMARY OF THE PLAN

**This Disclosure Statement contains only a summary of the Plan, a copy of which is included herein as Exhibit A.  It is not intended to replace the careful and detailed review and analysis of the Plan, but only to aid and supplement such review.  This Disclosure Statement is qualified in its entirety by reference to the Plan, the Plan Supplement, and the exhibits attached thereto and the agreements and documents described therein.  If there is a conflict between the Plan and this Disclosure Statement, the provisions of the Plan will govern.  You are encouraged to review the full text of the Plan and the Plan Supplement and to read carefully the entire Disclosure Statement, including all exhibits, before deciding how to vote with respect to the Plan.**

The Plan reflects the evaluation and analysis undertaken by the Plan Proponents with respect to a number of different business, financial, and legal considerations.  Among other things, the Plan Proponents, with the assistance of their advisors, considered both overall enterprise value and the extent to which such value may be available for distribution to the Debtors' different Classes of stakeholders in light of such parties' legal and equitable rights.

The Plan is therefore proposed in the nature of a settlement pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, and the Debtors believe that Confirmation of the Plan is in the best interests of the Debtors' Estates and their creditors.

### A.      Means of Implementation of the Plan

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distribution, releases, and other benefits provided under the Plan, on the Effective

---

[11] The Beneficiaries of the PHHI Intercompany Loans are also the beneficiaries of the PHG Unsecured Loan (collectively, the "Beneficiaries of the Intercompany Loans").

4847-0265-3116.11

7163194 v4
EAST\175019097.2

Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Equity Interests, and controversies resolved pursuant to the Plan.

1.      **Substantive Consolidation**

a)      **Legal Standard for Substantive Consolidation**

Substantive consolidation is an equitable remedy to which the estates of related debtors are combined and treated as a single estate. It pools the assets and liabilities of related debtor entities into a single debtor estate from which all non-duplicative claims are paid (except for inter-entity liabilities, which are eliminated). Creditors of each of the debtors are treated as creditors of the consolidated estate and receive distributions from the consolidated estate. Substantive consolidation, therefore, restructures (and revalues) the rights of creditors and, for certain creditors, this may increase or decrease their recovery.

The leading case addressing substantive consolidation in the United States Court of Appeals for the Third Circuit (the "Third Circuit") is *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005). In analyzing whether substantive consolidation was appropriate, the Third Circuit identified the following principles: (1) the separateness of entities should be respected; (2) the harms addressed by substantive consolidation are nearly always those caused by debtors who disregard separateness; (3) the mere benefit to the administration of the case does not call substantive consolidation into play; (4) the remedy of substantive consolidation should be "rare" and one of "last resort" after considering and rejecting other remedies; and (5) while substantive consolidation may be used defensively to remedy the identifiable harms caused by the entangled affairs of a corporation and its affiliates, it may not be used offensively as part of a strategy to disadvantage a particular group of creditors. *Id.* at 211. Based on those guiding principles, the Third Circuit held that, absent consent, a court can substantively consolidate one or more debtors' estates if either "(i) prepetition [the entities for whom substantive consolidation is sought] disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." *Id.*

b)      **Factual Analysis of Substantive Consolidation**

The following facts show that on a pre-petition basis, the Debtors often disregarded corporate separateness such that the assets and liabilities of each Debtor entity were often intertwined:.

- PHG and its subsidiaries maintained and filed financial statements on a consolidated basis only and all the accounting and auditing work for the Debtors was handled by a single firm. None of the subsidiary entities created or maintained separate financial statements. Each subsidiary maintained a "trial balance," which would then be incorporated into the consolidated financials.

- The Debtors shared overhead, accounting, and other related expenses. For instance, all of the accounting personnel utilized by the Debtors were employed by PHI. Moreover, the subsidiaries did not have their own employee benefit or 401-k plans for employees. Rather, those employees participated in plans administered at the corporate level. In addition, all of the company's insurance policies were issued through PHG.

- The Debtors operated an integrated cash management system where funds from the Debtors' secured loans were funded into a single master disbursement account owned by

PHI that was then transferred into various operating and related accounts based on need, not contribution.

- Debtor, facility-level contracts with vendors were often drafted and executed with "Promise Healthcare" or PHI as the debtor contracting party. Further, many contracts and leases that provided for equipment and services at the various subsidiary facilities were negotiated and entered into by PHI at the corporate parent level.

- All of the Debtors generally used a single letterhead form that stated either "Promise Healthcare" or "Success Healthcare" at the top, with the Boca Raton, Florida corporate address at the bottom.

Additionally, the Debtors' post-petition assets and liabilities are so complexly intertwined that undertaking the process of disentangling the Debtors' estates would be cost and time prohibitive and detrimental to the Debtors' creditors. For example, the proceeds of the Debtors' sales of each of the subsidiary facilities, after satisfaction of transaction specific costs and expenses, were fully applied towards repayment of the Debtors' obligations under the DIP Credit Agreement rather than limiting repayment from such proceeds to each Debtor's respective proportional share as a borrower under the DIP Credit Agreement. As a result, the DIP Credit Agreement was fully repaid on May 2, 2019. While this repayment strategy resulted in overall savings for the Debtors' Estates in interest, fees, and related costs, under a non-consolidated plan, the ultimate consequence of this sequencing of repayment is that the Debtor entities that sold their assets at the beginning of these Chapter 11 Cases were left with no assets or proceeds available for unsecured creditor distributions while Debtor entities that conducted asset sales after the May 2, 2019 payoff of the DIP Credit Agreement were allowed to retain the proceeds of the sale resulting in higher recoveries for those creditors.

The process of determining the intercompany indebtedness between the Debtor entities as a result of (a) pre-petition transfers between the Debtor entities, (b) the repayment of the DIP Credit Facility disproportionately among the Debtors, and (c) all other intercompany transactions during the chapter 11 cases, would be prohibitively costly and harmful to recoveries for unsecured creditors herein.

c)    **Substantive Consolidation under the Plan**

As set forth in Article IV.B of the Plan, and subject to Articles IV.C and IV.H of the Plan, the Plan treats the Debtors as comprising a single Estate solely for the purposes of voting on the Plan, confirming the Plan, and making Distributions pursuant to the Plan with respect to Allowed Claims. Such substantive consolidation solely for the purposes of voting on the Plan, confirming the Plan, and making Distributions pursuant to the Plan is a condition precedent to the Effective Date. Accordingly, voting on the Plan shall be conducted and counted on a consolidated basis.

On the Effective Date, (a) the assets of the Debtors and their Estates will be merged and/or treated as if they are merged into a consolidated Estate for the purpose of making distributions on account of Allowed Claims against the Debtors and their Estates; (b) any Claim filed or asserted against any of the Debtors will be deemed a Claim against the consolidated Estate (and any duplication of claims arising from both primary operative documents and guaranty and/or other secondary obligations, or other Claims for which more than one Debtor may be liable, shall be eliminated and all such Claims against the Debtors shall be treated as a single Claim that eliminates such duplications); (c) any obligation of any of the Debtors or their Estates will be deemed to be an obligation of the consolidated Estate; (d) all guarantees by one of the Debtors in favor of any of the other Debtors shall be eliminated, and (e) any and all Intercompany Claims shall be eliminated and not entitled to any distribution under the Plan. For the avoidance of doubt,

Holders of Allowed Claims or Allowed Equity Interests who assert identical Claims against or Equity Interests in multiple Debtors shall be entitled to only a single satisfaction of such Claims or Equity Interests.

Neither this substantive consolidation nor anything else in the Plan shall (i) affect any Debtor's status as a separate and independent legal entity; (ii) affect the Debtors' organizational structure; (iii) constitute a change of control of any Debtor for any purpose; (iv) cause a merger or consolidation of any legal entities; (v) cause a transfer of any Debtor or Estate assets; (vi) affect any valid, enforceable, and unavoidable Liens (other than any Liens that secure any Claims eliminated as a result of the substantive consolidation and any Liens against any Collateral that cease to exist as a result of the substantive consolidation); (vii) cause any Lien to attach to any property of any Debtor or Estate to which such Lien would not attach in the absence of the substantive consolidation provided for in Article IV.B of the Plan (e.g., holders of floating Liens on particular classes of property shall not attach to property of a Debtor that did not secure such Claim on the Effective Date); (viii) create new collateral with respect to any Lien, charge, or other encumbrance securing the payment or performance of any Claim; (ix) make any Debtor or Estate assets or proceeds thereof available for the satisfaction of any Secured Claim that would not be available for the satisfaction of such Secured Claim in the absence of the substantive consolidation provided for in Article IV.B of the Plan; (x) create any Claim in a Class different from the Class in which such Claim would have been placed in the absence of this substantive consolidation; (xi) change the priority or nature of any Claim; (xii) affect any Debtor's independent ownership of any assets for any purposes other than the substantive consolidation described herein; or (xiii) result in the substantive consolidation of the Debtors. Except as otherwise expressly provided by or permitted in the Plan, all Debtors shall continue to exist as separate and independent legal entities.

The treatment set forth in Article IV.B of the Plan shall not (a) affect any Cause of Action available to any Debtor or Estate, including Chapter 5 Actions (except with respect to Intercompany Claims and Settlement Claims) or the ability of the Liquidation Trustee or Debtor Representative, as applicable, to pursue such Causes of Action or object to Claims, and all such Causes of Action and rights of objection are preserved as they existed immediately before the Effective Date for the Liquidating Trustee or Debtor Representative, as applicable, to pursue on behalf of the Liquidating Trust or the Debtors' estates, as applicable; (b) constitute any admission by any Debtor or Estate with respect to any Cause of Action or right of objection; (c) have any estoppel effect with respect to any Cause of Action or right of objection; or (d) constitute or affect admissible evidence in connection with any litigation of any Cause of Action or objection. The treatment described in Article IV.B of the Plan serves only as a mechanism to effect a fair distribution of value to the Holders of Allowed Claims.

**2.    Sources of Consideration for Distributions under the Plan.**

All Distributions shall be funded by existing Cash on hand with the Debtors and their Estates as of the Effective Date, including any Cash proceeds from the sales of assets of the Debtors; the collection of accounts receivable; the litigation of Causes of Action by the Debtors, the Debtor Representative, or Liquidating Trustee and the proceeds thereof, as applicable, prior to or after the Effective Date; and the recovery and/or liquidation of any and all other assets of the Debtors and their Estates by the Liquidating Trustee on and after the Effective Date.

Upon the full and final satisfaction of any Allowed Claims of the IRS and/or other taxing authorities on account of alleged amounts owed by certain of the Debtors for the Payroll Defalcation, any amounts remaining in the Tax Escrow shall be immediately released to the Liquidating Trust, free and clear of any liens, interests or other encumbrances and shall be available for distribution pursuant to the terms of the Plan.

On the Effective Date, any amounts in the Guarantees Escrow shall be immediately released to the Liquidating Trust, free and clear of any liens, interests or other encumbrances and shall be available for distribution pursuant to the terms of the Plan.

On the Effective Date, the amounts currently held in the Legal Fees Escrow shall remain in such escrow to be distributed pursuant to Article III(B)(5) of the Plan and the terms of the Legal Expense Indemnification Recovery.  For the avoidance of doubt, notwithstanding anything contained herein or in the Plan, all objections and Causes of Action, including, but not limited to, Chapter 5 Actions, with respect to the Alleged Legal Expense Indemnification Claims are expressly reserved and preserved.

### 3.        The Liquidating Trustee and Debtor Representative

#### a)        Formation of the Liquidating Trust

The Plan Proponents, on their own behalf and on behalf of the beneficiaries, shall execute the Liquidating Trust Agreement and take all other necessary steps to establish the Liquidating Trust.  As set forth more fully in the Liquidating Trust Agreement, the Liquidating Trust shall be established for the sole purpose of (a) administering the Liquidating Trust Assets; (b) adjudicating Claims against the Debtors; and (c) prosecuting, compromising, and resolving the Causes of Action (except the Debtor Rep Causes of Action); (d) distributing the Liquidating Trust's assets for the benefit of the beneficiaries provided for under the Plan; (e) performing the general powers set forth in the Liquidating Trust Agreement; (f) performing all other duties, obligations, rights, and benefits reasonably necessary to accomplish the purpose of the Liquidating Trust under the Plan, the Confirmation Order, the Liquidating Trust Agreement, and any other agreement entered into pursuant to or in connection with the Plan, with no objective to engage in the conduct of a trade or business; and (g) all other purposes described herein and in the Liquidating Trust Agreement. As set forth more fully in the Liquidating Trust Agreement, the Liquidating Trust shall be deemed to be a party in interest for purposes of contesting, settling or compromising objections to Claims against the Debtors or their Estates or Causes of Action (other than the Debtor Rep Causes of Action) of or against the Debtors or their Estates.  The Liquidating Trust shall be vested with all the powers and authority set forth in the Plan and the Liquidating Trust Agreement.   As set forth more fully in the Liquidating Trust Agreement, except to the extent that any objection is pending as of the Confirmation Date and the Liquidating Trustee does not intervene or substitute into such contested matter or adversary proceeding, the Liquidating Trustee shall be the sole entity responsible for reconciling and objecting to Claims against the Debtors and their Estates and making Distributions to Allowed Claims against the Debtors and their Estates. The funding for the payments to be made to Holders of Allowed Claims under the Plan and the payment of Post-Effective Date Expenses will be the Liquidating Trust Assets or the specified escrows and reserves as set forth in the Plan, as applicable.

#### b)        The Liquidating Trustee and Debtor Representative

Prior to the Effective Date, the Debtors and the Liquidating Trustee shall execute the Liquidating Trust Agreement.  The Liquidating Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to ensure the continued treatment of the Liquidating Trust as a grantor trust.

The Liquidating Trustee will be deemed appointed as of the Effective Date.  The Liquidating Trustee will pay or otherwise make distributions on account of all Allowed Claims against the Debtors in accordance with the terms of the Plan.

On the Effective Date, the Debtor Representative shall be deemed appointed pursuant to Section 1123(b)(3) of the Bankruptcy Code and vested with all power and authority granted to the Debtor Representative under the Plan.

The Liquidating Trustee and Debtor Representative shall each be entitled to retain counsel and other professionals, including the Liquidating Trustee Professionals and Debtor Representative Professionals, as applicable, to carry out their respective duties, including, but not limited to, (i) with respect to the Liquidating Trustee, pursuing all Causes of Action vested in the Liquidating Trust, whether known or unknown as of the Effective Date and irrespective of whether those Causes of Action have been identified or disclosed or described with any particularity and (ii) with respect to the Debtor Representative, pursuing all Debtor Rep Causes of Action, whether known or unknown as of the Effective Date and irrespective of whether those Debtor Rep Causes of Action have been identified or disclosed or described with any particularity. The Debtors, Estates, Debtor Representative and Liquidating Trust shall not be subject to estoppel to any extent with respect to any Causes of Action, including any Debtor Rep Causes of Action, not identified, disclosed or described.

The Liquidating Trustee shall be appointed for the sole purpose of effectuating the Plan and performing under the terms hereof and the Liquidating Trust Agreement, including liquidating and distributing the Debtors' assets, including, without limitation, the collection of the Debtors' accounts receivable and Causes of Action (other than the Debtor Rep Causes of Action), and with no objective to engage in the conduct of a trade or business. For the avoidance of doubt, collection of the Debtors' accounts receivable shall not constitute engaging in the conduct of a trade or business.

### c) Role of the Liquidating Trustee

The rights, duties, and powers of the Liquidating Trustee shall be as set forth in the Plan and in the Liquidating Trust Agreement. As set forth in the Plan and in the Liquidating Trust Agreement, the Liquidating Trustee shall be entitled to receive reasonable compensation and reimbursement of its reasonable out-of-pocket expenses for the performance of its duties after the Effective Date on the terms and conditions set forth in the Liquidating Trust Agreement.

### d) Role of the Debtor Representative

The rights, duties, and powers of the Debtor Representative shall be as set forth herein. As set forth herein, the Debtor Representative shall be entitled to receive reasonable compensation and reimbursement of its reasonable out-of-pocket expenses for the performance of its duties after the Effective Date on the terms and conditions set forth in the Plan.

### e) Vesting of Assets

On the Effective Date, and in accordance with the Confirmation Order, the Debtors' Assets (which exclude the Debtor Rep Causes of Action) shall automatically pass to the Liquidating Trust, free and clear of all Claims and equity interests in accordance with section 1141 of the Bankruptcy Code. Such transfer shall be free and clear of all Liens, Claims, charges, or other encumbrances.

The Confirmation Order shall constitute a determination that the transfers of the assets to the Liquidating Trust are legal and valid and consistent with the laws of the State of Delaware.

All parties shall execute any documents or other instruments as necessary to cause title to the applicable assets to be transferred to the Liquidating Trust. The Liquidating Trust Assets will be held in

trust for the benefit of all Holders of Allowed Claims pursuant to the terms of the Plan and the Liquidating Trust Agreement.

On the Effective Date, the Estates' interests in the Debtor Rep Causes of Action and rights in and proceeds of any Insurance Policies necessary for the prosecution of all such Debtor Rep Causes of Action will revest in the Debtor(s).  The Debtor Representative shall be authorized to institute and to prosecute through final judgment or settle any and all Debtor Rep Causes of Action in his or its discretion, subject to the provisions of Article IV.W of the Plan.

On the Effective Date, the Estates' interests in any Causes of Action other than the Debtor Rep Causes of Action will transfer to and vest in the Liquidating Trust.  The Liquidating Trustee shall be authorized to institute and to prosecute through final judgment or settle such Causes of Action in his or its discretion, subject to the provisions of Article IV.W of the Plan.  Upon the entry of a final judgment or settlement, the relevant proceeds of the Causes of Action shall vest in the Liquidating Trust for the benefit of the Holders of Allowed Claims in accordance with the provisions of the Plan.

In addition to the foregoing, the Debtor Representative is expressly authorized, in his discretion, to assign any or all of the Debtor Rep Causes of Action to the Liquidating Trust for prosecution and/or settlement by the Liquidating Trustee upon the occurrence of the Effective Date or at any time thereafter. To the extent necessary for the Liquidating Trustee to pursue and prosecute any such Debtor Rep Causes of Action, all rights in and proceeds of any applicable Insurance Policies shall be deemed transferred to the Liquidating Trust upon the assignment of such Debtor Rep Causes of Action.

### f)      Income Tax Status

For federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and the beneficiaries of the Liquidating Trust) shall treat the Liquidating Trust as a liquidating trust within the meaning of Treasury Income Tax Regulation section 301.7701-4(d) and IRS Revenue Procedure 94-45, 1994-2 C.B. 124.  For federal income tax purposes, the transfer of assets to the Liquidating Trust under the Plan shall be treated as a deemed transfer to the beneficiaries of the Liquidating Trust in satisfaction of their Claims followed by a deemed transfer of the assets by the beneficiaries to the Liquidating Trust.  For federal income tax purposes, the beneficiaries will be deemed to be the grantors and owners of the Liquidating Trust and its assets.  For federal income tax purposes, the Liquidating Trust will be taxed as a grantor trust within the meaning of IRC sections 671-677 (a non-taxable pass- through tax entity) owned by the beneficiaries.  The Liquidating Trust will file federal income tax returns as a grantor trust under IRC section 671 and Treasury Income Tax Regulation section 1.671-4 and report, but not pay tax on, the Liquidating Trust's tax items of income, gain, loss deductions, and credits ("*Tax Items*").  The beneficiaries will report such Tax Items on their federal income tax returns and pay any resulting federal income tax liability.  All parties will use consistent valuations of the assets transferred to the Liquidating Trust for all federal income tax purposes.  The Liquidating Trust Assets shall be valued based on the Liquidating Trustee's good faith determination of their fair market value.

The Liquidating Trustee may, at the Liquidating Trustee's sole discretion, file a tax election to treat any such Disputed Claims Reserve as a Disputed Ownership Fund within the meaning of section 1.468B-9(c) (2) (ii) of the Tax Code or other taxable entity rather than as a part of the Liquidating Trust for federal income tax purposes.  If the Liquidating Trustee timely elects to treat any portion of the Liquidating Trust subject to Disputed Claims as a Disputed Ownership Fund, any Holders of Claims who, as of the Effective Date, are Holders of Disputed Claims shall, to the extent of such Disputed Claims, not be treated as having received any portion of the Liquidating Trust Assets as to which legal or beneficial title is transferred to the Liquidating Trust hereunder and shall not be deemed grantors of the Liquidating Trust to the extent of such

Disputed Claims for U.S. federal income tax purposes, but rather shall be subject to U.S. federal income taxation in accordance with rules set forth in section 468B of the Internal Revenue Code and the Treasury Regulations thereunder. If such election is made, the Liquidating Trust shall comply with all tax reporting and tax compliance requirements applicable to the Disputed Ownership Fund or other taxable entity, including, but not limited to, the filing of separate income tax returns for the Disputed Ownership Fund or other taxable entity and the payment of any federal, state or local income tax due.

### g)    Liquidating Trust's Post-Effective Date Expenses

All expenses related to implementation of the Plan incurred from and after the Effective Date through the date on which the Liquidating Trust is dissolved will be expenses of the Liquidating Trust, and the Liquidating Trustee will disburse funds from the Liquidating Trust Assets as appropriate for purposes of paying the Post-Effective Date Expenses of the Liquidating Trust without the need for any further Order of the Bankruptcy Court. The Post-Effective Date Expenses shall include, but are not limited to, the fees and expenses of the Liquidating Trustee, the fees and expenses of the Debtor Representative, the fees and expenses of the professionals employed by the Liquidating Trustee and/or Debtor Representative, and other costs, expenses, and obligations of the Liquidating Trust until the date the Liquidating Trust is terminated in accordance with the Plan and the Liquidating Trust Agreement. The Liquidating Trustee, in his or its sole discretion, on and after the Effective Date, shall have authority to establish, increase, and/or decrease such reserves as reasonably necessary and appropriate to account for and pay all Post-Effective Date Expenses.

### h)    Powers and Authority of the Liquidating Trustee

The powers and authority of the Liquidating Trustee are set forth in full in the Liquidating Trust Agreement and include, among other things: (a) the power to sell, lease, license, abandon, or otherwise dispose of all Liquidating Trust Assets subject to the terms of the Plan; (b) the power to wind down the Debtors and their affairs, including by filing final cost reports and taking such other actions as are necessary after the Effective Date to bring about and orderly wind down of the Debtors' operations; (c) the power to effect distributions under the Plan to the Holders of Allowed Claims; (d) the authority to pay all costs and expenses of administering the Liquidating Trust after the Effective Date (including the Post-Effective Date Expenses), including the power to employ and compensate Persons and Entities to assist the Liquidating Trustee in carrying out the duties thereunder, and to obtain and pay premiums for insurance and any other powers necessary or incidental thereto; (e) the power to implement the Plan including any other powers necessary or incidental thereto; (f) the authority to settle Claims, applicable Causes of Action (other than the Debtor Rep Causes of Action), including Chapter 5 Actions, or disputes as to amounts owing to or from the Estates; (g) the authority to participate in any post-Effective Date motions to amend or modify the Plan or the Liquidating Trust Agreement, or appeals from the Confirmation Order; (h) the authority to participate in actions to enforce or interpret the Plan; and (i) the power to bind the Liquidating Trust. Except as otherwise set forth herein or in the Liquidating Trust Agreement, each of the foregoing powers may be exercised by the Liquidating Trustee without further order of the Bankruptcy Court. Notwithstanding any of the foregoing, the Liquidating Trustee may not materially amend or alter the terms and provisions of the Plan except as may otherwise be provided for in the Plan. For the avoidance of doubt, on and after the Effective Date, except as otherwise provided in the Plan or the Liquidating Trust Agreement, the Liquidating Trustee may use, acquire, or dispose of property and compromise or settle any Claims or Causes of Action (other than the Debtor Rep Causes of Action) without supervision or approval by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or Bankruptcy Rules.

### i)    Authority of the Debtor Representative

4847-0265-3116.11

7163194 v4
EAST\175019097.2

Upon the Effective Date, the Debtors' boards of directors and/or trustees, as applicable, shall be dissolved and the then-current officers of the Debtors and members of the boards of directors and/or trustees of the Debtors shall be relieved of their positions and corresponding duties and obligations. On and after the Effective Date, the Debtor Representative shall have full and complete authority to act on behalf of and bind the Debtors, and to enforce the rights of the Debtors and their Estates without further action or approval of the Bankruptcy Court or the boards of directors and/or trustees of the Debtors. After the Debtor Rep Causes of Action are liquidated and the proceeds of such Debtor Rep Causes of Action are transferred to the Liquidating Trust in accordance with the Plan, the Debtor Representative shall be empowered, but not directed, to effectuate the dissolution of the Debtors in accordance with the laws of the State of Delaware as appropriate for the effectuation of the Plan and wind down of the Debtors' Estates.

### j)    Employment and Compensation

The Liquidating Trustee and Debtor Representative shall serve without bond and shall receive compensation for serving as Liquidating Trustee and Debtor Representative, as applicable, as set forth in the Plan and in the Liquidating Trust Agreement, as applicable. At any time after the Effective Date and without further Order of the Bankruptcy Court, the Liquidating Trustee and Debtor Representative may employ and compensate Persons or Entities, including the Liquidating Trustee Professionals and Debtor Representative Professionals (which may, but need not, include Professionals previously or currently employed in the Chapter 11 Case), reasonably necessary to assist the Liquidating Trustee and Debtor Representative in the performance of their duties under the Liquidating Trust Agreement and the Plan, as applicable. Such Persons or Entities shall be compensated and reimbursed from the Liquidating Trust for their reasonable and necessary fees and out of pocket expenses on a monthly basis in arrears.

### k)    Liquidating Trustee as Successor in Interest to the Debtors and Committee

Except as to the Debtor Rep Causes of Action, the Liquidating Trustee is the successor in interest to the Debtors and the Committee, and thus, after the Effective Date, to the extent the Plan requires an action by the Debtors or the Committee (except as it relates to the Debtor Rep Causes of Action), the action shall be taken by the Liquidating Trustee on behalf of the Debtors and the Committee, as applicable.

For federal and applicable state income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and the beneficiaries of the Liquidating Trust Estate) shall treat the transfer of assets to the Liquidating Trust in accordance with the terms of the Plan, as a sale by the Debtors of such assets to the Liquidating Trust estate at a selling price equal to the fair market value of such assets on the Effective Date. The Liquidating Trust shall be treated as the owner of all assets that it holds.

### l)    Use of Existing Accounts

The Liquidating Trustee may use the Debtors' existing bank accounts (as of the Effective Date) for the purposes set forth herein, to the extent possible and desired. The Liquidating Trustee also may close the Debtors' existing bank accounts, in his or its discretion, and transfer all amounts therein to one or more accounts, in accordance with the terms of the Plan. Alternatively, notwithstanding any provisions to the contrary in the Plan, the Liquidating Trustee may invest some or all the funds that would otherwise be deposited into the accounts established pursuant to the Plan in allowed investments under applicable non-bankruptcy law.

### m)     Tax Reporting

The Liquidating Trustee shall file (or cause to be filed) any statements, returns or disclosures relating to the Debtors that are required by any governmental unit. The Liquidating Trustee shall be responsible for payment, out of the Liquidating Trust's assets, of any taxes imposed on the Debtors or the Liquidating Trust or their respective assets, including the applicable Disputed Claims Reserve. In the event, and to the extent, any Cash reserved on account of Disputed Claims in the applicable Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (a) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (b) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Liquidating Trustee as a result of the resolution of such Disputed Claims.

### n)     Dissolution of Liquidating Trust

The existence of the Liquidating Trust and the authority of the Liquidating Trustee will commence as of the Effective Date and will remain and continue in full force and effect until the earlier of (a) the date on which all of the assets are liquidated in accordance with the Plan, the funds in the Liquidating Trust have been completely distributed in accordance with the Plan, all tax returns and any other filings or reports have been filed with the appropriate state or federal regulatory authorities, the Liquidating Trustee's final report has been approved, and the order closing the Chapter 11 Cases is a Final Order or (b) five (5) years after the date of creation of the Liquidating Trust, unless extended by the Bankruptcy Court as provided in the Liquidating Trust Agreement.

At such time as the Liquidating Trust has been fully administered (*i.e.*, when all things requiring action by the Liquidating Trustee have been done, and the Plan has been substantially consummated), the Liquidating Trustee will file an application for approval of his or its final report and for the entry of the final decree by the Bankruptcy Court.

### o)     Indemnification of the Liquidating Trustee and Debtor Representative

The Liquidating Trustee, the Debtor Representative, and other Indemnified Persons shall be held harmless and indemnified as described in Article IX of the Plan.

### 4.     Continued Corporate Existence

Notwithstanding anything to the contrary in the Plan or Confirmation Order, each Debtor shall continue to exist as a separate corporate entity after the Effective Date solely for the purpose of implementing the Plan unless and until such Debtor is dissolved in accordance with applicable state law pursuant to the terms of the Plan.

The winding down of the Debtors' affairs, filing of any necessary documentation to dissolve the Debtors, and adoption of any and all corporate documents or resolutions necessary or appropriate to implement the Plan are hereby deemed authorized and approved in all respects without further action under any applicable law, regulation, order or rule.

### 5.     Cancellation of Existing Securities and Agreements

Except for purposes of evidencing a right to Distributions under the Plan, on the Effective Date, all agreements and other documents evidencing Claims or rights of any Holder of a Claim or Equity Interest

against any of the Debtors, including, but not limited to, all indentures, notes, bonds, and share certificates evidencing such Claims and Equity Interests and any agreements or guarantees related thereto shall be cancelled, terminated, deemed null and void and satisfied, as against the Debtors, but not as against any other Person or Entity unless specifically released by or under the Plan.

### 6.     Operations of the Debtors Between the Confirmation Date and the Effective Date

The Debtors shall continue to operate as debtors in possession during the period from the Confirmation Date through and until the Effective Date. The retention and employment of the Professionals retained by the Debtors shall terminate as of the Effective Date; *provided, however*, that the Debtors shall exist, and their Professionals shall be retained, after such date with respect to applications filed under sections 330 and 331 of the Bankruptcy Code.

### 7.     Automatic Stay

The automatic stay provided for under section 362 of the Bankruptcy Code shall remain in effect in the Chapter 11 Cases until the Effective Date at which time the injunctions described in the Plan shall come into effect with no gap in time.

### 8.     The Committee

Upon the Effective Date, the Committee shall be deemed dissolved, and their members shall be deemed released and discharged from all further authority, duties, responsibilities, and obligations relating to and arising from or in connection with  the Chapter 11 Cases. The retention and employment of the Professionals retained by the Committee shall be deemed terminated as of the Effective Date; *provided, however*, that the Committee shall continue to exist, and their Professionals shall continue to be retained, after such date with respect to applications filed under sections 330 and 331 of the Bankruptcy Code and, as appropriate, motions seeking the enforcement of the provisions of the Plan or the Confirmation Order.

On the Effective Date, the Committee shall be replaced by the POC that shall consist of not less than three (3) Persons or Entities that are beneficiaries of the Liquidating Trust, one of which such Persons or Entities shall be a representative of Credit Value Partners, LP ("CVP").  The identities of the Persons and/or Entities that will serve on the POC as of the Effective Date will be filed by the Committee with the Bankruptcy Court no later than five (5) days before the Confirmation Hearing.  The POC may also include such other Persons or Entities (including *ex officio* members) as may be requested by the POC, which Persons or Entities shall have agreed to participate in the performance of the POC's functions as set forth in the Plan.  The POC's sole function and responsibility shall be to advise the Liquidating Trustee and Debtor Representative in the performance of the Liquidating Trustee's and Debtor Representative's duties and obligations under the Plan for the benefit of the Holders of Allowed Claims entitled to distribution from the Liquidating Trust.  The members of the POC shall serve without compensation but may be reimbursed for reasonable expenses incurred in the performance of their duties as members of the POC.

The POC shall adopt by-laws governing all matters concerning participation in the POC, which by-laws shall include one or more mechanisms for individual members of the POC to be recused from consideration or voting upon matters that could pose a conflict of interest.  Such by-laws shall provide that neither the Liquidating Trustee nor the Debtor Representative shall settle any claims asserted by the Liquidating Trustee or Debtor Representative, as appropriate, in an amount equal to or greater than $1,000,000 without unanimous approval of such settlement by all members of the POC; *provided, however*, to the extent unanimous approval is not received, the Liquidating Trustee or Debtor Representative, as

appropriate, may pursue approval of such settlement by filing a motion with the Bankruptcy Court seeking approval of the settlement pursuant to Bankruptcy Rule 9019 and the standards applicable thereto.

### 9.    Books and Records

The Books and Records shall vest in the Liquidating Trust as of the Effective Date.  The Liquidating Trustee is authorized to treat and/or abandon the Books and Records consistent with the provisions of the Plan and the Liquidating Trust Agreement.

### 10.    Corporate Action

Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Debtors prior to the Effective Date shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan, and shall be authorized, approved, and ratified in all respects without any requirement of further action by Holders of Claims or Equity Interests, directors of the Debtors, or any other Entity.

### 11.    Preservation of Causes of Action

**Except as otherwise expressly provided in the Plan, any and all Causes of Action are preserved under the Plan.**

### a)    Vesting of Causes of Action

Except as otherwise provided in the Plan or Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, any and all Causes of Action that the Debtors and the Estates may hold against any Person or Entity (other than any Debtor Rep Causes of Action) shall vest in the Liquidating Trust on and after the Effective Date, including, but not limited to, the Causes of Action (other than any Debtor Rep Causes of Action) to be scheduled in the Plan Supplement.

Except as otherwise provided in the Plan or Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, any and all Debtor Rep Causes of Action shall revest in the Debtors, including, but not limited to, the Debtor Rep Causes of Action to be scheduled in the Plan Supplement.

Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, all privileges, including the attorney-client, work-product and other privileges held by the Debtors and the Estates shall vest in the Liquidating Trustee and the Debtors Representative, as applicable.

Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Liquidating Trustee shall have the exclusive right to investigate, institute, prosecute (in any court or other tribunal, including, without limitation, in an adversary proceeding relating to one or more of the Chapter 11 Cases in the Bankruptcy Court), abandon, settle or compromise any Causes of Action (other than the Debtor Rep Causes of Action) that were held by the Debtors and the Estates.  The Liquidating Trustee's authority to abandon, settle, or compromise such Causes of Action shall be in the Liquidating Trustee's sole discretion and without further order of the Bankruptcy Court, except as otherwise set forth herein.

Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Debtor Representative shall have the exclusive right to investigate, institute, prosecute (in any court or other tribunal, including, without limitation, in an adversary proceeding relating to one or more of the Chapter 11 Cases in the Bankruptcy Court), abandon, settle or compromise any Debtor Rep Causes of Action.  The Debtor Representative's authority to abandon, settle, or compromise such Debtor Rep Causes of Action

4847-0265-3116.11

shall be in the Debtor Representative's sole discretion and without further order of the Bankruptcy Court, except as otherwise set forth herein

> **b)    Preservation of All Causes of Action Not Expressly Identified, Disclosed, Settled or Released**

Unless a Cause of Action against a Holder or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order) of the Bankruptcy Court (including those de minimis claims settled under the de minimis settlement procedures order [D.I. 901]), the Debtors and their Estates expressly reserve such Cause of Action for later adjudication or administration by the Liquidating Trustee and Debtor Representative, as appropriate (including, without limitation, Causes of Action not specifically identified or described in the Plan or elsewhere or of which the Plan Proponents may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Plan Proponents at this time or facts or circumstances which may change or be different from those the Plan Proponents now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise), or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan, or Confirmation Order, except where such Causes of Action have been released in the Plan (including, without limitation, and for the avoidance of doubt, the releases contained in Article IX.B.1 of the Plan) or any other Final Order (including the Confirmation Order). In addition, the Debtors and their Estates expressly reserve the right of the Liquidating Trustee and Debtor Representative, as appropriate, to pursue or adopt any claims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Person or Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits. Further, the Debtors and their Estates expressly reserve all privileges, including the attorney-client, work-product and other privileges.

Any Person or Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that any such obligation, transfer, or transaction, including personal injury and other tort claims, may be reviewed by the Liquidating Trustee and Debtor Representative, as appropriate, subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether: (i) such Person or Entity has filed a proof of Claim against the Debtors in the Chapter 11 Cases; (ii) the Debtors have Allowed or objected to any such Person or Entity's proof of Claim; (iii)  any such Person or Entity's Claim was included in the Schedules; (iv) the Debtors have objected to any such Person or Entity's scheduled Claim; or (v) any such Person or Entity's scheduled Claim has been identified by the Debtors as disputed, contingent or unliquidated.

This reservation, retention, and preservation of Causes of Action further provides notice to Creditors and other parties in interest herein about **the types and categories of Causes of Action** that might enlarge the Estates, and is based upon information known by the Plan Proponents to date.  To the extent that any Creditor or party in interest has any questions or concerns regarding the scope and breadth of the types and/or categories of Causes of Action reserved, retained, and preserved, any such Creditor or party in interest should object to this Disclosure Statement and request that the Bankruptcy Court require a more complete description of the types or categories of Causes of Action reserved, retained, and preserved.

Further, no Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Plan Proponents, Liquidating Trustee, Debtor Representative, or the Liquidating Trust, as applicable, will not pursue any and all available

Causes of Action against them, it being the intent of the Plan Proponents that all Causes of Action not expressly released shall be reserved, retained, and preserved for the benefit of all Creditors and parties in interest.  No preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Plan's confirmation or occurrence of the Effective Date.  Any counterparty (or potential counterparty) to a Cause of Action that is concerned whether a Cause of Action may or will be asserted against it, him, or her, may contact the Plan Proponents in connection with the Plan confirmation process described in this Disclosure Statement for further information.

The Plan Proponents identify the following non-exhaustive list of types and categories of Causes of Action to be preserved and reserved:

a.　　The right to object to, challenge or otherwise contest any Claims, whether or not any such Claim is the subject of a proof of claim;

b.　　All Claims, Causes of Action, objections, rights, and remedies arising under Chapter 5 of the Bankruptcy Code pursuant to, among others, sections 502, 510, 542 through 545 and 547 through 553 or 558 thereof, including all Chapter 5 Actions, or similar or equivalent Claims, causes of action, objections, rights, and remedies arising under state law;

c.　　All Chapter 5 Actions and any and all fraudulent conveyance, voidable preference, or avoidable transfer Claims that, in any instance, could be brought under state or federal law, including, but not limited to, all causes of action under Chapter 5 of the Bankruptcy Code and any similar state or federal law against persons and entities identified as recipients of transfers from any of the Debtors prior to the Petition Date, including those persons or entities identified in the Debtors' respective Statements of Financial Affairs;

d.　　All Tort Claims (as defined in the Plan);

e.　　All D&O Claims (as defined in the Plan);

f.　　All Principal Claims (as defined in the Plan) and/or Claims relating to the Alleged Lease Indemnification and Alleged Legal Expense Indemnification Claims;

g.　　All Professional Claims (as defined in the Plan);

h.　　All Claims under any Insurance Policies applicable to the Debtors;

i.　　All Claims and/or Causes of Action of any kind or nature arising under state or federal law against the purchasers of any of the Debtors' assets and/or any entity or person which attempted to purchase any of the Debtors' assets;

j.　　All Claims, causes of action, and other rights (including rights to challenge any asserted Lien) of any kind or nature against any Creditor asserting a secured claim in these cases, other than Claims or Causes of Action released or otherwise waived during the cases;

k.　　All Claims and/or Causes of Action of any kind or nature arising under state or federal law arising under a theory of negligence, professional negligence, and/or malpractice;

l.　　All Claims and/or Causes of Action of any kind or nature arising under state or federal law arising under or based upon the formation and capitalization of the Debtors;

m.    All Claims and/or Causes of Action of any kind or nature arising state law based fraudulent conveyance theories;

n.    All legal and equitable defenses against any Claim or Cause of Action asserted against the Debtors; and

o.    All Claims, demands, and Causes of Action of any kind or nature whatsoever held by, through, or on behalf of the Debtors and/or the Estates against any other Person or Entity, that have not otherwise been resolved or disposed of, all of which are preserved in full, whether or not such Claims or Causes of Action are specifically identified in this Disclosure Statement.

**This Disclosure Statement constitutes notice to any party in interest and counterparty (or potential counterparty) to a Cause of Action of the intent to pursue any and all such Causes of Action described and defined herein and in the Plan to judgment and collection, and that the proceeds of all such Causes of Action are essential to the Plan.  This reservation, retention, and preservation is intended to be broad in scope, and provides notice to enable Creditors to (i) identify the Claims and Causes of Action (or potential Claims and Causes of Action) at issue and (ii) evaluate whether those Claims and Causes of Action might provide additional assets for distribution**

## B.    Administrative and Priority Claims

Certain types of Claims are not placed into Classes; instead, such Claims are unclassified Claims. Such unclassified Claims are not considered Impaired and their Holders are not entitled to vote on the Plan because they automatically receive specific treatment provided for them in the Bankruptcy Code.  As such, the Plan Proponents did not place the following Claims in any Class.  The respective treatment for these Claims is provided in Article II of the Plan, as summarized below.

### 1.    Administrative Claims

Administrative Claims are Claims that have been filed timely and properly (a) with respect to Claims accruing on or after the Petition Date through and including April 30, 2019 that remain unpaid, before the Interim Administrative Claims Bar Date, (b) with respect to Claims accruing on or after May 1, 2019 through and including September 1, 2019 that remain unpaid, before the Second Interim Administrative Claims Bar Date and (c) with respect to Claims accruing (i) on or after September 1, 2019 through the Effective Date that remain unpaid and (ii) prior to September 1, 2019 where the applicable Holder of such claim was not served with notice of the Interim Administrative Claims Bar Date or Second Interim Administrative Claims Bar Date, as applicable, before the Final Administrative Claims Bar Date set forth in the Confirmation Order (except, in each case, as otherwise provided by a separate order of the Bankruptcy Court), for costs and expenses of administration under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation: the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries or commissions for services and payments for goods and other services and leased premises, as determined by the Bankruptcy Court). Any fees or charges assessed against the Estates under section 1930 of chapter 123 of title 28 of the United States Code are excluded from the definition of Administrative Claims and shall be paid in accordance with Article V.N of the Plan.

In full and final satisfaction, settlement, release, and discharge of each Allowed Administrative Claim, except to the extent that a Holder of an Allowed Administrative Claim and the Debtors or the Liquidating Trustee (as applicable) agree in writing to less favorable treatment for such Administrative

Claim, the Liquidating Trustee shall pay in Cash, from the assets of the Debtors' Estates and/or the Liquidating Trust, each Holder of an Allowed Administrative Claim any unpaid amount of that Allowed Administrative Claim as follows: (a) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim becomes due or as soon as practicable thereafter); (b) if such Claim is Allowed after the Effective Date, on the date the Claim is Allowed or as soon as practicable after it is Allowed (or, if not then due, when such Allowed Administrative Claim becomes due, or as soon as reasonably practicable); (c) when and upon such terms as may be agreed upon by the Holder of the Allowed Administrative Claim and the Liquidating Trustee; or (d) in accordance with any Final Order of the Bankruptcy Court, as applicable. The Debtors estimate that Allowed Administrative Claims payable on the Effective Date, exclusive of compensation and reimbursement of expenses payable to professionals retained in the Chapter 11 Cases, will be approximately $1.1 million. For purposes of the bar dates described below, the Debtors expect to reserve not less than $1.1 million for such Administrative Claims.

## ADMINISTRATIVE CLAIMS BAR DATE

**Except as otherwise provided in the Plan, the Bar Date Order, the Second Bar Date Order, or another order of the Bankruptcy Court, any Entity or Person that seeks allowance of an Administrative Claim shall file with the Bankruptcy Court and serve on counsel for the Liquidating Trustee a request for payment of such Administrative Claim by 5:00 p.m., prevailing Eastern time, on the Final Administrative Claims Bar Date. Requests for payment of an Administrative Claim must include at a minimum: (a) the name of the Holder seeking allowance of an Administrative Claim; (b) the amount of the Administrative Claim sought; (c) the basis asserted for allowance of the Administrative Claim; and (d) all supporting documentation that justifies allowance of the Administrative Claim asserted. Any Person or Entity that is required to file and serve a request for allowance of an Administrative Claim by the Final Administrative Claims Bar Date that fails to file and serve a timely request will be forever barred, estopped, and enjoined from asserting any request for allowance of such Administrative Claim or participating in Distributions under the Plan on account thereof.**

A request for payment of an Administrative Claim consistent with the foregoing paragraph will be considered timely filed only if it is filed with the Bankruptcy Court and actually received by parties identified in Article II.A.1 of the Plan by 5:00 p.m., prevailing Eastern time, on the Final Administrative Claims Bar Date. Requests for payment of Administrative Claims may not be delivered by facsimile, telecopy, or electronic mail transmission. The Final Administrative Claims Bar Date shall not apply to (a) Claims for Accrued Professional Compensation, or (b) Administrative Claims accruing on and after the Petition Date through and including April 30, 2019 or September 1, 2019, as applicable, to the extent the holders of such Administrative Claims received notice of the Interim Administrative Claims Bar Date or Second Interim Administrative Claims Bar Date, as applicable. For the avoidance of doubt, to the extent any Claim is or was subject to a different and/or previously-established Bar Date, such different and/or previously-established Bar Date shall be deemed operative and will not be extended or deemed extended by virtue of Article III.A of the Plan.

Notwithstanding anything to the contrary in the Plan, the Debtors' and the Committee's Professionals shall not be required to file a request for payment of any Administrative Claim by the Final Administrative Claims Bar Date for fees and expenses allowable under sections 330, 331, or 503(b)(2-6) of the Bankruptcy Code, because Professionals will instead file final fee applications as required by the Article II.C of the Plan, the Bankruptcy Code, the Bankruptcy Rules, and the Confirmation Order

### 2.    Priority Tax Claims

In full and final satisfaction, settlement, release, and discharge of each Allowed Priority Tax Claim, except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtors or the Liquidating Trustee (as applicable) agree in writing to less favorable treatment for such Priority Tax Claim, the Liquidating Trustee shall pay in Cash, from the assets of the Debtors' Estates and/or the Liquidating Trust, each Holder of an Allowed Priority Tax Claim any unpaid amount of that Allowed Priority Tax Claim as follows: (a) on the Effective Date or as soon as practicable thereafter; (b) if such Claim is Allowed after the Effective Date, on the date the Claim is Allowed or as soon as practicable after it is Allowed; (c) when and upon such terms as may be agreed upon by the Holder of the Allowed Priority Tax Claim and the Liquidating Trustee; or (d) in accordance with any Final Order of the Bankruptcy Court, as applicable.

### 3.    Professional Compensation and Reimbursement Claims

The deadline for Professionals to submit final applications for approval of Accrued Professional Compensation to the Bankruptcy Court shall be sixty (60) days after the Effective Date. Any Professional

4847-0265-3116.11

or other Person or Entity that is required to file and serve a final application for approval of Accrued Professional Compensation that fails to file and serve a timely application will be forever barred, estopped, and enjoined from asserting any request for payment of Accrued Professional Compensation or participating in Distributions under the Plan on account thereof.

All Professionals employed by the Debtors or the Committee (including Ordinary Course Professionals) shall provide to the Debtors an estimate of their paid and unpaid Accrued Professional Compensation through the Effective Date (including an estimate for fees and expenses expected to be incurred after the Effective Date to prepare and prosecute allowance of final fee applications) no later than five (5) days prior to the Confirmation Hearing. Thereafter, but in any event no later than the Effective Date, the Debtors shall fully fund an escrow account to provide for the payment of Accrued Professional Compensation such that the condition precedent in Article VIII.A.5 of the Plan shall be deemed satisfied.

### C.     Classification and Treatment of Claims under the Plan

The Plan constitutes a global settlement, under section 9019 of the Bankruptcy Code, of all Claims and Equity Interests in the Debtors and their Estates, as set forth in the Plan and in the Plan Settlement, including the substantive consolidation of the Debtors' estates described in the Plan. Except for the Claims addressed in Article II of the Plan (described in Article IV.B above), all Claims and Equity Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code. A Claim or an Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and the remainder is classified in one or more other Classes to the extent that any portion of the Claim or Equity Interest qualifies within the description of such other Classes, without duplication. A Claim or an Equity Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or Allowed Equity Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. Further, the provision in the Plan for a Class of Claims or Equity Interests does not presume, and does not constitute any admission or determination regarding, the existence or validity of any Claim (including any purported Secured Claims) or Equity Interest within such Class.

The Plan is intended to deal with all Claims against and Equity Interests in the Debtors of whatever character, whether known or unknown, whether or not with recourse, whether or not contingent or unliquidated, and whether or not previously Allowed by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code, including unclassified Claims. However, only Holders of Allowed Claims and Equity Interests will receive any distribution under the Plan, and no Holder of a Claim or Equity Interest shall receive any distribution unless and until such Claim or Equity Interest is Allowed. For purposes of determining Pro Rata distributions under the Plan, Disputed Claims shall be included in the Class in which such Claims would be included if Allowed, until such Claims are finally disallowed. The Plan will not provide any distributions on account of a Claim or Equity Interest to the extent that such Claim or Equity Interest has been disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date.

The following table classifies Claims against and Equity Interests in the Debtors for all purposes, including voting, confirmation, and Distribution under the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, unless a Final Order provides otherwise. Each Class set forth below is treated under the Plan as a distinct Class for voting and Distribution purposes.

As set forth in the following table, Classes 4 – 9 are Impaired under the Plan. The treatment of Allowed Claims and Equity Interests in the Impaired Classes under the Plan is in full and complete

satisfaction of the legal, contractual, and equitable rights of each Holder of an Allowed Claim or Equity Interest in each such Impaired Class. Subject to the provisions of any Order approving the Disclosure Statement, Holders of Claims in the Impaired Classes 4 – 7 are entitled to vote on the Plan. Because Holders of Claims and Equity Interests in Classes 8 – 9 will not receive any distribution under the Plan, they are conclusively presumed to have rejected the Plan, and are not entitled to vote. Holders in Claims in Classes 1 – 3 are unimpaired, deemed to accept the Plan, and not entitled to vote on the Plan.

| Class | Claim | Status | Voting Rights |
|:---:|:---:|:---:|:---:|
| 1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 2 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 3 | Alleged Lease Indemnification Claims | Unimpaired | Deemed to Accept |
| 4 | Settlement Claims | Impaired | Entitled to Vote |
| 5 | Alleged Legal Expense Indemnification Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Convenience Class Claims | Impaired | Entitled to Vote |
| 8 | Intercompany Claims | Impaired | Deemed to Reject |
| 9 | Equity Interests | Impaired | Deemed to Reject |

The following description summarizes the classification and treatment of Claims and Equity Interests and the consideration contemplated to be distributed to the holders of such Claims and Equity Interests under the Plan. Unless otherwise provided, these estimates are as of the date of this Disclosure Statement and are subject to the Risk Factors provided in Section VI, titled "Risk Factors.".

    **1.**        **Other Secured Claims (Class 1)**

Other Secured Claims are Claims against the Debtors, excluding any Intercompany Claims or Settlement Claims, secured by Liens on property in which the Estates have an interest, which Liens are valid, perfected, unavoidable and enforceable under applicable law or by reason of a Final Order, or that are subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Creditor's interest in the Estates' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined under section 506(a) of the Bankruptcy Code; *provided, however*, that the DIP Indemnification Claims shall not be considered Other Secured Claims and payment of such DIP Indemnification Claims shall be governed by the terms of the DIP Payoff Letter and satisfaction of such DIP Indemnification Claims shall be limited to the amounts in the DIP Indemnity Account (as defined in the Final DIP Order).

In full and final satisfaction, settlement, release, and discharge of each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim, on or as soon as practicable after the later of the Effective Date or the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, will, at the sole election of the Liquidating Trustee, (i) either be paid the full amount of such Holder's Allowed Other Secured Claim, or such lesser amount as the Liquidating Trustee and the Holder of the Other Secured Claim may agree to in writing, in Cash; (ii) receive the collateral securing such Allowed Other Secured Claim; or (iii) receive the indubitable equivalent of such Allowed Other Secured Claim.

Class 1 is Unimpaired by the Plan. Holders of Other Secured Claims in Class 1 are deemed to accept and not entitled to vote to accept or reject the Plan.

### 2.    Other Priority Claims (Class 2)

Other Priority Claims are Claims against a Debtor (other than Administrative Claims) that are entitled to priority right of payment under section 507(a) of the Bankruptcy Code, other than Priority Tax Claims, *provided, however,* that no Intercompany Claims or Settlement Claims shall constitute Other Priority Claims.

In full and final satisfaction, settlement, release, and discharge of each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim, on or as soon as practicable after the later of the Effective Date or the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, will either be paid the full amount of such Holder's Allowed Other Priority Claim, or such lesser amount as the Liquidating Trustee and the Holder of the Other Priority Claim may agree to in writing, in Cash

Class 2 is Unimpaired by the Plan. Holders of Other Priority Claims in Class 2 are deemed to accept and not entitled to vote to accept or reject the Plan.

### 3.    Alleged Lease Indemnification Claims (Class 3)

Alleged Lease Indemnification Claims are any alleged indemnification Claims related to PHI's assumption of the Principal Guarantees, which Alleged Lease Indemnification Claims shall be deemed Allowed on the Effective Date pursuant to the terms of the Lease Indemnification Estimation set forth in Article III.G of the Plan.

In full and final satisfaction, settlement, release, and discharge of each Allowed Alleged Lease Indemnification Claim, each Allowed Alleged Lease Indemnification Claim shall be deemed fully satisfied as a result of the Lease Indemnification Estimation.

Class 3 is Unimpaired by the Plan. Holders of Alleged Lease Indemnification Claims in Class 3 are deemed to accept and not entitled to vote to accept or reject the Plan.

### 4.    Settlement Claims (Class 4)

Settlement Claims are the Unsecured PHG Intercompany Note Claims and any and all claims arising under or related to the Intercompany Loan Documents held by the Beneficiaries of the Intercompany Loans, which Settlement Claims shall be deemed Allowed on the Effective Date.

In full and final satisfaction, settlement, release, and discharge of each Allowed Settlement Claim, each Holder of an Allowed Settlement Claim, on or as soon as practicable after the Effective Date, shall receive its Pro Rata share of the Class A Interest, which shall entitle each such holder to share Pro Rata in the Class A Trust Recovery.

Class 4 is Impaired by the Plan. Each Holder of a Settlement Claim in Class 4 is therefore entitled to vote to accept or reject the Plan in an amount equal to such Holder's percentage membership interest in PHG (the "PHG Membership Interest").[12]

---

[12] The Holders of Settlement Claims in Class 4 shall be entitled to vote on the Plan and receive any distributions thereunder based on each Holder's PHG Membership Interest, which PHG Membership Interest shall be included on
4847-0265-3116.11

5.      **Alleged Legal Expense Indemnification Claims (Class 5)**

Alleged Legal Expense Indemnification Claims are any alleged legal expense indemnification Claim arising under section 6.1 of the Sun Capital Settlement Agreement.

In full and final satisfaction, settlement, release, and discharge of each Allowed Alleged Legal Expense Indemnification Claim, each Holder of an Allowed Alleged Legal Expense Indemnification Claim, on or as soon as practicable after the later of the Effective Date or the date on which such Alleged Legal Expense Indemnification Claim becomes an Allowed Alleged Legal Expense Indemnification Claim, shall receive its Pro Rata share of the Legal Expense Indemnification Recovery.

Class 5 is Impaired by the Plan. Each Holder of an Alleged Legal Expense Indemnification Claim in Class 5 is therefore entitled to vote to accept or reject the Plan.

6.      **General Unsecured Claims (Class 6)**

General Unsecured Claim are Claims against any Debtor that are not Administrative Claims, Accrued Professional Compensation Claims, Priority Tax Claims, DIP Indemnification Claims, Secured Claims, Other Secured Claims, Other Priority Claims, Alleged Lease Indemnification Claims, Settlement Claims, Alleged Legal Expense Indemnification Claims, Convenience Class Claims, Intercompany Claims, or Equity Interests.

Except to the extent that a Holder of an Allowed General Unsecured Claim and the Liquidating Trustee agree to a less favorable treatment in writing, in full and final satisfaction, settlement, release, and discharge of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim, on or as soon as practicable after the later of the Effective Date or the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, shall receive its Pro Rata share of the Class B Interest, which shall entitle each such Holder to share Pro Rata in the Class B Trust Recovery.

Class 6 is Impaired by the Plan. Each Holder of a General Unsecured Claim in Class 6 is therefore entitled to vote to accept or reject the Plan.

7.      **Convenience Class Claims (Class 7)**

A Convenience Class Claim is a Claim that would otherwise be a General Unsecured Claim but for treatment as a Convenience Class Claim that is (i) scheduled or asserted in the amount of $10,000 or less or (ii) scheduled or asserted in an amount greater than $10,000 but reduced to $10,000 by election of its Holder.

Except to the extent that a Holder of an Allowed Convenience Class Claim and the Liquidating Trustee agree to a less favorable treatment in writing, in full and final satisfaction, settlement, release, and discharge of each Allowed Convenience Class Claim, each Holder of an Allowed Convenience Class Claim, on or as soon as practicable after the later of the Effective Date or the date on which such

---

the ballot distributed to each Holder of a Settlement Claim.  The Debtors shall prepare a list of the Beneficiaries of the Intercompany Loans as of the Voting Record Date and the PHG Percentage Membership of each Beneficiary of the Intercompany Loans (the "Beneficial Holder Record"), which Beneficial Holder Record shall be used for solicitation, voting and distribution purposes with respect to Settlement Claims in Class 4.

Convenience Class Claim becomes an Allowed Convenience Class Claim, shall receive Cash in an amount equal to 14% of the amount of such Holder's Allowed Convenience Class Claim.

Class 7 is Impaired by the Plan. Each Holder of an Allowed Convenience Class Claim is therefore entitled to vote to accept or reject the Plan.

### 8. Intercompany Claims (Class 8)

An Intercompany Claim is any pre- or postpetition Claim against a Debtor held by another Debtor or by a controlled non-Debtor direct or indirect subsidiary of PHG, excluding any Settlement Claims.

On the Effective Date, all Intercompany Claims shall be deemed extinguished.

Class 8 is Impaired by the Plan. Holders of Intercompany Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Claims.

### 9. Equity Interests (Class 9)

Equity Interests are any equity interests in a Debtor that existed immediately prior to the Petition Date.

On the Effective Date, all Equity Interests shall be deemed extinguished.

Class 9 is Impaired by the Plan. Holders of Equity Interests in Class 9 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Equity Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Equity Interests.

### D. Estimation of Claims

Before or after the Effective Date, the Debtors (in consultation with the Committee) or the Liquidating Trustee, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim, including, but not limited to, any Alleged Legal Expense Indemnification Claim, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the claims register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim that is disputed, contingent, or unliquidated, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan, including for purposes of distributions. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before twenty one (21) days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court

4847-0265-3116.11

Pursuant to the Plan, the contingent and unliquidated indemnification Claims related to the Alleged Lease Indemnification (each an "Alleged Lease Indemnification Claim" and collectively, the "Alleged Lease Indemnification Claims"), shall be estimated for purposes of allowance at $0.00 (the "Lease Indemnification Estimation"), as a result of the assumption and assignment of (i) the Rosemead Lease to LADMC pursuant to the Silver Lake Sale Order, which sale closed on March 5, 2019, and (ii) the Concordia Lease to Sentry Concordia pursuant to the Miss Lou Sale Order, which sale closed on May 16, 2019. As a result of such assumption and assignment, the Principals' guarantees of (i) Success 1's obligations under the assumed and assigned Rosemead Lease and (ii) Vidalia's obligations under the assumed and assigned Concordia Lease, have been eliminated. To the extent the Principals guaranteed the obligations of any future tenant under the Rosemead Lease and/or Concordia Lease, the Court determined in the Silver Lake Sale Order and Miss Lou Sale Order that the new tenants, LADMC and Sentry Concordia, respectively, provided adequate assurance of future performance under the leases. *See* Silver Lake Sale Order, ¶ EE; Miss Lou Sale Order, ¶ DD. The Principals' Alleged Lease Indemnification Claims relating to PHI's assumption of the Principals' guarantee obligations under the Rosemead Lease and Concordia Lease are thus estimated at $0.00 under the Plan. Without estimation, the fixing or liquidating of such Alleged Lease Indemnification Claims would unduly delay the administration of these Chapter 11 Cases, as distributions under the Plan could not occur until the termination or expiration of the Rosemead Lease and Concordia Lease, the continuance of which leases could be indefinite.

### E.    Disputed Claims and Claim Objections

#### 1.    Disputed Claims Reserve.

On each date Distributions are to be made under the Plan to Holders of Allowed Claims, the Liquidating Trustee shall retain on account of Disputed Claims an amount the Liquidating Trustee estimates is necessary to fund the Pro Rata share of such Distributions to Holders of Disputed Claims if such Disputed Claims were Allowed (or such lesser amount as may be estimated in accordance with Article VI.D of the Plan), with any Disputed Claims that are unliquidated or contingent being reserved for in an amount reasonably determined by the Liquidating Trustee (the "Disputed Claim Reserve"). The Disputed Claims Reserve shall not include any funds in the Tax Escrow, the Legal Expense Escrow or the Guarantees Escrow, all of which escrowed funds shall be treated pursuant to Article IV(B) of the Plan, nor shall the Liquidating Trustee reserve any amounts in the Disputed Claims Reserve on account of any Alleged Lease Indemnification Claims or any Alleged Legal Expense Indemnification Claims, which Claims shall be treated pursuant to Article III(B)(3) and Article III(B)(5) of the Plan, respectively.

Cash retained on account of such Disputed Claims shall be retained in the Disputed Claims Reserve for the benefit of the Holders of such Disputed Claims pending a determination of their entitlement thereto under the terms of the Plan. To the extent that the property placed in the Disputed Claims Reserve consists of Cash, that Cash may be deposited in an interest-bearing account at a qualified institution.

If any Disputed Claim is disallowed or Allowed in an amount that is lower than the aggregate assets retained in the Disputed Claims Reserve on account of such Disputed Claim, then, the excess assets reserved for such Claim shall automatically revest in the Liquidating Trust and thereafter may be used consistent with the provisions of the Plan without restriction. Such assets shall not escheat to any federal, state, or local government or other Entity for any reason.

Payments on any Disputed Claim that becomes an Allowed Claim shall be distributed by the Disbursing Agent from the Disputed Claims Reserve on the next scheduled Distribution date after the Claim is Allowed. Distributions shall be made only to the extent of the aggregate distributions that the

Holder of any such Allowed Claim would have received had such Claim been Allowed as of the Effective Date (less any taxes paid with respect to amounts held in the Disputed Claims Reserve). Distributions to each Holder of a Disputed Claim that has become an Allowed Claim (and to the extent that the Holder of the Disputed Claim has not received prior distributions on account of that Claim) shall be made in accordance with the provisions of the Plan.

The Disputed Claims Reserve shall be closed and extinguished by the Liquidating Trustee when all Distributions and other dispositions of Cash or other property required to be made therefrom under the Plan have been effectuated.

### 2.    Claim Objections.

From and after the Effective Date, the Liquidating Trustee shall have the exclusive right and standing to (i) object to and contest the allowance of all Claims, (ii) compromise and settle any Disputed Claim or Claim that has not otherwise been Allowed, without further Order or approval of the Bankruptcy Court; and (iii) litigate to final resolution objections to Claims. Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, all Disputed Claims shall be subject to the exclusive jurisdiction of the Bankruptcy Court.

### 3.    Objection Deadline.

All objections to Disputed Claims shall be filed no later than the Claims Objection Bar Date, unless otherwise ordered by the Bankruptcy Court after notice and a hearing, with notice only to those parties set forth on the Post-Effective Date Notice List.

### 4.    Disallowance of Untimely Claims

Except as provided in the Plan or otherwise agreed by the Liquidating Trustee, any and all Holders of Claims filed after the applicable Bar Date shall not be treated as Creditors for purposes of voting and distribution pursuant to Bankruptcy Rule 3003(c)(2) unless on or before the Voting Deadline or the Confirmation Date, as the case may be, such late proofs of claim are deemed timely filed by a Final Order of the Bankruptcy Court.

Claims for which proofs of claim or requests for allowance were required to be filed by a Bar Date occurring before the Effective Date, and with respect to which no proof of claim or request for allowance was filed before the applicable Bar Date, shall be forever disallowed, barred, and discharged in their entirety as of the Effective Date, and shall not be enforceable against the Debtors, the Liquidating Trust, or the Estates, unless such proofs of claim or requests for allowance are deemed timely filed by a Final Order of the Bankruptcy Court before the Effective Date.

Claims for which proofs of claim or requests for allowance are required to be filed after the Effective Date pursuant to a Bar Date established by the Plan, and with respect to which no proof of claim or request for allowance is filed by the applicable Bar Date, shall be forever disallowed, barred, and discharged in their entirety as of the applicable Bar Date, and shall not be enforceable against the Debtors, the Liquidating Trust, or the Estates.

### 5.    Allowance of Claims.

Except as expressly provided herein or in any Final Order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed, unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court enters a

4847-0265-3116.11

7163194 v4
EAST\175019097.2

Final Order in the Chapter 11 Cases allowing such Claim. Except as expressly provided in the Plan or in any Final Order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), the Liquidating Trust, on and after the Effective Date, will have and retain any and all rights and defenses the Debtors had with respect to such Claims.

### F.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Plan Proponents', Debtor Representative's, or the Liquidating Trustee's (as applicable) rights with respect to any Unimpaired Claim, including, without limitation, all rights in respect of Causes of Action, or legal or equitable defenses to or setoffs or recoupments against any Unimpaired Claim.

### G.    Treatment of Executory Contracts and Unexpired Leases

The Bankruptcy Code grants the Debtors the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases. If an executory contract or unexpired lease is rejected, the counterparty to such contract or lease agreement may file a claim for prepetition damages incurred by reason of the rejection. In the case of rejection of leases of real property, such damage claims are subject to certain limitations imposed by the Bankruptcy Code.

### 1.    Assumption or Rejection of Executory Contracts and Unexpired Leases

In accordance with sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtors and any Person or Entity shall be deemed rejected by the Debtors as of the Effective Date, except for any executory contract or unexpired leases (a) that has been assumed or rejected by a Final Order of the Bankruptcy Court entered prior to the Effective Date, or (b) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Effective Date. Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of such rejection under section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejection is in the best interests of the Debtors, their Estates, and all parties in interest in the Chapter 11 Cases.

### 2.    Claims Based on Rejection of Executory Contracts and Unexpired Leases

Claims created by the rejection of executory contracts and unexpired leases under the Plan must be filed with the Bankruptcy Court and served on the Liquidating Trustee no later than thirty (30) days after the Effective Date. Any Claims arising from the rejection of an executory contract or unexpired lease under the Plan for which proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtors, the Estates, the Liquidating Trust, their successors and assigns, and their assets and properties. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article IX.D of the Plan. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article III of the Plam.

### 3.    Indemnification and Reimbursement

Subject to the occurrence of the Effective Date, except as set forth otherwise herein with respect to the Alleged Lease Indemnification Claims and the Alleged Legal Expense Indemnification Claims (which such Claims, for the avoidance of doubt, shall be treated in accordance with Article III(B)(3) and Article III(B)(5) of the Plan), all Allowed Claims against the Debtors for indemnification, defense, reimbursement, or limitation of liability of current or former directors, officers, or employees of the Debtors against any

Claims, costs, liabilities or causes of action as provided in the Debtors' articles of organization, certificates of incorporation, bylaws, other organizational documents, or applicable law, shall, to the extent such indemnification, defense, reimbursement, or limitation is owed in connection with one or more events or omissions occurring before the Petition Date, be (a) paid only to the extent of any applicable insurance coverage, and (b) to the extent a Claim is Allowed, treated as Allowed General Unsecured Claims to the extent such Claims are not covered by any applicable insurance, including deductibles. Nothing contained herein shall affect the rights of directors, officers, or employees under any insurance policy or coverage with respect to such Claims, costs, liabilities, or Causes of Action or limit the rights of the Plan Proponents, the Debtors' Estates, the Liquidating Trustee, or the Debtor Representative to object to, seek to subordinate or otherwise contest or challenge Claims or rights asserted by any current or former officer, director or employee of the Debtors.  The Liquidating Trustee shall maintain the DIP Indemnity Account in accordance with the DIP Payoff Letter.

### 4.        Certain Insurance Policy Matters

For the avoidance of doubt, on the Effective Date, the Debtors' rights with respect to all Insurance Policies under which any of the Debtors may be a beneficiary or assignee (including all Insurance Policies that may have expired prior to the Petition Date, all Insurance Policies in existence on the Petition Date, all Insurance Policies entered into by any Debtor after the Petition Date, and all Insurance Policies under which any Debtor holds rights to make, amend, prosecute, and benefit from claims) shall be retained by, revest in, or vest in the applicable Debtor(s), their Estates, the Debtor Representative, and/or the Liquidating Trust, as necessary for the Debtor Representative and/or Liquidating Trustee to pursue and prosecute any Causes of Action, including any Debtor Rep Causes of Action, and to the extent that any Insurance Policies are not necessary for the pursuit and prosecution of any such Causes of Action, all such Insurance Policies shall be transferred to the Liquidating Trust from the Effective Date until its dissolution, unless any such Insurance Policy is otherwise cancelled by the Liquidating Trustee in its discretion.  Notwithstanding any provision providing for the rejection of Executory Contracts, any Insurance Policy that is deemed to be an Executory Contract shall neither be rejected nor assumed by operation of the Plan and shall be the subject of a specific motion by the Liquidating Trustee, who shall retain the right to assume or reject any such Executory Contracts pursuant to and subject to the provisions of section 365 of the Bankruptcy Code following the Effective Date.

Nothing in the Disclosure Statement, the Plan, the Confirmation Order, any exhibit to the Plan or any other Plan document (including any provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing in any respect the legal, equitable, or contractual rights and defenses, if any, of the insureds or any of the Debtors with respect to any Insurance Policies or related agreements.  Nothing in the Disclosure Statement, the Plan, the Confirmation Order, any exhibit to the Plan or any other Plan document (including any provision that purports to be preemptory or supervening), shall in any way (a) limit a Debtor, the Debtor Representative, the Liquidating Trustee, or their successors or assignees from asserting a right or claim to the proceeds or unearned premium refunds of any Insurance Policy that insures any such Debtor, was issued to any such Debtor, or vested in any Debtor, any Debtor's Estate, the Debtor Representative, or the Liquidating Trust by operation of the Plan.

The Confirmation Order shall constitute a determination that no default by any Debtor exists with respect to any of the Insurance Policies requiring cure, and that nothing in any prior order, any prior agreements, or the Plan or any related documents shall be construed or applied to modify, impair, or otherwise affect the enforceability of the Insurance Policies or any coverage thereunder with regard to any Claims or Causes of Action.  The Plan shall be liberally construed to protect the interests of all Creditors in all Causes of Action and to limit any Claims against the Estates.

### H.     Conditions Precedent

The following are conditions precedent to the Effective Date that must be satisfied or waived:

- The Bankruptcy Court shall have entered the Confirmation Order authorizing and directing that the Debtors take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, and other agreements or documents created in connection with the Plan and the transactions contemplated thereby, including, without limitation, the transactions contemplated by the Liquidating Trust Agreement.

- There shall be no stay, injunction, or appeal in effect with respect to the Confirmation Order and the Confirmation Order shall have become a Final Order.

- All statutory fees and obligations then due and payable to the Office of the U.S. Trustee shall have been paid and satisfied.

- The appointment of the Liquidating Trustee and the terms of his service and compensation shall have been confirmed by the Bankruptcy Court in the Confirmation Order, and the Liquidating Trustee shall have accepted in writing such terms.

- The appointment of the Debtor Representative shall have been confirmed by the Bankruptcy Court in the Confirmation Order.

- All agreements and instruments that are exhibits to the Plan shall be in a form reasonably acceptable to the Plan Proponents and have been duly executed and delivered.

- The Debtors shall have transferred all Cash on hand or Cash dominion to the Liquidating Trust.

- All other actions, authorizations, consents and regulatory approvals required (if any) and necessary to implement the provisions of the Plan shall have been obtained, effected or executed in a manner acceptable to the Debtors and the Committee or, if waivable, waived by the Person or Persons entitled to the benefit thereof.

### 1.     Waiver

Notwithstanding the foregoing conditions in Article VIII.A of the Plan, the Plan Proponents reserve, in their sole discretion, the right to waive the occurrence of any condition precedent or to modify any of the foregoing conditions precedent. Any such written waiver of a condition precedent set forth in this Article may be effected at any time, without notice, without leave or order of the Bankruptcy Court or without any other formal action other than proceeding to consummate the Plan; provided, however, that such waiver will be reflected in the notice of occurrence of the Effective Date filed pursuant to Article VIII.E of the Plan. Any actions required to be taken on the Effective Date or Confirmation Date (as applicable) shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

### 2.     Effect of Failure of Conditions

In the event the Effective Date does not occur, upon motion by any party in interest, made before the time that each of the conditions precedent to the Effective Date has been satisfied or waived: (a) the

4847-0265-3116.11

7163194 v4
EAST\175019097.2

Confirmation Order shall be vacated, (b) no Distributions under the Plan shall be made, (c) the Debtors and all Holders of Claims and Equity Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (d) the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged, and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other Person or Entity or to prejudice in any manner the rights of the Debtors or any Person or Entity in any further proceedings involving the Debtors unless extended by Bankruptcy Court order.  Notwithstanding the foregoing, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived by the Plan Proponents or the Liquidating Trustee, as the case may be, before the Bankruptcy Court enters a Final Order granting such motion.

### 3.        Substantial Consummation

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

### I.        Indemnification, Release, Injunctive, and Related Provisions

### 1.        Term of Bankruptcy Injunction or Stay

Unless otherwise provided in the Plan, the Confirmation Order, or a separate order from the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise (excluding any injunctions or stays contained in the Plan or the Confirmation Order), and in existence on the Confirmation Date shall remain in full force and effect until the later of the Effective Date and the date indicated in such applicable order.

### 2.        Releases

**Releases by the Debtors and their Estates. Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, and to the fullest extent permitted by applicable law, the adequacy of which is hereby confirmed, for the good and valuable consideration provided by each of the Released Parties, each of the Debtors, the Estates, each of the Debtors' and the Estates' current and former affiliates (collectively, the "Debtor Releasing Parties") and the Committee shall be deemed to have provided a full, complete, unconditional, and irrevocable release to the Released Parties from any and all Causes of Action and any other debts, obligations, rights, suits, judgments, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing on or before the Effective Date, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including, without limitation, those that any of the Debtors would have been legally entitled to assert, including those in any way related to the Chapter 11 Cases, the Plan, the Plan Supplement, the Disclosure Statement, and any related agreements, instruments, or documents; provided, however, that the foregoing release shall not prohibit the Liquidating Trustee and/or Debtor Representative from asserting any and all defenses and counterclaims in respect of any Disputed Claim asserted by any Released Parties; provided further, that the Released Parties shall not be released from any act or omission that constitutes actual fraud, willful misconduct, or a criminal act as determined by a Final Order; and provided further that notwithstanding the forgoing, any Chapter 5 Actions against the Specified Directors shall only be released with respect to the payments listed on Exhibit 1 to the Settlement Order, and**

4847-0265-3116.11

7163194 v4
EAST\175019097.2

any and all other payments not listed on Exhibit 1 to the Settlement Order are not being released under the Plan or this provision.

**Releases by Holders of Claims and Equity Interests.** Each Holder of a Claim against or Equity Interest in the Debtors that has not opted-out of the releases set forth in this Article IX(B)(2) by marking the appropriate "opt out" box on such Holder's ballot or notice of non-voting status, as applicable, is deemed to have, to the fullest extent permitted by applicable law, the adequacy of which is hereby confirmed, fully, completely, unconditionally, irrevocably, and forever released the Released Parties of and from any and all Causes of Action, and any other debts, obligations, rights, suits, judgments damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing on or before the Effective Date, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including, without limitation, those that any holder of a Claim or Equity Interest would have been legally entitled to assert or that any Holder of a Claim or Equity Interest would have been legally entitled to assert for or on behalf of any of the Debtors or the Estates, including those in any way related to the Chapter 11 Cases, the Plan, the Plan Supplement, the Disclosure Statement, and any related agreements, instruments, or documents; *provided, however* that the Released Parties shall not be released from any act or omission that constitutes actual fraud, willful misconduct, or a criminal act as determined by a Final Order; *and provided further* that notwithstanding the forgoing, any Chapter 5 Actions against the Specified Directors shall only be released with respect to the payments listed on Exhibit 1 to the Settlement Order, and any and all other payments not listed on Exhibit 1 to the Settlement Order are not being released under the Plan or this provision.

For the avoidance of doubt, the releases set forth in Article IX.B of the Plan shall not affect or diminish the valid setoff or recoupment rights of the Debtors, the Liquidating Trustee, or any Creditor of the Debtors to the extent timely asserted by the applicable Bar Date, and all such rights are hereby preserved.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in Article IX.B of the Plan under Bankruptcy Rule 9019 and its finding that they are: (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the Claims and Causes of Action released by the Plan; (b) in the best interests of the Debtors and all Holders of Claims and Equity Interests; (c) fair, equitable and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to the assertion of any Claim or Cause of Action thereby released.

3.      **Exculpation**

Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties shall neither have nor incur any liability to any Entity for any act or omission arising after the Petition Date and through the Effective Date in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, or any other contract, instrument, release, other agreement or document created or entered into in connection with the Plan, or any other post-petition act taken or omitted to be taken in connection with the Chapter 11 Cases; *provided, however*, that the foregoing provisions of Article IX.C of the Plan shall have no effect on the liability of any Entity that results from any such

**act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or a criminal act.**

4. **Injunction**

Pursuant to section 1141(d)(3) of the Bankruptcy Code, confirmation of the Plan does not operate to discharge the Debtors; *provided, however*, that, upon confirmation of the Plan, the occurrence of the Effective Date, and the distributions provided for under the Plan, the Holders of Claims and Equity Interests may not seek payment or recourse against or otherwise be entitled to any distribution from the Estates or Liquidating Trust except as expressly provided in the Plan.  Further, the following terms apply except as otherwise expressly provided in the Plan or to the extent necessary to enforce the terms and conditions of the Plan:

1. Except as otherwise provided in the Plan, from and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtors, the Estates, the Committee, the Debtor Representative, the Liquidating Trust, the Liquidating Trustee, their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim or Equity Interest, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or satisfied or to be released or satisfied under the Plan or the Confirmation Order.

2. Except as otherwise expressly provided for in the Plan or in obligations issued under the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtors, the Estates, the Committee, the Debtor Representative, the Liquidating Trust, the Liquidating Trustee, or their successors and assigns and their assets and properties, any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, solely to the extent that (a) such Claims or Equity Interests have been released or satisfied under the Plan or the Confirmation Order or (b) such Claims, Equity Interests, actions or assertions of Liens relate to property that will be distributed under the Plan or the Confirmation Order.

3. The rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Equity Interests against the Debtors or any of their assets or properties solely to the extent that (a) such Claims or Equity Interests have been released or satisfied under the Plan or the Confirmation Order or (b) such Claims, Equity Interests, actions, or assertions of Liens relate to property that will be distributed under the Plan or the Confirmation Order. On the Effective Date, all such Claims against, and Equity Interests in, the Debtors shall be satisfied and released in full.

4. Except as otherwise expressly provided for in the Plan or in obligations issued under the Plan, all Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Equity Interest satisfied and released under the Plan or Confirmation Order, from (a) commencing or continuing in any manner any action or other proceeding of any kind against any Debtor, the Committee, the Debtor Representative, the Liquidating Trust, the Liquidating Trustee, their successors and assigns, and their assets and properties; (b) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Debtor, the Committee, the Debtor Representative, the Liquidating Trust, the Liquidating Trustee, their successors and assigns, and their assets and properties; (c) creating, perfecting or enforcing any encumbrance of any kind against any Debtor, or the property or estate of any Debtor, the Committee, the Debtor Representative, the Liquidating Trust, or the Liquidating

Trustee; and (d) commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Equity Interest or Cause of Action released or settled thereunder.

5.        Upon the entry of the Confirmation Order, all Holders of Claims and Equity Interests and other parties in interest, along with their respective present or former affiliates, employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

6.        As of the Effective Date, to the extent not enjoined by the other provisions of Article IX, all Persons and Entities who have held, hold, or may hold Claims against the Debtors, are permanently enjoined, on and after the Confirmation Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors, the Debtors' respective property, the Debtors' Estates, the Debtor Representative, the Liquidating Trust, the Liquidating Trust Assets, or the Liquidating Trustee with respect to any such Claim or taking any act to recover such Claim outside of the claims allowance procedure discussed in the Plan and the Bankruptcy Code and Bankruptcy Rules; (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtors, the Debtors' respective property, the Debtors' Estates, the Debtor Representative, the Liquidating Trust, the Liquidating Trust Assets, or the Liquidating Trustee on account of any such Claim; (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Debtors' respective property, the Debtors' estates, the Debtor Representative, the Liquidating Trust, the Liquidating Trust Assets, or the Liquidation Trustee on account of any such Claim; and (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtors, the Debtors' estates, the Debtor Representative, the Liquidating Trust, the Liquidating Trust Assets, or the Liquidating Trustee, or against the property or interests in property of the Debtors, the Debtors' estates, the Debtor Representative, the Liquidating Trust, the Liquidating Trust Assets, or the Liquidating Trustee on account of any such Claim.

7.        All injunctive provisions of Article IX of the Plan shall extend for the benefit of the Liquidating Trustee and the Debtor Representative, and any successors of the Debtors, and to any property and interests in property subject to the Plan.

**5.        Limitation on Liability of the Liquidating Trustee and Debtor Representative**

Neither the Liquidating Trustee nor the Debtor Representative shall be liable for any act they may do or omit to do as Liquidating Trustee or Debtor Representative under the Plan and the Liquidating Trust Agreement, as applicable, while acting in good faith and in the exercise of his or its reasonable business judgment; nor will the Liquidating Trustee or the Debtor Representative be liable in any event except for an act or omission that is determined in by Final Order to have constituted fraud, willful misconduct, or a criminal act. The foregoing limitation on liability also will apply to any Person or Entity employed by the Liquidating Trustee or Debtor Representative and acting on behalf of the Liquidating Trustee or Debtor Representative in the fulfillment of his or its duties hereunder or under the Liquidating Trust Agreement. In addition, the Liquidating Trustee, Debtor Representative, and any Person or Entity employed by the Liquidating Trustee or Debtor Representative and acting on behalf of the Liquidating Trustee or Debtor Representative shall be entitled to indemnification out of the assets of the Liquidating Trust against any losses, liabilities, expenses (including attorneys' fees and disbursements), damages, taxes, suits, or claims that they may incur or sustain by reason of being or having been employed by the Debtor Representative or Liquidating Trustee of the Liquidating Trust or for performing any functions incidental to such service; provided, however, that the foregoing shall not relieve the Liquidating Trustee, Debtor Representative, or

any Person employed by the Liquidating Trustee or Debtor Representative from liability for fraud, willful misconduct, or a criminal act as determined by a Final Order of the Bankruptcy Court.

### 6.    Injunction in Furtherance of Releases, Exculpations, and Limitations of Liability

From and after the Effective Date, to the extent of the releases, exculpations, and limitations of liability set forth in the Plan, the releasing parties shall be permanently enjoined from commencing or continuing in any manner against the beneficiaries of such releases, exculpations, and limitations and their respective assets and properties, as the case may be, any suit, action, or other proceeding on account of or respecting any Claim, demand, liability, obligation, debt, right, cause of action, interest, or remedy released or otherwise limited under the Plan to the extent set forth in the Plan.

### 7.    Releases of Liens and Cancellation of Documents

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created under the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of the Estates distributed under the Plan shall be fully released and discharged and all of the right, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interest shall revert to the Debtors.

In addition, on the Effective Date, except to the extent otherwise provided in the Plan, any and all notes, instruments, debentures, certificates, and other documents evidencing Claims against the Debtors shall be deemed inoperative and unenforceable solely as against the Debtors and their Estates.

Nothing contained in the Plan shall revive, preserve, or transfer any Claims or Liens that have been released pursuant to any prior order of the Bankruptcy Court.

## ARTICLE V.

## CONFIRMATION OF THE PLAN

### A.    Solicitation and Voting Procedures

On [_____], 2020, the Bankruptcy Court entered the Solicitation Procedures Order [Docket No. ____]. For purposes of this Article V, capitalized terms used but not defined herein or in the Plan or Plan Supplement shall have the meaning ascribed to such terms in the Solicitation Procedures Order. **The Solicitation Procedures Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.**

**THIS DISCUSSION OF THE SOLICITATION AND VOTING PROCEDURES SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY. PLEASE REFER TO THE SOLICITATION PROCEDURES ORDER [DOCKET NO. [__]] FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.**

### 1.    Solicitation Packages

Pursuant to the Solicitation Procedures Order, Holders of Claims who are eligible to vote to accept or reject the Plan will receive appropriate solicitation materials (the "General Solicitation Package"), including:

4847-0265-3116.11

7163194 v4
EAST\175019097.2

- a copy of the Solicitation Procedures Order (without exhibits);

- the Confirmation Hearing Notice;

- a cover letter, describing the contents of the General Solicitation Package and urging the Holders of Claims in each of the Voting Classes (defined below) to vote to accept the Plan;

- an appropriate form of Ballot for Holders of Claims;

- the approved Disclosure Statements (with all exhibits attached hereto, including the Plan and the exhibits attached thereto); and

- any supplemental documents the Debtors file with the Bankruptcy Court and any documents that the Bankruptcy Court orders to be made available.

The General Solicitation Package will provide the Disclosure Statement and Plan in electronic format and all other contents of the General Solicitation Package, including Ballots, in paper format. Any Holder of a Claim or Equity Interest may obtain, at no charge, a paper copy of the documents otherwise provided by (a) accessing Solicitation Agent's website at https://cases.primeclerk.com/promisehealthcaregroup, (b) writing to the Solicitation Agent, via first-class or overnight mail, at Promise Healthcare Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street Suite 1440 New York, NY 10165, (c) calling the Solicitation Agent at 1-844-822-9230 (US toll-free) or (347) 338-6503 (international, toll), or (d) e-mailing promisehealthcareballots@primeclerk.com.

2.      **Voting Rights**

a)      **Classes Entitled to Vote**

Under the provisions of the Bankruptcy Code, not all holders of claims against, or equity interests in, a debtor are entitled to vote on a chapter 11 plan. The following Classes (the "Voting Classes") in the table below are the only Classes entitled to vote to accept or reject the Plan. The Claims in the Voting Classes are Impaired under the Plan and the Holders of such Claims may, in certain circumstances and to the extent Allowed, receive a distribution under the Plan. Accordingly, Holders of Allowed Claims in the Voting Classes have the right to vote to accept or reject the Plan. If your Claim or Equity Interest is not included in one of these Voting Classes, you are not entitled to vote and you will not receive a General Solicitation Package. Each of the Voting Classes will have accepted the Plan if: (1) the Holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in each Class have voted to accept the Plan; and (2) the Holders of more than one half in number of the Allowed Claims actually voting in each Class have voted to accept the Plan. Additionally, if the Solicitation Agent receives no votes to accept or reject the Plan with respect to any particular Class of Claims, that Class will be deemed to have voted to accept the Plan.

For a discussion of the procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, see the Solicitation Procedures Order, attached to this Disclosure Statement as Exhibit B.

| Class | Claim | Status | Voting Rights |
|:-----:|:-----:|:------:|:-------------:|
| 4 | Settlement Claims | Impaired | Entitled to Vote |
| 5 | Alleged Legal Expense Indemnification Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Convenience Class Claims | Impaired | Entitled to Vote |

**b)** **Classes Not Entitled to Vote**

Under the Bankruptcy Code, Holders of Claims or Equity Interests are not entitled to vote if such Claims or Interests are unimpaired under the Plan or if they will receive no distribution of property under the Plan. Based on this standard, the following Classes of Claims and Equity Interests are not entitled to vote on the Plan and the Holders of such Claims and Equity Interests will *not* be solicited to vote on the Plan.

| Class | Claim | Status | Voting Rights |
|:-----:|:-----:|:------:|:-------------:|
| 1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 2 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 3 | Alleged Lease Indemnification Claims | Unimpaired | Deemed to Accept |
| 8 | Intercompany Claims | Impaired | Deemed to Reject |
| 9 | Equity Interests | Impaired | Deemed to Reject |

Additionally, the Solicitation Procedures Order provides that certain Holders of Claims in the Voting Classes, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The deadline for the Debtors file a motion under Bankruptcy Rule 3018(a) to temporarily allow a Claim or Equity Interest in a certain amount for voting purposes (a "3018 Motion") is [_____], 2020 at 4:00 p.m. (prevailing Eastern Time). The deadline for Holders of Claims or Equity Interests to respond to a 3018 Motion filed by the Debtors is [_____], 2020 at 4:00 p.m. (prevailing Eastern Time). The deadline for Holders of Claims or Equity Interests to file a 3018 Motion seeking an order temporarily allowing such Claims or Equity Interests in a different amount or classification for purposes of voting to accept or reject the Plan is [_____], 2020 at 4:00 p.m. (prevailing Eastern Time). The deadline for the Debtors to respond to a 3018 Motion filed by a Holder of a Claim or Equity Interest is [_____], 2020 at 4:00 p.m. (prevailing Eastern Time). [All 3018 Motions filed by the Debtors in accordance with the Solicitation Procedures Order will be heard at the Confirmation Hearing.]

**3.** **Voting Procedures**

More detailed instructions regarding the procedures for voting on the Plan are contained on the Ballots distributed to Holders of Claims that are entitled to vote to accept or reject the Plan.  All votes to

accept or reject the Plan must be cast by using the appropriate Ballot.  All Ballots must be properly executed, completed, and delivered according to their applicable voting instructions.

Each Holder of a Claim entitled to vote to accept or reject the Plan may cast only one Ballot for each Claim held by such Holder. By signing and returning a Ballot, each Holder of a Claim entitled to vote will certify to the Bankruptcy Court and the Debtors that no other Ballots with respect to such Claim have been cast or, if any other Ballots have been cast with respect to such Claim, such earlier Ballots are superseded and revoked.

As set forth in Article IX(B)(2) of the Plan, each Holder of a Claim will have an option on the Ballot or notice of non-voting status, as applicable, to "opt out" of the releases of the Released Parties provided in Article IX(B)(2) of the Plan, indicating that such Holder does not consent to the releases of the Released Parties on the terms set forth in the Plan.

### a)    The Voting Record Date

The Voting Record Date is [_____]. The Solicitation Procedures Order established the Voting Record Date for purposes of determining, among other things, which Holders of Claims are eligible to vote on the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee can vote as the Holder of a Claim.

### b)    The Voting Deadline

The Voting Deadline is [_____] (prevailing Eastern Time). The Solicitation Procedures Order also established the Voting Deadline as the deadline for submitting Ballots. To have votes to accept or reject the Plan counted, every registered Holder of a Claim must properly execute, complete, and deliver the Ballot by (i) first-class mail, (ii) overnight courier, (iii) personal delivery, or (iv) electronically via the E-Ballot system, as described below, in each case so that the Solicitation Agent *actually receives* the Ballot no later than the Voting Deadline. Delivery of a Ballot to the Solicitation Agent by facsimile or e-mail will render the corresponding vote invalid. It is important to follow the specific instructions provided on each Ballot. Except as provided in the Solicitation Procedures Order or your relevant Ballot, Ballots should be sent to:

By first-class mail, overnight courier, or hand delivery:

**Promise Healthcare Ballot Processing, c/o Prime Clerk LLC**
**One Grand Central Place**
**60 East 42nd Street Suite 1440**
**New York, NY 10165**

By electronic, online submission:

Please visit https://cases.primeclerk.com/promisehealthcaregroup/. Click on the "E-Ballot" section of the Debtors' website and follow the directions to submit you E-Ballot. If you choose to submit your Ballot via the Solicitation Agent's E-Ballot system, you should not also return a hard copy of your Ballot.

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized E-Ballot:**

**Unique E-Ballot ID#:**

_____

Ballots submitted by facsimile, e-mail, or electronic means (other than as set forth therein) will not be counted.

### c)    Elimination of Vacant Classes

Any Class of Claims or Equity Interests that does not have a holder of an Allowed Claim or Allowed Equity Interest, or a Claim or Equity Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### d)    Presumed Acceptance by Voting Classes That Do Not Vote

If a Class contains Claims or Equity Interests eligible to vote on the Plan and no holder of Claims or Equity Interests in such Class eligible to vote on the Plan votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Equity Interests in such Class.

### e)    Ballots Not Counted

Except as otherwise provided by the Solicitation Procedures Order, no Ballot will be counted toward Confirmation if, among other things: (i) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (ii) it was transmitted by facsimile, e-mail, or other electronic means except via E-Ballot; (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the Schedules as contingent, unliquidated, or disputed for which the applicable bar date has passed and no proof of claim was timely filed; (v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Solicitation Procedures Order); (vi) it was sent to the Debtors, the Debtors' agents (other than the Solicitation Agent), the Debtors' financial or legal advisors, the Committee, or the Committee's financial or legal advisors; (vii) it is unsigned, except with respect to Ballots submitted electronically, in accordance with the procedures set forth in the Solicitation Procedures Order; (viii) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan; or (ix) it is not received by the Solicitation Agent before the Voting Deadline.

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT AT 1-844-822-9230 (US TOLL-FREE) or (212) 257-5450 (LOCAL) OR EMAIL AT PROMISEHEALTHCAREBALLOTS@PRIMECLERK.COM. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION PROCEDURES ORDER WILL NOT BE COUNTED.**

### 4.    Nonconsensual Confirmation

If any impaired Class of Claims entitled to vote does not accept the Plan by the requisite statutory majority provided in section 1126 of the Bankruptcy Code, the Plan Proponents reserve the right to amend the Plan, or to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the

4847-0265-3116.11

7163194 v4
EAST\175019097.2

Bankruptcy Code, or both. With respect to impaired Classes that are deemed to reject the Plan, the Debtors intend to request that the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code notwithstanding the deemed rejection of the Plan by those classes.

### B.    Plan Confirmation Objection Deadline

The Bankruptcy Court has established [_____], prevailing Eastern Time, as the deadline to object to Confirmation of the Plan (the "<u>Objection Deadline</u>"). All such objections must be filed with the Bankruptcy Court and served on the Plan Proponents and certain other parties in interest, in accordance with the Disclosure Statement Order, so that they are ***actually received*** on or before the Objection Deadline. The Plan Proponents believe that the Objection Deadline, as established by the Bankruptcy Court, affords the Bankruptcy Court, the Plan Proponents, and other parties in interest reasonable time to consider the objections to the Plan before the Confirmation Hearing.

Any objection to the Plan must: (1) be in writing; (2) conform to the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the District of Delaware, and any orders of the Bankruptcy Court; (3) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (4) be filed with the Bankruptcy Court (contemporaneously with a proof of service) and served upon the following parties so as to be *actually received* on or before the Objection Deadline. **Unless an objection to the Plan is timely served and filed, it may not be considered by the Bankruptcy Court.**

| *Counsel to the Debtors* | |
|---|---|
| **DLA Piper LLP (US)** | **Waller Lansden Dortch & Davis, LLP** |
| 1201 N Market Street, Suite 2100 | 511 Union Street, Suite 2700 |
| Wilmington, Delaware 19801 | Nashville, Tennessee 37219 |
| Attn: Stuart R. Brown | Attn: John C. Tishler |
| Matthew S. Sarna | Tyler N. Layne |
| | Courtney K. Stone |

| *U.S. Trustee* |
|---|
| **Office of the United States Trustee for the District of Delaware** |
| 844 King Street |
| Suite 2207 |
| Wilmington, DE  19801 |
| Attn: Brya Michele Keilson |

| *Counsel to the Committee* | |
|---|---|
| **Pachulski Stang Ziehl & Jones LLP** | **Sills Cummis & Gross P.C.** |
| 919 North Market Street, 17th Floor | The Legal Center |
| P.O. Box 8705 | One Riverfront Plaza |
| Wilmington, DE  19899 | Newark, NJ  07102 |
| Attn: Jeffrey N. Pomerantz | Attn: Andrew H. Sherman |
| Bradford J. Sandler | Boris I. Mankovetskiy |
| Colin R. Robinson | Rachel E. Brennan |

## C.    Confirmation

The following is a brief summary of the Confirmation process with respect to the Plan. Holders of Claims or Equity Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided in this Disclosure Statement.

### 1.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to conduct a hearing to consider confirmation of a chapter 11 plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan. **The Bankruptcy Court has scheduled the Confirmation Hearing for [_____] prevailing Eastern Time**, before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge, in Courtroom #6 of the United States Bankruptcy Court for the District of Delaware, 824 Market St N, 3rd Floor, Wilmington, DE 19801.

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court or the Plan Proponents without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Disclosure Statement and Solicitation Procedures.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are satisfied. Among the requirements for confirmation of a plan are that the plan is (i) accepted by all impaired classes of claims and equity interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class; (ii) feasible; and (iii) in the "best interests" of creditors and stockholders that are impaired under the plan.

### 2.    Acceptance

Acceptance of a plan need only be solicited from holders of claims or interests whose claims or interests belong to a class that is impaired and not deemed to have rejected the plan. A class that is not impaired under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Pursuant to section 1124 of the Bankruptcy Code, a class is impaired unless the plan: (1) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (2) cures any default, reinstates the original terms of such obligation, and compensates the applicable party in question; or (3) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to or any fixed price at which the debtor may redeem the security. For a discussion on voting and voting procedures, see Sections Article I.A and Article I.B entitled "Holders of Claims Entitled to Vote" and "Voting Procedures," respectively.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class. Only those holders that actually vote to accept or to reject such plan are counted for purposes of determining whether these dollar and number thresholds are met. Section 1126(d) of the Bankruptcy Code similarly defines acceptance of a plan by a class of impaired interests. Thus, a class of claims or interests will have voted to accept the plan only if holders of two-thirds in dollar amount and more than one-half in number of allowed claims or interests, as applicable, in that class that actually vote cast their ballots in favor of acceptance of the plan.

If any impaired Class of Claims or Equity Interests entitled to vote does not accept the Plan by the requisite statutory majority provided in sections 1126(c) and (d) of the Bankruptcy Code, the Plan Proponents reserve the right to amend the Plan in accordance with section 1127 of the Bankruptcy Code or to seek Bankruptcy Court confirmation of the Plan under section 1129(b) of the Bankruptcy Code (a procedure known as "cram down"), or both. The determination as to whether to seek confirmation of the Plan under such circumstances will be announced before or at the Confirmation Hearing. With respect to Impaired Classes of Claims or Equity Interests that are deemed to reject the Plan, the Plan Proponents will request that the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code.

Article III.K of the Plan provides in full: "If a Class contains Claims eligible to vote on the Plan and no holder of a Claim in such Class eligible to vote on the Plan votes to accept or reject the Plan, the Plan shall be presumed accepted by the Class." Such "deemed acceptance" by an Impaired Class in which no Class members submit Ballots satisfies section 1129(a)(10) of the Bankruptcy Code.

3.    **Confirmation Standards**

a)    **Overview**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code with respect to the Debtors. The Plan Proponents believe that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code. Specifically, the Plan Proponents believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the Plan Proponents have complied with the applicable provisions of the Bankruptcy Code;

- the Plan has been proposed in good faith and not by any means forbidden by law;

- any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan;

- with respect to each Class of Claims, each holder of an impaired Allowed Claim has accepted the Plan or will receive or retain under the Plan on account of such Allowed Claim property of a value as of the Effective Date of the Plan that is not less than the amount that such holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code. With respect to each Class of Equity Interests, each holder of an impaired Allowed Equity Interest has accepted the Plan or will receive or retain under the Plan on account of such Allowed Equity Interest property of a value as of the Effective Date of the Plan that is not less than the amount that such holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code;

4847-0265-3116.11

7163194 v4
EAST\175019097.2

- each Class of Claims or Equity Interests that is entitled to vote on the Plan has either accepted the Plan or the Plan can be confirmed without the approval of such voting Class of Claims or Equity Interests pursuant to section 1129(b) of the Bankruptcy Code;

- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that Allowed Administrative Claims and Other Priority Claims (other than priority tax claims) will be paid in full on the Effective Date (except that if a class of priority claims has voted to accept the plan, holders of such claims may receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amounts of such claims) and that holders of Priority Tax Claims may receive on account of such claims deferred cash payments, over a period not exceeding six years after the date of assessment of such claims, of a value, as of the effective date, equal to the allowed amount of such claims;

- at least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim or Interest in that Class;

- confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization; and

- the Debtors have paid or the Plan provides for the payment of the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

       **b)        Best Interests of Creditors Test—Liquidation Analysis**

The "best interests" standard requires that the Bankruptcy Court find either:

- that all members of each Impaired Class have accepted the Plan; or

- that each holder of an allowed Claim or Equity Interest of each Impaired Class of Claims will receive or retain on account of such Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

       The first step in ascertaining whether the Debtors meet this standard is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in a chapter 7 liquidation case. The gross amount of cash available in such a liquidation would be the sum of the proceeds from the disposition of the Debtors' assets and the cash held by the Debtors at the time of the commencement of the chapter 7 case. This gross amount would be reduced by the amount of any Allowed Claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the liquidation of the Debtors' business and the use of chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders in strict accordance with the order of priority of claims contained in section 726 of the Bankruptcy Code. As discussed in the Plan Proponents' Liquidation Analysis attached to this Disclosure Statement as Exhibit C, the Pan Proponents have determined that confirmation of the Plan will provide each creditor and interest holder with a recovery that is not less than it would receive pursuant to a liquidation

of the Debtors under chapter 7 of the Bankruptcy Code. See **Exhibit C** for a further discussion of how the Plan satisfies the "best interests" test.

### c)    Financial Feasibility

The Bankruptcy Code requires that to confirm a chapter 11 plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor(s) unless contemplated by the plan.

The Plan provides for the liquidation of the Debtors' assets. Accordingly, the Pan Proponents believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

### 4.    Cram Down

**The Pan Proponents intend to seek to cram down the Plan on any Class of Claims in impaired Classes that vote against or are deemed to reject the Plan.**

The Bankruptcy Code contains provisions for confirmation of a plan even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the plan (determined without including any acceptance of the plan by any insider). The "cram down" provisions of the Bankruptcy Code are set forth in section 1129(b) of the Bankruptcy Code.

Under the "cram down" provisions, on the request of a plan proponent, the bankruptcy court will confirm a plan despite the lack of acceptance by an impaired class or classes if the bankruptcy court finds that:

- the plan does not discriminate unfairly with respect to each non-accepting impaired class;

- the plan is fair and equitable with respect to each non-accepting impaired class; and

- at least one impaired class has accepted the plan (determined without including any acceptance of the plan by any insider).

These standards ensure that holders of junior interests, such as common stockholders, cannot retain any interest in the debtor under a plan of reorganization that has been rejected by a senior impaired class of claims or interests unless the claims or interests in that senior impaired class are paid in full.

As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law. A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of similar value under a plan. By establishing separate Classes for the holders of each type of Claim or Equity Interest and by treating each holder of a Claim or Equity Interest in each Class similarly, the Plan has been structured in order to satisfy the "unfair discrimination" test of section 1129(b) of the Bankruptcy Code.

The Bankruptcy Code sets forth different standards for establishing that a plan is "fair and equitable" with respect to a dissenting class, depending on whether the class is comprised of secured claims, unsecured claims or equity interests. In general, section 1129(b) of the Bankruptcy Code permits confirmation of a plan despite non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule. This rule requires that the dissenting class be paid in full before a junior class may receive anything under the plan. The Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity holders as follows:

4847-0265-3116.11

- Secured Creditors. Either: (1) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim; (2) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim; or (3) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as described in clauses (1) and (2) above.

- Unsecured Creditors. Either: (1) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim; or (2) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- Equity Interests. Either: (1) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the fixed liquidation preference to which such holder is entitled, or the fixed redemption price to which such holder is entitled or the value of the interest; or (2) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

In addition, the Bankruptcy Code requires that a debtor demonstrate that no class senior to a non-accepting impaired class will receive more than payment in full on its claims.

If all of the applicable requirements for confirmation of the Plan are satisfied as set forth in section 1129(a)(1) through (13) of the Bankruptcy Code, except that one or more Classes of Impaired Claims have failed to accept the Plan under section 1129(a)(8) of the Bankruptcy Code, the Pan Proponents will request that the Bankruptcy Court confirm the Plan under the "cram down" procedures in accordance with section 1129(b) of the Bankruptcy Code. The Debtors believe that the Plan satisfies the "cram down" requirements of the Bankruptcy Code, but there can be no assurance that the Bankruptcy Court will determine that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code or that at least one Impaired Class of Claims will vote to accept the Plan, without including any acceptance by an insider, as required for confirmation of a plan under the "cram down" procedures.

**D.      Consummation**

The Plan will become effective and be consummated on the Effective Date. As used in this Disclosure Statement, the "Effective Date" means a Business Day selected by the Plan Proponents that is on or after the date by which all conditions precedent specified in Article VIII of the Plan have been satisfied or waived. Within five (5) Business Days of the Effective Date, notice of the Effective Date shall be filed in the Bankruptcy Court.

From and after the occurrence of the Effective Date, the Plan will be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

**ARTICLE VI.**

**RISK FACTORS**

**Before voting to accept or reject the Plan, Holders of Claims against the Debtors should read and consider carefully the following risk factors and the other information in this Disclosure Statement, the Plan, and the other documents delivered with or incorporated by reference in this Disclosure Statement and the Plan. These risk factors should not, however, be regarded as**

4847-0265-3116.11

7163194 v4
EAST\175019097.2

**constituting the only risks involved in connection with the Plan, its implementation, or the Debtors' businesses and operations following the Effective Date.**

### A. Bankruptcy Law Considerations and Other Legal Risks

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims or Interests in such Impaired Classes. If the Plan is not consummated, any settlement, compromise, or release embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), the assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan, shall be null and void.

### 1. Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims in such class. The Debtors believe that the classification of the Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims and Equity Interests that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2. The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article VIII of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

### 3. The Plan Proponents May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Plan Proponents intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Plan Proponents may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

### 4. The Plan Proponents May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

4847-0265-3116.11

7163194 v4
EAST\175019097.2

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim or Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the Balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the Balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Allowed Claims against them would ultimately receive on account of such Allowed Claims.

The effectiveness of the Plan is also subject to certain conditions as described in Article VIII of the Plan. If the Plan does  not become effective, it is unclear what distributions, if any, Holders of Allowed Claims will receive on account of such Allowed Claims.

The Plan Proponents, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan. Changes to the Plan may also delay the confirmation of the Plan and the liquidation of the Debtors' estates.

### 5.      Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Plan Proponents believe that the Plan satisfies these requirements, and the Plan Proponents may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

### 6.      The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Plan Proponents believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of, among other things, (a) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (b) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation.

7.      **The Plan Proponents and Liquidating Trustee May Object to the Amount or Classification of a Claim or Interest**

Except as otherwise provided in the Plan, the Plan Proponents and Liquidating Trustee (as applicable) reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

8.      **Risk of Non-Occurrence of the Effective Date**

The Debtors can provide no assurance as to the timing or as to whether the Effective Date will, in fact, occur. The occurrence of the Effective Date is subject to certain conditions precedent as described in Article VIII of the Plan, including, among others, those relating to consummation of the Plan, as well as the receipt of any necessary regulatory approvals. Failure to meet any of these conditions could result in the Plan not being consummated or the Confirmation Order being vacated.

9.      **Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan**

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims and Allowed Interests to be subordinated to other Allowed Claims and Allowed Interests. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims and Allowed Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

10.     **The Actual Amount of Allowed Claims May Differ From the Estimated Claims and Adversely Affect the Percentage Recovery of Claims**

The estimated Claims and creditor recoveries that are set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated amounts contained in this Disclosure Statement. Moreover, the Plan Proponents cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

11.     **Releases, Injunctions, and Exculpations Provisions May Not Be Approved**

Article IX of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against certain parties, as applicable. The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of capitalized terms) provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain parties, as more fully described in the Plan, may withdraw their support for the Plan.

12.    **Certain Tax Implications of the Chapter 11 Cases**

Holders of Claims and Equity Interests should carefully review Article VII hereof to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors and certain Holders of Claims and Equity Interests. The tax consequences of the Plan are very complicated.

13.    **Confirmation and Consummation May Be Delayed if the Plan Proponents Have to Resolicit**

If the Plan Proponents resolicit acceptances of the Plan from the parties entitled to vote thereon, the confirmation of the Plan could be delayed and possibly jeopardized. Non-confirmation of the Plan could result in an extended chapter 11 proceeding, during which time the Debtors could experience material administrative costs, including professional fees, which could hinder further attempts to liquidate through chapter 11.

B.    **Disclosure Statement Disclaimer**

1.    **Information Contained in this Disclosure Statement is for Soliciting Votes**

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

2.    **No Legal, Business, Accounting, or Tax Advice Is Provided to You by this Disclosure Statement**

**This Disclosure Statement is not advice to you**. The contents of this Disclosure Statement should not be construed as legal, business, accounting, or tax advice. Each Holder of a Claim or Equity Interest should consult such Holder's own legal counsel, accountant, or other applicable advisor with regard to any legal, business, accounting, tax, and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

3.    **No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Plan Proponents, the Debtor Representative, or Liquidating Trustee), nor (b) be deemed evidence of the tax or other legal effects of the Plan.

4.    **Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Plan Proponents, the Debtor Representative, or the Liquidating Trustee, as applicable, may seek to investigate, file, and prosecute Claims and Interests and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

5.    **No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a Holder of a Claim for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Plan Proponents, Debtor Representative, or Liquidating Trustee (or any Entity, as the case may be) to object to that Holder's Claim, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

6.       **Information Was Provided by the Debtors and Was Relied Upon by the Plan Proponents' Advisors**

The Plan Proponents' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Plan Proponents' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained in this Disclosure Statement.

7.       **Potential Exists for Inaccuracies, and the Plan Proponents Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Plan Proponents as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Plan Proponents have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Plan Proponents nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Plan Proponents may subsequently update the information in this Disclosure Statement, the Plan Proponents have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

8.       **No Representations Outside this Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Plan Proponents and the U.S. Trustee.

## ARTICLE VII.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

A.      **Introduction**

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain U.S. Holders (each a "Holder," and as defined below) of Claims. The following summary does not address the U.S. federal income tax consequences to Holders of Claims who are Unimpaired or otherwise entitled to payment in full in Cash under the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas,

4847-0265-3116.11

substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Plan Proponents do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

Except as specifically set forth below, this summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, employees or persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, persons who hold Claims, persons using a mark-to-market method of accounting, and holders of Claims who are themselves in bankruptcy), unless otherwise specifically stated herein. Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form. This summary does not discuss differences in tax consequences to a Holder that acts or receives consideration in a capacity other than as a Holder of a Claim of the same Class, and the tax consequences for such Holders may differ materially from that described below.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY, ONLY ADDRESSES CERTAIN CONSIDERATIONS WITH RESPECT TO THE U.S. TAX TREATMENT OF THE DEBTORS AND U.S. HOLDERS, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE**

FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.

### B.       Certain Material United States Federal Income Tax Consequences to the Debtors

### 1.       Gain or Loss Pursuant to the Plan

Upon implementation of the Plan, the Debtors' aggregate outstanding indebtedness will be discharged. In general, if a debtor conveys appreciated (or depreciated) property (i.e., property having an adjusted tax basis less (or greater) than its fair market value) to a creditor in cancellation of debt, the debtor must recognize taxable gain or loss (which may be ordinary income or loss, capital gain or loss, or a combination of each) equal to the excess or shortfall, respectively, of such fair market value over the debtor's adjusted tax basis in such property. For federal income tax purposes, the Debtors, Creditors, and the other parties to the Plan will treat the transfer of the Liquidating Trust Assets to the applicable Liquidating Trust under the Plan as (i) payment in proportion to the value of their Claims against Debtors in payment in full of their Claims against Debtors, followed by (ii) a nontaxable contribution by Creditors of the Liquidating Trust Assets to the applicable Liquidating Trust in exchange for Liquidating Trust Interests in the applicable Liquidating Trust equal in value to the property they contributed. These deemed distributions for federal income tax purposes will generally cause the Debtors to recognize gain or loss equal to the fair market value of the distributed assets less the tax basis of the Debtors in such assets. Such gain from the deemed distributions or actual conveyances of property to the Holders of Claims (or gain from other asset dispositions) may be offset by operating losses from the current year or the Debtors' net operating loss ("NOL") and/or capital loss carryforwards from prior years subject to certain limitations.

### 2.       Cancellation of Debt Income

Generally, a corporation will recognize cancellation of debt ("COD") income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied (generally, the amount received upon incurring the obligation plus the amount of any previously amortized original issue discount ("OID") and less the amount of any previously amortized bond premium) over (b) the sum of (x) the amount of cash paid, and (y) the issue price of any new indebtedness of the taxpayer issued and (z) the fair market value of any other new consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange. The amount of COD income will be calculated after applying the special foreign currency rules of Section 988 of the Tax Code in circumstances where indebtedness is denominated in a currency other that debtor's "functional currency" (generally, the U.S. dollar). Under Section 988 of the Tax Code, the debtor will recognize foreign exchange gain or loss equal to the difference between the functional currency value of the nonfunctional currency received when the debt was incurred and the value of the nonfunctional currency when the debt is retired. Foreign currency gain is treated as ordinary income. If, however, nonrecourse debt is satisfied with the underlying collateral, generally the debtor recognizes a gain from the disposition of property based on an amount realized equal to the nonrecourse debt satisfied, as opposed to COD income.

In accordance with section 108(e)(2) of the Tax Code, a corporation will not, however, be required to include any amount of COD income in gross income to the extent that payment of the liability would have given rise to a deduction. Also, COD income is not recognized by a taxpayer that is a debtor in a chapter 11 case if a discharge is granted by the court or pursuant to a plan approved by the court (the "bankruptcy exception"). When the debtor in a bankruptcy case is a partnership for federal income tax purposes, the bankruptcy exception is applied at the partner level, not at the partnership level.

The Tax Code provides that where COD income is excluded because of this bankruptcy exception, the debtor must reduce certain of its tax attributes - such as NOLs, current year losses, tax credits, and tax basis in property - by the amount of any excluded COD income after the determination of the federal income tax for the year of the discharge of the debt. To the extent the amount of COD income exceeds the tax attributes available for reduction, the remaining COD income is without further current or future tax cost to the debtor.

The Debtors anticipate that some of them will recognize COD income as a result of the discharge of Claims pursuant to the Plan. The amount of the COD will depend, in part, on the amount of cash and the value of the Liquidating Trust Assets or the interests in Causes of Action or other assets. Under the rules discussed above, the NOLs available to a Debtor may be substantially reduced or eliminated as a result of this COD income. Other tax attributes may also be reduced. However, the Debtors do not expect to hold material non-cash assets at the end of the taxable year in which the discharge of Claims occurs. In such case, the attribute reductions should not result in a substantial tax cost to such Debtors.

### C.    Certain Material United States Federal Income Tax Consequences With Respect to the Liquidating Trust

The Liquidating Trust is expected to be taxable as a grantor trust within the meaning of Tax Code section 671, et seq.  The Liquidating Trust Beneficiaries will be treated for all purposes of the Tax Code as the grantors of the Liquidating Trust and the owners of the Liquidating Trust. In general, to the extent the Liquidating Trust is taxed as a grantor trust, the items of income, gain, loss, and deductions of the Liquidating Trust will be allocated directly to the Liquidating Trust Beneficiaries, and the Liquidating Trust Beneficiaries will be responsible for payment of all taxes due with respect to the operations of the Liquidating Trust.

In general, trusts that are not grantor trusts are treated as entities separately taxable from their beneficiaries. The taxable income of a trust is generally computed in the same manner as for an individual with certain exceptions and special rules. However, trusts are allowed certain deductions not available to individuals, including a deduction for its distributions for any year, but not in excess of the trust's "distributable net income" ("DNI") and subject to various limitations. In general, a trust's DNI is equal to its taxable income computed with certain modifications. These modifications include: (1) no distribution deduction is taken while computing DNI, (2) no personal exemptions are taken, (3) capital gains are not included unless allocated to fiduciary accounting income, or paid, credited, or required to be distributed to a beneficiary, or paid or set aside for charitable purposes, (4) capital losses are not taken into account, except to the extent they reduce the amount of capital gains actually paid or credited to beneficiaries, (5) the exclusion under section 1202 is not taken into account, and (6) tax-exempt interest is included, net of disallowed deductions attributable to such interest.  Distributions are generally taxed to the recipient beneficiaries to the extent such distributions are treated as carrying out taxable items of DNI.  Distributions in excess of DNI are usually not taxed (unless, for example, throwback rules apply).  The payment by the Liquidating Trust to the Liquidating Trust Beneficiaries also may be subject to applicable withholding.  For example, under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to backup withholding at a 28% rate.  Backup withholding generally applies only if the holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"); (ii) furnishes an incorrect TIN; (iii) fails properly to report interest or dividends; or (iv) under certain circumstances, fails to provide a certified statement signed under penalty of perjury that the TIN provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including corporations and financial institutions.  The foregoing discussion set forth in this paragraph generally would apply to the

4847-0265-3116.11

7163194 v4
EAST\175019097.2

Liquidating Trust and Liquidating Trust Beneficiaries to the extent the Liquidating Trust is not taxable as grantor trusts.

> **D.      Certain Material United States Federal Income Tax Consequences to U.S. Holders of Claims Against the Debtors**

The United States federal income tax consequences to Holders of Claims (including the character, timing and amount of income, gain or loss recognized) generally will depend upon, among other things, (1) whether the Claim and the consideration received in respect thereof are "securities" for the United States federal income tax purposes; (2) the manner in which a Claim Holder acquired a Claim; (3) the length of time the Claim has been held; (4) whether the Claim was acquired at a discount; (5) whether the Claim Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (6) whether the Claim Holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim; (7) the Claim Holder's method of tax accounting; and (8) whether the Claim is an installment obligation for United States federal income tax purposes.

**THEREFORE, HOLDERS OF CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS FOR INFORMATION THAT MAY BE RELEVANT TO THEIR PARTICULAR SITUATIONS AND CIRCUMSTANCES AND THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.**

> **1.      Gain or Loss Recognition on the Satisfaction of Claims**

Pursuant to the Plan, in full satisfaction of their Claims, Holders of Allowed Other Secured Claims, Other Priority Claims and Alleged Lease Indemnification Claims will exchange such Claims for payment in full or receive such other treatment under the Plan as to render such Claims Unimpaired in accordance with section 1124 of the Bankruptcy Code, as applicable, and Holders of Allowed Settlement Claims, Allowed Alleged Legal Expense Indemnification Claims, Allowed General Unsecured Claims, and Allowed Convenience Class Claims will exchange such Claims for their applicable share in the Liquidating Trust available to satisfy such Claims in accordance with their relative priority and terms of the Plan.

A U.S. Holder of Allowed Claims that receives a Cash distribution under the Plan will be treated as receiving its distributions under the Plan in a taxable exchange under section 1001 of the Tax Code. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount), each U.S. Holder of such Claims should recognize gain or loss equal to the difference between the (a) sum of the Cash received in exchange for the Claim, and (b) such U.S. Holder's adjusted basis, if any, in such Claim. A U.S. Holder's ability to deduct any loss recognized on the exchange of its Claims will depend on such U.S. Holder's own circumstances and may be restricted under the Tax Code.

In the event any Claim is reinstated under the Plan, the Plan Proponents do not anticipate that such reinstatement would result in any material U.S. federal income tax consequences; payments made pursuant to such Claim going forward would be subject to the tax treatment that applied to payments on such debt instrument prior to the commencement of the chapter 11 proceedings.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.**

> **2.      Accrued Interest and OID**

A portion of the consideration received by Holders of Allowed Claims may be attributable to accrued interest or original issue discount ("OID") on such Claims. Such amount should be taxable to that U.S. Holder as interest income if such accrued interest or OID has not been previously included in the Holder's gross income for United States federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent any accrued interest or OID on the Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest or OID on Allowed Claims, the extent to which such consideration will be attributable to accrued interest or OID is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest or OID that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for United States federal income tax purposes, while certain Treasury Regulations generally treat payments as allocated first to any accrued but unpaid interest or OID and then as a payment of principal. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED INTEREST.**

### 3.     Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

### 4.     Matters Related to the Disputed Claims Reserve

The Plan Proponents intend to create a Disputed Claims Reserve to hold the cash retained for the possible payment of Disputed Claims. The Debtors intend to (i) treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. In general, property that is subject to disputed ownership fund treatment is subject to taxation within the fund (either at C-corporation or trust rates, depending on the nature of the assets held by the fund). Unlike a grantor trust, items of taxable income, gain, loss, and deduction do not flow up from such fund to the parties that may be entitled to assert a claim against such fund. Under disputed ownership fund treatment, a separate federal income tax return shall be filed with the IRS for the Disputed

4847-0265-3116.11

Claims Reserve with respect to any income attributable to the account, and any taxes imposed on the Disputed Claims Reserve or its assets shall be paid out of the assets of the Disputed Claims Reserve.

Although not free from doubt, U.S. Holders should not recognize any gain or loss on the date that the cash is transferred by the Debtors to the Disputed Claims Reserve, but should recognize gain or loss in an amount equal to: (i) the amount of Cash actually distributed to such U.S. Holder from the Disputed Claims Reserve, less (ii) the U.S. Holder's adjusted tax basis of its Claim when and to the extent Cash is actually distributed to such U.S. Holder. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim.

To the extent that a U.S. Holder of a Disputed Claim receives distributions of cash with respect to such Claim subsequent to the Effective Date, such Holder may recognize additional gain (if such Holder is in a gain position) and a portion of such cash may be treated as imputed interest income. In addition, it is possible that the recognition of any loss realized by a U.S. Holder may be deferred until all payments have been made out of the Disputed Claims Reserve to all Holders of Allowed Claims. U.S. Holders are urged to consult their tax advisors regarding the possible application (and the ability to elect out) of the "installment method" of reporting any gain that may be recognized by such Holders in respect of their Claims due to the receipt of cash in a taxable year subsequent to the taxable year in which the Effective Date occurs. The discussion herein assumes that the installment method does not apply.

The timing of the inclusion of income may be subject to alteration for accrual method U.S. Holders that prepare "applicable financial statements" (as defined in Section 451 of the Tax Code), which may require the inclusion of income no later than the time such amounts are reflected on such financial statement.

### E.    Certain United States Federal Income Tax Consequences to Non-U.S. Holders of Claims

The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the consummation of the Plan to such Non-U.S. Holder. Whether a Non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

### 1.    Gain or Loss Recognition on the Satisfaction of Claims

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which any transactions pursuant to the Plan occur and certain other conditions are met, (ii) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States), or (iii) any gain is subject to taxation under FIRPTA (as defined and discussed below).

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains

4847-0265-3116.11

7163194 v4
EAST\175019097.2

allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2.    Accrued Interest

Payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

- the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of the Debtors' stock entitled to vote;

- the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Debtors (each, within the meaning of the Tax Code);

- the Non-U.S. Holder is not a bank receiving interest described in Section 881(c)(3)(A) of the Tax Code; or

- such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### 3.    FIRPTA

Non-U.S. Holders and, in particular, holders of the Debtors' convertible debt instruments, should discuss the potential substantive taxation and withholding implications of the Plan in connection with the Foreign Investment in Real Property Tax Act of 1980, as amended ("FIRPTA"), with their own tax advisors.

The Debtors have not yet made any determinations with respect to whether FIRPTA withholding will be necessary in connection with distributions to any Non-U.S. Holders of Claims, and the question of whether recoveries under the Plan may be subject to substantive taxation under FIRPTA is not free from doubt with respect to certain categories of Claims. In the event FIRPTA withholding is ultimately determined to be necessary, a Non-U.S. Holder may be entitled to a refund of amounts withheld depending upon such Non-U.S. Holder's tax basis in its Claim, the amount of any distribution to such Non-U.S. Holder, and whether substantive FIRPTA taxation in fact applies to recoveries under the Plan.

U.S. Holders may be required to supply certain non-foreign withholding certificates to avoid FIRPTA withholding in the event the Debtors conclude that FIRPTA withholding is necessary with respect to any particular category of Claims.

### 4.    FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account Holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax. Case 17-36709 Document 464 Filed in TXSB on 02/21/18 Page 66 of 73 60 As currently proposed, FATCA withholding rules would apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends that occurs after December 31, 2018.

### F.    Information Reporting and Backup Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

The Debtors, or the applicable agent, will withhold all amounts required by law to be withheld from payments of interest and comply with all applicable information reporting requirements.

### G.    Importance of Obtaining Professional Legal Assistance

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT THEIR**
4847-0265-3116.11

**TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.**

## ARTICLE VIII.

### ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the Plan Propoents' alternatives include (i) the liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) the preparation and presentation of an alternative plan or plans of liquidation.

### A.    Liquidation Under Chapter 7

If no chapter 11 plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code. In such event, a trustee would be elected or appointed to liquidate the assets of the Debtors. A discussion of the effect that a chapter 7 liquidation would have on recoveries of Holders of Claims and Equity Interests is set forth in Article V.C.3, entitled "Confirmation Standards," of this Disclosure Statement. The Debtors believe that liquidation under chapter 7 would result in, among other things: (1) smaller distributions being made to creditors and interest holders than those provided for in the Plan, due to, among other things, the additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of financial and legal advisors and (2) additional expenses and claims, some of which would be entitled to priority, that would be generated during the liquidation. Further, there are no assurances that the settlements embodied in the Plan that are beneficial to Holders of General Unsecured Claims would be available in a Chapter 7 liquidation.  See the Debtors' Liquidation Analysis, attached to this Disclosure Statement as <u>Exhibit C</u>.

### B.    Alternative Plan

If the Plan is not confirmed, the Plan Proponents or, assuming exclusivity is terminated or lapses, any other party in interest, may attempt to formulate a different plan of liquidation. The Plan Proponents have concluded that the Plan represents the best alternative to protect the interests of creditors and other parties in interest.

The Plan Proponents believe that the Plan allows Holders of Claims and Equity Interests to realize the highest recoveries under the circumstances. In a liquidation under chapter 11 of the Bankruptcy Code, a chapter 7 trustee would not need to be appointed, nor would any costs or expenses be incurred in connection with the appointment of a chapter 7 trustee and its professionals, and the assets of the Debtors could be liquidated in an orderly fashion, which could occur over a more extended period of time that in a liquidation under chapter 7. Accordingly, creditors likely would receive greater recoveries in a chapter 11 liquidation than in a chapter 7 liquidation.

## ARTICLE IX

### MISCELLANEOUS PROVISIONS

### A.    Modification of Plan

Subject to the limitations contained in the Plan: (a) the Plan Proponents reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the

entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; provided, however, that any pre-Confirmation Date amendments shall not materially or adversely affect the interests, rights or treatment of any Allowed Claims or Equity Interests under the Plan; and (b) after the entry of the Confirmation Order, the Plan Proponents or the Liquidating Trustee may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

Objections with respect to any amendments or modifications to the Plan (as and to the extent permitted hereby) filed after the deadline for objections to the Plan, as set by the Bankruptcy Court, may be brought at the Confirmation Hearing. The Plan, and any modification or supplement thereof, may be inspected in the Office of the Clerk of the Bankruptcy Court or its designee during normal business hours. Holders of Claims may obtain a copy of the Plan and any supplement or modification thereto, if any, by contacting the Claims Agent at (844) 822-9230 or by reviewing such document on the internet at https://cases.primeclerk.com/promisehealthcaregroup/. The documents annexed to the Disclosure Statement or contained in any modification or supplement to the Plan or the Disclosure Statement are an integral part of the Plan and shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

### B.      Extension of Time

For cause shown, any deadlines herein that are applicable to the Debtors, the Committee, the Debtor Representative, the Liquidating Trustee, or the Liquidating Trust and which are not otherwise extendable, may be extended by the Bankruptcy Court.

### C.      Post-Effective Date Notice List

Because certain Persons and Entities may not desire to continue to receive notices after the Effective Date, the Plan provides for the establishment of a Post-Effective Date Notice List. Persons and Entities on such Post-Effective Date Notice List will be given certain notices and in some cases an opportunity to object to certain matters under the Plan (as described herein). Any Person or Entity desiring to be included in the Post-Effective Date Notice List must (i) file a request to be included on the Post-Effective Date Notice List and include thereon its name, contact person, address, telephone number and facsimile number, within thirty (30) days after the Effective Date, and (ii) concurrently serve a copy of its request to be included on the Post-Effective Date Notice List on the Liquidating Trustee pursuant to Article IX.L; *provided, however*, that those parties set forth in Article XI.L of the Plan shall be included in the Post-Effective Date Notice List without the necessity of filing a request.

### D.      Revocation of the Plan

The Plan Proponents reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order, and to file subsequent chapter 11 plans. If the Plan Proponents revoke or withdraw the Plan or if entry of the Confirmation Order or the Effective Date does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (c) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, any Debtor or any other Entity; (ii) prejudice in any manner the rights of the Plan Proponents or any other Entity; or (iii) constitute an admission of any sort by the Plan Proponents or any other Entity.

### E.  Binding Effect

On the Effective Date, the provisions of the Plan shall bind each Holder of a Claim against, or Equity Interest in, each Debtor and such Holder's respective successors and assigns, whether or not the Claim or Equity Interest of such Holder is Impaired under the Plan, whether or not such Holder has accepted the Plan and whether or not such Holder is entitled to a Distribution under the Plan.

### F.  Successors and Assigns

The rights, benefits and obligations of any Person or Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person or Entity.

### G.  Governing Law

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, unless otherwise stated, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the state of Delaware without giving effect to the principles of conflict of laws thereof.

### H.  Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Effective Date occurs. Neither the filing of the Plan, any statement or provision contained herein or in the Plan, nor the taking of any action by the Plan Proponents or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of any Debtor, the Committee, or other Entity with respect to the Holders of Claims or Equity Interests or other parties-in-interest.

### I.  Article 1146 Exemption

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property under the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any prohibited tax or governmental assessment and to accept for filing and recordation instruments or other documents transfers of property without the payment of any tax or governmental assessment.

### J.  Section 1125(e) Good Faith Compliance

Confirmation of the Plan shall act as a finding by the Bankruptcy Court that the Plan Proponents and each of their respective representatives have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

### K.  Further Assurances

The Plan Proponents, the Liquidating Trustee, all Holders of Claims receiving Distributions thereunder, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents, and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

**L.      Service of Documents**

Any pleading, notice, or other document required or permitted to be made in accordance with the Plan upon the Plan Proponents shall be made in writing and shall be delivered personally, by facsimile transmission, electronic mail or by first class U.S. mail, postage prepaid, as follows:

**To the Debtors:**

Promise Healthcare Group, LLC
c/o FTI Consulting
1201 W Peachtree St NE # 500,
Atlanta, GA 30309
Attn:    Andrew Hinkelman, Chief Restructuring Officer and Interim Chief Financial Officer, and
         Jennifer Byrne

with a copy to:

Waller Lansden Dortch & Davis, LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219
Attn: John C. Tishler, Tyler N. Layne, and Courtney K. Stone

and

DLA Piper LLP (US)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Attn: Stuart R. Brown and Matthew S. Sarna

**To the Committee:**

Sills Cummis & Gross, P.C.
One Riverfront Plaza
Newark, NJ 07102
Attn: Andrew H. Sherman and Boris I. Mankovetskiy
(asherman@sillscummis.com; bmankovetskiy@sillscummis.com)

and

Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Attn: Jeffrey N. Pomerantz, Bradford J. Sandler, and Colin R. Robinson
(jpomerantz@pszjlaw.com; bsandler@pszjlaw.com; crobinson@pszjlaw.com)

**To the Liquidating Trust/Liquidating Trustee:**

To be provided following election of Liquidating Trustee and counsel thereto.

**To the Debtor Representative:**

4847-0265-3116.11

7163194 v4
EAST\175019097.2

To be provided following election of the Debtor Representative and counsel thereto.

**M.      Filing** of **Additional Documents**

On or before the Effective Date, the Plan Proponents may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**N.      Severability**

The provisions of the Plan shall not be severable unless the Plan Proponents agree to such severance and such severance would constitute a permissible modification of the Plan pursuant to section 1127 of the Bankruptcy Code.

**O.      Entire Agreement**

The Plan, and any supplements or amendments thereto, supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects (other than the Liquidating Trust Agreement), all of which have become merged and integrated into the Plan.

**P.      No Stay of Confirmation Order**

The Debtors shall request that the Bankruptcy Court waive stay of enforcement of the Confirmation Order otherwise applicable, including under Bankruptcy Rules 3020(e), 6004(h), or 7062.

## ARTICLE X.

## RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, to the extent legally permissible, retain exclusive jurisdiction over the Chapter 11 Cases and all Persons and Entities with respect to all matters related to the Chapter 11 Cases, the Debtors, the Liquidating Trust, and the Plan until the Chapter 11 Cases are closed, including jurisdiction to issue any order necessary to administer the Debtors' Estates or the Liquidating Trust and enforce the terms of the Plan and/or the Liquidating Trust Agreement pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including to, without limitation:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest against the Debtors, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims;

- grant, deny or otherwise resolve any and all applications of Professionals or Persons or Entities retained in the Chapter 11 Cases by the Debtors or the Committee for allowance of compensation or reimbursement of expenses authorized by the Bankruptcy Code, the Plan, or order of the Bankruptcy Court, for periods ending by the Effective Date;

- resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired leases to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

- ensure that Distributions to Holders of Allowed Claims are accomplished under the provisions of the Plan, including by resolving any disputes regarding the Debtors', the Debtor Representative's, the Liquidating Trust's, or the Liquidating Trustee's (as applicable) entitlement to recover assets held by third parties;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving a Debtor that may be pending on the Effective Date or instituted by the Liquidating Trustee or Debtor Representative after the Effective Date;

- enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan, the Confirmation Order, or any Person or Entity's obligations incurred in connection with the Plan or the Confirmation Order;

- issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity or Person with the Effective Date or enforcement of the Plan;

- enforce Article IX.A, Article IX.B, and Article IX.C of the Plan;

- enforce the injunctions set forth in Article IX.D of the Plan;

- resolve any cases, controversies, suits or disputes with respect to the releases, injunction, and other provisions contained in Article IX of the Plan, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions, and other provisions of the Plan;

- enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked, or vacated;

- resolve any other matters that may arise in connection with or related to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document adopted in connection with the Plan or the Disclosure Statement;

- except as otherwise limited herein, to recover all assets of the Debtors and property of the Debtors' Estates, wherever located;

- to hear and determine any issue arising under the Plan;

- to adjudicate any adversary proceeding or other proceeding which may be commenced against any Person or Entity arising from, related to, or in connection with (i) any Chapter 5 Action; (ii) any Tort Claim, D&O Claim, Principal Claim and/or Professional Claim; and (iii) claims against third parties relating to the facts and circumstances surrounding the same;

- to hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

- to enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case (whether or not the Chapter 11 Case has been closed);

- to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof, or with respect to any other reserves established pursuant to the Plan and the administration thereof;

- to resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Case, the applicable Bar Date, the hearing on the approval of the Disclosure Statement as containing adequate information, the hearing on the confirmation of the Plan for the purpose of determining whether a Claim is waived, released, disallowed, or otherwise unenforceable thereunder, or for any other purpose;

- to hear any other matter not inconsistent with the Bankruptcy Code; and

- to enter an order and a Final Decree closing the Chapter 11 Cases.

**All Creditors who have filed Claims in the Chapter 11 Cases shall be deemed to have consented to the jurisdiction of the Bankruptcy Court for the purposes of pursuit of Causes of Action by the Liquidating Trustee and Debtor Representative.**

## ARTICLE XI.

## RECOMMENDATION OF THE PLAN PROPONENTS

In the opinion of the Plan Proponents, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Plan Proponents recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

*[Remainder of Page Intentionally Left Blank]*

Respectfully submitted,

Promise Healthcare Group, LLC, on behalf of itself and each of the Debtors

By:_____

Name: Andrew Hinkelman

Title:   Chief Restructuring Office and Interim Chief
         Financial Officer

Official Committee of Unsecured Creditors

By:_____

Name: Brendan Bakir

Title: Committee Chair for Official Committee of
       Unsecured Creditors

[Signature Page to Disclosure Statement]

Respectfully submitted,

Promise Healthcare Group, LLC, on behalf of itself
and each of the Debtors


By:_____

Name: Andrew Hinkelman

Title:  Chief Restructuring Office and Interim Chief
        Financial Officer


Official Committee of Unsecured Creditors


By:_____

Name: Brendan Bakir

Title: Committee Chair for Official Committee of
      Unsecured Creditors